IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROBERT EARL COUNCIL AKA KINETIK
JUSTICE, LEE EDWARD MOORE JR., LAKIERA
WALKER, JERAME APRENTICE COLE,
FREDERICK DENARD MCDOLE, MICHAEL
CAMPBELL, ARTHUR CHARLES PTOMEY JR.,
LANAIR PRITCHETT, ALIMIREO ENGLISH, and
TONI CARTWRIGHT, on their own behalf and on
behalf of those similarly situated; UNION OF
SOUTHERN SERVICE WORKERS, SERVICE
EMPLOYEES INTERNATIONAL UNION;
RETAIL, WHOLESALE AND DEPARTMENT
STORE UNION, MID-SOUTH COUNCIL; and THE
WOODS FOUNDATION,

                                Plaintiffs,

       v.

KAY IVEY, Governor of the State of Alabama, in her
individual and official capacities; STEVE
MARSHALL, Alabama Attorney General, in his
individual and official capacities; LEIGH
GWATHNEY, Chair of the Alabama Board of
Pardons and Paroles, in her individual and official
capacities; DARRYL LITTLETON, Associate
Member of the Alabama Board of Pardons and
Paroles, in his official capacity; GABRELLE
SIMMONS, Associate Member of the Alabama Board
of Pardons and Paroles, in her official capacity; JOHN
HAMM, Commissioner of the Alabama Department
of Corrections, in his individual and official
capacities; JOHN COOPER, Transportation Director
of the Alabama Department of Transportation, in his
individual and official capacities; CITY OF
MONTGOMERY; CITY OF TROY; JEFFERSON
COUNTY; RCF, LLC d/b/a GEMSTONE FOODS,
LLC; KOCH FOODS, LLC; JU-YOUNG
MANUFACTURING AMERICA, INC.; SL
ALABAMA, LLC; HWASEUNG AUTOMOTIVE
USA LLC; PROGRESSIVE FINISHES, INC.;
C.B.A.K., INC. d/b/a MCDONALD'S; PREMIER
KINGS INC. d/b/a BURGER KING; SOUTHEAST
RESTAURANT GROUP-WEN LLC d/b/a

Case No.

CLASS ACTION

**COMPLAINT**

JURY TRIAL DEMANDED

WENDY'S; PELL CITY KENTUCKY FRIED
CHICKEN, INC. d/b/a KENTUCKY FRIED
CHICKEN d/b/a KFC; MASONITE
CORPORATION; CAST PRODUCTS, INC.;
SOUTHEASTERN MEATS, INC.; PARAMOUNT
SERVICES, INC.; and BAMA BUDWEISER OF
MONTGOMERY, INC.,

                  Defendants.

**Table of Contents**

INTRODUCTION ....................................................................................................6

FACTUAL ALLEGATIONS .....................................................................................9

I.      THE STATE OF ALABAMA AND CITIES, COUNTIES, AND PRIVATE
        COMPANIES ACROSS ALABAMA REALIZE HUNDREDS OF
        MILLIONS OF DOLLARS IN ECONOMIC BENEFIT ANNUALLY
        FROM COERCING THE FORCED LABOR OF INCARCERATED
        BLACK ALABAMIANS ................................................................................9

        A.      Alabama Realizes Tens of Millions in Economic Benefit Annually
                Through Modern Day "Convict Leasing" of Disproportionately
                Black Alabamians to Private Employers................................................11

        B.      Alabama Counties, Cities, and State Agencies Obtain Millions in
                Economic Benefit Annually from Compelling Forced Labor
                Disproportionately from Black Alabamians ..........................................17

        C.      Alabama Profits from the Forced Laborers Who Are Compelled to
                Operate Its Correctional Industries Enterprises ....................................21

        D.      Alabama Is Deriving a Benefit of More than $450 Million in 2023
                from Compelling Predominantly Black Alabamians to Work as
                Unpaid Prison Staff ..............................................................................22

II.     ADOC COERCES INCARCERATED PEOPLE IN ITS CUSTODY TO
        PERFORM THE LABOR THAT DRIVES DEFENDANTS' PROFIT-
        MAKING SCHEME .....................................................................................24

        A.      ADOC Regulations Enforced by ADOC and Its Business Partners
                Coerce Labor from Incarcerated People by Harshly Punishing Any
                Refusals to Work ...................................................................................25

        B.      Alabama Extracts Labor from Predominantly Black Incarcerated
                Alabamians by Creating and Maintaining Coercive Conditions in
                ADOC's Extraordinarily Violent and Understaffed Medium- and
                Maximum-Security Facilities.................................................................28

        C.      At the Direction of Governor Ivey, ADOC Has Singled Out
                Leaders of Non-Violent Resistance to Forced Labor for
                Punishment, Including Cruel and Violent Physical Punishment,
                Repeatedly Threatening Leaders with Loss of Life, and Ordering
                Their Extensive Permanent Physical Harm and Disfigurement ...........33

        D.      The Excessive Prices ADOC Charges Incarcerated People and
                Their Families for Basic Necessities Contribute to the Coercive
                Environment...........................................................................................37

III.   THE GOVERNOR, ATTORNEY GENERAL, AND PAROLE BOARD
       HAVE CONSPIRED TO SUBVERT THE OPERATION OF ALABAMA'S
       PAROLE SYSTEM TO ACHIEVE SYSTEMIC WRONGFUL
       OVERDETENTION, PARTICULARLY OF BLACK ALABAMIANS,
       AND TO FUEL DEFENDANTS' FORCED LABOR SCHEME ...................................38

       A.   Governor Ivey and Attorney General Marshall Conspired to
            Substitute Bias-Driven Decisions for the Evidence-Based Parole
            Decisions Required by Law, Resulting in Systemic Modifications
            of Judicial Sentences and Discriminatory Denial of Lawful Parole
            Decisions for Black Incarcerated People ................................................39

       B.   The Conspiracy Among Governor Ivey, Attorney General
            Marshall, and the Parole Board Has Also Resulted in
            Disproportionate Delay in Parole Reconsideration Dates for Black
            Incarcerated People .................................................................................52

       C.   The Board's Disproportionate Denial of Parole to Black
            Alabamians Whom ADOC Has Determined Are Safe to Work in
            the Community Further Confirms That Racial Bias and the
            Perpetuation of Defendants' Forced Labor Scheme, Rather Than
            Public Safety Concerns, Are Driving the Board's Parole Decisions ....................54

       D.   Defendants Ivey, Marshall, and Parole Board Members Intend to
            Perpetuate the Consequences of Their Unlawful Conspiracy: A
            Parole System that Disproportionately Keeps Black People
            Imprisoned So They Can Be Exploited as Members of the State's
            Captive Labor Force ...............................................................................59

IV.    THE PRIVATE AND PUBLIC ENTITIES THAT PARTNER WITH ADOC
       TO "LEASE" INCARCERATED LABOR ARE KNOWING
       BENEFICIARIES AND PARTICIPANTS IN THE FORCED-LABOR
       SCHEME .....................................................................................................61

PARTIES .........................................................................................................................66

JURISDICTION AND VENUE ........................................................................................98

CLASS ALLEGATIONS .................................................................................................98

COUNT I – Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C.
       §1589.........................................................................................................104

COUNT II – Violation of the Racketeer Influenced and Corrupt Organizations Act
       (RICO), 18 U.S.C. §1962...........................................................................107

COUNT III – Violation of Alabama Constitution, Article I, Section 32 ....................108

COUNT IV – Violation of First Amendment of U.S. Constitution, Pursuant to 42
       U.S.C. §1983..............................................................................................109

COUNT V – Violation of Ex Post Facto Clause, U.S. Const., Art. I, §10, cl. 1,
    Pursuant to 42 U.S.C. §1983 .......................................................................... 111

COUNT VI – Denial of Equal Protection, U.S. Const. Amend. XIV, Pursuant to 42
    U.S.C. §1983 .................................................................................................... 113

COUNT VII – Denial of Equal Protection, U.S. Const. Amend. XIV, Pursuant to 42
    U.S.C. §1983 .................................................................................................... 115

COUNT VIII – Denial of Substantive Due Process, U.S. Const. Amend. V and XIV,
    Pursuant to 42 U.S.C. §1983 .......................................................................... 117

COUNT IX – Conspiracy in Violation of the KKK Act, 42 U.S.C. §1985(2), (3) ..................... 119

COUNT X – Conspiracy in Violation of the KKK Act, 42 U.S.C. §1985(3) ............................. 120

COUNT XI – Failure to Prevent Wrongs of KKK Act Conspiracy, 42 U.S.C. §1986 .............. 122

COUNT XII – Unjust Enrichment .............................................................................................. 123

PRAYER FOR RELIEF ............................................................................................................. 123

DEMAND FOR JURY TRIAL ................................................................................................... 125

Plaintiffs Robert Earl Council aka Kinetik Justice, Lee Edward Moore Jr., Lakiera Walker, Jerame Aprentice Cole, Frederick Denard McDole, Michael Campbell, Arthur Charles Ptomey Jr., Lanair Pritchett, Alimireo English, and Toni Cartwright, on behalf of themselves, and those similarly situated, along with the Union of Southern Service Workers, Service Employees International Union ("USSW"); Retail, Wholesale and Department Store Union, Mid-South Council ("RWDSU"); and The Woods Foundation, allege as follows:

## INTRODUCTION

1.      This case seeks to abolish a modern-day form of slavery. Plaintiffs Council, Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright are or have recently been incarcerated in Alabama's prison system. They have been entrapped in a system of "convict leasing" in which incarcerated people are forced to work, often for little or no money, for the benefit of the numerous government entities and private businesses that "employ" them. They live in a constant danger of being murdered, stabbed, or raped that is so profound that the federal government has sued Alabama for inflicting cruel and unusual punishment, and if they refuse to work, the State punishes them even more. They are trapped in this labor trafficking scheme. Although they are trusted to perform work for the State, local governments, and a vast array of private employers, some of the same people who profit from their coerced labor have systematically shut down grants of parole.

2.      It is no accident that Plaintiffs Council, Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright—like individuals who were enslaved and forced to work Alabama's cotton fields, and those forced to participate in the sharecropping and convict leasing schemes that followed the end of the Civil War—are Black. Alabama incarcerates a grossly disproportionate number of Black men and women in its prisons. And the State has long

used its prisons to perpetuate the racial subjugation that existed before the Civil War. From 1875 until 1928, Alabama maintained an extremely profitable "convict leasing" system—a system of bondage targeting Black people, widely acknowledged to be "one of the harshest and most exploitative labor systems known in American history." This scheme, whereby Black laborers were forced to work for private companies, who in turn paid substantial fees to state and county governments, covered 73% of Alabama's budget by 1898.[1] Defendants here have resurrected this practice for their own financial gain, in violation of: federal laws against human trafficking and conspiracies to deny equal protection of the laws; the Alabama Constitution, which was recently amended to outlaw all involuntary servitude; and the Ex Post Facto Clause and the First and Fourteenth Amendments of the U.S. Constitution.

3.      Defendants Governor Kay Ivey, Attorney General Steve Marshall, the Alabama Department of Corrections ("ADOC") through Commissioner John Hamm, Leigh Gwathney, the Chair of the Alabama Board of Pardons and Paroles ("Parole Board"), and the two other Parole Board members, together with the many state and local agencies and private employers participating in this resurrected "leasing" practice, knowingly benefit from the human suffering they support. Participating employers include the public employers named as defendants here: the City of Montgomery, the City of Troy, Jefferson County, and the Alabama Department of Transportation ("ADOT") through Director John Cooper; and the private company defendants, many of which represent national and international brands and supply chains: franchisees of McDonald's, KFC, Wendy's, and Burger King; Bama Budweiser, a distributor of Anheuser-Busch products; poultry and meat processors including Gemstone Foods, Koch Foods, and Southeastern Meats; Paramount Services, a linen company; and manufacturing and engineering

---

[1] Robert Perkinson, *Texas Tough: The Rise of America's Prison Empire* 105 (2010).

employers Masonite, Cast Products, Ju-Young, Hwaseung, SL Alabama, and Progressive Finishes. Since 2018, approximately 575 private employers and more than 100 public employers have "leased" incarcerated labor from Alabama prisons. By a conservative estimate, Defendants enjoy a benefit of more than $450 million annually from the individual plaintiffs' and class members' forced labor, inside and outside the prison walls.

4.    Defendants Ivey, Marshall, Hamm, and Parole Board members are perpetuating the lucrative and abusive practices that Plaintiffs challenge here by shutting down the possibility of parole—even as the State profits from individual plaintiffs' labor for businesses and government agencies in the community, without supervision. In an effort to reduce the burdens that unnecessary imprisonment places on taxpayers and to reduce bias and subjectivity in parole decision-making, the Alabama Legislature has required an objective, evidence-based assessment of parole eligibility. Governor Ivey and the other state official defendants refuse to follow this law, and have substituted their own subjective standards instead. This has predictably diminished the possibility of parole and resulted in extreme racial disparities, denying Black candidates for parole twice as often as similarly-situated white counterparts between FY 2020 and 2022— keeping Black men and women in the Alabama prison systems so they can be "leased" out to produce hundreds of millions of dollars in economic benefits for Defendants every year.

5.    Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, as currently and formerly incarcerated individuals, bring this suit on their own behalf and on behalf of classes of all incarcerated persons subject to the State's forced-labor scheme. Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright also bring claims on behalf of all incarcerated persons denied parole after Defendants Ivey, Marshall, and the Parole Board conspired to subvert the parole system. Plaintiff Council and

other individual plaintiffs also bring a claim on their own behalf and on behalf of those subjected

to unlawful retaliation for their protected advocacy. The individual plaintiffs are joined by

Plaintiffs USSW and RWDSU, labor organizations that are harmed by the Defendants'

exploitation of prison labor and abuse of the parole system; and Woods Foundation, a non-profit

organization dedicated to aiding persons with wrongful convictions and excessive sentences that

has committed resources to addressing the Defendants' racially discriminatory abuse of the

parole system and refusal to apply the statutory, evidence-based standards.

6.      Plaintiffs seek injunctive relief requiring Defendants Ivey, Marshall, and Parole

Board members to immediately correct their unlawful and discriminatory parole decision-making

practices, which are trapping thousands of people in Defendants' labor trafficking scheme; the

rescission of ADOC regulations and practices coercing incarcerated people to labor; and all

Defendants to cease their forced-labor practices that are harming and continuing to harm all

Plaintiffs and class members; monetary damages and disgorgement of profits; and all other

appropriate relief.

## FACTUAL ALLEGATIONS

**I.      THE STATE OF ALABAMA AND CITIES, COUNTIES, AND PRIVATE
COMPANIES ACROSS ALABAMA REALIZE HUNDREDS OF MILLIONS OF
DOLLARS IN ECONOMIC BENEFIT ANNUALLY FROM COERCING
FORCED LABOR FROM INCARCERATED BLACK ALABAMIANS.**

7.      Despite the end of the Civil War and the formal abolition of slavery, the Alabama

prison system continued to function as a mechanism for perpetuating racial apartheid and

extracting coerced labor from the State's disproportionately Black incarcerated population.

ADOC's own website acknowledges that during Reconstruction, the Alabama prison population

flipped from 99% white to 90% Black, marking the beginning of a new era of systemic

exploitation characterized by horrific conditions of detention and extremely dangerous work.[2]
The State forced incarcerated Black Alabamians to work under abhorrent conditions for the
benefit of the State and private industry, "leasing" those incarcerated persons to employers who
forced them to toil in coal and iron mines with notoriously high death rates, to build railroads (an
arrangement ADOC acknowledges was "especially profitable"), and to labor on plantations. In
1927, the State removed all white incarcerated people from the mines.[3] Not until the following
year, after "many reports of cruelty and barbarism," did Alabama purportedly abandon its
practice of "convict leasing"—making it the last state in the nation to do so.[4]

8.    Today, a century and a half after Reconstruction, Alabama's incarcerated
population remains disproportionately Black. Although 26.8% of Alabama's population
identifies as Black or African American, Black people comprise twice that percentage, or
approximately 53%, of the population in ADOC custody.[5]

9.    The State of Alabama makes hundreds of millions of dollars in profits and other
financial benefits every year from compelling the forced labor of its disproportionately Black
prison population. In recent years, ADOC has increasingly cultivated cruel and inhumane prison
conditions, reduced the staffing at its prisons, and made life inside its facilities unbearable and

---

[2] Ala. Dep't of Corrections, History of the ADOC, https://doc.alabama.gov/history (last visited
Dec. 10, 2023).

[3] *Id.*

[4] *Id.*; Mary Ellen Curtin, *Convict-Lease System*, Encyclopedia of Alabama,
https://encyclopediaofalabama.org/article/convict-lease-system/ (last updated Mar. 27, 2023).

[5] U.S. Census Bureau, QuickFacts Alabama, https://www.census.gov/quickfacts/AL (last visited
Dec. 10, 2023). An analysis of ADOC data shows that Black people comprise approximately
53% of the population of ADOC's maximum-, medium-, and minimum-security facilities,
including work-center and work-release facilities. The percentage is similar for all people under
ADOC's jurisdiction. *See* Monthly Statistical Report for September 2023 ("ADOC September
Monthly Report"), Ala. Dep't of Corrections,
https://doc.alabama.gov/docs/MonthlyRpts/September%202023.pdf.

unlivable. Concurrently, since 2019, the Parole Board, at the direction of Governor Ivey and Attorney General Marshall, has unlawfully refused to release people from prison and further skewed the racial composition of the incarcerated population by wrongfully denying parole to thousands of Alabamians—and to Black Alabamians in particular. The more people ADOC keeps incarcerated and working, the more money ADOC and its business partners reap through their forced labor and wrongful detention scheme, and the greater their economic incentive to keep perpetuating that unlawful scheme. In 2023 alone, Alabama will obtain an economic benefit of more than $450 million dollars from the forced labor scheme challenged in this lawsuit.

10.     ADOC and its public and private partners benefit from the forced labor of incarcerated persons who have been compelled to work through ADOC's work-release program, its work-center program, and its Correctional Industries program, and from the forced labor of incarcerated people who have been compelled to work inside ADOC facilities, in many cases directly replacing ADOC's plummeting numbers of correctional staff.

A.     **Alabama Realizes Tens of Millions in Economic Benefit Annually Through Modern-Day "Convict Leasing" of Disproportionately Black Alabamians to Private Employers.**

11.     Through its work-release program, ADOC contracts with private employers to "lease" incarcerated people's labor to private businesses. Before contracting out an incarcerated person's labor, ADOC determines through classification analyses that the individual is capable of working safely in the community alongside non-incarcerated coworkers, without supervision by prison staff. ADOC only permits individuals it has designated with its lowest custody level, "Minimum-Community," to participate in its work-release program.

12.     The incarcerated persons who are "leased" to private employers are housed in designated minimum-security work-release facilities and are transported to their jobs in the community each day. Defendants Gemstone Foods, Ju-Young, SL Alabama, Hwaseung,

Progressive Finishes, McDonald's, Burger King, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods, Paramount Services, and Bama Budweiser, together with the other approximately 560 private employers that have also contracted with ADOC in recent years to obtain work from forced laborers, pad their profits by: sometimes setting and paying wage rates to those incarcerated workers below the rates required by law; imposing long and demanding work hours and sometimes unsafe work conditions on those incarcerated workers that the employers know or should know would be unlikely to be tolerated by free workers without resistance; and/or exploiting those incarcerated workers in other ways, understanding that those "leased" laborers cannot refuse to work or raise concerns about workplace conditions without risking significant discipline and return to more violent and life-threatening facilities. *See infra* Part II. ADOC regulations prohibit incarcerated people working through the work-release program from joining labor unions.[6]

13.     According to ADOC's monthly report, in September 2023, 1,374 incarcerated people were assigned to ADOC's work-release program.[7]

14.     Although ADOC's work-release revenue was declining at the start of the COVID-19 pandemic, as the pandemic eased—and due to certain Defendants' concerted efforts described in Part III below to grow the State's incarcerated population, particularly with Black workers who have long demonstrated that they are safe for release by working for years out in the community alongside free workers—Alabama's work-release program became an increasingly

---

[6] Ala. Dep't of Corrections, Admin. Reg. 410 (Jan. 3, 2023) ("ADOC Admin. Reg. 410"), https://doc.alabama.gov/docs/AdminRegs/AR410.pdf.
[7] ADOC September Monthly Report at 2.

valuable money-maker. In fiscal year ("FY") 2023, ADOC reported that it collected a record

$12.9 million directly from its labor "leasing" work-release operations.[8]

15.     Alabama profits from ADOC's work-release operation in many ways, but first

and most directly by assessing a labor-trafficking fee equivalent to 40% of the gross earnings

paid by the private employers for the forced labor. ADOC takes this cut ahead of any

garnishments or payments for family support or restitution due to victims. Specifically, for each

paycheck issued by a private employer nominally in the name of the forced laborer, ADOC

receives the funds and automatically deducts 40% of gross earnings—that is, the amount the

forced laborer earned before required employer withholding and any deductions for federal and

state payroll taxes—purportedly "to assist in defraying the cost of his/her incarceration,"

regardless of what those costs may actually be or how much the work-release laborer actually

earned.[9] Notably, Alabama has continued to assess this flat 40% fee, purportedly to pay for the

incarcerated worker's supposedly minimally adequate conditions of confinement, even though

the State has been put on notice of the shocking deficiencies in the conditions ADOC actually

provides by a damning report by the U.S. Department of Justice ("DOJ") and by DOJ's

subsequent lawsuit that chronicle horrific conditions of incarceration,[10] court orders (including

those addressing serious deficiencies in access to medical and mental health care),[11] and ongoing

---

[8] *Id.* at 13. Alabama's fiscal year runs from October 1 to September 30.
[9] ADOC Admin. Reg. 410.
[10] U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (Apr. 2, 2019) ("2019 DOJ Report"), https://www.justice.gov/crt/case-document/file/1149971/download; Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. Dec. 9, 2020).
[11] *See Braggs v. Hamm*, No. 2:14CV601-MHT, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023); *see also* Consent Decree (Dkt. No. 11), *United States v. Alabama*, Case No. 2:15-cv-00368 (M.D. Ala. June 18, 2015) (concerning sexual abuse and harassment at Julia Tutwiler Prison for Women).

litigation.[12] The shocking fact that Alabama is making these workers pay ADOC to keep them

trapped in facilities unfit for habitation, thereby exposing them daily to threats to their life from

violence, disease, and appallingly insufficient conditions, cannot be squared with the millions

Alabama takes annually through these weekly payroll deductions—deductions that federal law

squarely prohibits any private or public employer from taking from a non-incarcerated worker's

paycheck without clear evidence and accounting of the actual cost, quality and habitability of the

food and housing provided. *See* 29 C.F.R. Part 531 *et seq.*

16.     In addition to the 40% labor-trafficking fee described above, ADOC also reaps

profits from charging incarcerated forced laborers for essential services, such as fees for laundry

($15 per month), medical and prescription co-pays (generally $4-8 per visit or prescription, but

with charges up to $20 for missed appointments), and inflated mandatory costs for work

transportation. ADOC also generally charges each incarcerated worker $5 per day for ADOC

transportation to and from their work-release job sites—which will yield another approximately

$1 million in revenue to Alabama in FY 2023.[13]

17.     Employers from a broad range of national and international industries have sought

out, rely on, and are seeking to expand the forced-labor force made available to them through the

State of Alabama's work-release program. Manufacturing and industrial employers involved in

all types of skilled fabrication and industrial processing and production—including national

manufacturers of refined building and engineering material—procure forced laborers to perform

---

[12] *See, e.g.*, *Barefield v. Dunn*, No. 2:20-CV-917-WKW, 2023 WL 5417550, at *1 n.1 (M.D. Ala. Aug. 22, 2023) (noting that, "[i]n the past year, several courts have found viable allegations of unconstitutionally violent conditions of confinement throughout the Alabama prison system" and citing cases).

[13] Overall, ADOC typically collects a transportation fee of $10 per worker per day, collecting $5 from the worker's daily wages and collecting another $5 daily from the private employer, which also indirectly depresses workers' wages since it reduces the funds available for wage payments.

long hours of labor, including skilled metal fabrication, welding, precision die casting, and large-scale industrial and craft production. Companies integral to national food and beverage chains, such as poultry processing plants serving Tyson's supply chain and a distributor of Budweiser beer, also pad their profits by "leasing" forced labor from Alabama. Nationally branded restaurants and food service companies procure dozens of forced laborers from Alabama every day, requiring those incarcerated individuals to work long hours for restaurant chains such as Bubba's Seafood Restaurant and many fast-food enterprises, including McDonald's, Burger King, KFC, and Wendy's.

18.    For example, Defendant SL Alabama, a manufacturing company, has required its incarcerated workforce to work 11- and 12-hour shifts, six days per week, with the pre-production shift starting at 5 a.m. and ending no earlier than 5 p.m.

19.    ADOC rules require incarcerated workers to fulfill their work assignments and comply with rules imposed by work-release employers like SL Alabama. Violations of ADOC's rules constitute disciplinary offenses that may result in the worker being "put behind the wall"—that is, the worker will be placed in one of the higher-security ultra-violent facilities that are currently the subject of the DOJ's Civil Rights of Institutionalized Persons Act ("CRIPA") enforcement action challenging the ADOC facilities' pervasive and systemic cruel and inhumane conditions.[14]

20.    All private employers that procure forced laborers through ADOC nominally agree to pay the "prevailing wage" for the jobs performed by those laborers. This prevailing-wage obligation is legally required as a condition of participating in the work-release program,

---

[14] *See* Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. Dec. 9, 2020).

yet appears to be regularly flouted. For example, Black forced laborers leased out for profit by Alabama report working side-by-side with white free workers who are performing less skilled or less difficult jobs while earning a markedly higher hourly rate.

21.     The Black Alabamians who are the targets and victims of Defendants' forced-labor scheme earn far less in practice than the hourly rates they are purportedly paid. For example, an incarcerated person forced to labor for Defendant Paramount Services, a private laundry cleaning service, may have a nominal pay rate of $7.25 per hour (even though that "leased" laborer's free coworkers are being paid more) and thus gross weekly income of $290 for a 40-hour workweek. The ADOC's 40% labor-trafficking fee, however, reduces that weekly wage to $174, and another 20% for federal and state payroll taxes reduces it to $116. Another $25-30 may be deducted and paid to the ADOC for weekly transportation, bringing the weekly wage to $86, and another $3.75 or so may be deducted for laundering a work uniform—leaving the worker with $82.25 for 40 hours of work, or $2.06 per hour. Alabama takes all of these deductions before the victims or the worker's family have any opportunity to receive support from the forced laborer. Moreover, even if no garnishment is required for victims or family support, the workers' weekly wages are reduced even further by the charges imposed by the ADOC for, e.g., necessary medicine, doctor visits, or to pay the high prices charged to buy a sandwich from the canteen or snack line upon returning to the ADOC facility after a long shift outside of normal eating hours.

22.     Like other employers who procure forced laborers from Alabama, Paramount Services is fully aware that its incarcerated workers themselves will not actually receive even half of the nominal pay that the company pays for their labor, because it has engaged incarcerated people under a program whereby participants agree and acknowledge that Alabama,

the human trafficker that provides this labor, deducts a fee equivalent to 40% of the gross nominal wages paid by the company, along with additional fees on top of that 40%. Private employers that contract with ADOC for "leased" labor do so with this knowledge that the forced laborers themselves will receive only a fraction of the wages paid.

23.     Black forced laborers, including some Plaintiffs and class members, also report that some private employers are enhancing their profits by charging those forced laborers fees and costs that the employers are prohibited from charging to free workers (even though these employers' contracts with the ADOC specifically obligate them to observe all requirements of the Fair Labor Standards Act), including by charging fees for work shoes and sky-high prices for safety equipment, such as eye protection.

**B.     Alabama Counties, Cities, and State Agencies Obtain Millions in Economic Benefit Annually from Compelling Forced Labor Disproportionately from Black Alabamians.**

24.     In addition to the profit Alabama reaps by compelling labor for private employers through the work-release program, Alabama operates "work centers," also known as "honor camps," through which incarcerated people with minimum custody classifications—generally "Minimum Out"—are compelled to perform labor for city, county, and state government agencies that contract with ADOC for such labor. Thus, before contracting out incarcerated persons' labor to these public employers, ADOC determines through classification analyses that the incarcerated people they are "leasing" are capable of working safely in the community without direct supervision by ADOC. ADOT, through Defendant Cooper, and Defendants City of Montgomery, City of Troy, and Jefferson County all contract for incarcerated labor through the work-center program, as do more than 100 other public sector employers.

25.     Through work centers, forced laborers are required to work in the local community and frequently work alongside and under the supervision of free people. The

incarcerated people whose labor is "leased" through Alabama's work-center scheme generally live in designated "work center/honor camp" ADOC facilities, from which they depart and return every day in performing their outside jobs. Approximately 1,800 incarcerated people were housed in work-center facilities as of September 2023.

26.     Regardless of how many hours incarcerated persons are required to work for state and local agencies each day—with some Black laborers reporting workdays regularly extending to 12 hours and beyond—their daily income for each day of labor is generally limited to a total of $2, remarkably the same daily wage rate that the State of Alabama set for incarcerated labor in 1927.

27.     The enormous amount of forced labor that ADOC contracts out to state and local governments through its work-center program underscores Alabama state and local governments' deep reliance on predominantly Black forced labor to provide core governmental services. In FY 2023 alone, Alabama state agencies and local governments procured more than *80,000 days* of forced labor from incarcerated Alabamians, who are predominantly Black. A huge number of state agencies and localities, and the State's highest leadership, participate in this coerced, disproportionately Black labor scheme. For example, the State's own records show that between 2018 and 2023, Alabama compelled incarcerated people to work for the State Capitol, the Governor's Mansion, the Alabama Supreme Court, and Decatur Youth Services. Local government entities, from the Pike County Road Department to Coffee County, have obtained coerced labor from ADOC as well. For example, in 2023, incarcerated persons were compelled to toil as landscapers, janitors, drivers, day laborers, and teachers, among other positions for public employers. In the first eight months of 2023, Defendant City of Montgomery had already procured at least 343 incarcerated "laborers" to work in various capacities, including working

directly for the city, for "Montgomery Street Maintenance," for the landfill, and for the Montgomery Biscuits park.

28.    The scale of Defendants' forced-labor scheme is immense. Between 2017 and 2023, ADOT contracted with ADOC and spent more than $2.5 million—the vast majority of which was pocketed by ADOC as essentially a human trafficking fee—to "lease" incarcerated persons from ADOC to perform jobs that would otherwise be performed by state employees who would likely receive starting wages of $11.30 per hour, plus benefits. Assuming ADOT pays only $15 per day per incarcerated person,[15] that $2.5 million payment reflects ADOT's use of more than 165,000 days of incarcerated labor between 2017 and 2023, or potentially far more days pursuant to the contractual "piece rate" of 15 cents per mile reflected in other contracts between ADOT and ADOC.

29.    Worse still, and reflecting that Alabama is using incarcerated labor explicitly as currency, in 2016, ADOT and ADOC entered a ten-year lease agreement providing that ADOT would lease ADOC land "in exchange for the use of" incarcerated people to perform highway maintenance.[16]

30.    Alabama has not only generated millions of dollars in fees for itself through its forced-labor scheme and labor trafficking contracts between ADOC and numerous state agencies

---

[15] ADOC's human leasing fees appear to vary from agency to agency and over time. For example, an April 2019 invoice between ADOC's Red Eagle work center and Defendant ADOT showed that ADOT paid the ADOC work center $50 a day per worker to weed, erect signs and guard rails, and cut trees and limbs over an 18-day period. Pursuant to ADOC policy, each incarcerated laborer would have received only $2 per day, meaning ADOC pocketed the remaining $48 per day per worker. The total amount of the invoice was $7,150, yielding an estimated $6,864 in revenue for ADOC from that single contract.

[16] This lease provides that ADOT and ADOC "mutually agree that the lease of real property in exchange for the use of prison inmates to perform highway maintenance activities will contribute" to their respective goals.

and entities, but it has also benefited, and continues to benefit, by not having to pay state employees at the statutory or prevailing rates to perform these state jobs. For the work coerced for ADOT between 2017-2023 alone, Alabama realized a benefit estimated at more than $12.5 million (relying on just the starting wage for state employees and no addition for benefits). This amount does not account for the fact that the road squad work incarcerated people are often required to perform—like much of the work compelled from predominantly Black incarcerated people for ADOT—is physically dangerous, as the tragic deaths of two incarcerated people killed while performing such work earlier this year demonstrate.[17]

31.     To provide another example, between January 1, 2018 and September 7, 2023, incarcerated workers were forced to provide approximately 33,634 days of labor—or an average of 5,605 days per year—to the City of Montgomery, including at the city's landfill and for Montgomery Street Maintenance. The starting wage for a City of Montgomery service maintenance worker in sanitation and street maintenance is $13.36 per hour. Assuming the City of Montgomery pays ADOC its standard rate of $15 per day per worker, the City of Montgomery generated more than $3 million in wage savings alone by employing incarcerated labor during this period.

32.     Overall, from 2018 to 2023, Alabama public entities have reaped approximately $30 million in wage savings alone by using incarcerated laborers through the work-center program instead of hiring free workers.

---

[17] *2 Alabama Inmates Killed While Working on Road Crew for State,* AP (Aug. 2, 2023), https://apnews.com/article/alabama-inmates-killed-road-crew-f7b3ecdb6ee0505a6cdfc18c56c9ebdc; *see also An Alabama Prisoner Forced to Work on Road Crew Killed by Passing Car,* Equal Justice Initiative, https://eji.org/news/alabama-prisoner-kenric-turner-forced-to-work-on-road-crew-killed-by-car/ (June 18, 2012).

33.     Many work crews that perform grossly underpaid labor for state and local government are more disproportionately Black than the ADOC population on the whole. Of the nearly 400 people hired by the City of Montgomery to work as laborers between 2018 and 2023, approximately 65% were Black. Incarcerated maintenance workers at Trenholm State Community College in recent years were approximately 85% Black. Over the same period, 60% of the incarcerated workers laboring for ADOT were Black. 85% of the incarcerated workers in the Bullock County Sanitation Department since 2018 have been Black.

34.     The racial breakdown of incarcerated workers among ADOC's array of forced labor-leasing operations reveals that Black people with minimum security classifications are disproportionately assigned to lower-paid work-center jobs for public employers instead of being assigned to higher-paid work-release jobs for private employers. Incarcerated Black persons perform a markedly larger proportion of the work for public employers than do incarcerated white persons, based on the number of days worked, while white incarcerated people perform a relatively larger portion of the work for private employers. In FY 2022, for example, Black people performed approximately 64% of the total days worked for public, work-center employers—for which they are generally paid only $2 per day. By contrast, Black people performed approximately 54% of the days worked by incarcerated people in higher-paid work-release jobs for private employers. In each employment setting, though, the coerced workforce is disproportionately Black, as compared to Alabama's population.

**C.     Alabama Profits from the Forced Laborers Who Are Compelled to Operate Its Correctional Industries Enterprises.**

35.     Another forced-labor profit engine for the State's general fund is Alabama's "Correctional Industries Program," which requires incarcerated people to produce goods on ADOC property (e.g., by producing and restoring furniture—including judges' benches,

manufacturing clothing, working in printing plants, and making vehicle tags) for purchase by

state and local government entities. Approximately 274 incarcerated people worked in ADOC's

Correctional Industries as of September 2023, with ADOC's September 2023 report showing

that it secured more than $3.1 million in profit from the work performed by these laborers,[18] a

greater amount than it obtained in FY 2022. Most of the 2023 profit has been generated by

incarcerated workers in the clothing and vehicle tag plants—more than $1.9 million from the

approximately 112 workers in the clothing plant and nearly $1.5 million from the approximately

19 workers in the vehicle tag plant. These declared profits understate the true economic benefit

of this program to the State, because the state agencies purchasing goods manufactured through

the Correctional Industries program would have to pay more for such goods on the open market.

The purchasing agencies are simply paying another Alabama entity for goods produced through

the in-house forced labor manufacturing operations.

36.     Unlike the incarcerated people who are compelled to labor through Alabama's

work-release and honor-camp schemes, the incarcerated workers who are compelled to labor in

Alabama's Correctional Industries have higher security classifications and perform this labor in

designated plants contained on the grounds of medium- and maximum-security facilities. These

laborers typically have starting pay of 25 cents per hour or less.

**D.      Alabama Is Deriving a Benefit of More than $450 Million in 2023 from
         Compelling Predominantly Black Alabamians to Work as Unpaid Prison
         Staff.**

37.     Most of the remaining 16,000 incarcerated people in ADOC's custody—i.e., those

not forced to labor within the work-release, work-center, and Correctional Industries schemes—

are also forced to work for ADOC's economic benefit. As the understaffing crisis at ADOC has

---

[18] ADOC September Monthly Report at 15.

intensified in recent years, Alabama has increasingly turned to forcing incarcerated persons to perform jobs that correctional and other free state employee staff historically performed. For the State, this diversion of disproportionately Black forced labor yields nothing but economic benefit because ADOC does not pay any wages to the incarcerated people whom it assigns to perform in-facility work.

38.      ADOC currently relies on its incarcerated labor force to perform all manner of jobs necessary to run ADOC's own facilities, including: all types of skilled construction, including clearing land for, and building and repairing new and current facilities, dorms, and warden's houses; wiring and repairing the HVAC and electricity systems; overseeing and serving as the direct care providers for the drug and alcohol treatment program, mental health, and hospice and wards; traditional prison staff duties like serving as the Officer in Charge of an entire dorm, conducting "the count" daily, or supervising incarcerated people in segregation facilities; handling medical emergencies (including primary responsibility for providing CPR), and performing the administrative aspects of correctional supervision, including processing new admittees; working in the cafeteria; handling trash; mowing lawns; building and maintaining fences; and basic needs like laundry.

39.      ADOC's staffing shortages have markedly worsened since 2015, resulting in a reduction of nearly 40% of the security staff employed by ADOC since 2015, including a nearly 20% loss in staff since December 2021. ADOC reported employing 2,843 security staff as of September 2015. By June 2023, that number had fallen to 1,744.

40.      As discussed below and in the investigative report prepared by the DOJ, ADOC's extreme understaffing is a root cause of the violence that pervades ADOC's medium- and

maximum-security facilities.[19] Yet, as paid staff increasingly leave ADOC, there has been a corresponding increase in the number of unpaid incarcerated persons performing those former staff members' jobs—for free. With correctional officer trainees earning more than $24 per hour as their starting wage, assuming every incarcerated person assigned to fill a paid staff member's job at no cost to ADOC saves ADOC $24 per hour, that results in a minimum wage cost savings to ADOC of approximately $50,000 per year per position.

41.     Indeed, the benefit to Alabama of the compelled labor of its unpaid, in-house population to cover the work of just the 1,100 correctional staff lost since 2015 is approximately $55 million per year.

42.     A review of labor assignments and schedules of incarcerated people held at the St. Clair Correctional Facility (a maximum-security facility) indicates a net benefit to Alabama of approximately $30 million for just the labor performed by people at St. Clair from January to December 2023, extrapolating from available data through August 2023. The work performed at St. Clair suggests a benefit to Alabama of more than $400 million in 2023 from the forced labor of the disproportionately Black Alabamians being held in Alabama's maximum- and medium-security facilities.

## II.     ADOC COERCES INCARCERATED PEOPLE IN ITS CUSTODY TO PERFORM THE LABOR THAT DRIVES DEFENDANTS' PROFIT-MAKING SCHEME.

43.     Labor coerced from Alabama's disproportionately Black incarcerated population is the fuel that fires ADOC's extremely lucrative profit-making engine, to the benefit of all Defendants. Through Defendant Hamm and under the governance and direction of Governor Ivey, ADOC subjects incarcerated people in its custody to multiple forms of coercion. First, at Governor Ivey's direction and with the assistance of ADOC's public and private forced-labor-

---

[19] *See infra* Part II.B; 2019 DOJ Report at 9-11.

employer partners, ADOC enforces express rules that severely punish incarcerated people both for refusing to work and for encouraging work stoppages, including by imposing physical restraint, extending the duration of confinement, and requiring additional forced labor from those who reject work assignments. Second, ADOC subjects incarcerated people to extraordinarily violent conditions in its understaffed medium- and maximum-security facilities, conditions so life-threatening that the people incarcerated in those facilities are forced for their own safety to accept any work assignment that may take them away from the most dangerous areas of those facilities. Third, through Defendant Hamm and under the governance and direction of Governor Ivey, Alabama has singled out and violently punished incarcerated people who have led, or are perceived as leading, nonviolent resistance and nonviolent refusals to perform forced labor for the benefit of Defendants. The additional coercion imposed by Governor Ivey, Attorney General Marshall, and the Parole Board through the abuse of the parole system is separately discussed in Part III and is part of the same overall scheme.

> **A.    ADOC Regulations Enforced by ADOC and Its Business Partners Coerce Labor from Incarcerated People by Harshly Punishing Any Refusals to Work.**

44.    ADOC, at Governor Ivey's direction, coerces incarcerated persons in ADOC custody to work by disciplining people, up to and including through the imposition of extreme punishment, if they refuse to work.

45.    For more than a decade, ADOC has punished incarcerated people who refuse to work. If the incarcerated person refuses to work on more than one occasion, the disciplinary offense is upgraded in severity and can be categorized as refusing to follow orders and high-severity disciplinary offenses punishable through solitary confinement.

46.    In addition, in a January 9, 2023 Executive Order, Governor Ivey provided explicit directions requiring stringent consequences for violations of the forced labor

requirements imposed on people incarcerated by ADOC, specifically with respect to "good-time" credits earned by incarcerated people.[20] Governor Ivey's Executive Order identifies refusals to work and *encouragement* of work stoppages—a term that includes speech encouraging others to refuse to engage in forced labor—as "medium" and "high" level violations, respectively, of the ADOC rules, which means that incarcerated persons who decline work, including forced labor, or encourage others to do so are subject to significant discipline. The Governor expressly authorized ADOC to impose additional punishments for such violations, including "time to be served in restrictive housing,"[21] which generally means solitary confinement and other cruel conditions as documented in prison conditions litigation and federal government reports.

47.     The ADOC Commissioner complied with the Government's Executive Order, as reflected in the ADOC's current regulations. Those regulations deem it a "medium level" offense to refuse to work.[22] Medium level violations may be punished by, among other penalties, confinement to restrictive housing (solitary confinement) for up to 30 days; forfeiture of a minimum of 720 accrued good-time days—the forfeiture of "good time" days means the extension of a person's sentence; for example the forfeiture of 720 days of good time means the person will have to spend approximately two more years in prison—or, if a person's balance is less than 720 days, forfeiture of the entire accrued good-time leave balance (thereby pushing out the person's release date proportionally); at least a six-month bar from earning additional good-time days (keeping the person's sentence from being reduced for good time for that six month

---

[20] Correctional incentive time deductions, or "good-time" credits, reduce the term of an incarcerated person's sentence and thus the duration of confinement.

[21] Exec. Order 725, Promoting Public Safety by Establishing Standards and Accountability for Correctional Incentive Time (Jan. 9, 2023),
https://governor.alabama.gov/newsroom/2023/01/executive-order-725/.

[22] Ala. Dep't of Corrections, Admin. Reg. 403, Annex A & B (July 24, 2023),
http://www.doc.state.al.us/docs/AdminRegs/ar403.pdf.

period); a recommendation for custody review, which can result in an incarcerated person being moved to a more restrictive security classification; loss of any and all privileges and incentives for up to 45 days; and "extra duty" for up to 45 days—meaning additional forced labor.

48.     ADOC's regulations also deem "[e]ncouraging or causing others to stop work" to be a "high level" violation—on par with an assault, robbery, and inciting a riot.[23] Incarcerated people whom ADOC finds to have committed high-level violations are subject to even more severe penalties than those whom ADOC finds to have committed medium-level violations, including solitary confinement for up to 45 days; forfeiture of a minimum of 1,080 accrued good-time days—which equates to an extension of three years to a person's release date—or the entire leave balance if fewer than 1,080 days; at least a one-year bar from earning additional good-time days; a recommendation for custody review; loss of any privileges and incentives for up to 60 days; and extra duty for up to 60 days.

49.     Private work-release employers and public work-center employers are aware of and knowingly assist in enforcing these and other ADOC regulations that coerce work from incarcerated people. ADOC's Work Release Program Employer Agreement expressly provides that incarcerated people participating in the program "shall comply with … all ADOC rules and regulations," and if an incarcerated person "fails to follow any rule, or refuses to work as requested, notice shall be given in writing to the [ADOC] J[ob] P[lacement] O[fficer]/Designee" when the incarcerated person returns to the work-release facility.[24] The Government Work Project Service Agreement that applies to the work-center program similarly provides that, in supervising incarcerated workers, the public entity "shall require [incarcerated people] to obey

---

[23] *Id.*
[24] ADOC Admin. Reg. 410.

all rules and regulations."[25] As in work release, if an incarcerated person "fails to follow any rule, or refuses to work as requested, notice shall be given in writing" to ADOC.

50.     As widely and repeatedly reported across Alabama, ADOC has imposed other dire hardships, including food deprivation and physical punishment, on incarcerated persons who have refused to work or encouraged people to refuse to work. For example, during a strike by incarcerated workers in September 2022 to protest, among other issues, the life-threatening conditions in ADOC facilities and the broken parole system,[26] Alabama responded with what is colloquially known as "bird-feeding," essentially reducing the supply of food to the striking workers, among other extreme punishments Alabama showered upon the striking workers.

**B.     Alabama Extracts Labor from Predominantly Black Incarcerated Alabamians by Creating and Maintaining Coercive Conditions in ADOC's Extraordinarily Violent and Understaffed Medium- and Maximum-Security Facilities.**

51.     Alabama's notorious medium- and maximum-security prisons, which are growing increasingly dangerous over time due to worsening understaffing and severe overcrowding, present life-threatening conditions for the Alabamians confined in those facilities. By creating and maintaining conditions of extraordinary violence at these facilities, where incarcerated people face the constant and imminent risk of being severely injured or killed, Alabama—with the knowledge and assistance of Governor Ivey, Attorney General Marshall, and the Parole Board—has created and maintained inherently coercive conditions that render forced all labor extracted from the predominantly Black population incarcerated at ADOC facilities.

---

[25] Ala. Dep't of Corrections, Admin. Reg. 439 (Aug. 21, 2023), https://doc.alabama.gov/docs/AdminRegs/AR439.pdf.
[26] Evan Mealins, *'Am I Next?': Prison Laborers Strike as Activists Deliver Demands to Corrections Department*, Montgomery Advertiser (Sept. 26, 2022), https://www.montgomeryadvertiser.com/story/news/2022/09/26/alabama-prison-laborers-strike-activists-deliver-demands-to-adoc/69517876007/.

52.     ADOC's disproportionately Black incarcerated population is currently being
subjected to extremely violent and legally inadequate conditions of incarceration. The stunningly
dangerous conditions that incarcerated people in Alabama face are well documented and widely
publicized, including in the April 2019 DOJ report summarizing its investigation of Alabama's
state prisons for men,[27] DOJ's 2020 report on violence perpetrated by correctional staff,[28] DOJ's
related civil litigation against the State and ADOC for their allegedly widespread cruel and
inhumane treatment of incarcerated men in violation of CRIPA,[29] the federal litigation resulting
in an injunction—with which ADOC has not yet complied—that required ADOC to hire
approximately 2,000 correctional staff to address the "horrendously inadequate" mental health
care system in a prison system plagued by "persistent and severe shortages of mental-health and
correctional staff, combined with chronic and significant overcrowding,"[30] DOJ's litigation
regarding Eighth Amendment violations at Julia Tutwiler Prison for Women resulting in a
consent decree requiring ADOC to address sexual abuse and harassment,[31] and numerous other
media reports and prison condition cases.[32]

53.     The level of violence in Alabama's medium- and maximum-security prisons is
extraordinary even within the U.S. carceral system. During fiscal year 2017—the year examined
in the 2019 DOJ Report—ADOC publicly reported a homicide rate that was approximately eight

---

[27] 2019 DOJ Report.

[28] U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (July 23, 2020) ("2020 DOJ Report"), https://www.justice.gov/crt/case-document/file/1297031/download.

[29] *See* Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. Dec. 9, 2020).

[30] *See Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1259-64 (M.D. Ala. 2021); *see also Braggs v. Hamm*, No. 2:14CV601-MHT, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023) (ordering parties to file a plan "to address ADOC's still grossly inadequate correctional staffing levels").

[31] *See* Consent Decree (Dkt. No. 11), *United States v. Alabama*, Case No. 2:15-cv-00368 (M.D. Ala. June 18, 2015).

[32] *See, e.g.*, *Barefield*, 2023 WL 5417550, at *1 n.1.

times the national average homicide rate for prisons—56 per 100,000 prisoners in Alabama, compared to seven homicides per 100,000 nationwide.[33] DOJ experts "observed that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than other similar systems" and had increased dramatically since 2013.[34] In the third quarter of FY 2023 alone, ADOC publicly reported five additional homicides, with numerous other deaths still under investigation.[35] ADOC's September 2023 statistical report records 1,997 assaults in its medium- and maximum-security facilities this fiscal year, and it is likely that not all assaults are reported.[36]

54.    Individuals incarcerated in Alabama's medium- and maximum-security prisons face a serious risk of excessive force from security staff, with incidents "often result[ing] in serious injuries and, sometimes, death."[37] The DOJ documented ADOC staff frequently using excessive force against even compliant or restrained prisoners, and as punishment or retribution.

55.    As the 2019 DOJ report found, "ADOC does not protect prisoners in its custody from death caused by prisoner-on-prisoner violence," which "is systemic and life-threatening."[38] DOJ's report recounts that deadly and near-fatal assaults are frequently committed against people incarcerated in ADOC's medium- and maximum-security facilities and ADOC officials have on multiple occasions failed to protect persons who specifically alerted officials to their high risk of being killed if not adequately protected. Weapons—homemade and contraband—are

---

[33] *Id.* at 6 (citing DOJ's Bureau of Justice Statistics data from 2014).
[34] *Id.* at 6.
[35] Ala. Dep't of Corrections, Fiscal Year 2023 Joint Legislative Prison Oversight Committee Quarterly Report Ending 06/30/2023, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding06-30-2023.pdf.
[36] ADOC September Monthly Report at 3.
[37] 2020 DOJ Report at 2.
[38] 2019 DOJ Report at 13, 16.

"ubiquitous" throughout ADOC's medium- and maximum-security facilities and are frequently used to deadly effect.[39]

56.     Persistent overcrowding and worsening understaffing are driving forces behind the lethal conditions in ADOC's medium- and maximum-security facilities. ADOC's facilities were designed for a total in-house population of no more than 12,115 individuals.[40] Yet, according to the September 2023 statistical report published by ADOC, the state prison system currently houses 20,361 people, the vast majority of whom are housed in medium- and maximum-security facilities.[41] Specifically, ADOC's maximum-security facilities have a total designed capacity of 5,637 beds, but the month-end population in September 2023 exceeded that capacity by 2,661 individuals. ADOC's medium-security facilities have a total designed capacity of 4,690 beds, but the month-end population in September 2023 was 8,881, nearly double the designed capacity.[42]

57.     This overcrowding is coupled with understaffing that the DOJ found to be "at a crisis level" and that has significantly worsened since that 2019 report. According to ADOC's fourth quarter FY 2022 report, in FY 2022 ADOC had a net decrease of 415 security employees, including correctional officers and wardens—an 18.7% decrease in staffing since September 30, 2021. These staff decreases come on the heels of ADOC staffing reductions of 197 employees in FY 2021.[43] Correctional officer positions have experienced a particularly sharp decline, with a

---

[39] *Id*. at 25.
[40] ADOC September Monthly Report at 2.
[41] *Id.* at 2.
[42] *Id.* at 3.
[43] Ala. Dep't of Corrections, Fiscal Year 2022 Code of Alabama §14-1-24 – Quarterly Report Ending 9/30/22, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding9-30-22.pdf; Ala. Dep't of Corrections, Fiscal Year 2022 Code of Alabama §14-1-24 – Quarterly Report Ending 12/31/21, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding12-31-21_1.pdf.

net loss of 214 basic correctional officers in FY 2022 (down 36.3% from 2021, to 375) and a net

loss of 185 Alabama Peace Officer Standards and Training certified officers—which includes

correctional officers and senior and trainee correctional officers (down 16.9%, to 910). Available

information for FY 2023 suggests further staffing losses, with ADOC reporting as of June 30,

2023 that it employed only 326 correctional security officers and 884 correctional officers

(trainee, officers, and senior officers).[44]

58.     These extreme levels of deliberate understaffing result in violent incidents in

medium- and maximum-security facilities often going unnoticed by correctional staff and

unreported. ADOC dormitories in these facilities often have so few staff that incarcerated people

are essentially unsupervised for hours or shifts at a time in areas rife with weapons; and the

physical layout of many ADOC housing units makes it impossible for the limited available staff

to observe what is occurring and to provide even minimal security. The predictable result has

been that sexual abuse and acts of horrific violence occur in ADOC facilities without any

intervention from prison officials, including such horrors as hostage-taking and torture lasting

days.[45]

59.     Commissioner Hamm coerces labor from the disproportionately Black population

incarcerated by ADOC by maintaining conditions of extreme understaffing and extraordinary

violence that pervade every aspect of life in ADOC's medium- and maximum-security facilities.

Being incarcerated in one of these facilities is life-threatening, and the incarcerated people who

live there know it. Accepting a job—ideally outside the walls of medium- and maximum-security

---

[44] Ala. Dep't of Corrections, Fiscal Year 2023 Joint Legislative Prison Oversight Committee Quarterly Report Ending 06/30/2023, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding06-30-2023.pdf.
[45] 2019 DOJ Report at 9, 36, 39.

facilities, but also in any position that physically removes an incarcerated person from the most dangerous areas in those facilities—is the only way to escape the serious threat of physical harm, even temporarily.

60.      Plaintiff Lee Edward Moore Jr.'s experience is representative. Constantly threatened by the extreme violence within the facilities in which he has been housed, Mr. Moore knew his only means of avoiding that violence was to turn over his labor, full time, to ADOC. He has worked for more than 25 years, providing an array of highly skilled mechanical, building, and electrical tasks for ADOC—including installing and maintaining the HVAC system in use today, and refurbishing and renovating houses for the wardens—without receiving a single cent in compensation for his labor. Mr. Moore currently works on the "custody squad" at Holman, which allows him to work unsupervised cutting grass outside the walls of one of the highest-security facilities in ADOC, as Holman also houses incarcerated people on Death Row and others subject to high security classifications. He also performs maintenance tasks inside the facility, which allows him to spend time during the day away from more violent areas of the prison. In conjunction with approving Mr. Moore for this job, ADOC also approved Mr. Moore to live in a separate, much smaller, and less violent dorm within Holman that is limited to incarcerated people in kitchen, canteen, and officer-runner roles.

**C.      At the Direction of Governor Ivey, ADOC Has Singled Out Leaders of Non-Violent Resistance to Forced Labor for Punishment, Including Cruel and Violent Physical Punishment, Repeatedly Threatening Leaders with Loss of Life, and Ordering Their Extensive Permanent Physical Harm and Disfigurement.**

61.      Individual plaintiff Robert Earl Council aka Kinetic Justice has been subjected to severe threats, cruel and violent physical punishment, and other retaliation by Alabama officials in response to his efforts to resist and encourage others within ADOC to resist Defendants' unlawful conduct and specifically Defendants' forced labor demands. Beginning in 2013, Mr.

Council and another individual incarcerated by ADOC founded and organized the Free Alabama Movement, which has grown from its Alabama roots to become a nationwide movement on behalf of incarcerated people, their families, and their communities. From its inception, the Free Alabama Movement has embraced one core strategy: "the Non-Violent and Peaceful Protest strategy of 'shutdowns' / work stoppages to combat the multi-billion dollar Prison Industrialized Complex that has incarcerated over 2 million people for the sole purpose of exploitation through free labor, private prisons, exorbitant fees, and more."[46] Through the Free Alabama Movement, Mr. Council and his co-leader have formed and led a labor movement whose focus has been to peacefully resist the systematic profiting by the State of Alabama from their forced labor and to eliminate modern-day forced labor trafficking and profiteering through their non-violent protests.

62.     As part of this movement, beginning on January 1, 2014, Mr. Council and his co-leader organized non-violent work stoppages at Holman, St. Clair, and Elmore Correctional Facilities, stoppages that were joined by 2,300 individuals incarcerated at those two prisons and ultimately joined by a total of 4,500 people across ADOC facilities.

63.     In 2016 and 2018, Mr. Council, along with other leaders of the Free Alabama Movement, led national strikes of incarcerated workers. These strikes spanned 24 states, including Alabama, and 46 prisons and jails, including as many as 57,000 incarcerated individuals.

64.     Post-pandemic, the Free Alabama Movement organized a sweeping statewide strike in Alabama to protest rapidly worsening conditions and continued forced labor in ADOC facilities on September 26, 2022. This 2022 strike lasted approximately a month and involved the

---

[46] F.A.M. Pamphlet, Free Alabama Movement, https://freealabamamovement.wordpress.com/f-a-m-pamphlet-who-we-are/ (last visited Dec. 10, 2023).

withholding of labor by incarcerated men across all 13 of ADOC's medium- and high-security facilities.

65.     Following the 2022 strike, as detailed above, ADOC, at the direction of Governor Ivey, meted out violent repression. This included reducing the food supply to the strikers; physically abusing and punishing them, including by placing in solitary confinement strike leaders and work-release workers who refused to work as strikebreakers as compelled by ADOC; and modifying ADOC regulations to identify increased punishments for disciplinary violations, including violations that involve the withholding of labor, refusing to work as directed by ADOC, and organizing or encouraging other people to refuse to provide coerced labor to ADOC and the private and public employers participating in Defendants' coerced labor scheme.

66.     ADOC has singled out Mr. Council and other Free Alabama Movement leaders, including the late James Pleasant, for singular abuse and punishment in retaliation against their leadership of peaceful resistance to Alabama's forced labor regime. Since 2015, Mr. Council and his co-leader have been subject to long stretches of solitary confinement in response to their resistance to forced labor, and have been the victims of physical beatings, strip searches, exposure to chemical agents, harassment, and psychological abuse at the hands of ADOC officials while in solitary confinement.

67.     Mr. Council and his co-leaders have often been assigned to ADOC's Donaldson Correctional Facility, which is infamous as a facility where ADOC personnel carry out brutal beatings of those suspected of advocating for human rights protections. During the approximately two years that Mr. Council was at Donaldson, he spent more than a year in solitary confinement, with less than nine months in general population. While at Donaldson, all

three leaders—Mr. Council and his two co-leaders—were attacked by ADOC personnel, including while in solitary confinement.

68.     Mr. Council has endured life-threatening abuse in retaliation for his work on the Free Alabama Movement strikes and labor protests. In 2020, a group of ADOC officers beat Mr. Council so severely he had to be med-flighted to a trauma center to save his life. Following the trauma center, ADOC transferred Mr. Council to a cell at Kilby and denied him medical care while he bled for 21 days, despite ADOC knowing that he had experienced devastating brain trauma and an injury to his head and eye. As a result of that beating—for which the officers are currently awaiting trial on their criminal prosecution for the assault—Mr. Council lost vision in one eye and has suffered extensive physical permanent damage, including brain injury.

69.     Many of these incidents of violent repression and retaliation against the leaders of peaceful resistance to forced labor have been confirmed by state and federal officials, including as part of ongoing enforcement action by the DOJ. In addition to these physical assaults and abuse, ADOC has placed Mr. Council in cells with intolerable and inhumane conditions, including cells infested with rats, roaches, or spiders, without lights, and frequently without working plumbing and sometimes without even a mattress. ADOC denied Mr. Council visitation privileges, phone privileges, and outside exercise activities for years at a time. The last time Mr. Council was permitted to see his daughter and mother was in December 2015.

70.     ADOC's repression also extends to incarcerated workers who have participated in the Free Alabama Movement's efforts to resist forced labor. For example, one work-release worker was forced by ADOC to work within its facilities to break the 2022 strike. When this worker sought to honor the strike and declined to work, he was removed from the work-release

program, put "behind the wall" at Limestone, a maximum-security facility where he still remains

today (more than one year later), and placed in solitary confinement for several months.

71.     ADOC's extreme violence in response to Mr. Council and his co-leaders'

peaceful efforts to resist forced labor, and its extreme response to incarcerated workers who

sought to support these efforts, are powerfully coercive signals to all in ADOC custody of what

awaits them if they resist ADOC's labor demands. Indeed, ADOC officials repeatedly caution

incarcerated laborers that a refusal to work will be met with the same punishment meted out to

Mr. Council. It's known as the "Robert Earl Rule."

**D.     The Excessive Prices ADOC Charges Incarcerated People and Their Families for Basic Necessities Contribute to the Coercive Environment.**

72.     Despite extremely limited opportunities to be paid for their labor, incarcerated

people in ADOC facilities are required to pay excessive, marked-up amounts to ADOC to obtain

basic life necessities. The need to acquire funds to purchase such necessities contributes to

forcing incarcerated people in ADOC's custody to accept any paid work they can, and to remain

in those jobs no matter the conditions for as long as possible.

73.     For example, ADOC does not provide incarcerated people with adequate warm

winter clothes, usable shoes (including work shoes), or deodorant. Incarcerated people must

instead purchase those items from ADOC, sometimes at highly marked-up prices. For example,

one pair of shoes that retails for $70 outside of prison costs incarcerated people 58% more to

purchase through ADOC. When incarcerated people cannot pay these prices themselves, the

burden falls on their families and loved ones.

74.     ADOC facilities also charge many incarcerated people fees for medical visits.

These fees range from approximately $4 to $8, with additional costs for some medicines.

Incarcerated people housed in facilities without on-premises medical care may be charged $8-12

for van transport to a prison with a medical facility. These fees impose a significant burden on incarcerated people, considering that the vast majority of them are paid either nothing at all or at most $2 per day for their forced labor, meaning that a single serious or recurring medical condition can wipe out years of earnings. Incarcerated people are also required to pay approximately $10 per month to use ADOC's electronic tablets, $0.25 for every message sent on the tablet, and additional onerous fees for every minute used in a phone call to connect with their loved ones.

75.     In recent years, the fees charged by ADOC to incarcerated people for some basic necessities have soared, far outpacing inflation. Meanwhile, the extremely limited purchasing power of most incarcerated people has not increased at all.

76.     The excessive prices ADOC charges for such basic necessities provide ADOC an additional incentive to keep as many people incarcerated as possible, because ADOC gets a share of all funds received for goods purchased in the canteen or the snack line. These charges further contribute to compelling incarcerated people to accept whatever work assignments they are given if the job includes any pay at all. For FY 2022, ADOC reported revenue of more than $11.2 million for "Corrections Canteen Profits," more than $5.1 million from pay telephones, more than $106,000 in medical co-pays, and more than $311,000 in electronic transfer fees.

III.    **THE GOVERNOR, ATTORNEY GENERAL, AND PAROLE BOARD HAVE CONSPIRED TO SUBVERT THE OPERATION OF ALABAMA'S PAROLE SYSTEM TO ACHIEVE SYSTEMIC WRONGFUL OVERDETENTION, PARTICULARLY OF BLACK ALABAMIANS, AND TO FUEL DEFENDANTS' FORCED LABOR SCHEME.**

77.     Defendants' forced labor enterprise is also powered by an ongoing conspiracy among the Governor, Attorney General, and Parole Board to grow the size of the predominantly Black Alabama prison population (and thus the number of incarcerated persons available to

provide forced labor for Defendants' benefit) through the Governor, Attorney General, and

Parole Board's unlawful practice of ignoring the evidence-based criteria governing parole

decisions and instead administering the parole system in a manner they knew or should have

known would (1) eliminate any possibility of parole for a huge number of incarcerated people

sentenced to terms of imprisonment with the possibility of parole, and (2) result in the

discriminatory denial of lawful parole hearings and decision-making and, ultimately, parole to

Black parole candidates. In fact, as the Governor, Attorney General, and Parole Board are fully

aware, their challenged practices and policies resulted in the discriminatory denial of parole to

Black parole candidates at a rate of 2 to 1 compared to similarly situated white parole candidates

between FY 2020 and 2022.[47]

> **A.**  **Governor Ivey and Attorney General Marshall Conspired to Substitute Bias-Driven Decisions for the Evidence-Based Parole Decisions Required by Law, Resulting in Systemic Modifications of Judicial Sentences and Discriminatory Denial of Lawful Parole Decisions for Black Incarcerated People.**

78.     Defendants' unlawful conspiracy to hijack the parole process was, in part, a

reaction to, and a deliberate effort to undercut, the goals and intended consequences of the

Alabama Legislature's 2015 enactment of the Justice Reinvestment Act ("JRA").

79.     By September 2014, Alabama's prisons had become the most overcrowded in the

nation, operating at 195% of capacity.[48] Alabama's correctional system was "in crisis" such that,

in 2014, a coalition of government actors (including then-Governor Bentley, the Chief Justice,

---

[47] The Alabama Bureau of Pardons and Paroles is an Alabama state agency. Within the Bureau, the Parole Board is the three-person panel tasked with determining which incarcerated people may be released on parole and under what conditions. Defendant Gwathney is the Chair of the Parole Board.

[48] Justice Reinvestment in Alabama Analysis and Policy Framework, Council of State Governments Justice Center (Mar. 2015) ("Justice Reinvestment Analysis"), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG-AlabamaJRFramework.pdf.

and representatives from the Alabama House and Senate) asked the federal government and Pew Charitable Trusts for support "to explore a 'justice reinvestment' approach to reduce corrections spending and reinvest in strategies that can reduce recidivism and improve public safety," with technical assistance from the Council of State Governments Justice Center ("CSG").[49] The resulting justice reinvestment analysis and policy recommendations were adopted by the Alabama Prison Reform Task Force, a bipartisan, interbranch body created by the Alabama legislature.[50]

80.     The comprehensive justice reinvestment analysis concluded that the absence of "structured parole decision making" was an important contributor to prison overcrowding in Alabama. The report found that "[t]he parole board does not have formal guidelines for parole release decisions," resulting in a "lack of consistency in what factors they consider when determining if a person is ready for parole."[51] The report also noted, based on the Parole Board's own reports, that the Board placed less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison, than on factors an individual cannot change, such as prior criminal history and the nature of the underlying offense.[52]

81.     To address these concerns, the justice reinvestment analysis recommended developing guidelines that "require the consideration of a person's risk level as determined by a validated risk assessment tool," among other factors.[53]

---

[49] *Id.* at 2.
[50] Mike Cason, *Alabama Prison Reform Task Force Approves Plan to Reduce Crowding; Now It's Up to Legislature*, AL.com (Mar. 3, 2015), https://www.al.com/news/2015/03/alabama_prison_reform_task_for.html.
[51] Justice Reinvestment Analysis at 3, 22.
[52] *Id.*
[53] *Id.* at 25.

82.      When validated risk and needs assessment tools are used properly, they can help to limit racial bias in the parole process.[54]

83.      The result of this statewide effort to address Alabama's correctional systems crisis was the JRA. The JRA was designed to save Alabamians $380 million and to "cut the state's prison population by more than 4,200 people"[55] by radically changing the way the Parole Board decided whom to release, while also reducing construction and operations costs and reinvesting state funds in supervision, treatment, and support for crime victims.[56] The JRA required the Parole Board to incorporate evidence-based practices into its decision-making. The JRA also required the Parole Board to implement "structured, actuarially based" guidelines to determine fitness for parole, which "promote the use of prison space for the most violent and greatest risk offenders" and include consideration of the "prisoner's risk to reoffend, based upon a validated risk and needs assessment." Ala. Code §15-22-26.

84.      Consistent with the JRA, the resulting "Parole Guidelines" require the Board to consider a potential parolee's risk of reoffending based on a "validated risk and needs assessment" ("Risk Assessment") that takes into account: the parolee's potential for future violence; progress by the incarcerated person and ADOC to plan for reentry; input from

---

[54] *See* Risk and Needs Assessment and Race in the Criminal Justice System, Council of State Governments Justice Center (May 31, 2016), https://csgjusticecenter.org/2016/05/31/risk-and-needs-assessment-and-race-in-the-criminal-justice-system/.

[55] Press Release, Ala. Dep't of Corrections, Governor Bentley Signs Historic Criminal Justice Reform Legislation Into Law (May 21, 2015), https://doc.alabama.gov/NewsRelease?article=Governor+Bentley+Signs+Historic+Criminal+Justice+Reform+Legislation+into+Law+; *see also* Brendan Kirby, *5 Ways Proposed Law Would Radically Change Parole in Alabama*, AL.com (Mar. 24, 2015), https://www.al.com/news/2015/03/5_ways_proposed_law_would_radi.html.

[56] Alabama's Justice Reinvestment Approach, Council of State Governments Justice Center (May 2015), https://csgjusticecenter.org/wp-content/uploads/2020/01/AlabamasJusticeReinvestmentApproach.pdf.

stakeholders; participation in risk-reduction programs; institutional behavior; and the severity of the underlying offense. Specifically, the State adopted a proven, evidence-driven Risk Assessment tool, the Ohio Risk Assessment System ("ORAS"), as the actuarial anchor for its Parole Guidelines.

85.     Following the Risk Assessment and taking account the other relevant factors, the Parole Board must give each potential parolee a parole score.[57] The Parole Guidelines indicate that the Parole Board should generally grant parole to those who score between 0-7 and should deny parole to those who score 8 or higher.

86.     As required by the JRA, the state implemented a training program on the Risk Assessment's use for the members of the Parole Board, along with parole and probation officers. Eddie Cook was chosen by the Parole Board to lead the JRA's implementation and eventually became the Executive Director of the Bureau of Pardons and Paroles.

87.     The Parole Board members, equipped with training and the ORAS evaluation matrix to make objective, evidence-based evaluations of each parole candidate's risk of reoffending, oversaw a steady rise in parole grant rates between 2015 and 2018—achieving exactly the practical result that the Legislature had intended. By applying the JRA's objective standards, parole grants rose from 2,270 people in FY 2015 to 3,730 people in FY 2018—more than a 50% increase in the number of incarcerated people released on parole relative to 2015.[58]

88.     Implementation of the JRA's evidence-based standards achieved the Legislature's stated goal of reducing the population in ADOC facilities, as the number of incarcerated persons

---

[57] Parole Guidelines, Ala. Bureau of Pardons & Paroles, https://paroles.alabama.gov/wp-content/uploads/ABPP-2-Final-PAROLE-GUIDELINES.pdf (last visited Dec. 10, 2023).
[58] Ala. Bureau of Pardons & Paroles, Monthly Statistical Report (Aug. 2023), https://paroles.alabama.gov/wp-content/uploads/AUGUST-2023-MSR.pdf.

dropped from 24,191 at the end of FY 2015 to 20,087 at the end of FY 2018. These reductions were especially pronounced among incarcerated people held in work-release and work-center facilities—those who, logically, should be the most frequently paroled once evidence-based, objective decision-making is implemented (given ADOC's determination that they could safely work outside ADOC facilities and the fact that work-release and work-center workers spend most of their week out in the community without ADOC supervision). Between 2015 and 2018, the work-release population was reduced by 38.2%, and the work-center population dropped by 17.5% with the application of evidence-based parole criteria.

89.     The decreasing population of Alabamians in prisons, however, threatened ADOC's and its public and private partners' supply of cheap incarcerated labor—and thus threatened to curtail the substantial financial benefit ADOC and other were reaping from their institutionalized forced-labor scheme.

90.     Available data concerning parole grant rates in FY 2018 suggest that implementing the statutorily required objective, evidence-based criteria also delivered another important dividend in the public interest: near parity in parole outcomes between Black and white parole applicants. Among incarcerated people in maximum-security, medium-security, work-center, and work-release facilities considered for parole in FY 2018 (January-September 2018), both Black and white parole applicants had parole grant rates above 50%, with 50.7% of Black incarcerated people granted parole and 54.4% of white incarcerated people granted parole.

91.     Despite the JRA's success in reducing the incarcerated population and diminishing the impact of racial bias in parole decision-making, Governor Ivey and Attorney General Marshall joined forces in 2018 to direct the Parole Board to ignore the JRA's clear mandates. Seizing upon the tragic crime committed by Jimmy Spencer, a white man, after he was

released on parole and evaded supervision, and cloaking their actions in the language of public
safety, Governor Ivey and Attorney General Marshall summoned the members of the Parole
Board to a meeting in the Governor's office. In that meeting, the Governor and the Attorney
General commanded that the Parole Board disregard the evidence- and data-based decision-
making framework required by law under the JRA and stop releasing people, particularly any
person in prison on a "violent" conviction. At the time, the Board members—none of whom
remain on the Board today—pushed back, defending the evidence-based practices that drove
their parole decisions and explaining that the data-driven approach required by state law was
supported by available social science.

92.     Dissatisfied with the pushback she received in a meeting with Parole Board
members at which she was "disappointed," Governor Ivey issued an Executive Order requiring a
moratorium on early parole consideration to last for 75 days or until the Board implemented a
corrective action plan.[59] Attorney General Marshall made clear that "there was an expectation
from the [G]overnor and I that we'll see change."[60]

93.     In June 2019, based on the Governor's and Attorney General's continued
dissatisfaction with the Parole Board's refusal to disregard the evidence-based decision-making
process required by state law, the Attorney General introduced, and Alabama passed, a law to

_____

[59] *AL Governor Orders Freeze on Violent Inmates' Early Parole*, WSFA 12 News (Oct. 15,
2018), https://www.wsfa.com/2018/10/15/gov-ivey-issues-executive-order-freeze-early-parole-
violent-inmates/; Exec. Order No. 716, Imposing a Temporary Moratorium on Early Parole
Hearings and Requiring the Submission and Implementation of a Corrective Action Plan for the
Board of Pardons and Paroles (Oct. 15, 2018),
https://governor.alabama.gov/newsroom/2018/10/executive-order-no-716/.
[60] Brian Lyman, *Ivey Announces Early Parole Moratorium, Shake-Up of State Parole Board*,
Montgomery Advertiser (Oct. 15, 2018),
https://www.montgomeryadvertiser.com/story/news/politics/2018/10/15/ivey-announces-early-
parole-moratorium-shake-up-state-parole-board/1647632002/.

give the Governor more oversight of the Parole Board and the power to directly appoint the

Executive Director, whom the Parole Board previously had appointed.[61] Those 2019

amendments, however, did *not* amend or repeal the JRA's objective, evidence-based

requirements for making parole decisions, which remain fully in effect.

94.     In July 2019, Governor Ivey replaced Executive Director Eddie Cook with former

Alabama Attorney General and Circuit Judge Charles Graddick. Governor Ivey appointed

Graddick to oversee the Parole Board and to implement her and Attorney General Marshall's

agenda. Graddick, who once reportedly called for abolishing the Parole Board altogether, [62]

immediately served the three top officials at the Bureau of Pardons and Paroles, each of whom

was Black—Cook, as well as the Assistant Executive Director and the Director of Personnel—

with disciplinary charges stating that, if they did not resign, they would be terminated. On the

day Graddick told Cook and other senior Black agency officials to resign or be fired, Graddick

instructed security to escort the officials from the office.

95.     In his first week on the job, Graddick also issued a directive that the wearing of a

wide array of natural hairstyles, typically worn by Black people, would be prohibited as

"unprofessional" and unsuitable at the Parole Board office.

96.     Former Board chair Lyn Head resigned in September 2019. She later disclosed

that one of the reasons for her resignation was the "blatant … racial discrimination" she observed

---

[61] Press Release, Office of the Governor, Governor Ivey Signs Bill Reforming Alabama Board of
Pardons and Paroles (June 6, 2019), https://governor.alabama.gov/newsroom/2019/06/governor-
ivey-signs-bill-reforming-alabama-board-of-pardons-and-paroles/.
[62] Brian Lyman, *Graddick Talks Violent Crimes Before Resumption of Parole Hearings*,
Montgomery Advertiser (Nov. 4, 2019),
https://www.montgomeryadvertiser.com/story/news/2019/11/04/parole-hearings-resume-
pardons-and-paroles-director-charles-graddick-weighs/4149639002/.

at the Parole Board after Graddick took over.[63] Shortly thereafter, the Governor installed the current Board chair, Defendant Leigh Gwathney, who had previously worked as an Assistant Attorney General in the Alabama Attorney General's Office.

97.     Upon his appointment, Graddick suspended hundreds of parole hearings until November 2019.[64] When hearings resumed, Graddick stated, of the Parole Board, "They know now that their job isn't to create space in Alabama['s] prison system[,] that's not what they were brought in to do."[65]

98.     When parole hearings resumed—and in the years since then—the Parole Board's own records make abundantly clear that the Governor, Attorney General, and Parole Board members agreed to, and did in fact, abandon the objective, evidence-based framework required by the JRA. In fact, in a meeting called by Alabama legislators in late 2020 to address the legislators' concerns regarding the Parole Board's slowdown in hearings and the sharp racial differences in parole outcomes since Governor Ivey installed the new board, Parole Board Chair Gwathney admitted that she did not use or rely on the objective, evidence-based standards required by the JRA because she did not think those objective standards were the "important things" to consider. According to a witness, she also admitted to changing parole scores.

---

[63] Patrick Darrington, *Former Parole Chair Discusses the Declining Parole Rate*, Alabama Political Reporter (Aug. 16, 2023), https://www.alreporter.com/2023/08/16/former-pardons-and-parole-chair-discusses-the-declining-parole-rate/.
[64] Eddie Burkhalter, *Charlie Graddick to Resign as Director of Alabama Bureau of Pardons and Paroles*, Alabama Political Reporter (Nov. 2, 2020), https://www.alreporter.com/2020/11/02/charlie-graddick-to-resign-as-director-of-alabama-bureau-of-pardons-and-paroles/.
[65] Caroline Beck, *As Parole Hearings Resume, Graddick Says Release Is Not a Right*, Alabama Daily News (Nov. 5, 2019), https://aldailynews.com/as-parole-hearings-resume-graddick-said-release-is-not-a-right/.

99.     Meanwhile, and since Graddick's installation, the Attorney General has regularly submitted letters opposing parole and coordinated with the group Victims of Crime and Leniency ("VOCAL"), which often appears at parole hearings to oppose parole even when the victim of a crime chooses not to oppose—or even supports—the parole application of an incarcerated person.

100.    One immediate, predictable effect of the Parole Board's agreement to abandon the JRA was a rapid decrease in the rate of parole grants across the board, with the precipitous decline affecting Black incarcerated people most severely, as the chart below illustrates.



101.     As the graph below showing the relative difference in parole grant rates in FY
2018 and FY 2021 demonstrates, the impact on racial equality of abandoning the JRA's
evidence-based objective standards was striking.



102.     The degree to which the Parole Board implemented Governor Ivey's directive, at
the expense of the evidence-based approach mandated by the JRA, is most starkly evident in the
drastic reduction in parole release for incarcerated people convicted of "violent" crimes —
revealing that the Parole Board effectively resentenced these individuals to terms of
imprisonment "without parole." Alabama broadly defines which crimes are deemed "violent,"
including not only crimes that have as an element the use, attempted use, or threatened use of a
weapon or physical force against another person but also, for example, third-degree burglary,
trafficking in cannabis, and attempts, conspiracies, or solicitations to commit "violent" offenses.
Ala. Code §12-25-32. As the following graph shows, under Gwathney and Graddick's

leadership, the parole grant rate for people incarcerated on convictions for "violent" crimes fell

from a rate of approximately 44.7% in FY 2018 to 6.9% for Black and 10.6% for white

incarcerated people in FY 2020, falling to a rate of approximately 2.2% for Black and 4.9% for

white parole candidates in FY 2022.



Discrepancy in Parole Rates by Race, Subset to those with Violent Convictions
Among Incarcerated People with a Parole Hearing

*2018 is a Partial Fiscal Year, 01/01/18-09/30/18

103.    These analyses make clear that the Graddick-Gwathney Parole Board

implemented Governor Ivey's directive to deny parole to people convicted of an offense that

Alabama law characterizes as "violent," particularly with respect to Black incarcerated people. In

doing so, Governor Ivey secured the alteration of thousands of sentences issued to people convicted of violent offenses, effectively changing those sentences to a fixed term *without* any real possibility of parole.

104.    The Parole Board's own data show that in the vast majority of cases in recent months, the Board has wholly disregarded the objective, evidence-based Parole Guideline recommendations. As of August 2023, the Board followed the Parole Guidelines' recommendation only 6% of the time.[66]



105.    As Defendant Gwathney recently acknowledged in public comments when confronted with the high rate at which the current Parole Board has been rejecting the Parole Guidelines' recommendation to grant parole, "This board is not driven by statistics."[67]

106.    The implementation of Governor Ivey and Attorney General Marshall's directive to stop letting people out, and particularly not to let anyone with a "violent" conviction out—

---

[66] Monthly Statistical Report August 2023, Ala. Bureau of Pardons & Paroles, https://paroles.alabama.gov/wp-content/uploads/AUGUST-2023-MSR.pdf.

[67] Alexander Willis, *'This Board is Not Driven by Statistics;' Parole Board Chair Defends Shrinking Parole Grant Rate*, Ala. Daily News (Aug. 17, 2023), https://aldailynews.com/this-board-is-not-driven-by-statistics-parole-board-chair-defends-shrinking-parole-grant-rate/.

regardless of the objective, evidence-based factors the JRA requires the Parole Board to consider—has effectively altered, system-wide, sentences carefully crafted and issued by the judicial branch to permit parole, to make them harsher sentences that either do not provide parole consideration at all or only permit parole consideration in an impermissible, racially biased manner. The Parole Board's decision-making—untethered to evidence and the objective standards dictated by Alabama law—created a significant risk of prolonging the period of incarceration for all persons sentenced to a term of imprisonment with the possibility of parole. Evidence concerning the operation of the parole system since 2019 demonstrates that this risk has become a reality: incarcerated people convicted of "violent" crimes are denied almost every time and incarcerated people convicted of all other crimes are typically denied release, regardless of the results of their Risk Assessment, the duration of confinement, their efforts to prepare for reentry, months or years without incident or re-offense working alongside free workers (including living unsupervised in the community on weekends or other extended "passes"), or any other factor.

107.    The data regarding the Parole Board's decisions since Governor Ivey and Attorney General Marshall implemented their plan, with the agreement of the Parole Board, also confirm that the evidence-based decision-making required by state law has been replaced by a racially skewed decision-making process.

108.    The low disparity in parole decisions that was secured through the previous Board's compliance with the JRA's evidence-based decision-making framework has been replaced with an unlawful practice that, between FY 2020 and FY 2022, favored white incarcerated people over Black incarcerated people for parole release *at a rate of approximately 2 to 1*, when taking into account facility type (including close/maximum, medium, minimum

work center, and minimum work release, which generally reflects the parole applicant's custody level), fiscal year, sex, and whether ADOC reported that the person had an off-site job in the past year.

109.     For both men and women, the Parole Board's racial bias in parole decisions at the direction of Governor Ivey and Attorney General Marshall cannot be denied—and cannot be defended on public safety grounds. Rather, the data demonstrates that Defendants' intentional scheme to capture Black lives for use and profit for Alabama through human trafficking and forced labor has succeeded, to the enormous detriment of incarcerated Black Alabamians, plaintiff organizations, the families of incarcerated people, and communities across Alabama.

**B.     The Conspiracy Among Governor Ivey, Attorney General Marshall, and the Parole Board Has Also Resulted in Disproportionate Delay in Parole Reconsideration Dates for Black Incarcerated People.**

110.     Once a potential parolee has been denied parole, the Board typically must also specify the date upon which that person will be considered again for parole, known colloquially as a "reset" or "set-off" date. The agreement between Governor Ivey, Attorney General Marshall, and the Parole Board members to keep Black people incarcerated and available for profit-generating forced labor is further demonstrated by the unmistakable racial skew reflected in the Parole Board's set-off date determinations.

111.     The Parole Board under Defendant Gwathney has disproportionately issued the maximum set-off date of five years to Black parole candidates, while more frequently giving white parole candidates set-off dates of fewer than five years. The chart below reflects the distribution of set-off dates of various lengths among Black and white people who received set-off dates from the Parole Board between FY 2018 and FY 2023.



112.    Thus, in addition to denying parole to Black incarcerated people at higher rates than their white counterparts, the Parole Board also reinforces the racially disproportionate demographics of the Alabama prison population by more often denying Black incarcerated people, for the maximum amount of time possible, the opportunity to prove their readiness for parole. Four years into the racist conspiracy among Governor Ivey, Attorney General Marshall, Board Chair Gwathney and the associate Board members to undermine the JRA's evidence-based practices and to keep Black people disproportionately incarcerated, the effect on the prison population has been as stark as it is unsurprising: as of the September 2023 report from ADOC, 53.4% of the incarcerated population was Black, compared to 26.8% of the overall State population.

C.     **The Board's Disproportionate Denial of Parole to Black Alabamians Whom ADOC Has Determined Are Safe to Work in the Community Further Confirms That Racial Bias and the Perpetuation of Defendants' Forced Labor Scheme, Rather Than Public Safety Concerns, Are Driving the Board's Parole Decisions.**

113.    Defendants Ivey, Marshall, Gwathney and the associate Board members' conspiracy to subvert the methodical, evidence-based approach to parole decision-making required by the JRA in favor of a parole system infected with racial bias is further demonstrated by the clear incompatibility between the conspirators' invocations of public safety and the Parole Board's treatment of incarcerated people who participate in ADOC's work-release and work-center programs—incarcerated people whom ADOC has determined pose the least threat to public safety of any category of incarcerated people. If the conspirators' goal were truly to grant parole only to those who are safest to be back in the community, those low-risk incarcerated people in ADOC's work-release and work-center programs would be released through parole at a far greater rate than they are currently being released.

114.    As explained above, to qualify for work release, an incarcerated person must have the lowest custody status: "Minimum-Community." Incarcerated people classified as Minimum-Community are "allowed gainful employment in the community on a full-time basis and are supervised in community-based facilities when not working."[68] ADOC precludes incarcerated people with certain crimes of conviction—for example, sex offenses, homicides, or three felony convictions involving the use of a weapon within the past 15 years—from ever obtaining Minimum-Community status, regardless of the current danger presented by that incarcerated person or how much time has elapsed since their conviction.[69] ADOC only classifies individuals

---

[68] Admin. Reg. 410.
[69] Ala. Dep't of Corrections, Male Classification Manual (Jan. 2018).

as Minimum-Community if they are within specified time periods near the end of their sentences or parole consideration dates; and, among other restrictions, they must also have a record clear of major disciplinary actions for at least 90 days. In addition, ADOC notifies the district attorney of each county of conviction when an individual is approved for Minimum-Community placement, and the district attorney has the right to object to the placement before it is completed.

115.     ADOC has thus already determined that all incarcerated people participating in work release pose such a minimal threat to public safety that they are permitted to attend work each day outside ADOC's walls, among non-incarcerated coworkers and customers, in ordinary civilian clothing. Incarcerated people with Minimum-Community custody levels are also regularly granted weekend passes for home visits.

116.     Similarly, by ADOC's own evaluation, incarcerated people classified as "Minimum-Out"—the next-lowest security classification associated with the work-center program— "do not pose a significant risk to self or others and [are] suitable to be assigned off-property work details without the direct supervision of correctional officers."[70] ADOC only classifies individuals as "Minimum-Out" if, among other restrictions, they have had no major disciplinary actions for at least 90 days and if they satisfy certain time-frame requirements with respect to the end of their sentence or parole consideration date. As with Minimum-Community, certain convictions completely bar incarcerated people from obtaining Minimum-Out classification.[71]

117.     Notwithstanding the determination that individuals in Minimum-Community and Minimum-Out classifications pose a low risk of committing further offenses or interfering with

---

[70] Definitions, Ala. Dep't of Corrections, https://doc.alabama.gov/Definitions (last visited Dec. 11, 2023).
[71] Ala. Dep't of Corrections, Male Classification Manual (Jan. 2018).

public safety, the Parole Board has nevertheless denied parole to such individuals at unjustifiably high rates, with Black incarcerated people who work through a work-center or work-release facility denied at considerably higher rates than similarly situated white participants.

118.    Between June and August 2023, for example, parole was granted to only 10 of the 74 individuals assigned to work-release facilities whose parole hearings were conducted publicly. During that period, 86.5% of the potential parolees assigned to work-release facilities were denied parole.

119.    The racial disparities resulting from the challenged conspiracy to wrongfully abandon the legally required evidence-based parole determination system are further shown by the parole outcomes for incarcerated people in work-release facilities, who are classified as Minimum-Community. While Black and white incarcerated people in these facilities were granted parole at essentially equal rates in 2018 (78.4% and 78.9%, respectively), the drop in parole-grant rates after 2018 was directed in a markedly disproportionate way against Black incarcerated people. By FY 2020, the parole grant rate for white individuals in work-release facilities was 45.4%, while the rate for the Black work-release group fell to 26.0%. By FY 2022, 23.4% of white parole candidates in work-release facilities were granted parole, compared to 15.5% for Black parole candidates in work-release facilities.

120.    Throughout the challenged conspiracy, the Board has also consistently granted parole for Black incarcerated people living in work center facilities, generally in Minimum-Out custody, at lower rates than for similarly situated white incarcerated people. In FY 2018, Black and white incarcerated people at work center facilities were granted parole more than 60% of the time (61.6% and 65.7%, respectively). By FY 2021, after the Governor installed Chairperson Gwathney, the parole grant rate for Black incarcerated people in work center facilities fell to less

than *half* the parole rate for white people in that same classification—5.2% for Black people, compared to 15.3% for white people.

121.    Further demonstrating that public safety is a pretextual justification and is not in fact driving the Parole Board's decisions, the Parole Board has maintained lower parole grant rates in recent years for individuals classified as "low" risk under the Risk Assessment[72] than for individuals classified as "medium" risk. In FY 2021, for example, the Parole Board granted parole to only 10% of incarcerated people deemed "low" risk by the Risk Assessment, while granting parole to 25% of those deemed "medium" risk. The chart below demonstrates these patterns, which run directly contrary to Governor Ivey's and Attorney General Marshall's repeated professions of concern only for public safety.

| | Risk Assessment | Total Decisions | Total Granted | Grant Rate |
|---|---|---|---|---|
| **FY 2021** | **Low** | 1228 | 126 | 10% |
| | **Moderate** | 1848 | 471 | 25% |
| **FY 2022** | **Low** | 1312 | 131 | 10% |
| | **Moderate** | 1709 | 248 | 15% |
| **FY 2023 (YTD, Aug. 2023)** | **Low** | 1122 | 85 | 8% |
| | **Moderate** | 1517 | 160 | 11% |

122.    If public safety explained the Board's parole decisions—rather than racial bias and a desire to expand the population of low-risk incarcerated people (those best situated to be "leased" to outside employers)—the Board would not disproportionately deny parole to incarcerated people identified as presenting lower risks to public safety.

---

[72] As discussed, *see supra* Part III.A, the Risk Assessment is a component of the Parole Guidelines focused specifically on an assessing an incarcerated person's risk of reoffending.

123.    Racial disparities in parole outcomes for parole candidates convicted of "non-violent" offenses further demonstrate that the Board's public safety rationale is pretextual.



Discrepancy in Parole Rates by Race, Subset to those with Non-Violent Convictions
Among Incarcerated People with a Parole Hearing

124.    As shown above, during Defendant Gwathney's tenure, the Parole Board has granted parole to Black parole candidates convicted of nonviolent offenses at lower rates than white parole candidates convicted of such offenses.

125.    The Parole Board's willingness to deny access to parole at the expense of the law is further demonstrated by the Parole Board's treatment of incarcerated people convicted of

"nonviolent" offenses who have been sentenced to terms of imprisonment of less than 20 years.
State statute provides that "if a prisoner convicted of a nonviolent offense, as defined in Section
12-25-32, with a sentence of 20 years or less is denied parole, the board shall reconsider
releasing the prisoner on parole *no more than two years* after such parole release denial." Ala.
Code §15-22-37 (emphasis added). Despite this statutory requirement, Bureau of Pardons and
Paroles records indicate that, between January 1, 2018 and September 7, 2023, the Parole Board
established set-off dates more than two years from the date of parole denial for approximately 63
people convicted of "non-violent" offenses and sentenced to terms of less than 20 years. In FY
2022 and 2023 (through September 7, 2023), the Parole Board appears to have assigned set-off
dates more than two years in the future to approximately 22 such individuals, with 18 of these
individuals receiving five-year set-off dates.

> **D.    Defendants Ivey, Marshall, and Parole Board Members Intend to Perpetuate
> the Consequences of Their Unlawful Conspiracy: A Parole System that
> Disproportionately Keeps Black People Imprisoned So They Can Be
> Exploited as Members of the State's Captive Labor Force.**

126.    Governor Ivey, Attorney General Marshall, and the Parole Board's embrace of the
racially discriminatory parole system they engineered is further demonstrated by their refusal to
change course when faced with evidence of the discriminatory effects of their unlawful scheme.

127.    As discussed, in late 2020, legislators called a meeting to address the racial
differences in parole outcomes. *See supra* ¶98. Defendant Gwathney was present for that
meeting, acknowledged that she did not rely on the evidence-based standards the JRA required
the Board to consider, and did not commit to taking any action to address the racial disparities
that have persisted to this day.

128.    When confronted again in March 2022 with the stark disparity in parole outcomes
between Black and white parole candidates, for example, Defendant Marshall's office opposed

legislation introduced to address these disparities, in part on the ground that the legislation would "make it more difficult for the Board to deny parole." Defendant Gwathney declined to comment.[73]

129.    The conspiracy between Defendants Ivey, Marshall, and the Parole Board has achieved its intended purpose: the Parole Board openly disregards the evidence-based framework required by the JRA in favor of a parole system that overwhelmingly denies parole, particularly to anyone convicted of a "violent" offense, and systemically denies parole disproportionately to Black people—particularly Black people whom ADOC has deemed low-risk and eligible to participate in ADOC's extremely lucrative work-release and work-center programs.

130.    The conspirators' efforts have helped to keep the incarcerated population—and thus the labor force coerced into supporting Defendants' forced-labor scheme—disproportionately Black.

131.    The success of the conspirators' efforts to maintain a captive, disproportionately Black labor force for the economic benefit of ADOC and others is particularly noteworthy given that white *admissions* to ADOC custody have been outpacing Black admissions for years.

| Fiscal Year | Black Admissions (%) | White Admissions (%) |
|---|---|---|
| FY 2013 | 48.93% | 50.58% |
| FY 2014 | 48.72% | 50.43% |
| FY 2015 | 46.85% | 52.49% |
| FY 2016 | 44.61% | 54.76% |

---

[73] Brian Lyman, *'No One Has an Answer': Racial Disparities Accelerated in Alabama Parole Grants for 2020, 2021*, Montgomery Advertiser (Mar. 4, 2022), https://www.montgomeryadvertiser.com/story/news/2022/03/04/alabama-paroles-show-show-growing-racial-disparities-statistics-show/9332685002/.

| | | |
|---|---|---|
| **FY 2017** | 41.52% | 57.87% |
| **FY 2018** | 40.98% | 58.29% |
| **FY 2019** | 39.62% | 59.63% |
| **FY 2020** | 38.33% | 60.97% |
| **FY 2021** | 38.64% | 60.61% |
| **FY 2022** | 38.31% | 60.75% |

132.    Every person denied parole due to the unlawful operation of the conspiracy challenged herein is trapped within a system that coerces labor from incarcerated people for the benefit of all Defendants. The defendant conspirators, Ivey, Marshall, and the Parole Board members, have long been aware that increasing the rate of parole denials, particularly for Black incarcerated people with a demonstrated history of safely participating in off-site work programs, would ensure that these low-risk incarcerated workers would remain available to provide labor for the benefit of all participants in the State's forced-labor scheme.

**IV.    THE PRIVATE AND PUBLIC ENTITIES THAT PARTNER WITH ADOC TO "LEASE" INCARCERATED LABOR ARE KNOWING BENEFICIARIES AND PARTICIPANTS IN THE FORCED-LABOR SCHEME.**

133.    As discussed above, *supra* Part I.A-B, the private work-release employers, including Defendants Gemstone Foods, Ju-Young, SL Alabama, Hwaseung, Progressive Finishes, McDonald's, Burger King, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods, Paramount Services, and Bama Budweiser, and public work-center employers, including Defendants Ivey, ADOT, City of Montgomery, City of Troy, and Jefferson County, have a powerful economic self-interest in perpetuating and expanding the use of incarcerated forced labor. These employer defendants have played and continue to play an active

role in the forced-labor enterprise, and they knowingly receive substantial financial and other benefits because of their participation.

134.    The work-release and work-center employers that partner with ADOC function as an integral component of the overall forced-labor enterprise. By knowingly and willfully participating in ADOC's work-release and work-center programs, these outside employers gain access to workers who are compelled to work for them at a substantially lower cost to the employer than free-world employees performing the same work—including the lower cost realized because workers leased from ADOC are directly prohibited from refusing to work or participating in work stoppages, and effectively prohibited from communicating concerns regarding work conditions, pay, or safety, including the fact of their forced labor, by the threat of discipline for refusing to work. Meanwhile, the work-release and work-center employers funnel money to ADOC in exchange for the incarcerated labor they receive—with ADOC often receiving a substantially greater share of those workers' wages than the workers themselves receive. *See supra* Part I.A-B. This mutually beneficial arrangement between ADOC and the participating employers generates enormous financial benefits for everyone involved, except the incarcerated workers who have been coerced to work. *See id*. Defendants are acting together for the common purpose of extracting profit through a pattern of daily forced labor from incarcerated Alabamians.

135.    Defendants' ongoing enterprise is well established. Defendant ADOT has contracted with ADOC at least as far back as 1972. Defendants City of Montgomery, City of Troy, Bama Budweiser, SL Alabama, Cast Products, Gemstone Foods, KFC, Koch Foods, McDonald's, Progressive Finishes, and Wendy's, contracted with ADOC at least as far back as 2018. Defendant Paramount Services has contracted with ADOC at least since 2019. Defendant

Masonite has contracted with ADOC dating back at least to 2020. Defendants Ju-Young, Hwaseung, and Southeastern Meats have contracted with ADOC dating back to at least 2021. Burger King has contracted with ADOC since 2022.

136.    The forced-labor enterprise as a whole is involved in the production, distribution, and/or acquisition of goods and services in interstate commerce, including Budweiser beer and poultry products.

137.    Each work-release and work-center employer Defendant knew or recklessly disregarded that the incarcerated labor provided through its contracts with ADOC was coerced.

138.    The private and public employers that willingly participate in these programs have agreed to collaborate with ADOC to enforce its explicitly coercive disciplinary rules as a condition of gaining access to the cheap coerced labor ADOC provides.

139.    By sometimes assigning Black incarcerated workers to more dangerous tasks or less desirable shifts than they assign to their otherwise similarly situated free-world workers, private and public employers know and take advantage of the fact that ADOC coerces incarcerated workers to take whatever shifts they are assigned and to accept without complaint all workplace terms and conditions dictated by the employer and ADOC. The consequences to these incarcerated workers if they do not accept such assignments and conditions include being subject to discipline, including more restrictive conditions of confinement and loss of two years of good-time credit (which correlates to an effective extension of the person's prison sentence), as well as being sent back "behind the wall" to the life-threatening conditions in medium- and maximum-security facilities and losing the ability to obtain funds needed for the worker to be able to afford basic necessities. *See supra* Part II. The employer Defendants are aware that ADOC's programs offer them access to a pool of uniquely compliant workers who, by virtue of

their incarcerated status, are severely limited in their ability to advocate for improved workplace conditions, to organize themselves and their co-workers or join a labor union, to publicize workplace abuses, or to pursue or participate in wage-and-hour or other workplace litigation.

140.    The exceptionally violent conditions in ADOC's medium- and maximum-security facilities that coerce incarcerated people to accept work-release and work-center jobs away from those facilities are a matter of broad public knowledge, and Alabama employers who contract with ADOC to provide incarcerated workers know or should know of these conditions. The DOJ reports detailing the extreme levels of guard-on-prisoner and prisoner-on-prisoner violence in ADOC facilities, including shocking levels of homicides, rapes, and serious injuries, and the subsequent federal lawsuit filed in Alabama federal court in December 2022 alleging that the conditions in medium- and maximum-security facilities for men violate the U.S. Constitution, have been widely publicized in the local and national media and frequently discussed by state officials.[74] ADOC's extreme understaffing is likewise frequently covered in the media.[75]

141.    Media outlets also widely reported the September 2022 state-wide strike by thousands of incarcerated workers at ADOC's major correctional facilities to protest the conditions inside those facilities and to demand changes to the State's broken parole system.[76]

---

[74] *See, e.g*., Kim Chandler, *Justice Department Sues Alabama Over Prison Conditions*, AP (Dec. 9, 2020), https://apnews.com/article/alabama-constitutions-prisons-lawsuits-violence-b8549a9ee4cdd959057735f07822e8ba; Mike Cason, *U.S. Department of Justice Sues Alabama Over Unsafe Prison Conditions*, AL.com (Dec. 9, 2020), https://www.al.com/news/2020/12/us-department-of-justice-sues-alabama-over-unsafe-prison-conditions.html.

[75] *See, e.g*., Kim Chandler, *Alabama Prison Staff Shortage Worsens Despite Court Order*, AL.com (Feb. 11, 2023), https://www.al.com/news/2023/02/alabama-prison-staff-shortage-worsens-despite-court-order.html.

[76] *See, e.g*., Eduardo Medina, *Alabama Inmates Strike, Denouncing Prison Conditions*, N.Y. Times (Sept. 28, 2022), https://www.nytimes.com/2022/09/28/us/alabama-prisons-strike-protest.html; Evan Mealins, *'I'm Fighting for My Life': Inside Alabama's Prisons During Ongoing Labor Strike*, Montgomery Advertiser (Sept. 30, 2022),

Indeed, as noted above, a subset of incarcerated people in the work-release program were initially forced to work in the struck facilities to break the strike, rather than reporting to the jobs assigned by ADOC's work-release facilities as they would on any other day, a fact any impacted work-release employers must have known.

142.    The private and public employer Defendants also knew or should have known that Chair Gwathney and the other Parole Board members were conspiring with Governor Ivey and Attorney General Marshall to discriminatorily deny parole. The racial bias infecting the Parole Board's decisions since 2019 has been the subject of repeated news stories, proposed legislation, and public statements. In 2021, for example, the Associated Press reported that "Black prisoners are being granted parole less than half as often as their white counterparts," based on data dating back to November 2019.[77] In 2022, the Montgomery Advertiser reported on racial disparities in parole grant rates, including by reporting on a press conference held by State Representative Chris England in conjunction with proposed legislation in which he emphasized that, "If you're a Black (parole) applicant, your white counterparts are two times more likely to get paroled."[78] In another article that month, Alabama Today reported Representative England's comments that 66% of parole grants between November 2019 and January 2022 went to white applicants, with

---

https://www.montgomeryadvertiser.com/story/news/2022/09/29/alabama-prison-labor-strike-cold-meals-conditions-inside/69524237007/.
[77] *Alabama Paroles Drop Further; Releases Lag for Black Inmates* (Nov. 29, 2021), AP News https://apnews.com/article/prisons-alabama-race-and-ethnicity-105cd119dd76e84b29f36f810c0a0a74.
[78] Brian Lyman, *'No One Has an Answer': Racial Disparities Accelerated in Alabama Parole Grants for 2020, 2021*, Montgomery Advertiser (Mar. 4, 2022), https://www.montgomeryadvertiser.com/story/news/2022/03/04/alabama-paroles-show-show-growing-racial-disparities-statistics-show/9332685002/.

white applicants two times more likely to get released than Black applicants.[79] Representative England also highlighted Board Chair Gwathney's efforts to unduly delay parole reconsideration dates.[80]

143.    The employer Defendants, together with the other work-center and work-release employers benefiting from the exploitative work-release and work-center programs, are positioned and have the ability to prevent or to aid in preventing the exploitation of forced labor by incarcerated Alabamians, including through the discriminatory operation of the parole system. Nonetheless, they have refused or neglected to use their power to do so. The employer Defendants have a choice about whether to participate in the work-center and work-release programs—and those programs provide a powerful incentive for the conspirators to continue operating the parole system unlawfully, particularly with respect to Black incarcerated people who are authorized to work outside of ADOC facilities. Nonetheless, each of the employer Defendants has made the deliberate choice to continue to participate in and benefit from the forced labor of incarcerated Alabamians, instead of insisting upon the immediate release of all incarcerated workers who have been "leased" to them for labor and refusing to perpetuate and expand the scheme that compels forced labor from predominantly Black incarcerated Alabamians.

## PARTIES

144.    Plaintiffs are ten individuals currently and formerly incarcerated at facilities operated by ADOC, who have been subject to harm, including extended detention, forced labor, and increased risk of physical violence, as a result of Defendants' unlawful actions; two labor

---

[79] Beth Cann, *AG Steve Marshall Opposes New Parole Legislation Led by Rep. Chris England*, Alabama Today (Mar. 1, 2022), https://altoday.com/archives/44332-ag-steve-marshall-opposes-new-parole-legislation-led-by-rep-chris-england.
[80] *Id.*

organizations committed to improving the lives and working conditions of all workers, including by combatting racial discrimination, and whose members and core organizational interests have been and continue to be injured by Defendants' unlawful procurement of the forced labor of incarcerated Alabamians; and The Woods Foundation, an organization devoted to ending racial discrimination and the unfair, arbitrary and inhumane treatment of incarcerated individuals in Alabama's prison and parole system, a mission that is injured by the Governor, Attorney General, and Parole Board's deliberate undermining of and disregard for an evidence-based approach to parole decision-making.

145.    Plaintiff Robert Earl Council aka Kinetik Justice is currently incarcerated at Limestone, a maximum-custody facility operated by ADOC. Mr. Council, a Black man, has been in ADOC custody for 29 years, including at ADOC's Holman, St. Clair, Limestone, Kilby and Donaldson facilities, among other locations. Mr. Council is one of the founders and leaders of the Free Alabama Movement. Mr. Council has been subject to severe and abusive treatment in retaliation for advocating that incarcerated persons refuse to submit to forced labor, including by withholding their labor. Mr. Council has been subject to long stretches of solitary confinement, exceeding eight years (spending five years continuously in solitary confinement) since he started the Free Alabama Movement, in response to his resistance to forced labor, and has been subjected to physical beatings, harassment, death threats, and psychological abuse from Alabama guards and officials. The personal and financial harms perpetrated by Defendants Ivey, Marshall, and Hamm, including ongoing abuse and retaliation against Mr. Council for any resistance against Defendants' forced labor scheme, are ongoing each day that Mr. Council remains incarcerated.

146.    Plaintiff Lee Edward Moore Jr. is currently incarcerated at William C. Holman Correctional Facility, a maximum-custody facility operated by ADOC. Mr. Moore is a Black man and has been in ADOC facilities since 1997. He was most recently denied parole in 2022, following a parole hearing at which Defendant Marshall's office and VOCAL opposed parole. His parole hearing date was set off by five years. Mr. Moore has been performing labor outside the walls of an ADOC facility for approximately ten years, commonly without supervision. He has no record of violence since being in ADOC custody. There is no reasonable argument that he poses a threat to public safety as he has been working long hours daily since he was first incarcerated, without pay, for ADOC, both inside and outside prison walls without incident. As a consequence of his decades of highly skilled work maintaining, building, and wiring various ADOC facilities—including refurbishing and work on wardens' houses—high-ranking prison officials, including many correctional officer supervisors and wardens, have sent numerous recommendations of him for parole. Mr. Moore performs a wide array of functions, including highly skilled plumbing, heating and air conditioning installation and maintenance, installation of phone lines, electrical work and all manner of construction and yard work for ADOC. He receives no pay for his labor, which provides a significant economic benefit to ADOC and the State. Because Mr. Moore receives no pay for the work he is required to perform for ADOC, he is not able to afford his canteen expenses for necessities such as soap and warm clothes—as well as the necessities he requires to do his job, such as the work shoes he needs to work safely as a highly-skilled builder and electrician—requiring his family to bear the cost of these necessities. Mr. Moore has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board Members. Their alteration of the criteria governing parole and changes to the parole system have clearly extended the duration of his

confinement. When he was denied parole in 2022 and given a five-year reset date, similarly situated white incarcerated people were granted parole and were more likely to receive shorter reset dates. Mr. Moore has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. Moore has also experienced financial harm, in the form of lost wages he would have received had he not been forced to labor without pay, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Moore remains incarcerated.

147.    Plaintiff Lakiera Walker was incarcerated by ADOC from 2007 to 2023. Ms. Walker is a Black woman and was incarcerated in ADOC facilities, including at Tutwiler, Montgomery, and Birmingham Work Release. She was initially scheduled to have a Parole Board hearing in 2020, but her hearing was pushed to April 2023 as a result of Defendants Ivey and Marshall's scheme to undermine the parole system. When Ms. Walker had her parole hearing, Defendant Marshall's office opposed parole and also advocated for an increase in her restitution payment, even though her "victims" spoke out on her behalf, urging her release, at the hearing. Beginning in approximately 2010, ADOC required Ms. Walker to perform long daily hours of uncompensated work, upon threat of discipline up to and including solitary confinement, including housekeeping, stripping floors, providing care for mentally disabled or other ill incarcerated people, and unloading chemical trucks. She was regularly required to work seven days a week, many years working two shifts a day. Ms. Walker was also required to work outside ADOC facilities and in the community for years before her release. She worked for Jefferson County doing roadwork from approximately 2018 to 2020, during which time she was

paid only $2 per day. During this time, she was sexually harassed by a supervising officer, and when she gave a statement about the harassment, she was given a disciplinary offense for refusing to work, then sent back to the kitchen to perform additional, unpaid forced labor. She subsequently worked at Southeastern Meats, from approximately October 2022 to February 2023, where she worked in harsh conditions inside freezers without adequate work clothes to prevent workplace injury and illness and often worked 12-hour shifts, from 2 pm to 2 am. She then worked for Burger King in Pelham, Alabama and then in Birmingham, Alabama. On one occasion, Ms. Walker was so ill that she had to be carried to the healthcare unit and could not work; she was approached by an ADOC job placement officer who told her she had to "get up and go make us our 40%." There is no reasonable argument that Ms. Walker posed a threat to public safety for more than a decade before she was released, given her history of performing work both inside and outside prison walls without incident. Ms. Walker experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board Members. As a result of their changes to the parole process and criteria for parole, Ms. Walker experienced a significant risk of extended incarceration. Ms. Walker also experienced substantial harm as a result of Defendants' forced labor scheme, and she experienced physical and emotional harm as a result of her continued confinement and forced labor. Ms. Walker has also experienced financial harm, in the form of lost wages she would have received had she not been forced to labor for no wages for years, labor at the rate of $2/day for public employers, and labor for pay less than the prevailing wage, as well as being subjected to excessive, mandatory deductions for ADOC's benefit.

148.    Plaintiff Jerame Aprentice Cole is currently incarcerated at Limestone Correctional Facility, a maximum-custody facility operated by ADOC. Mr. Cole is a Black man

and has been in ADOC custody for 15 years, including at Draper, Elmore, Kilby, Holman,

Easterling, Bullock, Limestone, and Alabama Therapeutic Education Facility; Red Eagle and

J.O. Davis work centers; and Decatur and Hamilton work-release facilities. He has been before

the Parole Board four times, most recently on August 8, 2023, when the Parole Board denied him

parole and informed him that he would not be reconsidered for parole before the end of his

sentence in 2027. Mr. Cole was not permitted to attend the most recent Parole Board hearing

regarding his incarceration and was informed that he was denied parole based on "overall

institutional behavior." However, he has worked, without incident, out in the community,

alongside free and incarcerated workers, in jobs assigned through work centers and work-release

facilities, beginning in 2016. He also has received passes regularly to visit his family in the

community since 2021. Mr. Cole has worked multiple jobs through the work-release program,

including at a packaging and pallet-making facility; at Defendant Gemstone Food, where he

worked long shifts sometimes past midnight, and sometimes six days a week; and at Defendant

Masonite, building doors. While at Masonite, Defendant Masonite deducted $225 from his

wages for "safety glasses" required for use to perform his job. He expects to continue

participating in the work-release program, as his custody level continues to be Minimum-

Community. While Mr. Cole has been in the work-release program, ADOC has deducted and

taken 40% of his gross wages purportedly for costs incident to confinement and has also charged

him $5 per day for van rides and $15 per month for laundry. Previously, while at Red Eagle work

center, Mr. Cole worked for the City of Elmore cleaning up trash on the roads, and at Sale Lot, a

warehouse that puts on auctions, and was paid $2 for each eight- to ten-hour day of work. Mr.

Cole was advised directly by an ADOC warden that if he were to withhold labor, he would be

"put behind the wall." Mr. Cole has experienced profound harm as a result of the conspiracy

between and among Defendants Ivey, Marshall, and the Parole Board. His confinement has been extended as a result of these Defendants' agreement to subvert the parole system and ignore the JRA's objective, evidence-based standards. Mr. Cole has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. Cole has also experienced financial harm, in the form of lost wages he would have received had he not been forced to labor for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey's, Marshall's, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Cole remains incarcerated.

149.    Plaintiff Arthur Charles Ptomey Jr. is currently incarcerated by ADOC at Childersburg Work Release. He has been incarcerated by ADOC for 16 years and has been in work release for five years. Mr. Ptomey is a Black man. Mr. Ptomey currently works at Progressive Finishes hanging parts, five and sometimes six days per week. He is permitted to leave ADOC facilities and live with his family in the community unsupervised on 48-hour passes every two weeks. Mr. Ptomey previously worked for KFC in Pell City, where his starting wage was $7.25 per hour. He has also previously worked for Arby's and Metalplate through the work-release program. While working through the work-release program, ADOC has collected 40% of his gross pay, a fee of $5 per day for van rides to and from the work sites, and $15 per month for laundry, plus restitution. Before working for private employers through the work-release program, Mr. Ptomey provided labor for the "motor pool" in Montgomery, for which he detailed cars for government use for $2 per day. Prior to the motor pool, Mr. Ptomey performed other jobs, including working for ADOT road squads, the City of Sylacauga, and in ADOC facilities in

the kitchen and on the cleaning squad, where he was responsible for burials of individuals who died in ADOC custody and were not claimed by their families. Mr. Ptomey had a parole hearing in September 2022 at which the Parole Board denied him parole and set him off for three years. The Parole Board told his family that he was being denied parole because he was fired from KFC for refusing work in 2019. In fact, he declined to work for KFC in 2019 due to the low wage rate paid and was issued a disciplinary violation for refusing to work. His manager who supervised his work at that KFC wrote a letter to the Parole Board specifically recommending him for parole in light of his strong work performance. By the time of his September 2022 parole hearing, he was working for Progressive Finishes and had also worked for Arby's and a company called Metalplate without incident, and his current employer, Progressive Finishes, recommended him for parole to the Parole Board. Mr. Ptomey was previously considered for parole in 2017, while incarcerated at a medium-custody facility. At that time, he was denied parole and set off for two years, setting his next date for parole consideration in 2019. In 2019, when he asked about when his parole hearing would occur, he was informed by his Institutional Probation Officer that the Parole Board, without giving him hearing or notice, had pushed back his next parole hearing by three years, to 2022. Mr. Ptomey has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. While Mr. Ptomey was denied parole in 2022, and during the three years between 2019 and 2022 that he was denied any parole hearing at all, similarly situated white incarcerated people were granted parole. Mr. Ptomey has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. Ptomey has also experienced financial harm in the

form of lost wages he would have received had he not been forced to labor for no wages, for $2 per day when leased out for labor to Montgomery, and for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Ptomey remains incarcerated.

150.    Plaintiff Frederick Denard McDole is currently incarcerated by ADOC at Childersburg Work Release. He has been incarcerated by ADOC since 2009 and has been housed at other ADOC facilities including Bullock, Hamilton Aged & Infirm, Ventress, and Hamilton Work Release. Mr. McDole is a Black man. Mr. McDole had a parole hearing in 2022 and was denied parole, with his next parole hearing set off for five years. Defendant Marshall opposed his parole. He was previously considered for and denied parole in 2018, with a three-year set-off date, and was told at that time that he would be eligible for parole if he completed a specific rehabilitation program in Columbiana. Mr. McDole completed that rehabilitation program prior to his 2022 parole hearing, at which he was again denied parole. Mr. McDole has worked at private work-release employers including Royal Foods, a food processing plant, performing janitorial work; Hawks, a plastics company, performing a "lead man" role in which he performed many functions; and Progressive Finishes, as a line person unloading parts and stacking them on pallets for various companies. While Mr. McDole was working for Royal Foods, Hawks, and Progressive Finishes, ADOC collected 40% of his pay, plus a fee of $5 per day for van rides to and from the work sites. In each of his work-release jobs, he worked alongside free workers who were paid more for performing the same work. While at Ventress, a medium-security facility, Mr. McDole was assigned an unpaid job with the canine training

squad, in which he was instructed to walk through the woods and wait for the dogs to find him. Mr. McDole was also at the Alabama Therapeutic Education Facility, where he worked as an unpaid senior coordinator for programming. Mr. McDole has also been provided regular passes, without incident, to spend time living with his family in the community unsupervised on weekends. Mr. McDole has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. While Mr. McDole was denied parole in 2022, similarly situated white incarcerated people were granted parole. Mr. McDole has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced emotional harm as a result of his continued confinement and forced labor. Mr. McDole has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. McDole remains incarcerated.

151.    Plaintiff Michael Campbell is currently incarcerated by ADOC and housed in Childersburg Work Release. Mr. Campbell had a parole hearing in July 2023 and was denied parole and set off for five years. Mr. Campbell was previously scheduled for a parole hearing in 2019, which was delayed until June 2020. In 2020, he was denied parole and given a three-year set-off date. Mr. Campbell is a Black man. Mr. Campbell previously worked at Progressive Finishes, from approximately June 2019 through March 2020, and from approximately November 2021 to January 2023, alongside free workers who performed the same work. For

approximately four months in 2019, Mr. Campbell was "lead man" at Progressive Finishes but not compensated as such. Although it was company policy to provide a raise after 90 days, Mr. Campbell did not receive a raise. Since February 2023, Mr. Campbell has worked for a KFC in Pell City as a cook. While working for Progressive Finishes and KFC, ADOC has taken 40% of his pay, plus a fee of $5 per day for van rides to and from the work sites, and $15 per month for laundry. Mr. Campbell was previously housed at Bibb, a medium-security facility, where he worked on the road squad for Bibb County/ADOT. Mr. Campbell has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. Mr. Campbell has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. Campbell has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and/or for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Campbell remains incarcerated.

152.    Plaintiff Lanair Pritchett is currently incarcerated by ADOC and has been in ADOC custody since 2009. He is currently housed in Elmore Correctional Facility, a medium-custody facility. Mr. Pritchett is a Black man. He was denied parole in 2021, after his 2020 hearing was delayed due to the pandemic, and the Parole Board set off his next hearing date for 5 years. He was previously considered for parole in 2015 and 2017. Mr. Pritchett has performed coerced labor while incarcerated in several settings. While in Childersburg Work Release in

approximately 2014-2015, he worked on the road squad for Talladega, at a rate of $2 per day. He also worked in the kitchen without pay at Childersburg, Limestone, Ventress, Easterling, Frank Lee, Alex City, and Elmore and worked as an unpaid healthcare runner at Ventress, Kilby, and Donaldson. During a previous period when he was housed in Elmore, he was assigned to work at a recycling facility. He was told to report to work after lunch one day, but when he arrived, he was written up for refusing to work because he did not come in during the morning. Mr. Pritchett also worked for Smith Company, a private work-release employer, processing wood alongside free workers who made substantially more per hour for the same work. Mr. Pritchett also worked for the City of Troy and ADOT, for which he was paid $2 per day. From June until October 2023, Mr. Pritchett worked as a runner cleaning up the floor of the hospital ward at Kilby. He received no pay for that work and performed it because it allowed him to temporarily escape the horrific conditions within the dorms. Mr. Pritchett has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. Mr. Pritchett has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. Pritchett has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and/or for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Pritchett remains incarcerated.

153.     Plaintiff Alimireo English is currently incarcerated by ADOC and has been in ADOC custody since October 2020, when the Parole Board revoked his parole on the basis of charges for which a jury acquitted him on November 8, 2021. Despite the acquittal and the judge ordering his release, Mr. English continues to be incarcerated by ADOC. Mr. English's parole hearing was not held until November 28, 2023, at which time the Parole Board denied him parole and issued a set-off date of one year, with Chairperson Leigh Gwathney seeking a five-year set-off. Mr. English is currently housed at Ventress Correctional Facility, a medium-custody facility. Mr. English is a Black man. At Ventress, Mr. English is employed as the Dorm Representative for the Faith dorm, which has no other supervision by correctional officers other than by Mr. English, who serves as the Officer in Charge of the Faith Dorm. He was recommended and selected for this position by the Chaplain of the facility. As the Officer in Charge, Mr. English must be available 24 hours a day, seven days per week, and is responsible for overseeing all matters relating to the custodial supervision of the 190 incarcerated people in the Faith dorm. In addition to being on-call at all times, Mr. English regularly works 12-15 hour shifts, seven days a week, screening and monitoring visitors who are not assigned to the Faith dorm, overseeing and performing maintenance tasks, supervising behavior, providing resources such as books and grievance forms, and responding to health and drug emergencies. Since Mr. English has been in this position, the Faith dorm has had no fights, deaths, or overdoses. Mr. English has set up an entry procedure into the dorm so that no person may enter the dorm without being screened by someone at the dorm, which has meant he personally and regularly has put his body on the line to keep his dorm residents safe. The Faith dorm houses 50-60 people who are elderly, many of whom are vulnerable and wheelchair bound. English also is a class coordinator and facilitator for "True Talk," which serves as a counseling and therapy group for the incarcerated men. Mr.

English has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. Mr. English has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. English has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. English remains incarcerated.

154.    Plaintiff Toni Cartwright is currently incarcerated by ADOC. She has been incarcerated since 2016, and has been housed at multiple ADOC facilities, including Tutwiler, Montgomery, and Birmingham Work Release. Ms. Cartwright is a Black woman. Ms. Cartwright had a parole hearing in March 2021. At that time, she had a custody level of Minimum-Community, as she does now, and was working unsupervised in the community at a work-release job at a McDonald's in Birmingham six days per week. She had submitted numerous recommendations for parole from guards and her work-release employers. After the hearing, she was informed that she was denied parole and set off for five years. After learning of her parole denial and being unable to apply for parole again for 5 years, until 2026, Ms. Cartwright has struggled to find hope to move forward, relying on her faith in God and the guidance of her grandmother to keep going, despite feeling that she has proven repeatedly that she is qualified for release. She has asked for a brief break from work requirements so that she can attend to her mental health needs, as she has been so disheartened by the Parole Board's denial, but she has

been repeatedly advised that any failure to work, even for health reasons, will be considered a refusal to work and will result in a disciplinary offense. Ms. Cartwright has been working at workrelease jobs since 2020, including jobs with Southeastern Meats, Paramount, a McDonald's restaurant, Bud's Best Cookies, and Hager's. Currently, she is employed at a Wendy's located in Montgomery. Prior to securing her Minimum-Community custody, she had been assigned to work a job inside the facilities where she was incarcerated in the kitchen. Ms. Cartwright has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. Ms. Cartwright has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of her continued confinement and forced labor. Ms. Cartwright has also experienced financial harm in the form of lost wages she would have received had she not been forced to labor for no wages and/or for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had she not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Ms. Cartwright remains incarcerated.

155.    Plaintiff Retail, Wholesale and Department Store Union, Mid-South Council (RWDSU) is a labor organization that represents employees in various industries, including the poultry processing industry, within the states of Alabama, Mississippi and parts of Florida, Louisiana, Ohio and Tennessee. RWDSU represents approximately 4,000 workers working in poultry plants located across Alabama. Defendants' actions have caused RWDSU and its members harm by perpetuating racial discrimination, unsafe working conditions, and low wages

in the poultry processing industry, including in facilities operated by employers where RWDSU represents poultry processing workers. In Alabama, RWDSU represents approximately 200 workers employed by Defendants Gemstone Foods and 1,800 workers at Koch Foods, as well as workers at poultry processors Wayne Farms and Pilgrim's Pride: each of those four companies employs or has employed persons incarcerated by ADOC as part of the coerced labor scheme at issue in this complaint. RWDSU and its members are further harmed by Defendants' unlawful conduct, including Defendants' coerced labor scheme and unlawful subversion of the parole process, because that conduct interferes with RWDSU's ability to organize and represent workers in the poultry industry. RWDSU has sought to represent ADOC work-release employees at Koch Foods and to ensure that its collective bargaining agreement covered those workers, but the company and ADOC took the position that the employees could not be members of RWDSU, including because the employees could not enter into binding contracts without permission of the warden. Not being able to represent all workers in the union's bargaining unit at Koch Foods harms RWDSU's interests and the interests of its members. RWDSU has also committed resources to organizing and seeking to represent workers at Gemstone Foods' Decatur poultry processing plant, including incarcerated persons who work at that plant. The employment of incarcerated workers by poultry processing plants undermines RWDSU's ability to improve the wages and working conditions of poultry plant workers because it is difficult to communicate with incarcerated workers and they often fear discipline if they advocate for better wages and working conditions. Further, the poultry processing plants' use of incarcerated labor depresses wages and working conditions for all workers in the sector, who are predominantly Black and Brown. RWDSU and its members are also harmed by the Governor, Attorney General, and Parole Board members' unlawful conduct with respect to the parole system, as well as by

employer Defendants' failure to prevent or assist in preventing the racial conspiracy to deny parole to Black incarcerated individuals, because the incarcerated persons currently working pursuant to ADOC's work-release scheme, if granted parole, could be free workers and could freely become members of RWDSU. In addition, the parole conspiracy has functioned to keep a substantial portion of the poultry plant workforce incarcerated and subject to harsh penalties for any labor organizing activity, which undermines RWDSU's efforts to organize and represent workers in the poultry industry. This action pertains to the purposes for which RWDSU's members are associated together and is germane to the union's interests. Defendants' actions as alleged herein directly conflict with RWDSU's mission and goal of improving the wages and working conditions of its members, and ensuring safe, racially just, equitable, and fair workplaces and pay for its members.

156.    Union of Southern Service Workers, Service Employees International Union (USSW) is an organization built by and for low-wage workers coming together across the service industry in the Southern United States, including in Alabama, which is committed to improving the lives of these workers and their communities and combatting systemic racism. A key industry in which USSW has been and is advocating for improved wages and working conditions is the fast-food sector. USSW has devoted significant time and resources to supporting workers at fast-food restaurants in speaking out about intolerable working conditions such as excessive heat and sexual harassment, and about the need for a living wage. USSW's work has included advocacy on behalf of workers at McDonald's, KFC, Burger King, and Wendy's locations in Alabama. The employment of incarcerated workers by fast-food employers undermines USSW's ability to improve the working conditions of fast-food workers because it is difficult to communicate with incarcerated workers and incarcerated workers fear discipline if they advocate for better wages

and working conditions. Further, these employers' use of incarcerated labor depresses wages and working conditions in the fast-food sector. USSW has expended time and resources on addressing the impact of fast-food employers' employment of incarcerated persons. This action pertains to the objectives of USSW and is germane to its interests. Defendants' actions as alleged herein directly conflict with USSW's mission and goal of improving the wages and working conditions of service workers in the Southern United States, and ensuring safe, equitable, and fair workplaces and pay for those workers.

157.    Plaintiff The Woods Foundation is a non-profit organization based in Birmingham, Alabama that is dedicated to aiding persons with wrongful convictions and excessive sentences, particularly in Alabama. Woods Foundation's ability to fulfill its mission is frustrated by the arbitrary and racially discriminatory practices of the Parole Board and the scheme alleged herein to undermine Alabama's parole system. As a result of Defendants' unlawful actions, Woods Foundation has had to devote increased resources, including money and staff time, towards addressing the unfair and unlawful functioning of the parole system. For example, Woods Foundation has had to redirect resources from other projects such as investigations of wrongful convictions to address the Governor, Attorney General, and Parole Board's racially discriminatory abuse of the parole system and their rejection of the JRA's objective standards. Woods Foundation will continue to divert its resources, impairing its ability to perform its mission, unless and until Defendants' unlawful conduct stops.

158.    Defendants in this action include Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons, who have participated and continue to participate in the unlawful and racially discriminatory scheme to profit and otherwise benefit from the forced labor of incarcerated Alabamians by orchestrating the unlawful operation of the parole system in disregard of the

evidence-based standards required by law, and to discriminate on the basis of race in the evaluation of parole applications and issuance of parole rehearing dates. ADOC Commissioner Hamm is also sued in his official capacity as a necessary defendant with respect to the claims against the Governor, Attorney General, and Parole Board members for the unlawful operation of the parole system, and as a participant in the unlawful coerced-labor scheme.

159.    Defendants also include "Employer Defendants," each of which is a public or private employer that has knowingly and willingly participated in the forced-labor scheme alleged herein and that has thereby benefitted, economically and otherwise, from the unlawfully coerced labor of incarcerated Alabamians, and that has failed to aid in preventing the wrongs caused by the racial conspiracy—namely, the racially discriminatory detention of Black Alabamians. Defendant Ivey, who has employed and benefited from the forced labor of incarcerated individuals, is also an Employer Defendant. Other Employer Defendants are identified in paragraphs 164-183 below.

160.    Defendant KAY IVEY is the Governor of the State of Alabama and the head of the State's executive branch. Defendant Ivey is sued in her individual and official capacities. As detailed herein, Defendant Ivey conspired with Defendant Marshall and others to pervert Alabama's parole system, including by nullifying the evidence-based standards the Parole Board is required by statute to use in evaluating parole candidates, which effectively and systematically altered sentences issued by the judicial branch, substantially increasing the risk that incarcerated people, particularly Black people, eligible for parole would be subjected to extended confinement due to a denial of lawful parole consideration, with the foreseeable and intended effect of maintaining a large, incarcerated, and disproportionately Black workforce. Defendant Ivey's mansion has employed the coerced labor of incarcerated Alabamians, including as janitors

in the Governor's Mansion. The Governor appoints the Director of the Bureau of Pardons and Paroles, who serves at the pleasure of the Governor. Ala Code §15-22-21. The Governor also appoints members of the Parole Board, choosing from a list of persons nominated by a panel set forth by statute, and designates the Chair. *Id.* §15-22-20. The Governor has the authority, whether formal or informal, to refuse to participate in the parole conspiracy and, further, to direct the Parole Board members to follow the evidence-based standards required by state law in making parole decisions, which would provide relief to Plaintiffs.

161.    Defendant STEVE MARSHALL is the Attorney General of the State of Alabama. The Attorney General is an elected public officer who serves as the State's attorney and is the State's chief law enforcement officer. Defendant Marshall is sued in his individual and official capacities. Defendant Marshall is a co-conspirator of Defendants Ivey, Gwathney, and the associate Parole Board members. By statute, the Parole Board cannot grant parole until it provides 30 days' notice to the Attorney General that an incarcerated person is being considered for parole. Ala. Code §15-22-36. Attorney General Marshall systemically submits letters to the Parole Board opposing parole for incarcerated individuals and often urges disregard of the Parole Guideline recommendations. He also systemically coordinates with VOCAL, which opposes granting parole in many cases. The Attorney General has the authority and, indeed, the duty to refuse to participate in the parole conspiracy and, further, to advocate for adherence to evidence-based standards in the parole process.

162.    Defendant LEIGH GWATHNEY is the Chair of the Parole Board within the Alabama Bureau of Pardons and Paroles, a state agency created by statute. *See* Ala. Const., §124; Ala. Code §15-22-20. Defendant Gwathney is sued in her individual and official capacities. Defendant Gwathney was appointed in 2019 and since then has exercised her authority as Chair

of the Parole Board to effectuate the wholesale revision of the standards governing parole eligibility in a manner substantially likely to increase the duration of confinement for parole-eligible Alabamians and to discriminate against Black incarcerated Alabamians in the granting of parole and the issuance of parole rehearing dates. As a member of the Parole Board, Defendant Gwathney has the authority to refuse to participate in the parole conspiracy and to apply objective standards in the granting of parole and establishment of reset dates.

163.    Defendants DARRYL LITTLETON and GABRELLE SIMMONS are Associate Members of the Parole Board. They are sued in their official capacities. Defendant Littleton was appointed in 2021. Defendant Simmons was appointed in August 2023. As members of the Parole Board, Defendants Littleton and Simmons have the authority to refuse to participate in the parole conspiracy and to apply objective standards in the granting of parole and establishment of reset dates.

164.    Defendant JOHN HAMM is the Commissioner of the ADOC. The Commissioner is responsible for the independent direction, supervision, and control of the Department. Ala. Code §14-1-1.3. Defendant Hamm is sued in his official and individual capacities.

165.    Defendant JOHN COOPER is the Transportation Director and the chief executive officer of the Alabama Department of Transportation (ADOT). Ala. Code §23-1-21. ADOT regularly has persons incarcerated by ADOC perform work for the department. From January 1, 2018 through September 7, 2023, approximately 942 people incarcerated by ADOC have worked for ADOT, generally receiving only $2 per day for their labor. At least 130 individuals incarcerated by ADOC have worked for ADOT this fiscal year. ADOT knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to clean and repair roadways and engage in other coerced labor to benefit ADOT.

ADOT knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Defendant Cooper has the power to withdraw ADOT from participating in the work-center program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-center program, ADOT has subjected incarcerated persons to involuntary servitude. Defendant Cooper is sued in his individual and official capacities.

166.    Defendant CITY OF MONTGOMERY regularly has persons incarcerated by ADOC perform work for the city. From January 1, 2018 through September 7, 2023, approximately 399 people incarcerated by ADOC have worked for the City of Montgomery and for City of Montgomery road crews, generally receiving only $2 per day for their labor. At least 100 individuals incarcerated by ADOC have worked for the City of Montgomery and its road crews this fiscal year. Incarcerated people also regularly perform work at Riverwalk Stadium, the home of the Montgomery Biscuits, a minor league baseball team. From January 1, 2018 through September 7, 2023, approximately 44 people incarcerated by ADOC have worked at Riverwalk Stadium, generally receiving only $2 per day for their labor. At least 13 individuals incarcerated by ADOT have worked for Riverwalk Stadium this calendar year. The City of Montgomery knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform road work and engage in other coerced labor to benefit the city. The City of Montgomery knows or should know that its lucrative enterprise with ADOC and other defendants is dependent on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. The City of Montgomery has the power to withdraw from the work-center program but has continued to participate. By requiring

incarcerated persons to labor in accordance with the terms of ADOC's work-center program, the City of Montgomery has subjected incarcerated persons to involuntary servitude.

167.    Defendant CITY OF TROY regularly has persons incarcerated by ADOC perform work for the city. From January 1, 2018 through September 7, 2023, approximately 297 people incarcerated by ADOC have worked for the City of Troy, generally receiving only $2 per day for their labor. At least 66 individuals incarcerated by ADOC have worked for the City of Troy this fiscal year. The City of Troy knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform road work and engage in other coerced labor to benefit the city. The City of Troy knows or should know that its lucrative enterprise with ADOC and other defendants is dependent on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. The City of Troy has the power to withdraw from the work-center program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-center program, the City of Troy has subjected incarcerated persons to involuntary servitude.

168.    Defendant JEFFERSON COUNTY regularly has persons incarcerated by ADOC perform work for the county, generally receiving only $2 per day for their labor. Jefferson County knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform road work and engage in other coerced labor to benefit the county. Jefferson County knows or should know that its lucrative enterprise with ADOC and other defendants is dependent on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Jefferson County has the power to withdraw from the work-center program but has continued to participate. By requiring

incarcerated persons to labor in accordance with the terms of ADOC's work-center program, Jefferson County has subjected incarcerated persons to involuntary servitude.

169.    Defendant RCF, LLC d/b/a GEMSTONE FOODS, LLC ("Gemstone Foods") is a poultry processing company with plant operations in Decatur and Florence, Alabama that contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. During the period of January 1, 2018 through September 7, 2023, approximately 220 people incarcerated by ADOC worked for Gemstone Foods. Plaintiff Cole was coerced to work at Gemstone Foods from November 2016 to February 2017. Gemstone Foods knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous poultry processing work and engage in other coerced labor to benefit the company. Gemstone Foods knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Gemstone Foods has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Gemstone Foods has subjected incarcerated persons to involuntary servitude.

170.    Defendant JU-YOUNG MANUFACTURING AMERICA, INC. ("Ju-Young") is a corporation based in Montgomery, Alabama that engages in manufacturing and contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 97 people incarcerated by ADOC have worked for Ju-Young, with at least 61 incarcerated people working for the company in the 2023 fiscal year. Ju-Young knowingly benefits, financially and otherwise,

from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. Ju-Young knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Ju-Young has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Ju-Young has subjected incarcerated persons to involuntary servitude.

171.    Defendant SL ALABAMA, LLC ("SL Alabama") is a manufacturing company based in Alexander City, Alabama that contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 83 people incarcerated by ADOC have worked for SL Alabama, with at least 53 incarcerated people working for the company in the 2023 fiscal year. SL Alabama knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. SL Alabama knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. SL Alabama has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, SL Alabama has subjected incarcerated persons to involuntary servitude.

172.    Defendant HWASEUNG AUTOMOTIVE USA LLC ("Hwaseung") is a corporation based in Enterprise, Alabama that engages in manufacturing and contracts with

ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 43 people incarcerated by ADOC have worked for Hwaseung, with at least 31 incarcerated people working for the company in the 2023 fiscal year. Hwaseung knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. Hwaseung knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Hwaseung has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Hwaseung has subjected incarcerated persons to involuntary servitude.

173.    Defendant PROGRESSIVE FINISHES, INC. ("Progressive") is a corporation with a facility in Alabaster, Alabama that provides e-coating and powder coating services. Progressive contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 154 people incarcerated by ADOC have worked for Progressive, with at least 36 people working for the company in the 2023 fiscal year. Progressive knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. Progressive knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Progressive has the power to withdraw from the

work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Progressive has subjected incarcerated persons to involuntary servitude.

174.    Defendant C.B.A.K., Inc. d/b/a MCDONALD'S ("McDonald's") is a franchisee of McDonald's USA, LLC, with multiple locations in Alabama, including in Bay Minette, Daphne, Fairhope, Foley, and Loxley, which has regularly contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. During the period of January 1, 2018 through September 7, 2023, approximately 122 people incarcerated by ADOC worked at this McDonald's. McDonald's knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage in other coerced labor to benefit the company. McDonald's knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. McDonald's has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, McDonald's has subjected incarcerated persons to involuntary servitude.

175.    Defendant PREMIER KINGS INC. d/b/a BURGER KING ("Burger King") is a franchisee of Burger King Corporation, with multiple locations in Alabama, including in Birmingham and McCalla. Burger King contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 23 people incarcerated by ADOC have worked for Premier Kings Inc. d/b/a Burger King, with at least 20 incarcerated people working for the company in

the 2023 fiscal year. Burger King knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage in other coerced labor to benefit the company. Burger King knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Burger King has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Burger King has subjected incarcerated persons to involuntary servitude.

176. Defendant SOUTHEAST RESTAURANT GROUP-WEN LLC d/b/a WENDY'S ("Wendy's") is a franchisee of Quality Is Our Recipe, LLC, with multiple locations in Alabama, including in Montgomery. Wendy's contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 11 people incarcerated by ADOC have worked for Southeast Restaurant Group-Wen LLC d/b/a Wendy's, with at least 7 incarcerated people working for the company in the 2023 fiscal year. Wendy's knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage in other coerced labor to benefit the company. Wendy's knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Wendy's has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Wendy's has subjected incarcerated persons to involuntary servitude.

177.    Defendant PELL CITY KENTUCKY FRIED CHICKEN, INC. d/b/a
KENTUCKY FRIED CHICKEN d/b/a KFC is a franchisee of KFC US, LLC, with a location in
Pell City, Alabama. KFC contracts with ADOC to obtain the labor of incarcerated workers
participating in ADOC's work-release program. From January 1, 2018 through September 7,
2023, approximately 50 people incarcerated by ADOC have worked for KFC restaurants, with at
least 15 incarcerated people working for KFC restaurants in the 2023 fiscal year. The restaurants
at which incarcerated people have worked include the one in Pell City where Plaintiff Campbell
works. KFC knowingly benefits, financially and otherwise, from its exploitation of this coerced
workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage
in other coerced labor to benefit the company. KFC knows or should know that its lucrative
enterprise with ADOC and other defendants depends on obtaining labor and services from
persons incarcerated by ADOC by unlawful means as alleged herein. KFC has the power to
withdraw from the work-release program but has continued to participate. By requiring
incarcerated persons to labor in accordance with the terms of ADOC's work-release program,
KFC has subjected incarcerated persons to involuntary servitude.

178.    Defendant MASONITE CORPORATION ("Masonite") is a corporation that
designs and manufactures doors and is based in Haleyville, Alabama. Masonite contracts with
ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release
program. From January 1, 2018 through September 7, 2023, approximately 107 people
incarcerated by ADOC have worked for Masonite, with at least 59 incarcerated people working
for the company in the 2023 fiscal year. Masonite knowingly benefits, financially and otherwise,
from its exploitation of this coerced workforce: incarcerated persons are forced to perform
difficult manufacturing work and engage in other coerced labor to benefit the company.

Masonite knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Masonite has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Masonite has subjected incarcerated persons to involuntary servitude.

179.   Defendant CAST PRODUCTS, INC. ("Cast Products") is a corporation based in Athens, Alabama that designs and manufactures custom aluminum castings. Cast Products contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 454 people incarcerated by ADOC have worked for Cast Products, with at least 19 incarcerated people working for the company in the 2023 fiscal year. Cast Products knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult manufacturing work and engage in other coerced labor to benefit the company. Cast Products knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Cast Products has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Cast Products has subjected incarcerated persons to involuntary servitude.

180.   Defendant SOUTHEASTERN MEATS, INC. ("Southeastern Meats") is a corporation based in Birmingham, Alabama that packs meat, vegetables and specialty items for freezing and for sale. Southeastern Meats contracts with ADOC to obtain the labor of

incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 85 people incarcerated by ADOC have worked for Southeastern Meats, with at least 45 incarcerated people working for the company in the 2023 fiscal year. Southeastern Meats knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in freezing conditions and engage in other coerced labor to benefit the company. Southeastern Meats knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Southeastern Meats has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Southeastern Meats has subjected incarcerated persons to involuntary servitude.

181.    Defendant KOCH FOODS, LLC ("Koch Foods") is a limited liability company that processes poultry at facilities across Alabama. Koch Foods contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 30 people incarcerated by ADOC have worked for Koch Foods, with at least 1 incarcerated person working for the company in the 2023 fiscal year. Koch Foods knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work processing poultry and engage in other coerced labor to benefit the company. Koch Foods knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Koch Foods has the power to withdraw from the work-release program but has continued to

participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Koch Foods has subjected incarcerated persons to involuntary servitude.

182.    Defendant PARAMOUNT SERVICES, INC. ("Paramount") is a corporation based in Birmingham, Alabama that provides linen and uniform services for hotels, hospitals and other establishments. Paramount contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 74 people incarcerated by ADOC have worked for Paramount, with at least 26 incarcerated people working for the company in the 2023 fiscal year. Paramount knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work hauling and laundering linens and engage in other coerced labor to benefit the company. Paramount knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Paramount has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Paramount has subjected incarcerated persons to involuntary servitude.

183.    Defendant BAMA BUDWEISER OF MONTGOMERY, INC. ("Bama Budweiser") is a corporation based in Montgomery, Alabama that is an Anheuser-Busch wholesale beer distributor. Bama Budweiser contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through September 7, 2023, approximately 173 people incarcerated by ADOC have worked for Bama Budweiser, with at least 15 incarcerated people working for the company in the 2023 fiscal year. Bama Budweiser knowingly benefits, financially and otherwise, from its exploitation

of this coerced workforce. Bama Budweiser knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Bama Budweiser has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Bama Budweiser has subjected incarcerated persons to involuntary servitude.

## JURISDICTION AND VENUE

184.    This Court has original jurisdiction pursuant to 28 U.S.C. §1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§1983, 1985, 1986, and pursuant to 18 U.S.C. §1595(a) because Plaintiffs assert a claim under 18 U.S.C. §1589. This court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiffs' related claims under state law.

185.    The Court has jurisdiction to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, and its equitable powers.

186.    Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district. Defendants Ivey, Marshall, Hamm, and Gwathney maintain offices in Montgomery, which is located in this district. Defendants Cities of Montgomery and Troy are municipalities located in this this district. Defendants Ju-Young Manufacturing America, Inc. and Bama Budweiser are based in this district.

## CLASS ALLEGATIONS

187.    Plaintiffs Robert Earl Council aka Kinetik Justice, Lee Edward Moore Jr., Lakiera Walker, Jerame Aprentice Cole, Frederick Denard McDole, Michael Campbell, Arthur Charles

Ptomey Jr., Lanair Pritchett, Alimireo English, and Toni Cartwright ("Individual Plaintiffs") bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief and damages on behalf of the following Classes, respectively:

188. **Forced Labor Class (by Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who worked while in the custody of ADOC at any time between the earliest applicable statute of limitations and the date a class is certified in this action (the "Forced Labor Class").

189. **Parole Denial Class (by Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were denied parole while in the custody of ADOC at any time between the earliest applicable statute of limitations and the date a class is certified in this action (the "Parole Denial Class").

   a. **Discriminatory Parole Denial Subclass (by Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright):** All Black Parole Denial Class Members.

   b. **Off-Site Work Subclass (by Plaintiffs Walker, Cole, McDole, Campbell, Ptomey, Pritchett, and Cartwright):** All Parole Denial Class Members who provided labor through the work-release and/or work-center programs while in the custody of ADOC.

190. **Strike Class (by Plaintiffs Council, Walker, and Ptomey):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by

ADOC, who were subjected to discipline by ADOC as a result of their advocacy for or participation in any strike, work stoppage, or refusal to work while incarcerated, at any time between the earliest applicable statute of limitations and the date a class is certified in this action (the "Strike Class").

191.    Plaintiffs reserve the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or to add one or more subclasses based on information obtained during this litigation.

192.    All members of the Forced Labor Class, the Parole Denial Class, the Discriminatory Parole Denial Subclass, the Off-Site Work Subclass, and the Strike Class have suffered or are threatened with imminent injury as a result of Defendants' wrongful acts and omissions, as alleged herein.

193.    This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

194.    **Numerosity—Rule 23(a)(1).** The members of each Class and Subclass are so numerous that joinder of all members is impractical. As of September 2023, ADOC reported that 20,361 incarcerated people were housed within correctional facilities it owned and operated. Approximately 50% of the incarcerated people within ADOC's custody are Black. Approximately 3,585 people were denied parole in FY 2022, of whom 1933 were Black. Approximately 235 people performed work for private and public employers through the ADOC work-center/work-release programs in FY 2022 and were denied parole; of this group, approximately 141 were Black. More than 10,000 incarcerated people participated in the September 2022 strike at ADOC facilities and, on information and belief, many incarcerated

people were disciplined for their participation in that strike or other work stoppages and/or alleged refusal to perform forced labor or labor under unlawful conditions.

195. **Commonality and Predominance—Rule 23(a)(2) and 23(b)(3).** There are many questions of law and fact common to each of the Classes and the Subclasses that will predominate over any questions affecting only the individual members. These common questions include, but are not limited to:

    a. With respect to the Forced Labor Class, whether Defendants have a policy and practice of compelling incarcerated persons to work through threats of force, physical restraint, economic coercion, abuse of law or legal process, or serious harm;

    b. With respect to the Forced Labor Class, whether Defendants have a policy and practice of subjecting incarcerated people to a condition of involuntary servitude;

    c. With respect to the Parole Denial Class, whether the Governor, Attorney General, and Parole Board acted arbitrarily and capriciously or in a flagrant and unauthorized manner in denying lawful parole hearings and/or parole consideration and decision-making to class members, or denied parole to class members in violation of those class members' substantive due process rights;

    d. With respect to the Parole Denial Class, whether the Governor, Attorney General, and Parole Board unlawfully altered the criteria governing parole in a manner that systemically altered sentences issued by the judicial branch and/or substantially increased the risk of the class members' prolonged confinement;

    e. With respect to the Discriminatory Parole Denial Subclass, whether the Governor, Attorney General, and Parole Board orchestrated and are legally responsible for

the intentional and disproportionate denial of parole consideration and/or parole

release to Black incarcerated people as compared to similarly situated white

incarcerated people;

f.   With respect to the Discriminatory Parole Denial Subclass, whether the Governor,

Attorney General, and Parole Board intentionally and disproportionately extended

the parole reconsideration dates of Plaintiffs Moore, Cole, McDole, Campbell,

Ptomey, Pritchett, English, and Cartwright, and other Black incarcerated people as

compared to similarly situated white incarcerated people;

g.   Whether Defendants are part of an association-in-fact within the meaning of

RICO;

h.   Whether Defendants have engaged in a pattern of racketeering activity.

196.   **Typicality—Rule 23(a)(3).** Because the policies and practices challenged in this

Complaint apply with equal force to the Individual Plaintiffs and the absent members of each

Class and Subclass, the Individual Plaintiffs' claims are typical of the claims of the members of

the putative Classes and Subclasses they purport to represent.

197.   **Adequacy—Rule 23(a)(4) and 23(g)(1).** The Individual Plaintiffs are adequate

representatives of the Classes and Subclasses they represent because they are each a member of

their respective Classes and Subclasses and because there are no material conflicts of interest

between Individual Plaintiffs and the interests of the Classes and Subclasses they seek to

represent. The Individual Plaintiffs have retained and are represented by competent and qualified

counsel with extensive experience handling civil rights, class action, and other complex civil

litigation. Proposed class counsel have litigated dozens of civil rights and other class actions and

have substantial experience litigating cases under 42 U.S.C. §1983, the Ku Klux Klan Act of

1871 ("KKK Act"), Trafficking Victims Protection Act of 2000 ("TVPA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs' counsel will vigorously prosecute this action for the benefit of all putative members of each proposed Class and Subclass.

198.    **Risk of Inconsistent Adjudications—Rule 23(b)(1).** Certification is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of putative Class and Subclass members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class and Subclass members.

199.    **Declaratory and Injunctive Relief—Rule 23(b)(2).** Certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to each respective Class and Subclass, thereby making appropriate final declaratory and injunctive relief with respect to each of the proposed Classes and Subclasses as a whole.

200.    **Predominance and Superiority—Rule 23(b)(3).** Certification is appropriate under Rule 23(b)(3) because questions of law or fact common to each of the respective Classes and Subclasses predominate over any questions affecting only individual members, and because class action treatment is superior to other available methods for fairly and efficiently adjudicating this controversy. Individual litigation of the claims of each member of the proposed Classes and Subclasses would be impracticable and unduly burdensome to the courts. There is no foreseeable difficulty in managing this action as a class action, and it provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

201.    **Issue Certification—Rule 23(c)(4).** Certification of issues of liability under Rule 23(c)(4) is appropriate because these issues are common to putative members of each Class and

Subclass, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

202.    Defendants have acted or refused to act on grounds generally applicable to the proposed Classes and Subclasses. Their policies, practices, acts, and omissions have affected all members of each of the respective Classes and Subclasses. Accordingly, final injunctive and declaratory relief is appropriate as to each Class and Subclass as a whole.

## COUNT I
**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and**
**Cartwright, on Behalf of Themselves and the Forced Labor Class, USSW, and RWDSU**
**Against All Defendants**

203.    Plaintiffs incorporate the allegations in paragraphs 1-144, 146-88, and 191-202 by reference.

204.    The TVPA provides a private cause of action against anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. §1589(a).

205.    The TVPA also provides a private cause of action against anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means

described in [§1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means ….” 18 U.S.C. §1589(b).

206.    Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained, provided, and financially benefited from the labor or services of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the Forced Labor Class Members by means of force, threats of force, physical restraint, economic duress, and threats of physical restraint directed to those persons.

207.    Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained, provided, and financially benefited from the labor or services of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and members of the Forced Labor Class by means of the abuse or threatened abuse of law or legal process, including in particular by abusing the parole process through the racially discriminatory and arbitrary, capricious, flagrant, and unauthorized denial of lawful parole consideration and/or parole release to and delay of parole reconsideration dates for Black incarcerated people, in a manner contrary to the purpose for which the parole law was designed, for the purpose of ensuring the availability of incarcerated labor for the State and for work-release employers.

208.    Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained, provided, and financially benefited from the labor or services of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Forced Labor Class by means of serious harm or threats of serious harm to those persons, including physical, psychological, financial, or reputational harm sufficiently serious under the totality of circumstances to compel a reasonable person to perform or continue performing labor or services in order to avoid incurring those harms.

209.    Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained, provided, and financially benefited from the labor or services of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Forced Labor Class by means of a scheme, plan, or pattern intended to cause these Plaintiffs and the Forced Labor Class Members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including serious physical, psychological, financial, or reputational harm.

210.    Employer Defendants knowingly benefitted, financially and otherwise, from participation in ADOC's work-release and work-center programs, knowing or in reckless disregard of the fact that their lucrative joint venture with ADOC has engaged in the providing or obtaining of labor or services from Plaintiffs and the Forced Labor Class by each of the unlawful means alleged in paragraphs 1 through 143 above. For Defendants City of Montgomery, City of Troy, and Jefferson County, knowingly benefiting from participation in ADOC's work-release and work-center programs is a matter of custom and policy.

211.    Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, the members of the Forced Labor Class, USSW, and RWDSU have been harmed by Defendants' TVPA violations.[81]

---

[81] Plaintiffs Council, Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright are currently incarcerated in ADOC facilities. ADOC had no administrative grievance procedure in place at all prior to December 15, 2022. Their claims are not subject to ADOC's grievance procedure—to the extent such a grievance procedure is available to them at all—because Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright's claims concern Parole Board decisions and all Plaintiffs' claims concern the substance of federal and state laws. Exhaustion would therefore be futile. Nevertheless, prior to filing this complaint, Plaintiffs Council, Moore, Cole, McDole, Campbell, Ptomey, Pritchett, and English submitted emergency grievances to ADOC concerning the regulations, conditions, and practices forcing incarcerated people to labor and remain in a condition of involuntary servitude for all times after December 15, 2022, even though the filing of such grievances is futile given that the conditions

**COUNT II**
**Violation of the Racketeer Influenced and Corrupt Organizations Act
(RICO), 18 U.S.C. §1962
By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett,
English, and Cartwright, on Behalf of Themselves and the Forced Labor
Class, USSW, and RWDSU
Against All Defendants**

212.     Plaintiffs incorporate the allegations in paragraphs 1-144, 146-56, 158-88, and

191-202 by reference.

213.     The RICO Act, 18 U.S.C. §1962(c), makes it "unlawful for any person employed

by or associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity."

214.     Each Defendant is a "person" within the meaning of the RICO Act. 18 U.S.C.

§1962(a); *see id*. §1961(3) ("'person' includes any individual or entity capable of holding a legal

or beneficial interest in property").

215.     Defendants together constitute an association-in-fact enterprise ("the Enterprise")

"engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning

of the RICO Act. 18 U.S.C. §1962(c); *see id*. §1961(4) ("'enterprise' includes any individual,

partnership, corporation, association, or other legal entity, and any union or group of individuals

associated in fact although not a legal entity").

216.     In conducting its illegal racketeering scheme, the Enterprise acted and acts with

the common purpose of illegally obtaining forced labor from Plaintiffs Moore, Walker, Cole,

---

of forced labor are embedded in established regulations and systemic policies enforced by
Defendants, which are the subject of this complaint.

McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Forced

Labor Class for the participants' benefit.

217.    Defendants conduct and participate, directly or indirectly, in the conduct of the

Enterprise through a pattern of thousands of acts of racketeering activity.

218.    Pursuant to and in furtherance of their unlawful scheme, Defendants committed

multiple related acts of unlawfully coercing Plaintiffs Moore, Walker, Cole, McDole, Campbell,

Ptomey, Pritchett, English, Cartwright, and the members of the Forced Labor Class's forced

labor and knowingly benefiting from such forced labor, in violation of the TVPA, 18 U.S.C.

§1589.

219.    As a direct and proximate result of Defendants' unlawful pattern of racketeering

activity, Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English,

Cartwright, and the members of the Forced Labor Class have lost money or property within the

meaning of 18 U.S.C. §1964(c), including but not limited to lost past, current, and prospective

wages and benefits, and, with respect to Plaintiffs USSW and RWDSU, the diversion of financial

resources that they could have otherwise used to further their missions.

220.    As a result of Defendants' RICO violations, Plaintiffs Moore, Walker, Cole,

McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Forced

Labor Class are entitled to injunctive relief, treble damages, attorneys' fees and costs as provided

by law.

### COUNT III
**Violation of Alabama Constitution, Article I, Section 32**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and**
**Cartwright on Behalf of Themselves and the Forced Labor Class, USSW, RWDSU, and**
**Woods Foundation**
**Against All Defendants**

221.     Plaintiffs incorporate the allegations in paragraphs 1-144, 146-56, 158-88, and 191-202 by reference.

222.     Since November 2022, Article I, Section 32 of the Alabama Constitution has categorically prohibited all forms of slavery and involuntary servitude under all circumstances throughout the State. Article I, Section 32, as amended, has no exemption allowing involuntary servitude for the punishment of duly convicted crimes.

223.     In direct violation of Article I, Section 32 of the Alabama Constitution and the will of the voters, Defendants have subjected Plaintiffs and the members of the Forced Labor Class to involuntary servitude by forcing them to work, whether they want to or not, through the use or threatened use of extended incarceration, increased physical restraint and confinement, physical injury, law or legal process, and/or physical, psychological, and economic coercion.

224.     As alleged herein, these practices constitute compulsory labor and involuntary servitude in violation of the Alabama Constitution.

225.     As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Forced Labor Class have suffered and/or continue to suffer serious and irreparable harm.

### COUNT IV
**Violation of First Amendment of U.S. Constitution,**
**Pursuant to 42 U.S.C. §1983**
**By Plaintiffs Council, Walker, and Ptomey, on Behalf of Themselves and the Strike Class,**
**and Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright,**
**on Behalf of Themselves and the Forced Labor Class**
**Against Defendants Ivey and Hamm**

226.     Plaintiffs incorporate the allegations in paragraphs 1-76, 144-54, 158, 160, 164, 184-88, and 190-202 by reference.

227.    In violation of the First Amendment, ADOC has maintained a pattern and practice of retaliating against incarcerated persons who withhold labor and advocate for work stoppages and the withholding of labor in protest of the forced labor scheme alleged herein and of other inhumane conditions within ADOC facilities.

228.    Incarcerated persons' expressive activity in withholding labor and advocating for the withholding of labor by themselves and others is constitutionally protected.

229.    ADOC, as alleged in more detail herein, maintains a policy of disciplining and abusing incarcerated persons who withhold their labor and who advocate for others to withhold their labor, whether that labor is within ADOC facilities, for state and local agencies, or for private employers. ADOC has implemented a de facto policy that refusing to work on one or more occasions is punished, including with transfer to higher security and more violent facilities and solitary confinement. ADOC also has a longstanding history and practice of subjecting people in solitary confinement to physical and mental abuse. When imposed on incarcerated people because of their advocacy, this discipline and abuse constitute retaliation for protected First Amendment-protected speech and activity.

230.    ADOC has also deprived incarcerated individuals of food in response to their refusal to work and support for others who are refusing to work. This inhumane treatment constitutes retaliation for protected First Amendment-protected speech and activity.

231.    Defendant Ivey, in a January 9, 2023 Executive Order, directed ADOC to impose additional stringent consequences for disciplinary violations, including for refusing to work and for encouraging work stoppages, which Governor Ivey and ADOC define as "medium" and "high" level violations, respectively.

232.     Persons of ordinary firmness would be deterred from engaging in advocacy for withholding labor in light of the severe consequences imposed by ADOC for doing so, but members of the Strike Class have nevertheless engaged in such speech and suffered the consequences. Members of the Forced Labor Class have been deterred and can reasonably be expected to be deterred in the future from advocating for the withholding of labor because of Defendants Ivey and Hamm's policy of unlawful retaliation.

233.     Defendants Ivey and Hamm's policy of retaliating against incarcerated persons for advocating for the withholding of labor is not reasonable and is not a legitimate policy. There is no valid, rational connection between such a policy and any legitimate government interest, given the unlawfulness of forced labor and involuntary servitude.

234.     The Strike Class is entitled to damages for Defendants Ivey and Hamm's violation of their First Amendment rights; and the Strike Class and Forced Labor Class are entitled to damages for violation of their First Amendment rights to date and injunctive relief prohibiting Ivey and Hamm from maintaining policies and practices of retaliating against incarcerated persons for refusing to work or encouraging work stoppages.

### COUNT V
**Violation of Ex Post Facto Clause**
**U.S. Const., Art. I, §10, cl. 1, Pursuant to 42 U.S.C. §1983**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on Behalf of Themselves and the Parole Denial Class, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

235.     Plaintiffs incorporate the allegations in paragraphs 1-42, 77-132, 144, 146, 148-64, 184-87, 189, and 191-202 by reference.

236.     The Ex Post Facto Clause of the U.S. Constitution, art. I, §10, cl. 1, prohibits states from enacting ex post facto laws, including laws that retroactively increase the punishment for criminal acts previously committed. Coverage of the Ex Post Facto Clause is not limited to acts of the legislature.

237.     Governor Ivey and Attorney General Marshall's directive to subvert the parole process by ignoring the evidence-based approach required by state law, thereby systematically denying parole consideration and release to incarcerated people in Alabama who are qualified for parole release under the JRA's evidence-based standards and sentenced to a term of imprisonment with the possibility of parole—and the Parole Board's agreement with and enactment of that directive—violates the Ex Post Facto Clause because it makes more burdensome the punishment imposed for offenses committed prior to Governor Ivey and Attorney General Marshall's directive. By Governor Ivey and Attorney General Marshall's directive, and by the Parole Board's and Defendant Hamm's enactment of that directive, incarcerated people sentenced to a term of imprisonment with the possibility of parole have, in effect, had their sentences converted to a term of imprisonment *without* the possibility of parole.

238.     The wholesale revision to the standards governing suitability for parole mandated by Governor Ivey and Attorney General Marshall and implemented by the Parole Board and Defendant Hamm has materially changed the substantive policies that govern parole decisions, replacing evidence-based parole decision-making based on actuarially-based objective standards required by the JRA with racially skewed decision-making untethered to evidence or the actuarially based objective standards required by the JRA. These policy changes have created a significant risk of increasing the duration of imprisonment for Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Parole Denial Class,

whose sentences include the possibility of parole. Indeed, Plaintiffs Moore, Cole, McDole,

Campbell, Ptomey, Pritchett, English, and Cartwright have already been denied parole since

2019, despite a demonstrated track record of working safely outside prison gates.

239.    Records concerning the operation of the Alabama parole system since Governor

Ivey and Attorney General Marshall issued their directive show a precipitous decline in parole

grant rates since 2019, including for incarcerated people in work-release and work-center

facilities, and demonstrate the severe risk that incarcerated people who would have been granted

parole under a parole system compliant with the JRA's evidence-based standards are now being

denied lawful parole consideration and thus subjected to increased periods of incarceration.

Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm's violation of the Ex Post

Facto Clause has caused harm to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett,

English, Cartwright, all Parole Denial Class members, and Plaintiffs USSW, RWDSU, and

Woods Foundation.

**COUNT VI**
**Denial of Equal Protection**
**U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fourteenth Amendment Equal Protection Right Against Racially**
**Discriminatory Parole Denials**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright,**
**on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU,**
**and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

240.    Plaintiffs incorporate the allegations in paragraphs 1-42, 77-132, 144, 146, 148-

64, 184-87, 189, and 191-202 by reference.

241.    Plaintiffs USSW, RWDSU, and Woods Foundation are organizations that have

diverted resources to address racial disparities in Alabama's prison system, as described above.

Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright are incarcerated Black people who have been denied parole in Alabama.

242.    Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. §1983.

243.    The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. §1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws, regardless of their race.

244.    Accordingly, the Equal Protection Clause prohibits the Parole Board from discriminatorily denying parole to Black incarcerated people on the basis of their race.

245.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have unequally applied Alabama's laws governing parole, and have unequally exercised their discretion and authority, for the purposes of discriminating against Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, and the Discriminatory Parole Denial Subclass Members.

246.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have intentionally and disproportionately denied parole to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and other Black incarcerated people on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and have been at least callous or recklessly indifferent to their deprivation of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright's and Discriminatory Parole Denial Subclass Members' constitutional rights.

247.     Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board who deliberately and discriminatorily denied Black people parole on the basis of their race; she failed to ensure adequate policies and procedures were in place to prevent the discriminatory exercise of the Parole Board's discretion and decision-making; she failed to take corrective action following the discriminatory practices and outcomes of the Parole Board; and she acted intentionally or at least callously and with reckless indifference to her and others' deprivation of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members' constitutional rights

248.     This deprivation of equal protection has caused harm to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Discriminatory Parole Denial Class Members, and Plaintiffs USSW, RWDSU, and Woods Foundation.

## COUNT VII
**Denial of Equal Protection**
**U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fourteenth Amendment Equal Protection Right Against Racially Discriminatory Issuance of Parole Reconsideration Dates**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

249.     Plaintiffs incorporate the allegations in paragraphs 1-42, 77-132, 144, 146, 148-64, 184-87, 189, and 191-202 by reference.

250.     Plaintiffs Moore, McDole, Campbell, Ptomey, Pritchett, and Cartwright are incarcerated Black people who have been denied parole in Alabama and have received parole-reconsideration dates. Plaintiffs Cole and English were denied parole and not given reconsideration dates, with the Parole Board instead stating that they would remain incarcerated

until the end of their sentences. Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. §1983.

251.    The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. §1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws, regardless of their race.

252.    Accordingly, the Equal Protection Clause prohibits the Alabama Board of Pardons and Paroles from disproportionately delaying parole reconsideration dates for Black incarcerated people on the basis of their race.

253.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have unequally applied Alabama's laws governing parole, and have unequally exercised their discretion and authority, for the purposes of discriminating against Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members.

254.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have intentionally and disproportionately extended the parole reconsideration dates of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members on the basis of those Subclass Members' race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and have displayed an intentional or at least callous and reckless indifference to the deprivation of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members' constitutional rights.

255.     Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board who deliberately and disproportionately postponed the parole reconsideration dates for Black incarcerated people on the basis of their race; she failed to ensure adequate policies and procedures were in place to prevent the discriminatory exercise of the Parole Board's discretion and decision-making; she failed to take corrective action following the discriminatory practices and outcomes of the Parole Board; and she acted intentionally or at least callously and with reckless indifference to her and others' deprivation of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members' constitutional rights.

256.     This deprivation of equal protection has caused harm to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Discriminatory Parole Denial Subclass Members, USSW, RWDSU, and Woods Foundation.

## COUNT VIII
**Denial of Substantive Due Process**
**U.S. Const. Amend. V and XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fifth and Fourteenth Amendment Right Against Arbitrary, Capricious, Flagrant, and/or Unauthorized Parole Proceedings**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on Behalf of Themselves and the Parole Denial Class, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

257.     Plaintiffs incorporate the allegations in paragraphs 1-6, 77-132, 144, 146, 148-64, 184-87, 189, and 191-202 by reference.

258.     Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright are incarcerated Black people who have been denied parole in Alabama.

259.     Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. §1983.

260.    The Fifth and Fourteenth Amendments to the U.S. Constitution, enforceable pursuant to 42 U.S.C. §1983, prohibit arbitrary and capricious action, as well as flagrant and unauthorized action, by government officials in denying parole.

261.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have arbitrarily, capriciously, flagrantly, and in an unauthorized manner denied lawful parole consideration and parole release to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Parole Denial Class Members, including by denying parole in a racially discriminatory manner and by disregarding the Parole Guidelines promulgated under state law and in accordance with the JRA, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution, and have acted intentionally or at least with callous and reckless indifference to their deprivation of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Parole Denial Class Members' constitutional rights.

262.    Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board, deliberately choosing to implement a parole system that engaged in systematically arbitrary, capricious, flagrant, and unauthorized decision-making, failed to ensure adequate policies and procedures were in place to prevent the arbitrary, capricious, flagrant, and unauthorized exercise of the Parole Board's discretion and decision-making, failed to take corrective action following the arbitrary, capricious, flagrant, and unauthorized practices and outcomes of the Parole Board, and acted intentionally or at least with callous and reckless indifference to the deprivation of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Parole Denial Class Members' constitutional rights.

263.    This deprivation of substantive due process has caused harm to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Parole Denial Class Members, USSW, RWDSU, and Woods Foundation.

## COUNT IX
**Conspiracy in Violation of the KKK Act, 42 U.S.C. §1985(2), (3)**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright,**
**on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU,**
**and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

264.    Plaintiffs incorporate the allegations in paragraphs 1-42, 77-132, 144, 146, 148-64, 184-87, 189, and 191-202 by reference.

265.    Defendants Ivey, Marshall, Gwathney, and the associate Parole Board members, with the cooperation of Defendant Hamm, formed and implemented a civil conspiracy for the purpose of impeding, hindering, obstructing, or defeating the due course of justice in Alabama with the intent to deny Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Discriminatory Parole Denial Subclass the equal protection of the laws. Specifically, they conspired to impede, hinder, obstruct, and defeat the proper and lawful operation of the State's parole system.

266.    Defendants Ivey, Marshall, Gwathney, and the associate Parole Board members, with the cooperation of Defendant Hamm, formed and implemented a civil conspiracy for the purpose of depriving Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Discriminatory Parole Denial Subclass of the equal protection of the laws and the equal privileges and immunities under the laws. Specifically, they conspired to deprive Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Discriminatory Parole Denial Subclass of the opportunity to have parole decisions made without regard to race and conspired to subject Plaintiffs Moore,

Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the Discriminatory Parole Denial Subclass Members, on the basis of their race, to the consequences of remaining imprisoned and subject to involuntary servitude after parole is denied.

267.    Defendants Gwathney, Littleton, and Simmons, in agreement with co-conspirators Defendants Ivey and Marshall, engaged in overt acts in furtherance of their illegal objective, including denying lawful parole consideration and/or parole release to eligible Black incarcerated people on the basis of their race.

268.    Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons were motivated by race-based discriminatory animus against a protected class, namely Black people.

269.    Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Discriminatory Parole Denial Subclass Members, and RWDSU, USSW, and Woods Foundation suffered injury to their persons and property, and Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members were deprived of their rights and privileges as citizens of the United States as a result of the conspiracy entered into by Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons.

### COUNT X
**Conspiracy in Violation of the KKK Act, 42 U.S.C. §1985(3)**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey and Marshall**

270.    Plaintiffs incorporate the allegations in paragraphs 1-42, 77-132, 144, 146, 148-61, 184-87, 189, and 191-202 by reference.

271.    Defendants Ivey and Marshall formed and implemented a civil conspiracy for the purpose of preventing or hindering the constituted authorities of Alabama from giving or securing to all persons within the State the equal protection of the laws. Specifically, Defendants

Ivey and Marshall conspired to prevent and hinder the Parole Board from giving or securing to all parole candidates the equal protection and enforcement of the laws in the operation of the parole system.

272.    The conspiracy between Defendants Ivey and Marshall implicates Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright's, and the Discriminatory Parole Denial Subclass Members,' constitutional rights, namely the rights to be free from wrongful imprisonment, the right to be free from racially discriminatory parole decision-making and/or denials of parole and/or delay of parole reconsideration, and the right to be free from arbitrary, capricious, flagrant, and/or unauthorized exercise of the power to grant parole.

273.    Defendants Ivey and Marshall engaged in overt acts in furtherance of their illegal objective, including summoning the members of the 2018 Parole Board to a meeting and directing them to abandon the standards imposed by the JRA, and opposing granting parole to many incarcerated people, including in Plaintiffs Moore's and McDole's cases.

274.    Defendants Ivey and Marshall were motivated by race-based discriminatory animus against a protected class, namely Black people, in forming the conspiracy.

275.    Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, the members of the Discriminatory Parole Denial Subclass, and RWDSU, USSW, and Woods Foundation suffered injury to their persons and property and Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members were deprived of their rights and privileges as citizens of the United States as a result of the conspiracy entered into by Defendants Ivey and Marshall.

## COUNT XI
**Failure to Prevent Wrongs of KKK Act Conspiracy, 42 U.S.C. §1986**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright,**
**on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU,**
**and Woods Foundation**
**Against All Defendants**

276.     Plaintiffs incorporate the allegations in paragraphs 1-144, 146, 148-87, 189, and 191-202 by reference.

277.     All Defendants had knowledge of the wrongs that Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons conspired to be committed—namely, racially discriminatory denials of parole.

278.     Defendants had the power to prevent or aid in preventing the commission of these wrongs, including with respect to the work-release and work-center employer Defendants by withdrawing from the work-release and work-center programs and thereby reducing Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons' incentive to deny parole and maintain a larger, predominantly Black, captive and coerced work force.

279.     Defendants neglected or refused to prevent the commission of the harms resulting from the conspiracy among Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons, and through reasonable diligence could have done so. Defendants City of Montgomery, City of Troy, and Jefferson County neglected or refused to act as a matter of custom and policy. Employer Defendants are therefore liable under 42 U.S.C. §1986.

280.     Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, the members of the Discriminatory Parole Denial Subclass, and RWDSU, USSW, and Woods Foundation suffered injury to their persons and property and Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and Discriminatory Parole Denial Subclass Members were deprived of their rights and privileges as citizens of the United States as

a result of Defendants' neglect or refusal to aid in prevent the wrongs caused by the conspiracy among Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons.

**COUNT XII**
**Unjust Enrichment**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on Behalf of Themselves and the Forced Labor Class**
**Against Employer Defendants**

281.    Plaintiffs incorporate the allegations in paragraphs 1-144, 146-54, 158-60, 164-88, and 191-202 by reference.

282.    The involuntarily coerced labor of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Forced Labor Class has conferred a benefit on the Employer Defendants in the form of, among other things, decreased costs and increased profits, including but not limited to decreased costs and increased profits resulting from the lower wages and benefits paid to Forced Labor Class members working for them through Alabama work-release and work-center facilities than Employer Defendants would have had to pay to free workers had forced incarcerated labor not been available to them.

283.    It would be unjust for Employer Defendants to retain the value of this benefit without disgorgement to Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the Forced Labor Class Members because Employer Defendants obtained this benefit through unconscionable conduct, including through their knowing and voluntary participation in the State's coercive worker "leasing" programs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and respectfully request that the Court award relief as follows:

(1)     Issue a declaratory judgment that the practices complained of herein are unlawful under the TVPA, RICO, Article I Section 32 of the Alabama Constitution, the Ex Post Facto Clause of the U.S. Constitution, the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendment, and the KKK Act;

(2)     Issue a preliminary and permanent injunction requiring Defendants, their agents, employees, and all persons under their control or acting in active concert or participation with them to:

     a.     With respect to the Defendant members of the Parole Board, immediately remedy and correct their unlawful and discriminatory parole practices with respect to Plaintiffs and the members of the Parole Denial Class to whom the Parole Board denied parole after 2019;

     b.     With respect to Defendants Ivey, Marshall, and Hamm, cease enforcement of and rescind all ADOC regulations and practices coercing incarcerated people to labor; and

     c.     With respect to all Defendants, cease coercing labor from Plaintiffs and Forced Labor Class members on an ongoing basis and/or refrain from benefiting from coercion of such labor.

(3)     Award compensatory and/or consequential damages in an amount to be determined at trial pursuant to 42 U.S.C. §§1983, 1985, and 1986, and 18 U.S.C. §1595;

124

(4)     Award punitive damages as just and proper in light of Defendants' outrageous and malicious conduct and to deter such egregious conduct from occurring in the future;

(5)     Award treble damages pursuant to 18 U.S.C. §1964(c);

(6)     Award nominal damages in recognition of the violation of Plaintiffs' legal rights;

(7)     Require disgorgement from Defendants of the profits and benefit resulting from their participation in the forced-labor scheme alleged herein;

(8)     Certify the Classes and Subclasses as defined above, and such additional subclasses as may be appropriate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Individual Plaintiffs as the representatives for the Classes and Subclasses as set forth herein, and appoint Plaintiffs' counsel as class counsel;

(9)     Award reasonable attorneys' fees and costs, pursuant to 42 U.S.C. §1988, 18 U.S.C. §1595, 18 U.S.C. §1964, and any other applicable laws;

(10)    Award pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and

(11)    Award such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

DATED: December 12, 2023                Respectfully submitted,

                                        */s/ Richard P. Rouco*

                                        MICHAEL RUBIN (CA SBN 80618)*
                                        BARBARA J. CHISHOLM (CA SBN 224656)*
                                        CONNIE K. CHAN (CA SBN 284230)*
                                        AMANDA C. LYNCH (CA SBN 318022)*
                                        ALTSHULER BERZON LLP
                                        177 Post St., Suite 300
                                        San Francisco, CA 94108
                                        Telephone: (415) 421-7151
                                        Email: mrubin@altber.com; bchisholm@altber.com;
                                        cchan@altber.com; alynch@altber.com

                                        JANET HEROLD (CA SBN 186419)*
                                        JUSTICE CATALYST LAW
                                        40 Rector Street, 9th Floor
                                        New York, NY 10008
                                        Telephone: (518) 732-6703
                                        Email: jherold@justicecatalyst.org

                                        *Counsel for All Plaintiffs and the Proposed Classes
                                        and Subclasses*

                                        GEORGE N. DAVIES
                                        RICHARD P. ROUCO
                                        QUINN, CONNOR, WEAVER,
                                        DAVIES & ROUCO LLP
                                        2 – 20th Street North, Suite 930
                                        Birmingham, AL 35203
                                        Telephone: (205) 870-9989
                                        Email: gdavies@qcwdr.com; rrouco@qcwdr.com

                                        *Counsel for Plaintiffs RWDSU and SEIU*

                                        LAUREN FARAINO
                                        FARAINO, LLC
                                        2647 Rocky Ridge Ln.
                                        Vestavia Hills, AL 35216
                                        Telephone: (205) 737-3171
                                        Email: lauren@farainollc.com

                                        *Counsel for The Woods Foundation, Individual
                                        Plaintiffs, and the Proposed Classes and Subclasses*

                                        *Pro Hac Vice Application forthcoming*