IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROBERT EARL COUNCIL aka KINETIK JUSTICE, *et al.*,

                Plaintiffs,

    v.

KAY IVEY, *et al.*,

                Defendants.

Case No. 2:23-cv-00712-ECM-JTA

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS MOORE, COLE, MCDOLE, CAMPBELL, PTOMEY, AND ENGLISH'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    I.    ALABAMA'S PAROLE SYSTEM PRIOR TO 2019 ................................................3

        A.    The Justice Reinvestment Act of 2015 ...............................................5

        B.    Implementation of the Justice Reinvestment Act ...............................5

        C.    In 2018, Defendants Ivey and Marshall Pushed the Parole Board to Restrict Parole Grants and Disregard Objective Factors for Assessing Fitness .............8

    II.    2019 PAROLE AMENDMENTS ...........................................................................10

        A.    The Parole Board's Implementation of the 2019 Parole Amendments Resulted in the Systematic Nullification of the Opportunity for Parole ........................12

        B.    The Parole Board's Implementation of Governor Ivey's Directive and the 2019 Parole Amendments Created a Parole System Favoring White Applicants Over Black Applicants at a Rate of More than 2 to 1 .....................................14

        C.    Defendants Ivey, Marshall, and Parole Board Members Continued, and Recommitted to, Racist Parole Decision-Making After Repeatedly Being Placed on Notice of the Stark Racial Disparities Caused by Their Practices. .18

    III.    PLAINTIFFS' EXPERIENCE WITH THE POST-2019 PAROLE SYSTEM ...........20

ARGUMENT ......................................................................................................................24

    I.    LEGAL STANDARD ...........................................................................................24

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED IN DEMONSTRATING THAT DEFENDANTS' CONDUCT VIOLATES THE EX POST FACTO AND THE EQUAL PROTECTION CLAUSES OF THE U.S. CONSTITUTION ....................25

        A.    Plaintiffs Have Demonstrated a Substantial Likelihood of Success on Their Claim That State Defendants' Changes to Alabama's Parole System Violate the *Ex Post Facto* Clause ...........................................................................25

        B.    Plaintiffs Have Demonstrated a Substantial Likelihood of Success on Their Claims that State Defendants' Implementation of the Parole System Violates the Equal Protection Clause ............................................................................30

    III.    PLAINTIFFS ARE BEING IRREPARABLY HARMED BY DEFENDANTS' IMPLEMENTATION OF MORE STRINGENT AND RACIALLY DISCRIMINATORY PAROLE RULES ....................................................................37

    IV.    THE BALANCE OF THE EQUITIES STRONGLY FAVORS AN INJUNCTION REQUIRING DEFENDANTS TO CEASE IMPLEMENTING MORE STRINGENT PAROLE RULES AND TO CEASE DOING SO IN A RACIALLY DISCRIMINATORY MANNER ...................................................................................39

        A.    Defendants Will Not Be Harmed by the Injunction, While Plaintiffs Will Continue to be Harmed in Its Absence ...........................................................39

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLS.' MOT. FOR PRELIM. INJ.

CASE NO. 2:23-CV-00712-ECM-JTA

i

B. The Terms and Scope of the Injunction Are Narrowly Tailored to Address the Irreparable Harm to Plaintiffs ...........................................................................41

V. THE PUBLIC INTEREST FAVORS PLAINTIFFS ...................................................42

VI. PRELIMINARY INJUNCTIVE RELIEF SHOULD PROTECT ALL SIMILARLY SITUATED INDIVIDUALS .........................................................................................43

A. Although Plaintiffs Need Not Demonstrate Ascertainability to Certify a Class for Purposes of Preliminary Injunctive Relief, the Parole Denial Class and Discriminatory Parole Denial Subclass Are Adequately Defined and Clearly Ascertainable.............................................................................................................44

B. The Parole Denial Class and Discriminatory Parole Denial Subclass Satisfy the Requirements of Rule 23(a) ........................................................................44

C. The Parole Denial Class and Discriminatory Parole Denial Subclass Satisfy the Requirements of Rule 23(b)(2) .................................................................47

D. Plaintiffs' Counsel Should Be Appointed Class Counsel Under Rule 23(g) ...48

CONCLUSION.......................................................................................................................48

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLS.' MOT. FOR PRELIM. INJ.

CASE NO. 2:23-CV-00712-ECM-JTA

ii

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. Demopolis City Sch.*,
  80 F.4th 1259 (11th Cir. 2023) ...................................................................35

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)..................................................................................30

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ....................................................................43

*Allen v. Milligan*,
  599 U.S. 1 (2023) .....................................................................................30

*Ammons v. Dade City*,
  783 F.2d 982 (11th Cir. 1986) ..................................................................37

*Arevalo v. Hennessy*,
  882 F.3d 763 (9th Cir. 2018) ....................................................................38

*Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977)......................................................................32, 35, 36

*Baker v. City of Kissimmee*,
  645 F. Supp. 571 (M.D. Fla. 1986)...........................................................35

*Banks v. McIntosh Cnty., Ga.*,
  530 F.Supp.3d 1335 (S.D. Ga. 2021).........................................................35

*Barefield v. Dunn*,
  No. 2:20-CV-917-WKW, 2023 WL 5417550 (M.D. Ala. Aug. 22, 2023)............................39

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016)..................................................44, 45, 46, 47

*Braggs v. Dunn*,
  562 F. Supp. 3d 1178 (M.D. Ala. 2021) ...................................................39

*Braggs v. Hamm*,
  No. 2:14CV601-MHT, 2023 WL 6656991 (M.D. Ala. Oct. 12, 2023)....................39

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
  363 F.3d 427 (6th Cir. 2004) ....................................................................40

*Cherry v. Dometic Corp.*,
   986 F.3d 1296 (11th Cir. 2021) ................................................................44

*Damiano v. Fla. Parole & Prob. Comm'n*,
   785 F.2d 929 (11th Cir. 1986) (per curiam)...........................................31

*Dream Defenders v. DeSantis*,
   553 F.Supp.3d 1052 (N.D. Fla. 2021)..............................................35, 37

*Edwards v. Cofield*,
   No. 3:17-CV-321-WKW, 2017 WL 2255775 (M.D. Ala. May 18, 2017) .............38

*Elrod v. Burns*,
   427 U.S. 347 (1976).......................................................................25

*Evans v. U.S. Pipe & Foundry Co.*,
   696 F.2d 925 (11th Cir. 1983) ..............................................................45

*Fletcher v. District of Columbia*,
   391 F.3d 250 (D.C. Cir. 2004) ..............................................................26

*Fletcher v. Reilly*,
   433 F.3d 867 (D.C. Cir. 2006) .........................................................26, 29

*Ga. Gazette Publ'g Co. v. U.S. Dep't of Def.*,
   562 F. Supp. 1004 (S.D. Ga.1983)..........................................................42

*Garner v. Jones*,
   529 U.S. 244 (2000).................................................................25, 26, 27, 28

*Gonzalez ex rel. Gonzalez v. Reno*,
   No. 00-11424-D, 2000 WL 381901 (11th Cir. Apr. 19, 2000).........................24

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
   992 F.3d 1299 (11th Cir. 2021) .........................................33, 34, 35, 36

*Harris v. Hammonds*,
   217 F.3d 1346 (11th Cir. 2000) ..............................................................27

*Henderson v. Thomas*,
   289 F.R.D. 506 (M.D. Ala. 2012)......................................................45, 47

*Hisp. Int. Coal. of Ala. v. Governor of Ala.*,
   691 F.3d 1236 (11th Cir. 2012) ..............................................................24

*Jean v. Nelson*,
   711 F.2d 1455 (11th Cir. 1983) ..............................................................35

*Johnson v. U.S. Dep't of Agric.*,
   734 F.2d 774 (11th Cir. 1984) ........................................................................42

*Jones v. Garner*,
   211 F.3d 1225 (11th Cir. 2000) ..............................................................25, 27

*Jones v. Ray*,
   279 F.3d 944 (11th Cir. 2001) (per curiam).................................................31

*Laube v. Haley*,
   234 F. Supp. 2d 1227 (M.D. Ala. 2002) ..............................................38, 42

*Levi Strauss & Co. v. Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) ........................................................................25

*Lynce v. Mathis*,
   519 U.S. 433 (1997).........................................................................................25

*Michael v. Ghee*,
   498 F.3d 372 (6th Cir. 2007) ........................................................................26

*Miles v. M.N.C. Corp.*,
   750 F.2d 867 (11th Cir. 1985) ......................................................................33

*Monell v. Dep't of Soc. Servs. of N.Y.C.*,
   436 U.S. 658 .....................................................................................................30

*People First of Ala. v. Merrill*,
   467 F. Supp. 3d 1179 (N.D. Ala. 2020).......................................................40

*Peugh v. United States*,
   569 U.S. 530 (2013).........................................................................................25

*Reno v. Bossier Parish Sch. Bd.*,
   520 U.S. 471 (1997).........................................................................................32

*Rensel v. Centra Tech, Inc.*,
   2 F.4th 1359 (11th Cir. 2021) .......................................................................44

*Shealy v. City of Albany*,
   89 F.3d 804 (11th Cir. 1996) ........................................................................33

*Sofarelli v. Pinellas County*,
   931 F.2d 718 (11th Cir. 1991) ......................................................................32

*Strawser v. Strange*,
   105 F. Supp. 3d 1323 (S.D. Ala. 2015), *aff'd sub nom. Strawser v. Russell*,
   No. 15-12508 (11th Cir. Oct. 20, 2015) ..............................................41, 43

*Strawser v. Strange*,
    307 F.R.D. 604 (S.D. Ala. 2015) .........................................................................43

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023).............................................................................................31

*Thompson v. Merrill*,
    No. 2:16-CV-783-ECM, 2020 WL 411985 (M.D. Ala. Jan. 24, 2020)................44

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017)............................................................................................43

*United States v. Bogle*,
    855 F.2d 707 (11th Cir. 1988) .....................................................................37, 38

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................45

*Warden v. Marrero*,
    417 U.S. 653 (1974)............................................................................................26

*Weaver v. Graham*,
    450 U.S. 24 (1981).......................................................................................25, 26

*Williams v. City of Dothan*,
    745 F.2d 1406 (11th Cir. 1984) .........................................................................34

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ...................................................................45, 46

*Woods v. Florence*,
    No. CV82-PT-2272-S, 1985 WL 1270127 (N.D. Ala. 1985)............................37

**Federal Statutes**

U.S. Const., art. I, §10, cl. 1.................................................................................2, 25

U.S. Const., amend. XIV §1 ........................................................................................2

42 U.S.C. §1983......................................................................................................30

**Federal Rules**

Fed. R. Civ. P. 23(a) ....................................................................................... *passim*

Fed. R. Civ. P. 23(b) ...........................................................................................44, 47

Fed. R. Civ. P. 23(g) ..................................................................................................48

Fed. R. Civ. P. 65(d) ....................................................................................................41

**State Statutes**

Ala. Code §15-22-24(m) ................................................................................................5

Ala. Code §15-22-26 ........................................................................................... *passim*

Ala. Code §15-22-28 ..............................................................................................3, 27

Ala. Code §15-22-37(b)(4) ..........................................................................................18

Ala. Code §12-25-32 .......................................................................................5, 12, 20

1951 Ala. Laws 1030 .............................................................................................3, 27

Justice Reinvestment Act of 2015, 2015 Ala. Laws Act No. 2015-185 ............... *passim*

2019 Ala. Laws Act No. 2019-393 ...................................................................... *passim*

**Other Authorities**

Ala. Admin. Code r. 640-X-3-.03 ................................................................................16

Ala. Dep't of Corrections, Admin. Reg. 410,
    https://doc.alabama.gov/docs/AdminRegs/AR410.pdf...............................................8

## INTRODUCTION

Plaintiffs Lee Moore, Jerame Cole, Frederick McDole, Michael Campbell, Arthur Ptomey Jr., and Alimireo English ("Plaintiffs"), hereby move for preliminary injunctive relief on behalf of themselves and others similarly situated, to enjoin Defendants Governor Kay Ivey, Attorney General Steve Marshall, and members of the Alabama Board of Pardons and Paroles ("Parole Board") from systematically abandoning structured actuarially- and evidence-based decision making in the administration of parole and instead implementing 2019 legislative changes in a way that demonstrably increases the risk that Plaintiffs' terms of incarceration will be prolonged, and from systematically discriminating on the basis of race in the granting of parole and setting of parole reconsideration dates.

Alabama has long maintained a parole system that is intended to identify individuals who can safely and productively return to the community. The Alabama judiciary has imposed sentences of incarceration with the expectation that the State's parole system will operate fairly and without racial bias, and will allow incarcerated individuals to serve less than the full terms of their sentences when those individuals have demonstrated they can successfully participate in the community. Yet, Defendants Ivey and Marshall pushed through legislative changes in 2019 in furtherance of their view that parole should be extremely limited overall, with any limited parole opportunity decided not on the basis of objective, evidence-based risk assessments to determine fitness for parole, but rather turning on subjective factors and with a focus on the severity of underlying convictions.

These 2019 amendments gave Defendants Ivey and Marshall more control over the parole system and allowed them and the Parole Board to pervert and effectively shut down the parole system, resulting in markedly fewer grants of parole and extreme and well-publicized

racial disparities in the system. The numbers here tell their own story: there can be no doubt that Plaintiffs have demonstrated a risk of increased terms of incarceration as a result of Defendants' conduct, in violation of the *Ex Post Facto* Clause of the U.S. Constitution; and Plaintiffs have demonstrated that Defendants are intentionally maintaining a parole system that discriminates against Black parole applicants, in violation of the Equal Protection Clause of the U.S. Constitution.

Preliminary injunctive relief is necessary because Defendants' illegal conduct irreparably harms Plaintiffs and those similarly situated. As detailed in the accompanying declarations, Plaintiffs have done all that could be asked of them—they work alongside free workers every day in the community, live in the community with their families on weekend passes without incident, and have been trusted with significant responsibilities inside and outside the prison gates, regularly trusted to work without correctional supervision. They have demonstrated the ability to be productive members of the community and have long been qualified for parole, but they have been denied parole due to Defendants' unlawful conduct. Defendants' retrospective imposition of stricter and unjust terms of incarceration deprives Plaintiffs and hundreds of similarly situated individuals of their freedom and liberty—not just because it extends the length of their incarceration, but also because these individuals are subject to the harrowing and extremely violent conditions of the grossly overpopulated Alabama state prison system.

The balance of equities and the public interest strongly support the requested preliminary relief. Plaintiffs seek an order (1) requiring Defendants Ivey and Marshall to refrain from instructing the Parole Board to deny parole altogether for parole applicants serving sentences for "violent" offenses and abandon the structured, actuarially- and evidence-based parole decision making mandated by the Alabama Legislature; and (2) requiring the Defendant Parole Board

members to comply with evidence- and actuarially-based objective parole standards and structured decision making conforming to those standards going forward, and to review the parole application files of individuals denied parole since the Parole Board's adoption of stricter and discriminatory parole procedures on and after October 1, 2019—in response to Defendants Ivey and Marshall's instructions—and issue revised parole decisions in conformance with Alabama law and the U.S. Constitution.

Plaintiffs are at risk and deprived of their liberty every day they remain in ADOC facilities. They have demonstrated their eligibility for parole and are entitled to have their applications for parole considered pursuant to factors not infected with racial discrimination or Defendants' unconstitutional, after-the-fact decision to impose stricter terms. The requested preliminary injunctive relief should be granted.

## STATEMENT OF FACTS

### I.    ALABAMA'S PAROLE SYSTEM PRIOR TO 2019

Alabama law requires the Parole Board to consider incarcerated individuals for parole once they have completed a portion of their sentences, assuming the sentence is one that permits the possibility of parole. Ala. Code §15-22-28(e)(3) (requiring Parole Board in most cases to set initial parole consideration date to be after a person has served one-third of their sentence or 10 years, whichever is less; setting other deadlines in some circumstances). Since at least 1951, the Parole Board has been charged with assessing eligible individuals to determine their "fitness" for parole. *Id.* §15-22-26(a); *see* 2015 Ala. Laws Act 2015-185, §3; 1951 Ala. Laws 1030, 1032.

Despite the existence of the parole system, however, Alabama's prisons had become the most overcrowded in the nation by 2014—operating at 195% of capacity. Decl. of Amanda Lynch ("Lynch Decl."), Exh. A (Council of State Gov'ts Just. Ctr., Justice Reinvestment in

Alabama: Analysis and Policy Framework (Mar. 2015)) at 1. Recognizing that its correctional system was in crisis, the Alabama Legislature created a task force in 2014 to analyze options for reducing prison overcrowding and increasing public safety. *Id.* at 2. A significant driver of Alabama's continued prison overcrowding was dropping parole rates—for example, whereas Alabama had granted parole to around 40% of applicants in 2010, by 2013, the rate had fallen to approximately 30%. Lynch Decl., Exh. B.

The declining parole rates, particularly as to persons convicted of lower-level property and drug offenses, were in large part due to the Parole Board's failure to employ validated risk assessment tools and structured evidence-based parole guidelines in its decision making. Lynch Decl. Exh. A at 10, 20. Specifically, the Parole Board did "not have formal guidelines for parole release decisions," leading to a "lack of consistency in what factors [the Board] consider[s] when determining if a person is ready for parole." *Id.* at 22. Moreover, the Parole Board reported "placing less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison, than on … factors an individual cannot change, such as prior criminal history and nature of the underlying offense." *Id.* This was contrary to the national trend to use "parole guidelines that consider factors that demonstrate an individual's readiness for parole, including risk and needs assessment results, record of program completion in prison behavior, and the existence of a viable parole plan." *Id.*[1]

---

[1]  The Council of State Governments also criticized Alabama's practice of delaying parole consideration for up to five years, noting that setting reconsideration dates five years out "does not correspond to evidence-based practices for using the parole process to incentivize the individual in prison." Lynch Decl., Exh. A at 23.

### A.      The Justice Reinvestment Act of 2015

To address Alabama's growing correctional crisis and respond to the task force findings, the Legislature enacted the Justice Reinvestment Act of 2015 ("JRA"), Ala. Act No. 2015-185 (May 18, 2015). The stated goal of the JRA was to "cut the state's prison population by more than 4,200 people" and, in the process, save Alabamians $380 million. Lynch Decl., Exh. C (May 21, 2015 ADOC press release). It did so by requiring the Parole Board to adopt objective standards for assessing the "fitness" of individuals for parole, aimed at encouraging the release of those who posed a low risk of recidivism.

The JRA specifically required the Parole Board to establish "structured, actuarially based" guidelines to determine fitness for parole, and emphasized that those guidelines "shall [be designed to] promote the use of prison space for the most violent and greatest risk offenders." Ala. Code §15-22-26(a). According to the JRA, these actuarially based guidelines must include consideration of the "prisoner's risk to reoffend, *based upon a validated risk and needs assessment*." *Id.* §15-22-26(a)(1) (emphasis added); *see also id.* §12-25-32(11) (defining "validated risk and needs assessments" as a "validated" "actuarial tool"); Decl. of Lyn Head ("Head Decl.") ¶10 (describing mandate for "risk assessment" made based on "a validated risk assessment tool"). The JRA further required that probation and parole officers be trained on assessment techniques. Ala. Code §15-22-24(m)(1).

### B.      Implementation of the Justice Reinvestment Act

Alabama's implementation of the JRA yielded precisely the dividends the legislation's supporters had anticipated. In accordance with the JRA's mandate to use a "validated risk and needs assessment," Ala. Code §15-22-26(a), the Parole Board adopted a proven, evidence-based risk assessment tool, the Ohio Risk Assessment System ("ORAS"). Head Decl. ¶10.

Consistent with the JRA's requirements, parole applicants were scored based on an "actuarial assessment" pursuant to ORAS—a score that identifies the likelihood of the applicant's recidivism risk as low, moderate, high, or very high. *See* Head Decl. ¶10. This ORAS score was considered along with the other factors identified in a "Board Action Sheet," which was created to implement the JRA's requirements. *Id.* ¶¶10-11, Exh. A. The factors outlined in the Board Action Sheet served as the Board-adopted Guidelines required by the JRA, and included the ORAS risk level (with ORAS scores of low to moderate risk of reoffending favoring parole), the applicant's participation in risk-reducing programming, reentry progress, reports from work release or other community-based programs (with positive reports favoring parole), institutional behavior, and severity of offense of conviction (with severity of present offense being low or medium favoring parole). *See id.*, Exh. A. Reflecting the best practices identified in development of the JRA, of the factors identified for Parole Board consideration in denying parole, only two—the severity of offense and whether "release will depreciate [the] seriousness of [the] offense"—were outside the applicant's control, and severity of offense was not determinative. *Id*.

Further, consistent with the JRA, the Institutional Parole Officers ("IPOs") were "trained on ORAS" and prepared reports based on the risk assessment tool for the Parole Board members. Head Decl. ¶10. Former Parole Board Chair Head notes that training she received as part of the implementation of the JRA included data and study results revealing—contrary to her expectation as a seasoned prosecutor—that people convicted of violent offenses are statistically less, not more, likely to reoffend. *Id.* ¶8.

By 2018, the Parole Board's implementation of the JRA and its required actuarially based risk assessment tool had achieved the Act's legislative goals. Whereas prior to the JRA's

implementation, the percentage of applications being granted by the Parole Board hovered around 30%, with JRA implementation, the "grant rate steadily rose" and in "July 2018, the Parole Board's grant rate for applications for parole was about 54%, which was close to the national average grant rate at the time." *Id.* ¶¶12, 14. The following chart published by the Parole Board reflects changes in parole grant rates between fiscal years 2013 and 2018:



Lynch Decl. Exh. D at 6; *id.* This increased grant rate, based on the Parole Board's use of the actuarial risk assessment tool, had the intended effect of reducing the overall Alabama prison population held in facilities owned or operated by ADOC by approximately 4,000 people. *Id.*, Exh. F at 40; *see also* Head Decl. ¶¶10-11, 14.

Moreover, the impact of implementing the JRA's objective standards was near parity in grant rates for Black and white parole candidates, with Black candidates being granted parole approximately 50.7% of the time and white candidates being granted parole 54.4% of the time in fiscal year 2018. *See* Decl. of Lacey Keller ("Keller Decl.") ¶12; *see also id.* ¶¶17, 18 (in fiscal year 2018, parole applicants convicted of offenses deemed "violent" by Alabama were granted parole 44.7% of the time; those with nonviolent offense convictions were granted parole more than 60% of the time).

The resulting reduction in the number of people in ADOC custody was particularly pronounced among incarcerated people held in facilities from which they were sent to work in the community—either for private companies, as part of ADOC's "work release" program, or for state, county, and municipal entities, generally through "work centers."[2] Between 2015 and 2018, the work-release population of the Alabama prison system was reduced by 38.2%. Lynch Decl. Exh. E at 44 & Exh. F at 39. During that same period, the work-center population dropped by 17.5%. *Id.*, Exh. E at 44 & Exh. F at 39.

### C. In 2018, Defendants Ivey and Marshall Pushed the Parole Board to Restrict Parole Grants and Disregard Objective Factors for Assessing Fitness

In 2018, Governor Ivey and Attorney General Marshall began taking steps to significantly change Alabama's parole system, shutting down the Parole Board's evidence-based decision-making and replacing it with a system infected with racial bias. Seizing upon a tragic crime committed by a white man out on parole and a scheduling error that resulted in an early parole, Defendants Ivey and Marshall summoned all members of the Parole Board to a meeting in the Governor's office in October 2018. Head Decl. ¶¶20-23. In this meeting, Defendants Ivey and Marshall criticized the Parole Board members, with Governor Ivey repeatedly asking "'Why

---

[2] These individuals are working outside prison facilities and have been assessed by ADOC to be fit to work without ADOC supervision. Specifically, to qualify for "work release," an incarcerated person must have the lowest custody status: "Minimum-Community." *See* Ala. Dep't of Corrections, Admin. Reg. 410, https://doc.alabama.gov/docs/AdminRegs/AR410.pdf (permitting "gainful employment in the community on a full-time basis[,]" with housing in "community-based facilities when not working"). Incarcerated people working for public employers through "Work Centers" also have low custody statuses, generally "Minimum-out," a status that means ADOC has determined they "do not pose a significant risk to self or others and [are] suitable to be assigned off-property work details without the direct supervision of correctional officers." Definitions, Ala. Dep't of Corrections, https://doc.alabama.gov/Definitions (last visited Dec. 11, 2023). These low custody statuses are only available to individuals within specified periods near of the ends of their sentences or parole consideration dates, and with records clear of major disciplinary actions for at least 90 days. Lynch Decl. Exh. G at 32-40.

would you release anyone convicted of a violent crime?'" *Id.* ¶22. Defendants Ivey and Marshall told the Parole Board members that they "should be denying parole applications much more often than [they] were doing[,]" and "Governor Ivey specifically told [the members] that parole should be denied to applicants who had been convicted of a violent crime." *Id.* ¶23. Parole Board member Lyn Head objected and defended the Parole Board's decision-making process as legally required and supported by all available data and social science. *Id.* ¶22.

At the end of this October 2018 meeting, Defendant Ivey demoted Cliff Walker from Parole Board Chair to an Associate Member, and appointed Lyn Head to be Parole Board Chair. *Id.* ¶24. The following day, Governor Ivey's legal staff met with new Chair Head and informed her that she needed to remove Eddie Cook, who was serving as the Executive Director of the Alabama Bureau of Pardons and Parole ("ABPP") and was the key person in charge of implementing the JRA and its standards-based approach to parole decision making. *Id.* ¶¶8, 13, 16,25. He was also one of only three Black persons in director-level positions in the operations leadership at the ABPP. *Id.* ¶¶27-28. Governor Ivey's staff indicated that if Chair Head "removed Mr. Cook, then Governor Ivey and Attorney General Marshall would ease up on the Parole Board." *Id.* ¶25.

On October 15, 2018, Defendant Ivey issued an Executive Order imposing a moratorium on parole consideration for 75 days or until the Board implemented a "corrective action plan" addressing her priorities. Lynch Decl., Exh. H (Executive Order No. 716 (Oct. 15, 2018)). At the same time, Defendant Marshall told the press that "there was an expectation from the [G]overnor and I that we'll see change." *Id.*, Exh. I.

## II.     2019 PAROLE AMENDMENTS

In June 2019, after the Parole Board refused to remove Mr. Cook as the Executive Director, Defendant Marshall pushed through a new law (the "2019 Parole Amendments") that gave the governor unilateral power to appoint the ABPP Executive Director and, as described in Governor Ivey's press release, instituted new, "strict guidelines for granting a pardon or parole." 2019 Ala. Laws Act No. 2019-393, §1 (amending Ala. Code §15-22-20); Lynch Decl., Exh. J (Press Release); Head Decl. ¶26. Specifically, the 2019 Parole Amendments altered the language requiring the Parole Board to assess incarcerated individuals for parole based on whether they "meet[] criteria and guidelines established by the board to determine a prisoner's fitness for parole" by adding the phrase "and to ensure public safety" and, further, modifying the requirement that the Parole Board's "guidelines . . . promote the use of prison space for the most violent and greatest risk offenders," qualifying it with the phrase "while recognizing that the board's paramount duty is to protect public safety." 2019 Ala. Laws Act No. 2019-393, §1 (modifying Ala. Code §15-22-26(a)). The amendments took effect September 1, 2019.

Defendant Ivey immediately exercised her new authority on September 1, 2019, removing Mr. Cook and replacing him with Charles Graddick, who is white. Head Decl. ¶26. Graddick in turn immediately served disciplinary charges on Mr. Cook and on the two other Black individuals in Director-level positions, and notified them that if they did not resign, they would be terminated. *Id.* ¶¶27-28. In his first days, Graddick also had each of the Black directors who were being forced out "demonstratively escorted from the building," and he issued a directive prohibiting the wearing of traditional Black hairstyles at the ABPP office. Head Decl. ¶¶29-30.

Board Chair Head notified Governor Ivey's chief of staff on September 15, 2019, that she was resigning. *Id.* ¶31. She "could not in good conscience work with people who engaged in such openly racist practices." *Id.* Governor Ivey replaced Ms. Head with the current Board chair, Defendant Leigh Gwathney, who was working as an Assistant Attorney General in the Alabama Attorney General's Office under Defendant Marshall. *Id.* ¶32; Lynch Decl., Exh. K.

Governor Ivey's appointee Graddick—as Governor Ivey herself had done in October 2018—again suspended parole hearings in September 2019 through November 2019. Head Decl. ¶34. While hearings were suspended, Graddick and Defendant Gwathney crafted new Parole Guidelines ("2019 Parole Guidelines"), which created a new "scoring system" assigning specified weights to certain factors and recommended parole only for those with total scores of seven or less. Head Decl., Exh. B (Nov. 2019 Parole Guidelines: placing severity of the underlying offense at the top of the rubric, assigning two points to any offense deemed "high" in severity). Whereas a "moderate" ORAS score under the previous guidelines weighed in favor of granting parole, the 2019 Parole Guidelines assign two points to a "moderate" ORAS score (as opposed to 0 points for a "low" ORAS score), making individuals with moderate ratings less likely to be granted parole. *See id.* at 1; Head Decl. ¶11. Additionally, where the previous guidelines factored in positive reports from work release employers, the 2019 Parole Guidelines do not account for this in their weighted scoring. *Compare id.*, Exh. A *with id.*, Exh. B.[3]

---

[3] The Parole Board slightly modified its guidelines in 2020, but overall maintained the scoring and weighting system. *See* Lynch Decl. Exh. L ("Current Parole Guidelines," last revised July 13, 2020).

### A.   The Parole Board's Implementation of the 2019 Parole Amendments Resulted in the Systematic Nullification of the Opportunity for Parole

The Parole Board, now headed by Chair Gwathney at Governor Ivey's direction, soon began implementing Defendants Ivey and Marshall's previously stated agenda of shutting down parole for all but a very small group of people and rejecting the JRA's structured, standards- and evidence-based decision-making framework. While narrowly restricting parole in this way was contrary to the sentences of thousands of parole applicants, which called for the possibility of parole, Defendants relied on the 2019 Parole Amendments' mandate that the Parole Board's new "paramount duty" was to public safety. *See* Ala. Code §15-22-26(a). Thus, 2019 saw a dramatic shift in the parole system: with a sheer drop-off of parole grants, particularly for applicants with convictions for offenses Alabama deems "violent."[4]

The numbers tell the story. Whereas in fiscal year 2018, the parole grant rates stood around 53%, in fiscal year 2020, grant rates fell to 20%, then to 15% in fiscal year 2021, 10% in fiscal year 2022, and the overall grant rate for fiscal year 2023 is now down to 8%. Lynch Decl. Exh M at 9. Further, among persons convicted of offenses categorized by the State as "violent," the possibility of parole was effectively eliminated. In fiscal year 2018, parole candidates serving time on "violent" offenses were granted parole approximately 44.7% of the time. Keller Decl. ¶17 & Fig. C. By fiscal year 2020, the grant rate for this group had fallen to 8.4%, with the rate falling further in fiscal year 2021 to 3.9%, then to 3.2% in fiscal year 2022, and—based on data

---

[4] Alabama defines "violent" crimes broadly, to include not only crimes requiring the use of physical force or a weapon but also, for example, trafficking in cannabis. *See* Ala. Code §12-25-32(15). Alabama's long practice of over-designation of crimes as "violent" was discussed by the state task force in 2014 and cited as inconsistent with best practices nationwide. *See* Lynch Decl., Exh. A at 19-21.

through September 7, 2023, to 3.1% in FY 2023. *Id.*[5] This near-complete abolishment of parole release for anyone convicted of a "violent" offense means that Defendant Gwathney and her fellow board members, aided by the Governor's appointee Graddick, effectively implemented the Governor's 2018 agenda to eliminate the possibility of parole for anyone convicted of a "violent" offense.

The Parole Board's own reports also demonstrate that Defendants have achieved a near-total abandonment of the structured decision-making framework and actuarially-based risk assessments that state law continues to require. By fiscal year 2022, ABPP reported that its decisions conformed to its own Parole Guidelines only 30% of the time—a startling nonconformance rate given that the Parole Board in late 2019, as described above, already modified its Parole Guidelines to skew its decision making away from reliance on the statutorily required actuarial- and evidence-based risk assessments of parole applicants' fitness for release. Lynch Decl., Exh. N at 10. In fiscal year 2023, the Parole Board's decisions conformed to its guidelines a mere 12% of the time. *Id.*, Exh. M at 10. In other words, the Parole Board is taking advantage of the 2019 Parole Amendments and its newly stated "paramount duty" to "protect public safety" to effectively close down parole consideration for post parole applicants, acting contrary to its own guidelines *88%* of the time.

Underlying how at odds the Parole Board's current approach is with the parole decision-making JRA sought to achieve by mandating the consistent use of a validated risk assessment

_____

[5] As explained in the Ms. Keller's declaration, sufficient data to determine grant rates by offense type was available from January 1, 2018 through September 7, 2023, and this analysis considers individuals with parole hearings in ADOC's "in-house" population—those in maximum, medium, and minimum security (work release and work center) facilities. Keller Decl. ¶4. A similar trend is visible for people convicted of "non-violent" offenses who are eligible for parole. In FY 2018, candidates with non-violent offense convictions were granted parole more than 60% of the time, but in FY 2022, the parole grant rates were around 20%. Keller Decl. ¶18.

tool as part of structured decision making, ABPP's data also show that the Board now regularly grants parole to incarcerated people who receive a score of "Low" in the Risk Assessment at lower rates than those who receive a score of "Moderate." In fiscal year 2023, parole candidates rated "Low" in the Risk Assessment were granted parole 8% of the time, while parole candidates scored "Moderate" received parole 11% of the time. Lynch Decl. Exh. M at 11.

**B.      The Parole Board's Implementation of Governor Ivey's Directive and the 2019 Parole Amendments Created a Parole System Favoring White Applicants Over Black Applicants at a Rate of More than 2 to 1**

As soon as the Parole Board began implementing the 2019 Parole Amendments—along with Governor Ivey and Attorney General Marshall's directives to stop letting people out of prison—the decided racial skew in the Board's decision-making calculus was obvious. In sharp contrast to the near racial parity in parole decisions achieved in 2018 (with both white and Black applicants being granted parole more than 50% of the time), the Parole Board in fiscal year 2020 granted parole to 21.9% of white parole applicants while only granting parole to 12.3% of Black parole applicants. Keller Decl. ¶12 & Fig. A. In fiscal year 2021, this racial gap broadened into a chasm, with white applicants experiencing a grant rate 2.5 times that of Black applicants. *Id.* ¶¶12-14 & Fig B (showing for fiscal year 2021, white applicants' grant rate of 17.6% compared to Black applicants' rate of 7.0%). In fiscal year 2022, the Parole Board continued to favor white applicants at a rate exceeding two to one, granting parole to white applicants at a rate of 12.4% and Black applicants at a rate of only 6.0%. Available data on parole grant rates by race in 2023 show that, through September 7, 2023, Black parole candidates continued to be granted parole at similarly rock-bottom rates. *Id.* ¶12 & Fig. A; *see also* Lynch Decl., Exh. EE at 15-16 (ACLU report documenting two-to-one favoring of white candidates in 2023 parole grants).

A regression analysis of the ABPP's own data that controls for facility type, fiscal year, sex, and job status, reveals that between FY 2020 and 2022, "white parole candidates were 2.06

times as likely to be granted parole as Black parole candidates, with a 95% confidence interval of 1.80-2.35." Keller Decl. ¶15.

Additional analysis of parole grant rates by racial groups shows that disparities persist among parole candidates convicted of both "violent" and "nonviolent" offenses. Both Black and white parole candidates convicted of at least one "violent" offense were granted parole 44.7% of the time in fiscal year 2018. *Id.* ¶17 & Fig. C. By fiscal year 2020, the rates had fallen to 10.6% for white parole candidates and only 6.9% for Black parole candidates; by fiscal year 2022, white parole candidates with one "violent" offense were granted parole 4.9% of the time, while Black parole candidates were granted parole ***less than half as often***—only 2.2% of the time. *Id.* ¶19. Among parole candidates convicted only of non-violent offenses, parole grant rates fell from 66.7% for Black candidates and 63.8% for white candidates in fiscal year 2018 to 29.6% for white candidates and 21.7% for Black candidates in fiscal year 2020, with rates of 34.3% and 27.0%, respectively, in fiscal year 2021. *Id.* ¶20.

The racial skew in the Board's parole decisions is also very marked in relation to the group of parole applicants who would appear to have the best evidence they are ready and fit for parole:  parole applicants compelled to labor for ADOC's benefit for private or public employers beyond prison walls, unsupervised by prison officials, out in the community. In fiscal year 2018, Black and white incarcerated people in work-release facilities (i.e., those people with the lowest custody status) were "granted parole at essentially equal rates … (78.4% and 78.9%, respectively)." *Id.* ¶21. After implementing the 2019 Parole Amendments, in fiscal year 2020, the Parole Board granted parole to ***45.4%*** of white parole candidates in work-release facilities while granting parole to ***only 26.0%*** of Black parole candidates in those same work-release facilities. *Id.* The following year, in fiscal year 2021, the Parole Board continued this trend—granting

white work-release candidates parole at a rate of ***32.5%*** while granting parole to Black work-release candidates at nearly *half* the rate for their white counterparts, at just ***17.6%***. *Id.* Parole grant rates for incarcerated people held in work-center facilities—from which they are regularly forced to work for city, county and state agencies—show similarly steep declines over this period of fiscal year 2018 through 2022, as well as significant racial discrepancies. *Id.* ¶22 (showing that grant rates for white parole candidates in work-center facilities fell from 65.7% in fiscal year 2018 to 18.9% in fiscal year 2020, and 16.5% in fiscal year 2022, while the rate for Black parole candidates fell from 61.6% in fiscal year 2018, to 13.8% in fiscal year 2020, to 9.0% in fiscal year 2022).

The Parole Board's decided racist bent in its decision-making is not confined just to grants of parole. The Parole Board's practice of putting a heavy thumb on the scale in favor of white applicants continues for "set off" dates—the period of time the Board assigns an applicant to wait before they can be considered for parole again. Despite Alabama being advised as part of its task force's work in 2014 leading up to the JRA that set off dates longer than one or two years were contrary to best practices, following the 2019 Parole Amendments, the Parole Board began extending set off periods, including dramatically increasing the frequency of set-offs of five years, the maximum allowable time. Keller Decl. ¶¶23, 24, 27 & Fig. E; Ala. Admin. Code r. 640-X-3-.03; *see also supra* n.1. Yet, just as with decisions to grant parole, since fiscal year 2020, as shown graphically below, the Parole Board has issued longer setoffs more frequently for Black parole applicants.



Keller Decl. ¶23 & Fig. E.  As shown in the above figure, in fiscal year 2018, the Parole Board

was issuing the maximum set-off of five years at nearly equal rates across racial groups—just

13.5% of the time for Black applicants and just 14.0% of the time for white applicants.

Suddenly, however, following the Parole Board's implementation of the 2019 Parole

Amendments, the Parole Board's set-off patterns took an extreme racial swerve, with the Board

issuing five-year set-offs to Black applicants at a rate of 82.2% by fiscal year 2021, while

granting only 10.6% of Black applicants a set-off date of two years or less. In that same year,

fiscal year 2021, the Parole Board issued set-offs of two years or less to white applicants at a rate

of 29.1%—favoring white to Black applicants nearly three to one—and resulting in Black

applicants having to wait years longer than white applicants for new parole hearings.[6]

     **C.**      **Defendants Ivey, Marshall, and Parole Board Members Continued, and Recommitted to, Racist Parole Decision-Making After Repeatedly Being Placed on Notice of the Stark Racial Disparities Caused by Their Practices**

     The racial bias infecting the Parole Board's decisions since 2019 has been the subject of

repeated news stories, proposed legislation, and public statements. In 2020, a number of

legislators, including Alabama State Representative Chris England, and members of the

Sentencing Commission secured a meeting with Defendant Gwathney and the Governor's

selected ABPP Executive Director Graddick to raise concerns about the Parole Board's operation

and decisions, including the already clear racial skew in parole grant decisions. Head Decl. ¶36.

In response to Representative England's questions, Defendant Gwathney reportedly admitted not

just to disregarding use of the objective risk assessment tool—because it did not give weight to

what she deemed "important"—but also changing the scores for various applicants produced by

the Risk Assessment System without notifying her fellow Board members of her actions. *Id.* ¶37.

     In 2021, the Associated Press reported that "Black prisoners are being granted parole less

than half as often as their white counterparts," based on data dating back to November 2019.[7] In

---

[6] Moreover, with regard to set-off dates for people convicted of non-violent offenses sentenced to 20 years or less, Alabama law dictates that the parole reconsideration must occur no less frequently than every two. *See* Ala. Code §15-22-37(b)(4). Nevertheless, Parole Board and ADOC data shows that in fiscal year 2022 and 2023, the Parole Board appears to have "assigned set-off dates more than two years in the future" to approximately 22 individuals "convicted only of 'non-violent' offenses and sentenced to terms of less than 20 years, with 18 of these individuals receiving five-year set-off dates." Keller Decl. ¶27.

[7] *Alabama Paroles Drop Further; Releases Lag for Black Inmates* (Nov. 29, 2021), AP News https://apnews.com/article/prisons-alabama-race-and-ethnicity-105cd119dd76e84b29f36f810c0a0a74 (last accessed Dec. 21, 2023), attached as Exh. FF to Lynch Decl.

2022, the Montgomery Advertiser reported on racial disparities in parole grant rates, including by reporting on a press conference held by State Representative England in conjunction with proposed legislation in which he emphasized that, "If you're a Black (parole) applicant, your white counterparts are two times more likely to get paroled."[8] In another article that same month, Alabama Today reported Representative England's comments that 66% of parole grants between November 2019 and January 2022 went to white applicants, with white applicants two times more likely to get released than Black applicants.[9] Defendant Marshall issued public statements opposing Representative England's proposed legislation to require the Parole Board to provide an explanation for any decisions that did not conform with the 2019 Parole Guidelines, asserting that the Parole Board was operating appropriately.[10]

Most recently, in response to public attention to Parole Board proceedings and the stark racial disparities in parole outcomes and set-off rates for Black and white Parole applicants, Defendant Gwathney issued a statement that the Parole Board would not be guided by "statistics"[11] and Defendant Marshall issued a response revealing his continued support for the

---

[8] Brian Lyman, *'No one has an answer': Racial disparities accelerated in Alabama parole grants for 2020, 2021*, Montgomery Advertiser (Mar. 4, 2022), https://www.montgomeryadvertiser.com/story/news/2022/03/04/alabama-paroles-show-show-growing-racial-disparities-statistics-show/9332685002/ (last accessed Dec. 20, 2023), attached as Exh. Y to Lynch Decl.

[9] Beth Cann, *AG Steve Marshall opposes new parole legislation led by Rep. Chris England*, Alabama Today (Mar. 1, 2022), https://altoday.com/archives/44332-ag-steve-marshall-opposes-new-parole-legislation-led-by-rep-chris-england (last accessed Dec. 20, 2023), attached as Exh. AA to Lynch Decl.

[10] *See id.*; Lynch Decl. Exh. O.

[11] Alexander Willis, *'This board is not driven by statistics;' parole board chair defends shrinking parole grant rate*, Alabama Daily News (Aug. 17, 2023), https://aldailynews.com/this-board-is-not-driven-by-statistics-parole-board-chair-defends-shrinking-parole-grant-rate/ (last accessed Dec. 20, 2023), attached as Exh. BB to Lynch Decl.

systemically racist parole outcomes and systemic modification of sentences to achieve longer periods of incarceration.[12]

## III.    PLAINTIFFS' EXPERIENCE WITH THE POST-2019 PAROLE SYSTEM

The sworn testimony from Plaintiffs Jerame Cole, Michael Campbell, Alimireo English, Lee Moore, Frederick McDole, and Arthur Ptomey Jr. details the lived consequences of the more punitive and discriminatory parole system the Parole Board implemented under the 2019 Parole Amendments, at the urging of Defendants Ivey and Marshall. Each of these plaintiffs is Black and had a parole hearing within the last two years.[13] All aside from Mr. Campbell are currently serving sentences for at least one crime Alabama deems "violent."[14] Each was denied parole by

---

[12] Mike Cason, *Report says even low risk inmates unlikely to get parole in Alabama*, AL.com (September 21, 2023)(citing statement by Attorney General Marshall, "The Attorney General is grateful to the ACLU for highlighting his work to keep violent offenders behind bars") https://www.al.com/news/2023/09/report-says-public-safety-concerns-do-not-justify-alabamas-low-parole-rate.html (last accessed Dec. 21, 2023), attached as Exh. W to Lynch Decl. *See also* Lauren Gill, *In Alabama, an "Out of Control Board" Cuts Chances for Parole,* Bolts Magazine (Nov. 28, 2023) (citing statement from former Parole Board member Kim Davidson attesting that Attorney General Marshall "did not want people to be released on parole"), https://boltsmag.org/alabama-parole-board/ (last accessed Dec. 21, 2023), attached as Exh. GG to Lynch Decl.

[13] Decl. of Jerame Cole ("Cole Decl.") ¶¶5, 7; Decl. of Michael Campbell ("Campbell Decl.") ¶11; Decl. of Jerame Alimireo English ("English Decl.") ¶¶7-8; Decl. of Lee Edward Moore Jr. ("Moore Decl.") ¶9; Decl. of Frederick McDole ("McDole Decl.") ¶9; Decl. of Arthur Ptomey Jr. ("Ptomey Decl.") ¶7; Lynch Decl. Exh. P-U.

[14] *See* Lynch Decl. Exhs. Q-U (ADOC records displaying crimes of conviction for Mr. Cole, Mr. English, Mr. Moore, Mr. McDole, and Mr. Ptomey); Ala. Code §12-25-32(15). Mr. Campbell was convicted of crimes in both categories but, having completed the sentences for his "violent" crimes, remains incarcerated as a result of the 30-year sentences he received for distribution of a controlled substance, which is not on the enumerated list of "violent" offenses. *See* Lynch Decl. Exh. P; Ala. Code §12-25-32(15).

the Parole Board, despite work and programming records that clearly demonstrate their qualification for parole release.[15]

Plaintiffs' terms of incarceration have been extended, and their sentences made more punitive, by the Parole Board's effective shutdown of parole, particularly for parole applicants convicted of "violent" offenses, following enactment of the 2019 Parole Amendments. Plaintiffs have experienced firsthand the impact of the Parole Board's abandonment of the validated risk assessment tool and structured decision-making required by the JRA, including the forced weighting the Parole Board introduced for "severity" of offenses in the revised Parole Guidelines. While the Parole Board regularly takes the position that the "scores" provided to individual parole applicants are privileged, and thus Plaintiffs do not have access to even their own scores,[16] Plaintiffs have demonstrated time and again that they present a low risk of reoffending and are able productively to contribute to the community by working both inside and outside prison walls with limited or no supervision from correctional officers.

As explained by Plaintiffs Campbell, Ptomey, Cole and McDole, they have worked safely and without reoffending for *years* out in the community, without ADOC supervision, for public and private employers, alongside free workers. Campbell Decl. ¶7; Ptomey Decl. ¶4; Cole Decl. ¶4; McDole Decl. ¶11. Each has a low custody level, "Minimum-Community" or "Minimum-

---

[15] Plaintiffs McDole, Moore, and Campbell all had their parole reconsideration dates set off for the maximum amount of time, or five years. McDole Decl. ¶13; Moore Decl. ¶9; Campbell Decl. ¶11. Mr. Ptomey Jr. had his parole set off for three years, Ptomey Decl. ¶7; and Mr. English had his parole set off for one year, English Decl. ¶9. Mr. Cole did not receive a parole consideration date before the end of his sentence. Lynch Decl. Exh. Q.

[16] *See* Decl. of Lauren Faraino ("Faraino Decl.") ¶4. Moreover, it appears the current Parole Board has a practice of not only ignoring the scores provided pursuant to the state-mandated assessments, but current Chair Gwathney may also modify the scores, further subverting the mandate to use a validated, actuarially based methodology. Head Decl. ¶37.

Out." Lynch Decl. Exhs. P-Q, S, U. Mr. Campbell has worked for approximately four years for private and public employers, ranging from Bibb County to the Alabama Department of Transportation to KFC to Progressive Finishes, a company that paints metal parts. Campbell Decl. ¶¶6–8. Mr. Ptomey has similarly worked for approximately four years for private employers in the community, as have Mr. Cole and Mr. McDole. *See* Ptomey Decl. ¶4; Cole Decl. ¶¶3-4 (describing jobs with private employers, including making packaging, building pallets, operating a saw mill, stacking wood, and manufacturing doors for private employers); McDole Decl. ¶¶7-11 (worked for approximately four years manufacturing cabinets, providing janitorial services to a pork and poultry processing plant, supervising teams of workers manufacturing PVC pipes, and servicing parts for automobiles and agricultural equipment). Mr. McDole has participated in training exercises for ADOC's canines, work that involved him walking through the woods outside prison walls unaccompanied and waiting for the dogs to find him. *Id.* ¶5.

Underlying just how trustworthy and safe these Plaintiffs are for purposes of parole release, in addition to the hours they spend every week unsupervised in the community at work, they have also been eligible for numerous passes to visit and live with their families unsupervised in the community for up to 72 hours on weekends. Cole Decl. ¶3; McDole Decl. ¶4; Ptomey Decl. ¶4; Campbell Decl. ¶5. The indisputable evidence and institutional records for these Plaintiffs show that they spend significant time working or living unsupervised in the community, without incident, raising the question what better evidence of eligibility for parole could be presented.

Although not assigned to work jobs assigned through one of ADOC's work release or work center facilities, Plaintiffs Moore and English present equally impeccable records of fitness

for release. Mr. Moore has worked nearly every day of his 31 years of incarceration, performing a wide range of skilled labor for the benefit of the ADOC, working largely unsupervised or alongside free workers to install ADOC's HVAC system and performing all types of mechanical, building and electrical work, including renovating the wardens' houses. Moore Decl. ¶¶4–7. For the last 11 years, Mr. Moore has been assigned work outside prison gates, performing construction, groundskeeping and maintenance work, with limited or no supervision. *Id.* Mr. Moore has earned recommendations for release from numerous correctional staff, including wardens. *Id.* ¶8. Like the other plaintiffs assigned to work outside prison gates, he has participated in job training and trade school programs, as well as rehabilitation and behavioral modification classes available to help incarcerated people get ready to return to society. Moore Decl. ¶¶2, 7; *see also* Campbell Decl. ¶4; McDole Decl. ¶¶3, 12; Ptomey Decl. ¶2.[17]

Mr. English's current job is serving as the sole Officer in Charge of a dormitory that houses more than 190 incarcerated individuals, including approximately 50 or 60 elderly, wheelchair-bound, or otherwise vulnerable residents. English Decl. ¶¶3–5. He is trusted by the ADOC for all aspects of overseeing the care and correction of the 190 residents in his dorm, as there are no correctional staff regularly present other than him to supervise his dorm. *Id.* Mr. English was paroled in 2016 and had his parole revoked in 2020 on the basis of charges for which he was acquitted in a jury trial in November 2021. *Id.* ¶2.  Despite this acquittal, he was required to wait for a parole hearing until late 2023, at which time he was notified that he was

---

[17] Mr. McDole also coordinated re-entry programming for other incarcerated individuals. McDole Decl. ¶6.

again denied parole, apparently based on obviously erroneous information relied upon by the Parole Board despite his counsel's efforts to correct the record. *Id.* ¶8.[18]

In short, Plaintiffs have done everything in their power to demonstrate they can be productive members of society who pose no risk to public safety. Despite this, Defendant Marshall's office opposed granting parole in the cases of Mr. Moore, Mr. McDole, Mr. Ptomey Jr., and Mr. English. Moore Decl. ¶9; McDole Decl. ¶13; Ptomey Decl. ¶7; English Decl. ¶6. And, ultimately, the Parole Board denied each of them parole.

## ARGUMENT

## I.   LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction where they establish: "'(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.'" *Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1242 (11th Cir. 2012) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Where the "'balance of equities weighs heavily in favor of granting the [injunction],' the movant[s] need only show a 'substantial case on the merits.'" *Gonzalez ex rel. Gonzalez v. Reno*, No. 00-11424-D, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981)).

---

[18] Under current Parole Board procedures, parole applicants are not permitted to attend or participate in their parole hearings, which means that parole applicants cannot correct inaccurate facts or evidence which the Parole Board discloses in the hearing it is relying upon in its decision to grant or deny parole. *See* Lynch Decl., Exh. HH (ABPP website noting that parole applicants "will not be present" for their parole hearings).

When a court rules on a preliminary injunction, "all of the well-pleaded allegations [in the movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976); *see also Levi Strauss & Co. v. Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (in considering preliminary injunction motion, courts may "rely on affidavits and hearsay material" that might not be permitted at later stages of litigation).

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED IN DEMONSTRATING THAT DEFENDANTS' CONDUCT VIOLATES THE *EX POST FACTO* AND THE EQUAL PROTECTION CLAUSES OF THE U.S. CONSTITUTION

### A.     Plaintiffs Have Demonstrated a Substantial Likelihood of Success on Their Claim That State Defendants' Changes to Alabama's Parole System Violate the *Ex Post Facto* Clause

Plaintiffs are likely to prevail on their claim that Defendants have implemented the 2019 Parole Amendments in contravention of the *Ex Post Facto* Clause of the U.S. Constitution, U.S. Const., Art. I, § 10, cl. 1. The *Ex Post Facto* Clause "bar[s] enactments which, by retroactive operation, increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249 (2000). A retroactive change in "laws governing parole … may be violative of this precept" when it creates "a sufficient risk of increasing the measure of punishment…." *Id.* at 250 (internal quotations omitted). Thus, the question for the Court is whether, as an objective matter, Alabama's change in its parole rules "creates a significant risk of prolonging [Plaintiffs'] incarceration." *Garner*, 529 U.S. at 251; *see also Lynce v. Mathis*, 519 U.S. 433, 442-43 (1997) (rejecting arguments about state's motivation as "not relevant to the essential inquiry demanded by the *Ex Post Facto* Clause").

The Supreme Court and the Eleventh Circuit have repeatedly held that laws that materially limit the availability of parole or early release may support a claim under the *Ex Post Facto* Clause. *See, e.g.*, *Garner*, 529 U.S. at 253; *Weaver v. Graham*, 450 U.S. 24, 29 (1981); *Jones v. Garner*, 211 F.3d 1225, 1225 (11th Cir. 2000). "The danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has

stated that the Ex Post Facto Clause guards against such abuse." *Garner*, 529 U.S. at 253. Moreover, that an incarcerated person is "not guaranteed parole but rather receive[s] it at the will of the parole board" is not fatal to an *Ex Post Facto* Clause claim. *Peugh v. United States*, 569 U.S. 530, 547 (2013); *see also Weaver*, 450 U.S. at 29 ("a law need not impair a vested right to violate the *ex post facto* prohibition" (internal quotation marks omitted)); *Warden v. Marrero*, 417 U.S. 653, 663 (1974) ("a repealer of parole eligibility previously available to imprisoned offenders would clearly present (a) serious question under the *ex post facto* clause of . . . the Constitution"). It is also settled law that "'[t]he presence of discretion'" such as that which exists with respect to parole decisions "'does not displace the protections of the *Ex Post Facto* Clause.'" *Peugh*, 569 U.S. at 546 (quoting *Garner*, 529 U.S. at 253).

The Supreme Court has also "foreclosed [a] categorical distinction between a measure with the force of law and 'guidelines . . . from which [a parole board] may depart in its discretion.'" *Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004). "The controlling inquiry under *Garner* is how the Board . . . exercises discretion *in practice*, and whether differences between the exercise of discretion in two systems actually 'create[] a significant risk of prolonging [a person's] incarceration.'" *Fletcher v. Reilly*, 433 F.3d 867, 876-77 (D.C. Cir. 2006) (quoting *Garner*, 529 U.S. at 251) (emphasis added); *see also Michael v. Ghee*, 498 F.3d 372, 383 (6th Cir. 2007) ("After *Garner*, the relevant inquiry, therefore, is not whether the challenged parole regulation is a 'law' . . ., but rather whether the new guidelines present a significant risk of increasing the plaintiff's amount of time actually served.").

Where a rule does not on its face increase the length of incarceration for affected individuals, an *Ex Post Facto* Clause violation may be shown by "evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Garner*, 529 U.S. at 255. Thus, a parole board's "internal policy statement[s]" and "actual practices" should be considered as "important instruction as to how the Board interprets its enabling statute and regulations, and therefore whether, as a matter of fact, the [challenged application] created a

significant risk of increased punishment." 529 U.S. at 256 (reversing and admonishing Eleventh Circuit for not considering parole board's policy statements); *see also ibid*. ("It is often the case that an agency's policies and practices will indicate the manner in which it is exercising its discretion."); *Jones*, 211 F.3d at 1225 (on remand from Supreme Court, remanding to district court "to determine, after permitting sufficient discovery, whether the [new Georgia policy] in its operation created a significant risk of increased punishment for" the plaintiff); *Harris v. Hammonds*, 217 F.3d 1346, 1349-50 (11th Cir. 2000) (vacating summary judgment to defendants and remanding for evidence on "the general operation of the Georgia parole system" in support of *Ex Post Facto* claim).

Here, Plaintiffs have amply demonstrated that the change in Alabama's parole framework occasioned by the 2019 Parole Amendments, the attendant changes to the 2019 Parole Guidelines, and Defendants' related instructions to shut down the grants of parole have, "as a matter of fact, … created a significant risk of increased punishment." *Garner*, 529 U.S. at 257.

Under Alabama law, the State's Parole Board is required to consider people incarcerated in Alabama's prisons for parole within certain mandated time periods, so long as they are not serving sentences without the possibility of parole. *See* Ala. Code §15-22-28. And from at least 1951 until 2019, the touchstone of the Parole Board's inquiry was the individual's "fitness" for parole. Ala. Code §15-22-26(a); 1951 Ala. Laws 1030, 1032. In 2015, Alabama made clear its commitment to measuring fitness based on an actuarially determined risk assessment and evidence-based structured decision-making. *See* 2015 Ala. Laws Act No. 2015-185.

Yet, as detailed above, *supra* at 8-9, beginning in 2018 Defendants Ivey and Marshall began directing changes to the parole system. They instructed the Parole Board to stop "letting people out" of prison overall, and specifically to stop granting parole to incarcerated individuals serving sentences for crimes Alabama deems "violent" and to abandon the then-existing, structured, evidence- and validated risk assessment-based parole practices. Seizing upon the legislative changes obtained by Defendants Ivey and Marshall in 2019, the new Parole Board

Chair and Executive Director, both appointed by the Governor, implemented these earlier instructions. 2019 Ala. Laws Act No. 2019-393; *see also supra* at 10-11.

Applying the Supreme Court's instructions here to review the "actual practice" and policies of a parole board in determining whether there is "a significant risk of increased punishment," *Garner*, 529 U.S. at 256, it is clear the Parole Board's actual practices and policies demonstrate that the implementation of the 2019 Parole Amendments and associated changes to both its Parole Guidelines and to its regular practices have increased people's terms of incarceration and will continue to do so if not enjoined. Specifically, Defendants seized upon the inclusion of the newly announced "paramount duty" of the Parole Board to advance "public safety," 2019 Ala. Laws Act No. 2019-393, §1 (modifying Ala. Code §15-22-26(a)),[19] to largely shut down grants of parole, and to abandon both structured and evidence-based parole decision-making informed and guided by utilization of ORAS (the validated risk assessment tool selected by Alabama), including going so far as to order the trained IPOs who conducted these assessments to stop reporting their recommendations and findings to the Parole Board. *See* Head Decl. ¶37; *supra* at 9-14, 18.

As of 2023, the Parole Board "conforms" to the parole guidelines they put in place, and which purport to implement the 2019 Parole Amendments by focusing on the severity of a parole applicant's offense, a mere *6%* of the time. Lynch Decl., Exh. M at 10. In fiscal year 2023 alone, the Parole Board held 3,751 parole hearings. *Id.* According to ABPP's own reported statistics, 81% of those persons satisfied the current Parole Guidelines for a grant of parole. *Id.* Thus, of the more than 3,000 people who qualified for parole release, the Parole Board granted parole to only 351. There can be no doubt that the 2019 Parole Amendments resulted in changed Parole Board practices and policies: namely, to overwhelmingly reject IPO fitness assessments. Despite the

---

[19] The 2019 legislation also gave Defendants Ivey unilateral authority over the selection of the ABPP Director. Ala. Act No. 2019-393 (modifying Ala. Code §15-22-21). As a practical matter, the replacement of Executive Director Cook with Executive Director Graddick on September 1, 2019—the first day the legislation took effect—facilitated changes in Parole Board policies that resulted in the severe decrease in grants of parole.

Parole Board having the discretionary authority to depart from the Parole Guidelines, the Supreme Court has counseled that the *Ex Post Facto* Clause is violated if the way the Board "exercises discretion in practice" "actually 'create[s] a significant risk of prolonging'" persons' incarceration. *Fletcher*, 433 F.3d at 876-77. Plaintiffs have clearly demonstrated that to be the case here.

Finally, the most drastic and obvious retrospective change to the Parole Board practices following the 2019 Parole Amendments is the near-complete elimination of parole for individuals serving sentences for convictions deemed "violent" under Alabama law. Defendant Ivey had called for this elimination in 2018 and—after she pushed through the 2019 Parole Amendments, removed the ABPP Executive Director, and appointed Defendant Gwathney as Chair of the Parole Board, and after Defendant Marshall began systematically opposing parole grants based on the "violent nature" of the offense[20]—it is no surprise that the Parole Board adhered to those instructions. This is clear from the data. Whereas in fiscal year 2018, candidates were paroled around 44.7% of the time, these rates dropped by fiscal year 2022 so that only 3.2% of candidates convicted of "violent" offenses were granted parole. Keller Decl. ¶17 & Fig. C. Similarly, in fiscal year 2023 through September 7, 2023, only three in *one hundred* applicants with convictions for violent offenses were granted parole. *Id.* For each person who had received a sentence that included a possibility of parole, Defendants' actions in closing down the availability of parole represent an unconstitutional retrospective lengthening of their period of incarceration.

Each of the Plaintiffs who brings this motion has demonstrated that the changes in law, policies, and practices described herein increase the risks they will remain incarcerated. The Parole Board's practices following the 2019 Parole Amendments' focus on "public safety"

---

[20] *See* Lynch Decl., Exh. V (sample of Attorney General opposition letters). Defendant Marshall's practice of objecting to parole for people convicted of "violent" crimes directly increases the risk that such people's terms of incarceration will be extended because, under the revised Guidelines, the Attorney General's opposition adds a point to the parole applicant's "score"—thereby increasing the risk that they will be denied parole. *Id.*.

increased each Plaintiff's risk of further incarceration. The policy of disregarding parole recommendations and revising the approach to scoring also increased that risk. Further, each Plaintiff aside from Mr. Campbell is currently incarcerated for an offense Alabama deems to be "violent," and each Plaintiff has been denied parole: certainly, the Defendants' policy of denying parole to anyone with a violent offense conviction increase the chances these Plaintiffs' applications for parole will be denied. Plaintiffs do not need to prove that they would necessarily have been granted parole but for the retrospective application of these policies; rather, they need only show that the rule has increased the risk their incarceration will be extended. They have clearly done that.

**B.      Plaintiffs Have Demonstrated a Substantial Likelihood of Success on Their Claims that State Defendants' Implementation of the Parole System Violates the Equal Protection Clause**

Plaintiffs have also amply demonstrated a "reasonable likelihood of success," *Allen v. Milligan*, 599 U.S. 1, 17 (2023), on their claims that Defendants have intentionally discriminated on the basis of race against Plaintiffs and other Black incarcerated persons who qualify for parole. Specifically, Plaintiffs are likely to succeed in challenging the Defendant Parole Board members' racially discriminatory parole denials and setting of parole reconsideration dates, as well as Defendants Ivey and Marshall's actions in furtherance of that discrimination, as violations of the Equal Protection Clause.[21]

---

[21] Plaintiffs bring their Equal Protection Clause claim pursuant to 42 U.S.C. § 1983, which prohibits discriminatory customs and usages. As Justice Harlan explained: "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970), *quoted in Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978).

The "clear and central purpose" of the Fourteenth Amendment's Equal Protection Clause is "to eliminate all official state sources of invidious racial discrimination in the States." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (quoting *Loving v. Virginia*, 388 U.S. 1, 10 (1967)). The Eleventh Circuit has repeatedly recognized that invidious discrimination in the parole context may give rise to Equal Protection claims where (1) Black incarcerated people are treated more harshly than other "similarly situated" people and (2) there is evidence defendants have engaged in invidious race discrimination. *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932 (11th Cir. 1986) (per curiam) (reversing district court's denial of Equal Protection Clause claim regarding disparate presumptive parole release dates); *accord Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001) (per curiam).

Plaintiffs have more than demonstrated that they, and other Black incarcerated persons, are more frequently denied parole and more frequently given the maximum possible set-off period for parole rehearing dates. *See supra* Part II.A-B. Defendants' implementation of the 2019 changes to the Parole Board's decision-making process created a system in which, controlling for other factors, white parole applicants were granted parole *2.06 to 1* over Black applicants. *See supra* at 14-15; Keller Decl. ¶15. Similarly, in recent years, white parole applicants who are denied parole are more than twice as likely than Black applicants to receive set-offs of their parole hearing dates of two years or less; while Black applicants denied parole are more likely than whites to receive the maximum five-year setoff of their parole hearings. *Id.* ¶¶21-26 & Fig. E; *see also supra* at 16-18. Plaintiffs thus clearly satisfy the first part of the Equal Protection inquiry.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLS.' MOT. FOR PRELIM. INJ.

CASE NO. 2:23-CV-00712-ECM-JTA

31

Further, to evaluate whether Plaintiffs have shown a likelihood of establishing that race had "some role" in Defendants' implementation of the parole system, *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991), the Court must consider the factors outlined in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). In *Arlington Heights*, the Supreme Court cautioned that there is no requirement that "a plaintiff … prove that the challenged action rested *solely* on racially discriminatory purposes," because "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* at 265 (emphasis added). In short, if race is a "motivating factor" at all in the conduct, that is unconstitutional. *Id.* at 265-66.

The "impact of the official action" is "an important starting point" for the court's analysis because "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* at 266; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487, 489 (1997) (noting that effect is an "important starting point" because "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions"). Here, this factor weighs strongly in favor of finding discriminatory intent.

Defendants' implementation of the 2019 changes to Alabama's parole system has had a profound adverse impact on Black parole applicants. Beginning in 2018, Defendants Ivey and Marshall pressured the Parole Board to abandon its objective standards-based decision-making processes and, following the 2019 Parole Amendments, Defendant Ivey was able to effectuate that goal by forcing out the Parole Board Chair and unilaterally appointing the ABPP Executive Director. Parole grant rates went from being almost equal as among white and Black applicants

(and over 50%), to favoring white applicants 2.06 times to 1. *See supra* at 14-15. And while, as shown above, the Parole Board effectively shut down grants of parole to persons serving sentences for "violent" convictions (while still favoring white applicants by more than 2 to 1 among the small number of parole grants), *supra* at 12-13, the discarding of the JRA's objective factors also led to disparities among white and Black persons serving time for "nonviolent" offenses. *See* Keller Decl., ¶¶18-20 & Fig. D (grant rates fell from fiscal year 2018, when both white and Black applicants with nonviolent convictions were granted parole more than 63% of the time, to 21.7% for Black applicants and 29.6% for white applicants in fiscal year 2020). The Parole Board's decision making has also resulted in racial disparities in the setting of rehearing dates, i.e., the earliest date that a person who has been denied parole is permitted to reapply for parole. As discussed above, *supra* at 14-18, white parole applicants are unquestionably favored in this process.

The Eleventh Circuit has recognized several *Arlington Heights* factors related to the "impact" of the challenged conduct are probative of a discriminatory intent, including "the foreseeability of the disparate impact" and "knowledge of that impact." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021). The "foreseeability of the disparate impact" here strongly supports an inference of intentional discrimination. *Greater Birmingham Ministries*, 992 F.3d at 1322. The racial skewing of parole grant rates and set-off dates was an entirely predictable outcome of Defendants' decision to abandon objective evidence- and actuarially-based assessments. As courts have consistently recognized, disregarding objective standards allows racial bias to infect decision-making. *See, e.g.*, *Shealy v. City of Albany*, 89 F.3d 804, 806 (11th Cir. 1996) ("Subjective criteria tend to facilitate the consideration of impermissible criteria such as race."); *Miles v. M.N.C. Corp.*, 750

F.2d 867, 871 (11th Cir. 1985) (noting that circuit has "frequently noted" problems with "subjective evaluations" in employment context because they "provide a ready mechanism for racial discrimination"); *see also Williams v. City of Dothan*, 745 F.2d 1406, 1415 (11th Cir. 1984) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.") (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979)).

Even if Defendants here could plausibly claim to have been surprised by the racial inequities created by their changes to Alabama's parole system, they maintained their racially discriminatory practices in the face of undeniable evidence of the racial impact presented by legislators, the government data itself, and local press. *See* Head Decl. ¶37; Lynch Decl., Exhs. Y, AA, BB, FF. Their knowledge of the clear racial skew in the grants of parole and setting of rehearing dates further supports a finding of intentional discrimination. *Greater Birmingham Ministries*, 992 F.3d at 1322. As early as 2020, a number of legislators, including Representative England, raised concerns about the racial disparities in parole grant decisions. Head Decl. ¶36. In response, Defendant Gwathney reportedly claimed the ORAS standards did not work for her because they did not weight what was "important." *Id.*

Public critiques of the racially disparate impact of the Parole Board's decision making continued unabated through 2021, 2022, and 2023. *See supra* nn.7-11; Lynch Decl., Exh. X (article reflecting Representative England's criticism of Chair Gwathney for ignoring objective standards and tolerating racial disparity and describing multiple ways in which he raised racial inequality with ABPP and Parole Board); *id.*, Exhs. Y & Z. Just recently, in response continuing public attention about the declining parole rate and the racial skew in the Parole Board's decision making, Defendant Gwathney reportedly stated she did not care about "statistics," *id.*, Exh.

BB—a statement from which the Court may reasonably infer an intent to continue applying the parole system in a racially discriminatory way. *Cf. Baker v. City of Kissimmee, Fla.*, 645 F.Supp. 571, 587 (M.D. Fla. 1986) ("adherence to a challenged action with full knowledge of the predictable effects" factor to determine intent).

In short, the discriminatory practice here was so widely known and persistent that Defendants Ivey, Marshall, and the Parole Board members were on notice of the need to address racial discrimination in the Parole Board's operations; their failure to do so is evidence of discriminatory intent. *See Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) ("knowledge of discriminatory impact" suggests discriminatory intent); *see also Dream Defenders v. DeSantis*, 553 F.Supp.3d 1052, 1094 (N.D. Fla. 2021) (impact known, suggesting discriminatory intent, "based on the concerns raised by the opponents"); *Banks v. McIntosh County*, 530 F.Supp.3d 1335, 1375 (S.D. Ga. 2021) ("requests" to address disparate impact demonstrated foreseeability and knowledge of impact); *cf. Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1273 (11th Cir. 2023) (widespread discriminatory practice may place entity on notice of need to act).

Under *Arlington Heights* and Eleventh Circuit precedent, another important factor is "'the availability of less discriminatory alternatives.'" *Greater Birmingham Ministries*, 992 F.3d at 1327 (quoting *Jean*, 711 F.2d at 1486); *Dream Defenders*, 553 F.Supp.3d at 1095 ("less discriminatory alternative[], in form of preexisting law" supports finding discriminatory intent). Here, the less discriminatory alternative is the very parole system and procedures rejected by Defendants, with evidence- and actuarially-based standards that, when followed, undeniably achieved near racial parity in parole grant rates. *See* Keller Decl., Fig. A.

The remaining *Arlington Heights* factors address the context in which the challenged decisions were made—namely, the "historical background" of the challenged decisions, the

"specific sequence of events leading up" to those decisions, contemporaneous statements made by the decisionmakers, and procedural and substantive irregularities in the decision-making process. *Arlington Heights*, 429 U.S. at 267-68; *Greater Birmingham Ministries*, 992 F.3d at 1322. Consideration of these factors further supports a finding that Defendants' post-2019 operation of the parole system has been marked by impermissible racial bias.

As detailed in Part I.B, *supra*, Defendants Ivey and Marshall demanded in 2018 that the Parole Board members abandon the JRA standards- and objective risk assessment-based approach to parole decision-making—despite wide recognition that structured decision-making can reduce bias—and to stop letting people out of prison. In what is both a procedural and substantive irregularity, Defendant Ivey removed one Parole Board member as Chair, and then told her newly appointed Chair, Lyn Head, that she would "ease up" on the Parole Board if the board would fire the Black ABPP Executive Director, who was chiefly responsible for implementation of the JRA. Head Decl. ¶24. Chair Head's refusal to fire the Executive Director, and her defense of the JRA process, led to Defendants Ivey and Marshall advocating for the 2019 Parole Amendments. *See id.* ¶25. The 2019 Parole Amendments allowed Defendants Ivey and Marshall to achieve their demand: they used the insertion of "public safety" as the "paramount duty" of the Parole Board as a basis for abandoning the objective, data- and evidence-driven risk assessments mandated by the JRA. *See* Ala. Act No. 2019-393; Head Decl. ¶¶21-22, 34; Lynch Decl., Exh. J (Defendants Ivey and Marshall describing stricter approach to parole, and previous "flawed practices"). Defendant Ivey also, on the very first day the 2019 Parole Amendments took effect, used her new authority to replace the Black Executive Director with an individual who immediately fired and disparaged all three top-level Black officials at the ABPP and implemented racist personnel policies. Head Decl. ¶¶28-29. She also reshaped the Parole Board

itself, appointing a white former employee of the Attorney General after Chair Head resigned in protest over the racist actions of Governor Ivey's newly appointed Executive Director. *Id.* ¶¶30-31; *see also Ammons v. Dade City, Fla.*, 783 F.2d 982, 988 (11th Cir. 1986) ("history of racial discrimination in general and in [challenged area] in particular" support inference of discriminatory intent); *Woods v. Florence*, No. CV82-PT-2272-S, 1985 WL 1270127, at *48 (N.D. Ala. Jan. 31, 1985) ("deliberate decision" to ensure "absence of black members" supported inference of discriminatory intent); *Dream Defenders*, 553 F.Supp.3d at 1094-95 ("substantive and procedural departures" including "rushed timeline," "curtailment of public comment," "refusal to study its discriminatory impact," "revision to give it an unusual immediate effect" suggested discriminatory intent).

Plaintiffs have demonstrated the continued stark racial disparities in grants of parole and re-setting of parole hearing dates is likely based impermissibly on racial animus. Because, as described below, the balance of equities and public interest can never support the maintenance of racially discriminatory practices such as those of Defendants, Plaintiffs are entitled to a preliminary injunction.

## III.   PLAINTIFFS ARE BEING IRREPARABLY HARMED BY DEFENDANTS' IMPLEMENTATION OF MORE STRINGENT AND RACIALLY DISCRIMINATORY PAROLE RULES

Plaintiffs will continue to suffer unjustified incarceration absent preliminary injunctive relief. The Eleventh Circuit has squarely held that the incarceration of someone who, but for the challenged conduct, would be paroled constitutes an "unnecessary deprivation of liberty [that] clearly constitutes irreparable harm." *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (recognizing imprisonment as irreparable harm weighing against stay of an order holding sentencing guidelines unconstitutional, where stay would have meant that "some defendants who

would have received probation under the pre-guideline system will be required to serve a term of imprisonment).

The harms that Plaintiffs are suffering from being unjustly denied parole are extensive and irreparable. *See, e.g.*, *id.*; *Edwards v. Cofield*, No. 3:17-CV-321-WKW, 2017 WL 2255775, at *1 (M.D. Ala. May 18, 2017) ("Plaintiff has demonstrated that her continued detention constitutes the kind of irreparable injury justifying immediate relief."); *see also Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018) ("Deprivation of physical liberty by detention constitutes irreparable harm."). Each day that Plaintiffs are unnecessarily incarcerated is a day in which they are unable to develop meaningful connections with friends and family, work towards financial stability, or otherwise participate as engaged members of society. There is no remedy for that lost time and liberty.

Defendants' unlawful conduct is also forcing Plaintiffs and class members to remain incarcerated in one of the country's most violent and overcrowded prison systems. This, too, constitutes irreparable harm. *See Laube v. Haley*, 234 F.Supp.2d 1227, 1251 (M.D. Ala. 2002) (concluding that "a substantial threat of irreparable harm to women prisoners in the Alabama state prison system exists" where incarcerated women showed they were "living in overcrowded and understaffed open dorms, where weapons are easily accessible and where weak prisoners are not separated from aggressive prisoners").

The dangerous conditions that incarcerated people in Alabama face are well documented and widely publicized. They include systemic and life-threatening violence,[22] as well as

---

[22] Lynch Decl., Exh. II (U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (July 23, 2020)), at 10-16. While the U.S. Department of Justice's ("DOJ's") specific findings are not admissible as evidence, its investigation and findings have been published for the public's knowledge and consideration, and may be considered here for that purpose.

"horrendously inadequate" mental health care in a prison system plagued by "persistent and severe shortages of mental-health and correctional staff, combined with chronic and significant overcrowding."[23] DOJ experts also "observed that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than other similar systems" and had increased dramatically since 2013.[24] *See, e.g.*, *Barefield v. Dunn*, No. 2:20-CV-917-WKW, 2023 WL 5417550, at *1 n.1 (M.D. Ala. Aug. 22, 2023) (noting that, "[i]n the past year, several courts have found viable allegations of unconstitutionally violent conditions of confinement throughout the Alabama prison system"). Just last month, Alabama newsrooms have reported allegations of an incarcerated man's death after being tortured, sexually assaulted, and "rented out" by other incarcerated people, as well as systemic medical neglect throughout Alabama's correctional facilities. Lynch Decl., Exhs. CC & DD. Defendants' actions—trapping Plaintiffs and class members in ADOC facilities by unlawfully denying them parole—unfairly and unnecessarily subject Plaintiffs to these dangerous conditions.

## IV. THE BALANCE OF THE EQUITIES STRONGLY FAVORS AN INJUNCTION REQUIRING DEFENDANTS TO CEASE IMPLEMENTING MORE STRINGENT PAROLE RULES AND TO CEASE DOING SO IN A RACIALLY DISCRIMINATORY MANNER

### A. Defendants Will Not Be Harmed by the Injunction, While Plaintiffs Will Continue to be Harmed in Its Absence

Plaintiffs' ongoing injuries far outweigh any harm the Defendants would suffer from requiring them to re-evaluate Plaintiffs' eligibility for parole under the legally mandated and

---

[23] *See Braggs v. Dunn*, 562 F.Supp.3d 1178, 1193, 1206 (M.D. Ala. 2021). The ordered relief has not yet been implemented. *See Braggs v. Hamm*, No. 2:14CV601-MHT, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023) (ordering parties to file a plan "to address ADOC's still grossly inadequate correctional staffing levels").

[24] Lynch Decl., Exh. JJ (U.S. Dep't of Justice, Investigation of Alabama's State Prison for Men (April 2, 2019)), at 6.

objective standards of the JRA—the narrow remedy Plaintiffs seek for both the *Ex Post Facto* Clause and Equal Protection Clause violations.

Plaintiffs' requested relief serves to alleviate the irreparable harm caused by Defendants' change in the parole rules to make it more likely Plaintiffs' terms of incarceration will be extended, and addresses the racial discrimination Black parole applicants have suffered as a result of Defendants' deliberate and improper abandonment of objective parole standards in favor of sweeping, standardless denials. Restoring the Parole Board's decision-making process to the objective system that brought near racial parity to the Board's decisions will substantially decrease the likelihood of racially disparate parole outcomes. Defendants are government officials charged with enforcing and defending constitutional rights for everyone in Alabama: Defendants are helped, not harmed, by a cessation of unconstitutional practices.

Even if Defendants could articulate some perceived burden from Plaintiffs' requested relief, it cannot outweigh the irreparable harms Plaintiffs are suffering. *See People First of Ala. v. Merrill*, 467 F.Supp.3d 1179, 1226 (N.D. Ala. 2020) (injunction requiring state government "to quickly communicate the changed rules to local election officials and voters . . . do[es] not outweigh the irreparable injury the individual plaintiffs and similarly-situated voters could incur by foregoing their right to vote").

Defendants cannot articulate any injury when the relief Plaintiffs seek would only bring the Parole Board's practices in line with its statutory mandate. *See id.*; *see also Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[n]o substantial harm can be shown in the enjoinment of an unconstitutional policy," alternation in original). Under the JRA, the Parole Board is required to follow "structured, actuarially based" guidelines to determine fitness for parole and to "promote the use of prison space for the most

violent and greatest risk offenders." Ala. Code §15-22-26(a). The requested injunction will put the parties exactly where they would have been if Defendants continued to make parole decisions in accordance with the statutory mandate, instead of seizing on the 2019 Parole Amendments to abandon the JRA's procedures—except that far too many Plaintiffs will have lost years of their lives in the interim.

**B.      The Terms and Scope of the Injunction Are Narrowly Tailored to Address the Irreparable Harm to Plaintiffs**

Plaintiffs ask the Court to restore the parole process to the system mandated by the Alabama legislature and implemented by the Parole Board prior to the 2019 Parole Amendments, and only as to the affected putative class of incarcerated people, so those who qualify for parole need not continue being subjected to the horrors of the Alabama prison system while this litigation is pending. This is a proper and necessary exercise of the Court's power.

The *status quo ante* here is the Parole Board's operations under the procedures mandated by the JRA. Plaintiffs' requested relief seeks to restore that status quo for Plaintiffs and all members of the putative class who suffered adverse parole decisions after Defendants relied on the 2019 Parole Amendments to discard the JRA's procedures, largely shut down the parole system, and secure stark racial disparities in the grants of parole and setting of rehearing dates.

Plaintiffs' requested relief is specific in its terms and describes in reasonable detail the acts to be restrained, in compliance with Fed. R. Civ. P. 65(d). It is also a remedy well within the Court's discretionary power, as it seeks only to prohibit unconstitutional conduct and provisionally restore constitutional rights to those people who have suffered their deprivation. *See, e.g.*, *Strawser v. Strange*, 105 F.Supp.3d 1323, 1328, 1330 (S.D. Ala. 2015), *aff'd sub nom. Strawser v. Russell*, No. 15-12508 (11th Cir. Oct. 20, 2015) (prohibiting state official defendants from denying marriage licenses in violation of Fourteenth Amendment).

## V.      THE PUBLIC INTEREST FAVORS PLAINTIFFS

The public's interest in ending discrimination and not unjustly detaining individuals, as discussed above, strongly favors Plaintiffs. In addition, the public has a further interest in ensuring that Defendants are not permitted to subvert the JRA, whose objective standards-based approach remains a requirement of Alabama law, through their unconstitutional implementation of the 2019 Parole Amendments. The intent of the JRA is plain: to reduce prison overcrowding and to ensure that parole decisions are the result of structured decision making based on actuarially- and evidence-based risk assessments. *See* 2015 Ala. Laws Act No. 2015-185; *see also Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 788 (11th Cir. 1984) (reversing denial of preliminary injunction on grounds that, inter alia, "[c]ongressional intent and statutory purpose can be taken as a statement of public interest"). Indeed, it is well settled that the public has an interest in having agencies follow their own regulations. *See, e.g.*, *Ga. Gazette Publ'g Co. v. U.S. Dep't of Def.*, 562 F.Supp. 1004, 1011 (S.D. Ga. 1983) (describing "public interest in requiring agencies to stick to their regulations").

Defendants can articulate no public interest in allowing them to continue disregarding the terms of incarcerated people's sentences, the mandates of the Alabama legislature, and Alabama's responsibility to ensure equal protection of its laws to Alabamians of all races. Nor is there any public interest in allowing the stark racial disparities in the parole system to continue, or in forcing Plaintiffs and others similarly situated to continue to be exposed to the threats to life and liberty in one of this country's most dangerous prison systems. *See Laube*, 234 F.Supp.2d at 1252 (preliminary injunction warranted where "the public interest is in no way served by the defendants' current policy, practice, and custom of incarcerating inmates in dangerous conditions").

## VI.   PRELIMINARY INJUNCTIVE RELIEF SHOULD PROTECT ALL SIMILARLY SITUATED INDIVIDUALS

This Court should exercise its inherent equitable authority to issue an injunction extending relief to all similarly situated individuals. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (declining to stay injunctions in non-class case "with respect to respondents and those similarly situated"). Although the Court's inherent authority is, standing alone, sufficient to grant the requested relief here, it is also appropriate for the Court to provisionally certify a class and subclass—the Parole Denial Class and the Discriminatory Parole Denial Subclass, as defined below—for purposes of preliminary injunctive relief. Courts may grant "provisional class certification for purposes of preliminary injunction proceedings." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020); *see Strawser v. Strange*, 307 F.R.D. 604, 614 (S.D. Ala. 2015) (granting class certification on same day as preliminary injunction in *Strawser*, 105 F.Supp.3d at 1328); Newberg on Class Actions §4:30 ("[A] court may issue a classwide preliminary injunction in a putative class action prior to a ruling on the class certification motion….").

Specifically, this Court should provisionally certify the Parole Denial Class consisting of: all incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were denied parole while in the custody of ADOC at any time after October 1, 2019 and the date a class is provisionally certified. *See* Compl. ¶189. The Court should also provisionally certify the Discriminatory Parole Denial Subclass consisting of all Black Parole Denial Class Members. *See id.*

The Parole Denial Class and the Discriminatory Parole Denial Subclass are adequately defined, clearly ascertainable, and satisfy the numerosity, commonality, typicality, and adequacy

prongs of Rule 23(a); and Defendants have "acted or refused to act on grounds that apply

generally to the class. Fed. R. Civ. P. 23(b)(2).

      **A.**      **Although Plaintiffs Need Not Demonstrate Ascertainability to Certify a Class
for Purposes of Preliminary Injunctive Relief, the Parole Denial Class and
Discriminatory Parole Denial Subclass Are Adequately Defined and Clearly
Ascertainable.**

The weight of authority holds that Plaintiffs need not demonstrate ascertainability to

certify an injunctive-relief-only class under Federal Rule of Civil Procedure 23(b)(2). *See, e.g.*,

*Thompson v. Merrill*, No. 2:16-CV-783-ECM, 2020 WL 411985, at *2 (M.D. Ala. Jan. 24, 2020)

(citing *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970)); *Braggs v. Dunn*, 317 F.R.D. 634,

671-73 (M.D. Ala. 2016) (collecting cases). Nevertheless, the proposed Class and Subclass are

"adequately defined and clearly ascertainable." *Cherry v. Dometic Corp*., 986 F.3d 1296, 1302

(11th Cir. 2021) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). The

ascertainability requirement is satisfied if the membership of the class is "'capable of being'

determined," even if such determination is inconvenient. *Id.* (citation omitted). The proposed

Class and Subclass here are defined by objective, verifiable criteria readily identified by

reference to ADOC's records. *See Rensel v. Centra Tech, Inc*., 2 F.4th 1359, 1370 (11th Cir.

2021). ADOC's records include information on incarcerated individuals' races and parole

histories and therefore provide sufficient data to identify which incarcerated individuals were

denied parole during the relevant time period. *See id.* As such, the proposed provisional class

easily satisfies the ascertainability requirement, to the extent that requirement applies at all.

      **B.**      **The Parole Denial Class and Discriminatory Parole Denial Subclass Satisfy
the Requirements of Rule 23(a)**

1. <u>Numerosity</u>. The proposed provisional Class and Subclass are "so numerous that

joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Although there is no strict

threshold, classes containing more than 40 members are generally large enough to warrant certification." *Braggs*, 317 F.R.D. at 653 (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); Rubenstein, Newberg on Class Actions §3.12 (5th ed.)). "Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (in a racial discrimination class action, stating that "where the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity"). This is especially true in the prison litigation context, given the fluid nature of the incarcerated population, their classifications, and their parole statuses. *See Henderson v. Thomas*, 289 F.R.D. 506, 510 (M.D. Ala. 2012); *see also Braggs*, 317 F.R.D. at 653. The number of members of the proposed Parole Denial Class is estimated to exceed 7,000 people, while the Discriminatory Parole Denial Subclass is estimated to include approximately 3,700 people. *See* Keller Decl. ¶24. As such, the numerosity requirement is more than met.

2. <u>Commonality</u>. There are many "questions of law or fact common to" the proposed Class and Subclass in this case, Fed. R. Civ. P. 23(a)(2), although even one common question will satisfy this requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). Satisfying the commonality requirement is a "low hurdle," *Williams*, 568 F.3d at 1356, and only "requires a showing that there is 'some glue' holding the claims together," *Braggs*, 317 F.R.D. at 655 (quoting *Wal-Mart*, 564 U.S. at 352). The claims at issue in this motion raise several common questions. Members of the proposed Parole Denial Class share, among other common questions, the question whether the Parole Board's implementation of the 2019 Parole Amendments, which radically reduced access to parole for everyone previously sentenced to a term of imprisonment with the possibility

of parole, constitutes establishment of an unconstitutionally retrospective law. Members of the Discriminatory Parole Denial Subclass share, among other common issues, the common question whether Defendants Ivey, Marshall, and Parole Board Members acted with the requisite intent in establishing and maintaining a parole system that for years has denied parole to Black parole candidates substantially more often than to similarly situated white parole candidates. The proposed provisional Class and Subclass undoubtedly meet the commonality requirement.

    3. <u>Typicality</u>. Plaintiffs' claims are "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is also "somewhat of a low hurdle" and focuses on "whether a "sufficient nexus exists between the claims of the named representatives and those of the class at large." *Braggs*, 317 F.R.D. at 663 (citations omitted). Typicality is satisfied where, as here, the class claims arise from the same event, pattern, or practice of the Defendants, even "despite substantial factual differences," so long as "there is a strong similarity of legal theories." *Williams*, 568 F.3d at 1357 (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)). All of the proposed representatives of the Parole Denial Class were harmed by Defendants Ivey, Marshall, and the Parole Board's substantial restriction of access to parole, and all of the proposed representatives of the Discriminatory Parole Denial Subclass were harmed by their implementation of a parole decision-making scheme that discriminatorily denies parole to Black parole candidates. The Parole Board denied parole to Mr. Moore in December 2022, Moore Decl. ¶9; to Mr. Cole in August 2023, *see* Cole Decl. ¶¶5, 7; Lynch Decl. Exh. Q; to Mr. McDole in March 2022, McDole Decl. ¶13; to Mr. Campbell in July 2023, Campbell Decl. ¶11; to Mr. Ptomey in September 2022, Ptomey Decl. ¶7; and to Mr. English in November 2023, English Decl. ¶¶8-9. As in *Braggs,* "[a]lthough they need not do so, plaintiffs have in fact presented evidence that at least one of them has not only been exposed to but harmed by the risk created by

each of the policies or practices at issue"—here, the risk of unlawful denial of parole and thus unlawfully extended confinement. 317 F.R.D. at 664. As such, Plaintiffs satisfy the typicality requirement for the proposed provisional Class and Subclass.

4. Adequacy. Plaintiffs will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The fact that the plaintiffs have satisfied the commonality and typicality requirements is strong evidence that they adequately represent the class." *Henderson*, 289 F.R.D. at 511 (citing *Wal-Mart*, 564 U.S. at 349 n.5). Plaintiffs have the same types of interests and suffered the same types of injuries as other members of the proposed provisional class and subclass. There are no conflicts of interest between Plaintiffs and the members of the Class or Subclass—all share the same interest in ending Defendants' unconstitutional lengthening of their judicial sentences and ceasing the Parole Board's discriminatory denial of access to parole. The proposed class representatives have also provided valuable assistance in the investigation and prosecution of this matter. *See* Decl. of Barbara J. Chisholm ("Chisholm Decl.") ¶12.

**C.    The Parole Denial Class and Discriminatory Parole Denial Subclass Satisfy the Requirements of Rule 23(b)(2)**

Certification under Rule 23(b) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities," particularly where, as here, "the problems of which [plaintiffs] complain and the remedies they seek are systemic." *Braggs*, 317 F.R.D. at 667 (emphasis in original) (quoting *Bumgarner v. NCDOC*, 276 F.R.D. 452, 457 (E.D.N.C. 2011), and citing Wright & Miller, 7AA Fed. Prac. & Proc. Civ. §1776 (3d ed.)). "The Supreme Court has approved of system-wide relief in prison cases involving 'systemwide

violation[s]' resulting from 'systemwide deficiencies.'" *Id.* (alternation in original) (citing *Brown v. Plata*, 563 U.S. 493, 532 (2011)). Certification is therefore appropriate where, as here, there is evidence that Defendants' substantial restriction of access to parole affects the entire proposed Parole Denial Class, and practice of discriminating against parole candidates on the basis of race affects the Discriminatory Parole Denial Subclass as a whole. If Plaintiffs' claims are successful, injunctive relief applicable to the Class and Subclass of affected individuals is appropriate. Anything less would require putative Class and Subclass members to file hundreds, if not thousands, of separate actions to enforce their rights on an individual basis, a result that would be broadly inefficient and potentially lead to conflicting standards governing parole.

### D.  Plaintiffs' Counsel Should Be Appointed Class Counsel Under Rule 23(g)

Plaintiffs request the appointment of Altshuler Berzon LLP, Justice Catalyst Law, and Faraino LLC as provisional class counsel under Rule 23(g). Proposed provisional class counsel have investigated and vigorously pursued the claims in this action, have extensive experience handling class actions, and have adequate resources to litigate this action. *See* Chisholm Decl. of Barbara Chisholm ¶¶4-10; Decl. of Janet Herold ¶¶5-11; Faraino Decl. ¶2.

## CONCLUSION

For the reasons set forth above, and to restore the Alabama parole system to the *status quo ante*, a state of constitutional compliance, Plaintiffs respectfully request that the Court order:

1.  Defendants Ivey and Marshall are prohibited from instructing their agents and Defendant Parole Board members (a) to ensure that individuals who have been sentenced to incarceration for offenses Alabama deems "violent" are not granted parole, and (b) to disregard the actuarially- and evidence-based risk assessments for considering parole applications mandated by Alabama law.

2.      Defendants Gwathney, Littleton, and Simmons are prohibited from issuing parole decisions deviating from the pre-2019 Parole Guidelines and practices. In the event the Parole Board decides to deny parole to any parole applicant with a "low" or "moderate" ORAS risk assessment level, the Parole Board shall first provide a detailed, individualized written explanation of the evidence and reasons supporting the deviation from the Guidelines and/or ORAS risk assessment level and provide the parole applicant an opportunity to respond.

3.      Defendants Gwathney, Littleton, and Simmons are required to revert immediately to the Parole Guidelines and practices in place prior to October 1, 2019.

4.      Defendants Gwathney, Littleton, and Simmons are prohibited from scheduling parole reconsideration dates more than two years from the date of parole denial for all applicants except in exceptional cases, with such cases not exceeding 15% per year.

5.      Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons are prohibited from continuing to benefit from their unconstitutional increase of incarcerated people's sentences since October 1, 2019, as follows:

   a.   Defendants Gwathney, Littleton, and Simmons shall review the parole application files of every individual denied parole since October 1, 2019, in an order of priority to be specified by the Court or a Special Master appointed by the Court, at a rate of 1,000 applications per month, and issue revised parole decisions for those individuals such that the decisions deviate from the pre-2019 Parole Guidelines and/or parole recommendations for all applicants with ORAS "low" and "moderate" risk assessments in no more than 20% of cases per month, and provide a detailed individualized written

explanation of the evidence and reasons supporting the deviation, to which the parole applicant may provide evidence and a written response; and

    b.   In the event parole is denied to an applicant as a result of the review described in paragraph (a), Defendants Gwathney, Littleton, and Simmons shall not establish reconsideration dates that are longer than two years from the parole applicant's last hearing date and shall make appropriate changes in the parole hearing calendars to ensure the honoring of such revised reconsideration dates.

6.    Appoint a special master to oversee Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons' compliance with the above-described preliminary injunctive relief while this action is pending.

Dated: December 21, 2023              Respectfully submitted,

                                      */s/ Barbara J. Chisholm*

                                      MICHAEL RUBIN (CA SBN 80618)*
BARBARA J. CHISHOLM (CA SBN 224656)*
CONNIE K. CHAN (CA SBN 284230)*
AMANDA C. LYNCH (CA SBN 318022)*
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Email: mrubin@altber.com;
bchisholm@altber.com;
cchan@altber.com; alynch@altber.com

JANET HEROLD (CA SBN 186419)*
JUSTICE CATALYST LAW
40 Rector Street, 9th Floor
New York, NY 10008
Telephone: (518) 732-6703
Email: jherold@justicecatalyst.org

*Counsel for All Plaintiffs and the Proposed
Classes and Subclasses*
  **appearing pro hac vice*

LAUREN FARAINO
FARAINO, LLC
2647 Rocky Ridge Ln.
Vestavia Hills, AL 35216
Telephone: (205) 737-3171
Email: lauren@farainollc.com

*Counsel for The Woods Foundation, Individual
Plaintiffs, and the Proposed Classes and
Subclasses*