EXHIBIT A

# Justice Reinvestment in Alabama
## Analysis and Policy Framework

MARCH 2015

## Overview

**A**labama's correctional system is in crisis. Two-thirds of the 79,612 people convicted of felonies who are under correctional control in Alabama are primarily supervised in the state's overwhelmed probation and parole systems, where caseloads average close to 200 cases per officer.[1] The state's incarceration rate is the nation's fourth highest and, as of September 2014, Alabama's prisons—the most crowded in the country—were operating at 195 percent of capacity, with 26,029 people in a system designed to hold 13,318.[2] Between FY2009 and FY2013, General Fund expenditures for the Alabama Department of Corrections (DOC) remained constant at $372 million, while the prison population remained stable.[3] During the same time period, General Fund expenditures for the Alabama Board of Pardons and Paroles (BPP) decreased 41 percent, from $41 million to $25 million.[4]

Alabama policymakers have long wrestled with how to address prison overcrowding. Over the past 12 years, state leaders have engaged organizations outside the state to provide advice on this and other issues.[5] During this period, the legislature approved changes to state law, including establishing probation revocation caps and presumptive sentencing guidelines that help divert people convicted of low-level offenses from prison. The presumptive sentencing guidelines have been largely responsible for the reduction in the number of prison admissions, yet the decline in prison admissions has not eased prison overcrowding. In the past five years, there has been an increase in the number of people being revoked from supervision and a decline in the number released from prison, which has offset any impact the reduced admissions would have had on the prison population.

### Projected 6-Year Outcomes of Justice Reinvestment Policy Framework

| | |
|---|---|
| **Provide post-release supervision** | **3,000** people newly eligible for supervision |
| **Increase the number of probation and parole officers** | **100** additional officers |
| **Reduce prison overcrowding by FY2021** | **4,513** fewer people |
| **Avert prison construction and operations costs** | **$407** million averted |
| **Reinvest in supervision and behavioral health treatment** | **$26** million reinvested in FY2016 |

ANALYSIS AND POLICY FRAMEWORK



JUSTICE ★ CENTER
THE COUNCIL OF STATE GOVERNMENTS

Due to the state's severe level of prison crowding, Alabama policymakers must act immediately or face the prospect of the courts intervening and compelling the state to release thousands of people from prison or spend hundreds of millions of dollars to increase capacity. State leaders often cite the recent experience of California, whose prison system in 2011 was also nearing 200 percent of capacity when the U.S. Supreme Court ordered the state to immediately reduce its prison population to 137.5 percent of capacity.[6] For Alabama to reduce its prison population to 137.5 percent of capacity through construction alone, it would need to add space for 6,000 people, which would cost the state roughly $420 million in construction costs and $93 million in annual operating costs.[7]

In early 2014, Alabama Governor Robert Bentley, Chief Justice Roy Moore, Senate President Pro Tempore Del Marsh, House Speaker Michael Hubbard, and then-DOC Commissioner Kim Thomas requested support from The Pew Charitable Trusts and the U.S. Department of Justice's Bureau of Justice Assistance to explore a "justice reinvestment" approach to reduce corrections spending and reinvest in strategies that can reduce recidivism and improve public safety. The Council of State Governments (CSG) Justice Center was asked to provide intensive technical assistance in collecting and analyzing data to develop appropriate policy options for the state.

The Alabama legislature passed joint resolution SJR 20 in February 2014 to create the bipartisan, interbranch Prison Reform Task Force—which includes designees from all three branches of government and state and local criminal justice system stakeholders—to study the state's criminal justice system.[8] The task force reviewed the analyses that the CSG Justice Center conducted and discussed policy options that would reduce prison overcrowding and increase public safety.

In preparing its analyses, the CSG Justice Center reviewed vast amounts of data, drawing on information systems maintained by the DOC, the BPP, and the Alabama Sentencing Commission (Sentencing Commission). In total, the CSG Justice Center analyzed over 250,000 data records across these information systems and conducted separate surveys of judges, parole board members, probation and parole officers, Community Corrections Programs (CCP) staff, and sheriffs.

In addition to these quantitative analyses, the CSG Justice Center staff convened focus groups and meetings with people working on the front lines of Alabama's criminal justice system, including prosecutors; judges; defense attorneys; law enforcement and corrections officials; people who are currently incarcerated; victims and their advocates; probation, parole, and CCP officers; county officials; and others. Between June 2014 and February 2015, the CSG Justice Center conducted more than 100 in-person meetings with more than 250 people.

Since 2010, the U.S. Department of Justice's Bureau of Justice Assistance (BJA) has supported the Justice Reinvestment Initiative (JRI), which has assisted state and local governments as they generate cost-effective, evidence-based policies to produce meaningful cost savings for states while maintaining a focus on public safety. In a public-private partnership with The Pew Charitable Trusts, BJA provides technical assistance and financial support for these system-wide criminal justice reform efforts.

We at BJA are pleased to support the work in Alabama described in this report and culminating in the state's justice reinvestment policy framework, a pivotal achievement of the state's Prison Reform Task Force. We look forward to working with Alabama stakeholders to adopt and implement the policy changes described in this report.

*Denise E. O'Donnell*

Denise E. O'Donnell
Director, Bureau of Justice Assistance, U.S. Department of Justice

# Summary of Challenges and Policy Framework

**CHALLENGE 1. INSUFFICIENT COMMUNITY-BASED SUPERVISION AND TREATMENT RESOURCES.** People being supervised in the community who are at a high risk of reoffending do not receive sufficient supervision and treatment to reduce recidivism.

**STRATEGY 1.** Strengthen community-based supervision and treatment.

| FINDINGS | POLICY OPTIONS |
|---|---|
| 1. Probation and parole officers carry average caseloads of close to 200 cases. | A. Hire additional probation and parole officers. |
| 2. Risk and needs assessments are not consistently used to inform how supervision resources are applied. | B. Standardize the use of risk and needs assessments to target supervision resources for people who are most likely to reoffend, and reduce probation and parole officers' caseloads by limiting supervision intensity for people at low risk of reoffending. |
| 3. There are few intermediate sanctions prior to revocation for people on probation and parole supervision, and people whose supervision has been revoked spend long periods in jail awaiting hearings. | C. Establish intermediate sanctions to respond to technical violations of probation and parole, and incorporate short jail stays in the range of possible sanctions. |
| 4. The state does not provide funding for behavioral health treatment for people on probation and parole supervision, and there are insufficient behavioral health treatment resources available in the community. | D. Fund community-based behavioral health treatment programs that have proven to help reduce recidivism for people on probation and parole. |
| 5. Community Corrections Programs are not available statewide and existing programs are not required to measure outcomes. | E. Increase the capacity of Community Corrections Programs and establish recidivism-reduction requirements. |

**CHALLENGE 2. OVERCROWDED PRISONS.** The majority of prison admissions are people whose supervision has been revoked and people convicted of lower-level property and drug offenses whose average length of stay in prison has increased in recent years.

**STRATEGY 2.** Prioritize prison space for violent and dangerous offenders.

| FINDINGS | POLICY OPTIONS |
|---|---|
| 1. People revoked to prison for violating conditions of probation and parole supervision make up a significant portion of prison admissions. | A. Respond to serious technical probation and parole violations with periods of incarceration followed by supervision. |
| 2. Two-thirds of prison admissions are people convicted of property and drug offenses. | B. Create a new class of the least serious nonviolent felony offenses, and update felony thresholds for certain property and drug offenses. |
| 3. The parole board lacks structured parole decision making. | C. Adopt guidelines to structure the parole board's release decisions. |
| 4. The parole board reviews a high volume of cases. | D. Hire parole administrative hearing officers to review nonviolent cases and reduce the number of cases each parole board member must review. |

**CHALLENGE 3. UNSUPERVISED RELEASES.** A large number of people released from prison receive no supervision in the community, and the process for notifying victims regarding prison releases is fragmented.

**STRATEGY 3.** Provide supervision to every person released from prison and improve notification to victims regarding releases from prison.

| FINDINGS | POLICY OPTIONS |
|---|---|
| 1.  The majority of people released from prison without supervision are property and drug offenders. | A.  Require that people sentenced to prison for a Class C offense receive a split sentence to ensure supervision upon release. |
| 2.  Around half of all people under the parole board's jurisdiction complete their sentences in prison and, as a result, are released to the community without supervision. | B.  Require that all people serving a straight sentence receive supervision when released from prison. |
| 3.  The automated victim notification system is not operational, and not all victims are notified when people are released from prison. | C.  Complete the development of the automated victim notification system, and improve victim notification regarding releases from prison. |

### Additional Recommendations

The task force identified additional recommendations to assess, track, and ensure the long-term impact of the strategies outlined in the justice reinvestment policy framework:

- Direct the DOC to assess operational capacity of the state's existing prison facilities.

- Appropriate funds to establish model practices for and oversee evaluations of supervision and treatment programs funded by the state; to train BPP staff; and to invest in critical adult criminal justice information technology upgrades.

- Direct standing legislative oversight committees to evaluate reentry barriers for people with mental disorders, challenges faced by people seeking driver's licenses, and the state's restitution imposition and collection practices.

## Justice Reinvestment Policy Framework

Ultimately, the CSG Justice Center helped state leaders identify three challenges to Alabama's correctional system: (1) people being supervised in the community who are at a high risk of reoffending do not receive sufficient supervision and treatment to reduce recidivism; (2) the majority of prison admissions are people whose supervision has been revoked and people convicted of lower-level property and drug offenses whose average length of stay in prison has increased in recent years; and (3) a large number of people released from prison receive no supervision in the community, and the process for notifying victims regarding prison releases is fragmented.

With help from the CSG Justice Center and input from stakeholders across Alabama's criminal justice system, the task force developed a proposed policy framework to strengthen community-based supervision and treatment; prioritize prison space for violent and dangerous offenders; provide supervision to every person released from prison; and improve notification to victims regarding releases from prison. The task force voted nearly unanimously to support the policy framework and develop the policies into legislation to be considered by the legislature in the 2015 session.

## Projected Impact

Unless Alabama adopts policies to reduce the severe level of overcrowding in its prisons, the state will have to spend hundreds of millions of dollars to increase capacity. As a package, the policies described in this report have the potential to avert significant costs and reduce recidivism. Adoption of these policies would reduce the average probation caseload size by half, reduce prison overcrowding from 195 percent to 162 percent of capacity between FY2016 and FY2021, and decrease the prison population by 4,513 people.[9] (See Figure 1) For Alabama to lower its prison population to 162 percent by adding capacity alone, the state would need to spend at least $137.5 million in construction costs and $45 million in annual operating costs.[10] The justice reinvestment policy framework would allow the state to achieve this reduced level of crowding without these expenditures.

Even with adoption of the policy framework, however, Alabama's prison population is projected to continue to far exceed its capacity. Additional policy changes and/or construction will be needed to further reduce overcrowding. Prior to adding prison capacity, analysis should be conducted in order to assess the operational capacity of existing facilities; the projected need for capacity of different security levels following implementation of the policy options adopted by the state; and the most cost-effective options for expanding capacity.

**FIGURE 1. PROJECTED IMPACT OF JUSTICE REINVESTMENT POLICY FRAMEWORK ON ALABAMA'S PRISON POPULATION**[11]



## Reinvestment

It is critical that Alabama invest in additional supervision officers and community-based programs and treatment services to achieve these outcomes. Averted costs and proposed levels of reinvestment are based on projected impacts to the prison population as calculated by the CSG Justice Center, in consultation with the DOC, the BPP, and the Sentencing Commission. (See Figure 2)

**FIGURE 2. SUMMARY OF JUSTICE REINVESTMENT POLICY FRAMEWORK AVERTED COSTS AND REINVESTMENTS**[12]

| | | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | Total |
|---|---|---|---|---|---|---|---|---|
| **Averted costs** | Operational costs averted | $45.0M | $45.0M | $45.0M | $45.0M | $45.0M | $45.0M | $270.0M |
| | New construction costs averted | | | | | | | $137.5M |
| | **Total averted costs** | **$67.9M** | **$67.9M** | **$67.9M** | **$67.9M** | **$67.9M** | **$67.9M** | **$407.4M** |
| **Reinvestments** | Probation and parole officers | $10.0M | $10.0M | $10.0M | $10.0M | $10.0M | $10.0M | $60.0M |
| | Community-based programs and treatment to reduce recidivism | $8.0M | $8.0M | $8.0M | $8.0M | $8.0M | $8.0M | $48.0M |
| | Community Corrections Programs | $6.0M | $6.0M | $6.0M | $6.0M | $6.0M | $6.0M | $36.0M |
| | Victim notification system | $0.5M | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $1.0M |
| | Information technology and performance outcomes | $1.5M | $1.0M | $1.0M | $1.0M | $1.0M | $1.0M | $6.5M |
| | **Total reinvestment** | **$26.0M** | **$25.1M** | **$25.1M** | **$25.1M** | **$25.1M** | **$25.1M** | **$151.5M** |
| | **Net averted costs** | **$41.9M** | **$42.8M** | **$42.8M** | **$42.8M** | **$42.8M** | **$42.8M** | **$255.9M** |

## Alabama's Felony Sentencing Options and Supervision Types

Alabama has three felony offense categories: Class A, Class B, and Class C, with Class A offenses representing the most serious and Class C offenses the least serious. When an person is convicted of a felony there are several sentencing options available to the court.

**Probation:** A judge may impose a straight sentence of up to 5 years of probation or a split sentence of up to 17 years of probation (see below for more information on straight and split sentencing). For split sentences, the maximum overall sentence is 20 years, with between 3 and 5 years of incarceration or CCP supervision, followed by a period of up to 15 to 17 years on probation. People on probation supervision are under the jurisdiction of the BPP.

**Community Corrections Programs (CCPs):** CCPs are a sentencing option that includes more intensive supervision and treatment than probation. In addition to supervision, CCPs may also include educational, vocational, substance use treatment, and cognitive behavioral treatment services. About a quarter of these programs offer a residential component, where people typically participate in work release during the day and return to a residential correctional facility at night. CCPs are run locally at the county level and are established at the discretion of the counties. Not every county has a CCP or an agreement to use another county's CCP, therefore, it is not a sentencing option available everywhere in the state.

An individual may be sentenced to a CCP as an alternative to prison, as part of a split sentence, or, very rarely, as a condition of probation. People who demonstrate a pattern of violent behavior as defined in statute or who are convicted of certain crimes such as murder, rape, or robbery are not eligible for a CCP sentence. CCP participants are under the jurisdiction of the DOC when they have been sentenced to a CCP in lieu of a period of incarceration in prison. The DOC provides funding to CCPs for up to two years per program participant under DOC jurisdiction. All other CCP participants are under the jurisdiction of the county.

**County jail:** A sentence to county jail can be for as little as one year and up to three years in a jail. In practice, however, judges rarely sentence people convicted of felonies to jail.

**Prison:** A sentence to prison can be for as little as one year and a day. If a person is convicted of a felony and sentenced to a period of incarceration greater than three years, he or she is required to serve that time in prison.

There are two different types of sentences in Alabama: straight sentences and split sentences.

- ***Straight sentence:*** A judge sets a period of incarceration in jail or prison and the parole board has discretion to release the individual to parole before the end of his or her sentence.

- ***Split sentence:*** A judge sets the sentence and retains jurisdiction on the case until it is closed. If a period of incarceration in jail or prison is imposed, the individual will automatically be released to probation after serving the incarceration portion of the sentence. Split sentences are not an option when sentences exceed 20 years, or for Class A and Class B felony sex offenses involving a child.

**Parole:** Parole release is granted at the discretion of the three-member parole board. Parole is not available for people serving a split sentence. People on parole supervision are under the jurisdiction of the BPP.

## CHALLENGE 1:  INSUFFICIENT COMMUNITY-BASED SUPERVISION AND TREATMENT RESOURCES.  People being supervised in the community who are at high risk of reoffending do not receive sufficient supervision and treatment to reduce recidivism.

### FINDINGS AND ANALYSIS

**The BPP budget and spending per person on probation and parole supervision has fallen significantly in recent years.**

- In 2014, on average, two-thirds of Alabama's felony criminal justice population was supervised in the community, while one-third was incarcerated. At the end of June 2014, there were 44,854 people on probation, 8,391 people on parole, and 3,739 people participating in CCPs.[13]

- Appropriations for the BPP declined 41 percent between FY2009 and FY2013, from $41 million to $25 million.[14] Similar budget cuts were experienced across state agencies in Alabama during this period.

- The amount dedicated to probation and parole supervision fell from $1.87 per supervisee per day in FY2009 to $1.40 in FY2013.[15]

- Probation and parole officers have exceptionally high caseloads of almost 200 cases per officer, which makes it difficult to provide adequate supervision.

## Alabama Board of Pardons and Paroles

The Board of Pardons and Paroles (BPP) agency encompasses both the parole board and the probation and parole supervision divisions. The parole board consists of three members who make parole release and revocation decisions for people sentenced to straight prison sentences. The board does not have jurisdiction over people with split sentences because the sentencing judge retains jurisdiction over those cases. (See Box: Alabama's Felony Sentencing Options and Supervision Types, pages 7–8) The parole board also oversees felony probation and parole supervision administrative functions, which include submitting the BPP's annual budget request to the state legislature and hiring the BPP's leadership for the probation and parole supervision divisions. (See Figure 3)

**FIGURE 3. OVERVIEW OF BPP'S ORGANIZATIONAL STRUCTURE**[16]



**Risk and needs assessment tools are used inconsistently.**

- When a person is placed on probation or parole supervision, the likelihood of that person reoffending is assessed using an actuarial risk and needs assessment tool. This tool was created for Alabama's supervision population in 2003, however, and has not been validated.[17] (See Box: Understanding Risk and Needs Assessment, below)

- The BPP has been in the process of transitioning to a new risk and needs assessment instrument since 2011. Due to limited appropriations to BPP, insufficient resources have been dedicated to officer training on the use of this new tool and as a result, a number of probation and parole officers are still using the old tool.[18]

**Probation and parole officers lack sufficient training on the use of risk and needs assessments and do not use these assessments to manage caseloads and prioritize resources.**

- Probation and parole officers need additional training on incorporating the results of risk and needs assessments into the management of the people on their caseloads. Focus groups and a statewide survey of these officers indicate that risk and needs assessments are conducted at the beginning of supervision, but the results are not consistently used to inform caseload management or individual case planning. Many officers reported that most people on their caseloads receive the same level of supervision, regardless of their risk of reoffending.[19]

- Supervision resources are not being prioritized for higher-risk people on supervision. Although 38 percent of probationers were determined to be at a low risk of reoffending in 2014, 80 percent of these low-risk people received a higher level of supervision than their risk and needs assessments indicated was necessary.[20]

- Supervision officers do not use risk assessments to determine when probationers and parolees can be transitioned to less intensive supervision. The lowest level of supervision is administrative supervision, which has the fewest reporting requirements. While this type of supervision is an option for probation and parole officers to employ in appropriate circumstances, it is seldom used.

## Understanding Risk and Needs Assessment

Risk and needs assessment tools help sort people into low-, medium-, and high-risk groups. They are designed to gauge the likelihood that someone will come in contact with the criminal justice system, either as a result of a new arrest and conviction or reincarceration for violating the terms of supervision. These tools usually consist of 10 to 30 questions that are designed to ascertain an individual's history of criminal behavior, attitudes and personality, and life circumstances.

Risk and needs assessments can be administered at any time during a person's contact with the criminal justice system—during the pretrial period, while on probation, after admission to prison, prior to release, and during post-release supervision. These assessments are similar to actuarial tools used by insurance companies to rate risk: they predict the likelihood of future outcomes according to their analysis of past activities (e.g., criminal history) and present conditions (such as behavioral health or addiction). Objective risk and needs assessments have been shown to be more reliable than any professional's individual judgment, but are not absolutely predictive.[21] These tools can be used to inform parole release decision making and direct the intensity of the supervision, programming, and treatment provided.

The accuracy and reliability of risk and needs assessment tools must be routinely reexamined, or validated, to ensure ongoing usefulness. Such validation studies should consider the tool's ability to identify groups of people with different probabilities of reoffending, practicality and efficiency of use, and whether users of the tools achieve consistent scores for similar cases.

**Responses to violations of conditions of probation, parole, and CCP supervision are inconsistent.**

- The BPP and CCPs do not have standard guidelines to inform responses to supervision violations. As a result, sanctioning policies vary significantly across the state and practices are largely dependent upon local culture and court schedules.

- During focus groups, most probation, parole, and CCP officers reported that they did not use intermediate sanctions to respond to violations prior to revocation.[22] (See Box: Intermediate Sanctions, below)

**Probation and parole officers lack the authority to respond quickly to violations with short periods of incarceration.**

- Probation and parole officers do not have the authority to impose short periods of incarceration in response to violations and must instead arrest the probationer or parolee and wait for the court or parole board

to determine the sanction.[23] County jails typically house these people who are waiting for their violation hearings.

- Alabama law permits judges to respond to probation violations with periods of up to 90 days of incarceration, however this sanction does not apply to all probationers and some judges reported that they do not use this sanction.[24] A significant number of people on probation supervision are ineligible for this sanction because of their prior or current conviction for a violent offense.

- There are jurisdictions in Alabama where judges are working with local probation officers to implement intermediate responses to supervision violations, but there is no statute that clearly grants this authority to probation and parole officers.

- A statewide survey of judges found that 73 percent of respondents would like to see a clearer legal framework established for delegating the use of intermediate sanctions to probation officers.[25]

## Intermediate Sanctions

Intermediate sanctions are a range of responses to probationers' and parolees' behavior that probation and parole officers can use to help ensure accountability and deter recidivism. These sanctions can also help probation and parole officers respond consistently to violations with a level of swiftness and severity that is directly related to the probationer's or parolee's risk level and the seriousness of the violation. Standardizing responses provides a measure of fairness while giving probation and parole officers necessary flexibility. A low-severity sanction might involve increased monitoring or travel restrictions. Higher-severity responses could include placement in intensive outpatient treatment or a short, immediate jail sanction. These intermediate jail sanctions are often an integral element of the "swift and certain" approach to responding to violations.

**At the county level, people on supervision who are awaiting violation hearings spend long periods in jail.**

- In a survey of probation and parole officers, 46 percent of respondents indicated that the average

time in jail for a person waiting for a violation hearing is at least a week.[26]

- According to sheriffs surveyed, about 15 percent of jail beds are taken by probation violators waiting for a violation hearing.[27]

**The state does not provide funding for behavioral health treatment for people on probation and parole supervision, and state funding for the Department of Mental Health has declined in recent years.**

- Although research indicates that effective supervision paired with quality behavioral health treatment can have a significant impact on reducing recidivism, no state funding is allocated for providing targeted substance use or mental health treatment to people on probation or parole. The Department of Mental Health (DMH) serves as the only state-funded resource for treatment.

- State appropriations for the DMH declined from $144.9 million in FY2009 to $105.5 million in FY2015, a 27-percent decline.[28] This decrease in funding has diminished the availability of mental health treatment services for all Alabama residents, including people on community-based supervision.

- In a survey of probation and parole officers and CCP staff, 62 percent of probation and parole officers and 46 percent of CCP staff indicated that substance use treatment services for people on supervision are "sometimes available," "rarely available," or "non-existent."[29] (See Figure 4)

- Supervision officers who responded to the survey also reported that mental health treatment services in the community are even scarcer than substance use treatment services. Only 26 percent of probation and parole officers and 25 percent of CCP staff reported that mental health treatment services are "usually" or "readily available" for people under community-based supervision.[30] (See Figure 5)

**FIGURE 4. SUBSTANCE USE TREATMENT AVAILABILITY ACCORDING TO JUDGES, PROBATION/PAROLE OFFICERS, AND CCP STAFF (SURVEY RESULTS)**[31]



**FIGURE 5. MENTAL HEALTH TREATMENT AVAILABILITY ACCORDING TO JUDGES, PROBATION/PAROLE OFFICERS, AND CCP STAFF (SURVEY RESULTS)[32]**



## Cognitive Behavioral Programs

Cognitive behavioral programs help people who have committed crimes identify how their thinking patterns influence their feelings, which in turn influence their actions. These programs include structured social learning components where new skills, behaviors, and attitudes are consistently reinforced. Cognitive behavioral programs that target areas such as attitudes, values, and beliefs have a high likelihood of positively influencing future behavior, including a person's choice of peers, whether he or she abuses substances, and his or her interactions with family. Most effective cognitive behavioral programs are action-oriented and include components for people to practice skills through role-play with a trained instructor.[33]

### CCPs are not available statewide, and existing programs are not required to measure outcomes.

- In the past decade, CCPs have become a primary sentencing alternative to prison in Alabama.

- In 2014, 35 CCPs served 45 of Alabama's 67 counties. For the remaining 22 counties, a CCP sentencing option is not available. (See Box: Alabama Felony Sentencing Options and Supervision Types, pages 7–8)

- There are no state requirements for CCPs to measure results, such as program adherence to evidence-based practices or recidivism. Also, there is no mechanism to ensure accountability for how CCP funding is used to deliver treatment and other services to people on CCP supervision.

### CCPs do not use a consistent approach to determining the intensity of supervision and treatment services.

- In a statewide survey of CCP staff, respondents indicated that nearly half of CCP participants are at medium and high risk of reoffending and only 35 percent reported using risk and needs assessments to determine the intensity of supervision.[34] Further, the DOC's minimum standards for CCPs do not direct programs to differentiate supervision and treatment based on risk of reoffending.

- Not all CCPs offer work release programs, cognitive behavioral treatment services, or mental health courts.[35]

- Research indicates that appropriate treatment and supervision for medium- and high-risk people can have a significant impact to reduce recidivism; however, current practice does not prioritize supervision and treatment for those who are assessed as being medium- or high-risk.[36]

# Strategy 1: Strengthen community-based supervision and treatment.

## POLICY OPTIONS

### 1 (A) Hire additional probation and parole officers.

- Increase supervision capacity by hiring 100 additional probation and parole officers.

- Reduce probation and parole officers' caseloads to improve supervision.

### RATIONALE:

Alabama's probation and parole officers carry average caseloads of close to 200 cases per officer. Resources are spread thinly across many people on probation and parole, without differentiation based on their risk of reoffending or how long they have been under supervision. Adding supervision capacity will reduce caseloads by approximately half.

### 1 (B) Standardize the use of risk and needs assessments to target supervision resources for people who are most likely to reoffend, and reduce probation and parole officers' caseloads by limiting supervision intensity for people at low risk of reoffending.

- Require that all probation and parole officers be trained on the use of a validated risk and needs assessment by January 2017. Require ongoing training on risk and needs assessment strategies for supervision officers.

- Require that probation, parole, and CCP supervision intensity and services be determined according to results of risk and needs assessments.

- Limit the number of high-risk people on probation and parole officers' caseloads to 20.

- Transition lower-risk probationers and parolees to administrative supervision after they demonstrate compliance with the conditions of supervision for 9 to 12 months, provided that their sentences were not for violent or sex offenses, or felony driving under the influence.

- Require the review of an individual's suitability for discharge from probation or parole upon his or her second consecutive year of supervision without a revocation to prison. Require also that any legal financial obligations associated with the underlying case have been paid in full before the person is discharged from supervision.

- Preserve the role of the court and grant the parole board the authority to determine whether someone should be discharged from supervision prior to the originally scheduled discharge date. Parties to the case, including the local district attorney's office and victims, would have an opportunity to offer written recommendations regarding the proposed discharge.

### RATIONALE:

Effectively transitioning people to lower levels of supervision after demonstrated compliance will free resources to be focused on those who can most benefit from intensive supervision. Transition and discharge target dates also provide people with the opportunity and incentive to demonstrate they can change their behavior and succeed under less intensive supervision.

### 1 (C) Establish intermediate sanctions to respond to technical violations of probation and parole, and incorporate short jail stays in the range of possible sanctions.

- Establish an intermediate sanction policy that enables probation and parole officers to respond to specific supervision violations (e.g., missing curfew or failing a drug test) without a court or parole board hearing. Examples of these responses include requiring cognitive behavioral treatment, rapid assignment to substance use treatment, electronic monitoring, or a brief jail stay. The severity of the response should correspond to the seriousness of the violation.

- Authorize probation and parole officers to impose sanctions of up to three days in jail in response to certain violations of supervision, subject to the approval of the officer's supervisor.

- Ensure due process rights for people on supervision by preserving the right to request a court or parole board hearing to review the violation.

**RATIONALE:**

Probation and parole officers in Alabama already have the authority to arrest people under their supervision. This policy would provide them with the authority and flexibility to respond to supervision violations with swift and certain sanctions that can help increase accountability for people on supervision, deter recidivism, and reduce the cost of responding to supervision violations. Responses that are proportional to the seriousness of the violations can also improve the supervisee's perception that responses are fair and neutral, which can in turn deter future unwanted behaviors.[37]

### 1 (D) Fund community-based behavioral health treatment programs that have proven to help reduce recidivism for people on probation and parole.

- Provide funding for behavioral health treatment services for people on felony probation and parole.

- Prioritize these treatment resources for people at high risk of reoffending.

**RATIONALE:**

Research shows that pairing effective supervision and quality behavioral health treatment in the community can have a significant impact on reducing recidivism, yet the state does not provide funding of these services for people on supervision in the community.[38]

Approximately 10,000 treatment slots for cognitive behavioral and substance use treatment are needed to address the needs of the higher-risk people on probation and parole in Alabama.[39] Funding this treatment would address a critical gap in services.

### 1 (E) Increase the capacity of CCPs and establish recidivism-reduction requirements.

- Increase funding for CCPs to expand the number of people these programs can serve.

- Identify ways to allow counties that currently do not have CCPs to utilize this sentencing option.

- Require the DOC to create a new funding standard for CCPs that set appropriation levels based on the degree of implementation of evidence-based practices.

- Allow CCPs to volunteer to be the primary access point of behavioral health assessment and treatment referrals for their communities' probation, parole and CCP populations. The CCP would ensure that the community's limited treatment referral slots are prioritized for higher-risk probationers, parolees, and CCP participants.

**RATIONALE:**

Community-based behavioral health treatment can help reduce recidivism by addressing the risk and needs factors of the individual on supervision. Requiring programs to adhere to evidence-based practices will help ensure that CCPs have the most impact on reducing recidivism.

People on supervision are referred to treatment programs by probation, parole, or CCP officers, however these agencies do not share a standardized approach to prioritizing services in the community for people who are at a high risk of offending. Having one entity—in this case, a CCP—coordinate all behavioral health treatment referrals for people on supervision in the community would help to ensure that resources are targeted to high-risk people under probation, parole, and CCP supervision.

# Challenge 2: OVERCROWDED PRISONS. The majority of prison admissions are people whose supervision has been revoked and people convicted of lower-level property and drug offenses whose average length of stay in prison has increased in recent years.

## FINDINGS AND ANALYSIS

**People failing on probation and parole supervision make up a significant percentage of prison admissions.**

- People who violate the conditions of their probation and parole supervision made up 40 percent of prison admissions in FY2013. Of the total 8,313 admissions to DOC custody in FY2013, 2,387 of those admissions were revocations from probation and CCPs and 939 were revocations from parole.[40]

- A significant number of these probationers and parolees were revoked to prison for technical violations of their supervision. In FY2013, 36 percent of parole violators and 27 percent of probation violators were revoked for technical violations of their supervision, such as breaking curfews, missing appointments, or testing positive for drug use.[41]

- The number of people on felony probation who were revoked to prison increased 47 percent between FY2009 and FY2013, from 1,408 to 2,072.[42] (See Figure 6)

FIGURE 6. **FELONY PROBATION REVOCATIONS, FY2009–FY2013**[43]



## Alabama's Sentencing Guidelines

The Alabama Sentencing Commission was established in 2000 to review existing Alabama sentencing code and recommend changes to the code to the state legislature.

In 2003, the Sentencing Reform Act charged the Sentencing Commission with developing sentencing guidelines with the purpose of increasing public safety, improving the use of resources, enhancing certainty and fairness in sentencing, and addressing prison overcrowding and the premature release of people in prison.[44]

The Sentencing Commission established voluntary felony sentencing guidelines for person, property, and drug offenses in 2006. In October 2013, the sentencing guidelines for the majority of property and drug offenses became presumptive, meaning that they provide sentencing parameters that judges must use unless there are aggravating or mitigating factors to justify departing from the sentencing range. All classes of person and certain property and drug offenses, including burglary and drug trafficking offenses, are excluded from the presumptive guidelines. Voluntary guidelines for these offenses provide recommended sentencing ranges that are subject to the judge's discretion.

The state's sentencing guidelines assign point values to each felony offense that are used to calculate an "in prison" or "out" recommendation. For less serious felony offenses, an "in prison" recommendation would be a sentence to either prison or a CCP. CCPs were established as a sentencing option for "in prison" recommendations as a policy to divert people convicted of lower-level felonies away from prison. An "out" recommendation would be a sentence that would not include prison but could be a period of jail or a form of supervision, such as probation or a CCP. CCPs can be used for either an "in prison" or "out" recommendation. (See Box: Alabama's Felony Sentencing Options and Supervision Types, pages 7–8) When a new felony offense category is added to the guidelines, the Sentencing Commission must use past sentencing trends and other data to determine what point values to assign to the offenses within the category.

**Alabama has the fourth highest incarceration rate, as well as the most overcrowded prison system in the nation.**

- In 2013, Alabama's incarceration rate of 840 per every 100,000 adult state residents was the fourth highest in the country.[45]

- As of September 2014, prisons were operating at 195 percent of capacity, with 26,029 people held in a system designed to hold 13,318.[46]

**The state experienced declines in crime, arrests, and felony sentences between 2009 and 2013.**

- Alabama's index crime rate fell by almost 11 percent between 2009 and 2013, from 4,230 reported crimes per 100,000 residents to 3,769.[47]

- The number of arrests for index crimes and drug offenses fell by 10,549, a 21-percent decline, from 50,267 arrests in 2009 to 39,718 in 2013.[48]

- The number of felony sentences declined by 15 percent between FY2009 and FY2013, from 21,184 to 17,983.[49]

- The sentencing guidelines for property and drug offenses became presumptive in October 2013. The number of sentences to prison declined 16 percent between October 2013 and June 2014, from 6,260 to 5,253.[50] (See Figure 7)

**FIGURE 7. FELONY SENTENCES TO PRISON, OCTOBER TO JUNE, FY2011–FY2014.**[51]



| | Sentences to prison October–June | Percent change from previous year |
|---|---|---|
| **FY2011** | 6,932 | --- |
| **FY2012** | 6,664 | - 4% |
| **FY2013** | 6,260 | -6% |
| **FY2014** | 5,253 | -16% |
| *FY2011–FY2014 percent change* | | -24% |

*Presumptive guidelines effective beginning of FY2014 (October 2013)

**Despite the presumptive sentencing guidelines diverting a large number of people away from prison, people convicted of property and drug offenses continue to account for most prison admissions.**

- People convicted of property and drug offenses accounted for an estimated two-thirds of FY2014 prison admissions. An estimated 2,000 people convicted of drug offenses, 2,500 people convicted of property offenses, and 1,800 people convicted of person offenses were sentenced to prison in FY2014 (out of an estimated total 6,800 prison admissions).[52] These admissions represent both new convictions and revocations.[53] (See Figure 8)

**FIGURE 8. SENTENCES TO PRISON BY OFFENSE TYPE, FY2014**[54]



Estimated Total Sentences = 6,800

*"Other" represents community notifications, such as failure to register as a felon or as a sex offender.

### All categories of burglary in Alabama are classified as violent crimes.

- Alabama distinguishes the seriousness of burglary offenses by three separate degrees—first, second, and third degree—and all offenses within these burglary categories are considered violent offenses.

- Third-degree burglary—which is defined in Alabama as a burglary wherein no person is encountered while the crime is being committed—is the primary property offense for which people are sentenced to prison in Alabama, and ranks second among all types of offenses (drug, property, and person). Approximately 10 percent of all annual prison admissions are for third-degree burglary.[55]

- Other southern states, including Tennessee, Georgia, Mississippi, Louisiana, and Texas, have a nonviolent category of burglary or breaking and entering of a home or building.[56]

### Ten percent of people admitted to prison are convicted of the lowest-level felony property crimes.

- Approximately 10 percent of all annual prison admissions are for the lowest levels of felony property crimes (e.g., theft, forgery, and receipt of stolen property).[57]

- Theft of goods valued at more than $500 is a felony in Alabama punishable by sentences to probation, a CCP, jail, or prison. Theft of goods valued below that threshold is a misdemeanor.

- Thirty-three states now have a felony theft threshold that is greater than Alabama's $500 threshold, ranging from $650 to $2,500.[58]

## Parole Eligibility

Release to parole supervision is discretionary. The three-member parole board decides by a majority vote whether to grant parole after a person has served the statutorily required minimum portion of his or her straight sentence, which varies based on the type of crime committed. The parole board may also release someone before he or she is statutorily parole eligible with a unanimous vote. An individual convicted of certain offenses, including Class A or Class B felony sex offenses involving a child, is not eligible for parole and therefore can only be released from prison at the completion of his or her sentence.

**Despite fewer prison admissions, the prison population has not decreased, due to a corresponding decline in parole releases.**

- In FY2013, 30 percent of people eligible for parole were released, compared to 41 percent in FY2009.[59]

- The annual number people released on parole declined 30 percent between FY2009 and FY2013, from 3,280 to 2,312.[60] (See Figure 9)

- As a result of prison admissions and parole releases declining over the same period, the prison population remained stable.

- If the parole release rate had remained at FY2009 levels, approximately 2,205 additional people would have been released from prison between 2009 and 2013.[61]

**FIGURE 9. PAROLE CONSIDERATIONS AND APPROVALS, FY2009–FY2013**[62]





**Parole Approval Rates**

2009 = 41%
2010 = 40%
2011 = 31%
2012 = 29%
2013 = 30%

**The decline in parole releases contributes to longer lengths of stay in prison for people convicted of property and drug offenses who have been eligible for parole for at least a year.**

- The average length of stay in prison for people convicted of property offenses increased 52 percent between FY2009 and FY2014, from 23 months to 35 months.[63] (See Figure 10)

- During the same period, the average length of stay in prison for people convicted of drug offenses increased 58 percent, from 19 months in FY2009 to 30 months in FY2014.[64]

- The average length of stay in prison for people convicted of person offenses remained stable at 83 months in FY2009 and 81 months in FY2014.

People sentenced to 5-year prison terms for the most common property and drug offenses between FY2009 to FY2014 saw their average length of time served increase between 36 and 60 percent. For example, people convicted of third-degree burglary during this period experienced a 60-percent increase in time served, while people serving time for first- and second-degree theft of property experienced a 50-percent and 36-percent increase in time served, respectively. People serving time for possession of a controlled substance and possession of marijuana experienced a 60-percent and 36-percent increase in time served, respectively.[65]

**FIGURE 10. AVERAGE LENGTH OF STAY IN PRISON FOR PAROLEES BY OFFENSE TYPE (IN MONTHS), FY2009 AND FY2014**[66]



Property Offenses

FY2009: 23
FY2014: 35

52-percent increase in months served for property offenses



Drug Offenses

FY2009: 19
FY2014: 30

58-percent increase in months served for drug offenses



Person Offenses

FY2009: 83
FY2014: 81

Months served for person offenses remained stable.

**The average number of prior felony convictions (criminal history) for people convicted of property and drug offenses has not significantly changed in recent years.**

■ Criminal justice stakeholders, including prosecutors and parole board members, have suggested that Alabama's parole release numbers are declining, in part, because the current parole-eligible population has a more extensive criminal history than in previous years, and as a result, the parole board considers fewer people appropriate for parole.

■ The average number of prior felony convictions for parole-eligible people convicted of property offenses increased only slightly between FY2009 and FY2011, from 1.5 to 1.7 prior convictions.[67]

■ The average number of prior felony convictions for parole-eligible people convicted of drug offenses was also largely unchanged, with 1.2 prior convictions in FY2009 and 1.4 in FY2014.[68]

**The parole board considers factors beyond individual case reviews when making parole release decisions.**

- Parole board members reported that when making parole decisions, they account for the high caseloads parole officers carry and the limited community resources available to people on parole.

**The parole board lacks structured parole decision-making guidelines.**

- The three-member parole board often reviews more than 200 cases during the 3 days each week when hearings are held.

- The parole board does not have formal guidelines for parole release decisions. As a result, there is a lack of consistency in what factors they consider when determining if a person is ready for parole.

- In a survey of reasons for parole denial, the parole board reported placing less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison, than on other factors an individual cannot change, such as prior criminal history and nature of the underlying offense.[69] (See Figure 11)

- Parole boards across the country are increasingly using parole guidelines that consider factors that demonstrate an individual's readiness for parole, including risk and needs assessment results, record of program completion in prison behavior, and the existence of a viable parole plan.[70]

**There is little communication between the parole board and the people who are eligible for parole.**

- There is no formal communication between parole board members and the people they are considering for parole.

- People who are eligible for parole are not allowed to attend their hearings or in any other way directly make a case to the board regarding their readiness for parole.

- People who are denied parole are not informed of the reasons for denial and therefore do not know what they can do to increase their likelihood of being granted parole in subsequent hearings.

**FIGURE 11. FACTORS CITED FOR PAROLE DENIAL ACCORDING TO ALABAMA PAROLE BOARD (SURVEY RESULTS)**[71]

| Factors Cited for Denial | Percent of All Factors |
| --- | --- |
| Prior criminal history | 14% |
| Institutional misconduct – major | 14% |
| Stakeholder input | 12% |
| Risk to reoffend | 12% |
| Nature of underlying offense | 12% |
| Prior supervision failure on current case | 11% |
| Other* | 11% |
| Length of sentence imposed | 5% |
| Actual time served | 3% |
| Failure to complete programming | 3% |
| Lack of viable parole plan | 2% |
| Prior failed attempt at parole on same case | 1% |
| DOC recommendation against parole | < 1% |
| Institutional misconduct – minor | < 1% |

*"Other" includes cases with pending criminal charges.

**Time frames for reconsideration of parole do not correspond with best practices of parole authorities.**

- The possibility of parole is generally used as an incentive to encourage good behavior and to participate in prison programming. Typically an appropriate time period for a person to be able to demonstrate readiness for parole is one to two years after denial.[72]

- In Alabama, when parole is denied, the parole board sometimes sets the subsequent parole hearing at the statutory maximum of five years. A five-year time period does not correspond to evidence-based practices for using the parole process to incentivize the individual in prison.

## Strategy 2: Prioritize prison space for violent and dangerous offenders.

### POLICY OPTIONS

**2 (A) Respond to serious technical probation and parole violations with periods of incarceration followed by supervision.**

- Require that BPP implement policies for using administrative and intermediate sanctions in response to technical violations of probation and parole.

- Allow prison sanctions to be used only to respond to serious or persistent violations of supervision conditions. Cap prison sanctions at no more than 30 days.

- Specify that this sanction policy does not apply to people on supervision for violent or sex offenses, people charged with absconding from supervision, or people who are convicted of a new crime.

- Allow full revocation to prison only after a person has served 3 separate 30-day sanctions. Require continuation of the remaining supervision term upon release from prison.

**RATIONALE:**

Sanctioning probationers and parolees for technical violations of their supervision with 30 days of confinement followed by a return to supervision provides a less costly and more effective method of holding them accountable for their behavior than lengthier periods of confinement in prison. There were more than 3,000 probation and parole violators sent to prison in FY2013, almost 30 percent of whom had committed technical violations of the conditions of their supervision.[73]

**2 (B) Create a new class of the least serious nonviolent felony offenses, and update felony thresholds for certain property and drug offenses.**

- Create a new felony class of lower-level property and drug offenses ("Class D"). The new Class D felony offenses would have a prison sentencing penalty range of one year and a day to five years and be subject to the presumptive guidelines for nonviolent offenses. For "in prison" recommendations, the sentence would be a split sentence to a CCP with a maximum term of three years, with one year to be served on CCP supervision followed by two years of probation supervision.

- Preclude sentences to prison for Class D offenses unless the person has an extensive criminal history. People convicted of a Class D felony offense who have four or more prior felony convictions may receive a Class C felony sentence. People convicted of a Class D felony offense who have two or more prior convictions for Class B or higher offenses may also receive a Class C felony sentence.

- Limit the incarceration period for a revocation of a split sentence to no more than two years for Class D offenses, and limit the period of probation supervision served as part of a split sentence to no more than three years.

- Modify the classification of third-degree burglary as a nonviolent offense if the individual enters an uninhabited, non-domicile building and no person is encountered while the crime is being committed. This nonviolent form of third-degree burglary would be a Class D felony offense subject to the presumptive sentencing guidelines. Third-degree burglary would

be identified as a violent offense if the offender enters an occupied building or any domicile building regardless of whether a victim is encountered. This violent form of third-degree burglary would remain classified as a Class C felony and would not be subject to the presumptive sentencing guidelines.

■ Reclassify certain property and drug offenses as Class D offenses and update felony thresholds for certain property offenses. (See Figure 12)

■ Require the Sentencing Commission to determine the appropriate point values of the new Class D offenses for purposes of updating the sentencing guidelines. (See Box: Alabama's Sentencing Guidelines, page 17)

**FIGURE 12. CURRENT AND PROPOSED DRUG AND PROPERTY OFFENSE PENALTIES**

|  | CURRENT | PROPOSED |
|---|---|---|
| Felony Theft in the Second Degree | Threshold:<br>More than $500–$2,500<br><br>Offense Class:<br>*Class C* | Threshold:<br>More than $500–$1,499<br>Offense Class:<br>*Class D*<br><br>Threshold:<br>More than $1,500–$2,500<br>Offense Class:<br>*Class C* |
| Felony Theft in the First Degree | Threshold:<br>More than $2,500<br><br>Offense Class:<br>*Class B* | Threshold:<br>More than $2,501–$100,000<br>Offense Class:<br>*Class B*<br><br>Threshold:<br>More than $100,000 (or $50,000 in public monies)<br>Offense Class:<br>*Class A* |
| Forgery II<br>Possession of a Forged Instrument II<br>Fraudulent/Illegal Use of a Credit/Debit Card | Offense Class:<br>*Class C* | Offense Class:<br>*Class D* |
| Possession/<br>Receipt of Marijuana/<br>Controlled Substances | Offense Class:<br>*Class C* | Offense Class:<br>*Class D* |

## RATIONALE:

Creating a new felony offense class for the lowest-level property and drug offenses ensures that the degree of punishment is proportionate to the seriousness of the offense committed. Requiring people to first serve their sentences on probation or in a CCP allows the state to prioritize prison space for people who commit more serious offenses.

Alabama's burglary law is unusual among southern states in that it classifies all types of burglary offenses as violent offenses, regardless of the degree of offense, whether a victim was encountered, or the type of building entered. Redefining aspects of third-degree burglary and establishing a new nonviolent class would make the degree of punishment more proportional to the seriousness of the offense.

Establishing lower thresholds for property offenses would divert people convicted of lower-level property offenses away from prison. While many states have increased their felony property offense thresholds in recent years, Alabama remains in the minority of states who retain such a low threshold. In Georgia, for instance, the felony theft threshold was increased to $1,500 in 2012.

### 2 (C) Adopt guidelines to structure the parole board's release decisions.

- Stipulate that the parole board develop guidelines to structure the process for parole release decisions.

- Ensure that the guidelines require the consideration of a person's risk level as determined by a validated risk assessment tool, engagement in risk-reduction programs, institutional behavior (measured by serious misconduct), and the seriousness of the underlying offense for which he or she was sentenced to prison.

- Specify that the guidelines do not establish an expectation or right of release and that the ultimate decision of whether or not to grant parole resides with the parole board.

- Require increased transparency in decision making to inform the person under consideration for parole, the DOC, the victims, and other stakeholders of the reasons for parole approval or refusal.

- Require the DOC and the BPP to collaborate on formal reentry plans for people who are granted parole.

- Reduce the statutorily allowed maximum amount of time before reconsideration of parole from 5 years to 1 year or less after parole denial for people with prison sentences of 20 years or less, with the exception of those convicted of violent offenses. The guidelines will call for the next date for consideration to be determined by taking into account reasons for denial of parole and the time required to demonstrate readiness for supervision.

- Require the DOC and the BPP to establish a formal system of communication to share reasons for a person's parole denial and to prioritize programming.

### RATIONALE:

A structured decision-making process would assist the parole board in making more consistent and efficient parole decisions. Parole boards are increasingly using risk and needs assessments to inform both release decision making and responses to violations of parole supervision. Doing so enables the use of established criteria to prioritize prison space for those who pose the greatest risk to public safety.[74]

Currently, there is no communication between the parole board members and the person under consideration for parole. Sharing the reasons for parole denial can help people who are denied parole understand targets for behavior change, which can increase motivation to engage in programming and incentivizes good institutional behavior. Formal communication with the person who has been approved for parole will also be helpful in identifying how his or her reentry plan can be strengthened.

**2 (D) Hire parole administrative hearing officers to review nonviolent cases and reduce the number of cases each parole board member must review.**

- Establish three full-time positions to serve as administrative hearing officers for the parole board. Grant these officers one vote towards consideration of parole release for people incarcerated for nonviolent offenses.

- Establish voting procedures where two affirmative votes for parole—one from the administrative hearing officer and one from a parole board member—is sufficient for the person to be released to parole supervision. If either the officer or the parole board member does not vote for parole, the case will be placed on the parole board's next docket for review by all three parole board members.

- Require the administrative hearing officer to review an individual's preparedness for release to parole supervision no later than 12 months prior to an inmate's parole eligibility. The review shall take into account all relevant factors addressed by the guidelines developed by the parole board.

- Allow hearing officers to interview incarcerated people nearing parole eligibility to provide an opportunity for inmates to present their case for parole consideration to a voting member of the parole board.

**RATIONALE:**

The three-member parole board has a large number of cases to review weekly. Hiring parole administrative hearing officers will help reduce the number of nonviolent cases each board member must review and allows more of their time to be focused on the more serious, violent cases on its docket.

Currently, parole board members do not interview the people they are considering for parole. Having administrative hearing officers conduct these interviews will allow for some form of direct interaction with a parole-release decision maker, and provide an opportunity to ask questions or address concerns.

## Challenge 3: UNSUPERVISED RELEASES. A large number of people released from prison receive no supervision in the community, and the process for notifying victims regarding prison releases is fragmented.

### FINDINGS AND ANALYSIS

**One-third of the people leaving prison are released without supervision.**

- In FY2013, 2,852 people reached the end of their sentence in prison and therefore were released without supervision, accounting for 34 percent of total prison releases that year. All of these people were parole eligible due to their having received a straight prison sentence.[75] (See Box: Parole Eligibility, page 19)

- People who receive straight sentences of 15 years or less receive good time credit, and as a result experience short parole windows due to the impact good time has on the end-of-sentence date. For example, good time might

cause a 15-year straight sentence to have an adjusted end-of-sentence date of 4 years, 7 months, and 22 days, which is just about when the person serving that sentence would become eligible for parole. (See Box: Good Time, page 27)

- The parole board can and sometimes does use its authority to grant parole to people who are not yet eligible for parole (those who would otherwise complete their sentences before their parole eligibility date), but it requires a unanimous vote by the parole board, and the high volume of cases prevents the parole board from using this option as much as it might.

**FIGURE 13. RELEASES FROM PRISON BY TYPE OF RELEASE, FY2009–FY2013**[77]



**The majority of people released from prison without supervision are property and drug offenders.**

- In FY2013, people convicted of property and drug offenses accounted for 69 percent of releases without supervision.[78] (See Figure 13)

- Research indicates that lower-level property and drug offenders have high recidivism rates. In a national 5-year post-release study, 81 percent of people convicted of property offenses and 76 percent of people convicted of drug offenses were arrested for a new crime.[79]

- People convicted of low-level property and drug offenses who have received straight sentences tend to have little time to be considered for parole due to the impact of good time on their end-of-sentence dates.

## Good Time

People who receive straight sentences to period of incarceration in prison or a CCP automatically receive good time credit (based on time served and behavior, discipline, and work practices while in prison) that reduces the length of their sentences, unless statute explicitly excludes the person, based on crime of conviction, from receiving this credit. Good time can be denied or forfeited as a result of bad conduct or rule violations.

Not everyone sentenced to prison in Alabama can receive good time credit. For example, people who are serving any split sentence of any length or a straight sentence of more than 15 years are not eligible for good time credit. People convicted of Class A felonies or sex offenses involving a child are also not eligible for good time credit.

**People who receive no supervision upon release from prison have higher recidivism rates than people who receive supervision.**

- Of people released to parole supervision in FY2010, 18 percent were convicted of new offenses within 3 years of release.[80] (See Figure 14)

- Of the people released without supervision in FY2010, 27 percent were convicted of new offenses within 3 years of release.[81]

- Research demonstrates that people are most likely to recidivate within the first year of their release after incarceration, yet 34 percent of the total number of people released from Alabama prisons in FY2013 received no supervision in the community.[82]

**FIGURE 14. THREE-YEAR FELONY RECONVICTION RATES FOR PEOPLE RELEASED ON STRAIGHT SENTENCES IN FY2010**[83]



**Unlike straight sentencing, split sentencing guarantees supervision upon release from prison.**

- In FY2013, 2,736 people serving split sentences were released on probation. In the same year, of the 5,347 people released from prison on straight sentences, 2,495 were released on parole, while 2,852 completed their sentences in prison and therefore were released without supervision.[84]

- In the statewide survey, some judges indicated they prefer to use split sentences as a way to ensure both a period of incarceration and a period of supervision.[85]

- The average length of supervision for a split sentence is 44 months.[86]

**Alabama's automated victim notification system is not operational and not all victims are notified when people are released from prison to the community.**

- In 2011, Alabama passed legislation to create an automated victim notification system that would allow victims to receive notification through their preferred mode of communication, including email, text messages, automated voice recording, or U.S. mail. This notification system, called Alabama Crime Victims Automated Notification System (AlabamaCAN) was developed to be the primary vehicle for notification of victims regarding an offender's upcoming parole hearing or upon the offender's release from prison. AlabamaCAN is not yet operational due to a lack of financial resources to complete the system, so victims are only able to receive notification by U.S. mail.

- Currently, not all victims are notified when an offender is released from prison. There are gaps in the DOC notification process, such as victims not always being notified if the offender is released from prison for medical treatment or is released to a CCP work release program.

# Strategy 3: Provide supervision to every person released from prison and improve notification to victims regarding releases from prison.

## POLICY OPTIONS

### 3 (A) Require that people sentenced to prison for a Class C offense receive a split sentence to ensure supervision upon release.

- Eliminate straight sentences to prison as a sentencing option for Class C offenses, allowing sentences to prison only as a component of a split sentence, with the option of a CCP in lieu of prison.

- Restrict the incarceration period of a split sentence for Class C offenses to no more than two years.

- Limit the probation period of a split sentence for Class C offenses to no more than three years.

### RATIONALE:

Currently, one-third of people leaving prison are released without supervision, most of whom were convicted of lower-level offenses. Mandating split sentences for people convicted of Class C offenses ensures that these people will be held accountable after release from prison with mandatory supervision in the community.

Limiting probation supervision to three years would allow officers to focus supervision resources on people during the period when they are most likely to reoffend, which studies show is within the first year of release from prison.[87]

### 3 (B) Require that all people who serve a straight sentence receive supervision when released from prison.

- Require that people with straight sentences of five years or less receive at least three months of mandatory supervision in the community before their end-of-sentence date. For people who have sentences of more than 5 years but no more than 10 years, require that they receive at least 6 months of mandatory supervision in the community before their end-of-sentence date. For people who have sentences of more than 10 years, require that they receive at least 12 months of mandatory supervision in the community

before their end-of-sentence date. Require the DOC to notify victims when people are released to mandatory supervision in the community.

- Exclude people serving mandatory minimums for sex offenses involving children (§13A-6-124) from this policy as they already receive a form of supervision upon release.

### RATIONALE:

The combination of effective supervision and community-based treatment and programming has been shown to reduce recidivism by as much as 30 percent; however, around half of all people under the parole board's jurisdiction complete their sentences in prison and are released without supervision.[88] Ensuring that everyone receives some form of post-release supervision helps improve their chance of succeeding in the community and strengthens public safety. (See Figure 14)

### 3 (C) Complete the development of the automated victim notification system, and improve victim notification regarding releases from prison.

- Provide funding to complete the AlabamaCAN system.

- Require the DOC to use AlabamaCAN to notify victims when a person is released from prison to the community and remains under the jurisdiction of the DOC.

- Expand AlabamaCAN to include notifications from the attorney general's office (e.g., information regarding appeals or sex offender status).

### RATIONALE:

As outlined in the objectives in the Alabama Crime Victims' Right Act, victims have a right to be notified when an individual is released from prison. Completing the development of the AlabamaCAN system will enhance victim notification and help strengthen public safety.[89]

## Sustainability

If legislation is enacted, Alabama has the opportunity to request funding from BJA to enhance capacity-building efforts such as workforce training, information technology support, and ongoing quality assurance efforts. If approved for such funding, the state also has the opportunity to continue working with the CSG Justice Center to receive technical assistance in implementing the justice reinvestment policies.

## ENDNOTES

[1] CSG Justice Center analysis of Alabama Department of Corrections (DOC) June 2014 snapshot of felony prison population data and Alabama Board of Pardons and Paroles (BPP) FY2009–FY2014 probation and parole population data and parole entries data.

[2] E. Ann Carson, *Prisoners in 2013* (Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice, September 2014). The incarceration rate is the number of people incarcerated per 100,000 residents. The incarceration rate in Alabama takes into account people who are not housed in prison facilities. Some people serving time in Community Corrections Programs (CCP) are also included. DOC's capacity (operating at 195 percent) is calculated using the custody population. In September 2014, there were 26,029 people within DOC's custody population. This population is comprised of individuals housed in facilities owned and operated by DOC, in addition to those housed in DOC contract facilities and special program facilities. DOC *Monthly Statistical Report for September 2014* (Montgomery: Department of Corrections, September 2014).

[3] Email correspondence between CSG Justice Center and Alabama Legislative Fiscal Office on February 10, 2015. Alabama prison population has not increased or decreased between 2009 and 2013.

[4] Email correspondence between CSG Justice Center and Alabama Legislative Fiscal Office on February 10, 2015.

[5] Pew Center on the States, Public Safety Performance Project, 2007, pewtrusts. org/-/media/legacy/uploadedfiles/pcs_assets/2008/January2008Alabamapdf.pdf and Vera Institute of Justice, Cooperative Community Alternative Sentencing Project, 2010 sentencingcommission.alacourt.gov/CCASP/CCASP_CommonThemes_3.17.08. pdf.

[6] Brown v. Plata, 131 S. Ct. 1910 (2011).

[7] The Alabama Legislative Fiscal Office estimates $102 million construction cost for a 1,500 bed facility; Annual DOC operating costs are projected using the current DOC inmate operating cost of $42.54 per day. DOC, *Annual Report Fiscal Year 2013* (Montgomery: DOC, 2013)

[8] Senate Joint Resolution 20, (Alabama 2014) https://legiscan.com/AL/text/SJR20/id/955472.

[9] CSG Justice Center projected impact on the prison population and reinvestment analysis, 2015.

[10] CSG Justice Center projected averted costs analysis, 2015.

[11] CSG Justice Center projection impact analysis based on FY2008–FY2014 DOC prison population and felony sentencing data. The baseline population projection assumes a continuation of no growth or decline in the prison population.

[12] CSG Justice Center projected averted costs and recommended reinvestment.

[13] CSG Justice Center analysis of Alabama Sentencing Commission (Sentencing Commission) 2014 felony sentencing data, BPP 2014 probation and parole population data, and BPP 2014 parole entries data; DOC, *Annual Report Fiscal Year 2013*.

[14] Email correspondence between CSG Justice Center and Alabama Legislative Fiscal Office, Fall 2014.

[15] Probation and parole officers commonly supervise both people on probation and parole supervision. DOC, *Fiscal Year 2009 Annual Report* (Montgomery: DOC, 2009); DOC, *Annual Report Fiscal Year 2013*. Email correspondence between CSG Justice Center and Alabama Legislative Fiscal Office, Fall 2014.

[16] BPP, *Annual Report FY2013* (Montgomery: BPP, 2013).

[17] Email correspondence between CSG Justice Center and the BPP on June 9, 2014.

[18] *Ibid.*

[19] CSG Justice Center focus groups of probation and parole officers and community corrections programs staff, June–July 2014. CSG Justice Center electronic survey of Alabama probation and parole officers, August 2014 (234 of 249 probation and parole supervising officers completed the survey). CSG Justice Center electronic survey of Alabama community corrections program, August 2014.(37 CCP staff, including directors and officers, completed the survey.)

[20] CSG Justice Center analysis of BPP June 30, 2014 probation supervision snapshot data.

[21] Edward Latessa, "The Challenge of Change: Correctional Programs and Evidence-Based Practices," *Criminology & Public Policy,* 3, no. 4 (2004), 547–560; Marshall Clement, Matthew Schwarzfeld, and Michael Thompson, *The National Summit on Justice Reinvestment and Public Safety: Addressing Recidivism, Crime, and Corrections Spending,* (New York: CSG Justice Center, 2011).

[22] CSG Justice Center focus groups of probation and parole officers and community corrections programs staff, June–July 2014.

[23] CCP officers do not have arrest powers.

[24] Alabama Code §15-22-54

[25] CSG Justice Center electronic survey of Alabama Circuit Court Judges, November 2014. (71 of the 114 circuit court judges with criminal cases on their dockets took the survey).

[26] CSG Justice Center electronic survey of Alabama probation and parole officers, August 2014.

[27] CSG Justice Center survey of sheriffs for county jail capacity and population statistics, August 2014–January 2015. Some jails were unable to distinguish

between a parole, probation or CCP violator.

[28] Email correspondence between CSG Justice Center and the Alabama Legislative Fiscal Office, October and November 2014.

[29] CSG Justice Center electronic survey of Alabama probation and parole officers, August 2014; CSG Justice Center electronic survey of Alabama CCP staff, August 2014.

[30] Ibid.

[31] Ibid.; CSG Justice Center electronic survey of Alabama Circuit Court Judges, November 2014.

[32] Ibid.

[33] Edward Latessa, From Theory to Practice: What Works in Reducing Recidivism? (Cincinnati: University of Cincinnati Press, 2007).

[34] CSG Justice Center electronic survey of Alabama CCP staff, August 2014.

[35] Ibid.

[36] D.A. Andrews and C. Dowden, "Risk Principle of Case Classification in Correctional Treatment: A Meta-Analytic Investigation," International Journal of Offender Therapy and Comparative Criminology, no. 50 (2006): 88–100.

[37] Faye Taxman, David Soule, and Adam Gelb, "Graduated Sanctions: Stepping into Accountable Systems and Offenders," Prison Journal, 1999, 79(2): 182–205.

[38] N.A. Landenberger M. W. Lipsey, "The Positive Effects Of Cognitive-Behavioral Programs For Offenders: A Meta-Analysis of Factors Associated with Effective Treatment," Journal of Experimental Criminology, no. 1 (2005): 451–476.

[39] CSG Justice Center analysis of probation and parole risk and needs population distribution and need for treatment.

[40] CSG Justice Center analysis of DOC FY2013 prison admissions data.

[41] CSG Justice Center analysis and sampling of DOC FY2013 prison admissions data and BPP FY2013 parole and probation supervision data.

[42] CSG Justice Center analysis of BPP FY2009–FY2013 probation terminations data.

[43] CSG Justice Center analysis of BPP FY2009–FY2013 probation terminations data.

[44] Sentencing Commission, " Progress Continues: Presumptive Sentencing Standards Report," (Montgomery: Alabama Sentencing Commission, 2014).

[45] Carson, Prisoners in 2013.

[46] DOC, Monthly Statistical Report for September 2014.

[47] U.S. Department of Justice and Federal Bureau of Investigation, "Unified Crime Reporting Data," accessed February 22, 2015 ucrdatatool.gov/Search/Crime/State/RunCrimeStatebyState.cfm.

[48] Alabama Criminal Justice Information Center, Crime in Alabama Annual Reports 2009–2013, (Montgomery: Alabama Criminal Justice Information Center, 2009–2013); CSG Justice Center analysis of Sentencing Commission FY2009–FY2013 felony sentencing data; Index crimes consist of incidents reported by law enforcement to the FBI as part of the Uniform Crime Reporting Program, and are considered representative of the most serious crimes. Violent index crimes are murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault, and property index crimes are burglary, larceny-theft, and motor vehicle theft.

[49] Ibid.

[50] CSG Justice Center analysis of Sentencing Commission FY2011–FY2014 felony sentencing data; To measure the presumptive sentencing guidelines' impact on sentences to prison, an analysis was conducted using the first nine months the guidelines were in effect, from October 2013 through June 2014. For comparison, the same time period was used for prior years.

[51] Ibid.

[52] CSG Justice Center analysis of Sentencing Commission October 2013–June 2014 felony sentencing data.

[53] Ibid.

[54] Ibid.

[55] CSG Justice Center analysis of Sentencing Commission FY2009–FY2014 felony sentencing data.

[56] CSG Justice Center analysis research of state felony property offense statutes, November 2014. States have different terminology for "burglary."

[57] CSG Justice Center analysis of Sentencing Commission FY2009–FY2014 felony sentencing data.

[58] CSG Justice Center analysis research of state felony theft statutes, August 2014.

[59] CSG Justice Center analysis of FY2009–FY2013 BPP parole considerations and approvals.

[60] Ibid.

[61] CSG Justice Center analysis of DOC FY2009–FY2013 prison population and releases data. People may be revoked and subsequently re-released to parole over the course of a year. Therefore, some people may be represented multiple times.

[62] CSG Justice Center analysis of FY2009–FY2013 BPP parole considerations and approvals.

[63] CSG Justice Center analysis of DOC FY2009 and FY2014 prison releases data.

[64] Ibid.

[65] Ibid.

[66] Ibid.

[67] CSG Justice Center analysis of DOC FY2009 and FY2014 prison population data and Sentencing Commission FY2009 and FY2014 felony sentencing data; Note: The people convicted of property and drug offenses in FY2014 referenced here, had been eligible for parole for more than one year.

[68] Ibid.

[69] CSG Justice Center survey of parole board's reasons for denial. All three parole board members completed a survey for every parole denial for three weeks of hearings between Oct.–Nov. 2014; CSG Justice Center focus group with BPP staff and parole board members, November 3–5, 2014.

[70] Morris L. Thigpen et al., The Future of Parole as a Key Partner in Assuring Public Safety (Washington, DC: National Institute of Corrections, July 2011).

[71] CSG Justice Center survey of parole board's reasons for denial, Oct.–Nov. 2014.

[72] Strategic Management and Use of Evidence Based Practices for Parole Authorities, (Silver Spring: National Parole Resource Center, 2012).

[73] CSG Justice Center analysis and sampling of DOC FY2013 prison admissions data and BPP FY2013 parole and probation supervision data.

[74] Nancy M. Campbell, Comprehensive Framework for Paroling Authorities in an Era of Evidence-Based Practices (Washington, DC: National Institute of Corrections, 2008). Morris L. Thigpen et al., Core Competencies: A Resource of Parole Board Chairs, Members and Executive Staff (Washington, DC: National Institute of Corrections, March 2010).

[75] CSG Justice Center analysis of DOC FY2009–FY2013 prison release data.

[76] CSG Justice Center electronic survey of Alabama circuit court judges, November 2014.

[77] CSG Justice Center analysis of DOC FY2009–FY2013 prison release data.

[78] Ibid.

[79] Alexia D. Cooper, Matthew R. Durose, and Howard Snyder, Recidivism of

*Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* (Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice, 2014).

80 CSG Justice Center analysis of DOC 2010 prison releases data and Sentencing Commission FY2010–FY2013 felony sentencing data.

81 *Ibid.*

82 Patrick A. Langan and David J. Levin, "Recidivism of Prisoners Released in 1994." (Washington: United States Department of Justice, Bureau of Justice Statistics, 2002).

83 CSG Justice Center analysis of DOC 2010 prison releases data and Sentencing Commission FY2010–FY2013 felony sentencing data.

84 CSG Justice Center analysis of DOC FY2009–FY2013 prison releases data.

85 CSG Justice Center electronic survey of Alabama circuit court judges, November 2014.

86 CSG Justice Center analysis on FY2009–FY2013 BPP probation terminations data.

87 Patrick A. Langan and David J. Levin, "Recidivism of Prisoners Released in 1994" (Washington, DC: United States Department of Justice, Bureau of Justice Statistics, 2002).

88 D.A. Andrews and James Bonta, *The Psychology of Criminal Conduct,* 5th ed. (New York, New York: Routledge, 2010).

89 Alabama Code §15-23-60 through 15-23-84, and Constitutional Amendment No. 557.



This project was supported by Grant No. 2013-ZB-BX-K002 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, and the SMART office. Points of view or opinions in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice. To learn more about the Bureau of Justice Assistance, please visit bja.gov.



Research and analysis described in this report has been funded in part by the Public Safety Performance Project of The Pew Charitable Trusts. Launched in 2006 as a project of the Pew Center on the States, the Public Safety Performance  Project seeks to help states advance fiscally sound, data-driven policies and practices in sentencing and corrections that protect public safety, hold offenders accountable, and control corrections costs. To learn more about the Public Safety Performance Project, please visit pewstates.org/publicsafety.



The Council of State Governments (CSG) Justice Center is a national nonprofit organization that serves policymakers at the local, state, and federal levels from all branches of government. The CSG Justice Center provides practical, nonpartisan advice and evidence-based, consensus-driven strategies to increase public safety and strengthen communities. Points of view, recommendations, or findings stated in this document are those of the authors and do not necessarily reflect the official position or policies of The Pew Charitable Trusts, the Council of State Governments Justice Center, or the Council of State Governments' members.

For additional information about Justice Reinvestment in Alabama, please visit csgjusticecenter.org/jr.

**Project Contact:**

Cassandra Warney

Program Associate

cwarney@csg.org