IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ROBERT EARL COUNCIL aka KINETIK JUSTICE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KAY IVEY, *et al.*,<br><br>Defendants. | Case No. 2:23-cv-00712-ECM-JTA<br><br>**DECLARATION OF LACEY KELLER IN SUPPORT OF PLAINTIFFS MOORE, COLE, MCDOLE, CAMPBELL, PTOMEY, AND ENGLISH'S MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION** |

I, Lacey Keller, declare:

1. I am a co-founder of MK Analytics, Inc. (MK Analytics), which assists non-profits, governments, and law firms in using data to implement initiatives and conduct investigations. Before founding MK Analytics, I established the Research and Analytics Department at the New York State Office of the Attorney General, leading a team that employed cutting-edge data analysis in high-profile cases. As an expert witness, I have been deposed nearly 20 times and have provided testimony in six trials. In addition to over a decade of experience in research and analytics, I hold a Master of Economics from the New School and a Bachelor of Business Administration from Washburn University.

2. MK Analytics has been retained by Plaintiffs' counsel in the matter of *Council, et al. v. Ivey, et al.*, Civil Case No. 2:23-cv-00712-ECM-JTA (M.D. Ala.). I supervised MK Analytics' team of professionals that performed the analysis discussed herein, and I am familiar with the work each team member performed. Plaintiffs' counsel asked MK Analytics to analyze

data provided by the Alabama Department of Corrections ("ADOC") and the Alabama Bureau of Pardons and Paroles ("ABPP"). MK Analytics reviewed both publicly available data posted on the ABPP website and data provided by ADOC and ABPP in response to public records requests submitted by investigators working with Plaintiffs' counsel. MK Analytics used data from machine-readable, tabular data files and formats.

3.  MK Analytics considered three parole datasets compiled by ABPP that provide information on people in ADOC custody between January 1, 2018 and September 7, 2023 who were considered for parole. MK Analytics downloaded data files from ABPP's public website, ABPP Parole Results, https://paroles.alabama.gov/parole-results/. MKA also scraped data from the tables posted by ABPP on the pages "Parole Results – Current Year," https://paroles.alabama.gov/hearings/parole-results-current-year/, and "Parole Results – Previous Year," https://paroles.alabama.gov/hearings/parole-results-previous-year/. MK Analytics also referenced archived versions of these pages with the earliest snapshot dating back to December 2020. Finally, MK Analytics considered data provided by ABPP in response to public records requests. Using measures standard in the field of data science, MK Analytics combined these three data sources, which largely overlapped, into one single dataset, eliminating duplicates and resolving conflicts by referring to publicly posted PDF parole hearing minutes and ADOC custody data. The parole dataset includes, to the extent recorded by ABPP, the name of the incarcerated person considered for parole, the AIS number for that person, the date of parole hearings dating back to January 1, 2018, whether the Parole Board granted or denied parole on the specified date, and whether and when the incarcerated person was scheduled to be considered for parole in the future (the "reset date") where available in the data.

4. MK Analytics also received a dataset from ADOC containing demographic information regarding individuals in ADOC custody. According to ADOC, this dataset includes information including the names of incarcerated people, their AIS numbers, their race, and their sex. MK Analytics received an additional dataset showing information on the facilities in which incarcerated people were located between January 1, 2018 and September 7, 2023, including the date and time on which an incarcerated person arrived or departed from facilities within ADOC's jurisdiction and each individual's AIS number and associated suffix. I am informed and believe that the suffix identifies distinct periods of incarceration (for example, if the same person had been incarcerated by ADOC on more than one occasion) and sometimes an incarcerated person's status. MK Analytics categorized each facility type—maximum/close, medium, and minimum (work center or work release)—based on the name of the facility and publicly available information published by ADOC, including the facility type in which they appear in ADOC's public monthly reports.

5. MK Analytics reviewed additional data produced by ADOC in response to public records requests concerning the job status of incarcerated people in ADOC facilities. I was informed and believe that the job status information reflects whether an incarcerated person checked out of and back in to ADOC facilities to perform work on a given day. The time period covered by the jobs-related dataset is January 1, 2018 through September 7, 2023, and it also includes information on AIS number and suffix.

6. MK Analytics further received from ADOC two datasets containing sentencing information for all individuals housed in ADOC custody from approximately January 1, 2018 until September 7, 2023, with the exception of 33 people who appeared in the facilities dataset but did not have sentencing information reflected. According to ADOC, these sentencing

datasets include AIS numbers and suffixes, the case number, their crime(s) of conviction, the sentence date, the term(s) of their sentence(s) for each count and whether time will be served concurrently or consecutively, the total term as calculated by ADOC, the minimum release date, and information on time served. These datasets were also produced in response to a public records request.

7. Plaintiffs' counsel requested that MK Analytics analyze these datasets to identify parole grant rates for various groups of incarcerated people. MK Analytics performed the requested analysis applying reliable principles and methods that are industry standard.

8. MK Analytics used industry-standard practices to validate the completeness and reliability of the datasets described, to document limitations in the data, and to address the relatively small number of incomplete or implausible entries. The datasets on which MK Analytics ultimately relied are the type of information an expert in my field would reasonably rely upon. The data MK Analytics utilized was produced by government entities. Government datasets are generally deemed reliable in my field, and I understand that ADOC and ABPP rely upon this same information for their own reporting.

9. First, MK Analytics was asked to calculate the parole grant rates for different racial groups, over the period for which the necessary data were available (January 1, 2018 through September 7, 2023).

10. To identify parole outcomes by race, MK Analytics matched the race information from the ADOC demographics dataset, using the AIS number, with the parole outcomes associated with that same AIS number in the ABPP parole outcomes combined dataset. MK Analytics focused its analysis on what ADOC defines in its monthly reports as its "in-house"

population—incarcerated people in close/maximum-security, medium-security, minimum work release, and minimum work center facilities.

11. Because ADOC and ABPP reports generally report statistics with respect to Fiscal Years ("FYs"), MK Analytics used Alabama's FY of October 1 through September 30 in analyses where possible, taking into account that MK Analytics did not have data for the full FY 2018 or FY 2023.

12. Our analysis shows that, in FY 2018, Black parole candidates and white parole candidates were granted parole at rates above 50%. White parole candidates were granted parole 54.4% of the time, while Black parole candidates were granted parole 50.7% of the time, as reflected in Figure A below, which depicts parole grant rates between FY 2018 (beginning January 1) and FY 2023 (through September 7, 2023).

**FIGURE A**



13. As Figure A illustrates, parole grant rates fell substantially between FY 2018 and FY 2023.

14. Between FY 2018 and FY 2023, Black parole candidates have been granted parole at lower rates than white parole candidates, with the discrepancy widening substantially by FY 2020. Figure A demonstrates the absolute discrepancy in parole grant rates for Black and white incarcerated people. Figure B, below, illustrates the dramatic relative difference in parole grant rates for white and Black parole candidates, focusing on FY 2018 and FY 2021 as points of comparison.

**FIGURE B**



15. Using methods standard in the field, MK Analytics also prepared a regression analysis to assess the relationship between race and parole outcomes. MK Analytics treated parole grants as our dependent variable. MK Analytics controlled for facility type, Fiscal Year (2020, 2021, 2022), sex, and job status (whether ADOC reported that the incarcerated person had checked out for a job during the fiscal year of the parole hearing). This regression analysis demonstrates that, controlling for these variables, between FY 2020 and FY 2022, white parole candidates were 2.06 times as likely to be granted parole as Black parole candidates, with a 95% confidence interval of 1.80-2.35.

16. MK Analytics was also asked to assess parole grant rates for parole candidates convicted of offenses deemed "violent" by Alabama state law, as compared to parole candidates convicted of offenses deemed "non-violent." To evaluate the parole grant rates for these groups,

based on attorney guidance, MK Analytics assigned a category to each of the offenses of conviction included in the sentencing data provided by ADOC.

17. Figure C, below, shows the parole grant rates from FY 2018 (beginning January 1, 2018) through FY 2023 (through September 7, 2023) for parole candidates convicted of any "violent offense" in maximum/close, medium, and minimum (work center and work release) ADOC facilities.

**FIGURE C**



18. Figure D, below, illustrates the parole grant rates for parole candidates in those same facilities convicted only of "non-violent" offenses between FY 2018 (beginning January 1, 2018) and FY 2023 (through September 7, 2023).

**FIGURE D**



19. MK Analytics then separately analyzed parole grant rates by race for each group—those convicted of any "violent" offenses and those convicted only of "non-violent" offenses. In FY 2018, both Black and white parole candidates convicted of any "violent" offense were granted parole 44.7% of the time. In FY 2020, 10.6% of white and 6.9% of Black parole candidates convicted of any "violent" offense were granted parole. In FY 2022, 2.2% of

Black parole candidates convicted of any "violent" offense were granted parole, compared to 4.9% for white parole candidates convicted of any "violent" offense.

20. In FY 2018, Black parole candidates convicted only of "non-violent" offenses were granted parole 66.7% of the time, and white parole candidates convicted only of "non-violent" offenses were granted parole 63.8% of the time. In FY 2020, 29.6% of white and 21.7% of Black parole candidates convicted only of "non-violent" offenses were granted parole. In FY 2022, 20.0% of Black parole candidates convicted only of "non-violent" offenses were granted parole, compared to 21.3% for white parole candidates convicted only of "non-violent" offenses.

21. MK Analytics also analyzed the parole grant rates for incarcerated people based on the type of facility (medium security, work center, work release) in which they were housed before their parole hearings. Black and white incarcerated people in work-release facilities were granted parole at essentially equal rates in FY 2018 (78.4% and 78.9%, respectively). By FY 2020, white parole candidates in work-release facilities were granted parole 45.4% of the time, while Black parole candidates in work-release facilities were granted parole only 26.0% of the time. In FY 2021, Black parole candidates in work-release facilities were granted parole 17.6% of the time, compared to 32.5% of the time for white parole candidates in work-release facilities. A disparity persisted in FY 2022, with Black parole candidates in work-release facilities granted parole in 15.5% of hearings and white parole candidates in work-release facilities granted parole in 23.4% of hearings.

22. Parole grant rates for incarcerated people held in work-center facilities likewise saw steep declines over this period. In FY 2018, 65.7% of white and 61.6% of Black parole candidates in work-center facilities were granted parole. In FY 2019, these rates fell to 47.1%

for white and 40.2% for Black parole candidates in work-center facilities. In FY 2020, the rates were 18.9% for white and 13.8% for Black parole candidates in work-center facilities; in FY 2021, the rates were 15.3% and 5.2%, respectively; and in FY 2022, the rates were 16.5% for white parole candidates in work-center facilities and 9.0% for Black parole candidates in work-center facilities.

23.    Plaintiffs' counsel also asked us to analyze the distribution of parole reconsideration or "reset" dates the Parole Board assigned to parole candidates who were denied parole. Figure E, below, illustrates the distribution of reset periods by race in FY 2018 (beginning January 1, 2018) through FY 2023 (through September 7, 2023), among parole candidates who were given a reset date. At the request of counsel, MK Analytics grouped reset periods into three categories: 1-2 years, 3-4 years, and 5 years.

**FIGURE E**



24.     As this chart illustrates, since FY 2020, the Parole Board has granted reset dates of two years or less to white people denied parole substantially more frequently than it has to Black people denied parole. In FY 2021, 2022, and 2023, white parole candidates denied parole were given reset dates within two years more than twice as often as Black candidates denied parole.

25.     Since FY 2020, the Parole Board has also increased the frequency with which it has assigned incarcerated people denied parole five-year set-off dates, with Black people more often assigned the maximum set-off date. In FY 2018, only 13.2% of Black people and 14.0% of white people denied parole received five-year set-off dates. In FY 2021, 82.2% of Black people denied parole and 64.8% of white people denied parole received five-year set-off dates.

26. In FY 2022, the Parole Board denied parole to 3,585 parole candidates, 1,933 of whom are Black; within the FY 2022 group denied parole, the Parole Board gave five-year reconsideration dates to 1,360 people, of whom 900 are Black. In FY 2023 (through September 7, 2023), the Parole Board denied parole to 3,467 parole candidates, 1,789 of whom are Black; within the partial FY 2023 group denied parole, the Parole Board gave five-year reconsideration dates to 1,293 people, of whom 850 are Black.

27. MK Analytics was also asked to assess, using the available data for FY 2018 to FY 2023, whether any parole candidates convicted only of "non-violent" offenses and sentenced to terms of less than 20 years were given reset dates more than two years after the hearing at which parole was denied. MK Analytics identified at least 60 people who appear to fall in this category, based on the sentencing information provided by ADOC, 51 of whom appear still to be incarcerated based on ADOC's records. In FY 2022 and 2023 (through September 7, 2023), the Parole Board appears to have assigned set-off dates more than two years in the future to 22 individuals convicted only of "non-violent" offenses and sentenced to terms of less than 20 years, with 18 of these individuals receiving five-year set-off dates.

28. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 12/20/2023

DocuSigned by:

*Lacey Keller*
D5A592E70A944CC...

Lacey Keller