**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| ROBERT EARL COUNCIL AKA KINETIK JUSTICE, *et al.,* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO.: 2:23-CV-00712-CLM-JTA |
| KAY IVEY, et al., | ) ) | |
| Defendants. | ) ) | |

**RESPONSE IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**
**OF DEFENDANTS GOVERNOR KAY IVEY AND**
**ATTORNEY GENERAL STEVE MARSHALL**

Brad A. Chynoweth (ASB-0030-S63K)
*Assistant Chief Deputy, Civil Division*

Benjamin M. Seiss (ASB-2110-O00W)
*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Brad.Chynoweth@AlabamaAG.gov

***Counsel for Defendants Governor Kay Ivey***
***and Attorney General Steve Marshall***

# Table of Contents

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................. iii

Introduction ............................................................................................................... 1

Facts .......................................................................................................................... 2

   A.   The Individual Plaintiffs. ................................................................................ 2

   B.   Alabama Law on Parole and the Role of the Governor, Attorney General, and the Board. .............................................................................................................. 6

Legal Standard .......................................................................................................... 9

Argument ................................................................................................................. 10

   A.   Plaintiffs Fail to Carry Their Burden of Proving a Substantial Likelihood of Success on the Merits of Their Ex Post Facto and Equal Protection Claims. ............ 10

      1.   Since Plaintiffs' Request for Relief is Based on a Violation of State Law, Plaintiffs' Claims Are Barred by Sovereign Immunity Under Pennhurst. ......... 10

      2.   Plaintiffs Lack Standing for an Injunction Against Ivey and Marshall Because the Injuries They Complain of Are Neither Traceable to the Governor or the Attorney General Nor Redressable By Either of Them. .................................... 16

      3.   For the Same Reasons That Plaintiffs Lack Standing, Ivey and Marshall Are Entitled to Sovereign Immunity Because They Lack the Relevant Enforcement Connection to the Challenged Practices. ....................................... 21

      4.   Alternatively, Even if Plaintiffs' Claims for Prospective Relief Were not Barred by Sovereign Immunity, Plaintiffs' Request for Review of Past Parole Denials Is Barred by Sovereign Immunity. ......................................................... 24

      5.   Plaintiffs' Request for Review of Past Parole Denials Must Also Be Denied Because Habeas Is the Exclusive Remedy for Past Injury. ................................ 25

      6.   Plaintiffs Are Unlikely to Succeed on the Merits of their Ex Post Facto Challenge Because the Alleged 2019 Policy Changes Do Not Retroactively Increase the Punishment That Was in Effect at the Time Plaintiffs Committed Their Crimes. ................................................................................... 27

      7.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Equal Protection Claim Because They Have Failed to Allege or Prove That Their Parole Decisions Were the Result of Intentional Discrimination. ................................ 35

   B.   Plaintiffs Cannot Show They Are Facing Imminent Irreparable Harm Due to Their Delay in Seeking a Preliminary Injunction. ................................................ 44

   C.   Plaintiffs Have Not Shown That the Balance of Harm Weighs in Their Favor or That an Injunction Is in the Public Interest. ................................................ 46

D.   The Court Should Not Provisionally Certify the Parole Denial Class or Discriminatory Parole Denial Subclass. ................................................................ 48

   1.   Plaintiffs fail to satisfy Rule 23(b)(2) because parole decisions are highly individualized. ................................................................................... 49

   2.   The all-black named Plaintiffs with convictions that occurred prior to the JRA are not adequate representatives of the Class. ........................................ 52

E.   The Court Should Deny Plaintiffs' Motion for Preliminary Injunction Without Holding an Evidentiary Hearing. ................................................................ 54

Conclusion .................................................................................................................. 55

Certificate of Service .................................................................................................. 57

## Table of Authorities

**Cases**

*Allen v. Thompson*,
   815 F.2d 1433 (11th Cir. 1987) ................................................................. 23

*Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) ........................................................................ 41, 44

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 20

*Blinco v. Green Tree Servicing, LLC*,
   366 F.3d 1249 (11th Cir. 2004) ............................................................. 54

*Bonner v. City of Prichard, Ala.*,
   661 F.2d 1206 (11th Cir. 1981) ............................................................. 10

*Brown v. Electrolux Home Prods., Inc.*,
   817 F.3d 1125 (11th Cir. 2016) ............................................................. 48

*Brown v. Ga. Bd. of Pardons & Paroles*,
   335 F.3d 1259 (11th Cir. 2003) ............................................................. 25

*Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*,
   4 F.4th 1220 (11th Cir. 2021) .................................................................. 9

*Cal. Dep't of Corrs. v. Morales*,
   514 U.S. 499 (1995) ..................................................................... passim

*City of S. Miami v. Governor*,
   65 F.4th 631 (11th Cir. 2023) ............................................................... 19

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) .......................................................................... 17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................ 48

*Cummings v. Missouri*,
   4 Wall. 277 (1867) ................................................................................ 27

*Cumulus Media, Inc. v. Clear Channel Comms., Inc.*,
   304 F.3d 1167 (11th Cir. 2002) ............................................................. 54

*Dakota Indus., Inc. v. Ever Best Ltd.,*
    944 F.2d 438 (8th Cir. 1991) ........................................................................... 48

*Damiano v. Fla. Parole and Prob. Comm'n,*
    785 F.2d 929 (11th Cir. 1986)) ........................................................ 36, 41, 44

*DeKalb Cnty. Sch. Dist. v. Schrenko,*
    109 F.3d 680 (11th Cir. 1997) .......................................................... 12, 13, 14, 16

*Dobbert v. Fla.,*
    432 U.S. 282 (1977) ....................................................................................... 27

*Doe v. Pryor,*
    344 F.3d 1282 (11th Cir. 2003) ..................................................................... 17

*Dufresne v. Baer,*
    744 F.2d 1543 (11th Cir. 1984) ..................................................................... 27

*Emps. of Dep't of Pub. Health & Welfare, Mo. v. Dep't of Pub. Health & Welfare, Mo.,*
    411 U.S. 279 (1973) .......................................................................................11

*Ex parte Young,*
    209 U.S. 123 (1908) ............................................................................... passim

*Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.,*
    441 F.2d 560 (5th Cir. 1971) ......................................................................... 10

*Fair Fight Action, Inc. v. Raffensperger,*
    No. 1:18-CV-5391-SCJ, 2019 WL 13221296 (N.D. Ga. Dec. 27, 2019) ................................ 16

*Fletcher v. District of Columbia,*
    391 F.3d 250 (D.C. Cir. 2004) ....................................................................... 34

*Fletcher v. Reilly,*
    433 F.3d 867 (D.C. Cir. 2006) ....................................................................... 34

*Fuller v. Ga. State Bd. of Pardons & Paroles,*
    851 F.2d 1307 (11th Cir. 1988) ............................................................... passim

*Garner v. Jones,*
    529 U.S. 244 (2000) ....................................................................................... 33

*Greater Birmingham Ministries v. Sec'y of State for the State of Ala.,*
    992 F.3d 1299 (11th Cir. 2021) ............................................................... 35, 41

iv

*Green v. Mansour,*
474 U.S. 64 (1985) ............................................................................................ 24

*Griffin v. Dugger,*
823 F.2d 1476 (1987) ....................................................................................... 28

*Gwin v. Snow,*
870 F.2d 616 (11th Cir. 1989) ......................................................................... 46

*Hand v. Scott,*
888 F.3d 1206 (11th Cir. 2018) ....................................................................... 15

*Heck v. Humphrey,*
512 U.S. 477 (1994) .................................................................................... 25, 26

*Hock v. Singletary,*
41 F.3d 1470 (11th Cir. 1995) ......................................................................... 27

*Howe v. City of Enterprise,*
861 F.3d 1300 (11th Cir. 2017) .................................................................. 54, 55

*In re Hubbard,*
803 F.3d 1298 (11th Cir. 2015) ....................................................................... 55

*In re Upshaw,*
23 So. 2d 861 (Ala. 1945) .................................................................................. 7

*Iron City Indus. Cleaning Corp. v. Local 141, Laundry & Dry Cleaners Int'l Union, AFL-CIO,*
316 F. Supp. 1373 (W.D. Pa. 1970) ................................................................. 48

*Jacobson v. Fla. Sec'y of State,*
974 F.3d 1236 (11th Cir. 2020) .................................................................. 17, 20

*Jones v. Ga. State Bd. of Pardons & Paroles,*
59 F.3d 1145 (11th Cir. 1995) .................................................................. passim

*Jones v. Ray,*
279 F.3d 944 (11th Cir. 2001) ......................................................................... 36

*Lewis v. Gov. of Ala.,*
944 F.3d 1287 (11th Cir. 2019) ....................................................................... 17

*Lovett v. Ray,*
327 F.3d 1181 (11th Cir. 2003) ....................................................................... 25

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................... 16, 17

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976) ..................................................................... 10, 48

*McCleskey v. Kemp,*
    481 U.S. 279 (1987) .................................................................................... 35, 36

*McDonald's Corp. v. Robertson,*
    147 F.3d 1301 (11th Cir. 1998) .......................................................................... 54

*McNabb v. Comm'r Ala. Dep't of Corr.,*
    727 F.3d 1334 (11th Cir. 2013) .......................................................................... 25

*Miami Beach Fed. Sav. & Loan Ass'n v. Callander,*
    256 F.2d 410 (5th Cir. 1958) ............................................................................. 10

*Michael v. Ghee,*
    498 F.3d 372 (6th Cir. 2007) ............................................................................. 34

*Muransky v. Godiva Chocolatier, Inc.,*
    979 F.3d 917 (11th Cir. 2020) ........................................................................... 17

*Nance v. Ward,*
    142 S. Ct. 2214 (2022) ...................................................................................... 25

*Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.,*
    633 F.3d 1297 (11th Cir. 2011) ...................................................................... 11, 21

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
    896 F.2d 1283 (11th Cir. 1990) ........................................................................... 9

*Pardo-Steiman ex rel. Prado v. Bush,*
    221 F.3d 1266 (11th Cir. 2000) .......................................................................... 52

*Paschal v. Wainwright,*
    738 F.2d 1173 (11th Cir. 1984) .......................................................... 29, 30, 31, 35

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ................................................................................... passim

*Personnel Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) .......................................................................................... 35

vi

*Phillip v. Fairfield Univ.*,
   118 F.3d 131 (2d Cir. 1997) ................................................................. 48

*Porter v. Ray*,
   461 F.3d 1315 (11th Cir. 2006) ...................................................... 32, 33

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973) ........................................................................... 25

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
   506 U.S. 139 (1993) ........................................................................... 24

*S&M Brands, Inc. v. Georgia ex rel. Carr*,
   925 F.3d 1198 (11th Cir. 2019) ......................................... 12, 13, 14, 16

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ......................................................... 44

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ....................................................................... 17

*Sullivan v. Smith*,
   925 So. 2d 972 (Ala. Civ. App. 2005) .............................................. 20

*Summit Med. Assocs., P.C. v. Pryor*,
   180 F.3d 1326 (11th Cir. 1999) ......................................................... 21

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ................................................... 10, 46

*Tedder v. Ala. Bd. of Pardons & Paroles*,
   677 So. 2d 1261 (Ala. Crim. App. 1996) ......................................... 46

*Thomas v. Sellers*,
   691 F.2d 487 (11th Cir. 1982) ........................................................... 29

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*,
   592 U.S. 261 (2021) ........................................................................... 55

*United States v. Colon*,
   707 F.3d 1255 (11th Cir. 2013) ......................................................... 28

*United States v. Lambert*,
   695 F.2d 536 (11th Cir. 1983) ............................................................. 9

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ................................................. 52

*Waldman v. Conway*,
  871 F.3d 1283 (11th Cir. 2017) ................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................... 49

*Weaver v. Graham*,
  450 U.S. 24 (1981) ............................................................. 27, 28

*Wilkinson v. Dotson*,
  544 U.S. 74 (2005) ............................................................. 25, 26

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ................................................................... 9

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) ............................................................... 26

*Women's Emergency Network v. Bush*,
  323 F.3d 937 (11th Cir. 2003) ................................................. 22

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ........................................... 44, 46

**Statutes**

Ala. Code § 12-25-32 (1975) ...................................................... 39

Ala. Code § 13A-6-157 (1975) ............................................... 7, 19

Ala. Code § 15-22-20 (1975) ................................................. 6, 19

Ala. Code § 15-22-21 (1975) ...................................................... 7

Ala. Code § 15-22-23 (1975) .......................................... 7, 19, 23

Ala. Code § 15-22-24 (1975) ........................................ 6, 18, 22

Ala. Code § 15-22-26 (1975) ............................................. passim

Ala. Code § 15-22-28 (1975) ...................................................... 7

Ala. Code § 15-22-36 (1975) .......................................... 7, 19, 23

Ala. Code § 15-22-37 (1975) ............................................................................... 6, 18, 39

Ala. Code §§ 15-23-83 (1975) ........................................................................ 7, 19, 23, 47

**Other Authorities**

1951 Ala. Laws Act No. 1951-599 ............................................................................ passim

2015 Ala. Laws Act No. 2015-185 ........................................................................... 8, 9, 14

2019 Ala. Laws Act No. 2019-393 .................................................................... 9, 14, 31, 42

Ala. Admin Code r. 640-X-3-.03 ...................................................................... 6, 18, 22, 39

Ala. CONST.. Art. V, sec. 124 ....................................................................................... 7

U.S. CONST. amend. XI ................................................................................................ 10

U.S. CONST. art. I, § 10 ................................................................................................ 27

**Rules**

Fed. R. Civ. P. 23(b)(2) ........................................................................................ passim

**Introduction**

Six Plaintiffs in the Alabama Department of Corrections' custody who have been denied parole seek a preliminary injunction against Governor Kay Ivey, Attorney General Steve Marshall, and the three members of the Alabama Board of Pardons and Parole. They claim that changes made to the state's parole system in 2019 retroactively increased their punishment in violation of the *Ex Post Facto* Clause, and that these same changes intentionally discriminate against them on the basis of race in violation of the Equal Protection Clause. But Plaintiffs come nowhere near meeting their burden for a preliminary injunction.

Plaintiffs' disagreement lies primarily in the way the Board is interpreting and applying *state* law. Plaintiffs argue the Board attributes less weight to objective factors, such as actuarial risk assessments, when making parole decisions and over-emphasizes public safety and the severity of the crime. But federal courts lack jurisdiction to order state officials to follow state law. Since Plaintiffs' federal constitutional claims are really premised on a violation of state law, their claims are barred by sovereign immunity. Governor Ivey and Attorney General Marshall are entitled to sovereign immunity for the additional reason that they do not make the parole decisions that Plaintiffs challenge—rather, parole decisions lie solely within the discretion of the Board.

Even if the Court were to reach the merits of Plaintiffs' constitutional challenges, they fail to show a substantial likelihood of success on the merits. Plaintiffs' ex post facto challenge fails because they cannot show the 2019 parole changes retroactively increased their punishment. Both at the time Plaintiffs committed their offenses and after the 2019 changes, the decision to grant parole was at the complete discretion of the Board. The Board's modifications to its advisory and non-binding guidelines do not arise to the level of increased punishment. As to Plaintiffs' race discrimination claim, they make no attempt to show they were treated differently than similarly-situated white inmates. Instead, they rely solely on statistics purporting to show racial disparities

in parole outcomes. But these statistics prove nothing because they do not compare parole outcomes for similarly-situated inmates. Since parole decisions are highly individualized and consider a number of factors such as the nature of the crime, disciplinary history while in custody, and victim input, comparing parole grant rates based solely on race fails to prove intentional race discrimination in parole decisions generally or as to Plaintiffs specifically.

For all of these reasons, Plaintiffs' Motion for Preliminary Injunction (doc. 23) and The Woods Foundations' Motion for Joinder (doc. 44) should be denied.

## Facts

Plaintiffs Lee Edward Moore Jr. ("Moore"), Jerame Aprentice Cole ("Cole"), Frederick Denard McDole ("McDole"), Michael Campbell ("Campbell"), Arthur Charles Ptomey Jr. ("Ptomey"), and Almireo English ("English") (collectively "Plaintiffs") are all in the custody of the Alabama Department of Corrections ("ADOC"). Plaintiffs have all been denied parole and have future parole considerations scheduled in the coming years. Plaintiffs allege that Defendants Governor Kay Ivey ("Ivey"), Attorney General Steve Marshall ("Marshall"), Alabama Board of Pardons and Paroles Chair Leigh Gwathney, and Associate Parole Board members Darryl Littleton and Gabrelle Simmons (collectively "the Board") are violating the *Ex Post Facto* and Equal Protection Clauses of the United States Constitution in the administration of the parole system. In addition to the individual Plaintiffs, organizational Plaintiff The Woods Foundation ("TWF") also seeks a preliminary injunction on the grounds that opposing Defendants' parole practices has caused it to divert resources. (Doc. 44). Plaintiffs seek an injunction imposing various requirements on Defendants in the administration of parole.

## A.     The Individual Plaintiffs.

Since Plaintiffs raise an ex post facto claim, the date of their offenses is relevant to whether application of alleged 2019 changes to parole consideration retroactively increased their

2

punishment. While Plaintiffs have submitted incarceration details obtained from ADOC's website that contain the dates of their offenses (docs. 24-16 to 24-21), Defendants submit ADOC classification summaries for Plaintiffs for the limited purpose of establishing Plaintiffs' offense dates and disciplinary history while in ADOC custody. (*See* Exhibit 1).

Plaintiff Moore was sentenced to 50 years in prison for a 1994 murder charge and began serving his sentence in 1997. (Doc. 24-20 at 3). Moore's parole was last denied in December 2022, and his next parole consideration will be December 2027. (Doc. 25-4 ¶ 9). Marshall objected to Moore receiving parole prior to the December 2022 hearing. (Doc. 25-4 ¶ 8; Exhibit 2 at 2). Marshall objected to parole "due to the violent nature" of Moore's crime, namely "beating and killing sixteen month old Shaquinta Witherspoon." (Exhibit 2). Marshall also stated Moore had not served enough of his sentence and noted "Moore has incurred twenty-two disciplinary infractions" while in ADOC custody. (*See id.*; *see also* Exhibit 1 at 39-46).

Plaintiff Cole was sentenced to 20 years for a 2007 first degree robbery charge and began serving his sentence in 2008. (Doc. 24-17 at 3). Cole has been denied parole four times with his last denial occurring August 8, 2023. (Doc. 25-5 ¶¶ 2, 5). Marshall objected to parole prior to this hearing due to the violent nature of his crime and for incurring thirty-three disciplinary infractions since being incarcerated. (Exhibit 2 at 3).

Plaintiff McDole was sentenced to 21 years for a 2008 first degree assault charge and began serving his sentence in 2009. (Doc. 24-19 at 3; Exhibit 1 at 33). McDole's parole was denied in 2018 and again on March 23, 2022. (Doc. 25-2 ¶¶ 12-13). His parole will be considered again in 2027. (*Id.* ¶ 13). Then-Attorney General Luther Strange objected to McDole receiving parole in 2017, and Marshall objected again in March 2022. (Exhibit 2 at 4, 5). Both letters objected on the

basis of McDole's conviction for a violent offense, but Marshall's 2022 letter noted McDole had incurred an infraction for possession of drugs while in ADOC custody. (Exhibit 2 at 4).

Plaintiff Campbell was sentenced for multiple offenses in 2002 but was released on parole in 2012. (Doc. 25-1 ¶¶ 2-3). Campbell committed a new offense while on parole, and his parole was revoked in 2017. (*Id.* ¶ 3). Campbell is currently serving the remainder of his 30-year 2003 sentence for distribution of a controlled substance. (*Id.* ¶ 2; Doc. 24-16 at 4-5). Campbell's parole was denied in 2020 and again on July 12, 2023. (Doc. 25-1 ¶¶ 10-11). Campbell is not currently serving a sentence for a crime of violence, and Marshall *did not* object to him receiving parole. (Doc. 23-1 at 28, 32).

Plaintiff Ptomey was sentenced in 2007 to 22 years for first degree robbery and third-degree burglary and began serving his sentence that same year. (Doc. 24-21 at 3-4). Ptomey's parole was denied in 2017, and his next reconsideration was set for 2019. (Doc. 25 ¶ 3). In 2019, the Board changed Ptomey's reconsideration date from 2019 to 2022. (*Id.* ¶ 6). The Board denied Ptomey's parole in September 2022. (*Id.* ¶ 7). Marshall objected to Ptomey receiving parole in 2022 due to the violent nature of his crimes and for incurring eleven disciplinary infractions while incarcerated. (Exhibit 2 at 6).

Plaintiff English was sentenced for a 2010 drug trafficking charge in 2012 and began serving a twelve year, five month sentence in 2012. (Doc. 24-18 at 3). The Board granted English parole, but his parole was revoked in October 2020 after he was charged with a new offense. (Doc. 25-3 ¶ 2). The Board denied English parole on November 28, 2023. (*Id.* ¶ 8). Marshall objected to English receiving parole due to the violent nature of his crime, the fact that English was previously granted parole but had it revoked, and that he had committed twelve disciplinary infractions while in custody. (Exhibit 2 at 7).

All Plaintiffs committed their offenses and were sentenced between 1993 at the earliest and 2012 at the latest. Relevant to Plaintiffs' ex post fact claim, Plaintiffs' crimes predate the enactment of *both* the 2015 Justice Reinvestment Act ("JRA") *and* the 2019 parole amendments. When Plaintiffs committed the crimes for which they are now incarcerated, parole was governed by a 1951 law that remained in effect until the 2015 JRA. *See* 1951 Ala. Laws Act No. 1951-599.

The general tenor of Plaintiffs' declarations is the same. Plaintiffs are classified in various forms of minimum custody in ADOC and have participated in different programs and forms of work release. (*See* doc. 25 ¶¶ 4, 7; doc. 25-1 ¶¶ 4-8; doc. 25-2 ¶¶ 3-11; doc. 25-3 ¶¶ 3-7; doc. 25-4 ¶¶ 4-7; doc. 25-5- ¶¶ 3-5). Plaintiffs argue these facts provide "evidence of eligibility for parole," doc. 23-1 at 30, even though the Board's statute expressly states its parole eligibility guidelines "shall not create a right or expectation by a prisoner to parole release," and that "the decision concerning parole release shall be at the complete discretion of the board." Ala. Code § 15-22-26(c).

The five Plaintiffs convicted of crimes of violence as defined in Alabama Code § 12-25-32(15) note that Marshall objected to them receiving parole. (Doc. 23-1 at 28 n.14; *id.* at 32). Marshall did not object to Campbell's parole—the only Plaintiff who is not serving a sentence for a crime of violence. (*Id.*). Plaintiffs omit from their declarations that they have *all* committed disciplinary infractions while in custody. (*See* Exhibit 1 at 6, 14-17, 24-25, 34, 41-42, 51). And while they provide sample parole objection letters from Marshall as to *other* inmates (doc. 24-22), they fail to provide Marshall's objection letters as to *themselves*. (*See* Exhibit 2). Marshall's letters reflect that he objected to parole for Plaintiffs English, McDole, Ptomey, Moore, and Cole because (1) they had committed crimes of violence, (2) they had not served enough of their sentences, and (3) they had committed disciplinary infractions while in custody. (Exhibit 2 at 2-7). In the case of

English, Marshall's letter also noted English was previously granted parole but had it revoked. (Exhibit 2 at 7). In the case of Plaintiff McDole, prior Attorney General Luther Strange objected to parole on similar terms. (Exhibit 2 at 5). These letters reveal a consistent and race-neutral policy of objecting to parole on behalf of crime victims based on the severity of the offense and the institutional behavior of the inmates—factors that the Board considers when deciding parole. *See* Ala. Code § 15-22-26(a)(3), (5), (6).

As to Governor Ivey, Plaintiffs allege no act or omission by Ivey with respect to any of their cases.

**B.      Alabama Law on Parole and the Role of the Governor, Attorney General, and the Board.**

The parole Board consists of three members appointed by the Governor from a list of nominees, subject to confirmation by the Alabama Senate, one of whom the Governor designates as chair. Ala. Code § 15-22-20(a), (b), (d). Once appointed, the Board members serve six-year terms and can be removed by impeachment. *Id.* Only *the Board* has the power to grant or deny parole, not the Governor or Attorney General. *See* Ala. Code § 15-22-24(a)(1) (stating that the "Board of Pardons and Paroles shall be charged with all of the following: (1) Determining which prisoners serving sentences in the jails and prisons of the State of Alabama may be released on parole and when and under what conditions."); Ala. Code § 15-22-26(c) (stating that "the decision concerning parole release shall be at the complete discretion of the board."). With respect to the length of reset dates between parole considerations, only the Board has authority to set reset dates. *See* Ala. Code § 15-22-37(b)(4); Ala. Admin Code r. 640-X-3-.03.

With respect to granting or denying parole, Ivey's role, as Governor, is limited to appointing Board members, subject to confirmation by the State Senate, but she has no authority to order the Board to grant or deny parole or to set reset dates. *See* Ala. Code § 15-22-20(a), (b),

(d). Though the Governor at one time had exclusive constitutional authority over pardons and paroles, after a 1939 constitutional amendment, the Alabama Legislature may now "provide for and regulate the administration of" pardons and paroles. Ala. CONST. Art. V, sec. 124; *see also In re Upshaw*, 23 So. 2d 861, 863-64 (Ala. 1945). While Ivey also appoints a Director of Pardons and Paroles, the Director possesses purely administrative powers. *See* Ala. Code § 15-22-21(a); *id.* § 15-22-21(b) (stating the Director is "vested with all power necessary to perform the duties assigned to the board *except* the board's power to adopt rules, guidelines, or other policies *and to make individual determinations concerning* the grant or denial of pardons, *the grant or denial of paroles*, the restorations of political and civil rights, the remission of fines and forfeitures, and the revocation of parole.") (emphasis added).

Marshall's role, as Attorney General, is limited to receiving notice of parole hearings and representing victims before the Board. *See* Ala. Code §§ 15-22-23(b)(2)(a.); 15-22-36(d). Marshall's role before the Board is an extension of his general duty to advocate for crime victims. See, e.g., Ala. Code §§ 15-23-83 ("The Attorney General or district attorney may assert any right to which the victim is entitled."); 15-20A-41(c) (imposing a duty on the Attorney General to notify victims of the pending release of a sex offender); 13A-6-157.1(b) (authorizing Attorney General to file civil action on behalf of the state to recover damages for victims of human trafficking).

The 2019 amendments changed the length of time an inmate must serve before receiving *initial* consideration, but also provided a procedure for the Board to apply its prior calculations for initial consideration under certain circumstances. *See* Ala. Code § 15-22-28(f)(1). When the Board invokes this procedure, it is subject to legal review and veto by the Attorney General or Governor. *See* Ala. Code § 15-22-28(f)(2), (f)(4). But the statute is clear that, aside from this narrow

circumstance not at issue in this lawsuit, neither the Governor nor Attorney General have the power to make parole decisions. That power resides exclusively with the Board.

Plaintiffs' ex post facto and equal protection challenges are premised on changes that occurred from the time of the 2015 JRA to changes that occurred after the 2019 amendments to the parole statute. (Doc. 23-1 at 13-32). Plaintiffs complain that after 2019, the Board placed less weight on actuarial risk assessment scores and denied parole more frequently, particularly for violent offenders. (*Id.* at 19-21). But *neither* the 2015 *nor* the 2019 statutes were in effect at the time Plaintiffs committed their offenses. Instead, Plaintiffs expectations for parole were governed by the 1951 statute in effect at the time they committed their offense.

Under the 1951 statute, the Board's parole decisions were based on the following standard:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society.

1951 Ala. Laws Act No. 1951-599 § 7. The 1951 statute did not require the Board to adopt guidelines based on certain factors or to use risk assessments, but instead left parole decisions to the complete discretion of the Board. In 2015, the JRA amended the parole statute to require the Board to adopt guidelines to "serve as an aid in the parole decision process," which must include consideration of six statutory factors. 2015 Ala. Laws Act No. 2015-185 p. 78 (codified at Ala. Code § 15-22-26(a)). However, like the 1951 statute, the 2015 statute expressly stated the guidelines were advisory only and that the Board retained complete discretion over parole decisions:

> The use of established guidelines for parole consideration shall not create a right or expectation by a prisoner to parole release. Additionally, the articulated reasons for denial of parole release shall

> not create a right or expectation for parole release. The guidelines shall serve as an aid in the parole decision making process, and the decision concerning parole release shall be at the complete discretion of the board.

2015 Ala. Laws Act No. 2015-185 pp. 79-80 (codified at Ala. Code § 15-22-26(c)).

While Plaintiffs make much of the 2019 amendments, the only change made to the 2015 standard for parole was to add that the Board was "to determine a prisoner's fitness for parole <u>and to ensure public safety</u>," and to add that the guidelines were to "promote the use of prison space for the most violent and greatest offenders, <u>while recognizing that the board's paramount duty is to protect public safety</u>." 2019 Ala. Laws Act No. 2019-393 p. 9 (codified at Ala. Code § 15-22-26(a)). All other features governing the Board's consideration of parole remained the same, including the Board's "complete discretion" over the ultimate decision. Ala. Code § 15-22-26(c).

## Legal Standard

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). "Indeed, the grant of a preliminary injunction is 'the exception rather than the rule.'" *Id.* (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)). Thus, "[t]he preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites. The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990) (quotations omitted).

Those four prerequisites that a movant must show to obtain a preliminary injunction are: "(1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without a preliminary injunction; (3) that the threatened injury to the party outweighs any harm

that might result to the defendants; and (4) that an injunction is not adverse to the public interest." *Brown*, 4 F.4th at 1224. Where a government entity is involved, "'its interest and harm merge with the public interest,' so [a court] may consider the third and fourth factors together." *Id.* (quoting *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).

Where, as here, a preliminary injunction is sought to *change* the status quo and force another party to act, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases. *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).[1] Thus, a mandatory injunction "'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Id.* (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)); *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

### Argument

**A.   Plaintiffs Fail to Carry Their Burden of Proving a Substantial Likelihood of Success on the Merits of Their Ex Post Facto and Equal Protection Claims.**

**1.   Since Plaintiffs' Request for Relief is Based on a Violation of State Law, Plaintiffs' Claims Are Barred by Sovereign Immunity Under Pennhurst.**

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Under this amendment, "it is established

---

[1] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit held that the decisions of the Fifth Circuit handed down by the close of business on September 30, 1981 constitute binding precedent for the Eleventh Circuit.

that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Emps. of Dep't of Pub. Health & Welfare, Mo. v. Dep't of Pub. Health & Welfare, Mo.*, 411 U.S. 279, 280 (1973). "The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (internal quotation and citation omitted). "And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Id.* at 101-02.

There is a limited exception to the general rule of sovereign immunity for suits against State officials recognized in *Ex parte Young*, 209 U.S. 123 (1908). "In *Ex parte Young*, the Supreme Court carved out a narrow exception to the States' sovereign immunity when it held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308 (11th Cir. 2011). The theory of *Ex parte Young* "was that an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'" *Pennhurst*, 465 U.S. at 102 (quoting *Ex parte Young*, 209 U.S. at 160). As this language implies, "the *Young* doctrine rests on the need to promote the vindication of federal rights." *Id.* at 105.

But *Young*'s rationale "disappears" when "a plaintiff alleges that a state official has violated *state* law." *Pennhurst*, 465 U.S. at 106. A federal court's grant of relief on state law grounds "does not vindicate the supreme authority of federal law." "On the contrary, *it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law*." *Id.* (emphasis added). Since Eleventh Amendment immunity

is a limitation on federal courts' jurisdiction, "federal courts lack[] jurisdiction to enjoin . . . state officials on the basis of . . . state law." *Id.* at 124.

Plaintiffs purport to assert official-capacity claims against Ivey, Marshall, and the Board under the *Ex parte Young* exception to sovereign immunity based on alleged violations of federal law, namely the *Ex Post Facto* and Equal Protection Clauses of the United States Constitution. (*See* doc. 23-1 at 33-45). But Plaintiffs' characterization of their claims as based on violations of federal law is not dispositive. In determining whether a purported federal claim is actually a claim that state officials are violating state law, a court looks to the "gravamen" of the complaint and whether the request for relief is based on a violation of state, rather than federal law. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, at 1204-05 (11th Cir. 2019); *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir. 2017) (holding purported federal challenge based on state prison officials' failure to follow classification manual "is not a procedural due process challenge—it is a claim that state officials violated state law in carrying out their official responsibilities" barred under *Pennhurst*); *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997). The standard for whether a claim is state or federal for purposes of *Pennhurst* is "when the claim of entitlement to relief is based on a violation of state law, sovereign immunity applies." *S&M Brands*, 925 F.3d at 1204. "*And conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar.*" *Id.* (emphasis added).

In *S&M Brands*, a tobacco producer argued the Georgia Attorney General's refusal to release escrow funds as required by *state* law coerced it to give up its First Amendment rights and was a Fifth Amendment taking. 925 F.3d at 1204-05. While the tobacco producer argued its complaint was based on a violation of federal law, the Court stated:

> We don't buy it. Here, as in *Schrenko*, the obligation to release (or reimburse) funds comes from state law. The proper release amount is determined by state law. Accordingly, the "gravamen of [the] complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute," and *Pennhurst* bars such claims. [*Schrenko*] at 688. We affirm the dismissal of S&M's state-law claim.

*Id.* at 1205. *S&M Brands* relied on *Schrenko*, which looked to "the gravamen" of the complaint to determine that purported Fourteenth Amendment and federal statutory law claims by a school district were state law claims barred by *Pennhurst* because they "necessarily relied on a determination that state officials had not complied with state law." *S&M Brands, Inc.*, 925 F.3d at 1204 (citing *Schrenko*, 109 F.3d at 690).

Here, Plaintiffs' ex post facto and equal protection claims "necessarily rel[y] on a determination that state officials [have] not complied with state law." *S&M Brands, Inc.*, 925 F.3d at 1204. Plaintiffs' ex post facto and equal protection arguments are premised entirely on Defendants' alleged failure to follow state law, and the remedies they request are for Defendants to follow Plaintiffs' preferred interpretation of state law.

First, Defendants' alleged violations of federal constitutional rights are simply complaints that they are not following Plaintiffs' preferred interpretation of state law. The supposed ex post facto "policy" of the Board is the decision "to abandon both structured and evidence-based parole decision-making informed and guided by utilization of ORAS (the validated risk assessment tool selected by Alabama)," a decreased rate of conformance by the Board to its own guidelines, and the increased rate of parole denial for inmates convicted of violent offenses. (*See* doc. 23-1 at 35-37). *See also* (doc. 1 ¶ 238) (alleging policy of "replacing evidence-based parole decision-making based on actuarially-based objective standards required by the JRA with racially skewed decision-making untethered to evidence or the actuarially based objective standards required by the JRA.").

But the Board's consideration of actuarial risk-assessment tools, its authority to deviate from its own guidelines, and its authority to weigh the violent nature of an offense in deciding whether to grant parole were unchanged by the 2019 statutory amendments. *Compare* 2015 Ala. Laws Act No. 2015-185, at pp. 78-80, *with* 2019 Ala. Laws Act No. 2019-393, at pp. 9-11 (codified at Ala. Code § 15-22-26).

Plaintiffs' ex post facto challenge is simply a challenge to the way the Board exercises its discretion in applying state law. Plaintiffs rely heavily on a declaration of former Board Chair Lyn Head that her practice was to base parole decisions primarily, if not exclusively, on the inmate's risk assessment score. (*See* doc. 23-1 at 13-15) (citing Head Decl. [doc. 26] ¶¶ 8-14). Head states that this practice resulted in an increase of the parole grant rate from 30% in 2012 and 2013 to 54% in 2018. (Doc. 26 ¶¶ 12, 14). But under both the 2015 statute (which Plaintiffs laud) and the 2019 amendments (which they decry), the risk assessment is just one of six factors under the Board's guidelines, and the Board is not bound to follow its own guidelines. *See* Ala. Code § 15-22-26(c) ("The guidelines shall serve as an aid in the parole decision making process, and the decision concerning parole release shall be at the complete discretion of the board."). Plaintiffs' policy disagreement on how to weigh these factors is a matter of state law. *See S&M Brands, Inc.*, 925 F.3d at 1205 ("Accordingly, the 'gravamen of [the] complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute,' and *Pennhurst* bars such claims.") (quoting *Schrenko*, 109 F.3d at 688).

Likewise with Plaintiffs' purported equal protection claim. Plaintiffs do not allege they were treated differently than similarly situated white inmates, or that Defendants improperly considered race in making parole decisions. Instead, relying exclusively on grossly oversimplified statistical data, Plaintiffs argue that the Board's consideration of race-neutral factors resulted in

14

black inmates—as a group—being denied parole more frequently than white inmates. (*See* doc. 23-1 at 39-41). But again, the supposed policies resulting in this alleged and overgeneralized disparate impact are the Board's alleged disregard of actuarial risk assessments and increased denial rates for inmates convicted of violent offenses. (*Id.* at 40-41). Plaintiffs' less discriminatory alternative to these policies "is the very parole system and procedures rejected by Defendants, with evidence- and actuarially-based standards that, when followed, undeniably achieved near racial parity in parole grant rates." (*Id.* at 43). But this is nothing more than an accusation that the Board is failing to properly interpret and apply Alabama Code § 15-22-26 when compared to its pre-2019 practices, which Defendants dispute as a matter of state law.

Second, consider the relief Plaintiffs request. They seek an injunction prohibiting Defendants from "ensur[ing]" that inmates convicted of violent offenses are denied parole and from "disregard[ing] the actuarially- and evidence-based risk assessments for considering parole applications *mandated by Alabama law.*" (Doc. 23-1 at 56; *see also* Doc. 23-2 at 2) (emphasis added). *Pennhurst* bars this express request for state officials to follow state law. They next seek an injunction against the Board prohibiting them "from issuing parole decisions deviating from the pre-2019 Parole Guidelines and practices." (Doc. 23-1 at 57). This, too, seeks an order for the Board to follow state law, albeit a prior interpretation and application of state law. *See Hand v. Scott*, 888 F.3d 1206, 1213-14 (11th Cir. 2018) ("But the district court cannot enjoin Florida to follow the district court's interpretation of Florida's own constitution.") (citing *Pennhurst*). Plaintiffs lastly seek an order requiring the Board to weigh the risk assessments more heavily, and to give a written explanation for why they disregarded a "low" or "moderate" risk score. (Doc. 23-1 at 57). But, again, this seeks to impose what former Board Chair Head considered "best practices" and is not required under Alabama law. (Head Decl. [doc. 26] ¶ 11). The Court has no

jurisdiction to adjudicate a dispute between a former Board member and current Board members on the "best practices" (doc. 26 ¶ 11) for implementing Alabama Code § 15-22-26, because that requires resolution of differing opinions as to what level of detail the Board must explain its decisions under state law. *See Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2019 WL 13221296, at *5 n.15 (N.D. Ga. Dec. 27, 2019) ("Here, the Court is not being asked to find a statute unconstitutional. Plaintiffs are asking the Court to find a state official's interpretation of a statute unconstitutional.").

"[W]hen the claim of entitlement to relief is based on a violation of state law, sovereign immunity applies." *S&M Brands, Inc.*, 925 F.3d at 1204. The "gravamen" of Plaintiffs' complaint, *Schrenko*, 109 F.3d at 688, is that the Board's prior practice of weighing risk assessments more heavily resulted in higher parole grant rates and fewer racial disparities, and that the Board should be ordered to return to this practice. But the risk assessment is one of only six factors considered by the Board's guidelines, and current Board members are free to weigh severity of the offense, input from victims, or any number of other factors differently. *See* Ala. Code § 15-22-26(a). While Plaintiffs style their claims as federal constitutional challenges, they are in substance an attempt to impose their favored interpretation of state law. *See S&M Brands, Inc.*, 925 F.3d at 1204 ("Conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar."). As a result, Plaintiffs' claims are barred by sovereign immunity under *Pennhurst.*

2.      **Plaintiffs Lack Standing for an Injunction Against Ivey and Marshall Because the Injuries They Complain of Are Neither Traceable to the Governor or the Attorney General Nor Redressable By Either of Them.**

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "For a party to have standing to bring a lawsuit, it

must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917, 924 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016)). "Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc).

Standing requires the alleged injuries to be "fairly traceable to the *challenged action of the defendant*." *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) (citing *Lujan*, 504 U.S. at 560) (emphasis in original). In other words, a plaintiff's injuries must be redressable by an action against a particular defendant. *See id.* ("Even if we assume that all of those alleged injuries meet the *Lujan* injury-in-fact requirement, [plaintiff] still does not have standing to bring this claim because her injuries are not fairly traceable to the Alabama Attorney General, and they cannot be redressed through this action against him."); *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged.").

An injury is not fairly traceable to a state official if it is the result of actions of independent officials not subject to the control of the officials seeking to be enjoined. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253-54 (11th Cir. 2020) ("Because the Supervisors are independent officials not subject to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary for purposes of establishing traceability."). Nor is an injury redressable against state officials if they have no control over the relevant state officials who did cause the alleged injury. *See id.* at 1254 (stating an injunction against the Florida Secretary of State "cannot

provide redress, for neither she nor her agents control the order in which candidates appear on the ballot.").

Here, Plaintiffs' claims are not traceable to Ivey or Marshall or redressable by an order against either of them because they do not control the Board's decision to grant or deny parole or to determine the reset time between parole considerations. The Plaintiffs frame their injury as being "denied parole by the Parole Board, despite work and programming records that clearly demonstrate their qualification for parole release." (Doc. 23-1 at 28-29). They complain that the Board denied their parole pursuant to its alleged policy of denying parole to inmates convicted of violent offenses and failing to rely on risk assessments. (*Id.*). But Alabama law makes it abundantly clear that "the decision concerning parole release shall be *at the complete discretion of the board*." Ala. Code § 15-22-26(c) (emphasis added); *see also* Ala. Code § 15-22-24(a)(1) (stating that the "Board of Pardons and Paroles shall be charged with all of the following: (1) Determining which prisoners serving sentences in the jails and prisons of the State of Alabama may be released on parole and when and under what conditions."). Similarly with respect to Plaintiffs' race discrimination claim for length of reset dates between parole considerations, only the Board has authority to make this decision. *See* Ala. Code § 15-22-37(b)(4); ALA. ADMIN CODE r. 640-X-3-.03. Ivey and Marshall therefore did not cause Plaintiffs to be denied parole or determine their reset dates, and an injunction against Ivey and Marshall cannot redress Plaintiffs' injury by requiring the Board to give Plaintiffs what they want: a new parole decision based on a consideration of only those factors Plaintiffs wish them to consider or a shorter reset date.

To be sure, Plaintiffs allege that the Board's current policies are due to "the urging of Defendants Ivey and Marshall," (doc. 23-1 at 28), and even seek an injunction ordering that "Defendants Ivey and Marshall are prohibited *from instructing their agents **and Defendant Parole***

18

***Board members*** (a) *to ensure* that individuals who have been sentenced to incarceration for offenses Alabama deems 'violent' *are not granted parole*, and (b) *to disregard* the actuarially- and evidence-based risk assessments for considering parole applications mandated by Alabama law." (*Id.* at 56) (emphasis added). But these allegations and requests for relief are contrary to Ivey and Marshall's authority under state law.

Neither Ivey nor Marshall has authority or control over the Board's decisions to grant or deny parole or calculate reset dates. Ivey appoints Board members, subject to confirmation by the State Senate, but has no authority to order the Board to grant or deny parole. *See* Ala. Code § 15-22-20(b). Further, any indirect authority related to the Board would be insufficient to establish standing as to Governor Ivey. For example, "the governor's ability to suspend officials for cause" is insufficient to "establish[] traceability" as to the governor. *City of S. Miami v. Governor*, 65 F.4th 631, 643 (11th Cir. 2023). Likewise, whatever power Governor Ivey has related to parole is insufficient to satisfy standing requirements here.

Marshall's power, as Attorney General, is limited to receiving notice of parole hearings and representing victims before the Board. *See* Ala. Code §§ 15-22-23(b)(2)(a.); 15-22-36(d). Marshall's role before the Board is an extension of his general duty to advocate for crime victims. *See, e.g.*, Ala. Code §§ 15-23-83 ("The Attorney General or district attorney may assert any right to which the victim is entitled."); 15-20A-41(c) (imposing a duty on the Attorney General to notify victims of the pending release of a sex offender); 13A-6-157.1(b) (authorizing Attorney General to file civil action on behalf of the state to recover damages for victims of human trafficking). Marshall can object to parole on behalf of a victim and otherwise *advocate* before the Board, but he has no control over the Board's ultimate decision. While Marshall, and any other interested party, may advocate for a particular outcome before the Board, the Board is the sole arbiter of

whether parole is granted or denied and of reset dates. *See Sullivan v. Smith*, 925 So. 2d 972, 975 (Ala. Civ. App. 2005) ("The acts of the Board in granting or denying parole . . . are judicial in nature.").

With respect to the particular actions challenged by Plaintiffs—parole denial and reset dates—"the [Board members] are independent officials not subject to the [Governor or Attorney General's] control, [and so] their actions . . . may not be imputed to the [Governor or Attorney General] for purposes of establishing traceability." *Jacobson*, 974 F.3d at 1253-54. Plaintiffs' specific allegations further confirm neither the Governor nor Attorney General were the legal cause of their parole denial. Plaintiffs allege no act or omission of Ivey in relation to their specific cases either in the complaint or their declarations (docs. 25 to 25-5). As to Marshall, the five Plaintiffs convicted of violent offenses note that Marshall opposed granting parole in their cases. (Doc. 23-1 at 32). Plaintiff Campbell was no longer serving a sentence on a violent crime when his parole was denied, and Marshall did not object in his case. (Doc. 23-1 at 28; *id.* n.14; Doc. 25-1 ¶¶ 10-11). As a matter of law, Plaintiffs cannot allege that Ivey or Marshall compelled the Board to deny their parole, compelled the Board not to consider factors such as risk assessments, compelled the Board to deny parole for all Plaintiffs convicted of a violent offense, or compelled the Board to set a certain reset date. Such allegations are incorrect conclusions of law and are not entitled any presumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Since Plaintiffs' denial of parole and reset dates are neither traceable to Ivey or Marshall nor redressable by them, Plaintiffs lack standing to sue Ivey and Marshall for injunctive relief.

3. **For the Same Reasons That Plaintiffs Lack Standing, Ivey and Marshall Are Entitled to Sovereign Immunity Because They Lack the Relevant Enforcement Connection to the Challenged Practices.**

Plaintiffs' claims against Ivey and Marshall proceed under the "narrow exception" to sovereign immunity under *Ex parte Young* for official-capacity claims against state officials to enjoin an ongoing violation of federal law. *Nat'l Ass'n of Bds. of Pharmacy*, 633 F.3d at 1308. But "the doctrine of *Ex parte Young* cannot operate as an exception to Alabama's sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999). For the same reasons why Plaintiffs lack standing to sue Ivey and Marshall for parole decisions, namely lack of traceability and redressability, Ivey and Marshall likewise lack the relevant connection to parole decisions for purposes of *Ex parte Young*. Since Plaintiffs' claims against Ivey and Marshall do not come within the *Ex parte Young* exception to sovereign immunity, they are entitled to sovereign immunity from Plaintiffs' claims. *See Summit Med. Assocs, P.C.*, 180 F.3d at 1342.

*Ex parte Young* held its exception to sovereign immunity applied only for claims against state officers that had "some connection with the enforcement of the act"—otherwise, "it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." 209 U.S. at 157. "Therefore, unless the state officer has some responsibility to enforce the statute or provision at issue, the 'fiction' of *Ex parte Young* cannot operate." *Summit Med. Assocs., P.C.*, 180 F.3d at 1341. "Only if a state officer has the authority to enforce an unconstitutional act in the name of the state can the Supremacy Clause be invoked to strip the officer of his official or representative character and subject him to the individual consequences of his conduct." *Id.*

As already argued on standing, Ivey and Marshall do not have authority under state law to grant or deny parole, to compel the Board to deny parole for inmates convicted of violent offenses,

to compel the Board to disregard risk assessments, or to set reset dates. (*See* doc. 23-1 at 56) (seeking an injunction against Ivey and Marshall prohibiting them from "instructing" the Board to take these actions). For these same reasons, Ivey and Marshall lack the relevant enforcement connection to Alabama Code § 15-22-26 and § 15-22-37(b)(4) to come within the *Ex parte Young* exception to sovereign immunity.

Ivey, as Governor, lacks the necessary enforcement connection because she cannot direct the Board's actions regarding parole decisions. *See* Ala. Code §§ 15-22-20(b), (c), (e). It is the Board that has sole authority over parole decisions and reset dates. *See* Ala. Code § 15-22-24(a)(1), -26(c); § 15-22-37(b)(4); ALA. ADMIN CODE r. 640-X-3-.03. The Governor's power of appointment does not create the relevant enforcement connection for the *Ex parte Young* exception to apply. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003). In *Bush*, the court held the *Ex parte Young* exception did not apply to the Florida governor regarding a law enforced by the Department of Motor Vehicles even though the governor was responsible for the agency along with six cabinet members. *Id.* For the same reason, the *Ex parte Young* exception does not apply to the Governor here. *Bush* also held that appeal to the governor's general executive power could not overcome sovereign immunity:

> Appellants also contend Bush is a proper party because, as governor, he is responsible for the enforcement of § 320.0808(30). A governor's "general executive power" is not a basis for jurisdiction in most circumstances. If a governor's general executive power provided a sufficient connection to a state law to permit jurisdiction over him, any state statute could be challenged simply by naming the governor as a defendant. *Where the enforcement of a statute is the responsibility of parties other than the governor (the cabinet in this case), the governor's general executive power is insufficient to confer jurisdiction.*

*Id.* at 949-50 (citations omitted) (emphasis added). The same reasoning applies here, and so Governor Ivey is entitled to sovereign immunity.

As to Marshall, his role is to receive notice of parole hearings and to advocate for victims' interests before the Board. *See* Ala. Code §§ 15-22-23(b)(2)(a.); 15-22-36(d). The Attorney General's advocacy for victims before the Board is an extension of his role as the state's chief prosecutor and statutory advocate for victims. *See Allen v. Thompson*, 815 F.2d 1433, 1434 (11th Cir. 1987) (holding prosecutor forwarding information to parole commission was a prosecutorial act protected by absolute immunity because "[p]arole decisions are the continuation of the sentencing process."); Ala. Code § 15-23-83 ("The Attorney General or district attorney may assert any right to which the victim is entitled."). As with any action of an advocate before a quasi-judicial body, the advocate can only present his case. Marshall has no power to dictate the Board's parole decisions or what factors Board members should consider in making parole decisions.

Plaintiffs' requested injunction to prohibit Marshall from "instructing" the Board to deny parole for violent offenders and to disregard the results of actuarial risk assessments (doc. 23-1 at 56) fundamentally misconstrues the Attorney General's duties under state law. Marshall is not required to be impartial before the Board. Marshall's role as advocate for crime victims often results in him objecting to the grant of parole, as he did for five of the six Plaintiffs here. (Exhibit 2); *see also* (doc. 24-22). Other parties may appear before the Board and advocate their interests. *See* (Docs. 25 through 25-5). But the Board has sole authority to weigh all parties' views, consider the statutory factors incorporated into its guidelines, consider whether to follow its own guidelines in a given case, and to make the ultimate decision on parole—a decision that is "at the complete discretion of the board." Ala. Code § 15-22-26(c).

Since neither Ivey nor Marshall control the Board's parole decisions, they lack the relevant enforcement connection to come within the *Ex parte Young* exception to sovereign immunity and are accordingly entitled to absolute immunity from suit for Plaintiffs' claims.

**4.    Alternatively, Even if Plaintiffs' Claims for Prospective Relief Were not Barred by Sovereign Immunity, Plaintiffs' Request for Review of Past Parole Denials Is Barred by Sovereign Immunity.**

Plaintiffs request not only that their injunction apply to future parole hearings, but also that Ivey and Marshall be "prohibited from continuing to benefit" from alleged unconstitutional incarceration by ordering *the Board* (a) to review *past* parole denials at the rate of 1,000 a month; and (b) to reset parole consideration no longer than two years out if parole is still denied after reconsideration. (Doc. 23-1 at 57-58). But even assuming Plaintiffs' claims were otherwise proper under the *Ex parte Young* exception to sovereign immunity, which they are not, Plaintiffs' request for retroactive relief is nevertheless barred by sovereign immunity.

The "*Ex parte Young* doctrine applies only to ongoing and continuous violations of federal law." *Summit Med. Assocs., P.C.*, 180 F.3d at 1337. "In other words, *a plaintiff may not use the doctrine to adjudicate the legality of past conduct*." *Id.* (emphasis added); *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("Moreover, the [*Ex parte Young*] exception is narrow: It applies only to prospective relief, [and] does not permit judgments against state officers declaring that they violated federal law in the past.") (emphasis added); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young*, however, to claims for retrospective relief" because "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.")).

Plaintiffs' request for a remedy to the alleged "unconstitutional increase of incarcerated people's sentences since October 1, 2019," is a request to remedy a past violation of law, namely, the allegedly unconstitutional denial of parole in *every* case since October 1, 2019. Past parole denials are not "ongoing" injuries because the Board's denial of parole and choice of reset date are not "continuing violation[s]" but "a one time act with continued consequences." *Lovett v. Ray*, 327

F.3d 1181, 1183 (11th Cir. 2003). Nor does repeated denial of parole or choice of reset date pursuant to the same alleged policies constitute a "distinct and separate injury." *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003).

Plaintiffs' request for an injunction requiring the Board to reconsider past parole denials is thus retroactive because it seeks a remedy for a past injury that is a one-time act rather than an ongoing violation of federal law. *See Lovett*, 327 F.3d at 1183. As a result, Plaintiffs' request for reconsideration of all parole denials since October 1, 2019 does not come within the *Ex parte Young* exception to sovereign immunity and is barred by the Eleventh Amendment.

### 5.     Plaintiffs' Request for Review of Past Parole Denials Must Also Be Denied Because Habeas Is the Exclusive Remedy for Past Injury.

Both the federal habeas statute and § 1983 enable a prisoner to challenge "unconstitutional treatment at the hands of state officials." *Heck v. Humphrey*, 512 U.S. 477, 480 (1994). "But there the resemblance stops." *Nance v. Ward*, 142 S. Ct. 2214, 2221 (2022). Though the broad language of § 1983 might otherwise "apply to all of a prisoner's constitutional claims," *id.*, the Supreme Court has explained that § 1983 contains an "implicit exception" for actions that lie "within the core of habeas corpus," *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973)). That is, an action that is "within the core of habeas corpus" cannot be brought under § 1983. *See McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013) ("Issues sounding in habeas are mutually exclusive from those sounding in a § 1983 action.").

To determine whether an action lies within the core of habeas corpus as to foreclose a § 1983 claim, courts focus "on whether a claim challenges the validity of a conviction or sentence." *Nance*, 142 S. Ct. at 2221. Habeas is the exclusive remedy where plaintiffs seek "to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release

or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody." *Wilkinson*, 544 U.S. at 81.

Here, Plaintiffs' request for re-hearings to remedy allegedly unconstitutional parole denials in the *past* must proceed in habeas because it challenges the validity of their sentences. Plaintiffs request relief from Defendants "continuing to benefit from their *unconstitutional increase of incarcerated people's sentences* since October 1, 2019," and request parole reviews at the rate of 1,000 per month as a remedy. (Doc. 23-1 at 57) (emphasis added). But the claim that Plaintiffs' sentences were unconstitutionally increased challenges the validity of their sentences and thus seeks a speeder release, or at the very least "a judicial determination that necessarily implies the unlawfulness of the State's custody." *Wilkinson*, 544 U.S. at 81. Thus, Plaintiffs' claims for retroactive relief must proceed exclusively in habeas and may not proceed under § 1983.

While Plaintiffs may be able to assert constitutional challenges to procedures used at parole hearings pursuant to § 1983, they may challenge only the *prospective* enforcement of those procedures in a § 1983 proceeding. *See Wilkinson*, 544 U.S. at 79-80. That is because prospective relief requiring the Board to alter its procedures at parole hearings would not "necessarily" result in "immediate release or a shorter period of incarceration" and because Plaintiffs "attack[] only the 'wrong procedures, not . . . the *wrong result*." *Id.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)) (emphasis added); *see also Wolff v. McDonnell*, 418 U.S. 539, 554-55 (1974). Since Plaintiffs allege that their past denials of parole unconstitutionally lengthened their sentences, they may not challenge the allegedly "wrong result" result reached in every parole decision since October 1, 2019. *See Wilkinson*, 544 U.S. 79-80, 82.

Thus, both because sovereign immunity bars claims for retroactive relief and because habeas is the exclusive remedy for an allegedly unconstitutional past denial of parole that

unconstitutionally lengthens a sentence, Plaintiffs' request for review of all parole denials since October 1, 2019 at the rate of 1,000 cases a month must be denied.

**6.      Plaintiffs Are Unlikely to Succeed on the Merits of their Ex Post Facto Challenge Because the Alleged 2019 Policy Changes Do Not Retroactively Increase the Punishment That Was in Effect at the Time Plaintiffs Committed Their Crimes.**

The United States Constitution prohibits states from enacting any "ex post fact Law." U.S. CONST. art. I, § 10. "The *ex post facto* prohibition forbids the Congress and States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325-26 (1867)). "Thus, in order for a criminal or penal law to be ex post facto, it must be retroactively applied and must disadvantage the offender because it may impose greater punishment." *Hock v. Singletary*, 41 F.3d 1470, 1471 (11th Cir. 1995). "However, if a statute is merely procedural and does not affect the quantum of punishment attached to the crime, there is no ex post facto violation even when the statute is applied retroactively." *Id.* (citing *Dobbert v. Fla.*, 432 U.S. 282, 293 (1977)). In the context of an ex post facto challenge to parole laws, the inquiry is whether retroactive application of the law creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Cal. Dep't of Corrs. v. Morales*, 514 U.S. 499, 509 (1995).

"When subjecting a law to ex post facto scrutiny, courts should bear in mind the related aims of the ex post facto clause: providing fair notice of which acts will subject the perpetrator to criminal sanctions, and preventing vindictive criminal legislation." *Dufresne v. Baer*, 744 F.2d 1543, 1546 (11th Cir. 1984) (footnotes omitted). Since the ex post facto prohibition is premised on "fair notice," it "forbids the imposition of punishment more severe than the punishment assigned by law *when the act to be punished occurred*." *Weaver*, 450 U.S. at 30 (emphasis added). "Critical

to relief under the *Ex Post Facto Clause* is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what *was prescribed when the crime was consummated.*" *Id.* (emphasis added). As a result, "[t]he measuring point for purposes of the Ex Post Facto Clause is the time that [Plaintiffs] committed [their] crimes." *United States v. Colon*, 707 F.3d 1255, 1258 (11th Cir. 2013).

Plaintiffs incorrectly focus on alleged changes to parole practices between 2015 and October 1, 2019, arguing that the Board decreased reliance on risk assessments and decreased the grant rate for inmates convicted of violent offenses. (Doc. 23-1 at 35-36). But Plaintiffs fail to cite, or even mention, the parole law in effect *at the time Plaintiffs committed the offenses* for which they are currently serving sentences, even though that is the correct timeframe for the ex post facto analysis. *See Weaver*, 450 U.S. at 30-31. Plaintiffs in this case all committed their offenses and were sentenced between 1993 at the earliest and 2012 at the latest. Plaintiffs' offenses predated *both* the 2015 *and* 2019 parole amendments.[2]

Plaintiffs had "fair notice" of parole requirements under the *1951* law in effect at the time they committed their crimes—a law that remained unchanged until the 2015 JRA. *See* 1951 Ala. Laws Act No. 1951-599. Plaintiffs' expectations for parole under that statute were as follows: "No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and

---

[2] Plaintiffs have standing to bring an ex post facto challenge solely from the viewpoint of inmates convicted of offenses prior to 2015. Although members of the class they seek to represent may have different dates of conviction, Plaintiffs have standing to represent a class of only those members who suffered the same personal injury as themselves. *See Griffin v. Dugger*, 823 F.2d 1476, 1482–83 (1987) (holding that "it is not enough that a named plaintiff … hav[e] standing as to just one of many claims he wishes to assert;" instead, "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gave rise to the claim").

that his release is not incompatible with the welfare of society." 1951 Ala. Act No. 1951-599 § 7. That is it. Plaintiffs had fair notice that, once convicted, the Board would have sole authority to decide whether to release them on parole based on "subjective" and "discretionary" factors that create no expectation or right to release. *See Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982). Plaintiffs had no expectation that parole decisions would be based on guidelines that included objective factors such as the use of an actuarial validated risk assessment.

Plaintiffs' argument that the Board ceased to faithfully apply the 2015 statutory guidelines beginning in 2019 is *irrelevant* to the ex post facto challenge they have standing to bring. The question is whether the Board's alleged current policies of giving less weight to risk assessments and rarely granting parole to those convicted of violent offenses creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes," *Morales*, 514 U.S. at 509, *when compared to the law in effect when Plaintiffs committed their crimes*, *i.e.*, the 1951 law. The answer under binding precedent is that they do not. *See Jones v. Ga. State Bd. of Pardons & Paroles*, 59 F.3d 1145, 1149-50 (11th Cir. 1995); *Paschal v. Wainwright*, 738 F.2d 1173, 1179-81 (11th Cir. 1984).

The ex post facto challenge in *Paschal* is identical to Plaintiffs' here. When Paschal committed his crime, the Florida statute on parole consideration was nearly identical to the 1951 Alabama law in effect at the time of Plaintiffs' crimes here. *Compare Paschal*, 738 F.2d at 1178 (quoting statute stating parole could be granted only if "there is reasonable probability that, if he is placed on parole, he will live and conduct himself as a respectable and law abiding person, and that his release will be compatible with his own welfare and the welfare of society."); *with* 1951 Ala. Laws Act No. 1951-599 § 7 (stating parole could be granted only if "there is reasonable

probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society.").

While Paschal was incarcerated, Florida amended its law to require the parole commission to adopt "'objective guidelines' to channel its decision making" based on "'an acceptable research method and . . . based on the seriousness of the offense and the likelihood of favorable parole outcomes.'" *Paschal*, 738 F.2d at 1178. But the "basic features of the prior scheme" remained the same, including the "most important" feature that "the ultimate parole decision remains committed to the Commission's discretion." *Id.* Paschal argued the law was ex post facto because it retroactively classified his offense with "the highest possible offense severity rating" and extended his presumptive release date under the new guidelines, although the commission still retained discretion to set an earlier release date. *Id.* at 1175, 1179.

But the court rejected Paschal's ex post facto claim because the retroactively applied "guidelines are not more onerous than prior law" because they "did not substantively alter petitioner's parole eligibility or confine the Commission's discretion to release him; *they merely clarified the exercise of administrative discretion*." *Id.* at 1179 (emphasis added). The ex post facto analysis properly focused on the notice Paschal had at the time he committed his offense:

> At the time petitioner committed the murder that led to his incarceration, he was on fair notice that if he received a life sentence he would be subject to parole at the discretion of the Commission. *This was not changed*. The guidelines merely stated and rationalized the exercise of the Parole Commission's discretion. *Petitioner accordingly suffered no legislative increase in punishment*.

*Id.* at 1180 (emphasis added). This reasoning applies equally to Plaintiffs here, because the changes in Alabama law mirror the changes in Florida's law in *Paschal*.

Like the prior Florida law, parole decisions under Alabama's 1951 law were made "on an ad hoc basis," *id.* at 1178, based on a "reasonable probability" that the inmate "will live and remain

at liberty without violating the law, and that his release is not incompatible with the welfare of society." 1951 Ala. Laws Ala. Act No. 1951-599 § 7. Also like the Florida law, Alabama's 2015 amendments required the Board to adopt guidelines using objective criteria such as risk assessments to guide its decisions, but it remained unchanged that "the decision concerning parole release shall be at the complete discretion of the board." Ala. Code § 15-22-26(c). The 2019 law made no changes to the 2015 law other than requiring the Board "to ensure public safety" and stating that its "paramount duty is to protect public safety." 2019 Ala. Laws Act No. 2019-393 p. 9. But this is the equivalent of the 1951 law's requirement that an inmate's "release is not incompatible with the welfare of society." 1951 Ala. Laws Ala. Act No. 1951-599 § 7.

Since Plaintiffs had fair notice that they would be subject to the complete discretion of the Board both at the time of their offense and after the 2015 and 2019 changes, *Paschal*'s conclusion applies here:

> The promulgation of guidelines under the Act did not alter the consequences that flowed from petitioner's crime: both in 1968 when he committed that crime, and in 1979, when the Commission set his presumptive parole date, the Commission had complete discretion over the parole decision. Only the form by which the Commission exercised that discretion changed.

*Paschal*, 738 F.2d at 1180-81. The Eleventh Circuit later reached the same conclusion in a similar challenge to Georgia's parole board. *See Jones*, 59 F.3d at 1149 ("In our view, the key to answering this question [whether the method for calculating a Tentative Parole Month created a sufficient risk of increasing punishment] lies in the undisputed fact that, both before and after the January 22, 1991 rule change, the Board retained and *in fact exercised* virtually *unfettered* discretion to deviate both above and below the Guidelines-recommendation in setting the TPM.").

Plaintiffs' ex post facto argument here is significantly *weaker* than the arguments that were rejected in *Paschal* and *Jones*. In each of those cases, the retroactive application of the new

guidelines created a *presumption* of a later parole date than previously calculated. *See Jones*, 59 F.3d at 1147-48 (stating class members were inmates whose new guideline release date based on new requirement of serving one third of their sentence exceeded prior presumptive release date); *Paschal*, 738 F.2d at 1174-75 (stating Paschal went from yearly parole review in 1975, 1976, 1977, and 1978 to a presumptive release date of 1993 based on application of the 1978 guidelines). Plaintiffs here suffered no automatic reclassification or presumption against parole, but instead argue that the Board's "policies" make it unlikely they will be granted parole.

The only allegations and evidence Plaintiffs present of these allegedly unconstitutional "policies" are statistics on the declining parole grant rate and the frequency with which the Board deviates from its guidelines. (Doc. 23-1 at 36-7).[3] But where a parole board has complete discretion to grant or deny parole, statistics on grant rates not only fail to establish an ex post facto "policy" but are *irrelevant and inadmissible. See Jones*, 59 F.3d at 1150 (stating that because the Georgia parole board "retained and *in fact exercised* virtually *unfettered* discretion to deviate both above and below" its guidelines "[t]he statistics proffered by the plaintiff class demonstrate nothing more."); *see also Porter v. Ray*, 461 F.3d 1315, 1321, 1324 (11th Cir. 2006). *Porter* rejected the use of statistics to prove the Georgia parole board retroactively applied a "de facto policy" of requiring inmates to serve 90% of their sentences before granting parole. 461 F.3d at 1319. *Porter* stated that since the board had "virtually unfettered discretion" to vary from its guidelines, "we doubt whether comparison statistics would assist the appellants in showing that the Board violated the *Ex Post Facto* Clause." 461 F.3d at 1321. In fact, the court upheld the *denial* of the plaintiffs'

---

[3] Plaintiffs do not assert an ex post facto challenge based on the length of time between parole consideration, *i.e.* the reset dates. Any such challenge is hopelessly doomed by *Morales. See Morales*, 514 U.S. at 514 (holding retroactive increase of length of time between parole hearings did not violate *Ex Post Facto* Clause).

discovery request for parole files because "the appellants' argument that statistics will prove that the Board has applied a de facto 90% policy is *irrelevant* here." *Id.* at 1324 (emphasis added).

As *Jones* and *Porter* demonstrate, Plaintiffs' appeal to statistics proves nothing because the Board's "use of established guidelines for parole consideration shall not create a right or expectation by a prisoner to parole or release" and "the decision concerning parole release shall be at the complete discretion of the board." Ala. Code § 15-22-26(c). Since the Board has complete discretion, variations in parole outcomes "demonstrate nothing more" than this very discretion. *Jones*, 59 F.3d at 1150. The Board's declining grant rate could be due to the change of composition of Board members, changing attitudes towards public safety, increased violent crime rates, a philosophical commitment to inmates serving the sentences actually imposed—especially in the case of violent offenders—or any other number of subjective and discretionary factors Board members may consider. The Supreme Court case Plaintiffs themselves rely on recognizes the legitimacy of changes in parole outcomes based on discretionary decision making:

> On the other hand, to the extent there inheres in *ex post facto* doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression, we can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

*Garner v. Jones*, 529 U.S. 244, 253 (2000) (citation omitted).

While Plaintiffs quote *Garner* for the proposition that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause," (doc. 23-1 at 34), *Garner* also acknowledged in the above quote that an ex post facto challenge cannot be premised on the claim

that "discretion has been changed *in its exercise*." 529 U.S. at 253-54 (emphasis added). The challenge in *Garner* was to a retroactive extension of intervals between parole considerations. *Id.* at 246. The "essence of" the claim was "not that discretion has been changed in its exercise but that, in the period between parole reviews, *it will not be exercised at all*." *Id.* at 256 (emphasis added). *Garner* did not allege a "policy," like the one Plaintiffs allege here, that amounted only to accumulated data about discretionary decisions in individual cases. *Garner* itself shows that Plaintiffs cannot premise an ex post facto claim on decisional trends resulting from the exercise of the Board's discretion in individual cases.[4]

Plaintiffs' ex post facto claim fails because they cannot show that the 2019 amendments or alleged "policy" changes create "a sufficient risk of increasing the measure of punishment attached to the covered crimes," *Morales*, 514 U.S. at 509, *when compared to the law existing when they committed their offenses*. Under Plaintiffs' own theory, they would be in a *worse* position if the 2015 and 2019 laws were *repealed*. Plaintiffs complain that the Board gives insufficient weight to risk assessments and too much weight to conviction for a violent offense. But the 1951 law in effect when they committed their crimes did not require the Board to use guidelines with objective factors, such as risk assessments, at all. They had "fair notice" that the Board would have complete discretion over their release on parole based only on its subjective "opinion that there is a reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society." 1951 Alabama Laws Act No. 599 § 7. Since neither the 2019 law, the Board's guidelines, or its "policies"

---

[4] Plaintiffs further rely on three out-of-circuit, and hence nonbinding, cases. (Doc. 23-1 at 34) (citing *Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004); *Fletcher v. Reilly*, 433 F.3d 867 (D.C. Cir. 2006); *Michael v. Ghee*, 498 F.3d 372 (6th Cir. 2007). These cases are both nonbinding and distinguishable.

have "operated to [Plaintiffs'] detriment," *Paschal*, 738 F.2d at 1177, their ex post facto claim fails as a matter of law.

7.  **Plaintiffs Are Unlikely to Succeed on the Merits of Their Equal Protection Claim Because They Have Failed to Allege or Prove That Their Parole Decisions Were the Result of Intentional Discrimination.**

Plaintiffs make no allegations that they were treated differently than similarly-situated white inmates with respect to parole decisions. Instead, they attempt to carry their burden of alleging intentional race discrimination by presenting statistical disparities in outcomes of overall parole decisions. But since parole decisions are highly individualized and discretionary, statistics must provide "'exceptionally clear proof'" to support a claim of purposeful discrimination. *Fuller v. Ga. State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987)). Plaintiffs' statistics come nowhere near meeting this burden, so they fail to carry their burden of showing a likelihood of success on the merits of their race discrimination claim.

"A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group of people." *Id.* Thus, "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Id.* at 272. In short, "the Fourteenth Amendment guarantees equal laws, not equal results." *Id.* at 273.

Applying these equal protection principles to the parole context, "[t]o establish an equal protection claim, a prisoner must demonstrate that (1) 'he is similarly situated with other prisoners who received' more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001) (quoting *Damiano v. Fla. Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)). Plaintiffs make no attempt to even *allege* they were treated differently than a similarly-situated white inmate with respect to parole decisions. In the allegations in the complaint and in their declarations, Plaintiffs merely state that they are in various forms of minimum custody and that they believe they are suitable candidates for parole. (Docs. 25 to 25-5). In fact, Plaintiffs' only allegations relevant to Marshall undermine their own claims of race discrimination. They note that Marshall objected to parole for the five Plaintiffs serving convictions for violent offenses but *did not object* to parole for the one Plaintiff (Campbell) who is *not* serving a conviction for a violent offense, even though all Plaintiffs are black. (Doc. 23-1 at 28, 32). Plaintiffs fail to allege any facts to show Ivey or Marshall treated them differently because of their race or that the Board made any decision based on purposeful discrimination.

Instead, Plaintiffs attempt to carry their burden of showing purposeful discrimination solely by appeal to statistics. But *Fuller* shows that Plaintiffs' attempt fails for two reasons. First, when an inmate attempts to establish a race discrimination claim through statistics in the parole context, the statistics must provide "'exceptionally clear proof'" to support a claim of purposeful discrimination. *Fuller*, 851 F.2d at 1310 (quoting *McCleskey*, 481 U.S. at 297). *Fuller* adopted the "exceptionally clear proof" standard from *McClesky*, in which the Court rejected a race discrimination claim in death penalty sentencing based solely on racial statistical disparities. 481 U.S. at 292-98. Statistical evidence had to meet a higher burden since criminal decisions of that

type "rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense." *McClesky*, 481 U.S. at 294. Second, *Fuller* shows that in using statistical evidence, a plaintiff must still use the statistical evidence to show he was treated differently than *similarly-situated* white inmates. 851 F.2d at 1310:

> However, Fuller failed to provide the "exceptionally clear proof" of discrimination which is required because he did not show that he was similarly situated with white inmates who were paroled. The statistics showing that *white murderers* are paroled more frequently than *black rapists* do not appear to be relevant. Fuller makes comparisons between the numbers of black and white rapists paroled on initial, second and third consideration. However, it is unclear which, if any, of these comparisons are relevant because he does not state whether he was denied parole on initial, second or third consideration. *The decision to grant parole is based on many factors such as criminal history, nature of the offense, disciplinary record, employment and educational history, etc.* Fuller does not show himself to be similarly situated, *considering such factors*, with any inmates who were granted parole.

*Id.* (emphasis added). Plaintiffs' equal protection claim fails for both reasons noted in *Fuller*. That is, Plaintiffs' statistics fail to present "exceptionally clear proof" even when taken at face value, and Plaintiffs fail to show they are similarly situated in any relevant way to the groups analyzed in their statistics.

Plaintiffs first present a chart of discrepancies in parole grants based on race from fiscal years 2018 through 2023. (Doc. 26-3, Fig. A). But Plaintiffs' own chart shows that the absolute difference in grant rates between whites and blacks was *less* in 2023 (2.0 percentage points) than in 2018 (3.7 percentage points), even though 2018 was the golden age of parole hearings according to Plaintiffs. (*Id.*). While the absolute difference peaked in 2021, it began to narrow in 2022 and continued to decline in 2023 to less than in 2018. Plaintiffs' own calculations do not support an

inference of intentional discrimination because they do not show a trend of widening racial disparities.

More important, however, is that Figure A is *irrelevant* under *Fuller*. Plaintiffs derived Figure A simply by identifying the race of the inmate and the parole outcome. (Doc. 26-3 at 4 ¶10). But, as in *Fuller*, 851 F.2d at 1310, this fails to take into account a wide variety of individual circumstances that could result in different parole outcomes for race-neutral reasons. It does not take into account any of the six factors the Board's guidelines require it to consider, such as the risk to reoffend, the severity of the underlying offense, or the inmate's disciplinary record while in ADOC custody. *See* Ala. Code § 15-22-26(a). As a result, the disparities in Figure A prove nothing because they do not show that *similarly-situated* inmates of different races receive different treatment at significantly higher rates. *See Fuller*, 851 F.2d at 1310 ("The decision to grant or deny parole is based on many factors such as criminal history, nature of the offense, disciplinary record, employment and educational history, etc. Fuller does not show himself to be similarly situated, considering such factors, with any inmates who were granted parole."). Plaintiffs' regression analysis fares no better because it controls only for facility type, fiscal year, sex, and job status. (Doc. 26-3 at 7 ¶15). Only one of those factors (job status) is even debatably relevant to the factors the Board considers. *See* Ala. Code § 15-22-26(a). As a result, Plaintiffs' statistics on racial disparities in parole grant rates comes nowhere near the "exceptionally clear proof" required to prove discriminatory intent.

Plaintiffs' racial comparison of grant rates for inmates convicted of violent offenses and non-violent offenses fails for the same reason,[5] but should also be discounted entirely because of

---

[5] Plaintiffs must concede that even two inmates convicted of violent offenses are not similarly situated, because "violent offense" is defined in the parole statute to include a wide variety of

the selective omission of certain years where data is available. Plaintiffs had the data necessary to demonstrate declining grant rates for both violent and non-violent offenses from 2018 to 2023. (Doc. 26-3 at 8-9, Fig. C & D). However, when presenting data on racial disparities between grant rates based on violent and non-violent offenses, Plaintiffs—without explanation—provide outcomes only for 2018, 2020, and 2022. (Doc. 26-3 at 9-10 ¶¶ 19-20). The disparities in outcomes for the years Plaintiffs *do* provide are not significant—certainly not exceptionally clear proof— and they cannot prove a trend of race discrimination by selectively withholding outcomes for the years 2019, 2021, and 2023.

Plaintiffs' allegations and data on racial disparities for parole reset dates suffer from the same defects. For an inmate who has been denied parole, the Board may reset future parole consideration no more than two years out for inmates serving sentences of 20 years or less for convictions for nonviolent offenses and no more than five years out for all other inmates. *See* Ala. Code § 15-22-37(b)(4); ALA. ADMIN CODE r. 640-X-3-.03. The Board has unfettered discretion to choose a reset date so long as it is within the two and five-year maximums. Similar to Plaintiffs' data on parole grant rates, Plaintiffs' data on resets shows an increase of the length of time between parole considerations for all inmates with varying levels of racial disparity between 2018 and 2023. (Doc. 26-3 at 12, Fig. E).

But this data is useless since it compares length of resets based only on the inmate's race. *See Fuller*, 851 F.2d at 1310. Plaintiffs provide no data on racial disparities between similarly-situated inmates. For instance, Plaintiff Moore is serving a 50-year sentence for murder and has

---

offenses. *See* Ala. Code § 12-25-32(15). Plaintiffs themselves state that "Alabama defines 'violent' crimes broadly," and accuse the state of "over-designation of crimes as 'violent.'" (doc. 23-1 at 90 n.4). But when it comes to racial comparisons, Plaintiffs are content to lump all violent offenders together and differentiate them only by race.

incurred more than 20 disciplinary infractions since his time in custody. (Doc. 24-20 at 3; Exhibit 1 at 41-42). The Board's decision to reset Moore's parole consideration for the maximum five years may reflect a reasonable judgment that he should not be considered sooner because he is unlikely to be granted parole. Such a judgment would rest on race-neutral factors and legitimate justifications. *See Morales*, 514 U.S. at 510-11 (holding retroactive increase of length of time between parole considerations was not ex post facto because it applied only to inmates convicted of multiple homicides who were unlikely to get parole). Since Plaintiffs' data on resets does not compare similarly situated white and black inmates, "the statistical evidence is ambiguous at best and is 'clearly insufficient to support an inference that any of the decisionmakers . . . acted with discriminatory purpose.'" *Fuller*, 851 F.2d at 1310 (quoting *McClesky*, 481 U.S. at 297).

Finally, not only does Plaintiffs' statistical evidence fall far short of the "exceptionally clear proof" required by *Fuller*, but their equal protection claims also fail for the second independent reason that Fuller's failed. That is, Plaintiffs "do[] not show [themselves] to be similarly situated, *considering such factors*, with any inmates who were granted parole." *Fuller*, 851 F.2d at 1310 (emphasis added). Like Fuller, Plaintiffs fail to compare their outcomes with statistical outcomes for groups of similarly-situated inmates, such as inmates convicted of the same crime, who had served approximately the same amount of time on their sentence, with the same number of disciplinaries while in custody, etc. Instead, Plaintiffs compare themselves only insofar as they are black and had parole denied to inmates who are white and had parole denied from 2018 to 2023. Plaintiffs cannot ignore an element of their equal protection claim—that they are similarly situated to inmates who received more favorable treatment, *Jones*, 279 F.3d at 946-47—and instead rely on statistical abstractions. In sum, Plaintiffs have not only failed to show that race discrimination

is occurring *generally* in parole decisions, but they have also failed to show that race discrimination has occurred *in their cases*.

As an alternative argument, Plaintiffs argue that Defendants' actions should be analyzed under the framework of *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). (Doc. 23-1 at 40). But the *Arlington Heights* framework is used to determine whether *statutes* have a racially discriminatory purpose and effect. *See Greater Birmingham Ministries*, 992 F.3d at 1321-22. Plaintiffs do not allege that the 2019 statutory amendments to the parole laws are unconstitutional. Instead, they allege that Defendants' "customs and usages" regarding parole are racially discriminatory. (Doc. 23-1 at 38 n.21). Plaintiffs' claims should be analyzed under the specific framework for race discrimination in parole decisions provided by *Damiano*, *Jones*, and *Fuller*. As already argued, Plaintiffs fail to carry their burden under those cases and their race discrimination claims fail without regard to the *Arlington Heights* factors.

But even assuming *Arlington Heights* applies to Plaintiffs' race discrimination claims, those factors overwhelmingly weigh in Defendants' favor. The Eleventh Circuit summarized the *Arlington Heights* factors as evaluating the following:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries*, 992 F.3d at 1322. Application of these factors shows that the 2019 changes to the parole law were to re-emphasize the importance of public safety in light of specific incidents of danger to the public.

Beginning with factors (2) and (3)—the historical background and sequence of events leading up to the 2019 law's passage—Plaintiffs themselves note that Ivey and Marshall's advocacy began after "the tragic crime committed by Jimmy Spencer, *a white man*, after he was released on parole and evaded supervision." (Doc. 1 ¶ 91) (emphasis added). Spencer murdered three people in July 2018, including a seven-year-old boy, after being granted parole. (Doc. 26 at 6 ¶18; Doc. 24-9). According to former Board Chair Head's declaration, the Spencer murders occasioned the meeting between Ivey, Marshall, and the Board during which Ivey and Marshall allegedly expressed concern over the Board granting parole to inmates convicted of violent offenses. (Doc. 26 at 6-7 ¶¶ 20-23). The historical events leading to Ivey and Marshall's advocacy for parole reforms do not support a finding of race discrimination because their advocacy was occasioned by a murder committed by a white man, with an exceptionally violent past, and they advocated for the race-neutral value of public safety in considering parole release.

As to factors (4) and (5)—procedural and substantive departures and contemporary statements and actions of key legislators—these demonstrate that the 2019 amendments were passed by the Alabama legislature through the ordinary legislative process. Plaintiffs state that "Defendant Marshall pushed through a new law (the '2019 Parole Amendments') that gave the governor unilateral power to appoint the ABPP Executive Director and, as described in Governor Ivey's press release, instituted new, 'strict guidelines for granting a pardon or parole.'" (Doc. 23-1 at 18). But Marshall, as Attorney General, has no power to "push through," *i.e.*, *enact*, a statute—that power lies only with the Alabama legislature. And the people of the state, acting through their elected legislators, did amend the parole statute to add that the Board was "to ensure public safety" in making parole decisions and "that the board's paramount duty is to protect public safety." 2019 Ala. Laws Act No. 2019-393 p. 9. The statement on "strict guidelines for granting a pardon or

parole" attributed by Plaintiffs to "Governor Ivey's press release" (doc. 23-1 at 18) was actually made by Representative Connie Rowe, the bill's sponsor. (Doc. 24-10). Plaintiffs improperly ignore the independent role of the Alabama legislature in amending the parole law in 2019. Plaintiffs do not even attempt to argue that the Alabama legislature's amendments were irregular or racially motivated, and factors (4) and (5) confirm that the changes were based on concern for the race neutral value of public safety in light of the Jimmy Spencer incident.

For factors (1), (6), and (7)—the racial impact of the challenged law, and the foreseeability and knowledge of racial impact—Plaintiffs provide no evidence that emphasizing the value of public safety would have a foreseeable disproportionate impact on black inmates. The re-emphasis on the race-neutral value of public safety was occasioned by murders committed by a white parolee, Jimmy Spencer. As to the subsequent impact, for the reasons already stated above on Plaintiffs' statistics, Plaintiffs have failed to show any racially discriminatory effect because they do not provide data on outcomes for *similarly-situated* inmates with respect to parole grant rates or length of resets. These factors do not support an inference that parole reforms were adopted as a pretext for race discrimination.

Finally, as to factor (8)—the availability of less discriminatory alternatives—Plaintiffs simply advocate an emphasis on other factors that were authorized both before and after the 2019 amendments. (Doc. 23-1 at 43) ("Here, the less discriminatory alternative is the very parole system and procedures rejected by Defendants, with evidence- and actuarially-based standards that, when followed, undeniably achieved near racial parity in parole grant rates."). This reveals, once again, that Plaintiffs *real* argument is that the Board is not following Plaintiffs' preferred interpretation of *state* law by giving insufficient weight to risk assessments—a claim that is based on a violation of state law and therefore barred by *Pennhurst*. But for equal protection purposes, Plaintiffs

provide no evidence that near-total reliance on risk assessments is a less discriminatory alternative for *protecting public safety*, which is the value re-emphasized by the legislature. Plaintiffs provide no less discriminatory means of achieving this goal but simply note that reliance on risk assessments "achieved near racial parity in parole grant rates." (Doc. 23-1 at 43). Plaintiffs improperly substitute achieving "near racial parity" in parole outcomes as an end in itself while ignoring the race-neutral and legitimate goal of protecting public safety. They utterly fail to carry their burden on this factor.

In sum, *all Arlington Heights* factors weigh in favor of Defendants and against a finding that the 2019 parole reforms had a discriminatory purpose and effect. Even assuming these factors apply to the context of parole decisions, they fail to support Plaintiffs' equal protection claim. The relevant equal protection framework provided by *Damiano*, *Jones*, and *Fuller* compels rejection of Plaintiffs' race discrimination claims.

**B.      Plaintiffs Cannot Show They Are Facing Imminent Irreparable Harm Due to Their Delay in Seeking a Preliminary Injunction.**

"A preliminary injunction requires showing 'imminent' irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000)). "[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.* "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm . . . a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (citing cases).

All Plaintiffs, except Plaintiff English,[6] have waited months, if not *years* since their last parole denial, to seek a preliminary injunction on December 21, 2023. (Doc. 23). Plaintiff Ptomey's parole reconsideration was extended in fall of 2019 to 2022, and his parole was denied in September 2022. (Doc. 25 ¶¶ 6-7). His next parole consideration will be in 2025. (*Id.* ¶ 7). Plaintiff Campbell's prior parole was revoked in 2017 when he committed a new offense. (Doc. 25-1 ¶ 3). His parole has since been denied in 2020 and again on July 12, 2023. (*Id.* ¶¶ 10-11). His next parole consideration will be in 2028. (*Id.*). Plaintiff McDole's parole was denied in 2018 and on March 23, 2022. (Doc. 25-2 ¶¶ 12-13). His parole will be considered again in 2027. (*Id.* ¶ 13). Plaintiff Moore has been serving a 50-year sentence for murder since 1997. (Doc. 24-20 at 3). His parole was last denied December 2022, and his next parole consideration will be December 2027. (Doc. 25-4 ¶ 9). Plaintiff Cole has been incarcerated for 16 years, and he has been denied parole four times with his last denial occurring August 8, 2023. (Doc. 25-5 ¶¶ 2, 5).

Plaintiffs Ptomey, McDole, and Moore all had their last parole denials in 2022—over a year before seeking preliminary injunctive relief. Plaintiff Campbell's parole was last denied on July 12, 2023 and Cole's on August 8, 2023—over five and four months, respectively, before seeking a preliminary injunction. In addition to the six Parole Denial Plaintiffs, organizational Plaintiff TWF also seeks a preliminary injunction. (Doc. 44). TWF Director Lauren Faraino, and counsel of record, states in her affidavit that TWF has diverted resources to oppose Defendants' parole practices "[s]ince approximately June 2022." (Doc. 44-1 ¶ 4). Yet TWF waited until January 4, 2024, 18 months, to seek preliminary injunctive relief.

---

[6] Plaintiff English's parole was revoked in 2020 and his parole was denied on November 28, 2023. (Doc. 25-3 ¶¶ 2, 8). His parole will be considered again on November 28, 2024. (*Id.* ¶ 9).

According to Plaintiffs, the alleged irreparable harm began on October 1, 2019. *See* (Doc. 23-1 at 51) (seeking provisional certification of all persons "who were denied parole while in the custody of ADOC at any time after October 1, 2019."); *see also* (doc. 23-1 at 57) (requesting injunction ordering the Board to reconsider parole for everyone denied parole since October 1, 2019). Yet all Plaintiffs, except English, have waited months or years, sometimes being subjected to Defendants' allegedly unconstitutional policies repeatedly, before seeking injunctive relief. Since "a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm," *Wreal*, 840 F.3d at 1248, Plaintiffs fail to carry their burden of establishing a threat of imminent irreparable harm.

### C.    Plaintiffs Have Not Shown That the Balance of Harm Weighs in Their Favor or That an Injunction Is in the Public Interest.

Plaintiffs must also show that the threatened injury to them outweighs any harm the injunction might cause Defendants and that the injunction would not be adverse to the public interest. *Wreal*, 840 F.3d at 1247. Where "the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain*, 958 F.3d at 1091.

Here, the harm to Defendants outweighs the threatened injury to Plaintiffs because Plaintiffs have foregone easier and swifter forms of relief. Plaintiffs have the right to seek common law certiorari review of the denial of their parole in Alabama state courts. *See Tedder v. Ala. Bd. of Pardons & Paroles*, 677 So. 2d 1261, 1262 (Ala. Crim. App. 1996). Failing that, they have the right to seek federal court habeas review of the denial of their parole or the calculation of their reset dates to the extent they are seeking an earlier release. *See Gwin v. Snow*, 870 F.2d 616, 625 (11th Cir. 1989). But rather than pursue these avenues of relief, Plaintiffs instead delayed months or years after their last parole denial to file this lawsuit. And they chose to bury their parole claims in a sweeping 126-page lawsuit that names no fewer than 25 defendants, alleging primarily that

the use of inmate labor is "a modern-day form of slavery." (Doc. 1 ¶ 1). Plaintiffs' litigation strategy seems likely—indeed, calculated—to drag on for years. These are not the actions of Plaintiffs facing imminent harm, and this should be weighed against them in considering whether to issue an injunction.

As to Defendants, the harm caused by the requested injunction would be severe. The public has an interest in the continued enforcement of the laws validly enacted by their elected representatives, including the 2019 amendments to the parole statute. Ivey has an interest in Board members that she appoints exercising their independent judgment free from judicial oversight. Yet Plaintiffs request the Court to order the Board to reconsider every parole denial since October 1, 2019, at the rate of 1,000 a month, and to compel the Board to exercise its discretion in the way *Plaintiffs* want by forbidding the Board from resetting more than 15% of parole considerations more than two years out and compelling it to parole 80% of inmates scoring "low" or "moderate" on risk assessments. (Doc. 23-1 at 57). As to Marshall, Plaintiffs request an order forbidding him, as Attorney General, from carrying out his statutory duty of advocating for victims at parole hearings. *See* Ala. Code § 15-23-83. This would have the effect of requiring crime victims—many of whom still suffer from the trauma of the crimes committed against them—to relive their experiences by appearing before the Board to represent their own interests without support from the crime-victims' advocates supplied to the by the state. Plaintiffs' requested injunction would effectively bar Marshall from acting as an advocate for crime victims and speaking on their behalf through his victim service officers.

Finally, the equities weigh against Plaintiffs because they request a mandatory injunction, rather than an injunction that merely seeks to maintain the status quo. Such injunctions "are particularly disfavored, and should not be issued unless the facts and law clearly favor the moving

party." *Martinez*, 544 F.2d at 1243 (5th Cir. 1976). The standard for an injunction is even higher in a case like this one where the preliminary injunction will effectively end the dispute by granting Plaintiffs all conceivable relief. A "heightened showing" is "required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial." *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997); *see also Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991). Absent truly extraordinary circumstances, a "court should not by mandatory injunction grant temporary relief which will dispose of the case on the merits." *Iron City Indus. Cleaning Corp. v. Local 141, Laundry & Dry Cleaners Int'l Union, AFL-CIO*, 316 F. Supp. 1373, 1376 (W.D. Pa. 1970). But that kind of relief is exactly what Plaintiffs are seeking here. (*See* doc. 23-1 at 56-58). They seek an order requiring the Board to review all parole decisions since October 1, 2019, and "issue revised parole decisions" that release inmates in 80% of cases where they score "low" or "moderate" on risk assessments. (*Id.* at 57). But such decisions could not be undone once the inmates were released. This counsels against entering an injunction.

## D.   The Court Should Not Provisionally Certify the Parole Denial Class or Discriminatory Parole Denial Subclass.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotation marks omitted); *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1125, 1233 (11th Cir. 2016) ("All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." (citing *id.*)).

"To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23[.]" *Comcast*, 569 U.S. at 33 (quoting *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Rule 23 of the Federal Rules of Civil Procedure requires that Plaintiffs satisfy four prongs (numerosity, commonality, typicality, and adequacy of representation) along with satisfying one of three conditions in subsection (b).

Plaintiffs ask this Court to provisionally certify a "Parole Denial Class" consisting of "all incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were denied parole while in the custody of ADOC at any time after October 1, 2019[.]" Doc. 23-1 at 51 (citing doc. 1 ¶ 189). They also seek provisional certification of a "Discriminatory Parole Denial Subclass" consisting of all black members of the Class. *Id.* Of the three conditions in subsection (b), Plaintiffs argue that (b)(2) applies to both the Class and Subclass: that Defendants have "acted or refused to act on grounds that apply generally to the class." Doc. 23-1 at 52.

Because parole decisions are highly individualized, *see* Ala. Code § 15-22-26, Defendants have not acted on grounds that apply generally to the Class. Separately, the named Plaintiffs are not adequate representatives of the Class. They generally fail this prong because their convictions occurred prior to the JRA—making their ex post facto claim weaker; more specifically, the all-black named Plaintiffs who have an additional claim cannot adequately represent the non-black Class members. Thus, this Court should deny Plaintiffs' request for provisional class certification.

1.     **Plaintiffs fail to satisfy Rule 23(b)(2) because parole decisions are highly individualized.**

Claims about highly individualized determinations that consider more than a dozen factors do not involve Defendants' "act[ing] or refus[ing] to act on grounds that apply generally to the class." "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360 (citation and

internal quotation marks omitted). It applies "only when a single injunction or declaratory judgment would provide relief to each members of the class" and "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.* Plaintiffs fail to satisfy 23(b)(2) for two principal reasons.

First, Plaintiffs' ex post facto and equal protection claims allege mutually inconsistent practices by Defendants and therefore cannot be remedied by the same declaratory and injunctive relief. Plaintiffs' ex post facto claim alleges the Board has instituted a de facto ban on parole for violent offenders in complete disregard for individual inmate's risk assessment scores. But if that is so, then the Board is treating all inmates equally, albeit pursuant to a policy that Plaintiffs allege has the effect of retroactively imposing a harsher punishment. If those are the actions "that apply generally to the class," Fed. R. Civ. P. 23(b)(2), then the Board cannot simultaneously discriminate on the basis of race in making parole decisions. Plaintiffs' alleged ex post facto violation is precisely the failure of the Board to make individualized decisions, which is inconsistent with a simultaneous policy of making parole decisions based on the race of the inmate. If the post-2019 parole policies constitute a per se increase in punishment, then they do not constitute an increase in punishment just for black inmates. Nor could both the ex post facto and equal protection violations be remedied with the same declaratory and injunctive relief. A race-neutral ex post facto policy of retroactively increasing punishment for all inmates cannot be remedied by an injunction for the Board to cease such conduct only for black inmates. Plaintiffs' chosen constitutional theories do not allege the same type of conduct and cannot be remedied through the same injunction.

Second, Plaintiffs have failed to meet Rule 23(b)(2)'s requirements because they do not allege any common practices of the Board, but instead highlight collective results of highly-individualized decisions. Parole decisions are highly individualized. Ala. Code § 15-22-26(a) provides that the Board must determine whether "the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole and to ensure public safety." Those guidelines include (but are not limited to): risk of reoffense, reentry planning, stakeholder and community input, participation in risk-reduction, institutional behavior, and severity of the underlying offense. *Id.* at (1)-(6); *see also* (doc. 26-1 at 2, 3) (listing fourteen reasons for favoring parole and thirteen reasons favoring denial). Any one of these reasons—to varying degrees or combinations thereof—could constitute the Board's basis for denying parole, so Defendants have not "acted or refused to act on grounds that apply generally to the class."

While Plaintiffs allege the Board has acted pursuant to certain "policies," their evidence consists only in compiling outcomes of individual decisions. Plaintiffs' unproven theory regarding the 2019 Parole Amendments proves the point. As Plaintiffs claim, the 2019 Amendments ushered in an era where subjective considerations (severity of the offense) dominate over objective considerations (risk assessments), with even worse outcomes for black prisoners. *See, e.g.*, doc. 23-1 at 9. But if each of the three-member Board applies multiple subjective and discretionary factors, this necessarily implies they are not acting according to a uniform policy. And as already argued on the merits of Plaintiffs' equal protection claim, outcomes that consider only the race of the inmate and whether parole was denied proves nothing. Plaintiffs themselves demonstrate the many individualized and race-neutral reasons for different outcomes. For instance, Moore is guilty of an especially heinous crime—beating a sixteen-month old child to death—that is less severe when compared to Campbell's crime (distribution of controlled substance). Yet Campbell, like

English, was previously granted parole but had parole revoked after committing a new offense. So while Campbell's denial of parole may seem incongruous when comparing only his crime with Moore's, it is not when taking into account Campbell's own track record of re-offending after previously being granted parole. Plaintiffs' institutional behavior varies widely, with their number of infractions while in ADOC varying from one to over thirty. Alabama law authorizes the Board to consider any of these factors—or any combination of these factors—in making parole decisions. In sum, it is difficult to think of a worse candidate for class certification than parole decisions, which depend on multiple factors and ultimately rest on the "complete discretion" of the Board. Ala. Code § 15-22-26(c).

### 2.    The all-black named Plaintiffs with convictions that occurred prior to the JRA are not adequate representatives of the Class.

Rule 23(a)(4) requires Plaintiffs to prove that "the representative parties will fairly and adequately protect the interests of the class." One part of this inquiry is "whether any substantial conflicts of interest exist between the representatives and the class[.]" *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted); *see also Pardo-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (explaining that the named plaintiffs' incentivizes must "align with those of absent class members so as to assure that the absentees' interests will be fairly represented" (citations omitted)).

The named Plaintiffs' shared characteristics prevent them from adequately representing Class members who do not possess those characteristics. First, because all the named Plaintiffs are black, doc. 1 ¶¶ 146, 148, 149, 150, 151 153, ; *see* doc. 23-1 at 39, they possess an additional avenue for relief (their equal protection claim). In other words, no named Plaintiffs represent the interests of the non-black class members whose only opportunity for relief is through the ex post facto claim. The named Plaintiffs would have an interest in settling or prioritizing the equal

protection claim at the expense of the ex post facto claim (and thus the non-black Class members). And this concern is more founded because the named Plaintiffs have an additional reason to deprioritize their ex post facto claim. As discussed on the merits of the ex post facto claim, all the named Plaintiffs' offenses occurred prior to the implementation of the JRA, so they cannot rely on the Board's required consideration of objective criteria like risk assessments that Class members who committed their offenses between January 30, 2016 and October 1, 2019 could. Because the named Plaintiffs possess an additional avenue for relief and Plaintiffs are incentivized to prioritize that additional avenue, they cannot adequately protect the interests of the non-black Class members.

Because Plaintiffs fail to satisfy any of the Rule 23(b) conditions or the adequacy requirement in Rule 23(a)(4), they have failed their burden of proof that this Court should provisionally certify the Parole Denial Class and the Discriminatory Parole Denial Subclass.[7]\

---

[7] Plaintiffs also appeal to the Court's "inherent equitable authority to issue an injunction extending relief to all similarly situated individuals." Plaintiffs' only support for this request is a citation to *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). But the decision merely "le[ft] the injunctions entered by the lower courts in place with respect to . . . those similarly situated" non-parties without analyzing whether it was proper to do so. *See id.* at 579, 581, 582–83. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999). Rather, "while 'federal courts possess broad discretion to fashion an equitable remedy,' that discretion is bounded by both historical practice and traditional remedial principles." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (citations omitted). The "traditional scope of injunctive relief . . . [is] [t]he extent necessary to protect the interests of the parties." *Id.* (cleaned up) (quoting *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003)). This Court should thus reject Plaintiffs' request for an injunction that spans far beyond what is needed to provide the named Plaintiffs relief.

**E.      The Court Should Deny Plaintiffs' Motion for Preliminary Injunction Without Holding an Evidentiary Hearing.**

"An evidentiary hearing is required for entry of a preliminary injunction only 'where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue.'" *Cumulus Media, Inc. v. Clear Channel Comms., Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998)). If the only dispute regards the inferences to be drawn from the parties' written submissions, then the decision to hold an evidentiary hearing lies with the discretion of the Court. *Id.* In addition, a party is not entitled to discovery against a governmental official who has asserted immunity. "The defense of sovereign or qualified immunity protects government officials not only from having to stand trial, but from having to bear the burdens attend to litigation, including pretrial discovery." *Blinco v. Green Tree Servicing, LLC*, 366 F.3d 1249, 1252 (11th Cir. 2004). As a result, "immunity is a right not to be subjected to litigation beyond the point at which immunity is asserted." *Howe v. City of Enterprise*, 861 F.3d 1300, 1303 (11th Cir. 2017).

Plaintiffs' motion for a preliminary injunction can and should be decided on the parties' written submissions. Ivey and Marshall have demonstrated the legal insufficiency of Plaintiffs' claims without the need for an evidentiary hearing. Although Ivey and Marshall dispute many of Plaintiffs assertions and accusations, there is no need to wade through a sea of witnesses and exhibits to identify the relevant facts. For the ex post facto claims, the only relevant facts are Plaintiffs' dates of convictions and the changes that occurred to Alabama law since their convictions. For the equal protection claims, Plaintiffs rely solely on the use of statistics, which fails to carry their burden of alleging they were treated differently than similarly-situated white inmates on an individual basis. Defendants have also argued that, even if the statistics are taken at face value, they are irrelevant because they fail to compare similarly-situated inmates. Defendants'

sovereign immunity, standing, and other procedural defenses present questions of law for the Court and do not require an evidentiary hearing.

Ivey and Marshall have also asserted the defenses of sovereign immunity both as to Plaintiffs' claims as a whole and as to Ivey and Marshall specifically because they lack the necessary enforcement connection to the challenged parole policies. The assertion of sovereign immunity triggers a stay of any further discovery against Ivey and Marshall, including the necessity of appearing or responding to an evidentiary hearing. *See Howe*, 861 F.3d at 1302-03. In addition, the deliberative process and legislative privileges prevent Ivey and Marshall from disclosing evidence about internal decisionmaking processes or advocacy with the legislature. *See United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267-68 (2021); *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015). As a result, they have limited their evidentiary submissions at this stage to ADOC institutional records relating to Plaintiffs' dates of conviction and disciplinary violations and Marshall's parole objection letters, which are matters of public record.

Since Plaintiffs' motion turns largely on the inferences to be made from the written submissions and because Ivey and Marshall are entitled to an immunity-based stay of further proceedings, the Court should resolve Plaintiffs' motion for a preliminary injunction without an evidentiary hearing.

## Conclusion

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction (doc. 23) and The Woods Foundation's Motion for Joinder (doc. 44) in the preliminary injunction should be denied as well as Plaintiffs' request for provisional class certification.

Respectfully submitted,

/s/ Brad A. Chynoweth
Brad A. Chynoweth (ASB-0030-S63K)
  *Assistant Chief Deputy, Civil Division*

Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Brad.Chynoweth@AlabamaAG.gov

***Counsel for Defendants Governor Kay Ivey
and Attorney General Steve Marshall***

56

**Certificate of Service**

I hereby certify that on January 22, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Brad A. Chynoweth
*Assistant Chief Deputy, Civil Division*
