# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT EARL COUNCIL, et. al., | ) ) ) | |
| Petitioners, | ) ) | |
| V. | ) ) | Case No. 2:23-CV-712-ECM-JTA |
| KAY IVEY, et. al., | ) ) ) | |
| Respondents. | ) | |

## MEMORANDUM BRIEF IN SUPPORT OF DEFENDANTS ALABAMA BOARD OF PARDONS AND PAROLES CHAIR LEIGH GWATHNEY, BOARD MEMBER DARRYL LITTLTON, AND BOARD MEMBER GABRELLE SIMMONS'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PROVISIONAL <u>CLASS CERTIFICATION</u>

GARY L. WILLFORD, JR.
*ASSISTANT ATTORNEY GENERAL*

Alabama Board of Pardons and Paroles
301 South Ripley Street
Montgomery, AL 36104
Telephone: (334) 353-4495
Gary.willford@paroles.alabama.gov

***Counsel for Defendants Alabama Board of Pardons and Paroles, Leigh Gwathney, Darryl Littleton, Gabrelle Simmons***

# TABLE OF CONTENTS

Table of Contents.................................................................................................................. i

Table of Authorities ............................................................................................................. ii

Introduction ..........................................................................................................................1

Statement of Facts ................................................................................................................2

    I.      Alabama's Parole System Prior to 2016 .................................................3

    II.     The Moving Inmate Plaintiffs Committed Their Offenses and Were Sentenced Prior to the Effective Date of SB67........................................................6

    III.    Alabama's Parole System After the Enactment of SB67.........................8

    IV.    Board's Operation Under SB67 and the Resulting 2019 Alabama Laws Act 2019-393 (HB380)........................................................................................14

    V.     Changes to Board Membership Following SB67 and HB 380 ..........................29

    VI.    Current Parole Consideration Process ................................................29

    VII.   Parole Data Since 2009 .......................................................................32

    VIII.  Other Work Performed by the Board ..................................................36

Standard of Review ............................................................................................................37

Argument ............................................................................................................................39

    I.      Plaintiffs' Claims are Procedurally Barred .........................................39

    II.     Plaintiffs' Claims Fail on the Merits...................................................50

    III.    The Court Should Not Grant the Requested Injunctive Relief............................83

    IV     The Requested Class Certification is Not Clearly Defined and Ascertainable Given Plaintiffs' Claims Against the Board .......................................................94

    V.     No Hearing is Necessary .....................................................................98

Conclusion..........................................................................................................................99

Certificate of Service .......................................................................................................101

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009)....38

*Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006) ........................................................................45

*Baker v. Ivey*, No. 2:22-CV-375-RAH-SMD, 2023 WL 5499872, at *3 (M.D. Ala. June 23, 2023)..................................................................................................................................52

*Barber v. Governor of Alabama*, 73 F.4th 1306 (11th Cir. 2023)..............................................37

*Beavers v. State*, 666 So. 2d 868 (Ala. Crim. App. 1995)..........................................................55

*Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016) ..................................................................98

*Bonner v. City of Prichard*, Ala., 661 F.2d 1206 (11th Cir. 1981) .............................................39

*Bost v. Fed. Express Corp.*, 372 F.3d 1233 (11th Cir. 2004) ......................................................44

*Bowers v. United States Parole Comm'n*, 775 F. App'x 504 (11th Cir. 2019)...........................82

*Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220 (11th Cir. 2021) ...........38, 85

*Brown*, 335 F.3d at 1261 ............................................................................................................43

*Bulls v. Warden*, No. 20-10882-E, 2020 WL 3053502, at *1 (11th Cir. May 13, 2020).............82

*California Dep't of Corr. v. Morales*, 514 U.S. 499 (1995) ...........................................53, 57, 91

*Campbell v. Rainbow City, Alabama*, 434 F.3d 1306 (11th Cir. 2006) ......................................74

*Chang v. Carnival Corp.*, 839 F.3d 993(11th Cir. 2016)............................................................46

*Chappell v. Rich*, 340 F.3d 1279 (11th Cir. 2003) .....................................................................42

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994)................................................39, 84

*Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498 (11th Cir. 1990) .................................47

*Collins v. Alabama Dep't of Corr.*, 982 So. 2d 1078 (Ala. 2007)................................................2

*Collins v. Youngblood*, 497 U.S. 37 (1990)................................................................................53

*Conlogue v. Shinbaum*, 949 F.2d 378 (11th Cir. 1991)..............................................................82

iii

*Cook v. Wiley*, 208 F.3d 1314 (11th Cir. 2000)...................................................................82

*Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929 (11th Cir. 1986)....................61, 62, 63

*De La Fuente v. Merrill*, 214 F.Supp.3d 1241 (M.D. Ala. 2016) .................................................37

*Dobbert v. Fla.*, 432 U.S. 282 (1977).........................................................................................54

*Dotson v. United States*, 30 F.4th 1259 (11th Cir. 2022) ..................................................44, 45, 46

*E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987)......................................................78

*Ellard v. State*, 474 So. 2d 743 (Ala. Crim. App. 1984) ..........................................................2, 51

*Ex parte Alabama Bd. of Pardons & Paroles*, 849 So. 2d 255 (Ala. Crim. App. 2002) .............48

*Ex parte Alabama Bd. of Pardons and Paroles*, 814 So. 2d 870(Ala. 2001)...............................88

*Ex parte Baldwin Cnty. Comm'n*, 526 So. 2d 564 (Ala. 1988) ....................................................2

*Ex parte Bd. of Pardons & Paroles*, 793 So. 2d 774 (Ala. 2000) ....................................................2

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560 (5th Cir. 1971) ...........39

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) .................................................................83

*Foreman v. Gwathney*, No. 2:21-CV-675-WHA-SRW, 2022 WL 1256721, at *3 (M.D. Ala. 2022)........................................................................................................................................52

*Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988)..72, 74

*Garner v. Jones*, 529 U.S. 244, 249–50 (2000)..................................................53-54, 57-58, 61-62

*Gholston v. Bd. of Pardons & Paroles*, 627 So. 2d 945 (Ala. Civ. App. 1993).......................3, 49

*Gordon v. Bentley*, No. 7:15-CV-02282-LSC, 2016 WL 4379537, at *1 (N.D. Ala. 2016)........98

*Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979) ...... 40, 50-52, 83

*Hambright v. Alabama Bd. of Pardons & Paroles*, No. 2:18-CV-358-WHA-CSC, 2021 WL 506578, at *4 (M.D. Ala. 2021) ........................................................................................52

*Harris v. Hammonds*, 217 F.3d 1346 (11th Cir. 2000) ............................................................57

*Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979)............................................................39, 84

*Henry v. Abernathy*, 647 F. Supp. 3d 1235 (M.D. Ala. 2022) ...............................................37, 38

*Holland v. Fla.*, 560 U.S. 631 (2010) ........................................................................44

*Houston v. Davenport*, No. 2:18-CV-872-MHT-CSC, 2021 WL 6425558, at *4 (M.D. Ala. 2021)............................................................................................................................52

*Houston v. Williams*, 547 F.3d 1357 (11th Cir. 2008) ...............................................83

*In re Piper Aircraft Corp.*, 244 F.3d 1289 (11th Cir. 2001) .......................................47

*Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89 (1990) ................................................46

*Jackson v. Cook*, No. 2:17-CV-414-ALB, 2020 WL 4006671, at *6 (M.D. Ala. June 4, 2020) .67

*Joel v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000) ...........................................78

*Johnson v. Wainwright*, 772 F.2d 826 (11th Cir. 1985)..............................................61

*Jones v. Fla. Parole Comm'n*, 787 F.3d 1105 (11th Cir. 2015)......................58, 68, 72

*Jones v. Georgia State Bd. of Pardons & Paroles*, 59 F.3d 1145 (11th Cir. 1995)....................70

*Jones v. Ray*, 279 F.3d 944 (11th Cir. 2001)......................................................58, 68, 73

*Jones v. white*, 992 F.2d 154 (11th Cir. 1993) ...................................................77, 80

*Karantsalis v. City of Miami Springs, Fla.*, 17 F.4th 1316 (11th Cir. 2021) ..............42

*Ledbetter v. Pettaway*, No. 2:20-CV-276-RAH-SMD, 2023 WL 5920813, at *5 (M.D. Ala. Aug. 14, 2023)...................................................................................................................52

*Leonard v. Alabama State Bd. of Pharmacy*, 591 F.Supp.3d 1155(M.D. Ala. 2022)................38

*Lovett v. Ray*, 327 F.3d 1181 (11th Cir. 2003)...........................................................43

*Mann v. Palmer*, 713 F.3d 1306 (11th Cir. 2013)................................................47, 49

*Manning v. City of Auburn*, 953 F.2d 1355 (11th Cir. 1992)......................................48

*Martinez v. Mathews*, 544 F.2d 1233 (5th Cir. 1976) ................................................39

*Mathis v. Vizcarrondo*, 792 F. App'x 746 (11th Cir. 2019).......................................46

*Matthews v. Town of Autaugaville*, 574 F. Supp. 2d 1237 (M.D. Ala. 2008)...................74, 97

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .............................................................38

*McCleskey v. Kemp*, 481 U.S. 279 (1987)...........................................................77, 78

*McConico v. Alabama Dep't of Corr.*, 893 So. 2d 577 (Ala. Crim. App. 2004) .........................2

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir.1998) ...............................98

*McGroarty v. Swearingen*, 977 F.3d 1302 (11th Cir. 2020) ........................................42

*McGuire v. Marshall*, 512 F. Supp. 3d 1189 (M.D. Ala. 2021)...........................48, 50

*McNair v. Allen*, 515 F.3d 1168 (11th Cir. 2008) ...........................................41, 42, 43

*Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250 (2016).....................44, 45

*Mercedes-Benz U.S. Int'l, Inc. v. Cobasys*, LLC, 605 F. Supp. 2d 1189 (N.D. Ala. 2009).........39

*Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991) ............................................52, 55

*Morrissey v. United States*, 871 F.3d 1260 (11th Cir. 2017) .................................77, 80

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283 (11th Cir. 1990) ................................................................................39, 80

*Nix v. Alabama Bd. of Pardons & Paroles*, No. 2:19-CV-372-WHA-CSC, 2022 WL 1236362, at *4 (M.D. Ala. 2022) ................................................................................52

*Nordlinger v. Hahn*, 505 U.S. 1 (1992 .........................................................................74

*O'Kelley v. Snow*, 53 F.3d 319 (11th Cir. 1995).........................................40, 52, 86

*Olmstead v. Amoco Oil Co.*, 725 F.2d 627 (11th Cir. 1984).................................48, 50

*Owens v. Okure*, 488 U.S. 235 (1989).........................................................................42

*Paschal v. Wainwright*, 738 F.2d 1173 (11th Cir. 1984) .................................61, 62, 63

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ..........................41, 87, 91, 99

*Penoyer v. Briggs*, 206 F. App'x 962 (11th Cir. 2006).............................................62

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256(1979)...................................77

*Peugh v. United States*, 569 U.S. 530 (2013).......................................................54, 55

*Pleming v. Universal–Rundle Corp.*, 142 F.3d 1354 (11th Cir. 1998) .................48, 50

*Porter v. Ray*, 461 F.3d 1315 (11th Cir. 2006) .............................................68, 69, 70

*Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235 (11th Cir. 1999) ............................47, 49

*Robinson v. State*, 12 So. 3d 58 (Ala. 2008) ............................................................2

*Ron Grp., LLC v. Azar*, No. 2:20-CV-1038-ECM, 2021 WL 5576616, at *2 (M.D. Ala. Nov. 29, 2021)............................................................................................38

*S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198 (11th Cir. 2019). 41, 74-75, 87, 91, 99

*San Martin v. McNeil*, 633 F.3d 1257 (11th Cir. 2011) ............................................45

*Shuler v. Duke*, 792 F. App'x 69 (11th Cir. 2019) ....................................................46

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000)....................................................85

*Slakman v. State Bd. of Pardons & Paroles*, No. 21-12226, 2021 WL 5071858, at *2 n.4 (11th Cir. Nov. 2, 2021)....................................................................................72

*Slocum v. Georgia State Bd. of Pardons & Paroles*, 678 F.2d 940 (11th Cir. 1982) .................52

*States v. Bogle*, 855 F.2d 707 (11th Cir. 1988) .......................................................86

*Summers v. State*, 15 So. 2d 502 (Ala. 1943) ..........................................................2

*Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) ....................38

*Swarthout v. Cooke*, 562 U.S. 216 (2011)...............................................................88

*Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311 (11th Cir. 2006) ...............................73

*Swift v. Esdale*, 306 So. 2d 268 (Ala. 1975)............................................................2

*Taylor v. Nix*, 240 F. App'x 830 (11th Cir. 2007).....................................................75

*Tedder v. Alabama Bd. of Pardons & Paroles*, 677 So. 2d 1261 (Ala. Crim. App. 1996)......5, 51

*Thomas v. Sellers*, 691 F.2d 487 (11th Cir. 1982)....................................5, 40, 52, 55, 67

*Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374 (Ala. 2001) ....................5, 55

*Thompson v. Merrill*, 505 F. Supp. 3d 1239 (M.D. Ala. 2020)..................................54

*Thorne v. Chairperson Fla. Parole Comm'n*, 427 F. App'x 76 (11th Cir. 2011 ........................74

*Thornton v. Hunt*, 852 F.2d 526 (11th Cir. 1988) ....................................................82

*Tooma v. David*, 381 F. App'x 977 (11th Cir. 2010) ...........................................62, 63

*Tucker v. Alabama Bd. of Pardons & Paroles*, 188 So. 3d 713 (Ala. Crim. App. 2015) .............5

*Turner v. Ivey*, No. SC-2022-0538, 2023 WL 4672503, at *7 (Ala. July 21, 2023)

.............................................................................................................................

...................................................................................40, 51, 52, 86, 87

*United States v. Abraham*, 386 F.3d 1033 (11th Cir. 2004)........................................53

*United States v. Barfield*, 999 F.2d 1520 n.3 (11th Cir. 1993)....................................39

*United States v. Lambert*, 695 F.2d 536 (11th Cir. 1983) ..........................................37

*United States v. Rosario–Delgado*, 198 F.3d 1354 (11th Cir.1999) ...........................53

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ...................................................38

*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009)......................................95

*Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016) ...................45

*Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282 (11th Cir. 2022) ........................38, 85, 87

*Wallace v. Kato*, 549 U.S. 384 (2007)........................................................................42

*Weaver v. Graham*, 450 U.S. 24 (1981) ......................................................................54

*West v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1289 (11th Cir. 2017) ...............42

*Whitehead v. U.S. Parole Comm'n*, 755 F.2d 1536 (11th Cir. 1985) .........................76

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .........................................37

## Statutes

Ala. Code § 6-2-38 ......................................................................................................42

Ala. Code § 12-25-32 ..................................................................................................17

Ala. Code § 15-22-2 ....................................................................................................81

Ala. Code § 15-22-20 ...............................................................................................3, 21

Ala. Code § 15-22-21 ...............................................................................................3, 80

Ala. Code § 15-22-23 .......................................................................................4, 5, 13, 25

Ala. Code § 15-22-26 .....4, 11, 13, 15-16, 22-23, 25, 28, 31, 55-56, 59-60, 62-64, 66-67, 70, 72

Ala. Code § 15-22-26.2 ....................................................................................14, 25, 73

Ala. Code § 15-22-28 ........................................................................5, 15, 17, 23, 25, 30

Ala. Code § 15-22-32 ........................................................................................17, 37

Ala. Code § 15-22-36 ........................................................3-5, 13, 24-25, 30-31, 36

Ala. Code § 15-22-37 ........................................................................14, 24, 32, 90

Ala. Code § 15-22-38 ........................................................................................16

Ala. Code § 15-22-39 ................................................................................88, 90

Ala. Code § 15-22-40 ........................................................................................36

Ala. Code § 15-23-79 ........................................................................5, 13, 25, 89

## Other Authorities

Art. V. § 124(b), Ala. Const. 2022 ........................................................................2

Alabama Laws Act 2019-393 (HB380) ........................................................14, 22, 24

## Rules

Ala. Admin. Code. § 640-X-3.03 ........................................................................32

Ala. Admin. Code. § 640-X-5.01 ........................................................................31

Ala. Admin. Code. § 640-X-5.02 ........................................................................31

Ala. Admin. Code. § 640-X-5.06 -.011 ........................................................................32

Ala. Admin. Code. § 640-X-5.06 -.07 ................................................................31, 32

Ala. Admin. Code. § 640-X-5.09 ........................................................................32

Fed. R. Civ. P. 23 ................................................................................94, 95

**COME NOW** Defendants, Alabama Board of Pardons and Paroles Chair Leigh Gwathney ("Gwathney"), Board Member Darryl Littleton ("Littleton"), and Board Member Gabrelle Simmons ("Simmons") (collectively referred to hereinafter as the "Board"), and hereby files this Opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification.

## INTRODUCTION

On December 12, 2023, Plaintiffs filed a Complaint raising twelve claims against Governor Kay Ivey, Attorney General Steve Marshal, the Board, and the Alabama Department of Corrections ("ADOC") (collectively the "state Defendants"), two municipalities and various private Defendants. *See generally* Doc. 1. Inmate Plaintiffs subsequently filed a Notice of Motion and Motion for Preliminary Injunction and Provisional Class Certification on December 21, 2023. Doc. 23. In their motion, the Inmate Plaintiffs request an injunction against the state Defendants on the grounds that they will be irreparably harmed by the Board's alleged violation of the Ex Post Facto and Equal Protection clauses of the United States Constitution. *See* Doc. 23-1 at pp. 33, 38. As set forth below, the Plaintiffs preliminary injunction claims are procedurally barred, meritless as a matter of fact and law, and their putative class cannot be certified.

**STATEMENT OF FACTS**

Since 1939, the Alabama Legislature controls and regulates the administration of parole in Alabama. Under the Alabama Constitution, "[t]he legislature shall have power to provide for and to regulate the administration of . . . paroles[.]"Art. V. § 124(b), ALA. CONST. 2022. In turn, the Legislature created the Board and granted it the authority to grant paroles and administer parole release. (Ex. A.)

By creating the Board to administer Alabama's parole system, the Alabama Legislature granted to the Board exclusive power over parole decisions and over determining an inmate's fitness for parole. *See e.g.*, *Summers v. State*, 15 So. 2d 502, 504 (Ala. 1943); *Ex parte Bd. of Pardons & Paroles*, 793 So. 2d 774, 776 (Ala. 2000) (*citing Swift v. Esdale*, 306 So. 2d 268 (Ala. 1975)); *Ellard v. State*, 474 So. 2d 743, 749–50 (Ala. Crim. App. 1984). Given the exclusive legislative power granted to the Board, Alabama appellate courts recognize the Board as a legislative agency. *See e.g.*, *Ex parte Baldwin Cnty. Comm'n*, 526 So. 2d 564, 566 (Ala. 1988) ("the [Board] is a legislative agency[.]"); *McConico v. Alabama Dep't of Corr.*, 893 So. 2d 577, 579 (Ala. Crim. App. 2004) ("as both [the Court of Criminal Appeals] and the Court of Civil Appeals have recognized, the [Board] is a legislative agency, rather than an administrative agency."), *overruled on other grounds by Collins v. Alabama Dep't of Corr.*, 982 So. 2d 1078 (Ala. 2007) and *Robinson v. State*, 12 So. 3d 58 (Ala. 2008); *Gholston v. Bd. of Pardons & Paroles*, 627 So. 2d 945, 947 (Ala.

Civ. App. 1993) (original citation omitted). Thus, under Alabama law the parole power is vested in the Board which is a legislative agency under the control of the Alabama Legislature.

## I.  ALABAMA'S PAROLE SYSTEM PRIOR TO 2016.

Prior to the passage of 2015 Alabama Laws Act 2015-185,[1] the Board consisted of three members who were appointed by the Alabama Governor and confirmed by the Alabama Senate. *See* ALA. CODE § 15-22-20(a) (amended 2019). The Legislature granted to the Board the authority to grant parole. *See* ALA. CODE § 15-22-36(a) (amended 2015, 2019). Further, the Legislature created the position of Board Secretary to carry out the administrative duties of the Board, and the Board could appoint, with approval of the Governor, persons to this position. *See* ALA. CODE § 15-22-21 (amended 2019).[2]

When the Board considered an inmate for parole previous law provided:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society.

---

[1] Plaintiffs refer to this Act throughout their brief as the "Justice Reinvestment Act of 2015." *See, e.g.,* Doc. 23-1 at 5. The Act was never officially given that name and the name appears nowhere in the text of the Act. For purposes of the instant brief, the Act will be referred to as "SB67" (Senate Bill 67), the title by which it was enrolled in the 2015 legislative session.

[2] The Board Secretary was also called the Executive Director. (Ex. B at p. 1 (preamble).)

ALA. CODE § 15-22-26 (amended 2015, 2019). Before the Board could grant parole, prior law required the Board to send notice of an inmate's upcoming parole hearing to the Alabama Attorney General, the judge who presided over the inmate's case, the prosecuting attorney, law enforcement agents, victims, and other interested parties. *See* ALA. CODE §§ 15-22-36(d), -36(e) (amended 2015, 2019). Following a denial of parole, there was no statutorily imposed limit on when the Board could set an inmate for his/her next consideration date.

As part of the Board's preparations for parole consideration, Institutional Parole Officers ("IPOs") evaluated each parole candidate. (Ex. C at pp. 2–3.) IPO evaluations included an IPO Report, a Personal/Social History of the inmate, and an inmate's risk assessment. (*Id.* at pp. 2–3.) An IPO report included a parole plan, progress while incarcerated, participation in work release and reentry programs, physical and mental health condition, criminal behavior, and the IPO's appraisal. (*Id.* at pp. 4–6.) Once these documents were completed, the Board reviewed them for purposes of aiding them in making parole fitness determinations. (*Id.* at pp. 2–3.)

The Board next conducted a parole consideration hearing. *See* ALA. CODE § 15-22-23(a). This statutorily mandated hearing prohibited the Board from granting parole unless done in an open public meeting where all persons notified received an opportunity to present their opinions. *See* ALA. CODE § 15-22-23(b); *see also* ALA.

CODE § 15-23-79(b) (the victim has a right to be present and heard at parole consideration hearings). Once the statutory procedures were satisfied, the Board made a parole decision by majority vote. *See* Ala. Code § 15-22-23(d); *see also* Ala. Code § 15-22-28(d) (amended 2015, 2019, 2023). The Board did not have to provide its reasons for denying parole, only reasons for granting parole. *See Tucker v. Alabama Bd. of Pardons & Paroles*, 188 So. 3d 713, 716–17 (Ala. Crim. App. 2015) ("There is no statutory requirement that a Board member detail his reasons for *denying* parole.") (*citing Tedder v. Alabama Bd. of Pardons & Paroles*, 677 So.2d 1261, 1264 (Ala. Crim. App. 1996)) (emphasis in original); *see also* ALA. CODE § 15-22-36(b) (amended 2015, 2019).

When analyzing Alabama parole law prior to the enactment of SB67, the Eleventh Circuit noted:

> [Alabama Code § 15-22-26 (amended 2015, 2019)] calls for discretionary rather than mandatory action on the part of the board. The law directs the board to consider a number of factors in making their determination, ***which is a subjective rather than objective determination***. ***It does not contain any language that mandates parole***[.]

*Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982) (emphasis added). Likewise, the Alabama Supreme Court agreed holding "[Alabama Code § 15-22-26 (amended 2015, 2019)] is a typical parole statute that gives the parole board ***total discretion*** in the granting of paroles." *Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374, 375 (Ala. 2001) (emphasis added). Put simply, both federal and state law agreed:

under the parole law existing prior to the enactment of SB67, the Board's parole decisions were completely discretionary.

## II.   THE MOVING INMATE PLAINTIFFS COMMITED THEIR OFFENSES AND WERE SENTENCED PRIOR TO THE EFFECTIVE DATE OF SB67.

All of the moving inmate Plaintiffs committed their serving offenses prior to the effective date of SB67. Specifically, all of the moving inmate Plaintiffs were sentenced prior to SB67, meaning their offense dates precede SB67. These facts are critical to Plaintiffs request for injunctive relief and their ability to serve as representatives for the putative class. Consequently, it is important that the Court receive a brief recitation of the facts underlying each of the sentences the moving inmate Plaintiffs' are currently serving.[3]

Plaintiff Lee Edward Moore, Jr. ("Moore") brutally beat his 16-month-old child to death. *See* Doc. 55-1 at pp. 39–46.[4] Plaintiff Moore was convicted of Murder. *Id.* After pleading guilty, the Wilcox County Circuit Court sentenced Plaintiff Moore to 50-years imprisonment on April 16, 1997. *See* Doc. 55-1 at p. 40.

Plaintiff Michael Campbell ("Campbell") sold cocaine to two undercover police officers. The location of the sale was within three miles of a housing project

---

[3] In preparing this section, counsel for the Board members **did not** obtain the information or documentation from the inmate Plaintiffs' parole files. The relevant information and documentation for this section all comes from other sources including Plaintiffs' evidentiary submissions, court records available on Alacourt.com, and the ADOC.

[4] The Pre Sentence Investigation report was retrieved from the state court system's electronic database, Alacourt, and **not** from Plaintiff's parole file.

or an educational institution. *See* Doc. 55-1 at pp. 2–11.[5] Subsequently, Plaintiff Campbell convicted on two counts of Distribution of a Controlled Substance. *Id.* at p. 4. The Jefferson County Circuit Court then sentenced Plaintiff Campbell to 30-years imprisonment on June 6, 2003. *Id.*

Plaintiff Arthur Charles Ptomey ("Ptomey") robbed and seriously injured a man and burglarized four residences. *See* Doc. 55-1 at pp. 47–55. Plaintiff Ptomey convicted on one count of Robbery I and three counts of Burglary III in Jefferson County and one count of Burglary III in Shelby County. *Id.* at 48–50. The Jefferson County Circuit Court sentenced him to four 20-year sentences on November 9, 2007; and on January 10, 2008, the Shelby County District Court imposed a concurrent 2-year. *Id.*

Plaintiff Cole, while armed with a pistol, ambushed and stole money from three victims. *See* Doc. 55-1 at pp. 12–20. He was subsequently convicted on three counts of Robbery I. *Id.* at p. 13. The Morgan County Circuit Court then sentenced him to three concurrent 20-year sentences on August 6, 2008. *Id.*

Plaintiff McDole confronted a man at his workplace and shot the victim in the leg when the victim fled. *See* Doc. 55-1 at pp. 32–38. He was convicted of Assault

---

[5] Plaintiff Campbell is a repeat violent offender with a long criminal record that includes convictions for Distribution of a Controlled Substance, Possession of a Controlled Substance, Assault II, Attempted Assault I, and Certain Persons Forbidden to Carry a Firearm. *See* Doc. 55-1 at pp. 2–5. Plaintiff Campbell has completed his sentences on these prior convictions. *Id.*

I. *Id.* at p. 33. On October 16, 2009, the Jefferson County Circuit Court sentenced him to 21-years. (*Id.*)

The Baldwin County Drug Task Force purchased 1.62 grams of cocaine from Plaintiff Alimireo English ("English"). *See* Doc. 55-1 at pp. 22–31. Later, the Task Force conducted a search of Plaintiffs' residence and located 64.19 grams of cocaine, marijuana, and two Metronidazole pills. *Id.* After his arrest, Plaintiff English was convicted Unlawful Distribution of a Controlled Substance and Trafficking Cocaine. *Id.* at p. 23. On April 25, 2012, the Baldwin County Circuit Court sentenced Plaintiff English to Life for the Trafficking Cocaine offense and 40-years for the Unlawful Distribution of a Controlled Substance offense. *Id.*

## III.  ALABAMA'S PAROLE SYSTEM AFTER THE ENACTMENT OF SB67.

On February 18, 2014, former Alabama Governor Robert Bentley ("Bentley") signed Senate Joint Resolution 20 ("SJR20") which created the Alabama Prison Reform Task Force ("Task Force"). (Ex. D.) The Task Force's main purpose was studying and identifying the causes and potential solutions to overcrowding in Alabama's prison system. (*Id.*) As part of its main purpose, SJR20 mandated that the Task Force would consider a broad range of issues including parole policies. (*Id.*)

The Task Force received the Council of state Governments Justice Center's analysis of Alabama's prison system and parole policies – the Justice Reinvestment in Alabama: Analysis and Policy Framework. *See* Doc. 24-1 at pp. 2–3. The analysis

"discussed policy options that would reduce prison overcrowding *and increase public safety*." *Id.* at p. 3 (emphasis added). Further, the analysis focused on a "justice reinvestment" approach which promoted strategies to reduce recidivism and improve public safety. (*Id.*)

When discussing policy recommendations for Alabama's parole system, the analysis suggested that the Board adopt guidelines to aid parole decisions. *See* Doc. 24-1 at p. 26. Further, the analysis suggested that maximum time before reconsidering an inmate for parole be reduced from 5-years to 1-year. (*Id.*) The purpose of the analysis's suggestions was to prioritize prison space for those who pose the greatest risk *to public safety*. (*Id.*)

However, the analysis also recommended that the Board "[s]pecify that the guidelines do not establish an expectation or right of release and that *the ultimate decision of whether or not to grant parole resides with the parole board*." *See* Doc. 24-1 at p. 26 (emphasis added).) Likewise, the analysis's promotion of maximum setoff before reconsideration of parole did not extend to inmates with violent offenses. (*Id.* (suggesting the reduced setoff be provided to inmates with prison sentence of 20-years or less, "with the exception of those convicted of violent offenses.") (*Id.*) Thus, to increase public safety, the analysis promoted the Board's complete discretion and encouraged longer setoff times for violent offenders.

Many of the revisions contained the analysis were included in SB67 sponsored by the Board's current Director, then Senator Cam Ward. The Alabama Legislature passed SB67 on May 18, 2015. Following the Governor's signature, Section 23 of SB67 stated that the Act would become effective on January 30, 2016.

Despite making several changes to Alabama's parole law, SB67 did not change the composition and appointment process for the Board or the Board Secretary. *See generally* SB67. It did adopt the recommendations of the Council of State Governments' study that the Board create guidelines to use as an ***aid***. ALA. CODE § 15-22-26(a) (2016)[6]. Particularly, the amended statute required the guidelines to include, but not be limited to,

> (1) The prisoner's risk to reoffend, based upon a validated risk and needs assessment as defined in Section 12-25-32;
> (2) Progress by the prisoner and the Department of Corrections to plan for reentry;
> (3) Input from the victim or victims, the family of the victim or victims, prosecutors, and law enforcement entities;
> (4) Participation in risk-reduction programs while incarcerated;
> (5) Institutional behavior of the prisoner while incarcerated; and
> (6) Severity of the underlying offense for which the prisoner was sentenced to incarceration.

*Id.* The statue also required the Board to review its guidelines every three years. *Id.*

---

[6] Because there are at least three relevant versions of the statutes that will be discussed in this brief, moving forward the Board will use the convention of placing in parenthesis the year in which the cited version became effective at the end of the citation. Where no year appears, the relevant provisions of the current statute are identical or substantively similar to what existed in the time period under discussion.

However, the Alabama Legislature did not mandate that compliance with any or even all of the six listed factors was outcome determinative in parole cases. Rather, the post-S.B. 67 version of the statute provides:

> ***No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines*** established by the board to determine a prisoner's fitness for parole.

ALA. CODE § 15-22-26(a) (2016) (emphasis added). The statute further relegated the parole guidelines to no more than an "aid". *Id.*

To further emphasize the limited applicability of the guidelines, after relegating the guidelines to a mere "aid", the amended statute incorporated the Counsel on State Governments' discretion recommendation, explicitly providing that "***the decision concerning parole release shall be at the complete discretion of the board***." ALA. CODE § 15-22-26(c) (2016) (emphasis added). The Legislature diminished the importance of the guidelines even further by providing that "[t]he use of established guidelines for parole consideration ***shall not create a right or expectation by a prisoner to parole release***." *Id.* (emphasis added).

Following the enactment of S.B. 67, the Board provided notice for public comment on a draft of its parole guidelines. (Ex. E.) The notice made clear that the Board's parole guidelines "retain the Board's discretion in individual parole release cases while assisting the Board in determining fitness of offenders for parole[.]" (*Id.*

at p. 1.) The notice also emphasized that "**[i]mportantly, the guideline score creates no right or expectation for parole under Alabama law; the paroling decision is case specific and completely at the discretion of the Board. [Ala. Code § 15-22-26 (amended 2019).]**" (*Id*. (emphasis in original). Moreover, the draft guidelines contained no baseline score, and it provided no final suggestion on whether any particular score favored or disfavored a grant of parole. (*Id.* at 2.)

On January 30, 2016, the Board adopted the draft guidelines without change. (Ex. F.) When IPOs began implementing the 2016 guidelines, the Board's 2016 Parole Officer Manual stated that "[t]he Board's parole guidelines do not create a right or expectation of parole and *the Board's decision remains completely discretionary*." (Ex. G at p. 8 (emphasis added).) Further, the 2016 guidelines did not include weighted scores for risk-reducing programming as the Board was waiting for the ADOC to develop such programs, and the 2016 guidelines explicitly did not provide a final score that would recommended a grant or denial of parole. (*Id.* at pp. 8–9.) The 2016 guidelines remained in effect and unchanged until after the passage of Act 2019-393 discussed below.

Along with the Board's 2016 parole guidelines, IPOs continued to provide the Board with IPO Reports, the Personal/Social History of inmates, and the risk assessment scores for inmates. (Ex. G at p. 2–8.) These documents also assisted the Board in its parole decisions. (*Id*. at p. 2.) Like the prior version, the IPO reports still

included details about an inmate's parole plan, an inmate's participation in work release and reentry programs, an inmate's incarceration history, an inmate's physical and mental health, an inmate's criminal behavior, and the IPO's appraisal of an inmate. (*Id*. at pp. 3–6; Ex. H.) The Board reviewed the information contained in the IPO reports when evaluating an inmate's fitness for parole. (Ex. G at p. 2.)

However, some changes were made to the 2016 IPO Reports and to the Board's risk assessment tool. First, the revised IPO Reports included a section for the IPO to provide the Board with a recommendation on whether to grant or deny an inmate parole. (*Compare* Ex. C at p. 4 *with* Ex. H at p. 3.)[7] Second, the risk assessment tool used by the Board to calculate an inmate's risk of reoffending changed from the Board's own tool to the Ohio Risk Assessment System ("ORAS"). (*Compare* Ex. C at p. 10 *with* Ex. G at p. 2.)

Like before, the post-SB67 Alabama parole law mandated that notice of parole consideration be given to certain persons and required the Board to make parole decisions in an open public meetings. *See e.g.*, ALA. CODE § 15-22-23; ALA. CODE §§ 15-22-36(d), -36(e) (2016); ALA. CODE § 15-23-79(b). The law still required a majority vote of the Board, but now required the Board to state its reasons for or against parole. *See* ALA. CODE § 15-22-26(c) (2016); *see also* ALA. CODE § 15-22-

---

[7] Although there were some changes made to the IPO Reports between 2016 and 2019, none of these changes substantively altered the information provided in the reports.

28(d) (2016). For the first time, the law contained a 2-year limit on reconsideration setoffs that applied only to non-violent offenders with sentences of 20-years or less. ALA. CODE § 15-22-37(b)(4) (2016).

In SB67, the Legislature also created a mandatory release to supervision program. 2015 Alabama Laws Act 2015-185 at § 9 (later codified at ALA. CODE § 15-22-26.2 (2016)). To ensure that inmates received some supervision by the Board prior to their end of sentence ("EOS") dates, the Legislature provided windows during which the ADOC would release an inmate to intensive supervision by the Board (e.g., for offenders serving a sentence of ten or more years, the ADOC would release them between 24 months and 12 months of their EOS date). *Id.* The Legislature prohibited mandatory release for certain inmates including those convicted of a sex offense involving a child or sentenced to Life.

## IV. BOARD'S OPERATION UNDER SB67 AND THE RESULTING 2019 ALABAMA LAWS ACT 2019-393 (HB380).

Despite increases in the Board's parole grant rate post-SB67, according to Lyn Head ("Head") Board Members began relying heavily on the recommendations of IPO officers and the ORAS scores of inmates. *See* Doc. 26 at 3–5. Even though the Alabama Legislature never made the guidelines or IPO reports dispositive – leaving the ultimate decision up to the subjective opinion of the Board – Head claims that Board members based their votes on compliance with the guidelines. (*Id.* at ¶ 9.)

Remarkably, Head also asserts in in her Declaration that S.B. 67 ***required*** "the Parole Board to make structured decisions regarding parole applicants by following objective criteria for granting or denying parole." *See* Doc. 26 at ¶ 6. As the Court will note from its text, S.B. 67 did no such thing. While SB67 did require the creation of guidelines as an "aid," the use of a validated risk assessment tool, and the consideration of additional factors, the Legislature retained language from prior law prohibiting the Board from granting parole because an inmate has "earned" it, making parole available ***only*** if the Board's subjective "opinion" supported a grant of parole. ALA. CODE § 15-22-26(a) (2016). In fact, the Legislature went even further by making explicit what had previously been implied – the Board had "complete discretion" in parole consideration decisions. ALA. CODE § 15-22-26(c) (2016).

Similarly, Head claims that SB67 "required the Board to make decisions on the basis of evidence" by forcing it to use risk assessments made with a validated tool. *See* Doc. 26 at ¶ 10. Again, the text of SB67 belies this assertion in that a risk assessment is only one of several factors for the Board to consider, with, again, the final decision subject to the Board's subjective opinion and "complete discretion". ALA. CODE § 15-22-26(a), (c) (2016).

Furthermore, while Head claims her training taught her to, "in particular", discount the severity of an inmate's offense and that same training directed her to consider factors "particularly . . . within the individual's control," such an approach

finds no roots in the commands of SB67. In fact, the training Head cites arguably conflicts with SB67 because the Act did not emphasize or deemphasize any particular factor. *Compare* Doc. 26 at ¶ 11 *with* ALA. CODE § 15-22-26(a) (2016). Indeed, SB67 ***required*** the Board to consider the severity of the offense, specifically prohibited the Board from granting parole because an inmate has "earned" it and gave members "complete discretion". ALA. CODE § 15-22-26(a), (c) (2016). Contrary to any "training" Head references in her declaration, the actual statutory language unmistakably permits Board members to vote to deny parole based upon the severity of the offense alone.

Ultimately, what Head was "trained" to do was irrelevant to any vote but her own. However, she and the other Board members were required to follow state law. *See* ALA. CODE § 15-22-38. Tragically, decisions made by the Board and Head in which they relied on their "training" rather than what was actually mandated by the text of S.B. 67, combined with a reliance on what she deems to be "objective" criteria, directly lead to horrific consequences.

## A. The Deadly Failure of Lyn Head's "Objective" Approach to Parole Consideration: Jimmy Spencer.

In 2017, Spencer was serving a Life sentence for Escape I, a Life sentence for Burglary II, and a 15-year sentence for Assault II. (Ex. I.) On September 7, 2017, the Board scheduled a parole consideration hearing for Jimmy Spencer ("Spencer"). (Ex. J.) Previously, Spencer had prior sentences including two Escape I convictions,

one Burglary III conviction, and one Unlawful Breaking and Entering a Vehicle conviction. (Ex. I.) The Board had granted him parole for some of these convictions in 1988, but in 1989, the Board revoked his parole. (Ex. K; Ex. L.)

When the Board scheduled Spencer's 2017 parole consideration hearing, it did so based upon Operating Rules requiring a violent offender's initial parole consideration hearing date to take place no sooner than the completion of one-third or ten-years of the sentence, whichever was less. (Ex. M at p. 2; *see also* ALA. CODE § 15-22-28(e) (2016).)[8] For some violent offenses, the Board's Rules required inmates to complete 85% or 15-years of their sentence, whichever was less, before their initial consideration hearing. (Ex. M at pp. 2–3.)[9] While Assault II, Burglary II, and Escape I are violent offenses, *see* ALA. CODE §§ 12-25-32(14)(6), -32(14)(23), -32(14)(33), none of these offences fell under the 85% or 15-year rule, and consequently, the Board conducted Spencer's initial parole consideration hearing in 2013, denied him parole, and set his next hearing for 2018. (Ex. N.)

Although the Board originally set Spencer's next parole consideration hearing for 2018, the Board acted within its authority and rescheduled Spencer's hearing for November 2, 2017. (Ex. O (the Board's Operating Rules allowed the Board to reschedule parole hearing dates); Ex. J.) On November 2, 2017, the Board conducted

---

[8] This scheduling method is often called the "one-third or ten-year rule".
[9] This scheduling method is often called the "85% or 15-year rule".

Spencer's parole hearing. (Ex. P.) Despite multiple prior violent offenses, his prior failure while on parole, and the fact that three of his convictions were for Escape, the Board granted Spencer parole because of Spencer's "Medium" ORAS score and his "Positive" Institutional Record. (*Id*.)[10]

Still, perhaps realizing the risk of granting parole to Spencer given his prior criminal history, the Board ordered him to LIFE Tech. (Ex. P.) At the time, LIFE Tech was a Board-operated residential transition center that provided several programs for educational training, mental health counseling, and drug treatment. (Ex. Q at pp. 18–19 (describing LIFE Tech).) Parolees participating in LIFE Tech are supervised under intensive supervision which includes weekly reporting, weekly employment verification, mandatory curfews, weekly compliance verifications, and continued surveillance for criminal activities. (Ex. R at pp. 7–8 (describing intensive supervision level).) If sent to LIFE Tech, Spencer would only be allowed to community supervision *after* he completed the program. (Ex. Q at p. 19.)

However, Head later voted in favor of an order issued by the Board that *removed* LIFE Tech as a condition of Spencer's parole. (Ex. S.) The same Board order sent Spencer to a private half-way house. (*Id*.) Unlike LIFE Tech, which required intensive supervision by Board personnel and provided multiple

---

[10] Additionally, one Board Member granted parole because he believed that release would not depreciate the seriousness of Spencer's offenses or promote disrespect for the law. (Ex. P.)

rehabilitation programs, a half-way house, being private, then as now, is not supervised by Board personnel and provides transitional housing and referrals to community resources. (Ex. Q at p. 22.)

Despite Head's vote of confidence in him, Spencer abandoned the half-way house after a few weeks, remained homeless, traveled to Guntersville, AL, and committed several criminal offenses in Etowah County. (Ex. T at p. 4 ("[Spencer] was paroled to Jimmy Hale Mission – and walked away weeks later."); Ex. U at p. 3 (Spencer traveled to Guntersville in April and was homeless).) When a parole violation report was issued against Spencer on July 6, 2018, the Board, including former Head, ***took no action against Spencer***. (Ex. T at p. 4 ("'[Spencer] came into contact with the law two times [after being released on parole]. Both times they contacted the [Board] and never heard back. On July 13[, 2018] he was in court in Marshall County that morning at 10 a.m., they contacted the [Board] . . .'").) Even though the Board was presented with objective facts showing Spencer to be a risk ***contrary to the risk assessment tool and his positive institutional record***, the Board did not act until ***after*** Spencer brutally murdered three people – a 7-year-old child, Colton Lee, his 74-year-old great-grandmother, Marie Martin, and a 65-year-old neighbor, Martha Reliford. (Ex. T at p. 5.)

In response to the objective failure of the risk assessment tool, the training Head and other Board members received (based upon purported studies that are ***not***

contained in her declaration), and the Board's parole guidelines, communities across Alabama became outraged to learn that the Board released Spencer despite his history of violent crimes and prior failure on parole. (Ex. T; Ex. U.) When confronted by Governor Ivey and Attorney General Marshall about the obvious failure in the Board's practice of releasing violent offenders, Head doubled down on the parole guidelines even though the risk assessment tool failed to detect the danger Spencer posed. (*Compare* Doc. 26 at p. 6 ("I explained the objective standards that we employ . . .") and Ex. P (finding Spencer to be only at a moderate risk of reoffending) *with* Ex. T (Spencer being charged with murdering three people).) In the face of three dead people – including a 7-year-old child –  viciously murdered by a man ***she voted to release from LIFE Tech,***  Head rejected the text of the relevant law, insisted upon clinging to "training" and her own decision making process that clearly failed in Spencer's case. (*See* Doc. 26 at p. 6; Ex. T.) Based upon the declaration submitted in this case, she maintains her clearly failed outlook on releasing violent criminals to this day.

Shockingly, Plaintiffs dismiss the deaths of three innocent people – including a 7-year-old child – as mere "pretext" for the statutory changes that followed. *See* Doc. 1 at ¶¶ 43, 121, 123; *see also* Doc. 23-1 at 8 (asserting that the Governor and Attorney General "seize[ed]" on the murders to make changes to the parole statutes on the "pretext" of public safety).  The Court should carefully note what is ***not*** in the

preliminary injunction record or alleged in the Complaint. There is no evidence or even the allegation that there was any movement to make changes to Alabama parole law between the passage of SB67 and the murders of 7-year-old Colton Lee, Marie Martin, and Martha Reliford. It was only after the ***objective failure of Head's preferred parole consideration methodology*** that there was any change to the SB67 version of Alabama's parole statutes.

### B. 2019 Alabama Laws Act 2019-393's Amendment of Parole Law.

Fortunately for the people of the State of Alabama, other governmental leaders did not share Head's willingness to double down on failure. Backed by an outraged citizenry and negative media reporting and informed by the objective failures in Spencer's case, the Alabama ***Legislature*** passed 2019 Alabama Laws Act 2019-393 (referred to herein as H.B. 380). Contrary to Plaintiffs' allegations, H.B. 380 did not become law at the whim of the Attorney General. *See* Doc. 23-1 at 10. H.B. 380 passed overwhelmingly in the House by a nearly 3-1 majority of voting members, and in the Senate by a 5-1 margin of voting senators. (Ex V; Ex W.)

Like SB67, HB380 made no changes to the number of members on the Board. While it did make some changes to the appointment process for Board Members, the substance of the process remained the same – the Governor appointed a person to the Board and the Alabama Senate confirmed. *Compare* ALA. CODE § 15-22-20(b) (2003) *with* ALA. CODE § 15-22-20(b) (2019). Of note, for the first time the

Legislature directed diversity in the Board's membership: "[t]he membership of the Board shall be inclusive and reflect the racial, gender, geographic, urban/rural, or economic diversity of the state." HB380 at § 1.

As Plaintiffs' have alleged, HB380 did do away with the Board Secretary position and created a Director of Pardons and Paroles ("Board Director") position. HB380 at § 1. Plaintiffs make much of the Governor's "unilateral" authority to appoint the Director in HB380, but prior law required that the Board's choice for Board Secretary had to be approved by the Governor. *Id.* HB380 made the powers of the Board Director similar to those of the Board Secretary except that the Board Director was divested of any power "to adopt rules, guidelines, or other policies and to make individual determinations concerning . . . the grant or denial of paroles, . . . and the revocation of parole." *Id.*

For parole consideration, the amendment left the Board's authority over parole decisions substantively same. *Compare* ALA. CODE § 15-22-26 (2016) *with* ALA. CODE § 15-22-26 (2019). The amended statute retained the Board's authority to determine whether an inmate met the guideline criteria. *See* ALA. CODE § 15-22-26(a) (parole may be granted "only if the [Board] is of the opinion that the prisoner meets criteria and guidelines[.]"). The language relegating the guidelines to a mere aid and leaving parole decisions completely to the Board's discretion remained unchanged. *Compare* ALA. CODE § 15-22-26(c) (2016) *with* ALA. CODE § 15-22-

26(c) (2019). Likewise, the listed factors required for the guidelines and the mandate for the Board to review the guidelines every three years were untouched. *Compare* ALA. CODE § 15-22-26(a) (2016) *with* ALA. CODE § 15-22-26(a) (2019).

The HB380 revisions to Alabama Code § 15-22-26 made no changes to the substantive manner in which the Board makes parole decisions. It is true that the words "public safety" appear for the first time in the 2019 version of Alabama Code § 15-22-26. However, the SB67 revisions gave the Board "complete discretion" and also included the expressed intent that the use of guidelines was to "promote the use of prison space for the most violent and greatest risk offenders." ALA. CODE § 15-22-26(a) (2016)

Instead of altering the Board's authority over parole consideration, the major change introduced by HB380 involved the scheduling of initial parole consideration hearings. *Compare* ALA. CODE § 15-22-28 (2016) *with* ALA. CODE § 15-22-28 (2019). With slight alterations, the amendment codified the scheduling rules from the Board's Prior Operating Rules. (*Compare* ALA. CODE § 15-22-28(e) (2019) *with* Ex. M.) The amendment also established a procedure for deviations from a scheduled parole hearing. *See* ALA. CODE § 15-22-28(f) (2019). However, the statute

retained the two-year maximum setoff for non-violent offenders and set no limitation on the maximum setoff for violent offenders. *See* ALA. CODE 15-22-37(b)(4).[11]

Additionally, H.B. 380 revised the process of notifying victims of upcoming parole consideration hearings. Specifically, the amendment mandated that the Board needed to exercise due diligence when locating the victim or their family members. *See* ALA. CODE § 15-22-36(e)(3). The Alabama Legislature prohibited the Board from granting parole unless the Board certified that it exercised due diligence. *Id.*

### C. Implementation of 2019 Alabama Laws Act 2019-393.

Once HB380 became effective on September 1, 2019, Governor Ivey appointed Charles Graddick ("Director Graddick") to the new position of Board Director. (Ex. X.) Contrary to Plaintiffs' allegation, *see* Doc. 23-1 at 18, Governor Ivey did not replace Board Secretary Eddie Cook ("Cook") with Director Graddick. She could not have done so because the position of Board Secretary no longer existed as a matter of law. *See* HB380 § 1 (striking from Alabama Code § 15-22-21(a) the Board's ability to appoint a secretary, striking the word secretary, and replacing the foregoing with a new position "Director of Pardons and Paroles," to be appointed

---

[11] In the Complaint Plaintiffs aver that they have identified 63 inmates who were set off more than two years in violation of § 15-22-37(b)(4) without naming them. *See* Doc. 1 at 59. Strangely, Plaintiffs seek no relief in their preliminary injunction motion specifically for these individuals. *See* Doc. 23-1 at 49-50. Nonetheless, the Board makes the following offer because it has always maintained that it will correct any actual errors it makes. If Plaintiffs provide the 63 names and AIS numbers to Board counsel forthwith, the Board will review the last parole denial on each, determine whether § 15-22-37(b)(4) is applicable, and if a reset date error is found, correct it. No further litigation is necessary on this point.

by, and serve at the pleasure of, the Governor). Director Graddick became the first person to hold the newly created position of Director of Pardons and Paroles.

Director Graddick undertook a number of actions of which the Plaintiffs' complain. First, due to failures of the prior administration, he was forced to institute a parole moratorium. Second, those same prior administration failures and others required disciplinary action against certain high level Board employees. Finally, in 2020, he oversaw the review and revision of the parole guidelines mandated in SB67 and kept intact by HB380.

### 1.    <u>Parole Moratorium</u>.

As was the case before HB380, the Board must provide notice to certain persons before considering an inmate for parole, and it is required hold open public meetings before making parole decisions. ALA. CODE §§ 15-22-23 (2019); 15-22-36(d), -36(e) (2019); 15-23-79(b) (2019). The Board still decides whether to grant parole by majority vote, and the Board still provides its reasons for or against parole. ALA. CODE §§15-22-26(c) (2019); 15-22-28(d) (amended 2019). Further, the Board still has complete discretion over how long to set off an inmate's next hearing, and the mandatory supervised release program remains. *See* ALA. CODE § 15-22-26(c); *see also* ALA. CODE § 15-22-26.2.

Upon taking up his new position, Director Graddick learned that several officials in prior administration failed to perform their jobs properly. The more

egregious of these failures was the not preparing to implement changes to victim notification required by HB380. (Ex. Y; Ex. Z.) Cook admitted that he had taken no action to ensure that the Board's parole decisions were following the new law's requirement on notification to interested parties. (Ex. Y at p. 2.) Given that failure to comply with the victim notification would void any grant of parole, Director Graddick had no choice but to postpone parole consideration until the statutorily mandated notifications could be made. (Ex. Z. at p. 2.)

## 2. __Personnel Actions__.

With the Board no longer taking part in employment decisions in the wake of HB380, Director Graddick took the personnel actions complained of by the Plaintiffs. However, as Head's declaration attests, Director Graddick's actions were his own. The Board had no role in them. *See* Doc. 26 at ¶¶ 27-32.

Furthermore, Director Graddick's other actions dispositive refute Head's baseless claims of racial animus. Director Graddick kept Ira Shaw, a black man, in his executive position of Information Technology Director – a posting Shaw continues to hold to the present day. (Ex. AA.). Director Graddick replaced Belinda Johnson with Tasika Fielder, a black woman, as Personnel Director – a post she also continues to hold. (Ex. BB.) He also appointed Defendant Gabrelle Simmons, a black woman, to the executive position of Director of Board Operations in October 2020. (Ex. CC.)

Head alleges, without attaching the purportedly offending policy, that Director Graddick issued a personnel manual that "prohibited traditional Black hairstyles including weaves, locs, dreads and certain types of braids." Doc. 26 at ¶ 30. The Personnel Manual of which Head speaks remains in effect as of the filing of this brief and with respect to hairstyles states in relevant part in toto:

> Professional appearance includes good personal hygiene and grooming while at work. Hairstyles will project a professional appearance at all times. If hair color is changed, it must be of a natural color and well-maintained. Subtle highlighting or frosting is permitted, as long as it creates a uniform look over the entire head. Hair colors, wigs or hairpieces ***that appear unnatural*** are not permitted. Extreme styles are not permitted.

(Ex. DD (emphasis added).) Nowhere in the above referenced policy is there any mention of a specific type of hair style or specifically prohibit any type of braid, dreads or locs. To the extent it can be argued that weaves are prohibited as a hairpiece, only those "that appear unnatural" were and remain prohibited.

Finally on this issue, Director Cam Ward replaced Graddick on December 7, 2020, and continues to serve as the Director. (Ex. EE.) Director Ward, as a state senator, sponsored SB67. (Ex. FF at 1.) In his time as the Director, Cam Ward appointed Stacey Brown, a black woman, to the position previously held by Chris Norman. (Ex. GG.) He appointed Candace Moore, a black woman, to the executive staff position of Accounting Director. (Ex. HH.)

### 3.  <u>2020 Guidelines and IPO Reports Revisions</u>.

In 2020, the Board complied with the statutory requirement to review its parole guidelines every three years. *See* ALA. CODE § 15-22-26(a).[12] Following a review of its 2016 parole guidelines, the Board revised its guidelines in 2020. (Ex. II.) The main differences between the 2016 parole guidelines and the 2020 parole guidelines include (1) the addition of a static sex offender score, (2) an increased weight for receiving two or more disciplinaries involving violence within the last 12 months, (3) the removal of two points for three or more non-violent disciplinaries within the last 12 months, (4) the addition of weights to previously non-weighted factors, and (5) *for the first time*, the inclusion of a score suggesting a parole grant or a parole denial. (*Compare* Ex. II *with* Ex. F.)

In 2020, IPO Reports were revised. (Ex. JJ.) The 2020 reports continued to detail the same information about inmates previously provided with one exception – the 2020 reports no longer provided a section for IPOs to state whether they recommend parole. (Compare Ex. JJ with Ex. H.) Revisions to IPO Reports were made in 2023, but these revisions involved formatting and did not change the substances of the reports. (Compare Ex. KK with Ex. JJ.) IPOs still gave the reports to the Board, and the Board reviewed the reports and decided whether an inmate was fit for parole. (Ex. LL at pp. 2–4.)

---

[12] The statutory requirement that the Board review its parole guidelines every three-years is found in both SB67 and HB380. *Compare* Ala. Code § 15-22-26(a) (2016) with Ala. Code § 15-22-26(a) (2019).

## V.  CHANGES TO BOARD MEMBERSHIP FOLLOWING SB67 AND HB380.

On September 23, 2019, Governor Ivey appointed Board Chair Gwathney to the Board. (Ex. MM.) Later, former Board Member Cliff Walker's term ended, and on July 9, 2021, Governor Ivey appointed Defendant Littleton, a black man, to the Board. (Ex. NN.) Former Board Member Dwayne Spurlock subsequently resigned, and on March 10, 2023, Governor Ivey appointed former Board Member Kim Davidson to finish his term which ended June 2023. (Ex. OO.) Most recently, on August 25, 2023, Governor Ivey appointed Board Member Simmons, a black woman, to the Board which had the effect of creating a majority black Board. (Ex. PP.)

## VI.  CURRENT PAROLE CONSIDERATION PROCESS.

Throughout their Complaint and Motion, Plaintiffs repeatedly refer to parole "applicants." *See, e.g.,* Doc. 1 at ¶¶ 90, 108, 142; Doc. 23-1 at 10, 12, 14-15, 17. This misnomer reflects a deep misunderstanding on the part of Plaintiffs and/or their counsel regarding how parole consideration is conducted in Alabama that must be corrected. Thus, it is important to set forth how the Board considers an inmate for parole.

First and foremost, *__inmates do not apply for parole__*. Parole consideration is automatic and will be accomplished whether an inmate participates in the process or not. The Board's Board Operations division reviews each inmate following their

commitment to the ADOC. Board Operations makes an initial calculation, based upon the provisions contained in Alabama Code § 15-22-28(e), that provides the month and year in which an inmate will become eligible for parole. The inmate will be considered for parole by the Board near that time. (Ex. QQ at 2.)

As the time of the initial eligibility date approaches, Board Operations and IPOs begin preparing the inmate's file. (Ex. QQ at 2–5.) Board Operations double checks to ensure that the month/year previously set is correct. (*Id.*) An IPO is assigned to conduct a risk assessment and prepare an IPO report that is submitted to Board Operations. (*Id. see also* ALA. CODE § 15-22-28(a).) For its part, Board Operations conducts location research and notifies victims and other stakeholders who are required to be notified by law. (*Id. see also* ALA. CODE § 15-22-36(d)-(e).) Alabama law specifically provides that the Board:

> **shall have no power to grant a** . . . **parole** . . . until 30 days' notice that the prisoner is being considered has been given by the board to the board to the Attorney General, the judge who presided over the case, the district attorney who tried the subject's case, the chief of police in the municipality in which the crime occurred, if the crime was committed in an incorporated area with a police department, and to the sheriff of the county where convicted, and to the same officials of the county where the crime occurred if different from the county of conviction; provided, however, that if they are dead or not serving, the notice shall be given to the district attorney, incumbent sheriff, and one of the judges of the circuit in which the subject was convicted. The board also shall be required to provide the same notice to the Crime Victims Compensation Commission.
>
> . . .

***the board may not approve or order a parole . . . unless a 30 days'
written notice of the board's action to be considered has been provided
to the victim named in the indictment, the victim's representative, or
any other interested individuals***.

ALA. CODE § 15-22-36(d)-(e) (emphasis added).

Board Operations must also ensure that the inmate's file contains not just the IPO report, but other information including a warden's report and psychological report. From the ADOC Board Operations obtains an inmate's time sheet (marking it appropriately to identify completed sentences and split-sentences) and the inmate's most recent disciplinaries. They also check the inmate for pending cases, new cases, and his/her arrest record. (Ex. QQ at 5–6.)

The final consideration date may or may not be in the month initially calculated due to a variety of factors. However, once everything is complete, the inmate is set on a docket. At that time notifications are sent to the inmate and all other parties who are entitled to notice. (Ex. QQ at 2.)

The Board conducts parole hearings in an open public meeting. ALA. Admin. CODE. § 640-X-5.01. Persons testifying in support or opposition are placed under oath, and those speaking in favor of parole are permitted to speak first. ALA. Admin. CODE. § 640-X-5.02(3)-(4). The Board members may ask questions of anyone testifying. *Id.* Once the testimony is concluded, the Board members vote determining fitness for parole in accordance with Alabama Code § 15-22-26 and using the guidelines. ALA. Admin. CODE. § 640-X-5.06 -.07.

Board members are required to record only their ***reasons*** for favoring or denying parole – not the evidence relied upon – which is recorded on the Board Action Sheet. ALA. CODE § 15-22-36(b); ALA. Admin. CODE. § 640-X-5.06 -.07. The decision of the Board is decided by majority vote. If a quorum of two members is present, but the vote is split, the matter is continued to a new date that is announced in the open hearing. ALA. Admin. CODE. § 640-X-5.06 -.011.

If an inmate is denied parole, the Board decides whether and when (if applicable) to schedule a subsequent consideration hearing. ALA. Admin. CODE. § 640-X-5.09. For inmates serving sentences of 20 years or less on non-violent offenses, the maximum set off is two years and in all other cases, the maximum set off is five years. ALA. CODE § 15-22-37(b)(4); ALA. Admin. CODE. § 640-X-3.03. If the members do not specify a date, the default reconsideration date is the maximum set off allowed for the inmate. ALA. Admin. CODE. § 640-X-5.09. When the reconsideration date approaches, the process repeats. (Ex. QQ at 2.)

## VII.  PAROLE DATA SINCE 2009.

As will be discussed in the argument section below, Plaintiffs' statistical evidence regarding grant and guidelines compliance rates cannot, as a matter of law, carry their burden on either the ex post facto or equal protection claims. Concisely put, because each parole file is voted on in isolation on its own merit statistical

analysis is utterly meaningless. Nonetheless, the Board offers the following data to show that rates have historically fluctuated.

| FY | Granted | Denied | Total | Grant Rate |
|---|---|---|---|---|
| FY2009 | 3280 | 4644 | 7924 | 41% |
| FY2010 | 2690 | 4098 | 6788 | 40% |
| FY2011 | 2097 | 4774 | 6871 | 31% |
| FY2012 | 2178 | 5228 | 7406 | 29% |
| FY2013 | 2312 | 5315 | 7627 | 30% |
| FY2014 | 2237 | 4410 | 6647 | 34% |
| FY2015 | 2236 | 3722 | 5958 | 38% |
| FY2016 | 3108 | 3350 | 6458 | 48% |
| FY2017 | 3847 | 3151 | 6998 | 55% |
| FY2018 | 3521 | 2804 | 6325 | 56% |
| FY2019 | 1337 | 2933 | 4270 | 31% |
| FY2020 | 544 | 2160 | 2704 | 20% |
| FY2021 | 628 | 3225 | 3853 | 16% |
| FY2022 | 409 | 3593 | 4002 | 10% |

(Ex. RR at Attch. A.)

As with total grant rates, grant rates for violent offenders, non-violent offenders, black offenders and white offenders also varies year to year. (*Id.* at Attach. B-D.)

- During the time SB67's parole revisions were in effect, January 31, 2016 – August 31, 2019:

  o The total grant rate was 51%;

- o Of those granted parole, 6,252 were serving on violent offenses and 2,880 were serving on non-violent offenses;

- o 48% of both black and white violent offenders received parole; and

- o 64% of non-violent white offenders received parole compared to 59% of black non-violent offenders.

- Between September 1, 2019 (the effective date of HB380) and August 24, 2023 (the day before Defendant Simmons became a Board member:

  - o The total grant rate was 13%;

  - o Of those granted parole, 919 were serving on violent offenses and 877 inmates were serving on non-violent offenses;

  - o 12% of white violent offenders received parole and 6% of black violent offenders received parole; and

  - o 30% of white non-violent offenders received parole and 23% of black non-violent offenders received parole.

- Between August 25, 2023 (Defendant Simmons's first day on the Board making its membership majority black) and December 31, 2023 (the most recent day for which a full month's worth of data is available):

  - o The total grant rate was 16%;

  - o Of those granted parole, 91 were serving on violent offenses and 71 inmates were serving on non-violent offenses;

- 50 white violent offenders received parole (16% of those considered), and 41 black violent offenders received parole (10% of those considered); and

- 31% of white non-violent offenders received parole and 28% of black non-violent offenders received parole.

(*Id.*)

Since 2018, there has always been a difference in the total grant rates of black and white inmates. However, since 2021 – more than two years prior to the instant lawsuit and during the tenure of Chair Gwathney, the gap has narrowed and is trending down.



(Ex. RR at Attach. E.) The narrowing in the gap between black and white inmates also appears in the context of non-violent offenders.



(Ex. RR at Attach. E.)

## VIII. OTHER WORK PERFOMED BY THE BOARD.

The Board is responsible for providing more than just parole considerations. The Board has the authority to grant pardons, restore civil rights, and remit fines and forfeitures. ALA. CODE § 15-22-36. The Board also has the specific authority to grant a CERV (Certificate of Eligibility to Register to Vote) to those who have lost the franchise pursuant to a criminal conviction. ALA. CODE § 15-22-36.1. CERVs may be issued without action by the Board itself, but they do require Board Operations to investigate the application and provide it to the Director prior to the issuance of the CERV. *Id.* The Board's work must be done properly or any relief granted is deemed void. ALA. CODE § 15-22-40 ("Any pardon, parole, remission of a fine or forfeiture or restoration of civil and political rights granted, ordered or made contrary to the provisions of this article shall be null and void and shall have no force or effect."). In fiscal year 2023, the Board conducted 1,833 pardon applications, granting 1,082 of them. (Ex. QQ at 6 ; Ex. SS at 6.) The Board processed 1,462 CERVs in the same fiscal year. (Ex. QQ at ¶ 20.)

The Board also has the responsibility for adjudicating parole violations committed by parolees. ALA. CODE § 15-22-32. Hearing officers conduct parole court hearings to determine the facts of a case, decide whether the parolee is guilty of the charged violations, and to make a recommendation on sanctions. *Id.* However, the ultimate decision as to what sanction to impose must be made by the Board. *Id.* There were 1,384 parole court hearings conducted in FY 2023 that ultimately required a ruling from the Board. (Ex. SS at 7.)

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (original citation omitted)); *see also Henry v. Abernathy*, 647 F. Supp. 3d 1235, 1237 (M.D. Ala. 2022). The Court must balance the claims of injury and the effect that an injunction would have on each party, and the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (original quotations omitted). "Indeed, the issuance of a preliminary injunction is 'the exception rather than the rule.'" *Barber v. Governor of Alabama*, 73 F.4th 1306, 1317 (11th Cir. 2023) (*citing United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)); *see also De La Fuente v. Merrill*, 214 F.Supp.3d 1241, 1251 (M.D. Ala. 2016).

To obtain a preliminary injunction, "[a] party seeking a preliminary injunction must establish that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022) (original quotations omitted). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *see also Leonard v. Alabama State Bd. of Pharmacy*, 591 F.Supp.3d 1155, 1162 (M.D. Ala. 2022), *aff'd*, 61 F.4th 902 (11th Cir. 2023). Specifically, a "[f]ailure to show any of the four factors is fatal[.]" *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009); *see also Henry*, 647 F.Supp.3d at 1238.

Further, the purpose of a preliminary injunction is to keep the status quo, not replace it. *See e.g.*, *Alfieri*, 23 F.4th at 1290 (*citing Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1225 (11th Cir. 2021), *vacated as moot*, 20 F.4th 1385 (11th Cir. 2021); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001) (original citation omitted); *Ron Grp., LLC v. Azar*, No. 2:20-CV-1038-ECM, 2021 WL 5576616, at *2 (M.D. Ala. Nov. 29, 2021) (*quoting Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). When a preliminary injunction

seeks to change the status quo, the movant must satisfy a higher burden. *See e.g.*, *Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) (per curiam) (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560 (5th Cir. 1971) (per curiam)); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (original citations omitted); *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys*, LLC, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009) (original citations omitted).[13] Likewise, preliminary injunctions targeting legislative enactments fall under a heavier burden. *See Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (*citing Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE PROCEDURALLY BARRRED.

Before reaching the merits, Plaintiffs have numerous procedural hurdles that they fail to overcome. First, their preliminary injunction claims are barred by Eleventh Amendment sovereign immunity. Second, Plaintiffs' claims and the requested relief prohibit them from proceeding under 42 U.S.C. § 1983 and require that they seek federal habeas relief instead. In the interests of judicial economy, the

---

[13] The decisions of the Fifth Circuit rendered before October 1, 1981, constitute binding precedent in the Eleventh Circuit. *See United States v. Barfield*, 999 F.2d 1520, 1522 n.3 (11th Cir. 1993) (*citing Bonner v. City of Prichard*, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981)).

Board adopt and incorporate the sovereign immunity and habeas arguments of the Governor and Attorney General as if set forth herein *in extenso*.

With respect to the applicability of sovereign immunity, the Board will add one additional argument to those advanced by the Governor and Attorney General. Specifically, federal parole law makes it absolutely inescapable that Plaintiffs seek an Order from this Court instructing the state Defendants to apply state law using Plaintiffs preferred and self-interested construction of state statutes. *Ab initio*, there is no federal right to parole that Plaintiffs can cite. The United States Supreme Court has held that inmates have no right to parole whatsoever unless a liberty interest is created by **state law**. *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979). Parole in Alabama "is wholly contingent upon the grace of" the Board. *Turner*, 2023 WL 4672503, at *7. That Alabama has created no liberty interest in parole is borne out by the relevant statutes discussed above and is recognized by mandatory Eleventh Circuit precedent. *Thomas*, 691 F.2d at 488–89. Therefore, when conducting parole consideration, the Board, as a matter of **federal** law, does not even have to be fundamentally fair because an inmate has no liberty interest in parole. *O'Kelley v. Snow*, 53 F.3d 319 at 321 (11th Cir. 1995).

With no federal right to parole, the lynchpin of Plaintiffs ex post facto and equal protection claims inescapably comes down to two questions: 1) what is required by Alabama law; and 2) did these Defendants violate the applicable

Alabama law? With these two questions forming the gravamen of Plaintiffs claims, sovereign immunity applies and this Court does not have jurisdiction to consider, much less grant, the motion for preliminary injunction. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 204-05 (11th Cir. 2019). Accordingly, the Board is immune to both of Plaintiffs' preliminary injunction claims, and is entitled to have the preliminary injunction motion denied. *Id.*

Some of the individual inmate Plaintiffs have additional procedural bars that prevent them from obtaining preliminary relief. The statute of limitations applicable to 42 U.S.C. § 1983 bars several of the named inmate Plaintiffs' claims against the Board. Also, Plaintiff Ptomey's claims are barred by res judicata.

### A. The Statute of Limitations Bars Plaintiffs' 42 U.S.C. §1983 Claims Brought Against the Board.

Plaintiffs bring their Ex Post Facto and Equal Protection claims pursuant to 42 U.S.C. § 1983. Doc. 1 at 111–17; Doc. 23-1 at 38 n.21. However, the statute of limitations bars some of the moving inmate Plaintiffs from challenging the Board's prior parole denials. The following argument applies to Plaintiffs Pritchett, Campbell, and Cartwright.

"All constitutional claims brought under [42 U.S.C. § 1983] are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." *McNair v. Allen*, 515 F.3d 1168, 1173

(11th Cir. 2008); *see also Owens v. Okure*, 488 U.S. 235, 249–50 (1989) ("where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."). Under Alabama law, "[a]ll actions for any injury to the person or rights of another . . . must be brought within two years." ALA. CODE § 6-2-38(l); *see also West v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1289, 1298 (11th Cir. 2017) (*citing McNair*, 515 F.3d at 1173). "Therefore, in order to have his claim heard, [Plaintiff] was required to bring it within two years from the date the limitations period began to run." *McNair*, 515 F.3d at 1173.

Generally, "the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). The accrual date begins when a plaintiff knows or has reason to know that they suffered the alleged injury forming the basis of their complaint and when a Plaintiff knows or has reason to know who allegedly inflicted the injury. *See McGroarty v. Swearingen*, 977 F.3d 1302, 1309 (11th Cir. 2020); *see also Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003). Additionally, a plaintiff need not know whether their claim is viable nor does a plaintiff need to know the full extent of their injury. *See Karantsalis v. City of Miami Springs, Fla.*, 17 F.4th 1316, 1323 (11th Cir. 2021); *see also McGroarty*, 977 F.3d at 1309.

1. **The Ex Post Facto and Equal Protection claims raised by Plaintiffs Pritchett, Campbell, and Cartwright accrued more than two-years prior to the filing of the instant suit.**

On June 2, 2020, the Board denied parole to Plaintiff Campbell. (Ex. TT.) On March 16, 2021, the Board denied Plaintiff Cartwright parole. (Ex. UU.) On August 5, 2021, the Board denied Plaintiff Pritchett parole. (Ex. VV.) All of these denials occurred after October 1, 2019, the effective date of HB380. These three Plaintiffs base their ex post facto and equal protection claims on these parole denials and the revisions to Alabama's parole law made by HB380. *See* Doc. 23-1 at 33–45.

Plaintiffs Campbell, Cartwright, and Pritchett had to bring their claims within two-years of the Board's decision to deny them parole. *See McNair*, 515 F.3d at 1173; *see also Lovett v. Ray,* 327 F.3d 1181, 1182-83 (11th Cir. 2003) (the accrual date for a claim that challenged the Georgia Parole Board's parole decision began when the inmate learned of the decision). Plaintiff Campbell's deadline was June 2, 2022; Plaintiff Cartwright had until March 16, 2023; and Plaintiff Pritchett is barred because he had to file by August 5, 2023. The Complaint in the case at bar was filed on December 12, 2023. *See* Doc. 1 at 126.

Also, Plaintiffs Campbell, Cartwright, and Pritchett cannot allege that the Board's denial of parole is a continuing injury. *See Lovett*, 327 F.3d at 1183 (holding that the Georgia Parole Board's parole decision was a one-time act, not a continue violation). Likewise, Plaintiffs cannot claim that the Board's subsequent parole

denials or decisions are separate injuries. *See Brown*, 335 F.3d at 1261 (finding that once the plaintiff became aware of the parole decision, plaintiff knew a new parole policy would be applied to future parole considerations). "Rather, [Plaintiffs'] injury, to the extent it ever existed, was when the [Board] applied its new policy . . . retroactively." *Id.* Given that none of the above Plaintiffs brought their claims out of time, the statute of limitations bars their requested relief.

## 2. <u>Plaintiffs Pritchett, Campbell, and Cartwright cannot receive equitable tolling to extend the statute of limitations.</u>

Furthermore, Plaintiffs Campbell, Cartwright, and Pritchett cannot receive equitable tolling. "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016) (*quoting Holland v. Fla.*, 560 U.S. 631, 649 (2010)). ***If either element is missing***, a court cannot provide equitable tolling. *See Menominee Indian Tribe of Wisconsin*, 577 U.S. at 256 (original citations omitted). Thus, for equitable tolling, "the diligence prong[] covers those affairs within the litigant's control; the extraordinary-circumstances prong[] is meant to cover matters outside its control." *Id.* at 257.

Additionally, "[e]quitable tolling is an extraordinary remedy which should be extended ***only sparingly***." *Dotson v. United States*, 30 F.4th 1259, 1268 (11th Cir.

2022) (*quoting Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004)) (emphasis added). "The plaintiff has the burden of proving that such extraordinary circumstances exist." *Dotson*, 30 F.4th 1259, 1268 (11th Cir. 2022) (*quoting Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006)). "As to the diligence inquiry, we have stated that [t]he diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'" *Dotson*, 30 F.4th at 1269 (*quoting San Martin v. McNeil*, 633 F.3d 1257, 1267 (11th Cir. 2011)). Finally, "[a] plaintiff nonetheless can plead himself out of court by alleging facts that foreclose a finding of diligence or extraordinary circumstances, both of which are required for equitable tolling." *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (*citing Menominee Indian Tribe of Wisconsin*, 577 U.S. at 254).

In this case, Plaintiffs Campbell, Cartwright, and Pritchett cannot satisfy the two elements for equitable tolling. First, none of these Plaintiffs allege that they have pursued their rights diligently. (*See generally* Doc. 23-1.) Rather, these Plaintiffs appear to have waited until the instant suit, which as far as undersigned is aware, is their first attempt to pursue their rights. But a delay of two years cannot establish the due diligence required to receive equitable tolling. *See Villarreal*, 839 F.3d at 972 ("as a matter of law,[] a plaintiff ***who does nothing for two years is not diligent***.") (emphasis added); *see also Arce*, 434 F.3d at 1260–61 (original citation omitted)

("courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.").

Second, Plaintiffs Campbell, Cartwright, and Pritchett cannot allege facts showing extraordinary circumstances required for equitable tolling. Plaintiff's incarceration does not satisfy the extraordinary circumstances requirement. *See Mathis v. Vizcarrondo*, 792 F. App'x 746, 748 (11th Cir. 2019) (per curiam); *see also Shuler v. Duke*, 792 F. App'x 697, 703 (11th Cir. 2019) ("an imprisoned litigant must still show he pursued diligently his rights.") (per curiam). Similarly, "the interests of justice on which a tardy plaintiff relies do not support a plaintiff who has not file[d] her action in a timely fashion[.]" *Chang v. Carnival Corp.*, 839 F.3d 993, 996 (11th Cir. 2016). Moreover, these Plaintiffs have not attempted to plead facts that could be construed as meeting their burden. (*See generally* Docs. 1 and 23-1.) Thus, there is no set of facts that Plaintiff can bring before this Court to satisfy the extraordinary circumstances element. *See Dotson*, 30 F.4th at 1269 ("the principles of equitable tolling . . . do not extend to . . . *a garden variety claim of excusable neglect*.") (*quoting Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)) (emphasis added).

## B. The Doctrine of Res Judicata Bars Plaintiff Ptomey's Claims Challenging the Board's Parole Decisions.

For most of the Plaintiffs, the instant suit appears to be their first attempt at challenging the Board's prior parole decisions. However, for Plaintiff Ptomey, this

suit is his **second attempt**. (*Compare* Ex. WW *with* Doc. 1 at 111–19.) Consequently, the doctrine of res judicata bars his claims challenging the Board's decision to deny him parole.

"Res judicata bars the filing of claims which were raised or could have been raised in an earlier proceeding." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999) (*citing Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990)). "'In the Eleventh Circuit, a party seeking to invoke the doctrine [of res judicata] must establish its propriety by satisfying four initial elements: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action.'" *Mann v. Palmer*, 713 F.3d 1306, 1311 (11th Cir. 2013) (*quoting In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001)). If the claims in the new suit could have been raised in prior suit, then Res Judicata applies and bars the claims. *See Mann*, 713 F.3d at 1311.

For the fourth element, the courts consider two cases to be the same cause of action if the latter case "arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action[.]" *Ragsdale*, 193 F.3d at 1239 (citation omitted). "Res judicata acts as a bar 'not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of

the same operative nucleus of fact.'" *Pleming v. Universal–Rundle Corp.*, 142 F.3d 1354, 1356–57 (11th Cir. 1998) (*quoting Manning v. City of Auburn*, 953 F.2d 1355, 1358–59 (11th Cir. 1992)). "Under res judicata 'the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, *whether or not raised at trial*.'" *Olmstead v. Amoco Oil Co.*, 725 F.2d 627, 632 (11th Cir. 1984) (emphasis added) (original citation omitted); *see also McGuire v. Marshall*, 512 F. Supp. 3d 1189, 1212 (M.D. Ala. 2021) (original citation omitted).

Plaintiff Ptomey's prior state suit satisfies all four elements. On February 12, 2021, Plaintiff Ptomey filed a Petition for Writ of Certiorari in the Montgomery County Circuit Court ("Montgomery Court"). (Ex. WW.) In his suit, Plaintiff Ptomey argued that he had been

> *denied his Due Process Rights and Equal Protection of the Law under the* . . . *(14th) Fourteenth Amendment* to the United States Constitution, and the Constitution of the State of Alabama (1901) where "Exceptional Circumstances" exists invoking this court's jurisdiction for relief from the unconstitutional decision and *actions of the [Board]* that [has] acted in a manner that can only be considered [as] arbitrary and capricious [and] *that violated the Ex Post Facto Clause of the United States Constitution* when it set his next parole consideration date for January 2022[], *based on parole rules that were not in effect at the time he was convicted and sentenced*.

(*Id.* at 3–4 (emphasis added).)

The Montgomery Court is a court of competent jurisdiction for suits challenging the Board's parole decisions. *See Ex parte Alabama Bd. of Pardons & Paroles*, 849 So. 2d 255, 257 (Ala. Crim. App. 2002) ("Review of proceedings from

the Board is by a petition for a common-law writ of certiorari filed in the Circuit Court of Montgomery County.") (*citing Gholston*, 627 So. 2d 945). Additionally, the Montgomery Court issued a final judgment on the merits of Plaintiff Ptomey's suit. (Ex. XX.)[14] Likewise, Plaintiff Ptomey brought his certiorari petition against the Board. (Ex. WW at 1.) As its members, Board Chair Gwathney, Board Member Simmons, and Board Member Littleton are in privity with the Board and thus satisfy the identicality element. *See Mann*, 713 F.3d at 1311 (correctional officials were in privity with prior correctional officials in an inmate's prior suit).

Furthermore, Plaintiff Ptomey's current claims arise out of the same operative nucleus of fact. Like in his prior certiorari petition, Plaintiff Ptomey alleges that the Board's parole decisions violated his Equal Protection rights and the Ex Post Facto Clause. (*Compare* Ex. WW at 3–4 *with* Doc. 23-1 at 33–45.) Similarly, Plaintiff Ptomey's prior suit and his instant suit both challenged the Board's change in its rules and practices. (*Compare* Ex. WW at 6 (alleging that the Board violated his rights because it "instituted changes in its discretionary parole statutes, rules, regulations, policies, practices, and philosophy[.]") *with* Doc. 23-1 at 33–45.)

By challenging the Board's parole decisions and the changes to Alabama parole law in his prior certiorari petition, Plaintiff's Ptomey's current claims against the Board Members arise from the same operative nucleus of fact. *See Ragsdale*, 193

---

[14] Plaintiff Ptomey did not appeal the Montgomery Court's decision.

F.3d at 1239; *see also Pleming*, 142 F.3d at 1356. As such, Plaintiff Ptomey had to raise claims arising from his challenge against the changes in Alabama parole law in his state suite, but he did not do this. *See Olmstead*, 725 F.2d at 632; *see also McGuire*, 512 F. Supp. 3d at 1212. Thus, the Doctrine of Res Judicata bars Plaintiff Ptomey's current claims.

## II.     PLAINTIFFS CLAIMS FAIL ON THE MERITS.

Plaintiffs allege that the Board's implementation of HB380 violated the Ex Post Facto Clause of the United States Constitution. *See* Doc. 23-1 at 33. Further, Plaintiffs contend that they can demonstrate that intentional racial discrimination influenced the Board's parole decisions. *Id.* at 38. However, the precedent governing parole decisions under federal and Alabama law do not support their claims.

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). A "state may be specific or general in defining . . . the factors that should be considered by the parole authority." *Id.* at 8. "It is thus not surprising that there is no prescribed or defined combination of facts which, if shown, would mandate release on parole." *Id.*

Rather, as the United States Supreme Court recognized,

The decision [to grant or deny parole] differs from the traditional mold of judicial decisionmaking in that the choice involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is

best both for the individual inmate and for the community. This latter conclusion requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice. The entire inquiry is, in a sense, an "equity" type judgment that cannot always be articulated in traditional findings.

*Greenholtz*, 442 U.S. at 8 (emphasis added). Similarly, the United States Supreme Court acknowledged that

The parole-release decision . . . is more subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release. Unlike the revocation decision, there is no set of facts which, if shown, mandate a decision favorable to the individual.

*Id.* at 9–10. "That the state holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained." *Id.* at 11 (citation omitted) (emphasis in original).

Under Alabama law, the Board's parole powers are exclusive, and the Board's parole decisions are completely discretionary and have been since at least 1951. *See* ALA. CODE § 15-22-26(c); *see also Ellard*, 474 So. 2d at 749. "'Obtaining an early release through parole . . . is wholly contingent upon ***the grace of the detaining authority***[.]'" *Turner v. Ivey*, No. SC-2022-0538, 2023 WL 4672503, at *7 (Ala. July 21, 2023) (emphasis added) (*quoting Tedder v. Alabama Bd. of Pardons & Paroles*, 677 So. 2d 1261, 1263 (Ala. Crim. App. 1996)). Likewise, the Eleventh

Circuit has long recognized that the Board's parole decisions were discretionary. *See Monroe v. Thigpen*, 932 F.2d 1437, 1441 (11th Cir. 1991) ("[Alabama Code § 15-22-26] provides that parole may be granted ***at the Board's discretion***.") (emphasis added); *see also Thomas*, 691 F.2d at 489 ("The Alabama statute . . . calls for discretionary rather than mandatory action on the part of the [Board].").[15]

Because Alabama's parole law gives the Board complete discretion, an inmate has no liberty interest in how the Board reaches its decisions. *See Thomas*, 691 F.2d at 488–89. In fact, "the procedures followed in making the parole determination are not required to comport with standards of fundamental fairness." *O'Kelley v. Snow*, 53 F.3d 319, 321 (11th Cir. 1995) (*quoting Slocum v. Georgia State Bd. of Pardons & Paroles*, 678 F.2d 940, 942 (11th Cir. 1982)); *see also Turner*, 2023 WL 4672503, at *7 (original citations omitted). Only flagrant or unauthorized action will result in federal court interference. *See Thomas*, 691 F.2d at 489.

### A. As a Matter of Law, Plaintiffs Cannot Show that Defendants Violated the Ex Post Facto Clause of the United States Constitution.

---

[15] Even after the passage of SB67, this Court maintained that Alabama's parole system was discretionary. *See e.g.*, *Hambright v. Alabama Bd. of Pardons & Paroles*, No. 2:18-CV-358-WHA-CSC, 2021 WL 506578, at *4 (M.D. Ala. 2021) ("the Eleventh Circuit citing *Greenholtz* has recognized that . . . Alabama's parole system is discretionary[.]"); *Houston v. Davenport*, No. 2:18-CV-872-MHT-CSC, 2021 WL 6425558, at *4 (M.D. Ala. 2021); *Nix v. Alabama Bd. of Pardons & Paroles*, No. 2:19-CV-372-WHA-CSC, 2022 WL 1236362, at *4 (M.D. Ala. 2022). Similarly, after the passage of HB380, this Court still found that Alabama parole law was discretionary. *See e.g.*, *Foreman v. Gwathney*, No. 2:21-CV-675-WHA-SRW, 2022 WL 1256721, at *3 (M.D. Ala. 2022); *Baker v. Ivey*, No. 2:22-CV-375-RAH-SMD, 2023 WL 5499872, at *3 (M.D. Ala. June 23, 2023); *Ledbetter v. Pettaway*, No. 2:20-CV-276-RAH-SMD, 2023 WL 5920813, at *5 (M.D. Ala. Aug. 14, 2023) ("Nor is there a state-created liberty interest in parole in Alabama.").

States may not enact ex post facto laws "which, by retroactive operation, increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249–50 (2000) (*citing Collins v. Youngblood*, 497 U.S. 37, 42 (1990)). But "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited" *Garner*, 529 U.S. at 250 (*citing California Dep't of Corr. v. Morales*, 514 U.S. 499, 508–09 (1995)). "The controlling inquiry . . . [is] whether retroactive application of the change in [parole] law create[s] 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Garner*, 529 U.S. at 250 (*citing Morales*, 514 U.S. at 509).

"[F]or a court to find an ex post facto violation: (1) the law must be retrospective, meaning it applies to events occurring before its enactment; and (2) the offender must be disadvantaged by it." *United States v. Abraham*, 386 F.3d 1033, 1037 (11th Cir. 2004) (*citing United States v. Rosario–Delgado*, 198 F.3d 1354, 1356 (11th Cir.1999)). "Whether retroactive application of a particular change in parole law respects the prohibition on ex post facto legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account." *Garner*, 529 U.S. at 250. Although discretion does not displace the Ex Post Facto Clause, changes allowing for the better exercise of pre-existing discretion do not violate it. *Id.* at 252–55. Therefore, a plaintiff "must show that as applied to

his own sentence the law created a significant risk of increasing his punishment." *Id.* at 255.

1. **Plaintiffs cannot establish that HB380 is more onerous than the law in effect when they committed their offenses.**

"'The Constitution forbids the passage of ex post facto laws, a category that includes "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, ***when committed***.'" *Peugh v. United States*, 569 U.S. 530, 532–33 (2013) (emphasis added) (*quoting Calder v. Bull*, 3 U.S. 386, 390 (1798)); *see also Thompson v. Merrill*, 505 F. Supp. 3d 1239, 1263 (M.D. Ala. 2020) (citation omitted). "It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." *Dobbert v. Fla.*, 432 U.S. 282, 294 (1977). Thus, a statute "violates the [Ex Post Facto] Clause if it is both retrospective and more onerous ***than the law in effect on the date of the offense***." *Weaver v. Graham*, 450 U.S. 24, 30–31 (1981) (emphasis added).

While Plaintiffs claim that the statutory revisions brought about by the passage of HB380 disadvantages them because the Board "abandoned" its prior practices under SB67 (Doc. 23-1 at 36), none of the Plaintiffs committed their offenses after the effective date of SB67. To the contrary, all named Plaintiffs committed their offenses between November 9, 1993, and April 29, 2010. Consequently, the moving inmate Plaintiffs can have no claim based upon the use of guidelines, risk assessment scores, or any practice based upon changes to

Alabama parole law brought about by HB380 that impacted SB67's changes. *Peugh*, 569 U.S. at 532–33.

The moving inmate Plaintiffs committed their offenses during the time the 1951 version of Alabama Code § 15-22-26 was in effect. As noted in the statement of facts, that version of the law contained no reference to risk assessments, guidelines, or the use thereof. Instead, parole was granted by the Board only if in its subjective opinion there was a reasonable probability the inmate would not violate the law or damage the welfare of society if he was released.[16] ALA. CODE § 15-22-26 (1951). The Board's total discretion was widely recognized under the 1951 statutory scheme. *See e.g.*, *Monroe*, 932 F.2d at 1441; *Thomas*, 691 F.2d at 489; *Thompson*, 806 So. 2d at 375; *Beavers v. State*, 666 So. 2d 868, 870 (Ala. Crim. App. 1995) ("After an investigation, . . . whether to grant or deny parole is a matter of discretion with the Board.").

Because the substance of how the Board makes parole decisions remains unchanged between the 2016 and 2019 version of § 15-22-26, Plaintiffs are forced to focus on the non-substantive additional language referencing "public safety". (Doc. 23-1 at 10 *citing* ALA. CODE § 15-22-26 (2019).) However, public safety has always been a consideration, even under the 2016 version of § 15-22-26. SB67

---

[16] As will be shown later, neither SB67 nor HB380 substantively changed the Board's complete discretion over parole decisions or its ability to disregard its own parole guidelines. Consequently, HB380 is not more onerous than SB67.

explicitly gave the Board of "complete discretion" which necessarily includes the ability to take public safety into consideration. More importantly, the SB67 version of the statute directed the use of guidelines to "promote the use of prison space for the most violent and greatest risk offenders." ALA. CODE § 15-22-26(a) (2016). Keeping violent and at-risk offenders in prison is merely public safety phrased differently.

In fact, the Board's 2016 Parole Officer Manual (in effect during Head's tenure) makes clear that even under SB67, public safety was a concern of **the Board**. (Ex. YY at 2 ("the mission of this agency to promote and enhance public safety . . ."), 4 ("The Victims Unit will inform victims of the importance the Board places on their concerns, **as well as public safety**.") (emphasis added).) And again, public safety is always a factor considered in parole decisions. *See Greenholtz*, 442 U.S. at 8 (recognizing that a parole decision "involves a synthesis of record facts and personal observation . . . leading to a predictive judgment as to what is best . . . **for the community**.") (emphasis added). While the contrary is certainly possible, one would hope that former Chair Head would not assert that the Board did not take public safety into consideration when making parole decisions given that there is no evidence she attempted to have public safety removed from the officer's manual during her time on the Board.

Lastly on this point, assuming without conceding that the Court grants the Woods' Foundation's motion to intervene, it has not yet (presumably) committed a criminal violation for which it is serving time. In any event, the Foundation is not serving a sentence and there is no evidence in the preliminary injunction record that any of its members are serving sentences, let alone that they are serving sentences committed during the period in which SB67's parole law revisions were in effect. Thus, the Woods Foundation has no ex post facto claim at all.

## 2. The Board's parole denials under HB380 do not create a significant risk of increased punishment.

Courts reviewing the retroactive application of amended parole laws focus on if the challenged changes "alter[s] the standards for determining either the initial date for parole eligibility or an inmate's suitability for parole." *Garner*, 529 U.S. at 250 (*citing Morales*, 514 U.S. at 507). To find if changes in a parole law violate the Ex Post Facto Clause, courts analyze these claims on a case-by-case basis. *See Harris v. Hammonds*, 217 F.3d 1346, 1350 (11th Cir. 2000). However, when changes to parole laws are "designed for the better exercise of the discretion that a paroling authority had from the outset[,]" there is no Ex Post Facto violation. *See Garner*, 529 U.S. at 254–55 (finding that retroactive application to changes in Georgia parole law did not violate the Ex Post Facto Clause because the changes allowed for the better exercise of pre-existing discretion).

While discretion cannot prevent the finding of an Ex Post Facto violation,

to the extent there inheres in ex post facto doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression . . . we can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. ***The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions***.

*Garner*, 529 U.S. at 253 (emphasis added). As such, the Eleventh Circuit holds that when the substantive policies governing parole remain the same, changes in parole law cannot establish an Ex Post Facto violation. *See Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1108–09 (11th Cir. 2015) (finding that under *Garner* and *Morales*, changes in Florida's parole law did not inherently violate the Ex Post Facto Clause because the substantive policies remained the same). Consequently, a plaintiff must show that application of the old law would have made a difference in receiving earlier release. *Id.* at 1110 ("We have recognized that in the absence of a showing that an earlier interview would have made a difference, a delayed interview does not violate the Ex Post Facto Clause.") (*citing Jones v. Ray*, 279 F.3d 944, 946 (11th Cir. 2001)).

### a. Neither SB67 nor HB380 substantively altered the Board's complete discretionary authority over determining an inmate's fitness for parole.

As a matter of fact and law, Plaintiffs cannot establish that the substantive policies governing the Board's parole decision-making policies were changed by

either SB67 or HB380. Both amendments retained the prior statutory language that the Board subjectively determines whether some is fit for parole. *Compare* ALA. CODE § 15-22-26 (1951) ("only if the [Board] is of the opinion . . .") *with* ALA. CODE § 15-22-26(a) (2016) ("only if the [Board] is of the opinion . . ."), ALA. CODE § 15-22-26(a) (2019) ("only if the [Board] is of the opinion . . ."). Further, the Alabama Legislature explicitly included language firmly establishing that the Board's discretion over parole decisions was "complete". *See* ALA. CODE § 15-22-26(c) (2016); *see also* ALA. CODE § 15-22-26(c) (2019). Subjective and not objective decision making by a Board with unfettered discretion has been the hallmark of Alabama parole law for over 70 years.

Despite SB67's inclusion of parole guidelines, the Alabama Legislature still made clear that the Board alone determines whether an inmate meets the guidelines. *See* ALA. CODE § 15-22-26(a) (2016) ("only if the [Board] is of the opinion that the prisoner meets criteria and guidelines . . ."). Further, the Legislature included language in SB67 relegating the parole guidelines as aids, not once, but twice. *See* ALA. CODE § 15-22-26(a) (2016) ("The guidelines shall serve as an aid in the parole decision process . . ."); *see also* ALA. CODE § 15-22-26(c) (2016) ("The guidelines shall serve as an aid . . ."). And the Legislature explicitly subordinated the parole guidelines to the Board's discretion by stating that while the guidelines served as

aids, "the decision concerning parole release shall be at the complete discretion of the [Board]." ALA. CODE § 15-22-26(c) (2016).

The changes made by HB380 retained most of the statutory language found in SB67. *Compare* ALA. CODE § 15-22-26 (2016) *with* ALA. CODE § 15-22-26 (2019). Despite adding language requiring the Board to consider public safety, the Alabama Legislature subordinated even this factor to the Board's discretion over parole decisions. *See* ALA. CODE § 15-22-26(a) (2019) ("only if **the [Board] is of the opinion** that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole and to ensure public safety.") (emphasis added). Further, the Legislature emphasized the Board's authority over how to apply public safety in parole consideration by retaining the language that subordinated the guidelines, which includes public safety, to the Board's "complete" discretion. *See* ALA. CODE § 15-22-26(c) (2019).

When reviewing whether the retroactive applications of changes to Florida's parole guidelines, including the addition of new factors to be considered, constituted an Ex Post Facto violation, the Eleventh Circuit found that such a change did not violate the Ex Post Facto Clause because the changes "did not substantively alter petitioner's parole eligibility or confine the Commission's discretion to release him; they merely clarified the exercise of administrative discretion." *Paschal v.*

*Wainwright*, 738 F.2d 1173, 1179 (11th Cir. 1984). The Eleventh Circuit further stated that:

> At the time petitioner committed the murder that led to his incarceration, ***he was on fair notice that if he received a life sentence he would be subject to parole at the discretion of the Commission. This was not changed*.**[] The guidelines merely stated and rationalized the exercise of the Parole Commission's discretion. Petitioner accordingly suffered no legislative increase in punishment.

*Id.* at 1180 (citations omitted) (emphasis added). Additionally, the Eleventh Circuit concluded by finding that the new parole guidelines "did not alter the consequences that flowed from petitioner's crime" because "the Commission had complete discretion over the parole decision[]" and "[o]nly the form by which the Commission exercised that discretion changed." *Id.* at 1180–81.

In 1986, the Eleventh Circuit reaffirmed its *Paschel* holding. *See Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 933 (11th Cir. 1986) ("When appellant was convicted in 1974, parole was a matter of complete discretion[, and] remains so even under the objective parole guidelines of 1978, since parole is still ultimately a matter of discretion.") (*citing Paschal*, 738 F.2d 1173). In fact, the Eleventh Circuit firmly rejected the argument that "under the old system the goal of rehabilitation played a larger role in determining release dates than it does under the new system[]" stating that "[t]his attempted distinction fails." *See Johnson v. Wainwright*, 772 F.2d 826, 827 (11th Cir. 1985) (relying on *Paschel*). Moreover, the Eleventh Circuit continues to cite *Paschel* and its progeny as good law, citing them with *Garner*. *See*

*Tooma v. David*, 381 F. App'x 977, 980 (11th Cir. 2010) (citing *Garner* and *Wainwright* as good law); *see also Penoyer v. Briggs*, 206 F. App'x 962, 965 (11th Cir. 2006) (citing *Garner*, *Wainwright*, and *Damiano* as good law).

While not binding, the Eleventh Circuit's reasoning in *Tooma* is on point with this case. 381 F. App'x at 980. In *Tooma*, the petitioner challenged the retroactive application of a statutory provision allowing Florida's paroling authority to consider a judge's objection to a grant of parole. *Id.* However, the Eleventh Circuit found that "[Florida's paroling authority] has the discretion **to ignore or follow a judicial opinion**; thus, the provision does not alter or increase the punishment imposed for the underlying crime but, instead, simply provides an additional factor to weigh in parole eligibility." *Tooma*, 381 F. App'x at 980 (emphasis added).

Assuming without conceding that HB380 added public safety as a parole consideration factor, Plaintiffs still cannot meet their burden under the reasoning of *Tooma*. Similar to the *Tooma* petitioner's argument, Plaintiffs complain about HB380's inclusion of public safety in parole consideration. *Compare Tooma*, 381 F. App'x at 980 *with* Doc. 23-1 at 18, 20, 36. But as the Eleventh Circuit found with the statutory provision in *Tooma*, public safety is a factor subject to the Board's opinion. *Compare* 381 F. App'x at 980 (the new factor was subjected to the Florida paroling authority's discretion) *with* ALA. CODE § 15-22-26(a) (2019) (the parole guidelines, including the consideration of public safety is subjected to the Board's

opinion). Thus, the Eleventh Circuit's reasoning in *Tooma* likewise prevail in this case because the inclusion of public safety as a factor in parole consideration does not alter or increase an inmate's punishment. *Compare* 381 F. App'x at 980 *with* ALA. CODE § 15-22-26(a) (2019).

In this case, Plaintiffs decry HB380's explicit inclusion of public safety[17] as a factor in parole decisions, and they aver that certain factors are no longer weighted as highly as before. *See* Doc. 23-1 at 18–20, 36. However, the Eleventh Circuit in *Paschel* and its progeny rejected these very arguments. *See e.g.*, *Wainwright*, 772 F.2d at 827 (rejecting the argument that there was an Ex Post Facto violation because rehabilitation played a larger role in the prior parole system); *Damiano*, 785 F.2d at 933 (holding that there was no Ex Post Facto violation because Florida's paroling authority retained complete discretion over parole decisions before and after the enactment of parole guidelines); *Paschal*, 738 F.2d at 1179. Thus, explicitly adding the words "public safety" as one of many factors to consider cannot violate the Ex Post Facto Clause.

Furthermore, the Alabama Legislature included no language mandating that the Board conform its decision making to its parole guidelines. *See generally* ALA. CODE § 15-22-26 (amended 2019). The Legislature declined to emphasize any factor

---

[17] As noted, HB380's addition of public safety in Alabama Code § 15-22-26 merely explicitly stated what was already implicit in SB67's command that the guidelines reserve prison space for high risk and violent offenders and provision to the Board of complete discretion.

considered by the Board, to dictate the weight of factors considered, or mandated a particular outcome if factors were met. *Id*. Instead, the Legislature authorized the Board to determine the weight of each factor and whether an inmate met the guidelines. *See* ALA. CODE § 15-22-26(a) (2016). Far from creating an objective system where 1+1+1 = parole, the Legislature kept unchanged the subjective nature of parole decisions by giving the Board "complete discretion." *Id*.

Moreover, the Board has never held out – even under Head's tenure – that it would mechanically conform parole decisions to its parole guidelines or that it would bind itself to the recommendations of IPOs. The notice for public comment sent out before the adoption of the Board's 2016 parole guidelines makes that point clear. (Ex. E.) In fact, the Justice Reinvestment in Alabama: Analysis and Policy Framework – which Plaintiffs so laud, *see* Doc. 23-1 at 14, states as a policy recommendation: "that the guidelines do not establish an expectation or right to release and *that the ultimate decision of whether or not to grant parole resides with the parole board*." (Doc. 24-1 at 26 (emphasis added).) Likewise, Plaintiffs admit that "the [Board has] the discretionary authority to depart from the Parole Guidelines[.]" Doc. 23-1 at 36–37.

Additionally, Plaintiffs' claims that under HB380, the Board altered the weight of moderate ORAS scores and removed work release reports as factors

considered by the Board are divorced from reality.[18] Both the 2016 and the 2020 parole guidelines have the same score and weight for ORAS scores. (*Compare* Ex. F *with* Ex. II.) The only change to ORAS scoring found in the 2020 guidelines is that sex offenders now have a static score. (Ex. II.) Similarly, work release reports are still considered in IPO Reports, and the Board Action Sheets granting parole still list work release reports as a factor in parole consideration. (Ex. KK; Ex. ZZ.)

Likewise, the Court should not be misled by Plaintiffs apples and aardvarks comparison of Board Action Sheets (Doc. 26-1 at 2-3), to the Board's 2020 parole guidelines. (Doc. 26-2.) Specifically, Plaintiffs allege that because the 2020 guidelines do not include a specific factor for work release reports like the Board Action Sheets, the Board got rid of this factor after the effective date of HB380. *See* Doc. 23-1 at 19. Yet, as shown above, the IPO Reports still include appraisals of an inmate's progress in work release programs, and the current Board Action Sheets still include work release reports as a factor to consider. *See supra.*

While Plaintiffs rely on former Board Member Head's statements, her claims only establish how ***she applied*** the Board's prior parole guidelines. *See* Doc. 23-1 at 13–14. As a Board member, Head could apply the guidelines as she saw fit, but the

---

[18] Assuming, *arguendo*, that Plaintiffs are correct in their assertion that the Board dropped consideration of work release reports, the advancement of such an argument in their preliminary injunction motion is also puzzling given Plaintiffs' attack on work release in the Complaint. (Doc. 1 at 124 (seeking an injunction prohibiting the alleged coercion of "forced labor").) If Plaintiffs could prevail on their attack on the work release program, its demise would necessarily end the Board's consideration of work release reports.

Alabama Legislature never bound her or the Board to act as a rubber stamp to the final numbers on a guideline worksheet. *See generally* ALA. CODE § 15-22-26 (2016) (parole decisions are completely discretionary and no factor requires the Board to grant parole). Furthermore, Plaintiffs have cited, and cannot cite, any authority holding that the mental processes of one member of one iteration of a parole board is binding on future boards and future Board members.

Undeterred, Plaintiffs attempt to convince the Court that SB67 established an "objective" standard in the Board's parole decision-making process. *See* Doc. 23-1 at 5 ("[SB67] did so by requiring the [Board] to adopt objective standards for assessing the 'fitness' of individuals for parole[.]"). This argument borders on the fraudulent in that it is made by reading the words "opinion" and "complete discretion" completely out of SB67's version of § 15-22-26. It is preposterous to describe a statutory scheme that explicitly gives an agency "complete discretion" and leaves decisions up to that agency's "opinion" as anything other than subjective.

Nonetheless, the Eleventh Circuit explicitly rejected Plaintiffs' idea that provisions requiring the Board to consider certain factors makes a parole system "objective". Rather, the Eleventh Circuit held that:

> [Alabama Code § 15-22-26] calls for discretionary rather than mandatory action on the part of the board. The law directs the board to consider a number of factors in making their determination, ***which is a subjective rather than objective determination***. It does not contain any language that mandates parole as was found in *Greenholtz*. When the

> statute is framed in discretionary terms there is not a liberty interest created.

*Thomas*, 691 F.2d at 489 (emphasis added). That Alabama's parole system is and always has been subjective is matter of both statutory fact and Eleventh Circuit case law.

This Court's own prior decisions are in accord. Previously, this Court implicitly rejected Plaintiffs' argument that SB67 created an objective parole system. "This court's exhaustive review of the history of the Alabama statute governing release on parole establishes that ***from its inception until the present date the statute has been framed in discretionary terms***." *Jackson v. Cook*, No. 2:17-CV-414-ALB, 2020 WL 4006671, at *6 (M.D. Ala. June 4, 2020) (emphasis added). When this Court discussed Alabama Code § 15-22-26, as amended by SB67, this Court found: "The statute is clear that the decision to grant parole is within the sole discretion of members of the parole board and that parole is permitted only when board members, in their opinion, deem an inmate suitable for release on parole." *Id.* at *6 n.3.

### b. Plaintiffs cannot establish that as applied to them, HB380 creates a significant increase of increasing their punishment.

Absent a showing that the change in the law substantively changed the parole decision making, a plaintiff must present evidence that as applied to him, the challenged provision makes a difference in his case. *See Fla. Parole Comm'n*, 787

F.3d at 1109–10 (because the change in Florida's parole law did not inherently pose a risk of increasing an inmate's punishment, the petitioner needed to show that as applied to him, the change was unconstitutional); *see also Ray*, 279 F.3d 944, 946 (because plaintiff could not show that he would be eligible for parole at an earlier date, there was no Ex Post Facto violation). Plaintiffs attempt to meet their burden of showing a significant increase of risk of punishment to them primarily by resorting to statistics concerning grant and guideline compliance rates. *See* Doc. 23-1 at 6-8, 12-17. Almost as an afterthought, the moving Plaintiffs provide information on themselves. *Id.* at 20-24.

Plaintiffs fail to meet their burden for three reasons. First, the Eleventh Circuit has foreclosed the use of statistics to satisfy an inmate's burden in cases like the one at bar. Second, Plaintiffs' use of statistics in their motion is misleading. Finally, Plaintiffs information about themselves does not establish that they should have received parole sooner as a matter of law.

First, the Eleventh Circuit has rejected the use of statistics to prove that a change in parole law or practices constitutes an Ex Post Facto violation. *Porter v. Ray*, 461 F.3d 1315, 1321 (11th Cir. 2006). In *Porter*, Georgia inmates argued that the state's paroling authority continued retroactive application a "de facto" policy requiring inmates to serve 90% of their sentence before becoming parole eligible even after federal court struck it down. 461 F.3d at 1317. To support their arguments,

the inmates cited "to statistics compiled by the [Georgia] Board following its reconsideration of individuals to whom the [Georgia] Board had impermissibly applied the 90% policy". *Id.* at 1321. This data, according to the *Porter* inmates, showed that inmates were serving 5.6 years longer than the guidelines dictated and an average of 79% of the judicially imposed sentence. *Id.*

The Eleventh Circuit was unconvinced, noting that "these statistics are unavailing for two reasons." *Porter*, 461 F.3d at 1321. The Eleventh Circuit first held that "even assuming that these statistics could assist the appellants," the inmates did not offer any statistics to compare parole determinations prior to the alleged enactment of the "de facto 90% policy". *Id.* But more importantly for the present case, the Eleventh Circuit held that:

> the Board has **always had "virtually unfettered discretion"** to vary a prisoner's TPM and need not comply strictly with the Guidelines or the one-third statutory threshold. ***Therefore, we doubt whether comparison statistics would assist the appellants in showing that the Board violated the Ex Post Facto Clause***.

*Id*. (emphasis added).

Similarly, when discussing whether a change in parole law created a sufficient risk of increasing the punishment of inmates, the Eleventh Circuit held that:

> In our view, the key to answering this question lies in the undisputed fact that, both before and after the January 22, 1991 rule change, the Board retained and *in fact exercised* virtually *unfettered* discretion to deviate both above and below the Guidelines-recommendation in setting the TPM.

*Jones v. Georgia State Bd. of Pardons & Paroles*, 59 F.3d 1145, 1150 (11th Cir. 1995) (emphasis in original). Consequently, the Eleventh Circuit's reasoning firmly holds that when a change in parole law or policy retains a pre-existing discretion over a decision, there can be no Ex Post Facto violation if the paroling authority continues to exercise said discretion. *See Porter*, 461 F.3d at 1321; *see also Georgia State Bd. of Pardons & Paroles*, 59 F.3d at 1150.

Parole has been granted for 70 years in Alabama based on the Board's "opinion". ALA. CODE § 15-22-26 (1951, 2016, 2019). Since the passage of SB67, parole decisions have not just been based on the Board's subjective opinion, but exercised pursuant to "complete discretion". ALA. CODE § 15-22-26 (2016, 2019). Consequently, because the "Board retained and in fact exercised virtually unfettered discretion" under Alabama law, Plaintiffs' statistics – even if accurate and properly used – are unavailing and cannot establish an ex post facto violation. *Porter*, 461 F.3d at 1321; *see also Georgia State Bd. of Pardons & Paroles*, 59 F.3d at 1150.

Second, Plaintiffs' use of the data to show low guideline compliance is misleading. The Board's guidelines did not provide a baseline score suggesting a parole grant or a parole denial until the adoption of the 2020 parole guidelines. (Ex. F (providing no baseline score or recommendation); Ex. II (providing a baseline score suggesting the grant or denial of parole).) In fact, even Plaintiffs' own evidence shows that the Board only started collecting its conformance rate *in July 2020*. *See*

Doc. 24-13 at 11. Thus, even if legally relevant, the guidelines compliance data is all but useless for purposes of comparing what the Board did pre-HB380 because it became law a mere two months after the new guidelines went into effect.

Also, the conformance rate does not just include the denial of parole when the 2020 parole guideline suggests granting parole. It also includes the grant of parole when the guideline suggests a denial of parole. *See* Doc. 24-13 at 11 ("A conformance rate indicates the percentage of cases were the Board's decisions match that of the recommendation from the Parole Guidelines."). Thus, Plaintiffs attempt to hold non-compliance against the Board even when they agree with the ultimate decision.

Still, and belatedly, Plaintiffs argue that they are good candidates for parole for several reasons including their good performance while on work release, their low ADOC custody status, their completion of rehabilitation programs, "serving enough time", they have a good institutional record. *See e.g.*, Doc. 23-1 at 20-24; Doc. 25; Doc. 25-1; Doc. 25-2; Doc. 25-3; Doc. 25-4; Doc. 25-5. I so doing, Plaintiffs invite this Court to play super parole board and supplant the Board's judgment with its own on the basis of an incomplete and cherry-picked record. Nevertheless, assuming the truth of every word and further assuming that there is no counter indicating information against them, Plaintiffs' argument avails them not as a matter of law. Again, every iteration of § 15-22-26 for the past 70 years – including

under the time SB67 was in full effect – has specifically prohibited the Board from granting parole because an inmate has earned it. "No prisoner shall be released on parole merely *as a reward for good conduct or efficient performance of duties assigned in prison*[.]" ALA. CODE § 15-22-26 (1951, 2016, 2019) (emphasis added). Thus, Plaintiffs' good works evidence, even if true, does not establish that they would have been granted parole any sooner because every version of the statute prohibited the Board from granting them parole for those reasons. *Id*.

The Eleventh Circuit has foreclosed the Plaintiffs' invitation to this Court to substitute its judgment for that of the Board. When an inmate suggested that by serving 30-years on his life sentence, "he had served long enough and should be paroled[,]" the Eleventh Circuit explicitly rejected the argument. *Fla. Parole Comm'n*, 787 F.3d at 1110. The Eleventh Circuit correctly recognized that Florida law did not afford right to parole "even after decades in prison or at the age of 77." *Id.* Consequently, Plaintiffs cannot allege an Ex Post Facto violation merely because they may not be released earlier than they want to be, and "[Plaintiffs'] real gripe must be that [they were not] granted parole, not that [they weren't] eligible for it." *Slakman v. State Bd. of Pardons & Paroles*, No. 21-12226, 2021 WL 5071858, at *2 n.4 (11th Cir. Nov. 2, 2021).

As a final note on the ex post facto claim, Plaintiffs' claim that the Board has eliminated parole ignores the fact that all Plaintiffs, except Plaintiffs English and

Council, **will** be released prior to the end of their sentences. Unlike parole, which is at the Board's complete discretion, the Alabama Legislature enacted a Mandatory Release Program which requires an inmate's release from prison prior to the end of their sentence. *See* ALA. CODE § 15-22-26.2. Further, inmates are released to the Board's supervision which effectively makes Mandatory Release, mandatory parole by another name. *Id.* Mandatory release is a boon these Plaintiffs will receive because it did not exist at the time they committed their offenses. The mandatory release law definitively shows that when the Alabama Legislature wants to mandate an inmate's release from the ADOC to the Board's supervision it knows how to do so.

### B. As a Matter of Law, Plaintiffs Cannot Show that Defendants Violated Their Equal Protection Rights.

To state an Equal Protection claim, "a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (*citing Ray*, 279 F.3d at 946–47). When an equal protection claim involves a government action to which discretion is essential, **only exceptionally clear proof** will infer that such discretion has been abused. *See Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988); *see also Thorne v. Chairperson Fla. Parole Comm'n*, 427 F. App'x

765, 771 (11th Cir. 2011) (mere "allegations of disparate treatment were not detailed enough to raise [a] right to relief above a speculative level."). In this case, Plaintiffs' allegations fail both steps.

### 1. Plaintiffs cannot establish that they are similarly situated to white inmates.

"Our threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated, since the Equal Protection Clause requires that persons similarly situated . . . be treated alike." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019) (original quotations and citations omitted). For parole decisions, factors include "criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310. "To be similarly situated, comparators must be prima facie identical in all relevant respects." *Matthews v. Town of Autaugaville*, 574 F. Supp. 2d 1237, 1242 (M.D. Ala. 2008) (original quotations omitted) (*quoting Campbell v. Rainbow City, Alabama*, 434 F.3d 1306, 1314 (11th Cir. 2006)); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (the Equal Protection Clause only forbids "treating differently persons who are *in all relevant respects alike*.") (emphasis added).

Although Plaintiffs allege that the Board has discriminated against black inmates, they fail to present any comparators. (Doc. 23-1 at 39–45 (relying on statistics and public critiques of the Board's parole decisions).) But the threshold inquiry in an Equal Protection case is the comparator, *see S&M Brands, Inc.*, 925

F.3d at 1203, and Plaintiffs presented none. (Doc. 23-1 at 39–45.) Plaintiffs have not alleged that they are similarly situated to white inmates who received parole in all relevant respects including "criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310.

At best, Plaintiffs seem to allege that they are similarly situated to violent and non-violent white inmates. *See* Doc. 23-1 at 41. However, while not binding, the Eleventh Circuit found that an inmate's "comparator categories – 'parole violators,' and paroled life-sentenced inmates serving sentences for 'murder,' 'rape,' 'armed robbery,' 'kidnaping,' or 'aggravated sodomy' – *are extremely broad, and do not demonstrate that his self-identified comparators are 'prima facie identical in all relevant respects.'" Taylor v. Nix*, 240 F. App'x 830, 838 (11th Cir. 2007) (emphasis added). Indeed, unlike the inmate in *Fuller*, who at the bare minimum made an attempt at a comparison between "white murderers" and "black rapists", see 851 F.2d at 1310, Plaintiffs offer no other evidence showing that they are similar in any other respect to white inmates. *See generally* Doc. 23-1 at 39–45.

Plaintiffs cannot even establish that they similarly situated to each other. As already shown, all named Plaintiffs have different offenses of varying degrees. The Eleventh Circuit's precedent makes clear that differences in criminal history prevents an assertion that one inmate is similarly situated to another. *Fuller*, 851 F.2d at 1310; *see also Taylor*, 240 F. App'x at 838. Moreover, two Plaintiffs admit

that they have had their parole revoked Doc. 25-1 at 2; *see also* Doc. 25-3 at 2,[19] and prior failure on supervised release is another factor which distinguishes them from each other. Plaintiffs do not claim that they have the same institutional history or work performance record. (*See generally* Docs. 1, 23-1.)

Every inmate's parole file is as unique as the inmate. Beyond differences recognized by the courts lie an almost infinite number of distinguishing possibilities. Take, for example, the serving crime. Was it a Class A, B, C, or D felony? Was there a victim or not? If there was a victim, how many? What were the victim(s)' ages? What did the inmate do to the victim(s)? Did the inmate murder, rape, rob, assault, or defraud the victim(s)? Did the inmate commit multiple crimes against the victim(s)? If the crime was a violent one, how violent was it? Did the inmate shoot, stab, strangle, burn, beat, or bludgeon the victim(s)? What lasting injuries did the victim(s) suffer, if any? Were the injuries inflicted intentionally, recklessly or negligently? At the parole hearing, did the victim(s) appear? Did they support or oppose the inmate's parole? How compelling was their testimony? Add in an inmate's criminal history and this list repeats itself for each prior crime (other than victim testimony on completed sentences).

---

[19] Although Plaintiff English complains that he was acquitted of the criminal charge that resulted in the revocation of his parole, this claim is unavailing. *See Whitehead v. U.S. Parole Comm'n*, 755 F.2d 1536, 1537 (11th Cir. 1985) ("even if there had been an acquittal on the criminal charge, the conduct can be the basis of parole revocation."). The fact remains that he has a prior supervision failure which distinguishes him from the named Plaintiffs, putative class members, and potential white comparators who do not.

Similar questions revealing even more distinctions can be asked regarding the other mandatory guideline elements. Institutional behavior: how many disciplinaries, how serious, how recent, what were the facts of each? Risk reduction programming: how many, which ones, how recent, what level of progress within each? And so on with each major explicit and implicit guideline item spawning a myriad of additional questions that further elicit distinguishing material facts. Plaintiffs have not and cannot show a substantially similar comparator. Thus, they have failed to meet their burden.

### 2. **Plaintiffs cannot establish that the Board's decision to deny them parole was based on purposeful discrimination.**

Even assuming *arguendo* that Plaintiffs can satisfy the first step of the analysis, they cannot satisfy the second. Under the second step, the party alleging an Equal Protection violation "has the burden of proving the existence of purposeful discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (original quotations and citations omitted). "To make out an equal protection claim, a plaintiff must prove purposeful, intentional discrimination—and to do that, he must prove that the governmental decisionmaker acted as it did '*because of, and not merely in spite of, its effects upon an identifiable group*.'" *Morrissey v. United States*, 871 F.3d 1260, 1271 (11th Cir. 2017) (emphasis added) (*quoting Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)); *see also Jones v. white*, 992 F.2d 1548, 1573 (11th Cir. 1993) ("Discriminatory purpose implies that the decisionmaker selected a

course of action "because of " its detrimental effects on an identifiable group."). As such, evidence of disproportionate impact, by itself, will not prove discriminatory purpose. *See Joel v. City of Orlando*, 232 F.3d 1353, 1359 (11th Cir. 2000) (original citations omitted); *see also E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987) ("Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause.").

Plaintiffs fail at this step for three reasons. First, they cannot rely on statistics in the context of parole. Second, they cannot impute purported discrimination on the part of others onto the Board. Third, violent criminals are not a suspect class.

### a. Plaintiffs' statistical evidence is insufficient.

Despite the Eleventh Circuit clearly finding that disproportionate impact by itself insufficient, Plaintiffs offer no proof other than purported disproportionate impact. *See generally* Doc. 23-1 at 39–45. For cases involving parole decisions, the Eleventh Circuit rejected the use of statistics because "statistical evidence is ambiguous at best and is 'clearly insufficient to support an inference that any of the decisionmakers . . . acted with discriminatory purpose.'" *Fuller*, 851 F.2d at 1310 (*quoting McCleskey*, 481 U.S. at 297); *see also Taylor*, 240 F. App'x at 838 (disparity of parole in statistics for inmates with differing offenses insufficient). Accordingly, the alleged racial disparity which Plaintiffs rest their case is insufficient.

Further, Plaintiffs' claim that awareness of racial disparity can establish purposeful discrimination by the Board also fails. *See* Doc. 23-1 at 42–44. At the outset, in none of the cases cited by Plaintiffs did the Eleventh Circuit deal with alleged racial disparity in the context parole decisions. *See generally* Doc. 23-1 at 42–44. Unlike Plaintiffs' cited cases, the Eleventh Circuit holds that parole decisions rest on many factors which are specific to the individual being considered, and thus, mere awareness of alleged racial disparity cannot satisfy the exceptionally clear proof requirement. *See Fuller*, 851 F.2d at 1310.

Indeed, Plaintiffs admit, while taking her remarks out of context, that Board Chair Gwathney did not care about statistics. (Doc. 23-1 at 42.) To supply the full context:

> [Parole cases] ***are all very individualized decisions for that one particular inmate***, so whatever a statistic may or may not show, I'll leave that up to those members of the media to make of that whatever they want, . . . But as long as I'm sitting on this board, ***I will decide based on every individual that comes in front of me***, and whether or not that person can be released without being a danger to public safety. This board is not driven by statistics.

(Doc. 24-8 at 4–5 (emphasis added). Board Chair Gwathney's position is consistent with the prior Board's position when, under SB67, it adopted the 2016 parole guidelines. (*Compare* Doc. 24-8 at 4–5 *with* Ex. E ("***the paroling decision is case specific . . .***") (emphasis in original).) Further, Board Chair Gwathney's statement is consistent with the recognition by United States Supreme Court and the Eleventh

Circuit that parole decisions rest on facts that are unique to the individual being considered by the Board. *See Greenholtz*, 442 U.S. at 8, 9–10, 14–15; *see also Fuller*, 851 F.2d at 1310. At worst, Board Chair Gwathney's statement shows an indifference to statistics in favor of focusing on and considering the facts specific to the individual in front of her, and such a sentiment will not support a claim of purposeful discrimination. *See e.g.*, *Feeney*, 442 U.S. at 279; *Morrissey*, 871 F.3d at 1271; *Jones*, 992 F.2d at 1573.

### b. Plaintiffs' cannot impute the purported racial animus of others to the Board.

Moreover, to the extent that Plaintiffs complain about the actions of former Board Director Graddick, their complaints against him cannot establish "purposeful discrimination" by the Board. *See* Doc. 23-1 at 18, 44; *see also* Doc. 26 at 7–8. First and foremost, as Plaintiffs lament, Director Graddick was not an employee of the Board, but rather was appointed by the Governor. ALA. CODE § 15-22-21(a) (2019). The Board also had no control over employment decisions. ALA. CODE § 15-22-21(b)(1) (2019). For his part, the former Director had no authority as a matter of law to vote in parole cases. ALA. CODE § 15-22-21(b) (2019).

Even if Plaintiffs could prove a racial animus on the part of the former Director, the Board was (and remains) powerless to fire or discipline the Director or interfere in his agency decisions. Moreover, Director Graddick did not and could not vote on parole for any of the named Plaintiffs or any member of the putative classes.

Consequently, there is no principled way to impute onto the Board any improper racial animus Plaintiffs could prove existed in Director Graddick's acts. They have cited no authority permitting such a transfer of intent, and even if they could it would land on Lyn Head's Board and not the Defendants who are the present incumbents.

Plaintiffs have utterly failed to prove a racial animus on the part of the Governor or the Attorney General – in fact they have completely undercut such a claim by asserting that they acted to change the parole laws following murders committed by a white parolee. (Doc. 23-1 at 8.) Additional facts further undercut any notion that Governor Ivey has made decisions regarding the parole board in a racially biased way. In appointing Defendant Simmons – months before Plaintiffs filed this action – she created a majority black Board. Any assertion that the Governor has acted in a racially discriminatory manner is so bereft of supporting evidence that it would warrant the imposition of sanctions.

However, even if Plaintiff could prove such an animus, again, it cannot be imputed to the Board. Even though Plaintiffs allege that the Board has relied on the input of Governor Ivey and Attorney General Marshall when making parole decisions, *see* Doc. 23-1 at 16–17, 22, 29 n.20, they are both required and permitted to do so. ALA. CODE § 15-22-2(a)(3) (2016, 2019) (requiring that the Board receive stakeholder input including that of prosecutorial and law enforcement entities); *see also Bowers v. United States Parole Comm'n*, 775 F. App'x 504, 521–22 (11th Cir.

2019) (finding that the U.S. Parole Commission did not act with bias against an inmate when it considered negative input from the Department of Justice); *see generally Bulls v. Warden*, No. 20-10882-E, 2020 WL 3053502, at *1 (11th Cir. May 13, 2020) (finding that the Board could deny parole based on negative stakeholder input).

### c. Violent offenders are not a suspect class.

Plaintiffs also complain that the Board has "eliminated" parole for violent offenders. See Doc. 23-1 at 20–21, 41. As an initial matter, the data does not support Plaintiffs' claim. Since at least January 31, 2016, the Board granted parole to more violent offenders than non-violent inmates. (Ex. RR at Attchs. B-D.)

But even were the data supportive of Plaintiffs' claims, Eleventh Circuit precedent holds that stricter requirements for violent offenders constitutes a legitimate and rational governmental policy. *See e.g.*, *Cook v. Wiley*, 208 F.3d 1314, 1323 (11th Cir. 2000) (the Bureau of Prisons's refusal to consider an inmate convicted of a violent crime for parole was part of a "legitimate governmental objective of ***preventing the early release of potentially violent criminals***.") (emphasis added); *Conlogue v. Shinbaum*, 949 F.2d 378, 380 (11th Cir. 1991) ("Denying IGT to prisoners based on their criminal record is rationally related to the state's interest ***in preventing the early release of serious offenders***.") (emphasis added); *Thornton v. Hunt*, 852 F.2d 526, 527 (11th Cir. 1988). Thus, even if the

Board was focused on denying parole to violent offenders it is constitutionally acceptable to do so. *See Greenholtz*, 442 U.S. at 15 (parole decisions include consideration of the "gravity of the offense"). In short, violent offenders are not a suspect class.

As a final note on equal protection, the United States Supreme Court warned the federal courts against using the Equal Protection Clause as a means to effect the legitimate policy choices of a legislature. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "Policy determinations cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Houston v. Williams*, 547 F.3d 1357, 1363 (11th Cir. 2008) (original quotations and citations omitted). Given that consideration of stakeholder input and preventing early release for violent offenders are legitimate and rational governmental purposes, Plaintiffs cannot establish that the Board acted with purposeful discrimination when it denied them parole.

## III. THE COURT SHOULD NOT GRANT THE REQUESTED INJUNCTIVE RELIEF.

Plaintiffs demand that the Board review 1,000 of the nearly 26,000 parole denials since October 1, 2019. *See* Doc. 23-1 at 57. Further, Plaintiffs want "revised parole decisions for those individuals such that the decisions deviate from the pre-

2019 Parole Guidelines and/or parole recommendations for all applicants with ORAS "low" and "moderate" risk assessments in no more than 20% of cases per month". (*Id.*) Where the Board is permitted to deny parole under Plaintiffs' quota system, it must prepare a writing listing all of the evidence it relied upon – even if it is contained in the parole file. (*Id.*) The inmate would be entitled to a copy of the writing and be allowed to submit a rebuttal (incidentally, inmates already have the ability to submit anything they wish to the Board – including in rebuttal to a negative Board Action Sheet). Plaintiffs also want reconsideration set offs for ***all*** denials to be no more than two years. (*Id.* at 58).

Plaintiffs also seek a quota system limiting the Board to denying parole in no more than 20% of the reviewed cases per month. (Doc. 23-1 at 58.) This mindbogglingly dangerous scheme means that if the Board has already hit its 20% quota in the first week of a given month every single Jimmy Spencer-like inmate (and it is imperative that the Court recall that Spencer had a "moderate" risk assessment) who comes up for parole for the rest of the month gets out of prison to prey on the citizens of Alabama.

To obtain the relief they seek, the Plaintiffs have to meet the highest burden possible in a preliminary injunction motion because they are trying to upset the status quo which resulted from legislative enactments over four years ago. *Harris*, 596 F.2d at 680; *Church*, 30 F.3d at 1342. While it is inescapable that Plaintiffs must meet the

higher legislative enactment burden due to their stated goal of obtaining an order reversing the changes made HB380 to those changes made by SB67, they are also seeking to change the status quo. *See* Doc. 23-1 at 49 (referring to the "status quo ante"). Plaintiffs' invocation of the status quo ante is a backhanded way of avoiding their heightened burden. The status quo is indisputably the current law that has been in effect for over four years. Regardless, Plaintiffs are not entitled to a preliminary injunction regardless of the standard the Court uses.

As demonstrated immediately above, Plaintiffs cannot show they have valid claims, let alone prove a substantial likelihood of success on the merits. *Alfieri*, 23 F.4th at 1290–91. Even if they had valid claims, they cannot meet the rest of their preliminary injunction burden. Consequently, the Plaintiffs are not entitled to the relief sought.

Turning to the second preliminary injunction element, proving a substantial likelihood of a constitutional violation does not constitute irreparable harm. *See Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1225 (11th Cir. 2021) ("This argument finds no support in our precedents. In fact, those precedents cut the other way."), *vacated as moot*, 20 F.4th 1385 (11th Cir. 2021); *see also Siegel v. LePore*, 234 F.3d 1163, 1177–78 (11th Cir. 2000) (citations omitted). Plaintiffs have shown no irreparable injury for the same reason that the Board is entitled to sovereign immunity – Plaintiffs have no right to parole. *Greenholtz*, 442 U.S. at 7;

*Turner*, 2023 WL 4672503, at *7; *Thomas*, 691 F.2d at 488–89; *O'Kelley*, 53 F.3d at 321. With no federal right to parole (*Greenholtz*), and no way to earn it under Alabama law (Alabama Code § 15-22-26(a)), Plaintiffs can prove no set of facts that would result in an automatic grant of parole. Thus, they have no irreparable injury.

Plaintiffs argue that the Eleventh Circuit has held that the deprivation of liberty alone constitutes an irreparable injury. *See* Doc. 23-1 at 45 (*quoting United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988). *Bogle* has nothing to do with parole. In *Bogle*, the Eleventh Circuit was dealing with a challenge to **new federal sentencing guidelines – not parole**. 855 F.2d at 708.

With respect to the portion of the *Bogle* opinion cited by Plaintiffs, the old sentencing guidelines at issue would have permitted probation whereas the new sentencing guidelines would require some period of incarceration. 855 F.2d at 710. This necessarily meant that for some criminal defendants, the constitutionality of the new guidelines literally meant the difference between being incarcerated or not. *Id.* It is axiomatic that incarceration impacts a liberty interest.

In the instant case, each of the named moving inmate Plaintiffs and putative class members has been lawfully convicted and sentenced to the term of imprisonment they are currently serving. Regardless of the parole regime at issue – whether pre-SB67, SB67, or HB380 – as a matter of state and federal law, Plaintiffs **have no right to parole**. *Greenholtz*, 442 U.S. at 7; *Turner*, 2023 WL 4672503, at

*7; *Thomas*, 691 F.2d at 488–89. They have no liberty interest in parole. *Id.* They can, in fact, be constitutionally required to serve the entirety of their sentences. Accordingly, *Bogle* is of no assistance whatsoever in determining whether Plaintiffs have shown an irreparable harm.

With no way to prove irreparable injury, Plaintiffs likewise cannot meet their third preliminary injunction burden. On the scale of irreparable injury versus the damage caused by the proposed injunction, Plaintiffs start at zero – because they have no right to parole they have no injury, let alone an irreparable injury. Assuming momentarily that the Board could not show any harm the proposed injunction would cause to it, the scales even out requiring the Court to deny the motion. *Alfieri*, 23 F.4th at 1290–91. However, Plaintiffs proposed injunctive relief would cause great harm to the dignity of the state of Alabama, others not a party to this case seeking relief from the Board, and, ironically, the inmate Plaintiffs themselves. Furthermore, the impact to public safety by the indiscriminate release of inmates each month after the 20% quota has been exhausted also cuts against the Plaintiffs with respect to the fourth preliminary injunction element.

The least of these harms is the violation of Eleventh Amendment sovereign immunity and the principles of federalism that an Order from this Court granting the requested relief would necessarily embody. *Pennhurst*, 465 U.S. at 106; *S&M Brands*, 925 F.3d at 204-05. To comply with the provisions requiring a statement of

evidence relied upon when denying parole, the Board would have to violate the statutory parole file privilege that the Alabama Supreme Court has specifically found to create "an absolute privilege that the Board is legally bound to obey." ALA. CODE § 15-22-36(b); *Ex parte Alabama Bd. of Pardons and Paroles*, 814 So. 2d 870, 873 (Ala. 2001). Moreover, were the Court to order the citation of evidence remedy, it would do so contrary to the United States Supreme Court's finding that the Constitution has no such requirement. *Greenholtz*, 442 U.S. at 15 ("we find nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular "evidence" in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release.); *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) ("The Constitution," we held, "does not require more.") Chillingly, compliance with an Order from this Court directing the Board to reveal evidence contained in a parole file would require each of the individual Board members to arguably commit a felony under Alabama law. ALA. CODE § 15-22-39 (Any member of the Board of Pardons and Paroles who knowingly or willfully neglects or fails to perform any duty enjoined upon him by the provisions of this article [§15-22-36 is in the article] is guilty of a felony and, upon his conviction, shall be punished by imprisonment in the penitentiary for not less than one nor more than five years . . .")

Plaintiffs' counsel has previously argued to the undersigned that the Board would not have to hold hearings on the 1,000 cases to be reviewed each month because they are merely asking for a "revised decisions." Said argument, which the undersigned expects Plaintiffs' counsel will advance again, utterly ignores Alabama's parole statutes and shows a fundamental misunderstanding of the very ORAS risk assessment system their requested relief is premised upon. Built into Plaintiffs' relief is that 80% of all inmates who were "low" or "moderate" on either the revised guidelines or ORAS risk assessment will be guaranteed parole no matter how badly they have done in prison since their initial denial. *See* Doc. 23-1 at 57 (permitting denial in "no more than 20% of cases per month".) However, the Board has no power to grant parole unless it provides certain persons including victims and other stakeholders with a minimum of 30 days' notice. ALA. CODE §§ 15-22-36(d), (e) (2016, 2019). The Board cannot grant parole other than in an open public hearing at which the victim has a right to be present. ALA. CODE § 15-22-23(b); ALA. CODE § 15-23-79(b).

Additionally, as Plaintiffs have correctly noted, the Board is required to make use of risk assessments. (Doc. 23-1 at 13 *quoting* ALA. CODE § 15-22-26(a)(1).) However, ORAS risk assessments are only valid for six months. (Ex. QQ at 7.) Consequently, every inmate who was denied parole 181 days prior to the Board getting to their file or served enough time to trigger the use of a different ORAS tool,

will – by law – require a new risk assessment. This necessarily means that the Board's IPOs will likely have to perform new risk assessments on most of the roughly 26,000 cases to be reviewed. Considering that in 2023, the Board considered 3,583 inmates for parole (less than 300 per month), the IPOs would have to **triple** the number of assessments they do each month **just to keep up with the reviews.**

The Board cannot comply with the proposed order unless it violates – at minimum – the open hearing, notice, and risk assessment requirements of state law. As noted previously, each violation of a statutory requirement in the parole article would subject the Board members to potential felony prosecution. ALA. CODE § 15-22-39. Leaving aside the violence an accommodating Order would do to the sovereignty of the state, the Board member Defendants would have to either risk criminal prosecution, contempt of this Court, or simply resign to avoid being placed in peril of their own liberty (acts which would bring paroles in Alabama to a screeching halt because it seems highly unlikely that the Governor would find anyone willing to take on such a personal risk).

With respect to reconsideration set offs, *see* Doc. 23-1 at 58, the Plaintiffs are demanding that he Court not merely interpret state law the way they self-interestedly see it, they are actually asking the Court to write **new state law.** Current Alabama law limits the two-year set off maximum **only** to non-violent inmates serving sentences of 20 years or less. ALA. CODE § 15-22-37(b)(4). The legislature has set

no maximum set off time for any other kind of inmate, but the Board has done so on its own making the maximum five years. ALA. Admin. CODE § 640-X-3-.03. Plaintiffs have cited no federal law holding that longer set offs are unconstitutional. Indeed, the United States Supreme Court approved three year set offs. *Morales*,514 U.S. at 501-03.

While Plaintiffs' demand that set offs for all inmates not exceed two years would not violate Alabama law, per se, it would place this Court in the role of the state legislature and the Board crafting new state statutory and administrative law out of whole cloth. Eleventh Amendment immunity, the separation of powers doctrine, and federalism prohibit the Court from so acting. *Pennhurst*, 465 U.S. at 106; *S&M Brands*, 925 F.3d at 204-05. It should not willingly do so on the record before it.

Were the Board to go ahead and risk criminal prosecution and grant parole on the basis of four-year-old risk assessments without a public hearing or notice to victims, the negative impact on public safety is incalculable. Look at the Plaintiffs themselves. Plaintiff Moore beat a baby to death. Plaintiff Council is serving life for murder. Plaintiff Ptomey seriously injured his robbery victim. Plaintiff McDole shot his victim. Plaintiff Walker stabbed her victim multiple times. Plaintiff Cartwright beat his victim with a flashlight and a walker until the latter broke. These are individuals who have proven by their conduct that they are a threat to the public.

Plaintiffs' putative class is full of individuals who are as bad a risk if not worse. Again, the Court should be mindful that if it adopts Plaintiffs' relief the Board will be ***required each month*** to order the release to parole of 80% of inmates with outdated low or moderate risk assessment/guideline scores no matter how badly they have behaved since they were scored. And, again, Jimmy Spencer scored as a moderate risk. The devastating detriment to public safety that would result from Plaintiffs' demanded relief becomes apparent when considering that a large number of these denials to be reviewed took place up to four years ago. (Doc. 23-1 at 57 (requiring reviews of all denials since October 1, 2019.)

Hypothetical examples illustrate the point. Take two inmates who both scored as low on their ORAS risk assessment in November 2019. One inmate's prison record deteriorated to the point that he refused to participate in programming, had to be removed from work release, and racked up an average of five serious disciplinaries a month including assaults on correctional staff and other inmates. The second hypothetical inmate escaped from ADOC custody by walking off of his work release assignment (something that has happened all too frequently in recent years) and went on a murder and rape spree before being recaptured. Either one of these inmates would likely not currently score low or moderate on a risk assessment or come close to looking favorable on guidelines. But under Plaintiffs scheme, the Board would be forced to release each of them if, at the time they were reviewed,

the Board had already exhausted its allotted 20% of denials. (Doc. 23-1 at 57.) The harm to public safety caused by what can most charitably be called an unserious proposal is incalculable.

Finally, Plaintiffs' demanded relief is detrimental to their own interests – particularly the interests of the putative class. As previously discussed, the Board hears less than 300 parole cases a month in addition to hundreds more pardon applications and parole violation proceedings. (Ex. QQ at 6-7.) In 2023, they heard 1,833 pardon cases and hearing officers conducted 1,398 parole court hearings that the Board ultimately had to review. (*Id.*) Board Operations processed 1,462 CERV applications that had to be processed within 45 days. (*Id.* at ¶20; *see also* ALA. CODE § 15-22-36.1.)

It is simply impossible for IPOs to conduct 1,000 more assessments each month, for Board Operations to process 1,000 more files, and for a three-member Board to hold hearings on 1,000 more files per month without completely shutting down new parole considerations, pardon application reviews, and parole violation hearing report considerations. (Ex. QQ at 7–8.) A 1,000 file a month order would also place Board Operations between the Scylla and Charybdis of obeying this Court's Order or violating the CERV processing statute. ALA. CODE § 15-22-36.1.

Should the Court issue Plaintiffs' proposed order, the Board would have no choice but to freeze the parole docket and shut down processing everything else that

it does – likely opening itself up to new lawsuits from, for example, those would not get their voting rights restored. The putative class members currently on the docket would not get a hearing. Putative class members who would be next up on the docket would not get a hearing. And this would last for the roughly 26 months it would take to review the 26,000 parole denials demanded by the Plaintiffs. Given this detriment to themselves and the putative class members, the weight on Plaintiffs' side of the balance goes from zero to a negative number pushing the scales towards the Board.

## IV. THE REQUESTED CLASS CERTIFICATION IS NOT CLEARLY DEFINED AND ACERTAINABLE GIVEN PLAINTIFFS' CLAIMS AGAINST THE BOARD.

For purposes of the instant motion, Plaintiffs seek a provisional certification of a parole denial class consisting of "[a]ll incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were denied parole while in the custody of ADOC at any time between the earliest applicable statute of limitations and the date a class is certified." Doc. 1 at 99. They further seek certifications of sub classes consisting of those class members who are black and provided work through the ADOC work release program. *Id.* A class may be certified only if all of the requirements are met including numerosity, common questions of fact or law, typicality of the claims and defenses, and the representative parties will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a). Plaintiffs bear the burden of establishing every element

required for class certification. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009). For purposes of judicial economy, the Board adopts and incorporates all of the arguments against class certification made by the Governor and the Attorney General as if set forth herein, *in extenso*, to which the Board adds the following supplemental argument.

The overarching reason why the parole denial class and related subclasses cannot be certified in this case is simply this – every inmate is different. All of the facts surrounding whether an inmate should be granted parole or not is different. As Jimmy Spencer's case demonstrates, parole decisions are neither required to be, nor are they capable of, being reduced to a mathematical formula in which every "moderate" or "low" score guarantees an inmate may be given parole[20] with the absolute certainty that they will remain law abiding citizens for the rest of their lives. Moreover, as set forth in the affidavit of Scott Perkins, the facts contained in any given parole case are as unique as the inmates themselves. (Ex. QQ at ¶¶ 8–9.) Because of this, and because of the absolute discretion afforded to the Board – even under SB67 – each parole-eligible inmate is a class of one and thus class certification is inappropriate under the facts alleged in the Complaint and preliminary injunction motion. Fed. R. Civ. P. 23(a)(1).

---

[20] Unless they happen to find themselves considered during the time the Board would still be permitted to deny parole under Plaintiffs' 20% rule (which, of course, opens the Board up to further litigation because Plaintiffs' quota system has arbitrariness built into it as a feature).

The arguments contained in the preceding sections of this brief also demonstrate why Plaintiffs cannot satisfy either the commonality or adequacy requirements. Regardless of whether the Court considers the main class or the subclasses, there are extremely important variations that prevent class certification. Take, for example, Plaintiff Ptomey. He has already sued the board on ex post facto and equal protection grounds and lost in state court thus precluding him from even being a Plaintiff in this case – let alone a class representative. Any putative class member to whom res judicata applies would be similarly barred. The same is true for Plaintiffs Pritchett, Campbell, and Cartwright whose claims are barred by the statute of limitations – as are the claims of any putative class member who was considered for parole more than two years prior to the filing of the instant lawsuit – a fact Plaintiffs' themselves implicitly recognize. Doc. 1 at 99.

The Court should also consider the relevant time period here for purposes of the ex post facto claim which are three in number: 1) pre-SB67 era; 2) the SB67 era; and 3) the current post-SB67 era. ***All of the named inmate Plaintiffs committed their crimes prior to SB67 being drafted let alone passed into law***. Accordingly, they have no ex post facto claim and cannot serve as class representatives for those who committed their offenses while the provisions of SB67 were in effect. Moreover, ***no inmate*** who committed their offenses before January 31, 2016, or on or after October 1, 2019, has a colorable ex post facto argument (assuming,

*arguendo*, that HB380 could be construed as violating the ex post facto clause). Even then, as the United States Supreme Court has noted, for purposes of an ex post facto claim a plaintiff "must show that as applied to *his own sentence* the law created a significant risk of increasing his punishment." *Garner,* 529 U.S. at 255 (emphasis added).

For an equal protection claim, "To be similarly situated, comparators must be prima facie *identical in all relevant respects*." *Matthews*, 574 F. Supp. 2d at 1242. The Eleventh Circuit has enunciated a non-exhaustive list of relevant factors in the parole context including "criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310. Even before the "etc.", *Fuller*'s list of factors clearly demonstrates that a class fails the numerosity, commonality, and adequacy requirement because every class member would have to have his or her demographics and "criminal history, nature of the offense, disciplinary record, employment and educational history" of persons who did receive parole since the ending of Plaintiffs' purported golden age of parole. Add in the countless other relevant factors represented by the "etc." (e.g., programming participation, substance abuse history, home plan suitability, risk assessment score, position of the victim and other stakeholders on parole, *etc.*) and it becomes readily apparent that neither the Parole Denial Class nor the Black Parole Denial Subclass can be certified for the equal protection claim.

## V. NO HEARING IS NECESSARY.

As counsel for the state Defendants noted in the scheduling conference, there is no need for the hearing currently set for February 8, 2024. Whether to hold a hearing is within the discretion of the Court. Evidentiary hearings are required on preliminary injunction motions only "where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir.1998).

With respect to the State Defendants' sovereign immunity claim, there are no contested facts or matters of credibility to be resolved. Eleventh Amendment immunity "is a threshold question of jurisdiction." *Gordon v. Bentley*, No. 7:15-CV-02282-LSC, 2016 WL 4379537, at *1 (N.D. Ala. 2016) *citing Black v. Wigington*, 811 F.3d 1259, 1270 (11th Cir. 2016). The arguments raised by Governor, Attorney General, and the Board assert questions of pure law – whether Plaintiff's requested remedies require this Court to find the Board violated state law and enter an Order directing the State Defendants to follow state law. An affirmative answer to this question triggers sovereign immunity and deprives this Court of jurisdiction.

The three versions of § 15-22-26 are in the record as are the other relevant provisions of Alabama statutory and administrative law. The preliminary relief sought by the Plaintiffs is also set forth in the record turns on their interpretation, albeit erroneous, of the relevant Alabama statutes, administrative code, and acts. It

is simply unavoidable that Plaintiffs seek to have this Court Order the Defendants to comply with state law – a remedy that is barred by sovereign immunity under the Eleventh Amendment. *Pennhurst*, 465 U.S. at 106; *S&M Brands*, 925 F.3d at 204-05.

The other joined issues are similarly questions of law in which the facts are largely agreed upon. Where there are disagreements, the Board submits that for purposes of determining whether to hold a hearing, the Court could apply the applicable summary judgment standard – resolve all fact questions in favor of Plaintiffs. Even under that standard, the Board submits the applicable authority mandates a finding in the Board's favor and thus no hearing is necessary. Therefore, the Board respectfully requests that the Court review the Parties' filings and make a ruling without the necessity and added expense of a hearing.

## CONCLUSION

For the reasons set forth above, the Court should deny, *in toto*, Plaintiffs Motion for Preliminary Injunction and Provisional Class Certification. Furthermore, based upon the arguments set forth above – particularly the Eleventh Amendment Immunity Argument – the Board asserts that the Court may decide this matter on the filings and thus no oral argument or evidentiary hearing is necessary.

Respectfully submitted this the 22nd day of January, 2024.

/s/ *Gary L. Willford, Jr.*

**Gary L. Willford, Jr. (WIL198)**
*Assistant Attorney General*
Alabama Board of Pardons & Paroles
301 South Ripley Street, Bldg. D
Montgomery, AL 36104
(334) 353-4495 (phone)
Gary.willford@paroles.alabama.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record.


Done this the 22nd day of January, 2024.

/s/ Gary L. Willford, Jr._____
**Gary L. Willford, Jr.**
Assistant Attorney General