IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT EARL COUNCIL *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | 2:23-cv-00712-CLM-JTA |
| | § | |
| KAY IVEY *et al.*, | § | |
| | § | |
| *Defendants* | § | |

---

## Bama Budweiser's Motion to Dismiss

---

Aaron G. McLeod
Jonathan Metz
Adams and Reese llp
1901 6th Ave. N., Ste 1110
Birmingham, AL 35203
(205) 250-5000
aaron.mcleod@arlaw.com
jonathan.metz@arlaw.com
*Counsel for Bama Budweiser*

# Table of Contents

Introduction ..................................................................................................3

Argument ......................................................................................................6

    1.   Plaintiffs fail to state a claim under the TVPA.........................................6

        A.    Plaintiffs do not plead sufficient facts to make out a plausible claim for a TVPA violation ............................................7

        B.    The TVPA is unconstitutional on its face ..................................10

    2.   Plaintiffs' RICO claim fails because the predicate TVPA claim fails, and because Plaintiffs do not allege sufficient facts as to each element...................................................................................................12

    3.   Plaintiffs do not state a claim for violation of the Alabama Constitution ...................................................................................... 15

    4.   Plaintiffs do not state a claim under the KKK Act, which is unconstitutional ................................................................................ 16

        A.  The Complaint lacks facts showing that Bama Budweiser knew of a conspiracy among the State Defendants or had the power to prevent harm to Plaintiffs ............................................ 16

        B.  The KKK Act is unconstitutional on its face .............................. 19

    5.   Plaintiffs do not state a claim for unjust enrichment.......................... 24

    6.   The organization Plaintiffs lack standing, and in the alternative fail to state a cognizable claim .......................................................................25

Conclusion ................................................................................................ 31

Certificate of Service................................................................................ 31

**Introduction**

In response more to the tone than the substance of the Complaint,[1] Bama Budweiser offers a few preliminary points for context and to inform the Court's perspective.

First, while Plaintiffs are often careful with references to statistics, on occasion the Complaint refers to the racial division of parolees or prisoners as "disproportionately" black.[2] *See* Complaint ¶¶ 2, 8. To take one example, Plaintiffs allege that Alabama's prison population is "disproportionately Black," because while 26.8% of Alabamians are black, "twice that percentage" of Alabama's convicts are black. *Id.* ¶ 8.

But a proportion is simply the relationship of one number to another, and Plaintiffs' loose references to a number as out of proportion to the state population indulge in a *non sequitur*. Implicit in these statements is the assumption that, but for bias, the number of black parolees or prisoners would bear the same relationship to the number of all parolees as the black population does to the state population.

Black economist Dr. Thomas Sowell disabused us of that fallacy when he explained that there is no reason to assume that the distribution of races or demographic groups in a particular class would, absent prejudice, resemble the demography of a population. *See* Thomas Sowell, *Discrimination and Disparities* 6 (2019) (explaining that the belief that "equal" or "comparable" outcomes would exist "among people in various social groups," in the absence of discrimination, does not survive "the test of empirical evidence"). In discussing factors that have led to differing outcomes for groups, Dr. Sowell explained that differences in

---

[1] Which castigates the State of Alabama for modern-day "slavery."

[2] Bama Budweiser will eschew Plaintiffs' circumlocution "incarcerated persons." Plaintiffs are felons and criminals, not merely "incarcerated persons."

median age, for example, are often overlooked, yet income differences between the middle-aged and young adults are "larger than income differences between blacks and whites." *Id.* at 23.  Among ethnic groups, the median age of Japanese Americans is 51 while that of Mexican Americans is only 27. *Id.* at 24, 40.  "How likely is it," he asks, that these two groups would have the same representation in occupations that require long years of education or job experience? *Id.*

Dr. Sowell's discussion of crime data sheds even more light.  About 13% of the U.S. population is black, while the percentage of arrestees who are black is much greater.  *See id.* at 94.  This disparity is cited as evidence of discrimination, but Dr. Sowell points out that this makes as much sense as inferring prejudice from the percentage of black NBA players against whom referees call fouls. *Id.* "Anyone familiar with the NBA would immediately see the fallacy," because the proportion of black players in the NBA "greatly exceeds" the proportion of blacks in the general population. *Id.*  Thus, if the claim is that blacks are targeted for arrest or conviction—or parole denials—we need "objective data on the proportions of particular violations of the law committed by blacks, compared to the proportions of blacks arrested, convicted, and sentenced" for those violations. *See id.* at 94-95.

Homicide statistics are an example, and they demonstrate that the proportion of homicide victims who are black "has been some multiple of" the proportion of blacks in the population for a long time, and the "vast majority" of victims whose killers were identified "were killed by other blacks." *Id.* at 95.  It is therefore "hardly surprising" that the "arrest rate of blacks for homicide is also some multiple of the rate of homicide arrests among whites." *Id.*  What is "relevant . . . is not the proportion of blacks in the general population, but the proportion of blacks among people who commit a particular crime." *Id.*

While Plaintiffs may, in some instances, have alleged or (in other filings) produced evidence that controlled for other factors, such as the nature of the crimes, the arrest rate, the number of victims, the recidivism of a given individual, etc., it is imperative to be on guard, in a case alleging racism, against the profoundly mistaken assumption that if a statistic shows more (or less) of a minority relative to the whole than that minority's demographic relationship to the general population, some racial prejudice may be inferred.

Finally, the context of Plaintiffs' theories is better understood in light of the public records on why they were imprisoned:

- Robert Earl Council pleaded guilty to capital murder and was sentenced to life without parole.  71-CC-1994-000254.00.

- Lee Edward Moore Jr. pleaded guilty to murder and was sentenced to 50 years in prison.  CC-1994-000008.00. Wilcox County.

- Lakiera Shanae Walker was convicted of attempted murder and sentenced to 35 years in prison.  CC-2008-001217.00.  Calhoun County.  She also pleaded guilty to first-degree assault in 2010 and was sentenced to 15 years.  CC-2006-001216.00.  Calhoun County.

- Jerame Aprentice Cole pleaded guilty to three counts of felony first-degree robbery in 2008.  CC-2007-000572.00.  Morgan County.

- Arthur Ptomey pleaded guilty to receipt and possession of a controlled substance in 2002.  DC-2002-003681.  Jefferson County. He pleaded guilty to a felony count of burglary in the third degree in 2007.  DC-2007-003862.00.

- Frederick D. McDole pleaded guilty to a felony count of first-degree assault and was sentenced to 21 years in prison.  CC-2008-003553.00.  Jefferson County. He also pleaded guilty to third-degree burglary in 2008.  DC-2007-003862.00.  Shelby County.

- Lanair Pritchett pleaded guilty to two counts of first-degree robbery and one count of reckless driving in 2008.  CC-2007-

004735.  Jefferson County.  He was sentenced to 20 years in prison.

- Alimireo English pleaded guilty to a felony count of distribution and furnishing of a controlled substance in 2012.  CC-2011-001856. Baldwin County.

- Toni Cartwright pleaded guilty to a felony count of first-degree assault and first-degree robbery in 2011.  CC-2011-001725.00. Madison County.  She was sentenced to 20 years in prison.

What we have, then, are two murderers, an attempted murderer, multiple violent felons, robbers, burglars, and drug dealers.  And they come into this Court complaining about having to work for a beer distributor.[3]

## Argument

### 1.    Plaintiffs fail to state a claim under the TVPA.

To state what is called a "beneficiary claim" under the broad language of the Trafficking Victims Protection Act, 18 U.S.C. § 1595(a), a plaintiff must "plausibly allege that the defendant (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit," (3) that violated the TVPA as to the plaintiff, and (4) "that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPA as to the plaintiff."  *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 719, 723, 726 (11th Cir. 2021); *see also K.H. v. Riti, Inc.*, 2024 WL 505063, *2-3 (11th Cir. Feb. 9, 2024) (clarifying that allegations of financial benefit alone are not enough to allege the enterprise element).  The second element is also referred to as "participating in a venture."  *Red Roof Inns*, 21 F.4th at 725.  The last element requires allegations that a defendant "have either actual or constructive knowledge that the venture . . . violated the TVPRA as to the plaintiff."  *Id.* at 725-26.

---

[3] Bama Budweiser adopts and incorporates all arguments asserted in motions to dismiss by other employer defendants, to the extent applicable.

Surprisingly, there is no prison-inmate exemption in the TVPA. *See Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277-78 (11th Cir. 2020); *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 537 (5th Cir. 2021); *see also Burrell v. Staff*, 60 F.4th 25, 37-38 (3d Cir. 2023) (an example of a TVPA case involving a work-release program for convicts, where access to work release was conditioned on "dangerous, nearly unpaid" labor).[4]

A.      Plaintiffs do not plead sufficient facts to make out a plausible claim for a TVPA violation.

First, Plaintiffs do not allege sufficient facts to show that Bama Budweiser participated in some joint venture or enterprise that involved "risk and potential profit." The Complaint says that Bama Budweiser participated in the State's correctional work-release program and "benefit[s] from the forced labor of" felons, *see* Complaint ¶ 10, but does not allege facts to support the idea that this arrangement with the work-release system involved "risk" to Bama Budweiser, nor for that matter does the Complaint say what "potential profit" was involved, since there is no allegation that Plaintiffs worked *at Bama Budweiser* for less pay than free employees did. *See Red Roof Inns*, 21 F.4th at 725. Plaintiffs never allege that Bama Budweiser paid Plaintiffs less than other workers so as to realize an illicit profit, and Plaintiffs never explain what "risk" Bama Budweiser faced in having an agreement with the State to employ convicts on work release. (The undersigned assumes that Plaintiffs do not imply that the risk would be the prisoners themselves committing further crimes while out of jail.) The Complaint vaguely alleges that some Defendants "**sometimes**" "pad their profits" by paying

---

[4] Appellate courts do not appear to have addressed whether they understand Congress to have intended, in the TVPA, to more or less outlaw state penal systems' forced-labor programs, as Plaintiffs effectively allege here. The *Burrell* case comes disturbingly close.

wages below the legal minimum, but it contains no plausible allegations that this actually occurred as to Bama Budweiser and the labor of any Plaintiff, so the claim fails the *Twombly/Iqbal* test on this element.  *See* Complaint ¶ 12 (emphasis added).  In fact, Plaintiffs admit that private employers using work-release labor "agree to pay the 'prevailing wage' for the jobs" they perform, and that this is an "obligation" of participating in the program in the first place.  *Id.* ¶ 20.

That leads to the next flaw in the allegations: the Complaint never alleges that any Plaintiff *ever worked for this Defendant*.  Nowhere in the voluminous Complaint does a single Plaintiff allege that he or she worked for Bama Budweiser. *See* Complaint ¶¶ 145-54.  This one gap alone is enough to doom the TVPA claim against Bama Budweiser.  Plaintiffs cannot state a claim that Bama Budweiser participated in an unlawful work-release venture *as to Plaintiffs*, without an allegation that any Plaintiff worked there.  *See Red Roof Inns*, 21 F.4th at 725-26.

Finally, Plaintiffs do not allege facts to show how Bama Budweiser knew or should have known the work-release system was breaking the law.  Alleging this properly might mean stating that a defendant was part of imposing "extremely poor working conditions" or provided "direct on-site supervision" of the unlawful program, as in *Burrell*.  60 F.4th at 40.  General allegations, however, that defendants "were aware" of the unlawful conditions of work but that do not "state any facts supporting that general conclusion" are insufficient.  *Id.* at 41 (affirming dismissal of TVPA claims).  In fact, the Eleventh Circuit has analogously held, as to the participation element, that even allegations of financial benefit by a defendant who was said to have observed signs of sex-trafficking in hotel rooms the defendant rented out, were not enough to state a claim for *participating* in the venture.  *K.H.*, 2024 WL 505063 at *4.

Plaintiffs do not offer even that much by way of specificity here.  Under *Red Roof Inns* and *K.H.*, allegations that Bama Budweiser actually *observed*

unlawful coercive methods by the State Defendants or others would not be enough to allege participation. But Plaintiffs plead only conclusions. The Complaint never sets out what facts make it plausible that Bama Budweiser knew or should have known that the work-release program was wrongfully coercing Plaintiffs to get in the van and show up at work. Complaint ¶¶ 140-43, 183, 210. Instead, Plaintiffs say only that what they allege to be "violent conditions" in Alabama prisons were "broad public knowledge," and that the employer defendants "know or should know of these conditions." Complaint ¶ 140. And they say Bama Budweiser, as a member of the group of employer defendants, "knew or should have known that" the State Defendants "were conspiring" to deny parole along racial lines. *Id.* ¶ 142.

But Plaintiffs never say *why* that is so. The Court will search in vain for concrete, specific facts in the Complaint that would make it plausible for Bama Budweiser (without being lumped in shotgun-style with other employer defendants) to have known that these Plaintiffs were being discriminated against or coerced to work. (Nor, for that matter, do Plaintiffs explain what relevance the parole system has to this Defendant, as there are no allegations Bama Budweiser is involved in the parole system.) As to Bama Budweiser, Plaintiffs allege only that it "knew or should have know [sic] that its lucrative enterprise with ADOC" depended on coerced labor—but here again, the Complaint never alleges what *facts* placed this Defendant on actual or constructive notice of an illegal scheme. *Id.* ¶ 183.

Plaintiffs offer, in sum, only conclusions, not facts. They fail to state a plausible claim for a TVPA violation against Bama Budweiser.

B.    The TVPA is unconstitutional on its face.

Bama Budweiser understands the Court is bound by precedent but makes this argument to preserve the issue for further review.  As noted above, the TVPA has been interpreted so broadly that it is tantamount to the federal abolition of states' use of forced labor as a punishment, despite the Thirteenth Amendment's specific carve-out for convicted criminals, and despite the lack of any constitutional grant of power to Congress to limit how states punish felons, outside of what was cruel and unusual.  If that is indeed what the TVPA accomplishes, it represents a breathtaking arrogation of power by Congress wholly at odds with our system of federalism, contrary to the Tenth Amendment, and in defiance of the long-settled absence of a federal police power.  It is not for Congress to determine whether convicted felons may be forced to work instead of being a captive burden on the taxpayer.

The Thirteenth Amendment is no basis for the TVPA because it expressly excludes from its ban on involuntary servitude "punishment for crime" of which a party is "duly convicted."  U.S. Const. amend. XIII.  (This likely explains why Plaintiffs do not assert a Thirteenth Amendment claim.)

Nor is the Commerce Clause a source of power to Congress to interfere with states' forced-labor or work-release programs for felons, despite cases like *United States v. Evans* holding otherwise.  The Supreme Court's opinions allowing Congress to regulate activity that is itself undisputedly neither commerce nor interstate have flouted any reasonable notion of what "interstate commerce" is or how much power the Framers intended the central government to have.  *See* Raoul Berger, *Judicial Manipulation of the Commerce Clause*, 74 Tex. L. Rev. 695, 715 (1996) (stating that the "precedents of the 'past 60 years'" are "entitled to no more respect than the Court accorded those of the prior 140 years").  As Berger put it, "repetition does not legitimate usurpation."  *Id.*

Justice Thomas agrees that the Court has broken free from its constitutional anchor: "By holding that Congress may regulate activity that is neither interstate nor commerce under the Interstate Commerce Clause, the Court abandons any attempt to enforce the Constitution's limits on federal power." *Gonzales v. Raich*, 545 U.S. 1, 58 (2005) (Thomas, J., dissenting).  The Commerce Clause "empowers Congress to regulate the buying and selling of goods and services trafficked across state lines," but does *not* empower Congress to meddle with "all economic or gainful activity" that has some "attenuated connection to trade or exchange." *Id.* (quoting caselaw); *see also United States v. Lopez*, 514 U.S. 549 (1995) (Thomas, J., dissenting); *but see United States v. Evans*, 476 F.3d 1176, 1178 (11th Cir. 2007) (affirming the deeply flawed view that the Commerce Clause allows Congress to regulate not just interstate commerce but "activities that substantially affect interstate commerce") (citing caselaw).

The alleged facts here make this case a perfect example of why the Commerce Clause does not justify the TVPA.  The theory is that Bama Budweiser contracted with the State of Alabama itself, or one of its agencies, for work-release prisoners to labor outside the walls of the jail.  The economic activity here is literally a transaction *with* a State and *within* a State, and thus by definition is not commerce across state lines, nor is there any allegation that Plaintiffs worked for Bama Budweiser outside of Alabama (or within it, as noted above).  Even if Plaintiffs did work for this Defendant, that is merely the provision of labor within a State as part of a contract with the State itself.  That is not commerce, nor is it interstate in nature.[5]

---

[5] See also Raoul Berger, *Federalism: The Founders' Design* 153-54 (1987) (arguing that any construction of the Commerce Clause that "conduces to unlimited federal power, to invasion of [the states'] inviolable domain . . . violates the original design").

A further constitutional infirmity the TVPA suffers from is its intrusion into state criminal law and general police power, an area firmly dedicated to the states exclusively.  The Tenth Amendment is, after all, not decorative language.  *Cf. Bond v. United States*, 572 U.S. 844, 857 (2014) (refusing to read a statute so as to intrude on "traditional state criminal jurisdiction").  In fact, the Supreme Court has said that "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity."  *Id.* at 858.  And even during the tumultuous and judicially expansive 1960s, the Court still managed to recognize the "settled mandate" to not construe a federal statute as displacing the "historic police powers of the States" unless that was the "clear and manifest purpose of Congress."  *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146-47 (1963).

The TVPA, however, interferes with this traditionally state sphere of authority by effectively abolishing forced labor as a punishment, despite its lack of any explicit reference to states' penal systems and their use of work-release or forced-labor programs as a form of punishment (or, indeed, as a form of lenity).  If prison officials cannot coerce a violent convicted felon to work (for free or otherwise), including on pain of punishment for refusal (with solitary confinement for example), then Congress has in essence blotted out an entire aspect of states' customary criminal-justice powers without having said so, and in the teeth of the foundational balance of power between state and federal government.  The statute is, for that reason, void under our Constitution.

**2.    Plaintiffs' RICO claim fails because the predicate TVPA claim fails, and because Plaintiffs do not allege sufficient facts as to each element.**

If a plaintiff alleges a RICO violation with the "predicate acts" of racketeering activity being TVPA violations, the dismissal of the TVPA claim necessarily means the dismissal of a RICO claim dependent on them.  *Garcia-*

*Lopez v. Waste Mgmt. of Tex.*, 2022 WL 17547458, *2-3 (5th Cir. Dec. 9, 2022); *see also Burrell v. Staff*, 60 F.4th 25, 41-42 (3d Cir. 2023).  Because the predicate acts Plaintiffs allege here as the basis for their RICO count are the supposed TVPA violations, the RICO claim (Count II) must fail since, as shown above, Plaintiffs do not state a claim for a TVPA violation against Bama Budweiser.  Complaint ¶¶ 216, 218.

But even if the TVPA claim is not dismissed, the RICO claim should be, because Plaintiffs do not allege facts to support each element of that theory.  "A private plaintiff suing under the civil provisions of RICO must plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff. . . . If a plaintiff fails to adequately plead any one of these elements, she has failed to state a claim upon which relief may be granted, and her complaint must be dismissed."  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citing caselaw).

Plaintiffs allege an "association-in-fact enterprise" among Defendants, Complaint ¶ 215, so they are required to set out several additional sub-elements to satisfy the enterprise element of a RICO claim: "To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff must allege that a group of persons shares three structural features: '(1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'"  *Cisneros*, 972 F.3d at 1211 (quoting caselaw).  For the "purpose prong" of this test, a RICO plaintiff must plausibly allege "that the participants shared the purpose of enriching themselves through a particular **criminal** course of conduct."  *Id.* (emphasis added).  An "abstract common purpose" like a "generally shared interest in making money,"

the court noted, "will not suffice." *Id.* Instead the enterprise's purpose must specifically be to benefit from a *wrongful* course of conduct. *See id.* at 1211-12. And a complaint must have "concrete facts" to give rise to that inference. *Id.* at 1212.

Plaintiffs do not clear that hurdle. Even if their TVPA claims are not dismissed, they nowhere allege that Bama Budweiser formed an association-in-fact enterprise with the State Defendants for the mutual purpose of enrichment from *unlawfully* coerced labor by convicts on work release. Bama Budweiser is not alleged to have itself coerced any Plaintiff, and Plaintiffs do not say that the work-release program at large is unlawful, nor do they say that Bama Budweiser's mere participation in the program was criminal. Plaintiffs have sought to make out a case that they were unlawfully coerced into performing labor for employer defendants by means of force or threat of force or the like—but they never allege the specific facts that would make it plausible to suppose that Bama Budweiser's *reason* for participating in the work-release system was to benefit from labor that the State Defendants unlawfully coerced. *See* Complaint ¶ 216. As noted above, Plaintiffs do not allege facts showing that Bama Budweiser was *aware* of the supposedly unlawful coercion going on behind prison walls, so they do not come close to alleging a plausible claim that the purpose behind Bama Budweiser's contract with ADOC was to benefit from illegal compulsion. The Complaint alleges only that Bama Budweiser was one of a number of private defendants who gave gainful employment to felons. That does not state a RICO claim.

The same missing allegations likewise flunk the pattern prong and the "predicate acts" prong of the RICO cause of action, which require Plaintiffs to allege a pattern of conduct that includes at least two acts of racketeering. *Cisneros*, 972 F.3d at 1211. Plaintiffs don't allege even one as to Bama Budweiser because they never allege that any Plaintiff worked for this Defendant as part of the

ADOC's program.  No act of racketeering has been pleaded as between any Plaintiff and this Defendant.  The RICO claim fails.

3.     **Plaintiffs do not state a claim for violation of the Alabama Constitution**.

Plaintiffs' Count III alleges violation of the Alabama Constitution, Article 1, Section 32 against "all Defendants," which Plaintiffs plead is a ban on "slavery and involuntary servitude under all circumstances."  Complaint ¶ 222.  And Plaintiffs say Bama Budweiser (lumped in with "all" Defendants that is) "subjected Plaintiffs" to involuntary servitude by "forcing them" to work through coercion and force.  *Id.* ¶ 223.

But for one thing, Plaintiffs do not allege any specific facts showing that any of them ever worked for Bama Budweiser, nor any facts showing that Bama Budweiser "forced" them to work or, indeed, had any control over how the ADOC determined which prisoners would show up on a given day to work.  So just looking at the facts, Count III fails to state a claim.

What is more, the law does not furnish Plaintiff such a claim even if they had properly set out the facts.  Alabama does not recognize a private cause of action "for monetary damages based on violations of the provisions of the Constitution of Alabama."  *See Matthews v. Ala. A&M Univ.*, 787 So. 2d 691, 698 (Ala. 2000) (citing caselaw); *see also Brazelton Properties, Inc. v. City of Huntsville*, 237 So. 3d 209, 215 (Ala. Civ. App. 2017).  There is no private cause of action Plaintiffs can pursue for damages based on a state constitutional violation.  Count III should be dismissed.

Finally, Plaintiffs gloss over the former version of Section 32, which up until January 1, 2023 specifically exempted criminal punishments from the ban on involuntary servitude.  Ala Const. art. I sec. 32 (Constitution of 1901).  Plaintiffs

do not allege, as noted earlier, that any of them ever worked for Bama Budweiser, but they do clearly allege that they are all convicted criminals, so to the extent any of them, even in an amended pleading, allege that they worked for Bama Budweiser before January 1, 2023, they still fail to state a claim for relief under the Alabama Constitution.

**4.    Plaintiffs do not state a claim under the KKK Act, which is unconstitutional on its face.**

A.    The Complaint lacks facts showing that Bama Budweiser knew of a conspiracy among the State Defendants or had the power to prevent harm to Plaintiffs.

The Complaint's Count XI asserts a claim against all Defendants under 42 U.S.C. § 1986, which provides:

> Every person who, **having knowledge** that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and **having power to prevent or aid in preventing** the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, **which such person by reasonable diligence could have prevented** . . . .

42 U.S.C. § 1986 (emphasis added).  A claim under this section requires that a defendant "knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997)[6]; *see also Nassar v. Fla. Dept. of Agriculture*, 754 F. App'x 903, 907 (11th Cir. 2018).  Plaintiffs allege this claim against the employer defendants by accusing them of not "withdrawing from" the work-release program, which would supposedly reduce the State Defendants' "incentive" to deny parole and coerce their work force.  Complaint ¶¶ 278-79.

---

[6] It is derivative of a § 1985 claim, so if the Court dismisses that claim against the State Defendants, this claim necessarily fails. *Park*, 120 F.3d at 1160.

This theory is untenable for several reasons.  First, as with other claims, Plaintiffs fail to state a plausible basis for Bama Budweiser having knowledge of any wrongful conduct by the State Defendants *as to these Plaintiffs*, given the lack of allegations that any Plaintiff ever worked for Bama Budweiser.  Since knowledge is a prerequisite of a § 1986 claim, it fails at the outset on that element.

Second, Plaintiffs come well short of alleging facts that suggest Bama Budweiser had the power to "aid in preventing" some State Defendants' conspiracy to racially discriminate against Plaintiffs, and that Bama Budweiser could have "prevented" that conspiracy by "reasonable diligence."  42 U.S.C. § 1986.  Plaintiffs attempt to paper over this weakness by claiming that the employer defendants could have withdrawn from the program—though Plaintiffs say nothing of contractual commitments that might have impeded that—and thereby dis-incentivized the State Defendants.  Complaint ¶ 143.  But that is not what the statute requires.  Section 1986 applies only to defendants who have the power to not only "aid in **preventing**" a conspiracy but also to actually prevent it by "reasonable diligence."  Even if it were true that Bama Budweiser could have withdrawn from the work-release program and thereby (as one out of 560 employers) fractionally reduced the State Defendants' "incentive" to keep running it, Plaintiffs allege no facts to support their notion that a reduction in "incentive" would have in fact *prevented* the alleged conspiracy.[7]  Complaint ¶ 12.

That is to say, Plaintiffs do not allege facts to show that this Defendant's withdrawal would have prevented some ongoing conspiracy known to Bama Budweiser, do not allege facts to show that Bama Budweiser's withdrawal would have such a pronounced effect on the work-release program as to undermine its

---

[7] It is curious that Plaintiffs say employer defendants should have withdrawn from the work-release program.  Given the Complaint's lamentations of how little money Plaintiffs keep from work-release wages, it would seem that reducing the pool of potential employers would only further diminish prisoners' chances to make money.

viability, and do not allege facts to show that withdrawal from the program would have any impact on the conspiracy actually alleged: a racially skewed use of parole and work release.

That last failure is implicit in Plaintiffs' case but must be made clear. Plaintiffs rightly do not allege that the mere operation of a work-release program (if run on a colorblind basis) is a § 1985 conspiracy to violate civil rights. They allege the conspiracy was the *racially biased use* of the program against black convicts. And therein lies the disconnect with the Complaint's Count XI against Bama Budweiser. Plaintiffs' theory is that if the employer defendants stopped participating in work release, there would be less incentive for the State Defendants to "deny parole and maintain" a black "captive and coerced work force." Complaint ¶ 278. But that does not follow. It may be that mass withdrawals by private employers would, perhaps, dis-incentivize the continued operation of ADOC's work-release system altogether—but that is no reason to suppose that it would reduce the likelihood of the actual conspiracy alleged, which is the discrimination within the program's administration. A conspiracy to run a bus company is not the same thing as a conspiracy to run it while requiring blacks to sit in the back. The latter is actionable; the former is not. Plaintiffs are required to plead a plausible case that Bama Budweiser's withdrawal would aid in preventing the wrong at issue, not that it would aid in tearing down the entire program. They fail to do so.

What is worse, Plaintiffs' theory is a perversion of the plain text of the statute. To "aid in preventing" a conspiracy cannot be understood to include action that might reduce a third party's "incentive" to conspire. There must be some allegation of *power* to prevent or help prevent the wrong, and it is not sufficient to articulate an economics argument of incentive. *See Santiago v. City of Philadelphia*, 435 F. Supp. 136, 156 (E.D. Pa. 1977) (noting it was enough to allege

the officials had "some authority" to "control policies"). Plaintiffs' claim would turn the KKK Act into a federally imposed duty to aid third persons through some form of social-justice business model, a concept so foreign to the Constitution it scarcely requires argument. *Cf. Park*, 120 F.3d at 1161 (noting "concerns that § 1985 might be interpreted into a general federal tort law").

Finally, Plaintiffs ignore the forward-looking text of the statute. Liability rests on knowledge of a conspiracy to commit a wrong in the future and a failure to aid in *preventing* it from occurring. But Plaintiffs' allegations are retrospective. They allege that the wrongs have already occurred as to Plaintiffs' parole denial and work-release history, and never allege that at some point, Bama Budweiser learned of a pending plan by the State Defendants to deprive Plaintiffs of a civil right at some future period, and did nothing despite enjoying the power to prevent the wrong.

Plaintiffs have, in sum, not stated a KKK Act claim. The State Defendants wielded all authority over the work-release program while Bama Budweiser had none. Potentially reducing the economic incentive of a state actor is not a recognized basis for § 1986 liability.

B.     The KKK Act is unconstitutional.

As with the TVPA, Bama Budweiser asserts this argument to preserve it for later review. Section 1986 is "unique among American civil rights statutes in creating liability when a defendant has neither personally committed a discriminatory act, engaged in a conspiracy to do so, nor acted with discriminatory intent." Linda E. Fisher, *Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986*, 56 Washington & Lee L. Rev. 461, 464 (1999). The statute "reaches defendants who have no personal or vicarious liability" under § 1985, and the extent of that reach appears in its starkest light as to private defendants with no

power over conspirators, as to whom the "connection between inaction and the underlying racist conspiracy may be too tenuous to warrant liability." *Id.* at 502. The statute's scope demonstrates "the extent to which Congress reached, pursuant to the enforcement clause of the Fourteenth Amendment." *Id.* at 463.

It does indeed, and it illustrates that Congress reached too far.  In imposing a "Good Samaritan duty" on bystanders, it is, as one scholar has modestly noted, "startling and perhaps even inconsistent with ordinary notions of liability in our legal system." *Id.* at 475.  Part of the Civil Rights Act of 1871, Section 1986 was passed in response to KKK violence in the bygone Reconstruction Era, and its constitutionality has never been decided by the Supreme Court.  *Id.* at 471, 499.

But that is no reason to uphold it now.  While Section 5 of the Fourteenth Amendment is a grant of legislative power to Congress, *see City of Boerne v. Flores*, 521 U.S. 507, 517 (1997), it is so only to the extent of that Amendment's objectives and purposes.  *See id.* at 517, 519 (quoting caselaw).  Thus, legislation that "alters the meaning of" one of the Amendment's clauses "cannot be said to be enforcing" that clause.  *See id.* at 519.[8]  Congress cannot, in other words, expand on the scope of the Fourteenth Amendment with legislation.

The KKK Act does exactly that with § 1986, because the Fourteenth Amendment's Equal Protection Clause did not create new substantive rights against private persons, and it contains no language that would allow Congress to impose on private actors a general duty to aid third persons, when those private actors themselves do not infringe on the equal protection of citizens out of racial animus.  While a full discussion of the meaning of the Fourteenth Amendment is

---

[8] The Court even mentioned the KKK Act in *City of Boerne* when it explained that during the debate over that statute, congressmen argued that the Fourteenth Amendment's legislative history, then a matter of recent memory, showed that the enforcement power had limits.  *Id.* at 523. Scholars have agreed.  *Id.*

far beyond the scope of this motion, Bama Budweiser submits that § 1986 is out of step both with current law on the Equal Protection Clause and a correct understanding of the limited objectives of the Fourteenth Amendment generally.

As to the former, the Court has lately stated that the "core purpose" of the Equal Protection Clause is "doing away with all **governmentally imposed** discrimination based on race." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 206 (2023) (internal punctuation omitted; emphasis added) (quoting caselaw). The "central and clear purpose" of the Amendment is "to eliminate all **official state sources** of invidious racial discrimination in the States." *Id.* (quoting caselaw) (emphasis added). Thus the state-action requirement has long been part of proving a violation of the Fourteenth Amendment, which reaches only the actions of state officials, not private persons. *See, e.g.*, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) (citing *Moose Lodge v. Irvis*, 407 U.S. 163 (1972)). The equal-protection guarantee applies "only to action by the government." *Id.* This fundamental limitation on the scope of the Constitution "preserves an area of individual freedom by limiting the reach of federal law." *Id.* at 619 (quoting caselaw).

Section 1986 transgresses this settled rule. It purports, on the basis of the enforcement power in § 5 of the Fourteenth Amendment, to extend the Equal Protection Clause to not only forbid the action of state officials but to punish the *in*action of *private* parties like Bama Budweiser—and without a showing that the failure to "aid in preventing" a racist conspiracy was itself motivated by discriminatory purpose. *Cf. City of Boerne*, 521 U.S. at 523 (quoting with approval commentary that "Congress' powers are only prohibitive, corrective, vetoing, aimed only at due process of law"). The KKK Act is therefore a constitutional aberration, a freakish perversion of federalism and the limits on federal power. It imposes liability on those with no official authority for their mere failure to act in

protection of third persons as to whom they may have no relationship or duty otherwise.  The Equal Protection Clause has not been understood to reach that far, so Congress may not, under the guise of enforcing it, expand the scope of the conduct the Clause encompasses.[9]  With few exceptions, "constitutional guarantees of individual liberty and equal protection **do not apply to the actions of private entities**."  *Id.* (emphasis added).

  And then there is the more serious and fundamental error: the Fourteenth Amendment does not grant Congress nearly so much power as is often supposed, and certainly not enough to compel aid to strangers by private actors.  In his magisterial work on the text, legal scholar Raoul Berger explained that the backdrop of the Amendment was much otherwise than we might suppose today: far from being drafted and passed by an abolitionist body of legislators, the Amendment in fact came forth from men "swayed by the racism that gripped their constituents," rather than by "abolitionist ideology" shared by a minority, such as Charles Sumner.  Raoul Berger, *Government by Judiciary: The Transformation of the Fourteenth Amendment* 11 (2d ed. 1997).  Having just emerged from a bitterly fought and costly war, the framers of the Amendment were "far from anxious to embark on fresh crusades" against any inequality beyond "fundamental rights" at law.  *Id.* at 14-15.  Thus the modern view of the Fourteenth Amendment as a sword to be wielded against any conceivable inequality along racial (or other) lines is a fantasy, as detached from the historical record as possible.  The political reality of the times when the Amendment was passed helps demonstrate "the limited purposes of the framers of the Fourteenth

---

[9] The Clause actually doesn't even require *state* actors to go so far as the KKK Act would require private actors to go, because a governmental entity's "acquiescence" in another's conduct is "insufficient to create government action" in a § 1983 case.  *Smith v. N. La. Med. Review Ass'n*, 735 F.2d 168, 173 (5th Cir. 1984); *Becnel v. City Stores Co.*, 675 F.2d 731, 732 (5th Cir. 1982).

Amendment," and circumscribes "the so-called 'generality' of 'equal protection' and 'due process.'"  *Id.* at 16.

We therefore see that the proponents of a broad construction for the Equal Protection Clause—especially, it may be added, so broad a one as claimed here to enforce the KKK Act—bear the burden of proof on the scope of the Clause.  An interpretation "that invades what had long been considered the exclusive province of the States, as, for example, **criminal procedure**, requires some justification." *Id.* (emphasis added).  Plaintiffs here cannot carry that burden, for, to borrow scholarly phrasing, despite Plaintiffs' undoubted "zeal to ameliorate social injustice," enforcing the KKK Act's § 1986 will "undermine the constitutionalism that undergirds" our nation.  *See id.* at 22.

To be more specific, the framers of the Fourteenth Amendment chose "words which aptly expressed" and were wedded to their "limited purposes" of outlawing discrimination "**only** with respect to **enumerated** privileges."  *Id.* at 199 (emphasis added). And there was no mystery in what privileges were meant. They were those extended by the Civil Rights Act of 1866 and none other.  *Id.* at 201-02.  That statute secured to blacks certain fundamental rights enjoyed by whites: to contract, to hold property, to sue and give evidence in court, and the equal benefit of laws for "security of person and property."  *Id.* at 32-33, 201. This is all the Amendment's framers intended by "equal benefit" of the laws or "equal protection" of the law or "equality before the law."  *Id.* at 201-02, 206. Far from granting unlimited equality across the board, Berger explains, the extensive evidence from the debate and drafting history of the Amendment shows that its § 1 reference to "privileges and immunities" was specific to the rights enumerated by the 1866 Civil Rights Act.  *See id.* at 201-03, 205-06.  The Equal Protection Clause was carefully framed by its authors and understood by its ratifiers to accomplish nothing more than to set the 1866 Civil Rights Act into

constitutional stone, beyond the ability of the next Congress to amend by legislation.  "Again and again the framers stated that their purpose was to prevent one law for blacks, another for whites.  It was a ban on such discrimination that was expressed in . . . 'equal protection,'" not a "mandate that the States must confer rights not theretofore enjoyed by any citizen." *Id.* at 209.  The Equal Protection Clause was certainly never written or understood to be a roving commission to Congress or the courts to pursue justice by confecting new rights as cultural winds may suggest. *See generally id.*

Against this backdrop of corrective historical fact, it becomes manifest how far adrift the KKK Act's § 1986 has wandered in relation to the Equal Protection Clause.  No right to require bystanders to "aid in preventing" a conspiracy by others was imagined by the Clause's framers, no general tort duty imposed by federal fiat on citizens who enjoy no state authority, or on businesses that wield no power.  The Clause is not a source of power to Congress to so deeply and broadly upset the tort-law relations of citizens of the States, so Plaintiffs' § 1986 claim should be dismissed as based on a void and unenforceable act of Congress.

### 5.    Plaintiffs do not state a claim for unjust enrichment.

To state an unjust-enrichment claim, a plaintiff must allege that the defendant "knowingly accepted" and retained a benefit provided by another "who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, LLC*, 77 So. 3d 139, 145 (Ala. 2011) (quoting caselaw). Retention of a benefit, or enrichment, is not unjust unless the donor of the benefit "acted under a mistake of fact or in misreliance on a right or duty," or unless the recipient "engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Id.* at 146 (quoting caselaw).

Count XII fails from top to bottom on the elements of this theory.  As noted above, not a single Plaintiff alleges that he or she ever worked for Bama Budweiser, so there are thus no allegations in the entire 126-page Complaint to show that any Plaintiff conferred any benefit, labor or otherwise, on this Defendant, let alone that this Defendant paid Plaintiffs less than free employees would receive.

Nor are there any allegations to set forth a plausible theory that Bama Budweiser retained a benefit unjustly.  Bama Budweiser is not alleged to have had authority over the work-release program, nor are there allegations, as explained earlier, that show how this Defendant was aware of the supposedly illicit coercive measures taken by others to compel Plaintiffs' work.  Plaintiffs seem to think they can state a claim for unjust enrichment if the employer defendants accept a benefit as part of participating in a program involving *others* coercing Plaintiffs to work.  But that is not the theory under Alabama law.  The claim requires Plaintiffs to plead specific facts showing that *these* defendants—that this Defendant—engaged in unconscionable conduct like fraud or coercion, not that some third party engaged in coercion that Bama Budweiser did not prevent or in some way benefited from.  Since Plaintiff state no such facts, Count XII should be dismissed.

**6.     The organization Plaintiffs lack standing, and in the alternative fail to state a cognizable claim.**

Plaintiffs RWDSU, USSW, and the Woods Foundation are ill-suited as Plaintiffs in this case, because none of them say they were coerced to work as prison inmates and because none of them allege a single Plaintiff is a member of their organization.  Complaint ¶¶ 155-57.  These organizational Plaintiffs do not allege facts showing they have standing in their own right nor associational standing, and they do not state a claim for relief.

A plaintiff has standing if he has suffered "an injury in fact" that is "fairly traceable to the challenged conduct of the defendant" and that is "likely to be redressed" by a favorable decision.  *Schultz v. Alabama*, 42 F.4th 1298, 1319 (11th Cir. 2022); *see also Baughcum v. Jackson*, 92 F.4th 1024, 1030-31 (11th Cir. 2024).  Organizations may have standing "to sue on their own behalf" and may also have "associational standing to sue on behalf of their members."  *Baughcum*, 92 F.4th at 1031.

If an organization alleges standing based on some injury from diversion of resources or impediment to purpose, as these three Plaintiffs do here, it must allege that a defendant's "illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts."  *Jacobson v. Fla. Sec. of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) (citing caselaw).  While resource diversion is recognized as a concrete injury, there must be allegations as to what activities an organization is diverting resources "away from" to spend more of them combatting the allegedly illegal action.  *See id.* at 1250.  A plaintiff must show "what activities, if any, might be impaired" by the allocation elsewhere.  *See id.*  Harm to an organization's mere partisan social preferences is nothing more than a setback to its "abstract social interests" and is not cognizable as a concrete injury in fact.  *Id.* at 1250-51.

Even if there are allegations of diverted resources, it is not automatically enough because a plaintiff must also plead "**how** its diversion of resources impaired its ability to achieve its mission."  *La. Fair Housing Action Ctr. v. Azalea Garden Props., LLC*, 82 F.4th 345, 353 (5th Cir. 2023) (emphasis added).  An organization plaintiff must allege *how* impaired activities were canceled or postponed or otherwise curtailed, and simply stating that they were is a "threadbare allegation" that is insufficient, "even at the motion to dismiss stage."  *Id.*  If a plaintiff does not allege the specifics of how curtailment of some

activity or project "perceptibly impaired its ability to achieve its mission,"
standing is not properly pleaded. *See id.* at 354.

RWDSU does not allege that it counts among its members any current or
former employee of Bama Budweiser, nor that any Plaintiff is or has been a
member. Thus, whatever "injury in fact" RWDSU claims can only be in its own
right, and the Complaint lacks sufficient allegations of such an injury. Plaintiffs
allege that RWDSU has "sought to represent" work-release employees at Koch
Foods and Gemstone Foods poultry plants and that its efforts have been
"undermined" or "interfered with" because it cannot unionize convicted felons,
Complaint ¶ 155, but it does not allege that anything Bama Budweiser has done
has interfered with those efforts, nor does it allege that its frustration in pursuing
the wholesale unionizing of poultry workers has caused it, in a specific, concrete
way, to divert resources away from something else and how that diversion,
specifically, is traceable to Bama Budweiser or how the diversion has impeded its
ability to fulfill its mission.

Plaintiff USSW falls even shorter of the mark. It alleges that it exists to
improve the "lives of [low-wage] workers" and to "combat[] systemic racism."
Complaint ¶ 156.[10] And USSW says it has focused on the "fast-food sector" and
workers there. *Id.* It complains that fast-food employers hiring felons through
work release has frustrated the union's ability to advocate for higher wages for
fast-food workers. *Id.*

That is as may be, but it is not the allegation of a cognizable injury to the
union in its own right. For one thing, as with RWDSU, USSW fails to allege the
specifics of how the undermining of its unionization activities at fast-food
restaurants is fairly traceable to anything Bama Budweiser has done, and the entity

---

[10] This in itself is a curious term. The vice of racism inheres in individuals, not systems.

also fails to show how the frustration of that activity has led to the diversion of resources away from another ordinary endeavor, or has impeded its ability to fulfill its mission. *See id.*

For another thing, there is no cause of action in the Complaint alleging a theory of recovery for workers who say they aren't getting paid enough money because their boss is giving jobs to convicts. So there is no fit between the pleaded legal bases for recovery and the facts about why USSW is in this lawsuit. No cognizable injury is alleged to itself as part of any count of the Complaint. And as with other Plaintiffs, USSW never alleges that any of its members or would-be members ever worked for Bama Budweiser. *See id.*

And then at last there is the Woods Foundation, which claims to be a local non-profit that aids "persons with wrongful convictions and excessive sentences," and that its ability to fulfil that mission is "frustrated" by the supposedly discriminatory "practices of the Parole Board and the scheme alleged herein to undermine Alabama's parole system." Complaint ¶ 157. But the Woods Foundation does not allege anything germane to the work-release system, anything showing that one of its members was a work-release convict employed by Bama Budweiser, or indeed even that its mission concerns private-employer participation in Alabama's work-release program. *Id.* The foundation alleges that it has "redirect[ed] resources from other projects" to deal with the State Defendants' "abuse of the parole system," but does not allege that the "other projects" have been cancelled or postponed, and never alleges that its other projects were hampered due to Bama Budweiser's role in the "abuse of the parole system." *See id.* Woods Foundation has not alleged an injury in fact to itself or to its members that fits under any legal theory, nor that any such injury is fairly traceable to Bama Budweiser. This Plaintiff lacks standing.

Yet even if one or more of these organizations had standing, they all fail to state a claim under the TVPA, RICO, the KKK Act, the Alabama Constitution, or any other count pleaded against Bama Budweiser. This Defendant rests on its arguments given above as to the state constitutional count (Count III), as they apply equally to any Plaintiff, individual or associational.

But as to the statutory counts (Counts I, II, and XI), the rule is that courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Intern. Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). This is a presumption or requirement of "general application" that applies "unless it is expressly negated." *Id.* (quoting caselaw). And, of course, an organizational plaintiff must allege concrete facts to satisfy every element of a claim, just as an individual plaintiff must.

Against this rubric, none of the three entity Plaintiffs have a case. None of them plead, as explained earlier, that any of their members or they themselves have ever worked for Bama Budweiser, so none of them can or do allege any illegal coercion against them or their members, or any racketeering activity, or any failure to aid in preventing a conspiracy. Simply on the facts alleged compared to the elements of the statutory claims, these three Plaintiffs state no claim.

And looking to those statutes, the organization Plaintiffs also fall outside the zone of interests protected by those statutes and are not part of the class of plaintiffs Congress intended to grant causes of action to. The TVPA is clear in granting a civil remedy to a state attorney general and to "**an individual who is a victim** of a violation of this chapter." 18 U.S.C. § 1595(a) (emphasis added). There is no language even vaguely hinting at allowing labor unions or non-profits to file lawsuits because their budgets and missions are "frustrated" or "undermined" by the misfortunes of violent felons dealing with parole systems or

work-release programs.  *See N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 71-72 (N.D.N.Y. 2020) (holding that anyone "not expressly permitted to bring a cause of action under the TVPA cannot bring a civil suit to recover for violations of it").  "[U]nions do not have a cause of action under the TVPA."  *Id.* at 72.

That same failure spells the end of these Plaintiffs' RICO claim,[11] as that stands or falls on the predicate TVPA violations the Complaint pleads (as set forth above on the RICO count), and without plausibly alleged predicate acts of racketeering against the entity Plaintiffs, they of necessity cannot state a valid RICO claim, even apart from their failure to show that such organizations were within the zone of interests or parties Congress intended to protect with civil RICO claims.  *Cf. Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 266-69 (1992) (expressing doubt that Congress intended to allow "all factually injured plaintiffs to recover" under RICO and explaining the proximate-cause requirement).

And lastly, these entity Plaintiffs' KKK Act or § 1986 claim fails because the Complaint's factual allegations on that theory are insufficient, for any Plaintiff, and because the KKK Act allows a civil remedy only on the part of "the party injured, or his legal representatives." 42 U.S.C. § 1986.  None of the organization Plaintiffs have alleged that they were, themselves, injured by some failure to stop a racist conspiracy, nor that they are the legal representatives of an individual Plaintiff.  And it stretches credulity too far to say that Congress had in mind, in 1871, allowing labor unions or a non-profit outfit like the Woods Foundation to assert claims under a statute designed to combat racist violence and conspiracies against black Americans.

---

[11] Only USSW and RWDSU are listed as Plaintiffs on Count II for RICO violations.  Complaint at 107.

**Conclusion**

Bama Budweiser asks this Court to dismiss all Plaintiffs' claims against it with prejudice.

Respectfully submitted,

s/ *Aaron G. McLeod*
Aaron G. McLeod
Jonathan Metz
Counsel for Bama Budweiser

**Adams and Reese LLP**
1901 6th Ave. N. Ste 1110
Birmingham, AL 35203
(205) 250-5000
aaron.mcleod@arlaw.com
jonathan.metz@arlaw.com

**Certificate of Service**

I certify that on March 27th, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to all counsel of record.

*/s/ Aaron G. McLeod*
Of Counsel