**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| ROBERT EARL COUNCIL AKA KINETIK JUSTICE, *et al.,* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:23-CV-00712-CLM-JTA |
| | ) | |
| KAY IVEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CONSOLIDATED BRIEF IN SUPPORT OF MOTIONS TO DISMISS OF
STATE DEFENDANTS IVEY, MARSHALL, GWATHNEY,
LITTLETON, SIMMONS, HAMM, AND COOPER**

## Table of Contents

Table of Contents ............................................................................................................. i

Table of Authorities ......................................................................................................... i

Introduction ..................................................................................................................... 1

Legal Standard ................................................................................................................. 2

Facts ................................................................................................................................. 4

    A.   The Parties ........................................................................................................ 4

    B.   Facts Related to the Use of Inmate Labor .................................................... 6

Argument ....................................................................................................................... 18

    A.   Plaintiffs Council, Moore, Cole, Ptomey, McDole, Campbell, Pritchett, English and Cartwright Failed to Exhaust Their Administrative Remedies as to Counts I, II, and IV in Accordance with the PLRA Prior to Filing Suit. .............................................. 18

    B.   Council Should Be Dismissed from this Suit Due to Improper Claim Splitting. .......... 21

    C.   Sovereign Immunity Under *Pennhurst* Bars Plaintiffs' Claims Premised on a Violation of State Law. ........................................................................................................ 24

    D.   Plaintiffs' Parole-Based Claims Against Ivey, Marshall, and Hamm Should Be Dismissed for Lack of Standing and Sovereign Immunity. ..................................... 27

    E.   Count I Fails to State a Claim Against the State Defendants for a Violation of the Trafficking Victims Protection Act. ........................................................................ 31

        1.   The State Defendants are entitled to Eleventh Amendment sovereign immunity from Plaintiffs' official-capacity damages claims under the TVPA. ....... 32

        2.   Even assuming Eleventh Amendment immunity did not bar Plaintiffs' official-capacity damages claims, the State Defendants in their official capacities are not "persons" within the meaning of the TVPA. ............................... 33

        3.   Plaintiffs fail to state a claim for declaratory or injunctive relief against the State Defendants in their official capacities as there is no private right of action for equitable relief under the TVPA. ............................................. 35

4. Marshall is entitled to absolute prosecutorial immunity from Plaintiffs' individual-capacity damages claims under the TVPA, and Gwathney is entitled to absolute quasi-judicial immunity from individual-capacity damages claims. ..................................................................................... 36

5. The State Defendants are entitled to qualified immunity from Plaintiffs' individual-capacity damages claims under the TVPA. ............................................. 38

F. Count II Fails to State a Claim Against the State Defendants for a Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO). ............................. 50

G. *Pennhurst* Bars Plaintiffs' Claim in Count III Against the State Defendants under § 32 of the Alabama Constitution, Which Is Nonetheless Meritless. ............................. 52

H. Count IV Is Due to be Dismissed Because Count IV Plaintiffs Lack Standing to Seek Injunctive Relief, and Defendants Ivey and Hamm Are Entitled to Both Sovereign and Qualified Immunity. .......................................................................... 56

1. Count IV Plaintiffs lack standing to seek injunctive relief in Count IV because the allegations concern past conduct. ........................................................ 57

2. Defendants Ivey and Hamm, sued in their official capacities for monetary damages, are entitled to sovereign immunity. ............................................. 58

3. Defendants Ivey and Hamm, sued in their individual capacities for monetary damages, are entitled to qualified immunity on Count IV because Count IV Plaintiffs have failed to state a First Amendment retaliation claim. ....................... 58

I. Plaintiffs Failed to Allege a Plausible Ex Post Facto Claim in Count V. ....................... 61

1. The 2019 version of § 15-22-26 does not violate the Ex Post Facto Clause. .......... 63

2. Plaintiffs' Board policy-based Ex Post Facto claims fail. ...................................... 70

   a. The Board's 2020 guidelines are objectively more objective. ........................ 71

   b. Neither the creation nor revision of the guidelines violated the Ex Post Facto clause. ............................................................................................. 73

   c. Plaintiffs' statistical data does not support their Ex Post Facto claim. ................... 74

   d. The Board's failure to follow its guidelines is not an Ex Post Facto violation. ........ 76

3. The Incarcerated Plaintiffs cannot collectively or individually state an Ex Post Facto Claim. ............................................................................................. 78

J.    Plaintiffs Fail To State A Plausible Claim That Ivey, Marshall, The Parole Board Members, or Hamm Violated Black Inmates' Equal Protection Rights Under The Fourteenth Amendment of The United States Constitution in Counts VI and VII. . 82

    A.  The Inmate Plaintiffs failed to establish that they are similarly situated to White inmates who allegedly received more favorable treatment............................ 83

        1.  Plaintiffs' statistical analysis does not compare Black inmates who are similarly situated to White Inmates. .................................................................. 85

        2.  Plaintiffs cannot state an Equal Protection claim by asserting a "convincing mosaic of circumstantial evidence" theory..................................... 93

    B.  Plaintiffs failed to allege sufficient facts showing that parole decision-making was based on purposeful or invidious discrimination. ...................................................... 94

        1.  The impact of the Board's parole decision-making after HB380's enactment reflects a stricter review of violent offenders, not Black inmates. ................................................................................................................. 96

        2.  The historical background to the changes in Alabama's parole law and the parole decision-making after HB380's enactment reflects a response to the failure of the prior parole system. ......................................... 100

        3.  The events leading up to HB380's enactment and the subsequent actions of the Equal Protection Defendants provide no evidence of a discriminatory intent. .................................................................................. 103

        4.  The Board's parole decision-making after HB380's enactment did not depart from the normal procedural and substantive parole practices. .......... 107

        5.  The contemporary statements of officials show that non-race-based factors were motivating the Board's parole decision-making after HB380's enactment.................................................................................... 108

        6.  Foreseeability of a disparate impact could not be shown in Board's parole decision-making after HB380's enactment......................................... 109

        7.  The Complaint attributes no actual knowledge of the purported disproportionate impact. ............................................................................110

        8.  No allegedly less discriminatory alternative exists.............................................111

K.    Plaintiffs Failed To Plead A Plausible Substantive Due Process Claim in Count VIII. 112

A.  Plaintiffs' allegation that the Board violated Alabama law cannot establish that the Due Process Defendants violated their substantive due process rights. ...................................................................................................113

B.  Plaintiffs' allegation that the Due Process Defendants denied parole in a racially discriminatory manner does not state a substantive due process claim. .................114

C.  Plaintiffs cannot establish that Alabama inmates have a substantive due process right to parole or parole consideration under the Fifth Amendment or the Fourteenth Amendment. ...............................................................................................115

1.  The Fifth Amendment does not give inmates a fundamental right to parole or parole consideration. ..........................................................................116

2.  The Fourteenth Amendment does not give inmates a fundamental right to parole or parole consideration. ....................................................................116

L.  In Addition to Failing to State a Claim for Counts V – VIII, Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm Are Entitled to Immunity from these Claims. ...........118

M.  The Conspiracy and Failure to Prevent Claims in Counts IX, X, and XI Fail to State a Claim Against the State Defendants. ............................................................119

N.  Cooper Is Entitled to Dismissal of the State Law Unjust Enrichment Claim in Count XII. ...................................................................................................... 127

Conclusion ....................................................................................................... 131

Certificate of Service ........................................................................................... 133

## Table of Authorities

**Cases**

*Adams v. Wainwright,*
    709 F.2d 1443 (11th Cir. 1983) ................................................. 97

*Albright v. Oliver,*
    510 U.S. 266 (1994) ...........................................................114

*Alcocer v. Mills,*
    906 F.3d 944 (11th Cir. 2018) .............................................41, 115

*Allen v. Thompson,*
    815 F.2d 1433 (11th Cir. 1987) ..........................37, 51, 118, 122

*American Family Care, Inc. v. Fox,*
    642 So. 2d 486 (Ala. Civ. App. 1994) ................................... 127

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ...........................................................119

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................... passim

*Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.,*
    956 F.2d 1112 (11th Cir. 1992) .................................... 123, 124

*Bailey v. Wheeler,*
    843 F.3d 473 (11th Cir. 2016) ................................................ 59

*Barrientos v. CoreCivic, Inc.,*
    951 F.3d 1269 (11th Cir. 2020) .........................3343, 45, 47-49

*Beavers v. State,*
    666 So. 2d 868 (Ala. Crim. App. 1995) ................................ 64

*Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at Auburn Univ.,*
    267 F. Supp. 2d 1139 (M.D. Ala. 2003) ............................... 123

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................. 2, 42, 44

*Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.,*
    140 F.3d 898 (11th Cir. 1998) ............................................ 123

i

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) ........................................................ 3

*Bowers v. United States Parole Comm'n*,
   775 F. App'x 504 (11th Cir. 2019) .................................................. 81

*Brown v. Ga. Dep't of Revenue*,
   881 F.2d 1018 (11th Cir. 1989) ...................................................... 53

*Brown v. McClure*,
   849 F. App'x 837 (11th Cir. 2021) .................................................. 93

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ........................................................ 3

*Bryant v. Rich*,
   530 F.3d 1368 (11th Cir. 2008) ................................................. 19, 21

*Bulls v. Estes*, No.
   5:19-CV-0346-MHH-JEO, 2020 WL 906324 (N.D. Ala. Feb. 25, 2020) ........................ 77, 114

*Bulls v. Warden*,
   No. 20-10882-E, 2020 WL 3053502 (11th Cir. May 13, 2020) ............................... 81

*Burns v. Town of Palm Beach*,
   999 F.3d 1317 (11th Cir. 2021) ...................................................... 86

*Bursey v. Ameigh*,
   No. 6:08-CV-744, 2010 WL 3119389 (M.D. Fla. Aug. 4, 2010) ............................ 95

*Butler v. Perry*,
   240 U.S. 328 (1916) ................................................................. 54

*Bynum v. City of Oneonta*,
   175 So. 3d 63 (Ala. 2015) .......................................................... 56

*Calder v. Bull*,
   3 U.S. 386 (1798) .................................................................. 61

*California Dep't of Corr. v. Morales*,
   514 U.S. 499 (1995) ................................................................ 78

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*,
   572 F.3d 1271 (11th Cir. 2009) ....................................................... 2

*Carr v. City of Florence, Ala.*,
    916 F.2d 1521 (11th Cir. 1990) ............................................. 58

*Carson v. Ivey*,
    No. 520CV01151LCBSGC, 2021 WL 414540 (N.D. Ala. Jan. 19, 2021)............................. 95

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*,
    48 F.4th 1222 (11th Cir. 2022) ....................................... passim

*Chavis v. Clayton Cnty. Sch. Dist.*,
    300 F.3d 1288 (11th Cir. 2002) ....................................... 126

*Chudasama v. Mazda Motor Corp.*,
    123 F.3d 1353 (11th Cir. 1997) ......................................... 2

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985). ...................................................... 83

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ......................................................... 57

*City of S. Miami v. Governor*,
    65 F.4th 631 (11th Cir. 2023) .................................... 29, 105

*Cleavinger v. Saxner*,
    474 U.S. 193 (1985) ....................................................... 37

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .................................................114, 115

*Collins v. City of Harker Heights, Tex.*,
    503 U.S. 115 (1992) .....................................................116

*Collins v. Yellen*,
    141 S. Ct. 1761, 1779 (2021) ........................................... 27

*Coltharp v. United States*,
    413 F. Supp. 3d 1182 (M.D. Ala. 2019) ................................. 3

*Conlogue v. Shinbaum*,
    949 F.2d 378 (11th Cir. 1991) ............................ 97, 102, 106

*Cook v. Wiley*,
    208 F.3d 1314, 1322 (11th Cir. 2000) ...............97, 102, 106, 116

*Cottone v. Jenne,*
    326 F.3d 1352 (11th Cir. 2003) ................................................................ 2

*Council v. Hamm, et al.,*
    2:23-CV-658-ECM-CWB, .................................................................... 23

*Craik v. Minnesota State Univ. Bd.,*
    731 F.2d 465 (8th Cir. 1984) ................................................................ 87

*Damiano v. Fla. Parole & Prob. Comm'n,*
    785 F.2d 929 (11th Cir. 1986) .................................................... 70, 79, 82

*DeKalb Cnty. Sch. Dist. v. Schrenko,*
    109 F.3d 680 (11th Cir. 1997) ...................................................... 25, 26

*Denney v. City of Albany,*
    247 F.3d 1172 (11th Cir. 2001) ............................................................ 121

*Dobbert v. Florida,*
    432 U.S. 282 (1977). ...................................................................... 62

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022) ................................................................112, 115

*Doe v. Pryor,*
    344 F.3d 1282 (11th Cir. 2003) ............................................................ 27

*Douglas Asphalt Co. v. Qore, Inc.,*
    541 F.3d 1269 (11th Cir. 2008) ............................................................ 84

*E & T Realty v. Strickland,*
    830 F.2d 1107 (11th Cir. 1987)........................................... 83, 94-96, 111

*Elend v. Basham,*
    471 F.3d 1199 (11th Cir. 2006)............................................................ 57

*Ex parte Alabama Dept. of Transp.,*
    978 So. 2d 718 (Ala. 2007) ............................................................ 129

*Ex parte Bd. of Pardons & Paroles,*
    793 So. 2d 774 (Ala. 2000) ..............................................................11

*Ex parte Hayles,*
    852 So. 2d 117 (Ala. 2002) ............................................................ 130

*Ex parte Young*,
    209 U.S. 123 (1908) ........................................................................... passim

*Eknes-Tucker v. Governor of Ala.*,
    80 F.4th 1205 (11th Cir. 2023) .....................................................112, 115

*Farese v. Scherer*,
    342 F.3d 1223 (11th Cir. 2003) ............................................................ 126

*Fincher v. State of Fla. Dep't of Lab. & Emp. Sec. Unemployment Appeals Comm'n*,
    798 F.2d 1371 (11th Cir. 1986) ............................................................ 120

*Fleming v. Dowdell*,
    434 F. Supp. 2d 1138 (M.D. Ala. 2005) ................................................. 37

*Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*,
    314 So. 2d 51 (Ala. 1975) ...................................................................... 56

*Floyd v. City of New York*,
    959 F. Supp. 2d 540 (S.D.N.Y. 2013) ................................................... 87

*Fuller v. Georgia State Bd. of Pardons & Paroles*,
    851 F.2d 1307 (11th Cir. 1988) ........................................................ passim

*Fullman v. Graddick*,
    739 F.2d 553 (11th Cir. 1984) ............................................................. 123

*Garner v. Jones*,
    529 U.S. 244 (2000) ......................................................................... passim

*Gavillan Martinez v. Sec'y, Fla. Dep't of Corr.*,
    No. 21-10444, 2022 WL 16775338 (11th Cir. Nov. 8, 2022) ................. 93

*Godby v. Montgomery County Bd. of Educ.*,
    996 F. Supp. 1390 (M.D. Ala. 1999) ..................................................... 39

*Gonzalez v. Reno*,
    325 F.3d 1228 (11th Cir. 2003) ............................................................... 2

*Graves v. Watson*,
    909 F.2d 1549 (5th Cir. 1990) ......................................................... 46, 54

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
    992 F.3d 1299 (11th Cir. 2021) ......................................... 96, 98, 102, 103

*Greene v. H&R Block E. Enters., Inc.*,
  727 F.Supp.2d 1363 (S.D. Fla. 2010) ........................................................ 21

*Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*,
  442 U.S. 1 (1979) ..................................................................... 69, 75, 116

*Grider v. City of Auburn*,
  618 F.3d 1240 (11th Cir. 2010) ............................................................ 38

*Griffin Indus., Inc. v. Irvin*,
  496 F.3d at 11897 (11th Cir. 2007) ....................................................... 83

*Griffin v. Dugger*,
  823 F.2d 1476 (11th Cir. 1987) ............................................................. 4

*Griswold v. Alabama Dep't of Indus. Rels.*,
  903 F. Supp. 1492 (M.D. Ala. 1995) .................................................... 123

*Hammond v. Auburn Univ.*,
  669 F. Supp. 1555 (M.D. Ala. 198) ........................................................ 95

*Harbert Intern., Inc. v. James*,
  157 F.3d 1271 (11th Cir. 1998) ..................................................... passim

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ......................................................................... 38

*Hart v. Hodges*,
  587 F.3d 1288 (11th Cir. 2009) ........................................................... 37

*Hartley v. Parnell*,
  193 F.3d 1263 (11th Cir. 1999) ........................................................... 61

*Henry v. Fla. Bar*,
  701 F. App'x 878 (11th Cir. 2017) ....................................................... 120

*Hill v. Seaboard Coast Line R. Co.*,
  767 F.2d 771 (11th Cir. 1985) ........................................................... 110

*Hillcrest Prop., LLP v. Pasco Cnty.*,
  915 F.3d 1292 (11th Cir. 2019) .......................................................... 113

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ...................................................... 39, 41

*Holmes v. Crosby*,
    418 F.3d 1256 (11th Cir. 2005) ...............................................................37, 118, 122

*Hutchison v. Board of Trustees of Univ. of Alabama*,
    288 Ala. 20, 256 So.2d 281 (1971) ........................................................... 128

*In re Piper Aircraft Corp.*,
    244 F.3d 1289 (11th Cir. 2001)................................................................. 22

*Jackson v. Cook*,
    No. 2:17-CV-414-ALB, 2020 WL 4006671(M.D. Ala. June 4, 2020)............................... 66, 95

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ........................................................... 28, 30

*James-Bey v. Dillard*,
    No. 2:11-CV-067-TMH, 2014 WL 896968 (M.D. Ala. Mar. 6, 2014)..................... 97, 102, 106

*Johnson v. City of Bessemer*,
    180 F. Supp. 3d 1013 (N.D. Ala. 2016)........................................................ 130

*Johnson v. Meadows*,
    418 F.3d 1152 (11th Cir. 2005)................................................................ 21

*Johnson v. Wainwright*,
    772 F.2d 826 (11th Cir. 1985) ........................................................... 69, 70, 79

*Johnston v. Alabama Pardon & Parole Bd.*,
    530 F. Supp. 589 (M.D. Ala. 1982) ........................................................... 81

*Jones v. N.C. Prisoners' Lab. Union, Inc.*,
    433 U.S. 119 (1977) ............................................................................ 60

*Jones v. Ray*,
    279 F.3d 944 (11th Cir. 2001) ........................................................... 82, 93

*Jones v. White*,
    992 F.2d 1548 (11th Cir. 1993) ........................................................... 95

*Katz v. Gerardi*,
    655 F.3d 1212 (10th Cir. 2011) ........................................................... 22

*Kearson v. S. Bell Tel. & Tel. Co.*,
    763 F.2d 405 (11th Cir. 1985) ........................................................... 123

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ........................................................................... 32

*Kimel v. Fla. Bd. of Regents,*
    528 U.S. 62 (2000) ............................................................................. 33

*King v. Pridmore,*
    961 F.3d 1135 (11th Cir. 2020) .........................................................113

*Kirby v. Siegelman,*
    195 F.3d 1285 (11th Cir. 1999) .........................................................112

*Knight v. Jacobson,*
    300 F.3d 1272 (11th Cir. 2002) .........................................................114

*Kush v. Rutledge,*
    460 U.S. 719 (1983) ......................................................................... 126

*L.S. ex rel. Hernandez v. Peterson,*
    982 F.3d 1323 (11th Cir. 2020) .........................................................113

*Lamar v. Williams,*
    No. 21CA0511 (Colo. App. Aug. 18, 2022) ................................... 55, 56

*Lancaster v. Monroe County, Ala.,*
    116 F.3d 1419 (11th Cir. 1997) ..........................................3251, 118, 120

*Larkins v. Department of Mental Health & Mental Retardation,*
    806 So.2d 358 (Ala. 2001) ............................................................... 128

*Lee v. Hutson,*
    810 F.2d 1030 (11th Cir. 1987) .........................................................113

*Lee v. Smithart,*
    No. 2:23-523-MHT-CSC, 2023 WL 9442571 (M.D. Ala. Dec. 20, 2023)............................ 94

*LeFrere v. Quezada,*
    588 F.3d 1317 (11th Cir. 2009) ......................................................... 32

*Lenz v. Winburn,*
    51 F.3d 1540 (11th Cir. 1995) ........................................................... 39

*Lewis v. City of Union City, Georgia,*
    934 F.3d 1169 (11th Cir. 2019) ......................................................... 93

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 27

*Lynce v. Mathis*,
    519 U.S. 433 (1997) ................................................................. 62

*Maddox v. Stephens*,
    727 F.3d 1109 (11th Cir. 2013)............................................113

*Malowney v. Fed. Collection Deposit Grp.*,
    193 F.3d 1342 (11th Cir. 1999) ............................................. 57

*Mastroianni v. Bowers*,
    173 F.3d 1363 (11th Cir. 1999) ............................................. 37

*Matthews v. Alabama Agric & Mech. Univ.*,
    787 So. 2d 691 (Ala. 2000) ................................................... 53

*McAndrew v. Lockheed Martin Corp.*,
    206 F.3d 1031 (11th Cir. 2000) ............................... 120, 123-125

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) ........................................... 83, 96, 97

*McCullough v. Finley*,
    907 F.3d 1324 (11th Cir. 2018) ...................................... passim

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ................................................................115

*McKinney v. Pate*,
    20 F.3d 1550 (11th Cir. 1994) ..............................................114

*McQueary v. Blodgett*,
    924 F.2d 829 (9th Cir. 1991) ................................................ 96

*McQueen v. Alabama Department of Transportation*,
    2018 WL 2709319 (M.D. Ala. June 5, 2018) ......................... 22

*Mitchell v. Duval Cty. Sch. Bd.*,
    107 F.3d 837 (11th Cir. 1997) ............................................... 2

*Mojsilovic v. Okla. ex rel. Bd. of Regents for the Univ. of Okla.*,
    841 F.3d 1129 (10th Cir. 2016) ............................................ 33

*Monroe v. Thigpen,*
   932 F.2d 1437 (11th Cir. 1991) ............................................... 64

*Morast v. Lance,*
   807 F.2d 926 (11th Cir. 1987) ................................................. 126

*Morris v. Hamm,*
   No. 2:23-CV-001-MHT-CWB, 2023 WL 4056209 (M.D. Ala. Apr. 7, 2023) ......... 93

*Murray v. Weatherly,*
   No. 205-CV-1240-MEF, 2007 WL 4358256 (M.D. Ala. 2007) ................ 81

*Myers v. Ivey,*
   No. 2:21-CV-174-MHT-CSC, 2023 WL 8794608 (M.D. Ala. Dec. 4, 2023) ......... 94

*N.Y. State Nurses Ass'n v. Albany Med. Ctr.,*
   473 F. Supp. 3d 63 (N.D.N.Y. 2020) ................................... 35

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,*
   414 U.S. 453 (1974) ..................................................... 35

*O'Kelley v. Snow,*
   53 F.3d 319 (11th Cir. 1995) ............................................ 117

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ................................................... 57

*Opelika Prod. Credit Ass'n, Inc. v. Lamb,*
   361 So. 2d 95 (Ala. 1978) ............................................. 127

*Osborne v. Folmar,*
   735 F.2d 1316 (11th Cir. 1984) ......................................... 82

*Oxford Asset Mgmt., Ltd. v. Jaharis,*
   297 F.3d 1182 (11th Cir. 2002) ......................................... 57

*Park v. City of Atlanta,*
   120 F.3d 1157 (11th Cir. 1997) ........................................ 121

*Paschal v. Wainwright,*
   738 F. 2d 1173 (11th Cir. 1984) ..................................... passim

*PBT Real Est., LLC v. Town of Palm Beach,*
   988 F.3d 1274 (11th Cir. 2021) ...................................... 84, 86

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ........................................................................... 38

*Penoyer v. Briggs,*
    206 F. App'x 962 (11th Cir. 2006) ................................................. 70, 79

*Pers. Adm'r of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ........................................................................... 95

*Peugh v. United States,*
    569 U.S. 530 (2013) ..................................................................... 61, 79

*Pilgrim v. Luther,*
    571 F.3d 201 (2nd Cir. 2009) .......................................................... 60

*Porter v. Nussle*
    534 U.S. 516 (2002) ........................................................................... 19

*Porter v. Ray,*
    461 F.3d 1315 (11th Cir. 2006) ........................................................ 74

*Pozo v. McCaughtry,*
    286 F.3d 1022 (7th Cir. 2002) .......................................................... 21

*Reagan v. Alabama Alcoholic Beverage Control Board,*
    339 So. 3d 211 (Ala. 2021) ............................................................. 129

*Reno v. Flores,*
    507 U.S. 292 (1993) ..........................................................................113

*Return Mail, Inc. v. U.S Postal Serv.,*
    139 S. Ct. 1853 (2019) ...................................................................... 34

*Robert Earl Council aka Kinetik Justice #181418 v. John Hamm, et al.,*
    2:23-cv-730-ECM-JTA .................................................................... 23

*Roberts v. City of Geneva,*
    114 F. Supp. 2d 1199 (M.D. Ala. 2000) .......................................... 53

*Robertson v. Hecksel,*
    420 F.3d 1254 (11th Cir. 2005) .......................................................113

*Rogers v. Cam Ward - Dir. Bureau of Pardons & Paroles,*
    No. 2:23-CV-356-ECM-KFP, 2023 WL 7290463 (M.D. Ala. Sept. 18, 2023) ........................ 93

*Ron Grp., LLC v. Azar,*
  574 F. Supp. 3d 1094 (M.D. Ala. 2021) ................................................................ 52

*Ross v. Moffitt,*
  417 U.S. 600 (1974) ...................................................................................... 95

*Rowe v. City of Ft. Lauderdale,*
  279 F.3d 1271 (11th Cir. 2002) .............................................................. 36, 37

*S&M Brands, Inc. v. Georgia ex rel. Carr,*
  925 F.3d 1198 (11th Cir. 2019)............................................ 25, 26, 83, 84, 93

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.,*
  501 F.3d 1244 (11th Cir. 2007) ................................................................... 3

*Pennhurst v. State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984) ............................................................................... passim

*Sanders Lead Co. v. Levine,*
  370 F.Supp. 1115 (M.D. Ala. 1973) ........................................................ 128

*Seminole Tribe of Fla. v. Fla.,*
  517 U.S. 44 (1996) .................................................................................... 32

*Shealy v. City of Albany, Ga.,*
  89 F.3d 804 (11th Cir. 1996) ................................................................... 110

*Shepherd v. Wilson,*
  No. CV 15-00373-KD-N, 2015 WL 9685562 (S.D. Ala. Dec. 22, 2015), *aff'd,*
  663 F. App'x 813 (11th Cir. 2016) .......................................................... 116

*Sills v. FCI Talladega Warden,*
  No. 22-12656, 2023 WL 1775725 (11th Cir. Feb. 6, 2023) ..................... 117

*Slakman v. Buckner* ("*Slakman I*"),
  434 F. App'x 872(11th Cir. 2011)........................................................ 88, 89

*Slakman v. State Bd. of Pardons & Paroles* ("*Slakman II*"),
  No. 21-12226, 2021 WL 5071858 (11th Cir. Nov. 2, 2021) ......... 88, 89, 94

*Slocum v. Georgia State Bd. of Pardons & Paroles,*
  678 F.2d 940 (11th Cir. 1982) ................................................................ 117

*Smith v. Mosley,*
  532 F.3d 1270 (11th Cir. 2008) ................................................................ 59

*Stewart v. Baldwin Cnty. Bd. of Educ.*,
 908 F.2d 1499 (11th Cir. 1990) ........................................... 37

*Sullivan v. Smith*,
 925 So. 2d 972 (Ala. Civ. App. 2005) .......................... 29, 126

*Summit Med. Assocs., P.C. v. Pryor*,
 180 F.3d 1326 (11th Cir. 1999) ........................................... 30

*Swarthout v. Cooke*,
 562 U.S. 216 (2011) ...........................................................114

*Sweet v. Sec'y, Dep't of Corr.*,
 467 F.3d 1311 (11th Cir. 2006)............................................ 82

*Swift v. Esdale*,
 306 So. 2d 268 (Ala. 1975) ..................................................11

*Taylor v. Brooks*,
 No. 5:22-CV-237-CLS, 2022 WL 2441297 (N.D. Ala. July 5, 2022)....................................116

*Taylor v. Nix*,
 240 F. App'x 830 (11th Cir. 2007) ..................................... 84

*Taylor v. Troy State Univ.*,
 437 So.2d 472 (Ala. 1983) ................................................ 128

*Thaddeus-X v. Blatter*,
 175 F.3d 378 (11th Cir. 1999) ............................................ 59

*Thomas v. Merritt*,
167 So. 3d 283 (Ala. 2013)................................................... 8

*Thomas v. Sellers*,
 691 F.2d 487 (11th Cir. 1982) ..........................12, 64, 65, 116, 117

*Thompson v. Bd. of Pardons & Paroles*,
 806 So. 2d 374 (Ala. 2001) ...................................12, 64, 66, 79, 117

*Thompson v. Merrill*,
 505 F. Supp. 3d 1239 (M.D. Ala. 2020) ......................... 61, 96

*Thorne v. Chairperson Fla. Parole Comm'n*,
 427 F. App'x 765 (11th Cir. 2011)...................................... 84

*Thornton v. Hunt*,
  852 F.2d 526 (11th Cir. 1988) ........................................................... 97, 102, 106

*Tobon v. Martin*,
  809 F.2d 1544 (11th Cir. 1987) ........................................................... 76, 77

*Tooma v. David*,
  381 F. App'x 977 (11th Cir. 2010) ........................................................70, 79, 117

*Troupe v. Sarasota Cnty., Fla.*,
  419 F.3d 1160 (11th Cir. 2005) ...........................................................118

*Turner v. Burnside*,
  541 F.3d 1077 (11th Cir. 2008) ........................................................... 19

*Turner v. Safley*,
  482 U.S. 78 (1987) ........................................................... 60

*U.S. ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805 (11th Cir. 2015) ........................................................... 3

*United States v. Abraham*,
  386 F.3d 1033 (11th Cir. 2004) ........................................................... 62

*United States v. Kozminski*,
  487 U.S. 931 (1988) ........................................................... 46, 53, 55

*United States v. Rosario-Delgado*,
  198 F.3d 1354 (11th Cir. 1999) ........................................................... 62

*United States v. United Mine Workers of Amer.*,
  330 U.S. 258 (1947) ........................................................... 34

*Vanover v. NCO Financial Services, Inc.*,
  857 F.3d 833 (11th Cir. 2017) ........................................................... 21, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...........................................................94-97

*Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Commissioners*,
  No. 22-10773, 2024 WL 125969 (11th Cir. Jan. 11, 2024) ........................................................... 86

*Waddell v. Hendry Cnty. Sheriff's Off.*,
  329 F.3d 1300 (11th Cir. 2003) ...........................................................116

*Waldman v. Conway*,
    871 F.3d 1283 (11th Cir. 2017) ................................................. 25

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................ 94

*Weaver v. Graham*,
    450 U.S. 24 (1981) .................................................................. 61

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ...............................................116

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ................................................. 34, 35, 51, 120

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ..................................................... 3

*Woodford v. Ngo*,
    548 U.S. 81 (2006) ................................................................. 19

*Worthy v. City of Phenix City, Alabama*,
    930 F.3d 1206 (11th Cir. 2019) ...............................................115

*Young Apartments, Inc. v. Town of Jupiter, FL*,
    529 F.3d 1027 (11th Cir. 2008) ............................................... 83

**Statutes**

1 U.S.C. § 1 ............................................................................. 33, 34

18 U.S.C. § 1589(a) .................................................. 31, 33, 41, 42, 47

18 U.S.C. § 1589(a)(3) .................................................................. 43

18 U.S.C. § 1589(b) ...................................................................... 33

18 U.S.C. § 1595(a) ............................................................. 32, 33, 35

18 U.S.C. § 1595A(a) ................................................................ 32, 35

42 U.S.C. § 1985(2) .........................................................119, 123, 126

42 U.S.C. § 1985(3) .....................................................................119

42 U.S.C. § 1986 ................................................................................... 119-122, 126

42 U.S.C. § 1997e ................................................................................................. 18

42 U.S.C. § 1997e(a) ............................................................................... 18, 19, 20

ALA. CODE § 12-25-32(14) ................................................................................ 17

ALA. CODE § 12-25-32(15) .......................................................................... 14, 17

ALA. CODE § 14-1-1.3 ................................................................................... 39, 40

ALA. CODE § 14-3-47 ........................................................................................... 6

ALA. CODE § 14-5-1 et seq .......................................................................... 41, 46

ALA. CODE § 14-5-10 ....................................................................... 6, 8, 41, 47

ALA. CODE § 14-7-7 ............................................................................................. 9

ALA. CODE § 14-7-13 ........................................................................................... 9

ALA. CODE § 14-7-22 ........................................................................................... 9

ALA. CODE § 14-8-4 ............................................................................................. 7

ALA. CODE § 14-8-6 ......................................................................................... 7, 8

ALA. CODE § 14-8-36 ........................................................................................... 8

ALA. CODE § 15-22-20 et seq ...........................................................................11

ALA. CODE § 15-22-20(a) .................................................................................. 40

ALA. CODE § 15-22-20(b) ................................................................. 16, 29, 40

ALA. CODE § 15-22-20(d) .................................................................................. 40

ALA. CODE § 15-22-20(e) (2019) ................................................................. 125

ALA. CODE § 15-22-21 ............................................................................. passim

ALA. CODE § 15-22-21 (1951) ................................................................. 15, 101

ALA. CODE § 15-22-21 (2019) ......................................................................... 15

ALA. CODE § 15-22-21(b) (2019) ............................................................... 101, 105, 125

ALA. CODE § 15-22-21(b)(1) (2019) ............................................................................ 105

ALA. CODE § 15-22-23 (2011) ............................................................................... 12, 14

ALA. CODE § 15-22-24(a)(1) ..............................................................11, 28, 29, 40, 105

ALA. CODE § 15-22-25 ................................................................................................. 14

ALA. CODE § 15-22-25 (1951) ..................................................................................... 12

ALA. CODE § 15-22-26 (1951) ............................................................................ passim

ALA. CODE § 15-22-26 (2016) ............................................................................ passim

ALA. CODE § 15-22-26 (2019) ............................................................................ passim

ALA. CODE § 15-22-26(a) (2015) ............................................................................... 103

ALA. CODE § 15-22-26(a) (2016) ....................................................................... passim

ALA. CODE § 15-22-26(a) (2019) ....................................................................... passim

ALA. CODE § 15-22-26(a)(1)-(6) ......................................................................... 71, 91

ALA. CODE § 15-22-26(a)(3) (2016) ................................................................... 81, 125

ALA. CODE § 15-22-26(a)(6). ...................................................................................... 71

ALA. CODE § 15-22-26(a), (c) (2016) (2019) ...........................14, 65, 66, 67, 71, 75, 110

ALA. CODE § 15-22-26(c) ................................................................................... passim

ALA. CODE § 15-22-26(c) (2016) ....................................................................... passim

ALA. CODE § 15-22-26(c) (2019) ....................................................................... passim

ALA. CODE § 15-22-26.2 ............................................................................................. 67

ALA. CODE § 15-22-28(d) (2019) .............................................................................. 107

ALA. CODE § 15-22-28(e) (2019) ........................................................................ 16, 101

ALA. CODE § 15-22-36 (2012) .................................................................................... 12

ALA. CODE § 15-22-36 (2016) ......................................................................... 14

ALA. CODE § 15-22-37 (1951) .................................................................. 12, 14

ALA. CODE § 15-22-37(b)(1) (2019) ............................................................ 105

ALA. CODE § 15-22-37(b)(4) ........................................................................ 29

ALA. CODE § 15-23-79(b) ...................................................................... 12, 14

ALA. CODE § 15-23-83 ........................................................................... 12, 40

ALA. CODE § 23-1-21 .................................................................................. 41

ALA. CODE § 23-1-37 ............................................................................... 8, 41

ALA. CODE § 36-1-12(c) ..................................................................... 129, 130

ALA. CODE § 36-15-1(4) ............................................................................. 40

ALA. CODE § 36-15-1(7) ............................................................................. 40

ALA. CODE § 36-15-1(8) ............................................................................. 40

COLO. CONST. art. 2, § 26 ........................................................................... 55

FLA. STAT. ANN. § 947.18 (1973) .............................................................. 68

NEB. CONST. art. I, § 2 ............................................................................... 55

NEB. REV. STAT. § 83-183 ........................................................................... 55

OR. CONST. art. I, § 34 ............................................................................... 55

Section 12-25-32 ...................................................................................... 13

TENN. CONST. art. I, § 33 ........................................................................... 55

UTAH CODE § 64-13-19 ............................................................................... 55

UTAH CONST. art. I, § 21 ........................................................................... 55

VT. CONST. § art. I, § 1 ............................................................................. 55

## Rules

Ala. Admin. Code r. 640-X-3-.03 ............................................................................ 16

Colorado Rule of Appellate Procedure 35(e) ......................................................... 55

Fed. R. Civil P. 12(b)(1) ............................................................................... 2, 3, 130

Fed. R. Civil P. 12(b)(6) ........................................................................................... 2

Fed. R. Evid. 201(b)(2) ............................................................................................. 3

Fed. R. Evid. 201(c)(2) ............................................................................................. 3

Fed. R. Evid. 201(d) ................................................................................................. 3

## Constitutional Provisions

Ala. Const. art. V §§ 113 ....................................................................................... 39

Ala. Const. art. V §§ 120 ....................................................................................... 39

Ala. Const art. XVIII, § 286.02 ....................................................................... 52, 54

Art. V. § 124(b), Ala. Const. 2022 ......................................................................... 11

U.S. Const. amend. XI ........................................................................................... 24

U.S. Const. amend. XIV, § 1 ...................................................................... 112, 115

## Acts

2015 Alabama Laws Act 2015-185 ............................................................. 13, 64, 79

2015 Alabama Laws Act 2015-185, § 3 ................................................... 64, 79, 103

2019 Alabama Laws Act 2019-393, § 2 ................................................................. 65

Alabama Sentencing Reform Act of 2003 ............................................................. 17

Dictionary Act .................................................................................................. 33, 34

Fair Labor Standards Act .................................................................................. 7, 48

Justice Reinvestment Act ................................................................................ passim

Prison Reform Litigation Act .................................................................................... 18

**Other Authorities**

*About UCI*, UTAH CORR. INDUS., https://uci.utah.gov/about-uci/ (last visited Mar. 21, 2024) ..... 55

*About*, CORNHUSKER STATE INDUS., https://csi.nebraska.gov/about (last visited Mar. 21, 2024). 55

*Ballot Statement for the Constitution of Alabama of 2022*, FAIR BALLOT COMM'N, https://www.sos.alabama.gov/sites/default/files/sample-ballots/2022/gen/Statewide-Amendments.pdf (last visited Mar. 21, 2022) .......................................................... 54

Digitized versions of Alabama's prior constitutions are accessible at https://digital.archives.alabama.gov/digital/collection/constitutions ........................................ 52

*Memo on Racist Language*, JOINT INTERIM COMMITTEE ON THE RECOMPILATION OF THE CONSTITUTION, https://www.legislature.state.al.us/pdf/lsa/proposed-constitution/Racist_Language_Backgound_Memo.pdf (Aug. 27, 2021) .................................. 54

**Introduction**

The State Defendants—Governor Kay Ivey, Attorney General Steve Marshall, Alabama Board of Pardons and Paroles Chair Leigh Gwathney, Associate Board Members Darryl Littleton and Gabrelle Simmons, Alabama Department of Corrections Commissioner John Hamm, and Alabama Department of Transportation Director John Cooper—file this consolidated brief in support of their Motions to Dismiss (Docs. 143, 144, 145 and 146).

Plaintiffs bring sweeping challenges to two distinct state practices—the use of inmate labor and the parole system. Although Plaintiffs go so far as to accuse the State Defendants of engaging in human trafficking, when stripped of all rhetoric, Plaintiffs complain only of being required to do chores in prison without compensation, laboring on public works projects for less than the minimum wage, and working for private employers on work release for prevailing wages. It is well established that each of these forms of inmate labor is legal, and so Plaintiffs' claims challenging the use of inmate labor are due to be dismissed.

As to the parole system, Plaintiffs allege changes resulting from an amendment to Alabama's parole law in 2019 resulted in a declining grant rate and racial disparities in parole outcomes. But Plaintiffs' ex post facto claim fails because the 2019 parole law made no substantive changes to the law from the time they committed their offenses—rather, they complain about the cumulative effect of the Parole Board's exercise of discretion in individual cases. Plaintiffs' claims of race discrimination in parole fail because binding precedent establishes that mere racial disparities in parole outcomes fail to prove intentional race discrimination. Plaintiffs have failed to allege similarly-situated inmates are treated differently based on their race, and so their race discrimination claims fail.

Plaintiffs' claims against the State Defendants are due to be dismissed in their entirety.

## Legal Standard

A Rule 12(b)(1) motion to dismiss for a facial lack of subject-matter jurisdiction and a Rule 12(b)(6) motion to dismiss for failure to state a claim apply essentially the same test. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully" and more than labels, conclusions, "formulaic recitation of the elements," or "naked assertions." *Id.* (citing *Twombly*, 550 U.S. at 555–57). Additionally, legal conclusions and mixed questions of law and fact are not presumed to be true even at the pleading stage and do not prevent dismissal. *Id.*; *Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003).

Further, "[a] complaint is subject to dismissal under Rule 12(b)(6) when its allegations on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). "[A]s early as possible," a district court should resolve "[f]acial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss based on failure to state a claim for relief." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367, 1367 n.35 (11th Cir. 1997). This rule "appl[ies] with equal force to challenges to the sufficiency of affirmative defenses, counterclaims, or cross-claims found in any party's pleadings." *Id.* at 1367 n.35. Such disputes "always present[] a purely legal question; there are no issues of fact because the allegations contained in the pleading are presumed to be true." *Id.* at 1367 (citing *Mitchell v. Duval Cty. Sch. Bd.*, 107 F.3d 837, 838 n.1 (11th Cir. 1997)).

In addition to the pleadings, a court may consider both extrinsic materials incorporated by reference in the complaint and judicially noticeable facts when reviewing a Rule 12 motion without converting it into a summary judgment motion. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). An extrinsic document incorporated by reference may be considered "if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id.* Additionally, courts may consider judicially noticeable facts—i.e., facts generally known within the court's jurisdiction or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"—"at any stage of the proceeding." Fed. R. Evid. 201(b)(2), (d). Indeed, courts "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* 201(c)(2). A court may take judicial notice of other court proceedings and matters of public record. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

Lastly, a motion to dismiss under Rule 12(b)(1) may also take the form of a factual attack on subject-matter jurisdiction. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007); *Coltharp v. United States*, 413 F. Supp. 3d 1182, 1186 (M.D. Ala. 2019). Unlike a facial attack, "matters outside the pleadings, such as testimony and affidavits are considered." *McElmurray*, 501 F.3d at 1251. Accordingly, the district court may "dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)[1]). In other words, when necessary "the court is free to weigh the available evidence to satisfy itself of the existence of subject matter

---

[1] All decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

jurisdiction." *Coltharp*, 413 F. Supp. 3d at 1187 (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

**Facts[2]**

**A.     The Parties**

This suit has been brought by two groups of Plaintiffs: Incarcerated Plaintiffs in the custody of the Alabama Department of Corrections (ADOC) and Organizational Plaintiffs. The following are Incarcerated Plaintiffs: Robert Earl Council is assigned to maximum-custody facilities and has not nor will never be eligible for lower custody levels. Doc. 1 ¶ 145. Plaintiff Council along with another inmate founded and organized the Free Alabama Movement. *Id.* ¶ 61. Plaintiff Council has advocated and caused work stoppages in several correctional facilities, including Holman, St. Clair, and Elmore. *Id*. ¶¶ 61-62. The remaining Incarcerated Plaintiffs are Lee Edward Moore, Lakiera Walker,[3] Jerame Apprentice Cole, Arthur Charles Ptomey, Frederick Denard McDole, Michael Campbell, Lanair Pritchett, Alimireo English, and Toni Cartwright. *Id.* ¶¶ 146-54. These Plaintiffs all allege they have been denied parole, and that they have performed jobs either in ADOC facilities or while in ADOC custody working for outside employers on work release. *Id*. Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright all committed the offenses for which they are incarcerated and were sentenced prior to 2015—a fact that is relevant to the ex post facto claim they assert in Count V. *Id*. ¶¶ 146-154.

---

[2] This Statement of Facts will address primarily those facts related to the State Defendants. These facts are also confined to the allegations of the named Plaintiffs as no class has been certified in this case and the State Defendants deny that this case should proceed as a class action. Plaintiffs have standing to represent a class of only those members who suffered the same personal injury as themselves. *See Griffin v. Dugger*, 823 F.2d 1476, 1482-83 (11th Cir. 1987). Since Plaintiffs fail to state a claim and their Complaint should be dismissed in its entirety, it is unnecessary to address the class allegations because the putative class members' claims fail for the same reasons.

[3] Plaintiff Walker was released in 2023. Doc. 1 ¶ 147.

Retail, Wholesale and Department Store Union, Mid-South Council (RWDSU) is a labor organization for employees in the retail and wholesale industries. Doc. 1 ¶ 155. The Union of Southern Service Workers, Service Employees International Union, is another labor organization that caters to service industry workers. *Id.* ¶ 156. The Woods Foundation is a non-profit organization that assists inmates with various needs. *Id*. ¶ 157. These entities comprise the Organizational Plaintiffs.

Plaintiffs sue the State Defendants because of their role in allowing or using inmate labor and for their operation of the parole system. The State Defendants are comprised of the following: Governor Ivey as the head of the Executive Branch for the State of Alabama. Doc. 1 ¶ 160. Attorney General Marshall is an elected official and serves as the State's attorney and chief law enforcement officer. *Id.* ¶ 161. The Board of Pardons and Paroles (Board) is a three-member board. *Id*. at ¶ 77 n. 47. The current members of the Board are Chair Leigh Gwathney, and Associate Members Darryl Littleton and Gabrelle Simmons. *Id*. ¶¶ 162-163. ADOC is under the direction of John Hamm as Commissioner, and he was appointed by Governor Ivey. *Id.* ¶¶ 43, 164. John Cooper is the Director and chief executive officer of the Alabama Department of Transportation. *Id*. ¶ 165.

Plaintiffs sue the remaining Defendants for their role in contracting with ADOC for the use of inmate labor. These are the City of Montgomery, City of Troy, Jefferson County, Gemstone Foods, Ju-Young Manufacturing America, Inc., SL Alabama, LLC, Hwaseung Automotive USA LLC, Progressive Finishes, Inc., C.B.A.K., Southeastern Restaurant Group-Wen LLC, Pell City Kentucky Fried Chicken, Masonite Corporation, Cast Products, Inc., Southeastern Meats, Inc., Koch Foods, LLC, Paramount Services, Inc., and Bama Budweiser of Montgomery, Inc.[4] Doc. 1 ¶¶ 166-174; 176-183.

---

[4] These defendants will be denoted as the Employers.

**B.    Facts Related to the Use of Inmate Labor**

Plaintiffs allege four distinct types of inmate labor: (1) paid labor performed by inmates for private employers through ADOC's work release program, doc. 1 ¶¶ 11-23; (2) paid labor for public entities, such as ALDOT or cities and counties, working on public works or road projects, *id.* ¶¶ 24-34; (3) paid labor performed by inmates making goods for sale through ADOC's Correctional Industries, *id.* ¶¶ 35-36; and (4) unpaid jobs performed by inmates at ADOC facilities such as cleaning, repair, cafeteria work, and laundry, *id.* ¶¶ 37-42.

ADOC has various security levels that are relevant to the different types of labor inmates may perform. ADOC utilizes its classification system to evaluate each inmate to determine the appropriate security level for said inmate. Ex. 3 at 7. This evaluation includes determining whether the inmate can work unsupervised by ADOC staff and work alongside non-incarcerated coworkers. *Id*. Inmates are allowed and encouraged to work their way to the lowest classification level possible for them. Inmates are statutorily allowed to be employed "at such labor, in such places and under such regulations within the state as may be determined by the Department of Corrections." ALA. CODE § 14-3-47; *see also* § 14-5-10.

The lowest custody level, Minimum-Community, is relevant to Plaintiffs' first category of inmate labor: work release. Doc. 1 ¶¶ 11, 114. A Minimum-Community inmate is "allowed gainful employment in the community on a full-time basis and [is] supervised in community-based facilities when not working." Doc. 1 ¶ 114; Ex. 1. Work release is governed by Alabama statutory law that places four limitations on securing employment for inmates: (1) wages must be at the prevailing wage for similar work in the area; (2) the employment of inmate cannot displace already

employed workers; (3) inmates are not employed as strikebreakers or an impairment to an existing contract; and (4) no exploitation of eligible inmates. *See* ALA. CODE § 14-8-4. ADOC has also established regulations implementing this statute that provide inmates are compensated "equal to that of comparable workers and no less than federal minimum wage." Ex. 1 at 3. Employers sign an agreement that they "must pay for inmate labor in the same manner as for any other employee and must comply with the requirements established by the Fair Labor Standards Act." AR 410 at 10. The work release inmates are not employed "under adverse or unacceptable working conditions. *Id.*; *see also* AR 410 at 13. Employers are aware of the rules and regulations that govern inmate and employer conduct and when the employer should notify ADOC. Doc. 1 ¶ 49; Ex. 1 at 11-12.

The work release statute authorizes ADOC to deduct portions of work release inmates' wages to cover its costs, specifically:

> The employer of an inmate involved in work release shall pay the inmate's wages directly to the Department of Corrections. The department may adopt regulations concerning the disbursement of any earnings of the inmates involved in work release. The department is authorized to withhold from an inmate's earnings the cost incident to the inmate's confinement as the department shall deem appropriate and reasonable. In no event shall the withheld earnings exceed 40 percent of the earnings of the inmate. After all expenses have been deducted by the department, the remainder of the inmate's earnings shall be credited to his or her account with the department. Upon his or her release all moneys being held by the department shall be paid over to the inmate.

ALA. CODE § 14-8-6; *see also* Doc. 1 ¶ 15. If the inmate is in work release and employed, they are transported to their job site when they are assigned to work. Doc. 1 ¶ 12; Ex. 1 at 5. Accordingly, ADOC is also allowed to charge a fee for transportation (doc. 1 ¶ 15, Ex. 1 at 5) and laundry services (doc. 1 ¶ 16, Ex. 1 at 17-18). All inmates are subject to medical co-pays for various

medical services. Ex. 2. The Supreme Court of Alabama has held that ADOC is authorized pursuant to § 14-8-6 to withhold 40 percent of work release inmates' earnings and to charge for transportation, laundry, and medical co-pays. *See Thomas v. Merritt*, 167 So. 3d 283, 292-93 (Ala. 2013). When the work release Plaintiffs allege that ADOC deducted 40% of their gross pay and charged them $5 per day for van rides and $15 per month for laundry, they allege nothing more than that ADOC followed state law. *See, e.g.*, Doc. 1 ¶¶ 147-52.

Plaintiffs' second category of inmate laborers—those who perform public works projects for government entities—involves inmates classified as Minimum-Out. Doc. 1 ¶ 24; Ex. 3 at 7. The Minimum-Out classification is for inmates that "are not seen as risk to themselves or others and can be assigned to work assignments away from ADOC property without supervision by Correctional Officers. Most Minimum-Out custody inmates are housed at Community Work Centers." Ex. 3 at 7; Doc. 1 ¶¶ 25, 116. These inmates are usually assigned to a municipality, county, or state agency and shall be paid minimum wage. ALA. CODE § 14-8-36. Under a separate public works provision, ADOC is "authorized to hire or lease convicts to any department, agency, board, bureau or commission of the state on such terms, conditions and at such prices as may be mutually agreed upon…" ALA. CODE § 14-5-10. One state agency that contracts with ADOC for inmates to work for it is ALDOT. Doc. 1 ¶¶ 24, 133. ALDOT is specifically authorized by statute to contract with ADOC for the utilization of convict labor in its operations. ALA. CODE § 23-1-37. There are some counties and municipalities that contract with ADOC, such as the City of Troy, City of Montgomery, and Jefferson County. *Id.* ¶ 133. ADOC has developed and implemented a regulation that governs work squads working on government projects and safety training for squads that work near roadways. AR 439. Inmates receive pay from working in these positions. Ex. 4 at 4.

Plaintiffs' third category of inmate laborers make prison-made goods for Correctional Industries, another program established by statute based on the State Legislature's findings that ADOC is:

(1) To provide more adequate, regular and suitable employment for the vocational training and rehabilitation of the prisoners of this state, consistent with proper penal purposes.

(2) To utilize the labor of prisoners for self-maintenance, reimbursing this state for expenses incurred by reason of their crimes and imprisonment, and for initial living expenses upon reentry into the community following release from prison.

(3) To effect the requisitioning and disbursement of prison products directly through established state authorities without possibility of private profits therefrom.

(4) To provide prison industry projects designed to place inmates in working and training environments in which they are able to acquire marketable skills and earn money to off-set the cost of incarceration, make payments for restitution to their victims, provide support for their families, and prepare for their release from prison.

ALA. CODE § 14-7-7. ADOC implemented this statute by employing inmates in the Correctional Industries Program. Doc. 1 ¶ 35. Correctional Industries inmates engage in the manufacture of furniture, furniture restoration, chemicals, making clothing and mattresses, building modules, printing, and imprinting vehicle tags. *Id.* n.18 (citing ADOC September 2023 Monthly Report at 15). Prison-made goods produced by Correctional Industries may be sold only to the state or political subdivisions, and ADOC is prohibited from selling prison-made goods on the open market. *See* ALA. CODE §§ 14-7-13, -22.

Plaintiffs' fourth category of inmate laborers involves unpaid chores or jobs performed at ADOC facilities or in the immediate vicinity of those facilities. Doc. 1 ¶¶ 37-38. Inmates are assigned various jobs within the ADOC facilities. This assigned job is to assist an inmate in "their personal development and the efficient operation of their facility." Ex. 5 at 1. An Institutional Job

Placement Board assesses and assigns the inmate a job within the institution. Ex. 3 at 6; Ex. 5. Inmate assigned jobs include anything from cooking, cleaning, and laundry to wiring and repairing the HVAC and electricity systems at ADOC facilities. Doc. 1 ¶ 38.

With respect to unpaid inmate assigned jobs, inmates may be subject to discipline for "[r]efusing to work" or "[e]ncouraging or causing others to stop work." Ex. 6 at 19-20. For inmates who voluntarily assume paid employment outside ADOC facilities on public works projects or on work release, those inmates are expected to fulfill their work assignments and jobs; if not, the inmate may receive a disciplinary action for "Being Fired From A Job," which is defined as being terminated from employment or assigned job for cause. Doc. 1 ¶ 19; Ex. 6 at 32. There are various sanctions that may be imposed for this violation, such as loss of passes and reduction of money draw. *Id.* at 23. ADOC may also issue a disciplinary action for "Encouraging Or Causing Others To Stop Work," which is considered to be a High Level Violation. Doc. 1 ¶¶ 43, 48; Ex. 6 at 26. Some of the sanctions that may be imposed for this offense are confinement in restrictive housing for up to 45 days, recommendation for custody review, loss of any or all privileges, extra duty, and recommendation of a job changes. Ex. 6 at 22. ADOC is also allowed to take away Correctional Incentive Time. Doc. 1 ¶ 46; Ex. 6 at 22; Ex. 7.[5] In fact in 2022, inmates participated in a work stoppage within the facilities to protest prison conditions and lack of granting of parole. Doc. 1 ¶ 141.

With the above framework in place, Plaintiffs allegations regarding inmate labor are completely unextraordinary—despite their conclusory allegations of a sweeping conspiracy to engage in human trafficking. Plaintiff Council alleges that he has been disciplined for organizing

---

[5] ADOC AR 403, Procedures For Inmate Rule Violations, was revised to comply with Governor Ivey's Executive Order 725 issued January 9, 2023. Doc. 1 ¶ 47.

work stoppages at ADOC facilities, doc. 1 ¶ 145,—an allegation that is unsurprising given that this is a direct violation of ADOC disciplinary policy. Ex. 6 at 19. The remaining Inmate Plaintiffs allege they performed inmate assigned jobs at ADOC facilities without compensation, or that they worked on public works projects for less than the minimum wage or that they worked for private employers but had 40% of their gross pay deduced by ADOC and paid a charge of $5 per day for van rides and $15 per month for laundry for their non-ADOC work clothes. Doc. 1 ¶¶ 146-54. Distinctly lacking are any factual allegations about how these Plaintiffs were "forced" or "coerced" to take paid employment positions outside ADOC facilities for public works or private employers. Plaintiffs can point to no statute, rule, or act or omission by Hamm whereby they were forced to take paid work outside ADOC facilities.

**C.    Facts Related to Parole**

Plaintiffs allege that the Board "is an Alabama state agency" that is "within the Bureau [of Pardons and Paroles]" and comprised of a "three-person panel tasked with determining which incarcerated people may be released on parole and under what conditions." Doc. 1 at 39 n.47.[6] Since 1939, the Alabama Constitution granted the Alabama Legislature the power to "provide for and regulate the administration of . . . paroles[.]" Art. V. § 124(b), Ala. Const. 2022. In turn, the Legislature created the Board and granted it power over parole decision-making. *See Ex parte Bd. of Pardons & Paroles*, 793 So. 2d 774, 776 (Ala. 2000) (*citing Swift v. Esdale*, 306 So. 2d 268 (Ala. 1975)). Thus, Alabama law vests parole power in the Board. *See* ALA. CODE §§ 15-22-24(a)(1); 15-22-26(c).

---

[6] Plaintiffs incorrectly allege that the Board is "within" the Bureau. Doc. 1 at 39. As a matter of law, the Bureau is not and never has been a legal entity. It is the Board that is the statutorily created agency with the authority over parole matters. ALA. CODE §§ 15-22-20 *et seq*.

Originally, Alabama parole law provided that no parole would be granted as a reward but only if the Board believed that, if released, an inmate would not violate the law and that the inmate's release would not be incompatible with the welfare of society. *See* ALA. CODE § 15-22-26 (1951). Before the Board decided whether to grant or deny parole, the Board investigated the inmate coming up for parole review and gave notice to parties as required by statute. *See* ALA. CODE § 15-22-25 (1951); *see also* ALA. CODE § 15-22-36 (2012). After investigating an inmate, the Board would conduct a parole consideration hearing where interested parties could submit their input, including victims and the Attorney General. *See e.g.*, ALA. CODE § 15-22-23 (2011); ALA. CODE §§ 15-23-79(b); 15-23-83. The Board also established policies for setting off an inmate's subsequent parole hearing date, ALA. CODE § 15-22-37 (1951), and the Board set the maximum time to set-off a subsequent hearing at five-years. Under these laws, Alabama and federal courts recognized that the Board had total discretion over parole decision-making. *See Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982); *see also Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374, 375 (Ala. 2001).

In 2015, the Alabama Prison Reform Task Force received the Council on State Government's Report which recommended changes to Alabama's parole statutes that would "reduce recidivism and improve public safety." Doc. 1 at 39 n.48. When discussing policy recommendations for Alabama's parole system, the analysis suggested that the Board adopt guidelines to aid parole decisions. *Id.* at p. 26. Further, the analysis suggested that maximum time before reconsidering an inmate for parole be reduced from 5-years to 1-year. *Id*. The purpose of the analysis's suggestions was to prioritize prison space for those who pose the greatest risk ***to public safety***. *Id.*

However, the analysis also recommended that the Board "[s]pecify that the guidelines do not establish an expectation or right of release and that ***the ultimate decision of whether or not to grant parole resides with the parole board***." Doc. 1 at 39 n.48 at p. 26 (emphasis added). Likewise, the analysis's promotion of maximum setoff before reconsideration of parole did not extend to inmates with violent offenses. *Id*. (suggesting the reduced setoff be provided to inmates with prison sentence of 20-years or less, "with the exception of those convicted of violent offenses."). Thus, to increase public safety, the analysis promoted the Board's complete discretion and encouraged longer setoff times for violent offenders.

Subsequently, the Alabama Legislature passed SB67 which amended Alabama's parole statutes. 2015 Alabama Laws Act 2015-185.[7] SB67 went into effect on January 30, 2016. 2015 Alabama Laws Act 2015-185, § 23. Under SB67, Alabama parole law still prohibited granting parole as a reward and only authorized the Board to grant parole if, in its opinion, the inmate met guidelines. ALA. CODE § 15-22-26(a) (2016). SB67 directed the Board to create parole guidelines which included, at a minimum, six listed factors:

> (1) The prisoner's risk to reoffend, based upon a validated risk and needs assessment as defined in Section 12-25-32;
>
> (2) Progress by the prisoner and the Department of Corrections to plan for reentry;
>
> (3) Input from the victim or victims, the family of the victim or victims, prosecutors, and law enforcement entities;
>
> (4) Participation in risk-reduction programs while incarcerated;
>
> (5) Institutional behavior of the prisoner while incarcerated; and

---

[7] What Plaintiffs refer to as the JRA (Justice Reinvestment Act), is also known, and will be referred to as herein, as Senate Bill 67 ("SB67"), its Act number (2015 Alabama Laws Act 2015-185), or the specific statute into which a provision was later codified followed by the year of the version cited (e.g., § 15-22-26(c) (2016)).

(6) Severity of the underlying offense for which the prisoner was sentenced to incarceration.

*Id.*[8]

However, SB67 explicitly relegated the parole guidelines to mere aids (not once, but twice), and left the ultimate parole release decision to the "complete discretion" of the Board. ALA. CODE §§ 15-22-26(a), (c) (2016). SB67 kept in place the law governing the investigation of inmates, notice, set off dates for future hearings, and parole consideration hearings remained substantively the same. ALA. CODE §§ 15-22-23 (2011); 15-22-25; 15-22-37 (1951); 15-22-36 (2016); 15-23-79(b); 15-22-83. Pursuant to SB67's command, the Board created and adopted the 2016 Guidelines. Doc. 1 at ¶ 84; Ex. 8.

In 2017, the Board granted parole to white male Jimmy O'Neal Spencer pursuant to the law and guidelines put in place under SB67 ("Spencer"). Doc. 1 at 44 n.60. The Board granted parole to Spencer despite his criminal record which included convictions for Assault II, three counts of Escape I, Burglary II, Burglary III, and Unlawful Breaking and Entering of a Vehicle. *Id.* The Complaint alleges that the Board determined Spencer to be at a "low risk". Doc. 1 at 60 n.73. Within a year, Spencer evaded parole supervision and murdered three people, including a 7-year-old child. *Id.* at 45 n.62.

Spencer's brutal murders resulted in a public outcry against the Board's parole decision-making. Doc. 1 at 44 n.59, 44 n.60, 46 n.65. The Complaint alleges that the Governor and Attorney General met with the former Board members to determine why the Board had granted parole to Spencer, a violent offender, and why the Board was granting parole so easily to violent offenders. Doc. 1 at ¶ 91; Doc. 1 at 44 n.59, n.60; ALA. CODE § 12-25-32(15) (listing violent offenses

---

[8] In 2016, the Board adopted the Ohio Risk Assessment System ("ORAS") as its risk assessment tool. Doc. 1 at ¶ 85.

including Assault II, Burglary II, Burglary III, and Escape I). According to Plaintiffs, the former Board members, including former Board Chair Lynn Head ("Head"), defended their decision-making practices, which included following "structured decision making" and the "scienced-based guidelines", even though this practice objectively resulted in the release of an inmate who was unfit for parole and who eventually murdered three people. Doc. 1 at ¶ 91; Doc. 1 at 45 n.62, 46 n.63.

The Governor described this meeting as disappointing. Doc. 1 at ¶ 92 n.60. She further stated that "It's obvious we need a new approach, so we can strengthen the operations and management of that agency, so we can restore confidence in the process of pardons and paroles." *Id.* Following the meeting, Governor Ivey issued a moratorium on early parole consideration hearings after determining that the former Board members were still conducting early parole consideration hearings for violent offenders without justification. *Id.* at 44 n.59.

Due to the objective failure of SB67, the Governor and Attorney General advocated for, and the Alabama Legislature passed, HB380. Doc. 1 at ¶ 93. HB380 went into effect on September 1, 2019. 2019 Alabama Laws Act 2019-393. For parole decision-making, HB380 retained the requirement to create and use guidelines as an aid (again, saying so twice) but directed that the guidelines were to recognize the Board's "paramount" duty to public safety. ALA. CODE § 15-22-26(a) (2019). HB380 otherwise made view revisions to § 15-22-26, leaving unchanged much of the prior language including that parole decision-making remained at the complete discretion of the Board. ALA. CODE § 15-22-26(c) (2019).

HB380 removed the Board Secretary position and created a new position: the "Director of Pardons and Paroles". *Compare* ALA. CODE § 15-22-21 (1951) *with* ALA. CODE § 15-22-21 (2019). Additionally, HB380 established a schedule for setting an inmate's initial parole consideration

hearing date. *See* ALA. CODE § 15-22-28(e) (2019). However, like SB67, HB380 did not substantively change the law governing the investigation of inmates, notice, set off dates for future hearings, and parole consideration hearings. ALA. CODE §§ 15-22-23 (2011); 15-22-25 (1951); 15-22-36 (2019); 15-23-79(b); 15-22-83; Ala. Admin. Code r. 640-X-3-.03.

Following the effective date of HB380, Governor Ivey appointed Charles Graddick ("Graddick") as Director, and after former Board Chair Head resigned, Governor Ivey appointed Leigh Gwathney as the Board Chair. Doc. 1 at ¶¶ 94, 162. In 2021, Governor Ivey appointed Darryl Littleton ("Littleton") to the Board, and in 2023, Governor Ivey appointed Gabrelle Simmons ("Simmons") to the Board creating a Black-majority Board. *Id.* at ¶ 163.

The Board also issued new guidelines in 2020. Doc. 1 at ¶ 85 n.57. The revision was mandated by SB67's requirement that the Board review the guidelines every three years – a requirement kept in place by HB380. ALA. CODE § 15-22-26(a) (2016) (2019). The Board used the 2020 Guidelines when it considered the instant inmate Plaintiffs for parole. Doc. 1 at ¶¶ 146–54.

While Governor Ivey has the power to appoint members to the Board, subject to Senate confirmation, she has no authority to order the Board to grant or deny parole or to set reset dates. *See* ALA. CODE § 15-22-20(b). Attorney General Marshall, as chief law enforcement officer, is entitled to receive notice of parole hearings and to represent victims before the Board, but he likewise lacks the authority to order the Board to grant or deny parole or to set reset dates. *See* ALA. CODE §§ 15-22-23(b)(2)(a.); 15-22-36(d); § 15-23-83 ("The Attorney General or district attorney may assert any right to which the victim is entitled.").

Plaintiffs allege that Ivey and Marshall met with the Board and objected to parole for violent offenders, and that Marshall's office often sends letters to the Board opposing parole for

violent offenders. Doc. 1 ¶¶ 91, 99. "A violent offender is an offender who has been convicted of a violent offense, or who is determined by the trial court judge or a release authority to have demonstrated a propensity for violence, aggression, or weapons related behavior based on the criminal history or behavior of the offender while under supervision of any criminal justice system agency or entity." ALA. CODE § 12-25-32(14). There are fifty-one violent offenses that are defined in the Alabama Sentencing Reform Act of 2003. Some of these crimes are murder, manslaughter, assault, rape, sodomy, soliciting a child by computer, domestic violence, arson, etc. ALA. CODE § 12-25-32(15); Doc. 1 ¶ 102. There has been a downward trend in the granting of parole, which Gwathney has defended by stating "whether an inmate could pose a risk to public safety is the strongest factor in making decisions." Doc. 1 ¶ 105 n.67. Gwathney has stated that the decisions that are made are individualized for a specific inmate. *Id.* She further stated "[b]ut as long as I'm sitting on this board, I will decide based on every individual that comes in front of me, and whether or not that person can be released without being a danger to public safety. This board is not driven by statistics." *Id.*

When the Board denies parole to an offender, it will reset or set-off a date for the next time parole hearing for that offender. Doc. 1 ¶ 110. The maximum time to be set-off is five years. *Id.* ¶ 111. Non-violent offenders with sentences of twenty years or less that are denied parole shall have a set-off date that is no more than two years after the denial date. ALA. CODE § 15-22-37.

As with the allegations on labor, Plaintiffs' allegations as to parole are heavy on generalities but sparse as to the named Plaintiffs. Plaintiffs allege that they have been denied parole, and that in many cases Marshall objected to them receiving parole, and that they believe they are "qualified" for parole due to being in various forms of minimum custody or work release. *See* doc. 1 ¶¶ 146-54. Plaintiffs fail to allege that they were treated differently than similarly-situated white

17

inmates with respect to their specific parole decisions. (*Id.*). Instead, they cite statistical outcomes that show the parole grant rate declined from 2018 to 2023 and statistics that lump all inmates together and compare the rates of disparate impact for white and black inmates. *Id.* ¶¶ 100-112. The named Plaintiffs do not allege any act or omission as to their specific cases by Ivey or Hamm.

## Argument

**A.**   **Plaintiffs Council, Moore, Cole, Ptomey, McDole, Campbell, Pritchett, English and Cartwright Failed to Exhaust Their Administrative Remedies as to Counts I, II, and IV in Accordance with the PLRA Prior to Filing Suit.**

Counts I, II, and IV were in part brought by these plaintiffs: Council,[9] Moore, Cole, Ptomey, McDole, Campbell, Pritchett, English, and Cartwright ("PLRA Plaintiffs"), who are prisoners confined in ADOC, regarding prison conditions as contemplated by the Prison Reform Litigation Act ("PLRA") 42 U.S.C. § 1997e. The PLRA states that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

PLRA Plaintiffs assert in Count I that, in violation of the TVPA, they were coerced into forced labor through the voluntary work release program for either no pay or lower pay than would be expected in employment for a non-incarcerated employee. Doc. 1 ¶ 203-211. PLRA Plaintiffs assert in Count II that the State Defendants violated the RICO Act based on the Count I violation of the TVPA. Doc. 1 ¶ 212-220. PLRA Plaintiffs assert in Count IV that, in violation of the First Amendment under §1983, Defendants Ivey and Hamm retaliated against them for refusing to work and advocating for the withholding of labor. Doc. 1 ¶ 226-234.

---

[9] Council is a Plaintiff only in Count IV.

Counts I, II, and IV are all claims that are brought either under section 1983 or another Federal Law (i.e. the TVPA and RICO). Further, these claims are brought in respect to "prison conditions" as contemplated under the PLRA. 42 U.S.C. § 1997e(a)). The term "prison conditions" has been interpreted to include claims based on general circumstances of prison life (such as labor conditions or general retaliation claims) or specific instances (meaning specific retaliation claims). *See Porter v. Nussle* 534 U.S. 516, 532 (2002) ("PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Exhaustion of administrative remedies prior to bringing suit, as in this case, is not discretionary but is mandatory by a prisoner. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court but is mandatory.").

As this is considered an affirmative defense, "[t]he defendants bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." *Turner v. Burnside,* 541 F.3d 1077, 1082 (11th Cir. 2008). While this issue is raised at the motion-to-dismiss stage, the court may look behind the pleadings, and review the attached exhibits to conduct fact-finding to resolve this question. *See Bryant v. Rich,* 530 F.3d 1368, 1374 (11th Cir. 2008) (noting that a judge may conduct fact-finding when deciding "a motion to dismiss for failure to exhaust nonjudicial remedies").

State Defendants have satisfied their burden. ADOC established an inmate grievance procedure on August 1, 2023, pursuant to Administrative Regulation (AR) 406. *See* Ex. 9. AR 406 established the process for inmates in ADOC custody to seek administrative remedies within ADOC for any grievances that inmates may have for which they seek redress. *Id.* AR 406 further establishes an appeal process an inmate must take if they reject the decision rendered in response

to their grievance. *Id*. The appeal must be filed "within ten (10) days of receiving the decision. Failure to appeal within that timeframe shall be deemed an acceptance of the decision." *Id*. (AR 406(Z)(1)(e) (Grievance Appeal)) or (AR 406(AA)(3) (Emergency Grievance Appeal).

As ADOC has established a grievance procedure as an available administrative remedy, in accordance with the PLRA, an inmate in ADOC's custody is required to exhaust all administrative remedies prior to initiating an action with respect to prison conditions under section 1983, or any other Federal law. *See* 42 U.S.C. § 1997e(a).

PLRA Plaintiffs have failed to do so here. *See* Ex. 10. Grievances Coordinator Tina Tyler testified via affidavit that after reviewing the complaint and an extensive review of the internal records for the ADOC, she found that Plaintiffs English and Cartwright have not filed grievances related to the underlying claims for Count I, II and IV. *Id*.  Tyler further testifies that Plaintiffs, Council, Moore, Cole, Campbell, Ptomey, and Pritchett have filed an initial grievance each relating generally to Count I, II, and IV. *Id*. Tyler testifies that a response was provided to each inmate Plaintiff that submitted a grievance. *Id*. She also testifies that none of the inmates sought an appeal of these decisions under AR 406(Z)(1)(e) (Grievance Appeal) or AR 406(AA)3 (Emergency Grievance Appeal). *Id*. As a result of the failure to appeal, each Plaintiff who sought a grievance process has been deemed to have accepted the decisions rendered on their grievance pursuant to AR 406. See. Ex. 9 ("If the grievant rejects the decision, the grievant must submit a written Inmate Grievance Appeal Form 406-8, Inmate Grievance Appeal Form, to the IGO within ten (10) days of receiving the decision. Failure to appeal within this timeframe shall be deemed an acceptance of the decision.").

To exhaust administrative remedies in accordance with the PLRA, prisoners must "properly take each step within the administrative process." *Johnson v. Meadows*, 418 F.3d 1152,

1158 (11th Cir. 2005) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)). If their

initial grievance is denied, prisoners must then file a timely appeal. *See id.*; *see also Bryant v. Rich*,

530 F.3d 1368, 1378 (11th Cir. 2008) (concluding that a prisoner who declined to appeal an

untimely grievance failed to exhaust his administrative remedies). As discussed above, Plaintiffs

English and Cartwright failed to file any grievance relating to the allegations contained in Count

I, II, and IV prior to filing this claim. Plaintiffs Council, Moore, Cole, Campbell, Ptomey, and

Pritchett have been provided responses from ADOC to their respective grievances. However,

PLRA Plaintiffs' ability to appeal said resolution has not been exercised by the individual Plaintiffs

and thus they have been deemed as accepting the resolution. *See* Ex. 9. Therefore, in light of the

foregoing, none of the PLRA Plaintiffs have properly exhausted all administrative remedies prior

to bringing suit.

Based on the failure of PLRA Plaintiffs to exhaust all available administrative remedies as

to Counts I, II, and IV, those Counts as to the grievable conduct provided for in AR 406, namely

labor conditions and claims of retaliation, are due to be dismissed against the State Defendants.

Furthermore, Plaintiff Council should be dismissed entirely as a party as the only asserted claim

by Council are the allegations of retaliation contained in Count IV.

**B.    Council Should Be Dismissed from this Suit Due to Improper Claim Splitting.**

Plaintiff Council has created a claim splitting situation by filing three separate lawsuits that

include claims relating to a common set of facts, namely his allegation of First Amendment

retaliation for his advocacy of work stoppages. A plaintiff may not file duplicative complaints to

increase his legal rights. *See Vanover v. NCO Financial Services, Inc.*, 857 F.3d 833, 841 (11th

Cir. 2017) (citing *Greene v. H&R Block E. Enters., Inc.*, 727 F.Supp.2d 1363, 1367 (S.D. Fla.

2010)) (other citation omitted). "The claim-splitting doctrine thereby 'ensures that a plaintiff may

not "split up his demand and prosecute it by piecemeal, or present only a portion on the grounds upon which relief is sought, and leave the rest to be presented in a second suit, if the first fails."'" *Id.* (other citation omitted). "It is well settled that a plaintiff 'may not file duplicative complaints in order to expand their legal rights.'" *Id.* "The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit. By spreading claims around in multiple lawsuits in other courts or before other judges, parties waste 'scarce judicial resources' and undermine 'the efficient and comprehensive disposition of the case.'" *Id.* (other citation omitted).

Claim-splitting is analyzed as an aspect of res judicata or claim preclusion. *Vanover*, 857 F.3d at 841 (other citations omitted). "While claim-splitting and res judicata both promote judicial economy and shield parties from vexatious and duplicative litigation, 'claim splitting is more concerned with the district court's comprehensive management of its docket, whereas res judicata focuses on protecting the finality of judgments." *Id.; Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011). There is a two-factor test that the court must apply when analyzing claim-splitting: "(1) whether the case involves the same parties and their privies, and (2) whether separate cases arise from the same transaction or series of transactions." *Id.* at 841-42 (other citation omitted). "Claims are part of the same cause of action when they arise out of the same nucleus of operative fact, or are based on the same factual predicate." *McQueen v. Alabama Department of Transportation*, 2018 WL 2709319, at *7 (M.D. Ala. June 5, 2018) (citing *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296-97 (11th Cir. 2001)). To make this determination, "a court must compare the substance of the actions, not their form." *Id*.

Plaintiff Council has now filed three lawsuits – this present case,[10] *Council v. Hamm, et al.*, 2:23-CV-658-ECM-CWB,[11] and *Robert Earl Council aka Kinetik Justice #181418 v. John Hamm, et al.,* 2:23-cv-730-ECM-JTA.[12] It is unclear why Plaintiff Council is even included in this suit as he is serving a life sentence for capital murder and thus not eligible for parole or work release based on his violent offense, which is contrary to the remaining inmate Plaintiffs. Nevertheless, Plaintiff Council is included only in Count IV of the complaint. Doc. 1 at 109. Count IV alleges that in violation of the First Amendment, Council was retaliated against for the alleged protected activity of advocating for work stoppages by inmates within ADOC. Doc. 1 ¶ 226-234.

The parties included in *Council II* for Count IV include Governor Ivey and Commissioner Hamm. The parties in *Council I* also include Commissioner Hamm and several administrative personnel, while, in *Council III*, the Defendants include the *Council I* Defendants as well as other current and former administrative and correctional personnel. Each case contains a claim premised on Plaintiff Council being allegedly retaliated against in violation of his First Amendment. Each First Amendment retaliation claim includes among the claimed protected activity, organizing prison labor strikes, "resistance to unconstitutional confinement, conditions, and forced labor" or something similar. *See Council I* and *Council III*. As such each claim, from each case, arises from the same set of operative facts concerning this allegation in Count IV of this case, *Council II*. Doc. 1 ¶¶ 145 & 226-234. Plaintiff Council reiterates in each case the fact that he sued Defendant Commissioner Hamm in *Council I, Council II,* and *Council III*. Included in all three of Council's suits is a First Amendment retaliation claim based on his "protected activity" of organizing or

---

[10] The present case will be denoted as *Council II.*

[11] The first case filed will be denoted as *Council I.*

[12] The third case filed will be denoted as *Council III.*

advocating for work stoppages. In *Council I*, Plaintiff seeks injunctive relief, while in *Council III*, he seeks monetary damages. In *Council II,* he seeks both. Clearly, Plaintiff Council could have amended *Council I* to add defendants, facts, claims, and damages that may be included in *Council II*. Yet, he did not. It appears Plaintiff Council has simply filed duplicative complaints in order to expand his legal rights and waste judicial resources. Thus, as Council is a plaintiff only in Count IV of this Complaint, for which he already has two cases pending concerning the same claim and further bears no commonality to the remaining Plaintiffs, Plaintiff Council should be dismissed entirely as a party to this case due to improper claim splitting.

**C.    Sovereign Immunity Under *Pennhurst* Bars Plaintiffs' Claims Premised on a Violation of State Law.**

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Id.* at 101-102.

There is a limited exception to the general rule of sovereign immunity for suits against State officials recognized in *Ex parte Young*, 209 U.S. 123 (1908). "In *Ex parte Young*, the Supreme Court carved out a narrow exception to the States' sovereign immunity when it held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." But *Young*'s rationale "disappears" when "a plaintiff alleges that a state official has violated *state* law." *Pennhurst*, 465 U.S. at 106. A federal court's grant of relief on state law grounds "does not vindicate the supreme authority of federal law." *Id.* "On the contrary, *it is difficult to think of a greater intrusion on state sovereignty than*

*when a federal court instructs state officials on how to conform their conduct to state law.*" *Id.* (emphasis added).

Plaintiffs purport to assert official-capacity claims against the State Defendants under the *Ex parte Young* exception to sovereign immunity based on alleged violations of federal law, But Plaintiffs' characterization of their claims as based on violations of federal law is not dispositive. In determining whether a purported federal claim is actually a claim that state officials are violating state law, a court looks to the "gravamen" of the complaint and whether the request for relief is based on a violation of state, rather than federal law. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, at 1204-05 (11th Cir. 2019); *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir. 2017) (holding purported federal challenge based on state prison officials' failure to follow classification manual "is not a procedural due process challenge—it is a claim that state officials violated state law in carrying out their official responsibilities" barred under *Pennhurst*); *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997). The standard for whether a claim is state or federal for purposes of *Pennhurst* is "when the claim of entitlement to relief is based on a violation of state law, sovereign immunity applies." *S&M Brands*, 925 F.3d at 1204.

Here, many of Plaintiffs' claims "necessarily rel[y] on a determination that state officials [have] not complied with state law." *S&M Brands, Inc.*, 925 F.3d at 1204. These claims, namely Counts I, II, III, V, VI, VII, VIII, IX, X, and XI,[13] are premised entirely on Defendants' alleged failure to follow state law, and the remedies they request are for Defendants to follow Plaintiffs' preferred interpretation of state law.

---

[13] Plaintiffs do not even attempt to frame Count III—a claim explicitly brought under § 32 of the Alabama Constitution—as based on a violation of federal law. The State Defendants are entitled to sovereign immunity as to this Count without examining the "gravamen" of the Complaint.

Defendants' alleged violations of federal constitutional rights are simply complaints that they are not following Plaintiffs' preferred interpretation of state parole law. Their challenge to the State Defendants' alleged conspiracy to violate their federal rights with respect to parole decision are expressly premised on alleged violations of state law, such as the repeated assertions that Defendants have abandoned reliance on the ORAS and deny parole for violent offenders. (*See, e.g.*, doc. 1 ¶¶ 237-38, 261-62). Plaintiffs' policy disagreement on how to weigh these factors is a matter of state law. *See S&M Brands, Inc.*, 925 F.3d at 1205 ("Accordingly, the 'gravamen of [the] complaint appears to be that the State has improperly interpreted and failed to adhere to a state statute,' and *Pennhurst* bars such claims.") (quoting *Schrenko*, 109 F.3d at 688). Plaintiffs' allegations of forced labor simply reincorporate their allegations that Defendants are conspiring to deny parole to increase the pool of inmate workers—a theory that is again premised on Defendants' alleged violations of state parole law. *See, e.g.*, doc. 1 ¶¶ 207-09, 218, 265, 271, 278-80.

"[W]hen the claim of entitlement to relief is based on a violation of state law, sovereign immunity applies." *S&M Brands, Inc.*, 925 F.3d at 1204. The "gravamen" of Plaintiffs' complaint, *Schrenko*, 109 F.3d at 688, is that the Board's prior practice of weighing risk assessments more heavily resulted in higher parole grant rates and fewer racial disparities, and that the Board should be ordered to return to this practice. While Plaintiffs style their claims as federal constitutional challenges, they are in substance an attempt to impose their favored interpretation of state law. *See S&M Brands, Inc.*, 925 F.3d at 1204 ("Conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar."). As a result, Plaintiffs' claims are barred by sovereign immunity under *Pennhurst.*

**D.    Plaintiffs' Parole-Based Claims Against Ivey, Marshall, and Hamm Should Be Dismissed for Lack of Standing and Sovereign Immunity.**

All of Plaintiffs' claims against Ivey, except the First Amendment retaliation claim in Count IV, and all of their claims against Marshall relate to their alleged role in encouraging the denial of parole. Doc. 1 ¶¶ 206-09, 218, 237-39, 245-47, 253-55, 261-62, 265-68, 271-74, 278-80. Plaintiffs also include ADOC Commissioner Hamm in Counts V - VIII challenging parole practices. But Ivey, Marshall, and Hamm do not have authority or control over parole decisions, and so Plaintiffs lack standing to sue them for these claims and Ivey, Marshall, and Hamm enjoy sovereign immunity for these claims. As a result, all claims against Ivey except Count IV[14] should be dismissed for lack of standing and sovereign immunity. All claims against Marshall should be dismissed for lack of standing and sovereign immunity. Counts V – VIII should be dismissed against Hamm for lack of standing and sovereign immunity, and Counts I, II, and IX – XI against Hamm should be dismissed to the extent they are based on his alleged involvement in parole practices.

Standing requires the alleged injuries to be "fairly traceable to the *challenged action of the defendant.*" *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) (emphasis in original) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In other words, a plaintiff's injuries must be redressable by an action against a particular defendant. *See id.*; *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged.").

---

[14] The First Amendment retaliation claim against Ivey in Count IV should be dismissed for the reasons set out below as to that count.

An injury is not fairly traceable to a state official if it is the result of actions of independent officials not subject to the control of the officials seeking to be enjoined. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253-54 (11th Cir. 2020) ("Because the Supervisors are independent officials not subject to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary for purposes of establishing traceability."). Nor is an injury redressable against state officials if they have no control over the relevant state officials who did cause the alleged injury. *See id.* at 1254 (stating an injunction against the Florida Secretary of State "cannot provide redress, for neither she nor her agents control the order in which candidates appear on the ballot.").

Here, Plaintiffs' parole-based claims are not traceable to Ivey, Marshall, or Hamm or redressable by an order against them because they do not control the Board's decision to grant or deny parole or to determine the reset time between parole considerations. The Plaintiffs frame their injury as being denied parole based on the use of ex post facto considerations or receiving racially discriminatory reset dates. Doc. 1 ¶¶ 146-54, 237-39, 245-48, 250-56, 261-63. They complain that the Board denied their parole pursuant to its alleged policy of denying parole to inmates convicted of violent offenses and failing to rely on risk assessments. *Id.* But Alabama law makes it abundantly clear that "the decision concerning parole release shall be *at the complete discretion of the board*." Ala. Code § 15-22-26(c) (emphasis added); *see also* Ala. Code § 15-22-24(a)(1) (stating that the "Board of Pardons and Paroles shall be charged with all of the following: (1) Determining which prisoners serving sentences in the jails and prisons of the State of Alabama may be released on parole and when and under what conditions."). Similarly with respect to Plaintiffs' race discrimination claim for length of reset dates between parole considerations, only the Board has

authority to make this decision. *See* ALA. CODE § 15-22-37(b)(4); ALA. ADMIN CODE r. 640-X-3-.03.

Neither the Governor, the Attorney General, nor the ADOC Commissioner have authority or control over the Board's parole decisions. Ivey appoints Board members, subject to confirmation by the State Senate, but has no authority to order the Board to grant or deny parole. *See* ALA. CODE § 15-22-20(b). Further, any indirect authority related to the Board would be insufficient to establish standing as to Governor Ivey. For example, "the governor's ability to suspend officials for cause" is insufficient to "establish[] traceability" as to the governor. *City of S. Miami v. Governor*, 65 F.4th 631, 643 (11th Cir. 2023). Marshall's power, as Attorney General, is limited to receiving notice of parole hearings and representing victims before the Board. *See* ALA. CODE §§ 15-22-23(b)(2)(a.); 15-22-36(d); § 15-23-83 ("The Attorney General or district attorney may assert any right to which the victim is entitled."). While Marshall, and any other interested party, may advocate for a particular outcome before the Board, the Board is the sole arbiter of whether parole is granted or denied and of reset dates. *See Sullivan v. Smith*, 925 So. 2d 972, 975 (Ala. Civ. App. 2005) ("The acts of the Board in granting or denying parole . . . are judicial in nature."). Hamm has nothing to do with parole decisions but simply complies with the decision of the Board as to whether inmates in his custody are released on parole. *See* ALA. CODE § 15-22-24(a)(1).

Ivey, Marshall, and Hamm therefore did not cause Plaintiffs to be denied parole or determine their reset dates, and an injunction against Ivey, Marshall, or Hamm cannot redress Plaintiffs' injury by requiring the Board to give Plaintiffs what they want: a new parole decision based on a consideration of only those factors Plaintiffs wish them to consider or a shorter reset date. With respect to the particular actions challenged by Plaintiffs—parole denial and reset dates—"the [Board members] are independent officials not subject to the [Governor, Attorney

General, or ADOC Commissioner's] control, [and so] their actions . . . may not be imputed to the [Governor, Attorney General, or ADOC Commissioner] for purposes of establishing traceability." *Jacobson*, 974 F.3d at 1253-54. Plaintiffs' specific allegations further confirm neither the Governor, the Attorney General, nor the ADOC Commissioner were the legal cause of their parole denial. Plaintiffs allege no act or omission of Ivey or Hamm in relation to their specific cases either in the complaint or their declarations doc. 1 ¶¶ 146-54. As a matter of law, Plaintiffs cannot allege that Ivey, Marshall, or Hamm compelled the Board to deny their parole, compelled the Board not to consider factors such as risk assessments, compelled the Board to deny parole for all Plaintiffs convicted of a violent offense, or compelled the Board to set a certain reset date. Such allegations are incorrect conclusions of law and are not entitled to any presumption of truth. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Nor could Plaintiffs' claims against Ivey, Marshall, or Hamm proceed under the "narrow exception" to sovereign immunity under *Ex parte Young* for official-capacity claims against state officials to enjoin an ongoing violation of federal law. *Nat'l Ass'n of Bds. of Pharmacy*, 633 F.3d at 1308. "[T]he doctrine of *Ex parte Young* cannot operate as an exception to Alabama's sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999). For the same reasons why Plaintiffs lack standing to sue Ivey, Marshall, and Hamm for parole decisions, namely lack of traceability and redressability, Ivey, Marshall, and Hamm likewise lack the relevant connection to parole decisions for purposes of *Ex parte Young*. Since Plaintiffs' claims against Ivey, Marshall, and Hamm do not come within the *Ex parte Young* exception to sovereign immunity, they are entitled to sovereign immunity from Plaintiffs' claims. *See Summit Med. Assocs, P.C.*, 180 F.3d at 1342.

Since neither Ivey, Marshall, nor Hamm control the Board's parole decisions, Plaintiffs cannot establish the traceability and redressability elements of standing. Similarly, Ivey, Marshall, and Hamm are entitled to sovereign immunity because they lack the relevant enforcement connection to come within the *Ex parte Young*. As a result, all claims against Ivey except Count IV[15] should be dismissed for lack of standing and sovereign immunity. All claims against Marshall should be dismissed for lack of standing and sovereign immunity. Counts V – VIII should be dismissed against Hamm for lack of standing and sovereign immunity, and Counts I, II, and IX – XI against Hamm should be dismissed to the extent they are based on his alleged involvement in parole practices.

### E.    Count I Fails to State a Claim Against the State Defendants for a Violation of the Trafficking Victims Protection Act.

Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on behalf of themselves and the Forced Labor Class, and USSW, and RWDSU assert claims against all Defendants under the Trafficking Victims Protection Act ("TVPA"). Doc. 1 ¶¶ 203-211. The TVPA provides a private cause of action against "[w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a). The TVPA creates a private right of action for

---

[15] The First Amendment retaliation claim against Ivey in Count IV should be dismissed for the reasons set out below as to that count.

money damages, 18 U.S.C. § 1595(a), but authorizes injunctive relief only in suits brought by the United States Attorney General. *See* 18 U.S.C. § 1595A(a). Plaintiffs fail to state a claim for a violation of the TVPA against the State Defendants.

### 1.    The State Defendants are entitled to Eleventh Amendment sovereign immunity from Plaintiffs' official-capacity damages claims under the TVPA.

Plaintiffs have sued all State Defendants in their official capacities. Doc. 1 ¶¶ 160-165. Since "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent," a "plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (internal quotation and citation omitted). The Eleventh Amendment provides the State of Alabama with absolute immunity from suit unless the State either consents or waives its Eleventh Amendment immunity. *See Pennhurst v. State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984). Because "Alabama has not waived its Eleventh Amendment immunity" and "Congress has not abrogated Alabama's immunity," "Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997), *overruled in part on other grounds by LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009).

While the United States Congress can abrogate the state's sovereign immunity by statute, it has not done so under the TVPA. "[T]o determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity, and second, whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55 (1996) (internal quotation marks and citation omitted). The first question applies a "simple but stringent test: Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention

unmistakably clear in the language of the statute." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (internal quotation marks omitted).

The TVPA authorizes suit against "[w]hoever" knowingly provides or obtains labor coerced in one of four ways or who benefits from such labor and provides a money damages remedy against the "perpetrator" or "whoever" knowingly violates the statute. *See* 18 U.S.C. § 1589(a), (b); § 1595(a). Since the TVPA does not define "whoever" or "perpetrator," these terms do not signify an intent to abrogate sovereign immunity, much less an "unmistakably clear" intent. *Kimel*, 528 U.S. at 73; *see also Mojsilovic v. Okla. ex rel. Bd. of Regents for the Univ. of Okla.*, 841 F.3d 1129, 1131-34 (10th Cir. 2016) (holding that the TVPA did not abrogate states' sovereign immunity).

Since the State Defendants' sovereign immunity has neither been waived nor abrogated by Congress, Plaintiffs' official-capacity TVPA damages claims against the State Defendants are barred by sovereign immunity.

**2.      Even assuming Eleventh Amendment immunity did not bar Plaintiffs' official-capacity damages claims, the State Defendants in their official capacities are not "persons" within the meaning of the TVPA.**

The TVPA creates a private right of action for damages against "*[w]hoever* knowingly provides or obtains the labor or services of a person" by one of four enumerated coercive means. 18 U.S.C. §§ 1589(a), 1595(a) (emphasis added). While the TVPA does not define the term "[w]hoever," the federal Dictionary Act provides definitions for "determining the meaning of any Act of Congress." 1 U.S.C. § 1; *see also Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1277 (11th Cir. 2020) (relying on the Dictionary Act to determine whether a corporation was included in the meaning of "[w]hoever" under the TVPA).

The Dictionary Act states that "the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. The Supreme Court has long held that this definition does not include sovereign entities. *See United States v. United Mine Workers of Amer.*, 330 U.S. 258, 275 (1947) (stating that the term "person" "does not include the sovereign" in "common usage" and that the Dictionary Act's "absence of any comparable provision extending the term ['person'] to sovereign governments implies that Congress did not desire the term to extend to them."); *see also Return Mail, Inc. v. U.S Postal Serv.*, 139 S. Ct. 1853, 1862 (2019) (same).

The TVPA's use of "[w]hoever," interpreted through precedent on the Dictionary Act's definition of this term, does not include claims against the State Defendants in their official capacities. *Cf. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). *Will*'s analysis of entities subject to suit under 42 U.S.C. § 1983 applies to the TVPA claims here. *Will* relied on the statutory presumption against inclusion of the sovereign within the meaning of "person" and the historic reading of the Dictionary Act's definition "not to include the States" to exclude official-capacity claims against state officials from the meaning of "person" under § 1983. *See Will*, 491 U.S. at 69-70. As under § 1983, the TVPA's use of "[w]hoever," without further definition, "would be a decidedly awkward way of expressing an intent to subject the States to liability." *Id.* at 64.

As a result, independently of the State Defendants' sovereign immunity, Plaintiffs' fail to state a TVPA claim for damages against the State Defendants in their official capacities because they are not persons subject to suit within the meaning of the statute.

**3.     Plaintiffs fail to state a claim for declaratory or injunctive relief against the State Defendants in their official capacities as there is no private right of action for equitable relief under the TVPA.**

While the State Defendants *are* "persons" *only* with respect to official-capacity claims seeking declaratory and injunctive relief pursuant to the *Ex parte Young* exception to sovereign immunity, *see Will*, 491 U.S. at 71 n.10, there is no private right of action for equitable relief under the TVPA. The TVPA creates a private right of action for money damages, 18 U.S.C. § 1595(a), but authorizes injunctive relief only in suits brought by the United States Attorney General, *see* 18 U.S.C. § 1595A(a). The creation of a private right of action only for money damages expresses a legislative intent to limit private actions under the TVPA to only that form of relief. *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458-59 (1974).

"A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Id.* at 458. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Id.* (internal quotation and citation omitted). Since the TVPA "creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created" in 18 U.S.C. § 1595(a) are the exclusive remedies available in a private action. *Id.* Since the TVPA is publicly enforceable only through criminal prosecution or suits for injunctive relief brought by the United States Attorney General, these remedies are not available to private Plaintiffs here. *See N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 72 (N.D.N.Y. 2020) (stating "anyone not expressly permitted to bring a cause of action under the TVPA cannot bring a civil suit to recover for violations of it.").

As a result, Plaintiffs' TVPA claims for declaratory and injunctive relief against the State Defendants in their official capacities fail to state a claim.

**4.    Marshall is entitled to absolute prosecutorial immunity from Plaintiffs' individual-capacity damages claims under the TVPA, and Gwathney is entitled to absolute quasi-judicial immunity from individual-capacity damages claims.**

Plaintiffs' remaining TVPA claims against the State Defendants are individual-capacity claims for money damages against Ivey, Marshall, Gwathney, Hamm, and Cooper.[16] Marshall and Gwathney are both entitled to different forms of absolute immunity from Plaintiffs' individual-capacity damages claims—prosecutorial and quasi-judicial.

Marshall is entitled to absolute prosecutorial immunity from Plaintiffs' TVPA claims because they arise out of his prosecutorial function in advocating for victims before the Board. Doc. 1 ¶¶ 146-55, 158 (alleging Marshall objected to parole or "conspired" to have the Board deny parole thereby injuring all Count I Plaintiffs). The Eleventh Circuit has applied common law immunities to claims for damages under the TVPA. *See McCullough v. Finley*, 907 F.3d 1324, 1329, 1332-35 (11th Cir. 2018) (applying absolute judicial and qualified immunity to TVPA damages claims). "A prosecutor is entitled to absolute immunity for all actions he takes while performing his function as an advocate for the government." *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1279 (11th Cir. 2002). "The prosecutorial function includes the initiation and pursuit of criminal prosecution, and all appearances before the court, including examining witnesses and presenting evidence." *Id.* (citations omitted).

---

[16] Plaintiffs bring only official-capacity claims against Littleton and Simmons. Doc. 1 at 1; *see also id.* ¶ 163. They are due to be dismissed entirely from Count I for the reasons stated above regarding official-capacity claims.

In *Allen v. Thompson*, 815 F.2d 1433 (11th Cir. 1987), the court held a prosecutor providing information to a parole commission was a prosecutorial function protected by absolute immunity because "[p]arole decisions are the continuation of the sentencing process." 815 F.2d at 1434-35; *see also Hart v. Hodges*, 587 F.3d 1288, 1296 (11th Cir. 2009) ("This immunity may extend to certain post-sentencing conduct of a prosecutor."). *Allen* applies to Marshall's alleged conduct here of objecting to the grant of parole or "conspiring" with the Board to have their parole denied. Doc. 1 ¶¶ 146-55, 158. Where a prosecutorial function is protected by absolute immunity, a prior conspiracy to engage in that function is also protected by prosecutorial immunity. *See Rehberg v. Paulk*, 611 F.3d at 828, 840-41 (11th Cir. 2010) (stating that "absolute immunity applies to the alleged conspiracy decision in the investigative stage to make up and present . . . false testimony to the grand jury."); *Rowe*, 279 F.3d at 1282; *Mastroianni v. Bowers*, 173 F.3d 1363, 1367 (11th Cir. 1999). As a result, Marshall is entitled to absolute prosecutorial immunity from the individual-capacity TVPA damages claims.

Gwathney is entitled to absolute quasi-judicial immunity from Plaintiffs' TVPA claims. "It is well-established that judges are immune from liability for damages for acts committed within their judicial jurisdiction." *Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1507 (11th Cir. 1990). But the Supreme Court has also held "that this judicial immunity may protect certain executive and administrative personnel whose duties are 'classically adjudicatory.'" *Id.* (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201-04 (1985)). The Eleventh Circuit has "repeatedly . . . held that individual members of the [Georgia] Parole Board are entitled to absolute quasi-judicial immunity." *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005) (citations omitted); *e.g.*, *Fleming v. Dowdell*, 434 F. Supp. 2d 1138, 1154 (M.D. Ala. 2005) (applying the same to the members of the Alabama Board of Pardons & Paroles). Because Plaintiffs' allegations against

Gwathney relate to her application of the guidelines in deciding whether to grant parole, (doc. 1 ¶ 162)—a "classically adjudicatory" function—she is entitled to absolute quasi-judicial immunity from Plaintiffs' TVPA claims.

   **5.    The State Defendants are entitled to qualified immunity from Plaintiffs' individual-capacity damages claims under the TVPA.**

   Plaintiffs' TVPA claims, when stripped of their legal conclusions, allege nothing more than unactionable disagreement: (1) disagreement with Ivey and Marshall's advocacy for public safety in parole decisions, (2) disagreement with the manner in which Gwathney exercises her discretion in making parole decisions, (3) disagreement with the well-established right of Hamm's employees to require inmates to maintain the facilities in which they live or the conditions of work release that inmates voluntary agreed to, and (4) disagreement with Cooper's agency using inmate labor expressly authorized by Alabama law. Since Plaintiffs fail to allege a violation of clearly established law, Ivey, Marshall, Gwathney, Hamm, and Cooper are entitled to qualified immunity from Plaintiffs' individual-capacity claims under the TVPA.

   "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To invoke qualified immunity, a government official must have been acting within the scope of his "discretionary authority" when the allegedly wrongful acts occurred. *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010). The burden then shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). This "two-pronged analysis may be done in whatever order is . . . most appropriate for the case." *Grider*, 618 F.3d at 1254 (citing *Pearson*, 555 U.S. at 236).

**Prong zero: the State Defendants were acting within their discretionary authority.** "A government official acts within her discretionary authority if the actions were (1) undertaken pursuant to the performance of [her] duties and (2) within the scope of [her] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (alterations in original). "[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). The question is not whether the official acted with an improper purpose because such an inquiry reduces the discretionary authority prong of qualified immunity to an untenable tautology. *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). Accordingly, "the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."   *Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

Ivey, Marshall, Gwathney, Hamm, and Cooper can carry their initial burden of showing Plaintiffs' allegations against them arise from discretionary functions, *i.e.*, whether they were performing job-related functions that were within their state-law authority. *See Holloman*, 370 F.3d at 1265-66.

Plaintiffs allege Ivey directed ADOC to retaliate against striking inmates, doc. 1 ¶ 65, met with the Board to advocate certain changes, *id.* ¶ 91, that she issued an Executive Order placing a moratorium on Board hearings, *id.* ¶ 92, and that she exercised her state law powers to appoint an Executive Director to ABPP and designate a new Board Chair, *id.* ¶¶ 94, 96, 160. These allegations are within the Governor's job-related functions and state law powers of general governance as the state's chief executive, *see* Ala. Const. art. V §§ 113, 120, her power of appointment of the ADOC Commissioner, *see* ALA. CODE § 14-1-1.3, her power to appoint ABPP's Executive Director, *see*

ALA. CODE § 15-22-21, and her power to appoint members of the Board and to designate a Board Chair, *see* ALA. CODE §§ 15-22-20(a), (b), (d).

As to Marshall, Plaintiffs allege he met with the Board to advocate certain changes, doc. 1 ¶ 91, that he advocated for legislative changes to the parole statute in 2019, *id.* ¶ 93, and that Marshall or representatives from his office frequently object to inmates receiving parole, including some Plaintiffs, *id.* ¶¶ 146-47, 150, 161. These allegations are within Marshall's job-related functions and state law powers of advocating for victims before the Board. Alabama law requires the Attorney General to receive notice of parole hearings and to represent crime victims before the Board. *See* ALA. CODE §§ 15-22-23(b)(2)(a.); 15-22-36(d); *see also* ALA. CODE §§ 15-23-83 ("The Attorney General or district attorney may assert any right to which the victim is entitled."). The Attorney General is also tasked with communicating with and making suggestions to the Alabama Legislature, particularly regarding crime. *See* ALA. CODE §§ 36-15-1(4), (7), (8).

Plaintiffs' claims against Gwathney arise out of her discretionary function "in the granting of parole and establishment of reset dates." Doc. 1 ¶ 162. Gwathney's alleged conduct is within the scope of her authority as Board Chair, pursuant to which she exercises the power to "[d]etermin[e] which prisoners serving sentences in the jails and prisons of the State of Alabama may be released on parole and when and under what conditions," ALA. CODE § 15-22-24(a)(1), and to exercise her complete discretion to make parole decisions using statutory factors and Board guidelines as an aid. *See* ALA. CODE § 15-22-26.

Plaintiffs' allegations against Hamm arise out of his function as ADOC Commissioner of exercising "independent direction, supervision, and control" of ADOC and the inmates in its custody. ALA. CODE § 14-1-1.3; *see also* doc. 1 ¶ 164. The allegations against Hamm also involve his authority to provide inmate labor for community works squads working on government

projects, ALA. CODE §§ 14-5-1 et seq., and his authority to establish a work release program, ALA. CODE §§ 14-8-1 et seq.

Plaintiffs' allegations against Cooper arise out of his function as "chief executive officer of the State Department of Transportation." ALA. CODE § 23-1-21; *see also* doc. 1 ¶ 165. The allegations against Cooper also arise out of his authority to supervise ALDOT in contracting with ADOC to procure inmate workers for road projects and other public works. *See* ALA. CODE §§ 14-5-10. ALDOT is specifically authorized by statute to negotiate and contract with ADOC for the use of convict labor in its operations. ALA. CODE § 23-1-37.

Since Ivey, Marshall, Gwathney, Hamm, and Cooper have carried their initial burden of showing they were engaged in a discretionary function, the burden shifts to Plaintiffs to show that they are *not* entitled to qualified immunity by plausibly alleging (1) these Defendants violated a statutory right under the TVPA; and (2) that this right was clearly established at the time of the alleged violation. *Holloman*, 370 F.3d at 1264. In conducting this analysis, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Plaintiffs' TVPA claims fail under both prongs.

**Prong one: Plaintiffs fail to allege a violation of the TVPA.** The TVPA creates a private right of action for "[w]hoever knowingly provides or obtains the labor or services of a person by any one of" four coercive means. 18 U.S.C. § 1589(a). A two-step framework applies to whether Plaintiffs can survive a motion to dismiss their TVPA claim. *McCullough*, 907 F.3d at 1333. First, a court "identifies the allegations that are 'no more than conclusions'" because they "are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Second, "after disregarding conclusory allegations, we assume any remaining factual allegations are true and

41

determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* Plaintiffs must satisfy an additional pleading hurdle when they seek to impose liability on supervisors such as Defendants here—the Governor, Attorney General, Board Chair, ADOC Commissioner, and ALDOT Director—based on the acts of their subordinates. *See Iqbal*, 556 U.S. at 676. In such cases, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*," but instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

Plaintiffs' allegations against Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members (who are not included in Plaintiffs' individual-capacity damages claims) in Count I simply repeat the TVPA's elements and statutory definitions of "abuse or threatened abuse of law or legal process" and "serious harm." *Compare* doc. 1 ¶¶ 207-09, *with* 18 U.S.C. §§ 1589(a), (c). These are nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" and must be disregarded. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Cooper is not mentioned in Count I at all, but he is alleged collectively with "Employer Defendants" to have employed inmate laborers "knowing or in reckless disregard of the fact that their lucrative joint venture with ADOC has engaged in the providing or obtaining of labor or services from Plaintiffs and the Forced Labor Class by each of the unlawful means alleged in paragraphs 1 through 143 above." Doc. 1 ¶ 210. Cooper's alleged "lucrative joint venture" is just as conclusory as the allegations that the mayor and police chief of Montgomery implemented a "scheme" under the TVPA and "intended to subject [municipal court] jailees to the scheme" in *McCullough*, 907 F.3d at 1334.

After removing these conclusory allegations from the Complaint, the allegations as to Ivey, Marshall, and Gwathney are that they improperly denied Plaintiffs' parole thereby "ensuring the availability of incarcerated labor for the State and for work-release employees." Doc. 1 ¶ 207. But the only *factual* allegations regarding Ivey and Marshall are that they advocated for parole reforms after the Jimmy Spencer murders in 2018, doc. 1 ¶ 91, that they advocated for legislative changes to the parole statute in 2019 to include an emphasis on public safety, *id.* ¶ 93, and that they oppose granting parole to inmates convicted of violent offenses in disregard of risk assessments in parole decisions, *id.* ¶¶ 98, 99-100. None of these allegations constitute coercion of labor "by means of the abuse or threatened abuse of law or legal process" for several reasons. 18 U.S.C. § 1589(a)(3).

First, Ivey and Marshall no more make parole decisions than the mayor and police chief made judicial decisions that allegedly violated the TVPA in *McCullough*. *See* 907 F.3d at 1335 ("And any connection between the judicial acts and the mayor and chiefs is 'too chimerical to be maintained.'" (quoting *Iqbal*, 556 U.S. at 681)). Second, Plaintiffs do not plausibly allege Ivey, Marshall, or Gwathney made parole decisions or conspired to make parole decisions that were an "abuse of law or legal process." 18 U.S.C. § 1589(a)(3). Plaintiffs allege that these Defendants advocate or employ a parole decision-making process that emphasizes the severity of the offense and subjective factors over objective factors such as risk assessments. But Alabama law allows parole decisions to be based on these factors and leaves the ultimate decision to the complete discretion of the Board. *See* ALA. CODE §§ 15-22-26(a), (c). Plaintiffs fail to allege an "abuse of law or legal process" but rather allege only an exercise of discretion with which they disagree. Third, even assuming Plaintiffs alleged parole decisions that were incorrect as a matter of state law, they do not allege Defendants obtained labor "by means of" these incorrect decisions. 18 U.S.C. § 1589(a)(3). Plaintiffs allege no facts to show Defendants advocated for or made parole

decisions *for the purpose* of obtaining labor. Instead, they allege Ivey and Marshall advocated for parole reforms based on the Jimmy Spencer murders and that Gwathney increasingly denied parole by relying on 2019 statutory changes emphasizing public safety and disregarded risk assessments. But these actions are "merely consistent with" and do not "plausibly suggest[] . . . agreement" to create coerced labor, *Twombly*, 555 U.S. at 557, and such allegations "although consistent with a plaintiff's theory, may fail to state a plausible claim 'given more likely explanations.'" *McCullough*, 907 F.3d at 1335. Plaintiffs have alleged only that Ivey, Marshall, and Gwathney acted out of concern for public safety and have alleged no facts to support a conspiracy to create coerced labor.

Also regarding Gwathney, applying the reasoning from *McCullough* to the instant case demonstrates that the Board's denials of parole did not compel inmates to work. Like the *McCullough* inmates, the inmate Plaintiffs do not allege, much less show, that Gwathney or the Board used force, physical restraint, or the threat of either to compel inmates to work. *Compare* doc. 1 at 24–38 *with McCullough v. City of Montgomery*, 2020 WL 3803045 at *9 (M.D. Ala. Jul. 7, 2020) (no evidence of force or threat of force). The *McCullough* district court also rejected an argument advanced by the instant Plaintiffs that they were compelled to avoid spending time in jail. *Id.* at *8. Plaintiffs, like the *McCullough* inmates, cannot rely on their continued incarceration after being denied parole because as this Court recognized, only "unlawful" restraint violates the TVPA, and none of the inmate Plaintiffs allege that their sentences are unlawful. *Compare* doc. 1 at 67–80 *with McCullough*, 2020 WL 3803045 at *9 ("Lawful restraint alone does not render labor forced."). Nor, as noted above, do the inmate Plaintiffs "suffer" the purported prison conditions due to a parole denial. Assuming, *arguendo*, that Gwathney personally voted to deny parole to every named inmate Plaintiff and class member, she did not place them in prison, and according

to their own allegations, the conditions of which they complain pre-date the alleged downturn in parole grants in 2019. *Id.* at \*10; *Compare* doc. 1 at ¶ 53 (alleging bad prison conditions in 2017), ¶ 79 (alleging prison overcrowding in 2014) *with id.* at ¶¶ 97-98 (parole rates begin to drop in 2019). Finally, the denial of parole no more compels the inmate Plaintiffs to work than, as the *McCullough* district court found, the revocation of probation forced the Montgomery jail inmates to work. 2020 WL 3803045 at \*10.

As to Hamm, Plaintiffs allege he violated the TVPA by obtaining labor "by means of serious harm or threats of serious harm," by (1) requiring inmates to work while in prison and subjecting them to discipline for refusal to work; (2) authorizing inmates to leave facilities on work release, which Plaintiffs allege is by "force" due to the violent nature of the prisons; and (3) disciplining inmates who organize work stoppages. Doc. 1 ¶¶ 43, 208. These allegations fail to state a claim because the TVPA "should not be read to call into question the legality of voluntary work programs in federal immigration detention facilities, or to call into question the longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks." *Barrientos*, 951 F.3d at 1277-78. *Barrientos* adds that "basic disciplinary measures" in the context of incarceration such as "punishments for detainees who, among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages" do not "on their own, give rise to TVPA liability." *Id.* at 1278 n.5; *see also Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) ("[N]o Court of Appeals has ever questioned the power of a correctional institution to compel inmates to perform services for the institution without paying the minimum wage.") (quotation marks omitted).

Plaintiffs' novel TVPA theory would make inmate labor a per se violation of the statute, upending centuries of precedent recognizing the permissibility of labor by those incarcerated as a

punishment for the conviction of a crime. "By its terms the [Thirteenth] Amendment excludes involuntary servitude imposed as legal punishment for a crime." *United States v. Kozminski*, 487 U.S. 931, 943 (1988). The Thirteenth Amendment's exclusion of inmate labor led one court to reject a TVPA claim similar to Plaintiffs' here, since "Plaintiffs cannot use a federal statute enacted to implement the federal Thirteenth Amendment to criminalize behavior the Amendment plainly permits." *Fletcher v. Williams*, No. 22-1371, 2023 WL 6307494, at *2 (10th Cir. Sept. 28, 2023). Nor do ADOC's regulations punishing inmates for refusing to work or organizing work stoppages violate the TVPA. *Fletcher* also rejected this argument and held that punishing inmates' refusal to work with loss of good time or loss of privileges does not constitute a threat of serious harm or abuse of legal process under 18 U.S.C. § 1589. *See Fletcher*, 2023 WL 6307494, at *2. Plaintiffs' argument that they are coerced when they voluntarily agree to work on public works or go on work release is even more far-fetched. *See* ALA. CODE §§ 14-5-1 et seq; ALA. CODE §§ 14-8-30 et seq. Code §§ 14-8-30 et seq. Hamm does not force inmates to participate in work release, but if inmates choose to participate in work release it does not violate the TVPA to hold inmates accountable for on-the-job misconduct because they are still in ADOC's custody. *See Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 459 (2d Cir. 1996) ("The Thirteenth Amendment does not bar labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are 'exceedingly bad.'"); *Graves v. Watson*, 909 F.2d 1549, 1552 (5th Cir. 1990) (holding that "[w]hen the employee has a choice, even though it is a painful one, there is no involuntary servitude").

Finally, there is ALDOT Director Cooper. Plaintiffs allege Cooper's ALDOT contracts with ADOC to procure inmates for work on road crews, that these inmates are "forced" to work, and that they generally receive $2 a day for their labor. Doc. 1 ¶¶ 3, 24-30, 165. Plaintiffs' TVPA theory

against Cooper appears to be that Cooper acquired labor from ADOC "knowing" that such labor was involuntary based on allegedly illegal parole denials and the conditions in ADOC facilities. *See* doc. 1 ¶ 210 (alleging "Employer Defendants knowingly benefited" from labor obtained by "the unlawful means alleged in paragraphs 1 through 143 above"). But Plaintiffs allege only that Cooper's agency hires inmates pursuant to a work release program established by Alabama law. Alabama law authorizes ADOC to "lease convicts to any department . . . of the state on such terms, conditions and at such prices as may be mutually agreed upon." ALA. CODE § 14-5-10. In contrast to work release, this code section applies only to government entities who wish to contract for labor on public works. *See* ALA. CODE § 14-5-1. ADOC Administrative Regulation AR 439 governs community work squads working on government projects and provides that inmates receive $2.00 per day for labor. Ex. 4. Inmates are not required to engage in public works labor, but if they do, Form 439-C requires the inmates to agree to abide by inmate work rules. Ex. 4.

Plaintiffs' TVPA claim against Cooper fails because the inmate labor leased by ALDOT is not "by means of" any of the four illegally coercive means in 18 U.S.C. § 1589(a) and because they fail to allege any personal involvement by Cooper. The TVPA "should not be read to call into question the legality of voluntary work programs in . . . detention facilities." *Barrientos*, 951 F.3d at 1277-78. And unlike the pretrial detainees in *Barrientos*, Plaintiffs in this case are post-conviction inmates incarcerated as punishment. Under common law, post-conviction prisoners have "no property rights," *Givens v. Ala. Dept. of Corrs.*, 381 F.3d 1064, 1068 (11th Cir. 2004), and have only the property rights expressly created by Alabama law. *Id.* at 1069-70. Plaintiffs allege inmate workers leased for public works are paid $2 per day, which is the only income to which they are entitled under Alabama law. Doc. 1 ¶ 26. *See Gambetta v. Prison Rehab. Indus. & Diversified Enters., Inc.*, 112 F.3d 1119, 1125 (11th Cir. 1997) ("[I]nmates of state prisons who

work for industries operated as state instrumentalities are not covered by the Fair Labor Standards Act and are not entitled to receive federal minimum wage for their labor."). Plaintiffs fail to allege illegal coercion by Cooper under the TVPA, nor do they allege any individual act or omission by Cooper. *See* doc. 1 ¶ 165 (alleging "*ADOT* knowingly benefits" from coerced labor) (emphasis added). Since "a plaintiff must plead that each Government-official defendant, through the official's own individual actions," *Iqbal*, 556 U.S. at 676, has violated the TVPA, Plaintiffs fail to state a claim against Cooper.

**Prong two: Plaintiffs fail to allege a violation of clearly established law.** Even if a plaintiff alleges a violation of a federal right under the first prong, he must still show that the right in question was clearly established. A plaintiff can show that a right is clearly established in three ways. *See Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013). First, a plaintiff can "produce a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state." *Id.* (citation omitted). Second, a plaintiff can "point to a broader, clearly established principle [that] should control the novel facts" of the situation. *Id.* (citation and internal quotation marks omitted). And third, a plaintiff can show that the case is one of "obvious clarity" in that the federal constitutional provision is "specific enough to establish clearly the law applicable to particular conduct and circumstances . . . even in the *total absence of case law*." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).

Even assuming Plaintiffs alleged Ivey, Marshall, Gwathney, Hamm, and Cooper violated the TVPA, they cannot carry their burden of alleging these Defendants violated a clearly established right so as to overcome their qualified immunity. *See Morton*, 707 F.3d at 1282. Under the first method for clearly establishing law, the only binding precedent the State Defendants have located on the TVPA that bears any factual resemblance to this case are *Barrientos* and

*McCullough*, both of which *favor* Defendants. *Barrientos* reached only the limited issue certified for appeal of whether the TVPA applies to for-profit contractors operating federal immigration detention facilities. *Barrientos*, 951 F.3d at 1271, 1280. *Barrientos* stated the TVPA "should not be read to call into question the legality of voluntary work programs in . . . detention facilities" or "call into question longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks," but it did not reach the issue of whether the plaintiffs stated a claim. *Id.* at 1277-78, 1280. at 1277-78, 1280. *McCullough* granted qualified immunity at the motion-to-dismiss stage where the TVPA allegations of a mayor and police chief conspiring with a municipal judge to extract fines and labor were dismissed as conclusory and otherwise insufficient under *Iqbal*, 907 F.3d 1324.

Plaintiffs fail to clearly establish law under the second and third methods. These "obvious clarity" cases are uncommon, but they, occur "where the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful, or where the case law that does exist is so clear and broad (and not tied to particularized facts) that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017) (internal quotation and citation omitted).

Unlike an "obvious clarity" case, Plaintiffs seek a novel extension of the TVPA to prohibit the well-established (and directly permissible under the Thirteenth Amendment) use of inmate labor and to prohibit an alleged conspiracy to deny parole for the purpose of increasing the inmate labor pool. Plaintiffs' allegations that Ivey, Marshall, and Gwathney "conspired" to deny parole to increase the labor pool are conclusory and not entitled to the presumption of truth. *See*

*McCullough*, 907 F.3d at 1333-34. Their factual allegations are that Ivey and Marshall advocated parole reforms in the wake of Jimmy Spencer, and that Gwathney exercises her parole grant discretion in a way with which they disagree, none of which allege "obvious" violations of the TVPA. Their allegations that Hamm operates a work release program and that Cooper's agency leases some of these inmates likewise do not allege a violation of the TVPA at all, much less an "obvious" one. Since it is Plaintiffs' burden to allege a violation of clearly established law, Defendants reserve the remainder of their argument on this prong for the reply brief.

**F.    Count II Fails to State a Claim Against the State Defendants for a Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO).**

"RICO was enacted in 1970 and prohibits racketeering activity connected to interstate commerce." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1210 (11th Cir. 2020). The statute creates a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." *Id.* at 1210-11 (quoting 18 U.S.C. § 1964(c)). "A private plaintiff suing under the civil provisions of RICO must plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Id.* at 1211. "If a plaintiff fails to adequately plead any one of these elements, she has failed to state a claim upon which relief may be granted, and her complaint must be dismissed." *Id.*

Plaintiffs' RICO claims fail for many reasons, but the simplest of which is they fail to plead a predicate act of racketeering based on violations of the TVPA. Doc. 1 ¶ 218. "Beyond the establishment of a RICO enterprise, a plaintiff must allege that each defendant participated in the affairs of the enterprise through a 'pattern of racketeering activity,' which requires 'at least two acts of racketeering activity'" listed in 18 U.S.C. § 1961(1). *Cisneros*, 972 F.3d at 1215. "A plaintiff

must put forward enough facts with respect to each predicate act to make it independently *indictable as a crime*." *Id.* (emphasis added). Plaintiffs allege violations of the TVPA as the predicate acts. Doc. 1 ¶ 218. But for the reasons argued with respect to Count I, Plaintiffs fail to state a TVPA claim against the State Defendants and so their RICO claim necessarily fails. *See Fletcher*, 2023 WL 6307494, at *3 ("Because the amended complaint did not state a claim for relief under the TVPA, the magistrate judge determined that the RICO claims, which were predicated on violations of §§ 1584 or 1589, must also fail.").

In addition to Plaintiffs' failure to state a RICO claim on the merits, Plaintiffs' RICO claims against the State Defendants fail for reasons that parallel the State Defendants' TVPA arguments: (1) Plaintiffs' official-capacity RICO claims for damages against the State Defendants are barred by sovereign immunity, *Lancaster*, 116 F.3d at 1429; (2) the State Defendants in their official capacities are not "person[s]" within the meaning of 18 U.S.C. § 1962(c) or an "enterprise" within the meaning of 18 U.S.C. § 1961(4), *cf. Will*, 491 U.S. at 69-71; (3) there is otherwise no private right of action for equitable relief against the State Defendants in their official capacities, *Hengle v. Treppa*, 19 F.4th 324, 356 (4th Cir. 2021); *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1089 (9th Cir. 1986); (4) Marshall is entitled to absolute prosecutorial immunity, *Allen*, 815 F.2d at 1434-35, and Gwathney is entitled to absolute quasi-judicial immunity from Plaintiffs' RICO claims; and (5) Ivey, Marshall, Gwathney, Hamm, and Cooper are entitled to qualified immunity from Plaintiffs' RICO claims for the reasons argued above on the TVPA claims under *McCullough*, 907 F.3d at 1333-35.

As a result, Plaintiffs' RICO claim in Count II should be dismissed.

**G.** *Pennhurst* **Bars Plaintiffs' Claim in Count III Against the State Defendants under § 32 of the Alabama Constitution, Which Is Nonetheless Meritless.**

Beginning with the 1865 Constitution and through the 1901 Constitution, Alabama has prohibited slavery and involuntary servitude "otherwise than for the punishment of crime, of which the party shall have been duly convicted[,]" ALA. CONST. art. I, § 32 (1901).[17] But recently, Alabama voters amended the Constitution, authorizing the Legislature to, *inter alia*, "remov[e] all racist language." ALA. CONST. art. XVIII, § 286.02. The Joint Interim Legislative Committee on the Recompilation of the Constitution was formed to implement the amendment. ALA. ACT no. 2021-523. And with the passage of the Alabama Constitution of 2022, Alabama voters authorized the removal of the "otherwise than for the punishment of crime" language. *See* ALA. CONST. art. I, § 32; Doc. 1 ¶ 222. Plaintiffs' theory is that Alabama's current prison-labor practices hung on § 32's exception—a thread that the 2022 Constitution has frayed, rendering the practices and their authorizing statutes unconstitutional. *See id.* ¶ 223-24. *Pennhurst* obviously bars this State-law claim seeking relief under State law, but the theory fails regardless because an exception was never needed to sustain Alabama's current practices.

Plaintiffs' official-capacity claims against the State Defendants for declaratory and injunctive relief involve a clear application of *Pennhurst*. The State Defendants are immune under the Eleventh Amendment from all claims (official or individual capacity) and all relief (legal or equitable) because "the *Ex parte Young* exception is 'inapplicable in a suit against state officials on the basis of state law.'" Doc. 91 at 20 (quoting *Pennhurst*, 465 U.S. at 106). This claim is "premised on . . . alleged violations of state law *alone*." *Id.* (emphasis in original) (quoting *Ron Grp., LLC v. Azar*, 574 F. Supp. 3d 1094, 1109 (M.D. Ala. 2021)). And the answer to the

---

[17]    Digitized versions of Alabama's prior constitutions are accessible at https://digital.archives.alabama.gov/digital/collection/constitutions.

"determinative question" supports *Pennhurst*'s application: that "relief will be ordered pursuant to" State law. *Id.* (cleaned up) (quoting *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 10123-24 (11th Cir. 1989)). Thus, the Eleventh Amendment bars Plaintiffs' claim under § 32 of the Alabama Constitution.

Assuming Plaintiffs assert individual-capacity damages claims against the State Defendants for a violation of § 32, these claims fail because there is no cause of action for money damages for a violation of the Alabama Constitution. *See Matthews v. Alabama Agric & Mech. Univ.*, 787 So. 2d 691, 698 (Ala. 2000) ("However, Matthews presented no authority to the trial court, and he has presented no authority to this Court, that recognizes a private cause of action for monetary damages based on violations of the provisions of the Constitution of Alabama of 1901, and we have found none."); *Roberts v. City of Geneva*, 114 F. Supp. 2d 1199, 1215 (M.D. Ala. 2000) ("The Supreme Court of Alabama has held that there is no authority that 'recognizes a private right of action for monetary damages based on violations of provisions of the Constitution of Alabama.'" (quoting *Matthews*, 787 So. 2d at 698)).

Plaintiffs' § 32 claim also fails on the merits because the unpaid prison chores and voluntary paid public works and work release programs are not "slavery" or "involuntary servitude" regardless of the non-substantive textual changes to § 32. Because there is limited caselaw discussing § 32, the language of both § 32 and the Thirteenth Amendment is similar, and the amendments were adopted contemporaneously, federal cases examining the Thirteenth Amendment are instructive here. The Supreme Court has said that the "primary purpose" of the Thirteenth Amendment "was to abolish the institution of African slavery" and "forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *United States v. Kozminski*, 487 U.S. 931, 942 (1988) (internal quotation

marks omitted) (quoting *Butler v. Perry*, 240 U.S. 328, 332 (1916)). "[I]n every case in which this Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction." *Id.* at 942-43; *cf. Graves v. Watson*, 909 F.2d 1549, 1552 (5th Cir. 1990) (holding that "[w]hen the employee has a choice, even though it is a painful one, there is no involuntary servitude"). As discussed above regarding Count I, Alabama's paid and voluntary current practices do not involve this physical or legal coercion that the Supreme Court has identified, so they never came within § 32's ambit—regardless of the exception's existence.

Legislative history confirms that the Amendment did not have the substantive effect Plaintiffs wish it did. In a memorandum on "Background Information on the Removal of Racist Language" from Othni Lathram—the Director of the Legislative Services Agency whose involvement in amending the 1901 Constitution was constitutionally authorized, ALA. CONST art. XVIII, § 286.02—the Recompilation Committee considered: "Based on our research the removal of the phrase at issue would have no practical impact on our current incarceration practices nor punishment schemes." *Memo on Racist Language*, JOINT INTERIM COMMITTEE ON THE RECOMPILATION OF THE CONSTITUTION, https://www.legislature.state.al.us/pdf/lsa/proposed-constitution/Racist_Language_Backgound_Memo.pdf (Aug. 27, 2021); *see also Ballot Statement for the Constitution of Alabama of 2022*, FAIR BALLOT COMM'N, https://www.sos.alabama.gov/sites/default/files/sample-ballots/2022/gen/Statewide-Amendments.pdf (last visited Mar. 21, 2022) ("There are no costs to adopting the reorganized constitution."). One would think such an overhaul of prison labor practices—with a $45,000,000 financial impact, Doc. 1 ¶ 3—would at least be discussed if that were an intended effect of removing § 32's exception.

Litigation (or the lack thereof) in other States after they adopted similar amendments further dispels Plaintiffs' theory. Since 2018, Colorado, Utah, Nebraska, Oregon, Tennessee, and Vermont similarly amended their constitutions, and it does not appear that those States understood those amendments to substantively affect their inmate-labor practices.[18] *See, e.g.*, *About UCI*, UTAH CORR. INDUS., https://uci.utah.gov/about-uci/ (last visited Mar. 21, 2024) (referencing "400 inmate work participants producing products and services for state and local government agencies"); *About*, CORNHUSKER STATE INDUS., https://csi.nebraska.gov/about (last visited Mar. 21, 2024). Nor does it appear that the statutes authorizing such practices have been struck down. *See, e.g.*, UTAH CODE § 64-13-19; NEB. REV. STAT. § 83-183.

Colorado, which adopted its amendment in 2018, appears to be the farthest along. The Colorado Court of Appeals has recently rejected a challenge like Plaintiffs' here. *See Lamar v. Williams*, No. 21CA0511 (Colo. App. Aug. 18, 2022).[19] After Colorado amended its constitution to remove an identical (to § 32) exception, Lamar challenged the Colorado's inmate work program. *Id.* ¶ 2. Relying on legislative history about the amendment's passage, the Court held that Colorado voters "did not intend to abolish the DOC inmate work program[.]" *Id.* ¶¶ 12-14. And relying on *Kozminski*, it held that Lamar's allegations did not "show that the DOC forced him to work through the use or threat of physical restraint or physical injury or the use or threat of coercion through law or the legal process." *Id.* ¶¶ 15-21. *Lamar* thus upheld the trial court's dismissal of Lamar's

---

[18] *See* COLO. CONST. art. 2, § 26; UTAH CONST. art. I, § 21 (replacing the exception with language stating that the amendment does not apply to the criminal justice system); NEB. CONST. art. I, § 2; OR. CONST. art. I, § 34 (replacing the exception with language stating that court-ordered rehabilitation programs are permissible); TENN. CONST. art. I, § 33 (replacing the exception with language stating that the section does not apply an inmate from working); VT. CONST. § art. I, § 1.

[19] Pursuant to Colorado Rule of Appellate Procedure 35(e), *Lamar* was not designated for official publication and is thus not binding precedent. A copy of the opinion is attached as Exhibit 11.

complaint. *Id.* ¶ 21. *Lamar* is directly applicable to Alabama's materially similar amendment process, which didn't purport to eliminate Alabama's current inmate-labor practices.

Alabama's courts presume that "acts of the legislature are . . . constitutional" and "approach the question of the constitutionality of a legislative act with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government." *Bynum v. City of Oneonta*, 175 So. 3d 63, 66 (Ala. 2015) (cleaned up). Additionally, "repeal by implication is not favored. It is only when two laws are so repugnant to or in conflict with each other that it must be presumed that the Legislature intended that the latter should repeal the former." *Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*, 314 So. 2d 51, 54-55 (Ala. 1975) (cleaned up) (citation omitted). Plaintiffs' theory turns these presumptions upside down: it asks this Court to presume that repealing outdated language referring to a long-abolished labor practice rendered undiscussed current labor practices and the numerous State laws (that have been upheld by Alabama courts) unconstitutional. For all these reasons, Plaintiffs' claim under § 32 of the Alabama Constitution fails to state a claim.

**H.    Count IV Is Due to be Dismissed Because Count IV Plaintiffs Lack Standing to Seek Injunctive Relief, and Defendants Ivey and Hamm Are Entitled to Both Sovereign and Qualified Immunity.**

Plaintiffs Council, Walker, and Ptomey, on behalf of themselves and the Strike Class, as well as Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on behalf of themselves and the Forced Labor Class (collectively referred to as "Count IV Plaintiffs"), sue Defendants Ivey and Hamm for retaliating against them for advocating for and participating in work stoppages. But Count IV is due to be dismissed in its entirety. Count IV Plaintiffs lack standing to seek injunctive relief because the allegations in Count IV concern past conduct. In addition, any claims for monetary damages are barred by either sovereign or qualified immunity.

1.      **Count IV Plaintiffs lack standing to seek injunctive relief in Count IV because the allegations concern past conduct.**

"Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The plaintiff seeking injunctive relief must allege facts showing "a substantial likelihood that the plaintiff will suffer future injury: a 'perhaps' or 'maybe' chance is not enough." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) (quoting *Lyons*, 461 U.S. at 103). To survive dismissal, the plaintiff must show "a real and immediate threat of future harm." *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) (citing *Lyons*, 461 U.S. at 105). Where the Eleventh Circuit has "found a sufficient imminence of future harm based on a past injury, the plaintiff has alleged with particularity that a future injury would likely occur in substantially the same manner as the previous injury." *Id.* at 1208. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

The Complaint lacks any factual allegations related to a threat of future injury; instead, the Complaint concerns *past* conduct. The closest the Complaint comes to alleging a future injury is that "[m]embers of the Forced Labor Class . . . can reasonably be expected to be deterred in the future from advocating for the withholding of labor." Doc. 1 ¶ 232. This allegation is simply a "legal conclusion[] masquerading as fact[]" and does not prevent dismissal. *Jaharis*, 297 F.3d at 1188. Beyond this allegation, Count IV concerns *past* discipline, transfers, and placements in solitary confinement. *See* Doc. 1 ¶ 229. There are no specific facts showing that the Count IV Plaintiffs intend to orchestrate work stoppages in the future which would subject them to the alleged retaliation. Having failed to allege a substantial likelihood that Count IV Plaintiffs will suffer future injury, Count IV is due to be dismissed to the extent that it seeks injunctive relief.

### 2. Defendants Ivey and Hamm, sued in their official capacities for monetary damages, are entitled to sovereign immunity.

The Eleventh Amendment to the United States Constitution bars suits for money damages against a state unless the state waives its Eleventh Amendment immunity or Congress abrogates the immunity. *See Carr v. City of Florence, Ala*., 916 F.2d 1521, 1524 (11th Cir. 1990). Eleventh Amendment immunity also extends to state officials sued in their official capacities when, for all practical purposes, "'the state is the real, substantial party in interest.'" *Id*. Congress has not abrogated Eleventh Amendment immunity in § 1983 cases, and the State of Alabama has not consented to suit. *See id*. at 1525. Thus, Ivey and Hamm are entitled to Sovereign Immunity on Count IV to the extent that Plaintiffs seek monetary damages against them in their official capacities.

### 3. Defendants Ivey and Hamm, sued in their individual capacities for monetary damages, are entitled to qualified immunity on Count IV because Count IV Plaintiffs have failed to state a First Amendment retaliation claim.

To assert the defense of qualified immunity, the government official must first prove that the "allegedly unconstitutional conduct occurred while he [or she] was acting within the scope of his [or her] discretionary authority." *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). Ivey's and Hamm's alleged conduct falls within their discretionary authority. For Governor Ivey, Count IV Plaintiffs allege that she passed an Executive Order "direct[ing] ADOC to impose additional stringent consequences for disciplinary violations, including for refusing to work and for encouraging work stoppages." Doc. 1 ¶ 231. Passing executive orders certainly falls within Governor Ivey's purview as the head executive for the State of Alabama. While no specific acts are alleged for Commissioner Hamm, Count IV Plaintiffs reference a "policy of disciplining and abusing incarcerated person who withhold their labor," "transfer[s] to higher security and more violent facilities," and placing them in "solitary confinement." Doc. 1 ¶ 229. As Commissioner for

ADOC, disciplining, transferring, and classifying inmates falls within the discretionary authority of Hamm. Having established that the conduct of Ivey and Hamm falls within their discretionary authority, Count IV Plaintiffs must allege a violation of a clearly established right. *Harbert*, 157 F.3d at 1281 ("[I]f the official meets that burden, the plaintiff must prove that the official's conduct violated clearly established law.").

Count IV Plaintiffs fail to state a claim for First Amendment retaliation, so they have not alleged a violation of a clearly established right. "To state a claim for retaliation under the First Amendment, a plaintiff must demonstrate that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). While an inmate's speech is protected "when he complains to the prison's administrators about the conditions of his confinement," *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008), it "is not protected if affording protection would be inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 1277 (internal quotation and citation omitted). "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." *Id.* (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (11th Cir. 1999)).

Count IV Plaintiffs allege constitutionally protected activity "in withholding labor and advocating for the withholding of labor." Doc. 1 ¶ 228. Both activities, however, run afoul of ADOC regulations. ADOC Administrative Regulation 403, Rule Violation No. 924 makes it a violation for an inmate to "encourag[e] or caus[e] others to stop work." Ex. 6. Additionally, the regulations also make it a violation for an inmate to refuse to work. *Id.* (Rule Violation No. 518—Refusing to work/fail to check out for work). Count IV Plaintiffs seemingly do not dispute that

their activity violates ADOC regulations, arguing that there are "stringent consequences for disciplinary violations, including refusing to work and for encouraging work stoppages." Doc. 1 ¶ 231.

Both Rule Violations No. 924 and No. 518 are "legitimate prison regulations." "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Although *Turner* provides a four-factor framework for analyzing whether a regulation is "legitimate," an analysis of the factors is unnecessary because rules preventing work stoppages are clearly legitimate. *See Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 132 (1977) (upholding prison regulation that prevented inmates from joining a labor union); *see also Pilgrim v. Luther*, 571 F.3d 201, 205 (2nd Cir. 2009) (citing *Jones*, 433 U.S. at 132) (Work stoppages are a "species of 'organized union activity'" that "are deliberate disruptions of the regular order of the prison environment" and "plainly inconsistent with legitimate objectives of prison organization.").

Importantly, Count IV Plaintiffs are not even challenging the ADOC regulations that penalize refusing to work or encouraging others to work. Instead, Count IV Plaintiffs argue that, ADOC regulations notwithstanding, they are being retaliated against for not working or encouraging others not to work. But violating legitimate prison regulations, such as Rule Violations No. 924 and No. 518, is not "protected conduct." Accordingly, Count IV Plaintiffs cannot premise a First Amendment retaliation claim on their violations of ADOC regulations. Because refusing to work and encouraging others not to work is not protected conduct, Count IV Plaintiffs cannot state a claim for First Amendment retaliation.

Finally, it bears emphasis that the Defendants relevant here are Governor Ivey and Commissioner Hamm. And "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). That is, for any Defendant to be liable, Plaintiffs must identify specific wrongful actions that that particular Defendant took that violated Plaintiffs' clearly established constitutional rights. Plaintiffs' allegations about Ivey and Hamm retaliating against inmates are legal conclusions not entitled to the presumption of truth. *Compare* doc. 1 ¶ 65 (alleging that "ADOC, at the direction of Governor Ivey, meted out violent repression."); *with Iqbal*, 556 U.S. at 680-81 (holding allegations that Ashcroft was "the 'principal architect'" of an "invidious policy" of discrimination and that Mueller was "'instrumental' in adopting and executing it" were "bare assertions" and "not entitled to be assumed true."). As set forth above, Plaintiffs have not alleged facts that could show *any* violation of a clearly established constitutional right. But even if they have, Plaintiffs certainly have not shown that Governor Ivey or Commissioner Hamm have committed any wrongful acts that violated any such right. Ivey and Hamm are entitled to qualified immunity. Therefore, Count IV must be dismissed.

## I.    Plaintiffs Failed to Allege a Plausible Ex Post Facto Claim in Count V.

"The Constitution forbids the passage of ex post facto laws, a category that includes '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, **when committed**.'" *Peugh v. United States*, 569 U.S. 530, 532–33 (2013) (emphasis added) (*quoting Calder v. Bull*, 3 U.S. 386, 390 (1798)); *see also Thompson v. Merrill*, 505 F. Supp. 3d 1239, 1263 (M.D. Ala. 2020) (citation omitted).  A statute "violates the [Ex Post Facto] Clause if it is both retrospective and more onerous than the law in effect **on the date of the offense**." *Weaver v. Graham*, 450 U.S. 24, 30–31 (1981) (emphasis added).  Consequently, "[i]t is axiomatic

that for a law to be ex post facto it must be more onerous than the prior law." *Dobbert v. Florida*, 432 U.S. 282, 294 (1977).

"[T]o find an ex post facto violation: (1) the law must be retrospective, meaning it applies to events occurring before its enactment; and (2) the offender must be disadvantaged by it." *United States v. Abraham*, 386 F.3d 1033, 1037 (11th Cir. 2004) (*citing United States v. Rosario-Delgado*, 198 F.3d 1354, 1356 (11th Cir. 1999)). However, "not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited . . . [t]he question is a matter of degree." *Garner v. Jones*, 529 U.S. 244, 250 (2000) (internal quotations and citations omitted)). "The controlling inquiry . . . [is] whether retroactive application of the change in [parole] law create[s] 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Id.* (original citation omitted).

"Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of [the Ex Post Facto Clause]." *Garner*, 529 U.S. at 250 (*quoting Lynce v. Mathis*, 519 U.S. 433, 445–46 (1997)). "Whether retroactive application of a particular change in parole law respects the prohibition on ex post facto legislation is often a question of particular difficulty ***when the discretion vested in a parole board is taken into account***." *Garner*, 529 U.S. at 250 (emphasis added). In *Garner*, the Supreme Court noted:

> we can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. ***The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience***. ***New insights into*** the accuracy of predictions about the offense and ***the risk of recidivism consequent upon the offender's release***, along with a complex of other factors, ***will inform parole decisions***.

*Id.* at 253 (emphasis added). Accordingly, while discretion cannot displace the Ex Post Facto Clause, changes "designed for the better exercise of the discretion [that the Board] had from the outset" do not violate the Ex Post Facto Clause. *Id.* at 252–55.

In Count V, Plaintiffs attempt to assert a violation of the federal Constitution's Ex Post Facto Clause against the Governor, Attorney General, and Board members. Doc. 1 at 111-13. Plaintiffs allege in conclusory fashion that the Governor and Attorney General directed the Board to engage in a "wholesale revision" of the "substantive policies that govern parole decisions replacing evidence-based parole decision-making based on actuarially-based objective standards required by the JRA with racially skewed decision-making untethered to evidence or the actuarially-based objective standards required by the JRA." Doc. 1 at ¶ 238. Plaintiffs therefore appear to ground their Ex Post Facto claim on "the wholesale revision" to the Board's policies governing parole decision-making. *Id.* In so doing, they consistently invoke the statutory law to assert that the Board's "new" policies were violative of that law. *Id.* (Board replaced "evidence-based parole decision-making based on actuarially-based objective standards ***required by the JRA*** . . . " (emphasis added). However, as shown below, the named Plaintiffs fail to assert an Ex Post Facto violation as applied to them, and neither the Alabama Legislature's 2019 statutory revision nor the Board's 2020 revision to its guidelines violate the Ex Post Facto Clause.

### 1.    The 2019 version of § 15-22-26 does not violate the Ex Post Facto Clause.

From 1951 to 2016, Alabama parole law stated:

No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the [Board] is of the opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society.

ALA. CODE § 15-22-26 (1951). Unmistakably, the law at the time of all named inmate Plaintiffs' offenses was guided by two principles: 1) parole could not be earned; and 2) parole release decisions were subjectively based on the Board's opinion that an inmate would not harm public safety.[20] Both federal and Alabama courts recognized the Board had "total discretion" in parole decision-making. *See, e.g.*, *Monroe v. Thigpen*, 932 F.2d 1437, 1441 (11th Cir. 1991) ("[Alabama Code § 15-22-26 (1951)] provides that parole may be granted at the Board's discretion.") (original citation omitted); *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982) ("The Alabama statute . . . calls for discretionary rather than mandatory action on the part of the [Board].")); *Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374, 375 (Ala. 2001) ("[Alabama Code § 15-22-26 (1951)] is a typical parole statute that gives the parole [Board] total discretion in the granting of paroles."); *Beavers v. State*, 666 So. 2d 868, 870 (Ala. Crim. App. 1995) ("After an investigation, . . . whether to grant or deny parole is a matter of discretion with the Board.").

SB67 became effective on January 30, 2016 and, *inter alia*, amended Alabama Code § 15-22-26. *See* 2015 Alabama Laws Act 2015-185, § 23. Under SB67, Alabama Code § 15-22-26(a) was revised to read:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the [Board] is of the opinion that the prisoner meets criteria and guidelines established by the [Board] to determine a prisoner's fitness for parole. The guidelines shall serve as an aid in the parole decision process and shall promote the use of prison space for the most violent and greatest risk offenders.

ALA. CODE § 15-22-26(a) (2016); *see also* 2015 Alabama Laws Act 2015-185, § 3. The legislature directed that the Board's guidelines included, at minimum, the following factors: 1) an inmate's risk of reoffending based on a validated risk and needs assessment, 2) an inmate's progress on their

---

[20] As the Court rightly noted in oral argument on Plaintiffs preliminary injunction motion, welfare of society is just public safety stated in 1951 terms.

reentry plan, 3) the input of stakeholders, 4) an inmate's participation in risk-reduction programs, 5) an inmate's institutional behavior, and 6) the severity of an inmate's underlying offenses. *Id.* Additionally, SB67 added subsection (c):

> ***The use of established guidelines*** for parole consideration ***shall not create a right or expectation by a prisoner to parole release***. Additionally, the articulated reasons for denial of parole release shall not create a right or expectation for parole release. The guidelines shall serve as an aid in the parole decision making process, and ***the decision concerning parole release shall be at the complete discretion of the [Board]***.

ALA. CODE § 15-22-26(c) (2016) (emphasis added).

In July 2018 parolee Jimmy O'Neal Spencer murdered three people including a 7-year-old child while committing two robberies. Doc. 1 at 44 n.60. When released on parole in November 2017, Spencer was serving a life sentence for multiple robbery convictions including one committed when he was previously granted parole. *Id.* Spencer also had convictions for attempting to escape and an assault on another inmate. *Id.*

Spencer's heinous crime directly resulted in the legislature passing and the Governor signing Act 2019-393, which was HB380. The Act became effective on September 1, 2019,[21] and further amended Alabama Code § 15-22-26(a):

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the [Board] is of the opinion that the prisoner meets criteria and guidelines established by the [Board] to determine a prisoner's fitness for parole ***and to ensure public safety***. The guidelines shall serve as an aid in the parole decision ***making*** process and shall promote the use of prison space for the most violent and greatest risk offenders***, while recognizing that the [Board's] paramount duty is to protect public safety***.

ALA. CODE § 15-22-26(a) (2019) (amended language emphasized). HB380 did not alter the factors in subsection (a) nor amend in any way subsection (c). *See* ALA. CODE §§ 15-22-26(a), (c) (2019).

---

[21] 2019 Alabama Laws Act 2019-393, § 2.

Despite the changes by SB67 and HB380, the Board's parole decision-making remained subjective and within its complete discretion. Like the 1951 version of Alabama Code § 15-22-26, both the 2016 and 2019 changes provided that the Board's subjective opinion determined if an inmate met the criteria for parole – recidivism and welfare of society in 1951, guidelines in 2016 and 2019. *See* ALA. CODE § 15-22-26(a) (1951) (2016) (2019). All three versions also left the ultimate parole release decision – regardless of whether the criteria or guidelines were met – to the Board's "total" (1951) or "complete" discretion (2016 and 2019). ALA. CODE § 15-22-26 (2016) (2019); *Thompson*, 806 So. 2d at 375.[22]

Contrary to Plaintiffs' claims, the 2016 version of § 15-22-26 did not require the Board to mechanically follow "actuarially-based objective standards." Doc. 1 at ¶ 238. The SB67 requirement to create and consider guidelines in no way limited the Board's complete discretion or made parole decisions objective. To be sure, the Legislature mandated the ***creation*** of guidelines to "serve as an aid in the parole process." ALA. CODE § 15-22-26(a) (2016). However, the Legislature unmistakably relegated the guidelines to nothing more than aid – ***not once, but twice***. ALA. CODE §§ 15-22-26(a), (c) (2016). Moreover, in what should be dispositive of any argument that the guideline provisions in § 15-22-26(a) transformed parole decisions into an objective process binding on the Board, the legislature provided that "[t]he use of established guidelines for parole consideration shall not create a right or expectation by a prisoner to parole release." ALA. CODE § 15-22-26(c) (2016). At best for the Plaintiffs, the SB67 version of § 15-22-26 required the

---

[22] This Court has little trouble holding that the Board's parole decision-making authority is discretionary. *Jackson v. Cook*, No. 2:17-CV-414-ALB, 2020 WL 4006671, at *6 (M.D. Ala. June 4, 2020) ("This court's exhaustive review of the history of the Alabama statute governing release on parole establishes that from its inception until the present date the statute has been framed in discretionary terms."), *recommendation adopted by Jackson v. Cook*, 2020 WL 4004623 (M.D. Ala. Jul. 15, 2020).

Board to create and consider guidelines containing a minimum of six specified factors but did not mandate that the Board follow them. ALA. CODE §§ 15-22-26(a), (c) (2016).

The Legislature demonstrated that when it wanted to mandate release based upon certain factors, it knew how to do so. SB67 also created Mandatory Release to Supervision which became codified at Alabama Code § 15-22-26.2. This statute mandates that all but certain excepted inmates will be released by the ADOC to the supervision of the Board on a date within a range of months prior to their end of sentence. ALA. CODE § 15-22-26.2. Based upon their offenses, all named inmate Plaintiffs, except Plaintiffs English and Council, are eligible for Mandatory Release to Supervision – a boon and shortening of their incarceration that did not exist at the time they committed their offenses.

The 2019 changes to which Plaintiffs object were exclusively contained in subsection (a) and required that the **_guidelines_** recognize the Board's "paramount duty is to protect public safety." ALA. CODE § 15-22-26(a) (2019). Yet in so doing, the Legislature left unchanged the statute's language disavowing a right to parole and leaving the ultimate parole release decision up to the Board's "complete discretion". ALA. CODE §§ 15-22-26(a), (c) (2019). In enacting HB380, the Legislature did not, as Plaintiffs suggest, curtail the Board's discretion in any way – it, at most, tweaked what must be recognized _in the guidelines_. Accordingly, all the 2019 revision did was require the guidelines to recognize a paramount duty to public safety, but the Board remains just as free to not follow the guidelines now as it was when the guidelines were first created in 2016.

To the extent there is any Ex Post Facto claim contained in the Complaint based upon the Legislature's creation or modification of parole guidelines, such a claim was foreclosed by the Eleventh Circuit four decades ago. _See Paschal v. Wainwright_, 738 F. 2d 1173, 1180 (11th Cir. 1984). In _Paschal_, the Eleventh Circuit was presented with a fact pattern almost on all-fours with

the one at bar. There, prior Florida parole law contained language substantively identical to the 1951 version of § 15-22-26. *Paschal*, 738 F.2d at 1178 (*quoting* FLA. STAT. ANN. § 947.18 (1973)). The Florida Legislature then enacted a Parole Act due to the perceived lack of objective criteria in the prior law. *Id.* The objective criteria were "designed to give primary weight to the seriousness of the offender's present criminal offense and his past criminal record." *Id.* A hearing examiner would apply the guidelines to a particular case, consider any relevant matter not in the guidelines, set a presumptive parole release date range, and provide the Parole Commission with a recommended parole date (at, above, or below the guideline range) with an explanation if there was a deviation from the guidelines. *Id.* at 1179. The Commission was then free to accept the recommended date or set one of its own. *Id.* As with Alabama's changes, the new Florida parole law retained "the basic features of the prior [statutory] scheme" and "most important for [the 11th Circuit's] purposes, ***the ultimate parole decision remain[ed] committed to the Commission's discretion***." *Id.* (emphasis added, citations omitted).

In the face of an Ex Post Facto challenge by an inmate who had committed his offense under the prior law and been denied under the new guidelines statute, the Eleventh Circuit had no difficulty upholding Florida's new parole law holding:

> The promulgation of guidelines under the Act did not alter the consequences that flowed from petitioner's crime: both in 1968 when he committed that crime, and in 1979, when the Commission set his presumptive parole date, the Commission had complete discretion over the parole decision. Only the form by which the Commission exercised that discretion changed.

*Paschal*, 738 F.2d at 1180-81. In the Court's view, the guidelines did not change the Commission's ability to release the petitioner, "they merely clarified the exercise of administrative discretion." *Id.* at 1179. The Court noted that:

> At the time petitioner committed the murder that led to his incarceration, he was on fair notice that if he received a life sentence he would be subject to parole at the

discretion of the Commission. This was not changed. *See* FLA. STAT. ANN. § 947.18; *see also, e.g., Rifai v. United States Parole Commission*, 586 F.2d 695, 699 (9th Cir.1978). The guidelines merely stated and rationalized the exercise of the Parole Commission's discretion. Petitioner accordingly suffered no legislative increase in punishment.

*Id.* at 1180.  Though Plaintiffs claim that under SB67 other factors were emphasized more than under HB380, Doc. 1 at 112–113, the Eleventh Circuit later rejected this argument as well. *See Johnson v. Wainwright*, 772 F.2d 826, 827 (11th Cir. 1985) (citing *Paschal*, 738 F.2d at 1179) (rejecting the argument that "under the old system the goal of rehabilitation played a larger role in determining release dates than it does under the new system[]" and stating that "*[t]his attempted distinction fails.*" (emphasis added)).

Moreover, HB380's inclusion of "public safety" language does not alter the ultimate standard: an inmate's suitability for parole release. Neither SB67 nor the 1951 version of Alabama Code § 15-22-26 prohibited the Board from considering public safety. *See* ALA. CODE § 15-22-26 (1951) (required consideration of the welfare of society); *see also* ALA. CODE § 15-22-26(a) (2016) (explicitly permitting the Board to consider factors beyond those listed in the guidelines). In the same vein, nothing in HB380 mandates how the Board was to determine an inmate's public safety risk. *See* ALA. CODE § 15-22-26(a) (2019). Rather, the Board's determination of whether an inmate is a risk to public safety remains the same from its inception to the present day: the Board has complete discretion over how to weigh and evaluate an inmate's risk to public safety.

Furthermore, the United States Supreme Court recognizes that "public safety" must be considered in parole decision-making. *See Greenholtz*, 442 U.S. at 8.  In fact, the Council on State Government's report, which Plaintiffs highly laud (doc. 1 at 39–43), states that one of the intended goals for SB67 was to increase public safety. Doc. 1 ¶ 79 n.48 (citing Council on State Government's Report, herein cited at 2). Even if this Court declines to consider the foregoing

exhibit, Plaintiffs allege that one of the goals highlighted by the analysis and, by extension, adopted by SB67 was to "improve public safety".  Doc. 1 at 40 (citing the Counsel on State Government's report). Given that consideration of public safety was and continues to be a part of the Board's parole decision-making since the 1951 version of Alabama Code § 15-22-26, HB380's inclusion of "public safety" does nothing more than codify a factor already being considered in parole decision-making, including under SB67.

To the extent it relies upon changes to Alabama Code § 15-22-26, Plaintiffs' Ex Post Facto claim fails. As demonstrated above the Board has always had complete or total discretion with respect to the parole release decision. ALA. CODE § 15-22-26 (1951) (2016) (2019). The creation of guidelines as an aid that do not provide a right to parole at most changed "[o]nly the form" by which the Board exercises its "complete discretion" and does not constitute an Ex Post Facto violation as a matter of law. *Paschal*, 738 F.2d at 1180-81; *see also Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 933 (11th Cir. 1986); *Johnson*, 772 F.2d at 827; *Tooma v. David*, 381 F. App'x 977, 980 (11th Cir. 2010); *Penoyer v. Briggs*, 206 F. App'x 962, 965 (11th Cir. 2006). Accordingly, Plaintiffs have failed to state an Ex Post Facto claim based upon changes to Alabama Code § 15-22-26.

**2.    Plaintiffs' Board policy-based Ex Post Facto claims fail.**

Unlike their argument in the preliminary injunction, which focused heavily on the 2019 changes to Alabama's parole statutes, the Plaintiffs' Complaint focuses almost entirely on changes to the Board's guidelines. Doc. 1 at 111–13. Plaintiffs' central claim seems to be that the Board abandoned its statutorily "required" evidence and actuarially-based objective set of guidelines standards.  *Id.* ¶¶ 237-238. As explained thoroughly in the preceding section, the 2016 and 2019 versions of § 15-22-26 only "required" the Board to create guidelines (which created no right or

expectation of parole). Neither version of the statute "required" the Board to follow the guidelines and, instead, left the ultimate parole release decision to the Board's "complete discretion." ALA. CODE § 15-22-26(a), (c) (2016) (2019).

In addition, Plaintiffs' Ex Post Facto claim based upon the guidelines fails for four additional reasons. First, Plaintiffs' assertion that the Board's 2020 guidelines were less objective is demonstrably false. Second, as a matter of law, neither the creation nor the revision of the parole guidelines violated the Ex Post Facto Clause. Third, Plaintiffs' statistics are meaningless in the context of an Ex Post Facto claim. Finally, the Board's alleged failure to follow its own guidelines – even if true – does not constitute an Ex Post Facto violation.

### a. The Board's 2020 guidelines are objectively more objective.

After passage of SB67, the Board did as the Legislature commanded and created guidelines. Ex. 8.[23] The 2016 guidelines were in place and used during the time former Chair Head was on the Board. They contained each of the six legislatively mandated factors. *Compare* Ex 8 *with* ALA. CODE § 15-22-26(a)(1)-(6).[24] The factors of stakeholder input and reentry progress (designated as "non-weighted" factors) had blanks for comments rather than a numerical score, and the "risk-reducing/treatment referral/condition setting" factor only had checkmarks. Ex. 8. The 2016 guidelines did not have a recommended parole score. *Id.*

---

[23] Although Plaintiffs reference the Board's 2016 Guidelines, Doc. 1 ¶ 84, they erroneously cite to the Board's 2020 Guidelines to support their claims. *Id.* at 42 n.57. However, because the Board's 2016 Guidelines, which were promulgated under SB67 and used when the inmate Plaintiffs were considered for parole, are central to Plaintiffs' claims, this Court can consider this document under the incorporation-by-reference doctrine.

[24] Interestingly, given Plaintiffs' allegations regarding the then-constituted Board's views on factors an inmate could not change, the Board placed severity of the offense first on the 2016 guidelines sheet – a reversal of its placement in the statute. *Compare* Ex. 8 at 1, *with* ALA. CODE § 15-22-26(a)(6).

Then, as commanded by law, *see* ALA. CODE § 15-22-26(a) (2016), the Board reviewed and revised the guidelines that became effective in 2020. Ex. 12. The 2020 guidelines—which remain in place as of the filing of this brief—are also limited to just the six factors contained in § 15-22-26(a). *Id.* However, unlike its predecessor, the 2020 guidelines provided a numerical weighted score for each of the factors. *Id.* Moreover, for the first time a score for each factor is added up to reach a final total that "***suggests***" granting/not granting parole. *Id.* at 2 (italicized emphasis added). This "baseline" score is, as reflected in the guidelines themselves, an aggregate of decisional factors associated or actuarially related to risk reduction. *Id.* The Board is ***guided*** by the score as part of the "comprehensive parole hearing and evaluative decisional process. Conspicuously absent is any reference to a "paramount duty to public safety" although in the exercise of the Board's "complete discretion" individual Board members are free to consider it. *Id.*

Undaunted, Plaintiffs allege that the Board's current guidelines – the 2020 guidelines – "materially changed the substantive policies that govern parole decisions replacing evidence-based parole decision-making based on actuarially-based objective standards required by the JRA with racially skewed decision-making untethered to evidence or the actuarially-based objective standards required by the JRA." Doc. 1 ¶ 238. This is exceedingly strange given that the 2016 guidelines do not reference actuarial evidence-based standards, do not have numerical weighted scores for every factor, and they do not have a final score that suggests parole. Ex. 8. It is not until the 2020 guidelines that one finds a statement that the guidelines establish a baseline score of factors that are "associated or actuarially related to risk reduction." It is not until the 2020 guidelines that every factor receives a numerical weighted score. And it is not until it promulgated the 2020 guidelines that the Board's guideline worksheet contained a suggested parole score. Of the two, the 2020 guidelines are indisputably far more objective than the 2016 guidelines

championed by the Plaintiffs and directly undercut Plaintiffs' assertion that the Board abandoned prior actuarial and evidence-based practices.

Finally on this point, even if this Court declines to consider the Board's 2016 and 2020 parole guidelines under the incorporation-by-reference doctrine, both SB67 and HB380 provide the same list of factors and place no limits on the other factors that the Board can consider. *Compare* ALA. CODE § 15-22-26(a) (2016), *with* ALA. CODE § 15-22-26(a) (2019). Further, the statutory language under all versions of Alabama Code § 15-22-26 clearly recognize that the Board had complete discretion in parole decision-making. *See, e.g.*, ALA. CODE § 15-22-26 (1951) (no parole guidelines included in the Board's consideration of an inmate for parole); ALA. CODE § 15-22-26(c) (2016) (2019) (parole guidelines relegated as aids with parole decision-making being at the Board's complete discretion). Thus, the elements of the Board's guidelines remained the same statutorily from 2016 forward. Even if the guidelines changed, they were still a mere aid and the Board retained complete discretion over the parole release decision.

> **b.    Neither the creation nor revision of the guidelines violated the Ex Post Facto clause.**

Lest Plaintiffs attempt to move the goal posts and adopt the petitioner's argument in *Paschal* that the real objective factors found in the 2020 guidelines are the actual Ex Post Facto violation, it is important to reiterate that the Eleventh Circuit has already rejected this argument in binding precedent. *Paschal*, 738 F.2d at 1180-81. The Board has never been bound by the guidelines – whether in 2016 or 2020. The guidelines were, and remain, just one part of the overall parole consideration process with the final parole release decision left to the Board's "complete discretion." ALA. CODE § 15-22-26(c) (2016) (2019). The creation of an aid to assist in structured decision making – while simultaneously giving the Board both the ability to create guidelines and

the "complete discretion" to ignore them cannot be said to have changed the "total discretion" the Board had under the 1951 version of § 15-22-26. *Paschal*, 738 F.2d at 1180-81.

The same is true with respect to the 2020 guidelines. Even if the 2020 guidelines could somehow be read as being less objective than their predecessor, and further assuming *arguendo*, that the Board consistently disregarded the evidence-based guidelines score, nothing of concern to the Ex Post Facto clause changed. Neither the description of the guidelines as a mere aid, nor the Board's "complete discretion" over parole release decisions were altered between the 2016 and 2019 versions of § 15-22-26. The Board was free to disregard its guidelines as a matter of law in 2016 and the same remains true today. Consequently, the retained complete discretion vested in the Board over parole release decisions combined with the relegation of the guidelines as a mere aid precludes any Ex Post Facto claim based upon the creation or revision of the guidelines.

### c.    Plaintiffs' statistical data does not support their Ex Post Facto claim.

Plaintiffs argue that their statistical data supports their Ex Post Facto claim. Doc. 1 at 47–52. However, the Eleventh Circuit's holding in *Porter v. Ray*, 461 F.3d 1315 (11th Cir. 2006) rejects the use of statistical data to support an Ex Post Facto claim challenging parle decision-making. In *Porter*, Georgia inmates cited "to statistics compiled by the [Georgia Parole] Board following its reconsideration of individuals to whom the Board had impermissibly applied [a parole policy requiring inmates to serve 90% of their sentence before becoming eligible for parole consideration]." *Id.* at 1321. According to the Georgia inmates, the statistical data showed that inmates were serving 5.6 years longer than the guidelines dictated and an average of 79% of the judicially imposed sentence. *Id.*

However, the Eleventh Circuit was unconvinced, noting that "these statistics are unavailing for two reasons." *Porter*, 461 F.3d at 1321. First, the Eleventh Circuit found that the Georgia

inmates did not offer statistical data comparing parole determinations prior to the enactment of the challenged parole policy. *Id.* Second, and more importantly, the Eleventh Circuit held that:

> the Board has always had "virtually unfettered discretion" to vary a prisoner's TPM and need not comply strictly with the Guidelines or the one-third statutory threshold. Therefore, ***we doubt whether comparison statistics would assist the appellants in showing that the Board violated the Ex Post Facto Clause***.

*Id.* (emphasis added).[25]

Like the Georgia parole board in *Porter*, the Board retained total or complete discretion over parole decision-making under any relevant version of § 15-22-26. With respect to the guidelines, Alabama law even more strongly favors the Board. The guidelines in Alabama do not create a right to parole. ALA. CODE § 15-22-26(c) (2016) (2019). The guidelines are just an aid with no language whatsoever mandating that the Board's parole release decisions must comport with them.  ALA. CODE § 15-22-26(a), (c) (2016) (2019). Thus, *Porter's* holding makes the instant Plaintiffs' statistics of no value.

Further, the Eleventh Circuit's doubts about the usefulness of statistical data rest on well-founded considerations. The nature of statistical data, i.e., information usually regarding a defined group, cannot demonstrate that "as applied" to an individual inmate, a challenged parole policy increased their punishment. *See Garner*, 529 U.S. at 255. Parole decisions rest on many and varying factors. *See e.g.*, *Greenholtz*, 442 U.S. at 9–10 ("The parole-release decision, however, is more subtle and ***depends on an amalgam of elements*** . . .") (emphasis added); *Thomas*, 691 F.2d at 489 ("[Alabama parole] law directs the [Board] to consider a number of factors in making their determination . . ."); ALA. CODE § 15-22-26(a) (2016) (2019)(providing a non-exhaustive list of factors for the Board to consider). Statistical data generally, and Plaintiffs' data specifically, cannot establish that thousands of decisions based upon (at minimum) the six statutory guideline factors,

---

[25] TPM was defined as Tentative Parole Month.  *Porter*, 461 F. 3d at 1317.

and the hundreds if not thousands of potential variables within each guideline factor are the result of any particular statutory or guideline change. Thus, the Eleventh Circuit's rejection of statistical data in *Porter* should apply with equal force in the instant case.

      **d.**    **The Board's failure to follow its guidelines is not an Ex Post Facto violation.**

The United States Supreme Court has recognized that a paroling authority's discretion "has the capacity, and the obligation, ***to change and adapt based on experience***" including "[n]ew insights into . . . the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions." *Garner*, 529 U.S. at 253 (emphasis added). Plaintiffs admit that the Board's parole decision-making only changed after Jimmy O'Neal Spencer murdered three people after being released under the "evidence-based" risk assessment and "structured, actuarially based" parole guidelines implemented by SB67. Doc. 1 ¶¶ 83–84, 91, 97. The purported strict adherence of the Lyn Head Board to whatever it was that she deems to be an "evidence-based" approach to parole decision-making utterly failed in 2018 and cost three people their lives. The Board had the legal authority to learn from that horrific experience and adapt without violating the Ex Post Facto clause. *Garner*, 529 U.S. at 253.

When reviewing an Ex Post Facto claim alleging that the United States Parole Commission deviated from its parole guidelines, the Eleventh Circuit held:

> The Parole Commission **is not restricted to making parole determinations within its announced guidelines** if there is good cause for going outside those guidelines and the reasons are adequately explained to the prisoner[] . . . ***parole remains an act of discretion*** within the authority of the Parole Commission and the Commission **may follow its guidelines, disregard them or change them**.

*Tobon v. Martin*, 809 F.2d 1544, 1545 (11th Cir. 1987) (internal citations omitted) (emphasis added). Like the United States Parole Commission, the Board maintains "complete discretion" over its parole decision-making, and no version of Alabama Code § 15-22-26 directs the Board to

grant parole even if an inmate meets the criteria of its parole guidelines or gives inmate a right to parole based on the Board's use of its guidelines. *Compare Tobon*, 809 F.2d at 1545 *with* ALA. CODE § 15-22-26 (1951) (2016) (2019).  Accordingly, the Board's alleged disregard for its parole guidelines does not constitute an Ex Post Facto violation.

Likewise, Plaintiffs' complaint that Board Chair Gwathney admitted to not following the "objective, evidence-based standards" and to "changing parole scores" fails to support their Ex Post Facto claim. Doc. 1 at ¶ 98. The Alabama Northern District Court rejected a similar argument that a denial of parole was erroneous because a Board Member allegedly altered an inmate's risk assessment score; instead, the court found that "[the risk] assessment is *within the discretion of the members of the Board*[.]"  *Bulls v. Estes*, No. 5:19-CV-0346-MHH-JEO, 2020 WL 906324, at *2 (N.D. Ala. Feb. 25, 2020) (emphasis added). Consequently, even if Board Chair Gwathney did change one or more risk assessment scores, it is not a concern of the Ex Post Facto Clause.

Because neither the current statute nor the Board's current guidelines support Plaintiffs' Ex Post Facto claim as a matter of law, all the Complaint shows is that the current Board members are exercising their "complete discretion" in a way that differs from the way former Chair Head exercised hers. The only significant change between now and Plaintiffs' preferred period of parole operations is the people sitting on the Board – a change that does not implicate the Ex Post Facto Clause. As Justice Scalia said in his concurrence in *Garner*:

> Any sensible application of the Ex Post Facto Clause, and any application faithful to its historical meaning, must draw a distinction between the penalty that a person can anticipate for the commission of a particular crime, and opportunities for mercy or clemency that may go to the reduction of the penalty. *I know of no precedent for the proposition that a defendant is entitled to the same degree of mercy or clemency that he could have expected at the time he committed his offense*. Under the traditional system of minimum-maximum sentences (20 years to life, for example), *it would be absurd to argue that a defendant would have an ex post facto claim if the compassionate judge who presided over the district where he committed his crime were replaced, prior to the defendant's trial, by a so-called*

***"hanging judge." Discretion to be compassionate or harsh is inherent in the sentencing scheme, and being denied compassion is one of the risks that the offender knowingly assumes***.

. . .

***Just as the Ex Post Facto Clause gives respondent no cause to complain that the Board in place at the time of his offense has been replaced by a new, tough-on-crime Board that is much more parsimonious with parole, it gives him no cause to complain that it has been replaced by a new, big-on-efficiency Board that cuts back on reconsiderations without cause***.

529 U.S. at 258 (Scalia, J., concurring in part) (emphasis added).

> ### 3. The Incarcerated Plaintiffs cannot collectively or individually state an Ex Post Facto Claim.

None of the named inmate Plaintiffs collectively or individually have a valid Ex Post Facto claim. To state an Ex Post Facto claim in the context of parole, a plaintiff "must show that ***as applied to his own sentence***[,] the law created a significant risk of increasing his punishment." *Garner*, 529 U.S. at 255 (emphasis added). A change that does not "modify the statutory punishment imposed for any particular offenses[,]" "alter the standards for determining either the initial date for parole eligibility or an inmate's suitability for parole[,]" or "change the basic structure of [the prior] parole law[]" does not satisfy this standard. *Garner*, 529 U.S. at 250 (*citing California Dep't of Corr. v. Morales*, 514 U.S. 499, 507 (1995)). Moreover, the challenged parole decision-making must "increase[], to a significant degree, the likelihood or probability of prolonging respondent's incarceration," and such a probability must be more than mere speculation. *Garner*, 529 U.S. at 256. The Complaint fails to state a plausible claim for the Incarcerated Plaintiffs both as a group and individually.

As a group, the Incarcerated Plaintiffs must show that as applied to them the changes to Alabama's parole process were more onerous and significantly increased the risk of a longer incarceration. *Garner*, 529 U.S. at 255. The effective date of SB67 was January 30, 2016, which

is the earliest date for which the Board could have been legally obligated to create guidelines. 2015 Alabama Laws Act 2015-185, § 23. However, Alabama courts convicted **all** of the inmate Plaintiffs **before 2016**. Ex. 13. Thus, the parole law applicable to each of the Incarcerated Plaintiffs is the 1951 version of § 15-22-26, which, *inter alia*, **had no guidelines at all – least of all guidelines based upon objective, evidence and actuarially-based standards**. *See Peugh*, 569 U.S. at 532–33; ALA. CODE § 15-22-26 (1951).

As a matter of law, none of the Incarcerated Plaintiffs can earn parole, and the parole release decision is both subjective and left to the Board's "total discretion." *Thompson*, 806 So. 2d at 375; ALA. CODE § 15-22-26 (1951). Plaintiffs dedicate much of the parole-related allegations in the Complaint in praise of the virtues of the 2016 version of § 15-22-26 and the guidelines the Board created in conformance thereto. Doc. 1 at 38-43, 111-113. Thus, the Incarcerated Plaintiffs have eschewed any argument that the 2016 law was more onerous or posed a significant risk of increasing their sentences.

That necessarily leaves the named Inmate Plaintiffs with claiming – as they pivoted to in oral argument on the preliminary injunction motion – that the 2019 statute and 2020 guidelines are more onerous and significantly increase the risk of longer incarceration when compared to the "total discretion" of the 1951 statute. But, as noted above, that claim too is foreclosed by Eleventh Circuit precedent because in directing the creation of non-binding guidelines as an aid, the Legislature explicitly left the Board the "complete discretion" it had acted under since 1951. *See e.g.*, *Damiano*, 785 F.2d at 933; *Johnson*, 772 F.2d at 827; *Paschal*, 738 F.2d at 1180-81; *Tooma*, 381 F. App'x at 980; *Penoyer*, 206 F. App'x at 965; ALA. CODE § 15-22-26 (1951) (2019). Paraphrasing the Eleventh Circuit in the context of the case at bar:

the promulgation of guidelines under the Act did not alter the consequences that flowed from [the named inmate Plaintiffs'] crime[s]: both . . . when [they]

> committed [their] crime[s], and . . . when the [Board denied] parole [under the 2019 statute and 2020 guidelines], the [Board] had complete discretion over the parole decision.  Only the form by which the [Board] exercised that discretion changed.

*Paschal*, 738 F.2d at 1180-81.  Therefore, regardless of whether the Incarcerated Plaintiffs base their claims on the implementation of the 2016 parole law and guidelines, the 2019 revisions thereto, or both, Eleventh Circuit precedent requires dismissal of their Ex Post Facto claim. *Id.*

The Incarcerated Plaintiffs have additional individual reasons prohibiting them from making a plausible Ex Post Facto claim. Plaintiffs Ptomey, McDole, and Pritchett were each allegedly denied parole under the 2016 law, the 2016 guidelines, and the members of the Board who operated under the 2016 statutory and policy scheme. Doc. 1 at ¶¶ 149, 150, 152. Each of these inmates avers that they were subsequently denied parole by the current Board under the 2019 statute, 2020 guidelines, and the post-Lyn Head Board. *Id.* Plaintiff Pritchett has the interesting distinction of having been denied under ***all three*** versions of § 15-22-26, both versions of the guidelines, and Boards whose members were operating under each. *Id.* at 152. Having been denied parole under the Plaintiffs' favored regime – the 2016 law and guidelines – these inmates cannot show that the post-2019 parole changes were more onerous or increased the quantum of punishment in their cases.  *Garner*, 529 U.S. at 255.

In addition, the Incarcerated Plaintiffs have made specific averments citing the Board's reasoning for denying parole. Doc. 1 at 67–80. These allegations only further underscore why Plaintiffs have failed to state an Ex Post Facto violation. In addition to the "total" and "complete" discretion afforded to the Board since 1951, the reasons given for denying parole were valid under the post-2016 revisions as well:

- Plaintiff Moore alleges that at his most recent parole consideration hearing, the Alabama Attorney General's office and VOCAL protested, but under SB67,

stakeholder input constituted a valid reason to deny parole. *Compare* Doc. 1 at ¶ 146 *with* ALA. CODE § 15-22-26(a)(3) (2016), *Bowers v. United States Parole Comm'n*, 775 F. App'x 504, 521–22 (11th Cir. 2019) (finding that the U.S. Parole Commission did not act with bias against an inmate when it considered negative input from the Department of Justice), *Bulls v. Warden*, No. 20-10882-E, 2020 WL 3053502, at *1 (11th Cir. May 13, 2020) (finding that the Board could deny parole based on negative stakeholder input), *Johnston v. Alabama Pardon & Parole Bd.*, 530 F. Supp. 589, 591 (M.D. Ala. 1982) (protest is a valid reason to deny parole).)

-    Plaintiffs Cole and Ptomey respectively allege that the Board denied them parole based upon overall institutional behavior and receipt of a disciplinary while in prison. Doc. 1 at ¶¶ 148, 149. The 2016 and 2019 statutes as well as both versions of the guidelines contain institutional behavior as a factor.  *See e.g.*, ALA. CODE § 15-22-26(a)(5) (2016) (2019); Exs. 8 and 12; *Murray v. Weatherly*, No. 205-CV-1240-MEF, 2007 WL 4358256, at *4 (M.D. Ala. 2007) (evidence of institutional history sufficient reason to deny parole).

Neither the statutory changes in 2016 and 2019, nor the Board's promulgation of guidelines in 2016 and 2020 changed the Board discretion over parole release which remained complete. None of the aforementioned changes created a parole system that was more onerous or significantly likely to increase the length of incarceration for any of the named inmate Plaintiffs – all of whom committed their offenses prior to 2016 when the Board had "total discretion." Accordingly, the Plaintiffs have failed to allege a plausible Ex Post Facto claim, and Count V of the Complaint should be dismissed as a matter of law.

**J.    Plaintiffs Fail To State A Plausible Claim That Ivey, Marshall, The Parole Board Members, or Hamm Violated Black Inmates' Equal Protection Rights Under The Fourteenth Amendment of The United States Constitution in Counts VI and VII.**

Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, on behalf of themselves and the purported "Discriminatory Parole Subclass" (referred to in this section collectively as "Plaintiffs"), allege in Count VI that the Governor, Attorney General, and Board Members ("Equal Protection Defendants") "intentionally and disproportionately denied parole to . . . Black [inmates] on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment of the [United States] Constitution[.]" Doc. 1 ¶ 246. Plaintiffs further allege in Count VIII that the same Defendants "intentionally and disproportionately extended the parole reconsideration dates" of specific named inmate Plaintiffs and parole denial subclass members. *Id.* ¶ 254. Plaintiffs include Hamm in Counts VI and VII although they allege no act or omission by Hamm with respect to parole. Plaintiffs have failed to state a plausible equal protection claim in either count as a matter of law.

"[A]n inmate may challenge the denial of . . . parole on equal protection grounds[.]" *Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988) (*citing Osborne v. Folmar*, 735 F.2d 1316, 1317 (11th Cir. 1984)). "To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (*citing Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001); *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932–33 (11th Cir. 1986)). When "discretion is essential to the criminal justice process", such as in parole decision-making, ***only exceptionally clear proof*** will infer the abuse of such discretion. *See Fuller*, 851 F.2d at 1310

(*citing McCleskey v. Kemp*, 481 U.S. 279, 292–95 (1987)) (emphasis added). Plaintiffs cannot meet their burden on either element of their equal protection claims.

> **A.    The Inmate Plaintiffs failed to establish that they are similarly situated to White inmates who allegedly received more favorable treatment.**

"The threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated, since the Equal Protection Clause requires that 'persons similarly situated . . . be treated alike.'" *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019) (*quoting City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Eleventh Circuit precedent requires that courts closely examine a plaintiff's purported comparators "with rigor." *Griffin Indus., Inc. v. Irvin*, 496 F.3d at 1189, 1207 (11th Cir. 2007).[26] Where, as here, the outcomes of complex, multifactored governmental decisions are attacked as racially discriminatory, the comparators "must be very similar indeed." *Id.* at 1205 (internal quotation and citation omitted). The Eleventh Circuit requires plaintiffs to show themselves to be similarly situated to a comparator because "'[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause.'" *Id.* at 1207 (*quoting E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)).

For a plaintiff to satisfy this step, "[t]he [groups] being compared 'must be *prima facie* identical in all relevant respects.'" *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 48 F.4th 1222, 1233 (11th Cir. 2022) (emphasis in original) (*quoting PBT Real Est., LLC v. Town of*

---

[26] While *Griffin* is a case involving a "class of one" claim, the Eleventh Circuit has held that for purposes of the similarly situated element, the same strict analysis applies regardless of whether the claim is a traditional equal protection claim or a "class of one" claim. 496 F.3d at 1204-05 (holding that "class of one" claims should not be "subjected to a more lenient "similarly situated" requirement than . . . other contexts."); *see also Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1045 (11th Cir. 2008) (*citing Griffin* and noting that the same similarly situated standard applies to both "class of one" and traditional equal protection claims).

*Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021)). "A plaintiff must ultimately show that it and any comparators are similarly situated in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker." *Chabad Chayil, Inc.*, 48 F.4th at 1233 (original quotation marks omitted) (*quoting Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008)). "If the plaintiff has not been treated differently than a similarly situated comparator, no Equal Protection violation exists." *S&M Brands, Inc.*, 925 F.3d at 1203 (*citing Dawson*, 50 F.3d at 892).

In the context of parole decisions, the Eleventh Circuit holds that "[t]he decision to grant or deny parole ***is based on many factors*** such as criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310 (emphasis added); *see also Thorne v. Chairperson Fla. Parole Comm'n*, 427 F. App'x 765, 771 (11th Cir. 2011) (a plaintiff's mere "allegations of disparate treatment [are] not detailed enough to raise his right to relief above a speculative level."). The Eleventh Circuit has rejected statistical calculations that employ overly broad comparator categories. *See Taylor v. Nix*, 240 F. App'x 830, 838 (11th Cir. 2007) ("comparator categories—'parole violators,' and paroled life-sentenced inmates serving sentences for 'murder,' 'rape,' 'armed robbery,' 'kidnaping,' or 'aggravated sodomy'—are extremely broad, and do not demonstrate that his self-identified comparators are 'prima facie identical in all relevant respects.'") (original citation omitted). Consequently, statistical data that does not compare similarly situated groups based on relevant factors used in the parole decision-making process cannot satisfy the "exceptionally clear proof" standard. *See Fuller*, 851 F.2d at 1310.

1.    **Plaintiffs' statistical analysis does not compare Black inmates who are similarly situated to White Inmates.**

Plaintiffs eschew identifying one or more specific White inmates who received parole or a shorter reconsideration date following the denial of parole. Doc. 1 at 38-61, 113-117. Instead, Plaintiffs submit statistical data showing alleged discrepancies in the length of setoff dates for subsequent parole consideration hearings and in the parole grant rates between Black inmates and White inmates. Doc. 1 at 47–49, 53, 58. Plaintiffs allege their parole denial data took into account "facility type . . . fiscal year, sex, and whether the ADOC reported that the [inmate] had an off-site job in the past year." *Id.* ¶ 108. However, Plaintiffs' "distribution" chart for reconsideration set off dates provides nothing more than the numbers of White or Black inmates who received a hearing reset time within in one of three time periods. *Id.* at 52-53. Plaintiffs' failure to use relevant comparison factors in the parole denial context, and absolute failure to use any factors other than race for reconsideration setoffs likewise dooms their equal protection claims.

As an initial matter, Plaintiffs have utterly failed to show the existence of a similarly situated comparator for purposes of their reconsideration setoff claim. The entirety of their allegations in support of Count VII amounts to stating that more Black inmates who have been denied parole were given five-year setoffs dates than White inmates who were denied parole – period. Doc. 1 at 52-53. Unlike their parole denial data, Plaintiffs did not attempt to provide ***any*** points of comparison between Black and White inmates – other than race – for set off purposes. *Id.*  Plaintiffs' failure to provide any comparison allegations for purposes of Count VII is fatal to their claim. *Chabad Chayil, Inc.*, 48 F.4th at 1233.

While Plaintiffs do provide some factors other than race for their parole denial claim, the factors are insufficient. Despite the availability of the Board's published guidelines,[27] Eleventh Circuit published decisions, and Alabama statutory law, Plaintiffs presented the Court with statistical analyses containing none of the relevant factors from these sources. Accordingly, and as stated below, Plaintiffs' equal protection claims fail both as a matter of law and because their chosen factors are insufficient to meet their similarly situated burden.

Turning first to the law, at the threshold, Plaintiffs' statistics do not get the similarly situated element of their equal protection claims to the speculative level. Even now, the Eleventh Circuit requires in Equal Protection claims that plaintiffs be prima facie identical in all relevant respects to a comparator. *See Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Commissioners*, No. 22-10773, 2024 WL 125969, at *12 (11th Cir. Jan. 11, 2024) ("This Court requires all comparators to be 'prima facie identical in all relevant respects.'") (original citations omitted). The Complaint's statistics as alleged do not and cannot show that the named inmate Plaintiffs – let alone the unnamed class members for whom no details are alleged at all – are prima facie identical in all relevant respects to the unknown White inmates with unalleged characteristics who received more favorable parole decisions. *See e.g.*, *Chabad Chayil, Inc.*, 48 F.4th at 1233; *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1352 (11th Cir. 2021); *PBT Real Est., LLC*, 988 F.3d at 1285. Plaintiffs have utterly failed to meet their burden under the first element for their two equal protection claims. *Id.*

---

[27] At oral argument on Plaintiffs' Preliminary Injunction Motion, counsel for the Board misunderstood one of this Court's questions and incorrectly stated that the Board's parole guidelines were not available to the public. While the parole guideline forms ***that have been completed for each inmate are privileged*** and not available to the public, the blank parole guidelines forms are available to the public as Plaintiffs themselves allege. Doc. 1 at 42 n.57.

Plaintiffs have attempted to counter the foregoing binding precedent by asserting that other courts relied on statistical data to find for plaintiffs alleging Equal Protection claims. Specifically, they assert that different types of plaintiffs have used regression analyses to support Equal Protection claims challenging New York City's stop-and-frisk policy and challenging sex discrimination in employment decisions. *See Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013); *see also Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465 (8th Cir. 1984). However, leaving aside that these cases are not binding on this Court, each case is distinguishable in that they do not involve parole decision-making and thus do not provide even persuasive guidance on the factors that would be relevant for the case at bar. *Compare Floyd*, 959 F. Supp. 2d at 589, *Craik*, 731 F.2d at 475 *with Fuller*, 851 F.2d at 1310; ALA. CODE § 15-22-26(a).

Worse for Plaintiffs, their statistics are nearly identical to evidence rejected by mandatory Eleventh Circuit precedent. *Fuller*, 851 F.2d at 1310. As in *Fuller*, Plaintiffs allege that the Board's parole decisions favored White inmates twice as much as Black inmates. *Compare* Doc. 1 ¶ 108 (alleging that the Board favored White inmates over Black inmates by 2-to-1) *with Fuller*, 851 F.2d at 1309 ("from 1976 to 1986 more than twice as many White convicted rapists were paroled on their initial consideration as black convicted rapists[.]"). Plaintiffs similarly assert that despite there being more Black inmates, the paroling authority granted parole at a higher rate to White inmates. *Compare* Doc. 1 ¶¶ 8 (claiming that Black inmates comprise 53% of Alabama's inmates), 101 (alleging a substantial relative difference in the parole grant rate between Black and White inmates) *with Fuller*, 851 F.2d at 1309 ("although the number of black convicted rapists was substantially higher than white convicted rapists the defendants had systematically paroled more whites than blacks."). Plaintiffs' claim that there is persistent racial disparity in parole decisions over a period of time is also similar to *Fuller*. *Compare* Doc. 1 at ¶ 127 (alleging that there has

been persistent racial disparity since 2020 (i.e., approximately 4-years)) *with Fuller*, 851 F.2d at 1309 (alleging continued racial disparity between 1976 and 1986 (i.e., approximately 10-years).

However, the Eleventh Circuit rejected the use of such statistics to support an equal protection claim. *Fuller*, 851 F.2d at 1310. In rejecting the argument that White inmates were favored 2-to-1, the *Fuller* Court emphasized that the inmate's statistical analysis did not compare similarly situated inmates. *Id.* Further, the *Fuller* Court recognized that the inmate's statistical evidence was ambiguous and insufficient to satisfy the exceptionally clear proof standard because the statistical data showed that sometimes, the total number of parole grants favored Black inmates even though the relative difference seemed to favor White inmates. *Id.*

In an unpublished opinion, the Eleventh Circuit found that an inmate stated a plausible Equal Protection claim by identifying two specific comparators who received more favorable parole decisions using the following factors: similar offenses, similar amounts of time served, dissimilar education, and dissimilar pre-incarceration employment histories. *Slakman v. Buckner* ("*Slakman I*"), 434 F. App'x 872, 876 (11th Cir. 2011). Plaintiffs' data does not account for even these factors. *See generally* Doc. 1. The closest factor that the instant Plaintiffs provide is job status, but even that is different in that Plaintiffs control for employment status ***while incarcerated*** as opposed to the ***pre-incarceration work history*** in *Slakman I*. *Compare* Doc. 1 at ¶ 108 *with Fuller*, 851 F.2d at 1310; *Slakman I*, 434 F. App'x at 876. Plaintiffs' statistical analysis does not even satisfy a comparison between inmates with similar offenses and length of sentences which the Eleventh Circuit subsequently rejected as sufficient to state a plausible Equal Protection claim. *Compare* Doc. 1 at ¶ 108 *with Slakman v. State Bd. of Pardons & Paroles* ("*Slakman II*"), No. 21-12226, 2021 WL 5071858, at *3 (11th Cir. Nov. 2, 2021).

Neither the Eleventh Circuit nor Alabama law has held that any of the factors purportedly controlled for by the Plaintiffs in their parole denial data are relevant for establishing a comparator in parole equal protection cases. *See e.g.*, *Fuller*, 851 F.2d at 1310 (listing, but not limiting the factors to, criminal history, nature of the offense, disciplinary record, employment history, and educational history); ALA. CODE § 15-22-26(a) (2019) (listing, but not limiting the factors to, risk of reoffending, progress on re-entry plan, stakeholder input, participation in risk-reduction programs, institutional behavior, and severity of the underlying offense); Ex. 8; Ex. 12. Relatedly, Plaintiffs have not controlled for any of the factors Eleventh Circuit precedent requires. *See e.g.*, *Fuller*, 851 F.2d at 1310; *Slakman I*, 434 F. App'x at 876; *Slakman II*, 2021 WL 5071858, at *3. Because Plaintiffs' statistical analysis does not contain even the minimal comparison factors recognized by Eleventh Circuit precent, they have failed to meet their burden of establishing that they are similarly situated to White inmates who received more favorable parole decisions as a matter of law.

Plaintiffs' chosen factors also fail analytically. Even if there were no controlling Eleventh Circuit precent on point establishing a list of relevant factors for parole purposes, Alabama law provides the relevant factors for its parole decisions. Specifically, Plaintiffs have failed to control the factors contained in the very statute whose 2016 revision they laud as providing an objective and evidence-based framework for parole decision-making – Alabama Code § 15-22-26(a)(1)-(6) (2016). At minimum, given that Plaintiffs are attacking ***Alabama parole decisions***, their comparators (or control factors if they are using statistics) must be prima facie identical in the following respects:

(1) Same risk to offend as established by their risk assessments.

(2) Similar progress in their reentry plan.

(3) Similar input of stakeholders.

(4) Similar participation in risk-reduction programs while incarcerated.

(5) Similar disciplinary history while incarcerated.

(6) Similar criminal offense severity.

*Id.*; *Chabad Chayil, Inc.*, 48 F.4th at 1233. Plaintiffs' factors do not control for *any* of the foregoing.

Nor are the factors Plaintiffs claim to have controlled for a sufficient substitute. Plaintiffs' factors are not guideline factors, and Plaintiffs have provided no factual allegations or citations to law requiring that the Board consider them when making either parole release or reconsideration set off decisions. *See generally* Doc. 1; ALA. CODE § 15-22-26(a) (2016) (2019); Ex. 12.  There is no allegation that the Board considers any of the Plaintiffs' four factors in parole decision.  *See generally* Doc. 1. Moreover, in no conceivable way can fiscal year of parole decision, sex, or ADOC-reported job status account for the risk assessment, reentry plan, stakeholder input, risk-reduction program participation, disciplinary history, or criminal offense severity listed in Alabama Code § 15-22-26(a)(1)-(6) or the Board's guidelines. Therefore, on their face, all of Plaintiffs' factors other than facility type are of no use in establishing a comparator.

Facility type also fails to help Plaintiffs satisfy the similarly situated element. Facility type is an exceedingly broad factor based on *different evaluations* undertaken for *different purposes* under *different policies* that are conducted by *different agencies*. Plaintiffs have argued previously that facility type controls for some of the guideline factors. However, at minimum, the facility type cannot account for reentry plan progress or stakeholder input as neither of these factors are relevant outside of the parole release decision context. Moreover, when examined more closely, facility type does not account for any of the other guideline factors.

Plaintiffs concede that "facility type" is based on the ***ADOC's evaluation*** of an inmate for purposes of security and programming. Doc. 1 at 54–55 (discussing ADOC rules for work center placement). The Board's risk assessment, on the other hand, is mandated by statute to evaluate an inmate's risk to reoffend. ALA. CODE § 15-22-26(a)(1) (2019). The Board's evaluation also differs in that it does not include, for example, the same categorical restrictions for specific crimes as does ADOC's work center classification rules. *Compare* Doc. 1 ¶ 114 ("ADOC precludes incarcerated people with certain crimes of conviction . . ."), *with* ALA. CODE § 15-22-26(a)(1)-(6) (2019); 2020 Guidelines.)[28] Thus, Plaintiffs have not shown that controlling for facility type demonstrates that inmates are similarly situated for risk assessment purposes.

Facility type also does not account for an inmate's participation in risk-reduction programs. It is certainly conceivable that an inmate may be sent to a facility for purposes of obtaining one or more risk reduction programs. However, it does not follow that the inmate actually participated in those programs or completed them by the time the Board considered the inmate for parole.

The Board's review of prison disciplinary history is also different. As alleged in the Complaint, the ADOC only reviews three months of an inmate's disciplinary history for placement in a work center. Doc. 1 at ¶ 114. The Board, on the other hand, currently reviews the previous twelve months of disciplinary history and has the statutory authority to go further back in time. Ex. 12; ALA. CODE § 15-22-26(a)(5) (2019) (the Board considers an inmate's entire institutional behavior while incarcerated).

---

[28] Some sex offenders under Alabama law are ineligible for parole, but those inmates convicted of homicides (unless sentenced to life without parole) and ***any*** three felony convictions (there are some groupings of multiple convictions that do result in a parole bar) in the previous 15 years are eligible for parole. Doc. 1 at ¶ 114; ALA. CODE §§ 15-22-27.1, 15-22-27.2, 15-22-27.3 (listing circumstances in which some offenders are prohibited from receiving parole).

Severity of an inmate's serving offense is likewise not revealed by his/her facility type. As Plaintiffs indirectly acknowledge, inmates can qualify for placement in an ADOC work center with an offense ranging from third degree theft of property (a Class D felony) to first degree robbery (a Class A felony). Doc. 1 at ¶ 114; ALA. CODE §§ 13A-8-4.1, 13A-8-41. Accordingly, facility type is of no assistance whatsoever in determining the severity of an inmate's serving offense for parole release decision purposes.

The allegations in the Complaint regarding specific named inmate Plaintiffs also demonstrate that inmates in the same facility are not similarly situated. For example, Plaintiff Cole and Plaintiff Cartwright aver that they have or had a minimum-community custody level. Doc. 1 at ¶¶ 148, 154. However, they have different offenses, served different amounts of time, and have different criminal histories. Ex. 13. Likewise, Plaintiff Ptomey and Plaintiff Campbell admit to being housed in Childersburg Work Release, a Minimum-Community facility, Doc. 1 at ¶¶ 149, 151, but they do not have similar offenses, have not served the same amount of time, and do not have similar criminal histories. Ex. 13. Consequently, the inmate Plaintiffs themselves provide examples of why "facility type" does not control for relevant factors in parole decision-making.

In sum, the Complaint fails to allege sufficient facts to meet the Plaintiffs' stringent burden of showing they are similarly situated to inmates who received parole or a shorter reconsideration date. They have not even attempted to name one or more specific White inmates who were released on parole or received shorter reconsideration dates who were similarly situated to some or all of the inmate Plaintiffs. The use of statistics in place of specifically named and described inmates receiving favorable parole treatment has been rejected by the Eleventh Circuit. *Fuller*, 851 F.2d at 1310. Even if statistics could be used in the parole context, Plaintiffs' statistical analysis does not control for the relevant characteristics – specifically those identified by the Eleventh Circuit and/or

those contained in the Alabama parole statutes and guidelines. Accordingly, Plaintiffs did not compare similarly situated groups as required to state an Equal Protection claim requiring the dismissal of Counts VI and VII.  *See e.g., Chabad Chayil, Inc.*, 48 F.4th at 1233; *S&M Brands, Inc.*, 925 F.3d at 1203; *Fuller*, 851 F.2d at 1310.

> **2.**      **Plaintiffs cannot state an Equal Protection claim by asserting a "convincing mosaic of circumstantial evidence" theory.**

To the extent that Plaintiffs assert a "convincing mosaic of circumstantial evidence" theory, such a theory fails to state an Equal Protection claim against the Equal Protection Defendants. The Eleventh Circuit has recognized the convincing mosaic theory in the employment context. *See Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019). The elements of the convincing mosaic theory are: "(1) "suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (internal quotations and citations omitted). However, the undersigned found no case, and Plaintiffs proffered none in their filings on their preliminary injunction motion, in which the Eleventh Circuit has recognized that the convincing mosaic theory may be used in the context of parole.

Rather, the Eleventh Circuit and this Court require an inmate bringing an Equal Protection challenge to show that they are similarly situated to a comparator. *See e.g., Jones*, 279 F.3d at 946–47; *Fuller*, 851 F.2d at 1310; *Gavillan Martinez v. Sec'y, Fla. Dep't of Corr.*, No. 21-10444, 2022 WL 16775338, at *1 (11th Cir. Nov. 8, 2022); *Brown v. McClure*, 849 F. App'x 837, 842 (11th Cir. 2021); *Rogers v. Cam Ward - Dir. Bureau of Pardons & Paroles*, No. 2:23-CV-356-ECM-KFP, 2023 WL 7290463, at *3 (M.D. Ala. Sept. 18, 2023); *Morris v. Hamm*, No. 2:23-CV-001-MHT-CWB, 2023 WL 4056209, at *2 (M.D. Ala. Apr. 7, 2023); *Lee v. Smithart*, No. 2:23-523-MHT-

CSC, 2023 WL 9442571, at *2 n.4 (M.D. Ala. Dec. 20, 2023); *Myers v. Ivey*, No. 2:21-CV-174-MHT-CSC, 2023 WL 8794608, at *12 (M.D. Ala. Dec. 4, 2023). In the Eleventh Circuit, plaintiffs who fail to engage in a comparison of the many factors established in *Fuller* fail to state a claim. *See Slakman II*, 2021 WL 5071858, at *3. Thus, unlike employment discrimination cases, the Eleventh Circuit requires inmates generally, and specifically those challenging parole decisions, to show that they are similarly situated to other inmates who received more favorable treatment.

However, even if the "convincing mosaic" theory were applicable in Equal Protection claims challenging parole decision-making, Plaintiffs must still submit "exceptionally clear proof" even if the evidence is just circumstantial. *See Fuller*, 851 F.2d at 1310. Such a heightened burden is required because of the discretionary nature of parole decision-making and the many factors that go into a parole decision. *Id.* Particularly in light of this standard, as will be shown below, Plaintiffs failed to provide circumstantial evidence of discrimination.

> **B.    Plaintiffs failed to allege sufficient facts showing that parole decision-making was based on purposeful or invidious discrimination.**

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) (citing *Washington v. Davis*, 426 U.S. 229 (1976)). "***Proof of racially discriminatory intent or purpose is required*** to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265 (emphasis added). Thus,

> The requirement of intentional discrimination prevents plaintiffs from bootstrapping all misapplications of state law into equal protection claims. "Probably no law contrived by man for his own governance ever has had or will be enforced uniformly and without exception. But the Constitution does not demand perfection." . . . The equal protection clause requires no more than that state decisionmakers applying a facially neutral state not intentionally discriminate.

*E & T Realty*, 830 F.2d at 1114 (original citations omitted).

"Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause[] . . . [e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." *E & T Realty*, 830 F.2d at 1114. Also, neither unlawful administration of a statute nor mere demonstration of inequality constitute an Equal Protection violation without evidence of intentional or purposeful discrimination. *See e.g.*, *Sweet*, 467 F.3d at 1319 (original citations omitted); *Jones v. White*, 992 F.2d 1548, 1573 (11th Cir. 1993) (original citation omitted); *Jackson v. Cook*, No. 2:17-CV-414-ALB, 2020 WL 4006671, at *9 (M.D. Ala. June 4, 2020) (original citations omitted). Likewise, unfair treatment does not constitute an Equal Protection violation because the Fourteenth Amendment does not require absolute equality but only a system to be free of unreasoned distinctions. *See Carson v. Ivey*, No. 520CV01151LCBSGC, 2021 WL 414540, at *5 (N.D. Ala. Jan. 19, 2021) (*citing Ross v. Moffitt*, 417 U.S. 600, 612 (1974); *Hammond v. Auburn Univ.*, 669 F. Supp. 1555, 1563 (M.D. Ala. 198); *Bursey v. Ameigh*, No. 6:08-CV-744, 2010 WL 3119389, at *3 (M.D. Fla. Aug. 4, 2010)).

After *Arlington Heights*, the United States Supreme Court clarified that purposeful discrimination is more than just the existence of racial bias or disproportionate impact. Rather, "[u]nder extant precedent purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). Likewise, invidious discrimination "involves a decisionmaker's undertaking a course of action ***because of, not merely in spite of***, [the action's] adverse effects upon an identifiable group." *Ashcroft*, 556 U.S. at 676–77 (original quotations marks and citation omitted) (emphasis added).

To establish purposeful or invidious discrimination, an inmate may present either direct or circumstantial evidence. *See Arlington Heights*, 429 U.S. at 266. Relevant circumstantial evidence includes the following:

> (1) the impact of the challenged law [or action]; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322 (11th Cir. 2021); *see also Thompson v. Merrill*, 505 F. Supp. 3d 1239, 1259 (M.D. Ala. 2020). However, in the context of Equal Protection claims challenging parole decisions, the plaintiff carries the burden of providing "exceptionally clear proof" of intentional discrimination. *See Fuller*, 851 F.2d at 1310 (*citing McCleskey*, 481 U.S. at 280); *see also Jackson*, 2020 WL 4006671, at *9 (original citation omitted).

### 1.    The impact of the Board's parole decision-making after HB380's enactment reflects a stricter review of violent offenders, not Black inmates.

As already shown, Plaintiffs' statistical analysis failed to compare similarly situated inmates, *see supra*, and thus, the statistical data does not provide an accurate or reliable view of the impact in the Board's parole decision-making after the enactment of HB380. In fact, even if Plaintiffs could show that they were comparing Black inmates to similarly situated White inmates and that there was a disproportionate impact on Black inmates, this fact could not, as a matter of law, establish discriminatory intent. *See e.g.*, *Sweet*, 467 F.3d at 1319 ("'a mere demonstration of inequality is not enough[] . . . it is a settled rule that the Fourteenth Amendment guarantees equal laws, not equal results.'") (*quoting McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991)); *E & T Realty*, 830 F.2d at 1113 ("even if [plaintiffs] and [the comparator] were similarly situated, the

fact that defendants treated [plaintiffs] differently would not establish an equal protection violation absent proof that defendants acted with discriminatory intent."); *Jackson*, 2020 WL 4006671, at *9 ("***Evidence which merely indicates disparity of treatment*** . . . is insufficient to show discriminatory intent.") (emphasis added). Consequently, Plaintiffs' statistical data, which allegedly shows racial disparity, cannot establish discriminatory intent by the Board.

Further, Plaintiffs' allegation that the Board implemented a directive from Governor Ivey and Attorney General Marshall to deny parole to violent offenders undermines the claim of purposeful discrimination against Black inmates. Doc. 1 ¶ 106. Accepting without admitting that the Board was stricter in its parole consideration for violent offenders, then the Equal Protection Defendants did not violate the Equal Protection rights of inmates. *See e.g.*, *Cook v. Wiley*, 208 F.3d 1314, 1323 (11th Cir. 2000); *Conlogue v. Shinbaum*, 949 F.2d 378, 380 (11th Cir. 1991); *Thornton v. Hunt*, 852 F.2d 526, 527 (11th Cir. 1988); *James-Bey v. Dillard*, No. 2:11-CV-067-TMH, 2014 WL 896968, at *8 (M.D. Ala. Mar. 6, 2014) (original citations omitted). Given that Plaintiffs allege that the Board limited parole to "violent offenders", Doc. 1 ¶¶ 91, 102, 106, 129, Plaintiffs cannot show that the Board's parole decision-making was "because of", rather than "in spite of", the alleged disparate impact on Black inmates. *See e.g.*, *Iqbal*, 556 U.S. at 676–77 (purposeful discrimination requires action taken "because of", not "in spite of", a disparate impact); *McCleskey v. Kemp*, 753 F.2d 877, 892 (11th Cir. 1985) ("A showing of a disproportionate impact alone is not sufficient to prove discriminatory intent unless no other reasonable inference can be drawn.") (*citing Arlington Heights*, 429 U.S. at 264–66); *Adams v. Wainwright*, 709 F.2d 1443, 1449 (11th Cir. 1983) ("Only if the evidence of disparate impact is so strong that the only permissible inference is one of intentional discrimination will it alone suffice.").

Even Plaintiffs' flawed statistical data supports the conclusion that the Board's parole decision-making focused on inmates with violent offenses, not on an inmate's race. Specifically, Plaintiffs' data demonstrates that the most pronounced decrease in parole grant rates affected violent offenders instead of the overall parole grant rates. *Compare* Doc. 1 at 47 (graph showing steady decline in overall parole grant rates) *with* Doc. 1 at 49 (graph showing a sharp decline in parole grant rates to violent offenders). When inmates are grouped as violent offenders, Plaintiffs' statistical data establishes that in 2019, the year when HB380 became effective, more Black inmates convicted of violent offenses received parole than White inmates convicted of violent offenses. Doc. 1 at 49. Between 2020 and 2022, the absolute difference in the parole grant rate for Black and White inmates convicted of violent offenses never exceeded 4%, and by 2022, the grant rates were similar. *Id.*

While Plaintiffs focus on the relative differences in parole grant rates, Doc. 1 at 48, the Eleventh Circuit lambasted the use of statistical data to "mask" when groups are essentially identical. *See Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1329–30 (11th Cir. 2021) (finding that even though Black voters were technically "twice as likely" than White voters to lack a valid photo ID, the absolute difference of 1% between Black voters and White voters showed the groups to be essentially identical). For violent offenders, Plaintiffs' data establishes that the absolute difference between Black and White inmates never exceeded 4%. Doc. 1 at 49. Even if Plaintiffs argued that Black inmates convicted of violent offenses were "twice as likely" to be denied parole as White inmates convicted of violent offenses, this allegation cannot establish discriminatory intent by the Equal Protection Defendants because the absolute difference between the two groups is so small that they are effectively similar. *See Greater Birmingham Ministries*, 992 F.3d at 1329–30.

Likewise, when inmates are grouped as non-violent offenders, Plaintiffs' data shows no consistent pattern in the parole grant rates. Doc. 1 at 58. In 2019, the parole grant rates for Black and White inmates convicted of non-violent offenses were similar. *Id.* Between 2020 and 2021, the alleged disparity between the parole grant rates for Black and White inmates convicted of non-violent offenses increased. *Id.* However, by 2022, the parole grant rates for Black and White inmates convicted of non-violent offenses were nearly identical. *Id.* Rather than persistent racial disparity, Plaintiffs' statistical analysis shows at best two outlier years.

Though the Eleventh Circuit recognized that unexplained disparate treatment over time could infer an Equal Protection violation, *see Fuller*, 851 F.2d at 1310, Plaintiffs' analyses does not satisfy this requirement. For example, Plaintiffs' graph which allegedly shows racial disparity in the parole grant rates between Black and White inmates convicted of non-violent offenses does not demonstrate a trend or pattern over time but, at best, only shows alleged racial disparity for 2 out of the 5-years provided. Doc. 1 at 58. Also, unlike the inmate in *Fuller* who provided statistics for 15- and 10-year periods, Plaintiffs provide graphs covering a 5-year period and a chart covering a 6-year period, and only 4 years out of the 5-year period and 5 years out of the 6-year period involve parole decision-making ***after*** HB380's enactment. *Compare Id.* at 47 (graph of overall parole grant rates), 49 (graph of parole grant rates for violent offenders), 53 (chart of lengths for parole consideration setoffs), 58 (graph of parole grant rates for non-violent offenders) *with Fuller*, 851 F.2d at 1309 (showing that the inmate provided statistical data from 1971 to 1986 and from 1976 to 1986). Given that disparate impact cannot establish discriminatory intent, Plaintiffs' statistical data, which does not compare similarly situated inmates and does not show a consistent pattern of racial disparity, cannot demonstrate that the Board engaged in purposeful discrimination.

**2.      The historical background to the changes in Alabama's parole law and the parole decision-making after HB380's enactment reflects a response to the failure of the prior parole system.**

Contrary to Plaintiffs' claim that changes in Alabama's parole law targeted Black inmates, the background of HB380's enactment and the Board's parole decision-making after its enactment do not support a finding that the Equal Protection Defendants engaged in purposeful discrimination against Black inmates. Despite claiming that the Equal Protection Defendants engaged in a deliberate effort to undercut the parole system established by SB67, Plaintiffs do not allege that either the Governor Ivey, Attorney General, or Board took any action ***until 2018***. *See generally* Doc. 1 at 39–43. In 2018, the Board, using SB67's "evidence-based parole decision-making based on actuarially-based objective standards", granted parole to Jimmy O'Neal Spencer, a White man. *Id.* at ¶ 91. Subsequently, Spencer, who was deemed fit for parole under SB67, began evading parole supervision and eventually murdered three people. *Id.*

***After*** Spencer's murders demonstrated that the process in place under SB67 did not "reduce recidivism and improve public safety" as Plaintiffs' allege, Doc. 1 ¶ 79, Governor Ivey and Attorney General Marshall met with the Board to ask why Spencer, who had three prior Escape I convictions and had committed a robbery ***when he was previously released to parole supervision***, received parole and to push for changes in its parole decision-making. *Id.* ¶ 91; Doc. 1 at 44 n.60. Plaintiffs claim that the former Board members defended the "evidence-based practices" which was "supported by available social science", even though objectively, three people died because Plaintiffs' preferred policies directly resulted in the release of a very dangerous inmate. Doc. 1 ¶ 91. Given the refusal of the former Board members to change in light of the objective failure of their policies that resulted in a White man murdering three people, a push for parole reform cannot viewed as evidence of discriminatory intent.

While Plaintiffs complain that Governor Ivey gained oversight of the Board and the power to appoint the Board Director, Doc. 1 ¶ 93, three changes introduced by HB380 confirms that it was designed to combat SB67's failure. First, whereas previously, the Governor's authority was to approve the Board's selection of a secretary/executive director, the Alabama Governor now appointed the newly created "Director of Pardons and Paroles" ("Director"). *Compare* ALA. CODE § 15-22-21 (1951) ("The [Board], ***with the approval of the Governor***, may appoint a secretary and such clerical, stenographic, supervisory and expert assistants . . .") (emphasis added) *with* ALA. CODE § 15-22-21(a) (2019).[29] Once in office, the Director could implement the Board's policies for effective parole supervision and could propose recommendations to the Board, but HB380 explicitly prohibited the Director from being able to adopt rules, policies, or parole guidelines or to vote in parole decisions. *See* ALA. CODE § 15-22-21(b) (2019). Thus, the changes to Alabama Code § 15-22-21 retained the Board's discretion over parole decision-making while allowing the Director to ensure effective supervision of parolees, like Spencer, and to recommend changes more efficiently in response to failures in parole decision-making.

Second, HB380 established the scheduling of an inmate's initial parole consideration hearing date. *See* ALA. CODE § 15-22-28(e) (2019). Whereas previous Alabama parole law required inmates convicted of violent offenses to serve one-third or 10-years of their sentences unless the Board members unanimously granted parole, HB380 established a new schedule based on various criteria with an emphasis on requiring inmates convicted of certain violent offense to serve longer before being considered for parole. *Compare* ALA. CODE § 15-22-28(e) (2015) *with* ALA. CODE § 15-22-28(e) (2019). Requiring violent inmates to serve more time aligns with Governor Ivey and

---

[29] Prior to HB380, the legal title of the Director was the Board Secretary. *See* ALA. CODE § 15-22-21 (1951).

Attorney General Marshall's alleged directives, Doc. 1 ¶¶ 91, 103, 106, and their alleged advocacy constitutes a valid and non-discriminatory policy position directed at curbing the release of inmates who committed violent crimes. *See e.g.*, *Cook*, 208 F.3d at 1323; *Conlogue*, 949 F.2d at 380; *Thornton*, 852 F.2d at 527; *James-Bey*, 2014 WL 896968, at *8.

Third, HB380 included public safety as a factor for consideration in the Board's parole guidelines. *See* ALA. CODE § 15-22-26(a) (2019). However, even SB67 implicitly included public safety in parole consideration as Plaintiffs admit and as the JRA Analysis explicitly states that it was a goal. Doc. 1 ¶ 79 n.49. Contrary to Plaintiffs' belief that the murder of three people was merely "pretextual", *id.* ¶¶ 121, 123, the Board's consideration of "public safety" in its parole decision-making after HB380's enactment constitutes a valid response to the failure of the SB67 system that directly resulted in the murder of three people. *Accord Garner*, 529 U.S. at 253 (acknowledging that paroling authorities have the capacity ***and obligation to chang***e their parole decision-making in light of their experiences).

As shown above, these three changes introduced by HB380 confirm that far from the murder of three people being "pretextual", the Board's parole decision-making ***after*** Spencer constituted a valid and non-race-based response to the failures of SB67. Indeed, Plaintiffs have not alleged that there was any move to change Alabama's parole law prior to Spencer's heinous crimes. *See generally* Doc. 1. Given that no action was taken ***until after*** Spencer murdered three people, Spencer was White, and HB380's changes targeted the failures that resulted in Spencer's release and focused on curtailing the danger to public safety that the premature release of violent offenders could cause, the historical background to the enactment of HB380 and to the Board's subsequent policies and parole decision-making does not support a finding that the changes were motivated at all by an improper racial animus. *See Greater Birmingham Ministries*, 992 F.3d at 1323–24

(changes to laws that are needed to address a well-documented issue weighs against finding discriminatory intent).

### 3. The events leading up to HB380's enactment and the subsequent actions of the Equal Protection Defendants provide no evidence of a discriminatory intent.

Despite Plaintiffs complaining about the alleged events and actions of officials leading up to and immediately after HB380's enactment, Doc. 1 at 43–46, they fail to allege facts showing discriminatory intent by the Equal Protection Defendants. As Plaintiffs concede, Spencer's high-profile murders after being released on parole resulted in a demand for change in the Board's parole decision-making and for reforming Alabama parole law. *Id.* ¶ 91. In fact, Plaintiffs failed to allege that there was anything different about the manner of HB380's passage as opposed to any other act created to address a significant public safety event. *See Greater Birmingham Ministries*, 992 F.3d at 1326 (legislation that is passed through common methods weighs against finding discriminatory intent). Thus, the push for change in Alabama's parole law and practices following a horrific crime by a White parolee cannot be considered unreasonable or constitute evidence of invidious discrimination against Black inmates.

Regarding alleged changes to the parole guidelines after HB380's enactment, Plaintiffs do not allege that SB67 prohibited the Board from revising its parole guidelines. *See generally* Doc. 1 at 45–46. Nor can they because both SB67 and HB380 required the Board to review its parole guidelines every three-years. *Compare* Ala. Code § 15-22-26(a) (2015) *with* Ala. Code § 15-22-26(a) (2019). Not only did SB67 mandate a review, the Board's review and revisions that became its 2020 guidelines was timely given that SB67 became effective in 2016. *See* 2015 Alabama Laws Act 2015-185, § 23. Moreover, as discussed in the Ex Post Facto argument, the 2020 Guidelines are neutral on their face and given the inclusion of a suggested parole score and numerical weighted

103

scores to all guideline factors, they were even more objective than the 2016 Guidelines. Consequently, there was nothing unusual about the Board's promulgation of the 2020 guidelines that would support an inference of discriminatory intent.

To the extent that Plaintiffs challenge the alleged actions of former Board Director Charles Graddick, Doc. 1 at 44–45, their allegations fail to show invidious discriminatory intent. Plaintiffs allege that former Director Graddick took two actions: 1) disciplinary actions against certain officials who happened to be Black; and 2) issuance of a policy that prohibited hairstyles work by Black employees. *Id.* ¶¶ 94, 95. With respect to the former, Plaintiffs allege no more than the former Director brought disciplinary charges against three senior officials, and they happened to be Black.  Plaintiffs have carefully failed to allege that the disciplinary actions were unwarranted or that they were motivated in any way by an improper racial motive. Doc. 1 ¶ 94. With respect to the hairstyle policy, as the Board noted in its opposition to the motion for preliminary injunction, Plaintiffs' allegation that it banned hairstyles typically worn by Black employees does not stand up in light of the language of the policy. Doc. 1 ¶ 95; Ex. 14. As is the case with Plaintiffs' equal protection claims overall, the allegations against former Director Graddick amount to know more than averments that adverse actions were taken against people who happened to be Black – and no more.

As a matter of law, former Director Graddick's personnel decisions cannot be imputed to the Governor, the Attorney General or the Board. The Attorney General has no appointment, supervisory, or other authority over the Director, and Plaintiffs have failed to allege any basis for such a claim. *See generally* Doc. 1. Consequently, there is no nexus with which to connect former Director Graddick's acts to the Attorney General. While the Governor appointed Graddick, the appointment power, standing alone, does not plausibly allege the Governor had personal

knowledge of and condoned every specific action of Graddick. *See City of S. Miami*, 65 F.4th at 643 (stating "the governor's ability to suspend officials for cause" is insufficient to "establish[] traceability" as to the governor); *Women's Emergency Network*, 323 F.3d at 949 (holding the Florida governor's power of appointment did not create enforcement connection for the *Ex parte Young* exception to sovereign immunity to apply). Plaintiffs make no allegations about Ivey here other than her prior appointment of Graddick.

Nor can Director Graddick's alleged actions be imputed to the Board. Plaintiffs aver that the Governor appointed Director Graddick to "oversee the Parole Board," Doc. 1 at ¶ 94, but this allegation is demonstrably false as a matter of statutory law in that the Director has no authority to oversee the Board members. HB380 divested the Board from all employment decisions. ALA. CODE § 15-22-21(b)(1) (2019). Also, HB380 prohibited former Director Graddick from engaging in parole decision-making, and HB380 authorized the Board alone to adopt and revise its policies and parole guidelines. *See* ALA. CODE § 15-22-21(b) (2019); *see also* ALA. CODE § 15-22-37(b)(1) (2019). Consequently, the alleged actions of former Director Graddick, even if Plaintiffs could show they were motivated by an improper racial animus cannot support a finding that the Board engaged in purposeful discrimination.

Furthermore, Governor Ivey and Attorney General Marshall's alleged conduct leading up to HB380's enactment does not establish a discriminatory intent. As a matter of law, the Board does not fall under the Governor or Attorney General's supervision or control because the Board possesses the authority to grant or deny parole. *See* ALA. CODE §§ 15-22-24(a)(1); 15-22-26(c). Even if Governor Ivey and Attorney General Marshall did pressure the former Board members to change their parole decision-making for violent offenders, such advocacy before an independent agency was proper given SB67's failure and does not constitute discriminatory intent. *See e.g.*,

*Cook*, 208 F.3d at 1323; *Conlogue*, 949 F.2d at 380; *Thornton*, 852 F.2d at 527; *James-Bey*, 2014 WL 896968, at *8.

Additionally, Plaintiffs' citation to the purported meeting between Governor Ivey, Attorney General Marshall, and the former Board members provides no support for their claim of discriminatory intent. Plaintiffs admit that the alleged meeting was called in response to the murders of three people committed by a White male parolee. Doc. 1 ¶ 91. Plaintiffs also aver that the meeting focused on the Board's parole decision-making for "violent offenders". *Id.* There are no allegations whatsoever that the Governor and the Attorney General directed the Board to stop paroling Black inmates or otherwise voiced any improper racial reason for the Board to take the requested actions. Moreover, there is no allegation to support even the inference that there was more than one meeting. *See generally* Doc. 1.

Plaintiffs' allegations that the Attorney General regularly opposes grants of parole does not show a racial animus. Doc. 1 ¶ 99. Noticeably absent is any allegation that he only protests against Black inmates or even a disproportionate number of Black inmates. *Id.* Plaintiffs do not even allege that he only protests against parole for Black inmates. Alabama law specifically empowers the Attorney General to protest against parole release and, as a member of law enforcement, the Attorney General is one of the stakeholders the Board is statutorily obligated to hear – even under the 2016 version of the law. ALA. CODE §§ 15-22-23(b), 15-22-26(a)(3) (2016) (2019).

Perhaps the most dispositive fact that completely undercuts Plaintiffs' allegations of a discriminatory intent on the part of the Governor is the current make-up of the Board. Prior to Plaintiffs' filing suit, Governor Ivey appointed Board Members Littleton and Simmons, and these appointments ***created a Black-majority Board***. Doc. 1 ¶ 163. It borders on the ludicrous to assert

that someone bent on discriminating against Black inmates would deliberately create a majority Black parole board.

### 4. The Board's parole decision-making after HB380's enactment did not depart from the normal procedural and substantive parole practices.

Plaintiffs allege in conclusory fashion that the Board changed its parole decision-making process after HB380. Doc. 1 at 46. However, as discussed at length in the context of the Ex Post Facto claim, the Board always had complete discretion over its parole release decision. ALA. CODE § 15-22-26 (1951) (2016) (2019). Even after the Legislature mandated the creation of guidelines in SB67, they did so in a way that maintained the Board's complete discretion and relegated the guidelines to a mere aid. ALA. CODE § 15-22-26 (2016). The subsequent changes to the guidelines actually made them more objective on their face. Exs. 8 and 12. From 2016 to the present day, the law and guidelines driving the Board's parole release decisions has remained fundamentally unchanged.

The only thing of import that has changed is the membership of the Board. Plaintiffs have failed to allege facts showing that the Black Board Members Littleton and Simmons (who constitute a voting majority) are motivated by a racial animus against Black inmates. *See generally* Doc. 1. Under Alabama parole law, all parole decisions are by majority vote. *See* ALA. CODE § 15-22-28(d) (2019) ("No prisoner shall be released on parole except by a majority vote of the [Board]."). Even if Plaintiffs did sufficiently allege a racial animus on the part of Chair Gwathney (which they fail to do as discussed below), she cannot deny parole to anyone, let alone a Black inmate, without one of the Black Board members voting with her. *Id.*

**5.    The contemporary statements of officials show that non-race-based factors were motivating the Board's parole decision-making after HB380's enactment.**

While Plaintiffs allege that Board Chair Gwathney said that "[t]his [B]oard is not driven by statistics[,]" Doc. 1 at ¶ 105, this out of context statement provides no evidence of an improper racial animus. Plaintiffs have disingenuously cherry picked this statement out of context. From the article to which they cite, Chair Gwathney also said:

- "[Parole decisions] are all very individualized decisions for that one particular inmate, so whatever a statistic may or may not show, I'll leave that up to those members of the media to make of that whatever they want."

- "But as long as I'm sitting this board, I will decide based on every individual that comes in front of me, and whether or not that person can be released without being a danger to public safety. ***This board is not driven by statistics***."

- "We spend an awful lot of time studying these files, (and) what's often difficult is that our files are privileged, so we can't put our files out there for (the) public or the media. Because our files are privileged, we can't put out there everything that we know and that we study before these hearings ever begin."

Doc. 1 ¶ 105 n.67 (emphasis added).

Not only does Plaintiffs' out of context statement fail to establish discriminatory intent on the part of Chair Gwathney, their insistence that parole decisions fall on racial lines would result in the very kind of race-based decision-making they claim to be against. As Alabama parole law clearly states, "[n]o prisoner shall be released on parole [unless] the [Board] is of the opinion that the prisoner meets criteria and guidelines . . . to determine a prisoner's fitness for parole[.]" ALA. CODE § 15-22-26(a) (2019). If Board members focused on statistics and strict maintenance of

parity for race, sex, religion, national origin, etc., then parole decisions would cease to be about the merits of the individual inmates and become an arbitrary and capricious quota system.

Plaintiffs' citation to statements of the Governor and the Attorney General likewise fail to establish discriminatory intent. Doc. 1 at 43–46. While Executive Order 716 created a "moratorium on early parole considerations," the order explicitly states that the purpose of the moratorium was to address the early release of "***violent offenders***" because their release endangers public safety. *Id.* ¶ 91 n.59 (emphasis added). The press noted at time that there were "hundreds of dangerous inmates" scheduled for early parole consideration by the former Board without justification. *Id.* Moreover, the article reports that the meeting between the Governor, Board, and Attorney General referenced in the Complaint came ***after*** the news outlet "launched an investigation into the board's actions, revealing the number of violent inmates up for early parole consideration, and those released long before their sentences were served." *Id.*

No racial statement is attributed in the article to the Governor or the Attorney General. *Id.* ¶ 92 n.59. The entire focus of the executive order and statements regarding it was clearly on violent offenders being released too early and the impact on public safety. *Id.* Thus, Plaintiffs' reliance on the moratorium on early release for violent offenders is very much misplaced.

### 6. Foreseeability of a disparate impact could not be shown in Board's parole decision-making after HB380's enactment.

Even though Plaintiffs complain about "abandoning" SB67's allegedly "evidence-based" parole decision-making, Doc. 1 ¶ 98, there are no factual allegations in the Complaint that support a conclusion that the changes would lead to a disparate impact against any protected class of inmates. The closest the Plaintiffs come is their citation to an article stating that validated risk and needs assessment tools can help limit racial bias. *Id.* ¶ 82. However, risk assessments ***remained*** part of the guidelines under HB380. Further, Plaintiffs allegations regarding the risks of allowing

racial bias by giving parole boards discretion do not help their argument because HB380 retained without change the "complete discretion" provided to the Board under SB67. ALA. CODE § 15-22-26(c) (2016) (2019).

While Plaintiffs also bemoan the subjective nature of parole decision-making under current Alabama law, Doc. 1 at 46, a subjective standard for parole decision-making does not constitute evidence that an alleged disparate impact on Black inmates would be foreseeable – particularly where, as here, the standard had always been subjective. ALA. CODE § 15-22-26(a), (c) (2016) (2019). Indeed, the Eleventh Circuit clearly holds that subjective criteria are not per se discriminatory. *See Shealy v. City of Albany, Ga.*, 89 F.3d 804, 805 (11th Cir. 1996); *Hill v. Seaboard Coast Line R. Co.*, 767 F.2d 771, 775 (11th Cir. 1985). Likewise, this Court acknowledges that without more, the difficulty in employing a standard does not provide exceptionally clear proof of discriminatory intent. *See Merrill*, 505 F. Supp. 3d at 1260 ("evidence of the difficulty of implementing the "moral turpitude" standard in the years following the adoption of the standard, without more, is not evidence probative of any racially discriminatory intent[.]"). Thus, Plaintiffs' allegations regarding risk assessments, discretion, and subjectivity fail to show that it was foreseeable that HB380 and the following changes to the Board's guidelines would lead to a disparate racial impact.

### 7. The Complaint attributes no actual knowledge of the purported disproportionate impact.

Plaintiffs' averment that the press and legislative officials alerted and criticized the Board of the alleged improper disproportionate impact of the Board parole decisions is unavailing. Doc. 1 ¶¶ 98, 142. The statements by the media and other persons Plaintiffs rely upon suffer from the same fundamental failings in their own statistics – they are uninformed by the specific parole cases considered by the Board. As Chair Gwathney correctly noted, because of the parole file privilege,

no commenter was aware of what was in any of the parole files. Likewise, there is no allegation in the Complaint that any commentor actually accounted for the facts known only to the Board. *See generally* Doc. 1. Plaintiffs also do not allege that the articles rested their claims after controlling for the "many factors" which go into the Board's parole decisions. *Id.*; *Fuller*, 851 F.2d at 1310; ALA. CODE § 15-22-26(a) (2019)). Thus, what the Board knew – even in the face of the criticism – was "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *E & T Realty*, 830 F.2d at 1109.

Chair Gwathney's dismissal of statistical data does not represent awareness of an improper racial impact. Doc. 1 ¶ 105. Instead, in context, Chair Gwathney demonstrated an awareness of a fundamental and undisputed truth: what is in the parole file presently in front of the Board is what matters, not statistics. Accordingly, any averments related to statements made by the press and legislative officials, which never compared similarly situated inmates nor considered the factors inherent in the Board's parole decisions, cannot establish that the Board was aware of an improper disparate impact or that its parole decisions were being made "because of" rather than "in spite of" the alleged disparate impact.

### 8.    No allegedly less discriminatory alternative exists.

Finally, Plaintiffs do not present any allegedly less discriminatory alternative to the Board's parole decision-making after HB380's enactment. Rather, Plaintiffs only laud the alleged parole system under SB67, Doc. 1 at 39–43, and decry the current parole system under HB380. *Id.* at 46–52. To be sure, Plaintiffs have argued elsewhere that a return to the SB67 regime would be an acceptable alternative. However, that system directly led to the murder of three people including a 7-year-old child. And, as noted throughout the Ex Post Facto argument, there is no appreciable difference in the SB67 and HB380 versions of § 15-22-26, and the Board's 2020 Guidelines are

objectively more objective than ones they replaced. Thus, returning to the prior version of the law and guidelines would decrease objectivity in parole decision-making and increase the risk to public safety – two of the things SB67 was designed to avoid. *Id.* ¶ 79.

The Complaint fails to satisfy Plaintiffs' burden of showing that the named inmate Plaintiffs or the putative class members are similarly situated to those receiving more favorable parole decisions. Their allegations likewise fall far below the exceptionally clear proof necessary to show that the State Defendants establish that the State Defendants actions related to parole were based upon a purposeful or invidious discriminatory motives. Thus, the State Defendants are entitled to dismissal of Counts VI and VII as a matter of law.

**K.    Plaintiffs Failed To Plead A Plausible Substantive Due Process Claim in Count VIII.**

Plaintiffs allege that Ivey, Marshall, the Board, and Hamm (collectively the "Due Process Defendants") "arbitrarily, capriciously, flagrantly, and in an unauthorized manner denied lawful parole consideration and parole release" to Alabama inmates purportedly in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Doc. 1 ¶ 261. Specifically, Plaintiffs allege that the Due Process Defendants denied them parole "in a racially discriminatory manner and by disregarding the Parole Guidelines promulgated under state law and in accordance with [SB67.]" *Id.* However, under the clear and binding precedent of the United States Supreme Court and the Eleventh Circuit, Plaintiffs' allegations fail to state a substantive due process claim.

"The Due Process Clause protects against deprivations of 'life, liberty, or property without due process of law.'" *Kirby v. Siegelman*, 195 F.3d 1285, 1290 (11th Cir. 1999) (*citing* U.S. CONST. amend. XIV, § 1). "The [United States] Supreme Court [holds] that this language guarantees both procedural and substantive rights." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1219 (11th Cir. 2023) (*citing Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237 (2022)); *see also*

*Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013) ("A violation of either of these two kinds of protection may form the basis for a suit under § 1983.") (original citation omitted). A court's substantive Due Process analysis "must begin with a careful description of the asserted right[.]" *Reno v. Flores*, 507 U.S. 292, 302 (1993) (original citations omitted).

However, "not every wrong committed by a state actor rises to the level of a constitutional tort, sufficient to trigger a substantive due process violation,[] as the Constitution does not protect against all encroachments by the state onto the interests of individuals[.]" *Maddox*, 727 F.3d at 1119 (internal quotation marks omitted) (*quoting Lee v. Hutson*, 810 F.2d 1030, 1032 (11th Cir. 1987); *Robertson v. Hecksel*, 420 F.3d 1254, 1262 (11th Cir. 2005)):

> [Courts] must 'exercise the utmost care' when we consider claims about substantive due process.[] Substantive due process is a legal concept 'untethered from the text of the Constitution,' so 'the Supreme Court has been reluctant to expand' its scope.[] And both we and the Supreme Court have 'said repeatedly that the Fourteenth Amendment is not a 'font of tort law' ' that can support novel federal causes of action.[] After all, 'not every injury is an injury of constitutional magnitude.'

*L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020) (original quotations omitted). "[T]o prove a substantive due process violation, plaintiffs face a very 'high bar.'" *King v. Pridmore*, 961 F.3d 1135, 1143 (11th Cir. 2020) (original citations omitted).

### A.    Plaintiffs' allegation that the Board violated Alabama law cannot establish that the Due Process Defendants violated their substantive due process rights.

Plaintiffs allege that "by disregarding the Parole Guidelines promulgated ***under state law*** and in accordance with [SB67,]" the Board violated the substantive Due Process rights of Alabama inmates. Doc. 1 ¶ 261 (emphasis added). To the extent that Plaintiffs' claim is grounded on violations of state law, "fundamental rights in the constitutional sense ***do not include 'state-created rights.'***" *Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1297 (11th Cir. 2019) (original quotation omitted) (emphasis added); *see also McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir.

1994) ("areas in which substantive rights are created only by state law . . . are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'") (original quotation omitted). As such, even if the Board did not have the statutory authority to disregard its parole guidelines or otherwise violated Alabama law, this allegation does not state a substantive due process claim.

Further, the United States Supreme Court has "long recognized that *a mere error of state law is not a denial of due process*." *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) (internal quotations marks omitted) (emphasis added). Similarly, a Board Member does not err by altering an inmate's risk assessment because an inmate "does not have a due process right to a particular risk assessment[]" and because the "assessment is within the discretion of the members of the Board[.]" *Bulls v. Estes*, No. 5:19-CV-0346-MHH-JEO, 2020 WL 906324, at *2 (N.D. Ala. Feb. 25, 2020). Additionally, "[w]hile the violation of state law may (or may not) give rise to a state tort claim, it is not enough by itself to support a claim under section 1983." *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) (original citations omitted). Consequently, Plaintiffs' allegation that the Board violated state law does not state a substantive due process claim.

### B.    Plaintiffs' allegation that the Due Process Defendants denied parole in a racially discriminatory manner does not state a substantive due process claim.

Plaintiffs also allege that "by denying parole in a racially discriminatory manner[,]" the Due Process Defendants violated the substantive Due Process rights of Alabama inmates. Doc. 1 ¶ 261. However, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, *not the more generalized notion of substantive due process*, must be the guide for analyzing these claims.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (*citing Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) (*quoting Graham v. Connor*, 490 U.S.

386, 395 (1989))) (emphasis added). Eleventh Circuit precedent is in accord. *See Worthy v. City of Phenix City, Alabama*, 930 F.3d 1206, 1221–22 (11th Cir. 2019); *see also Alcocer v. Mills*, 906 F.3d 944, 955 (11th Cir. 2018).

Plaintiffs' allegations of racial discrimination in their substantive due process claim merely restates their allegations of discriminatory parole denial in their Equal Protection claims. The Equal Protection Clause of the Fourteenth Amendment provides an explicit textual source for protecting against allegations of racial discrimination in parole decisions. U.S. CONST. amend. XIV, § 1; *see also Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988) ("an inmate may challenge the denial of . . . parole on equal protection grounds.") (original citation omitted). Therefore, Plaintiffs' allegations of racial discrimination in parole decisions fails to state a substantive Due Process claim. *Lewis*, 523 U.S. at 842; *Worthy*, 930 F.3d at 1221–22; *Alcocer*, 906 F.3d at 955.

    **C.**    **Plaintiffs cannot establish that Alabama inmates have a substantive due process right to parole or parole consideration under the Fifth Amendment or the Fourteenth Amendment.**

Under the Due Process Clause, "substantive rights include a 'great majority' of the rights guaranteed by the first eight Amendments vis-à-vis the federal government, as well as 'a select list of fundamental rights that are not mentioned anywhere in the Constitution.'" *Eknes-Tucker*, 80 F.4th at 1219–20 (*quoting Dobbs*, 597 U.S. at 237; *citing McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 760–66 (2010)). "To determine whether a right at issue is one of the substantive rights guaranteed by the Due Process Clause, courts must look to whether the right is deeply rooted in [our] history and tradition and essential to our Nation's 'scheme of ordered liberty.'" *Eknes-Tucker*, 80 F.4th at 1220 (internal quotations omitted) (*quoting Dobbs*, 597 U.S. at 237–38). Thus, "[t]he substantive component of the Due Process Clause protects individual liberty against certain

government actions regardless of the fairness of the procedures used to implement them." *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003) (internal quotations marks omitted) (*quoting Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)).

1. **The Fifth Amendment does not give inmates a fundamental right to parole or parole consideration.**

Strangely, Plaintiffs allege that the Board's denial of parole violated their substantive due process rights **under the Fifth Amendment**. Doc. 1 ¶ 261. However, the Eleventh Circuit holds that "[t]he Fifth Amendment . . . protects a citizen's rights against infringement by the federal government, not by state government." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1328 (11th Cir. 2015) (original citations omitted); *see also Taylor v. Brooks*, No. 5:22-CV-237-CLS, 2022 WL 2441297, at *4 (N.D. Ala. July 5, 2022) ("The Fifth Amendment applies only to federal actors.") (original citation omitted); *see also Shepherd v. Wilson*, No. CV 15-00373-KD-N, 2015 WL 9685562, at *8 n.15 (S.D. Ala. Dec. 22, 2015), *aff'd*, 663 F. App'x 813 (11th Cir. 2016) (original citation omitted). Plaintiffs bring their Fifth Amendment claim against state, not federal, officials. Therefore, they have failed to state a Fifth Amendment claim. *Id.*

2. **The Fourteenth Amendment does not give inmates a fundamental right to parole or parole consideration.**

While Plaintiffs claim that the Board violated their substantive Due Process rights under the Fourteenth Amendment, Doc. 1 ¶ 261, the governing precedent firmly forecloses their claim. "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *see also Cook v. Wiley*, 208 F.3d 1314, 1322 (11th Cir. 2000); *see also Thomas v. Sellers*, 691 F.2d 487, 488 (11th Cir. 1982). Alabama's parole statutes "do[] not confer a liberty interest in parole that is protected by the Due Process Clause of the Fourteenth

Amendment to the United States Constitution." *Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374, 375 (Ala. 2001); *see also Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982). Therefore, Plaintiffs have no federal right to parole, nor a state created right protected by the Fourteenth Amendment.

Likewise, Plaintiffs cannot claim that they have a fundamental right in parole consideration procedures. Plaintiffs will no doubt argue as they have before that they have not made a procedural due process claim. However, they specifically allege in Count X that the Due Process Defendants "disregard[ed] the Parole Guidelines promulgated under state law." Doc. 1 ¶ 261. The guidelines and related law are ***procedural***. Thus, in an abundance of caution it is necessary for the Due Process Defendants to note that not only do the named inmate Plaintiffs not have a right to parole, no liberty interest in parole, and they have no right to any particular procedure. "'Unless there is a liberty interest in parole, the procedures followed in making the parole determination are not required to comport with standards of fundamental fairness.'" *O'Kelley v. Snow*, 53 F.3d 319, 321 (11th Cir. 1995) (*quoting Slocum v. Georgia State Bd. of Pardons & Paroles*, 678 F.2d 940, 942 (11th Cir. 1982)); *see also Sills v. FCI Talladega Warden*, No. 22-12656, 2023 WL 1775725, at *4 (11th Cir. Feb. 6, 2023); *see also Tooma v. David*, 381 F. App'x 977, 979 (11th Cir. 2010) (because parole procedures do not have to comport with the standards of fundamental fairness, an inmate cannot state a due process claim even if a paroling authority abuses its discretion in its parole decision-making). Thus, regardless of whether Plaintiffs' Due Process claim is viewed as substantive or procedural, they have failed to state a claim.

L.    **In Addition to Failing to State a Claim for Counts V – VIII, Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm Are Entitled to Immunity from these Claims.**

Plaintiffs fail to state a claim as to their parole challenges in Couns V – VIII for the reasons stated above. In addition, Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm are entitled to sovereign immunity from official-capacity money damages claims for the same counts. *See Lancaster*, 116 F.3d at 1429.[30] Since these counts arise out of Marshall's prosecutorial function of representing victims and the state before the Board, he is entitled to absolute prosecutorial immunity from individual-capacity money damages claims under these counts. *See Allen*, 815 F.2d at 1434-35. Since these counts arise out of Gwathney's judicial function of exercising discretion in parole decisions, she is entitled to absolute quasi-judicial immunity from individual-capacity money damages claims under these counts. *See Holmes*, 418 F.3d at 1258.

Ivey, Marshall, Gwathney, and Hamm are also entitled to qualified immunity from Plaintiffs' individual-capacity money damages claims for these counts. For the same reasons that Plaintiffs lack standing to sue Ivey, Marshall, and Hamm for parole decisions—lack of traceability and redressability—Plaintiffs' § 1983 money damages claims against them fail for lack of causation. "A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005). Since Ivey, Marshall, and Hamm lack the authority to make parole decisions or calculate reset dates, they are entitled to qualified immunity from Counts V – VIII. Nor can Plaintiffs carry their burden of showing Ivey and Marshall's actions in advocating for public safety in parole decisions or Marshall's objecting to parole for inmates

---

[30] Since Plaintiffs assert only official-capacity claims against Littleton and Simmons, and since Plaintiffs are entitled to neither injunctive relief nor damages against them in their official capacities, they should be dismissed entirely from these counts without further analysis.

pursuant to his state law duty to represent victims violates clearly established law. *See Morton*, 707 F.3d at 1276. As to Hamm, Plaintiffs make no allegations whatsoever as to acts or omissions he took regarding parole. Ivey, Marshall, and Hamm are therefore entitled to qualified immunity.

As to Gwathney, Plaintiffs cannot carry their burden of showing her parole decisions violated any clearly established law. In fact, binding precedent clearly weighs in Gwathney's favor, as *Paschal* supports dismissal of Plaintiffs' ex post facto claim and *Fuller* supports dismissal of their equal protection claim. *Paschal* stands for the proposition that changes in a parole board's exercise of discretion do not violate the Ex Post Facto Clause where the board retained complete discretion both before and after the changes to deviate from its own guidelines. 738 F.2d at 1179-81. *Fuller* stands for the proposition that an inmate cannot prove race discrimination in parole based on statistics that show only disparate impact and do not compare similarly-situated inmates. 851 F.2d at 1310. In order to overcome Gwathney's assertion of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). Since Plaintiffs cannot carry their burden of alleging Gwathney violated a clearly established right, she is entitled to qualified immunity.

**M.    The Conspiracy and Failure to Prevent Claims in Counts IX, X, and XI Fail to State a Claim Against the State Defendants.**

Plaintiffs allege in Count IX that Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm violated 42 U.S.C. § 1985(2) and (3) by conspiring to violate their equal protection rights by racially discriminating against them in parole decisions with the consequence that they remain imprisoned and subject to involuntary servitude. Doc. 1 ¶¶ 265-69. Plaintiffs allege in Count X that Ivey and Marshall violated 42 U.S.C. § 1985(3) by conspiring to violate their equal protection rights by racially discriminating against them in parole decisions. *Id.* ¶¶ 271-75. Plaintiffs allege in Count XI that all Defendants violated 42 U.S.C. § 1986 by failing to prevent Ivey, Marshall,

Gwathney, Littleton, and Simmons from engaging in a conspiracy to deny parole in a racially discriminatory manner. *Id.* ¶¶ 277-80.

All of Plaintiffs' claims fail for six reasons. First, sovereign immunity bars Plaintiffs' official capacity claims. Second, Plaintiffs' claims are barred by the intracorporate conspiracy doctrine. Third, Plaintiffs conspiracy claims fail because their prerequisite substantive claims fail. Fourth, all of the State Defendants are entitled to qualified immunity. Fifth, the Board members are entitled to quasi-judicial immunity and Marshall is entitled to prosecutorial immunity. Sixth, Plaintiffs fail to plead a conspiracy.

First, Plaintiffs' official-capacity damages claims under §§ 1985 and 1986 against the State Defendants are barred by sovereign immunity. *See Lancaster*, 116 F.3d at 1429; *see also Fincher v. State of Fla. Dep't of Lab. & Emp. Sec. Unemployment Appeals Comm'n*, 798 F.2d 1371, 1372 (11th Cir. 1986) (holding Congress did not abrogate states' sovereign immunity in enacting § 1985); *Henry v. Fla. Bar*, 701 F. App'x 878, 881 (11th Cir. 2017) (holding that "because Eleventh Amendment immunity bars [the plaintiff's] 42 U.S.C. § 1985 claim" the plaintiff "cannot make a successful § 1986 claim."). Nor are the State Defendants in their official capacities "persons" subject to suit under §§ 1985 and 1986. *See Will*, 491 U.S. at 71. Because Littleton and Simmons are sued only in their official capacities, Doc. 1 ¶ 163, they are entitled to a complete dismissal of Counts IX, X, and XI.

Second, the § 1985 conspiracy claims in Counts IX and X are barred by the intracorporate conspiracy doctrine. "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). "Simply put, under the doctrine, a corporation cannot conspire with its employees,

and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.* The Eleventh Circuit has applied the intracorporate conspiracy doctrine to § 1985 claims. *See Denney v. City of Albany*, 247 F.3d 1172, 1190-91 (11th Cir. 2001). Both § 1985 counts allege a conspiracy exclusively between state officials—Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm in Count IX, and Ivey and Marshall in Count X. Since the only conspirators alleged are state officials and the alleged conspiracy "relates to their performance of their official, not personal, duties," Counts IX and X fail to state a claim due to the intracorporate conspiracy doctrine. *Denney*, 247 F.3d at 1191.

Third, the § 1985 and § 1986 claims fail on the merits independently of the intracorporate conspiracy doctrine. Where plaintiffs' "substantive claims fail on the merits, their conspiracy claim fails as well because Plaintiffs would not have been 'deprived of any rights or privilege' by the Defendants' allegedly wrongful acts." *Denney*, 247 F.3d at 1190. Since Plaintiffs' preceding claims in Counts I through VIII fail for the reasons already stated, their § 1985 claims fail because they are predicated on those underlying claims. *Id.* Section 1986 provides a cause of action for anyone who has knowledge of a § 1985 conspiracy and fails to prevent it. *See* 42 U.S.C. § 1986. "Section 1986 claims are therefore derivative of § 1985 violations." *Park v. City of Atlanta*, 120 F.3d 1157, 1159-60 (11th Cir. 1997). Since "§ 1986 requires a violation of § 1985," *id.* at 1160, and there is no § 1985 violation, Plaintiffs' § 1986 claim in Count XI fails.

Fourth, the State Defendants are entitled to qualified immunity from Plaintiffs' individual-capacity money damages claims under § 1985 and § 1986. For the reasons previously argued as to Plaintiffs' substantive claims in Counts I through VIII, Plaintiffs' claims against the State Defendants arise out of their performance of discretionary functions. As a result, Plaintiffs bear the burden of alleging qualified immunity *does not* apply. *See Harbert*, 157 F.3d at 1281. Plaintiffs

fail to carry their burden of alleging violations of §§ 1985 and 1986 for the reasons stated above, *i.e.*, the intracorporate conspiracy doctrine and failure to allege underlying substantive violations. In addition, Plaintiffs fail to carry their burden of alleging a violation of clearly established law. Plaintiffs cannot cite a case of materially similar binding precedent establishing that parole decisions based on race-neutral factors such as public safety that, at most, have a disparate impact violate equal protection and are for the purpose of forcing labor in Alabama's prisons. Nor do Plaintiffs' allegations, when stripped of their legal conclusions, clearly establish law based on the "obvious clarity" of the violation since "[c]ases to not often arise under the second and third methods" of clearly establishing law. *Gaines*, 871 F.3d at 1209.

Fifth, with respect to Gwathney (and Littleton and Simmons to the extent Plaintiffs sought to make individual capacity claims against them) she is entitled to absolute quasi-judicial immunity, and Marshall is entitled to absolute prosecutorial immunity. As noted previously, money damages claims against the parole board members are barred by quasi-judicial immunity. *Holmes*, 418 F.3d at 1258. All of Plaintiffs' allegations against the Board center around their parole decision-making. Doc. 1 at 48-61. Regardless of whether the averment is use of the guidelines, use of risk assessments, parole denials, reconsideration setoffs, or in Gwathney's case actions taken as Board Chair, each of Plaintiffs' conspiracy claims relies upon actions taken in furtherance of Board duties. *Id.* Accordingly, the Board members are entitled to quasi-judicial immunity from all of Plaintiffs' money damages claims. *Holmes*, 418 at 1258. Marshall is entitled to absolute prosecutorial immunity from Plaintiffs' conspiracy claims because the claims against him arise from his prosecutorial function in representing victims before the Board. *See Allen*, 815 F.2d at 1434-35.

Finally, Plaintiffs' conspiracy claims fail on the merits. Plaintiffs face a heightened pleading standard for their conspiracy claims. *See e.g., Kearson v. S. Bell Tel. & Tel. Co.*, 763 F.2d 405, 407 (11th Cir. 1985); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984) ("In civil rights and conspiracy actions, courts have recognized that ***more than mere conclusory notice pleading is required*.**") Therefore, "conclusory, vague, and general allegations of conspiracy may justify dismissal of a complaint." *Kearson*, 763 F.2d at 407. Under the heightened pleading standard, a plaintiff must show "a meeting of the minds between two or more persons to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (*citing Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 912 (11th Cir. 1998)). "[T]he linchpin for conspiracy is agreement, ***which presupposes communication***[.]" *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992) (emphasis added). Knowledge of the propensities and actions of other defendants is not sufficient. *Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at Auburn Univ.*, 267 F. Supp. 2d 1139, 1147 (M.D. Ala. 2003). Additionally, an averment of an adverse act done independently of a conspiracy does not support a civil conspiracy claim. *See Griswold v. Alabama Dep't of Indus. Rels.*, 903 F. Supp. 1492, 1501 (M.D. Ala. 1995) (finding that an adverse act done independently of a conspiracy does not state a claim pursuant to 42 U.S.C. § 1985(2)).

Though Plaintiffs allege in a conclusory manner that the State Defendants formed and implemented a conspiracy, Doc. 1 at 119–20, Plaintiffs did not allege with any specificity facts alleging communications from which it can be either alleged or inferred that there was a "meeting of the minds". *See generally* Doc. 1. For example, Plaintiffs allege no specific communications between Hamm and the Board members – let alone the details of such communications – that formed or furthered a conspiracy to deny parole so that inmates would remain in the ADOC

custody. *Id.* Plaintiffs have not even alleged that the Commissioner or the Board members communicated. *Id.* Thus, Plaintiffs fail to allege a "meeting of the minds" at the level of specificity required under the heightened pleading standard. *McAndrew*, 206 F.3d at 1036; *Bailey*, 956 F.2d at 1122.

Likewise, Plaintiffs failed to allege the requisite communication between the Board and Governor Ivey, and the Attorney General. Plaintiffs only allege that the Governor and Attorney General communicated with the ***prior Board Members,*** and Plaintiffs admit that "none of [the prior Board Members] remain on the Board today." Doc. 1 ¶ 91. More telling, neither the Plaintiffs' allegations nor the media reports cited in the Complaint aver that there was any discussion at all about black inmates or denying parole for purposes of making money off of their labor. *Id.* at ¶¶ 91-92 n.59, 60. Plaintiffs only aver that the discussion involved moving away from "evidence and data-based" parole decisions ***and the then existing Board members pushed back***. *Id.* at ¶ 91. Consequently, not only have Plaintiffs failed to allege that the current Board members were in attendance or that the meeting centered on parole denials and profiting off of inmate labor, they have directly alleged that ***there was no meeting of the minds***. Consequently, the allegations related to the 2018 meetings completely undercut rather than support the civil conspiracy claim. *McAndrew*, 206 F.3d at 1036.

Plaintiffs do allege that the Board has since "implemented Governor Ivey's directive." Doc. 1 at ¶ 102. However, there is no allegation that the 2018 directive was ever communicated to any of the current members of the Board. *Id.* at ¶¶ 91-96, 102. Even if it were, the directive as alleged was to "abandon the objective evidence-based framework required by the JRA." *Id.* at ¶ 102. The Complaint does not allege that the directive was for the Board to deny parole for the purpose of profiting from inmate labor. *Id.* Once again, the Complaint fails to allege facts that meet the

Plaintiffs' heightened pleading burden of establishing a meeting of the minds. *McAndrew*, 206 F.3d at 1036.

Plaintiffs' allegations concerning Governor Ivey's appointment of Charles Graddick to the position of Director and her appointment of Gwathney as the Board Chair does not show an agreement between the Board members and Governor Ivey to deny parole to profit from inmate labor. As a matter of law, the Director cannot vote in parole decisions, *see* ALA. CODE § 15-22-21(b) (2019), and once appointed, Board members act independently of the Governor who cannot force them to grant or deny parole. *See* ALA. CODE § 15-22-20(e) (2019) (Board Members can only be removed through impeachment); *see also* ALA. CODE § 15-22-26(c) (2019) (the Board has complete discretion over parole decision-making). Additionally, despite Governor Ivey appointing all the current Board Members, Doc. 1 at ¶¶ 162–63, parole decisions require a majority vote, and the allegations regarding Plaintiff English show that the current Board Members can and do disagree with each other. *Id.* at ¶ 153. Thus, the fact that Governor Ivey appointed former Board Director Graddick and the current Board Chair Gwathney provides no support for Plaintiffs' civil conspiracy claim.

With respect to the Attorney General, the only other communications Plaintiffs allege are his protests regarding parole cases. Doc. 1 at ¶ 99. As a member of law enforcement, the Board is statutorily required to hear from the Attorney General on specific parole cases if he chooses to communicate with them – an obligation placed on the Board by the very "JRA" Plaintiffs otherwise laud. ALA. CODE § 15-22-26(a)(3) (2016) (2019). Even before SB67's creation of guidelines including stakeholder input, the Attorney General was statutorily authorized to receive notice and represent the interests of the state at parole hearings. ALA. CODE §§ 15-22-23(b)(2)(a), (b)(4) (1983). "[A]s long as an attorney's conduct falls within the scope of the representation of his client,

*such conduct is immune from an allegation of a § 1985 conspiracy*." *Farese v. Scherer*, 342 F.3d 1223, 1232 (11th Cir. 2003) (emphasis added). More generally, *anyone* who testifies in parole consideration proceedings is entitled to absolute immunity for the testimony given. *See Sullivan v. Smith*, 925 So. 2d 972, 974–76 (Ala. Civ. App. 2005) (the Board's parole consideration hearings are quasi-judicial in nature, and thus, persons testifying at these hearings are afforded absolute immunity for testimony given). Plaintiffs seek to turn a statutorily required series of communications regarding specific parole cases, for which the Attorney General is absolutely immune, in at least two ways, into conspiracy communications. These communications do not establish a conspiracy, but rather the fulfillment of the Attorney General and the Board's statutorily-imposed duties.

Finally, Plaintiffs' allegation that the State Defendants conspired "to impede, hinder, obstruct, and defeat the proper and lawful operation of [Alabama's] parole system[]" fails to state a claim pursuant to 42 U.S.C. § 1985(2). Doc. 1 ¶ 265. "The second part of § 1985(2) applies to conspiracies to obstruct the course of justice in state courts[.]" *Kush v. Rutledge*, 460 U.S. 719, 725 (1983); *see also Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1293 (11th Cir. 2002) (applying the second clause of 42 U.S.C. § 1985(2) in state court proceedings). Because nothing in 42 U.S.C. § 1985(2) indicates that the statute applies in administrative or quasi-judicial proceedings, Plaintiffs fail to state a claim under § 1985(2). *Morast v. Lance*, 807 F.2d 926, 930 (11th Cir. 1987) (proceedings before an administrative agency does not fall under the first clause of 42 U.S.C. § 1985(2)).

As a result, Plaintiffs' §§ 1985 and 1986 conspiracy claims in Counts IX, X, and XI should be dismissed.

**N.    Cooper Is Entitled to Dismissal of the State Law Unjust Enrichment Claim in Count XII.**

Count XII of the Complaint alleges that Employer Defendants, including ALDOT, have been "conferred a benefit" by members of the "Forced Labor Class" in "the form of, among other things, decreased costs and increased profits, including, but not limited to decreased costs and increased profits resulting from the lower wages and benefits paid to Forced Labor Class members working for them through Alabama work-release and work-center facilities than [ALDOT] would have to pay to free workers had forced incarcerated labor not been available to them." Doc. 1 ¶ 282. Plaintiffs further allege that it would be "unjust for [ALDOT] to retain the value of the benefits without disgorgement to Plaintiffs . . . because [ALDOT] obtained this benefit through unconscionable conduct, including through their knowing and voluntary participation in the State's coercive worker 'leasing' programs." Doc. 1 ¶ 283.

"To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Portofino Seaport Vill., LLC v. Welch,* 4 So. 3d 1095, 1098 (Ala. 2008). "The amount of the recovery is limited to the value of the benefit gained by the defendant, regardless of the extent of the detriment to the plaintiff." *American Family Care, Inc. v. Fox,* 642 So. 2d 486, 488 (Ala. Civ. App. 1994). More specifically,

> [w]here the plaintiff has suffered a detriment, and the defendant has received a benefit as a result, it is said that justice demands the repayment by the defendant of the plaintiff's loss. The measure of the defendant's liability is, however, limited to the value of the benefit received, whether or not it is equal to, less than, or greater than the plaintiff's loss.

*Opelika Prod. Credit Ass'n, Inc. v. Lamb,* 361 So. 2d 95, 99 (Ala. 1978).

In this case, Plaintiffs have sued Cooper, the director of ALDOT, in his official and individual capacity, for ALDOT's alleged insufficient compensation of convict labor contracted

127

for from ADOC, which has allegedly unjustly enriched ALDOT, and ultimately, the State of Alabama. Plaintiffs argue that this conduct constitutes a state law tort claim of unjust enrichment which entitles them to the monetary damages described above. The unjust enrichment claim differs from those discussed above because it is a claim arising under <u>state</u> law rather than federal law. While *Ex parte Young*, 209 U.S. 123 (1908) provides an exception to *Pennhurst*, which allows federal courts to grant prospective injunctive relief to stop a continuing federal law violation, this is not applicable when a state official has allegedly violated <u>state</u> law rather than federal law. *See Pennhurst*, 465 U.S. at 106. In addition, because the unjust enrichment claim against ALDOT is a state law claim and only seeks the recovery of monetary damages, the *Ex parte Young* exception is not applicable.

Under Alabama law, Cooper is entitled to sovereign immunity, which also shields him from liability from the Plaintiffs' state law unjust enrichment claim. In *Patterson v. Gladwin Corp.*, 835 So. 2d 137 (Ala. 2002), a taxpayer brought a class action against the state by suing the Commissioner of the Alabama Department of Revenue in his official capacity for refunds of disputed foreign corporation franchise taxes. As argued by the Commissioner in *Patterson*, Cooper asserts that the Court lacks subject matter jurisdiction over the state law unjust enrichment claim due to the application of sovereign immunity expressed in Ala. Const. 1901, § 14. Section 14 expressly states that "the State of Alabama shall never be made a defendant in any court of law or equity." In describing this historical doctrine, the *Patterson* court stated as follows:

> The wall of immunity erected by § 14 is nearly impregnable. *Sanders Lead Co. v. Levine*, 370 F.Supp. 1115, 1117 (M.D. Ala. 1973); *Taylor v. Troy State Univ.*, 437 So.2d 472, 474 (Ala. 1983); *Hutchison v. Board of Trustees of Univ. of Alabama*, 288 Ala. 20, 24, 256 So.2d 281, 284 (1971). This immunity may not be waived. *Larkins v. Department of Mental Health & Mental Retardation*, 806 So.2d 358, 363 (Ala. 2001) ("The State is immune from suit, and its immunity cannot be waived

128

by the Legislature or by any other State authority.") (citations omitted). "This means not only can the state itself may not be sued, but that this cannot be *indirectly* accomplished by suing its officers in their official capacity, when a result favorable to the plaintiff would be directly to *affect the financial status of the state treasury*." (emphasis added) (citations omitted).

835 So. 2d at 142. The *Patterson* court held that the class action against the commissioner in his official capacity for a refund of taxes of approximately $1 billion would "affect the financial status of the state treasury" within the meaning of § 14 and, as a result, was a suit against the state subject to a dismissal for lack of subject matter jurisdiction. *Id*. at 143, 154.

More recently, in *Reagan v. Alabama Alcoholic Beverage Control Board*, 339 So. 3d 211, 215 (Ala. 2021), the court determined that a class action claim against a state board and various individuals, including the administrator and chairman of the board, for alleged incorrectly calculated sales taxes on alcohol was barred by sovereign immunity and affirmed the dismissal of the trial court. *See also Ex parte Alabama Dept. of Transp*., 978 So. 2d 718 (Ala. 2007) (ALDOT entitled to dismissal of case seeking the recovery monetary damages for breach of contract based on application of sovereign immunity).

To the extent the Plaintiffs attempt to seek recovery from Cooper in his <u>individual</u> capacity, the state law unjust enrichment claim is barred by "state agent" immunity found at Ala. Code § 36-1-12(c), because all actions or inactions alleged against Cooper in the Complaint are solely based on Cooper's exercise of his judgment in executing his responsibilities as Director of ALDOT. Section 36-1-12(c), states in pertinent part:

(c)  An officer, employee, or agent of the state, including, but not limited to, an education employee, is <u>immune from civil liability in his or her personal capacity</u> when the conduct made the basis of the claim is based on the agent's doing any of the following:
  (1)    Formulating plans, policies, or designs.
  (2)    Exercising his or her judgment in the administration of a department or agency of government, including but not limited to, examples such as:
      a.    Making administrative adjudications.

     b.  Allocating resources.

     c.  Negotiating contracts.

    . . .

  (3)  Discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the manner for performing the duties and the state agent performs the duties in that manner.

State agent immunity is designed to protect state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities. *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002); s*ee also Johnson v. City of Bessemer*, 180 F. Supp. 3d 1013, 1027 (N.D. Ala. 2016) (abuse of process claim brought under 42 U.S.C. § 1983 against individuals involved in employment decision barred by application of state agent immunity).

  Specifically, Plaintiffs' claims against Cooper revolve around how and the amount Plaintiffs were compensated for providing services pursuant to lawfully executed contracts executed between ALDOT and ADOC regarding the use of convict labor by ALDOT. The Complaint contains no specific allegations of any actions or inactions taken by Cooper in his individual capacity; rather, all claims arise out of his exercising his judgment as the Director or ALDOT in the administration of the department, including entering into the contracts with ADOC for the use of convict labor. There are no allegations that Cooper personally benefitted from these contracts. Accordingly, the alleged wrongful conduct alleged by Plaintiffs against Cooper in his individual capacity clearly falls within the parameters of ALA. CODE § 36-1-12(c).

  In conclusion, because Cooper is entitled to sovereign and state agent immunity for the state law claim of unjust enrichment, subject matter jurisdiction is lacking in this case and, in addition, Count XII fails to state a claim for which relief can be granted. Accordingly, Cooper is entitled to dismissal of this claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

**Conclusion**

For the reasons stated above, all claims against the State Defendants are due to be dismissed.

Respectfully submitted,

Steve Marshall,
  *Attorney General*

/s/ Brad A. Chynoweth
Brad A. Chynoweth
  *Assistant Chief Deputy, Civil Division*

Benjamin M. Seiss
  *Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Brad.Chynoweth@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

***Counsel for Defendants Governor Kay Ivey
and Attorney General Steve Marshall***

/s/ Tara S. Hetzel (with permission)
Tara S. Hetzel
  *Deputy Attorney General*

Cameron W. Elkins
  *Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Tara.Hetzel@AlabamaAG.gov
Cameron.Elkins@AlabamaAG.gov

***Counsel for Defendant ADOC Commissioner John Hamm***

/s/ Gary L. Willford, Jr. (with permission)
Gary L. Willford, Jr.
  *Assistant Attorney General*

Alabama Board of Pardons & Paroles
301 South Ripley Street, Bldg. D
Montgomery, AL 36104
(334) 353-4495 (phone)
(334) 315-4793 (fax)
Gary.Willford@paroles.alabama.gov

***Counsel for Defendants Alabama Board of Pardons and Paroles Chair Leigh Gwathney and Parole Board members Darryl Littleton and Gabrelle Simmons***

/s/ S. Anthony Higgins (with permission)
S. Anthony Higgins
  *Assistant Attorney General*

William F. Patty
  *Assistant Attorney General*
  *Chief Counsel*

State     of     Alabama     Department     of
Transportation
1409 Coliseum Boulevard, Room 147
Montgomery, Alabama 36110
Telephone: (334) 242-6350
Facsimile: (334) 264-4359
higginss@dot.state.al.us
pattyw@dot.state.al.us

***Counsel for Defendant John Cooper***

132

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this the 29th day of March 2024, I electronically filed a copy of the foregoing Consolidated Brief with the Clerk of the Court via CM/ECF which will notify all counsel of record.

<u>Brad A. Chynoweth</u>
*Assistant Chief Deputy, Civil Division*