IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROBERT EARL COUNCIL aka KINETIK
JUSTICE, *et al.*,

                Plaintiffs,

    v.

KAY IVEY, *et al*.,

                Defendants.

Case No**.** 2:23-cv-00712-CLM-JTA

CLASS ACTION

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS FILED BY DEFENDANTS BAMA BUDWEISER, JEFFERSON COUNTY, CITY OF TROY, KAY IVEY, STEVE MARSHALL, LEIGH GWATHNEY, DARRYL LITTLETON, GABRELLE SIMMONS, JOHN HAMM, JOHN COOPER, SOUTHEAST RESTAURANT GROUP-WEN, LLC, SOUTHEASTERN MEATS, INC., MASONITE CORPORATION, CITY OF MONTGOMERY, PROGRESSIVE FINISHES, INC., PARAMOUNT SERVICES, INC., SL ALABAMA, LLC, JU-YOUNG MANUFACTURING AMERICA, INC., HWASEUNG AUTOMOTIVE USA LLC, CAST PRODUCTS, INC., KOCH FOODS, LLC, AND RCF, LLC D/B/A/ GEMSTONE FOODS, LLC**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT .................................................................................................... 5

I.  The PLRA Does Not Bar the Currently Incarcerated Plaintiffs' TVPA, RICO, and First Amendment Claims ...................................................................... 5

II.  *Pennhurst* Is No Obstacle to Plaintiffs' Federal Claims for Injunctive Relief Against the State Defendants in Their Official Capacities .............................. 16

III.  Plaintiffs Have Adequately Alleged TVPA Claims Against Each of the Defendants ................................................................................................ 19

    A.  Plaintiffs Have Alleged Facts to Make Out the Elements of a TVPA Claim Against Each Defendant .......................................................... 21

        1.  Plaintiffs have plausibly alleged that the labor of Coerced Labor Individual Plaintiffs and other incarcerated workers was provided and obtained by prohibited coercive means and that Defendants knew or should have known of this coercion ...................... 22

            a.  Labor obtained through physical restraint, threats of physical restraint, serious harm, and threats of serious harm ........... 23

            b.  Abuse or threatened abuse of law or legal process ........................... 34

            c.  Scheme intended to cause belief that incarcerated workers would suffer serious harm or physical restraint ................................. 35

        2.  Plaintiffs have alleged that Defendants knowingly benefit from participation in an enterprise that violates the TVPA ............................. 37

    B.  Defendants' Remaining TVPA Arguments Are Without Merit ........................... 41

        1.  State Defendants are subject to suit for declaratory and injunctive relief ...................................................................... 41

        2.  Plaintiffs may bring claims for injunctive and declaratory relief under the TVPA ...................................................................... 43

        3.  State Defendants are subject to the TVPA ............................... 45

        4.  There is no bar against incarcerated individuals bringing TVPA claims ...................................................................... 47

5.     State Defendants are not immune from Plaintiffs' TVPA claims in their personal capacities .................................................................... 49

      a.   State Defendants cannot establish that they are entitled to qualified immunity in their individual capacities ............................. 49

      b.   State Defendants cannot establish that Marshall is entitled to prosecutorial immunity from Plaintiffs' individual-capacity claims under the TVPA ......................................................... 52

      c.   State Defendants cannot establish that Gwathney is entitled to quasi-judicial immunity from Plaintiffs' individual-capacity claims under the TVPA ......................................................... 53

6.     The TVPA is constitutional .................................................................... 53

C.    Plaintiffs Have Sufficiently Alleged Standing to Bring Their TVPA Claims Against the Employer Defendants ........................................................... 55

IV.   Plaintiffs Have Adequately Alleged RICO Violations by All Defendants ...................... 65

A.    Plaintiffs Have Adequately Alleged a Pattern of Racketeering Activity in the Form of Widespread, Routine TVPA Violations by Defendants ............... 66

B.    Plaintiffs Have Adequately Alleged That Defendants Participated in the Conduct of a RICO Enterprise ....................................................... 68

C.    Plaintiffs Have Sufficiently Alleged Injuries to Their Business and Property Directly Caused by the Defendants' Racketeering Activities .............. 73

D.    Public Employer Defendants Are Subject to RICO Liability Here .................... 75

V.   Plaintiffs Have Stated a Plausible State Constitutional Claim for Injunctive Relief Against the Local Government and Private Employer Defendants ...................... 79

VI.   Plaintiffs Have Stated a Plausible Ex Post Facto Clause Claim Against Ivey, Marshall, Hamm, and the Parole Board Members ........................................... 90

VII.  Plaintiffs Have Stated Plausible Equal Protection Clause Claims Against Ivey, Marshall, Hamm, and the Parole Board Members ........................................ 102

A.    Equal Protection Plaintiffs Have Plausibly Alleged Disparate Treatment Because They Have Alleged Sufficient Facts to Support an Inference That Black Parole Candidates Were Treated Less Favorably Than Similarly Situated White Parole Candidates ............................................ 104

B.  Plaintiffs Have Sufficiently Alleged That Racial Discrimination Motivated Equal Protection Defendants' Administration of the Parole System ................................................................................... 111

C.  Even Absent Appropriate Comparators for All Plaintiffs Denied Parole, Plaintiffs Have Alleged Sufficient Facts to Support a Plausible Inference of Disparate Impact and Discriminatory Intent Under Eleventh Circuit Precedent ............................................................ 120

D.  Equal Protection Defendants' Immunity Arguments Are No Obstacle to Plaintiffs' Claim ................................................................................ 123

VIII.  Plaintiffs Have Stated a Plausible Substantive Due Process Claim Against Ivey, Marshall, Hamm, and the Parole Board Members .............................. 124

IX.  Plaintiffs Have Sufficiently Pleaded KKK Act Claims Under 42 U.S.C. §1985 Against Defendants Ivey, Marshall, Hamm, and the Parole Board Members .............. 130

A.  Plaintiffs Have Alleged Viable 42 U.S.C. §1985(2) and (3) Claims Against Ivey, Marshall, Hamm, and the Parole Board Members ..................... 130

B.  Plaintiffs Have Alleged Sufficient Facts to State a 42 U.S.C. §1985(3) Claim Against Ivey and Marshall Based on Their Conspiracy to Interfere with Operation of the State Parole System. ........................................ 139

X.  Plaintiffs Have Adequately Alleged a 42 U.S.C. §1986 Claim Against All Defendants. ................................................................................................. 141

XI.  State Defendants Are Subject to Suit for Declaratory and Injunctive Relief for Plaintiffs' Parole-Related Claims Under *Ex parte Young* ............................... 152

A.  State Defendants Are Subject to Suit for Declaratory and Injunctive Relief for Plaintiffs' Parole-Related Claims Under *Ex parte Young* ................ 152

B.  Plaintiffs Have Standing to Pursue Their Parole-Related Claims ..................... 153

XII.  Plaintiffs Have Stated a Plausible First Amendment Claim Against Defendants Ivey and Hamm ......................................................................................... 158

A.  The First Amendment Plaintiffs Have Adequately Alleged a Violation of Their First Amendment Rights ........................................................ 158

B.  Ivey and Hamm Are Subject to Supervisory Liability ....................................... 164

C.  Ivey and Marshall Are Not Entitled to Qualified Immunity, and First Amendment Plaintiffs Have Standing to Seek Injunctive Relief ............................................................................................... 167

D.      Ivey and Hamm's Attempt to Invoke the Rule Against Claim Splitting Is Spurious ................................................................................ 169

XIII.   Plaintiffs Have Stated a Claim for Unjust Enrichment Against the Employer Defendants ............................................................................ 172

XIV.    Defendants' Protestations that the Complaint Is a "Shotgun" Pleading Are Without Merit ................................................................................. 180

CONCLUSION ............................................................................................ 184

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Federal Cases

*Absolute Activist Value Master Fund Ltd. v. Devine*,
No. 2:15-CV-328-FTM-29MRM, 2016 WL 1572388 (M.D. Fla. Apr. 19,
2016) ................................................................................................................77

*Adams v. Demopolis City Schs.*,
80 F.4th 1259 (11th Cir. 2023) ......................................................................115

*Alvarez v. Lakeland Area Mass Transit Dist.*,
406 F.Supp.3d 1348 (M.D. Fla. 2019) ...........................................................104

*Ambrosia Coal & Const. Co. v. Pages Morales*,
482 F.3d 1309 (11th Cir. 2007) .......................................................................66

*Ammons v. Dade City*,
783 F.2d 982 (11th Cir. 1986) .......................................................................117

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) .........................................................................................75

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .......................................................................62

*Argosy Ltd. v. Hennigan*,
404 F.2d 14 (5th Cir. 1968) .............................................................................46

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011).........................................................................................51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................181

*Auburn University v. International Business Machines, Corp.*,
716 F.Supp.2d 1114 (M.D. Ala. 2010) ..................................................177, 178

*Bailey v. Alabama*,
219 U.S. 219 (1911).........................................................................................82

*Baker v. City of Kissimmee*,
645 F.Supp. 571 (M.D. Fla. 1986) .................................................................115

*Banks v. McIntosh Cnty.*,
530 F.Supp.3d 1335 (S.D. Ga. 2021) .............................................................115

*Barmapov v. Amuial*,
  986 F.3d 1321 (11th Cir. 2021) ..................................................................183

*Barnhart v. Peabody Coal Co.*,
  537 U.S. 149 (2003)...................................................................................44

*Barr v. Clinton*,
  370 F.3d 1196 (D.C. Cir. 2004) ................................................................131

*Barrientos v. CoreCivic, Inc.*,
  332 F.Supp.3d 1305 (M.D. Ga. 2018) .............................................47, 175

*Barrientos v. CoreCivic, Inc.*,
  951 F.3d 1269 (11th Cir. 2020) ...................................................... *passim*

*Bell Atl. v. Twombly*,
  550 U.S. 544 (2007)...............................................................20, 132, 180

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir.1981) .................................................................141

*Borkowski v. Baltimore Cnty.*,
  414 F.Supp.3d 788 (D. Md. 2019) ...........................................................145

*Boyd v. Corr. Corp. of Am.*,
  380 F.3d 989 (6th Cir. 2004) ......................................................................13

*Branch Banking and Tr. Co. v. McDonald*,
  No. 2:13-CV-000831-KOB, 2013 WL 5719084 (N.D. Ala. Oct. 18, 2013) ........................179

*Brantley v. City of Macon*,
  390 F.Supp.2d 1314 (M.D. Ga. 2005) .....................................................141

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008)...................................................................................74

*Bridges v. Poe*,
  487 F.Supp.3d 1250 (N.D. Ala. 2020) .......................................23, 24, 47

*Brooks v. Kiser*,
  No. 1:21CV541-ECM-SMD, 2022 WL 2155037 (M.D. Ala. May 13, 2022)........................87

*Brown v. Geo Grp., Inc.*,
  No. 18-80026-CV, 2020 WL 13847462 (S.D. Fla. Oct. 20, 2020)......................................122

*Brown v. Georgia Dep't of Revenue*,
  881 F.2d 1018 (11th Cir. 1989) ..................................................16, 18, 19

*Brown v. McClure*,
    849 F. App'x 837 (11th Cir. 2021) .................................................................. 122

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) .................................................................... 20

*Bryant v. Rich*,
    530 F.3d 1368 (11th Cir. 2008) ................................................................. 8, 10

*Buck v. Bd. of Elections of City of New York*,
    536 F.2d 522 (2d Cir. 1976) ...................................................................... 144

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1983) ....................................................................... 50, 52, 53

*Burrell v. Staff*,
    60 F.4th 25 (3d Cir.), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc.*
    *v. Burrell*, 143 S. Ct. 2662 (2023) ............................................................ *passim*

*Cal. Dep't of Corr. v. Morales*,
    514 U.S. 499 (1995) ................................................................................ 17

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................................ 43

*CBS Inc. v. PrimeTime 24 Joint Venture*,
    245 F.3d 1217 (11th Cir. 2001) .................................................................... 94

*Chavis v. Clayton Cnty. Sch. Dist.*,
    300 F.3d 1288 (11th Cir. 2002) .............................................................. 137, 139

*Chevron Corp. v. Donziger*,
    833 F.3d 74 (2d Cir. 2016) ........................................................................ 77

*Chiles v. United States*,
    69 F.3d 1094 (11th Cir. 1995) ..................................................................... 55

*Chua v. Ekonomou*,
    1 F.4th 948 (11th Cir. 2021) ................................................................ 130, 131

*Cisneros v. Petland, Inc.*,
    972 F.3d 1204 (11th Cir. 2020) ............................................................... *passim*

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) .............................................................................. 151

*City of Newport v. Fact Concerts, Inc.*,
    453 U.S. 247 (1981) ................................................................................ 76

*Clark v. Clabaugh*,
  20 F.3d 1290 (3d Cir. 1994)................................................................143, 145, 151

*Cohen v. Monarch Sales, Ltd., Inc.*,
  No. 20-CV-24876-UU, 2021 WL 3934203 (S.D. Fla. Jan. 19, 2021)...................................172

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986)....................................................................................49

*Copeland v. C.A.A.I.R., Inc.*,
  2019 WL 4307125 (N.D. Okla. Sept. 11, 2019) ............................................. *passim*

*Craik v. Minnesota State Univ. Bd.*,
  731 F.2d 465 (8th Cir. 1984) ..........................................................................106

*Damiano v. Fla. Parole & Prob. Comm'n*,
  785 F.2d 929 (11th Cir. 1986) ...................................................................99, 103

*Daniels v. Williams*,
  474 U.S. 327 (1986)...................................................................................125

*Dean v. Warren*,
  12 F.4th 1248 (11th Cir. 2021) ........................................................................137

*Denney v. City of Albany*,
  247 F.3d 1172 (11th Cir. 2001) .......................................................................135

*Dickerson v. Alachua Cnty. Comm'n*,
  200 F.3d 761 (11th Cir. 2000) ...................................................................135, 137

*Dimanche v. Brown*,
  783 F.3d 1204 (11th Cir. 2015) ........................................................................13

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) .....................................................................37, 38

*Dowbenko v. Google Inc.*,
  582 F. App'x 801 (11th Cir. 2014) .....................................................................66

*Dream Defenders v. DeSantis*,
  553 F.Supp.3d 1052 (N.D. Fla. 2021)............................................................115, 116

*Dream Defs. v. Governor of the State of Fla.*,
  57 F.4th 879 (11th Cir. 2023) ........................................................................169

*Duckworth v. Georgia Dep't of Hum. Servs.*,
  No. 1:22-CV-04326-SDG, 2024 WL 1377650 (N.D. Ga. Mar. 31, 2024) ...........................122

*Edmonson v. Leesville Concrete Co.*,
    500 U.S. 614 (1991).............................................................................151

*Ellison v. Alabama Bd. of Pardons & Paroles*,
    No. 17-13235-D, 2017 WL 6947946 (11th Cir. Dec. 13, 2017)............................126

*Emory v. Peeler*,
    756 F.2d 1547 (11th Cir. 1982) ..................................................................59

*Erickson v. Pardus*,
    551 U.S. 89 (2007)...................................................................................181

*Farese v. Scherer*,
    342 F.3d 1223 (11th Cir. 2003) .................................................................133

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) .....................................................61, 63, 64

*Fla. State Conf. of NAACP v. Lee*,
    576 F.Supp.3d 974 (N.D. Fla. 2021)...........................................................120

*Fleming v. Dowdell*,
    434 F.Supp.2d 1138 (M.D. Ala. 2005) ..........................................................53

*Fletcher v. Reilly*,
    433 F.3d 867 (D.C. Cir. 2006) ....................................................................91

*Floyd v. City of New York*,
    959 F.Supp.2d 540 (S.D.N.Y. 2013)............................................................105

*Fortune v. Cibran*,
    No. 2:23-CV-00318-ACA, 2023 WL 5351986 (N.D. Ala. Aug. 21, 2023) ........................176

*Fuller v. Georgia State Bd. of Pardons & Paroles*,
    851 F.2d 1307 (11th Cir. 1988) .......................................................... *passim*

*Gaines v. Wardynski*,
    871 F.3d 1203 (11th Cir. 2017) ...................................................................51

*Garner v. Jones*,
    529 U.S. 244 (2000)...................................................................... *passim*

*Genty v. Resolution Trust Corp.*,
    937 F.2d 899 (3d Cir. 1991)........................................................................76

*Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration
    & Elections*,
    36 F.4th 1110 (11th Cir. 2022) ............................................62, 63, 64, 153

*Georgia Latino All. for Hum. Rts. v. Gov. of Georgia*,
    691 F.3d 1250 (11th Cir. 2012) ..................................................155

*Gerstein v. Pugh*,
    420 U.S. 103 (1975).................................................................59, 61

*Gingras v. Think Fin., Inc.*,
    922 F.3d 112 (2d Cir. 2019)............................................................76

*Goebert v. Lee Cnty.*,
    510 F.3d 1312 (11th Cir. 2007) ...............................................8, 9, 10, 14

*Gonzalez v. CoreCivic, Inc.*,
    986 F.3d 536 (5th Cir. 2021) ..........................................................49

*Gonzalez v. Lee Cnty. Hous. Auth.*,
    161 F.3d 1290 (11th Cir. 1998) .......................................................79

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*,
    442 U.S. 366 (1979).................................................................151

*Greater Birmingham Ministries v. Sec'y of State*,
    992 F.3d 1299 (11th Cir. 2021) ................................................ *passim*

*Green v. Roberts*,
    No. 2:06-CV-667-WKW, 2008 WL 4767471 (M.D. Ala. Oct. 29, 2008)..............13

*Grider v. City of Auburn*,
    618 F.3d 1240 (11th Cir. 2010) .................................................135, 137

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971)...............................................................  *passim*

*Griffin v. Kelly*,
    No. 92 CIV. 8623 (LBS), 1994 WL 9670 (S.D.N.Y. Jan. 11, 1994).................151

*Griggs v. Holt*,
    No. CV 117-089, 2018 WL 5283448 (S.D. Ga. Oct. 24, 2018) ......................8

*Hall v. Holder*,
    117 F.3d 1222 (11th Cir. 1997) .....................................................120

*Hamilton v. Hall*,
    790 F.Supp.2d 1368 (N.D. Fla. 2011)................................................160

*Hampton v. City of Chicago*,
    484 F.2d 602 (7th Cir. 1973) .......................................................145

*Harden v. Bodiford*,
　442 F. App'x 893 (4th Cir. 2011) ....................................................................84

*Harris v. Hammonds*,
　217 F.3d 1346 (11th Cir. 2000) ................................................................92, 96

*Hart v. Hodges*,
　587 F.3d 1288 (11th Cir. 2009) ..............................................52, 101, 123, 138

*Havens Realty Corp. v. Coleman*,
　455 U.S. 363 (1982)......................................................................................64

*Hicks v. Ferrero*,
　241 F. App'x 595 (11th Cir. 2007) ..............................................................167

*Hill v. Seaboard Coast Line R.R. Co.*,
　767 F.2d 771 (11th Cir. 1985) ....................................................................114

*Hilton v. S.C. Pub. Railways Comm'n*,
　502 U.S. 197 (1991)................................................................................47, 77

*Hoefling v. City of Miami*,
　811 F.3d 1271 (11th Cir. 2016) ..................................................................131

*Hoggard v. Rhodes*,
　141 S. Ct. 2421 (2021)..................................................................................51

*Holmes v. Crosby*,
　418 F.3d 1256 (11th Cir. 2005) ....................................................................53

*Hope v. Pelzer*,
　536 U.S. 730 (2002)......................................................................................51

*Hunter v. Underwood*,
　471 U.S. 222 (1985)............................................................................105, 112

*J.G. Rogers Corp. v. Metallized Carbon Corp.*,
　No. 2:18-CV-01955-RDP, 2019 WL 1597845 (N.D. Ala. Apr. 15, 2019)...........176

*Jackson v. BellSouth Telecomms.*,
　372 F.3d 1250 (11th Cir. 2004) ....................................................................66

*Jackson v. Griffin*,
　762 F. App'x 744 (11th Cir. 2019) ................................................................10

*Jacobson v. Fla. Sec'y of State*,
　974 F.3d 1236 (11th Cir. 2020) ............................................................42, 155

*Jarrard v. Moats*,
No. 4:20-CV-2-MLB, 2021 WL 1192948 (N.D. Ga. Mar. 30, 2021) ...................................160

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) ...............................................................................115

*Jenkins v. Jones*,
No. 3:14-CV-1503-J-39MCR, 2017 WL 3381713 (M.D. Fla. Aug. 7, 2017)......................165

*Jimenez v. Wellstar Health Sys.*,
596 F.3d 1304 (11th Cir. 2010) ................................................................................80

*Jingrong v. Chinese Anti-Cult World All.*,
287 F.Supp.3d 290 (E.D.N.Y. 2018) ........................................................................140

*Jobson v. Henne*,
355 F.2d 129 (2d Cir. 1966).....................................................................................89

*Johnson v. Avery*,
393 U.S. 483 (1969)...............................................................................................163

*Johnson v. Dunn*,
No. 2:21-CV-1701-AMM, 2024 WL 1076802 (N.D. Ala. Mar. 12, 2024)........................180

*Johnson v. Johnson*,
385 F.3d 503 (5th Cir. 2004) ..................................................................................121

*Johnson v. Wainwright*,
772 F.2d 826 (11th Cir. 1985) ..................................................................................99

*Jones v. Bock*,
549 U.S. 199 (2007).............................................................................................6, 15

*Jones v. Garner*,
211 F.3d 1225 (11th Cir. 2000) .............................................................................91, 92

*Jones v. North Carolina Prisoners' Labor Union, Inc.*,
433 U.S. 119 (1977)...............................................................................................162

*Jones v. Ray*,
279 F.3d 944 (11th Cir. 2001) ..........................................................................105, 122

*In re Juul Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
No. 19-MD-02913-WHO, 2022 WL 1955678 (N.D. Cal. Jan. 28, 2022) ...........................74

*K.H. v. Riti, Inc.*,
2024 WL 505063 (11th Cir. Feb. 9, 2024) ............................................................37, 39

*Kassa v. Fulton Cnty.*,
40 F.4th 1289 (11th Cir. 2022) ........................................................123

*Katz v. Gerardi*,
655 F.3d 1212 (10th Cir. 2011) ........................................................169

*Kentner v. City of Sanibel*,
750 F.3d 1274 (11th Cir. 2014) ........................................................128

*King v. Pridmore*,
961 F.3d 1135 (11th Cir. 2020) ........................................................125

*Konikov v. Orange Cnty.*,
276 F. App'x 916 (11th Cir. 2008) ....................................................171

*Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*,
775 F.3d 1255 (11th Cir. 2014) ..........................................................65

*Kush v. Rutledge*,
460 U.S. 719 (1983) ..........................................................................130

*La Mar v. H & B Hovelty & Loan Co.*,
489 F.2d 461 (9th Cir. 1973) ..............................................................62

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*,
759 F.Supp. 1339 (W.D. Wis. 1991) ..........................................148, 151

*LaFlamboy v. Landek*,
587 F.Supp.2d 914 (N.D. Ill. 2008) ....................................................78

*Lee v. Christian*,
98 F.Supp.3d 1265 (S.D. Ga. 2015) ..................................................138

*Lee v. Smithart*,
No. 2:23-523-MHT-CSC, 2023 WL 9442571 (M.D. Ala. Dec. 20, 2023)..........122

*Lemley v. Bowers*,
813 F.Supp. 814 (N.D. Ga. 1992) ........................................53, 101, 124

*Lesnik v. Eisenmann SE*,
374 F.Supp.3d 923 (N.D. Cal. 2019) ............................................24, 32

*Lewis v. City of Union City*,
918 F.3d 1213 (11th Cir. 2019) ........................................................104

*Lewis v. City of Union City*,
934 F.3d 1169 (11th Cir. 2019) ..................................................120, 121

*Lewis v. Gov. of Ala.*,
    944 F.3d 1287 (11th Cir. 2019) ....................................................................156

*Libertad v. Welch*,
    53 F.3d 428 (1st Cir. 1995)..........................................................................140

*Luckey v. Harris*,
    860 F.2d 1012 (11th Cir. 1988) ............................................................42, 152

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................55

*Lynce v. Mathis*,
    519 U.S. 433 (1997)........................................................................................90

*Lynch v. Baxley*,
    744 F.2d 1452 (11th Cir. 1984) ...........................................................59, 60, 61

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) ....................................................................183

*Magoon v. Texas Dep't of Crim. Just.*,
    247 F.3d 240 (5th Cir. 2001) ..........................................................................84

*Malley v. Briggs*,
    475 U.S. 335 (1986)........................................................................................50

*Malowney v. Fed. Collection Deposit Grp.*,
    193 F.3d 1342 (11th Cir. 1999) ....................................................................168

*In re Managed Care Litig.*,
    298 F.Supp.2d 1259 (S.D. Fla. 2003) ......................................................71, 77

*Mancero-Ramirez v. City of Hoover*,
    No. 05-BE-2618-S, 2006 WL 8436600 (N.D. Ala. June 14, 2006) ...............81

*Manley v. Thomas*,
    255 F.Supp.2d 263 (S.D.N.Y. 2003).............................................................129

*Mathews v. Crosby*,
    480 F.3d 1265 (11th Cir. 2007) ............................................................165, 167

*Mathis v. City of Lakeland*,
    No. 22-12426, 2023 WL 2568814 (11th Cir. Mar. 20, 2023).......................182

*McAlister v. Alaska*,
    No. 3:23-CV-0029-HRH, 2023 WL 3480001 (D. Alaska May 16, 2023) .........141

*McAndrew v. Lockheed Martin Corp.*,
   206 F.3d 1031 (11th Cir. 2000) ........................................................131, 134, 136

*McCleskey v. Kemp*,
   481 U.S. 279 (1987)........................................................................................108

*McCullough v. Finley*,
   907 F.3d 1324 (11th Cir. 2018) ...............................................................50, 78

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) .......................................................................167

*McGarry v. Pallito*,
   687 F.3d 505 (2d Cir. 2012)..............................................................................84

*Menocal v. GEO Grp., Inc.*,
   635 F.Supp.3d 1151 (D. Colo. 2022).................................................................23

*Mercado v. City of Orlando*,
   407 F.3d 1152 (11th Cir. 2005) .......................................................................101

*Michael v. Ghee*,
   498 F.3d 372 (6th Cir. 2007) .....................................................................17, 91

*Miles v. M.N.C. Corp.*,
   750 F.2d 867 (11th Cir. 1985) .........................................................................114

*Mitchell v. Town of Hayneville*,
   No. 2:20CV252-MHT, 2020 WL 7480551 (M.D. Ala. Dec. 18, 2020) ................179

*Mize v. 300 "F" St., Inc.*,
   No. 2:21-CV-38, 2021 WL 5494790 (S.D. Ga. Oct. 13, 2021)............................110

*Mizell v. N. Broward Hosp. Dist.*,
   427 F.2d 468 (5th Cir. 1970) ...........................................................................141

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978)........................................................................................149

*Monroe v. Thigpen*,
   932 F.2d 1437 (11th Cir. 1991) ...............................................................124, 125

*Moore v. Comfed Sav. Bank*,
   908 F.2d 834 (11th Cir. 1990) ...........................................................................62

*Morast v. Lance*,
   807 F.2d 926 (11th Cir. 1987) .........................................................................138

*Muchira v. Al-Rawaf*,
    850 F.3d 605 (4th Cir. 2017) ...............................................................19

*Nat'l Ass'n of the Deaf v. Fla.*,
    980 F.3d 763 (11th Cir. 2020) ..............................................................41

*Nat'l Broad. Co. v. Commc'ns Workers of Am.*,
    860 F.2d 1022 (11th Cir. 1988) ...........................................................60

*National Organization for Women, Inc. v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003)........................77

*National Railroad Passenger Corp. v. National Association of Railroad
Passengers*,
    414 U.S. 453 (1974).............................................................................44

*New York State Nurses Ass'n v. Albany Med. Ctr.*,
    473 F.Supp.3d 63 (N.D.N.Y. 2020) ....................................................65

*Nielsen v. DeSantis*,
    No. 4:20CV236-RH-MJF, 2020 WL 6548462 (N.D. Fla. June 10, 2020) .............................16

*O'Bryant v. Finch*,
    637 F.3d 1207 (11th Cir. 2011) ..................................................163, 168

*O'Connor v. Warden, Fla. State Prison*,
    754 F. App'x 940 (11th Cir. 2019) ....................................................172

*OIC Dreams Greene Cnty. IV, Inc. v. Benison*,
    No. 7:23-CV-1297-ACA, 2023 WL 8634789 (N.D. Ala. Dec. 13, 2023)............................128

*Omnipol, A.S. v. Multinational Def. Servs., LLC*,
    32 F.4th 1298 (11th Cir. 2022) ...........................................65, 69, 71

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)...............................................................................119

*Osborne v. Folmar*,
    735 F.2d 1316 (11th Cir. 1984) .........................................................124

*Osterback v. Kemp*,
    300 F.Supp.2d 1238 (N.D. Fla. 2003).................................................159

*Owino v. CoreCivic, Inc.*,
    No. 17-CV-1112 JLS (NLS), 2018 WL 2193644 (S.D. Cal. May 14, 2018) .............23, 47, 48

*Park v. City of Atlanta*,
    120 F.3d 1157 (11th Cir. 1997) ....................................................... *passim*

*Parm v. Nat'l Bank of California, N.A.*,
   242 F.Supp.3d 1321 (N.D. Ga. 2017) .......................................................73

*Paschal v. Wainwright*,
   738 F.2d 1173 (11th Cir. 1984) ...............................................................99

*PBT Real Est., LLC v. Town of Palm Beach*,
   988 F.3d 1274 (11th Cir. 2021) .............................................................104

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ................................................................................124

*Pennhurst State School & Hospital v. Halderman*,
   465 U.S. 89 (1984) ...........................................................................16, 41

*Percival v. Girard*,
   692 F.Supp.2d 712 (E.D. Mich. 2010) ..................................................151

*Pesci v. Budz*,
   730 F.3d 1291 (11th Cir. 2013) .............................................................160

*Peugh v. United States*,
   569 U.S. 530 (2013) ...........................................................................91, 94

*Pilgrim v. Luther*,
   571 F.3d 201 (2d Cir. 2009) ..................................................................162

*Pine Ridge Recycling, Inc. v. Butts Cnty.*,
   855 F.Supp. 1264 (M.D. Ga. 1994) .........................................................76

*Planned Parenthood Gulf Coast, Inc. v. Phillips*,
   24 F.4th 442 (5th Cir. 2022) ...................................................................19

*Porter v. Ray*,
   461 F.3d 1315 (11th Cir. 2006) ...............................................................96

*Powe v. Ennis*,
   177 F.3d 393 (5th Cir. 1999) ...................................................................13

*Presley v. Scott*,
   679 F. App'x 910 (11th Cir. 2017) .............................................................9

*Profit v. Rabon*,
   No. 1:19-CV-129-MW-GRJ, 2020 WL 687590 (N.D. Fla. Jan. 9, 2020) ............................161

*Qureshi v. Alabama Coll. of Osteopathic Med., Inc.*,
   No. 1:20-CV-934-RAH-SMD, 2021 WL 2364210 (M.D. Ala. June 9, 2021) ....................110

*Ratha v. Phatthana Seafood Co.*,
  No. CV 16-4271, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017), *aff'd*, 35
  F.4th 1159 (9th Cir. 2022) .................................................................................41

*Ray v. Gadson*,
  No. 2:20-CV-00499-RDP, 2023 WL 7228933 (N.D. Ala. Nov. 2, 2023) ...........................166

*Ray v. Spirit Airlines, Inc.*,
  836 F.3d 1340 (11th Cir. 2016) ..........................................................................75

*Red Door Asian Bistro v. City of Fort Lauderdale*,
  No. 22-11489, 2023 WL 5606088 (11th Cir. Aug. 30, 2023) .......................................120, 121

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997) ........................................................................................112

*Ricchio v. McLean*,
  853 F.3d 553 (1st Cir. 2017) .............................................................................37

*Risley v. Hawk*,
  918 F.Supp. 18 (D.D.C. 1996) ..........................................................................145

*Robeson v. Fanelli*,
  94 F.Supp. 62 (S.D.N.Y. 1950) .........................................................................150

*Rogers v. Cam Ward*,
  No. 2:23-CV-356-ECM-KFP, 2023 WL 7290463 (M.D. Ala. Sept. 18, 2023) ...................122

*Rogers v. Miller*,
  57 F.3d 986 (11th Cir. 1995) ...........................................................................168

*Ron Grp., LLC v. Azar*,
  574 F.Supp.3d 1094 (M.D. Ala. 2021) ...............................................................16

*Ross v. Blake*,
  578 U.S. 632 (2016) ................................................................................7, 8, 11, 15

*Ruelas v. County of Alameda*,
  No. 19-cv-07637-JST, 2021 WL 12144269 (N.D. Cal. June 24, 2021) .................23, 38, 85

*Ryder v. Lifestance Health Grp., Inc.*,
  No. 6:22-CV-2050-RBD-RMN, 2024 WL 1119821 (M.D. Fla. Feb. 12, 2024)...................88

*S&M Brands, Inc. v. Georgia*,
  925 F.3d 1198 (11th Cir. 2019) ........................................................................18

*S.J. v. Choice Hotels Int'l, Inc.*,
  473 F.Supp.3d 147 (E.D.N.Y. 2020) ..................................................................34

*Santiago v. City of Philadelphia*,
    435 F.Supp. 136 (E.D. Pa. 1977) ...................................................147

*Santillana v. Fla. State Ct. Sys.*,
    No. 6:09-CV-2095-ORL-19, 2010 WL 6774486 (M.D. Fla. June 4, 2010) .......................133

*SE Prop. Holdings, LLC v. Saint Fam. Ltd. P'ship*,
    No. CV 16-0567-WS-MU, 2017 WL 1628898 (S.D. Ala. May 1, 2017).............................134

*Shealy v. City of Albany*,
    89 F.3d 804 (11th Cir. 1996) ......................................................114

*Sheet Metal Workers Loc. 441 Health & Welfare Plan, v. GlaxoSmithKline, PLC*,
    263 F.R.D. 205 (E.D. Pa. 2009).....................................................177

*In Re Shek*,
    947 F.3d 770 (11th Cir. 2020) ......................................................85

*Shimer v. Washington*,
    100 F.3d 506 (7th Cir. 1996) ......................................................160

*Sills v. FCI Talladega Warden*,
    No. 22-12656, 2023 WL 1775725 (11th Cir. Feb. 6, 2023) ...................................126

*Simpson v. Sanderson Farms, Inc.*,
    744 F.3d 702 (11th Cir. 2014) ......................................................73

*Sims v. Sec'y, Fla. Dep't of Corr.*,
    75 F.4th 1224 (11th Cir. 2023) ......................................................6

*Slakman v. Buckner*,
    434 F. App'x 872 (11th Cir. 2011) ........................................108, 109, 124, 125

*Slakman v. State Bd. of Pardons & Paroles*,
    No. 21-12226, 2021 WL 5071858 (11th Cir. Nov. 2, 2021) ...................................108

*Smith v. Correct Health Co.*,
    No. 1:19-CV-1120-MHC-CCB, 2020 WL 13979386 (N.D. Ga. July 10, 2020)....................13

*Smith v. Hamm*,
    No. 2:23-CV-656-RAH, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024) ...............................160

*Spence-Jones v. Rundle*,
    991 F.Supp.2d 1221 (S.D. Fla. 2013) ...............................................78

*St. v. Talladega City Bd. of Educ.*,
    No. 1:22-CV-614-CLM, 2023 WL 2520340 (N.D. Ala. Mar. 14, 2023) ...........................104

*Stallworth v. Collins*,
    773 F. App'x 1078 (11th Cir. 2019) ...................................................124

*Stathos v. Bowden*,
    728 F.2d 15 (1st Cir. 1984) .............................................................136

*Stein v. Buccaneers Ltd. P'ship*,
    772 F.3d 698 (11th Cir. 2014) ..........................................................61

*Stout by Stout v. Jefferson Cnty. Bd. of Educ.*,
    882 F.3d 988 (11th Cir. 2018) ...................................................112, 113

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)........................................................................102

*Sultenfuss v. Snow*,
    894 F.2d 1277 (11th Cir. 1990) ......................................................123

*Summit Medical Associates, P.C. v. Pryor*,
    180 F.3d 1326 (11th Cir. 1999) ......................................................153

*Swarthout v. Cooke*,
    562 U.S. 216 (2011)........................................................................127

*Sweet v. Secretary, Dep't of Corrs.*,
    467 F.3d 1311 (11th Cir. 2006) ......................................................105

*In re Takata Airbag Products Liab. Litig.*,
    462 F.Supp.3d 1304 (S.D. Fla. 2020) ............................................177

*Thompson v. Alabama*,
    293 F.Supp.3d 1313 (M.D. Ala. 2017) ...........................................113

*Tobon v. Martin*,
    809 F.2d 1544 (11th Cir. 1987) ........................................................97

*Tooma v. David*,
    381 F. App'x 977 (11th Cir. 2010) ...................................................99

*Trawinski v. United Techs.*,
    313 F.3d 1295 (11th Cir. 2002) ......................................................131

*Turner v. Burnside*,
    541 F.3d 1077 (11th Cir. 2008) ...................................................8, 11,

*Turner v. Safley*,
    482 U.S. 78 (1987)...............................................................159, 163, 164

*Tynes v. Fla. Dep't of Juv. Just.*,
88 F.4th 939 (11th Cir. 2023) ............................................................. 122

*United Bhd. of Carpenters & Joiners of Am. v. Scott*,
463 U.S. 825 (1983) ............................................................................. 150

*United States v. Armstrong*,
517 U.S. 456 (1996) ............................................................................. 106

*United States v. Browne*,
505 F.3d 1229 (11th Cir. 2007) ............................................................ 67

*United States v. Calimlim*,
538 F.3d 706 (7th Cir. 2008) ..........................................24, 28, 34, 51

*United States v. Callahan*,
801 F.3d 606 (6th Cir. 2015) ..............................................20, 23, 54

*United States v. Concentrated Phosphate Export Ass'n*,
393 U.S. 199 (1968) ............................................................................... 61

*United States v. Dann*,
652 F.3d 1160 (9th Cir. 2011) ............................................................... 28

*United States v. Flores*,
572 F.3d 1254 (11th Cir. 2009) ............................................................ 70

*United States v. Godwin*,
765 F.3d 1306 (11th Cir. 2014) ............................................................ 72

*United States v. Kozminski*,
487 U.S. 931 (1988) ............................................................................... 83

*United States v. Lanier*,
520 U.S. 259 (1997) ......................................................................51, 129

*United States v. Law*,
990 F.3d 1058 (7th Cir. 2021) ............................................................... 23

*United States v. Lopez*,
514 U.S. 549 (1995) ............................................................................... 54

*United States v. Menasche*,
348 U.S. 528 (1955) ............................................................................... 85

*United States v. Pineiro*,
389 F.3d 1359 (11th Cir. 2004) .......................................................... 132

*United States v. Reynolds*,
  235 U.S. 133 (1914).............................................................................31, 85

*United States v. Schwartz*,
  541 F.3d 1331 (11th Cir. 2008) ...................................................................132

*United States v. United Mine Workers of America*,
  330 U.S. 258 (1947)........................................................................................47

*Vanover v. NCO Fin. Services, Inc.*,
  857 F.3d 833 (11th Cir. 2017) ...................................................169, 170, 171, 172

*Vega v. Semple*,
  963 F.3d 259 (2d Cir. 2020)...........................................................................16

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977).........................................................................111, 116, 117

*Villareal v. City of Laredo*,
  94 F.4th 374 (5th Cir. 2024) ...........................................................................51

*Vinyard v. Wilson*,
  311 F.3d 1340 (11th Cir. 2002) .......................................................................52

*Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Comm'rs*,
  No. 22-10773, 2024 WL 125969 (11th Cir. Jan. 11, 2024)..............................104

*Waldman v. Conway*,
  871 F.3d 1283 (11th Cir. 2017) .......................................................................18

*Waldron v. Spicher*,
  954 F.3d 1297 (11th Cir. 2020) .....................................................................125

*Walker v. Fla. Parole Comm'n*,
  299 F. App'x 900 (11th Cir. 2008) ................................................................126

*Warden v. Marrero*,
  417 U.S. 653 (1974).........................................................................................91

*Washington v. Davis*,
  426 U.S. 229, 242 (1976)...............................................................................120

*Watson v. Graves*,
  909 F.2d 1549 (5th Cir. 1990) .........................................................................87

*Weaver v. Graham*,
  450 U.S. 24 (1981)...........................................................................................91

*Weaver v. Nat'l Better Living Ass'n, Inc.*,
No. 4:13-CV-2112-VEH, 2014 WL 12614481 (N.D. Ala. July 3, 2014).............175, 176, 179

*Weiland v. Palm Beach County Sheriff's Office*,
792 F.3d 1313 (11th Cir. 2015) ...........................................................181, 182, 184

*West v. Warden*,
869 F.3d 1289 (11th Cir. 2017) ...............................................................118

*Whatley v. Warden, Ware State Prison*,
802 F.3d 1205 (11th Cir. 2015) ..............................................................7, 13

*White v. Microsoft Corp.*,
454 F.Supp.2d 1118 (S.D. Ala. 2006)...........................................................178

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019) ...............................................................55

*Wilkinson v. Dotson*,
544 U.S. 74 (2005)..........................................................................102

*Will v. Michigan Department of State Police*,
491 U.S. 58 (1989)......................................................................46, 47, 77

*Williams v. City of Dothan*,
745 F.2d 1406 (11th Cir. 1984) ..............................................................114

*Williams v. Mohawk Indus., Inc.*,
465 F.3d 1277 (11th Cir. 2006) ...............................................................74

*Williams v. Radford*,
64 F.4th 1185 (11th Cir. 2023) ..............................................................159

*Wilson v. Rackmill*,
878 F.2d 772 (3d Cir. 1989)........................................................53, 101, 124

*Wilson v. State Bar of Ga.*,
132 F.3d 1422 (11th Cir. 1998) ..............................................................168

*Ex parte Wilson*,
114 U.S. 417 (1885)..........................................................................83

*Wright v. Brown*,
817 F. App'x 797 (11th Cir. 2020) .............................................................7

*Wright v. United States*,
302 U.S. 583 (1938)..........................................................................81

*Ex parte Wright*,
    114 U.S. 417, 429 (1885) ...................................................................................83

*Ex parte Young*,
    209 U.S. 123 (1908) ................................................................................41, 152

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..........................................................................................50

**State Cases**

*Altmayer v. City of Daphne*,
    613 So.2d 366 (Ala. 1993) ...........................................................................179

*Am. Auto. Ins. Co. v. McDonald*,
    812 So.2d 309 (Ala. 2001) .............................................................................81

*Ex parte Birmingham Airport Auth.*,
    274 So.3d 964 (Ala. 2018) .............................................................................85

*Blockbuster, Inc. v. White*,
    819 So.2d 43 (Ala. 2001) ...............................................................................81

*Burnett v. Chilton Cnty. Health Care Auth.*,
    278 So.3d 1220 (Ala. 2018) ...........................................................................80

*Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*,
    314 So.2d 51 (Ala. 1975) ...............................................................................87

*Ford v. Jefferson Cnty.*,
    774 So.2d 600 (Ala. Civ. App. 2000) ...........................................................80

*George v. State*,
    39 Ala. 675 (1866) ..........................................................................................80

*Jefferson Cnty. v. Weissman*,
    69 So.3d 827 (Ala. 2011) ...............................................................................81

*Jewett v. Boihem*,
    23 So.3d 658 (Ala. 2009) .............................................................................174

*Lamar v. CDOC*,
    No. 21CA0511 (Colo. App. Aug. 18, 2022) .................................................88

*Lee v. Houser*,
    148 So.3d 406 (Ala. 2013) ...........................................................................179

*Magee v. Boyd*,
    175 So.3d 79 (Ala. 2015) ...............................................................................80

*Mantiply v. Mantiply*,
  951 So.2d 638 (Ala. 2006)................................................................172, 173

*Matthews v. Alabama Agric. & Mech. Univ.*,
  787 So.2d 691 (Ala. 2000)...........................................................................80

*McGee v. Borom*,
  341 So.2d 141 (Ala. 1976)...........................................................................81

*Odom v. Helms*,
  314 So.3d 220 (Ala. 2020).........................................................................180

*Poiroux v. Rich*,
  150 So.3d 1027 (Ala. 2014).........................................................................80

*Protective Life Ins. Co. v. Jenkins*,
  ___ So. 3d ___, 2023 WL 3768321 (Ala. June 2, 2023) ............................178

*Scrushy v. Tucker*,
  955 So.2d 988 (Ala. 2006).........................................................................172

*Sparks v. Parker*,
  368 So.2d 528 (Ala. 1979)...........................................................................81

*Sullivan v. Smith*,
  925 So.2d 972 (Ala. Civ. App. 2005) .......................................................134

*Washington v. Washington*,
  69 Ala. 281 (1881) ......................................................................................82

## Federal Constitution, Statutes, and Rules

U.S. Constitution
  U.S. Const., amend. I ....................................................................... *passim*
  U.S. Const., amend. X.....................................................................................53
  U.S. Const., amend. XI...................................................................................16
  U.S. Const., amend. XIII................................................................... *passim*
  U.S. Const., amend. XIV .................................................................. *passim*

1 U.S.C §1 ......................................................................................................46

18 U.S.C.
  §241...............................................................................................................83
  §1584................................................................................................... 19, 84
  §1585A..........................................................................................................45
  §1589.................................................................................................. *passim*
  §1595.................................................................................................. *passim*
  §1961.................................................................................................66, 69, 77

§1962 ........................................................................................................72
§1964 ........................................................................................................73

22 U.S.C. §7101 .................................................................................... *passim*

34 U.S.C. §12601 ........................................................................................54

42 U.S.C.
§1983 .................................................................................................. *passim*
§1985 .................................................................................................. *passim*
§1986 .................................................................................................. *passim*
§1997a .........................................................................................................54
§1997e .........................................................................................................14

Fed. R. Civ. P. 8 ...............................................................................176, 181

Fed. R. Civ. P. 9 ......................................................................................66

Fed. R. Civ. P. 12 ................................................................110, 160, 184

Fed. R. Civ. P. 19 ......................................................................................90

Fed. R. Civ. P. 23 ...................................................................................177

Fed. R. Evid. 201 ......................................................................................98

## State Constitutions, Statutes, and Rules

Alabama Constitution
Ala. Const, art. I, §32 (2022) .................................................3, 79, 81, 82
Ala. Const, art. I, §32 (1901) .............................................................79
Ala. Const, art. I, §107 ......................................................................80
Ala. Const. art. V, §112 ....................................................................135
Ala. Const. art. V, §124 ....................................................................135

Alabama Code
Ala. Code §6-2-34....................................................................177, 178
Ala. Code §6-2-38.............................................................................177
Ala. Code §11-47-190.......................................................................179
Ala. Code §11-47-192.......................................................................179
Ala. Code §12-25-32...........................................................................98
Ala. Code §14-1-1.3..........................................................................136
Ala. Code §15-22-20.................................................................135, 154
Ala. Code §15-22-21.........................................................................154
Ala. Code §15-22-23.........................................................................154
Ala. Code §15-22-24.........................................................................154
Ala. Code §15-22-26.................................................................. *passim*

Ala. Code §15-22-28.................................................................................93, 154
Ala. Code §15-22-36........................................................................................154
Ala. Code §15-22-36.2.....................................................................................154
Ala. Code §15-22-37........................................................................................154
Ala. Code §36-1-12..........................................................................................179

1951 Ala. Laws 1030, 1032...............................................................................93

2015 Ala. Laws Act No. 2015-185.....................................................................93

2019 Ala. Laws Act No. 2019-393................................................................90, 94

Colo. R. App. P. 35(e)........................................................................................88

Ga. Code Ann. §42-9-43(a).............................................................................109

## Other Authorities

Ala. Dep't of Corr., Admin. Reg. 406 (Aug. 1 2023),
    https://doc.alabama.gov/docs/AdminRegs/AR406.pdf......................6, 12

Ala. Dep't of Corr.,"Inmate Search,"
    https://doc.alabama.gov/InmateSearch .........................................................98

Ala. Dep't of Archives & History, Alabama Convict Labor Revenue and
    Demographics, 1896-1929 (Oct. 2021),
    https://alison.legislature.state.al.us/files/pdfdocs/lsa/proposed-
    constitution/Alabama_Convict_Labor_ADAH_LSA.pdf ......................86

Ala. Legislature, Statewide Provisions: Textual Differences Between the Current
    "Official Recompilation" of the Alabama Constitution of 1901 (as reflected in
    Volume 1 of the Alabama Code) and the Proposed Constitution of Alabama of
    2022, https://alison-file.legislature.state.al.us/pdfdocs/lsa/proposed-
    constitution/Chart_of_Textual_Differences_in_Proposed_Constitution_of_20
    22_vs_Recompilation.pdf ...........................................................................86

Ballot Statement for the Constitution of Alabama of 2022,
    https://www.sos.alabama.gov/sites/default/files/election-
    2022/BallotStatementForConstitutionofAlabamaof2022.pdf..................85

H.R. Conf. Rep. 106-939 (2000).......................................................................44

H.R. Rep. No. 106-939 (2000).....................................................................20, 23

Involuntary, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/involuntary (last visited
    May 30, 2024)...............................................................................................82

Involuntary, Merriam-Webster, https://www.merriam-webster.com/dictionary/involuntary (last visited May 30, 2024) ..........................................82

Othni J. Lathram, Background Information on the Removal of Racist Language (Aug 27, 2021), https://alison.legislature.state.al.us/files/pdfdocs/lsa/proposed-constitution/Racist_Language_Backgound_Memo.pdf............................................86

Paramount, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/paramount (last visited May 21, 2024) ..........................................94

Servitude, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/servitude (last visited May 30, 2024)....................................................................................82

Servitude, Merriam-Webster, https://www.merriam-webster.com/dictionary/servitude (last visited May 30, 2024)..............................................82

## INTRODUCTION

This consolidated opposition addresses twenty-two Defendants' motions to dismiss the Complaint filed by ten currently or formerly incarcerated individuals; Union of Southern Service Workers, Service Employees International Union ("USSW"); Retail, Wholesale and Department Store Union, Mid-South Council ("RWDSU"); and The Woods Foundation.

The Complaint presents specific allegations concerning each Defendant's involvement in a State-wide labor trafficking operation that systematically extracts forced labor from individuals incarcerated by the Alabama Department of Corrections ("ADOC"). ADOC, through Defendant Commissioner John Hamm, has partnered with employers across the State, including all the public and private Employer Defendants,[1] to reap enormous benefits from the forced labor of incarcerated people. Compl. ¶¶9-34. Plaintiffs allege these interdependent, mutually beneficial relationships in detail. Briefly, the public Employer Defendants who operate through ADOC's work-center program—Jefferson County, the City of Troy, the City of Montgomery, Alabama Department of Transportation Director John Cooper, and Governor Ivey—agree to "lease" the coerced labor of incarcerated workers from ADOC, generally for $2 per day, regardless of how grueling or dangerous the work is or how much the employer would pay a non-incarcerated worker to do the same work. *See id.* ¶¶24-28, 30. The private Employer Defendants—as relevant here, Bama Budweiser, Southeast Restaurant Group-Wen LLC ("SRG"); Southeastern Meats,

---

[1] The Employer Defendants include the movant off-site public employers (Jefferson County, the City of Troy, the City of Montgomery, Alabama Department of Transportation Director John Cooper, and Governor Ivey), movant private employers (Bama Budweiser, Southeast Restaurant Group-Wen LLC, Southeastern Meats, Inc., Masonite Corporation, Progressive Finishes, Inc., Paramount Services, Inc., SL Alabama, LLC, Ju-Young Manufacturing America, Inc., Hwaseung Automotive USA LLC, Cast Products, Inc., Koch Foods, LLC, and RCF, LLC), and ADOC Commissioner Hamm.

Inc.; Masonite Corporation; Progressive Finishes, Inc.; Paramount Services, Inc.; SL Alabama, LLC, Ju-Young Manufacturing America, Inc., and Hwaseung Automotive USA LLC (together, "Automotive Defendants"); Cast Products, Inc.; Koch Foods, LLC; and RCF, LLC—likewise contract with ADOC to obtain the forced labor of incarcerated workers whom ADOC has deemed safe to work in the community. *Id*. ¶¶11-12. In doing so, these private employers gain access to a captive workforce composed of workers who essentially are unable to turn down work and to complain about working conditions without facing serious reprisal, and benefit from other cost savings. *Id.* ¶¶19, 133-34, 139. ADOC collects a substantial portion of the incarcerated workers' wages and other fees, reaping $12.9 million from the program in fiscal year 2023 alone. *Id.* ¶¶14-16. ADOC itself has also extracted millions of dollars in benefits directly from the forced labor of those who work within its facilities without pay, including because they often perform skilled labor in place of the public employees ADOC would otherwise need to hire. *Id*. ¶¶37-42. The Complaint alleges a labor-trafficking scheme that is well established and that the participants have powerful economic incentives to perpetuate and expand. *Id.* ¶¶30-33.

As the Complaint also details, the individual Plaintiffs who perform forced labor pursuant to this scheme do so under intensely coercive conditions. *See id.* ¶¶43-76. ADOC regulations, which all the above Employer Defendants expressly agree to abide by and enforce, *id.* ¶49, subject incarcerated people to extreme consequences for refusing to work and encouraging others to do so—including restrictive housing (solitary confinement), loss of years' worth of good-time credit resulting in prolonged periods of imprisonment, and additional forced labor, *id.* ¶¶47-48. The coercive measures built into the regulations that expressly govern the labor-trafficking scheme are supplemented, as the Complaint explains, by other, sometimes life-threatening,

consequences for refusing to work as directed—from being moved "behind the wall" to an ADOC facility that cannot protect the physical safety of an incarcerated worker given the dire, intensely violent conditions in Alabama's medium- and maximum-security facilities, to open, violent reprisals against outspoken opponents of forced labor. *Id.* ¶¶19, 50-59, 61, 64-71, 139. As Plaintiffs Lee Moore, Lakiera Walker, Jerame Cole, Frederick McDole, Michael Campbell, Arthur Ptomey, Lanair Pritchett, Alimireo English, and Toni Cartwright (together, the "Coerced Labor Individual Plaintiffs") allege, laboring under such intensely coercive conditions for the benefit of the participants in the forced-labor scheme has exacted a profound toll. *See id.* ¶¶146-54.

Three of the claims, brought against all Defendants, arise most directly out of the harms caused by this forced-labor scheme: Counts I (Violation of the Trafficking Victims Protection Act ("TVPA")), II (Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")), and III (Violation of Alabama Constitution, Article I, §32). Plaintiff Robert Earl Council aka Kinetik Justice and all Coerced Labor Individual Plaintiffs also allege a First Amendment claim premised on ADOC and Governor Ivey's retaliation against those advocating against forced labor, and the Coerced Labor Individual Plaintiffs state an unjust enrichment claim against the Employer Defendants premised on the benefits these Defendants realize by participating in the labor-trafficking scheme.

Plaintiffs also present detailed allegations that Alabama's parole practices since 2019 have not only meaningfully contributed to the labor-trafficking scheme—by dramatically reducing access to parole and thereby ensuring a steady pool of workers—but also independently violated the rights of incarcerated people eligible for parole, including the currently incarcerated Plaintiffs who were denied parole: Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English,

and Cartwright ("Individual Parole Plaintiffs"). The Complaint alleges that, in 2018, Governor Ivey and Attorney General Marshall began a campaign to radically decrease access to parole. *See id.* ¶¶91-106. That campaign began with a meeting at which Ivey and Marshall directed the members of the Parole Board to stop releasing people on parole—particularly those convicted of "violent" offenses. *Id.* ¶91. The meeting was followed by Governor Ivey's Executive Order imposing a moratorium on early parole consideration pending a corrective action plan. *Id.* ¶92. And, after Marshall's advocacy, the Legislature in 2019 amended the statutes governing parole eligibility, requiring that the Parole Board for the first time make protecting public safety its "paramount duty." *Id.* ¶93; Ala. Code §15-22-26(a).

With the agreement of Defendant Parole Board Chair Leigh Gwathney and ultimately the other two current Parole Board members, Defendants Darryl Littleton and Gabrelle Simmons (together, "Parole Board Members"), access to parole in Alabama decreased dramatically—and unequally. *See* Compl. ¶¶96-125, 158, 163. Whereas 44.7% of parole candidates convicted of violent offenses were granted parole in fiscal year 2018, by fiscal year 2022, only 4.9% of white parole candidates and 2.2% of Black parole candidates in this group were granted parole. *Id.* ¶102. After 2019, Black parole candidates were consistently disfavored in parole decisions. *See id.* ¶¶100-03, 108-24. After controlling for factors relevant to parole eligibility, white parole candidates were granted parole at a rate of approximately two to one, when compared to Black parole candidates, between fiscal year 2020 and 2022. *Id.* ¶108. The consequences of Ivey, Marshall, Gwathney, and the other Parole Board Members' efforts to severely restrict access to parole in a racially discriminatory manner are a matter of widespread public concern, yet the Parole Board's practices have continued unabated, while the Employer Defendants maintain their lucrative labor-trafficking arrangement with ADOC. *See id.* ¶¶126-35, 139-43.

Defendants' conduct concerning the pronounced reduction in access to parole beginning in 2019 gives rise to seven of Plaintiffs' claims: Count V (Ex Post Facto Clause), VI and VII (Equal Protection Clause), VIII (Substantive Due Process), and IX, X, and XI (Conspiracy and Failure to Prevent Wrongs of Conspiracy in Violation of the Ku Klux Klan Act).

All Defendants who have appeared in the case have moved to dismiss. Dkts. 139, 141-53, 155-57, 171, 147, 175. For the sake of judicial efficiency, Plaintiffs provide a consolidated opposition addressing all Defendants' arguments and explaining why dismissal of the Complaint is not warranted under the applicable law. After responding to some of State Defendants' threshold arguments regarding exhaustion and immunity, Plaintiffs address each group of claims in turn, explaining how they have adequately pled (1) claims rooted in Defendants' labor-trafficking scheme (Counts I-III), (2) claims arising out of the post-2019 changes to the parole system (Counts V-XI), (3) claims under the First Amendment (Count VI), and (4) claims for Unjust Enrichment (Count XII). As the discussion that follows demonstrates, despite Defendants' strenuous efforts to dispute Plaintiffs' well-founded allegations—a strategy that cannot justify dismissal of Plaintiffs' claims at this juncture—and to preclude the Court from evaluating the sufficiency of Plaintiffs' claims on the merits, Plaintiffs have stated viable claims against all Defendants, and the motions to dismiss should be denied.

## ARGUMENT

### I.   The PLRA Does Not Bar the Currently Incarcerated Plaintiffs' TVPA, RICO, and First Amendment Claims

State Defendants' attempt to rely on the Prison Litigation Reform Act ("PLRA") to avoid addressing the merits of the currently incarcerated Plaintiffs' TVPA, RICO, and First Amendment claims fails for multiple reasons.

First, ADOC's grievance procedure—adopted just four months before this lawsuit was filed—applies at most to the currently incarcerated Plaintiffs' First Amendment claim (Count IV) and, even then, only to the extent that claim accrued after August 1, 2023. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). ADOC Administrative Regulation 406 excludes certain subject matter from ADOC's grievance procedure, including "[p]arole board decisions," "[t]he substance of State and federal laws and regulations," and "[o]ther matters beyond the control of the Department."[2] State Defendants concede that this new grievance procedure does not apply to Counts III, V, VI, VII, VIII, IX, X, XI, or XII—i.e., every claim except Plaintiffs' TVPA, RICO, and First Amendment claims. *See* Dkt. 148 at 18. It is also clear that the grievance procedure does not and cannot apply to *any* of Plaintiffs' claims that accrued before August 1, 2023, the date the grievance procedure was adopted. *See id.* at 19 (grievance procedure adopted Aug. 1, 2023); AR 406.

Contrary to State Defendants' position, Plaintiffs' TVPA and RICO claims (Counts I and II) accruing *after* August 1, 2023, also fall outside the scope of the new grievance procedure and are not subject to any exhaustion requirement. *See Sims v. Sec'y, Fla. Dep't of Corr.*, 75 F.4th 1224, 1230 (11th Cir. 2023) ("[W]e look to the requirements of the applicable prison grievance system to determine the boundaries of proper exhaustion."). Plaintiffs' TVPA and RICO claims allege that State Defendants participate in an entrenched labor-trafficking operation involving not only the Governor, Attorney General, Parole Board, and Transportation Director but also a network of partner public and private employers, including the other Employer Defendants. *See,*

---

[2] Ala. Dep't of Corr., Admin. Reg. 406 ("AR 406") (Aug. 1, 2023), https://doc.alabama.gov/docs/AdminRegs/AR406.pdf.

*e.g.*, Compl. ¶¶1, 3, 9-10, 12-13, 17-18, 24-32. Those two federal statutory claims concern the substance of the requirements of the TVPA and RICO as applied not only to Hamm, the ADOC Commissioner, but to multiple actors beyond the control of ADOC, *see* Compl. ¶¶203-20, and they are thus not properly subject to the grievance process as ADOC has defined it.

Second, State Defendants' PLRA exhaustion arguments fail because ADOC's grievance process was not "available" to the currently incarcerated Plaintiffs in the sense required by the PLRA.[3] An incarcerated person "is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of,'" considering "the real-world workings of prison grievance systems." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The Supreme Court has explained that, notwithstanding the appearance of a grievance procedure "on the books," a grievance procedure is nonetheless unavailable where, for example, "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved" individuals, where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it," or where "prison administrators thwart" incarcerated people "from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44. "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Wright v. Brown*, 817 F. App'x 797, 802 (11th Cir. 2020) (quoting

---

[3] Courts in the Eleventh Circuit engage in a two-step process to assess whether a claim subject to a grievance procedure has been exhausted. First, courts "look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true," dismissing the claim if the facts stated by the incarcerated person show a failure to exhaust. *Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015) (citation omitted). Then, "if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact" as to exhaustion. *Id.*

*Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008)); *see Goebert v. Lee Cnty.*, 510 F.3d 1312, 1323 (11th Cir. 2007) (citing, *inter alia*, *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004)); *Griggs v. Holt*, No. CV 117-089, 2018 WL 5283448, at *5 (S.D. Ga. Oct. 24, 2018).

State Defendants assert that ADOC adopted a grievance procedure by regulation on August 1, 2023, and they complain that—although, as they acknowledge, nearly all the currently incarcerated Plaintiffs timely filed adequate grievances[4]—the Plaintiffs who filed grievances did not timely appeal ADOC's responses to those grievances. *See* Dkt. 148 at 18-21. Yet State Defendants tellingly say nothing about how ADOC's new grievance procedure was communicated to incarcerated people or staff, how the procedure was implemented, or the fact that ADOC did not follow its own procedures in responding to the emergency grievances Plaintiffs filed. *See id.*

The record here demonstrates that ADOC generally has not made its grievance procedure "available" to incarcerated people as a matter of fact, despite introducing one "on the books." Where availability is at issue, courts routinely consider the information prisons make available to incarcerated people. *See, e.g.*, *Ross*, 578 U.S. at 647-48 (remanding for consideration of the "complete universe of relevant documents" to assess whether grievance procedure was available). As the incarcerated Plaintiffs' experiences reflect,[5] the rollout of ADOC's new grievance procedure has been extremely uneven—sometimes nonexistent—with many people

---

[4] All currently incarcerated Plaintiffs except Cartwright and English filed emergency grievances prior to filing the Complaint; Cartwright and English's justifiable delays are explained below.

[5] Because the issue of exhaustion is treated as a matter in abatement, the Court may consider evidence on this issue. *See Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008). Plaintiffs submit the Declarations of Plaintiffs Robert Earl Council aka Kinetik Justice, Lee Edward Moore Jr., Jerame Aprentice Cole, Frederick Denard McDole, Michael Campbell, Arthur Charles Ptomey Jr., Lanair Pritchett, Alimireo English, and Toni Cartwright, along with an attorney declaration attaching correspondence with counsel for ADOC and another explaining why Moore's declaration is presently unsigned.

incarcerated by ADOC still unaware that it exists at all, let alone familiar enough with the process to use it. The grievance procedure is not referenced in the most obvious source of information for incarcerated individuals: the handbook proffered by the State Defendants, which contains no information or guidance on the grievance procedure. *See* Dkt. 148-3 (dated Sept. 25, 2017); *Goebert*, 510 F.3d at 1322 (considering absence of grievance procedure from handbook in concluding grievance procedure was not available). As Plaintiff Robert Council, who asserts a First Amendment claim (Count IV), testifies, he had not understood ADOC to have any formal grievance process until November 2023, and he is not aware of any efforts by ADOC to educate incarcerated people at Limestone Correctional Facility about the new grievance process. Council Decl. ¶6. Council further explains that ADOC's Administrative Regulations are not available to him because the computers incarcerated people could use to access those Regulations do not work—an issue he has raised with ADOC. Council Decl. ¶7; *see Presley v. Scott*, 679 F. App'x 910, 912 (11th Cir. 2017) (grievance procedure unavailable where plaintiff could not access regulations on library computer and defendants provided no information about process). State Defendants fail to establish that the grievance procedure was available to those in Council's position.

As the testimony of other currently incarcerated Plaintiffs makes clear, the grievance procedure also was not available in other ADOC facilities at the time this lawsuit was filed. While ADOC may have formally adopted the procedure in August 2023, its implementation of that policy was inconsistent, confusing, and at times, did not occur at all, making the procedure objectively unavailable. As Plaintiff Alimireo English explains in his declaration, while incarcerated at Ventress Correctional Facility in November and December 2023, he was unable to submit a grievance because he did not know how to do so and was unaware of any information

about the process. English Decl. ¶¶4-5.[6] Plaintiff Lanair Pritchett, meanwhile, tried to submit an emergency grievance at Elmore Correctional Facility on or around December 7, 2023, but when he followed up, he was told the prison had not received it; he then submitted a second emergency grievance and was later told his first one had been found and sent to Montgomery. Pritchett Decl. ¶¶5-11.[7] Pritchett should not be penalized for ADOC's failure to timely process his initial emergency grievance. *Jackson v. Griffin*, 762 F. App'x 744, 746 (11th Cir. 2019) (holding district court erred in not addressing availability where prison failed to comply with rules for collecting and logging grievances). Although all currently incarcerated Plaintiffs ultimately were able to submit emergency grievances, *see* Compl. ¶211 n.81; Dkt. 148-10; English Decl. ¶6; Cartwright Decl. ¶10, the evidence nevertheless reflects that ADOC did not communicate the process such that a reasonable incarcerated person could use it. *See Goebert*, 510 F.3d at 1322 ("It is difficult to define 'such remedies as are available' to an inmate in a way that includes remedies or requirements for remedies that an inmate does not know about, and cannot discover through reasonable effort by the time they are needed.").

---

[6] Although English was finally able to submit a grievance raising the issues in this lawsuit after he was transferred to North Alabama Work Release, ADOC apparently did not track that grievance, and he never received a response. *Id.* ¶¶6-7; *See* Dkt. 148-10 at 3 (stating that no grievance for English was found). English was transferred again on March 28, 2024 to Hamilton Work Center, and he has not encountered any grievance forms or process at all. English Decl. ¶9.

[7] Oddly, State Defendants did not provide copies of the grievances and responses they purport to have on file. It is thus difficult to discern whether the information State Defendants provide about Pritchett's grievance concerns his original emergency grievance, the grievance he submitted after he was told the first one was lost, or some other document. *See* Dkt. 148-10. The Court should reject State Defendants' PLRA arguments on the current record, but to the extent the Court is inclined to dismiss any of Plaintiffs' claims on the basis of the PLRA, Plaintiffs should be permitted to conduct expedited discovery concerning ADOC's grievance process and Plaintiffs' good-faith efforts to exhaust, to facilitate the fact-finding process. *See Bryant*, 530 F.3d at 1376 (holding it appropriate for the Court to resolve factual issues relating to exhaustion only after "the parties have sufficient opportunity to develop a record").

The grievance procedure was unavailable to Plaintiff Toni Cartwright for a different reason: intimidation. Although Cartwright intended to submit an emergency grievance challenging the issues raised in this lawsuit, before doing so, she learned of another person incarcerated in the same facility and participating in the same work program who had submitted a grievance concerning similar issues. Cartwright Decl. ¶¶4-6. ADOC subjected the grievant to significant retaliation, including being followed by guards, removed from her off-site job, and losing weekend passes. *Id.* ¶5. ADOC's treatment of this person was common knowledge and thus a clear signal to those in Cartwright's facility that invoking the grievance process, far from resolving any concerns, would subject people to swift and serious retaliation. Such machinations by ADOC personnel likewise make the grievance procedure unavailable. *See id.* ¶5; *Ross*, 578 U.S. at 644; *Turner*, 541 F.3d at 1084-85.[8]

Even if the initial step of the grievance procedure was available to some of the currently incarcerated Plaintiffs, however, the record evidence uniformly demonstrates that any subsequent steps of the grievance process, including the appeal procedure State Defendants purport to rely on, were not available. As State Defendants concede, Plaintiffs Council, Moore, Cole, McDole, Campbell, Ptomey, and Pritchett each submitted timely emergency grievances to ADOC raising the issues in this lawsuit. *See* Dkt. 148 at 20-21; Dkt. 148-10 at 1-3; Council Decl. ¶4 (emergency grievance submitted on or around Nov. 27, 2023); Cole Decl. ¶3 (same); McDole Decl. ¶4 (emergency grievance submitted on or around Nov. 29, 2023); Campbell Decl. ¶4 (same); Ptomey Decl. ¶4 (same); Moore Decl. ¶6 (emergency grievance submitted on or around December 2, 2023); Pritchett Decl. ¶4 (emergency grievance submitted on or around December

---

[8] Cartwright later submitted an emergency grievance while incarcerated in a different facility. Cartwright Decl. ¶10.

7, 2023). **ADOC, however, did not timely respond to any of Plaintiffs' grievances—and ADOC still has not provided responses to two of the Plaintiffs' grievances at all.** AR 406, which sets forth the required procedures in ADOC's new grievance process, provides a ten-business-day deadline for ADOC to respond to *regular* grievances, and a *shorter* timeline for emergency grievances. As the State Defendants' affiant admits—but which the State Defendants fail to note in their brief when asserting their purported PLRA defense—ADOC did not respond within either of these deadlines. *See* AR 406(Z)(1)(d), (AA)(1); Dkt. 148-10 (claiming that grievance responses were provided on January 9, 2024 (Council, McDole, Campbell, Ptomey, Pritchett), January 10, 2024 (Moore), and February 8, 2024 (Cole)); *but see* Cole Decl. ¶8 (still has not received copy of grievance response); English Decl. ¶7 (same). Nor did ADOC inform Plaintiffs that it was handling their grievances as non-emergency grievances or provide any guidance whatsoever, in the regulation or otherwise, on how to proceed if Plaintiffs did not timely receive a response to their grievances. *See* Council Decl. ¶9; Moore Decl. ¶8; Cole Decl. ¶9; McDole Decl. ¶5; Campbell Decl. ¶5; Ptomey Decl. ¶5; Pritchett Decl. ¶¶14-16; AR 406. Moreover, as of the date of this filing, ADOC still has not provided Plaintiff Jerame Cole, despite his repeated requests, with a written grievance response at all, and the parties agree that ADOC has never responded to the grievance filed by Plaintiff English. Cole Decl. ¶¶5-8; English Decl. ¶7; Dkt. 148-10 at 3. Failure to comply with its own procedures appears to remain a widespread problem, given that ADOC also has not timely responded to a more recent grievance filed by Cole. Cole Decl. ¶10. While ADOC can perhaps be forgiven for failing to implement its grievance procedure as of yet, given that it was only recently adopted, ADOC cannot foreclose

incarcerated people from pursuing federal claims on the basis of technical rules of the sort ADOC itself routinely disregards.[9]

All Plaintiffs who had filed grievances satisfied any applicable exhaustion requirement upon ADOC's failure to respond to Plaintiffs' grievances within the timeline for emergency grievances specified in ADOC's own written grievance procedure. Courts have recognized that when prisons do not comply with their own procedures, the grievance procedure has been exhausted, and the PLRA does not require dismissal of the relevant claims. *See Whatley*, 802 F.3d at 1212 (holding that plaintiff had properly exhausted where he alleged that "the prison's failure to respond to his grievance prevented him from completing the informal grievance procedure"); *Dimanche v. Brown*, 783 F.3d 1204, 1214 (11th Cir. 2015) (claim was exhausted where prison erroneously returned form to prisoner; PLRA does not require incarcerated person "to grieve a breakdown in the grievance process" (citation omitted)); *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004) ("[S]everal circuits have held that the exhaustion requirement is satisfied where prison officials fail to timely respond to an inmate's written grievance.") (collecting cases); *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) ("A prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired."); *Smith v. Correct Health Co.*, No. 1:19-CV-1120-MHC-CCB, 2020 WL 13979386, at *3 (N.D. Ga. July 10, 2020) ("[T]his Court will not sanction Plaintiff for his procedural failures when jail officials also failed to follow the rules."); *Green v. Roberts*, No.

---

[9] The few Plaintiffs who recall ADOC posting any information about the grievance process recall ADOC committing itself to abide by this ten-day deadline and do not specifically recall information being provided about emergency grievances. *See* Ptomey Decl. ¶5; McDole Decl. ¶5; Campbell Decl. ¶5. A failure to respond, under ADOC's regulation and the simplified information ADOC seems to have made available, means that ADOC abandoned the grievance procedure.

2:06-CV-667-WKW, 2008 WL 4767471, at *4 (M.D. Ala. Oct. 29, 2008) (finding grievance procedure exhausted where prison officials did not timely respond to attempt to exhaust first step of grievance process).

ADOC's belated responses, provided only after Plaintiffs filed their Complaint, do not change this analysis, because "an administrative remedy that is unavailable until after the lawsuit is filed is not an available remedy within the meaning of § 1997e(a)'s exhaustion requirement." *Goebert*, 510 F.3d at 1324.  Even then, ADOC's belated form response was ambiguous as to whether ADOC intended to take further action, and it demonstrated that the grievance procedure was unable to provide any relief for Plaintiffs' concerns, because it simply cited the regulations that Plaintiffs contend support a system of forced labor that violates federal law. *See* Moore Decl. Ex. B; Ptomey Decl. Ex. A. As ADOC's regulation itself recognizes, the lawfulness of those regulations as a matter of federal law could only be addressed in court, not by the grievance procedure ADOC itself had failed to follow. Further, on their face, the written responses some Plaintiffs ultimately received did not clearly signal that appeal was warranted, as the responses stated that "[i]f there is a concern about a prison condition, then the specified incident will be investigated and addressed as warranted." Moore Decl. Ex. B; Ptomey Decl. Ex. A. Upon receiving the State Defendants' brief and learning that these Defendants contended that the responses some Plaintiffs received were subject to appeal—notwithstanding that ADOC abandoned its own grievance process by not responding to Plaintiffs' grievances within the time frames it established—Plaintiffs' counsel, taking ADOC's response as indicating that it believed Plaintiffs' issues should be addressed through the internal grievance procedure after all, wrote to counsel for Defendant Hamm to request an extension of Plaintiffs' appeal deadlines for good cause, citing many of the factors raised here that were beyond Plaintiffs' control. Lynch Decl. Ex.

A. Counsel for ADOC denied the request, demonstrating that ADOC continues to forego its own grievance process and does not have any intention of resolving the issues raised in the present litigation through that process. *See* Lynch Decl. Ex. B.

Further, even after Plaintiffs filed their emergency grievances, ADOC continued to signal to Plaintiffs that the grievance procedure would operate "as a simple dead end" and thwart the process through its machinations. *See Ross*, 578 U.S. at 643. The head of Classification at Holman told Moore that Moore could let him know if he wanted to appeal, while also telling Moore that appealing would accomplish nothing, because ADOC would not change its practices. *See* Moore Decl. ¶10. Cole has been unable to obtain a copy of his grievance response despite repeated efforts and has yet to receive a response to another grievance he submitted. Cole Decl. ¶¶8, 10. Further, ADOC interfered with the grievance process at ADOC's Childersburg facility by engaging in an intimidating show of force in response to the grievances filed, rounding up incarcerated workers after Plaintiffs McDole, Ptomey, and Campbell filed their grievances and demanding that they sign paperwork relating to the work-release program. *See* McDole Decl. ¶7; Ptomey Decl. ¶7; Campbell Decl. ¶7. While ADOC's appeal procedures were plainly exhausted after ADOC failed to comply with its own timelines, ADOC's additional efforts to deter people from seeking to invoke the process it had abandoned only further demonstrate why there are no grounds for dismissal here.

For all these reasons, the PLRA presents no obstacle to any of Plaintiffs' claims.[10]

---

[10] Even if the Court were to conclude that any of Plaintiffs' claims were not administratively exhausted for purposes of the PLRA—and it should not, for all the reasons provided—the remainder of Plaintiffs' Complaint would stand. *See Jones*, 549 U.S. at 223.

**II.**    ***Pennhurst* Is No Obstacle to Plaintiffs' Federal Claims for Injunctive Relief Against the State Defendants in Their Official Capacities**

With the exception of Plaintiffs' state constitutional claim, which Plaintiffs previously agreed not to pursue in this forum,[11] and their unjust enrichment claim, which is addressed below, *see infra* Part XIII, all of Plaintiffs' claims against the State Defendants plainly assert federal rights, and an injunction requiring the State Defendants to comply with federal law is thus clearly not barred by sovereign immunity under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984).

*Pennhurst* instructs that "[t]he Eleventh Amendment bars suits for injunctive relief against state officials premised on their alleged violations of state law *alone*." *Ron Grp., LLC v. Azar*, 574 F.Supp.3d 1094, 1108 (M.D. Ala. 2021) (emphasis added). The "determinative question" under *Pennhurst* is not whether Plaintiffs in some way reference state law as part of their legal theory or requested relief, but "whether the relief [will be] ordered pursuant to [1] state or [2] federal law." *Brown v. Georgia Dep't of Revenue*, 881 F.2d 1018, 1023-24 (11th Cir. 1989); *see also, e.g.*, *Vega v. Semple*, 963 F.3d 259, 283-84 (2d Cir. 2020) ("While any relief ultimately granted must serve to remedy a violation of federal law, the *Pennhurst* doctrine does not compel dismissal of claims for prospective relief against state officers in their official capacities for alleged violations of federal law simply because the party seeking such relief refers to state law in order to bolster their federal claim."); *Nielsen v. DeSantis*, No. 4:20-CV-236-RH-MJF, 2020 WL 6548462, at *1 (N.D. Fla. June 10, 2020) (*Pennhurst* does not preclude order

---

[11] As State Defendants acknowledge, Dkt. 143 at 4 n.1, Plaintiffs informed State Defendants prior to the filing of the motions to dismiss that Plaintiffs agreed not to pursue their state constitutional claim against the State Defendants in this forum.

modifying procedures otherwise required by state law to remedy alleged violations of federal law).

As the discussion that follows demonstrates, the claims that State Defendants contend are barred—Counts I (TVPA), II (RICO), V (Ex Post Facto Clause), VI-VII (Equal Protection Clause), VIII (Substantive Due Process), and IX-XI (KKK Act)—are plainly premised on violations of federal law, not Alabama law. The State Defendants unpersuasively argue that—even though Plaintiffs are seeking federal remedies for violations of their federal rights—all of Plaintiffs' claims boil down to complaints that State Defendants "are not following Plaintiffs' preferred interpretation of state parole law." Dkt. 148 at 26. Although the Court's inquiry, as in every case challenging elements of a state's parole procedures or incarcerated labor program, will require some reference to and understanding of Alabama's laws and practices, that threshold consideration of what the underlying state laws provide does not convert the federal constitutional inquiry into a state law dispute. *See, e.g.*, *Garner v. Jones*, 529 U.S. 244, 252-53 (2000) (analyzing Georgia parole law); *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 507 (1995) (analyzing California parole law); *Michael v. Ghee*, 498 F.3d 372, 384 (6th Cir. 2007) (analyzing Ohio's parole practices under state law); *Burrell v. Staff*, 60 F.4th 25, 37 (3d Cir.), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell*, 143 S. Ct. 2662 (2023) (analyzing Pennsylvania's labor practices for child support civil contemnors in ruling on TVPA claim). Indeed, if State Defendants' position were correct, no person incarcerated in a state facility could ever bring an Ex Post Facto Clause claim at all, because determining whether the Clause has been violated will always require a comparative assessment of state law or practice before and after the challenged enactment. *See, e.g.*, *Garner*, 529 U.S. at 249. Whether Plaintiffs have alleged that Ivey, Marshall, and the Parole Board members' administration of the parole system

to drastically limit access to parole after 2019, particularly for Black parole candidates, violates the Ex Post Facto, Equal Protection, and Due Process Clauses of the U.S. Constitution, and the KKK Act, will plainly require addressing the requirements of federal law. Any violation of state law that occurred as part of these Defendants' transformation of the parole system may support the inference, for example, that racial discrimination, rather than a legitimate state concern, underlies these Defendants' conduct, or that these Defendants have acted arbitrarily and capriciously in violation of substantive due process protections, but the "gravamen" of Plaintiffs' complaint is plainly federal law. Similarly, adjudicating Plaintiffs' TVPA and RICO claims will require the Court to assess whether the State's incarcerated labor programs—which are arguably authorized by state law—transgress these federal statutes by requiring forced labor. *Cf. S&M Brands, Inc. v. Georgia*, 925 F.3d 1198, 1202-05 (11th Cir. 2019) (concluding only claim concerning whether Georgia was required to release escrow funds pursuant to state statute was barred by *Pennhurst*; adjudicating federal claims under the Contract and Equal Protection Clauses); *Waldman v. Conway*, 871 F.3d 1283, 1290-95 (11th Cir. 2017) (only claim challenging ADOC officials' "application of the notice requirements in the ADOC classification manual" was barred by *Pennhurst*; federal claims rejected on ripeness and merits grounds, including substantive due process and Ex Post Facto claims).

Nor does the fact that some of Plaintiffs' requested relief may require reference to state law create a *Pennhurst* problem. The Eleventh Circuit has explained that "the determinative question is not the relief ordered, but whether the relief [will be] ordered pursuant to state or federal law." *Brown*, 881 F.2d at 1023. Thus, injunctive relief requiring state officials to act in accordance with the Constitution is not barred by sovereign immunity, even if a plaintiff references state law in support of federal claims. Indeed, as the Fifth Circuit explained, even an

injunction requiring a state defendant to take certain steps to comply with the requirements of the Constitution, within the framework provided by state law, "does not order [a state defendant] to conform to state law in violation of *Pennhurst*." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 452-53 (5th Cir. 2022) (citing *Brown*, 881 F.2d at 1023). Given the nature of an Ex Post Facto Clause claim, in particular—which necessarily requires reference to the law in force ex ante—it is only logical that an injunction that seeks to remedy an Ex Post Facto Clause violation premised on a change in state law or practice would refer to the law or practice previously in force. To the extent Plaintiffs' other claims arise out of the same series of events, the requested relief may likewise refer to preexisting state law as a point of reference prior to the violations Plaintiffs seek to address here. Those references to state law in framing their federal relief do not convert Plaintiffs' federal constitutional and statutory claims into state law claims. *See Brown*, 881 F.2d at 1023-24.

## III.    Plaintiffs Have Adequately Alleged TVPA Claims Against Each of the Defendants

Plaintiffs have plausibly alleged that each Defendant violated the TVPA's prohibitions on coercion of labor, and Defendants' motions to dismiss Plaintiffs' TVPA claims are grounded in their disagreement with the facts as alleged by Plaintiffs and an unjustifiably narrow understanding of what constitutes prohibited "coercion" under the Act. Congress enacted the TVPA in 2000 to override what it deemed the Supreme Court's unduly narrow definition of "involuntary servitude" in 18 U.S.C. §1584 and the Thirteenth Amendment as limited to "physical or legal coercion." *See, e.g.*, Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, §102(b)(13) (codified at 22 U.S.C. §7101(b)(13)); *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017); *see also* 22 U.S.C. §7101(b)(13)-(14) (explaining existing law did not sufficiently reach all forms of coercion). Congress explained that the TVPA was intended

"to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined" under then-existing law. H.R. Rep. No. 106-939, at 101 (2000); *see also United States v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015) (noting Congress' intent "to expand the forms of coercion that could result in forced labor"). In enacting the TVPA, Congress specifically sought to ensure that the "range of conduct" prohibited by the TVPA "encompasses circumstances in which the person whose labor is being exploited is faced with any number of choices as an alternative to working, including actual or threatened physical restraint, serious harm, and abuse of law or legal process." *Burrell*, 60 F.4th at 37.

As detailed below, Coerced Labor Individual Plaintiffs[12] have alleged they were forced to work by prohibited means, *see* Compl. ¶¶16, 19-21, 23, 26, 34, 36, 38, 48-50, 54, 59-60, 65-71, 73, 140, 145-50, 152, 154, 229; and that Defendants were at least knowing beneficiaries of the forced-labor scheme, *id.* ¶¶17-18, 20-21, 26-34, 47, 49, 59-60, 134, 139, 147-52, 154. This is sufficient to state a claim under the TVPA. While Defendants take issue with many of the facts as alleged by Plaintiffs, that is no basis to grant their motions to dismiss. Rather, the Court must accept the factual allegations in Plaintiffs' Complaint as true and construe all "reasonable inferences … in the light most favorable to" Plaintiffs. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). To overcome the pending motions to dismiss, Plaintiffs need only state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

---

[12] Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright bring Counts I-III and are referred to herein as the "Coerced Labor Individual Plaintiffs." Together with the RWDSU and USSW, they are the "Coerced Labor Plaintiffs."

The Court should also reject the array of other, non-merits arguments Defendants make with respect to the TVPA claims, including State Defendants' invocation of various kinds of immunity, Masonite and State Defendants' arguments that the TVPA is inapplicable to people convicted of crimes, and the novel (and borderline frivolous) argument advanced primarily by Bama Budweiser that the TVPA is unconstitutional. Finally, the Court should find that Coerced Labor Plaintiffs have plausibly alleged standing to bring their TVPA claims.

**A.    Plaintiffs Have Alleged Sufficient Facts to Make Out the Elements of a TVPA Claim Against Each Defendant**

The Eleventh Circuit explained the structure of the TVPA's private cause of action in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1271-72 (11th Cir. 2020). It starts with identifying the conduct prohibited by the TVPA. In §1589(a), "[t]he TVPA prohibits knowingly 'obtain[ing] the labor or services of a person' *by any one of, or combination of,* the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Id.* (quoting 18 U.S.C. §1589(a), first alteration in original, emphasis added).

That prohibition applies to "'[w]hoever' knowingly provides or obtains such forced labor or services." *Id.* Section 1595(a) then provides a private cause of action for any victim of a violation of §1589. *See* 18 U.S.C §1595(a). Under §1595(a), "[a]n individual who is a victim of a violation" of the TVPA "may bring a civil action against [1] the perpetrator," and against [2] "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving

anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPA. 18 U.S.C. §1595(a).[13]

### 1. Plaintiffs have plausibly alleged that the labor of Coerced Labor Individual Plaintiffs and other incarcerated workers was provided and obtained by prohibited coercive means and that Defendants knew or should have known of this coercion

Plaintiffs have alleged that the labor of Coerced Labor Individual Plaintiffs and other similarly situated incarcerated individuals was "knowingly … obtain[ed]" by Hamm, together with Ivey, Marshall, and the Parole Board members, by all four of the coercive means prohibited by the TVPA. 18 U.S.C. §1589(a); *see, e.g.*, Compl. ¶¶47-48, 65-67, 70,147, 154, 208. Plaintiffs also plausibly allege that Employer Defendants knowingly benefited from and contributed to the coercion of this labor. *See, e.g.*, *id.* ¶¶12, 17, 21, 47-49, 134, 139, 147-51, 154, 210. In the sections below, we first address Plaintiffs' allegations describing the prohibited coercion and then respond to the array of arguments from the Employer Defendants, which deny knowledge of any coercion, and argue—unpersuasively and in various iterations—that it is not plausible that they had knowledge of the working conditions, regulations, or financial arrangements relating to the work performed for them by individuals working in their businesses and agencies. Plaintiffs, however, have adequately alleged that Defendants knew or should have known that the incarcerated workers' labor was obtained through prohibited coercive means.

---

[13] Progressive Finishes, even while recognizing that Plaintiffs' civil cause of action arises under §1595—with respect to violations of §1589—argues that Plaintiffs' claim should be dismissed for failure to invoke §1595 as the primary statutory provision. Dkt. 153-1 at 6-8. Progressive Finishes clearly had notice of the claims against it, *id.* at 8, and its technical objection is not well taken: Plaintiffs certainly bring a civil claim against Progressive Finishes for violations of the TVPA prohibitions identified in §1589 and as a beneficiary of those violations. *See, e.g.*, *Barrientos*, 951 F.3d at 1271-72 (discussing elements of a private claim based on violations of §1589).

a.   **Labor obtained through physical restraint, threats of physical restraint, serious harm, and threats of serious harm**

In accordance with Congress' intent to expand the forms of coercion that give rise to unlawful forced labor, *Callahan*, 801 F.3d at 618, the statute "define[s] broadly" the types of harms and threats that qualify under the statute. *United States v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021); *see also, e.g.*, *Burrell*, 60 F.4th at 36. The terms "physical restraint" and "serious harm" must thus be construed broadly. "Physical restraint" for incarcerated people includes increased periods of confinement, including in the person's cell or in segregation. *See Menocal v. GEO Grp., Inc.*, 635 F.Supp.3d 1151, 1187 (D. Colo. 2022) ("imposition of segregation is physical restraint"; even 72 hours in solitary confinement could be "serious harm"); *Bridges v. Poe*, 487 F.Supp.3d 1250, 1261 (N.D. Ala. 2020) ("'Confinement' to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of 'physical restraint.'"); *cf. Ruelas v. County of Alameda*, 2021 WL 12144269, at *6 (N.D. Cal. June 24, 2021) (finding solitary confinement or threat of solitary confinement to be a "serious harm"); *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS, 2018 WL 2193644, at *11 (S.D. Cal. May 14, 2018).

The term "serious harm" includes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. §1589(c)(1).[14] Thus, "[s]ection 1589 is not written in terms

---

[14] As the legislative history explains, the TVPA's "terms and provisions are intended to be construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. No. 106-939, at 101 (2000).

limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion" such as threatening "financial," "psychological," or "reputation[al]" harm. *United States v. Calimlim*, 538 F.3d 706, 709, 714 (7th Cir. 2008) (recognizing "not be[ing] able to send any more money back to … family" as a serious harm); *see also Lesnik v. Eisenmann SE*, 374 F.Supp.3d 923, 952 (N.D. Cal. 2019) ("financial threats, threats of litigation, and threats to withhold medical care" are serious harms).

Plaintiffs' Complaint is replete with allegations regarding the ways in which Coerced Labor Individual Plaintiffs are required to work for ADOC and the other Employer Defendants by means of serious harm, physical restraint, and threats thereof.

(1) First, Plaintiffs have alleged that ADOC regulations and practices, which are implemented and enforced by State Defendants, threaten Coerced Labor Individual Plaintiffs with severe consequences, including prolonged confinement, if they refuse to work, and, further, that Employer Defendants are aware of, participate in the enforcement of, and benefit from these rules. Compl. ¶¶44-49, 134; *see also Bridges*, 487 F.Supp.3d at 1261 ("threat of additional confinement" qualifies as a threat of "physical restraint" within the meaning of the TVPA).

Some of the Employer Defendants attempt to equate the ability of incarcerated workers to stop working to that of free workers. For example, Cast Products suggests that §1589 should "not apply when the employee could simply quit and change jobs." Dkt. 171 at 8 (citing *Calimilim*, 528 F.3d 706); and the Automotive Defendants refer to "natural consequence[s] of [an] employee's decision to cease work." Dkt. 157 at 20 (citing *Salem v. Mich. State Univ.*, No. 1:19-cv-220, 2021 WL 1381149 (W.D. Mich. April 13, 2021)). But if Coerced Labor Individual Plaintiffs or members of the putative class refuse to work, under ADOC regulations and

established practices, there are severe consequences that are nothing like those that flow from a decision to simply "quit and change jobs."

Ivey has ordered ADOC to treat both refusals to work and encouragement of work stoppages as violations subject to significant discipline, including time in "solitary confinement and other cruel conditions." Compl. ¶46. Under ADOC regulations, an incarcerated individual who refuses to work may be punished by restrictive housing, which generally means solitary confinement, for up to 30 days and losing "a minimum of 720 accrued good-time days," which "means the extension of [that] person's sentence … [by] approximately *two more years*." *Id.* ¶47 (explaining that withholding labor is a "medium-level" offense) (emphasis added). An incarcerated person who refuses to work—whether for ADOC or for an outside employer—can also be barred for six months from "earning additional good-time days." *Id.* And if a person refusing work is deemed to have encouraged or caused others to stop work, they are subject to even more severe punishment: loss of a minimum of 1,080 accrued good time days or *three years* of extended prison time, and a one-year bar on earning good time credits. *Id.* ¶48.

The Complaint further alleges that "ADOC has implemented a de facto policy that refusing to work on one or more occasions is punished, including with transfer to higher security and more violent facilities and solitary confinement." *Id.* ¶¶45, 229; *see also id.* ¶154 (Cartwright told "any failure to work, even for health reasons, will be considered a refusal to work" subject to discipline); *id.* ¶147 (Walker told by ADOC job placement officer to go work despite being "so ill that she had to be carried to the healthcare unit"). Workers who refuse to labor have been "placed in solitary confinement for several months." *Id.* ¶70; *see also id.* ¶¶65-67, 145. And, as Plaintiffs have alleged, transfer to higher-security facilities or more dangerous areas of the prison exposes incarcerated workers to severe, uncontrolled violent conditions. *Id.* ¶¶51-60.

Plaintiffs have alleged that Hamm, Ivey, and Marshall have an active role in maintaining and enforcing these regulations and practices, which harshly punish any refusal to work, and therefore naturally have knowledge of these regulations and practices. *See id.* ¶¶43-48, 50.[15]

Employer Defendants generally argue that they have no or little knowledge of or involvement in this coercion, and that Plaintiffs have not plausibly alleged that they did. *See, e.g.*, Dkt. 139 at 8; Dkt. 141 at 8-10; Dkt. 147 at 14; Dkt. 148 at 46-48; Dkt. 149 at 4-6; Dkt. 151 at 10-15. Employer Defendants, however, are not entitled to argue the facts on a motion to dismiss, nor are they permitted to simply disregard the facts alleged by Plaintiffs. Plaintiffs allege: "Private work-release employers and public work-center employers are aware of and knowingly assist in enforcing these [regulations imposing discipline for refusal to work] and other ADOC regulations that coerce work from incarcerated people." Compl. ¶49. That allegation, in the context of all the facts alleged in the complaint, is not conclusory and far from implausible.

Plaintiffs' allegation of knowledge is buttressed by the terms of the contracts that govern the relationships between ADOC and the other Employer Defendants. As Plaintiffs allege, "ADOC's Work Release Program Employer Agreement expressly provides that incarcerated people participating in the program 'shall comply with … all ADOC rules and regulations,' and if an incarcerated person 'fails to follow any rule, or refuses to work as requested," the employer

---

[15] The Complaint also alleges that Defendant Gwathney and the other Parole Board Members—in cooperation with Ivey and Marshall—generally restructured the parole scheme to increase terms of confinement in order to force incarcerated people to work, Compl. ¶¶126-32, and specifically extended prison sentences for those who refused to work. *See, e.g.*, *id.* ¶149 (Board told Ptomey's family "that he was being denied parole because he was fired from KFC for refusing to work" despite the fact that Ptomey had only protested his low wage rate and his manager had "recommend[ed] him for parole in light of his strong work performance").

must give notice to an ADOC Job Placement Officer "when the incarcerated person returns to the work-release facility." *Id.* The Complaint also describes the similar "Government Work Project Service Agreement," which requires government employers of incarcerated workers to notify ADOC if any incarcerated person "fails to follow any rule, or refuses to work as requested." *Id.* Thus, in addition to the Employer Defendants have contractual relationships with ADOC that establish some of the terms of incarcerated workers' labor, they also have contracts that contemplate that the Employer Defendants will maintain open lines of communication with ADOC, including through the ADOC Job Placement Officer. *Id.* The Complaint therefore more than adequately alleges that each participating Employer Defendant that obtains and benefits from incarcerated labor was aware of and knowingly assisted in enforcing these regulations.[16] Employer Defendants protest that they cannot be expected to know *every* ADOC rule, *see, e.g.*, Dkt. 149 at 5, but that misses the point: they can reasonably be expected to have knowledge of the specific rules regarding incarcerated individuals' work, which they expressly agree to enforce, and that refusals to work will result in discipline by ADOC, and indeed Plaintiffs have alleged that they do.[17] Plaintiffs' allegations must be accepted as true for purposes of a motion to dismiss.

---

[16] City of Troy unconvincingly contends that Plaintiffs have failed to allege that the harms for which it is responsible are the result of "official policies" attributable to the City. Dkt. 142 at 6-7. Yet Plaintiffs have clearly alleged that the TVPA violations are the result of the City's official partnership with ADOC to employ incarcerated workers, and that the City has played an integral role in enacting and benefiting from the forced labor at issue. *See* Compl. ¶210 (for City of Troy, "knowingly benefiting from participation in ADOC's work-release and work-center programs is a matter of custom and policy").

[17] In addition to their agreements incorporating regulations requiring coercive punishments for refusal to work, Employer Defendants should know that their reporting will lead to coercive punishment because of widespread media coverage of how refusals to work are punished. Plaintiffs allege that it is "widely and repeatedly reported across Alabama" that incarcerated

(2) Second, Plaintiffs allege that ADOC, with the knowledge and participation of Employer Defendants, subjects Coerced Labor Individual Plaintiffs to serious financial coercion, which is cognizable under the TVPA. Compl. ¶¶15-16, 26, 28, 37-38, 72-76; *see Calimlim*, 538 F.3d at 712-14 (threat to stop paying victim's indigent family members constitutes serious harm for TVPA); *see also United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (threat not to pay back wages). Incarcerated people need funds to purchase basic necessities,[18] and the absent or substantially reduced wages incarcerated people accept for labor that is often grueling or dangerous demonstrates that the labor occurs under conditions of coercion.

Within ADOC, incarcerated workers are required to perform skilled and essential work completely without pay. Compl. ¶¶37-38; *see also id.* ¶153 (English was charged with running a dorm of 50-60 individuals for ADOC for no pay, despite work involving round-the-clock responsibilities, including responding to health and drug emergencies); *id.* ¶150 (McDole assigned to unpaid job with the canine training squad, where he had to walk in the woods and wait for the dogs to find him); *id.* ¶146 (Moore has performed decades of highly skilled work maintaining, building, and wiring ADOC facilities and refurbishing wardens' houses).[19]

---

people who refuse to work are regularly subject to additional extreme punishments, including food deprivation and life-threatening physical punishment. Compl. ¶¶50, 140-42. Widespread reporting regarding the consequences of what Employer Defendants are required by contract to report also shows those Defendants' constructive knowledge of how their employees were being forced to work—coercion that Employer Defendants participated in by virtue of their contractual obligations.

[18] ADOC charges exorbitant prices for such basic necessities as soap, deodorant, clothing needed for work (marked up nearly 60% above what it would cost outside), medical care ($4-8 per visit or prescription, $8-12 for transport to facility to receive care, $20 for missed appointments), and food, which workers need to buy when returning after a late shift and outside of normal eating hours. Compl. ¶¶16, 21, 73-74, 146.

[19] As alleged in the Complaint, ADOC is paying only 25 cents per hour, if that, to workers in the Correctional Industries Program. *Id.* ¶36.

As detailed in the Complaint, incarcerated workers who provide labor to Employer Defendants through ADOC's work-release and work-center programs receive little pay for their difficult and often dangerous work. *Id.* ¶¶7-23. It is hard to credit Employer Defendants' various protestations that they do not know that the wages and deductions they set in contracts with ADOC—and which the workers are forced to accept given all the coercive circumstances alleged—leave their incarcerated workers in dire financial distress.

Public Employer Defendants (Ivey, Cooper, City of Montgomery, City of Troy, and Jefferson County) must know that their "lease" arrangements with ADOC mean that incarcerated individuals receive only $2 per day, regardless of how long or hard they work, *see id.* ¶¶26, 28; and even if the public Employer Defendants could reasonably deny that knowledge (they can't, especially on a motion to dismiss), they certainly know that ADOC takes a significant cut from the $15 daily rate the public entities generally pay ADOC. Even if the workers, rather than ADOC, were paid the $15 per day—and they are not—assuming an 8-hour day, workers would still receive less than $2 an hour. *Id.* ¶¶26, 34.

Meanwhile, the private Employer Defendants well know, given their contractual arrangements and contacts with ADOC, that they pay *ADOC*, not the incarcerated workers, and that ADOC automatically deducts 40% of all gross earnings and charges workers for transportation and other job-related expenses. *Id.* ¶¶15, 16, 148, 150. Automotive Defendants argue that it is not plausible for them to have knowledge that ADOC deducts money from paychecks provided to it. Dkt. 157 at 24. They do not and cannot explain why that is implausible, but it is irrelevant: the Complaint's allegations must be taken as true, and Plaintiffs allege that "employers who procure forced laborers from Alabama," are "fully aware that its incarcerated workers themselves will not actually receive even half of the nominal pay that the company pays

for their labor, because it has engaged incarcerated people under a program whereby participants agree and acknowledge that Alabama… deducts a fee equivalent to 40% of the gross nominal wages paid by the company, along with additional fees on top of that 40%."[20] Compl. ¶22. The Complaint further alleges that "[p]rivate employers that contract with ADOC for 'leased' labor do so with this knowledge that the forced laborers themselves will receive only a fraction of the wages paid." *Id.* That Plaintiffs recover so little (or nothing at all) financially for their labor, despite a need for funds to supply their basic necessities, supports the conclusion that their labor is coerced and the Employer Defendants know it.[21]

Some Employer Defendants also attempt to sanitize the financial harms incarcerated workers face by arguing, for example, that it is not "onerous" to "push[] a broom at the Biscuits Baseball Stadium" for $2 a day, Dkt. 152 at 13 (City of Montgomery), or, in response to allegations of long hours in poultry processing plants, that "[h]ard working people in the United States work night shifts and oftentimes have to work six days per week to meet production demands," Dkt. 175 at 16 (RCF). But the question is whether it is a reasonable inference that Coerced Labor Individual Plaintiffs would not have worked for little or no pay absent coercion, and it is.

---

[20] Plaintiffs' Complaint explains that ADOC deducts more than 40%, as it also charges workers in its work-release program for transportation to the job site, and at times, for laundry. Compl. ¶¶16, 148-50. Plaintiffs also allege they are required to pay for equipment necessary to do work they are forced to do, either for private employers or inside the prison. *E.g.*, Compl. ¶146 (Moore charged exorbitant sums for work boots necessary for work as builder and electrician inside prison); ¶148 (Cole forced to pay $225 for safety glasses by Defendant Masonite).

[21] The fact that the Coerced Labor Individual Plaintiffs can be required to work harder and in more dangerous jobs than their free peers for the little pay they receive, Compl. ¶¶19, 59-60, 152, 154, puts Employer Defendants on notice that the incarcerated labor was coerced. *See Burrell*, 60 F.4th at 40 ("apparent to those … overseeing plaintiffs' work … no individual … would choose to work in the dangerous conditions … for $5 per day").

Underlying many of the Employer Defendants' arguments is also a suggestion that incarcerated workers voluntarily participate in the work-release and work-center programs. *See, e.g.*, Dkt. 152 at 13-14. As described below, incarcerated individuals enter these programs under threat of serious harm due to the dangerous conditions in the prisons. But even if entry were voluntary, if there are threats of serious harm or abuse of process that compel the continued provision of individuals' labor, that is "involuntary servitude" for purposes of the Thirteenth Amendment—and thus plainly coercive enough to support liability under the TVPA. In *United States v. Reynolds*, 235 U.S. 133 (1914), the Supreme Court considered an Alabama practice in which people convicted of crimes, who would otherwise be imprisoned or sentenced to hard labor, could instead choose to have a surety—a private party—pay their fines. *Id.* at 146. In exchange, they would agree to work for the surety. *Id.* But if they violated that agreement, they could be rearrested and sent back to jail. *Id.* Even though the labor contract was entered "voluntarily," the Court held that laboring under "the constant fear of imprisonment" if the contract is violated, "renders the work compulsory" in violation of the Thirteenth Amendment. *Id.* If the "voluntary" participation in *Reynolds* was deemed to be compulsory for purposes of the Thirteenth Amendment, participation of the Coerced Labor Individual Plaintiffs and other incarcerated persons in the work-release and work-center programs, under threat of discipline and return to higher-security facilities, should fall within the TVPA's scope of prohibited coercive means, which is broader than that of the Thirteenth Amendment, including because the TVPA's protections apply to those convicted of crimes. *See supra*; *see also infra* Part III.B.4.

(3) Third, the Complaint plausibly alleges that Ivey, Marshall, Hamm, and the other Employer Defendants knowingly obtain and benefit from labor from incarcerated individuals, including Coerced Labor Individual Plaintiffs, through the coercive effect of the horrific

conditions in medium- and maximum-security facilities. Compl. ¶229. Confinement in such facilities and the attendant risk to life and limb are a serious harm and physical restraint within the meaning of the TVPA, and the labor incarcerated people provide to avoid these life-threatening conditions is coerced by that serious harm and physical restraint. *See Copeland v. C.A.A.I.R., Inc.*, No. 17-CV-564-TCK-JFJ, 2019 WL 4307125, at *8 (N.D. Okla. Sept. 11, 2019) (threat of incarceration to people in drug court program is threat of serious harm); *see also Lesnik*, 374 F.Supp.3d at 952 ("threats to withhold medical care"). Plaintiffs allege that incarceration in these facilities is life-threatening: the Complaint details frequent deadly and near-fatal assaults in ADOC facilities, and the failure of ADOC officials "on multiple occasions" "to protect persons who specifically alerted officials to their high risk of being killed if not adequately protected." Compl. ¶55; *see also id.* ¶53 (homicide rate in ADOC facilities is many times the national average—"56 per 100,000 prisoners in Alabama, compared to seven homicides per 100,000 nationwide"); *id.* ¶¶53, 140. The Complaint further alleges that incarcerated individuals in Alabama's medium- and maximum-security prisons "face a serious risk of excessive force from security staff, with incidents 'often result[ing] in serious injuries and, sometimes, death.'" *Id.* ¶54; *see also id.* ¶67 (describing violence against Plaintiff Council).

The violence and threats of violence for those incarcerated in medium- and maximum-security facilities have the coercive effect of pushing people housed in those facilities to labor, whether for ADOC or for the other Employer Defendants. The threat of physical harm and death means that individuals take any job that physically removes them from the most dangerous areas of the facilities to decrease the risk they will be killed. *Id.* ¶59 ("Accepting a job—ideally outside the walls of medium- and maximum-security facilities, but also in any position that physically removes an incarcerated person from the most dangerous areas of the facility—is the *only* way to

escape the serious threat of physical harm, even temporarily," emphasis added). For instance, Pritchett worked without pay just to "temporarily escape the horrific conditions within the dorms." *Id.* ¶152. Moore has provided highly skilled labor without any compensation for years just "to spend time during the day away from the more violent areas of the prison." *Id.* ¶60. Likewise, people housed outside these facilities and who participate in the work-release and work-center programs, are forced to work by the threat that they will be "put behind the wall," i.e., transferred into these violent, higher security facilities. *Id.* ¶19. Cole was told "directly by an ADOC warden that if he were to withhold labor, he would be 'put behind the wall.'" *Id.* ¶148. Another incarcerated worker who declined to work was in fact "put 'behind the wall' at Limestone, a maximum-security facility." *Id.* ¶70. These allegations are more than sufficient to support Plaintiffs' claim that individuals incarcerated in ADOC facilities, including Coerced Labor Individual Plaintiffs, labor for the benefit of ADOC and the Employer Defendants under threat of violence and serious harm.

Plaintiffs allege that the Employer Defendants knew or should have known of the coercive effects of the violent situation within ADOC facilities. The Complaint states: "The exceptionally violent conditions in ADOC's medium- and maximum-security facilities that coerce incarcerated people to accept work-release and work-center jobs away from those facilities are a matter of broad public knowledge, and Alabama employers who contract with ADOC to provide incarcerated workers know or should know of these conditions." Compl. ¶140; *see also id.* 141-42 & nn.74-78. Despite some of the Employer Defendants' objections that this cannot be true or is somehow insufficient, Dkt. 152 at 14; Dkt. 141 at 12, it is not conclusory and reflects a reasonable inference, particularly given that the Employer Defendants regularly interact not only with ADOC but with the workers who report to their facilities day in and day

out. Nor is this allegation similar to the one at issue in *S.J. v. Choice Hotels International, Inc.*, 473 F.Supp.3d 147, 154 (E.D.N.Y. 2020), where awareness of a sex trafficking problem in low-budget lodgings generally could not be relied on to show knowledge of coercion at particular hotels. Here, Plaintiffs allege that public knowledge of the violence within ADOC facilities supports an inference that Employer Defendants knew that incarcerated individuals work outside ADOC facilities to avoid that violence and threat of harm.

### b.      Abuse or threatened abuse of law or legal process

Plaintiffs have alleged facts sufficient to support a finding that Defendants knowingly obtained their labor by means of abuse or threatened abuse of law or legal process. "Congress … broadly defined 'abuse or threatened abuse of law or legal process' as 'the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.'" *Burrell*, 60 F.4th at 37 (quoting 18 U.S.C. § 1589(c)(1)). "[W]arnings about … consequences … directed to an end different from those envisioned by the law [are] an abuse of the legal process." *Calimlim*, 538 F.3d at 713; *see also Copeland*, 2019 WL 4307125, at *8 (threat of additional punitive consequences "when work was deemed unsatisfactory" or when "unable to work due to injury, constitutes threatened abuse of law or legal process").

The Employer Defendants have all agreed, as part of their contracts with ADOC, to report incarcerated people for refusing to work or for advocating for the withholding of work, and thus to subject those workers to coercive consequences, including extended detention, described above. Compl. ¶¶49, 65-67, 70, 145, 147, 149, 154. Plaintiffs have adequately alleged that the severe consequences attending refusals to work are designed, not for any valid need to impose

discipline, but rather to ensure that incarcerated individuals continue to labor for the benefit of ADOC and the Employer Defendants and do not raise concerns about their coercive working conditions. Thus, Ptomey was disciplined when he raised concerns about "the low wage rate he was paid" and declined to work at KFC. *Id.* ¶149. Walker was told "by an ADOC job placement officer [that] she had to 'get up and go make us our 40%.'" *Id.* ¶147. She was also reported for allegedly failing to work when she was sexually harassed at work for Jefferson County and gave a statement about the harassment. *Id.* And Ms. Cartwright was told that "any failure to work, even for health reasons, will be considered a refusal to work and will result in a disciplinary offense." *Id.* ¶154. This manipulation of legal consequences for an end other than a valid penological need is an abuse of legal process. *See Copeland*, 2019 WL 4307125, at *8 (purpose of law to allow for confinement in certain circumstances does not mean purpose "to allow parties who contract with … programs to retain employees").

**c.      Scheme intended to cause belief that incarcerated workers would suffer serious harm or physical restraint**

The Complaint alleges that Hamm and Ivey have taken steps to ensure that incarcerated individuals who *advocate* for withholding work are subject to serious harm and physical restraint—including extended prison sentences, solitary confinement, deprivation of food, and life-threatening physical harm. Compl. ¶¶48, 61-71. This is a quintessential scheme intended to instill the belief in others that they will be subject to serious harm and physical restraint should they refuse to work.

As alleged in the Complaint, ADOC implements this scheme by making examples of prominent opponents of the forced labor system who refuse work, depriving them of food and

subjecting them to life-threatening conditions. *Id.* ¶¶65-71.[22] These examples are meant to make incarcerated people believe that they or their fellow incarcerated people may be seriously harmed and even killed if they do not work. The Complaint alleges that it is common knowledge among incarcerated individuals, and indeed was widely publicized throughout Alabama, that ADOC imposes "food deprivation and physical punishment[] on incarcerated persons who have refused to work or encouraged people to refuse to work." *Id.* ¶50; *see Copeland*, 2019 WL 4307125, at *8 (threats to prisoners plausible based on prisoners' experience in system).

There can be no doubt that the serious harm and physical restraint to which those who advocate for the withholding of labor are subjected is designed to make incarcerated people believe—in fact, to let them know—that if they stop working, they and others will likewise be punished. Plaintiffs have also plausibly alleged that the public reporting regarding ADOC's brutal response to those who advocated for the withholding of labor, *e.g.*, Compl. ¶¶50, 140-42, means that Employer Defendants were aware that the labor of incarcerated workers was obtained through this coercive scheme.

---

[22] Council, aka Kinetik Justice, has been "singled out" "for singular abuse and punishment" for the public role he has taken on for more than a decade advocating against forced labor. Compl. ¶66; *see also id.* ¶65 (describing general "violent repression" and "increased punishments" following protest of forced labor). Council has been "subject to long stretches of solitary confinement" as well as "physical beatings, strip searches, exposure to chemical agents, harassment, and psychological abuse." *Id.* ¶66; *see also id.* ¶67 (assignment to Donaldson where "ADOC personnel carry out brutal beatings of those suspected of advocating for human rights protections"). He has been placed in cells with inhumane conditions—"without lights" and infested with "rats, roaches, or spiders" —as well as in a facility known for "brutal beatings" and has in fact been "attacked by ADOC personnel, including while in solitary confinement." *Id.* ¶¶67, 69. That followed an assault by ADOC personnel in which officers "beat Mr. Council so severely he had to be med-flighted to a trauma center to save his life" and after which he was left to bleed "for 21 days," leading to permanent blindness in one eye and "brain injury." *Id.* ¶68.

### 2.     Plaintiffs have alleged that Defendants knowingly benefit from participation in an enterprise that violates the TVPA

Plaintiffs have adequately pled a "beneficiary" claim against Defendants because they have plausibly alleged that each Defendant: "(1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVP[]A as to the plaintiff, and (4) the defendant had constructive or actual knowledge" of that fact. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021).

As to the third and fourth requirements, the preceding section explains that Plaintiffs have adequately alleged that the labor-trafficking enterprise here violated the TVPA and that Defendants had constructive or actual knowledge of that fact. Plaintiffs have also adequately alleged the first and second elements: that all Defendants "took part in a common enterprise involving risk and potential profit" and "knowingly benefited" therefrom. *Id.*

First, Plaintiffs adequately allege Defendants' participation in the enterprise. Allegations that beneficiary defendants "had prior commercial dealings" with the primary perpetrator of the TVPA violations and "associat[ed] with" the primary perpetrator of the TVPA violations to force plaintiffs "to serve their business objective" are sufficient to establish "participation in" a common undertaking or enterprise for profit. *Id.* at 725-26 (discussing *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017)); *see also K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *3 (11th Cir. Feb. 9, 2024); *Ricchio*, 853 F.3d at 555 (finding participation in enterprise where beneficiary hotel operators previously rented to the primary perpetrator and spoke with him "about 'getting this thing going again'" and primary perpetrator's "coercive and abusive treatment … had become apparent" to the beneficiaries).

Here, Plaintiffs have alleged that each of the Employer Defendants has "had prior business dealings" with ADOC over an extended period of time. *E.g.*, Compl. ¶¶3, 33, 135. As

discussed above, each Employer Defendant associated with ADOC through explicit contracts that involve specific commitments to require incarcerated individuals to work, require reporting of any refusal to work and subject workers to discipline if they withhold their labor, and enshrine financial arrangements that ensure incarcerated individuals receive only small amounts of money for their labor. *See Ruelas*, 2021 WL 12144269, at *6 ("threat[s] to report" incarcerated employees "for punishment" showed participation). And, as explained above, enforcement of those rules is an integral part of ADOC's scheme to compel labor by means of threat of physical restraint and serious harm, subjecting those who violate them to extended prison sentences and solitary confinement. Compl. ¶47.

Defendants argue that the Eleventh Circuit's decision in *Red Roof Inns* is analogous to the situation here and supports an argument that Defendants did not take part in the forced labor enterprise. Dkt. 141 at 8-9; Dkt. 147 at 16-19; Dkt. 151 at 11-15; Dkt. 153-1 at 10-14; Dkt. 155 at 6-7; Dkt. 157 at 18-19; Dkt. 171 at 5-6; Dkt. 174 at 20-21. Just the opposite. *Red Roof Inns* involved a sexual trafficking venture at certain franchisee hotels, but there was no allegation that franchisors—the defendants at issue in that case—took *any* part in that sexual trafficking enterprise. 21 F.4th at 726-27. At most, the franchisors inspected the premises, read reviews, and provided general training to some franchisee employees who were alleged to have been part of the enterprise. *Id.* at 727. Here, Employer Defendants actively participate in the alleged venture. They directly supervise the incarcerated workers, directing their work and making assignments; Employer Defendants set the working conditions, which Plaintiffs have alleged include "long and demanding hours … that the employers know or should know would be unlikely to be tolerated by free workers without resistance." Compl. ¶12; *see also Burrell*, 60 F.4th at 40 (finding allegations of "extremely poor working conditions and direct on-site supervision"

sufficient to support reasonable inference that defendants knew venture was using prohibited means of obtaining labor).[23] And, as discussed above, Employer Defendants also agree to specific economic terms of "leasing" incarcerated people's labor, which result in minimal wages actually being received by incarcerated workers, and agree to report workers who refuse to work, understanding that a refusal to work subjects workers to discipline, including prolonged time in prison and solitary confinement. *See supra* Part III.A.1; Compl. ¶15.

Defendants' attempt to analogize this case to *K.H. v. Riti, Inc.*, Dkt. 141 at 8-9; Dkt. 147 at 16-17; Dkt. 153-1 at 10-14; Dkt. 157 at 18-19; Dkt. 171 at 6, is unavailing. There, the Eleventh Circuit found that a hotel operator that rented rooms to a trafficker, without more, was not sufficient to support an inference of participation. 2024 WL 505063, at *3. But renting a room to a trafficker is far different from providing the workplace in which people are forced to work through prohibited means, supervising them in those jobs, and reporting back to ADOC on whether they worked "as requested." *See* Compl. ¶49.

Second, as alleged in the Complaint, Defendants "knowingly benefit" from their participation in this joint venture of coercing labor from incarcerated workers. *Id.* ¶134. (alleging that it is a benefit to the Employer Defendants that incarcerated workers "are directly prohibited

---

[23] Incarcerated workers at state and local agencies have "workdays regularly extending 12 hours and beyond," and pay that is generally limited to $2 per day "[r]egardless of how many hours [they] are required to work." *Id.* ¶26. Workers for private Defendant Employers are also subject to harsh working conditions. *See id.* ¶147 (Southeastern Meats required Walker to work "12-hour shifts, from 2 pm to 2 am[,]" including in harsh conditions without basic protective equipment); *id.* ¶18 (SL Alabama "has required its incarcerated workforce to work 11- and 12-hour shifts, six days per week, with the pre-production shift starting at 5 a.m. and ending no earlier than 5 p.m."); *id.* ¶148 (RCF required Cole to work "long shifts sometimes past midnight, and sometimes six days a week"); *id.* ¶21 (Paramount Services pays incarcerated workers less than "free coworkers are being paid"); *id.* ¶151 (describing how Progressive Finishes did not compensate Campbell for "lead man" role and did not provide raise, despite company policy).

from refusing to work" and "effectively prohibited from communicating concerns regarding working conditions, pay, or safety"). Hamm and ADOC benefit both from the labor provided within the walls of ADOC facilities, with incarcerated individuals performing for free many functions necessary to ADOC's operations and for which ADOC would otherwise have to pay substantial amounts, *id.* ¶¶9, 35-42, and from its "leasing" of labor to Employer Defendants, *id.* ¶¶10, 14-15. Public Employer Defendants benefit from paying significantly less for labor than they would have to pay if they were to hire free workers; and private and public Employer Defendants all benefit from obtaining workers who are threatened with severe consequences should they refuse to work, which restricts their ability to complain about their wages, hours, or working conditions, *id.* ¶¶10, 17, 23, 27-28, 30, 32, 133, 165-83.[24] In practice, when incarcerated workers raise concerns about wages or working conditions, they face discipline.[25]

Plaintiffs' allegations regarding the difficult conditions under which incarcerated workers labor is further evidence of the benefit to Employer Defendants. Plaintiffs allege that Employers including SL Alabama, Southeastern Meats, Paramount Services, Gemstone Food, and Progressive Finishes, require incarcerated people to labor for longer shifts, for more hours per week than they could obtain from free people without additional compensation, or for less

---

[24] Bama Budweiser makes the peculiar argument that it did not face any "risk" in taking part in the enterprise, Dkt. 139 at 7, as though it is a defense to benefiting from a trafficking enterprise that the enterprise was so successful that there was no financial risk from taking part. That is certainly not the law, and Bama Budweiser cites no authority even to suggest otherwise.

[25] For example, when Ptomey declined to work for KFC due to low wage rates, he was issued discipline for refusing to work, Compl. ¶149: he was not permitted to simply stop working without consequence, as a free worker could have done, a condition that benefits the private employer. And when Walker complained about sexual harassment by a supervisor while doing roadwork for Jefferson County, she was given a disciplinary offense for refusing to work"—a consequence that presumably would not have been meted out to a free employee and certainly chilled efforts or thoughts by any other worker of complaining of violation of bare minimum labor standards. *Id.* ¶147.

compensation than free people doing the same work. Compl. ¶¶17, 21, 134, 139, 147-51, 154; *see generally id.* ¶12 (employers impose conditions they "know or should know would be unlikely to be tolerated by free workers without resistance; and[] exploit[] those incarcerated workers in other ways"); *see also supra* n.25.[26]

Accordingly, Plaintiffs have adequately pled a "beneficiary" claim under the TVPA against each Defendant.

## B.   Defendants' Remaining TVPA Arguments Are Without Merit

### 1.   State Defendants are subject to suit for declaratory and injunctive relief

State Defendants argue that sovereign immunity bars Plaintiffs' coerced labor claims against state officials. Dkt. 148 at 32. In *Ex parte Young*, 209 U.S. 123 (1908), however, the Supreme Court created an "important exception" to the general rule that nonconsenting States are immune from suits brought by private parties in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). *Ex parte Young* applies when a litigant sues state officials in their official capacities, seeks prospective declaratory or injunctive relief, and advances a federal statutory or constitutional claim. *See, e.g.*, *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 774 (11th Cir. 2020). Each of these requirements is plainly met with respect to Plaintiffs' coerced labor claims against state officials—Count I (TVPA) and Count II (RICO)—

---

[26] Automotive Defendants argue that Plaintiffs cannot rely on "passive receipt" of a benefit. Dkt. 157 at 17 (citing *Ratha v. Phatthana Seafood Co.*, No. CV 16-4271, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017), *aff'd*, 35 F.4th 1159 (9th Cir. 2022)). But Plaintiffs have alleged significantly more than a "passive receipt," and the benefit at issue in *Ratha*—a claimed competitive advantage the defendant gained through marketing materials with the trafficker, 35 F.4th at 1165-76—stands in stark contrast to the benefits Employer Defendants receive, including the labor of incarcerated individuals and a workforce that is loath to complain.

and thus sovereign immunity is no bar to allowing these claims to proceed against State Defendants.

To be a "proper defendant under *Ex parte Young*[,]" "a state official need only have 'some connection'" with the challenged act or conduct. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) (citations omitted); *see also Luckey v. Harris*, 860 F.2d 1012, 1015-16 (11th Cir. 1988) ("Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity."). Here, Ivey, as Alabama's chief executive, issued an executive order directing stringent discipline for incarcerated workers who refuse to work or encourage others to do so, and demanded that the Parole Board reduce access to parole and thereby increase the pool of incarcerated workers, including by issuing a moratorium on early parole, Compl. ¶¶47, 77, 91-92, 98, 160; Hamm, as the head of ADOC, is responsible for "leasing" incarcerated individuals to public and private employers and requiring them to work without pay for ADOC, subject to threats of discipline and violence, *id.* ¶¶45, 47-48, 51-59; Marshall played an integral role in pressuring the Parole Board to implement a parole system that is substantially more likely to deny parole to incarcerated workers, *id.* ¶¶77, 91, 98, 161[27]; Cooper, as the chief executive officer of the ADOT, is responsible for that agency's use of incarcerated workers, *id.* ¶165; and the Parole Board Members are responsible for parole decisions that keep people in prison and subject to the coercive labor scheme, *id.* ¶¶162-63. These connections are more than sufficient to render these officials appropriate defendants.

---

[27] State Defendants make the odd argument that Hamm should be dismissed from the coerced labor claims (Counts I and II) "to the extent they are based on [Hamm's] involvement in parole practices." Dkt. 148 at 27. Clearly, Hamm is a proper *Ex parte Young* defendant on these claims based on his connection with the provision of "leased" labor and labor without pay within ADOC.

2. **Plaintiffs may bring claims for injunctive and declaratory relief under the TVPA**

State Defendants concede that claims for prospective declaratory and injunctive relief may lie against state officials in their official capacities. Dtk. 148 at 35 ("State Defendants *are* 'persons' *only* with respect to official-capacity claims seeking declaratory and injunctive relief….") (emphasis in original).[28] They argue, however, that such equitable relief is not available under the TVPA's private right of action, which they contend authorizes only money damages. *See id.* at 31-32. State Defendants' limiting construction of the TVPA is not correct.

By its plain terms, the TVPA authorizes a private right of action, and does not expressly limit the forms of relief a private plaintiff may pursue. The language authorizing a private cause of action provides: "[a]n individual who is a victim of a violation [of the TVPA] may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit …) in an appropriate district court of the United States *and* may recover damages and reasonable attorneys fees." 18 U.S.C. §1595(a) (emphasis added). The statute thus first authorizes private plaintiffs to "bring a civil action" and then *also* authorizes the "recover[y]" of damages and attorneys' fees. *Id.* Defendants' contention that this language limits district courts' abilities to award equitable relief would erroneously read the word "and" out of the statute, effectively rewriting the statute to provide for a civil action only "for" damages and fees.

When Congress grants a court jurisdiction to enforce a statute, unless Congress expressly limits that jurisdiction in the "clearest" language, the court retains power to issue all appropriate equitable remedies. *See Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). *Califano* is controlling.

---

[28] Plaintiffs do not seek damages from the State Defendants in their official capacities, and there is thus no need for the Court to reach State Defendants' arguments regarding whether there has been a waiver of sovereign immunity. *See* Dkt. 148 at 32-33.

There, the government argued that the district court lacked jurisdiction to issue an injunction to stop the government from issuing recoupment orders to individuals who it claimed had been overpaid, without first providing a notice and hearing. *Id.* at 698-99. The government—like State Defendants here—contended that the district court's authority was limited by language in the Social Security Act that authorized the court to enter "a judgment affirming, modifying, or reversing" the agency's decision. *Id.* The Supreme Court disagreed, holding that the statutory language, while identifying some aspects of district courts' authority, did not indicate Congress' intent to limit the equitable power of courts "to issue injunctions in suits over which they have jurisdiction." *Id.* at 698-99; *see also id.* at 705. Here, as in *Califano*, that the TVPA identifies certain remedies the Court is permitted to award should not be read as limiting or infringing on the Court's equitable powers. *See also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one [item] to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").[29]

The sole case cited by State Defendants, *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453 (1974), does not hold otherwise, and certainly does not stand for the proposition—as State Defendants would have it—that any time there is both public and private enforcement of a statute, the remedies available through public enforcement necessarily are not available to private plaintiffs. *See* Dkt. 148 at 35. In *National Railroad*, the Court considered whether a private right of action existed at all under the Amtrak Act. 414 U.S. at 455. Plaintiffs there sought to challenge a decision to discontinue passenger

---

[29] The broadly stated purpose of the TVPA also warrants caution in constraining courts' authority to award equitable relief. *See* H.R. Conf. Rep. 106-939, at 5-6 (2000) (explaining that trafficking is "an evil requiring concerted and vigorous action" and "involv[ing] grave violations of human rights").

trains, but the only statutory provision possibly creating a private cause of action was "explicitly limited to 'a case involving a labor agreement'" and available only to affected employees. *Id.* at 457 (quoting 45 U.S.C. §547(a)). Thus, the language at issue was nothing like the TVPA's express language authorizing individuals to bring civil actions. Nor was *National Railroad* a case about remedies. Thus, State Defendants' reliance on *National Railroad* for the proposition that any "public cause of action" necessarily eliminates remedies created for private enforcement, Dkt. 148 at 35, is misplaced. Certainly, that Congress subsequently amended the TVPA to add provisions expressly confirming the U.S. Attorney General's authority to bring a civil action, including for injunctive relief, *see* 18 U.S.C. §1585A, does not mean that the pre-existing reference in §1595(a) to a "civil action" should be read as limiting district courts' equitable powers.

### 3.      State Defendants are subject to the TVPA

State Defendants' argument that they should not be subject to the TVPA would read an exemption into the language of the TVPA that simply is not there. The TVPA provides a private right of action against "[w]hoever" engages in trafficking and against any "perpetrator" of trafficking. 8 U.S.C. §§1589(a), 1595(a). State Defendants argue that the broad term "whoever" should be interpreted as including an exemption for state officials, Dkt. 148 at 33-34; State Defendants make no argument at all with respect to the term "perpetrator." Neither term can be read as exempting state officials.

The Eleventh Circuit has explained that the TVPA's use of the general terms "[w]hoever" and "person":

> evinces no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims. Instead, the clear and unambiguous language of the statute limits liability only by reference to the actions taken by a would-be violator: it applies to anyone who knowingly "obtains the labor or services of a person" through one

of the four illegal coercive means explicitly listed in the statute. No other limiting principle is evident from the plain text.

*Barrientos*, 951 F.3d at 1276-77.

State Defendants argue for a more limited reading of "whoever," hinging their argument on the federal Dictionary Act's definition of "person," which provides only that "the words 'person' and 'whoever' *include* corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." Dkt. 148 at 34 (citing 1 U.S.C §1) (emphasis added). As a matter of statutory interpretation, "include" generally means including but not limited to. *See Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968) ("The word 'includes' is usually a term of enlargement, and not of limitation. It therefore conveys the conclusion that there are other items includable, though not specifically enumerated by the statutes."). And as the Eleventh Circuit has explained, the very point of including broad language like "whoever" is "to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." *Barrientos*, 951 F.3d at 1277 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012)).

In urging this Court to read an exception into the statutory text that simply is not there, State Defendants rely heavily on *Will v. Michigan Department of State Police*, 491 U.S. 58(1989), a case interpreting 42 U.S.C. §1983's use of the term "person" to exclude states and state officials acting in their official capacities. *See id.* at 71. But the Court in *Will* makes clear that it is analyzing §1983 and its particular language and history. *See id.* at 64 (noting that specific phrasing of §1983, with its reference to states and territories, would be awkward if "person" included states or their officials); *id.* at 68 (discussing the legislative history of §1983). Moreover, the Supreme Court subsequently rejected a reading of *Will* as adopting a "*per se* rule prohibiting the interpretation of general liability language to include the States, absent a clear

statement by Congress…." *Hilton v. S.C. Pub. Railways Comm'n*, 502 U.S. 197, 205 (1991). Rather, *Will* announced "an 'ordinary rule of statutory construction,'" which must be considered in conjunction with other rules of statutory construction. *Id.* at 205 (quoting *Will*, 491 U.S. at 65).[30]

Finally, State Defendants disregard the TVPA language imposing liability not just on "whoever" engages in the prohibited conduct, but also on the "perpetrators" of a violation. 18 U.S.C. §1595(a). State Defendants offer no interpretation of this term that would warrant the creation of an exception for state actors who perpetrate violations of the Act.

### 4. There is no bar against incarcerated individuals bringing TVPA claims

As noted above, the Eleventh Circuit has held that the TVPA "evinces no [congressional] intent … to restrict the application of the statute to … particular victims." *Barrientos*, 951 F.3d at 1276-77. Thus, Masonite's argument that labor by incarcerated individuals is always lawful, Dkt. 151 at 17, is not well taken; nor is the State Defendants' similar argument, *see* Dkt. 148 at 45.

The TVPA prohibits "obtain[ing] the labor or services of *a person*" by the listed means. 18 U.S.C. §1589(a) (emphasis added). "Section 1589 applies to any 'person'—there is no limitation on the type or status of said person." *Owino*, 2018 WL 2193644, at *4. This includes "persons who are held lawfully as detainees by the government"—"although they may be lawfully detained, they cannot be forced to labor in violation of the TVPA." *Barrientos v. CoreCivic, Inc.*, 332 F.Supp.3d 1305, 1310, 1311 (M.D. Ga. 2018); *see also Bridges*, 487

---

[30] State Defendants also cite *United States v. United Mine Workers of America*, 330 U.S. 258 (1947), but fail to explain that that case involved interpretation of the term "employer" and whether it extended to the United States as an employer. *Id.* at 275 (making clear that the Court's consideration of the word "persons" was "relative to the employer-employee relationship").

F.Supp.3d at 1261 (the "use of the prison system to effectuate confinement" may violate TVPA: "the statute makes no distinction between *methods* of restraint"); *Owino*, 2018 WL 2193644, at *6 ("Lawful detention, by itself, is not a shield against illegal conduct against those held in detention.").

Masonite contends that it is "well-settled" that incarcerated persons "can be required to perform labor while in detention." Dkt. 151 at 17 (citing *Barrientos*, 951 F.3d at 1277). But that is not the issue here. Plaintiffs are not alleging that they were merely "required" to perform labor, nor are they advocating a rule that would "make inmate labor a per se violation of the statute." Dkt. 148 at 45. Rather, Plaintiffs have alleged that Defendants unlawfully coerced their labor through physical restraint and serious harms and threats thereof, as well as abuse or threatened abuse of law or legal process. *See supra* Part III.A.1. Even *Barrientos*, on which Masonite relies, explains that, though some labor may be required of persons held in detention, the labor may *not* be obtained through the "illegal coercive means explicitly proscribed by the TVPA." 951 F.3d at 1277.

As the Eleventh Circuit has already recognized, nothing about Plaintiffs' status as incarcerated individuals removes them from the protections of the TVPA. If Plaintiffs have claims that their labor was obtained through unlawful coercive means, as they have alleged, they are entitled to pursue those claims—even if they are incarcerated. Nothing in the TVPA indicates that these federal rights are left at the prison door.[31]

---

[31] State Defendants, in arguing for qualified immunity for Hamm in his personal capacity, proffer an argument that the TVPA cannot be read as prohibiting coerced labor in a prison setting because the Thirteenth Amendment does not prohibit "involuntary servitude … as punishment of a crime." Dkt. 148 at 46. But certainly Congress in legislation can prohibit types of coerced labor beyond those prohibited by the U.S. Constitution: that is exactly what the TVPA does. Moreover, State Defendants' reliance on an unpublished and nonprecedential decision by the Tenth Circuit,

### 5.   State Defendants are not immune from Plaintiffs' TVPA claims in their personal capacities

State Defendants generally acknowledge that Plaintiffs may bring their TVPA claims against state officials in their personal capacities for monetary damages but invoke various forms of immunity from suit. All the State Defendants sued in their personal capacities—Hamm, Ivey, Marshall, Cooper, and Gwathney—claim they are entitled to qualified immunity but cannot show that qualified immunity is applicable to TVPA claims. Gwathney and Marshall also claim quasi-judicial and prosecutorial immunity, respectively, but neither is warranted. In short, accepting the allegations in Plaintiffs' Complaint, as is required at this stage of proceedings, it is clear that none of the invoked immunities justifies dismissal of Plaintiffs' claims.

### a.   State Defendants cannot establish that they are entitled to qualified immunity in their individual capacities

The State Defendants sued in their personal capacities invoke qualified immunity with respect to any damages claims against them. However, there is no basis in the text of the TVPA, or in any case law, to read qualified immunity into the TVPA. The statute itself does not mention qualified immunity, which should be dispositive. *See, e.g.*, *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 537 (5th Cir. 2021) ("Judges are not legislators. Legislators write laws—judges faithfully interpret them. So if a party wishes to have its activities exempted from a statute, it must ask the Legislature to enact such an exemption, not the judiciary."). The TVPA is written broadly to

---

and its dicta (which is actually a quote from a magistrate judge's recommendations), is not persuasive, *see id.* (citing *Fletcher v. Williams*, No. 22-1371, 2023 WL 6307494, at *2 (10th Cir. Sept. 28, 2023)): nothing in the Thirteenth Amendment impairs Congress' authority to enact subsequent legislation that is broadly applicable, including in the prison context. *See also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (court cannot "ignore the legislative will" because of dubious constitutional claims).

address trafficking wherever and by whomever it may occur, making clear that Congress did not intend to offer a safe harbor to those who engage in trafficking.

Nor have State Defendants identified any precedent that would support injecting qualified immunity into the TVPA. In *McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018), a case cited by State Defendants, the Eleventh Circuit determined that plaintiffs had not stated a plausible claim at all against a mayor and two police chiefs and thus did not engage in the remainder of the qualified immunity analysis, nor did it seriously consider whether qualified immunity applied to TVPA claims. *See id.* at 1332-35.

Moreover, the rationales courts have cited in recognizing a defense of qualified immunity under §1983 have no application to the TVPA. Qualified immunity has been read into §1983 based on the assumption that Congress in 1871 would not have abrogated common law immunities afforded in cases of common law torts, and that the constitutional torts enforced through §1983 may be defined by analogy to common law torts. *See Malley v. Briggs*, 475 U.S. 335, 339 (1986); *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1983); *see generally Ziglar v. Abbasi*, 582 U.S. 120, 159-60 (2017) (Thomas, J., concurring in part and concurring in the judgment). This reasoning, however, is not applicable to the TVPA. As relevant here, the TVPA prohibits coercing labor by specific means. 18 U.S.C. §1589(a); *see also id.* §1595. The TVPA makes no reference to common law torts by analogy or otherwise, and thus common law immunities, including qualified immunity, simply have no relevance to the statute.

Some courts have relied on policy justifications to recognize qualified immunity. For example, courts have justified reading qualified immunity into §1983 as providing "fair notice" to government officials, which is intended to provide a level of "protection[] from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal

statutes." *United States v. Lanier*, 520 U.S. 259, 270-71 (1997); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But the TVPA is not vague, *see, e.g.*, *Calimlim*, 538 F.3d at 710, and in any event, State Defendants cannot rely on such policy concerns in the absence of any statutory language indicating an intent to import qualified immunity principles.

Courts also justify qualified immunity as protecting government officials who have to make split second decisions, particularly regarding the use of force. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). That rationale has no application to deliberate schemes to coerce like those at issue in this case. *See, e.g.*, *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., statement respecting denial of certiorari); *Ashcroft*, 563 U.S. at 743; *Villareal v. City of Laredo*, 94 F.4th 374, 406-07 (5th Cir. 2024) (Willett, J., dissenting).

Even if State Defendants sued under the TVPA in their personal capacities could properly invoke qualified immunity—which they cannot—such a defense should be rejected, at a minimum as to Hamm, Ivey, and Cooper. Assuming *arguendo* that the conduct complained of for each of these State Defendants is discretionary, Plaintiffs have adequately alleged that each of them violated the TVPA, *see supra* Part III.A. Thus, the question (if qualified immunity applies) is whether an objectively reasonable government official would understand that their conduct obviously violated federal law. *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017). Hamm runs a work program that requires incarcerated workers pursuant to threats of physical and emotional harm, in direct conflict with the provisions of the TVPA, *e.g.*, Compl. ¶¶43, 47, 50, 59; Ivey has insisted on harsh punishments for incarcerated individuals who refuse to work or advocate for others who refuse to work, also in contradiction of the statue, and has employed incarcerated workers in her mansion while aware of those punishments, *e.g.*, *id.* ¶¶43-44, 46, 160; and Cooper has overseen the virtually free employment of incarcerated individuals at

ADOT pursuant to "lease" agreements, in dangerous conditions, and knew or should have known that refusal to work for ADOT would subject the workers to harsh punishment, *e.g.*, *id.* ¶¶24, 28-30, 165. All of these State Defendants were on fair notice, at least based on a consensus of authority, that threats to extend confinement, or to subject persons to serious harm and threat of serious harm, violated the TVPA. *See supra* Part III.A. The TVPA by its own terms is also specific enough to establish clearly the law applicable to the conduct and circumstances of this case, even absent case law. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).

> **b.    State Defendants cannot establish that Marshall is entitled to prosecutorial immunity from Plaintiffs' individual-capacity claims under the TVPA**

Marshall is not entitled to prosecutorial immunity for pressuring the Parole Board to impose more stringent parole procedures and to abandon objective standards-based decision-making, despite knowing that this would result in overcrowded and dangerous conditions in ADOC facilities and would prolong the terms of incarceration of individuals who are trapped in the coerced labor scheme. Compl. ¶¶91-93, 98-99, 126-32. In assessing Marshall's prosecutorial immunity, the question is "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). Where, as here, a prosecutor "acts outside the ambit of activities 'intimately associated' with the judicial process," including by carrying out administrative tasks or making statements to the press, there is no immunity. *Hart v. Hodges*, 587 F.3d 1288, 1296 (11th Cir. 2009). Marshall's actions, including the informal pressure on Board members in closed door meetings and his statements to the press regarding his view that there was no one left to parole, show that Marshall went outside of his prosecutorial role or anything "intimately associated with the judicial process." *Id.*; *cf. Buckley*, 509 U.S. at 274 (absolute prosecutorial immunity is limited to prosecutor's actions as an "advocate" and "[a]

prosecutor neither is, nor should consider himself to be, an advocate before he has probable

cause to have anyone arrested").

> **c.**     **State Defendants cannot establish that Gwathney is entitled to quasi-judicial immunity from Plaintiffs' individual-capacity claims under the TVPA**

Nor is Defendant Gwathney entitled to quasi-judicial immunity for any of her actions

other than those related to decision-making in individual parole cases. *See, e.g.*, *Wilson v.

Rackmill*, 878 F.2d 772, 775 (3d Cir. 1989); *Lemley v. Bowers*, 813 F.Supp. 814, 818-20 (N.D.

Ga. 1992); *cf. Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005); *Fleming v. Dowdell*, 434

F.Supp.2d 1138, 1154 (M.D. Ala. 2005). Plaintiffs allege Gwathney has imposed stringent

criteria for parole decisions and set-off dates in the service of increasing the number of people

who could be exploited as part of the trafficking enterprise. Compl. ¶¶98, 102-03, 105, 111-12,

126-32. Quasi-judicial immunity does not apply to these actions, which Plaintiffs allege violate

the TVPA.

> **6.**     **The TVPA is constitutional**

The TVPA is constitutional, on its face and as Plaintiffs seek to apply it here. Bama

Budweiser concedes that it cannot prevail on its facial challenge before this Court. Dkt. 139 at

10. In any case, its argument is patently meritless. Congress may translate its determination of

what constitute the badges and incidents of slavery into effective legislation to abolish those

badges and incidents, including as applicable to people convicted of crimes. *See Griffin*, 403

U.S. at 105. The Tenth Amendment is not to the contrary. Bama Budweiser's position that

Congress cannot place limitations on how people convicted of state crimes may be forced to

work, Dkt. 139 at 10, is simply a misstatement of Congress's authority under the Constitution.

Indeed, Bama Budweiser appears to acknowledge that its position would flout "precedents of the

'past 60 years.'" *Id.* at 10 (citation omitted). Under any interpretation of the Constitution, contracts for labor are commerce, and Bama Budweiser does not cite any authority to the contrary.

Progressive Finishes, Koch Foods, and RCF each make brief and unsupported arguments that the TVPA cannot be applied to them. Dkt. 153-1 at 16; *see also* Dkt. 174 at 23-24; Dkt. 175 at 18. They rely on *United States v. Lopez*, 514 U.S. 549 (1995), for the proposition that states have "primary authority for defining and enforcing the criminal law," suggesting that this restricts Congress from passing any legislation relating to the treatment of state prisoners. *See id.* at 561 n.3; Dkt. 174 at 23. But nothing in *Lopez* supports these Defendants' proposed expansive prohibition on Congress' legislative powers. Congress can, of course, pass legislation related to state prisoners and has done so. *See, e.g.*, 42 U.S.C. §1997a (Civil Rights of Institutionalized Persons Act); 34 U.S.C. §12601 (Violent Crime Control and Law Enforcement Act of 1994).

Koch Foods also argues that applying the TVPA to it in this case would "essentially re-write the language of the Thirteenth Amendment." Dkt. 174 at 24. The entire premise of this argument, however, is based on a flawed understanding of the TVPA as narrowly replicating the Thirteenth Amendment. The express purpose of the TVPA's forced-labor prohibition was "to expand the forms of coercion that could result in forced labor" beyond the Thirteenth Amendment and to provide a remedy to those who experienced it. *Callahan*, 801 F.3d at 618.

The application of the TVPA to prohibit Progressive Finishes, Koch Foods, and RCF from participating in and benefiting from the coerced labor scheme alleged in the Complaint simply presents no constitutional issue.

C.     **Plaintiffs Have Sufficiently Alleged Standing to Bring Their TVPA Claims Against the Employer Defendants**

The Coerced Labor Individual Plaintiffs and the Organizational Plaintiffs have standing to pursue their TVPA claims against the Employer Defendants.[32] At this stage of litigation, Plaintiffs need only allege that they have suffered an "injury in fact" that is "fairly … trace[able] to the challenged action of the defendant" and which is likely to be redressed in some part by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019) (citing *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310-11 (11th Cir. 2001) for proposition that "even partial relief suffices for redressability"); *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995) (holding redressability prong satisfied where order against named defendants "would offer some relief"). Plaintiffs satisfy the injury in fact, causation, and redressability inquiries necessary to allege standing.

*Coerced Labor Individual Plaintiffs.* The Coerced Labor Individual Plaintiffs allege they were forced to labor under coercive conditions in violation of the TVPA. *See supra* Part III.A; *see also* Compl. ¶¶147-54 (alleging as to each Coerced Labor Individual Plaintiff the conditions under which they labored and alleging that Defendants' forced labor scheme caused them

_____

[32] State Defendants directly challenge Plaintiffs' standing only with respect to Defendants Ivey, Marshall, and Hamm, and only with respect to the parole-related claims. *See* Dkt. 148 at 52. In any event, Coerced Labor Individual Plaintiffs clearly have standing to challenge these state officials' actions in maintaining and implementing the forced labor scheme alleged in the Complaint. Moreover, Ivey's mansion has employed coerced labor of incarcerated Alabamians, and she and Marshall have directed the Parole Board to act in ways that maintain a large, incarcerated workforce, *see* Compl. ¶¶160-61; Hamm oversees the coerced labor scheme, *id.* ¶164; Cooper, as Transportation Director, is a large employer of coerced labor through ADOC, *id.* ¶165; and the Parole Board members' actions have kept incarcerated individuals in prison, even when—through the coerced labor scheme alleged in the Complaint—they have worked safely in the community, *id.* ¶¶162-63.

substantial harm, including physical, emotional, and financial harm). The harm suffered by Coerced Labor Individual Plaintiffs satisfies the injury prong of the standing inquiry.

Further, the Complaint includes allegations that Plaintiffs' injuries are fairly traceable to the Employer Defendants' actions. The Complaint alleges that each Employer Defendant's participation in the coerced labor scheme supports the maintenance of that scheme. Compl. ¶¶160, 164-83, 210. In other words, each of the Employer Defendants allegedly "leased" or employed persons incarcerated by ADOC and thereby participated in programs designed and intended to perpetuate the coercion of incarcerated persons' labor. *See id.* Specifically, Defendants Cooper (as the chief executive officer of ADOT), Ivey (as the employer of the incarcerated workers who labor in her mansion), City of Montgomery, City of Troy, and Jefferson County all participate in and support the "leasing" of incarcerated individuals who provide labor to them and others through "work centers." *See id.* ¶¶165-68. These public employers each agree to and maintain contractual arrangements with ADOC whereby incarcerated workers are generally only paid a maximum of $2 per day (regardless of how many hours they work), with ADOC reaping a significant "leasing" fee by trafficking labor. *See id.* ¶¶24-27. Private Employer Defendants have all agreed to participate in a coercive scheme in which they pay ADOC directly for the work of incarcerated persons, knowing that those workers are subject to punishment and threats of violence if they do not work, *see supra* Part III.A, and also knowing that ADOC will pay the workers only a small portion of their wages—withholding the remainder for its own benefit. Compl. ¶¶15-16, 19, 169-83. Because the Coerced Labor Individual Plaintiffs allege that they have been and are harmed by the ongoing operation of this scheme to obtain their labor through coercion, and that each Employer Defendant's participation in the scheme contributes to the profitability and maintenance of this scheme, they have standing

to bring their TVPA claims against all Employer Defendants. Indeed, because Employer

Defendants' participation in and support of this scheme harms and has harmed each of the

Coerced Labor Individual Plaintiffs—and those who remain incarcerated may still be forced to

labor for any public or private employer that ADOC designates—the Coerced Labor Individual

Plaintiffs have standing to assert their TVPA claims against *all* the participating Employer

Defendants, not only against those for whom they work or worked.[33]

Defendants Bama Budweiser, Koch Foods, LLC, SL Alabama, LLC, Ju-Young

Manufacturing America, Inc., and Hwaseung Automotive USA LLC acknowledge, as they must,

that the Complaint alleges they employed incarcerated persons (i.e., absent putative class

members) under coercive conditions. Dkt. 139 at 8; Dkt. 157 at 3-4; Dkt. 174 at 3. However,

these Defendants assert that none of the named class representative individual Plaintiffs

specifically worked directly for them, only for other employers that participated in the

challenged conspiratorial scheme. *Id.* These Defendants misunderstand the nature of Plaintiffs'

claims and the standing analysis that applies. There is no dispute the Complaint alleges that each

of the nine Coerced Labor Individual Plaintiffs was forced to labor for specific named Employer

Defendants, including the movants, as reflected in the table below.

| Plaintiff | Movant Employer Defendant(s) | |
|---|---|---|
| Lee Edward Moore Jr. | ADOC (Defendant Hamm) | Compl. ¶146 |
| Lakeira Walker | ADOC, Jefferson County, Southeastern Meats, Inc. | Compl. ¶147 |

---

[33] Defendant City of Troy argues that Plaintiffs complain of actions "emanating solely from state policies," and that the intervening, independent acts of the State break the chain of causation. Dkt. 142 at 7. This argument, however, belies the fact that it is the City of Troy that has chosen to contract for coerced labor with ADOC, and it is the City of Troy that benefits from the labor of incarcerated individuals. Compl. ¶¶167, 210; *see also id.* ¶¶218-19.

| Jerame Aprentice Cole | RCF, LLC (aka Gemstone Foods), Masonite Corp. | Compl. ¶148 |
| Arthur Charles Ptomey Jr. | ADOC, ADOT, City of Montgomery, Progressive Finishes, Inc. | Compl. ¶149 |
| Frederick Denard McDole | ADOC, Progressive Finishes, Inc. | Compl. ¶150 |
| Michael Campbell | ADOT, Progressive Finishes, Inc. | Compl. ¶151 |
| Lanair Pritchett | City of Troy, ADOT (Defendant Cooper) | Compl. ¶152 |
| Alimireo English | ADOC | Compl. ¶153 |
| Toni Cartwright | Southeastern Meats, Inc., Paramount Services, Inc., Wendy's[34] | Compl. ¶154 |

The Complaint also alleges that each of those named Employer Defendants participated in a venture with the other named Defendants to maintain and operate a large-scale coordinated program of coercing labor, and that Defendants' maintenance and operation of the coercive work program as a whole caused each Coerced Labor Individual Plaintiff substantial harm. The program persists and is profitable only because of companies' willingness to participate in it. *See* Compl. ¶¶17-23, 49, 169-72, 183 (describing Defendants' continued participation in work-release program, despite their ability to withdraw).[35] Thus, there can be no question that Plaintiffs have alleged injuries fairly traceable to the Employer Defendants' actions.

---

[34] Cartwright alleges that, at the time of the filing, she was working at "a Wendy's located in Montgomery." Compl. ¶154. While that is fairly understood as a reference to SRG, which operates Wendy's in Montgomery, *id.* ¶176, if a more specific allegation is needed, Plaintiffs should be permitted to amend.

[35] As discussed *infra* pp. 62-65, Organizational Plaintiffs also have standing to bring claims against these Defendants. In particular, RWDSU represents workers at Koch Foods, LLC and has alleged that the company's employment of incarcerated workers harms RWDSU and its members. Compl. ¶155.

Plaintiffs also satisfy the redressability requirement of the standing analysis. Coerced Labor Individual Plaintiffs request injunctive and declaratory relief that would remedy their harms: specifically, a declaration and injunction providing that all Coerced Labor Individual Plaintiffs should not be compelled to work and that Employer Defendants should not be permitted to benefit from Coerced Labor Individual Plaintiffs' coerced labor. Compl. at 124 (Prayer for Relief, (1) and (2)). As alleged in the Complaint, the forced labor scheme requires incarcerated individuals to labor for public and private employers, and the Employer Defendants' participation in the scheme sustains and perpetuates the coercion of labor, making it exceedingly profitable. *See* Compl. ¶¶11-76. The declaratory and injunctive relief sought by Coerced Labor Individual Plaintiffs would provide "some relief" for these Plaintiffs' injuries by precluding Employer Defendants from continuing to support and perpetuate this coercive scheme.[36]

Moreover, because Plaintiffs allege that all of the Employer Defendants are currently employing or have recently employed incarcerated labor, the requested declaratory relief will address an actual dispute. *See Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1982) (noting that, to have standing for declaratory relief, "plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred"); *see also Lynch v. Baxley*, 744 F.2d 1452, 1455-57 (11th Cir. 1984) (concluding threat of repeated unconstitutional detention of named plaintiff or similarly situated persons in the future constituted actual case or controversy, even though named plaintiff was not detained at the time of filing amended complaint (citing *Sosna v. Iowa*, 419 U.S. 393, 400 (1957); *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975))).

---

[36] The Automotive Defendants also argue that redressability is lacking because their withdrawal from the forced-labor scheme would not have an appreciable impact. *See* Dkt. 157 at 4-6. This factual argument is addressed in the discussion of Plaintiffs' 42 U.S.C. §1986 claim below, *infra* Part X.

Some of the Employer Defendants argue that declaratory and injunctive relief cannot be sought against them because, while they may have previously employed one of the Coerced Labor Individual Plaintiffs, they do not currently do so. *See, e.g.*, Dkt. 142 at 6 (arguing that no individual plaintiff is currently assigned to work for City of Troy); Dkt. 151 at 7 (arguing that no named Plaintiff was working for Masonite at time of filing); Dkt. 152 at 6 (City of Montgomery: same). But regardless of whether they are presently employing any of the specific Coerced Labor Individual Plaintiffs, Plaintiffs allege that each of the Employer Defendants is still presently participating in the ongoing program of forced labor with ADOC. Compl. ¶¶133-35, 160, 165-83. As long as each Employer Defendant is still participating in the forced labor scheme with ADOC, it continues to receive labor from other incarcerated putative class members and continues to support and benefit from the coerced labor scheme, and there also continues to be a reasonable possibility that one of the Coerced Labor Individual Plaintiffs who is still incarcerated will be reassigned to that Employer Defendant. *See Lynch*, 744 F.2d at 1457. ADOC regularly assigns incarcerated individuals to a variety of employers and changes those assignments: by way of example, Ptomey has worked for at least seven private and public employers as well as for ADOC, Compl. ¶149; and Cartwright has worked for at least six separate private employers just since 2020 (Southeastern Meats, Paramount, a McDonald's restaurant, Bud's Best Cookies, Hager's, and a Wendy's restaurant), *id.* ¶154. Thus, to the extent Employer Defendants' argument is that they can be sued by individuals only at the precise moment those individuals are being forced to work for a given defendant, Plaintiffs' claims would fall within the well-established exception of conduct that is too short in duration "to be fully litigated prior to its cessation or expiration," and which is likely to recur. *Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1023 (11th Cir. 1988) (noting "capable of repetition, yet evading review" exception

applicable in the absence of a class action). Moreover, although individual incarcerated persons have no control over where they are assigned to work, there is at least a realistic possibility they will be assigned to work for the Employer Defendants in the future. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1162 (11th Cir. 2008) (no *per se* rule against standing based on probabilistic injuries); *Lynch*, 744 F.2d at 1457 (mentally ill plaintiff who was not in state custody had standing to challenge an Alabama state practice that would likely affect him *if* a petition for his involuntary commitment was filed and was likely to affect others similarly situated); *see also Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 705-06 (11th Cir. 2014) (discussing *Gerstein*, 420 U.S. 103, involving challenge to procedure allowing for 30-day detention of individuals, and court's holding that class action may not be moot when individual claims become moot before certification).[37]

Coerced Labor Individual Plaintiffs' harms are also redressable by their requested relief of compensatory and consequential damages under 18 U.S.C. §1595—relief intended to redress the financial, physical, and emotional harms they have suffered as a result of being coerced to labor as part of the forced labor scheme. *See* Compl. at 124 (Prayer for Relief, (3)); Compl. ¶¶146-54 (describing each Coerced Labor Individual Plaintiff's work and the financial, physical, and emotional harm resulting from being forced to labor with little or no pay under difficult and coercive conditions).

---

[37] Even if some Employer Defendants argue on reply that they have stopped participating in the coerced labor scheme, such voluntary cessation of unlawful conduct is not sufficient to defeat standing. *See United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ("[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant … free to return to his old ways" (internal quotation marks omitted)).

Finally, Plaintiffs' claims against all the Employer Defendants are viable under the "juridical link" doctrine articulated in *La Mar v. H & B Hovelty & Loan Co.*, 489 F.2d 461, 462 (9th Cir. 1973), and adopted by the Eleventh Circuit in *Moore v. Comfed Sav. Bank*, 908 F.2d 834, 839 (11th Cir. 1990). In *Moore*, the Eleventh Circuit held that named plaintiffs in a class action could bring a claim against multiple defendants—*including* defendants against which the named plaintiffs did not have a direct claim—where there was a "juridical link," or some contractual or legal obligation requiring common action by the defendants. 908 F.2d at 838-39. Here, Plaintiffs allege that each of the Employer Defendants has a contract with ADOC pursuant to which they are obligated to enforce the prohibitions on withholding work and advocating for withholding of work, and pursuant to which incarcerated workers are required to work for exceedingly little, if any, compensation. This link makes it appropriate for employers participating in the coerced labor scheme to be named and subject to suit by Plaintiffs, both on behalf of themselves and the proposed class.

**Organizational Plaintiffs.** It is well settled that organizations may allege standing that is based on their own diversion of limited organizational resources to address defendants' wrongful conduct. Here, the allegations in the Complaint are sufficient to support each organizational plaintiff's standing to assert claims under the TVPA.

"An organization can establish standing … through its own injury in fact that satisfies the traceability and redressability elements. … [A]n organization can establish its own injury in fact under a diversion of resources theory." *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1110, 1114 (11th Cir. 2022). The diversion or "redirection" of resources to "counteract" a defendant's challenged conduct "is a concrete and demonstrable injury, not an abstract social interest." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335,

1341 (11th Cir. 2014) (internal quotation marks omitted); *see also Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1165-66 (finding standing where organizations "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters").[38]

Bama Budweiser, Progressive Finishes Inc., and Automotive Defendants erroneously argue that Organizational Plaintiffs have not alleged how Defendant Employers' participation in the alleged coercion of labor has caused the organizations to divert resources. Dkt. 139 at 26; Dkt. 153-1 at 50; Dkt. 157 at 12. Plaintiffs, in fact, have alleged plainly how the organizations have diverted resources to address the Employer Defendants' unlawful conduct.

RWDSU, which represents workers laboring in poultry plants throughout Alabama, alleges that Defendants' actions have caused it harm by, *inter alia*, perpetuating "unsafe working conditions[] and low wages…, including in facilities operated by employers where RWDSU represents poultry processing workers." Compl. ¶155. The Complaint describes how RWDSU has needed to devote resources to address employers' employment of incarcerated workers, committing substantial resources to attempt to organize and represent some of the workers. *Id.* The use of incarcerated workers makes it difficult for RWDSU to engage in these activities because incarcerated workers often fear discipline; furthermore, it can be difficult to communicate with incarcerated workers. *Id.*[39] USSW similarly alleges that it has "devoted significant time and resources to supporting workers at fast-food restaurants in speaking out

---

[38] The assertion that Organizational Plaintiffs cannot adequately allege standing solely because they do not represent workers at those organizations, *see, e.g.*, Dkt. 147 at 13-14, is simply wrong: Organizational Plaintiffs can show standing either through associational standing or by alleging a diversion of resources. *Georgia Ass'n of Latino Elected Offs.*, 36 F.4th at 1114.

[39] As described *infra*, RWDSU also has associational standing. However, to the extent the Court finds that the allegations regarding RWDSU and/or USSW do not sufficiently detail what its resources would have been spent on, but for the need to address Defendants' unlawful conduct, that is a matter that could be addressed through amendment.

about intolerable working conditions … and about the need for a living wage," but that its ability to improve the working conditions of fast-food workers is undermined by the employment of incarcerated workers because those workers fear discipline if they advocate for better wages. Compl. ¶156; *see also id.* (alleging employers' "use of incarcerated labor depresses wages and working conditions in the fast-food sector").[40] Both RWDSU and USSW allege that the Employer Defendants' unlawful conduct and coercion of labor from incarcerated individuals "directly conflict[s]" with the organizations' missions and has caused the organizations to have to direct limited resources to addressing that conduct and its impact on the organizations—a commitment of resources that would not have been required but for the alleged unlawful conduct. *Id.* ¶¶155-56.[41] Because Defendants' conduct as alleged in the Complaint has "perceptibly impaired" both RWDSU's and USSW's organizational missions, "there can be no question" that the organizations "ha[ve] suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

An organization may also establish associational standing through its members. *Georgia Ass'n of Latino Elected Offs.*, 36 F.4th at 1114 ("An organization can establish standing…through its members (i.e., associational standing)"). In addition to the standing it has alleged on its own behalf, RWDSU has alleged sufficient facts to support associational standing. RWDSU's members work at facilities operated by Defendants RCF and Koch Foods, as well as

---

[40] Bama Budweiser misleadingly and erroneously characterizes Organizational Plaintiffs' allegations, which include depression of wages and working conditions and interference with the ability to organize, as invoking only "abstract social interests." Dkt. 139 at 26.

[41] Masonite also asserts that Organizational Plaintiffs have not alleged they "spent money or will spend money" to counteract its allegedly unlawful conduct. Dkt. 151 at 15. But nothing requires that the diverted resources be monetary. *See Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1165-66 (standing where organizations would need to divert personnel and time).

at two other poultry processors in Alabama that employ persons incarcerated by ADOC. Compl. ¶155. As alleged in the Complaint, "[n]ot being able to represent all workers in the union's bargaining unit at Koch Foods harms RWDSU's interests *and* the interest of its members." *Id.* (emphasis added). This is true in part because the employers' "use of incarcerated labor depresses wages and working conditions for all workers in the sector," including RWDSU's members. *Id.*[42]

## IV.     Plaintiffs Have Adequately Alleged RICO Violations by All Defendants

In addition to systematic violations of the TVPA, Coerced Labor Plaintiffs have alleged facts plausibly supporting the inference that all Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by forming and maintaining a labor-trafficking enterprise for the purpose of benefiting from the unlawful forced labor of Coerced Labor Individual Plaintiffs and other incarcerated workers. To make out a RICO claim, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) (citation

---

[42] Bama Budweiser also makes an argument that organizational plaintiffs may not plead TVPA claims because they fall outside the "zone of interests" of the statute. Dkt. 139 at 29; *see also* Dkt. 174 at 19; Dkt. 175 at 18. But the TVPA is concerned with preventing the coercion of labor and protecting victims of labor trafficking and Organizational Plaintiffs' interests in protecting workers from exploitation fall within the zone of interests protected by the TVPA. *See Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*, 775 F.3d 1255, 1260-61 (11th Cir. 2014) ("The zone of interests test is not meant to be especially demanding." (internal quotation marks omitted)). While Bama Budweiser cites a district court decision from New York, *New York State Nurses Ass'n v. Albany Med. Ctr.*, 473 F.Supp.3d 63, 71-71 (N.D.N.Y. 2020), that finds an organization could not assert a TVPA claim, that decision has not been followed by any other court and it fails to engage with the zone-of-interests standard.

omitted). The facts Coerced Labor Plaintiffs allege adequately address each of these elements, and Defendants' motions to dismiss must therefore be denied.

A.     **Plaintiffs Have Adequately Alleged a Pattern of Racketeering Activity in the Form of Widespread, Routine TVPA Violations by Defendants**

Plaintiffs have alleged not only that Defendants routinely violate the TVPA, a RICO predicate act, *see supra* Part III.A; 18 U.S.C. §1961(1),[43] but also that Defendants have engaged in a *pattern* of such violations sufficient to support a RICO claim. "To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis omitted); *see also* 18 U.S.C. § 1961(5).[44] As detailed in the preceding section, Coerced Labor Plaintiffs have alleged a statewide labor-trafficking system in which ADOC "leases" out incarcerated workers to

---

[43] Progressive Finishes makes a puzzling argument that Plaintiffs allege only a violation of 18 U.S.C. §1595, the statute providing a private civil cause of action for TVPA violations, which is not a RICO predicate act. Dkt. 153-1 at 21-22. Progressive Finishes misreads the Complaint, which plainly alleges that it violated 18 U.S.C. §1589(b)—which is a RICO predicate act—by knowingly benefiting from participation in the labor-trafficking scheme. Compl. ¶210.
[44] SRG incorrectly suggests that a heightened pleading standard applies here but, as its brief implicitly acknowledges, the heightened pleading standard of Rule 9(b) applies only when the predicate acts involve fraud. Dkt. 147 at 20-22; *see, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216 (11th Cir. 2020) ("Like any allegation *of fraud*, Cisneros's alleged predicate acts must satisfy the heightened pleading standards embodied in Federal Rule of Civil Procedure 9(b), which requires the plaintiff to "state with particularity *the circumstances constituting fraud*." (citation omitted; emphasis added); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) ("Mr. Dowbenko appears to hinge his RICO claim on a pattern of fraudulent activity …"); *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1311, 1316-17 & n.12 (11th Cir. 2007) (RICO claim premised on fraudulent inducement). Plainly, the predicate violations alleged here are TVPA violations, not fraud claims, and there is no requirement to plead fraud as a component of the TVPA provisions on which Plaintiffs rely. *See supra* Part III.A. The Automotive Defendants' similar argument should be rejected for the same reason. Dkt. 157 at 25-26.

engage in forced labor for its public and private partners, including Employer Defendants, who knowingly accept this forced labor, as well as coercing labor from incarcerated people in its own facilities. *See supra* Part III.A. ADOC, with the assistance and knowledge of the Employer Defendants, subjects incarcerated workers to draconian disciplinary sanctions for refusing to work, or to work as directed, as well as threats to transfer incarcerated workers to facilities where their physical safety is at grave risk, and violent reprisals for advocating against forced labor. Compl. ¶¶43-76, 133-43. As discussed above, by extracting and knowingly benefiting from incarcerated workers' labor under these conditions, Defendants routinely violate the TVPA. *See supra* Part III.A. Coerced Labor Plaintiffs have alleged that Defendants have extracted thousands of days of forced labor from incarcerated workers, *see* Compl. ¶¶17, 27-28, 31, 42, including years of work from individual Coerced Labor Plaintiffs, *see id.* ¶¶146-54.

While Defendants advance meritless objections to Plaintiffs' theory of TVPA liability, *see supra* Part III.A-B, they do not meaningfully dispute that, if Plaintiffs have adequately alleged that each day of labor Coerced Labor Individual Plaintiffs provided occurred under coercive conditions that violate the TVPA, Coerced Labor Plaintiffs have also adequately alleged that these violations were related and continuing. The predicate TVPA violations are not "isolated events" but rather "have the same or similar purposes, results, participants," and "methods of commission." *United States v. Browne*, 505 F.3d 1229, 1258 (11th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)). As Plaintiffs allege, the basic framework of Defendants' labor-trafficking scheme is common across the Employer Defendants. *See* Compl. ¶¶11-17, 19-26, 30. All the outside Employer Defendants contract with ADOC to obtain incarcerated labor using contracts with similar terms that ensure workers will remain under constant threat of the extreme disciplinary consequences authorized by ADOC regulation and

any other measures ADOC deems appropriate to impose in response to negative reports from an employer, which thereby guarantees the Employer Defendants a workforce uniquely unable to refuse dangerous or extremely grueling assignments, or to register complaints. *See* Compl. ¶¶47-49, 134, 139. ADOC, meanwhile, is promised a substantial portion of the incarcerated workers' earnings, with respect to the private Employer Defendants, or a fixed daily labor-trafficking fee, with respect to the public Employer Defendants. *Id.* ¶¶15-16, 28, 31.

Coerced Labor Plaintiffs have further alleged the necessary continuity of the criminal conduct at issue to give rise to RICO liability. A plaintiff can adequately allege continuity "either by alleging 'a series of related predicates extending over a substantial period of time' or 'the threat of continuity,'" the latter of which requires "'either that the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future.'" *Cisneros*, 972 F.3d at 1216 (quoting *Jackson*, 372 F.3d at 1216). Coerced Labor Plaintiffs have clearly alleged both here. All of the Employer Defendants have years-long relationships with ADOC through which the Employer Defendants obtain coerced incarcerated labor. *See* Compl. ¶¶135, 165-83. Coerced Labor Plaintiffs have also alleged facts showing that using incarcerated labor is a regular part of the Employer Defendants' way of doing business, including by pleading the substantial number of incarcerated workers Employer Defendants have utilized since 2018, and the range of jobs that individual Coerced Labor Plaintiffs have performed for Employer Defendants. *See id.* ¶¶165-83; *e.g.*, *id.* ¶147 (road work for Jefferson County); *id.* ¶148 (building doors for Masonite); *id.* ¶149 (motor pool for Montgomery); *id.* ¶150 (line person for Progressive Finishes); *id.* ¶151 ("lead man" at Progressive Finishes). Coerced Labor Plaintiffs have additionally outlined the powerful incentive structure that is the engine of the labor-trafficking operation, a dynamic that makes it quite plausible that Defendants' joint

enterprise will continue to coerce labor and benefit from forced labor from individual Coerced Labor Plaintiffs and other incarcerated people in the future absent intervention by the Court. *See id.* ¶¶9-42, 133-43. Coerced Labor Plaintiffs have thus satisfied the requirements to plausibly allege a pattern of racketeering activity.

### B. Plaintiffs Have Adequately Alleged That Defendants Participated in the Conduct of a RICO Enterprise

By detailing the coordinated, interdependent, and ongoing nature of the relationships between ADOC, the public and private Employer Defendants, and the State's parole apparatus, as influenced by the Governor and Attorney General, in enacting the forced-labor scheme at the heart of the Complaint, *see* Compl. ¶¶9-17, 24-28, 30-32, 77, 133, 135, 165-83, Plaintiffs have adequately alleged that each Defendant has participated in the conduct of a RICO enterprise. An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). No formal enterprise is necessary; an informal, associated-in-fact enterprise like the one Coerced Labor Plaintiffs allege here suffices. *See Omnipol*, 32 F.4th at 1309. An associated-in-fact enterprise "is defined as 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "To plead an associated-in-fact enterprise, a plaintiff must allege that a group of persons shares three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (quoting *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017))

(internal quotation marks omitted).[45] The facts Coerced Labor Plaintiffs allege amply satisfy the standard to plead an associated-in-fact enterprise.

**Purpose.** First, contrary to several Defendants' assertions, *see* Dkt. 139 at 13-14; Dkt. 147 at 22-23; Dkt. 151 at 18-19; Dkt. 155 at 8-9; Dkt. 157 at 27-28; Dkt. 174 at 26-27; Dkt. 175 at 20-21, Plaintiffs have sufficiently alleged a common purpose. "[W]here the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves *through a particular criminal course of conduct*." *Cisneros*, 972 F.3d at 1211 (emphasis added) (citing cases).[46] Here, the Complaint plainly states that the participants in the enterprise—ADOC, the Employer Defendants, and the Defendants involved in constricting access to parole (Ivey, Marshall, and the Parole Board Members)—share a common purpose of obtaining a financial benefit *through extracting unlawful forced labor from incarcerated people*, including Coerced Labor Individual Plaintiffs. *See* Compl. ¶¶1, 3-4, 9-10, 77, 133-34, 137-43.

Defendants' own arguments underline why extracting unlawful forced labor is central, not ancillary, to the labor-trafficking enterprise's common purpose. Automotive Defendants assert, for example, that the "obvious alternative" to Plaintiffs' common purpose is that these Defendants "were trying to participate in a State proffered program to secure labor to staff its facilities to make profit." Dkt. 157 at 28; *see also* Dkt. 151 at 18-19. Yet this case is not like

---

[45] Defendants rightly do not dispute that the enterprise Plaintiffs allege is engaged in and affects interstate commerce. *See United States v. Flores*, 572 F.3d 1254, 1267 (11th Cir. 2009) ("[I]n the context of a RICO conspiracy, 'only a slight effect on interstate commerce is required.'" (citation omitted)).

[46] Contrary to Automotive Defendants' assertion, Dkt. 157 at 27, that shared purpose need not necessarily be "fraudulent," where, as here, the underlying predicate acts do not hinge upon fraud. *See Cisneros*, 972 F.3d at 1212 (providing examples RICO common purposes not premised on fraud).

*Cisneros*, which many Defendants cite, where the plaintiff simply alleged "an anodyne franchise business model." 97 F.3d at 1212. Here, Plaintiffs have alleged "concrete facts giving rise to the inference that the 'unique system' [Defendants] used"—indeed, the reason contracting for incarcerated workers is so likely to result in a profit for Employer Defendants—is accessing a pool of laborers who can be forced to work, often for less than the wages and benefits paid to free-world workers, and substantially limited in their ability to resist workplace abuses, complain about dangerous or extremely grueling job assignments, or otherwise advocate for themselves. *Id.*; *see* Compl. ¶¶134-43. While access to such workers at $2 per day—or no pay at all—is a clear benefit of the arrangement for the public Employer Defendants, some private Employer Defendants assert that they pay the prevailing wage to incarcerated workers. *See, e.g.*, Dkt. 157 at 28-29. If that is so, it is logical to infer that these private Employer Defendants—like all Employer Defendants—know they are getting some benefit *other than* paying lower wages, or else they would not go through the trouble of contracting with ADOC for workers subject to specific constraints and distinct payroll practices, rather than hiring free workers. Forced labor in violation of the TVPA is the very heart of the enterprise, and perpetuating that forced labor for all Defendants' benefit is the enterprise's common, unlawful purpose.

**Relationships and Longevity.** Plaintiffs have also clearly alleged relationships among those associated with the enterprise and longevity sufficient to enable the Defendants to pursue the enterprise's common purpose. *See Omnipol*, 32 F.4th at 1309. As discussed, Plaintiffs have alleged contractual relationships of substantial duration between the Employer Defendants and ADOC, *see* Compl. ¶¶135, 165-83. These concrete allegations regarding the relationships between the Defendants and the duration of those relationships more than suffice to plausibly plead these elements of an association-in-fact enterprise. *See In re Managed Care Litig.*, 298

F.Supp.2d 1259, 1275-76 (S.D. Fla. 2003) (enterprise adequately alleged where Plaintiffs alleged contractual relationships supported by a common purpose and that the entities involved in the enterprise "have a stake in the ongoing function of the enterprise," with "[e]very individual entity play[ing] a role in the enterprise equation").

**Conduct of the Enterprise.** Masonite, the Automotive Defendants, and RCF argue that Coerced Labor Plaintiffs have not sufficiently alleged that these Defendants participated, directly or indirectly, in the "conduct" of the RICO enterprise, but their effort to evade liability fails. *See* Dkt. 151 at 18-19; Dkt. 157 at 30-31; Dkt. 175 at 21-22; 18 U.S.C. §1962(c). These Defendants cite *Reves v. Ernst & Young*, which holds that RICO liability requires a defendant to have "participated in the operation or management of the enterprise itself." 507 U.S. 170, 183 (1993). *Reves* also clarifies that liability is "not limited to upper management" but rather can include, for example, "lower rung participants in the enterprise who are under the direction of upper management" or "others 'associated with' the enterprise who exert control over it …." *Id.* at 184; *see also United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014).

All of the Employer Defendants plainly satisfy this standard. Contrary to the Automotive Defendants' characterization, the private Employer Defendants are not outsiders "[s]imply performing services for an enterprise," Dkt. 157 at 31-32—they are all active participants with control over the affairs of the labor-trafficking scheme. As Plaintiffs allege, they knowingly contract with ADOC to benefit from the forced labor of incarcerated workers and determine how many workers they wish to employ. *See* Compl. ¶¶12, 17, 133-35, 137-39. They set employment conditions for the incarcerated workers, which are often harsher than those set for free workers, to capitalize on the effects of the coercion these workers experience, and they impose those conditions through their daily interactions with incarcerated workers. *See id.* ¶¶17-23, 134, 139.

Employer Defendants also determine how much they will pay the workers, while agreeing with ADOC to divert much of that amount to ADOC. *See id.* ¶¶15-17, 20. And Employer Defendants agree through their contracts with ADOC to report any violations of their own or ADOC's rules—thereby subjecting the incarcerated workers to a constant threat that they will be sent "behind the wall" or otherwise severely disciplined—an important mechanism of coercion. *See* Compl. ¶¶19, 47-49, 134, 138-41. This is not the role of a passive service provider; it is the role of an active manager of the labor-trafficking enterprise's affairs. *Cf. Parm v. Nat'l Bank of California, N.A.*, 242 F.Supp.3d 1321, 1348 (N.D. Ga. 2017) ("Plaintiff's non-conclusory allegations simply indicate that Defendant transmitted debits originated at the request of the payday lenders to the ACH Network.").

### C.   Plaintiffs Have Sufficiently Alleged Injuries to Their Business and Property Directly Caused by the Defendants' Racketeering Activities

Coerced Labor Plaintiffs have also satisfied RICO's statutory standing requirements, which permit a civil RICO claim to be pursued by "[a]ny person injured in his business or property by reason of a" RICO violation. 18 U.S.C. §1964(c).[47] To state a civil RICO claim, a plaintiff must allege both the requisite injury and "that the defendant's racketeering activity proximately caused the injury." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014) (quoting *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991)). Plaintiffs have done so here. Coerced Labor Individual Plaintiffs have adequately alleged concrete injuries to their business or property, in the form of lost past, current, and prospective wages and benefits resulting from the RICO enterprise, which impelled them to labor for ADOC for no pay, for $2

---

[47] For all the same reasons that Coerced Labor Plaintiffs have sufficiently alleged Article III standing to pursue their TVPA claims, *see supra* Part III.C, they also have standing to pursue their RICO claims.

per day for the public Employers, or for at least 40% less than the prevailing wage in the private market. *See* Compl. ¶¶146-54, 219; *see, e.g.*, *Williams v. Mohawk Indus., Inc*., 465 F.3d 1277, 1286-87 (11th Cir. 2006), *abrogated on other grounds as recognized in Simpson*, 744 F.3d 702 (depressed wages qualify as RICO injury). The Organizational Plaintiffs have alleged the diversion of financial resources that they could have otherwise used to further their missions, as well as interference with their ability, in the case of RWDSU and USSW, to represent all workers and advocate for improved working conditions, and depressed wages and working conditions for their members. Compl. at ¶¶155-57, 219; *see In re Juul Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig*., No. 19-MD-02913-WHO, 2022 WL 1955678, at *5 (N.D. Cal. Jan. 28, 2022) (diversion of resources caused by defendants' conduct was a sufficient RICO injury).

Contrary to a few Defendants' assertions, Plaintiffs have also sufficiently alleged proximate causation. *See* Dkt. 142 at 12-13; Dkt. 153-1 at 22-23 (alleging absence of proximate cause only as to Plaintiffs who were not directly employed by Progressive Finishes); Dkt. 157 at 34-38. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 654 (2008) (quoting *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 461 (2006)). Unlike the cases Defendants cite, the relationship between the RICO enterprise and the harm Coerced Labor Plaintiffs allege is not in any way abstract; it is the Plaintiffs' forced labor for the participants in that enterprise that directly gives rise to the harm. Defendants' arrangement of the enterprise to extract the labor of incarcerated workers by coercion and knowingly benefit from that labor, while—in the case of ADOC, paying nothing; in the case of the public Employer Defendants, generally paying $2 per day; and, in the case of the private Employer Defendants, diverting a substantial portion of the incarcerated workers' pay to

ADOC—directly caused Plaintiffs to be deprived of all or much of the economic value of their labor, in addition to the other harms caused by forced labor that Plaintiffs allege. *See* Compl. ¶¶146-54; *Copeland*, 2019 WL 4307125, at *11 (RICO proximate cause stated where "Plaintiffs allege that they were injured because, *inter alia*, they were forced to work without payment and without the ability to leave."). There is no attenuated chain of causation between the work Coerced Labor Individual Plaintiffs were required to provide as part of the RICO labor-trafficking enterprise and the economic harm these Plaintiffs suffered. Nor is there an attenuated relationship between the enterprise's introduction of forced labor to the workforce and the resources USSW and RWDSU are required to divert to address the problems associated with the presence of forced labor in workplaces that employ their constituencies. *Cf. Anza*, 547 U.S. at 453-54, 458 (proximate cause was absent where plaintiff steel supply company's economic injury was premised on competitor's submission of fraudulent tax returns, which required intervening "set of actions (offering lower prices) entirely distinct from the alleged RICO violation" to affect plaintiff); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1350 (11th Cir. 2016) (proximate cause not adequately alleged where plaintiffs did not allege "any link at all" between the airline's presentation of the allegedly fraudulent Passenger Usage Fee and the plaintiffs' decision to purchase tickets on the airline's website).[48]

### D.   Public Employer Defendants Are Subject to RICO Liability Here

The local government Defendants—Jefferson County, City of Montgomery, and City of Troy—dispute that they may be held liable under RICO at all, but these arguments are

---

[48] RCF argues that Coerced Labor Plaintiffs' claim is barred by the statute of limitations because Plaintiff Cole worked for RCF as early as 2016, Dkt. 175 at 19-20, but given that Defendants are engaging in ongoing TVPA violations through the RICO enterprise, *see supra* Part III.A, the statute of limitations presents no obstacle here.

unpersuasive. *See* Dkt. 141 at 11-12; Dkt. 142 at 11-12; Dkt. 152 at 15-16. Plaintiffs

acknowledge that some courts—although apparently not the Eleventh Circuit—have concluded

that municipal corporations cannot form the mens rea necessary for RICO liability. *See, e.g.*,

*Pine Ridge Recycling, Inc. v. Butts Cnty*., 855 F.Supp. 1264, 1273 (M.D. Ga. 1994). However,

this Court should reject these cases and instead conclude that "courts exempting municipalities

from RICO liability on the ground that they are incapable of forming a RICO *mens rea* have

failed to furnish a defensible explanation for their conclusion, particularly given that private

corporations are routinely held liable for damages under RICO." *Gingras v. Think Fin., Inc*., 922

F.3d 112, 125 (2d Cir. 2019) (citing *Genty v. Resolution Trust Corp*., 937 F.2d 899, 909 (3d Cir.

1991)); *see also Genty*, 937 F.2d at 909 (cases concluding municipalities cannot form RICO

mens rea do "not distinguish adequately those situations where municipal corporations are

indeed held liable for the tortious or criminal acts of its officials, even where such acts require a

malicious, willful or criminal intent"). Where, as here, Plaintiffs have adequately alleged that the

municipalities engaged in predicate TVPA violations, there is no reason to conclude that

Plaintiffs cannot clear the hurdle of establishing a RICO violation premised on those predicate

acts.

 The local government Defendants also argue that they are not subject to treble damages

to the extent such damages are punitive. Dkt. 141 at 12; *see* Dkt. 142 at 18; Dkt. 152 at 16-17;

*City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 267 (1981) (addressing punitive damages

under 42 U.S.C. §1983). Even if that is so, however, it is no shield against Plaintiffs' RICO claim

for injunctive relief—a remedy courts in this Circuit have recognized is available. *See, e.g.*,

*Gingras*, 922 F.3d at 125 ("[C]oncern for the inappropriateness of saddling the taxpayers with

the financial burden of punitive damages imposed on a government entity is plainly not

implicated where, as here, the relief sought is an injunction and not money damages."); *Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-CV-328-FTM-29MRM, 2016 WL 1572388, at *4 (M.D. Fla. Apr. 19, 2016) (concluding injunctive relief is available in RICO actions); *In re Managed Care Litig.*, 298 F.Supp.2d at 1283 (same).

State Defendants' arguments against liability are also unavailing. *See* Dkt. 148 at 50-51. Plaintiffs do not seek damages from State Defendants for RICO violations in their official capacities, only injunctive relief. As noted above, courts in this Circuit have appropriately concluded such relief is available based on RICO's text and the Court's inherent authority to grant equitable relief. *See Absolute Activist Value Master Fund Ltd.*, 2016 WL 1572388, at *4; *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 137-39 (2d Cir. 2016); *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687, 695-700 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003).

State Defendants assert in passing that they cannot be sued in their official capacities because they are not "person[s]" or an "enterprise," citing only *Will*, 491 U.S. at 69-71. Dkt. 148 at 51. Yet both terms are defined broadly and not exclusively: "'person' includes any individual or entity capable of holding a legal or beneficial interest in property," and "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(3), (4). As discussed above, *supra* Part III.B.3, *Will*'s interpretation of the meaning of "person" in the specific context of §1983 cannot preclude reading "person" within the RICO statute to include state officials when the language of the statute permits it. *See Will*, 491 U.S. at 64, 68; *Hilton*, 502 U.S. at 205. Nor does the definition of enterprise preclude one of the associated parties from being a state official. As the Eleventh Circuit and Supreme Court have recognized, "the RICO

statute provides that its terms are to be liberally construed to effectuate its remedial purposes." *Cisneros*, 972 F.3d at 1211 (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)). Neither the text nor the purpose of the statute supports shielding an offending state official who uses their official position to conduct the affairs of a RICO enterprise from injunctive relief to enforce the requirements of federal law.

Further, Marshall and Gwathney are not entitled to absolute immunity with respect to their course of conduct in violating the TVPA for the reasons discussed above. *See* Dkt. 148 at 51; *supra* Part III.B.5.b-c.

And, finally, State Defendants are not entitled to qualified immunity. Public officials may be sued in their individual capacities under RICO. *See, e.g.*, *LaFlamboy v. Landek*, 587 F.Supp.2d 914, 937 (N.D. Ill. 2008) ("[P]ublic officials can be held individually liable for actions taken while holding public office and/or misuse of their public office."). For many of the same reasons discussed in the context of the TVPA, *see supra* Part III.B.5.a, there is no basis to import the doctrine of qualified immunity into the RICO context: it is not in the text of the statute; *McCullough*, 907 F.3d at 1332-35, the only case State Defendants cite, does not articulate a basis for importing qualified immunity in the RICO context; and the policy reasons underlying qualified immunity do not support its application to a statute prohibiting persons from participating in enterprises that have engaged in multiple criminal acts over time. *See supra* Part III.B.5.a; *see also Spence-Jones v. Rundle*, 991 F.Supp.2d 1221, 1256 (S.D. Fla. 2013) (noting that "the Eleventh Circuit has not directly addressed the issue of whether absolute or qualified immunity applies to a RICO claim"). At least as to Hamm, Ivey, and Cooper, as discussed *supra* Part III.B.5.a, these Defendants had fair notice that their conduct would violate the TVPA and, as participants in the present enterprise, they were put on notice by the RICO statute itself that their

conduct violated the law. *See Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1302 (11th Cir. 1998) (in appropriate cases where broad constitutional rights are not at issue, "the statutory provisions at issue in [a] case, standing alone, provide fair warning" of clearly established law).

## V. Plaintiffs Have Stated a Plausible State Constitutional Claim for Injunctive Relief Against the Local Government and Private Employer Defendants

In November 2022, Alabama voters ratified a constitutional amendment that by its plain language extended Alabama's prohibition against slavery and involuntary servitude to people convicted of crimes. Effective January 1, 2023, Article I, Section 32 of Alabama's Constitution declares: "That no form of slavery shall exist in this state; and there shall not be any involuntary servitude." Ala. Const., art. I, §32 (2022). The amendment removed the historical exception to these protections, which had allowed involuntary servitude "for the punishment of crime, of which the party shall have been duly convicted." Ala. Const., art. I, §32 (1901). Defendants wrongly contend that this amendment had no effect and that it is unenforceable. But State Constitutional Plaintiffs[49] have plainly alleged that Defendants subjected them to involuntary servitude—a wrong for which State Constitutional Plaintiffs may now seek redress under the amended State Constitution.[50]

Several of the issues Defendants raise can be resolved swiftly: first, as Plaintiffs conveyed to the State Defendants, and as State Defendants acknowledge, Dkt. 143 at 4, Plaintiffs

---

[49] "State Constitutional Plaintiffs" are Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, USSW, RWDSU, and the Woods Foundation.

[50] For the reasons that Coerced Labor Plaintiffs have standing to pursue their TVPA claims against the non-State Defendants, *see supra* Part III.C, they also have standing to pursue their claim under the Alabama Constitution. The Woods Foundation additionally has standing, based on its diversion of resources to address the effects of the shutdown of the parole system, including subjection of those denied parole to the labor-trafficking scheme. *See* Compl. ¶¶144, 157; *supra* Part III.C.

agreed before the motions to dismiss were filed not to pursue their state constitutional claim against these Defendants in this federal forum.

Second, Plaintiffs are pursuing only equitable relief, not monetary damages, for their state constitutional claim. *See* Compl., Prayer for Relief; Dkt. 157 at 39 n.5 (acknowledging that Plaintiffs are seeking only equitable relief under Count III). Courts have narrowly concluded that Alabama constitutional provisions do not give rise to claims for monetary damages. *See Matthews v. Alabama Agric. & Mech. Univ.*, 787 So.2d 691, 698 (Ala. 2000). But plaintiffs may enforce Alabama constitutional provisions by way of prospective relief and, in such cases, courts regularly reach the merits of constitutional claims.[51] *See, e.g.*, *Burnett v. Chilton Cnty. Health Care Auth.*, 278 So.3d 1220, 1236-37 (Ala. 2018) (holding, in action for declaratory and injunctive relief, that act violated §107 of the Alabama Constitution of 1901); *Magee v. Boyd*, 175 So.3d 79, 91, 106, 142 (Ala. 2015) (denying state constitutional challenges to education statute but affirming that challenges were not precluded by the political question doctrine because "[t]he authority to determine adherence to the Constitution is with the judiciary, and, if the legislature has not discharged its constitutional duty, then it is the judiciary's duty to say so"); *Poiroux v. Rich*, 150 So.3d 1027, 1032, 1043 (Ala. 2014) (allowing claim to proceed where it was "brought to enjoin State officials from enforcing an unconstitutional law"); *Ford v. Jefferson Cnty.*, 774 So.2d 600, 605 (Ala. Civ. App. 2000) (trial court erred "[t]o the extent that the trial court's judgment barred the issuance of permanent injunctive relief against the defendants based upon the deprivations of state constitutional rights of free speech asserted by the officers" based

---

[51] Constitutional protections against involuntary servitude, which were enacted with provisions abolishing slavery following the Civil War, run against private parties. *See George v. State*, 39 Ala. 675, 676 (1866) (discussing purpose of amendment); *cf. Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993)).

on notice-of claim statute); *Mancero-Ramirez v. City of Hoover*, No. 05-BE-2618-S, 2006 WL 8436600, at *3-4 (N.D. Ala. June 14, 2006) (denying motion to dismiss claim for declaratory and injunctive relief that defendants violated State Constitution's search and seizure provision); *see also Sparks v. Parker*, 368 So.2d 528, 533-34 (Ala. 1979) (rejecting on merits challenge to orders establishing indigent defense system arguing that it constituted involuntary servitude under state constitution).[52]

The question before the Court is thus whether Plaintiffs have plausibly stated a claim for prospective relief against the local government and private Employer Defendants for violation of Article I, §32, as amended, and, under the plain language of that Section—which was expressly amended to extend protection to those convicted of crimes—they have. "The Constitution is a document of the people. Words or terms used in that document must be given their ordinary meaning common to understanding at the time of its adoption by the people." *McGee v. Borom*, 341 So.2d 141, 143 (Ala. 1976) (citing *Wright v. United States*, 302 U.S. 583 (1938)); *see also, e.g.*, *Jefferson Cnty. v. Weissman*, 69 So.3d 827, 834 (Ala. 2011) ("We are cognizant that the long-settled and fundamental rule binding this Court in construing provisions of the constitution is adherence to the plain meaning of the text. Constitutions are the result of popular will, and their words are to be understood ordinarily as used in the sense that such words convey to the popular mind." (internal quotation marks and citations omitted)).

---

[52] *Am. Auto. Ins. Co. v. McDonald*, 812 So.2d 309, 311 (Ala. 2001), and *Blockbuster, Inc. v. White*, 819 So.2d 43, 44 (Ala. 2001), cited by SRG, Dkt. 147 at 25-26, which specifically address the analysis that applies when one seeks to assert a private right of action under a "statutory scheme," are thus inapposite.

The City of Troy, in opposing this claim, proffers an affidavit of the City Clerk, Dkt. 142-1. The City suggests in a footnote that its affidavit may be considered either because it is referenced in the Complaint or is subject to judicial notice, Dkt. 142 at 9 n.1, but it is neither. The Court should disregard this evidence at the motion to dismiss stage.

The ordinary meaning of "involuntary servitude" encompasses the labor that Coerced Labor Individual Plaintiffs have been required to perform for the local government and private Employer Defendants while incarcerated. Contemporary dictionaries reflecting the understanding of the voters in 2022 who adopted amended Article I, §32 define "involuntary" to mean "done contrary to or without choice" or "compulsory," and "servitude" to mean "a condition in which one lacks liberty especially to determine one's course of action or way of life."[53] Authority interpreting "involuntary servitude" shortly after the Civil War[54] likewise suggests that work required under conditions of actual or threatened imprisonment readily meets the definition of involuntary servitude: "The exception of servitude as a punishment for crime gives an idea of the class of servitude that is meant. The word servitude is of larger meaning than slavery, as the latter is popularly understood in this country, and the obvious purpose [of prohibiting involuntary servitude] was to forbid all shades and conditions of African slavery." *Slaughter-House Cases*, 83 U.S. 36, 69 (1872); *see also Bailey v. Alabama*, 219 U.S. 219, 241 (1911) ("The plain intention" of provisions prohibiting involuntary servitude "was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary

---

[53] Involuntary, Merriam-Webster, https://www.merriam-webster.com/dictionary/involuntary (last visited May 30, 2024); Servitude, Merriam-Webster, https://www.merriam-webster.com/dictionary/servitude (last visited May 30, 2024); *see also, e.g.*, Involuntary, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/involuntary (last visited May 30, 2024) ("not done by choice; done unwillingly, or without the decision or intention of the person involved"); Servitude, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/servitude (last visited May 30, 2024) ("the state of being under the control of someone else and of having no freedom").

[54] Alabama's prohibition of involuntary servitude was first adopted in 1865. *Washington v. Washington*, 69 Ala. 281, 284 (1881).

servitude."); *Ex parte Wilson*, 114 U.S. 417, 429 (1885) ("Imprisonment at hard labor, compulsory and unpaid, is, in the strongest sense of the words, 'involuntary servitude for crime,' spoken of in the provision of the ordinance of 1787, and of the thirteenth amendment of the constitution, by which all other slavery was abolished.").

As discussed in detail in the preceding sections, *see supra* Part III.A, local government and private Employer Defendants require and benefit from requiring Coerced Labor Individual Plaintiffs to work subject to ADOC's punishment scheme, which imposes confinement to restrictive housing, forfeiture of accrued good-time (and thus a longer period of imprisonment), additional forced labor, transfer to extremely dangerous facilities, and other measures if an incarcerated worker refuses to work as directed. *See* Compl. ¶¶48-60. Plaintiffs have alleged that incarcerated workers are not at liberty to refuse work assigned by the local government and private Employer Defendants, regardless of whether they face dangerous working conditions, harassment, or inadequate pay. *See id.* ¶¶134, 137, 139, 147. Labor under these conditions falls well within the ordinary understanding of "involuntary servitude." [55] And, following Alabama's constitutional amendment, such conditions cannot be imposed on workers simply because they have been convicted of a crime.

This analysis holds even if, as urged by some Defendants, the Court adopts the definition of "involuntary servitude" articulated by the Supreme Court in *United States v. Kozminski*, 487 U.S. 931, 944 (1988). The Court in *Kozminski* was interpreting two criminal statutes—18 U.S.C. §241, which criminalizes conspiracy to interfere with an individual's Thirteenth Amendment

---

[55] Bama Budweiser argues that Plaintiffs fail to allege facts showing that the company had control over how ADOC determined which workers would show up on a given day, Dkt. 139 at 15, but such an allegation is not essential to the claim. The question is whether the local government and private Employer Defendants imposed conditions of involuntary servitude.

rights, and 18 U.S.C. §1584, which authorizes criminal punishment for certain acts relating to "involuntary servitude"—and thus applied the rule of lenity to read the Amendment narrowly. *Id.* at 952. Ultimately, the Court concluded "the term 'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* at 952.

Through the local government and private Employer Defendants' control over their labor and relationship with ADOC, Coerced Labor Individual Plaintiffs plainly face the use and threat of physical restraint, as well as the use and threat of coercion through law. Cases applying the *Kozminski* standard to those already subject to confinement recognize that threats of more severe forms of confinement and discipline that will extend the duration of confinement, like those enshrined in ADOC's regulations and incorporated into the contracts between ADOC and the local government and private Employer Defendants, can subject detained people to involuntary servitude. In *McGarry v. Pallito*, 687 F.3d 505 (2d Cir. 2012), for example, a pretrial detainee alleged that prison officials compelled him to work in the prison laundry by threatening that if he did not, he would be placed in administrative segregation and subject to disciplinary reports that affect when sentenced prisoners are eligible for release. *Id.* at 509. The Second Circuit held that the complaint plausibly stated a Thirteenth Amendment claim and that the defendant prison officials were not entitled to qualified immunity. *Id.* at 508, 511-12, 514; *see also, e.g.*, *Harden v. Bodiford*, 442 F. App'x 893, 894 (4th Cir. 2011) (denial of summary judgment was appropriate where pretrial detainee alleged that, if he refused work assignments, he would be placed in punitive segregation); *Magoon v. Texas Dep't of Crim. Just.*, 247 F.3d 240 (5th Cir. 2001) (per curiam) (unpublished) ("Assuming arguendo that both Austin and Magoon have been placed in

punitive segregation for their refusal to work, the compulsion requirement has been met."); *Ruelas*, 2021 WL 12144269, at \*15 ("Plaintiffs allege that County Defendants forced them to work under the threat of punishment, including lengthier sentences and solitary confinement."); *supra* p. 31 (discussing *Reynolds*, 235 U.S. 133).

Defendants' counterarguments are meritless. First, the State Defendants contend that the 2022 amendments were merely "non-substantive textual changes," but this flies in the face of ordinary principles of constitutional and statutory interpretation, which seek to give meaning to each word of the relevant text. Dkt. 148 at 53; *see United States v. Menasche*, 348 U.S. 528, 538-39 (1955); *In Re Shek*, 947 F.3d 770, 776-77 (11th Cir. 2020) ("Because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant." (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* at 176)).

State Defendants also cite legislative history in support of their position but, as an initial matter, there is no need to consult legislative history where the text of the provision at issue is clear, as it is here. *See, e.g.*, *Ex parte Birmingham Airport Auth.*, 274 So.3d 964, 968 n.3 (Ala. 2018).

Moreover, the legislative history underlying the amendment suggests the Legislature, and ultimately the people of Alabama, sought to rid the Constitution of any vestiges of "convict leasing"—an interpretation of the amendment that powerfully supports State Constitutional Plaintiffs' claims here. The 2022 amendment was intended to "remove racist language" from the Constitution of 1901.[56] Also revised pursuant to this mandate to remove racist language were Article XVI, §256, addressing school segregation, and Article XVI, §259, addressing poll

---

[56] *See* Ballot Statement for the Constitution of Alabama of 2022, https://www.sos.alabama.gov/sites/default/files/election-2022/BallotStatementForConstitutionofAlabamaof2022.pdf.

taxes.[57] While it is true that the August 27, 2021 memorandum the State Defendants cite posits

that the amendment "would have no practical impact," it provides absolutely no reasoning or

facts in support of this conclusion, nor any indication that the memorandum's drafter was aware

of the State's current practices of "leasing" incarcerated labor to public and private employers or

the extremely coercive conditions under which such "leasing" occurs.[58] Available legislative

history materials from October 2021 show that, after receiving the memorandum the State

Defendants cite, the Legislature considered a series of graphs showing "Alabama Convict Labor

Revenue and Demographics, 1896-1929," materials that revealed the startling proportion of the

State's revenue collected through "lease of state prisoners as well as … state-operated

enterprises" during this time period.[59] The Legislature's concern with eradicating the odious

practice of "convict leasing" fully supports State Constitutional Plaintiffs' position that the

amendment was intended to preclude the compulsory labor that Plaintiffs challenge here,

including the contracting of incarcerated people to the local government and private Employer

Defendants. *See* Compl. ¶¶11-13, 17-28. State Defendants themselves acknowledge that current

---

[57] Ala. Legislature, Statewide Provisions: Textual Differences Between the Current "Official Recompilation" of the Alabama Constitution of 1901 (as reflected in Volume 1 of the Alabama Code) and the Proposed Constitution of Alabama of 2022, https://alison-file.legislature.state.al.us/pdfdocs/lsa/proposed-constitution/Chart_of_Textual_Differences_in_Proposed_Constitution_of_2022_vs_Recompilation.pdf.

[58] Othni J. Lathram, Background Information on the Removal of Racist Language (Aug 27, 2021), https://alison.legislature.state.al.us/files/pdfdocs/lsa/proposed-constitution/Racist_Language_Backgound_Memo.pdf.

[59] Ala. Dep't of Archives & History, Alabama Convict Labor Revenue and Demographics, 1896-1929 (Oct. 2021), https://alison.legislature.state.al.us/files/pdfdocs/lsa/proposed-constitution/Alabama_Convict_Labor_ADAH_LSA.pdf. This document also showed the stark racial disparities in the populations subject to these practices, reflecting that African Americans were incarcerated at approximately two times their proportion in the population at large (42.5-45.2% of the general population between 1896 and 1914, relative to 82.6-90.4% of the incarcerated population). *Id.* Today's population reflects similar disparities. Compl. ¶8 (26.8% of the general population, relative to 53% of the population in ADOC custody).

labor practices include "using incarcerated labor explicitly as currency"—leasing land "'in exchange for the use of' incarcerated people" and their labor, Compl. ¶29, thus directly echoing the infamous "convict leasing" practices the Legislature sought to ensure would be barred under Alabama's Constitution.

Defendants also assert that Plaintiffs were merely confronted with a "painful" choice, not involuntary servitude. Dkt. 151 at 21; Dkt. 152 at 19-20. This characterization is at odds with the allegations in the Complaint: the alternative faced by work-center and work-release laborers under the ADOC rules and practices the local government and private Employer Defendants agree to enforce, and benefit from, is severe punishment, including additional confinement, and being sent to extremely violent higher-security facilities. Compl. ¶¶47-48, 134, 138-39. None of the cases Defendants cite suggest this is insufficient to plead involuntary servitude. In *Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990), the choice was between "work[ing] outside of the jail for twenty dollars a day or remain[ing] inside the jail and earn[ing] nothing," with no evidence showing intimidation, intensely violent facilities, or other coercion. *Id.* at 1552-53.[60] In *Brooks v. Kiser*, No. 1:21CV541-ECM-SMD, 2022 WL 2155037, at *4 (M.D. Ala. May 13, 2022), *report and recommendation adopted*, 2022 WL 2134987 (M.D. Ala. June 14, 2022), the plaintiff alleged

---

[60] State Defendants and Koch Foods argue that Plaintiffs' state constitutional claim should be dismissed because it requires the Court to conclude that that the Legislature repealed the work-release program by implication, which is "disfavored." Dkt. 174 at 31 (citing *Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*, 314 So.2d 51, 54-55 (Ala. 1975)); Dkt. 148 at 56. Plaintiffs are not asking the Court to hold unconstitutional the statutes governing Alabama's work-release program; they are asking the Court to hold unconstitutional the work-release program *as implemented by Defendants*, which includes harsh punishment for refusals to work and the threat that workers will be sent to life-endangering higher-security facilities if they do not work. In any event, it is quite plausible that an amendment intended to ensure that "convict leasing" would never recur, *see supra* pp. 85-86, might be "repugnant to or in conflict with" a program providing incarcerated labor to private parties under the circumstances presented here. *Fletcher*, 314 So.2d at 55.

that the defendant threatened to terminate him from his other job if he did not continue cutting his grass without pay. There was no allegation that the plaintiff's physical liberty would be restricted if he did not complete the work, for example. *See also Ryder v. Lifestance Health Grp.,* *Inc.,* No. 6:22-CV-2050-RBD-RMN, 2024 WL 1119821, at *8 (M.D. Fla. Feb. 12, 2024) (rejecting a psychiatrist's argument that his former employer's compensation agreement, which included monthly advances he was later required to repay when he ended his employment, was unconstitutional under the Thirteenth Amendment).[61] Plaintiffs are not simply choosing between working and remaining incarcerated; if they do not work, they are subject to more extreme conditions of confinement—including transfers to facilities plagued by life-threatening violence—and severe disciplinary sanctions, as set forth in the Complaint and discussed above. *See* Compl. ¶¶43-59; *supra* Part III.A.

The local government and private Employer Defendants also argue that they are insufficiently culpable to be found liable for holding incarcerated workers in involuntary servitude. But these Employer Defendants jointly establish the coercive working conditions under which Coerced Labor Individual Plaintiffs work. As discussed above, *supra* Part III.A, this dynamic is reflected in the formal contractual relationships between these Employer Defendants and ADOC, which require the Employer Defendants to assist in enforcing ADOC's coercive regulations requiring work from incarcerated people. Compl. ¶¶133-34, 137-39, 143. Thus, present in every interaction an incarcerated worker has with an employer is the threat that, if the

---

[61] State Defendants also cite an unpublished Colorado Court of Appeals decision resolving a claim brought by a pro se incarcerated person who did *not* allege in the complaint at issue "that refusing to work could result in sanctions, including restrictive privileges, arrest, handcuffing, restrictive housing, delayed parole hearings, and loss of earned time and good time." *Lamar v. CDOC,* No. 21CA0511, at 9-10 (Colo. App. Aug. 18, 2022) (unreported opinion). This decision concluding dismissal was appropriate "[u]nder these circumstances," *id.* at 9, which is not precedential even within Colorado, *see* Colo. R. App. P. 35(e), is of course not controlling here.

employer is displeased, the employer will initiate a process that will shatter that worker's relative safety by sending the worker to a violent high security facility and extend the duration of the worker's confinement by subjecting the worker to a disciplinary violation with all the consequences previously discussed—punishments that would plainly qualify as coercive if applied to non-incarcerated workers. *See id.* ¶¶49, 59, 138-40. It is certainly plausible, as Plaintiffs have alleged, that the local government and private Employer Defendants understood that reporting to ADOC an incarcerated worker's refusal to work, or a failure to work "as requested," would subject the incarcerated worker to the severe punishments, including physical restraint and other coercive measures. *See supra* Part III.A.

Coerced Labor Individual Plaintiffs have also alleged that local government and private Employer Defendants have subjected them to coercive, very onerous working conditions in their own rights that Plaintiffs cannot resist because of the Employer Defendants' voluntary partnership with ADOC.[62] Coerced Labor Individual Plaintiffs allege, among other facts, exhausting and difficult work conditions, lack of adequate protective gear, and exposure to a supervisor who demanded sexual favors. *See, e.g.*, Compl. ¶¶147 (Walker was sexually harassed by a supervising officer while working for Jefferson County for $2 per day and was disciplined and subjected to additional unpaid labor when she gave a statement about the harassment); *id.* (harsh working conditions inside freezers at Southeastern Meats without adequate work clothes, often for 12-hour shifts); *id.* ¶148 (Masonite deducted $225 for required safety glasses). Due to local government and private Employer Defendants' partnership with ADOC, workers in these

---

[62] Some private Employer Defendants highlight that incarcerated workers are paid, *see, e.g.*, Dkt. 147 at 26, but payment is insufficient to render work voluntary. *See, e.g.*, *Jobson v. Henne*, 355 F.2d 129, 132 n.3 (2d Cir. 1966) ("[T]he mere payment of a compensation, unless the receipt of the compensation induces consent to the performance of the work, cannot serve to justify forced labor.").

situations have no option but to perform the work, no matter the conditions. *Id.* ¶¶133-34, 138-39. Thus, State Constitutional Plaintiffs have alleged sufficient facts regarding the local government and private Employer Defendants' direct involvement in the forced-labor scheme, including but not limited to their role as enforcers and beneficiaries of ADOC's draconian rules, to establish that these Defendants are not merely bystanders but knowing participants in enacting the Coerced Labor Individual Plaintiffs' involuntary servitude.

## VI.    Plaintiffs Have Stated a Plausible Ex Post Facto Clause Claim Against Ivey, Marshall, Hamm, and the Parole Board Members

The Ex Post Facto Clause "bar[s] enactments which, by retroactive operation, increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249 (2000). A retroactive change in "laws governing parole … may be violative of this precept" when it creates "a sufficient risk of increasing the measure of punishment…." *Id.* at 250 (internal quotations omitted). Thus, the question for the Court is whether Plaintiffs have alleged, as an objective matter, that Alabama's 2019 alterations to the parole system "create[] a significant risk of prolonging [Plaintiffs'] incarceration." *Garner*, 529 U.S. at 251; *see also Lynce v. Mathis*, 519 U.S. 433, 442-43 (1997) (rejecting arguments about state's motivation as "not relevant to the essential inquiry demanded by the Ex Post Facto Clause"). Plaintiffs have presented detailed allegations demonstrating that Ivey, Marshall, and the Parole Board Members ("Ex Post Facto Defendants") implemented the 2019 revisions to the statutes governing parole ("2019 Parole Amendments")[63] in a manner that has resulted in a significant risk of prolonging the incarceration of the currently incarcerated Plaintiffs and many other incarcerated Alabamians.[64]

---

[63] 2019 Ala. Laws Act No. 2019-393, §1 (amending Ala. Code §15-22-26).

[64] Defendant Hamm was named a defendant to the Ex Post Facto Clause claim only as a party without whom "the court cannot accord complete relief among existing parties." Fed. R. Civ. P.

As State Defendants acknowledge, laws that materially limit the availability of parole or early release may support a claim under the Ex Post Facto Clause. *See, e.g.*, *Garner*, 529 U.S. at 253; *Weaver v. Graham*, 450 U.S. 24, 29-30 (1981); *Jones v. Garner*, 211 F.3d 1225, 1225 (11th Cir. 2000). "The danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has stated that the Ex Post Facto Clause guards against such abuse." *Garner*, 529 U.S. at 253. Moreover, that an incarcerated person is "not guaranteed parole but rather receive[s] it at the will of the parole board" does not preclude an Ex Post Facto Clause claim. *Peugh v. United States*, 569 U.S. 530, 547 (2013); *see also Weaver*, 450 U.S. at 29 ("a law need not impair a vested right to violate the *ex post facto* prohibition" (internal quotation marks omitted)); *Warden v. Marrero*, 417 U.S. 653, 663 (1974) ("a repealer of parole eligibility previously available to imprisoned offenders would clearly present [a] serious question under the ex post facto clause of . . . the Constitution").

As State Defendants also recognize, Dkt. 148 at 62-63, "'[t]he presence of discretion'" like that which exists with respect to parole decisions "'does not displace the protections of the *Ex Post Facto* Clause.'" *Peugh*, 569 U.S. at 546 (quoting *Garner*, 529 U.S. at 253). "The controlling inquiry under *Garner* is how the Board . . . exercises discretion *in practice*, and whether differences between the exercise of discretion in two systems actually 'create[] a significant risk of prolonging [a person's] incarceration.'" *Fletcher v. Reilly*, 433 F.3d 867, 876-77 (D.C. Cir. 2006) (quoting *Garner*, 529 U.S. at 251) (emphasis added); *see also Michael v. Ghee*, 498 F.3d 372, 383 (6th Cir. 2007) ("After *Garner*, the relevant inquiry, therefore, is not

---

19(a)(1)(A); *but see infra* n.106. The "Ex Post Facto Plaintiffs" are the currently incarcerated Plaintiffs denied parole (Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright), and the Organizational Plaintiffs.

whether the challenged parole regulation is a 'law' . . . , but rather whether the new guidelines present a significant risk of increasing the plaintiff's amount of time actually served.").

Where a rule does not on its face increase the length of incarceration for affected individuals, the Supreme Court has explained that an Ex Post Facto Clause violation may be shown by "evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Garner*, 529 U.S. at 255. Thus, a parole board's "internal policy statement[s]" and "actual practices" should be considered as "important instruction as to how the Board interprets its enabling statute and regulations, and therefore whether, as a matter of fact, the [challenged application] created a significant risk of increased punishment." *Id.* at 256 (reversing and admonishing Eleventh Circuit for not considering parole board's policy statements); *see also id.* ("It is often the case that an agency's policies and practices will indicate the manner in which it is exercising its discretion."); *Jones*, 211 F.3d at 1225 (on remand from Supreme Court, remanding to district court "to determine, after permitting sufficient discovery, whether the [new Georgia policy] in its operation created a significant risk of increased punishment for" the plaintiff); *Harris v. Hammonds*, 217 F.3d 1346, 1349-50 (11th Cir. 2000) (vacating summary judgment to defendants and remanding for evidence on "the general operation of the Georgia parole system" in support of Ex Post Facto claim).

Here, Plaintiffs have clearly alleged that the changes to Alabama's parole system occasioned by the 2019 Parole Amendments and the Ex Post Facto Defendants' interpretation of those Amendments—informed by Ivey and Marshall's directive to drastically limit parole—have "as a matter of fact, … created a significant risk of increased punishment." *Garner*, 529 U.S. at 256. The Parole Board is required to consider for parole all incarcerated people whose sentence

does not preclude it. *See generally* Ala. Code §15-22-28. From at least 1951 until 2019, the Parole Board's inquiry centered on an individual's "fitness" for parole. Ala. Code §15-22-26(a); 1951 Ala. Laws 1030, 1032. In 2015, Alabama committed to measuring fitness for parole based on an actuarially determined risk assessment and evidence-based, structured decision-making by enacting the Justice Reinvestment Act ("JRA"), or SB67. *See* 2015 Ala. Laws Act No. 2015-185.

As the Complaint alleges, beginning in 2018, Defendants Ivey and Marshall began directing changes to the parole system. Compl. ¶91. Seizing on the crimes of Jimmy Spencer, a man who committed murder after he was released on parole and evaded supervision, Ivey and Marshall summoned the Parole Board members to a meeting in the Governor's office. *Id.* As alleged in the Complaint, Ivey and Marshall instructed the Parole Board members to disregard the evidence-based decision-making framework established by the JRA and instead stop releasing people, particularly those convicted of a "violent" offense. *Id.* When the Board members pushed back, Ivey issued a moratorium on early parole demanding that the Board implement a corrective action plan, and Marshall turned his attention to the Legislature. *Id.* ¶¶92-93.

In 2019, Marshall introduced, and the Legislature enacted, an amended statute governing parole eligibility—the 2019 Parole Amendments. The statute now directs that "the [B]oard's paramount duty is to protect public safety." Ala. Code §15-22-26(a). Specifically, the Legislature added the underlined language:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole <u>and to ensure public safety</u>. The guidelines shall serve as an aid in the parole decision <u>making</u> process and shall promote the use of prison space for the most violent and greatest risk offenders<u>, while recognizing that the board's paramount duty is to protect public safety</u>.

2019 Ala. Laws Act No. 2019-393 §1 (amending §15-22-26(a)).[65] Among other changes, the 2019 Parole Amendments also gave the Governor the power to directly appoint the Executive Director of the Parole Board. *Id.* Governor Ivey promptly appointed Charles Graddick as Executive Director, who informed the public that the Board members, including newly appointed Chair Gwathney, "know now that their job isn't to create space in Alabama['s] prison system[,] that's not what they were brought in to do." Compl. ¶¶96-97.

These 2019 Parole Amendments and the Ex Post Facto Defendants' implementation of the law as amended are at the heart of Plaintiffs' Ex Post Facto Clause challenge.[66] First, there is the language of the statute itself, which expressly makes public safety the Board's "paramount duty." Statutes are construed according to their plain language, *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001), and the plain meaning of "paramount" is "superior to all others" or "supreme," Paramount, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/paramount (last visited May 21, 2024). Defendants unconvincingly contend that the 2019 Parole Amendments had no substantive effect on access to parole but rather, "at most, tweaked what must be recognized *in the guidelines*." Dkt. 148 at 67; *see also id.* at 69-70 ("HB380's inclusion of 'public safety' does nothing more than codify a

---

[65] State Defendants emphasize that the Parole Board retained discretion under the 2019 Parole Amendments, as it did under previous iterations of the law. Dkt. 148 at 66-67. But, as discussed, the exercise of discretion does not preclude an Ex Post Facto Clause violation. *See, e.g.*, *Peugh*, 569 U.S. at 546. More importantly, as discussed *infra*, State Defendants ignore that the 2019 Amendments, both in their plain text and practical implementation, substantially altered the exercise of the Parole Board's discretion. *See* Compl. ¶¶93-94, 97-100, 102-04, 106.

[66] State Defendants complain that they are not clear on the scope of Plaintiffs' Ex Post Facto Clause claim, despite the extensive briefing and argument regarding this claim in the context of the pending preliminary injunction motion, which preceded the filing of State Defendants' motion to dismiss; nevertheless, if the Court concludes Plaintiffs' Ex Post Facto theory must be restated, Plaintiffs request the opportunity to amend the Complaint.

factor already being considered in parole decision-making . . . ."). But the pronouncement of "the [B]oard's paramount duty" is not so limited; the statute first instructs the Board "to ensure public safety" and further directs that this is the Board's "paramount duty." That a portion of this instruction comes in reference to the guidelines in no way undermines the fact that, as a substantive matter, the 2019 Parole Amendments specifically elevated public safety to be the paramount duty of the Board.[67]

Applying the Supreme Court's instructions to review the "actual practices" and policies of a parole board in determining whether there is "a significant risk of increased punishment," *Garner*, 529 U.S. at 256, Plaintiffs have clearly alleged adequate facts demonstrating that the Ex Post Facto Defendants' implementation of the 2019 Parole Amendments has resulted in a substantially increased risk of prolonging the incarceration of the currently incarcerated Plaintiffs denied parole. Specifically, Plaintiffs allege that the Ex Post Facto Defendants, seizing on the command to hold "public safety" as the Board's "paramount duty," dramatically reduced access to parole, including by abandoning the structured, evidence-based decision-making framework in place after the enactment of the JRA, and all but eliminated the possibility of parole for parole candidates convicted of offenses deemed "violent" under Alabama law. *See* Compl. ¶¶98, 100, 102.[68] Whereas 44.7% of parole candidates convicted of "violent" offenses were granted parole in 2018, those grant rates fell to 4.9% for white parole candidates and a mere 2.2% for Black parole candidates by 2022. Compl. ¶102. It is this "evidence drawn from the [2019 Parole

---

[67] State Defendants' argument that the "paramount duty" language merely relates to the development of the guidelines is also belied by the fact that, as State Defendants acknowledge, no corresponding public safety language was actually incorporated into the Parole Guidelines. *See* Dkt. 148 at 72; Dkt. 148-12; Compl. ¶85 n.57.

[68] Parole grants rates were higher than 50% in 2018, before the 2019 Parole Amendments; by 2022, after steadily declining each year, the parole grant rate for white parole candidates fell to 12.4%, while the rate for Black parole candidates fell to 6.0%. Compl. ¶100.

Amendments'] practical implementation by the agency charged with exercising discretion" that most strongly creates the eminently plausible inference that the challenged rule "as a matter of fact … created a significant risk of increased punishment." *Garner*, 529 U.S. at 255-56; *see also Harris*, 217 F.3d at 1349.

State Defendants incorrectly argue that *Porter v. Ray*, 461 F.3d 1315 (11th Cir. 2006), "makes the instant Plaintiffs' statistics of no value." Dkt. 148 at 74-75. In *Porter*, the Eleventh Circuit reasonably concluded that statistical evidence showing that, on average, individuals served 79% of their sentences was insufficient to establish the existence of a de facto policy of requiring prisoners to serve the greater of 90% of their sentences or a Guidelines range. 461 F.3d at 1321. The *Porter* plaintiffs did not present any evidence at summary judgment comparing parole determinations before adoption of the alleged de facto policy; they simply asserted that people served lower percentages of their sentences previously. *Id*. Here, at the pleading stage, Plaintiffs have already presented detailed allegations showing dramatic changes to parole access after 2018. Compl. ¶¶100-03, 123. Further, far from holding that statistics have "no value" in an Ex Post Facto challenge to the laws and practices governing parole, the Eleventh Circuit merely expressed doubt in *Porter* that statistics would be able to show the de facto policy at issue when there had been no change to the agency's discretion. *See* 461 F.3d at 1321. Here, the Legislature plainly decreed that "public safety" was to be the Board's "paramount duty," and Plaintiffs' statistics show that the implementation of this mandate significantly and systemically reduced access to parole, thereby creating a significant risk of increased punishment. *See* Ala. Code §15-22-26(a); *e.g.*, Compl. ¶¶100, 102. State Defendants are thus incorrect that Plaintiffs' statistical allegations demonstrating a punitive statewide change in parole policy cannot support the inference of an Ex Post Facto violation.

Plaintiffs also allege, based on data provided by the Parole Board, that the Parole Board in most cases in recent years has deviated from its Parole Guidelines. Compl. ¶104. Contrary to State Defendants' suggestion, Dkt. 148 at 76-78, Plaintiffs are not asserting that this deviation from the Parole Guidelines is itself the Ex Post Facto violation. *Cf. Tobon v. Martin*, 809 F.2d 1544, 1545 (11th Cir. 1987). Rather, consistent deviation from the Parole Guidelines is a strong indication that the Parole Board after 2019 was applying a *stricter* rule than supported by the Parole Guidelines—which demonstrates the plausibility of Plaintiffs' allegation that Ivey and Marshall had directed that access to parole be restricted, particularly for those convicted of "violent" offenses and that the Parole Board was implementing the Legislature's instruction to treat "public safety" as "paramount." Gwathney's statement that she did not consider the Parole Guidelines important is consistent with this interpretation. *See* Compl. ¶98.

The incarcerated Ex Post Facto Plaintiffs additionally allege facts demonstrating that they are strong parole candidates who are likely to be affected by the post-2019 changes to parole availability. Cole, Ptomey, McDole, Campbell, and Cartwright have worked for years out in the community, alongside free workers, and many of them regularly receive passes to spend days at a time with their families outside of ADOC facilities. Compl. ¶¶148-51, 154. Moore, who has been incarcerated since 1997, has worked in positions of trust and performed skilled labor throughout ADOC facilities. *Id.* ¶146. For approximately the last decade, he has worked outside the walls of ADOC facilities without incident, commonly without supervision. *Id.* English has also been entrusted by ADOC with substantial responsibility, including successfully serving as the Officer in Charge of the Faith Dorm and serving as a class coordinator and facilitator for a counseling and therapy group. *Id.* ¶153. Pritchett has also demonstrated his readiness for release, including by supporting ADOC staff in his role as a hospital runner. *Id.* ¶152. ADOC considers

all currently incarcerated Plaintiffs other than Campbell to be currently incarcerated for crimes Alabama deems "violent."[69] Plaintiffs' histories, which demonstrate that they are viable parole candidates, further support the inference that the post-2019 changes to parole access have substantially increased the likelihood that they will remain in prison.

Ex Post Facto Defendants' remaining arguments largely elide Plaintiffs' actual Ex Post Facto theory. As Plaintiffs emphasized during the preliminary injunction briefing and hearing—both of which predated the filing of State Defendants' motion—Plaintiffs are challenging the 2019 Parole Amendments and their implementation by Ivey, Marshall, and the Parole Board Members. Plaintiffs are not contending that the Legislature's requirement in the JRA to create Parole Guidelines, or the Parole Board's issuance of these Guidelines—whether in 2016 or 2020—was an Ex Post Facto violation as such. *See* Dkt. 148 at 67-70, 71-80; Compl. ¶85 (citing the 2020 Parole Guidelines); *see also id.* ¶¶235-239 (not mentioning the Parole Guidelines).[70]

Further, contrary to Ex Post Facto Defendants' arguments, Dkt. 148 at 72-73, the Complaint does not allege that the 2020 Parole Guidelines themselves were the material change to the substantive policies governing parole decisions. Rather, Plaintiffs argue that the Parole Board's implementation *in practice* of the 2019 Parole Amendments, at Ivey and Marshall's

---

[69] The Court may take judicial notice of this fact, which is reflected on ADOC's public "Inmate Search" page, https://doc.alabama.gov/InmateSearch, which displays "Incarceration Details" for those in ADOC custody. *See* Ala. Code §12-25-32(15) (defining "violent" offenses); Fed. R. Evid. 201(b)(2) (permitting judicial notice of facts not subject to reasonable dispute because they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also* Dkt. 24-16–24-21 (PDFs of some Plaintiffs' "Incarceration Details" pages).

[70] State Defendants' assertion that Plaintiffs' Complaint somehow incorporated by reference what State Defendants present as the 2016 Parole Guidelines, *see* Dkt. 148 at 71 n.23 & Dkt. 148-8 (undated parole guidelines), is incorrect: the 2016 Parole Guidelines are not mentioned in the Complaint. The Court should disregard this exhibit (Dkt. 148-8) in ruling on their motion to dismiss.

urging, rendered the post-2019 parole regime substantially more likely to increase the duration of the confinement of the incarcerated Plaintiffs denied parole. *See* Compl. ¶238. Indeed, as explained above, the Parole Board's consistent deviation from the 2020 Parole Guidelines demonstrates that the standards applied in the post-2019 parole regime are *not* explained by the Guidelines but rather support Plaintiffs' allegations that Ivey, Marshall, and the Parole Board are implementing the 2019 Parole Amendments in a manner that drastically reduces access to parole relative to the pre-2019 time period. *See* Compl. ¶104.

State Defendants' citation to *Paschal v. Wainwright*, 738 F.2d 1173 (11th Cir. 1984), Dkt. 148 at 67-69, a pre-*Garner* case, is thus inapposite. There, "an examination of the parole process both before and after" enactment of a Florida law establishing parole guidelines recommending presumptive parole release dates "show[ed] that neither the Parole Act nor the guidelines have operated to petitioner's detriment*." Paschal*, 738 F.2d at 1177. In *Paschal*, the guidelines "ensured an explicit, systematic continuation of the Parole Commission's past practice," and "parole at the discretion of the Commission … was not changed." *Id.* at 1180; *Johnson v. Wainwright*, 772 F.2d 826, 827 (11th Cir. 1985) (considering same guidelines); *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 933 (11th Cir. 1986); *Tooma v. David*, 381 F. App'x 977, 980 (11th Cir. 2010).

State Defendants also seek to explain away the dramatic drop in access to parole by ascribing it simply to a change in personnel. Dkt. 148 at 77-78. As an initial matter, this allegation alone is not sufficient grounds for the Court to ignore Plaintiffs' plausible allegations that Ex Post Facto Defendants' implementation of the 2019 Parole Amendments significantly increased the risk of lengthened terms of incarceration for individual Plaintiffs. Moreover, as the Complaint indicates, while there have been personnel changes since Gwathney was installed as

the Chair, each iteration of the Board since her arrival has maintained parole grant rates dramatically lower than pre-2019 rates—especially for those convicted of "violent" offenses. *See* Compl. ¶¶100, 102, 123, 163 (Littleton appointed in 2021; Simmons appointed in August 2023). It is certainly plausible that this pattern reflects that, as Governor Ivey has appointed new Board members, they have implemented the 2019 Parole Amendments with a shared understanding that they impose a more stringent standard than the one in effect prior to the amendments. It would therefore be improper to dismiss Plaintiffs' Ex Post Facto claim on the basis of State Defendants' competing and implausible theory of the facts.

State Defendants also make a perplexing argument that Plaintiffs Ptomey, McDole, and Pritchett cannot state an Ex Post Facto Clause claim because they were denied parole both prior to *and* after 2019. Dkt. 148 at 80. Of course, it is not as though the Parole Board evaluated Plaintiffs Ptomey, McDole, and Pritchett under both the pre- and post-2019 parole regimes simultaneously. Ptomey was denied parole in 2017, while incarcerated at a medium-custody facility. Compl. ¶149. After serving five more years of his sentence, during which time he spent years working for private employers in the community and safely returned home to his family on weekends, he was again denied parole in 2022 and set off for three years. *Id.* McDole was considered for parole in 2018, at which time he was told he would be eligible if he completed a specific rehabilitation program. *Id.* ¶150. He was then denied parole again in 2022 and set off for five years, despite completing the specified program and safely working in the community and returning home on passes in the intervening years. *Id.* Pritchett had likewise been incarcerated for a substantially longer period, and had a demonstrated work history, when he was denied parole and set off for five years in 2021, relative to his earlier parole denials in 2015 and 2017. *Id.* ¶152. These Plaintiffs were thus stronger candidates for parole when they were denied parole

after 2019 than when they were previously denied parole, and there is no basis to conclude that the stricter approach to parole implemented in 2019 did not substantially increase the likelihood of extending their incarceration.[71]

State Defendants' immunity arguments also present no obstacle to Plaintiffs' Ex Post Facto Clause claim. *See* Dkt. 148 at 118-19. As discussed, Marshall and Gwathney's entitlement to absolute immunity turns on the conduct in question. *See supra* Part III.B.5.b. Because Marshall's involvement in the Ex Post Facto Clause violation involves public statements and legislative advocacy, as well as pressuring the Parole Board in a meeting with the Governor, his liability is not limited to activities intimately associated with the judicial process, and he is not entitled to prosecutorial immunity. *See Hart*, 587 F.3d at 1296. Similarly, Gwathney's role went beyond quasi-judicial decision-making in individual parole cases, encompassing a sweeping revision to the framework that has governed parole since her installation, based on her and the other Ex Post Facto Defendants' interpretation of the 2019 Parole Amendments. *See Wilson*, 878 F.2d at 775; *Lemley*, 813 F.Supp. at 818-20. Ex Post Facto Defendants also are not entitled to qualified immunity, because it was clearly established by 2019 that imposing a retroactive, far stricter parole regime that creates a significant risk of increased punishment violates the Ex Post Facto Clause—particularly to the extent that parole regime, in its operation, now effectively denies access to parole to the entire category of incarcerated people convicted of "violent" offenses whose sentences include the possibility of parole. *See Garner*, 529 U.S. at 253-57; *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (qualified immunity can be defeated where "broader, clearly established principle should control" when applied to

---

[71] Nor does State Defendants' partial recitation of the facts regarding Moore, Cole, and Ptomey's recent parole hearings suggest that the post-2019 parole regime did not substantially increase the risk of extending their confinement. *See* Dkt. 148 at 80-81; Compl. ¶¶146, 148-49.

specific facts). Moreover, as with Plaintiffs' other claims, even if the Ex Post Facto Defendants were entitled to absolute or qualified immunity with respect to damages, Plaintiffs could still obtain prospective relief. *See, e.g.*, *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

In short, Ex Post Facto Plaintiffs have alleged detailed facts demonstrating that the changes in the law, policies, and practices governing parole after 2019 materially increase the risk that they will remain incarcerated. The Legislature's clear direction to treat "public safety" as paramount increased that risk, particularly when the meaning of "public safety" is viewed in the light of Ivey and Marshall's pressure campaign. The Parole Board's policy of systematically disregarding the recommendations of the Parole Guidelines, in favor of the far stricter approach to parole that they implemented, also increased that risk. The Plaintiffs denied parole have also presented facts showing that they are strong candidates for release. *See* Compl. ¶¶146, 148-54. It is thus apparent from the facts alleged that the Ex Post Facto Defendants' policy of severely restricting access to parole has materially increased the chances that these Plaintiffs will be denied parole. Particularly at the motion to dismiss stage, Plaintiffs do not need to prove that they would necessarily have been granted parole but for the retrospective application of these policies. Under governing precedent, *see, e.g.*, *Garner*, 529 U.S. at 255, they need only plausibly allege that the current parole system has significantly increased the risk their incarceration will be extended, and they have clearly done so.

## VII.   Plaintiffs Have Stated Plausible Equal Protection Clause Claims Against Ivey, Marshall, Hamm, and the Parole Board Members

The "clear and central purpose" of the Fourteenth Amendment's Equal Protection Clause is "to eliminate all official state sources of invidious racial discrimination in the States." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023)

(quoting *Loving v. Virginia*, 388 U.S. 1, 10 (1967)). As Ivey, Marshall, Hamm,[72] and the Parole Board Members acknowledge, Dkt. 148 at 82, parole candidates "may challenge the denial of … parole on equal protection grounds." *Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988); *see also Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986) (per curiam). To state an Equal Protection Clause claim, Plaintiffs must plausibly allege "an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1321 (11th Cir. 2021). The individual Plaintiffs denied parole[73] and Organizational Plaintiffs ("Equal Protection Plaintiffs") have more than met that burden here as to Ivey, Marshall, and the Parole Board Members ("Equal Protection Defendants").

Equal Protection Plaintiffs have clearly alleged a discriminatory effect—that is, that Equal Protection Defendants' implementation of the 2019 changes to the parole decision-making framework resulted in a system in which Black parole candidates are substantially more frequently denied parole and more frequently given the maximum possible set-off period for parole rehearing dates. Compl. ¶¶97-98, 100-03, 107-12. Indeed, Plaintiffs have presented a statistically significant regression analysis showing that Black parole candidates were approximately half as likely to be granted parole as similarly situated white parole candidates, controlling for material differences among parole candidates including ADOC facility type, fiscal year of parole decision, sex, and whether ADOC reported that the person had an off-site job in the past year. *Id.* ¶108. Plaintiffs have further alleged facts that, together, demonstrate that Equal

---

[72] Defendant Hamm is presently named in this claim solely as party necessary for complete relief. *See supra* n.64; *infra* n.106.

[73] Individual Plaintiffs who bring Equal Protection claims are Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright. Compl., Counts VI, VII.

Protection Defendants were motivated by racial discrimination in implementing and maintaining a parole system that systematically disfavors Black parole candidates. *See infra* Part VII.B. Equal Protection Defendants' request to dismiss these constitutional claims should thus be denied.

A.   **Equal Protection Plaintiffs Have Plausibly Alleged Disparate Treatment Because They Have Alleged Sufficient Facts to Support an Inference That Black Parole Candidates Were Treated Less Favorably Than Similarly Situated White Parole Candidates**

One path to proving an Equal Protection claim involves showing that a plaintiff in a protected class was treated worse than similarly situated comparators. *See Lewis v. City of Union City* ("*Lewis I*"), 918 F.3d 1213, 1220-21 & n.6 (11th Cir. 2019) (en banc). Ultimately, to satisfy the "similarly situated" standard, a plaintiff must demonstrate that "she and her comparators are 'similarly situated in all material respects.'" *Id.* at 1226.[74] However, at the pleading stage, the "complaint only needs to 'set out enough factual content to allow a court to draw the reasonable inference' of disparate treatment." *St. v. Talladega City Bd. of Educ.*, No. 1:22-CV-614-CLM, 2023 WL 2520340, at *8 (N.D. Ala. Mar. 14, 2023) (quoting *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1023 (11th Cir. 2016)); *see also Alvarez v. Lakeland Area Mass Transit Dist.*, 406 F.Supp.3d 1348, 1354 (M.D. Fla. 2019) ("Determining whether a

---

[74] State Defendants erroneously contend that Plaintiffs must show that comparators are "prima facie identical in all relevant respects," notwithstanding *Lewis I*, an Eleventh Circuit en banc decision holding that the "nearly-identical test" for comparators in intentional discrimination cases "is too strict." Dkt. 148 at 86; *Lewis I*, 918 F.3d at 1224. None of Defendants' cited cases, all of which address class-of-one claims, suggest that this Court should apply anything other than the standard articulated by the en banc Court in *Lewis* in this race discrimination case. *See Vision Warriors Church, Inc. v. Cherokee Cnty. Bd. of Comm'rs*, No. 22-10773, 2024 WL 125969, at *12 (11th Cir. Jan. 11, 2024) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007)); *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1233 (11th Cir. 2022); *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021) (quoting *Griffin Indus.*, 496 F.3d at 1207). The en banc Eleventh Circuit, by rejecting a standard requiring nearly identical comparators, sought to ensure that courts did not require "something akin to doppelganger-like sameness"—the standard State Defendants advance here—to prevail on an intentional discrimination claim. *Lewis I*, 918 F.3d at 1226.

plaintiff and comparator are 'similarly situated in all material respects' is a fact-intensive inquiry better suited to summary judgment." (citation omitted)). Here, Plaintiffs have presented well-substantiated allegations that they are "similarly situated to other prisoners who received more favorable treatment"—and plainly sufficient facts to make plausible the inference that Black parole candidates were treated differently from white parole candidates. *Sweet v. Secretary, Dep't of Corrs.*, 467 F.3d 1311, 1318-19 (11th Cir. 2006) (quoting *Damiano*, 785 F.2d at 931, and *Jones v. Ray*, 279 F.3d 944, 947 (11th Cir. 2001)).

Equal Protection Plaintiffs have presented detailed allegations supporting their assertion that Equal Protection Defendants have disfavored Black parole candidates. First, Plaintiffs present a statistically significant analysis of parole outcomes demonstrating that white parole candidates are more likely to be granted parole than similarly situated Black parole candidates. Compl. ¶108. This analysis controls for highly material variables that might affect parole outcomes, including facility type, fiscal year of hearing, sex, and job status (whether ADOC reported that the incarcerated person had checked out for a job during the fiscal year of the parole hearing). *Id.* Controlling for these variables, this regression analysis demonstrates that between fiscal year 2020 and fiscal year 2022, white parole candidates were approximately two times as likely to be granted parole as Black parole candidates. *Id.* As Equal Protection Defendants acknowledge, courts have recognized that statistical analysis—and regression analyses controlling for material differences, in particular—can *prove* disparate treatment of similarly situated individuals on the basis of a constitutionally protected interest. *See, e.g.*, *Floyd v. City of New York*, 959 F.Supp.2d 540, 560, 590 (S.D.N.Y. 2013) (holding following bench trial that the NYPD was "impermissibly targeting blacks and Hispanics for stops and frisks at a higher rate than similarly situated whites" based on regression analyses that controlled for

relevant variables); *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 475-76 (8th Cir. 1984) ("plaintiffs presented multiple linear regression analyses controlling for [relevant] factors" showing at trial that, "in many cases, women wait longer for promotion than similarly situated men"); *see also Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (plaintiffs proved discriminatory impact of facially neutral Alabama constitutional provision by showing disenfranchisement of Black people in Jefferson and Montgomery counties for non-prison offenses was 1.7 times as likely as disenfranchisement for white people, without controlling for other factors); *United States v. Armstrong*, 517 U.S. 456, 467 (1996) (describing *Hunter* as "consistent with ordinary equal protection principles, including the similarly situated requirement" because of this statistic). That Plaintiffs have here presented a robust regression analysis in their Complaint strongly indicates that they will ultimately be able to prove disparate treatment, which is more than sufficient at the pleading stage—and certainly supports a plausible inference of disparate treatment.

Plaintiffs have further alleged that, even within the groups of incarcerated people deemed sufficiently low risk to work unsupervised by ADOC staff in the community, Black parole candidates are denied parole more frequently than white parole candidates. For example, the Parole Board granted parole to Black parole candidates in work-release facilities at essentially equal rates as it granted parole to white candidates in 2018 (78.4% and 78.9%, respectively), but a sharp racial disparity appeared thereafter—in 2022, 23.4% of white parole candidates and 15.5% of Black parole candidates in work release were granted parole. Compl. ¶¶117-20 (also alleging that parole grant rates for Black parole candidates in work center facilities dropped from 61.6% to 5.2% between 2018 and 2022; rates for white parole candidates in this group fell from 65.7% to 15.3%). Plaintiffs have further alleged that, among the group denied parole in recent

years, white parole candidates are more than twice as likely as Black candidates to receive set-offs of their parole hearing dates of two years or less, while Black candidates denied parole are more likely than white candidates to receive the maximum five-year setoff of their parole hearings. *Id.* ¶110-12. Further, Plaintiffs have alleged that racial disparities persist when looking only at the group of parole candidates convicted of violent offenses, *id.* ¶¶102-03, and, separately, at those convicted of non-violent offenses, *id.* ¶¶123-24.

Equal Protection Defendants rehash arguments they made in opposition to Plaintiffs' preliminary injunction motion, arguing that Plaintiffs cannot make out an Equal Protection claim by relying on statistics. Equal Protection Defendants' cases, however, do not support this proposition. Equal Protection Defendants emphasize *Fuller*, 851 F.2d 1307, a case affirming the district court's grant of summary judgment to the state defendants on an Equal Protection Clause claim. Dkt. 148 at 87-88. In *Fuller*, the plaintiff argued that he had carried his evidentiary burden to establish a prima facie case, but the Court disagreed, concluding the statistics Fuller had compiled after discovery—showing that white murderers were paroled more frequently than Black rapists, and that, in the year the plaintiff was denied parole, more Black rapists were paroled than white rapists—were "ambiguous at best." 851 F.2d at 1310. Contrary to Equal Protection Defendants' characterization, the Eleventh Circuit did not wholesale "reject[]" the "use of statistics" in Equal Protection Clause claims in the parole context, Dkt. 148 at 92; on the contrary, *Fuller* acknowledges "that an unexplained statistical showing of disparate racial treatment by a single entity over a period of time could raise the inference of an equal protection violation." 851 F.2d at 1310 (citing *McCleskey v. Kemp*, 481 U.S. 279, 295 n.15 (1987)).[75] Equal

---

[75] State Defendants repeatedly invoke the phrase "exceptionally clear proof" used in *Fuller*, 851 F.2d at 1310. Dkt. 148 at 82, 84, 88, 94, 96, 110, 112. There are at least two reasons why this is

Protection Defendants' other cases likewise do not counsel dismissal here. In *Slakman v. Buckner*, the Eleventh Circuit concluded the plaintiff had plausibly stated an Equal Protection Clause claim when he provided an anecdotal comparison of himself and two people of a different race granted parole who had been convicted of similar crimes and completed similar periods of incarceration, while having completed less education and, in one instance, having no regular work history. *Slakman v. Buckner* ("*Slakman I*"), 434 F. App'x 872, 876 (11th Cir. 2011). In a later *Slakman* case, also cited by Equal Protection Defendants, the plaintiff alleged he was discriminated against as a class of one among people serving life sentences for murder. *Slakman v. State Bd. of Pardons & Paroles* ("*Slackman II*"), No. 21-12226, 2021 WL 5071858, at *2-3 (11th Cir. Nov. 2, 2021). There, the Eleventh Circuit concluded that he had only "conclusorily asserted" that others sentenced to life in prison for murder, who were "not as advantageously positioned," had been paroled following shorter periods of incarceration, which was insufficient to state a claim. *Id.* at *3. None of these cases holds that, to plausibly allege race discrimination in the context of parole, a plaintiff necessarily must control for the precise factors the plaintiffs in

---

not the relevant standard. First, *Fuller* is a summary judgment case premised on a factual record, not a ruling on a motion to dismiss; thus, questions of "proof" were properly at issue. 851 F.2d at 1310. Second, *Fuller* took the "exceptionally clear proof" standard from *McCleskey*, 481 U.S. at 294-97, which concluded that statistical evidence showing a pattern of racially disparate outcomes in capital sentencing decisions—each made by a unique jury—was insufficient to show purposeful discrimination in the individual petitioner's case. The *Fuller* court acknowledged that *McClesky* was not on all fours, because the *Fuller* plaintiff's challenge "focuse[d] on the decisions of a single entity, the Georgia Parole Board, rather than the decisions of many unique juries." 851 F.2d at 1310; *see also id.* (recognizing that "an unexplained statistical showing of disparate racial treatment by a single entity over a period of time could raise the inference of an equal protection violation"). *Fuller* concluded that the plaintiff was required to show "exceptionally clear proof" because he had *not* shown that he was similarly situated to white people who were paroled, and further determined that this standard was not met because the statistical evidence presented in that case was "ambiguous at best." *Id.* By contrast, here, Plaintiffs have both alleged similarly situated comparators and provided clearer, statistically significant analysis.

these cases highlighted, as opposed to alleging facts that plausibly support the inference that the plaintiffs were treated worse than similarly situated comparators, when considering material factors.

Perhaps recognizing that there is more than one way to satisfy the similarly situated standard, Equal Protection Defendants also contend that "[a]t minimum" plaintiffs must show comparators who are "prima facie identical" with respect to each factor listed in Alabama Code §15-22-26(a)(1)-(6), including the "[s]ame risk to offend as established by their risk assessments." Dkt. 148 at 89-90. In other words, Equal Protection Defendants would have this Court create a new test that no plaintiff could meet, given that information on all these precise factors is not publicly available, let alone in a format amenable to statistical analysis. *See id.* at 86 n.27 (acknowledging that completed parole guideline forms, which include risk assessment scores, "are privileged and not available to the public" (emphasis omitted)); *see also id.* at 108 (Chair Gwathney: "[O]ur files are privileged, so we can't put our files out there for [the] public or the media."); *id.* at 111 ("[T]here is no allegation in the Complaint that any commentor actually accounted for the facts known only to the Board."). There is simply no legal basis for Equal Protection Defendants' claim that analysis of each of these specific factors is a pleading prerequisite. *Cf. Slakman I*, 434 F. App'x at 876 (Equal Protection Clause claim survived motion to dismiss where plaintiff alleged information about the duration of confinement, crimes, and education/work history); Ga. Code Ann. §42-9-43(a) (statute listing factors to be considered in assessing parole eligibility in Georgia, many of which were not addressed by the plaintiff in *Slakman I*).

In any event, Plaintiffs *have* controlled for factors that overlap with the information captured by the statutory parole factors, and the Court should reject Equal Protection Defendants'

invitation to resolve factual disputes at the motion to dismiss stage. ADOC's facility types range from "Minimum-Community" facilities, which house incarcerated people whom ADOC has concluded present a sufficiently low security risk that they may work full-time in the community without supervision, to maximum-security/close custody facilities. *See* Compl. ¶¶11, 24, 51, 114-16. Implicit in these decisions are assessments of a person's criminal history, disciplinary record in prison, and proximity to the end of their sentence. *See id.* ¶¶114, 116. The regression analysis cited in the Complaint also controls for job status, which, according to ADOC's own documents, reflects ADOC's assessment of a person's ability to interact with the public unsupervised by correctional officers—which is plausibly related to ADOC's assessment of their risk to reoffend. *See id.* ¶¶108, 114-16. A determination that an individual is able to work unsupervised in the community is also a reasonable indication of progress toward reentry. [76] Moreover, beyond the regression analysis, Plaintiffs have presented analyses showing that Black parole candidates

_____

[76] Equal Protection Defendants acknowledge that "facility type" reflects ADOC's assessment of an incarcerated person "for purposes of security and programming." Dkt. 148 at 91. They object that some of the details are different from ABPP's assessment. *Id.* at 90-92. For instance, Equal Protection Defendants contend that ADOC reviews a shorter period of disciplinary history than does the Board. *Id.* at 91. While access to the (apparently privileged) information on the Board's Parole Guidelines sheets would admittedly allow for a more precise analysis of the factors the Board purports to consider, none of the differences Equal Protection Defendants highlight invalidate "facility type" and "job status" as variables capturing many of the factors relevant to parole.

　　State Defendants also argue that Incarcerated Plaintiffs in the same facilities are not necessarily similarly situated—citing an affidavit and 74 pages of documents that the Court should disregard at this juncture, Dkt. 148-13. *See* Fed. R. Civ. P. 12(d); *Mize v. 300 "F" St., Inc.*, No. 2:21-CV-38, 2021 WL 5494790, at *1 (S.D. Ga. Oct. 13, 2021); *Qureshi v. Alabama Coll. of Osteopathic Med., Inc.*, No. 1:20-CV-934-RAH-SMD, 2021 WL 2364210, at *3 n.2 (M.D. Ala. June 9, 2021) (refusing to consider evidence outside the complaint and convert motion to summary judgment where "the current body of evidence is not sufficient to support a ruling on a motion for summary judgment" (citing *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1232 (11th Cir. 2010))). If the Court is inclined to convert the motion into a motion for summary judgment under Rule 12(d), Plaintiffs should be provided a reasonable opportunity for discovery before a ruling. *See, e.g., Mize*, 2021 WL 5494790, at *1.

convicted of violent offenses are denied parole more often that white parole candidates convicted of violent offenses, with a similar racial pattern reflected in the available data regarding parole candidates convicted of non-violent offenses. *Id.* ¶¶102-03, 123-24. The factors included in Plaintiffs' analyses are thus closely correlated with the statutory parole factors highlighted by Equal Protection Defendants. *See* Ala. Code §15-22-26(a) (citing, inter alia, reentry progress, risk to reoffend, institutional behavior, and severity of the underlying offense); *see also Fuller*, 851 F.2d at 1310 (noting that "criminal history, nature of the offense, disciplinary record, employment and educational history, etc." are relevant to the parole suitability consideration). Plaintiffs' regression analysis thus controls for material differences among Black and white parole candidates and supports Plaintiffs' allegation that Black parole candidates are significantly disfavored in comparison to similarly situated white parole candidates. The additional facts alleged by Plaintiffs only bolster this disparate impact showing.[77]

### B.    Plaintiffs Have Sufficiently Alleged That Racial Discrimination Motivated Equal Protection Defendants' Administration of the Parole System

In addition to alleging the stark disparate racial impact of Equal Protection Defendants' parole policies, Equal Protection Plaintiffs also adequately allege that these Defendants acted with racially discriminatory intent. Plaintiffs have presented facts demonstrating that the weight of the factors articulated by the U.S. Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and developed in Eleventh

---

[77] As we have explained, Equal Protection Defendants' insistence that disparate impact can only be alleged by identifying a specific prima facie identical comparator in the Complaint is unsupported by Eleventh Circuit precedent. But, if the Court concludes Plaintiffs must allege individual similarly situated white comparators to survive a motion to dismiss, Plaintiffs should be provided the opportunity to amend their Complaint to do so. *See* Dkt. 91-1 (expert declaration providing additional analysis of publicly available data in support of motion for preliminary injunction).

Circuit precedent, support an inference of intentional discrimination here. *Id.* at 266-68; *see also*

*Greater Birmingham Ministries*, 992 F.3d at 1322 (enumerating *Arlington Heights* and additional

relevant factors). Plaintiffs also allege facts plausibly tending to show that Equal Protection

Defendants' proffered non-discriminatory justification for the clear racial disparities in parole

grant rates is pretextual.

As Equal Protection Defendants acknowledge, *Arlington Heights* and subsequent cases

provide the governing framework for courts to assess whether race is a "substantial or motivating

factor" in a defendant's challenged conduct. *Hunter*, 471 U.S. at 227-28; *see also Stout by Stout*

*v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018).

The "impact of the official action" is "an important starting point" for the Court's intent

analysis under *Arlington Heights* because "[s]ometimes a clear pattern, unexplainable on grounds

other than race, emerges from the effect of the state action," despite its facial neutrality. 429 U.S.

at 266; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487, 489 (1997) (noting that

effect is an "important starting point" because "impact of an official action is often probative of

why the action was taken in the first place since people usually intend the natural consequences

of their actions"). This factor weighs strongly in favor of inferring discriminatory intent here. As

discussed, Equal Protection Defendants' implementation of the 2019 changes to Alabama's

parole system had a substantial negative impact on Black parole candidates. Parole grant rates

went from being almost equal for white and Black candidates, with both receiving parole more

than 50% of the time, to favoring white applicants at a rate of two to one. Compl. ¶¶100-01, 108.

As Plaintiffs have alleged, these disparities persist even when looking separately at parole

candidates serving sentences for "violent" convictions, for whom parole grant rates fell

especially sharply—while still favoring white candidates by more than two to one among the

small group granted parole, *id.* ¶102.[78] Black parole candidates convicted of nonviolent offenses are likewise less often granted parole than their white counterparts, as are Black parole candidates in work release and work center facilities, respectively. *Id.* ¶¶119-20, 123-24. The Board has also issued decisions resulting in racial disparities in the setting of parole rehearing dates, with white candidates favored for shorter reset periods. *Id.* ¶¶110-12. The demonstrated burdensome impact of the challenged policies and practices on Black parole candidates is thus a factor strongly supporting an inference of discriminatory intent. *See, e.g.*, *Thompson v. Alabama*, 293 F.Supp.3d 1313, 1322 (M.D. Ala. 2017) (impact factor weighed in favor of plaintiffs where they alleged that statute disenfranchised 15% of the Black voting-age population but only 5% of the white voting age population).

Equal Protection Plaintiffs' allegations relevant to other *Arlington Heights* factors and the impact of the challenged conduct are likewise probative of discriminatory intent here, including "the foreseeability of the disparate impact" and "knowledge of that impact." *Greater*

---

[78] Equal Protection Defendants cite a series of cases for the proposition that disparate treatment of people convicted of violent offenses as such is not an Equal Protection Clause violation, and they contend that Plaintiffs' statistics are also consistent with a motive to deny parole to people convicted of violent offenses. Dkt. 148 at 97-99 (citing, e.g., *Cook v. Wiley*, 208 F.3d 1314, 1323 (11th Cir. 2000)). Plaintiffs' equal protection theory is premised on racial discrimination, not offense classification. Although Defendants Ivey and Marshall expressed a desire to deny parole access to those convicted of violent offenses, that does not rule out that racial discrimination was also a "motivating factor" in their campaign to overhaul access to parole. *Stout by Stout*, 882 F.3d at 1006. Equal Protection Defendants do not dispute that Black parole candidates convicted of violent offenses have been consistently granted parole at lower rates than white parole candidates convicted of violent offenses, but argue that the absolute (as opposed to relative) racial difference is small, and that the racial disparity among those convicted of non-violent offenses is insufficiently consistent. Dkt. 148 at 98-99. Plaintiffs disagree, but a motion to dismiss is not an appropriate vehicle to resolve disputes about the proper interpretation of Plaintiffs' statistical evidence. *Cf. Greater Birmingham Ministries*, 992 F.3d at 1304, 1329-30 (discussing statistical evidence in adjudicating motion for summary judgment). Viewing all the relevant facts in context, Plaintiffs have adequately alleged that race was a substantial factor motivating these defendants' conduct.

*Birmingham Ministries*, 992 F.3d at 1322. First, the racial skewing of parole grant rates and set-off dates was a predictable outcome of Equal Protection Defendants' decision to abandon objective evidence-based assessments. Compl. ¶¶102, 108, 111. Courts have consistently recognized that disregarding objective standards allows racial bias to infect decision-making. *See, e.g.*, *Shealy v. City of Albany*, 89 F.3d 804, 806 (11th Cir. 1996) ("Subjective criteria tend to facilitate the consideration of impermissible criteria such as race."); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir. 1985) (noting that this Circuit has "frequently noted" problems with "subjective evaluations" in employment context because they "provide a ready mechanism for racial discrimination"); *see also Williams v. City of Dothan*, 745 F.2d 1406, 1415 (11th Cir. 1984) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.") (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979)).[79]

Moreover, Equal Protection Plaintiffs have alleged facts demonstrating that Equal Protection Defendants knew about the racially discriminatory impact of their parole policies and practices yet maintained them, *see* Compl. ¶¶98, 126-28, another factor supporting the inference of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1322. As early as 2020, several legislators raised concerns about the racial disparities reflected in parole grant decisions.

---

[79] Plaintiffs are not contending that subjective criteria are per se discriminatory, and the cases Equal Protection Defendants cite are consistent with Plaintiffs' position that the discriminatory effect of abandoning structured decision-making was foreseeable. *See* Dkt. 148 at 110; *see, e.g.*, *Hill v. Seaboard Coast Line R.R. Co.*, 767 F.2d 771, 774-75 (11th Cir. 1985) ("It is difficult to imagine how a large corporation with a numerous work force can expect to satisfy its legal duties towards minorities when its selections for promotion are made in such an unstructured and unguided manner."). And, notwithstanding the presence in the applicable statute of the requirement that the Board engage in structured decision-making after 2019, Dkt. 148 at 109-10, Plaintiffs have alleged facts showing that the Parole Board in the vast majority of cases ignored the recommendations of these structured guidelines during the relevant period.

Compl. ¶98. Public critiques continued in the years that followed, but Equal Protection Defendants continued apace, with parole grant rates continuing to decline in a racially skewed manner. Compl. ¶¶100, 107, 127-28. Indeed, Gwathney reportedly responded to recent public attention regarding the declining parole rates by asserting that she did not care about "statistics," suggesting that no level of racially disparate impact would suffice to persuade the Board to revisit its approach.[80] *See* Compl. ¶105; *cf. Baker v. City of Kissimmee*, 645 F.Supp. 571, 587 (M.D. Fla. 1986) ("adherence to a challenged action with full knowledge of the predictable effects" is relevant to determine intent). In short, Ivey, Marshall, and the Parole Board Members were plainly on notice of the discriminatory effect of their policies and practices. Their failure to address these concerns is indicative of discriminatory intent. *See Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) ("knowledge of discriminatory impact" suggests discriminatory intent); *see also Dream Defenders v. DeSantis*, 553 F.Supp.3d 1052, 1094 (N.D. Fla. 2021) (impact known, suggesting discriminatory intent, "based on the concerns raised by the opponents"); *Banks v. McIntosh Cnty.*, 530 F.Supp.3d 1335, 1375 (S.D. Ga. 2021) ("requests" to address disparate impact demonstrated foreseeability and knowledge of impact); *cf. Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023) (widespread discriminatory practice may place entity on notice of need to act). Equal Protection Defendants do not dispute that they were aware of the press and legislative reports concerning the racial differences in parole outcomes; they simply contend that these racial differences could not possibly be "improper" because they are justified by "facts known only to the Board." Dkt. 148 at 111. At this motion to dismiss stage, the

---

[80] Equal Protection Defendants vehemently object to Plaintiffs' citation of this statement, Dkt. 148 at 108-09, 111, but none of their objections undermine the purpose for which Plaintiffs cite it here: it supports the proposition that Chair Gwathney was aware of the statistics showing a pattern of worse parole outcomes for Black parole candidates yet committed to continuing the same practices.

inquiry is whether Plaintiffs have plausibly alleged discriminatory intent, and Equal Protection

Defendants' maintenance and support of practices they knew were accompanied by stark racial

differences in parole outcomes makes an inference of discriminatory intent plausible.

Another factor weighing in favor of Plaintiffs here is "the availability of less

discriminatory alternatives." *Greater Birmingham Ministries*, 992 F.3d at 1327 (quoting *Jean*,

711 F.2d at 1486); *Dream Defenders*, 553 F.Supp.3d at 1095 ("less discriminatory alternative[],

in the form of preexisting law" supports finding discriminatory intent). Here, the parole practices

and procedures Ivey, Marshall, and the Parole Board Members abandoned in favor of the more

restrictive and racially discriminatory system currently in place demonstrate a feasible, less

discriminatory alternative. Equal Protection Defendants contend that alternative is not feasible

because it was the regime in place when Jimmy Spencer evaded parole supervision and

committed his crimes. *See* Dkt. 148 at 14-15, 111. The notion that the Spencer incident

demonstrates that the use of objective standards is infeasible is unsupported, implausible, and in

any event, certainly not a factual assertion that this Court can or should consider on a motion to

dismiss. Moreover, Equal Protection Plaintiffs are not challenging aspects of HB380 that Equal

Protection Defendants contend contribute to public safety by addressing the circumstances of the

Spencer case, including the changes to initial parole consideration dates and appointment of an

Executive Director by the Governor to oversee parole supervision. *See* Dkt. 148 at 101-02. There

is no reason those additional legislative measures could not remain in place while the evaluation

of parole fitness itself reverts to the less discriminatory alternative.

The remaining *Arlington Heights* factors address the context in which the challenged

decisions were made—namely, the "historical background" of the policy or practice, the

"specific sequence of events leading up" to the decisions at issue, contemporaneous statements

made by the decisionmakers, and procedural and substantive irregularities in the decision-making process. *Arlington Heights*, 429 U.S. at 267-68; *Greater Birmingham Ministries*, 992 F.3d at 1322.

The allegations set forth in the Complaint speak to these additional factors. For example, the Complaint alleges that Defendants Ivey and Marshall directed Parole Board members in 2018 to abandon the structured parole decision-making framework established by the JRA—despite the benefits of structured decision-making in reducing racial bias—and instead stop granting parole. *See supra* Part VI; Compl. ¶91. This direct pressure by the Governor and Attorney General to curtail access to parole and abandon the parole decision-making framework is a procedural and substantive irregularity. When the Parole Board refused, Ivey and Marshall also advocated for the 2019 Parole Amendments allowing them to achieve their aims: seizing on the language making "public safety" the "paramount duty" of the Parole Board, Ivey, Marshall, and ultimately the new Parole Board members, abandoned the evidence-based decision-making framework mandated by the JRA in favor of a system driven by bias. *See* Ala. Act No. 2019-393; Compl. ¶¶92-93, 98. The Complaint also alleges that, as soon as the 2019 Parole Amendments took effect, Ivey replaced the Black Executive Director with white Executive Director Charles Graddick, who promptly fired and disparaged three high-ranking Black officials at the ABPP and implemented racist personnel policies. Compl. ¶¶94-95. *See generally Ammons v. Dade City*, 783 F.2d 982, 988 (11th Cir. 1986) ("history of racial discrimination in general and in [challenged area] in particular" support inference of discriminatory intent).

Equal Protection Defendants emphasize different facts as part of their *Arlington Heights* arguments, but in doing so they at most suggest that a factfinder might ultimately draw different inferences from a fully developed factual record than the one Plaintiffs advance. Because the

Court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor" at this stage, Equal Protection Defendants' arguments are insufficient to support dismissal. *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) (citation omitted).

For example, these Defendants argue that the historical background and events leading up to the challenged conduct support their position, because—in their view—the 2019 Parole Amendments and their subsequent actions are fully explained by the case of Jimmy Spencer, a white man who evaded parole supervision and committed murder. Dkt. 148 at 100-03. While the Complaint acknowledges that this incident played some role in spurring legislation, it further alleges that this was not the sole cause of the changes in parole that Plaintiffs challenge. *See* Compl. ¶91. The Spencer incident cannot fully explain these defendants' *implementation* of that legislation in a manner that substantially disadvantages Black parole candidates, an outcome the Legislature did not expressly direct and one that does not logically follow from an attempt to avoid repetition of the Spencer incident.

Indeed, even if this were an appropriate dispute for the Court to resolve on a motion to dismiss, Plaintiffs have alleged facts that undermine Defendants' stated public safety rationale. The Parole Board has denied parole to demonstrably low-risk Black parole candidates whom ADOC has concluded may safely work in the community and, in some cases, return home on weekends, at higher rates than white parole candidates working in the same programs. *See id.* ¶¶113-20. And the Parole Board has in recent years granted parole more frequently to incarcerated people rated as "medium" risk under the Board's formal risk assessment than those rated as "low" risk. *Id.* ¶121. Parole grants also dipped sharply after 2018 for those convicted of non-violent offenses, with Black parole candidates in this group denied parole more frequently.

*Id.* ¶123. None of these analyses suggests that public safety is the primary and sole motivation for Equal Protection Defendants' actions, as Equal Protection Defendants ask this Court to conclude.

Equal Protection Defendants also seek to argue the facts with respect to the allegations regarding former Board Director Charles Graddick, Governor Ivey's hand-picked successor to Eddie Cook. Dkt. 148 at 104-05; Compl. ¶94.[81] Yet Plaintiffs' allegations regarding Graddick shed light on the culture of the Parole Board since 2019 and the messages that Governor Ivey sought to communicate to the Board. Plaintiffs allege that former Board chair Lyn Head, who witnessed Executive Director Graddick's actions firsthand, perceived his actions as racially discriminatory. *Id.* ¶¶95-96. And Graddick himself suggested that he set the tone for the Board going forward, stating that the Board "know[s] now that their job isn't to create space in Alabama['s] prison system[,] that's not what they were brought in to do." *Id.* ¶97. While Graddick may no longer be the Executive Director, Board Chair Leigh Gwathney was appointed during Graddick's tenure and has remained Board Chair throughout the period when especially stark racial disparities emerged in the parole data. *Id.* ¶¶96, 128.[82]

Overall, Defendants' argument seems to be that no one component of the overall discriminatory picture is independently sufficient to establish discriminatory intent. *See* Dkt. 148 at 96-112. Even if that were so, it is no obstacle to stating an Equal Protection Clause claim. The

---

[81] The Court should again disregard Equal Protection Defendants' effort to introduce evidence not properly considered on a motion to dismiss—namely, the appearance and dress code policy these defendants contend was implemented by Graddick, which is Dkt. 148-14. *See supra* n.76.

[82] Defendant Ivey also trumpets that she appointed a majority Black Board. Dkt. 148 at 106-07. While Ivey's choice of whom to appoint may not itself be evidence of anti-Black bias, it bears noting that anti-Black discrimination perpetuated by a Black-majority Board is no less unlawful than anti-Black discrimination by a majority white Board. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (Court has rejected "presumption that [a defendant] will not discriminate against members of his own race" (citation omitted)).

Eleventh Circuit has long recognized that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Hall v. Holder*, 117 F.3d 1222, 1225 (11th Cir. 1997) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Fla. State Conf. of NAACP v. Lee*, 576 F.Supp.3d 974, 983 (N.D. Fla. 2021) ("*Arlington Heights* … is a *totality* of circumstances test; this Court must weigh Plaintiffs' evidence as a whole. Thus, Defendants' argument invites this Court to err, … by 'miss[ing] the forest in carefully surveying the many trees.'") (quoting *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016)). Viewing all the relevant allegations in context, Plaintiffs have presented sufficient facts to plausibly support the inference that race was a motivating factor in Ivey, Marshall, and the Parole Board's campaign to deny access to parole, particularly to Black parole candidates, after 2019.

C.   **Even Absent Appropriate Comparators for All Plaintiffs Denied Parole, Plaintiffs Have Alleged Sufficient Facts to Support a Plausible Inference of Disparate Impact and Discriminatory Intent Under Eleventh Circuit Precedent**

Even if the Court finds that Plaintiffs have not sufficiently alleged disparate impact, despite the regression analysis and alleged relevant comparators, this is not grounds to dismiss Plaintiffs' Equal Protection claim where, as here, the facts present a convincing mosaic of circumstances indicating discrimination. The Eleventh Circuit has recognized that "[n]ot every [person] subjected to unlawful discrimination will be able to produce a similarly situated comparator[,]" and "a proper comparator simply may not exist" in every context. *Lewis v. City of Union City* ("*Lewis II*"), 934 F.3d 1169, 1185 (11th Cir. 2019). The Eleventh Circuit recently reiterated that "proof of a similarly situated comparator is not necessary [in every case] … to establish the core elements of an equal-protection claim: (1) a discriminatory motive; and (2) a discriminatory effect." *Red Door Asian Bistro v. City of Fort Lauderdale*, No. 22-11489, 2023

WL 5606088, at *8 (11th Cir. Aug. 30, 2023) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985), and *Lewis II*, 934 F.3d at 1185). Even without appropriate comparators, a plaintiff may establish an Equal Protection Clause violation by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Lewis II*, 934 F.3d at 1185 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). In overturning a grant of summary judgment to the defendants in *Lewis II*, the Eleventh Circuit explained that an inference of intentional discrimination can be supported by evidence that demonstrates—like evidence relevant to the *Arlington Heights* factors, see *supra* Part VII.B— "suspicious timing, ambiguous statements," "systematically better treatment of similarly situated" individuals, and "other bits and pieces" from which an inference of discrimination can be drawn, among other factors. *Lewis II*, 934 F.3d at 1185 (citations omitted). Here, at the pleading stage, Plaintiffs need only allege such facts supporting the inference of intentional discrimination and, as outlined in the preceding section, they have done so.

Defendants seek to limit this Eleventh Circuit precedent and the "convincing mosaic" theory to the employment context, Dkt. 148 at 93, but there is no rational justification for doing so and Equal Protection Defendants do not even attempt to offer one. *See, e.g.*, *Greater Birmingham Ministries*, 992 F.3d at 1322 n.33 (discussing the convincing mosaic framework in a voting rights case); *Red Door Asian Bistro*, 2023 WL 5606088, at *7-8 & n.4 (citing convincing mosaic framework in reversing grant of summary judgment to defendant in case alleging racially discriminatory kitchen inspections). Just as in the employment context, an incarcerated person may not be able to identify (particularly at the pleading stage) a close comparator yet still may be able to demonstrate that government officials treated him adversely because of his membership in a protected class. *See Johnson v. Johnson*, 385 F.3d 503, 531 (5th Cir. 2004) ("Leaving aside

the question whether identifying information about other inmates would even be available to a plaintiff at the pleading stage, we do not believe that a plaintiff's complaint must plead the circumstantial case that the defendants are requesting," i.e., alleging a similarly situated comparator in detail); *Brown v. Geo Grp., Inc*., No. 18-80026-CV, 2020 WL 13847462, at *13 (S.D. Fla. Oct. 20, 2020) (similar, citing *Johnson*, 385 F.3d at 530-32). At the summary judgment stage, when courts "use … the convincing mosaic standard, [they] look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination." *Tynes v. Fla. Dep't of Juv. Just*., 88 F.4th 939, 947 (11th Cir. 2023). At the motion to dismiss stage, the standard is less demanding: "a plaintiff will always survive a motion to dismiss if his complaint contains sufficiently well-pled facts to make a claim of intentional discrimination 'plausible on its face.'" *Duckworth v. Georgia Dep't of Hum. Servs*., No. 1:22-CV-04326-SDG, 2024 WL 1377650, at *3 (N.D. Ga. Mar. 31, 2024) (quoting *Twombly*, 550 U.S. at 570)). As demonstrated in the preceding section, the Complaint here presents a convincing mosaic of facts sufficiently alleging an Equal Protection Clause violation. *See supra* Part VII.B.[83]

---

[83] It is no surprise that the series of primarily pro se cases including individual Equal Protection Clause claims that State Defendants cite do not consider the Eleventh Circuit's convincing mosaic standard, as none of these plaintiffs appear to have invoked it. *See, e.g.*, *Jones*, 279 F.3d at 947 ("Jones did not set forth any facts in support of his allegations. Even a liberal interpretation of this pro se pleading does not reveal any factual basis for an equal protection claim."); *Brown v. McClure*, 849 F. App'x 837, 842 (11th Cir. 2021) (insufficient competent evidence supported equal protection claim based on "close management" status to survive summary judgment); *Rogers v. Ward*, No. 2:23-CV-356-ECM-KFP, 2023 WL 7290463, at *3 (M.D. Ala. Sept. 18, 2023) ("Rogers asserts in conclusory fashion that Defendants' failure to adhere to agency rules and regulations violated his right to equal protection."); *Lee v. Smithart*, No. 2:23-523-MHT-CSC, 2023 WL 9442571, at *2 n.4 (M.D. Ala. Dec. 20, 2023) ("Lee fails to meet his pleading burden as he does not allege that he was subjected to any adverse treatment based on some constitutionally impermissible reason.").

D.     **Equal Protection Defendants' Immunity Arguments Are No Obstacle to Plaintiffs' Claim**

Equal Protection Defendants seek to invoke several immunity doctrines to escape liability for all the federal constitutional violations Plaintiffs allege, Dkt. 148 at 118-19, but none extinguishes Plaintiffs' Equal Protection Clause claim. First, Plaintiffs are not pursuing money damages against these defendants in their official capacities. Second, Marshall is not entitled to absolute prosecutorial immunity with respect to his role in pressuring the Parole Board to implement a discriminatory parole system. As discussed, the scope of prosecutorial immunity "is a fact-specific inquiry that 'looks to the nature of the function performed, not the identity of the actor who performed it.'" *Kassa v. Fulton Cnty.*, 40 F.4th 1289, 1292 (11th Cir. 2022) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). It "does not apply when the prosecutor acts outside the ambit of activities 'intimately associated' with the judicial process," including administrative tasks and making statements to the press. *Hart*, 587 F.3d at 1296 (citations omitted). Here, Marshall's involvement is not limited to activities intimately associated with the judicial process; Plaintiffs allege that he engaged in public statements, including opposing legislation inconsistent with his priorities, and a pressure campaign aimed at the Parole Board members, including statements at a closed-door meeting with the Governor, that ultimately resulted in their agreement to operate the parole system in a racially discriminatory manner. Compl. ¶¶91-93, 98-99, 128. Absolute prosecutorial immunity therefore is not available with respect to this claim. Third, although Gwathney is entitled to damages immunity to the extent her liability is premised on her decisions in parole cases, *see Sultenfuss v. Snow*, 894 F.2d 1277, 1279 (11th Cir. 1990), Plaintiffs here allege that she engaged in conduct beyond quasi-judicial decision-making in individual parole cases, including a wholesale revision of the criteria governing parole decisions and set-off dates, and changing parole scores, *see, e.g.*, Compl. ¶¶98,

102-03, 105-06, 111-12. Defendant Gwathney thus is not entitled to absolute immunity either. *See, e.g.*, *Wilson*, 878 F.2d at 775; *Lemley*, 813 F.Supp. at 818-20.

Nor are any of the Equal Protection Defendants entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It has long been clearly established in this Circuit that the U.S. Constitution bars race-based parole denials. *See, e.g.*, *Fuller*, 851 F.2d at 1310; *Osborne v. Folmar*, 735 F.2d 1316, 1317 (11th Cir. 1984); *Slakman I*, 434 F. App'x at 876. Thus, if Plaintiffs are able to prove their Equal Protection claim premised on Equal Protection Defendants' adoption of a parole scheme that systematically denies parole for race-based reasons, they will also show that Equal Protection Defendants violated clearly established law.

Further, and importantly, even if Equal Protection Defendants were entitled to absolute or qualified immunity with respect to damages—and they are not for all the reasons provided—they would remain subject to prospective relief, and Plaintiffs' Equal Protection Clause claims for such relief could proceed. *See Pearson*, 555 U.S. at 242-43; *Fuller*, 851 F.2d at 1310; *Stallworth v. Collins*, 773 F. App'x 1078, 1080 n.2 (11th Cir. 2019).

## VIII.   Plaintiffs Have Stated a Plausible Substantive Due Process Claim Against Ivey, Marshall, Hamm, and the Parole Board Members

The Eleventh Circuit has long recognized that, even when state law creates no liberty interest in parole, state officials violate the substantive due process provisions of the Fourteenth Amendment when they engage in "arbitrary and capricious" or "flagrant or unauthorized action" in denying parole. *Monroe v. Thigpen*, 932 F.2d 1437, 1442 (11th Cir. 1991). Ivey, Marshall, Hamm, and the Parole Board Members ("Due Process Defendants") have engaged in conduct

that satisfies this standard, and the currently incarcerated Plaintiffs denied parole and

Organizational Plaintiffs ("Due Process Plaintiffs") have stated a valid claim.[84]

The Due Process Clause's substantive component "bar[s] certain government actions

regardless of the fairness used to implement them" and "serves to prevent governmental power

from being 'used for purposes of oppression.'" *Daniels v. Williams*, 474 U.S. 327, 331 (1986)

(citations omitted). In evaluating whether government conduct gives rise to a substantive due

process claim, "[c]ontext and the circumstances are significant, and the level of culpability

required can vary with the context." *Waldron v. Spicher*, 954 F.3d 1297, 1306 (11th Cir. 2020)

(citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849-54 (1998)). "[C]onduct by a government

actor will rise to the level of a substantive due process violation" where "the act can be

characterized as arbitrary or conscience shocking in a constitutional sense." *Slakman I*, 434 F.

App'x at 875 (quoting *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir.

2003)).

Although courts are "reluctant to expand the concept of substantive due process," *King v.

Pridmore*, 961 F.3d 1135, 1143 (11th Cir. 2020) (citations omitted), no expansion is needed in

this case because the right against arbitrary and capricious parole denials is well established in

the Eleventh Circuit. In *Monroe v. Thigpen*, plaintiff Monroe's prison file included a report with

statements that erroneously implied that he had raped his victim, which interfered with his ability

to obtain parole. 932 F.2d at 1438-39. The state official defendants ultimately admitted the

statements were false but argued that, "because there is no liberty interest in parole release or in a

particular security classification[,] Monroe has no right to due process in the procedures relating

---

[84] As State Defendants acknowledge, Dkt. 148 at 117, Plaintiffs are not pursuing a procedural due process claim. Hamm is included only to the extent necessary for relief. *See infra* n.106.

to parole release." *Id.* at 1441-42. The Eleventh Circuit disagreed. While acknowledging that Alabama's parole statute "is framed in discretionary terms and therefore does not confer a liberty interest in parole," the Court held that "this discretion is not unlimited" because "[a] parole board may not engage in 'flagrant or unauthorized action.'" *Id.* at 1442 (citing *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982)). The Court concluded that the Parole Board had "treated Monroe arbitrarily and capriciously in violation of due process" by relying on admittedly false information in determining whether to grant parole. *Id.* The Eleventh Circuit has repeatedly acknowledged the viability of this substantive due process right against arbitrary and capricious parole denials. *See, e.g., Sills v. FCI Talladega Warden*, No. 22-12656, 2023 WL 1775725, at *4 (11th Cir. Feb. 6, 2023) (Eleventh Circuit has "recognized a due-process right not to be treated 'arbitrarily and capriciously,' even in the absence of a liberty interest in parole"); *Ellison v. Alabama Bd. of Pardons & Paroles*, No. 17-13235-D, 2017 WL 6947946, at *5 (11th Cir. Dec. 13, 2017) ("[E]ven though Alabama's parole statute is discretionary, see Ala. Code §15-22-26, a prison official may not act in an 'arbitrary and capricious' manner or engage in a 'flagrant or unauthorized action,' in denying parole[.]" (citing *Thomas*, 691 F.2d at 489); *Walker v. Fla. Parole Comm'n*, 299 F. App'x 900, 902 (11th Cir. 2008) ("Although an inmate has no due-process right to an error-free determination of parole eligibility, a prison official may not engage in 'arbitrary and capricious' or 'flagrant or unauthorized action,' such as knowingly or admittedly relying on false information in making parole decisions." (citations omitted)).

Due Process Plaintiffs contend that Due Process Defendants engaged in arbitrary, capricious, flagrant, and unauthorized conduct that violates Plaintiffs' substantive due process rights. The Complaint details how Ivey, Marshall, and the Parole Board Members made a deliberate decision to alter the framework governing parole and thereby arbitrarily cut off access

to parole for thousands of incarcerated people sentenced to terms of imprisonment with the possibility of parole, including for many people who have been working safely in the community. *See* Compl. ¶¶77-78, 83-120. Plaintiffs allege that this decision and its implementation by Due Process Defendants resulted in denials of parole to nearly all parole candidates convicted of violent offenses and systemically racially biased decision-making. *See id.* ¶¶100-04, 106-20. The arbitrary and unauthorized nature of these Defendants' current approach to parole is only emphasized by the data showing that, in the vast majority of cases, the Parole Board not only denies parole but also ignores the recommendation of the evidence-based Parole Guidelines, sweeping them aside in favor of a consistently more punitive baseline. *Id.* ¶104.

Because Plaintiffs are alleging violations of their recognized federal right against arbitrary government action in the context of parole, the case law the State Defendants cite for the proposition that violation of state-created rights is insufficient to give rise to a substantive due process claim is inapposite. Dkt. 148 at 113-14; *see, e.g.*, *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) (reciting, in the context of a procedural due process challenge, that "a 'mere error of state law' is not a denial of due process" (citation omitted)). The evidence that the Parole Board in the vast majority of cases did not conform to the recommendations of the Parole Guidelines is powerful evidence that the Board is acting arbitrarily, capriciously, and in an unauthorized manner, *see* Compl. ¶104, but the violation of state law does not itself give rise to the due process claim.

In any event, there is "at least one exception" to the rule that violation of state-created rights cannot give rise to a due process claim: "Where a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally

protects that person from arbitrary and irrational governmental action." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279-80 (11th Cir. 2014). "[L]aws and broad-ranging executive regulations are the most common examples" of legislative acts; executive acts, by contrast, "'typically arise from the ministerial or administrative activities of members of the executive branch' and 'characteristically apply to a limited number of persons (and often only one person),'" frequently in the context of employment terminations or individual zoning decisions. *OIC Dreams Greene Cnty. IV, Inc. v. Benison*, No. 7:23-CV-1297-ACA, 2023 WL 8634789, at *5 (N.D. Ala. Dec. 13, 2023) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1557 n.9 (11th Cir. 1994) (en banc)). In addition to alleging violation of the established right against arbitrary and capricious parole decisions, here, as discussed *supra* Part VI, Plaintiffs have also alleged that the Due Process Defendants engaged in a legislative act, by seizing on a change in state law to implement far more stringent and discriminatory parole criteria that apply to all parole hearings. *See* Compl. ¶¶77, 91-93, 97-98, 100-08. Plaintiffs further contend that this overhaul of the parole system, in derogation of the state-law requirement to meaningfully consider parole candidates pursuant to the specified criteria, as well as federal rights against racially discriminatory government conduct and retroactive increases in the severity of punishment—is "arbitrary and irrational and not rationally related to a legitimate government purpose." *OIC Dreams Greene Cnty. IV*, 2023 WL 8634789, at *5 (N.D. Ala. Dec. 13, 2023) (quoting *PBT Real Est., LLC*, 988 F.3d 1274, 1284 (11th Cir. 2021)).[85]

---

[85] The State Defendants again invoke the case of Jimmy Spencer. *See* Dkt. 148 at 65. While the State certainly has a legitimate interest in protecting public safety, a reaction so disproportionate as to deny parole in essentially all situations where the incarcerated person committed a violent offense—regardless of any other factor, or their resemblance to Spencer's case—is arbitrary, capricious, and unjustified.

In a similar vein, the persistent pattern of racially disparate outcomes for parole candidates set forth in the Complaint is, for purposes of Plaintiffs' substantive due process claim, a strong indication that the Due Process Defendants are acting in a flagrant and unauthorized manner by taking race into account when deciding who is granted parole. *See* Compl. ¶¶100-03, 107-09; *Manley v. Thomas*, 255 F.Supp.2d 263, 266 (S.D.N.Y. 2003) ("[I]nsofar as any inmate incarcerated in a New York State facility has any liberty interest in parole, that interest extends only to not being denied a petition arbitrarily or capriciously, based on inappropriate consideration of a protected classification or an irrational distinction, or by reason of any other constitutionally unlawful grounds." (citing, *inter alia*, *Meachum v. Fano*, 427 U.S. 215, 226 (1976)). Due Process Defendants complain that the overlap in Plaintiffs' substantive due process and Equal Protection claims bars Plaintiffs from pursuing a substantive due process claim, citing *County of Sacramento v. Lewis*, 523 U.S. at 852. Dkt. 148 at 114-15. Yet the Supreme Court has acknowledged that, where a claim is not fully "covered by a specific constitutional provision," a substantive due process analysis remains appropriate. *Id.* at 843 (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). While some of the constitutionally arbitrary conduct Plaintiffs allege violates the Equal Protection Clause, as discussed above, it also encompasses arbitrary and unauthorized conduct beyond racial discrimination, including substantially increased denials of access to parole for parole candidates of all races, particularly those convicted of violent offenses and including those already deemed low-risk enough to work in the community and return home on weekends. *See* Compl. ¶¶102-04, 106, 113-23. That some of the Due Process Defendants' unauthorized conduct offends the Equal Protection and Ex Post Facto Clauses as well demonstrates the constitutional dimension of their arbitrary, wrongful conduct, but it does not bar

Plaintiffs' substantive due process claim based on the totality of these defendants' conduct in dramatically, arbitrarily, and capriciously reducing access to parole.[86]

## IX.   Plaintiffs Have Sufficiently Pleaded KKK Act Claims Under 42 U.S.C. §1985 Against Defendants' Ivey, Marshall, Hamm, and the Parole Board Members

### A.   Plaintiffs Have Alleged Viable 42 U.S.C. §1985(2) and (3) Claims Against Ivey, Marshall, Hamm, and the Parole Board Members

The Individual Plaintiffs denied parole and Organizational Plaintiffs ("§1985 Plaintiffs") allege that Defendants Ivey, Marshall, and the Parole Board Members ("§1985 Defendants")[87] violated 42 U.S.C. §1985, a provision of the Ku Klux Klan Act enacted in the wake of the Civil War to redress conspiracies to interfere with civil rights. *See Chua v. Ekonomou*, 1 F.4th 948, 955 (11th Cir. 2021). Specifically, the §1985 Plaintiffs allege that these Defendants engaged in conduct that violated two clauses of 42 U.S.C. §1985: The first, within §1985(3), applies "[i]f two or more persons in any State or Territory conspire . . . , for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." The second, within §1985(2), applies when "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State … with intent to deny to any citizen the equal protection of the laws." The KKK Act provides a cause of action to those injured by such conspiracies. *Id.* §1985(3); *see Kush v. Rutledge*, 460 U.S. 719, 724 (1983).

The Complaint includes sufficient facts to state a §1985 claim based on the coordinated efforts of Defendants Ivey, Marshall, and the Parole Board Members to radically decrease access

---

[86] Plaintiffs are seeking only prospective relief for their substantive due process claim. Thus, the Court does not need to reach State Defendants' immunity arguments as to this claim. *See* Dkt. 148 at 118-19; *supra* Part III.B.1.

[87] Defendant Hamm is sued as a party necessary to obtain complete relief with respect to this claim. *See supra* n.64; *infra* n.106.

to parole, particularly for Black parole candidates.[88] To state a §1985(3) claim under the "deprivation" clause, a plaintiff must allege: "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Trawinski v. United Techs.*, 313 F.3d 1295, 1299 (11th Cir. 2002) (citing *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996)). A claim under §1985(2) has similar elements, except the purpose of the conspiracy must be to impede, hinder, obstruct, or defeat, in any manner, the due course of justice in the State, with intent to deny the equal protection of the laws. *See* 42 U.S.C. §§1985(2), (3); *Chua*, 1 F.4th at 955.

**Conspiracy and Overt Acts.** First, Plaintiffs have adequately alleged a conspiracy—that is, "a meeting of the minds between two or more persons to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc) (citing *Bivens Gardens Office Bldg., Inc. v. Barnett Banks Inc.*, 140 F.3d 898, 912 (11th Cir.1998)); *see also Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) ("Among other things, section 1985 plaintiffs must allege the elements of civil conspiracy, including: 'an agreement to take part in an unlawful action or a lawful action in an unlawful manner.'" (citation omitted)). "An agreement to conspire may 'be proved by circumstantial as well as direct evidence' and may

---

[88] State Defendants incorrectly assert that there is a "heightened pleading standard" for civil rights and conspiracy claims, citing cases from the 1980s. Dkt. 148 at 123-24; *see also* Dkt. 142 at 14-15. The Eleventh Circuit has since held that "whatever requirements our heightened pleading standard once imposed have since been replaced by those of the *Twombly-Iqbal* plausibility standard.... [which] applies to *all* civil actions." *Hoefling v. City of Miami*, 811 F.3d 1271, 1276 (11th Cir. 2016) (citation omitted; alterations in original). No heightened pleading standard applies to §1985 claims.

be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *United States v. Schwartz*, 541 F.3d 1331, 1361 (11th Cir. 2008) (citations omitted). Indeed, "[i]t is well-settled that the 'existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement.... The more common method of proving an agreement is through circumstantial evidence.'" *United States v. Pineiro*, 389 F.3d 1359, 1369 (11th Cir. 2004), *amended*, 2004 WL 3059008 (11th Cir. Nov. 15, 2004) (citation omitted; second alteration in original). Plaintiffs need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement," *Twombly*, 550 U.S. at 556, and they have done so here.

Plaintiffs' factual allegations regarding the relationships among the §1985 Defendants, their overt acts, and the totality of their challenged conduct with respect to the manipulation of the State parole program are sufficient to state a §1985 conspiracy. The Complaint alleges that Governor Ivey and Attorney General Marshall together pressured previous Parole Board members to shut down access to parole in 2018. Compl. ¶91. Ivey and Marshall's coordinated action in arranging the meeting with Parole Board members and presenting a consistent, unified position during that meeting and afterward presupposes advance discussion and agreement. Although the State Defendants are correct that no agreement with the Parole Board members was formed during that 2018 meeting (because those Board members would not acquiesce in Ivey and Marshall's demands, Dkt. 148 at 124), subsequent Board members—including those who are defendants here—implemented a parole decision-making framework that closely hews to Ivey and Marshall's priorities, *see* Compl. ¶¶98-112. It is plausible to infer based on the concert of action and relationships between Ivey, Marshall, and the Parole Board Members, that Ivey and

Marshall communicated their priorities to the new Parole Board members and that the new

Parole Board members agreed to implement them. This is particularly plausible given that each

of the current Board members was appointed by Ivey after Ivey and Marshall announced their

parole priorities, and further given that Gwathney, who remained on the Board during the

relevant period, was working in the Office of the Attorney General under Marshall when she was

appointed. Compl. ¶¶96, 163. Further, given the frequency with which the Parole Board began

denying parole once Gwathney was installed as Chair, including as Governor Ivey appointed

different members of the Board over time, it is reasonable to infer—and certainly far more than

plausible—that Gwathney, Ivey, and Marshall's shared priorities were communicated to and

accepted by the other Board members in 2019 and after. The subsequent Boards oversaw

plummeting parole grant rates and extended reconsideration periods, with Black parole

candidates particularly disfavored, and with the Board exhibiting consistent disregard for and

departure from the Parole Guidelines recommendations. *See* Compl. ¶¶98-112; *see Santillana v.*

*Fla. State Ct. Sys*., No. 6:09-CV-2095-ORL-19, 2010 WL 6774486, at *6 (M.D. Fla. June 4,

2010) (allegations that defendants acted in concert and contrived efforts to terminate plaintiff and

falsify her performance record as a pretext for race-based termination were sufficient to survive

motion to dismiss).[89] Even at trial, a "conspiracy's existence may be proven … inferentially and

_____

[89] State Defendants also invoke, out of context, the principle that "as long as an attorney's
conduct falls within the scope of his representation, the attorney is immune from allegations of §
1985 conspiratorial conduct" as the reason why Marshall cannot be held liable for his protests
regarding parole cases. *Farese v. Scherer*, 342 F.3d 1223, 1231 (11th Cir. 2003); Dkt. 148 at 125-
26. Marshall, however, does not assert that he operates within an attorney-client relationship with
the Parole Board or the Governor when his office takes a position before the Parole Board, so
this exception would not apply. *Cf. Farese*, 343 F.3d at 1231 ("[T]o plead a § 1985 conspiracy
*involving a client and his attorneys*, one must prove that the attorneys were operating outside the
scope of their representation." (emphasis added)). Nor are Plaintiffs seeking to hold Marshall
liable based on the content of his statements at particular parole hearings; they are alleging that

circumstantially by the character of the acts done, the relation of the parties, and other facts and circumstances suggestive of concerted action." *See SE Prop. Holdings, LLC v. Saint Fam. Ltd. P'ship*, No. CV 16-0567-WS-MU, 2017 WL 1628898, at *9 (S.D. Ala. May 1, 2017). Here, at the motion to dismiss stage, Plaintiffs' allegations are more than sufficient to support the inference of a conspiracy.

Plaintiffs have also alleged numerous acts in furtherance of the conspiracy, including Ivey Marshall, and the Parole Board Members' conduct in implementing a racially discriminatory parole decision-making framework, Ivey's appointment of a new Executive Director, and hundreds of parole denials. *See* Compl. ¶¶94, 98, 100-04, 106-09, 110-12, 119-20, 123-24, 267.

Defendants' invocation of the intracorporate conspiracy doctrine as to the alleged conspirators—Governor Ivey, Attorney General Marshall, and the Parole Board Members—is unavailing. *See* Dkt. 142 at 13-14; Dkt. 148 at 120-21; Dkt. 152 at 21-22; 153-1 at 25-27. "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew*, 206 F.3d at 1036. While the Eleventh Circuit has extended the doctrine to cases in which employees of the same government office or municipality conspire with one another in the course of their official duties, State Defendants cite no case—and Plaintiffs have

---

his pattern of opposing parole, and the Parole Board's pattern of denying it, demonstrates coordination with the Governor and Parole Board. *Cf. Sullivan v. Smith*, 925 So.2d 972, 974-76 (Ala. Civ. App. 2005) (plaintiff could not hold family members liable for slander based on statements at parole hearing). And, of course, Plaintiffs allege conduct by Marshall beyond his parole oppositions, including the meeting to pressure the Parole Board to restrict parole and his public statements advocacy. *See* Compl. ¶¶91-93.

not identified any—that extends the doctrine to apply it to public officials working in *different* state or federal government offices and agencies. *See Denney v. City of Albany*, 247 F.3d 1172, 1191 (11th Cir. 2001) ("Here, the only two conspirators identified by Plaintiffs—Fields and Jackson—are both City employees; no outsiders are alleged to be involved."); *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767-68 (11th Cir. 2000) (applying the doctrine to a county and its employees, who were "part of a single, public entity," where the conspiracy "does not involve even a single conspirator from outside that public entity"); *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010) ("Both Defendants Carver and Crook are law enforcement officers with the A[uburn] P[olice] D[epartment]. No outsiders are involved.").[90]

The intracorporate conspiracy doctrine is premised on basic agency principles, which do not support application of the doctrine here. *See, e.g.*, *Dickerson*, 200 F.3d at 767 ("doctrine stems from basic agency principles that 'attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor'" (citations omitted)). The alleged conspirators are Governor Ivey, the head of the executive branch; Attorney General Marshall, a separately elected constitutional officer, *see* Ala. Const. art. V, §112 (2022); and the members of the Parole Board, a state agency governed by the Legislature and created by statute, *see* Ala. Const. art. V, §124 ("The Legislature may provide for and regulate the administration of pardons, paroles ...."); Ala. Code §15-22-20(a).[91] There is no legal

---

[90] Progressive Finishes argues that *Denney* stands for the proposition that the doctrine applies more broadly so long as the "separate agencies/organizations" are part of a "single larger public entity." Dkt. 153-1 at 26. *Denney* did not address the question whether employees of independent state offices and agencies could invoke the intracorporate conspiracy doctrine; it ruled on the basis of agency principles, concluding that the two City employees who were alleged to have conspired "were both effectively acting as the City itself." 247 F.3d at 1191.

[91] ADOC Commissioner Hamm, sued as a necessary party with respect to this KKK Act claim, *see supra* n.64; *infra* n.106, oversees an entirely separate government department and is

basis for expanding the doctrine to preclude liability for those who conspire to violate civil rights while employed by and representing *different* state agencies or officers, none of which are acting as agents of the other. In particular, there is no reasonable argument, given the structure of Alabama State government, that in the usual course of business, the members of the Parole Board act as agents of Ivey, Marshall, or anyone else, especially in light of the State Defendants' repeated assertions that the Governor, Attorney General, and Parole Board operate independently. *See, e.g.*, Dkt. 148 at 27-29 ("Neither the Governor, the Attorney General, nor the ADOC Commissioner have authority or control over the Board's parole decisions."); *id.* at 105 (describing the Parole Board as an "independent agency"); *id.* at 125 ("Board members act independently of the Governor who cannot force them to grant or deny parole."). The "cases employing [the intracorporate conspiracy doctrine] have rested in large part on precedent drawn from the antitrust field, where considerations underlying the need for an 'intracorporate' exception to ordinary conspiracy principles are very different" from those presented here. *Stathos v. Bowden*, 728 F.2d 15, 20-21 (1st Cir. 1984); *see also McAndrew*, 206 F.3d at 1036 (doctrine developed in the antitrust context, "where it seemed particularly logical to conclude that a single corporation could not conspire with itself to restrain trade in the way imagined by Section 1 of the Sherman Antitrust Act"). It does not make sense to extend the doctrine to a situation where, independent of the alleged conspiracy, no agency relationship exists among the alleged conspirators and the statute at issue was enacted in principal part to target conspiracies by state actors to interfere with civil rights and the due course of justice, not to ensure economic competition. By §1985 Defendants' logic, it would essentially never be possible to bring a §1985

---

responsible for the "the independent direction, supervision and control" of the Department. Ala. Code §14-1-1.3.

claim against any combination of individuals working for any branch or agency of the State, no matter how independent those offices or wrongful their conduct. Given the breadth with which the Supreme Court has instructed courts to apply Reconstruction Era statutes, precluding liability on a novel basis would be unwarranted here. *See Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971).[92]

**Unlawful purpose.** Plaintiffs have also sufficiently alleged the requisite unlawful purposes to proceed under these clauses of §1985. In particular, Plaintiffs have adequately alleged "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102; *see also Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1292 (11th Cir. 2002). In practice, the "animus requirement is comprised of two analytically distinct inquiries: (1) whether there is a 'qualifying class' and (2) whether the defendant was motivated by discriminatory animus against the class." *Dean v. Warren*, 12 F.4th 1248, 1258 (11th Cir. 2021) (citing *Bray*, 506 U.S. at 269).

Racial groups clearly satisfy the first inquiry. As the Eleventh Circuit recently reaffirmed, "the class of African Americans is the strongest qualifying class imaginable because protecting African Americans and their advocates from the 'massive, organized lawlessness that infected our Southern States during the post-Civil War era' was the chief purpose of § 1985(3)'s passage." *Id.* at 1262 (quoting *Bray*, 506 U.S. at 307 (Stevens, J., dissenting)).

---

[92] Even if the intracorporate conspiracy doctrine applied to these disparate public officials—and it does not, as discussed—Plaintiffs' claims would fall within the exception to the doctrine that applies where defendants "engage in a series of discriminatory acts as opposed to a single action." *Dickerson*, 200 F.3d at 770; *see also Grider*, 618 F.3d at 1262 n.34 (noting that the exceptions to the intracorporate conspiracy doctrine "appear to have developed to reduce the impact of the doctrine in § 1985 cases"). As alleged, §1985 Defendants have engaged in a years-long alteration of the framework governing parole, resulting in a series of thousands of parole denials under this racially discriminatory scheme. *See* Compl. ¶¶98, 100-02, 107-08, 267.

As to the second inquiry, as discussed above in the context of the Equal Protection Clause claims, Plaintiffs have plausibly alleged that Ivey, Marshall, and the Parole Board Members were motivated by racially discriminatory animus when they agreed to abandon the structured decision-making framework that previously governed parole and instead to adopt an approach that discriminatorily denies parole to Black parole candidates. *See supra* Part VII.B; *see also Lee v. Christian*, 98 F.Supp.3d 1265, 1272-73 (S.D. Ga. 2015) (alleging circumstantial evidence of purpose sufficient to survive motion to dismiss). Thus, Plaintiffs have alleged that the purpose of this conspiracy was to deny the class of Black parole candidates the equal protection of the laws under the Fourteenth Amendment, *see supra* Part VII.A-C—in addition to the protection of the state laws intended to ensure fair parole consideration, *see Lee*, 98 F.Supp.3d at 1274 ("[E]ven a conspiracy to commit a violation of state law could be the basis for a § 1985(3) conspiracy.").

The State Defendants' counterarguments are without merit. They contend that the clause of §1985(2) that Plaintiffs invoke, which prohibits conspiracies intended to impede, hinder, obstruct, or defeat, in any manner, the due course of justice in the State, applies only in relation to state court proceedings. Dkt. 148 at 126. Even if correct, that contention would create no obstacle here, because Plaintiffs contend that the conspirators *have* interfered with the course of justice in state courts. Plaintiffs allege that, by eliminating the possibility of parole for impermissible, racially discriminatory reasons, the conspirators have acted to subvert sentences imposed by state judges that include the possibility of parole. Compl. ¶¶106-07; *see also Hart*, 587 F.3d at 1296 ("Parole decisions are the continuation of the sentencing process[.]" (alteration and citation omitted)). In any event, *Morast v. Lance*, 807 F.2d 926 (11th Cir. 1987), which State Defendants rely upon, interprets a separate and distinct clause of §1985(2) that specifically applies to parties or witnesses in a "court of the United States." *Id.* at 929-30. The clause

Plaintiffs invoke here is phrased more broadly to apply to "the due course of justice in any State." 42 U.S.C. §1985(2). The Supreme Court has instructed that "the Reconstruction civil rights acts, such as section 1985, are to be 'accord(ed) [] a sweep as broad as (their) language.'" *Chavis*, 300 F.3d at 1292 (quoting *Griffin*, 403 U.S. at 97). There is no reason to read this broad language regarding the "due course of justice" in a state to exclude parole consideration by a state Parole Board as part of a sentence issued by a state court judge.

**Injury to Person or Property and/or Deprivation of Any Right or Privilege.** Section 1985 Plaintiffs have plainly alleged that they were injured in their persons or property, and deprived of their rights or privileges under the Constitution, as a result of the racially discriminatory parole denials and associated deprivations that were the object of the §1985 Defendants' conspiracy. Compl. ¶¶146-57. As a result of these parole denials, §1985 Plaintiffs are required to remain in prison, facing harrowing and sometimes life-threatening conditions, as well as economic injury resulting from Plaintiffs' inability to receive their full earnings for work performed or, in some cases, any earnings at all. *See id.* In addition, as discussed above, these defendants deprived Plaintiffs of their rights under the Equal Protection and Ex Post Facto Clauses of the Constitution. *See supra* Parts VI-VII. The injury requirement is therefore no obstacle to §1985 Plaintiffs' claim here.

**B.      Plaintiffs Have Alleged Sufficient Facts to State a 42 U.S.C. §1985(3) Claim Against Ivey and Marshall Based on Their Conspiracy to Interfere with Operation of the State Parole System.**

In addition to the claims under §1985(2) and (3) against the larger group of conspirators, §1985 Plaintiffs also allege a separate claim against Ivey and Marshall under the clause of §1985(3) that prohibits conspiracies "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or

Territory the equal protection of the laws." To state a claim under this "hindrance" clause, a plaintiff must allege a conspiracy (1) with the purpose of "interfer[ing] with state law enforcement, not just … interfer[ing] with the persons seeking to exercise their legal rights"; (2) that is "directed at a protected class"; and (3) "implicate[s] 'a constitutional right.'" *Jingrong v. Chinese Anti-Cult World All.*, 287 F.Supp.3d 290, 300 (E.D.N.Y. 2018) (quoting *Nat'l Abortions Fed. v. Operation Rescue*, 8 F.3d 680, 685 (9th Cir. 1993)); *see also Libertad v. Welch*, 53 F.3d 428, 450 (1st Cir. 1995), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997).

As discussed above, Plaintiffs have alleged facts showing that Ivey and Marshall conspired for the purpose of overriding the governing parole framework implemented by the Parole Board and replacing that framework with one they knew would be infected with racial discrimination and bias. *See supra* Part IX.A. Plaintiffs have also alleged that these two conspirators engaged in overt acts in furtherance of their conspiracy, including their meeting to pressure the members of the 2018 Parole Board to abandon the evidence-based parole criteria and start denying parole across the board to "violent" offenders, their public statements expressing their intent to overhaul the Parole Board's priorities, Ivey's appointment of Director Graddick and Chair Gwathney, and Governor Ivey's Executive Order imposing a moratorium on parole until her requirements were met. *See* Compl. ¶¶91-94, 96. All these acts were in service of Ivey and Marshall's goal "to interfere with the State's power to secure equal protection of the laws" to Black parole candidates, by interfering with the Parole Board's operations. *Zhang Jingrong*, 287 F.Supp.3d at 301. Race is clearly a protected class. *See supra* Part IX.A. And Ivey and Marshall's conspiracy to interfere with the operations of the Parole Board implicated parole candidates' constitutional rights to the equal protection of the laws and not to be subjected to Ex

Post Facto laws, as previously discussed. *See supra* Parts VI-VII. Plaintiffs have thus stated a separate 42 U.S.C. §1985(3) claim against Ivey and Marshall.[93]

## X.     Plaintiffs Have Adequately Alleged a 42 U.S.C. §1986 Claim Against All Defendants

Section 1986 provides a cause of action against those who have knowledge of but fail to prevent the wrongs that are the focus of the conspiracies identified in 42 U.S.C. §1985:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action ….

The scope of liability under §1986 is broader than under §1985. First, a defendant need not participate in a §1985(3) conspiracy to be liable under §1986. *Park v. City of Atlanta*, 120 F.3d 1157, 1158 (11th Cir. 1997).[94] Nor must a §1986 defendant share in the racially discriminatory

---

[93] Plaintiffs incorporate their response to Gwathney and Marshall's absolute immunity arguments at *supra* Part VI. With respect to qualified immunity, as with Plaintiffs' Equal Protection Clause claim, if Plaintiffs can show that the §1985 Defendants conspired to deny parole on race-based grounds, they will have shown a violation of clearly established law, and a dismissal on the basis of qualified immunity is therefore not appropriate. *See Fuller*, 851 F.2d at 1310. Even if Plaintiffs' claims for money damages were barred, however, Plaintiffs could still pursue their claims for prospective relief under 42 U.S.C. §1985. *See id.* ("[T]o the extent that Fuller is seeking declaratory and injunctive relief, the shield of absolute immunity is inapplicable."); *Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) (holding that injunctive relief is available under §1985); *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting Fifth Circuit decisions prior to September 30, 1981 as precedent); *see also McAlister v. Alaska*, No. 3:23-CV-0029-HRH, 2023 WL 3480001, at *8 (D. Alaska May 16, 2023) ("[T]he majority of courts which have considered the issue have held that injunctive relief is available under Section 1985(3).").

[94] Thus, SRG's argument that Plaintiffs cannot state a §1986 claim against SRG without also stating a claim against it under §1985 fails under well-established law. Dkt. 147 at 29-30; *see, e.g.*, *Brantley v. City of Macon*, 390 F.Supp.2d 1314, 1330 (M.D. Ga. 2005) ("[T]he statute does not require a showing that the defendants subject to the § 1986 claim actually 'participated in

motive animating the members of the conspiracy. *Id.* at 1160. Instead, a showing of negligence is sufficient to maintain a §1986 claim. *Id.* As the Eleventh Circuit has explained, if defendants "knew of a § 1985(3) conspiracy, were in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it, they are liable under § 1986." *Id.* (citations omitted). Thus, at this stage of proceedings, Plaintiffs' burden is to allege (1) knowledge of a §1985(3) conspiracy, (2) that defendants were in a position to prevent the implementation of the conspiracy, and (3) they neglected or refused to take action. *Id.*

First, as discussed above, §1985 Plaintiffs have alleged plausible §1985 conspiracies among Defendants Ivey, Marshall, and the Parole Board Members. *See supra* Part IX. Plaintiffs have alleged that all five co-conspirators conspired to deprive Black parole candidates of the equal protection of the laws, and of equal privileges and immunities under the laws; and that these same defendants conspired for the purpose of impeding, hindering, obstructing, or defeating the due course of justice in Alabama, with intent to deny Black parole candidates the equal protection of the laws. *See supra* Part IX.A; 42 U.S.C. §1985(2), (3). Plaintiffs have further alleged that Ivey and Marshall conspired to prevent or hinder the Parole Board from giving or securing to all persons the equal protection of the laws. *Supra* Part IX.B; 42 U.S.C. §1985(3).

Second, §1985 Plaintiffs have adequately alleged that each of the Defendants had sufficient knowledge of the *wrongs* conspired to be done by Ivey, Marshall, and the Parole Board Members—namely, racially discriminatory denials of parole that entrap a disproportionately

---

that conspiracy or that they shared in the discriminatory animus with members of the conspiracy.'" (citing *Park*, 120 F.3d at 1160)).

Similarly, Masonite's suggestion that it cannot be liable under §1986 if it participated in the work-release program "for valid economic and ethical reasons," Dkt. 151 at 23, is meritless. The relevant question is whether Plaintiffs have plausibly alleged that Masonite had knowledge of the §1985 Defendants' conspiracy, not whether they allege that Masonite shared an unlawful, racially discriminatory purpose with the conspirators.

Black, captive workforce to participate in the labor-trafficking scheme. *See* Compl. ¶¶4, 9, 77,

277. As discussed above, Plaintiffs allege that each of the Employer Defendants "knowingly and

willfully participat[ed] in ADOC's work-release and work-center programs," through which they

"gain access to workers who are compelled to work for them at a substantially lower cost … than

free-world employees performing the same work—including the lower cost realized because

workers leased from ADOC are directly prohibited from refusing to work or participating in

work stoppages…." *Id.* ¶134; *see also id.* ¶¶134, 138-39. As participants in this scheme, each of

the Employer Defendants has regular contact with ADOC and the incarcerated workers, and

likely has knowledge of when and whether those workers are being granted parole, at least to the

extent they are consulted during the parole process. *See id.* ¶¶149, 154. This day-to-day

knowledge of whether workers remain available to them for work, when combined with

widespread public knowledge alleged in the Complaint of the racially discriminatory application

of the parole process—and in some cases, the disproportionately Black workers ADOC provides

to Employer Defendants, *see* Compl. ¶¶33-34—supports Plaintiffs' allegation that Employer

Defendants knew of the §1985 Defendants' conspiracy to dramatically reduce access to parole

for Black incarcerated people, in turn making them available to serve as part of ADOC's captive

workforce for all Employer Defendants' benefit. *Id.* ¶142.

Several Employer Defendants argue that Plaintiffs cannot rely on the Complaint's

allegations of a steady drumbeat of news reports, proposed legislation, and public statements

regarding the racial disparities in parole grant rates after 2019 to support an inference that

Employer Defendants had knowledge of the wrongs intended by the conspiracy. But at the

pleading stage, Plaintiffs are not required to prove knowledge: their allegations that Employer

Defendants had knowledge need only be plausible, which they are. *See Clark v. Clabaugh*, 20

F.3d 1290, 1296 (3d Cir. 1994) (widespread rumors of which defendants were aware sufficed to establish knowledge of the alleged conspiracy). And Plaintiffs must plausibly allege knowledge of the *wrongs* that are the object of the conspiracy, not all the details of the conspiracy itself. *See* 42 U.S.C. §1986 ("Every person who, having knowledge that *any of the wrongs* conspired to be done, and mentioned in section 1985 of this title, are about to be committed …" (emphasis added)).

Turning to the Parole Board Members, Plaintiffs have alleged these Defendants had firsthand knowledge of the conspiracy under §1985(3) between Ivey and Marshall to prevent or hinder them from deciding parole cases in a manner consistent with the Equal Protection Clause, because Board members are the direct targets of Ivey and Marshall's pressure campaign, and Ivey installed the other current Board members after initiating that campaign. *See* Compl. ¶¶91-92, 98. 163. Also, Ivey and Marshall necessarily had knowledge of the conspiracy themselves, as they are the powerful individuals who Plaintiffs allege conducted the campaign to prevent or hinder Parole Board Members from deciding parole cases in a manner consistent with the guarantees of the Equal Protection Clause. *See id.* ¶¶91-94.[95]

Defendants attempt to attack Plaintiffs' allegations regarding Defendants' knowledge of the conspiracy by citing a handful of cases in which courts found allegations of knowledge lacking. But in those cases, the allegations of knowledge were entirely absent or extremely thin, or there was no factual basis from which an underlying §1985 conspiracy could reasonably be inferred. *See Buck v. Bd. of Elections of City of New York*, 536 F.2d 522, 524 (2d Cir. 1976) (knowledge element not satisfied where "Appellant does not allege that any of [the defendant]

---

[95] The State Defendants do not specifically dispute that they had the requisite knowledge or power to intervene. *See* Dkt. 148 at 119-26.

entities were aware of her problems or had any way to know of her situation or that they refused to take action to vindicate her rights"); *Hampton v. City of Chicago*, 484 F.2d 602, 610 (7th Cir. 1973) (allegations that Mayor and Superintendent were liable under §1986 for conspiracy by police officers and state's attorneys insufficient where plaintiffs merely alleged "that due to their positions of authority and responsibility, [they] knew of the conspiracy"); *Borkowski v. Baltimore Cnty.*, 414 F.Supp.3d 788, 803 (D. Md. 2019) (general allegation that defendants could have intervened, without specific substantiating factual allegations, was insufficient to state §1986 claim); *Risley v. Hawk*, 918 F.Supp. 18, 22 & n.1 (D.D.C. 1996) (motion to dismiss granted where plaintiff "fail[ed] to assert any factual basis to support the conclusion that a conspiracy existed"). Here, in contrast, Plaintiffs have alleged facts sufficient to support a reasonable inference that Defendants had knowledge of the §1985 conspiracies: Plaintiffs' allegations identify mechanisms by which the Employer Defendants, who contract with ADOC, interact with workers incarcerated by ADOC, and regularly benefit from the labor of those harmed by the §1985 conspiracies, plausibly learned of those conspiracies.[96]

Third, Plaintiffs have sufficiently alleged that each of the Defendants had the ability to aid in preventing the harms of the conspiracy and neglected to do so. *Park*, 120 F.3d at 1159-60. Ivey, Marshall, Hamm, and the Parole Board members all had the ability to withdraw from the

---

[96] Further, Bama Budweiser is incorrect when it suggests that the knowledge requirement requires knowledge that the wrongful conduct will harm specific individuals. *See* Dkt. 139 at 17. Section 1986 requires knowledge of "the wrongs conspired to be done," not wrongful conduct as to a specific person with whom the §1986 defendant has a prior relationship. *See, e.g.*, *Clark*, 20 F.3d at 1294 (plaintiffs' §1986 claims survived summary judgment where police failed to intervene in spite of rumors that bikers would assemble for a racial confrontation in town square). Here, Plaintiffs allege facts supporting the inference that Defendants had knowledge of the conspiracies by Ivey, Marshall, Hamm, and the Parole Board members to deny parole to Black parole candidates, *see* Compl. ¶¶133, 135, 142-43, 277; that is sufficient to satisfy §1986's knowledge requirement.

conspiracy and to take steps within their official roles to halt the racially discriminatory application of the parole system. *See* Compl. ¶¶77, 91, 92, 98, 99, 126-29, 132, 278-79. With respect to the Employer Defendants, Plaintiffs have alleged that ADOC's employer partners have the power to withdraw from ADOC's work programs and thereby aid in the prevention of the harms of the §1985 conspiracy, yet continue to participate. Compl. ¶¶143, 165-83, 278-79. By withdrawing from the work program, each Employer Defendant would decrease the incentive for the conspirators to continue operating the parole system unlawfully, particularly by denying parole to Black parole candidates who present a low risk to public safety and are able to work without incident outside of ADOC facilities. *Id.* Even measures short of withdrawing altogether could aid in preventing the harms of the conspiracy: Employer Defendants could improve working for incarcerated workers, provide opportunities for incarcerated workers to decline assignments without subjecting the workers to discipline if they choose to do so, or communicate to ADOC concerns about the racially skewed parole grant rates, or the fact that some employers, like the City of Montgomery, were consistently provided predominantly with Black workers. *See* Compl. ¶33. Any of these measures would have demonstrated to the §1985 Defendants that their public and private partners would not blindly accept a parole system that disproportionately entraps Black workers. Further, the requirement that the harms of the conspiracy be "about to be committed" is clearly no obstacle here, because the harms of the conspiracy are ongoing and thus remain "about to be committed" unless and until the Defendants dismantle or aid in dismantling the conspiracy. 42 U.S.C. §1986; *see* Compl. ¶¶142-43.

Bama Budweiser and SRG incorrectly suggest it is insufficient for Plaintiffs to allege that the Employer Defendants have the power to "aid in preventing" the harms of the conspiracy, and that Plaintiffs needed to allege that each Employer Defendant has the power to prevent the harms

of the conspiracy in their entirety. Dkt. 139 at 17; Dkt. 147 at 28. That argument is directly contrary to the plain language of the statute, which unambiguously imposes liability on those "having power to prevent *or aid in preventing* the commission of the" wrongs of the §1985 conspiracy. 42 U.S.C. §1986 (emphasis added). Moreover, the statute provides that the amount of recovery turns on the damages "such person by reasonable diligence could have prevented," thus recognizing that a defendant may not be able to prevent all harm flowing from an unlawful conspiracy yet may still be liable. *Id.*; *see also Park*, 120 F.3d at 1160 ("Section 1986 requires only that Appellees knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so."); *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 156 (E.D. Pa. 1977), *abrogated on other grounds by Chowdhury v. Reading Hosp. & Med. Ctr.*, 677 F.2d 317 (3d Cir. 1982) (Section 1986 claim against mayor and managing director stated where these defendants had "some authority, although limited, to control policies and practices" of the juvenile confinement center).

Ultimately, many of the Employer Defendants' challenges boil down to a factual dispute about whether withdrawal from ADOC's work programs would in fact have meaningfully prevented any of the harms of the conspiracy §1985 Plaintiffs allege, which is not properly subject to resolution on a motion to dismiss. *See* Dkt. 147 at 28-29; Dkt. 151 at 23; Dkt. 152 at 23-24; Dkt. 153-1 at 28-29; Dkt. 175 at 24-25.[97] Plaintiffs have alleged facts demonstrating that Defendants' withdrawal would meaningfully affect ADOC's incentives. Plaintiffs have alleged

---

[97] Defendants' statute of limitations arguments, *see* Dkt. 141 at 14; Dkt. 142 at 13-14; Dkt. 147 at 32-33; Dkt. 152 at 20-21; Dkt. 157 at 40-41; Dkt. 175 at 24, are meritless, as all Plaintiffs denied parole and the Organizational Plaintiffs have standing to challenge Defendants' inaction in preventing the harms resulting from the §1985 Defendants' ongoing conspiracy to deny parole in a racially discriminatory manner, and maintain a predominantly Black pool of incarcerated labor available for all Defendants' benefit. *See infra* Part XI.B.

that the City of Montgomery has received thousands of days of labor per year in recent years. *See* Compl. ¶166 (approximately 399 incarcerated people working for Montgomery between January 2018 and September 2023); *see also, e.g.*, *id.* ¶167 (297 people working for City of Troy between January 2018 and September 2023); *id.* ¶¶28-29, 31, 165 (approximately 942 incarcerated people worked for ADOT between January 2018 and September 2023). The private Employer Defendants' efforts to dispute the economic benefit they confer on ADOC, and thus the influence they have on the conspirators, also fail—both because this is not a dispute to be resolved on motions to dismiss and because the allegations in the Complaint are to the contrary. *See* Compl. ¶¶13-16. ADOC reaps such substantial benefits from the private Employer Defendants each day an incarcerated person works—in practice, a minimum of 40% of workers' wages, plus additional fees, equaling approximately $12.9 million in fiscal year 2023—that terminating a relationship with even a single employer has a noticeable impact. *See, e.g.*, Compl. ¶¶13-16.[98] And the public and private Employer Defendants named in the Complaint have well-established relationships with ADOC, such that it is plausible their departure would impact the profitability and sustainability of the conspiracy. *See* Compl. ¶169 (220 people worked for RCF, LLC between January 2018 and September 2023); *id.* ¶170-172 (combined 223 people worked for Ju-Young, SL Alabama, and Hwaseung during this period); *id.* ¶173 (154 people worked for Progressive Finishes during this period); *id.* ¶176 (11 people worked for SRG during this

---

[98] To the extent Progressive Finishes suggests only government officials have the power necessary for liability under §1986, *see* Dkt. 153-1 at 28, that position is mistaken. Section 1986, unlike §1983, does not limit liability to those acting under color of state law but rather imposes liability on "[e]very person who" has the requisite knowledge and power for failing to act. Courts have thus not limited §1986 claims to public officials. *See, e.g.*, *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 759 F.Supp. 1339, 1352 (W.D. Wis. 1991) (granting preliminary injunctive relief under §1986 against private individual and organization).

period); *id.* ¶178 (107 people worked for Masonite during this period); *id.* ¶179 (454 people

worked for Cast Products during this period); *id.* ¶180 (85 people worked for Southeastern Meats

during this period); *id.* ¶181 (30 people worked for Koch Foods during this period); *id.* ¶182 (74

people worked for Paramount Services during this period); *id.* ¶183 (173 people worked for

Bama Budweiser during this period).

In sum, Plaintiffs have sufficiently alleged the elements of their §1986 claim: the

existence of a §1985 conspiracy; knowledge of that conspiracy by Ivey, Marshall, Hamm, and

the Parole Board Members, as well as the private and public Employer Defendants; and that each

Defendant had some ability to aid in preventing the conspiracy and neglected or refused do so.[99]

Finally, Bama Budweiser and SRG invite this Court to rule that §1986 is unconstitutional,

despite the fact that no court since the section was enacted during Reconstruction has ever done

so. Dkt. 139 at 19-24; Dkt. 147 at 30-32. These two private Employer Defendants take the

untenable position that the Reconstruction Congress' enactment of §1986 exceeded the bounds of

the Fourteenth Amendment—despite this provision being enacted a mere three years after

ratification of the Fourteenth Amendment. *See Monell v. Dep't of Soc. Servs. of City of New York*,

436 U.S. 658, 669 (1978) (discussing the enactment of §1986 as part of the Civil Rights Act of

1871). These Defendants first incorrectly suggest that Congress can never extend constitutional

protection to anything beyond government action, ignoring well-established precedent to the

contrary. Dkt. 139 at 21-22. For example, in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the

Supreme Court analyzed the constitutionality of §1985(3), another provision of the KKK Act. In

*Griffin*, the Plaintiffs sued private individuals who had conspired to block the road, force the

---

[99] Plaintiffs seek only injunctive relief under §1986 against the State Defendants; State
Defendants' immunity arguments therefore should be disregarded.

plaintiffs out of their vehicle, and beat and menace them, under the belief that the plaintiffs were associated with the civil rights movement. *Id.* at 90-92. The Court concluded that "all indicators—text, companion provisions, and legislative history—point unwaveringly to [§] 1985(3)'s coverage of private conspiracies." *Id.* at 101. The Court further explained: "That [§] 1985(3) reaches private conspiracies to deprive others of legal rights can, of itself, cause no doubts of its constitutionality." *Id.* at 104. Ultimately, the Court concluded that both the Fourteenth Amendment and the Thirteenth Amendment authorized liability under the circumstances presented. *Id.* at 104-107; *see also United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 832 (1983) (Section 1985 "is not limited by the constraints of the Fourteenth Amendment."). To avoid rendering §1985(3) "a general federal tort law," the Court read into §1985(3) an element of the cause of action stressed by those in the Reconstruction Congress: namely, "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities," which "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102; *see also supra* Part IX (applying discriminatory animus requirement to all provisions of §1985 at issue here). Thus, Bama Budweiser and SRG's hyperbolic and exaggerated characterization of §1986's breadth ignores that, to succeed on a claim under §1986, a plaintiff must also first establish a conspiracy that violates §1985—a requirement that necessarily limits the scope of §1986 and ensures it remains closely tethered to the Reconstruction Amendments. *See Park*, 120 F.3d at 1160; *Robeson v. Fanelli*, 94 F.Supp. 62, 68 (S.D.N.Y. 1950) ("Section [1986] serves only to further and bolster the protection afforded by Section [1985], and to the extent that the latter

statute is free of constitutional infirmities, the former to the same extent, and for the same reasons, is likewise valid.").[100]

Bama Budweiser asks this Court to adopt its view that "the modern view of the Fourteenth Amendment" *as reflected in controlling precedent*, is wrong. *See* Dkt. 139 at 22-24. Notwithstanding this Defendant's effort to interpose so-called "corrective historical fact" demonstrating "how far adrift the KKK Act's § 1986 has wandered in relation to the Equal Protection Clause," *id.* at 24—again, notwithstanding that §1986 was enacted roughly contemporaneously with the Fourteenth Amendment—the parties here, and this Court, are bound by existing law. Such law recognizes §1986 as creating a viable cause of action. *See, e.g.*, *Park*, 120 F.3d at 1160-61; *Clark*, 20 F.3d at 1295-98; *Superior Chippewa Indians*, 759 F.Supp. at 1352.[101]

---

[100] To provide one more example, the Supreme Court has recognized that, even under §1983—which unlike §1985 expressly requires state action—private defendants may be liable if their conduct is sufficiently bound up with that of the state. *See, e.g.*, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621-22 (1991) (private litigant may be deemed a state actor based on reliance on governmental assistance and benefits, performance of a traditional government function, or aggravation of the injury caused by the incidents of government authority). It bears noting that the conspiracy alleged here in fact involves state actors, and the private Employer Defendants' liability arises directly out of their close relationship with these state actors and involvement in state incarcerated labor programs, which is what grants them both the knowledge of the conspiracy and the power to intervene.

[101] *City of Boerne v. Flores*, 521 U.S. 507 (1997), cited by Bama Budweiser and SRG, which addressed Congress' effort to expand religious liberty through the Religious Freedom Restoration Act, is not to the contrary. Along with §1985, §1986 is a purely remedial mechanism for enforcing established constitutional rights. *See, e.g.*, *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979) ("Section 1985(3) … creates no rights. It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section."); *Percival v. Girard*, 692 F.Supp.2d 712, 731 n.3 (E.D. Mich. 2010) ("Section 1986 is merely a remedial provision for conspiracies properly alleged under § 1985."); *Griffin v. Kelly*, No. 92 CIV. 8623 (LBS), 1994 WL 9670, at *3 (S.D.N.Y. Jan. 11, 1994) ("§ 1986 … provides a remedy for neglect to prevent a § 1985 violation"). This case thus presents no reason to question the constitutionality of §1986.

**XI.   State Defendants' Threshold Arguments Regarding Plaintiffs' Parole-Related Claims Are Without Merit.**

**A.   State Defendants Are Subject to Suit for Declaratory and Injunctive Relief for Plaintiffs' Parole-Related Claims Under *Ex parte Young***

State Defendants argue that individual plaintiffs asserting the parole-related claims ("Individual Parole Plaintiffs")[102] cannot pursue those claims against Ivey, Marshall, and Hamm in their official capacities. Dkt. 148 at 27-31.[103] However, Individual Parole Plaintiffs' parole-related claims against these state officials fall squarely within the *Ex parte Young* doctrine.

State Defendants contend, contrary to the allegations in the Complaint, that Ivey and Marshall have no connection to the parole practices that Plaintiffs challenge. *See* Dkt. 148 at 30; *but see, e.g.*, Compl. ¶¶160-61. A state official is a proper defendant under the *Ex parte Young* exception to sovereign immunity where the official has "'some connection' with the unconstitutional act or conduct complained of." *Luckey*, 860 F.2d at 1015-16 (quoting *Ex parte Young*, 209 U.S. at 157). Here, the Governor's role in appointing the Board Chair and Executive Director, coupled with her actions in pressuring the Parole Board to reduce access to parole, to deny parole to those convicted of "violent" offenses, and to disregard the objective standards for reviewing parole applications, *see* Compl. ¶¶77, 91-94, 98, 106-07, 109-10, 160, including by issuing a moratorium pending the Parole Board's implementation of a corrective action plan, *id.* ¶92, are more than sufficient to demonstrate "some connection" with the challenged conduct.

---

[102] Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright bring the parole-related claims on their own behalf and on behalf of the parole denial class and the discriminatory parole denial subclass. *See* Compl., Counts V-XI.

[103] The parole-related claims include Count V (violation of Ex Post Facto Clause), VI and VII (violations of Equal Protection Clause), VIII (denial of substantive due process), and IX, X, and XI (violations of the KKK Act, 42 U.S.C. §§1985 and 1986). Defendants correctly do not advance any argument that the Parole Board Members—Gwathney, Littleton and Simmons—lack the requisite connection with enforcement of the challenged policy and practice to fall within the *Ex parte Young* exception to sovereign immunity.

Similarly, Marshall's role in the 2018 meeting and subsequent efforts to change the law and pressure the Parole Board, including by routinely opposing parole, provide a sufficient connection to the conduct Plaintiffs challenge to attribute responsibility to him. *See id.* ¶¶91-93, 106-07, 109-10. This is thus nothing like the case cited by State Defendants, *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999), where "no defendant ha[d] any connection to the enforcement of the challenged law at issue."

### B.  Plaintiffs Have Standing to Pursue Their Parole-Related Claims

Plaintiffs have alleged sufficient facts establishing their standing to seek relief from Ivey, Marshall, Hamm and Parole Board Members as to their Ex Post Facto, Equal Protection, Substantive Due Process, and KKK Act claims (Counts V-XI).[104] They have also sufficiently alleged standing as to the public and private Employer Defendants, who are named as defendants with respect to Plaintiffs' "failure to prevent" KKK Act claim under 42 U.S.C. §1986 (Count XI).

*State Defendants.* State Defendants do not dispute that the Individual Parole Plaintiffs have alleged injuries-in-fact. Rather, they assert that Plaintiffs' injuries are not fairly traceable to Ivey, Marshall, and Hamm, or redressable by an order against them. Dkt. 148 at 27-31.

"To establish causation [for purposes of standing], a plaintiff need only demonstrate, as a matter of *fact*, 'a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant.'" *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnet Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1116 (11th Cir. 2022) (quoting *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005)) (emphasis and alteration in original). Here, Ivey and Marshall, as Alabama's Governor and Attorney General, have certain statutorily

---

[104] Count X is asserted only against Ivey and Marshall; and Hamm is included as a defendant only in Counts V-VII and IX. *See* Compl., Counts V-VII, IX-X.

defined roles in administering the parole system. The Governor appoints Parole Board members from a list of five people and designates the Chair. Ala. Code §15-22-20(b), (d). The Governor also has the exclusive authority to appoint the Executive Director of the Parole Board, who serves "at the pleasure of the Governor." *Id.* §15-22-21(a). The Parole Board must give the Governor and Attorney General notice of rules, procedures, guidelines, and other policies the Board seeks to implement. *Id.* §15-22-37(c). Further, Alabama's statutes require that the Attorney General be given an opportunity to provide input into parole decisions. *Id.* §15-22-23(b)(2); *see also id.* §15-22-36(d).[105] As alleged in the Complaint, the Attorney General systematically opposes parole and urges disregard of the Parole Guideline recommendations. Compl. ¶¶99, 161.

Plaintiffs have also alleged that Ivey and Marshall share responsibility for the policies and practices that have resulted in the stringent implementation of the 2019 Parole Amendments to the statutes governing parole, the racially discriminatory denials of parole, and the arbitrary denials of parole. *Id.* ¶¶91-107, 160-61. For example, Ivey and Marshall presided over a meeting pressuring the Parole Board to reduce parole grant rates, particularly for people convicted of violent crimes, announced priorities that materially influenced Parole Board Members' exercise of their discretion, and spearheaded legislative changes purporting to authorize more stringent review of parole applications and a departure from objective standards for reviewing parole

---

[105] This list of the Governor and Attorney General's parole-related duties is not comprehensive. The Board is required each year to report its activities and functions to the Governor, Secretary of State, and Department of Archives and History, Ala. Code §15-22-24(b). The Governor and Attorney General must be notified and provided an opportunity to object if the Board seeks to hold earlier parole hearings than those set by statutory default. *Id.* §15-22-28(f)(4). The Governor may also initiate proceedings, with the assistance of the Attorney General, to determine whether a Board member is incapacitated by reason of physical or mental disability or illness, Ala. Code §15-22-20(e), and plays a role in evaluating treatment programs and providers, *id.* §15-22-24(k). The Attorney General also designates the members of the victim notification implementation task force. *Id.* §15-22-36.2.

applications. *Id.* ¶¶91-94. Ivey also exercised her authority to issue an Executive Order imposing a moratorium on early parole consideration for 75 days or until the Board implemented a corrective action plan implementing her priorities—authority she could seek to exercise once again if she were dissatisfied with the Board's performance. *Id.* ¶92. Ivey also demoted the Parole Board Chair and assigned a new Chair, in furtherance of her directives that parole standards should be more stringent and objective standards discarded. *Id.* ¶94; *see also id.* ¶¶95-97, 106. Plaintiffs also allege that Ivey and Marshall conspired with each other and the Parole Board members to implement the parole system in a racially discriminatory manner, resulting in racially discriminatory denials of parole. Compl. ¶¶100, 107, 265-69, 271-75.

Plaintiffs have thus sufficiently alleged a connection between the challenged conduct, the Governor, and the Attorney General. *See Georgia Latino All. for Hum. Rts. v. Gov. of Georgia*, 691 F.3d 1250, 1260 n.5 (11th Cir. 2012) (citing *Luckey*, 860 F.2d at 1015-16, and noting that governor was proper party and standing requirements were satisfied where governor had "sufficient, albeit indirect, contact with the [challenged] program's enforcement"). Individual Plaintiffs' injuries that flow from their parole-related claims—the unconstitutional increased risk of being subject to longer terms of imprisonment following the adoption of the 2019 Parole Amendments, being subject to racially discriminatory parole denials, and being subject to arbitrary and capricious parole denials—can all be linked to actions taken by Ivey and Marshall to further their goals of drastically reducing grants of parole and discounting reliance on ORAS or other objective standards for parole application processing. *See* Compl. ¶¶91-99.

That Parole Board Members *also* play a role in implementing these policies and goals and causing the harms complained of does not negate Ivey and Marshall's roles. State Defendants cite *Jacobson v. Florida Secretary of State*, 974 F.3d 1236, in support of their assertion that an

injury cannot be traced to a state official for standing purposes "if it is the result of actions of independent officials not subject to the control of the officials seeking to be enjoined." Dkt. 148 at 28. But that argument is a red herring: if an injury is *wholly* the result of a particular official's action, then of course it will not be traceable to another official. But nothing in *Jacobson* precludes a situation, as Plaintiffs here allege, where more than one official contributes to Plaintiffs' injuries. In such a circumstance, Plaintiffs satisfy the requirement that their injuries be fairly traceable to Ivey and Marshall.

As to redressability, State Defendants make a related argument—that *only* the Parole Board members can take action to remedy Plaintiffs' claimed injuries. Dkt. 148 at 28. To assess redressability, however, courts ask (1) "whether a decision in a plaintiff's favor would significant[ly] increase ... the likelihood that she would obtain relief that directly redresses the injury that she claims to have suffered," and (2) whether it is "the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (quotation marks, emphasis, and citations omitted). Here, relief for Plaintiffs' injuries is available from Ivey and Marshall: the Court could order the Governor and Attorney General to refrain from instructing their agents and the Parole Board Members to disregard the evidence-based risk assessments evaluating parole candidates and to deny parole to certain categories of incarcerated individuals. *See* Dkt. 23-2 (proposed order granting preliminary injunction). Such an order would significantly increase the likelihood that the parole decision-making framework would come into compliance with constitutional requirements—just as the contrary scenario, where the Governor and Attorney General pressure Parole Board Members to severely restrict access to parole and

abandon an evidence-based decision-making framework, perhaps coupled with a declared moratorium until such actions are taken, exacerbates Plaintiffs' harm. *Cf.* Compl. ¶¶91-99.[106]

**Employer Defendants.** Several of the Employer Defendants also attack Plaintiffs' standing to assert a claim under 42 U.S.C. §1986. But the Individual Parole Plaintiffs and the Organizational Plaintiffs have plausibly alleged that each of the Employer Defendants' failure to withdraw from the coerced labor scheme and to exercise their ability to aid in preventing the wrongs associated with the parole conspiracy, harmed them.

The Automotive Defendants (SL Alabama, LLC, Ju-Young Manufacturing America, Inc., Hwaseung Automotive USA LLC) argue that they cannot redress Plaintiffs' injuries because they do not play any role in the parole process and did not make any threats of coercion. Dkt. 157 at 9-10. But of course Plaintiffs allege that Automotive Defendants and the other private and public Employer Defendants knew that they were participating in a coercive labor scheme and had the power to intervene, Compl. ¶¶170-72, 278, and Plaintiffs' allegations must be treated as true on a motion to dismiss. *See also supra* Part X.

As described above, Plaintiffs allege that the public and private Employer Defendants could prevent but have failed to prevent the commission of harms resulting from the unlawful agreement between Ivey, Marshall, and the Parole Board members to administer the parole system in a racially discriminatory manner. *See supra* Part X. This satisfies the traceability and

---

[106] Plaintiffs contend that Hamm, as the state official with authority and responsibility over ADOC and thus custody of the currently incarcerated Plaintiffs, is a necessary party to the Ex Post Facto Clause, Equal Protection, and Substantive Due Process claims. *See supra* nn.64, 72, 87, 91. However, given State Defendants' arguments that the Parole Board Members have authority to provide complete relief, Plaintiffs are willing to agree that he should not be named as a defendant to these claims, Counts V-VIII. Hamm, however, as the supplier of coerced labor, is certainly in a position to aid in the prevention of the racial parole conspiracy, as alleged in Count XI, and Plaintiffs have adequately alleged standing as to him on that claim.

redressability requirements for standing purposes: Plaintiffs are alleging harm that flows from each employer's failure to "withdraw[] from the work-release and work-center programs and thereby reduc[e] Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons' incentive to deny parole and maintain a larger, predominantly Black, captive and coerced work force." Compl. ¶278. Plaintiffs thus allege that the harm is traceable to the failure to withdraw, and that the harm could be remedied by withdrawal. That some of the Defendant Employers may disagree as a factual matter cannot defeat Plaintiffs' standing at the pleading stage.[107]

## XII.   Plaintiffs Have Stated a Plausible First Amendment Claim Against Defendants Ivey and Hamm

### A.   The First Amendment Plaintiffs Have Adequately Alleged a Violation of Their First Amendment Rights

The First Amendment Plaintiffs[108] have adequately alleged that Defendants Ivey and Hamm violated their First Amendment rights by ordering and maintaining a policy of retaliating against Plaintiffs who withhold their labor or advocate for other incarcerated people to do the same. Plaintiffs seeking to state a claim against prison officials under the First Amendment must establish three elements: (1) their speech was constitutionally protected, (2) some adverse action was taken against them that "would likely deter a person of ordinary firmness from engaging in

---

[107] Bama Budweiser argues that Plaintiffs cannot sufficiently allege standing for the §1986 claim unless they allege that Bama Budweiser's withdrawal from the work-center program would have prevented the conspiracy. See Dkt. 139 at 17. But as discussed above, that is not the appropriate inquiry: Plaintiffs need only allege that Bama Budweiser could have aided in the prevention of the wrongs resulting from the conspiracy. *See* 42 U.S.C §1986; *see also supra* Part X. Automotive Defendants make a similar argument with respect to Organizational Plaintiffs' standing to bring the §1986 claim, which boils down to a disagreement with Plaintiffs' allegation that their withdrawal from the work-release program would have an impact. *See* Dkt. 157 at 10. Again, that is not sufficient to defeat the Organizational Plaintiffs' standing on a motion to dismiss, and the Organizational Plaintiffs have adequately alleged standing, as explained *supra* Part III.C. & n.50.

[108] All of the individual Plaintiffs are "First Amendment Plaintiffs." Compl., Count IV.

such speech," and (3) there is a causal nexus between the retaliatory action and the protected speech. *Williams v. Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023). Ivey and Hamm only dispute the first element here, arguing that Plaintiffs' speech could not be constitutionally protected because it runs afoul of ADOC regulations.[109] Even if the ADOC regulations covered all of the retaliatory conduct as issue here (and they do not), that would not be the end of the inquiry: Plaintiffs adequately allege that the regulations are invalid and their speech thus protected under the First Amendment. *See* Compl. ¶¶43-48, 227-29, 231-33. Moreover, Ivey and Hamm's argument is completely unavailing as to their actions that were not taken pursuant to ADOC regulations, including ADOC's withholding of food from incarcerated individuals who refused to work or supported those who did so. Compl. ¶¶230-31.

A regulation that infringes upon incarcerated people's First Amendment rights is only valid if defendants show "it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Determining whether that is the case requires the use of a four-part test: "(1) whether there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation

---

[109] The retaliation that Plaintiffs have suffered and will suffer, which includes transfers to more violent facilities and placement in solitary confinement, is plainly sufficient to satisfy the second element. *See, e.g.*, *Williams*, 64 F.4th at 1192-93; *Osterback v. Kemp*, 300 F. Supp. 2d 1238 (N.D. Fla.), *on reconsideration*, 300 F.Supp.2d 1263 (N.D. Fla. 2003). Plaintiffs have adequately alleged that these actions were taken specifically in retaliation for their protected speech. Compl. ¶¶229-30.

represents an exaggerated response to prison concerns." *Jarrard v. Moats*, No. 4:20-CV-2-MLB, 2021 WL 1192948, at *6 (N.D. Ga. Mar. 30, 2021).

Ivey and Hamm do not even attempt to apply the *Turner* factors, instead simply asserting that "an analysis of the factors is unnecessary because rules preventing work stoppages are clearly legitimate." Dkt. 148 at 60. But that is not the law. While "the *Turner* standard is a deferential one … it is not toothless." *Pesci v. Budz*, 730 F.3d 1291, 1299 (11th Cir. 2013) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)). As such, "deference to the professional judgment of the facility administration is not tantamount to carte blanche permission to deny the fundamental rights of free speech and free expression," and "[c]are must be exercised to examine each claim individually and particularly." *Pesci*, 30 F.3d at 1299. Ivey and Hamm "cannot avoid court scrutiny by reflexive, rote assertions." *Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir. 1996) (citation omitted). That is particularly true in the context of determining whether a given restriction on constitutional freedoms is legitimate, because "evaluating whether there is a legitimate penological interest that permits a restriction on the constitutional rights of incarcerated individuals is not normally an exercise that can be undertaken in the context of a motion to dismiss brought under Rule 12(b)(6)." *Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *13 (M.D. Ala. Jan. 10, 2024), *adhered to,* 2024 WL 262867 (M.D. Ala. Jan. 24, 2024), and *aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corrs.*, No. 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024) (quoting *Mayberry v. Humphreys Cnty.*, No. 3:11-0855, 2012 WL 4506027, at *9 (M.D. Tenn. Sept. 4, 2012), *report and recommendation adopted*, 2012 WL 4490809 (M.D. Tenn. Sept. 28, 2012)).

On a motion to dismiss, the question is whether plaintiffs have plausibly alleged their conduct is protected by the First Amendment. *See Hamilton v. Hall*, 790 F.Supp.2d 1368, 1370

(N.D. Fla. 2011) (where plaintiff alleged that prison policy deprived her of her First Amendment rights because it limited her ability to communicate, allegation could not be resolved on a motion to dismiss). While Ivey and Hamm have not even attempted to articulate why the ADOC regulations on which they rely are reasonably related to a legitimate penological interest, Plaintiffs here have alleged facts sufficient to conclude that the regulations are not valid. *See* Compl. ¶¶46-48, 65, 226-29, 231-33.

Specifically, Plaintiffs' allegations demonstrate that at least three of the *Turner* factors weigh in their favor: (1) the regulation's failure to rationally advance a *legitimate* government interest, and (2) the absence of alternative means of expression, and (3) the exaggerated nature of the response in relation to officials' alleged concerns.

First, Plaintiffs have plausibly alleged that Alabama's forced labor scheme does *not* advance a legitimate interest and, instead, that Ivey and Hamm are maintaining an unlawful coerced labor scheme, and regulations that punish incarcerated individuals for withholding work and advocating the withholding of work aid in the maintenance of that illegal scheme. *See, e.g.*, Compl. ¶¶9-10, 15-17, 27-32, 46-48, 65, 233. Plaintiffs allege Ivey and Hamm (along with the other Defendants) knowingly benefitted financially and otherwise from the unlawful coercion of Individual Plaintiffs and other incarcerated individuals. *See generally id.*, Counts I-IV. If Plaintiffs are correct—a question that cannot be resolved on a motion to dismiss—then the regulations that Defendants rely on to compel Plaintiffs to work are not advancing a legitimate penological interest. Issues like this are precisely why "[t]he parties will … need to develop a record before the Court can engage in the proper *Turner* inquiry." *Profit v. Rabon*, No. 1:19-CV-129-MW-GRJ, 2020 WL 687590, at *4 (N.D. Fla. Jan. 9, 2020), *report and recommendation*

*adopted,* 2020 WL 674427 (N.D. Fla. Feb. 11, 2020). Ivey's and Hamm's effort to short-circuit that inquiry on no record whatsoever should be rejected.

Second, Plaintiffs' allegations plausibly demonstrate that there were not adequate alternatives for them to express their complaints about being coerced to work in the Alabama prison system and being subjected to a racially discriminatory parole system. *See* Compl. ¶211 n.81; *see also supra* Part I. Withholding their labor and advocating for others to do so is a quintessential exercise of First Amendment Plaintiffs' constitutional right, and Ivey and Hamm point to no reasonable alternative for Plaintiffs to express their message.

The cases Ivey and Hamm rely on to contend that ADOC's regulations are valid, *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977), and *Pilgrim v. Luther*, 571 F.3d 201 (2d Cir. 2009), both rested their holdings on the fact that the incarcerated people bringing their claims had access to a grievance process. *See Jones*, 433 U.S. at 130 n.6 ("There exists an inmate grievance procedure through which correctional officials are informed about complaints concerning prison conditions, and through which remedial action may be secured. … With this presumably effective path available for the transmission of grievances, the fact that the Union's grievance procedures might be more 'desirable' does not convert the prohibitory regulations into unconstitutional acts."); *Pilgrim*, 571 F.3d at 205 ("So long as [incarcerated people] had grievance procedures available to them, regulations limiting their rights to organize and petition were reasonable restrictions designed to further the government's interest in the orderly administration of prisons.").

Here, ADOC had no administrative grievance procedures in place prior to August 1, 2023, *see* Dkt. 148 at 19, and, as discussed *supra* Part I, the nascent ten-month-old grievance procedures are rife with problems and functionally unavailable. Ivey and Hamm have

implemented and administered a system that gives Plaintiffs no effective alternative way to express their opposition to forced labor other than refusing to work and encouraging others in their facilities to do the same. "Prison walls do not form a barrier separating [incarcerated people] from the protections of the Constitution," *Turner* 482 U.S. at 84, and officials thus cannot permissibly implement a policy that effectively bars incarcerated people from making complaints about their working conditions and retaliates against them for doing so. *See Johnson v. Avery*, 393 U.S. 483, 487, 490 (1969) (holding that regulation preventing some incarcerated people from providing legal assistance to others effectively prevented illiterate people from filing habeas petitions and was thus unenforceable "unless and until the State provides some reasonable alternative").

Importantly, the *Turner* court emphasized that incarcerated people "retain the constitutional right to petition the government for the redress of grievances." *Id.* The Eleventh Circuit, following that guidance, has made clear that "[i]t is an established principle of constitutional law" that, when incarcerated people "complain[] to the prison's administrators about the conditions of [their] confinement," they are exercising their First Amendment free speech rights. *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (quoting *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008)). Plaintiffs here have alleged that they were making exactly those kinds of constitutionally protected complaints using the only tools available to them, and have stated a claim of unlawful retaliation under the First Amendment on that basis.

Third, Plaintiffs have alleged that ADOC's regulations are grossly disproportionate to ADOC's concerns, which State Defendants do not articulate. As discussed in Part III.A., *supra*, the ADOC regulations classify refusals to work as medium level violations that may be punished by, among other penalties, solitary confinement for up to 30 days and the forfeiture of a

minimum of 720 accrued "good time" days, which can extend a person's time in prison by nearly two years. Compl. ¶47. The arguably less disruptive conduct of "encouraging" others to stop work—which lies squarely at the heart of the First Amendment—is punished even more harshly, on par with offenses such as assault, robbery, and inciting a riot. *Id.* ¶48. This conduct can be punished with up to 45 days in solitary confinement, a three-year extension of a person's release date, and loss of privileges for up to 60 days, among other penalties. *Id.* Placing Plaintiffs' exercise of their rights on the same level as violent criminal acts is unnecessary, particularly when ADOC has not articulated any valid penological interest and the "obvious, easy alternative[]" of punishing speech less harshly, or not at all, exists. *Turner*, 482 U.S. at 90.

Further, even beyond the harsh punitive measures purportedly authorized by ADOC's regulations, Plaintiffs have alleged that Ivey and Marshall have overseen widespread retaliatory conduct that is even more severe and is *not* authorized by regulation. *See* Compl. ¶¶50, 61-71. For example, Plaintiffs have alleged that, in retaliation for the September 2022 strike by incarcerated workers, ADOC responded by reducing the supply of food to striking workers across the State. *See id.* ¶¶50, 65. ADOC has also repeatedly engaged in violent and well-publicized reprisals against vocal opponents of forced labor, including assaults resulting in criminal prosecution, which State Defendants do not seek to defend and do not contend are authorized by a valid ADOC regulation. *See id.* ¶¶61-71.

**B.     Ivey and Hamm Are Subject to Supervisory Liability**

Plaintiffs also have plausibly alleged that Ivey and Hamm are susceptible to supervisory liability for the First Amendment violations at issue here. Supervisory liability under §1983 is proper "when the supervisor personally participates in the alleged constitutional violation *or when there is a causal connection between the actions of the supervising official and the alleged*

*constitutional deprivation.*" *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)) (emphasis added).[110] To establish a causal connection, plaintiffs may show "1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; *or* 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.* (emphasis added) In other words, Ivey and Hamm misconstrue the law when they argue that "Plaintiffs must identify specific wrongful actions that that particular Defendant took" to establish liability. Dkt. 148 at 61.

Here, Plaintiffs have alleged a causal connection in all three ways. First, Plaintiffs have adequately alleged the existence of a "history of widespread abuse" that should have put Ivey and Hamm on notice that constitutional deprivations are taking place in the Alabama prison system. *See* Compl. ¶¶46-48, 50, 61-71, 229. This is not a case where Plaintiffs allege "isolated occurrences" of retaliation for the exercise of their constitutionally protected speech, *see Jenkins v. Jones*, No. 3:14-CV-1503-J-39MCR, 2017 WL 3381713, at *6 (M.D. Fla. Aug. 7, 2017); instead, they allege that ADOC "maintains a policy of disciplining and abusing persons who withhold their labor and who advocate for others to withhold their labor," Compl. ¶229. That policy is due at least in part to Governor Ivey's executive order strengthening the punishment for

---

[110] While Plaintiffs focus here on how they have adequately alleged a causal connection between the supervising officials' actions and the infringement of their First Amendment rights, at least Ivey has personally participated in that constitutional violation. Plaintiffs plausibly allege that Ivey, by issuing an executive order that explicitly directed ADOC to increase punishments for incarcerated people who refuse to work or encourage others to do so, personally participated in the unlawful scheme. Compl. ¶¶44-46.

refusing to work and encouraging others to do so, which she issued after the strike during which ADOC restricted incarcerated people's access to food and engaged in extreme measures to silence movement leaders. *See id.* ¶¶46-48, 50. Plaintiffs further allege that thousands of people in Alabama prisons are compelled to work for the state under this policy, *id.* ¶¶13, 25, and that some version of this policy has been in place for years with no sign of stopping. *See, e.g.*, *id.* ¶¶28-29, 32. Beyond the policy on the books, Plaintiffs have also alleged multiple incidents of severe retaliation, including restricting access to food and assaults of those advocating against forced labor. *See id.* ¶¶50, 61-71. These allegations, which reflect "multiple … incidents over the course of a continued duration," are sufficient to establish a causal connection to Ivey and Hamm. *Ray v. Gadson*, No. 2:20-CV-00499-RDP, 2023 WL 7228933, at *7 (N.D. Ala. Nov. 2, 2023) (citing *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)); *see also Jenkins*, 2017 WL 3381713, at *6 (allegations that deprivations are "obvious, flagrant, rampant, and of lengthy duration" are sufficient to state a claim).

Second, Plaintiffs also adequately allege that Ivey and Hamm's customs and policies at the very least resulted in a culture of deliberate indifference towards Plaintiffs' First Amendment rights. For example, Plaintiffs allege that Ivey, on January 9, 2023, issued an executive order that identified refusals of work and the encouragement of work stoppages as medium- and high-level violations, and authorized ADOC to impose additional punishments for such violations. Compl. ¶46. Hamm then issued regulations that implemented that order by authorizing extreme punishments, including solitary confinement, effectively longer sentences, and even more forced labor, for incarcerated people who exercised their First Amendment rights. *Id.* ¶¶47-48. These allegations, combined with the allegations of widespread and longstanding retaliation by Alabama against incarcerated people who seek to exercise their rights, *see id.* ¶¶61-71, 227, 229-

30, are sufficient to state a claim that Ivey and Hamm are personally liable for the constitutional deprivations Plaintiffs suffered. *See, e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (a "persistent and wide-spread practice" can demonstrate a policy or custom under §1983) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)).

And lastly, Plaintiffs' allegations that Governor Ivey issued an executive order specifically intended to increase punishment for incarcerated people who exercised their First Amendment rights to refuse work or advocate for others to do so, and that Commissioner Hamm then issued regulations to implement that executive order, Compl. ¶¶46-48, "support an inference that the supervisor[s] directed subordinates to act unlawfully." *Mathews*, 480 F.3d at 1270. Any one of these three means of establishing a causal connection is sufficient, *id.*, and Plaintiffs have therefore plausibly alleged supervisory liability.

### C.   Ivey and Marshall Are Not Entitled to Qualified Immunity, and First Amendment Plaintiffs Have Standing to Seek Injunctive Relief

As explained above, Plaintiffs have stated a viable First Amendment claim against Ivey and Hamm. Ivey and Hamm assert that they are entitled in their individual capacities to qualified immunity as to damages liability for that claim, Dkt. 148 at 58-61, but they are wrong. First, the Eleventh Circuit "concluded as early as 1989—well before this [case]—that [an incarcerated person's] First Amendment free speech rights are violated when prison officials retaliate against him or her for filing a grievance." *Hicks v. Ferrero*, 241 F. App'x 595, 598-99 (11th Cir. 2007). First Amendment Plaintiffs have plausibly alleged that they were engaged in and have been deterred from engaging in substantially the same core conduct as grievance filing, *see* Compl. ¶¶232-33—namely, making "complain[ts] to the prison's administrators about the conditions of [their] confinement"—and this clearly established law forbidding "retaliat[ion] against [them] for

exercising [their] right to free speech" precludes qualified immunity here. *O'Bryant*, 637 F.3d at 1212.

Further, setting aside qualified immunity, the currently incarcerated Plaintiffs are entitled to and have standing to seek injunctive relief.[111] State Defendants erroneously contend that the Complaint concerns only past conduct, Dkt. 148 at 57, but Plaintiffs plausibly "allege facts from which it appears there is a substantial likelihood that [they] will suffer injury in the future." *Malowney v. Fed. Collection Deposit Grp*., 193 F.3d 1342, 1346 (11th Cir. 1999). Among other facts, Plaintiff Council alleges that he is a leader of a movement that regularly organizes work stoppages by incarcerated workers as a means of expressing their opposition to forced labor and plausibly alleges facts showing he intends to do so in the future. *See* Compl. ¶61 (Council is a leader of a movement whose "core strategy" is "the Non-violent and Peaceful Protest strategy of 'shutdowns' / work stoppages …."); *id.* ¶¶62-64. All other currently incarcerated Plaintiffs challenge their subjection to forced labor, and all face the imminent threat of enforcement action by ADOC of the stringent prohibitions that they presently defend, including solitary confinement and loss of good-time credits, if they engage in speech or expressive activity relating to forced labor. *See id.* ¶¶44-48; *id.* ¶71 ("ADOC officials repeatedly caution incarcerated laborers that a refusal to work will be met with the same punishment meted out to Mr. Council."). Thus, the speech of First Amendment Plaintiffs is being chilled in an ongoing manner, an actual injury supporting standing to seek injunctive relief. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998); *see also* Compl. ¶232. Moreover, Plaintiffs have plausibly alleged that the "threatened injury" of ADOC enforcing its regulations and engaging in other retaliatory conduct

---

[111] Claims against public official defendants for prospective relief are not subject to a qualified immunity defense. *See Rogers v. Miller*, 57 F.3d 986, 988 n.4 (11th Cir. 1995).

"is certainly impending or there is a substantial risk that the harm will occur.'" *Dream Defs. v. Governor of the State of Fla*., 57 F.4th 879, 887 (11th Cir. 2023). First Amendment Plaintiffs have stated facts supporting the inference that they "wish to exercise their right to protest, speech that is affected with a First Amendment interest, and believe that [ADOC regulations and practices] prevent[] them from doing so." *Id.* That belief is well-founded, given ADOC's history of enforcing its regulations and engaging in brutal retaliatory conduct. *See* Compl. ¶¶44-48, 50, 65-70. Plaintiffs have also alleged an intent by ADOC to enforce the challenged regulations in the future. *See Dream Defs.*, 57 F.4th at 887-88. The regulations are presently in effect, and Ivey and Hamm have vigorously defended their right to enforce them in this litigation. *See* Compl. ¶¶44-48, 229, 231-32; Dkt. 148 at 59-60; *Dream Defs.*, 57 F.4th at 887-88. Thus, in addition to alleging sufficient facts to recover against Ivey and Hamm in their personal capacities, the currently incarcerated Plaintiffs have also established standing to seek injunctive relief and are entitled to such relief.

### D.    Ivey and Hamm's Attempt to Invoke the Rule Against Claim Splitting Is Spurious

Finally, contrary to State Defendants' arguments, Dkt. 148 at 21-24, Council has not engaged in claim splitting, and his claim cannot be dismissed on that ground. The prohibition against claim splitting prevents parties from attempting to expand their legal rights by "spreading claims around in multiple lawsuits in other courts or before other judges." *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011). To prevent that conduct and conserve judicial resources, the Eleventh Circuit employs a two-part test to determine whether improper claim splitting has occurred. First, courts ask "whether the case involves the same parties and their privies." *Vanover v. NCO Fin. Services, Inc.*, 857 F.3d 833, 841-42 (11th Cir. 2017). Second, courts ask whether the separate cases "arise from the same transaction or series of transactions"; in other

words, whether they "are based on the same nucleus of operative facts." *Id.* Neither element is met here.

Council currently has three suits pending in the Middle District of Alabama: this case, one that was filed prior to this case, and one filed after this case. *Council v. Hamm, et al.*, 2:23-CV-658-ECM-CWB (*Council I*), the case predating the instant case, seeks specific *injunctive* relief against Commissioner Hamm and others only in their *official* capacities. The complaint in *Council I* describes the history of violence and retaliation, and solitary confinement that Mr. Council has personally suffered during his incarceration at ADOC, but, notably, only seeks relief in the form of permitting Mr. Council to be transferred to a different facility and removed from solitary confinement. *See id.*, Dkt. 2 ¶¶7, 133, 150. In *Council I*, Mr. Council does *not* allege that a transfer is necessary because of his labor activism in ADOC facilities. Rather, he alleges that an ADOC official, Lt. Jeremy Pelzer, harbors a deep-seated animus towards him and has threatened his life on multiple occasions. *Id.* ¶¶1,4, 23-25, 52-60. Indeed, Mr. Council lists the protected First Amendment activity that he alleges has provoked or will provoke retaliation in *Council I*; none of that activity includes either refusal to work or encouraging others to refuse to work. *Id.* ¶¶38, 120. In *Council I*, Mr. Council seeks to enjoin Commissioner Hamm from preventing a transfer that could save his life. *Id.*, Dkt. 2, Prayer for Relief. Governor Ivey is not a named defendant in *Council I.*

In *Robert Earl Council aka Kinetik Justice #181418 v. John Hamm, et al.*, 2:23-cv-730-ECM-JTA (*Council III*), the case filed after the instant case, Council seeks damages for the violence and retribution he has suffered at the hands of Commissioner Hamm and ADOC officials in their individual capacities. As in *Council I*, Governor Ivey is not a named defendant. The *Council III* complaint describes the continuous violence and retaliation Mr. Council has

suffered at the hands of ADOC, particularly Lt. Pelzer; it does not, however, reference or seek any remedy regarding ADOC's policy of retaliating against those in its custody for refusing to work or advocating for others to do the same. Instead, the complaint alleges that Mr. Council has been personally retaliated against via improper transfers, false disciplinary charges, and physical violence due to his efforts to expose corruption and mistreatment within Alabama's prisons. *Id.*, Dkt. 2 ¶¶ 108-111.

The actual allegations in *Council I* and *III*, which Ivey and Hamm largely elide in favor of sweeping generalizations about the suits, make clear that Mr. Council has not engaged in claim splitting. First, and most obviously, Ivey is not named as a defendant in either *Council I* or *Council III*, but is named as a defendant here. As such, she clearly has no valid argument that Mr. Council has split his claims to the extent he seeks now to sue her in her individual capacity. *See Konikov v. Orange Cnty.*, 276 F. App'x 916, 918 (11th Cir. 2008) ("A judgment against a government or one government official does not bind a different official in subsequent litigation that asserts a personal liability against the official.") (quoting 18A Wright, Miller & Cooper, Federal Practice and Procedure §4458, at 567 & n. 20 (2d ed. 2002)).

Further, even a cursory review of Council's complaints reflects that none of his claims in this case against Ivey and Hamm are barred by the rule against claim splitting. The claims in *Council I* and *Council III* are not based on the "same nucleus of operative facts" as those that give rise to the First Amendment claim here. *Vanover*, 857 F.3d at 842. In this suit, Council seeks relief for ADOC's official, codified policy of retaliation against him and other people in its custody who resist ADOC's coercive labor scheme. Compl. ¶¶226-234. In *Council I* and *Council III*, Mr. Council seeks individualized relief to ameliorate the unique and personal harms he has suffered at the hands of specific ADOC officials with a targeted animus towards him. The claims

in this case "arise out of separate incidents … at different prison facilities, and against different defendants." *O'Connor v. Warden, Fla. State Prison*, 754 F. App'x 940, 942 (11th Cir. 2019). To the extent there is some overlap in the time periods of the claims Mr. Council asserts, it bears emphasis that Mr. Council has been incarcerated for nearly 20 years. As another court explained in rejecting claim splitting accusations in the employment context where the plaintiff had been employed for over 17 years, "[g]iven this extensive period of [incarceration], the fact that Plaintiff's claims arise by virtue of [his incarceration] with Defendants is insufficient to establish a common nucleus of operative facts." *Cohen v. Monarch Sales, Ltd., Inc.*, No. 20-CV-24876-UU, 2021 WL 3934203, at *3 (S.D. Fla. Jan. 19, 2021). Further, because both the relief sought and defendants sued are different, neither *Council I* nor *Council III*, "assuming [they] were final, would preclude" Mr. Council's claim here. *Vanover*, 857 F.3d at 841 (explaining that the claim splitting doctrine draws on *res judicata* principles). As such, he has not split his claims and they should be allowed to proceed against both Ivey and Hamm here.

## XIII.   Plaintiffs Have Stated a Claim for Unjust Enrichment Against the Employer Defendants

Unjust Enrichment Plaintiffs[112] have stated a claim for unjust enrichment against the Employer Defendants under Alabama law. A plaintiff pursuing an unjust enrichment claim in Alabama must be able to show that "the defendant holds money which, *in equity or good conscience*, belongs to the plaintiff." *Mantiply v. Mantiply*, 951 So.2d 638, 654 (Ala. 2006); *see Scrushy v. Tucker*, 955 So.2d 988, 1011 (Ala. 2006) ("The doctrine of unjust enrichment is an old *equitable* remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." (citations omitted)). The unjust enrichment doctrine

---

[112] Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright are the "Unjust Enrichment Plaintiffs." *See* Compl., Count XII.

is intended to prevent one party from being "unjustly enriched at the expense of another," particularly if "the recipient of the benefit … engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Mantiply*, 951 So.2d at 654-55 (quoting *Welch v. Montgomery Eye Physicians, P.C.*, 891 So.2d 837, 843 (Ala. 2004)). Because the question whether a defendant was unjustly enriched ultimately "depends on the particular facts and circumstances of each case," unjust enrichment claims are ill-suited for resolution at the motion to dismiss stage. *Id.* at 655.

Plaintiffs have properly invoked that equitable remedy here. Plaintiffs allege that the Employer Defendants, as participants in the State's forced-labor system, knowingly accepted and retained benefits from Unjust Enrichment Plaintiffs and putative class members in the form of coerced labor from incarcerated workers, who are not able to withhold their labor, and have no or little opportunity to turn down assignments or complain about workplace conditions and pay. Compl. ¶¶12, 139, 282. Plaintiffs further allege, with respect to Hamm specifically, that ADOC reaps an enormous financial benefit—more than $400 million—from the unpaid labor that Plaintiffs Moore, English, Walker, Ptomey, McDole, Pritchett, Walker, and other incarcerated individuals have and continue to provide to it. *See* Compl. ¶60 (describing Moore's skilled work for ADOC, including installing and maintaining the HVAC system and renovating wardens' houses); *id.* ¶¶146-47, 149-50 152-54 (describing additional unpaid work provided by Plaintiffs for ADOC's benefit); *id.* ¶¶37-42 (describing economic benefit to ADOC of using unpaid incarcerated labor in lieu of paid corrections staff). With respect to the non-ADOC employers, Plaintiffs allege that their use of incarcerated labor, including by Plaintiffs Walker, Cole, Ptomey, McDole, Campbell, Pritchett, and Cartwright, depresses wages and working conditions, inuring

to the benefit of these Employer Defendants. *Id.* ¶¶12, 147-52, 154-56.[113] Finally, the public Employer Defendants that "lease" incarcerated workers from ADOC cannot dispute (particularly on a motion to dismiss) the financial benefit to them of this scheme: they generally pay workers only $2 a day, regardless of the number of hours worked per day, and often only pay ADOC $15 a day for the "lease" of each incarcerated person, *id.* ¶¶26, 28, 31—instead of paying the wages they would need to pay for a free person to perform comparable work, *id.* ¶¶28-30 (alleging a benefit to ADOT of $12.5 million, based on failure to pay the starting wage for state employees); *id.* ¶31 (alleging a benefit to Montgomery of more than $3 million in wage savings); *see also id.* ¶32 (alleging use of incarcerated labor resulted in $30 million in wage savings between 2018 and 2023 for public entity employers).

In sum, participating in this forced-labor scheme allowed Employer Defendants to retain more profits than they would have if this forced labor pool had not been available. *See Jewett v. Boihem*, 23 So.3d 658, 661-62 (Ala. 2009) ("Whenever one person adds to the other's advantage in any form, whether by increasing his holdings or saving him from expense or loss, he has conferred a benefit upon the other.") (quoting *Opelika Prod. Credit Ass'n v. Lamb*, 361 So.2d 95, 99 (Ala. 1978)). Further, as explained in Parts III and V, *supra*, Plaintiffs have adequately alleged that their labor was coerced, in violation of the state constitution and federal law. At this stage of the litigation, it must be accepted as true that the Employer Defendants were aware that Plaintiffs and other incarcerated workers performed work for them under duress, and that these Defendants willingly gained a substantial benefit from that coerced labor. *See* Compl. ¶¶133-43. Those

---

[113] Even if it is correct that, as some private Employer Defendants contend, they pay the prevailing wage to incarcerated workers, Plaintiffs have alleged that the arrangement is beneficial to all private Employer Defendants because of this depressive effect and the other benefits they reap from a captive workforce with limited ability to complain about working conditions. Compl. ¶12; *see also supra* Part III.A.

allegations state a claim for unjust enrichment. *See Barrientos*, 332 F.Supp.3d at 1312-13 (explaining that the plaintiffs stated a claim for unjust enrichment under Georgia law by alleging they were coerced to work in a carceral facility); *see also* Restatement (Third) of Restitution and Unjust Enrichment §1 (2011) ("While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss.").

The Employer Defendants' attempts to have Plaintiffs' unjust enrichment claim dismissed fall flat. On the merits, the Employer Defendants' argument that they were not aware of the coercion or did not participate in the coercive scheme fail in the face of Plaintiffs' allegations, which must be accepted as true at this stage. *See also supra* Parts III.A, IV.A-C, V (discussing Employer Defendants' knowledge of and participation in the coerced labor scheme). To the extent the Employer Defendants argue they were not active participants in Alabama's forced labor scheme, or plead ignorance of the frequently reported conditions in Alabama's prisons and racial disparities in Alabama's parole system, despite partnering with ADOC, those arguments contradict Plaintiffs' allegations and present factual disputes that are not appropriately resolved on motions to dismiss. *See* Compl. ¶¶142-43.

The Employer Defendants' other defenses likewise do not warrant dismissal here. First, Progressive Finishes, Cast Products, and Koch Foods make much of the fact that Alabama law precludes plaintiffs from recovering simultaneously under both unjust enrichment and breach of contract theories. *See* Dkt. 153-1 at 35-37; Dkt. 171 at 15; Dkt. 174 at 32-33. The doctrine, however, only applies to scenarios in which there is an "express contract" between the party asserting unjust enrichment and the party alleged to have been unjustly enriched. *Weaver v. Nat'l*

*Better Living Ass'n, Inc.*, No. 4:13-CV-2112-VEH, 2014 WL 12614481, at *24 (N.D. Ala. July 3, 2014) (quoting *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So.2d 443, 447 (Ala. 1996)). This is because "an unjust enrichment cause of action operates through the mechanism of an equitably-implied contract," and, when there is an express agreement, "there is no need to imply an agreement between [the parties] to ward off inequitable results." *Id.* Here, there is no allegation of an express contract between *Plaintiffs* and the Employer Defendants, and thus the doctrine is inapplicable. Unjust Enrichment Plaintiffs allege that *ADOC* contracted out their labor, *see, e.g.*, Compl. ¶29 (alleging a contract specifying that ADOT would lease ADOC land in exchange for a specified amount of incarcerated labor), but these contracts between ADOC and the Employer Defendants do not afford Unjust Enrichment Plaintiffs contractual remedies that would preclude their equitable claim. In any event, "[a]lthough a party may not *recover* for both breach of contract and unjust enrichment, at the pleading stage, 'a party may state as many separate claims or defenses as it has, regardless of consistency.'" *Fortune v. Cibran*, No. 2:23-CV-00318-ACA, 2023 WL 5351986, at *3 (N.D. Ala. Aug. 21, 2023) (quoting Fed. R. Civ. P. 8(d)(3) (emphasis added)); *see also J.G. Rogers Corp. v. Metallized Carbon Corp.*, No. 2:18-CV-01955-RDP, 2019 WL 1597845, at *5 (N.D. Ala. Apr. 15, 2019) (while a plaintiff "may not *recover* on both an unjust-enrichment and breach-of-contract claim based on the same facts and contract … that does not mean [plaintiffs] may not *plead* claims for both unjust enrichment and breach-of-contract in the alternative."). Thus, even if the express contract preclusion doctrine were applicable here, and it is not, it would not be adequate grounds for dismissal of the unjust enrichment claim at this stage.

Second, Southeastern Meats and Cast Products argue that unjust enrichment claims are ill-suited to resolution on a class-wide basis, based on statements to that effect from the Alabama

Supreme Court. *See* Dkt. 149 at 13; Dkt. 171 at 14-15. These class certification arguments, however, are not ones that should be considered by the Court on motions to dismiss. *See Sheet Metal Workers Loc. 441 Health & Welfare Plan*, *v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 217 (E.D. Pa. 2009) ("Whether or not Alabama would certify an unjust enrichment class such as this one has no bearing on the viability [of] the claim.").[114]

Further, the arguments by Jefferson County, SRG, Southeastern Meats, and City of Montgomery that the unjust enrichment claim as to them should be dismissed as wholly or partially time-barred because certain Plaintiffs worked for these defendants more than two years ago, are not well taken. Dkt. 141 at 14-15; Dkt. 147 at 33-34, Dkt. 149 at 13-14; Dkt. 152 at 26-27. First, only the City of Montgomery acknowledges that Alabama has two potentially relevant statutes of limitations for unjust enrichment claims: a two-year statute of limitations for "[a]ll actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section," Ala. Code §6-2-38(*l*), and a six-year statute of limitations for "[a]ctions upon any simple contract or speciality not specifically enumerated in this section," Ala. Code §6-2-34(9). In *Auburn University v. International Business Machines, Corp.*, 716 F.Supp.2d 1114, 1117-18 (M.D. Ala. 2010), this Court explained that "the Alabama

---

[114] In any event, the Alabama Supreme Court cases on which these defendants rely were interpreting the State's class-action rule, not Federal Rule of Civil Procedure 23, and "[t]hat Alabama interprets its own class action certification rule as precluding certain types of claims does not mean that the same class claims would be barred in federal court." *Sheet Metal Workers Loc. 441 Health & Welfare Plan*, 263 F.R.D. at 216-17 (rejecting the defendants' motion for judgment on the pleadings as to an unjust enrichment claim "[b]ecause Alabama's class action rule merely sets forth the procedural requirements for maintaining a class action, [so] the Court must follow Federal Rule 23 when deciding whether to certify a class."); *see also In re Takata Airbag Products Liab. Litig.*, 462 F.Supp.3d 1304, 1333 (S.D. Fla. 2020) ("whether an unjust enrichment claim can satisfy the predominance and superiority requirements of an Alabama class action has no bearing on whether Plaintiffs can certify a nationwide unjust enrichment class action under federal law").

state courts have not decided whether unjust-enrichment claims are tort claims or implied-contract claims, much less which statute of limitations applied to such claims." Which statute of limitations applies thus depends on the nature of the unjust enrichment claim. *See id.* The objecting Defendants therefore often oversimplify the law regarding the statute of limitations.

The better argument is that Plaintiffs' unjust enrichment claim, which seeks to recover the full benefits the Employer Defendants gained from their use of Plaintiffs' labor under coercive conditions, asserts a claim involving an injury arising from contracts and thus is subject to a six-year statute of limitations. *See* Ala. Code §6-2-34(9) (six-year statute of limitations applicable to claims for injuries "arising from" contracts); *Auburn U.*, 716 F.Supp.2d at 1118. Here, the law equitably implies a contractual arrangement between Employer Defendants and Unjust Enrichment Plaintiffs that prevents the Employer Defendants from profiting unjustly from Plaintiffs' coerced labor. *See White v. Microsoft Corp.*, 454 F.Supp.2d 1118, 1132 (S.D. Ala. 2006) ("[U]nder Alabama law, it is clear that an unjust enrichment claim sounds in the nature of quasi-contract, as the law equitably implies a contract between the parties to prevent the unjust enrichment of a defendant at the expense of a plaintiff." (citing *American Family Care, Inc. v. Fox*, 642 So.2d 486, 488 (Ala. Civ. App. 1994)). Even if the Court does not agree, however, the question of which statute of limitations applies to Unjust Enrichment Plaintiffs' claim could not be resolved on a motion to dismiss. The Alabama Supreme Court, as recently as last year, endorsed the *Auburn* court's reasoning in declining to dismiss a plaintiff's claim for unjust enrichment regarding overpayment to an employee, noting that "[w]hether [the plaintiff's] unjust-enrichment claim falls into either category requires a factual inquiry, and, therefore, [the plaintiff's] allegations in its complaint were sufficient to survive [the defendant's] motion to dismiss." *Protective Life Ins. Co. v. Jenkins*, ___ So. 3d ___, 2023 WL 3768321, at *3 (Ala. June

2, 2023); *see also Weaver*, 2014 WL 12614481, at *12 (adopting the *Auburn* inquiry to determine the statute of limitations for an unjust enrichment case); *Branch Banking and Tr. Co. v. McDonald*, No. 2:13-CV-000831-KOB, 2013 WL 5719084, at *7 (N.D. Ala. Oct. 18, 2013) (same). The same is true here. If nothing else, the question whether Plaintiffs' claims arise in tort or contract requires factual development and cannot be answered at this stage of proceedings.[115]

State Defendants also incorrectly contend that the unjust enrichment claim against Defendant Cooper must be dismissed, and do not specifically address the claim as to Defendants Ivey and Hamm, both of whom are also Employer Defendants. *See* Dkt. 148 at 127-30.[116] Whether Plaintiffs may recover from Defendant Cooper in his individual capacity turns on whether he may invoke state-agent immunity, which is not available if he acted "willfully, maliciously, fraudulently, in bad faith, beyond his … authority, or under a mistaken interpretation of the law." Ala. Code §36-1-12(d)(2). Plaintiffs here have alleged facts supporting the inference that Cooper acted at least willfully, beyond his authority, and under a mistaken interpretation of the law in participating in and benefiting from the forced-labor partnership with ADOC. *See* Compl. ¶134 (alleging knowing and willful participation in forced-labor program); *id.* ¶¶138-39,

---

[115] Whether Plaintiffs' equitable unjust enrichment claims against the City of Troy and City of Montgomery may proceed also depends on the nature of the claim, as the notice of claims statute these Defendants cite applies only to "a claim for personal injury received," Ala. Code §11-47-192, and the municipal immunity statute applies only to "damages for injury done to or wrong suffered by any person or corporation," with certain exceptions for negligence, Ala. Code §11-47-190. *See Lee v. Houser*, 148 So.3d 406, 420 n.2 (Ala. 2013) (holding §11-47-192 applies only to personal injury claims, not, for example, claims for lost profits) (citing *Coffee Cnty. Comm'n v. Smith*, 480 So.2d 1194, 1195 (Ala. 1985)); *Mitchell v. Town of Hayneville*, No. 2:20CV252-MHT, 2020 WL 7480551, at *8 (M.D. Ala. Dec. 18, 2020) (§11-47-192 does not bar contract claim arising out of alleged wrongful termination, and §11-47-23 did not bar claims to the extent they sought equitable relief); *Altmayer v. City of Daphne*, 613 So.2d 366, 369 (Ala. 1993) (Ala. Code §11-47-190 "absolves a municipality from liability for the intentional torts of its agents"). Plaintiffs' quasi-contractual unjust enrichment claim thus is not barred.
[116] Plaintiffs are not pursuing their unjust enrichment claim against Cooper, Ivey, and Hamm in their official capacities and are not seeking injunctive relief from them with respect to this claim.

143; *id.* ¶283 (alleging that Employer Defendants, including Cooper, Ivey, and Hamm, obtained a benefit "through their knowing and voluntary participation in the State's coercive worker 'leasing' program").[117] The Alabama Supreme Court has recognized "that a motion to dismiss is typically not the appropriate vehicle by which to assert ... State-agent immunity and that normally the determination as to the existence of such a defense should be reserved until the summary-judgment stage, following appropriate discovery." *Odom v. Helms*, 314 So.3d 220, 229 (Ala. 2020) (quoting *Ex parte Alabama Dep't of Mental Health & Retardation*, 837 So.2d 808, 813-14 (Ala. 2002)); *see also, e.g.*, *Johnson v. Dunn*, No. 2:21-CV-1701-AMM, 2024 WL 1076802, at *11 (N.D. Ala. Mar. 12, 2024). "[I]n pleading a claim against a State agent, a plaintiff's initial burden is merely to state a cause of action against the defendant," and a plaintiff need not anticipate a state-agent immunity defense by pleading an exception to the defense with particularity. *Odom*, 314 So.3d at 229 n.3. Where, as here, Plaintiffs have stated sufficient facts to allege an unjust enrichment claim against Cooper, Ivey, and Hamm based on their willful participation in an unlawful forced-labor program, and the Complaint strongly suggests that Plaintiffs will be able to invoke an exception to state-agent immunity, the motion to dismiss on this ground must be denied.

## XIV.   Defendants' Protestations that the Complaint Is a "Shotgun" Pleading Are Without Merit

Some of the Employer Defendants argue that Plaintiffs' claims should be dismissed outright because the Complaint is a "shotgun" pleading, citing various Eleventh Circuit decisions that advise against so-called "shotgun" pleading. *See* Dkt. 147 at 9 (SRG); Dkt. 151 at 8-9

---

[117] Although State Defendants do not assert this defense with respect to Ivey and Hamm, any belated attempt to invoke it would fail for the same reasons, given that their participation in the forced-labor scheme was at least willful, beyond their authority, and pursuant to a mistaken interpretation of law. *See* Compl. ¶¶35-42, 134, 138-39, 143, 160, 283.

(Masonite); Dkt. 157 at 11-12 (Automotive Defendants); Dkt. 174 at 17-18 (Koch Foods); Dkt. 175 at 9-10 (RCF, LLC). But the Eleventh Circuit has not changed, and indeed could not change, the notice pleading requirements set forth in the federal rules and by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The question is simply whether Defendants have received notice of the claims against them and the allegations underlying those claims. *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). Here, the Complaint meets that standard as to each Defendant.

The Employer Defendants who invoke "shotgun" pleading case law generally complain that the Complaint is long. *See, e.g.*, Dkt. 147 at 9. Their other primary objection is to Plaintiffs' use of the term Employer Defendants, arguing that Eleventh Circuit precedent prohibits any such reference to multiple defendants at once and that claims should not be brought against multiple defendants at all. *See, e.g.*, Dkt. 151 at 9 (complaining that "employer defendants" are "lumped together"); Dkt. 147 at 9-10. But this misstates the relevant standard. There is of course no rule against lengthy complaints; nor is there any rule that claims may not be brought against multiple defendants or that plaintiffs may not reference defendants collectively. Rather, the test is whether each defendant has *fair notice* of the allegations that relate to it and the claims against it. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (under Fed. R. Civ. P. 8, a "statement need only give the defendant fair notice of what the … claim is and the ground upon which it rests" (citation omitted)); *Weiland*, 792 F.3d at 1323 (question is whether complaint provides defendants "adequate notice of the claims against them and the grounds upon which each claim rests"). Nothing in the general prohibition on so-called "shotgun" pleadings can or does undermine that test, which Plaintiffs have met.

The Eleventh Circuit has identified "four rough types or categories of shotgun pleadings":

> (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint "; (2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that does not separate "each cause of action or claim for relief" into a different count; and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."

*Mathis v. City of Lakeland*, No. 22-12426, 2023 WL 2568814, at *4 (11th Cir. Mar. 20, 2023) (quoting *Weiland*, 792 F.3d at 1321-23). There is no colorable argument that the first, second, or third categories apply. The counts in the Complaint do not incorporate previous counts—they incorporate only the factual allegations relevant to each specific count; the Complaint does not allege "immaterial facts" that are unrelated to the counts—the Complaint clearly delineates which factual allegations relate to each count; and the Complaint clearly separates each cause of action into a different count. *See* Compl., Counts I-XII. The Defendants that raise the "shotgun" question must thus focus on whether Plaintiffs are permitted to assert multiple claims against multiple defendants.

Plaintiffs' Complaint, however, undoubtedly places SRG, Masonite, Automotive Defendants, Koch Foods, and RCF on notice of the allegations and claims against them. Plaintiffs include allegations specific to each of these Defendants, identifying the number of incarcerated individuals employed by them from January 1, 2018 through September 7, 2023, the number of incarcerated individuals employed in the 2023 fiscal year, and, where applicable, which Individual Plaintiffs worked for them. That Plaintiffs also allege, with reference to these and other Defendants, a number of common facts—e.g., that all the companies had contracts

with ADOC, that those contracts require the companies to enforce ADOC rules, that the contracts

provide for ADOC to take 40% or more of incarcerated persons' wages, and that the companies

knew or should have known that the work-release program is a lucrative enterprise for ADOC—

does not mean that the companies did not have notice of those facts.[118] It is reasonable for

Plaintiffs to refer to Employer Defendants collectively for allegations that apply to all of the

entities employing incarcerated labor, and this alone does not turn the Complaint into a

prohibited "shotgun" pleading.[119] *See Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021)

(fourth category of shotgun pleadings did not apply "because even though several of the counts

target multiple defendants, these counts specify which of the defendants are responsible for

which acts or omissions" (internal quotation marks omitted)); c*f. Mathis*, 2023 WL 2568814, at

*4 (plaintiff sued 12 defendants but amended complaint failed to identify "which claims were

raised against which defendants").

       Finally, if the objecting Defendants truly did not have notice of the claims and allegations

made against them, the appropriate step would be to move for a more definite statement. Only

---

[118] The Automotive Defendants assert that the private companies contracting with ADOC for incarcerated persons' labor are each "distinct" and that there may be "geographic," "temporal," and "economic" differences. Dkt. 151 at 9. Plaintiffs do not disagree, but that does not make Plaintiffs' allegations about circumstances common to these companies inaccurate, nor does it mean that the defendant companies did not have fair notice of the claims against them. This is not like *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001), where "geographic and temporal realities ma[de] plain that all of the defendants could not have participated" in the acts alleged.

[119] Automotive Defendants object to two instances in the Complaint in which Plaintiffs did *not* use a term that would cover all defendants employing incarcerated workers. *See* Dkt. 157 at 12 (referring to Compl. ¶¶12, 23, which refer to "some" employers and a practice that occurred "sometimes"). Those two discrete references do not refer to any specific employer and Plaintiffs agree they should not be read to ascribe conduct to Automotive Defendants or to any other named Defendant. Their inclusion, however, does not defeat the fact that the Complaint provides fair notice of the claims and factual allegations specific to each Defendant employing incarcerated individuals through ADOC.

Masonite even references such an approach, Dkt. 151 at 8, and none of the defendants actually move for this relief. *Cf. Weiland*, 792 F.3d at 1324 (where defendants did not move for a more definite statement under Fed. R. Civ. P. 12(e), it suggested they did not have difficulty knowing what they were alleged to have done).

## CONCLUSION

For the foregoing reasons, all the pending motions to dismiss, Dkts. 139, 141, 142-53, 155-57, 171, 174, 175, should be denied, except to the extent the State Defendants seek dismissal of Plaintiffs' state constitutional claim against those Defendants. If the Court concludes that dismissal of any of the claims in the Complaint is warranted, Plaintiffs respectfully request leave to amend and, to the extent the Court concludes additional facts are necessary to address State Defendants' PLRA defense, Plaintiffs respectfully seek leave to conduct expedited discovery.

Respectfully submitted,

DATED: May 31, 2024                    /s/ Barbara J. Chisholm

MICHAEL RUBIN (CA SBN 80618)*
BARBARA J. CHISHOLM (CA SBN 224656)*
CONNIE K. CHAN (CA SBN 284230)*
AMANDA C. LYNCH (CA SBN 318022)*
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Email: mrubin@altber.com; bchisholm@altber.com;
cchan@altber.com; alynch@altber.com

JANET HEROLD (CA SBN 186419)*
JUSTICE CATALYST LAW
40 Rector Street, 9th Floor
New York, NY 10008
Telephone: (518) 732-6703
Email: jherold@justicecatalyst.org

*Counsel for All Plaintiffs and the Proposed Classes and Subclasses*
     *Appearing pro hac vice*

GEORGE N. DAVIES (SBN ASB-3923-A63G)
RICHARD P. ROUCO (SBN ASB-6182-R76R)
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
Email: gdavies@qcwdr.com; rrouco@qcwdr.com

*Counsel for Plaintiffs RWDSU and SEIU*

LAUREN FARAINO (SBN ASB-8098-C65A)
FARAINO, LLC
2647 Rocky Ridge Ln.
Vestavia Hills, AL 35216
Telephone: (205) 737-3171
Email: lauren@farainollc.com

*Counsel for The Woods Foundation, Individual
Plaintiffs, and the Proposed Classes and Subclasses*