## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**ROBERT EARL COUNCIL AKA**
**KINETIK JUSTICE, *et al.*,**
     Plaintiffs,

**v.**
                                          **Case No. 2:23-cv-712-CLM**

**KAY IVEY, *et al.*,**
     Defendants.

## ORDER

Lee Edward Moore, Jr., Jerame Aprentice Cole, Frederick Denard McDole, Michael Campbell, Arthur Charles Ptomey, Jr., and Alimireo English are Black inmates recently denied parole by the Alabama Board of Pardons and Paroles. The Woods Foundation is a non-profit organization dedicated to ending racial discrimination and what it contends is "the unfair, arbitrary, and inhumane treatment of incarcerated individuals in Alabama's prison and parole system." (Doc. 44-1, ¶ 2).

The Plaintiff inmates and the Woods Foundation claim that Alabama's Governor and Attorney General effectively shut down parole in 2019 and Black inmates have been particularly discriminated against in the granting of parole and setting of parole reconsideration dates. So Plaintiffs sue the Governor, Attorney General, and members of the Board of Pardons and Parole, alleging their acts violate the Ex Post Facto and Equal Protection Clauses of the U.S. Constitution. Plaintiffs ask the court for preliminary injunctive relief and provisional class certification.

The court **GRANTS** The Woods Foundation's motion to join Plaintiffs' motion for preliminary injunction (doc. 44) and Plaintiffs' motion for the court to take judicial notice of several of their evidentiary submissions (doc. 27). The court **DENIES** Plaintiffs' motion for preliminary injunction and provisional class certification (doc. 23). The court explains its decision to deny preliminary injunctive relief below.

BACKGROUND

Under Alabama law, "the decision concerning parole release shall be at the complete discretion" of the members of the Board of Pardons and Paroles. *See* Ala. Code § 15-22-26(c). The State Legislature offers guidance on how to use that discretion—guidance that has changed over time. As explained later, the difference in the statutory language in effect at the time Plaintiffs committed their offenses and now is important to their Ex Post Facto Clause challenge. So the court starts by describing Plaintiffs' crimes of conviction, sentences, and parole hearing history. The court will then trace the history of Alabama law on parole and explain the Parole Board's current practices.

## A.    The Individual Plaintiffs

The Plaintiff inmates share three things in common: each (1) is Black; (2) is serving a sentence for which there is a possibility of parole; and, (3) was denied parole within two years of filing this lawsuit.

Moore was sentenced to 50 years' imprisonment for a 1994 murder charge and began serving his sentence in 1997. (Doc. 24-20, p. 3). The Parole Board most recently denied Moore parole in December 2022 and scheduled his next parole reconsideration date for December 2027. (Doc. 25-4, ¶ 9).

Cole was sentenced to 20 years' imprisonment for a 2007 first degree robbery charge and began serving his sentence in 2008. (Doc. 24-17, p. 3). The Parole Board has denied Cole parole four times with his last denial in August 2023. (Doc. 25-5, ¶ 5). Cole's sentence ends in June 2027, and the Parole Board has not given him a parole reconsideration date before the end of his sentence. (Doc. 24-17, p. 3).

McDole was sentenced to 21 years' imprisonment for a 2008 Assault I charge and began serving his sentence in 2009. (Doc. 24-19, p. 3). The Parole Board denied McDole parole in 2018 and again in 2022. (Doc. 25-2, ¶¶ 12–13). McDole's parole reconsideration date is set for March 2027. (*Id.*, ¶ 13).

Campbell was sentenced for multiple offenses in 2002, including two drug distribution charges for which he was sentenced to 30 years' imprisonment. (Doc. 25-1, ¶ 2). Campbell was paroled in 2012 but had his parole revoked in 2017 because he committed new offenses while on parole.

(*Id.*, ¶ 3). Campbell reached the end-of-sentence on his 2017 charges several years ago but is still serving time for the two drug distribution charges. (*Id.*, ¶¶ 2–3). The Parole Board denied Campbell parole in 2020 and July 2023. (*Id.*, ¶¶ 10–11). His parole reconsideration date is set for July 2028. (*Id.*, ¶ 11).

Ptomey was sentenced in 2007 to 22 years' imprisonment for robbery and third-degree burglary. (Doc. 24-21, pp. 3–4). The Parole Board denied Ptomey parole in 2017 and September 2022. (Doc. 25, ¶¶ 3,7). Ptomey's next parole reconsideration date is in 2025. (*Id.*, ¶ 7).

English was sentenced in 2012 to life with the possibility of parole for a 2010 drug trafficking charge. (Doc. 24-18, p. 3). The Parole Board granted English parole but revoked his parole in October 2020 because of new charges that a jury ultimately acquitted him of. (Doc. 25-3, ¶ 2). In a 2-1 decision, the Parole Board denied English parole in November 2023 and set his parole reconsideration date for November 2024. (*Id.*, ¶ 9).

## B.    1951 Statute

At the time the Plaintiff inmates committed their offenses, a 1951 statute described how the Parole Board was to exercise its discretion when deciding whether to grant parole:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society.

1951 Ala. Laws Act No. 1951-599 § 7. Under this standard, Alabama prisons were the most crowded in the country by September 2014 and operating at a 195% capacity. (Doc. 24-1, p. 2). So the Alabama Legislature created a task force to study the state's criminal justice system. (*Id.*, p. 3).

One analysis that the task force considered stated that part of the reason for overcrowding was a decline in parole releases. (*Id.*, p. 21). For example, the parole grant rate was around 40% in 2010 but had fallen to 30% in 2013. (*Id.*). The analysis also found that the Parole Board did "not have

formal guidelines for parole release decisions," leading to "a lack of consistency in what factors [Parole Board members] consider when determining if a person is ready for parole." (*Id.*, p. 23). And the Parole Board "reported placing less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison, than on other factors an individual cannot change, such as prior criminal history and nature of the underlying offense." (*Id.*). The study said this practice was contrary to the practice of parole boards across the country who were "increasingly using parole guidelines that consider factors that demonstrate an individual's readiness for parole, including risk and needs assessment results, record of program completion in prison behavior, and the existence of a viable parole plan." (*Id.*).

## C. Justice Reinvestment Act of 2015

In response to the task force's findings, the Alabama Legislature enacted the Justice Reinvestment Act of 2015. This Act required the Parole Board to establish "structured, actuarially based" guidelines to aid Board members in determining a prisoner's fitness for parole and stated that the guidelines "shall promote the use of prison space for the most violent and greatest risk offenders." Ala. Code § 15-22-26(a). The Board's guidelines had to include:

> (1) The prisoner's risk to reoffend, based upon a validated risk and needs assessment;
>
> (2) Progress by the prisoner and the Department of Corrections to plan for reentry;
>
> (3) Input from the victim or victims, the family of the victim or victims, prosecutors, and law enforcement entities;
>
> (4) Participation in risk-reduction programs while incarcerated;
>
> (5) Institutional behavior of the prisoner while incarcerated; and
>
> (6) Severity of the underlying offense for which the prisoner was sentenced to incarceration.

*See id.* But the guidelines did not "create a right or expectation by a prisoner to parole release" and "the decision concerning parole release" remained "at the complete discretion of the board." Ala. Code § 15-22-26(c).

The Board adopted the Ohio Risk Assessment System ("ORAS"), which scored prisoners up for parole at either a low, medium, high, or very high risk to reoffend. (Doc. 26, ¶ 10). These scores were then considered by the Board along with other factors identified on a Board Action Sheet. (*Id.*, ¶¶ 9–11).

Implementation of the Justice Reinvestment Act had its intended effect—by 2018 parole grant rates had risen to around 54%, which was close to the national average. (*Id.*, ¶ 14). The grant rates for Black and white inmates were also similar with Black candidates being granted parole 50.7% of the time and white candidates being granted parole 54.4% of the time. (Doc. 26-3, ¶ 12).

### D.    Jimmy Spencer Murders Three in 2018

In November 2017, the Parole Board granted parole to Jimmy Spencer, a white man serving a life sentence for Escape I and Burglary II and a 15-year sentence for Assault II. (Docs. 58-8; 58-1, p. 1). A special condition of Spencer's parole was that he live at an approved halfway house, but he abandoned the shelter "weeks later." (Docs. 58-11; 58-12, p. 4). In July 2018, Spencer murdered three people, including a seven-year-old boy, while committing a robbery. (Docs. 26, ¶ 18; 58-12, p. 4).

A few months later, Governor Ivey summoned Parole Board members Lyn Head, Cliff Walker, and Dwayne Spurlock to her office. (Doc. 26, ¶ 20). Attorney General Steve Marshall was also at the meeting. (*Id.*, ¶ 21). According to Head, both Ivey and Marshall conveyed that the Parole Board should be denying parole applications much more often, and Governor Ivey stated that parole should be denied to those who had been convicted of a violent crime. (*Id.*, ¶ 23). Head says that Ivey demoted Walker from Parole Board Chair to Associate Member and appointed Head as Chair. (*Id.*, ¶ 24). The next day, Ivey's staff pressured Head to remove Eddie Cook, a Black man, from his position as Parole Board Executive Director. (*Id.*, ¶ 25). Head refused, and Ivey issued a 75-day moratorium on parole. (*Id.*, ¶¶ 25–26).

### E. 2019 Parole Amendments + Implementation

About a year later, the Alabama Legislature amended the Justice Reinvestment Act. These 2019 amendments gave the Governor exclusive authority to appoint the Director of Pardons and Paroles who is to "serve at the pleasure of the Governor." Ala. Code § 15-22-21(a). The amendments also required for the first time that "[t]he membership of the board . . . be inclusive and reflect the racial, gender, geographic, urban/rural, or economic diversity of the state" and include at least one member who is current or former law enforcement. Ala. Code § 15-22-20(a). And the statutory standard for parole decisions changed to:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole and to ensure public safety. The guidelines shall serve as an aid in the parole process and shall promote the use of prison space for the most violent and greatest risk offenders, while recognizing that the board's paramount duty is to protect public safety.

Ala. Code § 15-22-26(a) (highlight added).

The day the 2019 amendments took effect, Governor Ivey appointed Charles Graddick to replace Cook as Executive Director. (Doc. 26, ¶ 27). Graddick then served disciplinary charges on Cook, Assistant Executive Director Christopher Norman, and Personnel Director Belinda Johnson. (*Id.*). Graddick also told Cook, Norman, and Johnson—who Plaintiffs assert were the only Black Parole Board employees in director-level positions—that if they did not resign, he would terminate their employment. (*Id.*, ¶¶ 27–28). And Graddick issued a personal appearance policy that Head interpreted as prohibiting traditional Black hairstyles. (*Id.*, ¶ 30). A month later, Head resigned from her position as Parole Board Chair because she "could not in good conscience work with people who" she felt "engaged in . . . openly racist practices." (*Id.*, ¶ 31). Ivey appointed Leigh Gwathney, an Assistant Attorney General, to replace Head as Parole Board Chair. (*Id.*, ¶ 32).

Gwathney replaced Head at the beginning of Fiscal Year 2020. (Docs. 26, ¶¶ 31–32; 26-3, ¶ 11). Parole grant rates have declined each year the 2019 amendments have been in effect and Gwathney has been Parole Board Chair:



| Fiscal Year | Grants | Denials | Total Decisions | Grant Rate |
|---|---|---|---|---|
| FY2015 | 2270 | 3782 | 6052 | 38% |
| FY2016 | 3107 | 3350 | 6457 | 48% |
| FY2017 | 3847 | 3151 | 6998 | 54% |
| FY2018 | 3730 | 3263 | 6993 | 53% |
| FY2019 | 1368 | 3078 | 4446 | 31% |
| FY2020 | 548 | 2160 | 2708 | 20% |
| FY 2021 | 648 | 3584 | 4232 | 15% |
| FY 2022 | 409 | 3593 | 4002 | 10% |
| FY 2023 | 312 | 3479 | 3791 | 8% |

(Doc. 24-13, p. 10).

The decline in grant rates has been particularly sharp for inmates convicted of violent offenses. As seen in the below chart, the parole grant rate for inmates convicted of violent offenses in Fiscal Year 2018 was 44.7%. The grant rate was reduced to 21.1% in Fiscal Year 2019 and has hovered around 3% from Fiscal Year 2021 to Fiscal Year 2023.

**FIGURE C**



(Doc. 26–3, ¶ 17 & Fig. C).

Plaintiffs say that there has also been a racial skew in the Parole Board's decision-making calculus since the 2019 amendments were enacted. To make their point, Plaintiffs retained an expert, Lacey Keller of MK Analytics. Keller's regression analysis, which controlled for facility type, fiscal year, sex, and job status, shows that between Fiscal Years 2020 and 2022, white parole candidates were 2.06 times as likely to be granted parole as Black parole candidates. (*Id.*, ¶ 15).

Keller also says that the below chart illustrates that, since Fiscal Year 2020, the Parole Board has granted reset dates of two years or less to white parole candidates denied parole much more often than it has to Black parole candidates denied parole:

**FIGURE E**



(*Id.*, ¶¶ 23–24 & Fig. E).

## F.   Plaintiffs' Motion for Preliminary Injunctive Relief

Plaintiffs assert that the 2019 Parole Amendments violate the Ex Post Facto Clause and that the Parole Board's practices since 2019 violate the Equal Protection Clause. As articulated during the preliminary injunction hearing, Plaintiffs' Ex Post Facto Clause claim is that the 2019 amendments elevated the Parole Board's duty of protecting public safety over all other factors, which has resulted in the shutting down of parole for persons convicted of violent offenses. (Doc. 170, pp. 6–7). Plaintiffs' Equal Protection Clause claim is that the Parole Board has departed from applying the objective risk assessments created in 2015, which has injected racial bias into the overall decision-making process. (*Id.*, pp. 23–25).[1]

---

[1] The court heard argument on Plaintiffs' motion for preliminary injunctive relief and provisional class certification on March 15, 2024. Though the court offered the parties the opportunity to present evidence and witness testimony at the hearing, they declined to do so. (Doc. 170, pp. 94–95).

In their motion, Plaintiffs ask the court to grant this preliminary injunctive relief:

- Prohibit Ivey and Marshall from instructing their agents and Defendant Parole Board members (a) to ensure that those incarcerated for violent offenses aren't granted parole, and (b) to disregard the actuarially- and evidence-based risk assessments.

- Prohibit the Parole Board members from issuing parole decisions deviating from the pre-2019 Parole Guidelines and practices and require the Parole Board to provide detailed, individualized written explanations for denying parole to those with a "low" or "moderate" ORAS risk assessment level.

- Require the Parole Board to revert to the Parole Guidelines and practices in place before October 1, 2019.

- Prohibit the Parole Board from scheduling parole reconsideration dates more than two years from the date of parole denial for all except exceptional cases, which cannot exceed 15% per year.

- Require the Parole Board to review parole files of every person denied parole since October 1, 2019, at a rate of 1,000 per month, and issue revised parole decisions that deviate from the pre-2019 Parole Guidelines for those with "low" or "moderate" ORAS risk assessments in no more than 20% of cases per month. And order reconsideration dates for parole denied after this review to be no longer than two years after the parole applicant's last hearing date.

- Appoint a special master to oversee Defendants' compliance with the preliminary injunctive relief while this action is pending.

(Doc. 23-1, pp. 56–58).

## STANDARD OF REVIEW

"A preliminary injunction is appropriate only when the moving party can show that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quotations omitted). The "[f]ailure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

Preliminary injunctions are designed to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, "the findings of fact and conclusions of law made by a court granting [or denying] a preliminary injunction are not binding at trial on the merits." *Id.* (citations omitted).

## DISCUSSION

No matter how the court would weigh the other preliminary injunction factors, the court cannot issue a preliminary injunction and grant provisional class certification if Plaintiffs fail to establish a substantial likelihood that they will succeed at trial on their Ex Post Facto and Equal Protection Clause claims. Defendants argue that Plaintiffs cannot establish a substantial likelihood of success on the merits because (a) the court lacks jurisdiction over Plaintiffs' claims, and (b) Plaintiffs haven't shown a violation of either the Ex Post Facto or Equal Protection Clause.

As explained below, the court finds that it has jurisdiction to consider the Ex Post Facto and Equal Protection Clause challenges brought by most (but not all) Plaintiffs against Defendant Parole Board Members. But the court agrees with Defendants that Plaintiffs haven't established a substantial likelihood that they will prove an Ex Post Facto or Equal Protection Clause violation at trial. This finding precludes the court from granting Plaintiffs their requested preliminary injunctive relief.

## A.    Jurisdictional Challenges

The court starts, as it must, with jurisdiction. Defendants assert that: (a) under *Pennhurst*, sovereign immunity bars both of Plaintiffs' claims (Ex Post Facto and Equal Protection), and (b) Plaintiffs cannot seek relief from the Governor or Attorney General. If successful, Defendants' *Pennhurst* argument would prevent the court from reaching the merits of either the ex post facto or equal protection claim. So the court starts there.

### 1. *Pennhurst*

The Eleventh Amendment limits federal court jurisdiction over the sovereign states. *See* U.S. CONST. amend. XI. Under this amendment, a state generally cannot be sued by its own citizens or others in federal court. *See DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 687 (11th Cir. 1997). An exception to this general rule of sovereign immunity is that "the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308 (11th Cir. 2011) (citing *Ex parte Young*). But as explained in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984), this exception doesn't apply to a claim for prospective relief against state officials based on state law. "And conclusory allegations that the same conduct that violates state law also violates the U.S. Constitution will not boost the claim over the sovereign-immunity bar." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204 (11th Cir. 2019).

To decide whether *Pennhurst*'s jurisdictional bar applies, the court must ask whether the gravamen of the complaint is that the state has improperly interpreted and failed to adhere to a state statute. *See id.* at 1204–05. Defendants say that Plaintiffs' ex post facto and equal protection claims are barred because their allegations are that Defendants failed to follow state law "and the remedies they request are for Defendants' to follow Plaintiffs' preferred interpretation of state law." (Doc. 55, p. 23). The court disagrees on both counts.

A. *Ex post facto:* Plaintiffs have clarified that their ex post facto challenge is that the 2019 amendments' requirement that the Parole Board's guidelines recognize that protecting public safety is the Board's paramount duty creates a significant risk that Plaintiffs will spend more time incarcerated than they would if the standard from the 1951 statute applied. A claim that new statutory language is impermissibly being applied retroactively to increase criminal punishment is a classic ex post facto claim that sounds in federal, not state law. *See Garner v. Jones*, 529 U.S. 244, 249 (2000) ("One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission."). And though there is no federal right to parole, a state's "[r]etroactive changes in laws governing parole of prisoners" still cannot violate the Ex Post Facto Clause. *See id.* at 249–50. So under *Ex parte Young*, this court may enjoin state officials from breaching the Ex Post Facto Clause by retroactively applying a change in the state's law on parole that increases the length of incarceration for those who committed their offenses before the law was enacted. That's what Plaintiffs ask the court to do.

To be sure, Plaintiffs' ex post facto claim will require the court to consider the differences between the Parole Board's practices before and after the 2019 amendments' enactment. But that by itself doesn't transform Plaintiffs' ex post facto claim into a state-law claim that this court lacks jurisdiction to consider. If it did, either this court could never hear an Ex Post Facto Clause challenge, or such challenges would always fail because the plaintiff could never present the evidence necessary to support his claim. Nor does the fact that the Parole Board has discretion to disregard its guidelines mean that Plaintiffs' Ex Post Facto Clause challenge is really a state-law claim in disguise. *See id.* at 253 ("The presence of discretion does not displace the protections of the *Ex Post Facto* Clause."); *see also Peugh v. United States*, 569 U.S. 530, 547 (2013) (None of the Court's ex post facto cases involving changes in parole law have suggested "that the mere fact that the prisoner was not guaranteed parole but rather received it at the will of the parole board was fatal to his claim."). Rather, how the 2019 amendments affected the Parole Board's practices goes to the merits of Plaintiffs' ex post facto challenge. The court thus finds that *Pennhurst* doesn't bar Plaintiffs' Ex Post Facto Clause claim.

B. *Equal Protection*: Plaintiffs' equal protection claim is that the Parole Board's implementation of the 2019 amendments and departure from applying the objective risk assessments discriminates against Black parole candidates because it makes it less likely that they will receive parole than their white counterparts. If Plaintiffs can show that these practices have an actual discriminatory effect and that there is an intent to discriminate based on race, they will have stated a valid Equal Protection Clause claim. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). And "[a]n injunction ordering [Defendants] to . . . heed the requirements of the Equal Protection Clause does not order [them] to conform to state law in violation of *Pennhurst*." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 453 (5th Cir. 2022).

It doesn't matter that the injunctive relief Plaintiffs seek is for the court to order Defendants to go back to applying a previous (*i.e.*, Plaintiffs' preferred) version of state law. "Under *Pennhurst*, . . . the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law." *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989). And the court would only order Defendants to apply a different version of state law to prevent Defendants from violating either the Ex Post Facto or Equal Protection Clause of the U.S. Constitution. Granting this type of relief against state officials sued in their official capacities falls squarely within the *Ex parte Young* exception to sovereign immunity, so Plaintiffs' ex post facto and equal protection claims don't create a *Pennhurst* problem.

## 2. Article III Standing

Plaintiffs face a second jurisdictional hurdle: at least one Plaintiff must have standing to sue at least one Defendant. To have Article III standing, a plaintiff must show three things: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to conduct of the defendant; and (3) a favorable decision would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). As explained below, no Plaintiff has standing to sue the Governor or Attorney, but some can sue Parole Board members.

### A. Governor and Attorney General

Plaintiffs lack standing to sue the Governor and Attorney General because neither official has denied or will deny an individual Plaintiff's parole request (*i.e.*, causation), and neither has the authority to force individual parole decisions (*i.e.*, redressability).

1. *Causation*: "To satisfy the causation requirement of standing, a plaintiff's injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quotations omitted). In the complaint, the individual Plaintiffs contend that they are injured because they are being denied lawful parole consideration and subjected to increased incarceration. (Doc. 1, ¶¶ 237–39, 246–48, 253–56). The Woods Foundation says it has been injured by having to divert its resources to address the harms caused by the unconstitutional denial of parole. (*Id.*, ¶¶ 239, 241, 256). Even if Plaintiffs can prove these injuries, they cannot show that their injuries are traceable to Governor Ivey or Attorney General Marshall.

a) The Alabama Legislature has set forth statutorily defined roles for the Governor, Attorney General, and Parole Board when it comes to parole. The Governor, with the advice and consent of the Senate, appoints Parole Board members from a list of five people provided by a nominating board. Ala. Code § 15-22-20(b). It is also her responsibility to designate one of the Parole Board members as chair. Ala. Code § 15-22-20(d). And as discussed, the 2019 amendments gave the Governor the exclusive authority to appoint the Parole Board's executive director "who shall serve at the pleasure of the Governor." Ala. Code § 15-22-21(a).

But "the decision concerning parole release [is] at the complete discretion of the" Parole Board. Ala. Code § 15-22-26(c). The Parole Board also has the sole authority to decide the length of reset dates between parole considerations. *See* Ala. Code § 15-22-37(b)(4); Ala. Admin. Code r. 640-X-3-.03. The Parole Board must give the Governor and Attorney General notice of rules, procedures, guidelines, and policies that it seeks to either implement or repeal. *See* Ala. Code § 15-22-37(c). And the Parole Board cannot grant parole

unless it has given the Attorney General adequate notice of the parole hearing and an opportunity to provide input.[2] *See* Ala. Code §§ 15-22-23(b), 15-22-36(d). But the Parole Board has the final—and only—vote on parole.

Plaintiffs ask the court to restrain the Governor and Attorney General "from issuing across-the-board instructions to their agents that parole should be denied to all individuals with convictions for 'violent' offenses and that risk assessments should be disregarded." (Doc. 91, p. 25). But the Governor's parole related duties don't give her the power to require the Parole Board to deny parole for those convicted of violent offenses or to disregard risk assessments. Yes, the Governor appoints the Parole Board members and the Parole Board's executive director. But once appointed, the Parole Board members have complete discretion over parole related decisions and may be removed before the expiration of their six-year term through only impeachment or a finding of incapacitation. *See* Ala. Code §§ 15-22-26(c), 15-22-20(c), 15-22-20(e). And though the executive director serves at the pleasure of the Governor, Ala. Code § 15-22-21(a), he isn't the one who makes individual parole determinations, Ala. Code § 15-22-26(c). Even if he did have a role in making parole determinations, the Governor's ability to remove the executive director for cause wouldn't be enough to establish traceability. *See City of South Miami v. Governor*, 65 F.4th 631, 643 (11th Cir. 2023).

Nor does the Attorney General's power to advocate for or against parole to the Parole Board mean that his conduct is what caused Plaintiffs' alleged injuries. As the court discussed with the parties during the preliminary injunction hearing, the Attorney General is but one of several stakeholders whose views the Parole Board considers at parole review hearings. And while stakeholder input factors into the Parole Board's decisions, the Parole Board is free to disregard this input in making parole determinations because the Parole Board members alone have the power to grant parole and set parole reconsideration dates. So the court rejects Plaintiffs' argument that the Governor and Attorney General's statutory duties make Plaintiffs' alleged injuries traceable to Governor Ivey and Attorney General Marshall.

---

[2] Attorney General Marshall has used his power to advocate for or against parole to object to the Parole Board granting parole to five of the six individual Plaintiffs.

b) The court also rejects Plaintiffs' argument that they have standing because Ivey and Marshall share responsibility for the policies and practices that Plaintiffs are challenging. The Alabama Legislature, not the Governor or Attorney General, passed the 2019 amendments' changes to Alabama's law on parole. And the Parole Board members have implemented the alleged changes in law, policy, and procedure. While the Governor and Attorney General *advocated* for passage of the 2019 amendments, their advocacy is too remote of a connection to trace Plaintiffs' alleged injuries to the Governor and Attorney General.

Plus, traceability is "lacking if the plaintiff would have been injured in precisely the same way without the defendant's alleged misconduct." *Id.* at 645. So "a plaintiff lacks standing to sue over a defendant's action if an independent source would have caused him to suffer the same injury." *Id.*

Plaintiffs haven't shown that the Parole Board would have acted differently without Ivey or Marshall's alleged misconduct. Plaintiffs fault Ivey for telling the Parole Board to not parole anyone convicted of violent offenses, demoting Walker from Parole Board Chair, pressuring Head to remove Cook as Executive Director, and issuing a 75-day moratorium on early parole consideration. But Plaintiffs haven't shown that Ivey's actions will affect future parole determinations in their cases. And there's evidence that the Parole Board has maintained some independence from Ivey because (a) around 3% of violent offenders are still granted parole, and (b) Head did not heed the directive to remove Cook. The court thus finds it too speculative to say that Plaintiffs' injuries wouldn't have happened "in precisely the same way" without the Governor's actions. *See id.*

To sum up, the court finds that neither the Governor and Attorney General's statutory powers nor actions, either individually or combined, make Plaintiffs' alleged injuries traceable to Ivey or Marshall. As a result, Plaintiffs lack standing to sue Governor Ivey or Attorney General Marshall. *Jacobson*, 974 F.3d at 1253.

2. *Redressability*: Even if Plaintiffs could establish traceability, the court enjoining Governor Ivey and Attorney General Marshall wouldn't redress Plaintiffs' injuries. When assessing redressability, this court must

ask "whether a decision in plaintiff's favor would significant[ly] increase . . . the likelihood that [they] would obtain relief that directly redresses the injury that [they] claim to have suffered." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (quotations omitted). And "it must be *the effect of the court's judgment on the defendant* . . . that redresses the plaintiff's injury, whether directly or indirectly." *Id.* (quotations omitted).

The only relief Plaintiffs seek that is specific to Ivey and Marshall is an order that prohibits Ivey and Marshall from instructing their agents and the Parole Board members to (a) ensure that individuals who have been sentenced to incarceration for violent offenses are not granted parole, and (b) to disregard the actuarially- and evidence-based risk assessments for considering parole applications. (Doc. 23-1, p. 56). Even if the court entered that order, nothing requires the Parole Board to start granting parole to more individuals convicted of violent offenses or to start following the risk assessments' recommendations simply because the Governor and Attorney General are prohibited from instructing the Parole Board to do the opposite. So enjoining Governor Ivey and Attorney General Marshall wouldn't "significant[ly] increase . . . the likelihood" that Plaintiffs would obtain the relief they seek. *See Lewis*, 944 F.3d at 1301. Instead, the Parole Board members, not Governor Ivey or Attorney General Marshall, would have to implement Plaintiffs' requested relief. Because enjoining Ivey and Marshall would not redress Plaintiffs' alleged injuries, Plaintiffs cannot bring their ex post facto or equal protection claims against them.[3]

### B. Parole Board Members

Most Plaintiffs, however, have standing to sue the Parole Board members for the alleged Ex Post Facto and Equal Protection Clause violations. "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to merely conjectural or hypothetical—threat of *future* injury." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262,

---

[3] Governor Ivey and Attorney General Marshall also argue that the claims against them don't fall within the *Ex parte Young* exception to sovereign immunity because they lack an enforcement connection to the parole law, policies, and procedures that Plaintiffs challenge. Because the court finds that Plaintiffs don't have standing to sue Governor Ivey and Attorney General Marshall, it needn't address this argument.

1284 (11th Cir. 2001). Cole will not have a parole reconsideration date before the end of his sentence, so he hasn't established that he faces "a real and immediate threat of future injury" from the alleged Ex Post Facto and Equal Protection Clause violations. Plus, the court cannot craft prospective relief that would remedy Cole's alleged past injury of being denied parole in August 2023. As a result, the court finds that Cole lacks standing to obtain preliminary injunctive relief from the Parole Board members.

Moore, McDole, Campbell, Ptomey, and English have, however, shown that they will likely suffer future injuries from the increase in parole denials and alleged racial disparity in parole related decisions because they are all Black, parole eligible inmates who have parole reconsideration dates set for some time between November 2024 and July 2028.[4] These alleged future injuries are traceable to the Parole Board, which has sole authority to grant parole and set reset dates. And the court can redress these injuries by enjoining the Parole Board from continuing its current practices. Because all three Article III standing requirements are met, the court has jurisdiction and will thus consider the likelihood that Plaintiffs will succeed on the merits of their ex post facto and equal protection claims against the Parole Board.

## B.    Likelihood of Success: Ex Post Facto Clause

The United States Constitution prohibits states from passing an "ex post facto Law." U.S. CONST. art. I, § 10. Among other things, the clause prevents states from passing laws that "increase the punishment for a crime after its commission." *Garner*, 529 U.S. at 249. Changing the state's parole law violates the clause if the change creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 250.

---

[4] The Woods Foundation asserts that it's injured by having to divert its resources from other projects to parole related issues. As Plaintiffs note, the Eleventh Circuit has consistently recognized a diversion of resources theory of standing for organizational plaintiffs. *See, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). But the court questions whether this theory of standing survives the Supreme Court's recent opinion in *FDA v. Alliance for Hippocratic Medicine*, ___ U.S. ___, Case No. 23-235 (decided June 13, 2024). The court, however, needn't decide whether the Woods Foundation has standing because the court finds that five of the individual Plaintiffs have standing to sue the Parole Board. *See Greater Birmingham Ministries*, 992 F.3d at 1317 ("Our conclusion that the two advocacy organizations have associational standing makes it unnecessary for us to engage in a full standing analysis of the claims made by individual Plaintiffs.").

### 1. What laws to compare

As explained in the Background section, Alabama twice changed its 1951 parole statute after Plaintiffs committed their crimes; first in 2015 to add guidelines that in theory would increase the grants of parole for less violent offenders, then in 2019 in response to recent parolee Jimmy Spencer murdering three people. This creates three relevant eras of Alabama parole law: (1) 1951 to 2015, (2) 2015 to 2019, and (3) 2019 to Present.

Plaintiffs prefer the 2015-19 version of Alabama parole law and thus asked the court to order the Parole Board Members "to revert immediately to the Parole Guidelines and practices in place prior to October 1, 2019." (Doc. 23-1, p. 57). But as Plaintiffs now concede, the 2015-19 era law is irrelevant to their Ex Post Facto claim because each Plaintiff committed his offense before 2015 and each Plaintiffs' upcoming parole hearing will be governed by the post-2019 statute. Again, the Ex Post Facto Clause looks at whether the current law increases the punishment attached to the crime when it was committed, *see Garner*, 529 U.S. at 249, so the difference between the 1951 and 2019 version of Alabama's parole statute is all that matters.

### 2. How to compare those laws

Now that we know *which* laws to compare, we look chronologically at Supreme Court and Eleventh Circuit precedent that teaches *how* to compare them—starting with a similar change made by Florida.

*a. Florida's parole guidelines (CA11)*: Before 1978, Florida's parole law was like Alabama's 1951 statute. Florida's Parole Commission had complete discretion over whether to grant parole, but the Florida Legislature gave the Commission this standard to follow when exercising its discretion:

> No person shall be placed on parole merely as a reward for good conduct or efficient performance of duties assigned in prison. No person shall be placed on parole until and unless the commission shall find that there is reasonable probability that, if he is placed on parole, he will live and conduct himself as a respectable and law abiding person, and that his release will be compatible with his own welfare and the welfare of society. No person shall be placed on parole unless and until the commission is satisfied that

> he will be suitably employed in self-sustaining employment, or
> that he will not become a public charge.

*Paschal v. Wainwright*, 738 F.2d 1173, 1178 (11th Cir. 1984) (quoting Fla. Stat. Ann. § 947.18 (1973)).

In 1978, Florida passed the Objective Parole Guidelines Act, finding that its "previous system lacked objective criteria for parole decision making and, thus, was subject to allegations of arbitrary and capricious release [decisions]." *Id.* at 1175, 1178 (quotations omitted). Under the Parole Act, "the ultimate parole decision remain[ed] committed to the Commission's discretion," but the Act "changed the manner in which the Commission's discretion may be exercised." *Id.* at 1178. The Commission's decisions were no longer to be made ad hoc but were to follow "objective guidelines . . . developed according to an acceptable research method and . . . based on the seriousness of offense and the likelihood of favorable parole outcome." *Id.* The guidelines the Commission adopted "were a series of schedules assessing the seriousness of the crime for which an inmate had been incarcerated ('offense severity rating') and predicting his chances of successfully completing parole ('parole prognosis')." *Id.* at 1179. A hearing examiner would consider the inmate's offense and several relevant factors to determine the offense severity rating and parole prognosis and then "consult a grid to determine a 'matrix time range' that the inmate presumptively would have to serve before he was paroled." *Id.* He would then consider any aggravating or mitigating factors that the guidelines didn't account for. *Id.*

After weighing these factors, the examiner would recommend one of three things to the Commission: (1) the Commission should give the inmate a presumptive parole date within the matrix time range, (2) the Commission should give a parole date above that time range because of aggravating circumstances, or (3) the Commission should give a parole date below that time range because of mitigating circumstances. *See id.* The Commission would "either accept the examiner's recommended date or set a new one." *Id.*

Several Florida inmates challenged the Parole Act as violating the Ex Post Facto Clause. For example, in *Paschal*, the petitioner asserted the guidelines "increased his punishment because, realistically, he [would] not be considered eligible for parole until the presumptive date, March 29, 1993." *Id.*

The Eleventh Circuit rejected Paschal's ex post facto challenge, finding that the Parole Act and guidelines "did not substantively alter petitioner's parole eligibility or confine the Commission's discretion to release him; they merely clarified the exercise of administrative discretion." *Id.* Key to the Eleventh Circuit's holding were two factors. First, the Commission retained "the same authority it had under prior law; it could have released petitioner immediately had there been a 'reasonable possibility' that his release would 'be compatible with his own welfare and the welfare of society.'" *Id.* (quoting Fla. Stat. Ann. § 947.18 (1983 Supp.)). Second, while the guidelines "stated and rationalized the exercise of the Parole Commission's discretion," the petitioner was always "on fair notice that if he received a life sentence he would be subject to parole at the discretion of the Commission." *Id.* at 1180.

Other inmates' challenges to the Parole Act fared no better. In *Johnson v. Wainwright*, the plaintiff argued that the Parole Act violated his ex post facto rights because "under the old system the goal of rehabilitation played a larger role in determining release dates than it does under the new system." 772 F.2d 826, 827 (11th Cir. 1985). The Eleventh Circuit disagreed, holding that "[t]his attempted distinction fails" because "[t]he substantive power of the commission remains unchanged; only the manner in which it exercises this power has been altered." *Id.* And in *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 933 (11th Cir. 1986), the circuit court found that the petitioner's Ex Post Facto Clause claim failed because the objective parole guidelines didn't change the fact that the Commission had complete discretion to grant parole.

*b. Garner v. Jones (SCOTUS)*: Georgia came next, passing a law that extended the period between parole considerations from three to eight years. The Eleventh Circuit found this change violated the Ex Post Facto Clause. *See Jones v. Garner*, 164 F.3d 589, 589–90 (11th Cir. 1999).

The Supreme Court reversed, holding that the circuit court's analysis didn't consider whether the amendment, "in its operation, created a significant risk of increased punishment." *Garner*, 529 U.S. at 257. In reversing the circuit court, the Court noted that "[t]he controlling inquiry" is whether retroactive application of the change in law "created a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.*

22

at 250. "When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." *Id.* at 255.

The Court also cautioned that while "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause, . . . where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised." *Id.* at 253. And the Court viewed the Georgia Parole Board's rule changes as "designed for the better exercise of the discretion it had from the outset." *Id.* at 254–55. But the Court noted that the record "contained little information bearing on the level of risk created by the change in law," so it remanded the case for the lower courts to consider whether more discovery was needed. *Id.* at 256–57.

*c. Non-binding interpretations of Garner*: The parties agree that the court should apply the *Garner* standard here. But they disagree on what *Garner* means for Plaintiffs' claims. The Parole Board says that *Garner* shows that the Eleventh Circuit's precedent on Florida's Objective Parole Guidelines Act forecloses Plaintiffs' ex post facto arguments. As the Parole Board notes, the Eleventh Circuit's recent unpublished opinions on challenges to Florida parole law have cited to both *Garner* and the Objective Parole Guidelines Act cases to find that statutory changes to Florida parole law didn't violate the Ex Post Facto Clause. *See, e.g., Tooma v. David*, 381 F. App'x 977, 980 (11th Cir. 2010) (rejecting challenge to retroactive application of law allowing for input from sentencing judge).

Plaintiffs say that *Garner* establishes that the practical effect on the plaintiff is what matters when considering an ex post facto challenge in the parole context. In support of this argument, Plaintiffs cite cases from the D.C. and Sixth Circuits. Both circuits have held that "[t]he controlling inquiry under *Garner* is how the Board or the Commission exercises discretion in practice, and whether differences between the exercise of discretion in two systems actually 'create [ ] a significant risk of prolonging [an inmate's] incarceration.'" *Michael v. Ghee*, 498 F.3d 372, 383 (6th Cir. 2007) (quoting *Fletcher v. Reilly*, 433 F.3d 867, 876–77 (D.C. Cir. 2006)). In *Fletcher*, the

D.C. Circuit reversed the district court's dismissal of the petitioner's ex post facto claim because D.C.'s "new federal regulations, unlike the regulations they replaced, do not take post-incarceration behavior into account." *Fletcher*, 433 F.3d at 879. On remand, the D.C. Circuit instructed the district court to make "a searching comparison of the old and new parole regimes in order to determine whether" there was "a significant risk that [the petitioner] will be subjected to a lengthier incarceration than he would have been if the Commission had adhered to" the former parole regulations. *Id.*

In *Michael*, the Sixth Circuit affirmed the district court's grant of defendants' motion for summary judgment on the plaintiffs' claim that retroactive application of Ohio's 1998 parole guidelines violated the Ex Post Fact Clause. *See Michael*, 498 F.3d at 385. The Sixth Circuit found that the plaintiffs' as-applied challenge failed because: (a) the record didn't include evidence of what Ohio's 1987 parole guidelines were; (b) the plaintiffs didn't show how any one individual defendant faced a substantial risk of serving more time under the new guidelines; and (c) the proffered statistics didn't show how current parole practices differed from the pre-1998 guidelines practices. *See id.* at 384–85.

—

Based on this precedent, Plaintiffs can establish an ex post facto violation in one of two ways. First, they can show that the 2019 amendments, on their face, create a significant risk of increased incarceration as compared to the 1951 statute. Second, they can show that "evidence drawn from the [2019 amendments'] practical implementation" establishes that their "retroactive application will result in a longer period of incarceration than under the earlier rule." *Garner*, 529 U.S. at 255. Below, the court decides whether Plaintiffs have shown a substantial likelihood that they could succeed on a facial or as-applied challenge at trial.

### 3. Comparing the 1951 and 2019 statutes

a. *Facial challenge*: Here are the two relevant statutes side-by-side:

| 1951 Statute | 2019 Amendments |
|---|---|
| No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society. | No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole ==and to ensure public safety.== The guidelines shall serve as an aid in the parole process and shall promote the use of prison space for the most violent and greatest risk offenders, ==while recognizing that the board's paramount duty is to protect public safety.== |

1951 Ala. Laws Act No. 1951-599 § 7; Ala. Code § 15-22-26(a) (highlight added). Plaintiffs argue that the highlighted language increases the likelihood of parole denial (and thus longer sentences) by making public safety the Boards' "paramount" concern. The court disagrees for two reasons.

First, the 1951 and 2019 versions use slightly different words to say the same thing. As Plaintiffs note, the Legislature's use of the term "paramount" means that protecting public safety is the top consideration for the Board when crafting its guidelines. *See Paramount,* Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/paramount (last visited June 17, 2024) ("superior to all others"). And in exercising its discretion to make parole-related decisions, the Board is charged with granting parole to only prisoners who meet the public safety driven guidelines.

25

But the 1951 statute also limited suitable parolees to persons (a) who had a reasonable probability of living and remaining at liberty without violating the law, and (b) whose release was not incompatible with the welfare of society. 1951 Ala. Laws Act No. 1951-599 § 7. Plaintiffs agree that the second part of this standard relates to protecting public safety but argue that the reference to a prisoner's "reasonable probability of living and remaining at liberty without violating the law" refers to a prisoner's fitness for parole or risk of recidivism. So Plaintiffs say that the 2019 amendments impermissibly elevate the protecting public safety factor over the fitness for parole factor when the two factors had been on equal footing. The court disagrees. Both the probability of a prisoner not violating the law and the prisoner's release being compatible with the welfare of society are factors that relate to protecting public safety. Indeed, recidivism is a serious public safety concern. So the court finds that the Board was charged with making public safety considerations its number one concern under both the 1951 statute and 2019 amendments.

Second, in interpreting the 2019 amendments, the court must consider the context in which the Board is charged with promulgating guidelines that recognize that public safety is the Board's paramount duty. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012) (Courts must "consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). Subsection (c) of the 2019 Act explains that the guidelines are merely "an aid in the parole decisionmaking process[;] the decision concerning parole release [is] at the complete discretion of the board." *See* Ala. Code § 15-22-26(c). So the 2019 amendments "did not substantively alter [Plaintiffs'] parole eligibility or confine the [Board's] discretion to release [them]; they merely clarified the exercise of administrative discretion." *Paschal*, 738 F.2d at 1179.

Plaintiffs' facial challenge to the 2019 amendments is thus identical to the ex post facto challenges to Florida's Objective Parole Guidelines Act that the Eleventh Circuit has rejected. And Plaintiffs haven't argued or shown that *Garner* somehow abrogated or overruled those holdings. As a result, even if the 2019 amendments tell the Board to elevate protecting public safety over other factors considered when the 1951 statute was in effect, Plaintiffs haven't established that, by its plain language, the 2019

amendments create a significant risk of increased incarceration. *See Johnson*, 772 F.2d at 827 (rejecting argument that there was an ex post facto violation because "under the old system the goal of rehabilitation played a larger role in determining release dates than it does under the new system"); *see also Paschal*, 738 F.2d at 1177–78 ("[r]ehabilitation was a primary goal" of old system but objective guidelines gave "primary weight to the seriousness of the offender's present criminal offense and his past criminal record").

b. *As-applied challenge*: Plaintiffs therefore must show that evidence of the 2019 amendments' "practical implementation" establishes that their "retroactive application will result in a longer period of incarceration than under the earlier rule." *Garner*, 529 U.S. at 255. Plaintiffs say that they have made this showing by pointing to statistical evidence of lower parole grant rates, especially for violent offenders, since the 2019 amendments' enactment. They also say that public statements from Ivey and Gwathney show that the Board is using the 2019 amendments to greatly limit who the Board finds eligible for parole.

Plaintiffs don't establish a substantial likelihood of success on their as-applied ex post facto challenge for three reasons. First, "[t]he measuring point for purposes of the Ex Post Facto Clause is the time that [Plaintiffs] committed [their] crimes." *United States v. Colon*, 707 F.3d 1255, 1258 (11th Cir. 2013). Plaintiffs were all charged with their offenses between 1994 and 2010—meaning that Plaintiffs must show that application of the 2019 amendments make it more likely that they would be denied parole now than they would have been when they committed their crimes in 1994 to 2010.

But Plaintiffs' statistics focus on the difference between parole grant rates in 2018 and today. Plaintiffs laud the 2015 Justice Reinvestment Act for increasing the parole grant rate and reducing the overall prison population. While this is factually true, it is pointless here.

What Plaintiffs must show is that the 2019 amendments have increased denial rates as compared to the years they committed their crimes. But they presented no statistics for 1994, 2002, 2007, and early 2008.[5] The

---

[5] McDole's offense date was May 5, 2008, (*see* Doc. 1, p. 2 in CC-2008-3553), which was during Fiscal Year 2008, not Fiscal Year 2009.

only relevant comparison evidence is that when English was charged in 2010 and sentenced in 2012 the parole grant rate hovered around 30 to 40%:

| FY | Granted | Denied | Total | Grant Rate |
|---|---|---|---|---|
| FY2009 | 3280 | 4644 | 7924 | 41% |
| FY2010 | 2690 | 4098 | 6788 | 40% |
| FY2011 | 2097 | 4774 | 6871 | 31% |
| FY2012 | 2178 | 5228 | 7406 | 29% |
| FY2013 | 2312 | 5315 | 7627 | 30% |
| FY2014 | 2237 | 4410 | 6647 | 34% |
| FY2015 | 2236 | 3722 | 5958 | 38% |
| FY2016 | 3108 | 3350 | 6458 | 48% |
| FY2017 | 3847 | 3151 | 6998 | 55% |
| FY2018 | 3521 | 2804 | 6325 | 56% |
| FY2019 | 1337 | 2933 | 4270 | 31% |
| FY2020 | 544 | 2160 | 2704 | 20% |
| FY2021 | 628 | 3225 | 3853 | 16% |
| FY2022 | 409 | 3593 | 4002 | 10% |

(Doc. 61-1, p. 4).

The Eleventh Circuit, however, has been skeptical of the helpfulness of comparison statistics in showing an Ex Post Facto Clause violation when parole boards retain complete discretion over parole-related decisions. *See Porter v. Ray*, 461 F.3d 1315, 1321 (11th Cir. 2006) (doubting the relevance of comparison statistics when parole board "had virtually unfettered discretion" to deviate from guidelines); *Jones v. Ga. State Bd. of Pardons & Paroles*, 59 F.3d 1145, 1150 (11th Cir. 1995) (statistics "demonstrate nothing more" than fact that Board "retained and *in fact exercised* virtually *unfettered* discretion to deviate" from guidelines). And variations in parole outcomes from 2010 to 2024 could be based on several factors that have nothing to do with the 2019 amendments. *See Garner*, 529 U.S. at 253. So the court finds that the bare fact that the parole grant rate hovered around 40% when English committed his offense and is now around 10% fails to show that English has a substantial likelihood of succeeding on his Ex Post Facto Clause challenge.

Second, Plaintiffs' statistics suggest that something other than the 2019 amendments caused the decline in the parole grant rate. The 2019 amendments took effect on September 1, 2019. Fiscal Year 2019 ended on September 30, 2019, and Fiscal Year 2020 began on October 1, 2019. So if, as

Plaintiffs say, the 2019 amendments caused the Board to grant parole to fewer prisoners, you'd expect the declining rates to start with Fiscal Year 2020—*i.e.,* the fiscal year that contained 11 of the first 12 months under the new law. But the data for both the overall grant rate and the grant rate for those convicted of violent offenses show that the greatest percentage decrease in parole grant rates was between Fiscal Year 2018 and Fiscal Year 2019— *i.e.*, the year *before* the amendments took effect.

As shown in the below chart, the overall parole grant rate for both violent and non-violent offenses was 53% in Fiscal Year 2018, dropped to 31% in Fiscal Year 2019, and declined to 20% in Fiscal Year 2020:



| Fiscal Year | Grants | Denials | Total Decisions | Grant Rate |
|---|---|---|---|---|
| FY2015 | 2270 | 3782 | 6052 | 38% |
| FY2016 | 3107 | 3350 | 6457 | 48% |
| FY2017 | 3847 | 3151 | 6998 | 54% |
| FY2018 | 3730 | 3263 | 6993 | 53% |
| FY2019 | 1368 | 3078 | 4446 | 31% |
| FY2020 | 548 | 2160 | 2708 | 20% |
| FY 2021 | 648 | 3584 | 4232 | 15% |
| FY 2022 | 409 | 3593 | 4002 | 10% |
| FY 2023 | 312 | 3479 | 3791 | 8% |

(Doc. 24-13, p. 10). And the grant rate for those convicted of violent offenses was 44.7% in Fiscal Year 2018, 21.1% in Fiscal Year 2019, and 8.4% in Fiscal Year 2020:



(Doc. 26–3, ¶ 17 & Fig. C).

Thus, the data shows that (a) the parole grant rate decline began before the 2019 amendments took effect, and (b) the 2019 amendments were effective for only one month of the fiscal year that had the greatest percentage decrease in parole grant rates. This suggests that the 2018 Jimmy Spencer murders—or some other factor that preceded the 2019 amendments—drove the decrease in parole grant rates. And without showing that a statute, rule, regulation, or policy change caused the parole grant rates to decline, Plaintiffs cannot succeed on their ex post facto claims.

Finally, Plaintiffs cite statements from Gwathney and Ivey stating that public safety is the strongest factor in making parole-related decisions to argue that the Board is using the 2019 amendments to impermissibly elevate public safety over the question of fitness for parole. As the court has repeatedly noted, the Ex Post Facto Clause is concerned with the state of the law at the time Plaintiffs committed their offenses and whether a more stringent standard is being applied to keep them incarcerated. And Plaintiffs haven't shown that the Parole Board in fact put public safety and fitness for parole on equal footing during the relevant period. Instead, Plaintiffs' evidence shows that before the 2015 Justice Reinvestment Act, the Parole Board "reported placing less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison,

than on other factors an individual cannot change, such as prior criminal history and nature of the underlying offense." (Doc. 24-1, p. 23). Plaintiffs contrast this practice to the practice of parole boards across the country who were "increasingly using parole guidelines that consider factors that demonstrate an individual's readiness for parole, including risk and needs assessment results, record of program completion in prison behavior, and the existence of a viable parole plan." (*Id.*).

In other words, before the 2015 Justice Reinvestment Act, Parole Board members were mainly looking at whether the parole candidate had committed a violent offense. They were not making decisions based on a risk needs assessment. The court thus finds that Plaintiffs haven't shown that there is a material difference between the practical implementation of the 1951 and 2019 statutes. So based on the present record, Plaintiffs are unlikely to prove at trial that application of the 2019 amendments creates a sufficient risk that Plaintiffs will suffer an increased length in incarceration.

—

To sum up, the court finds that (a) on its face, the 2019 statute doesn't create a significant risk of increased incarceration, and (b) Plaintiffs haven't shown that the practical effect of the 2019 amendments is to create a risk of increased punishment. So Plaintiffs haven't established a substantial likelihood of success on the merits of their ex post facto claim.

## C.   Likelihood of Success: Equal Protection Clause

The Fourteenth Amendment's Equal Protection Clause prohibits the state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Plaintiffs assert that the Parole Board's practices since 2019—disregarding the objective risk assessments and implementing the goals of the 2019 amendments—have violated the equal protection rights of Black parole candidates. According to Plaintiffs, these practices have made it where white parole candidates are around two times more likely than Black parole candidates to be paroled. Plaintiffs also say that the Board is setting reconsideration dates for Black parole candidates further out than it is setting reconsideration dates for white parole candidates.

### 1. Standard of Review

"A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries*, 992 F.3d at 1321. "Discriminatory purpose may be established by proof that the [Parole Board] used race as a substantial or motivating factor in its . . . practices." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999). "But [d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987).

In assessing equal protection claims brought in the parole context, the Eleventh Circuit has traditionally required the plaintiff to show that he was treated worse than a similarly situated comparator. *See, e.g.*, *Damiano*, 785 F.2d at 932. Thus, the Parole Board argues that comparator evidence is required for Plaintiffs to succeed on their equal protection claims.

Plaintiffs disagree. They point out that "a convincing mosaic of circumstantial evidence" can also establish disparate treatment based on race. *See Lewis v. City of Union City (Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019). So Plaintiffs ask the court to apply the factors from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977), to find that there is circumstantial evidence of racial discrimination. *See, e.g.*, *Greater Birmingham Ministries*, 992 F.3d at 1321–28 (engaging in this analysis).

For now, this disagreement doesn't matter because Plaintiffs have failed to show a substantial likelihood of success on the merits of their equal protection claims under either theory (comparator or convincing mosaic).

### 2. Comparator evidence

Under a comparator-based test, a plaintiff must establish "that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001).

Plaintiffs rely on statistics, such as their regression analysis, to argue that the Board's recent practices are discriminatory. "[A]n unexplained statistical showing of disparate racial treatment by a single entity over a period of time could raise the inference of an equal protection violation." *Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988). But at least in the parole context, statistics must provide "exceptionally clear proof" of differential treatment before the court can find that they establish an equal protection violation. *See id.* Statistical evidence that is "ambiguous at best" is "clearly insufficient to support an inference that any of the decisionmakers . . . acted with discriminatory purpose." *Id.*

*a. Plaintiffs' evidence:* Plaintiffs cite several different statistics that they say show that the Parole Board is discriminating based on race. First, Plaintiffs recognize that the parole grant rate for both white and Black parole candidates has decreased since Fiscal Year 2018:



(Doc. 26-3, ¶ 13 & Fig. A). But Plaintiffs point out that there has been a spike in the relative difference between parole grant rates for white and Black parole candidates:

**FIGURE B**



(*Id.*, ¶ 14 & Fig. B).

Plaintiffs' expert MK Analytics also performed a regression analysis that controlled for facility type, fiscal year, sex, and job status. (*Id.*, ¶ 15). According to Plaintiffs, the regression analysis establishes that "between FY 2020 and 2022, white parole candidates were 2.06 times as likely to be granted parole as Black parole candidates, with a 95% confidence interval of 1.80-2.35." (*Id.*).

MK Analytics then separately analyzed the parole grant rates for those convicted of violent and non-violent offenses. (*Id.*, ¶ 19). According to this analysis, in Fiscal Year 2018, the Parole Board granted parole to 44.7% of both white and Black violent offense parole candidates. (*Id.*). By Fiscal Year 2020, the Parole Board granted parole to only 10.6% of white and 6.9% of Black violent offense parole candidates. (*Id.*). In Fiscal Year 2022, the parole grant rate had fallen to 4.9% of white and 2.2% of Black violent offense parole candidates. (*Id.*). As for those convicted of non-violent offenses, in 2018, the Parole Board granted parole for 63.8% of white and 66.7% of Black parole candidates. (*Id.*, ¶ 20). In Fiscal Year 2020, the Parole Board granted parole

to 29.6% of white and 21.7% of Black non-violent offense parole candidates. (*Id.*). And in Fiscal Year 2022, the Parole Board granted parole to 21.3% of white and 20.0% of Black non-violent offense parole candidates. (*Id.*).

MK Analytics also analyzed parole grant rates based on the type of facility the parole candidates were housed in. In Fiscal Year 2018, the parole grant rate for parole candidates housed in work-release facilities was 78.9% for white parole candidates and 78.4% for Black parole candidates. (*Id.*, ¶ 21). In Fiscal Year 2020, this number had fallen to 45.4% for white parole candidates and 26.0% for Black parole candidates. (*Id.*). In Fiscal Year 2021, the grant rate was 32.5% for white parole candidates and 17.6% for Black parole candidates. (*Id.*). And in Fiscal Year 2022 the grant rate was 23.4% for white parole candidates and 15.5% for Black parole candidates. (*Id.*).

The grant rate decline for those housed in work-center facilities has been similar. In Fiscal Year 2018, the Parole Board granted parole to 65.7% of white and 61.6% of Black parole candidates in work-center facilities. (*Id.*, ¶ 22). In Fiscal Year 2019, these grant rates fell to 47.1% for white and 40.2% for Black parole candidates. (*Id.*). In Fiscal Year 2020, the grant rate was 18.9% for white and 13.8% for Black parole candidates; in Fiscal Year 2021, the rates were 15.3% for white and 5.2% for Black parole candidates; and in Fiscal Year 2022 the rates were 16.5% for white and 9.0% for Black parole candidates. (*Id.*).

Plaintiffs say that MK Analytics' data shows discrimination in the setting of parole reconsideration dates too. The below chart shows the racial difference in hearing reset dates:



FIGURE E

(*Id.*, ¶ 23 & Fig. E). For example, in Fiscal Year 2018 only 13.2% of Black and 14% of white parole candidates were given the maximum reset date of five years. But by Fiscal Year 2022, 74.6% of Black and 57.6% of white parole candidates received five-year set off dates.

Finally, in response to the Parole Board's argument that Plaintiffs' equal protection claim requires a similarly situated comparator, Plaintiffs submitted supplemental data from MK Analytics that compared the parole grant rates for parole candidates convicted of the same offenses as Plaintiffs who had also served the same (or less) amount of time as Plaintiffs. (Doc. 91-1, ¶ 4). For each of the subsets of data reflecting men who shared similar characteristics with Moore, McDole, Campbell, and Ptomey, the Parole Board granted parole to a smaller proportion of Black men than white men:

| Plaintiff | White Grant Rate | Black Grant Rate |
| --- | --- | --- |
| Moore (Murder) | 0.38% (1/264) | 0.00% (0/732) |
| McDole (Assault I) | 3.17% (2/63) | 0.00% (0/130) |
| Campbell (Controlled Substance Distribution) | 18.96% (80/422) | 18.14% (113/623) |
| Ptomey (Robbery I and Burglary II) | 4.17% (1/24) | 0.00% (0/95) |

(*Id.*, ¶¶ 6, 8, 10–12).[6]

 *b. Analysis:* Plaintiffs' statistics fail to establish "exceptionally clear proof" of disparate treatment. "The decision to grant or deny parole is based on many factors such as criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310. And Plaintiffs' data related to the increased relative difference in parole grant rates and disparity in parole set-off dates doesn't control for any of these factors. Instead, this data compares only the races of parole candidates. Thus, neither dataset shows that white parole candidates being granted parole or shorter hearing reset dates were similarly situated to Black parole candidates being denied parole or given longer hearing reset dates. Nor do they show that these white parole candidates were similarly situated to the individual Plaintiffs.

 Plaintiffs do categorize Black and white parole candidates into four distinct categories: those convicted of violent offenses, those convicted of non-violent offenses, those housed in work-release facilities, and those housed in work-center facilities. But comparators must be "similarly situated in all material respects." *See Lewis v. City of Union City*, 918 F.3d 1213, 1226 ("*Lewis I*") (11th Cir. 2019) (en banc). And these four categories of parole candidates are too broad for the court to say that there are no material differences between the parole candidates being compared.

 Plaintiffs acknowledge that "Alabama defines 'violent' crimes broadly, to include not only crimes requiring the use of physical force or a weapon but also, for example, trafficking in cannabis." (Doc. 23-1, p. 20 n.4). The category of non-violent crimes is similarly broad and covers many types of offenses. The nature of an inmate's offense, his disciplinary history, and escape history are factors relevant to both the Parole Board's decision to grant or deny parole and the Alabama Department of Corrections' decision to house an inmate in work-release or work-center facilities. (Doc. 24-7, pp. 33–38). But as shown by the differences between the individual Plaintiffs, the inmates housed in work-release and work-center facilities have varying types of

---

[6] MK Analytics didn't have the necessary data to analyze parole candidates similar to English, and its analysis related to Cole is irrelevant because he lacks standing.

convictions and criminal and disciplinary histories. So statistics showing the racial breakdown of parole grant rates for these comparator categories also fail to establish "exceptionally clear proof" that similarly situated inmates were treated differently. *See Taylor v. Nix*, 240 F. App'x 830, 838 (11th Cir. 2007) (finding in class of one equal protection case that comparator categories of "parole violators" and "paroled life-sentenced inmates serving sentences for murder, rape, armed robbery, kidnaping, or aggravated sodomy" didn't make this showing (internal quotations omitted)).

Plaintiffs' regression analysis, which showed white parole candidates were 2.06 times as likely to be granted parole as Black parole candidates, controls for a few more factors than Plaintiffs' work-release and work-center facilities statistics because it also categorized inmates by job status and sex. But this analysis didn't consider other relevant factors such as whether the parole candidates had been convicted of the same or similar crimes, were recidivists, had been paroled previously and had re-offended, or had similar disciplinary histories. So Plaintiffs haven't shown that their regression analysis establishes that inmates who are "similarly situated in ***all material respects***" are being treated differently. *See Lewis I*, 918 F.3d at 1226 (emphasis added).

Plaintiffs' supplemental evidentiary submission does do a good job of identifying parole candidates similarly situated to the individual Plaintiffs. Though Plaintiffs didn't control for criminal or disciplinary history, they did control for the offense of conviction and amount of time served, which are two factors that are highly relevant to the Parole Board's determinations.

The problem for Plaintiffs is that this "statistical evidence is ambiguous at best." *Fuller*, 851 F.2d at 1310. Yes, the Parole Board granted parole for 3% of white and 0% of Black parole candidates convicted of Assault I. But a closer look at these numbers shows that only two white individuals were granted parole. The same is true for parole candidates convicted of Robbery I and Burglary II. While the Parole Board granted parole to 4% of white and 0% of Black parole candidates, these percentages "mask[ ] the fact that the populations were effectively identical." *Greater Birmingham Ministries*, 992 F.3d at 1330. Only one white parole candidate convicted of both Robbery I and Burglary II was granted parole. And the differences in percentage of

white and Black parole candidates convicted of murder or distribution of a controlled substance are negligible. There is only a 0.38% difference in the grant rate for white and Black parole candidates convicted of murder, with once again only one white parole candidate being granted parole. And there's only a 0.82% difference in the grant rate for white and Black parole candidates convicted of distribution of a controlled substance, with 33 *more* Black parole candidates being granted parole than white parole candidates.[7]

These minimal differences in parole grant outcomes for Black and white parole candidates convicted of the same crime do not provide "exceptionally clear proof" that the Parole Board is treating similarly situated parole candidates differently. *See Fuller*, 851 F.2d at 1310. And even if these statistics show that the Parole Board's practices have had a slight discriminatory effect, they are "clearly insufficient to support an inference that any of the decisionmakers acted with discriminatory purpose." *See id.* (cleaned up). So the court finds that Plaintiffs haven't (1) presented "exceptionally clear proof" that the Parole Board has treated similarly situated parole candidates differently, or (2) shown that their statistics, standing alone, establish that the Parole Board has acted with a discriminatory purpose.

### 3. Convincing mosaic

The court thus turns to the *Arlington Heights* factors and Plaintiffs' argument that they have established a convincing mosaic of circumstantial evidence of discrimination. The court's *Arlington Heights* analysis must start "by determining whether the challenged law has a discriminatory impact." *Greater Birmingham Ministries*, 992 F.3d at 1321. Other relevant factors include: (1) the historical background; (2) the specific sequence of events leading up to its passage; (3) procedural and substantive departures; (4) the contemporary statements and actions of key legislators; (5) the foreseeability of the disparate impact; (6) knowledge of that impact; and (7) the availability of less discriminatory alternatives. *Id.* at 1322.

---

[7] As stated, the statistics of parole candidates similarly situated to Cole are irrelevant because he lacks standing. But even if relevant, these statistics similarly show only a 1.68% difference in the parole grant rate for white and Black parole candidates and that the Parole Board granted parole for four more Black parole candidates than white parole candidates. (Doc. 91-1, ¶ 9).

*a. Impact of the challenged law:* "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights*, 429 U.S. at 266. "But such cases are rare" and "[a]bsent a pattern as stark as that . . . impact alone is not determinative." *Id.* As explained above, Plaintiffs' statistics, standing alone, do not show that the Parole Board acted with a discriminatory purpose. Nor do they establish that the lower parole grant rates and longer reset dates for Black parole candidates are "unexplainable on grounds other than race." *Id.* So the court must look to the other *Arlington Heights* factors to determine whether Plaintiffs have shown they are likely to prove discriminatory intent.

*b. Foreknowledge:* The next two factors that Plaintiffs point to are the foreseeability of the disparate impact and the knowledge of that impact. Plaintiffs say that it was foreseeable that the Parole Board's practice of disregarding the objective risk assessments for subjective criteria would have a disparate impact on Black parole candidates because "[s]ubjective criteria tend to facilitate the consideration of impermissible criteria such as race." *Shealy v. City of Albany*, 89 F.3d 804, 806 (11th Cir. 1996). But "subjective . . . criteria are not discriminatory per se." *Id.* at 805. And Plaintiffs haven't shown that there is anything specific about departing from the ORAS risk assessments that suggests that doing so would have a disparate impact on Black parole candidates. For example, Plaintiffs haven't shown that before implementing ORAS in 2015 the Parole Board's reliance on subjective criteria caused a racial disparity in parole grant rates.

As for knowledge of the disparate impact, Plaintiffs point out that for several years the media and some state legislators have been questioning the Parole Board about the 2:1 racial disparity in parole grant decisions. But Plaintiffs haven't shown that the Parole Board knew of similarly situated parole candidates who had been treated differently. And as explained, there is a negligible difference in the parole grant rates for parole candidates with the same crime of conviction and time served in prison. Thus, the court "decline[s] to infer 'foreknowledge' of disparate impact on the part of the" Parole Board. *Greater Birmingham Ministries*, 992 F.3d at 1327.

*c. Availability of less discriminatory alternatives:* The next factor asks whether the Parole Board has not considered or implemented less discriminatory available alternatives to its current practices. Plaintiffs assert that the less discriminatory alternative is "the very parole system and procedures rejected by Defendants, with evidence-and actuarially-based standards that, when followed, undeniably achieved near racial parity in parole grant rates." (Doc. 23-1, p. 43). But the less discriminatory alternative must further the asserted race neutral policy behind the Government's challenged practice as effectively as the challenged practice does. *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978). And Plaintiffs haven't shown (or even argued) that relying on risk needs assessments to decide whether to grant parole is as effective at protecting public safety as the Parole Board's current practices. As a result, the court cannot say that this factor weighs in Plaintiffs' favor.

*d. Context:* The four remaining factors—historical background, procedural and substantive departures from previous practices, contemporaneous statements by decisionmakers, and the specific sequence of events leading up to the challenged conduct—require the court to consider the context in which the Parole Board adopted its challenged practices. Plaintiffs argue that the following evidence shows that these factors weigh in their favor:

- In 2018, Ivey and Marshall summoned the Parole Board to a meeting in which they demanded that the Parole Board abandon an objective risk assessment-based approach to parole and stop letting people out of prison.

- Ivey removed Walker as Parole Board Chair and her staff told Head (who was the newly appointed Chair) that Ivey would ease up on the Parole Board if they would fire the Black Executive Director, who had implemented the Justice Reinvestment Act.

- Head's refusal to fire Cook led to Marshall and Ivey advocating for the 2019 parole amendments and requiring strict guidelines for granting parole.

- The 2019 amendments' instruction that the Board consider
  public safety as its paramount duty justified abandoning
  the risk assessment approach to parole.

- The day the 2019 amendments took effect, Ivey replaced
  Cook with Graddick who fired three Black Parole Board
  officials at the director level and implemented personal
  appearance policies that Head viewed as racist.

- When Head resigned, Ivey replaced her with a white former
  employee of the Attorney General's Office.

- The Parole Board has departed from past practices by
  ignoring risk assessments and guidelines in most cases and
  applying unwritten, but far more stringent parole criteria.

Plaintiffs' evidence doesn't establish that a racially discriminatory
intent or purpose motivates the Parole Board members to disregard the
objective risk assessments. Nor does Plaintiffs' evidence show that there was
a discriminatory intent behind the 2019 amendments. Head admits that the
2018 meeting with Ivey and Marshall was because parolee Jimmy Spencer
murdered three people and the Parole Board was criticized for how it handled
his case. That also appears to be why Ivey demoted Walker, pressured Head
to fire Cook, and advocated for passage of the 2019 amendments.

And nothing about the 2019 amendments' legislative history or
comments from the legislation's sponsors suggest that the law was intended
to discriminate against Black parole candidates. Plaintiffs have not explained
why they assert that the court should infer a discriminatory purpose from
statements characterizing the 2019 amendments as requiring "strict
guidelines for granting a pardon or parole." (*See* Doc. 91, p. 47 (quoting Doc.
24-10)). That the 2019 amendments recognized the value in requiring the
Parole Board's membership to "be inclusive and reflect the racial, gender,
geographic, urban/rural, or economic diversity of the state," Ala. Code § 15-
22-20(a), suggests that there wasn't a discriminatory purpose behind the
amendments. Plus, the more reasonable inference to draw from these

comments is that the 2019 amendments' focus on public safety stemmed from the Jimmy Spencer murders—murders committed by a *white* parolee.

Discriminatory intent also cannot be inferred from Ivey replacing Cook with Graddick, Graddick firing three Black director level employees, the implementation of the new personal appearance policy, and the appointment of Gwathney as Parole Board Chair. As explained, Plaintiffs lack standing to sue Ivey and Marshall. And they haven't sued Graddick. So the intent that matters is the intent of the Parole Board members, not the intent of Ivey, Marshall, or Graddick. Besides, there is no evidence that the actions of Graddick, who had no power to grant or deny parole, were connected to the Parole Board's change in practices or implementation of the 2019 amendments. Nor have Plaintiffs convinced the court that Graddick's actions were racially motivated. As the Parole Board points out, Graddick kept Ira Shaw, a Black man, in the position of Information Technology Director. Graddick also replaced Personnel Director Belinda Johnson with a Black woman, and later appointed another Black woman, Simmons, to the executive position of Director of Board Operations. And Head's declaration suggests that Ivey's motivation for ousting Cook was the Spencer murders and VOCAL's criticisms of Cook's support of the Justice Reinvestment Act's risk needs assessment approach to parole. Plus, the court cannot say that Ivey replacing Head (a white woman) with Gwathney (another white woman) supports a finding of discriminatory intent. That's especially true considering that Ivey's two most recent appointments to the Parole Board have been Black, resulting in a majority Black Board.

Finally, the mere fact that the Parole Board is departing from the risk assessments and guidelines doesn't establish discriminatory intent. For the court to enjoin the Parole Board for violating the Equal Protection Clause, Plaintiffs must show a racially discriminatory motivation behind the Parole Board's actions. *See Greater Birmingham Ministries*, 992 F.3d at 1327. It isn't enough for Plaintiffs to assert that the Board is applying more stringent parole criteria than before and that this practice has a discriminatory effect.

—

"[T]he *Arlington Heights* [factors] are meant to assist this Court in determining whether racially discriminatory intent" motivated the Parole Board to disregard the objective risk assessments and apply more stringent criteria to its decisions to grant parole and set reconsideration dates. *See id.* After reviewing these factors and examining Plaintiffs' evidence, the court finds that Plaintiffs haven't shown that the majority Black Parole Board is acting with discriminatory intent against Black inmates. Thus, even if Plaintiffs have shown that the Parole Board's new practices have a slight discriminatory effect, the court cannot find that Plaintiffs have shown a substantial likelihood of success on the merits of their Equal Protection Clause claim. *See id.* ("Without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. The Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class.*" (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 207 (2008) (Scalia, J., concurring) (cleaned up)).

—

To sum up, Plaintiffs haven't established a substantial likelihood of success on the merits of either their Ex Post Facto or Equal Protection Clause claims.[8] So the court will deny Plaintiffs' motion for preliminary injunctive relief without addressing the other preliminary injunction factors. Because Plaintiffs' request for provisional class certification hinges on the court granting preliminary injunctive relief, the court will also not address the parties' arguments related to provisional class certification.

---

[8] Based on this ruling, the court needn't address the Parole Board's argument that the statute of limitations and principles of res judicata bar certain Plaintiffs' claims. The court also has no need to reach Defendants' argument that the court is barred from granting Plaintiffs' request to order the Parole Board to review past parole denials.

## CONCLUSION

For these reasons, the court **GRANTS** The Woods Foundation's motion to join in the motion for preliminary injunction (doc. 44) and Plaintiffs' motion for the court to take judicial notice of several of their evidentiary submissions (doc. 27). The court **DENIES** Plaintiffs' motion for preliminary injunction and provisional class certification (doc. 23).

**Done** and **Ordered** on June 18, 2024.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE