**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

ROBERT EARL COUNCIL AKA ) 
KINETIK JUSTICE, *et al.,* )
 )
     Plaintiffs, )
 )
v. )     CASE NO.: 2:23-CV-00712-CLM-JTA
 )
KAY IVEY, et al., )
 )
     Defendants. )

**REPLY BRIEF IN SUPPORT OF MOTIONS TO DISMISS OF
STATE DEFENDANTS IVEY, MARSHALL, GWATHNEY,
<u>LITTLETON, SIMMONS, HAMM, AND COOPER</u>**

## Table of Contents

Table of Contents ................................................................................................................. i

Table of Authorities ......................................................................................................... iii

A. Plaintiffs Council, Moore, Cole, Ptomey, McDole, Campbell, Pritchett, English, and Cartwright's Claims in Counts I, II, and IV Should Be Dismissed for Failure to Exhaust under the PLRA. ............................................................................ 1

B. Council Should Be Dismissed from this Suit Due to Improper Claim Splitting. ............ 5

C. In Light of the Court's Preliminary Injunction Ruling, the State Defendants Withdraw Their Argument that Pennhurst Bars Plaintiffs' Claims Except as to Count III. ....... 8

D. Plaintiffs' Parole-Based Claims Against Ivey, Marshall, and Hamm Should Be Dismissed for Lack of Standing and Sovereign Immunity. ........................................ 9

E. Plaintiffs Fail to State a Claim for Injunctive Relief Against the State Defendants in Their Official Capacities under the TVPA, and Ivey, Marshall, Hamm, Gwathney, and Cooper Are Entitled to Immunity from All Individual-Capacity Damages Claims under the TVPA. .......................................................................................... 11

   1. Plaintiffs' claims for injunctive relief fail because there is no private right of action for injunctive relief under the TVPA. .............................................. 12

   2. Plaintiffs fail to state a claim against the State Defendants for a violation of the TVPA. .............................................................................................. 14

   3. The State Defendants are entitled to immunity from Plaintiffs' individual-capacity claims for damages under the TVPA. ................................... 21

F. Plaintiffs' RICO Claim Should Be Dismissed Because They Fail to State a Violation of the TVPA as a Predicate Act and Because There is No Private Right of Action for Injunctive Relief under RICO; The State Defendants Are Immune from Individual-Capacity Damages Claims Under RICO for the Same Reasons as to the TVPA. ... 28

G. Count IV Is Due to Be Dismissed Because Count IV Plaintiffs Lack Standing to Seek Injunctive Relief, and Defendants Ivey and Hamm Are Entitled to Qualified Immunity. ................................................................................................................ 30

   a. Plaintiffs lack standing to seek injunctive relief against Ivey and Hamm because they fail to allege a substantial risk of future injury. ......................... 30

   b. Plaintiffs fail to state a First Amendment retaliation claim in Count IV. ........ 31

   c. Plaintiffs failed to establish supervisory liability in Count IV. ...................... 32

   d. Ivey and Hamm are entitled to qualified immunity on Count IV. ................. 34

H. Plaintiffs Fail to Plead A Plausible Ex Post Facto Claim. ........................................... 35

   1. Plaintiffs fail to state an Ex Post Facto claim on the merits. .................................. 36

   a. Plaintiffs' facial challenge fails. ...................................................................... 37

   b. Plaintiffs' as-applied challenge fails. .............................................................. 39

2.  Ivey, Marshall, and Gwathney are entitled to immunity from individual-capacity damages claims. ...................................................... 45

I.  Plaintiffs Fail to Plausibly Allege an Equal Protection Claim Against the State Defendants. ...................................................... 47

1.  Plaintiffs fail the comparator test. ...................................................... 47

a.  The complaint fails to state sufficient non-conclusory facts establishing that Equal Protection Plaintiffs are similarly situated to White inmates whom the Board paroled. ...................................................... 48

b.  The complaint fails to allege facts plausibly demonstrating intentional discrimination. ...................................................... 54

i.  The complaint does not aver facts sufficient to establish a plausible substantial disparate impact. ...................................................... 55

ii.  The complaint's foreseeability and knowledge allegations are insufficient. ...................................................... 57

iii.  Plaintiffs do not plausibly plead a reasonably less discriminatory alternative. ...................................................... 58

iv.  Neither the historical background, alleged procedural and substantive departures from previous practices, contemporaneous statements by officials, or the specific events leading up to the challenged conduct plausibly infer discriminatory intent by Equal Protection Defendants. ...................................................... 60

2.  Plaintiffs Cannot Prevail on a "Convincing Mosaic" Theory. ...................................................... 66

3.  The Equal Protection Defendants are entitled to immunity. ...................................................... 73

J.  Plaintiffs Fail to Plead a Plausible Substantive Due Process Claim. ...................................................... 73

1.  Plaintiffs fail to plead any facts plausibly alleging a due process claim based on the Fifth Amendment. ...................................................... 74

K.  Plaintiffs' Conspiracy and Failure-to-Prevent Claims in Counts IX, X, and XI Fail Because Their Substantive Claims in Counts I – VIII Fail. ...................................................... 87

L.  Cooper Is Entitled to State-Agent Immunity from Plaintiff's Unjust Enrichment Claim and Plaintiffs Fail to State a Claim Against Him; Ivey and Hamm Dispute that They Are Included in Count XII; But Even If They Are, the Claims Against Them Fail. ...................................................... 88

Conclusion ...................................................... 97

Certificate of Service ...................................................... 100

**Table of Authorities**

## Cases

*Absolute Activist Value Master Fund Ltd. v. Devine*, 2016 WL 1572388 (M.D. Fla. 2016)......... 29

*Akins v. Perdue*, 204 F. App'x 839 (11th Cir. 2006) ............................................................. 38

*Alcocer v. Mills*, 906 F.3d 944 (11th Cir. 2018)............................................................. 25, 85

*Algeion, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 2019
    WL 4145525 (M.D. Ala. 2019) ......................................................................... 14

*Allen v. Thompson*, 815 F.2d 1433 (11th Cir. 1987)........................................................ 22, 46

*American Family Care, Inc. v. Fox*, 642 So. 2d 486 (Ala. Civ. App.1994) ............................ 89

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)........................................................... 26, 28, 46

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ passim

*Auburn Med. Ctr., Inc. v. Peters*, 953 F. Supp. 1518 (M.D. Ala. 1996)................................. 30

*Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) ..................................... 43

*Bowers v. United States Parole Comm'n*, 775 F. App'x 504 (11th Cir. 2019)....................... 45, 83

*Braddy v. Fla. Dep't of Labor & Empl. Servs.*, 133 F.3d 797 (11th Cir. 1998)..................... 28, 33

*Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990)....................................................... 33

*Bryant v. Rich*, 530 F.3d 1378 (11th Cir. 2008) ......................................................... 3

*Bulls v. Estes*, 2020 WL 906324 (N.D. Ala. 2020) ...................................... 65, 79, 81, 83

*Burrell v. Bd. of Trustees of Georgia Mil. Coll.*, 125 F.3d 1390 (11th Cir. 1997)................... 71

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ........................................................... 12, 13

*Campbell v. Rainbow City, Ala.*, 434 F.3d 1306 (11th Cir. 2006)........................................ 68

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 48 F.4th 1222
    (11th Cir. 2022) ................................................................... 50, 52, 53

*Cisneros v. Petland, Inc.*, 972 F.3d 1204 (11th Cir. 2020) ............................................. 29

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)....................................................... 30

*City of S. Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023)........................................... 10

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ...................................... 76, 84, 85

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)........................................ 24, 76, 78

*Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198 (11th Cir. 1991)................... 74

*Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003)........................................................ 32

*Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929 (11th Cir. 1986)........................... 66, 77

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)........................................ 74, 75

*E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987) .................................... 48, 66, 67

*Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019)............................................. 82, 85

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1220 (11th Cir. 2023)..................... 74, 75

*Ellard v. State*, 474 So. 2d 743, 749 (Ala. Crim. App. 1984) ...................................... 63, 82

*Ellison v. Alabama Bd. of Pardons & Paroles*, 2017 WL 6947946 (11th Cir. 2017) ................ 86

*Ex parte Bd. of Pardons & Paroles*, 793 So. 2d 774 (Ala. 2000)........................................ 61

*Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000) ...................................................... 94, 95

*Ex parte Davis*, 930 So 2d 497 (Ala. 2005) ................................................................ 93

*Ex parte Estate of Reynolds*, 946 So. 2d 450 (Ala. 2006) ........................................... 95

*Ex parte Gilland*, 274 So. 3d 976 (Ala. 2018) ............................................................ 96

*Ex parte Hayles*, 852 So. 2d 117 (Ala. 2002) ............................................................ 90

*Ex parte Price*, 256 So. 3d 1184 (Ala. 2018) ............................................................. 96

*Ex parte Ruffin*, 160 So. 3d 750 (Ala. 2014) ............................................................. 96

*Fletcher v. Williams*, 2023 WL 6307494 (10th Cir. 2023) ............................... 17, 29, 43

*Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307 (11th Cir. 1988) ........... passim

*Gaines v. Wardynski*, 871 F.3d 1203 (11th Cir. 2017) ........................................... 27, 46

*Gambetta v. Prison Rehab. Indus. & Diversified Enters., Inc.*, 112 F.3d 1119
  (11th Cir. 1997) ............................................................................................... 18, 27

*Garner v. Jones*, 529 U.S. 244 (2000) ................................................................. passim

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004) ......................... 92

*Givens v. Ala. Dept. of Corrs.*, 381 F.3d 1064 (11th Cir. 2004) ............................ 18, 27

*Gomez-Diaz v. United States*, 433 F.3d 788 (11th Cir. 2005) .................................. 70

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299
  (11th Cir. 2021) .......................................................................................... 54, 55, 69

*Greene v. H&R Block E. Enters., Inc.*, 727 F.Supp.2d 1363 (S.D. Fla. 2010) ................ 5

*Griffin Indus., Inc. v. Irvin*, 496 F.3d at 1189 (11th Cir. 2007) ....................... 48, 50, 67

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271 (11th Cir. 1998) ............................... 25, 34

*Harrell v. Fla. Parole Comm'n*, 479 F. App'x 234 (11th Cir. 2012) ........................... 77

*Harris v. Garner*, 216 F.3d 970 (11th Cir. 2002) ..................................................... 3, 5

*Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021) ...................................................... 29

*Higginbottom v. Carter*, 223 F.3d 1259 (11th Cir. 2000) ........................................ 3, 5

*Hillcrest Prop., LLP*, 915 F.3d 1292 (11th Cir. 2019) ........................................... 81, 85

*Hoffman v. Office of State Attorney, Fourth Judicial Circuit*, 793 F. App'x 945
  (11th Cir. 2019) ................................................................................................. 22

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) .............. 25, 46

*Howard v. City of Atmore*, 887 So. 2d 201 (Ala. 2003) ............................................ 96

*In re Upshaw*, 23 So. 2d 861 (1945) ...................................................................... 62

*Jackson v. Cook*, 2020 WL 4006671 (M.D. Ala. 2020) ........................................ 56, 61

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) ............................... 10

*Johnston v. Alabama Pardon & Parole Bd.*, 530 F. Supp. 589 (M.D. Ala. 1982) ........ 83

*Jones v. Fla. Parole Comm'n*, 787 F.3d 1105 (11th Cir. 2015) .................. 36, 49, 53, 83, 85

*Jones v. Ga. State Bd. of Pardons and Paroles*, 59 F.3d 1145 (11th Cir. 1995) .......... 44

*Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119 (1977) ........................... passim

*Jones v. Ray*, 279 F.3d 944 (11th Cir. 2001) ........................................................ passim

*Kentner v. City of Sanibel*, 750 F.3d 1274 (11th Cir. 2014) ..................................... 85

*Kentucky v. Graham*, 473 U.S. 159 (1985) ........................................................... 21

*King v. Pridmore*, 961 F.3d 1135 (11th Cir. 2020) .................................................. 78

iv

*Kyle v. Lindsay*, 2008 WL 4571871 (M.D. Pa. Oct. 10, 2008) ..................................... 43

*L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323 (11th Cir. 2020).......................... 76

*Lemley v. Bowers*, 813 F. Supp. 814 (1992)............................................................ 45

*Lewis v. City of Union City, Georgia* ("*Lewis I*"), 918 F.3d 1213 (11th Cir. 2019) .............. passim

*Lewis v. City of Union City, Georgia* ("*Lewis II*"), 934 F.3d 1169 (11th Cir. 2019)... 66, 69, 70, 71

*Lewis v. Governor of Ala.*, 944 F.3d 1287 (11th Cir. 2019) ......................................... 10

*Maddox v. Stephens*, 727 F.3d 1109 (11th Cir. 2013) ........................................... 78, 82

*Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342 (11th Cir. 1999) .............................. 30

*McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018) ............................ 23, 24, 27, 46

*McKinney v. Carter*, WL 5920267, *4 (N.D. Ala. 2021) .......................................... 33

*Michael v. Ghee*, 498 F.3d 372 (6th Cir. 2007) ..................................................... 43

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) .................................................. 16

*Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989 (11th Cir. 2010)..................................... 14

*Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991) ........................... 44, 75, 76, 79

*Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013) ......................................... 26, 35

*N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63 (N.D.N.Y. 2020)..................... 12

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453 (1974) ........... 12, 13

*Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373 (11th Cir. 2002) ................................. 78

*O'Kelley v. Snow*, 53 F.3d 319 (11th Cir. 1995).......................................... 75, 80

*Odom v. Helms*, 314 So. 3d 220 (Ala. 2020) ...................................................... 96

*Ohio Valley Conf. v. Jones*, 2023 WL 3559583 (Ala. 2023) ........................................ 96

*Okpala v. Drew*, 248 F. App'x 72 (11th Cir. 2003)..................................................... 3

*Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002)........................................ 31

*Park v. City of Atlanta*, 120 F.3d 1157 (11th Cir. 1997)........................................... 87

*PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274 (11th Cir. 2021) ...................... 85, 86

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).......................................... 8

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979)........................................... 55, 61

*Peterson v. Baker*, 504 F.3d 1331 (11th Cir. 2007)................................................. 87

*Phillips v. Fulwood*, 616 F.3d 577 (D.C. Cir. 2010) .............................................. 43

*Pilgrim v. Luther*, 571 F.3d 201 (2nd Cir. 2009).................................................. 31

*Pinkerton v. State*, 198 So. 157 (Ala. Ct. App. 1940) .............................................. 62

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ......................................................... 28

*Porter v. Roy*, 461 F.3d 1315 (11th Cir. 2006).......................................... 43, 44, 45, 46

*Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, (Ala. 2008) ...................................... 89, 97

*Red Door Asian Bistro v. City of Fort Lauderdale*, 2023 WL 5606088 (11th Cir. 2023)....... 68, 70

*Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) ............................. 29

*Reynolds v. Calhoun*, 650 F. Supp. 3d 1272 (M.D. Ala. 2023)..................................... 93

*Romero v. Sec'y, U.S. Dep't of Homeland Sec'y*, 20 F.4th 1374 (11th Cir. 2021)....................... 21

*S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198 (11th Cir. 2019)................................. 48

*Sanders v. Boutwell*, 426 F. Supp. 3d 1235 (M.D. Ala. 2019) .......................... 76, 77, 78

*Santos v. Healthcare Revenue Recovery Grp., LLC.*, 90 F.4th 1144, (11th Cir. 2024) ................ 37

*Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008) ........................ 67, 68, 70, 71

*Sellmon v. Reilly*, 561 F. Supp. 2d 46 (D.D.C. 2008)................................................................. 43

*Shepherd v. Wilson*, 2015 WL 9685562 (S.D. Ala. 2015),
    *aff'd*, 663 F. App'x 813 (11th Cir. 2016 ................................................................................ 74

*Sills v. FCI Talladega Warden*, 2023 WL 1775725 (11th Cir. 2023) ............................... 75, 79, 80

*Slakman v. Buckner* 434 F. App'x 872 (11th Cir. 2011)....................................................... passim

*Slakman v. State Bd. of Pardons & Paroles* 2021 WL 5071858 (11th Cir. 2021) ...................... 54

*Slocum v. Georgia State Bd. of Pardons & Paroles*, 678 F.2d 940 (11th Cir. 1982) .................. 80

*Smith v. Terry*, 491 F. App'x 83 (11th Cir. 2012).................................................................... 3

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)................................................................... 30, 31

*Strickland v. Alderman*, 74 F.3d 260 (11th Cir. 1996) ............................................................ 66

*Summers v. State*, 15 So. 2d 502 (1943) ............................................................................. 62

*Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311 (11th Cir. 2006)....................................... 49, 56, 61

*Swift v. Esdale*, 306 So. 2d 268 (1975) .............................................................................. 61

*Tapley v. Collins*, 211 F.3d 1210 (11th Cir. 2000).............................................................. 24, 30

*Taylor v. Brooks*, 2022 WL 2441297 (N.D. Ala. 2022)........................................................... 74

*Taylor v. Nix*, 240 F. App'x 830 (11th Cir. 2007).......................................................... 49, 80, 81

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981) ................................................... 49

*Thomas v. Merritt*, 167 So. 3d 283 (Ala. 2013) .................................................................. 19

*Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374 (Ala. 2001) .................................. 22, 44

*Turner v. Ivey*, 2023 WL 4672503 (Ala. 2023) ................................................................... 86

*Turner v. Safley*, 482 U.S. 78 (1987)................................................................................. 32

*U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805 (11th Cir. 2015) ....................................... 61

*United States ex rel. Marsteller v. Tilton*, 556 F. Supp. 3d 1291 (N.D. Ala. 2021) ..................... 74

*United States v. Armstrong*, 517 U.S. 456 (1996)................................................................. 68

*United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400 (7th Cir. 1979)....... 59

*United States v. Carlton*, 512 U.S. 26 (1994) ..................................................................... 82

*United States v. Kozminski*, 487 U.S. 931 (1988) ........................................................... 16, 20

*United States v. Reynolds*, 235 U.S. 133 (1914) ............................................................. 17, 21

*United States v. Saylor*, 626 F. App'x 802 (11th Cir. 2015)..................................................... 51

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ............................................................. 38

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) ................................................................ 22

*Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833 (11th Cir. 2017)......................................... 5, 6, 8

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)
    ............................................................................................................................ 72

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002). ........................................................ 27, 35

*Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300 (11th Cir. 2003)................................ 76, 78

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313 (11th Cir. 2015) ........................ 74, 93

*White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999) .............................................................. 76

*Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030 (11th Cir. 1987)......................... 76, 77

*Wilson v. Rackmill*, 878 F.2d 772 (3rd Cir. 1989) ........................................................ 45

*Worthy v. City of Phenix City*, 930 F.3d 1206 (11th Cir. 2019)................................... 85

*Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) ........................................ 49

**Statutes**

18 U.S.C. § 1589 .................................................................................. 16, 19, 25

18 U.S.C. § 1595 ...................................................................................... 12, 13

42 U.S.C. § 1985 ........................................................................................... 87

42 U.S.C. § 1986 ........................................................................................... 87

42 U.S.C. § 1997e ........................................................................................... 1

ALA. CODE § 14-1-1 (1975) .......................................................................... 95

ALA. CODE § 14-5-1 (1975) .......................................................................... 95

ALA. CODE § 14-5-10 (1975) ........................................................................ 27

ALA. CODE § 14-8-6 (1975) ..................................................................... 15, 19

ALA. CODE § 15-22-21 (2019) ...................................................................... 60

ALA. CODE § 15-22-24 (1975) ...................................................................... 71

ALA. CODE § 15-22-26 (2019) ................................................................. passim

ALA. CODE § 15-22-28 (2019) ...................................................................... 64

ALA. CODE § 15-22-36 (2019) ...................................................................... 53

ALA. CODE § 23-1-37 (1975) ............................................................... 27, 89, 90

ALA. CODE § 36-1-12 (1975) .................................................................. 90, 91

ALA. CODE § 41-9-541 (1975) ...................................................................... 94

ALA. CODE § 41-9-543 (1975) .................................................................. 92, 97

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012) ................................................................................................. 37

FED. R. EVID. 201(b)...................................................................................... 51

**Rules**

Fed.R.Civ.P. Rule 12 ............................................................................... 89, 91

**Constitutional Provisions**

Ala. Const. Art. V, sec. 112 .......................................................................... 94

A. **Plaintiffs Council, Moore, Cole, Ptomey, McDole, Campbell, Pritchett, English, and Cartwright's Claims in Counts I, II, and IV Should Be Dismissed for Failure to Exhaust under the PLRA.**

Plaintiffs Council, Moore, Cole, Ptomey, McDole, Campbell, Pritchett, English, and Cartwright ("PLRA Plaintiffs") are prisoners confined in the Alabama Department of Corrections (ADOC) and bringing suit regarding prison conditions and are subject to the exhaustion requirement of the Prison Reform Litigation Act ("PLRA") 42 U.S.C. § 1997e. PLRA Plaintiffs contend that the PLRA's requirement to administratively exhaust remedies prior to filing suit regarding prison conditions is inapplicable to them and advance several theories to support their position. First, they argue that the PLRA Plaintiffs' TVPA and RICO claims are outside the scope of the grievance procedure as they include numerous defendants in addition to Hamm and thus are outside of the control of ADOC to address. Doc. 178 ¶ 1. Second, PLRA Plaintiffs argue that ADOC's grievance process was not "available" to them. *Id*. at 36-41. Third, PLRA Plaintiffs assert that since ADOC failed to respond within the timeframe established in Administrative Regulation ("AR") 406, the PLRA Plaintiffs should be deemed to have exhausted their administrative remedies. *Id*. at 41-44. However, all theories advanced by PLRA Plaintiffs are meritless. Thus, Counts I, II and IV are due to be dismissed for failure to exhaust administrative remedies prior to bringing suit as to the PLRA Plaintiffs.

First, PLRA Plaintiffs claim Counts I and II[1] are outside the scope of AR 406 and thus not subject to the PLRA. *Id*. at 35-36. Plaintiffs' "TVPA and RICO claims allege that State Defendants participate in an entrenched labor-trafficking operation involving not only the Governor, Attorney General, Parole Board, and Transportation Director but also a network of partner public and private employers, including the other Employer Defendants." *Id*. at 35. Plaintiffs seem to concede that

---

[1] Plaintiffs seemingly concede that Count IV would be within the scope of the PLRA and only take issue with Counts I and II. Doc. 178 at 35.

these claims regard prison conditions as contemplated under the PLRA as they advance no argument to the contrary. They assert that their claims apply "not only to Hamm, the ADOC Commissioner, but to multiple actors beyond the control of ADOC, *see* Compl. ¶¶ 203-20, and they are thus not properly subject to the grievance process as ADOC has defined it." *Id*. Yet, they fail to address why the claims as applied to Hamm would not be subject to the PLRA. Nonetheless, their argument is unsupported by case law establishing that adding additional parties outside of prison officials nullifies the affirmative defense of exhaustion of administrative remedies under the PLRA raised by Hamm. Contrary to Plaintiffs' arguments, the substance of Counts I and II regard labor conditions in work release programs run by ADOC and are thus grievable prison conditions under AR 406 that could be resolved through this process.

Next, PLRA Plaintiffs argue that ADOC's grievance process was not "available" to them. *Id*. at 36. This is contradicted by the fact that Plaintiffs Council, Moore, Cole, Campbell, Ptomey, and Pritchett, all participated in the "unavailable" grievance process prior to the filing of their complaint while Plaintiffs English and Cartwright have subsequently done so once put on notice of the claim. *Id*. at 38-40 and Doc. 148-10. Their averments are further contradicted within their own complaint: "Plaintiffs Council, Moore, Cole, McDole, Campbell, Ptomey, Pritchett, and English submitted emergency grievances to ADOC concerning the regulations, conditions, and practices forcing incarcerated people to labor and remain in a condition of involuntary servitude. . . ." Doc. 1 ¶ 211 n.81. The argument as to Plaintiffs Council, Moore, Cole, Campbell, Ptomey and Pritchett is spurious at best – the process was clearly available to them since they participated in the process and showed prior knowledge of the process in their complaint. However, PLRA Plaintiffs also claim that Plaintiffs English and Cartwright subsequently filed grievances. Doc. 178 at 39-40. Despite the availability of all Plaintiffs to file such grievances, Plaintiffs assert

that "[a]lthough all currently incarcerated Plaintiffs ultimately were able to submit emergency grievances, the evidence nevertheless reflects that ADOC did not communicate the process such that a reasonable incarcerated person could use it." *Id.* (internal citations omitted). This is supported only by self-serving statements that openly contradict their previous statements averred in the complaint. As such their claim that the grievance process was "unavailable" is meritless and contrary to the record already established.

Third, in an alternative argument, PLRA Plaintiffs assert that because their submitted grievances were not answered within the appropriate timeline established in AR 406, Plaintiffs should be deemed to have exhausted their administrative remedies. They support this argument with erroneous readings of cases that do not actually support their position. But the Court need not examine their cases cited because ADOC was still within the time to respond at the time PLRA Plaintiffs filed suit, and therefore they indisputably failed to exhaust. "[T]he exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile. The plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Higginbottom v. Carter,* 223 F.3d 1259, 1261 (11th Cir. 2000) (internal citations omitted). Further, an incarcerated person cannot "cure" an exhaustion defect by properly exhausting all remedies after filing suit. *See Smith v. Terry*, 491 F. App'x 83 (11th Cir. 2012); *see also Harris v. Garner,* 216 F.3d 970 at 974 (11th Cir. 2002). Moreover, to properly exhaust, prisoners must do more than simply initiate grievances; they must also appeal any denial of relief through all levels of review that comprise the administrative grievance process. *See Bryant v. Rich,* 530 F.3d 1378 (11th Cir. 2008); *see also Okpala v. Drew,* 248 F. App'x 72, 73 (11th Cir. 2003) (affirming sua sponte dismissal for failure to exhaust when a federal inmate submitted a

written complaint and appealed the decision but filed his lawsuit before receiving the final decision on his appeal).

ADOC was within the time to respond when PLRA Plaintiffs filed suit, and when ADOC did respond, PLRA Plaintiffs failed to appeal as required by AR 406. The complaint in this matter was filed on December 12, 2023. Doc. 1. AR 406 dictates that "the IGO[2] shall provide a response to the grievant within ten (10) days of IGO receipt." Doc. 148-9. Therefore, the operative response time is determined not by date of submission by inmates but by the date of receipt of said grievances by the IGO. Grievances from each inmates were received by the respective IGO on the following dates: Council's Grievance was signed November 27, 2023 but was received by the IGO on December 18, 2023; Moore's Grievance was signed December 2, 2023 but was received by the IGO on December 8, 2023; Cole's Grievance was signed November 27, 2023; McDole was signed November 29, 2023 but was received by the IGO on December 5, 2023; Campbell was signed November 29, 2023 but was received by the IGO on December 5, 2023; Ptomey was signed November 29, 2023 but was received by the IGO on December 5, 2023; Pritchett was signed December 13, 2023 and was received by the IGO on December 13, 2023. Doc. 148-10. As admitted by Plaintiffs, Cartwright and English filed their respective grievances after this complaint was filed. Doc. 178 at 39-40. A response was due to those inmates who filed prior to bringing suit a ten business days afterwards. Plaintiffs admit that a response was provided to each inmate, although they do contest Inmate Cole received a response which is contradicted via Tina Tyler testifying previously via affidavit. Doc. 148-10. Even acknowledging that ADOC responded longer than the time dictated by AR 406, this does not exempt Plaintiffs from the exhaustion requirement of the PLRA, as exhaustion of administrative remedies is a "precondition" to filing an action in federal

---

[2] IGO is the abbreviation for Institutional Grievance Officer. Doc. 148-9.

court. *Higginbottom*, 223 F.3d at 1261. When examining the relative timeframe of when a response was due from ADOC compared to when each grievance was received by the respective IGO, those response deadlines were all due after the complaint was filed. *Compare* Doc. 1 *with* Doc. 148-10.

Even considering the responses provided by ADOC may have been untimely, PLRA Plaintiffs filed suit before the time allowed for ADOC to respond to their grievances and therefore violated the PLRA's exhaustion requirement. Since the initial filing was brought in violation of the PLRA, PLRA Plaintiffs' post-suit claim of an untimely response cannot cure the initial failure to exhaust. And when ADOC did respond to PLRA Plaintiffs' grievances, Plaintiffs failed to appeal. An incarcerated individual cannot 'cure' an exhaustion defect by properly exhausting all remedies after filing suit. *Terry*, 491 F. App'x at 83; *Harris*, 216 F.3d at 974. As such, Counts I, II, and IV are due to be dismissed as to PLRA Plaintiffs.

Further, if this Court takes Plaintiffs' arguments as well founded, this would apply only to Counts I and II as the substance of each of the grievances only vaguely refer to work conditions but contain no allegation of retaliation as is alleged in Count IV. *See* doc. 148-10. Therefore, if this Court determines that the grievance process was available to the PLRA Plaintiffs, then all claims contained in Count IV dealing with any retaliation allegations are due to be dismissed for failure to exhaust administrative remedies as no grievance was ever filed regarding that issue by any PLRA Plaintiff.

**B.   Council Should Be Dismissed from this Suit Due to Improper Claim Splitting.**

Contrary to Plaintiff Council's argument, doc. 178 at 198-201, he has split his First Amendment retaliation claim relating to his advocacy of work stoppages improperly across three lawsuits. A plaintiff may not file duplicative complaints to increase his legal rights. *See Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841 (11th Cir. 2017) (citing *Greene v. H&R Block E. Enters., Inc.*, 727 F.Supp.2d 1363, 1367 (S.D. Fla. 2010)) (other citation omitted). Council has

done the same here by pursuing this claim in three separate lawsuits: this case (*Council II*), *Council v. Hamm, et al.*, 2:23-CV-658-ECM-CWB (*Council I*), and *Robert Earl Council aka Kinetik Justice #181418 v. John Hamm, et al.,* 2:23-cv-730-ECM-JTA (*Council III*).

In analyzing whether a plaintiff is splitting his claims, courts examine "(1) whether the case involves the same parties and their privies, and (2) whether separate cases arise from the same transaction or series of transactions." *Vanover*, 857 F.3d at 841–42 (quotation marks and citation omitted). "Successive causes of action arise from the same transaction or series of transactions when the two actions are based on the same nucleus of operative facts." *Id.* at 842 (citation omitted).

While not all the defendants in *Council II* (this case) are defendants in *Council I* or *III,* Hamm is a defendant in all three; Hamm is sued in his official capacity in *Council I* and *Council II*, while he is sued in his individual capacity in *Council II* and *Council III*. Thus, at least one party (Hamm) with the same *privies* is present in all three cases, meeting the first *Vanover* factor.

Plaintiffs attempt to distinguish the facts of these three cases, but the three cases arise from the same nucleus of operative facts relating to Council's incarceration with ADOC. Plaintiffs allege that Council has faced retaliation by "Alabama officials in response to his efforts to resist and encourage others within ADOC to resist Defendants' unlawful conduct and specifically Defendants' forced labor demands." Doc. 1 ¶ 61. This paragraph then describes Council's organization of the Free Alabama Movement (FAM) and his activist role within ADOC. *Id.* Furthermore, Council and FAM "have formed and lead a labor movement whose focus has been to peacefully resist the systematic profiting by the State of Alabama from their forced labor …" *Id.* The operative complaint in *Council I* alleges similarly that Council has been "organizing, advocating, and litigating for the rights of prisoners in Alabama." *Council I*, Doc. 67 ¶ 4. In keeping

with this theme, the operative complaint in *Council III* alleges that Council co-founded FAM, the purpose of which is "defined by peaceful protest of and resistance to unconstitutional confinement, conditions, and forced labor." *Council III*, Doc. 31 ¶ 2. "FAM has brought attention to the ADOC's exploitation of inmate work strikes within and across ADOC facilities." *Id.* at ¶ 33.

Plaintiffs depict Council's efforts to organize work stoppages within ADOC facilities. Doc. 1 ¶¶ 62-64. Council alleges in *Council I* that "he has gone on numerous hunger strikes, organized state-wide (and nation-wide) prisoner labor strikes, a correctional officer strike, filed or helped file hundreds of prisoner rights lawsuits against ADOC, and garnered national and international press for ADOC's abuse and mistreatment of prisoners." *Council I*, Doc. 67 ¶ 4. Council alleges this same concept in *Council III*, stating that FAM "uses strikes, boycotts, protests, and social-media campaigns to resist and educate others to resist unconstitutional conditions within the ADOC… FAM has organized or helped to organize several inmate work strikes within and across ADOC facilities." *Council III*, Doc. 31 ¶ 32.

Plaintiffs allege punishments that ADOC doles out to inmates, like reducing food supply to strikers, physically abusing inmates, and increasing punishments for disciplinary violations. Doc. 1 ¶ 65. Specifically, Council has "been subjected to long stretches of solitary confinement in response to their resistance to forced labor, and have been the victims of physical beatings, strip searches, exposure to chemical agents, harassment, and psychological abuse at the hands of ADOC officials while in solitary confinement." *Id.* at ¶ 66. *Council I* alleges similarly that "Council has suffered years of solitary confinement and placed his own life on the line many times over, exposing himself to beatings and chemical sprays at the hands of correctional officers . . ." *Council I*, Doc. 67 ¶ 4. The operative complaint in *Council III* then complains of the same alleged treatment: "Plaintiff has been subjected to long stretches of solitary confinement and has been beaten, strip

searched, exposed to chemical agents, harassed, and psychologically abused by ADOC officials." *Council III*, Doc. 31 ¶ 11.

Further still, each lawsuit also alleges an incident wherein Council received severe injuries while he was assigned to William E. Donaldson Correctional Facility. *See Council II*, Doc. 1 ¶ 68; *Council I*, Doc. 67 ¶ 53; *Council III*, Doc. 31 ¶ 36. Likewise, each lawsuit also raises the same First Amendment Retaliation claim, the *only* claim applicable to Council. *See Council II*, Doc. 1 ¶¶ 226-234; *Council I*, Doc. 67 ¶¶ 137-154; *Council III*, Doc. 31 ¶¶ 169-172.

For these reasons, all three cases arise from the same nucleus of operative facts, thereby meeting the second *Vanover* factor. Therefore, Council is attempting to split his claims among the courts under the two-factor *Vanover* test, and he should be dismissed from this lawsuit.

**C.    In Light of the Court's Preliminary Injunction Ruling, the State Defendants Withdraw Their Argument that Pennhurst Bars Plaintiffs' Claims Except as to Count III.**

The State Defendants moved to dismiss Counts I, II, III, V, VI, VII, VIII, XI, X, and XI for lack of subject matter jurisdiction under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984). Doc. 148 at 49-51. The State Defendants argued that the gravamen of Plaintiffs' complaint was premised on violations of state law and sought relief pursuant to state law. *Id.* However, the Court disagreed in its order denying Plaintiffs' motion for preliminary injunction. Doc. 181 at 12-14. The Court construed Plaintiffs' Ex Post Facto and Equal Protection claims as premised on violations of federal law and seeking relief pursuant to federal law, even if the relief sought was Plaintiffs' preferred application of state law. *Id.* at 14.

In light of the Court's ruling on *Pennhurst*, the State Defendants withdraw their *Pennhurst* argument except as to Count III brought pursuant to Article I, Section 32 of the Alabama Constitution. Plaintiffs have agreed not to pursue the state law claim in Count III against the State Defendants in this federal forum. Doc. 178 at 108-09. Therefore, the State Defendants respectfully

request that Count III be dismissed against them without prejudice for lack of subject matter jurisdiction.

### D.   Plaintiffs' Parole-Based Claims Against Ivey, Marshall, and Hamm Should Be Dismissed for Lack of Standing and Sovereign Immunity.

This Court has already held that "no Plaintiff has standing to sue the Governor or Attorney [General]" as to Plaintiffs' Ex Post Facto (Count V) and Equal Protection (Counts VI & VII) claims. Doc. 181 at 14. The same reasons for that holding—Plaintiffs' inability to establish causation and redressability, *id.* at 15—apply to all Plaintiffs' parole-based claims[3] against Ivey, Marshall, and Hamm. None of these State Defendants "has denied or will deny an individual Plaintiff's parole request . . ., and neither has the authority to force individual parole decisions[.]" *Id.* Thus, all parole-based claims against these Defendants must be dismissed for lack of subject-matter jurisdiction.

Faced with the reality that the Parole Board "has sole authority to grant parole and set reset dates," Doc. 181 at 19, Plaintiffs cobble together no fewer than ten citations to the Alabama Code (which they deem a "not comprehensive" list) involving Ivey's and Marshall's tangential connection to parole decisions in an attempt to establish causation, *see* Doc. 178 at 183.[4] But this

---

[3] While Plaintiffs interpreted the reference to "parole-based" claims to refer only to Counts V through XI, *see* Doc. 178 at 182; *accord id.* at 84 n.32, Ivey, Marshall, and Hamm meant what they said: that these claims include all Counts except the First Amendment retaliation claim (Count IV) against Ivey and Hamm and all Counts against Marshall. *See* Doc. 148 at 52. Counts I and II, despite including additional allegations about prison-labor practices, allege forced labor (which forms the RICO predicate) from "abusing the parole process[.]" *E.g.*, Doc. 1 ¶ 207. For want of standing, such parole-based allegations cannot support any claim.

[4] Plaintiffs' "willing[ness] to agree that [Hamm] should not be named as a defendant" to Counts V through VIII aside, Doc. 178 at 186 n.106, though Plaintiffs twice reference Hamm in the body of their standing section, *see* Doc. 178 at 182, Plaintiffs do not appear to substantively address standing as to the parole-based claims against him. To be sure, Plaintiffs directly refer to Hamm's "participation" in the alleged parole scheme in Counts V through VIII. *See* Doc. 1 ¶¶ 237 (V), 245 (VI), 253 (VII), 261 (VIII). And Counts I, II, and IX through XI should be dismissed against him to the extent they are based on his alleged involvement in parole practices.

whole-is-greater-than-the-sum-of-its-parts approach is insufficient to establish that Plaintiffs' injuries are "fairly traceable" to Ivey, Marshall, and Hamm rather than "the independent action of some third party[.]" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quotations omitted); *see also* Doc. 181 at 17 (citing *City of S. Miami v. Governor*, 65 F.4th 631, 645 (11th Cir. 2023) (holding that "Plaintiffs haven't shown that the Parole Board would have acted differently without Ivey or Marshall's alleged misconduct"). Indeed, this Court has already rejected "Plaintiffs' argument that the Governor and Attorney General's statutory duties" establish causation. Doc. 181 at 16. Just as the Eleventh Circuit found that the plaintiffs in *Jacobson* didn't establish causation as to the Florida Secretary of State "[b]ecause the Supervisors are independent officials not subject to the Secretary's control[,]" 974 F.3d at 1253, Plaintiffs fail to establish causation as to Ivey, Marshall, or Hamm because "the Parole Board members alone have the power to grant parole and set parole reconsideration dates," Doc. 181 at 16.[5]

So too for redressability. Plaintiffs get the standard right but bury their heads in the sand as to their failure to meet it. *See* Doc. 178 at 185-86. That the only parole-specific relief in the complaint is directed "to the Defendant members of the Parole Board[,]" Doc. 1 at 123-125, proves the point that it is not "*the effect of the court's judgment* on [Ivey, Marshall, and Hamm]" that would redress Plaintiffs' injuries, *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (citations and internal quotation marks omitted). And Plaintiffs' claim that ordering Ivey and Marshall to "refrain from instructing their agents and the Parole Board Members to disregard the evidence-based risk assessments evaluating parole candidates and to deny parole to certain

---

[5] It is unclear why Plaintiffs are "willing to agree" that Hamm be dismissed as a defendant to Counts V through VIII because of "State Defendants' arguments that the Parole Board Members have authority to provide complete relief," Doc. 178 at 186, but not apply the same to Ivey and Marshall.

categories of incarcerated individuals" "would significantly increase the likelihood" does not square with the Parole Board's "complete discretion" over decisions concerning parole, ALA. CODE § 15-22-26(c). Doc. 181 at 18 ("Even if the court entered that order, nothing requires the Parole Board to start granting parole to more individuals convicted of violent offenses or to start following the risk assessments' recommendations simply because the Governor and Attorney General are prohibited from instructing the Parole Board to do the opposite."). Plaintiffs' failure to establish causation and redressability as to Ivey, Marshall, and Hamm proves fatal to their parole-based claims against them.[6]

**E.     Plaintiffs Fail to State a Claim for Injunctive Relief Against the State Defendants in Their Official Capacities under the TVPA, and Ivey, Marshall, Hamm, Gwathney, and Cooper Are Entitled to Immunity from All Individual-Capacity Damages Claims under the TVPA.**

Plaintiffs have narrowed the issues surrounding their TVPA claims by stipulating they do not seek money damages from the State Defendants in their official capacities. Doc. 178 at 72 n.28. This eliminates the need to reply to whether the TVPA abrogates the State Defendants' sovereign immunity (doc. 148 at 57-58) or whether the State Defendants are "persons" within the meaning of the TVPA in their official capacities (*id.* at 58-59). Plaintiffs do seek injunctive relief against the State Defendants in their official capacities under the TVPA pursuant to the *Ex parte Young* exception to sovereign immunity, and money damages against Ivey, Marshall, Hamm, Gwathney, and Cooper in their individual capacities.[7]

---

[6] Ivey, Marshall, and Hamm maintain that sovereign immunity separately mandates dismissal for lack of subject-matter jurisdiction, *see* Doc. 148 at 55-56, but agree with the Court's statement that it is unnecessary to reach this issue because Plaintiffs lack standing, *see* Doc. 181 at 18 n.3.
[7] Plaintiffs do not assert individual-capacity damages claims against Littleton or Simmons.

1.   **Plaintiffs' claims for injunctive relief fail because there is no private right of action for injunctive relief under the TVPA.**

The TVPA creates a private right of action for "[a]n individual who is a victim of a violation of [the TVPA]" to bring a civil suit for "damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). But when it authorized injunctive relief under the TVPA, Congress expressly provided that "*the [United States] Attorney General* may bring a civil action in a district court of the United States seeking an order to enjoin" violations. 18 U.S.C. § 1595A(a) (emphasis added). Since the TVPA authorizes damages and attorney's fees for "[a]n individual" victim but injunctive relief for the U.S. Attorney General, the principle of *expressio unius* implies that *only* the United States may seek injunctive relief through a public cause of action. *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974); *see also N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 72 (N.D.N.Y. 2020) (applying *National Railroad Passenger Corp.* to conclude "anyone not expressly permitted to bring a cause of action under the TVPA cannot bring a civil suit to recover for violations of it.").

In response, Plaintiffs ignore the statutory interpretation in *National Railroad Passenger Corp.* and rely on a case involving an unrelated issue, *Califano v. Yamasaki*, 442 U.S. 682 (1979). *See* Doc. 178 at 72-74. In *Califano*, the statute created a private right of action to sue the Secretary of Health, Education, and Welfare in federal court for a judgment "affirming, modifying, or reversing the decision of the Secretary" regarding social security payments. 442 U.S. at 705 (citing 42 U.S.C. § 205(g)). The Secretary argued that federal courts lacked authority to issue injunctions under the statute *at all*, an argument that the Court rejected. *Id.* ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable powers to issue injunctions in suits over which they have jurisdiction.").

But the State Defendants do not argue, as the Secretary in *Califano* argued, that federal courts lack equitable jurisdiction under the TVPA. *Califano* does not address a statutory cause of action that creates separate remedies for specified individuals and therefore is not controlling as Plaintiffs argue. Doc. 178 at 72. Instead, the injunctive relief provision of the TVPA is more similar to the application of *expressio unius* in *National Railroad Passenger Corp.*

The statute in that case authorized general enforcement against Amtrak by "the Attorney General of the United States" but authorized suits by railroad employees "in a case involving a labor agreement." *Nat'l R.R. Passenger Corp.*, 414 U.S. at 456-57. The Court applied the "frequently stated principle of statutory construction" that "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Id.* at 458. Since the statute "creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances," *id.*, the application of *expressio unius* implied that the U.S. Attorney General had "exclusive (except in cases involving labor agreements) authority to police the Amtrack system and to enforce the various duties and obligations imposed by the Act." *Id.* at 464.

Likewise, the TVPA "expressly provides a particular remedy or remedies," *id.* at 458, in the form of a civil suit by "[a]n individual who is a victim of a violation" of the TVPA who "may recover damages and reasonable attorneys fees," 18 U.S.C. § 1595(a), and a civil action by "the Attorney General . . . seeking an order to enjoin" a violation of the TVPA. 18 U.S.C. § 1595A(a). Therefore, the Court should not "expand the coverage of the statute to subsume other remedies" by reading the injunctive relief separately authorized by the public cause of action in § 1595A into the private cause of action in § 1595(a). *Nat'l R.R. Passengers Corp.*, 414 U.S. at 458.

Under the correct statutory framework, Congress's intent was to authorize private suits only for money damages and to authorize injunctive relief only by the U.S. Attorney General in public suits. This comports not only with sound statutory interpretation but properly delegates injunctive enforcement exclusively to the U.S. Attorney General who has exclusive enforcement over the TVPA's criminal provisions and authority to prohibit criminal or quasi-criminal activity that is interstate in nature. By contrast, Congress protected victims' interests by allowing them to seek damages to compensate them for injuries personally suffered while leaving criminal and injunctive enforcement to the government.

As a result, Plaintiffs fail to state a claim against the State Defendants in their official capacities for injunctive relief under the TVPA.

## 2. Plaintiffs fail to state a claim against the State Defendants for a violation of the TVPA.

Even assuming Plaintiffs could seek injunctive relief against the State Defendants in their official capacities, the State Defendants have argued Plaintiffs fail to state a claim for a violation of the TVPA by the State Defendants. Doc. 148 at 66-73. As an initial matter, Plaintiffs fail to allege, let alone argue, that the Board's denials of parole coerced, compelled, or incentivized any Alabama inmate to provide labor in the ADOC's work programs or that the Board has even benefited from the alleged coerced labor scheme. Doc. 178 at 50–70. The only reference to the Board in Plaintiffs' TVPA argument is a passing reference in a footnote that does not address the Board's TVPA argument. *Id*. at 55 n.15. Accordingly, Plaintiffs have effectively abandoned and waived their TVPA claims with respect the Board. *See Algeion, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 2019 WL 4145525, *5 n.1. (M.D. Ala. 2019) (*citing Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989, 992 (11th Cir. 2010).

This leaves Plaintiffs' TVPA claims against the remaining State Defendants. The State Defendants' initial brief analyzed the TVPA claims against them on a Defendant-by-Defendant basis. *Id.* In their opposition, Plaintiffs focus on *types of conduct* that allegedly violate the TVPA rather than actions of specific Defendants. Accordingly, the State Defendants reply to Plaintiffs' argument that the following types of conduct violate the TVPA: (1) disciplining ADOC inmates for refusing to work, organizing work stoppages, or being terminated from a work release position for cause (doc. 178 at 53-55, 63-64); (2) requiring inmates to work without compensation, paying less than the minimum wage, or deducting portions of wages earned on work release (*id.* at 57-60); and (3) incarcerating inmates in prisons where the levels of violence allegedly "coerce" them into accepting work release positions (*id.* at 60-63).

**Disciplining inmates for refusing to work, organizing work stoppages, or being terminated for cause.** Plaintiffs do not dispute the distinct categories of inmate labor set out in the State Defendants' brief, namely (1) inmates on work release who receive a "prevailing wage," no less than the federal minimum wage, who have 40% of their wages plus costs of transportation withheld for ADOC pursuant to Alabama Code § 14-8-6; (2) inmates who work on public works projects for public entities at less than the minimum wage; (3) inmates who make goods for sale through ADOC's Correctional Industries ("ACI") for less than the minimum wage; and (4) inmates who perform unpaid jobs at ADOC facilities such as cleaning, repair, cafeteria work, and laundry. Doc. 148 at 31-36. Inmates who fail to perform unpaid jobs at ADOC facilities may be disciplined for "[r]efusing to work" or "[e]ncouraging or causing others to stop work." *Id.* at 35; *see also* doc. 148-6 at 19-20, 26. Inmates who work outside the walls either on public works projects or work release may be disciplined for being fired from a job, but ADOC's regulations specify the inmate must have been terminated "for cause." Doc. 148-6 at 32.

Plaintiffs fail to engage with these distinct categories and instead argue that any work-related discipline of inmates results in "knowingly obtain[ing]" labor through use of force or the threat of force or abuse or threatened abuse of legal process. Doc. 178 at 53-55, 63-64; *see also* 18 U.S.C. § 1589(a)(1) – (4). The Eleventh Circuit rejected Plaintiffs' argument that imposing discipline in the context of inmate labor is a per se violation of the TVPA in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269 (11th Cir. 2020). *Barrientos* stated the TVPA "should not be read to call into question the legality of voluntary work programs in federal immigration detention facilities, or to call into question the longstanding requirements that detainees or inmates be required to perform basic housekeeping tasks." *Barrientos*, 951 F.3d at 1277-78. In addition, "basic disciplinary measures" in the context of incarceration such as "punishments for detainees who, among other things, refuse to complete basic personal housekeeping tasks or organize work stoppages" do not "on their own, give rise to TVPA liability." *Id.* at 1278 n.5.

As *Barrientos* recognizes, ADOC's disciplinary measures are inherent to maintaining order in a prison and do not constitute "force," "physical restraint," or "abuse or threatened abuse of law or legal process" within the meaning of the TVPA. Plaintiffs simply ignore the State Defendants' citation to *Barrientos* (doc. 148 at 70-71) and are unable to cite an on-point case applying the TVPA to the use of inmate labor in a post-conviction setting. Plaintiffs' novel theory of the TVPA violates the canon of statutory interpretation that courts "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Congress was aware when it enacted the TVPA that the Thirteenth Amendment "excludes involuntary servitude imposed as legal punishment for a crime." *United States v. Kozminski*, 487 U.S. 931, 943 (1988). This principle led the Tenth Circuit, albeit in an unpublished decision, to reject an inmate's challenge under the TVPA to the use of discipline to compel labor in prison. *See Fletcher v.*

*Williams*, No. 22-1371, 2023 WL 6307494, at *2 (10th Cir. Sept. 28, 2023) ("Plaintiffs cannot use a federal statute enacted to implement the federal Thirteenth Amendment to criminalize behavior the Amendment plainly permits.").

ADOC thus may discipline inmates who "refuse to complete basic personal housekeeping tasks or organize work stoppages," *Barrientos*, 951 F.3d at 1278 n.5, and impose discipline on inmates who *voluntarily* agree to work release but who violate ADOC regulations governing work release. Plaintiffs incorrectly equate punishment for violating disciplinary rules voluntarily assumed when agreeing to work release with "involuntary servitude," citing *United States v. Reynolds*, 235 U.S. 133 (1914). Doc. 178 at 60. But the practice in *Reynolds* violated anti-peonage statutes enacted pursuant to the Thirteenth Amendment because the laborers could be incarcerated for failing to work for private employers who contractually assumed their debts. 235 U.S. at 144-46. The debtors in *Reynolds* were not in the state's custody but could be incarcerated for failing to perform contractual obligations to private citizens. *Id.* at 139-40.

In this case, by contrast, Plaintiffs are *in ADOC custody* serving prison sentences. Work release is voluntary, and Plaintiffs are free to quit work release at any time. While it is true they will return to prison if they quit work release, their incarceration is not *because* they refuse to work, but because they are serving prison sentences. It is pure fiction to equate incarcerating debtors for failing to work in *Reynolds* with returning inmates serving a sentence to prison when they no longer want work release. Work release is a privilege offered to inmates otherwise required to serve a prison sentence. What Plaintiffs really want is the privilege of work release without the ability of ADOC to discipline them for violating rules. But there is no authority in the TVPA for such a remedy, and Plaintiffs cite no authority that states ADOC's discipline of inmates working

outside the walls of its prisons constitutes illegal coercion under the TVPA when the inmates voluntarily agree to work release.

**Requiring inmates to work without compensation, paying less than the minimum wage, or deducting portions of wages earned on work release.** Plaintiffs next argue that requiring inmates to work without pay, or for less than minimum wage, constitutes "serious financial coercion which is cognizable under the TVPA." Doc. 178 at 57. But *Barrientos* makes clear that requiring inmates to perform tasks at the facility without compensation does not violate the TVPA. *See* 951 F.3d at 1277-78; *id.* at 1278 n.5. It is also well established that "inmates of state prisons who work for industries operated as state instrumentalities are not covered by the Fair Labor Standards Act and are not entitled to receive federal minimum wage for their labor." *Gambetta v. Prison Rehab. Indus. & Diversified Enters., Inc.*, 112 F.3d 1119, 1125 (11th Cir. 1997). More fundamentally, *prison inmates have no common law property rights*. *See Givens v. Ala. Dept. of Corrs.*, 381 F.3d 1064, 1068-69 (11th Cir. 2004). In Alabama, prison inmates have property rights only if they are created "by enacting a statute, adopting a regulation or implementing a policy." *Id.* at 1069.

Despite the State Defendants citing these cases (doc. 148 at 72-73), Plaintiffs ignore them and repeat their allegations of "financial coercion" by complaining (1) ADOC pays only 25 cents an hour for workers in the ACI Program; (2) inmates on public works projects receive only $2 per day; and (3) inmates on work release who receive prevailing wages must pay 40% to ADOC and pay for transportation and other costs (doc. 178 at 57-58). Since inmates have only those property rights created by state law, inmates who receive 25 cents per hour for ACI Work or $2 per day for public works labor receive the rates set by Alabama law and so everything to which they are legally entitled. Inmates who receive all property to which they are legally entitled cannot be subject to

"financial coercion" under the TVPA as a matter of law. Inmates who feel they are underpaid need not work for ACI or on public works projects.

This leaves the 40% deduction from the wages of inmates on work release plus charges of $5 per day for van rides to work and $15 per month for laundering work clothes. Despite the State Defendants noting these deductions are *statutorily authorized*, (doc. 148 at 32-33), Plaintiffs again ignore this and cite these deductions as examples of financial coercion. Doc. 148 at 32-33. Alabama Code § 14-8-6 authorizes ADOC to withhold no more than 40% of the wages for an inmate on work release for "the cost incident to the inmate's confinement." The Supreme Court of Alabama has held that this statute also allows ADOC to withhold costs for transporting inmates to work release "and other fees stemming from the inmate's participation in the department's optional work-release program." *Thomas v. Merritt*, 167 So. 3d 283, 293 (Ala. 2013). So the withholdings Plaintiffs decry are legally authorized under Alabama law. If Plaintiffs feel these amounts are excessive, they need not participate in work release.

Since Plaintiffs receive all payment for labor to which they are legally entitled, they fail to allege financial coercion under the TVPA.

**Incarcerating inmates in prisons where the levels of violence allegedly "coerce" them into accepting work release positions.** Finally, Plaintiffs argue they are "coerced" to accept work release because of the threat of physical harm presented by incarceration in prison. Doc. 178 at 60-63. But Plaintiffs do not allege any facts that suggest the State Defendants created violent conditions in Alabama's prisons for the purpose of obtaining labor. Nor do Plaintiffs dispute that participation in work release outside the walls of the prisons is voluntary as a matter of Alabama law and ADOC policy. The TVPA prohibits "*knowingly . . . obtaining* the labor or services of a person" through one of four coercive means. 18 U.S.C. § 1589(a) (emphasis added). Nothing in

Plaintiffs' complaint or response suggests the State Defendants knowingly obtained coerced labor when participation in work release is objectively voluntary.

Plaintiffs' real claim is that their *circumstances* force them to accept work release outside the walls. But the TVPA does not extend to subjective feelings of coercion based on broader circumstances. The Supreme Court has rejected an attempt to expand a similar statute—one prohibiting "involuntary servitude"—along the lines Plaintiffs argue here. *See Kozminski*, 478 U.S. at 949-52. The Court rejected a "broad construction of 'involuntary servitude,' which would prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice." *Id.* at 949. Since this "would include compulsion through psychological coercion as well as almost any other type of speech or conduct intentionally employed to persuade a reluctant person to work," it "would appear to criminalize a broad range of day-to-day activity." *Id.* For instance, it could include a parent coercing an adult child to work in a family business on threat of withdrawing affection or a charismatic leader coercing others to work without pay. *Id.*

For the same reason as in *Kozminski*, Plaintiffs' theory of coercion "would depend entirely upon the victim's state of mind" and improperly expand the plain language of the coercive acts enumerated in the TVPA. *Id*. *Kozminski*'s limiting construction of "involuntary servitude" to "the use or threat of physical restraint or physical injury" or "the use or threat of coercion through law or the legal process" is already that of the plain language of the TVPA. It should not be expanded to include Plaintiffs' subjective theory of coercion that depends on the victim's state of mind. Plaintiffs' theory of "coercion" would lead to the absurd situation where one inmate from a facility could freely accept work release while another from the same facility could not based on how they viewed objectively the same situation. This would put the State Defendants in the impossible

position of trying to determine which inmates from the same facility could accept work release without being "coerced." Plaintiffs cite no authority for this interpretation of the TVPA, and therefore the claim for coercion based on mere presence in Alabama's prisons fails as a matter of law.

Finally, it is worth reiterating the novelty of Plaintiffs' TVPA claim. Plaintiffs are post-conviction inmates serving prison sentences, a situation that necessarily authorizes the state to impose a variety of forms of physical coercion. The legality of inmate labor is not seriously in dispute. *See Reynolds*, 235 U.S. at 149 ("There can be no doubt that the state has authority to impose involuntary servitude as a punishment for a crime."). Yet Plaintiffs argue it violates the TVPA to be granted the *privilege* of working outside prison walls *for pay* because their circumstances are coercive. Not only does this violate the rule of statutory interpretation that Congress is aware of existing law when it enacted the TVPA, it also violates the rule of lenity. The rule of lenity applies to the TVPA because it has both criminal and noncriminal applications. *See Romero v. Sec'y, U.S. Dep't of Homeland Sec'y*, 20 F.4th 1374, 1383 (11th Cir. 2021). The rule of lenity requires a court to apply the least harsh interpretation of a punitive statute. *Id.* Accordingly, the Court should conclude Plaintiffs fail to state a TVPA claim against the State Defendants because it applies the TVPA in a novel way that makes use of inmate labor a per se violation.

### 3. The State Defendants are entitled to immunity from Plaintiffs' individual-capacity claims for damages under the TVPA.

The State Defendants against whom Plaintiffs assert individual-capacity damages claims under the TVPA (Ivey, Marshall, Hamm, Gwathney, and Cooper) are entitled to various forms of immunity from suit. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Marshall has asserted absolute prosecutorial immunity, and Gwathney has asserted absolute judicial immunity. Doc. 148

at 61-63. Ivey, Marshall, Hamm, Gwathney, and Cooper have all asserted qualified immunity. *Id.* at 63-75. Plaintiffs fail to overcome these assertions of immunity.

**Marshall's absolute prosecutorial immunity.** Plaintiffs ignore (doc. 178 at 81-82) Marshall's citation (doc. 148 at 62) to *Allen v. Thompson*, 815 F.2d 1433 (11th Cir. 1987), which held that a prosecutor's provision of information to or advocacy before a parole board is a prosecutorial function entitled to absolute immunity. *See Allen*, 815 F.2d at 1434. Marshall's prosecutorial immunity extends to any alleged supervision of employees related to advocacy before the Board. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 344-45 (2009); *see also Hoffman v. Office of State Attorney, Fourth Judicial Circuit,* 793 F. App'x 945, 954 (11th Cir. 2019) ("In *Van de Kamp v. Goldstein*, the Court explained that, where a prosecutor is entitled to absolute immunity for certain conduct, a supervisory prosecutor should likewise be entitled to absolute immunity for supervision or training of that same conduct.").

Although Plaintiffs ignore *Allen*, they tacitly concede its applicability by arguing prosecutorial immunity does not extend to Marshall's "informal pressure on Board members in closed door meetings and his statements to the press regarding his view that there was no one left to parole." Doc. 178 at 81. But even assuming prosecutorial immunity does not apply to these alleged actions, qualified immunity does apply as will be argued below. Plaintiffs do not meaningfully dispute that prosecutorial immunity carves out nearly all of their claims against Marshall, which are based on his alleged objections to parole for violent offenders and alleged advocacy for disregarding risk assessments in parole decisions. *See* Doc. 178 at 81 (citing doc. 1 ¶¶ 91-93, 98-99, 126-32).

**Gwathney's absolute quasi-judicial immunity.** Plaintiffs do not dispute Gwathney's argument (doc. 148 at 62-63) that she is entitled to absolute quasi-judicial immunity for making

parole decisions but instead argue (1) it applies only "to decision-making in individual parole cases"; and (2) it does not apply to Gwathney's parole decisions made "in the service of increasing the number of people who could be exploited as part of the trafficking enterprise." Doc. 178 at 82. That is, Plaintiffs argue quasi-judicial immunity applies only to individual decisions, not general policies about how to make those decisions, and that quasi-judicial immunity depends on the official's *motives*.

The same two arguments against judicial immunity were rejected at the pleading stage in *McCullough v. Finley*, 907 F.3d 1324, 1330-32 (11th Cir. 2018). The plaintiffs in *McCullough* alleged that Montgomery's municipal judge violated the TVPA and federal anti-peonage statutes by imposing fines and incarcerating them for failing to pay fines. 907 F.3d at 1329. The plaintiffs alleged that because they were required to work while in city jail their labor was "forced" and the judges "administered and benefitted from their forced labor." *Id.* The district court held the judges were not entitled to judicial immunity because they were motivated by a desire to raise municipal revenue, but the Court reversed. *Id.* at 1331. Since "[a] judge's motivation is irrelevant to determining whether his act was judicial," "even if the judges were motivated to generate municipal revenue," their acts were still judicial in nature and entitled to absolute immunity. *Id.* Thus, even assuming Plaintiffs allege Gwathney's parole decisions are motivated by a desire to increase the inmate labor pool, this is irrelevant, and her parole decisions are protected by absolute quasi-judicial immunity. *Id.*

*McCullough* also rejected Plaintiffs' argument that judicial immunity applies only to individual cases but not to Gwathney "impos[ing] stringent criteria for parole decisions and set-off dates." Doc. 178 at 82. Gwathney applies these allegedly "stringent criteria" only in the context of making individual parole decisions. The Court in *McCullough* rejected the district court's

argument that "the jailees 'do not challenge any individual rulings of Presiding Judge Hayes' as an 'important nuance'" because "the judges ordered each jailee to sit-out his or her fines *during a pending case.*" *Id.* at 1332 (emphasis added). Plaintiffs are upset with Gwathney because her alleged parole decision-making *process* resulted in the denial of parole *in their individual cases*. Doc. 1 ¶¶ 146-54. Their claims against Gwathney under the TVPA are based on her parole decisions, and she is entitled to judicial immunity from suit regardless of her alleged motives. *See McCullough*, 907 F.3d at 1330-32.

**Qualified immunity.** Plaintiffs begin their discussion of qualified immunity with the extraordinary statement that because the "[TVPA] itself does not mention qualified immunity," this is "dispositive" and proves there is no basis "to read qualified immunity into the TVPA." Doc. 178 at 78. This is the opposite of the law:

> The Supreme Court has placed few restrictions on the availability of the qualified immunity defense. Of course, Congress creates and controls statutory causes of action and has the power to abrogate defenses, including the common law defense of qualified immunity, if it wishes to do so. But the Supreme Court has said that the defense of qualified immunity is so well established, that if Congress wishes to abrogate it, Congress should specifically say so.

*Tapley v. Collins*, 211 F.3d 1210, 1214 (11th Cir. 2000) (internal citations and quotations omitted) (emphasis added). Contrary to Plaintiffs' argument, since the TVPA does not expressly abrogate qualified immunity, then qualified immunity applies to claims under the TVPA. *Id.*

Plaintiffs follow this misstatement of the law with the even bolder claim that the State Defendants identified no precedent recognizing qualified immunity from TVPA claims, despite their extensive reliance on *McCullough*. Doc. 178 at 79. Plaintiffs argue *McCullough* determined only that the plaintiffs "had not stated a plausible claim at all" and did not "seriously consider" whether qualified immunity applies to TVPA claims. *Id.* But the sole issue on appeal for the mayor

and police chief was the denial of qualified immunity from the plaintiffs' claims under 18 U.S.C. §§ 1589 and 1595 (the TVPA), *see* 907 F.3d at 1329, which the Court granted. *Id.* at 1335 ("[W]e **REVERSE** the denial of qualified and state-agent immunity to Mayor Strange, Chief Finley, and Chief Murphy."). While the Court held the plaintiffs failed to state a claim under the pleading standard of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), this is a requirement of overcoming qualified immunity. *See Iqbal*, 556 U.S. at 673 ("[W]hether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded" and so factual pleadings are "inextricably intertwined with" and "directly implicated by" the "qualified-immunity defense." (internal quotation and citation omitted)). *McCullough* establishes that qualified immunity applies to TVPA claims, and if it did not "seriously consider" the issue it is only because this common law immunity is assumed to apply unless Congress specifically abrogates it.

Plaintiffs do not dispute that Ivey, Marshall, Hamm, Gwathney, or Cooper were engaged in discretionary functions, and therefore "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). In order to carry this burden, Plaintiffs must show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). In conducting this analysis, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

Plaintiffs argue the qualified immunity defense "should be rejected, at a minimum, as to Hamm, Ivey, and Cooper." Doc. 178 at 80. But Marshall and Gwathney also moved to dismiss based on qualified immunity as an alternative to prosecutorial and quasi-judicial immunity. *See*

doc. 148 at 67-70. Plaintiffs fail to dispute Marshall and Gwathney's assertion of qualified immunity. *See* doc. 178 at 80-81. They have failed to carry their burden of showing Marshall and Gwathney are not entitled to qualified immunity, and therefore the individual capacity claims against these defendants should be dismissed.

 **Prong one: Plaintiffs fail to allege a violation of the TVPA by Hamm, Ivey, or Cooper.** As the State Defendants have already argued above in Section E.2., Plaintiffs fail to state a claim for a violation of the TVPA. For these reasons, Plaintiffs fail to carry their burden under the first prong of qualified immunity.

 **Prong two: Plaintiffs fail to allege a violation of clearly established law.** Not only must Plaintiffs allege a violation of the TVPA, they must allege that Ivey, Hamm, and Cooper violated *clearly established law*. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). While courts "do not require a case directly on point," "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* (emphasis added).

 A plaintiff can show that a right is clearly established in three ways. *See Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013). First, a plaintiff can "produce a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state." *Id.* (citation omitted). Second, a plaintiff can "point to a broader, clearly established principle [that] should control the novel facts" of the situation. *Id.* (citation and internal quotation marks omitted). And third, a plaintiff can show that the case is one of "obvious clarity" in that the federal constitutional provision is "specific enough to establish clearly the law applicable to particular

conduct and circumstances . . . even in the *total absence of case law*." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002).

Plaintiffs do not even attempt to carry their burden under the first method. As argued above, Plaintiffs assert a novel TVPA claim that attempts to categorically prohibit the use of inmate labor for post-conviction inmates serving sentences in state prison. Plaintiffs cannot cite a "materially similar case" of binding precedent that would prevent (1) Hamm from requiring inmates to perform housekeeping tasks without compensation or voluntarily agreeing to work release for compensation; (2) Ivey from issuing an executive order revoking good time credits for inmates who refuse to work or encourage work stoppages or, at most, mere awareness of inmates working in the Governor's mansion; or (3) Cooper from using inmates for labor on public works projects pursuant to Alabama Code §§ 14-5-10 and 23-1-37. *See* doc. 178 at 80-81. In fact, materially similar cases demonstrate that the alleged actions of Hamm, Ivey, and Cooper do not violate the law at all. *See Barrientos*, 951 F.3d at 1277-78; *id.* at 1278 n.5; *Givens*, 381 F.3d at 1068-69; *Gambetta*, 112 F.3d at 1125; *McCullough*, 907 F.3d at 1332-35.

Instead, Plaintiffs attempt to assert a violation of clearly established law under the second and third methods, "generally known as 'obvious clarity' cases." *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017). "Cases do not often arise under the second and third methods." *Id.* Plaintiffs attempt to carry their burden of showing Ivey, Hamm, and Cooper violated the TVPA with "obvious clarity" by referring back to their discussion of the TVPA and stating the statute "by its own terms is also specific enough to establish clearly the law applicable to the conduct and circumstances of this case, even absent case law." Doc. 178 at 81.

But the mere text of the TVPA is exactly what *cannot* clearly establish law. The Supreme Court has repeatedly warned "not to define clearly established law at a high level of generality."

27

*al-Kidd*, 563 U.S. at 742. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.* But that is what Plaintiffs do here in a mere one paragraph with a general reference to the TVPA itself. Doc. 178 at 80-81. Plaintiffs cannot clearly establish law at such a high level of generality, since this "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

While Plaintiffs may feel their alleged TVPA violations are "obvious," when stripped of their legal conclusions, they are not. This is especially true since Plaintiffs must overcome the high bar for pleading supervisory liability against Ivey, Hamm, and Cooper. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*," but instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Fla. Dep't of Labor & Empl. Servs.*, 133 F.3d 797, 802 (11th Cir. 1998). Plaintiffs have failed to meet this rigorous standard, and accordingly the individual-capacity TVPA damages claims against Ivey, Marshall, Hamm, Gwathney, and Cooper should be dismissed on the basis of qualified immunity.

**F.   Plaintiffs' RICO Claim Should Be Dismissed Because They Fail to State a Violation of the TVPA as a Predicate Act and Because There is No Private Right of Action for Injunctive Relief under RICO; The State Defendants Are Immune from Individual-Capacity Damages Claims Under RICO for the Same Reasons as to the TVPA.**

Plaintiffs confirm in their opposition that the TVPA violations alleged in Count I are the sole predicate acts for their claims in Count II under the Racketeer Influenced and Corrupt Organizations Act (RICO). Doc. 178 at 95. *See also Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1215

(11th Cir. 2020) (stating pleading requirement for RICO of alleging at least two acts of racketeering). Since Plaintiffs fail to state a claim under the TVPA against the State Defendants as argued in the previous section, Plaintiffs' RICO claim in Count II necessarily fails. *See Fletcher*, 2023 WL 6307494, at *3 ("Because the amended complaint did not state a claim for relief under the TVPA, the magistrate judge determined that the RICO claims, which were predicated on violations of §§ 1584 or 1589, must also fail."). Although the Court need not reach the issues if it finds that Count I fails, the State Defendants make two additional replies to Plaintiffs' RICO argument.

First, Plaintiffs' RICO claim for injunctive relief against the State Defendants fails because there is no private right of action for injunctive relief under that statute. *See* Doc. 148 at 76 (citing *Hengle v. Treppa*, 19 F.4th 324, 356 (4th Cir. 2021); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1089 (9th Cir. 1986)). Plaintiffs argue that "courts in this Circuit" have concluded RICO contains a private right of action for injunctive relief, but they cite an unpublished district court case that notes there is a circuit split on the issue. Doc. 178 at 106 (citing *Absolute Activist Value Master Fund Ltd. v. Devine*, 2016 WL 1572388, at *4 (M.D. Fla. Apr. 19, 2016)). Since the issue is undecided in this Circuit, the Court should follow the reasoning of *Hengle* consistently with why the TVPA contains no private right of action for injunctive relief. That is, because RICO creates a private right of action for money damages and a separate provision authorizing the U.S. Attorney General to seek injunctive relief, the principle of *expressio unius* implies "Congress expressed its intent to withhold from private plaintiffs the ability to invoke the injunctive power granted to the courts." *Hengle*, 19 F.4th at 354.

Second, Plaintiffs' argument that the common law immunities of prosecutorial, judicial, and qualified immunity do not apply to RICO fail for the same reason as to the TVPA. Plaintiffs'

argument that because qualified immunity is not mentioned in the RICO statute, it does not apply is contrary to law. *See Tapley*, 211 F.3d at 1214 ("[T]he defense of qualified immunity is so well established, that if Congress wishes to abrogate it, Congress should specifically say so."); *see also Auburn Med. Ctr., Inc. v. Peters*, 953 F. Supp. 1518, 1522-24 (M.D. Ala. 1996) (applying qualified immunity to RICO claim). Therefore, Ivey, Marshall, Gwathney, Hamm, and Cooper are immune from Plaintiffs' RICO damages claims based on prosecutorial, quasi-judicial, and qualified immunity.

**G.   Count IV Is Due to Be Dismissed Because Count IV Plaintiffs Lack Standing to Seek Injunctive Relief, and Defendants Ivey and Hamm Are Entitled to Qualified Immunity.**

**a.   Plaintiffs lack standing to seek injunctive relief against Ivey and Hamm because they fail to allege a substantial risk of future injury.**

In Defendants' Motion to Dismiss, Ivey and Hamm argued that Count IV must be dismissed for multiple reasons. Doc. 148 at 81-86. Since Plaintiffs have stated they do not seek damages from Ivey and Hamm in their official capacities, a reply is necessary only to their official-capacity claims for injunctive relief. Ivey and Hamm argued Plaintiffs lack standing to seek injunctive relief on their First Amendment retaliation claim because they referenced only past conduct and failed to allege "a substantial likelihood that the plaintiff will suffer future injury." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). As the party invoking federal court jurisdiction, "at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up).

Plaintiffs have failed to carry their burden of alleging facts establishing a substantial likelihood of future harm. No Plaintiffs allege facts demonstrating that they will refuse to work or organize work stoppages in the future, thereby potentially subjecting them to discipline by ADOC.

*See* Doc. 1 ¶¶ 145-54 (containing allegations specific to individual Plaintiffs). The most Plaintiffs can muster is a citation to a pamphlet from Council's Free Alabama Movement ("FAM") that states "one core strategy" is "the Non-Violent and Peaceful Protest strategy of 'shutdowns'/work stoppages." Doc. 178 at 197 (citing Doc. 1 ¶ 61). This alleges only that Plaintiff Council is a member of an organization that advocates these things and does not "clearly . . . allege facts demonstrating" the likelihood that he will personally refuse to work or organize work stoppages in the future. *Spokeo*, 578 U.S. at 338. Allegations of past conduct and conclusory statements unentitled to the presumption of truth are insufficient to confer standing. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *Spokeo*, 578 U.S. at 338. Since there are no concrete facts indicating that Plaintiffs intend to refuse to work or orchestrate work stoppages in the future, which would subject them to the alleged retaliation, Plaintiffs lack standing to seek injunctive relief on Count IV.

### b.  Plaintiffs fail to state a First Amendment retaliation claim in Count IV.

Even assuming Plaintiffs had standing to seek injunctive relief against Ivey and Hamm, they fail to state a First Amendment retaliation claim. "On a motion to dismiss, the question is whether plaintiffs have plausibly alleged their conduct is protected by the First Amendment." Doc. 178 at 189. While this argument correctly frames the issue, Plaintiffs have failed to allege that their conduct is constitutionally protected. Plaintiffs are not engaged in "protected speech" when they violate legitimate prison regulations, specifically AR 403 No. 924 and No. 518, which prohibit encouragement to not work and refusals to work. *See* Doc. 148-6 at 19-20. Multiple cases make clear that preventing work stoppages is legitimate. *See Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 132 (1977); *see also Pilgrim v. Luther*, 571 F.3d 201, 205 (2nd Cir. 2009) (citing *Jones*, 433 U.S. at 132). Plaintiffs only counter to the regulations' legitimacy is that these two cited cases assume the availability of a grievance process. Doc. 178 at 191. But Plaintiffs cite only to a

*footnote* in *Jones* and ignore its substantive holding that inmates have no First Amendment right to collectively organize to assert labor rights. 433 U.S. at 129-33. In addition, Defendants have already detailed the availability of a grievance process to inmates within ADOC. Doc. 148 at 44. Thus, on Plaintiffs' own terms, both *Jones* and *Pilgrim* apply to the facts alleged in the complaint. Since regulations penalizing work stoppages are clearly legitimate, Plaintiffs cannot state a First Amendment retaliation claim.

Even if this Court were to engage in the four-factor analysis of *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), the factors would clearly weigh in Defendants' favor. First, there is a clear connection between the regulations and a legitimate interest in security and safety within ADOC. *See, e.g.*, *Jones*, 433 U.S. at 127 (crediting prison secretary's statement that "[w]ork stoppages and mutinies are easily foreseeable" consequences of inmate labor organization). Second, alternative means of exercising speech rights abound for Plaintiffs, including: writing the warden, writing a person outside ADOC, filing a grievance, and filing a lawsuit either in state or federal court. Third, any accommodation to work stoppages would be a detriment to ADOC resources, as correctional officers will be forced to monitor the strikes instead of having the work-release program function smoothly. Fourth and lastly, both AR 403 No. 924 and No. 518 are appropriately punished the same as numerous other medium and high-level violations; they are not given any unique treatment or punishment. Even under *Turner*, Plaintiff has not alleged constitutionally protected activity giving rise to a plausible retaliation claim. Accordingly, Count IV must be dismissed.

### c.  Plaintiffs failed to establish supervisory liability in Count IV.

"[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Plaintiffs argue that the complaint sufficiently

established a causal connection between the actions of the subordinates and Ivey and Hamm. Doc. 178 at 194. Specifically, Plaintiffs say they have shown: 1) a history of widespread abuse that put Ivey and Hamm on notice of the need to correct the alleged deprivation, 2) Ivey's and Hamm's custom or policies resulted in deliberate indifference to Plaintiffs' rights, and 3) that Ivey and Hamm directed subordinates to act unlawfully and/or knew the subordinates would and failed to stop them. *Id.* But the standard for supervisory liability is "extremely rigorous." *Braddy*, 133 F.3d at 802. Plaintiffs cannot meet this rigorous standard for supervisory liability because they have alleged no history of widespread abuse and because the conduct of Ivey and Hamm was constitutional.

First, Plaintiffs have failed to allege a history of widespread abuse that would have placed Ivey and Hamm on notice. Plaintiffs point to various facts alleged that are irrelevant to the widespread abuse analysis, including that "thousands of people in Alabama prisons are compelled to work for the state under this policy." Doc. 178 at 195. Instead, Plaintiffs must show incidents of retaliation that are "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The only facts cited to regarding retaliation are paragraphs 50 and 60-71 of the complaint, but most of these facts deal with the advocacy efforts of FAM. Furthermore, the few instances of conduct alleged to have been taken in retaliation were related solely to Plaintiff Council. Doc. 1 ¶¶ 67-69. Simply put, neither Plaintiffs' complaint nor their Opposition have provided facts that demonstrate "flagrant" and "rampant" retaliation such that Ivey and Hamm were placed on notice. *See McKinney v. Carter*, No. 1:20-cv-1536-ACA, 2021 WL 5920267, *4 (N.D. Ala. Dec. 15, 2021) (citing *Brown*, 906 F.2d at 671) (stating even "several instances of unlawful behavior" is not enough to establish supervisory liability.).

Second, regulations preventing the use or encouragement of work stoppages are constitutional, so Ivey and Hamm cannot be held liable under supervisory liability. Plaintiffs state that Ivey's passage of Executive Order ("EO") 725, as well as Hamm's passage of regulations enforcing the EO, are sufficient to show a "custom or policy" creating a culture of deliberate indifference. Doc. 178 at 195. Plaintiffs further argue that these regulations show that Ivey and Hamm directed their subordinates to act unlawfully. *Id.* at 196. These arguments, however, assume that punishing work stoppages is unconstitutional. As stated in Defendants' Motion to Dismiss, regulations preventing work stoppages are routinely upheld as constitutional. Doc. 148 at 85. Because Ivey's and Hamm's conduct was constitutional, it is a far stretch to say that their actions resulted in deliberate indifference to unconstitutional conduct or that their actions directed their subordinates to commit unconstitutional acts. Thus, Plaintiffs have failed to allege any causal connection between the actions of Ivey and Hamm and any unconstitutional conduct of subordinates. Count IV must be dismissed for failure to establish supervisory liability.

### d. Ivey and Hamm are entitled to qualified immunity on Count IV.

Ivey and Hamm have established, and Plaintiffs appear to not dispute, that that they were acting within their discretionary authority regarding the alleged actions in the complaint. Thus, the burden fell on Plaintiffs to prove that "the official's conduct violated clearly established law." *Harbert Intern., Inc. v. James*, 157 F.3d 1271 at 1281 (11th Cir. 1998). Plaintiffs do not meet their burden in their perfunctory attempt to respond to Ivey and Hamm's assertion of qualified immunity. Doc. 178 at 196-97.

First, Ivey and Hamm are entitled to qualified immunity under the first prong because Plaintiffs fail to state a claim for First Amendment retaliation.

Second, Plaintiffs fail to allege a violation of clearly established law under any of the three methods. Plaintiffs fail to cite a "materially similar case" of binding precedent to show Ivey and

Hamm violated clearly established law. *See Morton*, 707 F.3d at 1282. Plaintiffs cite a case stating that an inmate *filing a grievance* is constitutionally protected and argue Plaintiffs were engaged "in substantially the same core conduct as grievance filing." Doc. 178 at 196. But the "materially similar case" of binding precedent, *Jones*, establishes that refusing to work and organizing work stoppages is not a protected activity under the First Amendment. *Jones*, 433 U.S. at 127-36. *Jones* establishes that punishing the alleged activities of Plaintiffs is nothing like retaliating against them for filing protected grievances. Plaintiffs make no attempt to clearly establish law under the second and third methods. *See Morton*, 707 F.3d at 1282; *Vinyard*, 311 F.3d at 1350. Therefore, Plaintiffs fail to carry their burden of overcoming Ivey and Hamm's assertion of qualified immunity.

For all of these reasons, Count IV should be dismissed.

**H.      Plaintiffs Fail to Plead A Plausible Ex Post Facto Claim.**

A complaint alleging an Ex Post Facto challenge in the context of parole must allege sufficient non-conclusory facts showing that a change in the law: 1) increases the statutory punishment for a crime, changed the criteria for determining the initial review date or eligibility criteria, or modified the basic structure of the parole decision; 2) applies retrospectively; and 3) for the inmate challenging the law, when applied to his own sentence, it is more than speculative that the change will significantly increase his period of incarceration. *Garner v. Jones*, 529 U.S. 244, 250-56 (2000) (internal quotations and original citations omitted)). The inquiry becomes difficult where, as here, the Board is vested with discretion because "by its very definition, [discretion] is subject to change in the manner in which it is informed and exercised." *Id.* When a significant risk of increased punishment is not apparent from the text of the change, a plaintiff must show that the implementation of the change "will result in a longer period of incarceration" with "evidence drawn from the rule's practical implementation by the agency charged with exercising discretion". Doc. 181 at 23 (citing *Garner*, 529 U.S. at 255).

In their opposition, Plaintiffs assert both the facial and implementation challenges recognized by the Court. Docs. 178 at 121; 181 at 24. This Court previously ruled – on a far more developed record – that Plaintiffs were not likely to succeed on either theory. Doc. 181 at 31. Accordingly, for the reasons set forth in the Ex Post Facto Defendants' principal brief, the Court's preliminary injunction order, and the argument below, Plaintiffs' complaint does not state a plausible Ex Post Facto claim under either theory. Furthermore, Ivey, Marshall, and Gwathney are immune in their individual capacities from Plaintiffs' money damages Ex Post Facto claim.

### 1. Plaintiffs fail to state an Ex Post Facto claim on the merits.

The case at bar first presents the Court with the question of which laws to compare given that there are three relevant versions of the applicable parole statute. Doc. 181 at 20. As this Court has already found, because all the Ex Post Facto Plaintiffs committed their crimes before the effective date of S.B. 67, the proper statutory comparators are the 1951 and 2019 versions of Alabama Code § 15-22-26. *Id.* Thus, the complaint must show that either on its face the 2019 amendment to § 15-22-26 significantly increased the risk of Plaintiffs' own punishment, or that evidence from the Board's practical implementation of the 2019 amendments "*will* result in a longer period of incarceration." *Id.* (citing *Garner*, 529 U.S. at 255) (emphasis added). Failing that, Plaintiffs must show that the Ex Post Facto Defendants implemented changes in the 2019 amendments (as compared to the 1951 version of the statute) that "will" result in a longer period of incarceration for them specifically. *See Garner*, 529 U.S. at 255 ("In the case before us, respondent must show *that as applied to his own sentence* the law created a significant risk of increasing his punishment.") (emphasis added); *see also Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1109–10 (11th Cir. 2015) (requiring appellant to show that changes in Florida's parole laws violated the Ex Post Facto Clause *as applied to him*). The complaint fails to state a claim under either theory.

### a. Plaintiffs' facial challenge fails.

For the last seven decades, Alabama Code § 15-22-26 rested on two guiding principles: 1) an inmate cannot earn parole; and 2) inmates receive parole only at the Board's discretion. Doc. 148 at 88–91. Plaintiffs rest their facial challenge on the Alabama Legislature's inclusion of language requiring the Board to include, in the guidelines, it's "paramount duty" to public safety. Doc. 178 at 123-24. Plaintiffs' interpretation requires that the Court do what they have done: read the words "paramount duty" in utter isolation and completely ignore the rest of the statute – an approach foreclosed by Eleventh Circuit precedent and this Court's preliminary injunction Order. *Santos v. Healthcare Revenue Recovery Grp., LLC.*, 90 F.4th 1144, 1152 (11th Cir. 2024) ("'*[W]e look to the entire statutory context*' to 'ascertain the plain meaning of a statute.'") (emphasis added); Doc. 181 at 24 (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012)).

Read in the context of the *entirety* of the changes implemented in 2019, the Court has already rejected Plaintiffs' narrow focus on a single clause in a larger statute. Placing the two applicable versions of § 15-22-26 side-by-side, the Court found that these statutes "use slightly different words to say the same thing." Doc. 181 at 25. Rejecting Plaintiffs' contention that the "paramount duty" language improperly elevated public safety over fitness for parole, the Court concluded:

> *Both the probability of a prisoner not violating the law and the prisoner's release being compatible with the welfare of society are factors that relate to protecting public safety. Indeed, recidivism is a serious public safety concern. So the court finds that the Board was charged with making public safety considerations its number one concern under both the 1951 statute and 2019 amendments.*

Doc. 181 at 26 (emphasis added).

Moreover, as the Court correctly noted in its preliminary injunction order, when fully read in context the "paramount duty" phrase refers only to what the guidelines must recognize. Doc. 181 at 26. Further, the guidelines are a mere aid, and the ultimate parole decision is "at the complete discretion of the Board." *Id.* (quoting ALA. CODE § 15-22-26(c) (2019)). With no substantive alteration of parole eligibility criteria or limit to the Board's discretion, the 2019 amendments simply clarified the Board's exercise of administrative discretion – a change that does not violate the Ex Post Facto Clause. *Id.* (quoting *Paschal v. Wainwright*, 738 F.2d 1173, 1179 (11th Cir. 1984)).

Lastly with respect to the facial challenge, to constitute an Ex Post Facto violation, the new law must be more onerous than the law in effect when an inmate committed their crimes. *See Weaver v. Graham*, 450 U.S. 24, 30–31 (1981). The named Ex Post Facto Plaintiffs can never make such a showing because they committed their crimes under the 1951 version of the statute. Doc. 181 at 20. This Court's holding that the 1951 and 2019 versions "use slightly different words to say the same thing," applies with as much force now as it did at the preliminary injunction stage because the statutory text is the same. *Id.* at 25. Were the Court to compare the 2016 amendment instead of the 1951 version, "[e]ven if [S.B. 67] could have shortened [inmate Plaintiffs'] sentence[s], its [amendment] would not have increased the punishment for [their] crimes after their commission, because [S.B. 67] was not in effect when [they] committed [their] crimes." *Akins v. Perdue*, 204 F. App'x 839, 842 (11th Cir. 2006). Thus, Plaintiffs have not and cannot show a facial Ex Post Facto violation.

While the Court's findings and conclusions at the preliminary injunction stage are not dispositive here, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), Alabama Code § 15-22-26 has not changed since the Court issued its order, no discovery will change the text of § 15-22-

26, and Plaintiffs' opposition contains no new argument not addressed by the Court in its order. Thus, Plaintiffs have not and cannot give the Court a principled reason to reach a different conclusion in response to the Ex Post Facto Defendants' motions to dismiss. The Court should therefore find – again – that Plaintiffs' facial Ex Post Facto challenge fails.

### b. Plaintiffs' as-applied challenge fails.

As with their facial challenge, Plaintiffs' complaint fails to state a plausible "as applied" Ex Post Facto claim. At the threshold, the Ex Post Facto Defendants note Plaintiffs' concession that their as-applied challenge does not rely upon either the creation of or modification of the Board's parole guidelines. Doc. 178 at 127 ("Plaintiffs are not contending that the Legislature's requirement in the JRA to create Parole Guidelines, or the Parole Board's issuance of these Guidelines – whether in 2016 or 2020 – was an Ex Post Facto violation as such."). They specifically state that "the Complaint does not allege that the 2020 Parole Guidelines themselves were the material change to the substantive policies governing parole decisions." *Id.* Accordingly, this portion of Ex Post Facto Defendants' brief will focus on what Plaintiffs claim supports their as-applied challenge: when implementing the 2019 amendments, the Board (at the urging of the Ivey and Marshall) "abandon[ed] the structured, evidence-based decision-making framework in place after the enactment of the JRA [which] all but eliminated the possibility of parole for [violent offenders]." Doc. 178 at 124.

In analyzing Plaintiffs' as-applied challenge, it is important to address Plaintiffs conflation of the showing they must make. In the opposition, Plaintiffs state:

> Applying the Supreme Court's instructions to review the "actual practices" and policies of a parole board in determining whether there is "a significant risk of increased punishment," *Garner*, 529 U.S. at 256, Plaintiffs have clearly alleged adequate facts demonstrating that the Ex Post Facto Defendants' implementation of the 2019 Parole Amendments has resulted in a substantially increased risk of prolonging the incarceration of the currently

> *incarcerated Plaintiffs denied parole. Specifically, Plaintiffs allege that the Ex Post Facto Defendants, seizing on the command to hold "public safety" as the Board's "paramount duty," dramatically reduced access to parole, including by abandoning the structured, evidence-based decision-making framework in place after the enactment of the JRA, and all but eliminated the possibility of parole for parole candidates convicted of offenses deemed "violent" under Alabama law. See Compl. ¶¶ 98, 100, 102.*

Doc. 178 at 124 (emphasis added). As the Court previously found, however, to prevail here the complaint must contain sufficient non-conclusory factual averments that show that the Board's implementation of the 2019 amendments *will* result in longer periods of incarceration for them. Doc. 181 at 24 (citing *Garner*, 529 U.S. at 255). The complaint's factual averments must make a plausible claim that the Board's implementation of the 2019 amendments "*will*" – not might, may, or could – result in a longer period of incarceration for the Plaintiffs. *Id.* Plaintiffs have already failed to convince the Court with a more detailed evidentiary record. Doc. 181 at 31. And while Plaintiffs' burden is lower here – plausible versus a substantial likelihood to succeed on the merits – with far less evidentiary support before it,[8] the Court should not reach a different conclusion than it already has.

Plaintiffs' opposition arguments are no different than those raised in their preliminary injunction motion. Plaintiffs claim they have met their burden by alleging drops in parole rates and statements made by Ivey and Gwathney. Doc. 178 at 121-25; Doc. 181 at 27. The Court quickly disposed of each of these arguments with three conclusions: 1) Plaintiffs' statistical evidence focused on the wrong time frame and, in any event, was of doubtful use under Eleventh Circuit precedent; 2) Plaintiffs' cited statistics supported something other than a conclusion that the 2019 amendments caused a drop in parole grant rates; and 3) Plaintiffs failed to show that Ivey and

---

[8] *Compare* Doc. 1 *with* Docs. 23-26, 55, 57, 91.

Gwathney's statements placing public safety over fitness for parole was a departure from parole decision making at the time Plaintiffs committed their crimes. Doc. 181 at 30-31.

Turning to the Court's first and second conclusions, the bare bones and conclusory averments of the complaint provide even more reasons for the Court to reject the as-applied Ex Post Facto theory. To begin, considering the two versions of the statute that must be compared (1951 and 2019), the averments in the complaint are self-defeating and warrant a finding that there was no "implementation" caused by the 2019 amendments at all – let alone one that led to a decrease in grant rates. As alleged in the complaint, prior to S.B. 67, the Board did not use an objective structured parole decision process that included evidence-based guidelines, risk assessments, and a focus on what inmates could control. Doc. 1 at ¶¶ 80-84. Plaintiffs complain that the Board returned to this practice with the 2019 revisions. *Id.* at ¶¶ 98, 100-102, 104, 106-108. So, in essence, there was no implementation of the 2019 amendments because the Board kept right on doing in 2019 what it had been doing since 1951. ALA. CODE § 15-22-26(c) (1951) (2019); Doc. 1 at ¶¶ 98, 100-102, 104, 106-108.

Furthermore, assuming *arguendo* that the Board actually implemented a "return" from something else as a result of the passage of the 2019 amendments,[9] it came back to the same parole decision-making process that existed at the time each Ex Post Facto Plaintiff committed their crimes. As alleged by Plaintiffs, both the 1951 and 2019 versions of § 15-22-26 permitted the Board to emphasize public safety over fitness for parole, place factors inmates could not control such as the severity of the serving crime over factors inmates could control like participating in

---

[9] As noted in their principal brief, the State Defendants do not concede that the 2016 amendment was a departure from the 1951 statute in any material way given that the guidelines were relegated to a mere aid that the Board could follow or ignore at will and the codification of what had long been recognized in case law as the Board's "complete discretion" over parole decisions. Doc. 148 at 88–95.

programming, ignore risk assessments, and ignore promulgated guidelines. *Id.*; *see also* Doc. 181 at 26. Thus the "implementation" was to resume doing what the Board was doing when Plaintiffs committed their crimes. However, when the text of the two statutes is added to the mix, Plaintiffs' theory completely evaporates because the 2019 version of the statute contains the same 2016 mandate to create guidelines that Plaintiffs favor. Thus, not only do the allegations of the complaint fail to show that the Board's implementation of the 2019 amendments *will* make them serve a longer sentence, but the text gives Plaintiffs part of what they claim will shorten their sentences – guidelines. Ala. Code § 15-22-26(c) (1951) (2019); Doc. 1 at ¶¶ 98, 100-102, 104, 106-108.

Moreover, Plaintiffs' statistical averments regarding the drop in grant rates do not support an as-applied challenge. Initially, as the Court correctly points out, if one were to use the 2016 amendments as the baseline – which would be proper only if an inmate who committed his/her crime between the effective dates of the 2016 and 2019 amendments were added as a party Plaintiff – the complaint's evidence shows that the biggest decrease in grant rates occurred *before* the 2019 changes became effective. Doc. 181 at 28-29. As the Court rightly found, this utterly negates any claim that it was the Board's implementation of the 2019 amendment that caused the decline in grant rates. *Id.* at 30; *see also* Doc. 1 at 44 n.60. To the contrary, the decline is far more attributable to the Jimmy Spencer murders or some other effect. *Id.* With Plaintiffs' statistical evidence rendered a nullity, the complaint provides absolutely no other non-conclusory factual averments from a time before the Spencer murders that would support even the inference that the parole grant rate decline resulted from anything *other* than the Spencer murders. *See generally* Doc. 1.[10]

---

[10] Likewise, Plaintiffs' allegation that the 2016 amendments caused an increase in parole grant rates is questionable at best given that Plaintiffs' own statistics shows grant rates were rising *prior to the effective date* of the 2016 amendments. *See* Doc. 1 at 39 n.48 (showing a 29% grant rate for FY 2012 on page 20 of the JRA analysis), 42 n.58 (showing a 38% grant rate for FY 2015 on page 9 of the Board's Monthly Statistical Report for August 2023).

Additionally, Plaintiffs' reliance on *Fletcher v. Reilly*, 433 F.3d 867 (D.C. Cir. 2006) and *Michael v. Ghee*, 498 F.3d 372 (6th Cir. 2007) provide no support for their arguments. Doc. 178 at 120. Neither case is binding on this Court. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) ("the decisions of one circuit are not binding on other circuits."). This Court should decline to find *Fletcher* as persuasive authority because the D.C. Court applied the wrong analysis. *See Kyle v. Lindsay*, No. CIV.A.3:06-0948, 2008 WL 4571871, at *7 (M.D. Pa. Oct. 10, 2008) ("Significantly, nowhere in *Fletcher* did the D.C. Circuit discuss the guidelines *in effect when Fletcher committed the underlying offense of rape in 1980*.") (emphasis added). Further, even *Fletcher* acknowledges that if an inmate would have been denied parole under the prior and the current law, then there is no Ex Post Facto violation. *See Fletcher*, 433 F.3d 878 (there is no Ex Post Facto violation if the paroling authority's reasons for denying parole were proper under both the prior and current law); *see also Sellmon v. Reilly*, 561 F. Supp. 2d 46, 50 (D.D.C. 2008) (same), *aff'd sub nom. Phillips v. Fulwood*, 616 F.3d 577 (D.C. Cir. 2010) (citing *Fletcher* and finding no parole violation in departure from parole guidelines because earlier regulations also permitted the same departure). As alleged in the complaint, the Board's purported implementation of the 2019 amendments reflects nothing more than a return to the decision-making process in place at the time each Ex Post Facto Plaintiff committed their crime – a result that even the *Fletcher* Court held was no Ex Post Facto violation. *Id.*

Lastly with respect to statistical evidence, Eleventh Circuit precedent, as the Court noted, holds that it is of questionable utility in an as-applied challenge to a parole system that grants a board "virtually unfettered discretion" because such evidence shows nothing more than the board "*exercised* virtually *unfettered* discretion." Doc. 181 at 28 (quoting *Porter v. Roy*, 461 F.3d 1315, 1321 (11th Cir. 2006) and *Jones v. Ga. State Bd. of Pardons and Paroles*, 59 F.3d 1145, 1150 (11th

Cir. 1995) (emphasis in Court's original)). In the opposition, Plaintiffs attack *Porter* as "inapposite" because there was no "evidence at summary judgment comparing parole determinations before adoption of the alleged de facto policy" and relied only on an assertion that inmates served a lesser percentage of their sentences under prior law. Doc. 178 at 125. Plaintiffs' argument misses the explicit point of *Porter* and this Court's reliance on it in the preliminary injunction Order.

As the Court noted, the Eleventh Circuit's rejection of statistical evidence was not based upon a failure of proof from Plaintiffs, but on the fact that Georgia law provided its parole board with "virtually unfettered discretion". Doc. 181 at 28 (quoting *Porter*, 461 F. 3d at 1321).[11] Like the Georgia parole board, the Alabama Board of Pardons and Paroles has had unfettered "complete" discretion for over seventy years. ALA. CODE § 15-22-26(c) (1951), (2016), (2019); *Monroe v. Thigpen*, 932 F.2d 1437, 1441 (11th Cir. 1991); *Thompson v. Bd. of Pardons & Paroles*, 806 So. 2d 374, 375 (Ala. 2001). Therefore, it is not just that Plaintiffs have failed to allege the relevant statistical evidence in their complaint. *See generally* Doc. 1; *see also* Doc. 181 at 27-28 (finding that on the expanded preliminary injunction record only Plaintiff English provided data for the year in which he committed his crime). It is that they can *never* do so. No matter which versions of § 15-22-26 the Court ultimately settles on it is the Board's "virtually unfettered," total, and complete discretion that makes grant rate comparison data absolutely useless in an as-applied

---

[11] Nonetheless, the Court found that the one Ex Post Facto Plaintiff who did provide comparison data from the time he committed his crime, Plaintiff English, still did not show an Ex Post Facto violation even with a 30% reduction in grant rates. Doc. 181 at 28. There is no principled reason to reach a different conclusion for Rule 12(b)(6) purposes with respect to Plaintiff English. He cannot amend the complaint to allege statistical evidence that is any better than what was in the preliminary injunction record and thus, the facts will not get better for him on summary judgment. The same is true with any Plaintiff who cannot show, at minimum, a greater than 30% disparity in parole grant rates – to the extent such evidence is even relevant in light of *Porter*.

Ex Post Facto challenge. Doc. 181 at 28 (quoting *Porter v. Ray,* 461 F. 3d 1315 at 1321 (11th Cir. 2006).

Plaintiffs' statement evidence is also of no help to their as-applied challenge. None of the complaint's alleged statements by Ivey, Gwathney, or former Director Graddick plausibly show an implementation of the 2019 amendments – let alone one that would absolutely result in Ex Post Facto Plaintiffs spending more time in prison. The Court dealt with this argument in its preliminary injunction order noting "the Ex Post Facto Clause is concerned with the state of the law at the time Plaintiffs committed their offenses and whether a more stringent standard is being applied to keep them incarcerated." Doc. 181 at 30. Assuming the truth of what the complaint alleges Ivey, Gwathney, and former Director Graddick said, and even further assuming that Plaintiffs could find more statements in which Board members or others affirmatively rejected objective evidence-based parole decision-making, Plaintiffs would *still* not state a plausible claim because that is the same process the complaint says was in use at the time they committed their crimes. *Id.*; *see also*, Doc. 1 at ¶¶ 80-84, 98, 100-102, 104, 106-108.

### 2.     Ivey, Marshall, and Gwathney are entitled to immunity from individual-capacity damages claims.

**Gwathney is entitled to quasi-judicial immunity.** As they did in the TVPA claim, Plaintiffs assert that Gwathney is not entitled to quasi-judicial immunity because what she is accused of in the complaint for Ex Post Facto purposes is conduct that is administrative rather than adjudicatory. Doc. 178 at 130 (citing *Wilson v. Rackmill*, 878 F.2d 772 at 775 (3rd Cir. 1989) and *Lemley v. Bowers*, 813 F. Supp. 814 at 818-20 (1992)). Gwathney adopts and incorporates herein the arguments for quasi-judicial immunity contained in the TVPA argument above as to why she is entitled to quasi-judicial immunity. *See supra* § E.3. Gwathney's alleged "sweeping revision" to parole based on her "interpretation of the 2019 Parole Amendments" does not become

administrative rather than judicial because these alleged policy changes were all applied in the context of individual parole decisions. *See McCullough*, 907 F.3d at 1330-32. Accordingly, Plaintiffs' money damages claim against Gwathney is barred by absolute quasi-judicial immunity.

**Marshall is entitled to prosecutorial immunity.** As with their opposition to Marshall's prosecutorial immunity in the TVPA claim, Plaintiffs concede the applicability of *Allen* to Marshall's advocacy before the Board but argue it does not apply to Marshall's "public statements and legislative advocacy, as well as pressuring the Parole Board in a meeting with the Governor." Doc. 178 at 130. But prosecutorial immunity *does* bar the bulk of their claims against Marshall, which are premised mostly on his office's objection to the grant of parole on behalf of victims, particularly in the case of inmates serving sentences for crimes of violence. Marshall is entitled to qualified immunity for whatever conduct that is not prosecutorial in nature.

**Ivey, Marshall, and Gwathney are entitled to qualified immunity.** Plaintiffs do not dispute that their Ex Post Facto allegations against Ivey, Marshall, and Gwathney arise out of their performance of discretionary functions, and therefore the burden shifts to Plaintiffs to show qualified immunity does *not* apply. *See Holloman*, 370 F.3d at 1264. Plaintiffs attempt to carry their burden under the second method for clearly establishing law in a single sentence and argue the general statement of law in *Garner* clearly establishes these Defendants violated Plaintiffs' rights. Doc. 178 at 130. But Plaintiffs overlook that "[c]ases do not often arise under the second and third methods," *Gaines*, 781 F.3d at 1209, and again err by trying to clearly establish law "at a high level of generality." *al-Kidd*, 563 U.S. at 742. Plaintiffs make no attempt to clearly establish law under the first method, because materially similar binding precedent (*Paschal*, *Jones*, *Porter*) establishes Defendants' conduct did not violate Plaintiffs' rights. The Court has already concluded Plaintiffs are unlikely to succeed on their Ex Post Facto claim. Doc. 181 at 19-31. Therefore, they

necessarily fail to allege a violation of clearly established law, and Ivey, Marshall, and Gwathney are entitled to qualified immunity from the damages claim in Count V.

## I.    Plaintiffs Fail to Plausibly Allege an Equal Protection Claim Against the State Defendants.

Plaintiffs reassert that Ivey, Marshall, the Board, and Hamm (collectively "Equal Protection Defendants") implemented changes to parole decision-making that resulted in a system that frequently denied Black inmates more than White inmates. *See* Doc. 178 at 132; Doc. 1 at ¶¶ 240–56. Specifically, Plaintiffs claim that they plausibly allege an Equal Protection claim against Equal Protection Defendants because Black inmates were more likely to be denied parole and had longer waits for reconsideration than similarly-situated White inmates based on ADOC facility type, fiscal year of the parole decision, sex, and whether the ADOC reported that an inmate had an off-site job in the past year. *See* Doc. 178 at 132. Nonetheless, Plaintiffs fail to state a plausible Equal Protection claim.

At the preliminary injunction stage, the Court analyzed the Equal Protection Plaintiffs' claim under both the comparator and "convincing mosaic" analysis. Doc. 181 at 31-44. In their opposition, Plaintiffs likewise advance both frameworks and assert that they have stated a claim under each analysis. Doc. 178 at 131-151. However, as set forth in the State Defendants' principal brief, the Court's preliminary injunction order, and the arguments below, Plaintiffs are incorrect. Moreover, the State Defendants reassert their argument that the convincing mosaic analysis is inappropriate in the parole context.

### 1.    Plaintiffs fail the comparator test.

Inmates bringing an Equal Protection claim challenging the denial of parole must demonstrate that (1) they are similarly situated to other inmates who received more favorable treatment and (2) the decisionmaker engaged in invidious or purposeful discrimination against

them based on some constitutionally protected interest. *See* Doc. 181 at 32 (quoting *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001)). In the context of a parole decision-making regime that rests broad discretionary authority in a board, the comparator analysis satisfies the well-established constitutional principle that "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987). The complaint fails to plausibly meet the comparator or purposeful discrimination prongs.

a. **The complaint fails to state sufficient non-conclusory facts establishing that Equal Protection Plaintiffs are similarly situated to White inmates whom the Board paroled.**

The threshold inquiry for an Equal Protection claim is the rigorous comparison of a plaintiff and comparator(s) who are alleged to be similarly situated – prima facie identical in all relevant respects. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019); *Griffin Indus., Inc. v. Irvin*, 496 F.3d at 1189, 1207 (11th Cir. 2007).[12] In the parole context, many factors go into the decision, and an inmate must be similarly situated based on those factors. *Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988). Where, as here, inmates attempt to show a comparator using statistics, the statistics must provide exceptionally clear proof of differential treatment before a court will find an Equal Protection violation. *See* Doc. 181 at 33 (citing *Fuller*, 851 F.2d at 1310). Statistical evidence that is "ambiguous at best" is insufficient. *Id.*[13]

---

[12] To escape the heavy burden of a rigorous comparator analysis, Plaintiffs complain that the cases cited by Equal Protection Defendants are only "class of one" cases. *See* Doc. 178 at 133 n.74. However, Eleventh Circuit precedent holds that the analysis for "class of one" and "traditional" claims is identical. Doc. 148 at 108 n.26 (citing, *inter alia, Griffin*, 496 F.3d at 1204-05). Plaintiffs did not refute the cited precedent in their opposition. Doc. 178 at 133 n.74.

[13] Contrary to Plaintiffs' assertion, Doc. 178 at 136-37 n.75, the Eleventh Circuit never limited the aforementioned standard to just motions for summary judgment. *See*, 851 F.2d 1307 at 1310. Unlike the Eleventh Circuit and the district court in *Fuller*, this Court has *Fuller* to guide its

Initially, the Equal Protection Defendants must refute Plaintiffs' argument that *Lewis v. City of Union City, Georgia* ("*Lewis I*"), 918 F.3d 1213 (11th Cir. 2019) controls the application of the comparator analysis. Doc. 178 at 133 and n.74. The *Lewis I* Court explicitly rested its holding on the application of the comparator analysis in the context of the *McDonnell Douglas* framework for a claim brought under Title VII. *See Lewis I*, 918 F.3d at 1224 ("Having resolved that a comparator analysis must be conducted at the prima facie stage of the *McDonnell Douglas* framework . . .") (emphasis in original). Unlike the *Lewis I*, the instant suit challenges discretionary parole decisions made by government officials, and as such, the similarly situated analysis provided in *Fuller* and *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311 (11th Cir. 2006) governs.

Even if *Lewis I* applied, it supports the analysis provided by Equal Protection Defendants. *Lewis I* rejected two proposed similarly situated standards: a "not-useless" standard and a "nearly-identical" standard in favor of "similarly situated in all material respects." 918 F.3d at 1224–26. The *Lewis I* Court determined that to satisfy the comparator analysis "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)). Further, the *Lewis I* Court found that the "similarly situated" standard satisfied the prima facie requirement of "'eliminat[ing] the most common nondiscriminatory reasons' for [a challenged] action and thereby 'giv[ing] rise to an inference of unlawful discrimination[.]'" 918 F.3d at 1228 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)). Though Plaintiffs allege

---

application of the "exceptionally clear proof" standard. *Accord Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1111 (11th Cir. 2015) (in the context of an Ex Post Facto claim, the Eleventh Circuit recognized that while inmates in prior suits were allowed to proceed, the current suit did not need to proceed in part because the current court had the benefit of the prior suits to guide its decision). Further, the Eleventh Circuit has used the "exceptionally clear proof" standard at the motion to dismiss stage. *See Taylor v. Nix*, 240 F. App'x 830, 837–38 (11th Cir. 2007). Thus, the "exceptionally clear proof" standard applies.

that Equal Protection Defendants are invoking a "nearly-identical test," doc. 178 at 133 n.74, the law relied upon by the Equal Protection Defendants utilizes the same standard as *Lewis I*: comparators must be prima facie identical *in all relevant respects* – a distinction with no difference. *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 48 F.4th 1222, 1234 (11th Cir. 2022).

Even at the motion to dismiss stage, the Eleventh Circuit applies *Lewis I*'s "in all relevant respects" standard. Specifically, the *Chabad* Court held that dismissal of a plaintiff's Equal Protection claim is warranted when there is a critical distinction between the plaintiff and the identified similarly situated comparator. *See* 48 F.4th at 1234 (citing *Lewis I* and *Irvin* favorably). The complaint fails to identify a comparator because it does not identify the relevant comparison factors or allege facts related to the relevant factors.

The complaint fails to allege a sufficient comparator *ab initio* because it does not use the relevant points of comparison. To satisfy the similarly situated standard in the parole context, the factors to be compared must be relevant to an objectively reasonable governmental decisionmaker. *See Chabad Chayil, Inc.*, 48 F.4th at 1233–34. What constitutes relevant similarity rests on a case-by-case basis, and courts look to relevant law as guideposts. *See Lewis I*, 918 F.3d at 1227–28. Even at the motion to dismiss stage, the failure to allege facts eliminating critical distinctions between the plaintiff and a proposed comparator warrants dismissal. *See Chabad Chayil, Inc.*, 48 F.4th at 1234; *see also Lewis I*, 918 F.3d at 1230 (finding that plaintiff and their proposed comparators were not similarly situated because "[plaintiff's] broad-brush summary gloss[ed] over critical differences.").

Plaintiffs erroneously argue that Equal Protection Defendants are asserting that the Eleventh Circuit has wholly rejected the use of statistics in Equal Protection claims challenging

parole decisions. Doc. 178 at 136. But Equal Protection Defendants made no such assertion and only argued that the Eleventh Circuit rejected statistical analysis that did not provide for specific comparisons. Doc. 148 at 117. In any case, the Equal Protection Defendants argued that *Plaintiffs' statistics* were insufficient because they did not control for relevant factors in parole decision-making. *Id.* at 117–18.

Plaintiffs' statistics use only four points of comparison that are largely irrelevant to the Board's parole decision-making: (1) ADOC facility type, (2) fiscal year, (3) sex, and (4) whether the inmate had an off-site job. Doc. 1 at ¶ 108. Plaintiffs' reliance on the ADOC's assessment of inmates does not show that inmates in a work release facility type are similarly situated to each other. *See* Doc. 148 at 115–17.[14] This Court similarly agreed that inmates housed in the same facility do not necessarily indicate similarly situated inmates. Doc. 181 at 37–38. Accordingly, Plaintiffs' statistics gloss over critical distinctions between inmates which cannot as a matter of law satisfy the comparator analysis. *See Lewis I*, 918 F.3d at 1229–30.

Both Alabama and federal law provide relevant points of comparison. Under Alabama parole law, the Board considers six factors when making its parole decisions: (1) an inmate's risk if reoffending based upon a validated risk and needs assessment; (2) an inmate's progress on a plan for reentry; (3) stakeholder input; (4) an inmate's participation in risk-reduction programs (arguably the only factor Plaintiffs' controlled for with the off-site job data); (5) An inmate's

---

[14] Contrary to Plaintiffs, *see* Doc. 178 at 139 n.76, this Court may take judicial notice of Equal Protection Defendants' Exhibit 13. *See* Doc. 148-13. Equal Protection Defendants cited Exhibit 13 for the purposes of discussing inmate Plaintiffs' convictions and sentences. *See* Doc. 148 at 117. As a matter of law, this Court can take judicial notice of convictions because inmate Plaintiffs' convictions cannot be reasonably disputed and can be accurately and readily determined by sources whose accuracy cannot be reasonably questioned. *See* FED. R. EVID. 201(b); *see also United States v. Saylor*, 626 F. App'x 802 (11th Cir. 2015) (the district court did not err when it took judicial notice of a prior conviction). Therefore, this Court may consider Equal Protection Defendants' Exhibit without converting their Motion to Dismiss into a Motion for Summary Judgment.

institutional behavior while incarcerated; and (6) The severity of an inmate's underlying offense. *See* ALA. CODE § 15-22-26(a) (2019). These six factors provide the non-discriminatory reasons for denying parole, with Plaintiffs *possibly* controlling for only one of them: off-site job participation if such participation is considered program participation. *Id.*; Doc. 1 at ¶ 108.

Contrary to Plaintiffs' claim, the Equal Protection Defendants are not requesting a new test based solely on Alabama law. Doc. 178 at 138. If the Court were to use only Alabama law, it would do only what Plaintiffs invite it to do both in the complaint and in their opposition. Plaintiffs assert that the Board implemented *Alabama parole law* in an unequal way. *See* Doc. 178 at 132; Doc. 1 at ¶¶ 245, 253. To determine whether the Board was making its decisions under Alabama law in a racially discriminatory manner, it follows that it is Alabama law that must form the basis of the comparison. However, whether the Court decides to use state law (§ 15-22-26(a)), Eleventh Circuit precedent (*Fuller* or *Slakman v. Buckner* ("*Slakman I*"), 434 F. App'x 872, 876 (11th Cir. 2011)), other federal precedent,[15] or a combination of all of the above to determine which factors are relevant, it would employ an analysis based upon existing law. *See Chabad Chayil, Inc.*, 48 F.4th at 1233; *see also Lewis I*, 918 F.3d at 1227–28. No matter which of the three options the Court selects, the complaint's statistics fail to plausibly meet the Plaintiffs' comparator identification burden because their data controls for, at most, one element – off-site job participation.

For parole set-offs, the complaint does not provide any basis for comparison at all. Doc. 1 at 52-53; Doc. 181 at 37. Thus, Plaintiffs have not even attempted to identify *any* factor for the Court to compare the Board's decisions. *Id.* By failing to identify the relevant points of comparison for parole denial purposes, or any point of comparison at all for set-off dates, the complaint does

---

[15] Other federal factors include severity of the offense, rehabilitation, and community welfare. *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7–8 (1979).

not plausibly allege facts sufficient to identify a comparator. *See e.g.*, *Chabad Chayil, Inc*, 48 F.4th at 1234; *Lewis I*, 918 F.3d at 1228; *Thorne v. Chairperson Fla. Parole Comm'n*, 427 F. App'x 765, 771 (11th Cir. 2011). The Court's earlier conclusion that Plaintiffs' statistics did not control for any of the factors listed in *Fuller* and that Plaintiffs' controlled-for factors are too broad to determine whether there are no material differences between inmates, Doc. 181 at 37–38, warrants repeating here. With the complaint neither identifying and controlling for the proper points of comparison (or any points of comparison at all), the allegations in the complaint cannot satisfy the requisite comparator element.

Plaintiffs disingenuously contend that without inmate parole files, they cannot allege sufficient comparator guideline facts. Doc. 178 at 138. As the complaint shows, prior to filing suit, Plaintiffs obtained a great deal of information from the Board that they used to calculate grant rates and conduct a regression analysis.[16] The Board's reasons for granting or denying parole reflected on Board Action Sheet are public records exempt from the parole file privilege. ALA. CODE § 15-22-36(b) (2019). With parole grants in hand, Plaintiffs could have checked the serving offense and criminal history on all inmates granted parole on Alacourt. Also armed with the names of the inmates granted parole, Plaintiffs could have obtained from the ADOC inmate files information related to each paroled inmates social, educational, and employment history (i.e., risk of reoffending), disciplinary record (i.e., institutional behavior), and progress or completion of rehabilitation programs (i.e., participation in rehabilitation programs). Indeed, Plaintiffs' regression analysis, "controlling" as it does for facility type, demonstrates that Plaintiffs knew how

---

[16] Plaintiffs even submitted a second declaration from MK Analytics that both effectively proved there was no racial disparity in parole outcomes when controlled for crime of offense and length of time served and demonstrated their ability to obtain data related to crime of offense and length of time served without resort to the Board's protected parole files. Doc. 181 at 36-37 (citing Doc. 91-1).

to obtain ADOC data. Doc. 26-3. Failing that, Plaintiffs could have followed the shorter four-element comparison in *Slakman I*, 434 F. App'x at 876. Plaintiffs' failure to follow either the comparator roadmap provided by § 15-22-26(a) or the one a pro se inmate successfully developed in *Slakman I* and obtain readily available public information does not justify permitting their Equal Protection claim to continue.

Finally, on the comparator element, in their opposition, Plaintiffs appear to ask this Court to review their statistician's analysis from their preliminary injunction motion for purposes of ruling on the State Defendants' motion to dismiss. Doc. 178 at 140 n.77. Should the Court do so, it should dismiss the Equal Protection claim for three reasons. First, their statistician's admission that their regression analysis cannot compare similarly situated groups according to factors deemed relevant by Alabama or federal law undermines their use of a regression analysis. Doc. 91-1 at ¶ 3. Second, their statistician's analysis only provides a comparison based on two relevant factors, Doc. 91-1 at ¶ 4, and the Eleventh Circuit upheld the dismissal of an Equal Protection claim that only provided for the *same two factors*. *Slakman v. State Bd. of Pardons & Paroles* ("*Slakman II*"), No. 21-12226, 2021 WL 5071858, at *2–3 (11th Cir. Nov. 2, 2021). Third, as this Court found, the statistics, even if sufficient, show that when inmate Plaintiffs are compared to similarly situated White inmates, the parole grant rates between the two groups become similar. *See e.g.*, Doc. 181 at 38–39; Doc. 91-1 at ¶¶ 8–12; *accord Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1330 (11th Cir. 2021) (a plaintiff cannot use "relative" statistics to obfuscate data showing essential sameness).

### b. The complaint fails to allege facts plausibly demonstrating intentional discrimination.

As Equal Protection Defendants asserted, an Equal Protection violation requires more than just allegations or evidence of racially disparate impact, error or mistake in judgment, unlawful or

arbitrary administration, or even unfair treatment. *See* Doc. 148 at 119–20. Rather, the standard requires an allegation of purposeful discrimination – i.e., a decisionmaker took a course of action because of, not in spite of, an adverse effect on an identifiable group. *Id.* at 120 (citing *Iqbal*, 556 U.S. at 676 (*quoting Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979))). This Court found that purposeful discrimination could be shown by circumstantial evidence including: (1) impact of a challenged law or action; (2) historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) contemporary statements and actions of key legislators; (6) foreseeability of a disparate impact; (7) knowledge of a disparate impact, and (8) availability of less discriminatory alternatives. *See* Doc. 181 at 39 (citing *Greater Birmingham Ministries*, 992 F.3d at 1321–22); *see also* Doc. 148 at 121. However, Plaintiffs failed to allege facts plausibly demonstrating that Equal Protection Defendants intentionally discriminated against Alabama inmates.

Further, Plaintiffs incorrectly assume that Equal Protection Defendants only argue that "no one component" is sufficient to establish discriminatory intent. Doc. 178 at 148–49. But Equal Protection Defendants specifically argue that as a matter of law, none of Plaintiffs alleged facts, whether separately or in totality, shows purposeful discrimination. *See* Doc. 148 at 119–37. In fact, based on Plaintiffs' allegations, the factors weigh against finding purposeful discrimination by Equal Protection Defendants.

> ### i.   The complaint does not aver facts sufficient to establish a plausible substantial disparate impact.

With far more facts than those alleged in the complaint before it, the Court has already found that Plaintiffs – buttressed by additional declarations from Plaintiffs' statistician – failed to establish a stark pattern of disproportionate impact. Doc. 181 at 40. The logic behind the Court's analysis demonstrates why the Plaintiffs have failed to allege a sufficient disparate impact on Black

inmates. However, as the Court found previously, the regression analysis failed to account for the factors relevant to parole consideration and provided no points of comparison at all for set off dates. Doc. 181 at 37-38. In their opposition, Plaintiffs rely heavily on the regression analysis to show disparate impact. Doc. 178 at 142 (citing Doc. 1 at ¶¶ 100-01, 108). Without the regression analysis, the complaint's disparate impact allegations are reduced to conclusory statements that do not pass muster. *Iqbal*, 556 U.S. 678.

Moreover, Plaintiffs do not and cannot refute that "'a mere demonstration of inequality is not enough[] . . . it is a settled rule that the Fourteenth Amendment guarantees equal laws, not equal results.'" *Sweet*, 467 F.3d 1311 (quoting *McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991)); *see also Jackson v. Cook*, No. 2:17-CV-414-ALB, 2020 WL 4006671 at *9 (M.D. Ala. June 4, 2020) ("Evidence which merely indicates disparity of treatment . . . is insufficient to show discriminatory intent."). Given that parole decisions rest on many non-discriminatory factors, *see Fuller*, 851 F.2d at 1310, Plaintiffs' statistics and allegation of disproportionate impact cannot establish discriminatory intent beyond the speculative level. Thus, the complaint's averments of disparate impact are insufficient to survive a motion to dismiss.

> ii.   **The complaint's foreseeability and knowledge allegations are insufficient.**

Plaintiffs again rely upon their regression analysis allegations to establish foreseeability. Doc. 178 at 143 (citing Doc. 1 at 102, 108, 111.) This reliance fails to aid them on the foreseeability factor just as it does every place they use it – the analysis is flawed and provides no support to the complaint's otherwise conclusory allegations. *See* Doc. 181 at 37-38. Plaintiffs also argue that the complaint's allegations of racial skewing (based on the flawed regression analysis) show the foreseeability of "abandon[ing] objective evidence-based standards." Doc. 178 at 143.

Not content to rely on one false premise (the flawed regression analysis), Plaintiffs' argument is also premised on an incorrect statement of the law and the complaint's failure to allege racial disparities in parole outcomes *before* the implementation of the 2016 amendments. The Board did not, and as a matter of law, could not, "abandon" the "objective evidence-based" standards – the guidelines – because of the 2019 amendments or their implementation because the guidelines were never more than an aid that the Board could follow or not at their "complete discretion." ALA. CODE §§ 15-22-26(a), (c) (2016) (2019). This Court also found that there was no evidence in the preliminary injunction record (and there are no allegations in the complaint) showing that prior to adopting risk assessments there was a racial disparity in grant rates. *See generally* Doc. 1; Doc. 181 at 40.

Even if prior Board Members used and heavily relied on parole guidelines, their prior use and reliance would not mean that S.B. 67 mandated an objective evidence-based decision-making framework, and nothing in Alabama nor federal law required their successors to approach parole decision-making in the same way as prior Board Members. In fact, the Eleventh Circuit explicitly rejected the idea that consideration of factors in parole decision-making is an "objective" approach when it found that Alabama parole law directed the Board "to consider a number of factors in

making their determination, *which is a subjective rather than objective determination*." *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982) (emphasis added). Accordingly, Plaintiffs cannot plausibly allege that a racial skew was predictable due to a "switch" from an objective approach to a subjective approach because, as a matter of law, Alabama parole decision-making process was always subjective precluding any possible switch in approach that could give rise to foreseeability.

Plaintiffs also cherry-pick statements from Equal Protection Defendants' Motion to Dismiss to allege that according to Equal Protection Defendants, racial disparities were proper because the Board's decisions were justified by facts known only to the Board. Doc. 178 at 144. However, Equal Protection Defendants made no such claim. Rather, Equal Protection Defendants argued that "[t]he statements by the media and other persons Plaintiffs rely upon suffer from the same fundamental failings in their own statistics – they are uninformed by the specific parole cases considered by the Board." Doc. 148 at 110. Equal Protection Defendants specified that along with lacking information considered from parole files, none of the articles or persons cited by Plaintiffs stated that their "statistics" controlled for the "many factors" which go into a parole decision. *Id.* at 111. As this Court acknowledged, the failure of public criticism to be based on comparisons between similarly situated inmates precluded a finding of knowledge to support discriminatory intent. Doc. 181 at 40.

### iii. Plaintiffs do not plausibly plead a reasonably less discriminatory alternative.

Plaintiffs' opposition argument here focuses on two arguments: 1) they repeat their allegation that the S.B. 67 system is a less discriminatory alternative; and 2) attempt to cast the Jimmy Spencer case as just a supervision failure. Doc. 178 at 45. Plaintiffs' first argument fails for the reasons stated in the Equal Protection Defendants' principal brief and two other reasons. The complaint does not allege the existence of a racial disparity in parole grant rates prior to the passage

of S.B. 67. *See generally*, Doc. 1; Doc. 181 at 40. Additionally, there are no allegations in the complaint showing that the Board's prior practice furthers public safety at least as effectively as its current practice. Doc. 181 at 41 (citing *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1979)). The proof of Plaintiffs' failure to meet this standard is on the face of the complaint: in the three years of Plaintiffs' preferred method of parole decision-making a parolee murdered three people whereas no similar incident occurred in the roughly five years the Board operated the under existing procedures. *See generally* Doc. 1.

No doubt recognizing this, Plaintiffs attempt to recast the Spencer case as a supervision failure. Assuming, *arguendo*, that there was a supervision failure, Plaintiffs' argument ignores the giant "but for" in the room: there could be no supervision failure but for the prior Board's placement of Spencer on parole. It was the prior Board's adherence to Plaintiffs' preferred parole release analysis that resulted in Spencer murdering three people and a public outcry against said approach. *See* Doc. 148 at 39–40, 125. The Equal Protection Defendants were, and are not, required to ignore so monumental an error or the tragic consequences thereof. *Accord Garner*, 529 U.S. at 253 (paroling authorities have the capacity and obligation to change their parole decision-making in light of their experiences). Even the prior Board recognized a need to change as alleged both by the complaint and acknowledged by the Court. *See* Doc. 1 at 47 (showing that for the fiscal year of 2019, *prior to the effective date of H.B. 380*, saw the biggest one-year reduction in parole grants); Doc. 181 at 28–29.

iv.   **Neither the historical background, alleged procedural and substantive departures from previous practices, contemporaneous statements by officials, or the specific events leading up to the challenged conduct plausibly infer discriminatory intent by Equal Protection Defendants.**

As Equal Protection Defendants demonstrated, the events leading up to changes in the Board's parole decision-making approach and the enactment of H.B. 380 started with one event: Spencer's murders. *See* Doc. 148 at 128–32. Further, the actions taken by Equal Protection Defendants, including advocacy for changes to Alabama parole law,[17] a one-time meeting regarding the Board's parole decision-making in light of its decision to grant parole for Spencer, Marshall's protest against parole for violent offenders, and the appointment of Board Members to create a Black majority-Board, did not deviate from what Alabama and federal law permitted. *Id.*; *see also* Doc. 1 at ¶ 91 (Spencer's murders resulted in the one-time meeting). Indeed, this Court found that Spencer's murders was the motivating factor behind Equal Protection Defendants' actions and that H.B. 380 recognized racial inclusiveness in Board membership which Ivey implemented in her appointments. *See* Doc. 181 at 42–43.

Additionally, as this Court noted, former Board Director Charlie Graddick's actions cannot be used to infer that the Board acted with discriminatory intent. *See* Doc. 181 at 43. The Board Director cannot vote in or make parole decisions. *See* ALA. CODE § 15-22-21(b) (2019). As such, former Board Director Graddick's intent when he fired three Black Board officials or when

---

[17] Plaintiffs cannot sincerely argue that advocating for change through the legislative process, even if they disagree with the proposed change, is now sufficient to allege an inference of discriminatory intent.

implemented a new dress policy is irrelevant for determining the Board's intent to grant or deny parole, *see* ALA. CODE § 15-22-26(c) (2019), or in its implementation of H.B. 380.[18]

Despite conceding that Spencer's release on parole and his murders "played some role in spurring legislation," Plaintiffs contend that these murders were not the sole cause of changes in the Board's parole decision-making. Doc. 178 at 147. But Plaintiffs only speculate that because of an alleged disproportionate impact in parole decisions, Equal Protection Defendants' implementation of H.B. 380 cannot be explained as being a response to Spencer's horrific murders after his release under S.B. 67 but should infer discriminatory intent by Equal Protection Defendants. *See* Doc. 178 at 147. However, as this Court recognized, well-settled law refutes this idea because the Equal Protection Clause only requires equal laws, not equal results. *See e.g.*, Doc. 181 at 43–44; *Feeney*, 442 U.S. at 273; *Sweet*, 467 F.3d at 1319; *Jackson*, 2020 WL 4006671, at *9.

Moreover, Plaintiffs do not allege facts showing that the Board has a history of racial discrimination in parole decisions or that Alabama's parole laws were enacted with discriminatory intent. *See generally* Doc. 178 at 146.[19] As Equal Protection Defendants established, H.B. 380's

---

[18] The Court may consider the Board's appearance and dress code policy implemented by former Director Graddick without converting the Motion to Dismiss into a Motion for Summary Judgment. Doc. 178 at 148 n.81. Even though former Director Graddick's acts and statements are not attributable to these Defendants, if the Court accepts Plaintiffs' argument that "allegations regarding Graddick shed light on the culture of the [Board] since 2019[,]" Doc. 178 at 48, then this Court may also consider the policy itself. The policy is specifically referenced in the complaint, Doc. 1 at ¶ 95, and because Plaintiffs refer to and rely on it to support their discriminatory intent burden, the policy can be considered by the Court. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). It is troubling that Plaintiffs have alleged, and now double down on, a factual statement they know to be false.

[19] Nor could Plaintiffs plausibly allege such because politics, not race, motivates Alabama parole law. *See e.g.*, *Ex parte Bd. of Pardons & Paroles*, 793 So. 2d 774, 776 (Ala. 2000) ("Amendment No. 38 transferred that authority [over parole administration from the Governor to] the Legislature[.]") (citing *Swift v. Esdale*, 306 So. 2d 268, 271 (1975)); *In re Upshaw*, 23 So. 2d 861,

changes to Alabama parole law indicate a non-discriminatory purpose, and the specific changes in response to Spencer's murders constituted more than "pretextual" changes. *See* Doc. 148 at 125–28. This Court similarly found nothing in the historical context of the implementation of H.B. 380 that as alleged, warranted an inference of discriminatory intent. *See* Doc. 181 at 41–43.

In fact, Plaintiffs specifically allege that Equal Protection Defendants' actions were "a reaction to, and a deliberate effort to undercut, the goals and intended consequences of the Alabama Legislature's enactment of [S.B. 67.]" Doc. 1 at ¶ 78. Plaintiffs further allege that the goal of S.B. 67 was to address "overcrowding" in Alabama's prisons while reducing recidivism and improving public safety, but Plaintiffs never alleged that S.B. 67 was designed to reduce racial bias in parole decision-making. *Id.* at ¶¶ 79–81. Thus, even if H.B. 380 was implemented to undermine S.B. 67, such an action cannot infer that the current Board acted with discriminatory intent.

Further, Plaintiffs' lauded evidence, the Justice Reinvestment in Alabama Analysis and Policy Framework, never states that racial bias was an issue in the Board's parole decision-making nor that limiting racial bias was a goal of S.B. 67. *See* Doc. 1 at 39 n.48 (the words "race," "racial," and "discrimination" do not appear in the report). Instead, this report only lists three issues related to Alabama parole law: (1) "insufficient community-based supervision and treatment resources", (2) "overcrowded prisons", and (3)"unsupervised releases." *Id.* Given that Plaintiffs failed to allege any facts plausibly showing that racial disparity in parole decisions was a longstanding issue prior

---

864 (1945) ("The purpose of the Amendment [for parole administration in Alabama], in so far as the power of the court is concerned, was to grant to the Legislature the power to authorize the courts to exercise probation power."); *Summers v. State*, 15 So. 2d 502, 504 (1943) ("It thus appears that the very language of the amendment itself discloses an intention to grant to the Legislature the power, not only to regulate the administration of pardons and paroles, but also to provide therefor."); *Pinkerton v. State*, 198 So. 157, 158 (Ala. Ct. App. 1940).

to the enactment of S.B. 67, the historical background of the Board's implementation of H.B. 380 cannot infer racial discriminatory intent by its members.

Additionally, as the Equal Protection Defendants demonstrated, their statements, as well as the statements of former Board Director Graddick, do not infer discriminatory intent. *See* Doc. 148 at 133–34. None of the non-Board Members' statements about how the Board should vote or review parole cases can plausibly allege discriminatory intent because the Board, and its members, constitute the only Alabama entity that can grant or deny parole. *See* ALA. CODE § 15-22-26(c) (2019); *see also Ellard v. State*, 474 So. 2d 743, 749 (Ala. Crim. App. 1984) ("The Board has exclusive authority to grant paroles in Alabama.") (original citation omitted). In fact, Plaintiffs cite no authority holding that the opinions of non-Board Members are relevant for determining the intent of the actual Board Members. *See generally* Doc. 178 at 140–49.

As this Court noted, comments by the non-Board Members focused on how H.B. 380 would increase public safety. Doc. 181 at 42. In fact, Plaintiffs cite no authority holding that a public official's statements focusing on public safety can plausibly infer discriminatory intent. *See generally* Doc. 178 at 140–49.[20] Likewise, former Board Director Graddick's statement that the Board's job wasn't to create space in Alabama's prison system aligns with Plaintiffs' concession that the Board's central inquiry is an inmate's "fitness" for parole. *Compare id.* at 148 *with id.* at 122. Consequently, none of the non-Board Members' statements plausibly allege facts supporting an inference of discriminatory intent by the Board.

And as Equal Protection Defendants demonstrated, Gwathney's statements undermine Plaintiffs' allegation that racial discrimination motivated the Board's parole decision-making. *See*

---

[20] Plaintiffs even concede, albeit grudgingly, that improving public safety is a legitimate government interest. *See* Doc. 178 at 157 n.85.

Doc. 148 at 133. Plaintiffs strangely assert that Equal Protection Defendants object to their citation of Gwathney's statements, *see* Doc. 178 at 144 n.80, but Equal Protection Defendants only objected to Plaintiffs' routine habit of *cherry-picking quotes* when the full context does not fit their narrative. Doc. 148 at 133 ("Plaintiffs have disingenuously cherry picked this statement out of context."). Indeed, the full context of Gwathney's statement conclusively establishes that she makes parole decisions based on the individual in front of her – not parole statistics. *Id.* Again, Plaintiffs conceded that the central inquiry of the Board rests on whether an inmate is fit for parole, *see* Doc. 178 at 122, but if the central inquiry is fitness, not parole statistics, then Gwathney's statement that she makes decision based on the fitness of the person before her aligns with the conceded point. Doc. 148 at 133.

Likewise, Plaintiffs failed to cite any statements by Littleton or Simmons that could inform discriminatory intent by them. *See generally* Doc. 178 at 140–49. Plaintiffs' failure to allege any facts that could plausibly show purposeful discrimination by Littleton or Simmons precludes a finding of discriminatory intent by the Board because all Board parole decisions are by majority vote. *See* ALA. CODE § 15-22-28(d) (2019). Even if Plaintiffs could allege purposeful discrimination by Gwathney, which they failed to do, she is just one vote, and without purposeful discrimination by other Board Members, this Court could not infer discriminatory intent by the Board as a whole.

Finally, Equal Protection Defendants established that after H.B. 380's enactment, the Board did not depart from its normal procedural and substantive practices because the Board has always had complete discretion over the approach it Board Member took in their parole decisions. *See* Doc. 148 at 132. While Plaintiffs allege that non-Board Members pressured the Board to abandon Plaintiffs' favored approach to parole decision-making, *see* Doc. 178 at 146, one stakeholder

advocating against a lenient parole review is no more irregular, substantively or procedurally, than an inmate's request to the Board that he be given a lenient review. *See* ALA. CODE § 15-22-26(a)(3) (2016) (2019). Similarly, Plaintiffs cite no authority holding that the Board's alleged departure from an "evidence-based decision-making framework" plausibly constitutes a substantive or procedural departure from the Board's complete discretion over parole decision-making. *See generally* Doc. 178 at 140–49. In fact, Alabama parole law gives the Board the authority to deviate from the guidelines and even the risk assessment. *See* ALA. CODE § 15-22-26(b) (2016) (2019); *see also Bulls v. Estes*, No. 5:19-CV-0346-MHH-JEO, 2020 WL 906324, at *2 (N.D. Ala. Feb. 25, 2020) ("[The risk] assessment is within the discretion of the members of the Board[.]"). Given that the Board always had complete discretion over parole decisions, its application of a more stringent parole review standard does not plausibly infer discriminatory intent.

Likewise, Plaintiffs' claim that the Board has denied allegedly low-risk candidates does not undermine Equal Protection Defendants' public safety rationale. *See* Doc. 178 at 147. The central error in Plaintiffs' assumption rests on their treatment of the risk assessment as a divine oracle that definitively decides whether a person should be paroled and does with the risk assessment what Plaintiffs argue should not be done with public safety – makes it of paramount importance. There are other considerations the failure of any one of which would justify a parole denial to an inmate with a low risk assessment that are built in to the very 2016 version of § 15-22-26 that Plaintiffs otherwise laud: no plan for reentry, negative stakeholder input, no participation in risk-reduction programming while incarcerated, a poor disciplinary record, and the severity of the offender's serving offense. ALA. CODE § 15-22-26(a)(1)-(6) (2016).

However, Alabama parole explicitly states that the Board, not the risk assessment, determines whether an inmate meets the criteria set forth in the parole guidelines including whether

an inmate is at risk of reoffending. *See* ALA. CODE § 15-22-26(a) (2016 and 2019) ("only if the [Board] is of the opinion that the prisoner meets the criteria and guidelines . . ."). In fact, Plaintiffs allege that Gwathney does not rely on the risk assessment because she determines whether or not an inmate is a danger to public safety based on her review of said inmate's file. Doc. 1 at ¶ 98; *see also* Doc. 148 at 133. Because the Board, not the risk assessment, determines whether an inmate is a risk to public safety, differences in parole grant rates for inmates designated low or medium under a risk assessment do not undermine the public safety rationale especially when the standard praised by Plaintiffs failed to accurately provide Spencer's risk of reoffending.

### 2. Plaintiffs Cannot Prevail on a "Convincing Mosaic" Theory.

Despite the Eleventh Circuit precedent, *Ray*, 279 F.3d at 946–47 (citing *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932–33 (11th Cir. 1986)), Plaintiffs argue that under *Lewis v. City of Union City, Georgia* ("*Lewis II*"), 934 F.3d 1169 (11th Cir. 2019), they can proceed with their Equal Protection claim under the "convincing mosaic of circumstantial evidence" theory without showing themselves to be similarly situated to other inmates. *See* Doc. 178 at 149–51. However, *Lewis II* never abrogated Eleventh Circuit precedent requiring a comparator analysis in some cases and recognizing that

> In order to prevail *on an equal protection claim based upon the application of a facially neutral statute, it must be establish* that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff.

*Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) (emphasis added) (citing *E & T Realty*, 830 F.2d at 1109–10). For Equal Protection claims challenging government decision-making, the Eleventh Circuit elaborated on the necessity of a comparator analysis to distinguish between actual discrimination and decisions based on non-discriminatory reasons finding that:

> The reason that there is a similarly situated requirement in the first place is that at their heart, equal protection claims . . . are basically claims of discrimination. . . . To maintain this focus on discrimination, and *to avoid constitutionalizing every state regulatory dispute*, we are obliged to apply the similarly situated requirement with rigor. Different treatment of dissimilarly situated persons does not violate the equal protection clause.

*Irvin*, 496 F.3d at 1207 (emphasis added; internal quotation marks and original citations omitted).

Plaintiffs allege that Equal Protection Defendants unequally applied Alabama parole law and exercised discretionary authority to deny inmate Plaintiffs parole and earlier reconsideration dates. Doc. 1 at ¶¶ 245, 253; *see also* Doc. 178 at 33, 132. Further, Plaintiffs allege an Equal Protection violation because the Board's parole decisions disfavored Black inmates more than White inmates. Doc. 1 at ¶¶ 100–02, 108, 111–12, 117, 119–20, 123–24, 128–31; *see also* Doc. 178 at 33, 132. Additionally, Plaintiffs contend that the Board has applied H.B. 380's "public safety" language to deny Black inmates parole, but Plaintiffs concede that public safety is a legitimate interest in parole decision-making. Doc. 178 at 33, 124, 146, 157 n.85. In essence, Plaintiffs' Equal Protection claim does not challenge the validity of Alabama's parole law but the Board's alleged disparate treatment of Black and White inmates when it applies said law.

However, "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *E & T Realty*, 830 F.2d at 1109. "As its name suggests, a disparate treatment claim requires a plaintiff to show that he has actually been treated differently than similarly situated non-handicapped people." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008) (in the context of the Fair Housing Act) (original citations omitted). Describing the *Schwarz* plaintiff's disparate treatment claim as a selective enforcement claim, the Eleventh Circuit found that "[w]ith selective-enforcement claims like this, evenhanded application of the law is the end of the matter." *Id.* at 1217 (original citations omitted). Likewise, for selective enforcement cases,

the United States Supreme Court recognized that "[t]o establish a discriminatory effect in a race case, the claimant *must show* that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (emphasis added). Thus,

> [the Eleventh Circuit has] recognized any individual's right to be free from intentional discrimination at the hands of government officials. . . . To prevail on this traditional type of equal protection claim, basically a selective enforcement claim, that the [Board's more stringent parole policy based on H.B. 380's public safety language] was applied to [Black inmates], and not [White inmates], Plaintiffs must show (1) that they were treated differently from other similarly situated individuals, and (2) that [the Board] unequally applied[] facially neutral [parole law] for the purpose of discriminating against [Black inmates].

*Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313–14 (11th Cir. 2006) (original citations omitted); *see also Ray*, 279 F.3d at 946–47.

In an unpublished opinion, the Eleventh Circuit recognized that certain Equal Protection claims require a comparator. *Red Door Asian Bistro v. City of Fort Lauderdale*, No. 22-11489, 2023 WL 5606088 (11th Cir. Aug. 30, 2023). The *Red Door* Court stated that in selective enforcement cases "evidence of discriminatory motive alone does not establish a discriminatory effect—*that is, that the defendants applied the law unequally*." 2023 WL 5606088, at *7 (emphasis added) (citing *Schwarz*, 544 F.3d at 1216). The Eleventh Circuit also found that the similarly situated analysis is not needed only when plaintiffs plausibly allege facts showing a departure from the law. *See* 2023 WL 5606088, at *8.

But at best, Plaintiffs only alleged that Equal Protection Defendants abandoned the objective evidence-based decision-making framework imposed under S.B. 67. *See* Doc. 1 at ¶ 98; *see also* Doc. 178 at 146. However, Equal Protection Defendants established that neither S.B. 67 nor H.B. 380 mandated any framework for parole decision-making but left parole decision-making to the Board's complete discretion. *See* Doc. 148 at 91–92. Both S.B. 67 and H.B. 380 left

determination of an inmate's fitness of parole to the Board's opinion. *See* ALA. CODE § 15-22-26(a) (2016 and 2019). Additionally, Plaintiffs' own exhibits establish that Gwathney voted to grant or deny based on her review of an inmate's parole file which complies with Alabama parole law. Doc. 1 at ¶105 n.67; *see also* ALA. CODE § 15-22-26(a) (2016) (2019). Thus, Plaintiffs cannot allege that the Board has departed from the law as provided in H.B. 380.

Moreover, this case is distinguishable from the cases permitting a "convincing mosaic" theory. For example, the *Lewis II* Court permitted the plaintiff's claim to proceed on a "convincing mosaic" theory because "[*Lewis I*] does not foreclose altogether [plaintiff's] race and gender discrimination claims because ***establishing the elements of the McDonnell Douglas framework*** is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lewis II*, 934 F.3d at 1185 (emphasis in original and emphasis added) (internal quotation marks and original citation omitted). Rather than hold that the "convincing mosaic" theory was applicable to all Equal Protection claims, the *Lewis II* merely reaffirmed that the "convincing mosaic" theory was applicable in employment discrimination cases – i.e., an allegation that the employer departed from federal law under Title VII.

Likewise, *Greater Birmingham Ministries* does not involve an Equal Protection claim like the one alleged in this case. Unlike the instant Plaintiffs who challenge "Equal Protection Defendants implementation of [H.B. 380] to parole decision-making framework[,]" *see* Doc. 178 at 132, the *Greater Birmingham Ministries* plaintiffs "filed this lawsuit, claiming the 2011 voter ID law violates the Fourteenth and Fifteenth Amendments of the Constitution, as well as Section 2 of the Voting Rights Act, arguing the passage of the law was motivated by racial discrimination and that the law has a discriminatory effect." 992 F.3d at 1315. That *Greater Birmingham Ministries* discussed the "convincing mosaic" theory aligns with the Eleventh Circuit recognition

that *unlike selective enforcement cases*, a different analysis is needed when the Equal Protection claim challenges the validity or intent of an enacted law. *See Schwarz*, 544 F.3d at 1217. But given that Plaintiffs are challenging Equal Protection Defendants' alleged unequal *application* and *implementation* of the law, *see supra*, *Greater Birmingham Ministries* provides no support for the use of the "convincing mosaic" theory in claims challenging parole decisions. Even *Red Door* provides Plaintiffs no support. Unlike instant Plaintiffs who allege disparate treatment of Black and White inmates, *see supra*, the *Red Door* plaintiffs never alleged an Equal Protection claim based on disproportionate impact but on a government official's refusal to apply law based on the race of plaintiffs. *See* 2023 WL 5606088, at *8. The instant Plaintiffs do not allege that the Board departed from Alabama's parole law but unequally applied said law to disfavor Black inmates more than White inmates. *See supra*.

Contrary to Plaintiffs, *see* Doc. 178 at 151 n.83, the Eleventh Circuit's refusal to implement the "convincing mosaic" theory in the context of inmate Equal Protection claims challenging parole or correctional decisions demonstrates that the similarly situated analysis is still needed. *See* Doc. 148 at 118–19 (listing several post-*Lewis II* cases wherein the Eleventh Circuit and district courts required a similarly situated analysis). While Plaintiffs contend that the cases cited by Equal Protection Defendants are unavailing because pro se inmates did not invoke the "convincing mosaic" theory, this argument fails. *See* Doc. 178 at 151 n.83. Pro se inmate suits are liberally construed, *see Gomez-Diaz v. United States*, 433 F.3d 788, 791 (11th Cir. 2005), and thus, if the "convincing mosaic" theory was a viable option after *Lewis II*, then the courts would have considered the theory even if a pro se inmate did not explicitly raise it. Likewise, trial courts are presumed to know the law, *see Burrell v. Bd. of Trustees of Georgia Mil. Coll.*, 125 F.3d 1390,

1395 (11th Cir. 1997), and the absence of a "convincing mosaic" theory even after *Lewis II* implies that it is not applicable in Equal Protection claims challenging parole decisions.

Additionally, the practical reasons supporting the use of a "convincing mosaic" theory does not exist in the context of a claim challenging parole decision-making. The *Lewis II* Court allowed the plaintiff to proceed with the "convincing mosaic" theory in an employment discrimination claim for the following reason: "[n]ot every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator [because] a proper comparator simply may not exist in every work place." 934 F.3d at 1185. Unlike employment discrimination cases, Equal Protection claims challenging parole decisions will not lack comparators because the Board must consider all inmates who are eligible for parole. *See* ALA. CODE § 15-22-24(a)(1). Thus, inmate Plaintiffs have every inmate considered by the Board as a comparator, and if similarly situated comparators are treated the same, then Plaintiffs cannot allege an Equal Protection violation.

Given the multitude of available comparators and the statutory and caselaw existence of points of relevant comparison, Plaintiffs cannot reasonably argue that there are no similarly situated inmates as to require the "convincing mosaic" theory. Further, Plaintiffs cannot cling to the "convincing mosaic" theory just because similarly situated comparators are not being treated differently. Indeed, similar treatment of similarly situated inmates would establish that the Board is applying Alabama parole law evenhandedly. *See Schwarz*, 544 F.3d at 1217 ("evenhanded application of the law is the end of the matter.").

Further, Plaintiffs disingenuously argue that inmates may not be able to identify a close comparator during the pleading stage. *See* Doc. 178 at 150. In *Slakman I*, a *pro se inmate* provided two similarly situated comparators to proceed past the motion to dismiss stage. *See* 434 F. App'x at 876. Contrary to Plaintiffs, inmates *can find similarly situated comparators* at the motion to

dismiss stage, *see Id.*, and Plaintiffs are without excuse as to why they cannot find inmates with similar offenses, disciplinary records, length of time served, or any other relevant factor so that they need to proceed under a "convincing mosaic" theory.[21]

Even if this Court allows Plaintiffs to proceed on a "convincing mosaic" theory, Plaintiffs still failed to plausibly plead facts stating an Equal Protection claim. As Equal Protection Defendants already established, Plaintiffs' allegations do not plausibly infer discriminatory intent by the Board. *See supra*. Moreover, Equal Protection Defendants assert that under the "convincing mosaic" theory, the need for exceptionally clear proof becomes more necessary because disproportionate impact cannot show an Equal Protection violation and because the Court must still distinguish between unlawful parole decisions based on race and lawful parole decisions based the Board's discretionary review of non-discriminatory factors. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 at 264–65 (1977) (allegation of disproportionate impact does not render official action unconstitutional); *see also Fuller*, 851 F.2d at 1310 (exceptionally clear proof required because parole decisions rest on several non-discriminatory factors). This Court already went through the analysis on a more developed record and found that Plaintiffs did not establish a convincing mosaic in the instant case. Doc. 148 at 39-44. Given the serious flaws and deficiencies in the allegations of the complaint, this Court should

---

[21] If this Court permits Plaintiffs to present expert testimony from their preliminary injunction, *see* Doc. 178 at 140 n.77, then Equal Protection Defendants would argue that the availability of similarly situated comparators is established by their own exhibit. *See* Doc. 91-1. Furthermore, Equal Protection Defendants assert that Plaintiffs should not be allowed to disingenuously hide behind a "convincing mosaic" theory when their evidence shows that similarly situated comparators are treated similarly and does not support Plaintiffs' narrative of racial discrimination. *Id.* (statistics showing that when inmates are compared based on similar offense and length of time served, racial disparity is minimal and sometimes more Black inmates are granted parole).

have little difficulty reaching the same conclusion here, and thus, under either the comparator analysis or "convincing mosaic" theory, Plaintiffs failed to state an Equal Protection claim.

### 3.      The Equal Protection Defendants are entitled to immunity.

Plaintiffs assert the same immunity objections as they raised with respect to the other money damages claims. Doc. 178 at 152-53. Their arguments fail here for the reasons previously stated in response to the TVPA and Ex Post Facto claims. As with Plaintiffs' Ex Post Facto claim, the Court has concluded Plaintiffs are unlikely to succeed on the merits of their Equal Protection claim. Doc. 181 at 31-44. They necessarily fail to carry their burden of alleging a violation of clearly established law on their Equal Protection claims, and therefore Ivey, Marshall, and Gwathney are entitled to qualified immunity from the damages claims in Counts VI and VII.

## J.      Plaintiffs Fail to Plead a Plausible Substantive Due Process Claim.

Plaintiffs reassert that Ivey, Marshall, the Board, Hamm (collectively "Due Process Defendants") violated Plaintiffs' Substantive Due Process rights by denying parole in an arbitrary, capricious, fragrant, and unauthorized manner. Doc. 178 at 155–56; Doc. 1 at ¶ 261. Specifically, Plaintiffs reallege that Due Process Defendants' approach to parole decision violates their Due Process rights because it is racially biased and ignores the recommendation of parole guidelines. Doc. 178 at 155. However, as a matter of law, none of Plaintiffs' allegations plausibly state a Substantive Due Process claim.

Due Process Plaintiffs' opposition arguments do not save their Substantive Due Process claim for four main reasons. First, the Due Process Plaintiffs have abandoned their Fifth Amendment Substantive Due Process claim. Second, the complaint does not aver facts sufficient to state a plausible claim based upon the Fourteenth Amendment's Due Process Clause. Third, the legislative acts exception does not save the Due Process Plaintiffs' claim. Finally, the other alleged constitutional violations cannot support the Due Process Plaintiffs' claim.

1. **Plaintiffs fail to plead any facts plausibly alleging a due process claim based on the Fifth Amendment.**

Due Process Defendants reassert that Plaintiffs cannot bring their Substantive Due Process claim pursuant to the Fifth Amendment. Although their original claim alleged a Due Process violation under the Fifth Amendment, Plaintiffs, rightfully, do not address or attempt to rebut Due Process Defendants' correct assertion that they failed to state a claim pursuant to this amendment. *See e.g.*, *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1328 (11th Cir. 2015); *Taylor v. Brooks*, No. 5:22-CV-237-CLS, 2022 WL 2441297, at *4 (N.D. Ala. July 5, 2022); *Shepherd v. Wilson*, No. CV 15-00373-KDN, 2015 WL 9685562, at *8 n.15 (S.D. Ala. Dec. 22, 2015), *aff'd*, 663 F. App'x 813 (11th Cir. 2016). Given that Plaintiffs cite no authority to the contrary and failed to rebut Due Process Defendants' argument, Due Process Defendants are entitled to have Plaintiffs' claim of a Fifth Amendment violation be dismissed. Moreover, Due Process Plaintiffs' failure to address this issue in their opposition constitutes abandonment of the claim. *United States ex rel. Marsteller v. Tilton*, 556 F. Supp. 3d 1291, 1304 n.6 (N.D. Ala. 2021) (quoting *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991)).

2. **Plaintiffs fail to allege facts plausibly showing that Due Process Defendants violated their fundamental rights under Substantive Due Process.**

"To determine whether a right at issue is one of the substantive rights guaranteed by the Due Process Clause, courts must look to whether the right is deeply rooted in [our] history and tradition and essential to our Nation's scheme of ordered liberty." *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1220 (11th Cir. 2023) (internal quotation marks omitted) (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237–38 (2022)). Plaintiffs do not have a right, let alone a fundamental right, to parole or to the procedures followed in making parole determinations. *See e.g.*, *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *Cook v. Wiley*, 208 F.3d 1314, 1322 (11th Cir. 2000); *O'Kelley v. Snow*, 53 F.3d 319, 321 (11th Cir.

1995); *Thomas v. Sellers*, 691 F.2d 487, 488 (11th Cir. 1982); *Sills v. FCI Talladega Warden*, No. 22-12656, 2023 WL 1775725, at *4 (11th Cir. Feb. 6, 2023). Accordingly, Due Process Plaintiffs have not –and cannot– aver facts sufficient to state a Substantive Due Process claim based upon parole.

### a. Due Process Plaintiffs rely on Eleventh Circuit precedent that may no longer be good law.

Due Process Plaintiffs attempt to save their Substantive Due Process claim by citing *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991) for the proposition that the Eleventh Circuit recognizes a Substantive Due Process claim against arbitrary and capricious parole denials. Doc. 178 at 154–54. Given *Dobbs* and *Eknes-Tucker*, and assuming it actually is a Substantive Due Process case, *Monroe* and its progeny no longer appear to be good law. *Dobbs* requires valid Substantive Due Process rights to be "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." 597 U.S. at 231 (internal quotation marks omitted and original citation omitted); *see also Eknes-Tucker*, 80 F.4th at 1220 (adopting the same analysis from *Dobbs*).

The *Monroe* Court never had the benefit of the United States Supreme Court's ruling in *Dobbs* to guide their analysis. Further, despite citing *Greenholtz* favorably, the *Monroe* Court never engaged in an analysis of whether parole decision-making is deeply rooted in history and tradition or whether parole decision-making is implicit in the concept of ordered liberty. *See generally Monroe*, 932 F.2d at 1441–42. Rather, the *Monroe* Court merely jumped to the conclusion after conceding that there was no right to parole or parole consideration. *Id.* at 1442. Consequently, Due Process Defendants assert that in light of *Dobbs* and *Eknes-Tucker*, *Monroe* and its progeny no longer provide a basis for Substantive Due Process claims challenging parole decisions.

### b. Plaintiffs cannot demonstrate that Due Process Defendants violated Plaintiffs' Substantive Due Process rights by way of a custodial relationship.

Assuming *arguendo* that *Monroe* remains good law, the complaint still fails to state a Substantive Due Process claim. Plaintiffs who fail to allege a Substantive Due Process claim based on a fundamental right may only state such a claim by establishing that a defendant state official exercised custodial authority over them. *See e.g.*, *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020); *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)); *Sanders v. Boutwell*, 426 F. Supp. 3d 1235, 1241–42 (M.D. Ala. 2019). When a state official does not exercise custodial authority over a plaintiff, only conduct that is arbitrary, or conscience shocking, in a constitutional sense can support a Substantive Due Process claim. *See e.g.*, *Peterson*, 982 F.3d at 1329; *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003); *White*, 183 F.3d at 1258; *Sanders*, 426 F. Supp. 3d at 1242 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)).

In the context of a Substantive Due Process claim based on a custodial relationship, "'a constitutional duty can arise only when a state or municipality, *by exercising a significant degree of custody or control over an individual*, places that person in a worse *situation* than he would have been had the government not acted at all.'" *Sanders*, 426 F. Supp. 3d at 1241 (emphasis in original) (quoting *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1035 (11th Cir. 1987)); *see also Collins*, 503 U.S. at 127–28, ("The 'process' that the Constitution guarantees in connection with any deprivation of liberty thus includes a continuing obligation to satisfy certain minimal custodial standards.") (original citation omitted). The Due Process Plaintiffs do not, and as a matter of law cannot, allege that any Due Process Defendant has physical or legal custody over them other than Hamm. *See generally* Doc. 1; Doc. 178 at 124–159. Alabama law explicitly divests the Board of legal custody over inmates even when it grants parole. *See* ALA. CODE § 15-22-26(b) ("while

released on parole, *shall remain in the legal custody of the warden* of the prison from which he or she is paroled . . .") (emphasis added).

The complaint does allege that ADOC has physical custody of the Due Process Plaintiffs. Doc. 1 at ¶¶ 145–54. But, as noted above, with respect to parole decisions, the Due Process Plaintiffs do not have standing with respect to Hamm. They further do not allege that the ADOC had an obligation or duty to them based on the Board's denial of parole. *See generally id.*; *see generally* Doc. 178.

However, even assuming *arguendo* that the Due Process Plaintiffs' custodial relationship with the ADOC imposed a duty related to the denial of parole on Due Process Defendants, Plaintiffs still cannot state a substantive Due Process claim. Only conduct that places an individual who is in the state official's custody *in a worse situation than had the state official never acted* is violative of substantive Due Process. *See Wideman*, 826 F.2d at 1035; *see also Sanders*, 426 F. Supp. 3d at 1241. Here, the Board's denial of parole – a decision in which Ivey, Marshall, and Hamm play no role as a matter of law – leaves an inmate in the exact same position he/she was in prior to the Board's decision. *See e.g.*, *Greenholtz*, 442 U.S. at 9, 11 (drawing a "crucial distinction" between deprivation of a *possessed* liberty interest, and a deprivation of a *desired* conditional liberty interest, and stating that "the possibility of parole provides no more than a mere hope"); *Damiano*, 785 F.2d at 933 ("*the denial . . . of parole is merely a disappointment* rather than a punishment of cruel and unusual proportions.") (original citation omitted) (emphasis added); *Harrell v. Fla. Parole Comm'n*, 479 F. App'x 234, 237 (11th Cir. 2012) (denial of parole does not increase an inmate's punishment); *Slakman I*, 434 F. App'x at 874–75 (affirming that in *Damaino*, the Eleventh Circuit found no cruel, unusual, or excessive punishment based on the Florida parole board's extension of an inmate's presumptive parole release date). Put simply, a denial of parole

merely maintains the status quo ante. Therefore, Plaintiffs cannot rely on the Board's denial of parole to state a custodial relationship Substantive Due Process claim.

### c. The complaint does not allege a plausible claim that the Board arbitrarily or capriciously denied parole.

For a Substantive Due Process claim based on a non-custodial relationship, "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell*, 329 F.3d at 1305 (citing *Collins*, 503 U.S. at 128). However, "[t]he somewhat nebulous shocks the conscience phrase has taken on different meanings in different cases, depending on a given case's factual setting." *King v. Pridmore*, 961 F.3d 1135, 1143 (11th Cir. 2020) (internal quotation marks omitted) (quoting *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002)). "'[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *Waddell*, 329 F.3d at 1305 (quoting *Lewis*, 523 U.S. at 846). As such, "[a]cts 'intended to injure in some way unjustifiable by any government interest' are 'most likely to rise to the conscience-shocking level.'" *Waddell*, at 1305 (quoting *Lewis*, 523 U.S. at 849).

"This standard is 'narrowly interpreted and applied.'" *Peterson*, 982 F.3d at 1330 (quoting *White*, 183 F.3d at 1259). "Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision.*" *Waddell*, 329 F.3d at 1305 (emphasis in original) (original citations omitted). "[E]ven intentional wrongs seldom violate the Due Process Clause[.]" *King*, 961 F.3d at 1143 (quoting *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013)); *see e.g.*, *Waddell*, 329 F.3d at 1305 (11th Cir. 2003); *Nix*, 311 F.3d at 1378; *Sanders*, 426 F. Supp. 3d at 1243 (citing *Nix*, 311 F.3d at 1376; *Skinner v. City of Miami, Fla.*, 62 F.3d 344, 346 (11th Cir. 1995)). Likewise, a showing of negligence by a state actor cannot

demonstrate a violation of Substantive Due Process. *See e.g.*, *Lewis*, 523 U.S. at 834; *Maddox*, 727 F.3d at 1119; *Waddell*, 329 F.3d at 1305; *Sanders*, 426 F. Supp. 3d at 1242. It is important for the Court to note that *Monroe*, the case the Due Process Plaintiffs heavily rely upon, "did not adopt a broader 'due process right to be fairly considered for parole.'" *Sills*, 2023 WL 1775725, at *4 (original citation omitted).

In the context of parole decision-making, the Eleventh Circuit holds that only "flagrant or unauthorized actions" will support intervention in the Board's parole decisions. *Thomas*, 691 F.2d at 489. The Eleventh Circuit requires more than allegations of misconduct by the Board to state a Due Process claim challenging its parole decision-making. *See generally Jones v. Ray*, 279 F.3d 944, 946 (11th Cir. 2001) (failure to show that the Georgia's parole board relied on false information, i.e., an unauthorized action, precludes finding a Due Process violation); *see also Robinson v. Satz*, 260 F. App'x 209, 213 (11th Cir. 2007) (upholding the dismissal of an inmate's suit against Florida's paroling authority due to the inmate's failure to provide any information other than a conclusory allegation that the denial of parole was based on false information). The Eleventh Circuit has also suggested that if a parole authority has complete discretion over parole decision-making, its parole decisions will be upheld even when there is an alleged taint in its consideration so long as the decision can be justified by a valid reason. *See Bulls v. Warden*, No. 20-10882-E, 2020 WL 3053502, at *1 (11th Cir. May 13, 2020).

In the case at bar, the complaint's allegations do not come anywhere near conscious shocking, particularly when measured against what the Eleventh Circuit found problematic in *Monroe* – the deliberate and knowing use of false information to deny parole. 932 F.2d at 1442. Reduced to its essence, the complaint's allegations are that after over sixty years of making parole decisions without guidelines, risk assessments or any of the other devices Due Process Plaintiffs

laud in the 2016 amendments – none of which the Board was statutorily obligated to apply[22] – the Board went back to making parole decisions the way they did before. Doc. 1 at ¶¶ 79-98. When one adds the fact that the aforementioned reversion occurred *immediately after* an inmate released to parole under the new process murdered three people including a seven-year-old child, Doc. 1 at 43-45, what becomes conscious shocking is that the Due Process Plaintiffs advance such a claim. Opposition arguments notwithstanding, Doc. 178 at 153-159, the Due Process Defendants' alleged failure to comply with the guidelines, grant parole at Plaintiffs' preferred rates, grant parole to any inmate to whom the ADOC finds fit for work release or a pass, or grant parole to the Due Process Plaintiffs because they think they have earned it do not state a substantive Due Process claim. Furthermore, the complaint does not state a plausible racial discrimination substantive Due Process claim, and Due Process Plaintiffs failed to explain why their Equal Protection claim does not sufficiently cover their race-based grievances.

That the Due Process Plaintiffs would prefer adherence to the guidelines does not convert the Board's alleged lack of adherence into arbitrary or capricious conduct violative of Substantive Due Process. Even if the complaint alleged the Board had a zero percent guideline compliance and that every such deviation worked against an inmate (and it does not), it would still not shock the conscience. Doc. 1 at ¶ 104. As noted above, the Board's lack of adherence to guidelines, or even having them, did not shock the conscience for more than six decades. *See e.g.*, ALA. CODE § 15-22-26 (1951); *O'Kelley*, 53 F.3d at 321; *Slocum v. Georgia State Bd. of Pardons & Paroles*, 678 F.2d 940, 942 (11th Cir. 1982); *Sills*, 2023 WL 1775725, at *4; *Tooma v. David*, 381 F. App'x 977, 979 (11th Cir. 2010); *Taylor v. Nix*, 240 F. App'x 830, 833 (11th Cir. 2007) (finding that an inmate

---

[22] ALA. CODE § 15-22-26(a), (c).

cited "no caselaw recognizing a substantive due process violation in a failure to follow certain procedures in considering a parole request"); *Bulls*, No. 2020 WL 906324, at *2.

As Plaintiffs correctly concede, "the violation of state law does not itself give rise to the due process claim." Doc. 178 at 156.[23] Likewise, federal law clearly holds that the violation of state law does not constitute a violation of Due Process. *See Swarthout v. Cooke*, 562 U.S. 216, 222 (2011) ("we have long recognized that a mere error of state law is not a denial of due process.") (internal quotation marks omitted and original citations omitted); *see also Hillcrest Prop., LLP*, 915 F.3d 1292, 1297 (11th Cir. 2019) ("fundamental rights in the constitutional sense do not include 'state-created rights.'") (original citation omitted). Despite the above, Plaintiffs allege that the Board's nonconformity with its parole guidelines in a majority of cases is evidence of arbitrary and capricious conduct. Doc. 178 at 156.

Due Process Plaintiffs, at best, complain that the Board is not granting parole at their preferred rate or conforming their decisions to parole guidelines. *See generally* Doc. 1 at ¶ 261; Doc. 178 at 155–56. However, Plaintiffs cite no authority for the proposition that they have a right to any parole grant rate or to the Board's rate of conformance with its parole guidelines. *See generally* Doc. 1; Doc. 178 at 153–59. Given that Plaintiffs cited "no caselaw recognizing a substantive due process violation in a failure to follow certain procedures in considering a parole request[,]" "[a]ccordingly, [Plaintiffs] did not assert a cognizable due process claim[.]" *Taylor*, 240 F. App'x at 833.

---

[23] Contrary to Plaintiffs contentions, Doc. 178 at 156, their complaint did allege violations of state law as violating their Substantive Due Process rights. Specifically, Plaintiffs alleged that Due Process Defendants denied them parole "in an unauthorized manner" and "by disregarding the Parole Guidelines promulgated under state law[.]" Doc. 1 at ¶261. Plaintiffs likewise alleged that Ivey failed to exercise supervisory authority over the Board to prevent the Board from engaging in "unauthorized" actions, practices, and outcomes. Doc. 1 at ¶262.

It is of no importance that the ADOC determines that inmates are safe to work in the community. Doc. 178 at 155–56. Even if the ADOC's temporary release decisions (whether for work release, pass, furlough, or any other reason) could be interpreted as stating an opinion that an inmate was ready for parole, such an opinion would be only one of many other stakeholder opinions. *See* ALA. CODE § 15-22-26(a)(3). In the end, under both Alabama and federal law, it is, and has been for the last seventy-plus years, that it is the Board's opinion on fitness for parole – and the Board's opinion *only* – that matters. *See* ALA. CODE § 15-22-26 (1951), (2016), (2019); *Ellard v. State*, 474 So. 2d 743, 749 (Ala. Crim. App. 1984) ("The Board has exclusive authority to grant paroles in Alabama.").

Plaintiffs also cite no authority holding that a low parole grant rate is arbitrary or conscience shocking in the constitutional sense. *See generally* Doc. 178 at 153–59. In fact, the Eleventh Circuit's precedent weighs against looking at parole results to determine if a Substantive Due Process violation has occurred because "'the Due Process Clause guarantees *no* substantive rights, *but only (as it says) process*[.]'" *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (emphasis in original and emphasis added) (quoting *United States v. Carlton*, 512 U.S. 26, 40 (1994) (Scalia, J., concurring opinion)). Even if a low parole grant rate or a low conformance rate were "'untoward,' 'unfortunate,' or 'understandably upsetting'[, neither] necessarily rise to the level of a substantive due process violation." *Maddox*, 727 F.3d 1109, 1127 (original citations omitted). This is particularly true where there is no right whatsoever to parole. *Greenholtz*, 442 U.S. at 7.

Due Process Plaintiffs do not allege that the Board had no justification for denying parole to individual inmates. *See generally* Doc. 1; *see generally* Doc. 178 at 153–59. Their failure to allege that the Board had no justification for denying parole weighs against a finding of egregious

conduct because many non-discriminatory factors can uphold parole denial by themselves. *See e.g.*, *Greenholtz*, 442 U.S. at 8 (in determining what's best for the community, the paroling authority accesses the nature of an inmate's crime and whether "the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice."), 9–10 (parole decisions depend on an amalgam of elements), 15 (parole consideration must include the gravity of an inmate's offense); *Fuller*, 851 F.2d at 1310 (providing a list of factors considered in parole decision-making; *Bowers v. United States Parole Comm'n*, 775 F. App'x 504, 521–22 (11th Cir. 2019) (the U.S. Parole Commission did not act with bias against an inmate when it considered negative input from the Department of Justice); *Slakman I*, 434 F. App'x at 875 ("consideration of the severity of [an inmate's] offense . . . is not the type of "most egregious conduct" required in an arbitrary and capricious analysis."); *Walker v. Fla. Parole Comm'n*, 299 F. App'x 900, 902 (11th Cir. 2008) (Due Process does not require the Board to specify what evidence was relied on to deny parole) (citing *Greenholtz*, 442 U.S. at 15); *Johnston v. Alabama Pardon & Parole Bd.*, 530 F. Supp. 589, 591 (M.D. Ala. 1982) ("failure to adjust in prison and protest . . . are certainly valid grounds [to deny parole] under the discretionary authority granted the Board of Pardons and Paroles under Alabama law."); *Bulls*, 2020 WL 906324, at *1– 2; ALA. CODE § 15-22-26(a) (non-exhaustive list of reasons to deny parole).

The Due Process Plaintiffs assert, in conclusory fashion, that they are fit candidates for parole. Doc. 1 at 67-80. As a matter of law, it is not for them to decide when they are ready for parole. ALA. CODE § 15-22-26. That decision-making authority rests exclusively with the Board. *Id.* That the Due Process Plaintiffs disagree with the Board's decisions is not surprising, but it is also not conscience shocking.

Due Process Plaintiffs' race-based discrimination parole denial claims are likewise implausible for three reasons. First, the allegations that Due Process Defendants denied parole in a racially discriminatory manner merely regurgitate their implausible Equal Protection claim. The racial discrimination Substantive Due Process claim therefore fails for the same reasons the Equal Protection claim fails. *Id.*

Second, Due Process Plaintiffs failed to specify why their Substantive Due Process claim is not subsumed by their Equal Protection claim. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). Due Process Plaintiffs argue that their Substantive Due Process claim is not fully covered by their Equal Protection claim, but then fail to explain how:

> While some of the constitutionally arbitrary conduct Plaintiffs allege violates the Equal Protection Clause, as discussed above, it also encompasses arbitrary and unauthorized conduct *beyond racial discrimination*, including substantially increased denials of access to parole for parole candidates of all races, particularly those convicted of violent offenses and those already deemed low-risk enough to work in the community and return home on weekends.

Doc. 178 at 158–59 (citing *Cnty of Sacramento*, 523 U.S. at 843) (emphasis added). While referencing assertions that have nothing to do with Equal Protection (that are also addressed above in this brief), Due Process Plaintiffs' argument does not explain what specific racial discrimination act or omission attributed by the complaint to the Equal Protection Defendants' conduct is not covered by their Equal Protection claim. *Id.* Thus, they have failed to explain to the Court why their Substantive Due Process claim is not duplicative and prohibited by *Cnty of Sacramento*.

Finally, none of Due Process Plaintiffs' "uncovered" assertions finds support in Eleventh Circuit precedent. The Eleventh Circuit unambiguously holds that claims of racially discriminatory parole decisions are cognizable under the Equal Protection Clause. *See Fuller*, 851 F.2d at 1310. Likewise, the Eleventh Circuit recognizes that a plaintiff may challenge a parole decision by alleging a violation under the Ex Post Facto Clause. *See Jones v. Fla. Parole Comm'n*, 787 F.3d

1105 (11th Cir. 2015). Thus, all the Due Process Plaintiffs' claims are subsumed by other constitutional provisions. *See, e.g.*, *Cnty. of Sacramento*, 523 U.S. at 842; *Worthy v. City of Phenix City*, 930 F.3d 1206 at 1221–22 (11th Cir. 2019); *Alcocer*, 906 F.3d t 955. Thus, the Due Process Plaintiffs fail to state a plausible Substantive Due Process claim. *See Echols*, 913 F.3d at 1326 (the Due Process Clause cannot be used to supplement a substantive right specifically covered by a constitutional provision.).

### 3.   Plaintiffs cannot bring their Substantive Due Process claim pursuant to the legislative acts exception.

Ordinarily, Substantive Due Process only protects fundamental rights, but "'[w]here a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action.'" *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1284 (11th Cir. 2021) (quoting *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014)). The courts review this challenge under the rational basis standard, and the legislative act will be upheld if it is rationally related to a legitimate government purpose. *See PBT Real Est., LLC*, 988 F.3d at 1284. However,

> the legislative exception does not include as-applied challenges, which "are always executive because the executive is responsible for applying, or enforcing, the law." . . . We are mindful that "non-legislative deprivations of state-created rights . . . cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrar[ily] and irrationally."

*Id.* (original citations omitted). Further, federal law considers all "as-applied challenges" under this exception to be executive acts. *Id.* at 1824 n.20 (quoting *Hillcrest Prop., LLP*, 915 F.3d at 1301).

Despite asserting that they can bring their Substantive Due Process claim under the legislative act exception, Plaintiffs cannot for three reasons. First, as a matter of law, Alabama's parole statutes do not create a right to parole. *See e.g.*, ALA. CODE § 15-22-26(c) (no right to

parole); *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982) ("Alabama parole statutes do not create a liberty interest[.]"); *Ellison v. Alabama Bd. of Pardons & Paroles*, No. 17-13235-D, 2017 WL 6947946, at *5 (11th Cir. Dec. 13, 2017) ("Alabama has not created a liberty interest in parole."); *Turner v. Ivey*, No. SC-2022-0538, 2023 WL 4672503, at *7 (Ala. July 21, 2023) ("[Alabama] caselaw makes clear that an inmate has no liberty interest in parole.") (original citations omitted). Given that the legislative act exception only applies to the deprivation of a person's "state-created rights", the absence of a right to parole for inmates precludes Plaintiffs from raising their Substantive Due Process claim through this exception. *Id.*

Second, Plaintiffs explicitly allege that "Due Process Defendants engaged in a legislative act[] by seizing on a change in state law *to implement* far more stringent and discriminatory parole criteria that apply to all parole hearings." Doc. 178 at 157 (emphasis added). "The fundamental flaw in [Plaintiffs'] contentions, however, is that they take issue with the [Board's approach to parole decision-making] *as applied* to [them]." *PBT Real Est., LLC*, 988 F.3d at 1284 (emphasis in original). Like the plaintiffs in *PBT Real Est., LLC*, Plaintiffs challenge the Board's application and implementation of Alabama parole law, and under federal law, the Board's parole decision-making constitutes an executive act, not a legislative act, for the purposes of the legislative act exception. *See PBT Real Est., LLC*, 988 F.3d at 1284 n.20. Consequently, Plaintiffs cannot bring their Substantive Due Process claim under the legislative act exception. *Id.* at 1284.

Third, even if Plaintiffs could bring their Substantive Due Process claim pursuant to the legislative act exception, they cannot establish that the Board's implementation of Alabama law is not rationally based. At the outset, Plaintiffs do not allege that the Board's reasons for denying inmates parole was unjustified. *See generally* Doc. 1; Doc. 178 at 153–59. Further, Plaintiffs concede that the Board's consideration of public safety is a legitimate interest. Doc. 178 at 157

n.85. Consequently, Plaintiffs have not alleged that the Board was wholly unjustified in denying parole to them or other inmates. *See Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007) ("Plaintiff does not contend that the teacher's conduct *was wholly unjustified* by a government interest.") (emphasis added).[24]

### K.    Plaintiffs' Conspiracy and Failure-to-Prevent Claims in Counts IX, X, and XI Fail Because Their Substantive Claims in Counts I – VIII Fail.

The parties have extensively briefed Plaintiffs' conspiracy claims brought pursuant to 42 U.S.C. §§ 1985(2) and (3) and their failure to prevent claims brought pursuant to 42 U.S.C. § 1986 in Counts IX, X, and XI. Doc. 148 at 144-51; Doc. 178 at 159-80. No parties dispute that a § 1985 conspiracy claim fails if the underlying substantive claims fail on the merits. *See Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001). No parties dispute that a § 1986 failure-to-prevent claim "requires a violation of § 1985." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997).

Therefore, in reply, the State Defendants state the following: (1) the § 1985 claims against Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm in Counts IX and X fail because the substantive claims against them in Counts I – VIII fail on the merits, *Denney*, 247 F.3d at 1190; and (2) the § 1986 claims all State Defendants fail because their § 1985 conspiracy claims fail, *Park*, 120 F.3d at 1160.

The State Defendants are immune from Plaintiffs' individual-capacity damages claims for conspiracy for the same reason. Plaintiffs clarify that they do not seek individual-capacity damages claims under § 1986 against the State Defendants in Count XI and request that their immunity arguments be disregarded. Doc. 178 at 178 n.99. In response to the State Defendants' assertions of

---

[24] Plaintiffs clarify that they seek only prospective relief for their Substantive Due Process claim. Doc. 178 at 159 n.86. Therefore, there is no need for Due Process Defendants to assert immunities as to this claim.

prosecutorial, quasi-judicial, and qualified immunity from the damages claims in Counts IX and X (doc. 148 at 146-47), Plaintiffs simply reincorporate their opposition to immunity to the substantive counts in a footnote. Doc. 178 at 170 n.93. The State Defendants likewise reincorporate their assertions of immunity as to those counts and re-assert immunity from the conspiracy claims in Counts IX and X.

Since Plaintiffs' substantive claims against the State Defendants fail, the conspiracy and failure-to-prevent claims in Counts IX, X, and XI should be dismissed.

**L.    Cooper Is Entitled to State-Agent Immunity from Plaintiff's Unjust Enrichment Claim and Plaintiffs Fail to State a Claim Against Him; Ivey and Hamm Dispute that They Are Included in Count XII; But Even If They Are, the Claims Against Them Fail.**

**1.    Cooper is immune from Plaintiffs' individual-capacity damages claim for unjust enrichment, and Plaintiffs otherwise fail to state a claim against him.**

In this case, the Plaintiffs have sued Cooper, the director of ALDOT, in his official and individual capacity, for ALDOT's alleged insufficient compensation of convict labor obtained via contract from ADOC, which has allegedly unjustly enriched ALDOT, and ultimately the State of Alabama. The Plaintiffs assert that ALDOT "knowingly benefits, financially and otherwise, from the exploitation of this coerced workforce" and that ALDOT "has subjected incarcerated persons to involuntary servitude." Doc. 1, pp. 86-87, ¶ 165. In Count XII of the Complaint, the Plaintiffs assert this conduct constitutes a state law tort claim of unjust enrichment which entitles them to monetary damages from Cooper.

The unjust enrichment claim against Cooper in his *official* capacity was discussed at length in the State Defendants' Consolidated Brief in Support of Motions to Dismiss. Doc. 148, pp. 152-154. The State Defendants, including Cooper, adopt and incorporate the prior arguments and authorities seeking dismissal of this claim in their original Motion to Dismiss. However, since the Plaintiffs how now expressly stated they "are not pursuing their unjust enrichment claim against

Cooper, Ivey, and Hamm in their official capacities and are not seeking injunctive relief from them with respect to this claim," Cooper understands that only the unjust enrichment claim against him in his *individual* capacity is being advanced by the Plaintiffs. Doc. 178 at 208. n.116.

As to the individual-capacity claim against Cooper, Plaintiffs fail to state a claim for unjust enrichment and Cooper is entitled to State-agent immunity. "To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Portofino Seaport Vill., LLC v. Welch,* 4 So. 3d 1095, 1098 (Ala. 2008). "The amount of the recovery is limited to the value of the benefit gained by the defendant, regardless of the extent of the detriment to the plaintiff." *American Family Care, Inc. v. Fox,* 642 So. 2d 486, 488 (Ala. Civ. App.1994).

To the extent Plaintiffs seek recovery from Cooper in his *individual* capacity, Plaintiffs fail to appreciate that Cooper, who serves as the Director of ALDOT, could not and has not been "enriched" or personally benefited by ALDOT's statutorily-authorized use of convict labor via contract with ADOC. *See* Ala. Code § 23-1-37. Any purported "benefit" from the convict labor as alleged by Plaintiffs would have been to the favor of ALDOT, not Cooper individually. Likewise, any amount paid by ALDOT to ADOC for the disputed labor, legally sufficient or otherwise, would have been paid by ALDOT to ADOC. Accordingly, to the extent the Plaintiffs seek "disgorgement" or monetary damages as alleged in the complaint, any amount that could conceivably be owed would by ALDOT, not Cooper individually. In fact, the complaint acknowledges that it is ALDOT, *not Cooper*, that benefits "from its exploitation of this coerced workforce." Doc. 1, pp. 86-87, ¶ 165. As such, the complaint fails to state a valid unjust enrichment claim against Cooper in his individual capacity and this claim is due to be dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P.

In addition, to the extent the Plaintiffs attempt to seek recovery from Cooper in his *individual* capacity, the state law unjust enrichment claim is barred by State-agent immunity set out at Alabama Code § 36-1-12(c) because all actions or inactions alleged against are solely based on Cooper's exercise of his judgment in executing his responsibilities as Director of ALDOT. Section 36-1-12(c) states in pertinent part:

> "(c) An officer, employee, or agent of the state, including, but not limited to, an education employee, is immune from civil liability in his or her personal capacity when the conduct made the basis of the claim is based on the agent's doing any of the following:
>
>    (1)    Formulating plans, policies, or designs.
>
>    (2)    Exercising his or her judgment in the administration of a department or agency of government, including but not limited to, examples such as:
>
>        a.    Making administrative adjudications.
>
>        b.    Allocating resources.
>
>        c.    Negotiating contracts.
>
>        . . .
>
>    (3)    Discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the manner for performing the duties and the state agent performs the duties in that manner."

(Emphasis added). State-agent immunity is designed to protect state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities. *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). Contracting with ADOC for the use of convict labor, which is expressly permitted by Alabama Code § 23-1-37, certainly falls within the exercise of Cooper's judgment in performing his job responsibilities for ALDOT. The complaint contains no specific allegations of any actions or inactions taken by Cooper in his individual capacity; rather, all claims arise out of his exercising his official duties as the Director or ALDOT in the administration of the department, including entering contracts with ADOC for the use of convict labor. There are no

allegations that Cooper personally or individually benefitted financially from these contracts between the two state agencies.

The Plaintiffs in their Response fail to substantively address the broad State-agent immunity available to state employees like Cooper sued in their individual capacities and, instead, make unsupported assertions that they "have alleged facts supporting the inference that Cooper acted at least willfully, beyond his authority, and under a mistaken interpretation of law" as set out in Alabama Code § 36-1-12(d)(2) solely because they contend they were underpaid for their labor for ALDOT by ADOC. Doc.178 at 208. To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must state a claim to relief that, accepted as true, is plausible on its face." *Iqbal*, 556 U.S. at 678. Plausibility requires "more than a sheer possibility that a defendant acted unlawfully" and more than labels, conclusions, "formulaic recitations of the elements," or "naked assertions." *Id.* Plaintiffs have failed to meet their burden against Cooper in response to his assertion of State-agent immunity, and their unjust enrichment claim should be dismissed.

In conclusion, because Cooper is entitled to State-agent immunity for the state law claim of unjust enrichment. In addition, as set out above, Count XII fails to state a claim against Cooper for which relief can be granted. Accordingly, Cooper is entitled to dismissal of the unjust enrichment claim pursuant to Rule 12(b)(6).

### 2.   Plaintiffs improperly argue that Ivey and Hamm are included as "employer defendants" in Count XII.

Count XII is asserted collectively against "Employer Defendants," who are not specifically enumerated. The closest Plaintiffs come to defining "employer defendants" is paragraph 133, which mentions Ivey but does not state that she employs inmates. Doc. 1 ¶ 133. That paragraph does not mention Hamm at all. Plaintiffs allege "Ivey's mansion has employed the coerced labor of incarcerated Alabamians," but does not allege that Ivey herself employed inmates. *Id.* ¶ 160.

Plaintiffs do not allege that Hamm employs inmates, *id.* ¶ 164, and there is nothing to put Hamm on notice that he is included among the "employer defendants."

But Plaintiffs play "gotcha" and state Ivey and Hamm are included among the Employer Defendants but have failed to address the unjust enrichment claim. Doc. 178 at 208. Ivey was not on notice she was an "employer defendant" included in Count XII and cannot be considered an employer defendant. Ivey is sued only in her individual capacity in the unjust enrichment count. Doc. 178 at 208 n.116. The only reference conceivably related to Ivey and use of inmate labor is the allegation that "Ivey's mansion has employed the coerced labor of incarcerated Alabamians." Doc. 1 ¶ 160. But no *individual Plaintiff* alleges he or she worked in the Governor's mansion. *See* Doc. 146-54; *see also* Doc. 178 at 86-87 (containing chart indicating which Plaintiff worked for which employer defendant). Also the Governor's Mansion is not controlled by Ivey but an independent state agency, the Governor's Mansion Authority, which has "exclusive control" over the Governor's Mansion as well as title to the property. Ala. Code § 41-9-543(b), (c). Plaintiffs' allegation that the "mansion has employed" inmates can refer only to the Mansion Authority as a matter of law, and Plaintiffs make no factual allegations that Ivey in her individual capacity used inmate labor.

Hamm is also sued only in his individual capacity for unjust enrichment. Doc. 178 at 208 n.116. Hamm does not "employ" inmates in his individual capacity, nor is he alleged to have done so. ADOC requires inmates to perform chores in prisons and offers work release, but it is not alleged to have done so for any benefit to Hamm in his individual capacity.

Plaintiffs' argument that Ivey and Hamm are included as employer defendants when they are not mentioned in Count XII is an improper attempt to amend their complaint through argument in a brief. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Plaintiffs

use a "shotgun pleading" tactic of "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). These pleading and argument tactics fail "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* As a result, the Court should find that Ivey and Hamm are not included in Count XII. Alternatively, Ivey and Hamm should have their motions to dismiss Count XII considered for the reasons below.

### 3. Ivey and Hamm are entitled to immunity from Plaintiffs' unjust enrichment claim, and Plaintiffs otherwise fail to state a claim against them in their individual capacities.

Ivey is entitled to absolute sovereign immunity from suit for the damages claims asserted against her in her individual capacity. Unlike the State-agent immunity that applies to statutorily-created officers such as Cooper and Hamm, Ivey, as Governor, enjoys absolute immunity from damages claims under Article I, Section 14 of the Alabama Constitution. "When determining whether a State interest in an action against a state official or employee in his or her individual capacity is sufficient to trigger the immunity granted by § 14, [Supreme Court of Alabama] cases distinguish between the standards applied to those state agents or employees whose positions exist by virtue of legislative pronouncement and those who serve as the *constitutional officers* of this State." *Ex parte Davis*, 930 So 2d 497, 500 (Ala. 2005) (emphasis added). "[A] claim for monetary damages made against a *constitutional officer* in the officer's individual capacity is barred by State immunity whenever the acts that are the basis of the alleged liability were performed within the course and scope of the officer's employment." *Ex parte Davis*, 930 So. 2d at 500-01; *see also Reynolds v. Calhoun*, 650 F. Supp. 3d 1272, 1276-77 (M.D. Ala. 2023) (discussing the distinction

under Alabama law between suits against constitutional officers and suits against statutorily-created officers).

Governor Ivey is a state constitutional officer. *See* Ala. Const. Art. V, sec. 112 (listing the executive branch officers as "a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county."). As a result, she is entitled to absolute sovereign immunity from suit so long as her alleged conduct was within the course and scope of her employment. *Davis*, 930 So. 2d at 500-01; *Reynolds*, 650 F. Supp. 3d at 1277. Although Plaintiffs fail even to allege that Ivey employs inmate laborers, to the extent she is alleged to have used inmate labor for the maintenance of the Governor's Mansion, she acted within the line and scope of her office as Governor, who is specifically authorized to reside in the Governor's Mansion controlled by the Mansion Authority. *See* Ala. Code § 41-9-541(b). Ivey is entitled to absolute immunity from suit for Count XII.

Hamm is entitled to State-agent immunity from Count XII. In *Ex parte Cranman*, the Supreme Court of Alabama provided a non-exhaustive list of functions that entitle a state official to State-agent immunity as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1)     formulating plans, policies, or designs; or
>
> (2)     exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>  (a) making administrative adjudications;
>  (b) allocating resources;
>  (c) negotiating contracts;
>  (d)  hiring,  firing,  transferring,  assigning,  or  supervising personnel; or

(3)    discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4)    exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5)    exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity … when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

"In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity." *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006) (internal citations omitted). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

Hamm can easily carry his burden of showing he was carrying out duties within the scope of the categories set out in *Cranman*. Hamm is sued in his individual capacity in Count XII and is a defendant insofar as he "is responsible for the independent direction, supervision, and control of the Department [of Corrections]." Doc. 1 ¶ 164 (citing Ala. Code § 14-1-1.3). He is also sued for allegations arising from ADOC's statutory authority to provide inmate labor for public works projects, Ala. Code §§ 14-5-1 et seq., and to offer inmates work release, *see* Ala. Code §§ 14-8-1 et seq. Hamm is sued for "exercising 'judgment in the administration' of the [A]DOC," *Ex parte*

*Ruffin*, 160 So. 3d 750, 753 (Ala. 2014), and with respect to "the *confinement of prisoners*," which implicate Categories (3) and (4). *Howard v. City of Atmore*, 887 So. 2d 201, 206 (Ala. 2003). Since Hamm is responsible for operations at all ADOC facilities, the claims against him also implicate categories (1) and (2) for formulating plans and policies and exercising judgment in the administration of an agency. *See Ex parte Price*, 256 So. 3d 1184, 1189-91 (Ala. 2018).

Since Hamm's actions arose from functions entitling him to State-agent immunity under *Cranman*, the burden is on Plaintiffs to show that one of the exceptions to State-agent immunity applies. *See Ex parte Estate of Reynolds*, 946 So. 2d at 452. Plaintiffs fail to cite any facts to show Hamm acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405. Instead, they cite only to conclusory allegations in the complaint. *See* Doc. 178 at 208-09 (citing Doc. 1 ¶¶ 134, 138-39, 143, 160, 283). Plaintiffs cannot carry their burden of overcoming Hamm's assertion of State-agent immunity with conclusory allegations. *See Ex parte Gilland*, 274 So. 3d 976, 985 n.3 (Ala. 2018) ("Although we are required to accept [the plaintiff's] <u>factual</u> allegations as true at this stage of the proceedings, we are not required to accept her <u>conclusory</u> allegations that [the defendant] acted willfully, maliciously, fraudulently, or in bad faith."). Plaintiffs argue that State-agent immunity is typically not decided on a motion to dismiss. Doc. 178 at 209 (citing *Odom v. Helms*, 314 So. 3d 220, 229 (Ala. 2020)). But *Odom* does not prohibit a grant of State-agent immunity at the motion-to-dismiss stage, and the Supreme Court of Alabama has subsequently affirmed the 12(b)(6) grant of State-agent immunity. *See Ohio Valley Conf. v. Jones*, 2023 WL 3559583, at *18-19, __ So. 3d __ (Ala. May 19, 2023). Plaintiffs fail to carry their burden of overcoming Hamm's assertion of State-agent immunity.

Even assuming Ivey and Hamm were not immune from Plaintiffs' unjust enrichment claim, Plaintiffs fail to state a claim. Plaintiffs must plausibly allege Ivey "knowingly accepted and retained a benefit" that was "provided by" Plaintiffs. *Portofino Seaport Village, LLC*, 4 So. 3d at 1098. First, no Plaintiffs allege they even worked at the Governor's mansion, and therefore no Plaintiff "provided" any conceivable benefit to Ivey. Doc. 1 ¶¶ 146-54; *see also* Doc. 178 at 86-87. Second, even if Plaintiffs had alleged they worked at the Governor's mansion, the benefit would have been provided to the Mansion Authority, a separate state agency that owns the Governor's mansion and is responsible for maintaining it. *See* Ala. Code §§ 41-9-543(b), (c). Ivey does not employ workers for the Governor's mansion or financially benefit from any alleged inmate labor in her individual capacity, and Plaintiffs thus fail to allege she "knowingly accepted and retained a benefit" from any worker at the mansion. *Portofino*, 4 So. 3d at 1098. As to Hamm, Plaintiffs fail to allege he "knowingly accepted and retained a benefit" they provided to him, as opposed to ADOC. Plaintiffs have sued Hamm only in his individual capacity for unjust enrichment, doc. 178 at 208 n.116, yet they allege no personal benefit he receives from inmate labor. They allege only that ADOC benefits from their unpaid labor in performing chores in facilities, doc. 178 at 86-87, and therefore they fail to state an unjust enrichment claim against Hamm in his individual capacity.

While Plaintiffs should not be allowed to assert claims against Ivey and Hamm in Count XII due to the lack of notice, even if they could, they should be dismissed.

## Conclusion

For the reasons stated above, all claims against the State Defendants are due to be dismissed.

Respectfully submitted,

Steve Marshall,

*Attorney General*

/s/ Brad A. Chynoweth
Brad A. Chynoweth
*Assistant Chief Deputy, Civil Division*

Benjamin M. Seiss
*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Brad.Chynoweth@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

**Counsel for Defendants Governor Kay Ivey and Attorney General Steve Marshall**

/s/ Tara S. Hetzel (with permission)
Tara S. Hetzel
*Deputy Attorney General*

Cameron W. Elkins
*Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Tara.Hetzel@AlabamaAG.gov
Cameron.Elkins@AlabamaAG.gov

**Counsel for Defendant ADOC Commissioner John Hamm**

/s/ Gary L. Willford, Jr. (with permission)
Gary L. Willford, Jr.
*Assistant Attorney General*

Alabama Board of Pardons & Paroles
301 South Ripley Street, Bldg. D
Montgomery, AL 36104
(334) 353-4495 (phone)

(334) 315-4793 (fax)
Gary.Willford@paroles.alabama.gov

***Counsel for Defendants Alabama Board of Pardons and Paroles Chair Leigh Gwathney and Parole Board members Darryl Littleton and Gabrelle Simmons***

/s/ S. Anthony Higgins (with permission)
S. Anthony Higgins
 *Assistant Attorney General*

William F. Patty
 *Assistant Attorney General*
 *Chief Counsel*

State    of    Alabama    Department    of Transportation
1409 Coliseum Boulevard, Room 147
Montgomery, Alabama 36110
Telephone: (334) 242-6350
Facsimile: (334) 264-4359
higginss@dot.state.al.us
pattyw@dot.state.al.us

***Counsel for Defendant John Cooper***

**<u>Certificate of Service</u>**

I hereby certify that on this the 1st day of July 2024, I electronically filed a copy of the foregoing Reply Brief in Support of Motions to Dismiss of State Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, Hamm, And Cooper with the Clerk of the Court via CM/ECF which will notify all counsel of record.

<u>Brad A. Chynoweth</u>
*Assistant Chief Deputy, Civil Division*