# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**ROBERT EARL COUNCIL AKA**
**KINETIK JUSTICE, *et al.*,**
    Plaintiffs,

**v.**

**KAY IVEY, *et al.*,**
    Defendants.

**Case No. 2:23-cv-712-CLM**

## <u>MEMORANDUM OPINION</u>

Plaintiffs Robert Earl Council; Lee Edward Moore, Jr.; Lakiera Walker; Jerame Aprentice Cole; Frederick Denard McDole; Michael Campbell; Arthur Charles Ptomey, Jr.; Lanair Pritchett; Alimireo English; Toni Cartwright; Union of Southern Service Workers, Service Employees International Union ("USSW"); Retail, Wholesale and Department Store Union, Mid-South Council ("RWDSU"); and The Woods Foundation sue 24 defendants, challenging Alabama's parole system and work release program. Each defendant moves for the court to dismiss Plaintiffs' complaint under Rule 12. (*See* docs. 139, 141, 142, 143, 144, 145, 146, 147, 149, 150, 152, 153, 155, 156, 171, 174, 175, 201, 209).

As explained within, the court **GRANTS** the motions to dismiss the counts brought against both the Employer Defendants and State Defendants (Counts 1–3, 11–12) on shotgun pleading grounds. The court **GRANTS** the State Defendants' motions to dismiss the counts brought solely against them (Counts 4–10) for either jurisdictional or merits-based reasons.[1] Because this complaint is Plaintiffs' first, each dismissal is ***without*** prejudice and Plaintiffs will have until **April 10, 2025,** to file an amended complaint. Part IV of this opinion explains the procedure for filing responsive pleadings going forward.

---

[1] The court **DENIES AS MOOT** Plaintiffs' motion for a hearing on the pending motions to dismiss (doc. 211).

# I.

# BACKGROUND

Plaintiffs contend that Alabama Governor Kay Ivey, Attorney General Steve Marshall, and Alabama Department of Corrections ("ADOC") Commissioner John Hamm are engaged in an unlawful scheme to coerce persons in ADOC custody, especially Black inmates, to work for little or no pay. Plaintiffs also allege that employers who participate in Alabama's work release and work center programs are both the beneficiaries of and participants in this unlawful enterprise. These employers include Defendants John Cooper; City of Montgomery; City of Troy; Jefferson County; RCF, LLC; Koch Foods, LLC; Ju-Young Manufacturing America, Inc.; SL Alabama, LLC; Hwaseung Automotive USA LLC; Progressive Finishes, Inc.; C.B.A.K, Inc.; Southeast Restaurant Group-Wen, LLC; Pell City Kentucky Fried Chicken, Inc.; Masonite Corporation; Cast Products, Inc.; Southeastern Meats, Inc.; Paramount Services, Inc.; and Bama Budweiser of Montgomery, Inc.[2] The main way in which Plaintiffs allege Ivey and Marshall have coerced inmates into performing labor is by conspiring with Alabama's Board of Pardons and Parole to shut down the availability of parole in Alabama.

The court thus breaks its background section into two parts: (a) allegations related to the State's alleged forced labor scheme, and (b) allegations describing Alabama's decreasing parole grant rate. Because Defendants seek to dismiss the complaint under Rule 12, the court states the facts as Plaintiffs plead them and assumes that Plaintiffs' alleged facts are true. *See Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984).

## A.    The Alleged Forced Labor Scheme

Although only 26.8% of Alabama's population identifies as Black or African American, 53% of those in ADOC custody are Black. (Doc. 1, ¶ 8). And the State makes hundreds of millions of dollars in profits and other financial benefits every year by requiring this disproportionately Black prison

---

[2] Plaintiffs originally also named Premier Kings, Inc. as an Employer Defendant but voluntarily dismissed their claims against Premier Kings after Premier Kings filed a suggestion of bankruptcy. *(See* Docs. 19, 56, 75).

population to work. (*Id.*, ¶ 9).

### 1.    How the State uses prison labor

ADOC and its partners require inmates to perform four types of labor: (a) work for private employers under the work release program, (b) work for city, county, and State agencies under the work center program, (c) work to produce goods on ADOC property under the Correctional Industries Program, and (d) work as unpaid prison staff.

A. *Work release program*: Through its work release program, ADOC contracts with private employers to "lease" inmate's labor to private businesses. (*Id.*, ¶ 11). Gemstone Foods, Ju-Young, SL Alabama, Hwaseung, Progressive Finishes, McDonald's, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods, Paramount Services, and Bama Budweiser, along with around 560 other private employers, obtain work from inmates through this program. (*Id.*, ¶ 12).

Employers who participate in ADOC's work release program are legally required to pay inmates the prevailing wage for the job performed. (*Id.*, ¶ 20). But Black inmates have reported working side-by-side with white workers who are performing less skilled or less difficult jobs while making a markedly higher hourly rate. (*Id.*). And for each paycheck issued by a private employer for an inmate's work, ADOC receives the funds and automatically deducts 40% of the inmate's gross earnings "to assist in defraying the cost of his/her incarceration." (*Id.*, ¶ 15). ADOC assesses this flat 40% fee regardless of the actual cost of the inmate's incarceration or how much the inmate is earning from the private employer. (*Id.*). Plus, ADOC charges each inmate around $5 per day for ADOC transportation to and from their work release job site. (*Id.*, ¶ 16).

B. *Work center program*: ADOC also operates work centers that compel inmates with a minimum custody classification to perform work for city, county, and state government agencies, including the Alabama Department of Transportation ("ALDOT"), City of Montgomery, City of Troy, and Jefferson County. (*Id.*, ¶ 24). No matter how many hours inmates work for these state and local agencies their daily income for each day of labor is usually limited to $2. (*Id.*, ¶ 26).

Between 2018 and 2023, Alabama required inmates to work for the State Capitol, the Governor's Mansion, the Alabama Supreme Court, and Decatur Youth Services. (*Id.*, ¶ 27). Local government agencies, such as the Pike County Road Department and Coffee County, have also used inmate labor. (*Id.*). For example, in 2023, inmates worked for public employers as landscapers, janitors, drivers, day laborers, and teachers. (*Id.*). And in 2016, ALDOT and ADOC entered into a 10-year lease agreement providing that ALDOT would lease ADOC land "in exchange for the use of" inmates to perform highway maintenance. (*Id.*, ¶ 29).

Black inmates with minimum security classifications are disproportionately assigned to lower paid work center jobs for public employers rather than being assigned to the higher paid work release jobs for private employers. (*Id.*, ¶ 34). For example, 65% of the inmates working as laborers for the City of Montgomery were Black. (*Id.*, ¶ 33). And in fiscal year 2022, Black inmates performed around 64% of the total days worked for public, work center employers. (*Id.*, ¶ 34). In contrast, Black inmates performed around 54% of the days worked in the higher-paid work release jobs for private employers. (*Id.*).

C. *Correctional Industries Program*: Another one of ADOC's labor programs for inmates is the Correctional Industries Program, which requires inmates to produce goods, such as judge's benches or vehicle tags, on ADOC property. (*Id.*, ¶ 35). ADOC's September 2023 report shows that it had secured more than $3.1 million in profit from the work performed by the inmates involved in this program. (*Id.*). The program also benefits the state agencies who purchase goods manufactured through the Correctional Industries Program because these agencies would have to pay more for these goods in the open market. (*Id.*). The inmates who work for the Correctional Industries Program typically have a starting pay of 25 cents per hour or less. (*Id.*, ¶ 36).

D. *Staffing prisons*: Finally, because of understaffing, ADOC has turned to inmates to perform jobs that correctional and other state employee staff historically performed. (*Id.*, ¶ 37). These jobs include skilled construction, wiring and repairing HVAC and electricity systems, overseeing drug and alcohol treatment programs, serving as the Officer in Charge of an entire dorm, processing new admittees, working in the cafeteria, handling trash, mowing lawns, and doing laundry. (*Id.*, ¶ 38). ADOC does not pay any wages to the

inmates who perform this in-facility work. (*Id.*, ¶ 37).

## 2.    ADOC's response to work stoppages

Plaintiffs point to four ways in which Alabama coerces inmates to work. First, Plaintiffs say ADOC punishes inmates who refuse to work through ADOC regulations and the actions of individual corrections officers.

A. *ADOC regulations*: In January 2023, Governor Ivey issued an executive order that identified refusal to work and encouragement of work stoppages as medium and high-level violations of ADOC rules. (*Id.*, ¶ 46). She also authorized ADOC to impose additional punishments for these violations, including "time to be served in restrictive housing." (*Id.*). ADOC complied with Governor Ivey's directive by classifying the refusal to work as a medium level offense. (*Id.*, ¶ 47). As a result, this offense may now be punished by confinement to restrictive housing for up to 30 days, forfeiture of at least 720 accrued good-time days, at least a 6-month bar from earning good-time days, a recommendation for custody classification review, loss of all privileges and incentives for up to 45 days, and extra duty for up to 45 days. (*Id.*).

ADOC regulations consider encouraging or causing others to stop work as a high-level violation on par with assault, robbery, and inciting a riot. (*Id.*, ¶ 48). As a result, an inmate who encourages other inmates to refuse to work may be punished with solitary confinement for up to 45 days, a loss of at least 1,080 accrued good-time days, at least a one-year ban from earning additional good-time days, a recommendation for custody review, loss of any privileges and incentives for up to 60 days, and extra duty for up to 60 days. (*Id.*).

Inmates' private and public employers knowingly help enforce these ADOC regulations. (*Id.*, ¶ 49). For example, ADOC's Work Release Program Employer Agreement tells employers that if an inmate "refuses to work as requested," the employer must notify ADOC in writing when the inmate returns to their work release facility. (*Id.*).

B. *Correctional officer actions*: ADOC officials have also responded to efforts to resist labor demands with severe threats and cruel and violent physical punishment. (*Id.*, ¶ 61). For example, Plaintiff Robert Earl Council has been punished for founding and organizing the Free Alabama Movement, which has used work stoppages and strikes to protest prison conditions and the forced labor of inmates. (*Id.*, ¶¶ 61–64).

Following a 2022 strike, ADOC meted out violent repression toward strikers. (*Id.*, ¶ 65). For example, ADOC reduced the strikers' food supply, placed strike leaders in solitary confinement, and modified ADOC regulations to increase punishment for disciplinary violations related to the refusal to work. (*Id.*). Council has especially been singled out for punishment. (*Id.*, ¶ 66). In 2020, a group of ADOC officers beat Council so severely he had to be med-flighted to a trauma center to save his life. (*Id.*, ¶ 68). Because of the beating, Council lost vision in one eye and has suffered extensive physical permanent damage, including brain injury. (*Id.*). Council has also been denied visitation privileges, phone privileges, and outside exercise activities for years at a time. (*Id.*, ¶ 69). The last time ADOC allowed Council to see his daughter and mother was in December 2015. (*Id.*).

Inmates other than Council have also been punished for participating in the Free Alabama Movement's efforts to resist forced labor. For example, ADOC forced one work release worker to work within ADOC facilities to break the 2022 strike. (*Id.*, ¶ 70). When this worker sought to honor the strike by declining to work, ADOC removed him from the work release program, put him "behind the wall" at Limestone, and placed him in solitary confinement for several months. (*Id.*). ADOC officials caution other inmates that a refusal to work will be met with the same punishment meted out to Council, which is known as the "Robert Earl Rule." (*Id.*, ¶ 71).

### 3. Coercive conditions of confinement

Plaintiffs also say that by creating and maintaining conditions of extraordinary violence in its medium- and maximum-security prisons, Alabama has created inherently coercive conditions that render forced all labor extracted from ADOC's predominantly Black inmate population. (*Id.*, ¶ 51). Being incarcerated in one of these facilities is life-threatening, and the inmates

who live there know it. (*Id.*, ¶ 59). Accepting a job either outside the walls of medium-security and maximum-security facilities or in a position that removes an inmate from the most dangerous areas of those facilities is the only way to escape the serious threat of physical harm. (*Id.*).

For example, Plaintiff Lee Edward Moore, Jr. has worked for more than 25 years providing highly skilled mechanical, building, and electrical work for ADOC without *any* compensation. (*Id.*, ¶ 60). Moore currently works on the custody squad at Holman, which lets him work unsupervised cutting grass outside the walls of one of the highest-security facilities in ADOC. (*Id.*). Moore also performs maintenance tasks inside the facility, which lets him spend time during the day away from more violent areas of the prison. (*Id.*). When approving Moore for this job, ADOC also approved Moore to live in a separate, much smaller and less violent dorm within Holman that is limited to inmates who perform kitchen, canteen, and officer-runner roles. (*Id.*).

### 4.    Excessive charges for necessities

Plaintiffs say that ADOC also coerces inmates to perform labor by requiring inmates to pay excessive, marked-up amounts to ADOC for basic life necessities. (*Id.*, ¶ 72). For example, ADOC does not provide inmates with warm winter clothes, usable shoes, or deodorant. (*Id.*, ¶ 73). And a pair of shoes that retails for $70 outside of prison costs inmates 58% more to buy through ADOC. (*Id.*). ADOC also charges inmates for medical visits, and an inmate housed in a facility without on-premises medical care may be charged $8 to $12 for van transport to a prison with a medical facility. (*Id.*, ¶ 74).

In recent years, the fees charged by ADOC for necessities have soared, far outpacing inflation. (*Id.*, ¶ 75). Meanwhile, the limited purchasing power of most inmates has not increased at all. (*Id.*). ADOC's ability to charge these excessive prices encourages ADOC to keep as many people incarcerated as possible because ADOC gets a share of all funds for goods purchased in the canteen or snack line. (*Id.*, ¶ 76). These charges also compel inmates to accept whatever work assignments they are given if the job includes any pay at all. (*Id.*).

**B.    Alabama's Declining Parole Grant Rate**

Finally, Plaintiffs allege the Governor and Attorney General prop up Alabama's forced labor of inmates by conspiring with the Parole Board to grow the size of Alabama's predominantly Black prison population.

### 1.    1951 Statute

When each Plaintiff inmate committed his offense, a 1951 statute described how the Parole Board was to exercise its discretion when deciding whether to grant parole:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society.

1951 Ala. Laws Act No. 1951-599 § 7. By September 2014, Alabama's prisons had become the most overcrowded in the nation, operating at 195% capacity. (Doc. 1, ¶ 79). So the Alabama Legislature created a task force to study the State's criminal justice system. (*Id.*).

The taskforce determined that the absence of "structured parole decision making" was an important contributor to prison overcrowding. (*Id.*, ¶ 80). The taskforce also noted that based on the Parole Board's own reports, the Board placed less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison, than on factors an individual cannot change, such as prior criminal history and the nature of the underlying offense. (*Id.*).

### 2.    Justice Reinvestment Act of 2015

The result of the statewide effort to address Alabama's correctional systems crisis was the Justice Reinvestment Act of 2015 ("JRA"). (*Id.*, ¶ 83). This Act required the Parole Board to establish "structured, actuarially based" guidelines to aid Board members in determining a prisoner's fitness for parole and stated that the guidelines "shall promote the use of prison space for the

most violent and greatest risk offenders." Ala. Code § 15-22-26(a). The Board's guidelines had to include:

> (1) The prisoner's risk to reoffend, based upon a validated risk and needs assessment;
>
> (2) Progress by the prisoner and the Department of Corrections to plan for reentry;
>
> (3) Input from the victim or victims, the family of the victim or victims, prosecutors, and law enforcement entities;
>
> (4) Participation in risk-reduction programs while incarcerated;
>
> (5) Institutional behavior of the prisoner while incarcerated; and
>
> (6) Severity of the underlying offense for which the prisoner was sentenced to incarceration.

*See id.*

The risk needs assessment that the Board adopted was the Ohio Risk Assessment System ("ORAS"). (Doc. 1, ¶ 84). Following this risk assessment and accounting for the other relevant factors, the Board must give each potential parolee a parole score. (*Id.*, ¶ 85). The Parole Guidelines suggest that the Board should generally grant parole to those who score between 0 and 7 and should deny parole to those who score 8 or higher. (*Id.*).

Implementation of the JRA had its intended effect. By applying the JRA's objective standards, parole grants rose from 2,270 people in FY 2015 to 3,730 people in FY 2018. (*Id.*, ¶ 87). And there was near parity in parole outcomes between Black and white parole candidates. (*Id.*, ¶ 90). For example, in FY 2018, both Black and white parole candidates had parole grant rates above 50% with 50.7% of Black inmates granted parole and 54.4% of white inmates granted parole. (*Id.*).

### 3. Jimmy Spencer Murders Three in 2018

White parolee Jimmy Spencer murdered three people after he was released on parole and evaded supervision. (*Id.*, ¶ 91). Governor Ivey and Attorney General Marshall then summoned the Parole Board members to a meeting in the Governor's office. (*Id.*). During the meeting, the Governor and

Attorney General commanded the Parole Board to disregard the JRA's evidence-and-data-based decision-making framework and to stop releasing people, particularly those in prison for violent convictions. (*Id.*). The Board pushed back against the Governor and Attorney General's directives, so Governor Ivey issued an Executive Order that imposed a moratorium on early parole consideration for 75-days or until the Board implemented a corrective action plan. (*Id.*, ¶¶ 91–92).

### 4. 2019 Parole Amendments + Implementation

About a year later, the Alabama Legislature amended the JRA. These 2019 amendments gave the Governor exclusive authority to appoint the Director of Pardons and Paroles who is to "serve at the pleasure of the Governor." Ala. Code § 15-22-21(a). And the statutory standard for parole decisions changed to:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole and to ensure public safety. The guidelines shall serve as an aid in the parole process and shall promote the use of prison space for the most violent and greatest risk offenders, while recognizing that the board's paramount duty is to protect public safety.

Ala. Code § 15-22-26(a) (highlight added).

After the 2019 amendments went into effect, Ivey replaced the Parole Board's Black Executive Director Eddie Cook with former Alabama Circuit Judge Charles Graddick. (*Id.*, ¶ 94). Parole Board Chair Lyn Head resigned a few months later. (*Id.*, ¶ 96). According to Head, one of the reasons for her resignation was the "blatant . . . racial discrimination" she observed at the Parole Board after Graddick took over. (*Id.*). Ivey replaced Head with current Parole Board Chair Leigh Gwathney. (*Id.*). During Gwathney's tenure as Parole Board Chair, both the overall parole grant rate and the grant rate for those convicted of violent crimes has drastically declined:



Plaintiffs also say that there has also been a racial skew in the Parole Board's decision-making calculus since 2019. For example, when you control for facility type, fiscal year, sex, and job status white parole candidates are around 2 times more likely to be granted parole than Black parole candidates. (*Id.*, ¶ 108). And the Parole Board has granted reset dates of two years or less to white parole candidates denied parole much more often than it has to Black parole candidates denied parole:



—

Plaintiffs tie their parole-based allegations to their forced labor allegations by asserting that the Parole Board is also disproportionately denying parole to low-risk rather than medium-risk inmates. (*Id.*, ¶¶ 113–22). Plaintiffs say that this data establishes that Ivey, Marshall, and the Parole Board members are increasing the rate of parole denials to ensure that low-risk Black inmates are available to provide labor for the benefit of the participants in the State's forced-labor scheme. (*Id.*, ¶ 132).

Plaintiffs thus allege that Ivey, Marshall, Hamm, and the Parole Board have unlawfully obtained inmate labor in violation of the Trafficking Victims Protection Act ("TVPA"). (*Id.*, ¶¶ 203–211(Count 1)). Plaintiffs also allege that the Employer Defendants knowingly benefitted from participating in this unlawful forced labor scheme. (*Id.*). And Plaintiffs say that by unlawfully coercing inmates to work, Defendants have engaged in an illegal racketeering scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (*Id.*, ¶¶ 212–220 (Count 2)). Plaintiffs also assert that the Employer Defendants' actions (a) violate the Alabama constitution's prohibition on involuntary servitude, and (b) unjustly enriched the employers. (*Id.*, ¶¶ 221–25, 281–83 (Counts 3, 12)). Finally, Plaintiffs contend that the Employer Defendants violated 42 U.S.C. § 1986 by not withdrawing from the work release and work center programs to prevent Ivey, Marshall, and the Parole Board from conspiring to engage in racially discriminatory denials of parole. (*Id.*, ¶¶ 276–80 (Count 11)).

The court will address these claims that focus on the alleged conspiracy between the Employer Defendants and State Defendants to maintain a large, predominantly Black, work force before it addresses the claims brought against only the State Defendants.

## II.

## SHOTGUN PLEADING

Several of the Employer Defendants assert that the court should dismiss the counts against them for violating this Circuit's shotgun pleading rules. As explained below, the court agrees.

### A.    Standard

A shotgun pleading is any pleading which "fail[s] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Both the Federal Rules of Civil Procedure and Eleventh Circuit precedent prohibit shotgun pleadings. *See* Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 10(b); *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356–57 (11th Cir. 2018).

Although shotgun pleadings can take many forms, the Eleventh Circuit has identified four "rough types" of shotgun pleadings. *Weiland*, 792 F.3d at 1321–23. The categories most relevant here are (1) complaints that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," and (2) complaints that assert "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Id.* at 1322–23.

This court "has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading grounds." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). So rather than decide the case on the merits, "district courts faced with a shotgun pleading should—pursuant to their inherent authority—*immediately* order a repleader and instruct the party to plead its case in accordance with Federal Rules of Civil Procedure 8(a)(2) and 10(b)." *Barmapov v. Amual*, 986 F.3d 1321, 1329 (11th Cir. 2021) (Tjoflat, J., concurring).

## B.  Analysis

Each of the counts that include claims against the Employer Defendants is an example of an impermissible shotgun pleading.

1. *Count 1*: As explained, Count 1 alleges that each Defendant violated the TVPA by participating in ADOC's work release and work center programs. This count incorporates by reference all but 3 of the complaint's 202 numbered paragraphs of factual allegations, which span 98 pages. (Doc. 1, ¶ 203). But Count 1 does little to explain which factual allegations relate to which element of Plaintiffs' TVPA claims. Nor do Plaintiffs explain whether some of these factual allegations apply to only their claims against the State Defendants under 18 U.S.C. § 1589(a) or if they also apply to Plaintiffs' claims against the Employer Defendants under 18 U.S.C. § 1589(b). Thus, the court and Defendants must speculate how each of the 199 numbered paragraphs that Count 1 incorporates supports the elements of Plaintiffs' TVPA-related claims.

It is also far from apparent why each of these 199 paragraphs of factual allegations, especially those lauding the success of the JRA, are material to Count 1. So Count 1, as currently pleaded, doesn't comply with Rule 8 and 10's pleading requirements. *See Barmapov*, 986 F.3d at 1325 (finding a complaint was "undoubtedly" a shotgun pleading when it incorporated 249 numbered paragraphs of factual allegations into 9 of 19 counts "without any effort to connect or separate which of those 249 factual allegations relate to a particular count").

Plus, Count 1 alleges that the "Employer Defendants knowingly benefitted, financially and otherwise, from participation in ADOC's work-release and work-center programs, knowing or in reckless disregard of the fact that their lucrative joint venture with ADOC has engaged in the providing or obtaining of labor or services from Plaintiffs and the Forced Labor Class by each of the unlawful means alleged in paragraphs 1 through 143 above." (Doc. 1, ¶ 210). "[G]eographic and temporal realities make plain that all of the defendants could not have participated in every act complained of" in these 143 numbered paragraphs. *See Magulata v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). Yet Plaintiffs make no effort to explain which of these 143 paragraphs apply to which Employer Defendant. This type of pleading is

improper under both the Federal Rules of Civil Procedure and the Eleventh Circuit's shotgun pleading caselaw.

Because of these pleading deficiencies, the court will require Plaintiffs to replead Count 1. Plaintiffs' amended complaint should make clear which of the numbered paragraphs of factual allegations support which element of Plaintiffs' TVPA claims. Plaintiffs should also explain the specific Defendants that are alleged to be responsible for each alleged act or omission.

It may be helpful for Plaintiffs to use a chart to show how each Defendant is connected to the factual allegations that Plaintiffs say support their TVPA claim. It may also be helpful for Plaintiffs to separate into two counts their claims against the State Defendants under 18 U.S.C. § 1589(a) and their claims against the Employer Defendants under 18 U.S.C. § 1589(b).

2. *Count 2*: Count 2, which brings RICO claims against each Defendant, incorporates by reference all but 4 of Plaintiffs' 202 numbered paragraphs of factual allegations. (Doc. 1, ¶ 212). And Plaintiffs lump all Defendants together by simply alleging "Defendants conduct and participate, directly or indirectly, in the conduct of the Enterprise through a pattern of thousands of acts of racketeering activity." (*Id.*, ¶ 217). Thus, both the court and Defendants are left wondering (a) what's the specific racketeering activity that Plaintiffs contend support their RICO claim, and (b) which Defendants Plaintiffs allege are responsible for each alleged racketeering activity.

As a result, the court will require Plaintiffs to replead Count 2. Plaintiffs' amended complaint must point to the specific factual allegations that support their claim that Defendants engaged in thousands of acts of racketeering activity. Plaintiffs must also specify which Defendant is responsible for which act and how each Defendant either directly or indirectly participated in the alleged racketeering activity.

3. *Counts 3 & 12*: Count 3 alleges that Defendants' participation in the work release and work center programs violates Article I, Section 32 of the Alabama Constitution, which prohibits involuntary servitude. Count 12 alleges that the Employer Defendants' participation in these programs has led them to unjustly enrich themselves with the benefit of inmate labor.

Both these counts impermissibly lump all the Employer Defendants together, so no Defendant has "fair notice of the allegations brought against" it. *See Mathis v. City of Lakeland*, 2023 WL 2568814, at *4 (11th Cir. Mar. 20, 2023). For example, while Plaintiffs agree that private employers who participate in the work release program are required to pay inmates the prevailing wage, they allege that several Black inmates have discovered that their employers are paying white free workers more than them. (Doc. 1, ¶ 20). But Plaintiffs do not explain which of the Employer Defendants have paid Plaintiffs' white counterparts more than them, despite incorporating this factual allegation into both Counts 3 and 12. So it's unclear which of the private employers must defend themselves against the charge that they are paying inmates less than the prevailing wage.

These counts also both incorporate by reference all 66 numbered paragraphs of factual allegations related to Alabama's parole system. The court understands that Plaintiffs contend that (a) the need for inmate labor encourages the Parole Board to deny parole for most people, and (b) that the State Defendants are coercing labor by abusing the parole system. But it is far from apparent why each of these parole-related allegations, including allegations about the parole system before 2019 and the Parole Board's 2018 meeting with the Governor and Attorney General, are material to Plaintiffs' involuntary servitude and unjust enrichment claims. If these allegations are material, Plaintiffs will need to explain in the amended complaint how these allegations relate to the involuntary servitude and unjust enrichment counts.

4. *Count 11*: Plaintiffs' final claim that targets both the State Defendants and Employer Defendants is Count 11, which alleges that Defendants violated 42 U.S.C. § 1986 by not preventing Ivey, Marshall, and the Parole Board from committing racially discriminatory parole denials. In this count, Plaintiffs again impermissibly lump all Defendants together saying that "[a]ll Defendants had knowledge of the wrongs that Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons conspired to be committed" and that "Defendants had the power to prevent or aid in preventing the commission of these wrongs." (Doc. 1, ¶¶ 277–78).

Again, "geographic and temporal realities make plain that" Defendants would not have the same knowledge about or exact same power to prevent

racially discriminatory parole denials. *See Magulata*, 256 F.3d at 1284. Employer Defendants include ADOC Commissioner John Hamm, the City of Montgomery, Masonite, KFC, McDonald's, Koch Foods, and Bama Budweiser of Montgomery. So each of these employers necessarily interacted separately with state officials and employed different inmates, in different locations, at different times, and with different objectives.

Thus, Count 11, as pleaded, does not "adequately put [Defendants] on notice of the specific claims against them and the factual allegations that support those claims." *Weiland*, 792 F.3d at 1325. To comply with the pleading requirements, Plaintiffs' amended complaint must explain which factual allegations show that each specific Defendant had both the knowledge and power to prevent the alleged conspiracy to commit racially discriminatory parole denials. As with Count 1, it may be helpful for Plaintiffs to create a chart that shows which specific factual allegations establish that each Defendant can be held liable for violating § 1986.

—

To sum up, Counts 1–3 and 11–12 fail to properly notify Defendants of the claims against them and make it impossible for the court to determine whether Plaintiffs have stated a claim against any Defendant. So the court will grant the motions to dismiss these claims and order Plaintiffs to replead these counts to satisfy the requirements of Rules 8(a) and 10(b). *See Barmapov*, 986 F.3d at 1329 (Tjoflat, J., concurring). The court will not address the merits of these claims until Plaintiffs plead them in accordance with the Federal Rules of Civil Procedure's requirements.

## III.

## CLAIMS AGAINST STATE DEFENDANTS

The counts asserted against just the State Defendants (Counts 4–10) are not improperly pleaded because they are "informative enough to permit a court to readily determine if they state a claim upon which relief can be granted." *See Weiland*, 792 F.3d at 1326. So the court will address the merits of the State Defendants' motions to dismiss these counts.

In reviewing the State Defendants' motions, the ultimate question is whether Plaintiffs' allegations, when accepted as true, "plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). If the facts as pleaded could entitle Plaintiffs to relief, then the court must deny the State Defendants' motions to dismiss. If, however, the court accepts all of Plaintiffs' pleaded facts as true, and Plaintiffs still would not be entitled to relief, then the court must grant the motions.

## A.    Standing

The court starts, as it must, with jurisdiction. The State Defendants assert that (a) Plaintiffs lack standing to sue Ivey, Marshall, or Hamm for claims challenging the State's parole practices (Counts 5–10), and (b) that Ivey, Marshall, and Hamm enjoy sovereign immunity for these claims. The court agrees with the standing argument and thus needn't address the sovereign immunity argument.

To have standing, a plaintiff must show: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to conduct of the defendant; and (3) a favorable decision would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Based on the State Defendants' standing argument, Plaintiffs concede that they should not have named Hamm as a defendant to Counts 5–8. (Doc. 178, p. 186, n.106). And as explained in the court's order denying Plaintiffs' preliminary injunction motion, Plaintiffs lack standing to sue the Governor and Attorney General because neither official has denied or will deny an individual Plaintiff's parole request (*i.e.*, causation), and neither has the authority to force individual parole decisions (*i.e.*, redressability). (*See* Doc. 181, pp. 15–18). The court adopts that analysis here and briefly recounts the rationale behind its holding below.

1. *Causation*: "To satisfy the causation requirement of standing, a plaintiff's injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quotations omitted). For two reasons, Plaintiffs' parole-related claims against Ivey and Marshall fail to satisfy this requirement. First, the Alabama Legislature has set forth statutorily defined roles for the Governor, Attorney

General, and Parole Board when it comes to parole. "[T]he decision concerning parole release [is] at the complete discretion of the" Parole Board. Ala. Code § 15-22-26(c). The Parole Board also has the sole authority to decide the length of reset dates between parole considerations. *See* Ala. Code § 15-22-37(b)(4); Ala. Admin. Code r. 640-X-3-.03. So though Ivey and Marshall have some role to play in the parole process, the legal cause of Plaintiffs' parole denials and lengthy reset dates are the decisions of the Parole Board, not Ivey and Marshall.

Second, traceability is "lacking if the plaintiff would have been injured in precisely the same way without the defendant's alleged misconduct." *City of South Miami v. Governor*, 65 F.4th 631, 645 (11th Cir. 2023). And it is speculative to say that the Parole Board would have acted differently without Ivey and Marshall's alleged misconduct or that Ivey and Marshall's actions affected any of the individual parole determinations at issue.

*2. Redressability*: Granting Plaintiffs' requested prospective relief against the Governor and Attorney General for Counts 5-10 would not redress Plaintiffs' alleged injuries. Redressability asks "whether a decision in a plaintiff's favor would significant[ly] increase . . . the likelihood that she would obtain relief that directly redresses the injury that she claims to have suffered." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (quotations omitted).

Plaintiffs ask the court to "order the Governor and Attorney General to refrain from instructing their agents and the Parole Board Members to disregard the evidence-based risk assessments [when] evaluating parole candidates and to deny parole to certain categories of incarcerated individuals." (Doc. 178, p. 185). But even if the court entered that order, nothing would require the Parole Board to start granting parole to more individuals convicted of violent offenses or to start following the risk assessments' recommendations. So enjoining the Governor and Attorney General wouldn't redress Plaintiffs' parole related injuries.

—

In short, Plaintiffs only have standing to sue the Parole Board members for the parole related claims. So the court will dismiss Counts 5–10 against

Ivey, Marshall, and Hamm for lack of standing. The court will, however, address the merits of the parole related claims brought against the Parole Board members.[3] But first, the court discusses whether Ivey and Hamm unlawfully retaliated against Plaintiffs for exercising their First Amendment rights.

## B.    First Amendment Retaliation (Count 4)

"Congress shall make no law . . . abridging the freedom of speech, or . . . the right . . . to petition the government for a redress of grievances." U.S. CONST. amend. I. This "Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (quotations omitted). Plaintiffs assert that the First Amendment protects their withholding of labor and their advocacy for work stoppages. And they say that ADOC, at Ivey and Hamm's direction, has retaliated against inmates who have engaged in this activity by (a) classifying these actions as medium or high-level disciplinary violations, and (b) subjecting these inmates to inhumane treatment, such as the deprivation of food and physical beatings.

Ivey and Hamm respond that Plaintiffs lack standing to sue them for injunctive relief and that they are entitled to qualified immunity from Plaintiffs' individual capacity claims for monetary damages.[4] The court will address each argument in turn.

### 1. Claims for Injunctive Relief

"Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of

---

[3] The State Defendants have withdrawn their argument that *Pennhurst* bars Plaintiffs' parole related claims. And as the court has explained, Plaintiffs' constitutional and federal, statutory challenges to Alabama's parole system are not state-law claims in disguise, so they do not create a *Pennhurst* problem. (*See* Doc. 181, pp. 12–14).

[4] Plaintiffs do not seek monetary damages against Ivey and Hamm in their official capacities, so the court needn't address Ivey and Hamm's argument that the Eleventh Amendment bars Plaintiffs from bringing official capacity damages claims.

*future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994). And "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (cleaned up).

Plaintiffs' allegations that ADOC has retaliated against inmates, such as Council, through physical beatings and the deprivation of food concerns past conduct. And Plaintiffs have not plausibly alleged that they face a real and immediate threat that ADOC officials will respond to future work stoppages or labor demands by beating inmates or depriving them of food—actions that Plaintiffs acknowledge are not authorized by ADOC's regulations. So Plaintiffs have no standing to seek injunctive relief under this theory of retaliation.

As for Plaintiffs' claims that refusing to work and encouraging others to participate in work stoppages subjects inmates to disciplinary violations, "a plaintiff need not expose himself to enforcement of a law to challenge it in the First Amendment context." *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011). "[I]nstead, an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Id.* (quotations omitted). But the plaintiff still "must show that he has an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute or rule, *and* that there is a credible threat of prosecution." *Id.*

Plaintiffs have not shown that they have an unambiguous intention at a reasonably foreseeable time to engage in future work stoppages. Plaintiffs allege that Council is the leader of "a labor movement whose focus has been to peacefully resist the systematic profiting by the State of Alabama from [inmates'] forced labor." (Doc. 1, ¶ 61). But Plaintiffs do not allege a reasonably foreseeable time in which Council plans to advocate for future work stoppages or even state in conclusory manner that Council intends to organize strikes in the near future.

Nor do the other inmates allege an unambiguous, future intention to withhold labor or advocate for work stoppages. The closest Plaintiffs come to alleging a future injury is by asserting that Plaintiff Toni Cartwright "has

asked for a brief break from work requirements so that she can attend to her mental health needs . . ., but she has been repeatedly advised that any failure to work, even for health reasons, will be considered a refusal to work and will result in a disciplinary offense." (*Id.*, ¶ 154). Cartwright, however, does not explain when she asked for this brief work break or if but for ADOC's disciplinary regulations she would seek a future break from work. And Cartwright connects her request for a work break with being disheartened by the Parole Board denying her parole in March 2021. (*Id.*). So it appears that the denial of Cartwright's requested work break concerns a past, not future, injury. As a result, Plaintiffs have not plausibly alleged that they have standing to seek injunctive relief for their First Amendment retaliation claims.

## 2. Individual Capacity Damages Claims

The court thus turns to Plaintiffs' individual capacity damages claims. Ivey and Hamm assert the defense of qualified immunity in response to these claims. Qualified immunity protects government officials from being sued in their individual capacities so long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit applies a two-part test to determine whether a government official is entitled to the defense of qualified immunity. "First, the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets that burden, the plaintiff must prove that the official's conduct violated clearly established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citations omitted).

Plaintiffs do not dispute that overseeing the Alabama Department of Corrections is part of Governor Ivey and Commissioner Hamm's job descriptions. So this court's task is to determine whether Plaintiffs have plausibly alleged that Ivey and Hamm violated their clearly established First Amendment rights. The court will first address Plaintiffs' claims related to ADOC classifying work stoppages as a disciplinary violation and then discuss Plaintiffs' claims that they've been subjected to inhumane treatment for supporting work stoppages.

**A. Disciplinary violations:** "To state a § 1983 First Amendment retaliation claim, a plaintiff generally must show: (1) she engaged in constitutionally protected speech, . . .; (2) the defendant's retaliatory conduct adversely affected that protected speech . . .; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech." *DeMartini*, 942 F.3d at 1289. "[A]n inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

But "an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 1277 (quotations omitted). So "if a prisoner violates a legitimate prison regulation, he is not engaged in protected conduct and cannot proceed beyond step one" of his retaliation claim. *See id.* (quotations omitted).

Plaintiffs' challenge ADOC's implementation and enforcement of regulations that responded to Governor Ivey's 2023 Executive Order to impose stringent consequences for inmates who refused to work or encouraged work stoppages. ADOC Rule Violation No. 924 makes it a high-level violation to encourage or cause others to stop work. (Doc. 148-6, p. 26). Under Rule Violation 518, refusing to work/failing to check out for work is a medium-level violation. (*Id.*, p. 29). Prison regulations, such as these, are legitimate if (1) they are rationally connected to a legitimate governmental interest, (2) there are readily available alternative means for the prisoner to exercise his rights, (3) the prisoner cannot be accommodated without burdening fellow inmates or the prison's resources, and (4) there are no obvious alternatives available to the prison that would accommodate the prisoner's conduct at a *de minimis* cost to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

Because Ivey and Hamm have asserted a qualified immunity defense, Plaintiffs must show that every reasonable official in Ivey and Hamm's position would understand Rule Violations 518 and 924 to be illegitimate under *Turner*. *See Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013). Plaintiffs can make this showing in one of three ways: (1) by pointing to a case

with materially similar facts from the Supreme Court, Eleventh Circuit, or Alabama Supreme Court; "(2) by establishing that a broader clearly established principle should control the novel facts of the case; or (3) by convincing" the court that this "case is one of those rare ones that fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) (cleaned up). Plaintiffs have failed to make this showing under any of these three methods.

1. *Case with similar facts*: It is clearly established that disciplining an inmate for filing a grievance violates the inmate's First Amendment rights. *See Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989). Plaintiffs say that Ivey and Hamm aren't entitled to qualified immunity for implementing Rule Violations 518 and 924 because Plaintiffs' refusal to work and their encouragement of work stoppages "is substantially the same core conduct as grievance filing." The court disagrees. Filing a grievance about the conditions of your confinement or your disagreement with ADOC's work release program is different conduct than refusing to work or encouraging others to engage in work stoppages. So Plaintiffs haven't shown that caselaw with materially similar facts clearly establishes that enforcement of Rule Violations 518 and 924 is illegitimate.

Instead, caselaw on inmate labor union activity and work stoppages suggests that ADOC's prohibitions on the refusal to work and encouraging others to stop working are legitimate. For example, in *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 129 (1977), the Supreme Court rejected a First Amendment challenge to prison regulations that prohibited meetings of a prisoners' labor union and inmate solicitation of other inmates to join the union. In doing so, the Court held that "[t]he ban on inmate solicitation and group meetings . . . was rationally related to the reasonable, indeed to the central, objectives of prison administration." *Id.* Relying on *Jones*, the Second Circuit has held that "[w]ork stoppages are deliberate disruptions of the regular order of the prison environment and are a species of organized union activity" that is "plainly inconsistent with legitimate objectives of prison organization." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009). So "[e]ntreaties to such activity . . . are not entitled to First Amendment protection where other less disruptive means of airing grievances are available." *Id.*

Plaintiffs say that *Pilgrim* and *Jones* are distinguishable because unlike the inmates in those cases, Plaintiffs do not have an effective alternative to challenge their forced labor. As Plaintiffs note, they have alleged that ADOC did not have an administrative grievance procedure until December 2022 and that the filing of grievances "is futile given that the conditions of forced labor are embodied in established regulations and systemic policies enforced by Defendants." (Doc. 1, ¶ 211, n.81). But this allegation does not plausibly allege that refusing to work and encouraging work stoppages were the only ways Plaintiffs could air their grievances about being forced to work. For example, Plaintiffs do not allege that they were prevented from writing the warden, contacting the media, or filing a lawsuit to discuss their concerns about ADOC forcing them to work for private and public employers. Thus, the caselaw on labor movements within prisons would at least suggest to a reasonable official that ADOC's regulations on work stoppages do not violate Plaintiffs' First Amendment rights.

2. *Broad principle*: Under the second method of proving a clearly established constitutional violation, courts look to see if "broad statements of principle in case law" make "the unlawfulness of the [official's] conduct . . . apparent." *See Powell*, 25 F.4th at 920. And application of the *Turner* factors doesn't make it apparent that implementation and enforcement of ADOC's regulations on refusing to work and encouraging work stoppages violated Plaintiffs' First Amendment rights.

*Tuner* itself recognized that prisons have a legitimate interest in limiting organizational activity among inmates, such as the coordinated work stoppages that Rule Violation 924 seeks to prevent. *See Turner*, 482 U.S. at 92. And as explained in *Pilgrim*, "[w]ork stoppages . . . are plainly inconsistent with legitimate objectives of prison organization." 571 F.3d at 205. Plus, Plaintiffs have not plausibly alleged that refusing to work and encouraging work stoppages were the only ways they could air their grievances about the forced labor scheme. Finally, it's likely that work stoppages would affect ADOC's resources, and Rule Violations 924 and 518 do not appear to be an exaggerated response to prison concerns over work stoppages because violations of these rules are punished the same way in which other medium and high-level violations are punished. Thus, the general principles announced in *Turner* do not establish with "obvious clarity" that Ivey and Hamm's

implementation or enforcement of Rule Violations 924 and 518 violated Plaintiffs' First Amendment rights. *See Powell*, 25 F.4th at 923.

3. *Rare obvious case:* Given *Pilgrim* and *Jones*, the court also finds that Plaintiffs' allegations against Ivey and Marshall do not make this one of those rare cases that describes "conduct which so obviously violates the constitution that prior caselaw is unnecessary." *See id.* at 920 (cleaned up). Under the doctrine of qualified immunity, "[w]hen the courts are divided on an issue . . . central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability." *Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017). And at least the Second Circuit has held that punishing inmates for engaging in work stoppages does not violate the First Amendment. *See Pilgrim*, 571 F.3d at 205. So it is not beyond debate that the Rules Violations at issue violated Plaintiffs' right to be free from First Amendment retaliation.

—

In sum, Plaintiffs haven't shown that Ivey and Hamm violated their clearly established right to be free from First Amendment retaliation by implementing and enforcing ADOC's regulations on refusing to work and encouraging others to do so. Thus, Ivey and Hamm are entitled to qualified immunity on these First Amendment retaliation claims.

**B. Other alleged retaliation:** Plaintiffs' other First Amendment retaliation claims seek to hold Ivey and Hamm liable for actions by correctional officers that Plaintiffs contend weren't authorized by ADOC regulations. These alleged acts of retaliation include subjecting Council to physical and psychological abuse, reducing striking workers' food supply, and telling inmates that ADOC officials will apply the "Robert Earl Rule" to those who refuse to work. (Doc. 1, ¶¶ 50, 61–71).

Supervisors "are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Harley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quotations omitted). Instead, supervisors are liable under § 1983 "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir.

2010) (quotations omitted). A causal connection exists when (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so;" (2) "a supervisor's custom or policy results in deliberate indifference to constitutional rights;" or (3) "facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (quotations omitted).

Ivey's executive order and Hamm's ADOC regulations did not authorize reducing striking workers' food supply or the physical beatings, strip searches, intolerable cell conditions, and other punishment that Council has allegedly suffered in response to his involvement with the Free Alabama Movement. So the court finds that Plaintiffs haven't plausibly alleged that these actions resulted from the policies, customs, or directions of Ivey and Hamm. Nor do Plaintiffs' well-pled factual allegations suggest that Ivey and Hamm knew ahead of time that ADOC officials planned to reduce the striking worker's food or single Council out for punishment.

Plaintiffs, however, assert that they've shown that Ivey and Hamm should have been on notice that inmates who have resisted Alabama's forced labor demands have faced a history of widespread abuse in the form of unlawful retaliation not authorized by ADOC regulations. The court disagrees. To establish a history of widespread abuse, Plaintiffs must show constitutional violations that were "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Most of the alleged retaliation Plaintiffs point to are incidents involving only Council and were not so flagrant or obvious that they would have put Ivey and Hamm on notice that Council was being retaliated against. Plus, Plaintiffs do not explain in detail their allegations that ADOC reduced striking inmates' food supply. For example, Plaintiffs do not explain how many inmates this happened to, if it happened at more than one facility, or how long officers limited the food supply. As a result, Plaintiffs have not plausibly alleged that Ivey and Hamm have supervisory liability for these actions.

—

To sum up, Plaintiffs have not plausibly alleged that they have standing to seek injunctive relief against Ivey and Hamm for retaliating against them in violation of their First Amendment rights. And it is not clearly established that Ivey and Hamm unlawfully retaliated against Plaintiffs by implementing and enforcing ADOC rule violations on refusing to work and encouraging others to participate in work stoppages. Finally, Plaintiffs have not plausibly alleged that Ivey and Hamm have supervisory liability for the unauthorized retaliatory acts of their subordinates. The court will therefore grant Ivey and Hamm's motion to dismiss Plaintiffs' First Amendment retaliation claims.

## C.    Ex Post Facto Clause (Count 5)

In Count 5, Plaintiffs allege that the Parole Board's implementation of the 2019 parole amendments violates the United States Constitution's prohibition on passing an "ex post facto Law." U.S. CONST. art. I, § 10. Among other things, this clause prevents states from passing laws that "increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249 (2000). Changing a state's parole law violates the Ex Post Facto Clause if the change creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 250.

Plaintiffs can establish an ex post facto violation in one of two ways. First, they can show that the 2019 amendments, on their face, create a significant risk of increased incarceration. *Id.* at 255. Second, they can show that "evidence drawn from the [2019 amendments'] practical implementation" establishes that their "retroactive application will result in a longer period of incarceration than under the earlier rule." *See id.* The court finds that Plaintiffs have failed to plausibly allege an ex post facto violation for three reasons.

1. *Complaint doesn't compare relevant statutes:* First, "[t]he measuring point for purposes of the Ex Post Facto Clause is the time that [Plaintiffs] committed [their] crimes." *United States v. Colon*, 707 F.3d 1255, 1258 (11th Cir. 2013). And at the time the individual Plaintiffs committed their offenses, Alabama's 1951 parole law governed the Parole Board's determinations.

But Plaintiffs' ex post facto challenge focuses exclusively on differences between the Parole Board's implementation of the 2019 amendments and the Parole Board's application of the JRA from 2015 to 2019:

## Count V

### Violation of Ex Post Facto Clause

235. Plaintiffs incorporate the allegations in paragraphs 1–42, 77–132, 144, 146, 148–64, 184–87, and 191–202 by reference.

236. The Ex Post Facto Clause of the U.S. Constitution, art. I, § 10, cl.1, prohibits states from enacting ex post facto laws, including laws that retroactively increase the punishment for criminal acts previously committed. Coverage of the Ex Post Facto Clause is not limited to acts of the legislature.

237. Governor Ivey and Attorney General Marshall's directive to subvert the parole process by ignoring the evidence-based approach required by state law, thereby systematically denying parole consideration and release to incarcerated people in Alabama who are qualified for parole release under the JRA's evidence-based standards and sentenced to a term of imprisonment with the possibility of parole— and the Parole Board's agreement with and enactment of that directive—violates the Ex Post Facto Clause because it makes more burdensome the punishment imposed for offenses committed prior to Governor Ivey and Attorney General Marshall's directive. By Governor Ivey and Attorney General Marshall's directive, and by the Parole Board and Director Hamm's enactment of that directive, incarcerated people sentenced to a term of imprisonment with the possibility of parole have, in effect, had their sentences converted to a term of imprisonment *without* the possibility of parole.

238. The wholesale revision to the standards governing suitability for parole mandated by Governor Ivey and Attorney General Marshall and implemented by the Parole Board and Defendant Hamm has materially changed the substantive policies that govern parole decisions, ==replacing evidence-based parole decision-making based on actuarially-based objective standards required by the JRA== with racially skewed decision-making ==untethered to evidence or the actuarially based objective standards required by the JRA.== These policy changes have created a significant risk of increasing the duration of imprisonment for Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, and the members of the Parole Denial Class, whose sentences include the possibility of parole. Indeed, Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright have already been denied parole since 2019, despite a demonstrated track record of working safely outside prison gates.

239. Records concerning the operation of the Alabama parole system since Governor Ivey and Attorney General Marshall issued their directive show a precipitous decline in parole grant rates since 2019, including for incarcerated people in work-release and work-center facilities, and demonstrate the severe risk that incarcerated people ==who would have been granted parole under a parole system compliant with the JRA's evidence-based standards are now being denied lawful parole consideration== and thus subjected to increased periods of incarceration. Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm's violation of the Ex Post Facto Clause has caused harm to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, all Parole Denial Class members, and Plaintiffs USSW, RWDSU, and Woods Foundation.

(Doc. 1, ¶¶ 235–39) (highlights added).

As you can see, Plaintiffs' Ex Post Facto Clause count doesn't mention the standard the Parole Board used from 1951 until the JRA's enactment in 2015. Because the individual Plaintiffs committed their offenses before the JRA went into effect, their allegations that they are less likely to be paroled under the 2019 amendments than the JRA fail to plausibly allege a violation of the Ex Post Facto Clause, "which forbids the imposition of punishment more severe than the punishment assigned by law *when the act to be punished occurred*." *See Weaver v. Graham*, 450 U.S. 24, 30 (1981) (emphasis added). Assuming that USSW, RWDSU, and the Woods Foundation would have standing to bring an Ex Post Facto clause challenge, they have also failed to plausibly allege that they've suffered from an Ex Post Facto Clause violation. For example, the Woods Foundation says that it's been injured by having to divert resources to address the Parole Board's rejection of the JRA's objective standards. (*Id.*, ¶ 157). But the Woods Foundation fails to explain whether any of these resources have been used to help inmates who were convicted during the brief post-JRA but pre-2019 parole amendments timeframe.

RWDSU's alleged injury is that if granted parole, inmates currently working in Alabama poultry processing plants could be free workers that are free to become members of the RWDSU union. (*Id.*, ¶ 155). Plus, RWDSU says that "the parole conspiracy" has undermined its efforts to organize and represent workers in the poultry industry. (*See id.*). But RWDSU has failed to allege whether any of these poultry processing workers committed their offenses between the JRA's enactment in 2015 and the implementation of the parole amendments in 2019.

Nor do USSW's allegations show that it has suffered from an ex post facto violation. USSW says that fast-food employers' employment of inmates undermines its efforts to improve the working conditions of fast-food workers and that the use of inmate labor depresses wages in the fast-food sector. (*Id.*, ¶ 156). But like RWDSU, USSW doesn't allege when any of these fast-food workers committed their offenses.

Thus, no plaintiff has plausibly alleged that the standard applied under the JRA is relevant to their Ex Post Facto Clause challenge. And because Plaintiffs' ex post facto count discusses only the differences between the JRA

and the 2019 parole amendments, it fails to state a claim for an ex post facto violation.

2. *Facial challenge fails:* Even construing Plaintiffs' ex post facto count as a challenge to the differences between the 2019 amendments and 1951 statute, Plaintiffs haven't established that, by its plain language, the 2019 amendments create a significant risk of increased incarceration. Here are the two relevant statutes side-by-side:

| 1951 Statute | 2019 Amendments |
|---|---|
| No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society. | No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole ==and to ensure public safety.== The guidelines shall serve as an aid in the parole process and shall promote the use of prison space for the most violent and greatest risk offenders, ==while recognizing that the board's paramount duty is to protect public safety.== |

1951 Ala. Laws Act No. 1951-599 § 7; Ala. Code § 15-22-26(a) (highlight added).

As explained in the court's order on the motion for preliminary injunction, the court rejects Plaintiffs' argument that the 2019 amendments impermissibly elevate the protecting public safety factor over other factors, such as a parole candidate's fitness for parole. (Doc. 181, pp. 25–26). Instead, the 1951 and 2019 versions of Alabama law use slightly different words to say the same thing—the Parole Board's number one concern should be protecting public safety.

And in interpreting the 2019 amendments, the court must consider the context in which the Board is charged with promulgating guidelines that recognize that public safety is the Board's paramount duty. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012) (Courts must "consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). Subsection (c) of the 2019 Act explains that the guidelines are merely "an aid in the parole decisionmaking process[;] the decision concerning parole release [is] at the complete discretion of the board." *See* Ala. Code § 15-22-26(c). So the 2019 amendments "did not substantively alter [Plaintiffs'] parole eligibility or confine the [Board's] discretion to release [them]; they merely clarified the exercise of administrative discretion." *Paschal v. Wainwright*, 738 F.2d 1173, 1179 (11th Cir. 1984); *see also Johnson v. Wainwright*, 772 F.2d 826, 827 (11th Cir. 1985) (rejecting argument that there was an ex post facto violation because "under the old system the goal of rehabilitation played a larger role in determining release dates than it does under the new system"). As a result, Plaintiffs' facial challenge to the 2019 parole amendments fails.

3. *Practical implementation of statutes the same:* Plaintiffs must therefore show that "evidence drawn from the [2019 amendments'] practical implementation" establishes that their "retroactive application will result in a longer period of incarceration than under the earlier rule." *Garner*, 529 U.S. at 255. Plaintiffs haven't done so. In alleging an ex post facto violation, Plaintiffs point to statistical evidence of lower parole grant rates, especially for violent offenders, since the 2019 amendments' enactment. (*See* Doc. 1, ¶¶ 87–88, 100, 102). To state an ex post facto violation, what Plaintiffs must show with these statistics is that the 2019 amendments have increased parole denial rates as compared to the years they committed their crimes. But Plaintiffs' statistics show only the difference between parole grant rates in 2018 and today and don't explain what parole grant rates looked like when the individual Plaintiffs committed their offenses. Plus, the court has no idea what year the inmates connected to the Woods Foundation, USSW, and RWDSU committed their offenses in. So Plaintiffs' statistics do not plausibly allege an Ex Post Facto Clause violation.

Besides, Plaintiffs' only allegation about which factors the Parole Board considered pre-JRA is that "the Board placed less emphasis on factors within an individual's control, such as participation in programs or their behavior while in prison, than on factors an individual cannot change, such as prior criminal history and the nature of the underlying offense." (*Id.*, ¶ 80). This allegation undermines, rather than supports, Plaintiffs' claims that the implementation of the 2019 amendments violates the Ex Post Facto Clause because the Parole Board is automatically denying parole for those with violent convictions. (*See id.*, ¶¶ 102–03, 106). As a result, Plaintiffs haven't plausibly alleged a material difference between the practical implementation of the 1951 and 2019 statutes.

—

For all these reasons, the court will grant the Parole Board members' motion to dismiss Plaintiffs' Ex Post Facto Clause claim.

## D.    Equal Protection Clause (Counts 6 & 7)

Counts 6 and 7 allege that the Parole Board's practices since 2019 have violated the Equal Protection Clause, which prohibits the State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. In Count 6, Plaintiffs assert that the Parole Board has intentionally discriminated against Black inmates by disproportionately denying parole to Black parole candidates. In Count 7, Plaintiffs assert that the Parole Board has intentionally discriminated against Black inmates by disproportionately delaying the parole reconsideration dates for Black parole candidates.

### 1. Standard of review

The Eleventh Circuit has held that a plaintiff challenging his parole denial on equal protection grounds must show "that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001). So the Parole Board argues that Plaintiffs' equal protection claim must plausibly allege that Plaintiffs have been treated less favorably than a similarly situated

comparator. Plaintiffs disagree. They assert that as long as they have alleged "a convincing mosaic of circumstantial evidence" of discrimination they will have stated an equal protection claim. *See Lewis v. City of Union City ("Lewis II")*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Comparators aren't always required to show disparate treatment. But because "[t]he decision to grant or deny parole is based on many factors," the court agrees with the Parole Board that to survive dismissal under Rule 12, Plaintiffs must plausibly allege themselves "to be similarly situated, considering such factors, with . . . inmates who were granted parole." *See Fuller v. Ga. State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988). That's why the Eleventh Circuit's published opinions on equal protection claims brought in the parole context have uniformly required evidence of a similarly situated comparator receiving more favorable treatment. *See Jones*, 279 F.3d at 946–47; *Fuller*, 851 F.2d at 1310; *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932–33 (11th Cir. 1986).

To be sure, none of these cases were reviewing the sufficiency of a complaint under Rule 12. But the Circuit's unpublished opinions have consistently applied this same comparator-based test at the Rule 12 stage. As Plaintiffs point out, many of these opinions deal with class-of-one equal protection claims. *See, e.g.*, *Slakman v. State Bd. of Pardons & Parole ("Slakman II")*, 2021 WL 5071858, at *2–3 (11th Cir. Nov. 2, 2021). But there are also several examples of the Circuit requiring a comparator in race-based equal protection claims challenging parole determinations. *See Harrell v. Fla. Parole Comm'n*, 479 F. App'x 234, 237 (11th Cir. 2012) ("As to his equal protection claim, Harrell neither alleged that he was treated differently than similarly situated comparators nor that the alleged differential treatment was based on a constitutionally protected interest."); *Akins v. Perdue*, 204 F. App'x 839, 843 (11th Cir. 2006) (affirming dismissal for failure to state a claim because "Akins's complaint did not allege that he had been treated worse than similarly situated prisoners on account of a constitutionally protected interest"); *Lesley v. David*, 186 F. App'x 926, 929 (11th Cir. 2006) (Dismissal of complaint affirmed because it "failed to allege any facts to establish" that a similarly situated inmate received more favorable treatment). And the court has found no case in which the Circuit has applied a different test in the parole context. So the court finds that for equal protection claims like Plaintiffs' a

similarly situated comparator is required. *See Red Door Asian Bistro v. City of Fort Lauderdale*, 2023 WL 5606088, at *8 (11th Cir. Aug. 30, 2023) (noting that different equal protection claims may require different analysis).

## 2. Comparators not similarly situated

"The decision to grant or deny parole is based on many factors such as criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310. So applying the comparator-based test discussed above, this Circuit has required inmates to show that they are "similarly situated, considering such factors, with . . . inmates who were granted parole." *See id.* At the Rule 12 stage, the Circuit held that an inmate satisfied this requirement by alleging: (1) that he was white and his two comparators were Black; (2) that his comparators were paroled after serving 14 and 15 years, respectively, and that he was denied parole after being incarcerated for 15 years; (3) that the plaintiff and both of his comparators were convicted of murder; and (4) that while the plaintiff was college educated and had worked for 24 years before his conviction, both comparators were not college educated, and one had no regular work history. *See Slakman v. Buckner ("Slakman I")*, 434 F. App'x 872, 876 (11th Cir. 2011). But the same inmate did not plausibly allege differential treatment when he "failed to provide the district court with any information regarding these 'many factors'" and instead "conclusorily asserted that other similarly situated inmates with life sentences for murder, who were not as advantageously positioned as he, have been paroled with substantially shorter incarcerations." *Slakman II*, 2021 WL 5071858, at *3 (cleaned up).

Plaintiffs rely on statistics to assert that similarly situated parole candidates have been treated differently. The court will address the parole reconsideration date statistics relevant to Count 7 and then address the parole grant rate statistics relevant to Count 6.

A. *Parole reconsideration dates (Count 7)*: In Count 7, Plaintiffs allege that the Parole Board has violated their equal protection rights in the setting of parole reconsideration dates. According to Plaintiffs, the Parole Board has granted reset dates of two years or less to white parole candidates denied parole much more often than it has to Black parole candidates denied parole:



(Doc. 1, ¶ 111). For example, in 2018, only 14% of white and 13.2% of Black parole candidates were given the maximum reset date of 5 years. (*See id*). But by 2023, 53.7% of white and 68.6% of Black parole candidates received 5-year set off dates. (*See id.*).

These parole reconsideration date statistics do not control for the factors discussed in *Fuller*, such as criminal history, crime of conviction, disciplinary record, or employment and educational history. Instead, they simply compare the race of parole candidates. Thus, the court has no way to determine whether the white parole candidates being granted shorter parole reconsideration dates are similarly situated to the Black parole candidates being given longer parole reconsideration dates. Because Plaintiffs haven't shown that similarly situated parole candidates have received different parole reconsideration dates, the court will grant the Parole Board's motion to dismiss Count 7.

B. *Parole grant rates (Count 6)*: In Count 6, Plaintiffs contend that since 2019 the Parole Board has denied parole for Black parole candidates more often than white parole candidates. Controlling for facility type, fiscal year, sex, and job status, Plaintiffs allege that between Fiscal Year 2020 and 2022, the Parole Board was 2 times more likely to parole white parole candidates than Black parole candidates. (*Id.*, ¶ 108). And Plaintiffs assert that racial

disparities exist within four distinct categories of parole candidates: those convicted of violent offenses, those convicted of non-violent offenses, those housed in work release facilities, and those housed in work center facilities. (*See id.*, ¶¶ 102, 117–20, 123). For example, in 2022, 21.3% of white and 20.0% of Black parole candidates convicted of non-violent offenses were paroled while 4.9% of white and 2.2% of Black parole candidates convicted of violent offenses were paroled. (*Id.*, ¶¶ 102, 123). That same year, the Parole Board granted parole for 23.4% of white parole candidates in work release facilities compared to 15.5% of Black parole candidates in work release facilities. (*Id.*, ¶ 119). And in 2021, the Parole Board granted parole to 15.3% of white parole candidates living in work center facilities compared to 5.2% of Black parole candidates living in work center facilities. (*Id.*, ¶ 120).

Comparators must be "similarly situated in all material respects." *See Lewis v. City of Union City*, 918 F.3d 1213, 1226 ("*Lewis I*") (11th Cir. 2019) (en banc). And these four categories of parole candidates are too broad for the court to say that there are no material differences between the parole candidates being compared. Plaintiffs themselves allege that "Alabama broadly defines which crimes are deemed 'violent,' including not only crimes that have as an element the use, attempted use, or threatened use of a weapon or physical force against another person but also, for example, third-degree burglary, trafficking in cannabis, and attempts, conspiracies, or solicitations to commit 'violent' offenses." (Doc. 1, ¶ 102). The category of non-violent crimes is similarly broad covering "[a]ll offenses which are not violent offenses." *See* Ala. Code § 12-25-32(7).

To qualify for placement in a work release facility, an inmate must be within a specified time near the end of his sentence or parole consideration date and have had no major disciplinary action for at least 90 days. (Doc. 1, ¶ 114). He must also not have been convicted of a sex offense, homicide, or three felony convictions involving the use of a weapon within the past 15 years. (*Id.*). And to qualify for a work center facility, an inmate usually must be classified at the "Minimum-Out" custody level, meaning that he also must have had no major disciplinary actions for at least 90 days and satisfy certain time-frame requirements for the end of his sentence or parole consideration date. (*Id.*, ¶ 116). Thus, Plaintiffs' work release facility and work center facility statistics do account for the general nature of an inmate's offense and his recent

disciplinary history. But as shown by the differences between the individual Plaintiffs, the inmates housed in work release and work center facilities have varying types of convictions and criminal histories. For example, Ptomey, McDole, and Campbell are all housed at Childersburg Work Release. (*Id.*, ¶¶ 149–51). But Ptomey is serving 22 years' imprisonment for robbery and third-degree burglary, McDole is serving 21 years' imprisonment for Assault I, and Campbell is serving 30 years' imprisonment for drug distribution charges.[5] So Plaintiffs' work release facility and work center facility statistics do not show that inmates who are "similarly situated in ***all material respects***" are being treated differently. *See Lewis I*, 918 F.3d at 1226 (emphasis added).

Plaintiffs' regression analysis, which shows white parole candidates are 2 times more likely to be granted parole than Black parole candidates, controls for both facility type and job status. So the regression analysis controls for one factor discussed in *Fuller* (employment history) and an inmate's custody level, which is at least facially relevant to the factors you'd expect the Parole Board to consider in granting or denying parole. But it does not control for other highly relevant factors, such as whether the parole candidates had been convicted of the same or similar crimes, whether they were recidivists, and the time served when up for parole consideration. Thus, the court finds that it too fails to show that the parole candidates being compared are similarly situated.

As none of Plaintiffs' parole grant rate allegations show that they are "similarly situated with other prisoners who received more favorable treatment," *Jones*, 279 F.3d at 947, Plaintiffs have not stated an equal protection claim related to parole denials. So the court will grant the Parole Board's motion to dismiss Count 6 without discussing whether, as Plaintiffs assert, application of the factors from *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977), show that the Parole Board intends to discriminate against Black parole candidates.

---

[5] This court may take judicial notice of Plaintiffs' criminal convictions at the Rule 12 stage. *See* Fed. R. Evid. 201.

### E.    Substantive Due Process (Count 8)

Count 8 alleges that the Parole Board has violated Plaintiffs' rights under the Substantive Due Process Clause by "arbitrarily, capriciously, flagrantly, and in an unauthorized manner den[ying] lawful parole consideration and parole release to Plaintiffs . . . including by denying parole in a racially discriminatory manner and by disregarding the Parole Guidelines promulgated under state law and in accordance with the JRA." (Doc. 1, ¶ 261).

Under the Fourteenth Amendment, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1.[6] "The Supreme Court has interpreted this clause to provide two distinct guarantees: substantive due process and procedural due process." *DeKalb Stone, Inc., v. Cnty. of DeKalb*, 106 F.3d 956, 959 (11th Cir. 1997). "[S]ubstantive due process has two strands—one that protects against deprivation of fundamental rights and one that protects against arbitrary legislation." *Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1297 (11th Cir. 2019). The court discusses each strand below.

### 1. Fundamental, federal rights

Fundamental rights are "rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quotations omitted). They "include a great majority of the rights guaranteed by the first eight Amendments vis-à-vis the federal government, as well as a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1219–20 (11th Cir. 2023) (quotations omitted). "To determine whether a right at issue is one of the substantive rights guaranteed by the Due Process Clause, courts must look to whether the right is deeply rooted in our history and tradition and essential to our Nation's scheme of ordered liberty." *Id.* at 1220 (cleaned up).

---

[6] Count 8 alleges that the State Defendants violated Plaintiffs' substantive due process rights under both the Fifth and Fourteenth Amendments. But the Fifth Amendment "protects a citizen's rights against infringement by the federal government, not by state government." *See Weiland*, 792 F.3d at 1328. So the court will grant the State Defendants' motion to dismiss any Fifth Amendment substantive due process claims that Plaintiffs may be bringing.

For two reasons, the court finds that Plaintiffs have not plausibly alleged that the Parole Board deprived them of a fundamental, federal right in violation of the Due Process Clause.

A. *Other amendments govern*: First, "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing" a plaintiff's claims. *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (cleaned up). In other words, "when the Framers considered a matter and drafted an amendment to address it, a substantive-due-process analysis is inappropriate." *Echols v. Lawton*, 913 F.3d 1313, 1326 (11th Cir. 2019) (citations omitted).

The Equal Protection Clause protects Plaintiffs from being denied parole in a racially discriminatory manner, so Plaintiffs cannot use the Due Process Clause "to supplement that substantive right." *See id.* And to the extent that Plaintiffs are asserting that the Parole Board has violated their due process rights by impermissibly imposing a retroactive increase in punishment, those allegations would be duplicative of Plaintiffs' ex post facto claim. Thus, Plaintiffs may not bring a substantive due process claim based on racially discriminatory parole denials or allegations that the Parole Board retroactively increased the length of their incarceration.

B. *No federal right to parole*: Nor is the right to parole "implicit in the concept of ordered liberty." *See McKinney*, 20 F.3d at 1556. Instead, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Thus, Plaintiffs have not plausibly alleged that the Parole Board's parole denials deprived them of a fundamental, federal right in violation of the Due Process Clause.

## 2. State-created rights

That said, "[w]here a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action." *See Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014). And while Alabama's parole statutes do not create a liberty interest in parole, the Eleventh Circuit has held that the Parole Board still cannot "engage in flagrant or unauthorized action" by treating parole candidates "arbitrarily and capriciously in violation of due process." *See Monroe v. Thigpen*, 932 F.2d 1437, 1442 (11th Cir. 1991) (quotations omitted).[7]

Plaintiffs assert that the Parole Board engaged in unauthorized action by arbitrarily and capriciously denying parole to nearly all parole candidates convicted of violent offenses, including many people who have been working safely in the community. They also say that the Parole Board's recent overhaul of Alabama's parole system was a legislative act that arbitrarily and irrationally resulted in the Board not following the Parole Guidelines in "the vast majority of cases." The court will address each argument in turn.

A. *Flagrant or unauthorized action*: In *Monroe*, the Circuit held that the Parole Board exceeded its authority and treated a parole candidate "arbitrarily and capriciously in violation of due process" when it knowingly relied on false information in a parole candidate's parole file to deny him parole. *See Monroe*, 932 F.2d at 1442. But "even intentional wrongs seldom violate the Due Process Clause." *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003). So to succeed on their *Monroe*-based substantive due process claim, Plaintiffs must plausibly allege facts that allow the court to reasonably infer

---

[7] The court agrees with the Parole Board that it's questionable whether *Monroe* is a substantive (rather than procedural) due process case or whether it remains good law, especially in light of the Eleventh Circuit's en banc decision in *McKinney v. Pate*. But the Circuit has continued to cite *Monroe*, including in substantive due process cases, *see, e.g.*, *Ellison v. Ala. Bd. of Pardons & Parole*, 2017 WL 6947946, at *5 (11th Cir. Dec. 13, 2017), so the court will treat *Monroe* as a substantive due process case that binds this court.

that the Parole Board's actions "can be characterized as arbitrary or conscience shocking in a constitutional sense." *See id.*[8]

Plaintiffs have failed to make this showing. Several courts, including the Eleventh Circuit, have held that denying parole based on the seriousness of a parole candidate's offense isn't the type of conscience shocking behavior that offends the Due Process Clause. *See, e.g.*, *Slakman I*, 434 F. App'x at 875 ("[C]onsideration of the severity of Slakman's offense . . . is not the type of most egregious conduct required in an arbitrary and capricious analysis." (quotations omitted)). This court agrees that "[a] blanket policy denying parole to violent felony offenders simply does not constitute egregious official conduct." *Graziano v. Pataki*, 689 F.3d 110, 116 (2d Cir. 2012). As a result, the court finds that Plaintiffs haven't plausibly alleged that the Parole Board's alleged de facto policy of denying parole to nearly everyone convicted of a violent offense violates the Due Process Clause.

Nor have Plaintiffs plausibly alleged that the low parole grant rates for inmates in work release or work center facilities is arbitrary and capricious. Plaintiffs have not alleged that the Parole Board relied on false information or had no justification for denying parole to these inmates. And while an inmate's work in the community may be a factor that supports granting him parole, nothing in Alabama's parole statute suggests that participation in the work release or work center programs creates a right or expectation of being paroled. *See* Ala. Code § 15-22-26.

Simply put, "absent flagrant or unauthorized action by a parole board the discretionary power vested in a parole board will not be interfered with by the Federal courts." *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982). And Alabama law gives the Parole Board discretion to maintain a low parole grant rate (even for those who work in the community) and to deny parole because a parole candidate committed a violent offense. *See* Ala. Code § 15-22-26(a), (c).

---

[8] Plaintiffs do not allege that they are in the Parole Board's custody, so the court applies the substantive due process standard for non-custodial relationships to Plaintiffs' claims.

B. *Legislative acts exception*: The court also rejects Plaintiffs' argument that the Parole Board's deviation from its guidelines is a legislative act that violates the substantive component of the Due Process Clause. The legislative acts exception applies to the infringement of "state-created rights." *Kentner*, 750 F.3d at 1279. And a parole candidate's parole score does not create a right to parole. *See* Ala. Code § 15-22-26(c) ("The use of established guidelines for parole consideration shall not create a right or expectation by a prisoner to parole release. . . . The guidelines shall serve as an aid in the parole decisionmaking process, and the decision concerning parole release shall be at the complete discretion of the board."). So the Parole Board doesn't infringe on a state-created right when it fails to follow the guidelines' recommendation to grant parole. *Cf. Sultenfuss v. Snow*, 35 F.3d 1494, 1502 (11th Cir. 1994) (en banc) (While Georgia required its Parole Board "to adopt a guideline system to be used as a framework for making more consistent parole decisions, it also preserved the Board's authority to use its discretion in making final parole decisions." So "[t]he statute and regulations . . . do not mandate that release be granted if the Guidelines criteria is met.").

Plus, Plaintiffs' allegations are directed toward the Board's **implementation** of the 2019 parole amendments in the "**vast majority** of cases." So it appears that Plaintiffs are bringing an as-applied, rather than facial, challenge to the Parole Board's deviation from the parole guidelines. And the legislative acts exception never applies to as-applied challenges, which always involve executive acts "because the executive is responsible for applying, or enforcing, the law." *See Hillcrest*, 915 F.3d at 1301. For both these reasons, the court finds that Plaintiffs' allegations about the Parole Board deviating from the parole guidelines do not state a substantive due process violation.

—

Plaintiffs have not plausibly alleged that the Parole Board's parole denials violated a fundamental, federal right or arbitrarily infringed on a state-created interest, so the court will grant the Parole Board's motion to dismiss Plaintiffs' substantive due process claims.

## F.    Conspiracy (Counts 9 & 10)

In Counts 9 and 10, Plaintiffs bring conspiracy claims under 42 U.S.C. § 1985. Count 9 alleges that the Parole Board, Ivey, Marshall, and Hamm conspired under § 1985(2) and (3) to (a) impede, hinder, obstruct, and defeat the proper and lawful operation of the State's parole system, and (b) deprive Plaintiffs of the opportunity to have parole decisions made without regard to race. (Doc. 1, ¶¶ 265-66). Count 10 asserts that Ivey and Marshall violated § 1985(3) by preventing the Parole Board from giving all parole candidates equal protection and enforcement of Alabama's parole laws. (*Id.*, ¶ 271).

"Section 1985(2) provides a cause of action for victims of a conspiracy whose purpose is to impede, hinder, obstruct, or defeat, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws." *Chua v. Ekonomou*, 1 F.4th 948, 955 (11th Cir. 2021) (cleaned up). A plaintiff may sue under § 1985(3) if he is a victim "of a conspiracy whose purpose is to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of the equal privileges and immunities under the laws." *Id.* (cleaned up). For either subsection, a plaintiff must show "that the conspiracy was motivated by racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* (quotations omitted).

As explained, Plaintiffs have failed to trace the injury from their parole denials to Ivey and Marshall. And Ivey and Marshall are the only two Defendants sued in Count 10. So the court will dismiss Count 10 for lack of standing. As for Count 9, Plaintiffs haven't plausibly alleged that Black parole candidates were treated worse than their similarly situated white counterparts. So Plaintiffs haven't shown that they were deprived of "the equal protection of the laws" or "of the equal privileges and immunities under the laws." *See Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) ("Having concluded that Plaintiffs' substantive claims fail on the merits, their conspiracy claim fails as well because Plaintiffs would not have been 'deprived of any rights or privileges' by the Defendants' allegedly wrongful acts."). As a result, the court will grant the State Defendants' motion to dismiss Count 9 for failing to state a claim upon which relief can be granted.

—

To sum up, the court finds that Plaintiffs lack standing to sue Ivey, Marshall, and Hamm for their parole-related claims. And Plaintiffs' First Amendment retaliation and parole-related claims against the Parole Board members fail on the merits. So the court will grant the State Defendants' motions to dismiss Counts 4–10 without addressing the State Defendants' plaintiff-specific arguments, such as the incarcerated Plaintiffs' alleged failure to comply with the Prison Litigation Reform Act's exhaustion requirements and Council's alleged improper claim splitting.

## IV.

## LEAVE TO AMEND

Plaintiffs have asked the court to grant them leave to amend any pleading deficiencies that the court identifies in this opinion. Under Rule 15(a), this court should "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). So absent "undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment" this court should grant leave to amend. *See Perez v. Wells Fargo, N.A.*, 774 F.3d 1329, 1340 (11th Cir. 2014) (cleaned up).

This is Plaintiffs' first complaint, and the court finds that Plaintiffs may be able to cure the pleading deficiencies that the court has identified. So the dismissal of each of Plaintiffs' claims will be ***without prejudice***. Plaintiffs' deadline to file an amended complaint is on or before **April 10, 2025.**

The court recognizes that the parties, especially the currently incarcerated Plaintiffs, have an interest in the court expeditiously deciding whether this case can move past the motion to dismiss stage. And the court believes that by (a) requiring Plaintiffs to replead Counts 1–3, 11–12; and (b) clarifying the issues related to Counts 4–10, this opinion will help the court achieve that result.

That said, the parties cannot expect the court to quickly resolve Plaintiffs' claims if in response to the amended complaint, the court once again receives motions to dismiss totaling 589 pages, response briefs of 256 pages, and reply briefs totaling 417 pages—*i.e.*, **1262** pages of briefing.

So "to secure the just, speedy, and inexpensive determination" of this action, *see* Fed. R. Civ. P. 1, the court will require the parties' responsive pleadings to follow the below schedule and page-limitation requirements:

| Event | Date/Deadline |
|---|---|
| Deadline for Plaintiffs to file amended complaint | April 10, 2025 |
| Deadline for Defendants to respond to amended complaint | May 1, 2025<br><br>No motion to dismiss (or brief in support of a motion to dismiss) may exceed 30-pages, double-spaced, 14-point Times New Roman font. |
| Plaintiffs' consolidated response to any motions to dismiss filed | May 15, 2025<br><br>Plaintiffs' response brief cannot exceed 150-pages, double-spaced, 14-point Times New Roman font. |
| Defendants' reply briefs | May 29, 2025<br><br>No reply brief can exceed 15-pages, double-spaced, 14-point Times New Roman font. |

The court will not extend these page limitations absent a showing of **_exceptionally_** good cause.

## V.

## CONCLUSION

For these reasons, the court **GRANTS** Defendants' motions to dismiss (docs. 139, 141, 142, 143, 144, 145, 146, 147, 149, 150, 152, 153, 155, 156, 171, 174, 175, 201, 209) and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against each Defendant. The court **DENIES AS MOOT** Plaintiffs' motion for a hearing (doc. 211). Plaintiffs have until on or before **April 10, 2025,** to file an amended complaint.

The court will enter a separate order that carries out this ruling and sets a responsive pleading schedule consistent with the schedule discussed in this opinion.

**Done** on March 20, 2025.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE