IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| ROBERT EARL COUNCIL AKA KINETIK JUSTICE, LEE EDWARD MOORE JR., LAKIERA WALKER, JERAME APRENTICE COLE, FREDERICK DENARD MCDOLE, MICHAEL CAMPBELL, ARTHUR CHARLES PTOMEY JR., LANAIR PRITCHETT, ALIMIREO ENGLISH, TONI CARTWRIGHT, TURNER MASON, DANNY DANDRIDGE, ZACKARY BALL, RASHAAD CLARK, DECKRICE MORRISSEY, ERIC PREWITT, TREVION CLARK, LARRY DARNELL JARMON JR., CORDARIUS EVANS, MICHAEL BULLOCK, and VICTOR THOMAS, on their own behalf and on behalf of those similarly situated; UNION OF SOUTHERN SERVICE WORKERS, SERVICE EMPLOYEES INTERNATIONAL UNION; RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, MID-SOUTH COUNCIL; and THE WOODS FOUNDATION,<br><br>                  Plaintiffs,<br><br>   v.<br><br>KAY IVEY, Governor of the State of Alabama, in her individual and official capacities; STEVE MARSHALL, Alabama Attorney General, in his individual and official capacities; LEIGH GWATHNEY, Chair of the Alabama Board of Pardons and Paroles, in her individual and official capacities; DARRYL LITTLETON, Associate Member of the Alabama Board of Pardons and Paroles, in his official capacity; GABRELLE SIMMONS, Associate Member of the Alabama Board of Pardons and Paroles, in her official capacity; JOHN HAMM, Commissioner of the Alabama Department of Corrections, in his individual and official capacities; JOHN COOPER, Transportation Director of the Alabama Department of Transportation, in his individual and official capacities; CITY OF MONTGOMERY; CITY OF TROY; JEFFERSON COUNTY; RCF, LLC d/b/a GEMSTONE FOODS, LLC; KOCH FOODS, LLC; JU-YOUNG MANUFACTURING AMERICA, INC.; SL | Case No. 2:23-cv-712-CLM<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

ALABAMA, LLC; HWASEUNG AUTOMOTIVE
USA LLC; PROGRESSIVE FINISHES, INC.;
C.B.A.K., INC. d/b/a MCDONALD'S; SOUTHEAST
RESTAURANT GROUP-WEN LLC d/b/a
WENDY'S; PELL CITY KENTUCKY FRIED
CHICKEN, INC. d/b/a KENTUCKY FRIED
CHICKEN d/b/a KFC; MASONITE
CORPORATION; CAST PRODUCTS, INC.;
SOUTHEASTERN MEATS, INC.; PARAMOUNT
SERVICES, INC.; and BAMA BUDWEISER OF
MONTGOMERY, INC.,

                Defendants.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 10

PARTIES ........................................................................................................... 12

I.    Plaintiffs ................................................................................................... 12

    A.    Robert Earl Council aka Kinetik Justice ................................... 12

    B.    Lee Edward Moore Jr. .............................................................. 14

    C.    Lakiera Walker ......................................................................... 16

    D.    Jerame Aprentice Cole ............................................................. 17

    E.    Arthur Charles Ptomey Jr. ....................................................... 22

    F.    Frederick Denard McDole ........................................................ 24

    G.    Michael Campbell .................................................................... 27

    H.    Lanair Pritchett ........................................................................ 29

    I.    Alimireo English ...................................................................... 32

    J.    Toni Cartwright ........................................................................ 35

    K.    Turner Mason ........................................................................... 36

    L.    Danny Dandridge ..................................................................... 38

    M.    Zackary Ball ............................................................................. 42

    N.    Rashaad Clark .......................................................................... 45

    O.    Deckrice Morrissey .................................................................. 50

    P.    Eric Prewitt .............................................................................. 51

    Q.    Trevion Clark ........................................................................... 53

    R.    Larry Darnell Jarmon Jr. .......................................................... 56

    S.    Cordarius Evans ....................................................................... 58

    T.    Michael Bullock ....................................................................... 59

    U.    Victor Alan Thomas .................................................................. 61

    V.    Retail, Wholesale and Department Store Union,
        Mid-South Council (RWDSU) .................................................. 64

    W.    Union of Southern Service Workers, Service Employees
        International Union (USSW) ..................................................... 65

    X.    The Woods Foundation .............................................................. 66

Y.      Quannie McCorvey: Putative Class Member ................................. 67

II.   Defendants ......................................................................................... 69

A.      Governor Kay Ivey ..................................................................... 69

B.      Attorney General Steve Marshall................................................ 70

C.      Parole Board Chair Leigh Gwathney .......................................... 70

D.      Associate Parole Board Members Darryl Littleton and
Gabrelle Simmons ...................................................................... 71

E.      ADOC Commissioner John Hamm ............................................. 71

F.      Transportation Director John Cooper .......................................... 71

G.      City of Montgomery ................................................................... 72

H.      City of Troy................................................................................. 72

I.      Jefferson County ......................................................................... 73

J.      RCF, LLC d/b/a Gemstone Foods, LLC ..................................... 73

K.      Ju-Young Manufacturing America, Inc. ...................................... 74

L.      SL Alabama, LLC ....................................................................... 74

M.      Hwaseung Automotive USA LLC ............................................... 75

N.      Progressive Finishes, Inc. ........................................................... 76

O.      C.B.A.K., Inc. d/b/a McDonald's ................................................ 76

P.      Southeast Restaurant Group-Wen LLC d/b/a Wendy's................ 77

Q.      Pell City Kentucky Fried Chicken, Inc. d/b/a KFC ..................... 77

R.      Masonite Corporation ................................................................. 78

S.      Cast Products, Inc. ...................................................................... 78

T.      Southeastern Meats, Inc. ............................................................. 79

U.      Koch Foods, LLC........................................................................ 80

V.      Paramount Services, Inc.............................................................. 80

W.      Bama Budweiser of Montgomery, Inc......................................... 81

JURISDICTION AND VENUE ................................................................ 81

FACTUAL ALLEGATIONS ............................................................... 82

I.    ALABAMA HAS CREATED AND KNOWINGLY
      MAINTAINED EXTRAORDINARILY VIOLENT,
      INHUMANE AND UNSAFE MEDIUM- AND HIGH-
      SECURITY DETENTION FACILITIES THAT COERCE
      INCARCERATED ALABAMIANS TO LABOR TO SURVIVE ........... 82

      A.  Overview Of ADOC's Facilities.......................................... 82

      B.  ADOC Ties Incarcerated Workers' Custody Status and Safety
          to Their Willingness to Perform Work for the Benefit of
          ADOC and the Public and Private Employers Participating in
          the Forced Labor Scheme ................................................... 83

      C.  Alabama's Correctional Facilities Are Dangerously
          Overcrowded and Understaffed, Resulting in Life-Threatening
          Conditions for Incarcerated Alabamians, Rendering
          Submitting to Labor A Matter Of Survival............................ 87

          1.  In 2015, Alabama Enacted the Justice Reinvestment Act—
              Reforming State Parole Law—to Improve Public Safety
              by Reducing the Number of People Supervised Within
              ADOC's Overcrowded Facilities and to Allow Resources
              and Detention Space to Be Focused on Corrections and
              Rehabilitation Programming Proven to Reduce Recidivism ......... 87

          2.  The Violence That Pervades and Defines Alabama's
              Operation of All Medium- and High-Security Facilities
              Has Been Public Knowledge For Years and Has Been
              Knowingly Maintained and Exacerbated by Governor Ivey
              and Attorney General Marshall's Effective Shutdown of
              Parole Releases Since 2019 ......................................... 90

II.   THE STATE DEFENDANTS MAINTAIN A FORCED LABOR
      SCHEME THAT RELIES ON VIOLENCE, THREATS OF
      VIOLENCE, AND OTHER FORMS OF COERCION, WITH
      PUBLIC AND PRIVATE EMPLOYER DEFENDANTS
      KNOWINGLY PARTICIPATING IN AND BENEFITING
      FROM THAT SCHEME ..................................................... 102

      A.    ADOC's Regulations and Governor Ivey's Executive
            Order Lay the Groundwork for a Coerced Labor Scheme
            that Severely Punishes Refusals of Forced Labor and
            Peaceful Advocacy of Refusing Forced Labor ........................... 106

B.    *In- House ADOC Work:* ADOC Relies on Violence, Threats of Violence, and Other Coercion to Require Incarcerated Alabamians to Perform Unpaid Work Necessary for ADOC to Function and to ADOC's Immense Benefit .......................................................................... 109

    1.  Description of Coerced Work for ADOC Facilities ............................. 109

    2.  ADOC Enforces Its Requirement for In-House Work Through Violence, Threats of Violence, Deprivation of Necessities and Family Contact, Solitary Confinement, and Increased Lengths of Incarceration ................................. 112

        a.  ADOC Uses Transfers and Threats of Transfer to More Dangerous Facilities to Coerce Work .................................. 113

        b.  ADOC Uses Physical Violence and Threats of Violence and Bodily Harm to Coerce Work .................................... 114

        c.  ADOC Uses the Deprivation and Threat of Deprivation of Necessities to Coerce Work .................................... 117

        d.  ADOC Uses the Deprivation and Threat of Deprivation of Family Contact to Coerce Work .............................. 118

        e.  ADOC Uses Solitary Confinement and the Threat of Solitary Confinement to Coerce Work ......................................... 118

        f.  ADOC Uses the Imposition and Threat of Increased Lengths of Incarceration to Coerce Work ....................... 119

    3.  Defendants Hamm and Ivey Benefit from the Coerced In-House Work ......................................................................... 120

C.    *Correctional Industries Work:* ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Engage in Work for ADOC's Commercial Enterprise Called "Correctional Industries," to the Benefit of ADOC and the State ...................................... 122

    1.  Description of Coerced Work for Correctional Industries .................... 122

    2.  ADOC Enforces Its Requirement for CI Work Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration ......................................................... 122

3.  Defendants Hamm and Ivey Benefit from the Coercion of Work at CI ........................................................................ 124

D.  *Work Centers:* ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for State, County, and Local Government Entities, to the Benefit of ADOC and the Co-Employing Entities....................................... 124

1.  Coerced Work for Public Employers .................................. 124

2.  ADOC Enforces the Requirement that Incarcerated Alabamians Work for Public Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration ...................................................................... 129

3.  Public Employers Act as Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion .......................................... 131

4.  Defendants Hamm, Ivey, and the Public Employer Defendants Benefit from the Coercion of Work Through the Work Centers.................................................. 135

5.  Individual Public Employers That Partner With and Act as Agents of ADOC in Coercing Labor from Incarcerated Alabamians................................................ 139

a.  Alabama Department of Transportation ......................... 139

b.  City of Montgomery ..................................................... 141

c.  City of Troy ................................................................. 143

d.  Jefferson County .......................................................... 144

e.  Governor's Mansion ..................................................... 145

E.  *Work Release Program:* ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for Private, For-Profit Companies ..................................................... 146

1.  Description of Required Work for Private Employers .......................... 146

2.  ADOC Enforces the Requirement that Incarcerated
    Alabamians Work for Private Employers Through
    Violence, Threats of Violence, Solitary Confinement,
    Deprivation of Necessities, and Increased Lengths of
    Incarceration ...................................................................... 154

3.  Private Employers Act As Agents of ADOC and Are
    Aware or Reasonably Should Be Aware that the
    Incarcerated Alabamians Working for Them and ADOC
    Are Subject to Coercion...................................................... 157

4.  ADOC and Private Employers Benefit from the
    Coercion of Work Through the Work Release Program ...................... 159

5.  Private Employers That Partner With and Act As Agents
    of ADOC In Coercing Labor from Incarcerated
    Alabamians ....................................................................... 162

    a.  Gemstone Foods.......................................................... 162

    b.  Ju-Young ................................................................... 165

    c.  SL Alabama ............................................................... 168

    d.  Hwaseung.................................................................. 169

    e.  Progressive Finishes ..................................................... 171

    f.  McDonald's................................................................ 173

    g.  Wendy's ................................................................... 175

    h.  KFC......................................................................... 176

    i.  Masonite................................................................... 177

    j.  Cast Products............................................................. 178

    k.  Southeastern Meats ..................................................... 180

    l.  Koch Foods ............................................................... 182

    m. Bama Budweiser ......................................................... 184

    n.  Paramount Services...................................................... 186

F.  The Coerced Labor Scheme Is A Well Established and
    Ongoing Enterprise ...................................................................... 187

III.  STATE OF ALABAMA HAS RETALIATED AGAINST AND
      VIOLENTLY REPRESSED INCARCERATED WORKERS'
      EFFORTS TO PROTEST COERCIVE WORKING CONDITIONS .................... 189

A.   Defendants Ivey, Marshall, and Hamm Have Overseen, Ordered, and Maintained the Violent Repression of Plaintiffs' Council, Clark, Dandridge and Other Incarcerated Workers' Attempts to Protest Their Coercive Working Conditions .................................................................................... 189

B.   ADOC's Punitive and Unlawful Response to Peaceful Protests ................. 193

C.   ADOC's Brutal Retaliation Against Robert Earl Council ........................... 200

D.   Alabama's Limited and Inaccessible Grievance Process and ADOC's Rampant Culture of Retaliation Have Closed Off Any Other Avenue for Incarcerated People to Air Their Grievances ................. 202

IV.  THE GOVERNOR, ATTORNEY GENERAL, AND PAROLE BOARD HAVE CONSPIRED TO EXTEND SENTENCES ISSUED BY THE JUDICIAL BRANCH BY ABANDONING INDIVIDUALIZED PAROLE DECISION MAKING MANDATED BY THE LEGISLATIVE BRANCH TO FUEL DEFENDANTS' FORCED LABOR SCHEME, RESULTING IN SYSTEMIC OVERDETENTION AND PARTICUARLY RACIALLY-SKEWED OVERDETENTION AND FORCED LABOR FOR BLACK ALABAMIANS ................................................... 204

A.   Alabama's Parole Board Historically Considered Individualized Fitness for Parole and Granted 2,441 People Parole Annually From 1992 to 2015, at an Average Grant Rate of Just Under 35% ................................................................. 204

B.   Under the Bentley-Ivey Administration, Alabama Reformed Its Parole System to Address Overcrowding, Systemic Violence, and Threats to Public Safety ...................................... 206

C.   In late 2018, Governor Ivey and Attorney General Marshall Reverse Course, Issue Instructions to Parole Board, and Take Action, Including Securing a Legislative Amendment, to Extend Sentences by Dramatically Reducing Parole Rates, Effectively Eliminating Parole Consideration for Black Alabamians and for all People Serving Sentences for "Violent" Offenses .................................................................... 210

D.   The Conspiracy Among Governor Ivey, Attorney General Marshall, and the Parole Board Has Also Resulted in Disproportionate Delay in Parole Reconsideration Dates for Black Incarcerated People ............................................................ 226

E.      The Clear Incompatibility Between the Board's
        Disproportionate and Biased Denials of Parole and the
        Available Evidence Further Confirms That Racial Bias and
        the Perpetuation of Defendants' Forced Labor Scheme,
        Rather Than Public Safety Concerns, Are Driving the
        Board's Parole Decisions ................................................................ 227

F.      Defendants Ivey, Marshall, and Parole Board Members'
        Refusal to Change the State's Parole Practices Even In the
        Face of Public Evidence and Criticism Proves They Intend
        to Perpetuate the Consequences of Their Unlawful
        Conspiracy: A Parole System that Disproportionately Keeps
        Black People Imprisoned So They Can Be Exploited as
        Members of the State's Captive Labor Force ............................... 236

CLASS ALLEGATIONS .................................................................................... 245

COUNT I:     Violation of the Trafficking Victims Protection Act
             (TVPA), 18 U.S.C. §1589(a) ......................................................... 250

COUNT II:    Violation of the Trafficking Victims Protection Act
             (TVPA), 18 U.S.C. §1589(b) ......................................................... 258

COUNT III:   Violation of the Racketeer Influenced and Corrupt
             Organizations Act (RICO), 18 U.S.C. §1962 ............................... 265

COUNT IV:    Violation of Alabama Constitution, Article I, Section 32 ............................ 269

COUNT V:     Violation of First Amendment of U.S. Constitution,
             Pursuant to 42 U.S.C. §1983 ......................................................... 273

COUNT VI:    Violation of Ex Post Facto Clause ................................................. 275

COUNT VII:   Denial of Equal Protection
             U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983,
             Violation of Fourteenth Amendment Equal Protection Right
             Against Racially Discriminatory Parole Denials ......................................... 280

COUNT VIII:  Denial of Equal Protection
             U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983
             Violation of Fourteenth Amendment Equal Protection Right
             Against Racially Discriminatory Issuance of Parole
             Reconsideration Dates ................................................................... 282

COUNT IX:    Denial of Substantive Due Process
            U.S. Const. Amend. V and XIV, Pursuant to 42 U.S.C. §1983
            Violation of Fifth and Fourteenth Amendment Right
            Against Arbitrary, Capricious, Flagrant, and/or
            Unauthorized Parole Proceedings ................................................................ 285

COUNT X:    Conspiracy in Violation of the KKK Act, 42 U.S.C.
            §1985(2), (3) ................................................................................................ 287

COUNT XI:   Conspiracy in Violation of the KKK Act, 42 U.S.C.
            §1985(3) ........................................................................................................ 290

COUNT XII:  Unjust Enrichment ........................................................................................ 292

PRAYER FOR RELIEF ...................................................................................................... 293

DEMAND FOR JURY TRIAL .......................................................................................... 294

Plaintiffs Robert Earl Council aka Kinetik Justice, Lee Edward Moore Jr., Lakiera Walker, Jerame Aprentice Cole, Frederick Denard McDole, Michael Campbell, Arthur Charles Ptomey Jr., Lanair Pritchett, Alimireo English, Toni Cartwright, Turner Mason, Danny Dandridge, Zackary Ball, Rashaad Clark, Deckrice Morrissey, Trevion Clark, Larry Darnell Jarmon Jr., Cordarius Evans, Michael Bullock, and Victor Thomas ("Named Plaintiffs"), on behalf of themselves, and those similarly situated, along with the Union of Southern Service Workers, Service Employees International Union ("USSW"); Retail, Wholesale and Department Store Union, Mid-South Council ("RWDSU"); and The Woods Foundation, allege as follows:

## INTRODUCTION

1.      This case seeks to abolish a modern-day form of slavery.  Named Plaintiffs and putative Class Representatives Council, Moore, Walker, Cole, McDole, Campbell, Ptomey Jr., Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Trevion Clark, Jarmon Jr., Evans, Bullock, and Thomas are twenty individuals who are or have recently been incarcerated in Alabama's prison system.  They have been entrapped in a system of "convict leasing" in which incarcerated people are forced to work, subject to threats of physical violence, deprivation of bare necessities, and threat of extended imprisonment, for little or no money, to the significant benefit of the numerous government entities and private businesses that "employ" them.  These Plaintiffs and other incarcerated workers have been trusted to perform vital and skilled work for numerous State entities, including work essential to the functioning of the prisons themselves, for cities and counties, and for private employers in a wide variety of industries ranging from fast food, to poultry processing, to automobile manufacturing, to metal casting; and yet, some of those who benefit from this system of coerced labor are also involved in systematically shutting down grants of parole.

2.      Defendants Governor Kay Ivey, Attorney General Steve Marshall, the Alabama Department of Corrections ("ADOC") through Commissioner John Hamm, Leigh Gwathney, the Chair of the Alabama Board of Pardons and Paroles ("Parole Board"), and the two other Parole Board members, together with the many state and local agencies and private employers

participating in this resurrected "leasing" practice, knowingly benefit from the human suffering they support.  Participating employers include the public employers named as defendants here: the City of Montgomery, the City of Troy, Jefferson County, the Alabama Department of Transportation ("ADOT") through Director John Cooper, and the Governor's Mansion through Governor Ivey; and the private company defendants, many of which represent national and international brands and supply chains: franchisees of McDonald's, KFC, and Wendy's; Bama Budweiser, a distributor of Anheuser-Busch products; poultry and meat processors including Gemstone Foods, Koch Foods, and Southeastern Meats; Paramount Services, a linen company; and manufacturing and engineering employers Masonite, Cast Products, Ju-Young, Hwaseung, SL Alabama, and Progressive Finishes.  Since 2018, approximately 575 private employers and more than 100 public employers have "leased" incarcerated labor from Alabama prisons.  By a conservative estimate, Defendants enjoy a benefit of more than $450 million annually from the individual plaintiffs' and class members' forced labor, inside and outside the prison walls.

3.    Alabama's current prison labor system is a direct descendant of convict leasing, in which incarcerated people—the majority of whom are Black—are forced to labor, through threats of extraordinary violence, deprivations of bare necessities, extended incarceration, and solitary confinement, for the benefit of the State and its public and private partners.  Alabama has designed a prison system so deadly, so chaotic, and so overcrowded that survival depends on submission.  Refusal to work carries immediate and often severe consequences.  In Alabama, incarcerated people who refuse to work, or are simply perceived to be refusing to work, are sent to unsupervised dorms in Alabama's ultra-violent medium- and high-security facilities where stabbings and assaults are common, or sent to isolation units under the pretext of discipline.  ADOC uses this constant threat of danger—both official and unofficial—as leverage to ensure compliance with work requirements and suppress resistance.  Incarcerated Alabamians are trapped in this trafficking scheme—and the Defendants profit from it.  The use of terror to compel labor is not new in Alabama.  It was central to slavery.  It defined convict leasing.  And in Alabama's prisons today, it remains the currency of control.

4.     Plaintiffs seek to end this modern convict leasing, to hold accountable those who perpetuate and benefit from it, and to remedy the constitutionally infirm parole system that has trapped Alabamian men and women in this coerced labor scheme.

<u>**PARTIES**</u>

**I.    PLAINTIFFS**

5.     Plaintiffs are twenty individuals currently and formerly incarcerated at facilities operated by ADOC, who have been subject to harm, including extended detention, forced labor, and increased risk of physical violence, as a result of Defendants' unlawful actions; two labor organizations committed to improving the lives and working conditions of all workers, including by combatting racial discrimination, and whose members and core organizational interests have been and continue to be injured by Defendants' unlawful procurement of the forced labor of incarcerated Alabamians; and The Woods Foundation, an organization devoted to ending racial discrimination and the unfair, arbitrary and inhumane treatment of incarcerated individuals in Alabama's prison and parole system, a mission that is injured by the Governor, Attorney General, and Parole Board's deliberate undermining of and disregard for an evidence-based, non-discriminatory approach to parole decision-making.

**A.    Robert Earl Council aka Kinetik Justice**

6.     Plaintiff ROBERT EARL COUNCIL aka KINETIK JUSTICE is currently incarcerated at Limestone, a high-security facility operated by ADOC. Mr. Council, a Black man, has been in ADOC custody for 29 years, including at ADOC's Holman, St. Clair, Limestone, Kilby and Donaldson facilities, among other locations.  Mr. Council is one of the founders and leaders of the Free Alabama Movement.

7.     Mr. Council has been subject to severe and abusive treatment in retaliation for advocating that incarcerated persons refuse to submit to forced labor, including by withholding their labor.  Mr. Council has been subject to long stretches of solitary confinement, exceeding a total of eight years (including five continuous years in solitary) since he started the Free Alabama Movement, in response to continued advocacy to refuse forced labor, and has been

subjected to physical beatings, harassment, death threats, and psychological abuse from Alabama guards and officials as punishment and retaliation for his nonviolent advocacy.

8.      Since the inception of the Free Alabama Movement, Mr. Council has consistently advocated against, and spoken to others about, Alabama's coercion of labor from incarcerated people across Alabama, consistently speaking out against the slavery plantations run by Alabama through ADOC.  He has repeatedly advocated for nonviolent resistance, both by individuals and collectively, to ADOC's forced labor policies.  For example, he advocated for a strike at Holman in 2014 during which many incarcerated men refused to work.  He also advocated for a statewide strike in 2022, in which men from all 13 of Alabama's medium- and high-security facilities withheld their labor to protest Alabama's subversion of the parole system, excessively punitive carceral state, and forced labor policies.

9.      ADOC and State officials have brutally retaliated against Mr. Council for his activism.  In response to the 2014 strike at Holman, for example, ADOC placed Mr. Council and his fellow strike leaders in solitary confinement, kicking off years of solitary confinement, torture, taking away his personal and legal documents and records, beatings and transfers to prevent him from speaking about Alabama's forced labor system.  In 2021, a group of ADOC officers beat Mr. Council so severely he had to be med-flighted to a trauma center to save his life.  Following the trauma center, ADOC transferred Mr. Council to a cell at Kilby and denied him medical care while he bled for 21 days, despite ADOC knowing that he had experienced devastating brain trauma and an injury to his head and eye.  As a result of that beating, he lost vision in one eye for more than two years.  His vision is permanently impaired, and he suffers from other extensive and permanent physical damage, including brain injury.  Nevertheless, Mr. Council continues to lead the Free Alabama Movement, advocate for resistance to ADOC's unlawful and coercive labor practices, and strive to bring light to the issues plaguing Alabama's prisons.

10.     The personal and financial harms perpetrated by Defendants Ivey, Marshall, and Hamm, including ongoing abuse and retaliation against Mr. Council for advocacy of resistance to Defendants' forced labor scheme, are ongoing each day that Mr. Council remains incarcerated.

**B.     Lee Edward Moore Jr.**

11.     Plaintiff LEE EDWARD MOORE JR. is currently incarcerated at William C. Holman Correctional Facility, a high-security facility operated by ADOC.  Mr. Moore is a Black man and has been in ADOC facilities since 1997.

12.     Mr. Moore has personally witnessed and experienced repeated incidents of violence, retaliation, and staff corruption.  He has seen a systemic culture in which correctional officers regularly use excessive force without provocation and with impunity.  For instance, he observed officers beat a man who could not physically comply with a verbal command to lie down due to the condition of his bed, punching him repeatedly as a punitive response.  At Fountain Correctional Facility, he witnessed an individual tied up and denied food for a week due to an unpaid debt—an example of the widespread extortion and abuse that officers routinely ignore or facilitate.  He has also witnessed sexual assaults related to drug debts, enabled in part by contraband introduced by ADOC staff.

13.     In recent months, Mr. Moore has noticed that leadership at Holman Correctional Facility has curtailed officer-on-incarcerated violence simply by reviewing camera footage and writing up offending staff.  This shift suggests that the violence he has long endured in ADOC facilities has always been deliberate and preventable—and remains so today in other medium- and high-security prisons where such oversight is absent.  In Mr. Moore's experience, he has observed that ADOC officers rarely intervene to stop harm, often out of fear of retaliation or allegiance to corrupt practices.  In his view, violence has worsened in recent years as the collapse of the parole system has eroded any incentive for individuals to follow rules or avoid conflict.

14.     Mr. Moore has been performing labor outside the walls of an ADOC facility for approximately ten years, commonly without supervision.  He has no record of engaging in violence since being in ADOC custody.  There is no reasonable argument that he poses a threat

to public safety as he has been working long hours daily since he was first incarcerated, without pay, for ADOC, both inside and outside prison walls without incident. Mr. Moore performs a wide array of functions, including highly skilled plumbing, heating and air conditioning installation and maintenance, installation of phone lines, electrical work and all manner of construction and yard work for ADOC. He receives no pay for his labor, which provides a significant economic benefit to ADOC and the State. Because Mr. Moore receives no pay for the work he is required to perform for ADOC, he is not able to afford his canteen expenses for necessities such as soap and warm clothes—as well as the necessities he requires to do his job, such as the work shoes he needs to work safely as a highly-skilled builder and electrician— requiring his family to bear the cost of these necessities.

15. As a consequence of his decades of highly skilled work maintaining, building, and wiring various ADOC facilities—including refurbishing and work on wardens' houses—high-ranking prison officials, including many correctional officer supervisors and wardens, have sent numerous recommendations of him for parole. Nevertheless, he was most recently denied parole in 2022, following a parole hearing at which Defendant Marshall's office and VOCAL, an advocacy group with ties to and which coordinates its work with Defendant Marshall's office, opposed parole. Mr. Moore's parole hearing date was set off by five years.

16. Mr. Moore has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board Members. He has observed that the Defendants' alteration of the criteria governing parole and changes to the parole system have clearly extended the duration of his confinement, compared both to other people serving time on sentences similar or more severe to his offenses who were released by the Parole Board prior to 2019, and compared to the rates of parole release for his offense at the time the judge originally issued his sentence in 1997. When Mr. Moore was denied parole in 2022 and given a five-year reset date, similarly situated white incarcerated people were granted parole and were more likely to receive shorter reset dates. Mr. Moore has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of

his continued confinement and forced labor. Mr. Moore has also experienced financial harm, in the form of lost wages he would have received had he not been forced to labor without pay, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Moore remains incarcerated.

### C.    Lakiera Walker

17.    Plaintiff LAKIERA WALKER was incarcerated by ADOC from 2007 to 2023. Ms. Walker is a Black woman and was incarcerated in ADOC facilities, including at Tutwiler, Montgomery, and Birmingham Work Release.

18.    Ms. Walker was initially scheduled to have a Parole Board hearing in 2020, but her hearing was pushed to April 2023 as a result of Defendants Ivey and Marshall, and Parole Board's scheme to undermine the parole system. When Ms. Walker had her parole hearing, Defendant Marshall's office opposed parole and also advocated for an increase in her restitution payment, even though her "victims" spoke out on her behalf, urging her release, at the hearing. There is no reasonable argument that Ms. Walker posed a threat to public safety for more than a decade before she was released, given her history of performing work both inside and outside prison walls without incident.

19.    Beginning in approximately 2010, ADOC required Ms. Walker to perform long daily hours of uncompensated work, upon threat of discipline up to and including solitary confinement, including housekeeping, stripping floors, providing care for mentally disabled or other ill incarcerated people, and unloading chemical trucks. She was regularly required to work seven days a week, many years working two shifts a day. Ms. Walker was also required to work outside ADOC facilities and in the community for years before her release. She worked for Jefferson County doing roadwork from approximately 2018 to 2020, during which time she was paid only $2 per day. During this time, her supervisor demanded sex as a condition of work, and when she refused and then advised ADOC about the unlawful work condition, she was given a disciplinary offense by ADOC for purportedly refusing to work, then sent back to the kitchen to

perform unpaid forced labor as additional punishment. She subsequently worked at Southeastern Meats, from approximately October 2022 to February 2023, where she worked in harsh conditions inside freezers without adequate work clothes to prevent workplace injury and illness and often worked 12-hour shifts, from 2 pm to 2 am. She subsequently worked for Burger King in Pelham, Alabama and then in Birmingham, Alabama. On one occasion, Ms. Walker was so ill that she had to be carried to the healthcare unit and could not work; she was approached by an ADOC job placement officer who told her she had to "get up and go make us our 40%."

20.    Ms. Walker experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board Members. As a result of their changes to the parole process and criteria for parole, Ms. Walker experienced a significant risk of extended incarceration. Ms. Walker also experienced substantial harm as a result of Defendants' forced labor scheme, and she experienced physical and emotional harm as a result of her continued confinement and forced labor. Ms. Walker has also experienced financial harm, in the form of lost wages she would have received had she not been forced to labor for no wages for years, labor at the rate of $2/day for public employers, and labor for pay less than the prevailing wage, as well as being subjected to excessive, mandatory deductions for ADOC's benefit.

**D.    Jerame Aprentice Cole**

21.    Plaintiff JERAME APRENTICE COLE is currently incarcerated at Staton Correctional Facility, a medium-custody facility operated by ADOC. Mr. Cole is a Black man and has been in ADOC custody for 18 years, including at Draper, Elmore, Kilby, Holman, Easterling, Bullock, Limestone, Staton, and Alabama Therapeutic Education Facility; Red Eagle and J.O. Davis work centers; and Decatur, Hamilton, and Childersburg work-release facilities.

22.    Mr. Cole has witnessed and experienced severe and pervasive violence during his time in ADOC custody at each of the high- and medium-security facilities where he has been assigned.

23.    Mr. Cole has been before the Parole Board four times, most recently on August 8, 2023, when the Parole Board denied him parole and informed him that he would not be

reconsidered for parole before the end of his sentence in 2027.  Mr. Cole was not permitted to attend the most recent Parole Board hearing regarding his incarceration and was informed that he was denied parole based on "overall institutional behavior."  However, he worked, without incident, out in the community, alongside free and incarcerated workers, in jobs assigned through work centers and work-release facilities, beginning in 2016.  He also received passes regularly to visit his family in the community unsupervised beginning in 2021.

24.     Mr. Cole strives to mentor others in ADOC custody, but observes that many people have given up hope because the Parole Board has stopped granting parole.  This lack of hope makes rehabilitation feel useless, and consequently makes conditions in the prisons even more violent because incarcerated people feel they have no reason to control their behavior.

25.     Mr. Cole has worked multiple jobs through the work-release program, including at a packaging and pallet-making facility; at Defendant Gemstone Foods from approximately November 2016 to February 2017, where he worked long shifts sometimes past midnight, and sometimes six days a week; and at Defendant Masonite from approximately December 2022 to June 2023, building doors.

26.     While at Gemstone, Mr. Cole was forced to work as a "dumper" carrying large, heavy bins of chicken pieces in the facility, which was a job he did not request but understood he could not ask to be removed from without suffering punishment from ADOC, including possibility putting back "behind the wall."  His supervisors at Gemstone would threaten to send him back to the facility if they were not satisfied with the quality of his work, and they repeatedly made comments that reflected that they were well aware of the conditions at violent and unsafe ADOC facilities "behind the fence" and the severe physical and mental consequences that any termination of his employment with them would cause.  Gemstone paid Mr. Cole at a rate of $11 an hour.

27.     While at Masonite, Defendant Masonite deducted $225 from his wages for "safety glasses" required for use to perform his job.  Managers at Masonite also falsely accused him of drinking on the job and, when surveillance tapes proved his innocence, still threatened to report

him to ADOC for refusal to work unless he expressed sufficient gratitude for being given "another chance" even though he had done nothing wrong.  While working at Masonite, he was explicitly told not to speak with white women ever, and saw a white female coworker get punished for speaking to him, even though she could speak freely with and had a sexual relationship with a white coworker.

28.     About a week after the discussion with Masonite management about the false accusation, ADOC personnel arrived at Masonite to remove Mr. Cole from work.  When arriving at Masonite, ADOC personnel suddenly asserted a basis for issuing Mr. Cole a disciplinary (a claim that a urine sample was dirty, although the disciplinary ADOC about this allegedly dirty sample subsequently disappeared and ADOC never defended these assertions), and on that ground transferred Mr. Cole "behind the fence" to Limestone, a high-security facility.  ADOC subsequently changed Mr. Cole's custody status, apparently so as to keep him at the high-security facility.

29.     Mr. Cole expects to continue participating in the Work Release program, as he was recently advised that his classification officer had put him in for Minimum Community custody level again.  While Mr. Cole had his labor leased out to private employers through the Work Release program, ADOC has deducted 40% of his gross wages purportedly for costs incident to confinement and has also charged him $5 per day for van rides and $15 per month for laundry.

30.     Previously, while at the Red Eagle work center in 2016, Mr. Cole worked for the City of Elmore cleaning up trash on the roads, and at Sale Lot, a warehouse that puts on auctions, and was paid $2 for each eight- to ten-hour day of work.  Mr. Cole was advised directly by an ADOC warden at Red Eagle that if he were to withhold labor, he would be "put behind the wall." Being at Red Eagle was inherently coercive, because he was forced to work or give up his custody and be sent back to a more dangerous facility.

31.     During the course of Mr. Cole's work for public agency and private sector employers, Mr. Cole observed his supervisors make comments and take actions which made

plain that they knew about the dangerous conditions incarcerated workers faced if an employer sent them back for failing to do any work assigned by the employer, and would acknowledge that workers had no choice in the matter. When he was working for a City of Montgomery-affiliated employer, he repeatedly heard supervisors say they could "switch y'all out like socks," meaning that the employers had all the power and could send them back for a new worker at the first sign of resistance. An employer at the Elmore Department of Transportation made a similar statement. Mr. Cole observed that his employers were also aware of the poor working conditions the employers directly subjected them to, including racism and unsafe conditions, but did not care. Mr. Cole knows that private employers leasing laborers from the ADOC are aware of the violent and unsafe conditions incarcerated people face because he has seen how ADOC advertises the incarcerated workers as a coerced workforce that has to do what they say. Also, during his work for public and private employers, he has observed and been advised from fellow carceral forced laborers that ADOC will demonstrate how much control they have over the incarcerated workers by doing things like bringing dogs to work-release and honor camp worksites to shake down incarcerated workers in front of the free workers and supervisors. Mr. Cole is also aware that ADOC instructs the outside employers not to give workers food, but some employers, such as ADOT, ignored that directive because they knew how hungry the incarcerated workers are. Mr. Cole observed that all work release and honor camp employers he has encountered were on notice that the employment relationship was an abnormal and coerced one.

32.    Mr. Cole has been disciplined and retaliated against for refusing to work while in ADOC custody. While he was at Draper,[1] he observed and experienced physical violence from ADOC officials, who would beat incarcerated people who didn't want to work cutting grass on the farm with large blades. ADOC officials would also slap incarcerated people to punish them, particularly if they did not work. Mr. Cole watched some people get slapped so hard by ADOC

---

[1] Draper was a major ADOC correctional facility located in Elmore that closed in 2017 and re-opened for a period of time during the COVID pandemic.

officials that it would knock them over.  In his experience at Draper, if you were over 25 years old, ADOC would give you a choice—you could get slapped, or you could get a disciplinary. Mr. Cole was slapped by ADOC officials when given that option.  While at Limestone (where he was sent as punishment for speaking up about working conditions, despite having a lower custody level), he would also witness people walking around with machetes and observed constant theft among incarcerated people due to the complete absence of guards in the dorms.

33.    Mr. Cole has also experienced extreme violence and inhabitable conditions while in ADOC custody at medium- and high-security facilities and has witnessed criminal and unlawful activities by ADOC personnel at every facility where has been assigned, including ADOC personnel selling drugs, phones and weapons.  He has witnessed numerous deaths and seen ADOC engage in retaliatory transfers of people who make complaints about the conditions in the facilities.  Because of these experiences, Mr. Cole is compelled to work his way back down to a lower custody level so that he can avoid the violence plaguing ADOC's medium- and high-security facilities.  However, he has found that working down his custody can be challenging given the violence from guards, as the violence from ADOC personnel brings violence from incarcerated people in return, destabilizing the entire environment.  Mr. Cole feels he is often put in a position of having to protect himself from violence and to prevent violence from escalating, which then causes issues with the Parole Board because the actions taken to protect himself can be met by disciplinary action by ADOC.  Nevertheless, he has now again worked his way to Level 1 custody.

34.    Mr. Cole has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge issued his sentence in 2008, as a result of these Defendants' agreement to subvert the parole system.  Mr. Cole has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Cole has also experienced

financial harm, in the form of lost wages he would have received had he not been forced to labor for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey's, Marshall's, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Cole remains incarcerated.

### E.    Arthur Charles Ptomey Jr.

35.    Plaintiff ARTHUR CHARLES PTOMEY JR. is currently incarcerated by ADOC at Childersburg Work Release. He has been incarcerated by ADOC for nearly 18 years and has been in work release since 2018. Mr. Ptomey is a Black man.

36.    While incarcerated, he has been held at Childersburg, Bibb, Camden, Draper, St. Clair, Camden, and Red Eagle. While incarcerated, he personally witnessed a fellow incarcerated person get stabbed, and observes that such stabbings were "common."

37.    Mr. Ptomey has experienced the extreme violence in Alabama's high- and medium-security prisons. In his experience, stabbings are common, and violence is "in the dorm with you." He has seen stabbings at every facility at which he has been housed *except* work release.

38.    Mr. Ptomey currently works at Progressive Finishes hanging parts, five and sometimes six days per week. He is permitted to leave ADOC facilities and live with his family in the community unsupervised on 48-hour passes every two weeks, and on 72-hour passes every 90 days. He has been receiving passes since approximately 2019.

39.    Mr. Ptomey previously worked for KFC in Pell City, where his starting wage was $7.25 per hour. He has also previously worked for Arby's and Metalplate through the work-release program. While working through the work-release program, ADOC has collected 40% of his gross pay, a fee of $5 per day for van rides to and from the work sites, and $15 per month for laundry, plus restitution. He also has been leased by ADOC to work for the City of Montgomery and ADOT, working for ADOT in 2012 and 2015 for 4-5 months each time.

40.     Several years before he was granted work release community, in approximately 2012 or 2013, Mr. Ptomey was eligible for work release custody but was informed that he could not be transferred to a work release facility because the district attorney in his case had objected to the assignment.  After that, Mr. Ptomey completed additional programming and was later again considered for a transfer to work release and the transfer was granted, presumably because the district attorney no longer objected.

41.     Before working for private employers through the work-release program, Mr. Ptomey provided labor for the "motor pool" in Montgomery, for which he detailed cars for government use for $2 per day.  Prior to the motor pool, Mr. Ptomey performed other jobs, including working for ADOT road squads, the City of Sylacauga, and in ADOC facilities in the kitchen and on the cleaning squad, where he was responsible for burials of individuals who died in ADOC custody and were not claimed by their families.

42.     Mr. Ptomey had a parole hearing in September 2022 at which the Parole Board denied him parole and set him off for three years.  The Parole Board told his family that he was being denied parole because he was fired from KFC for refusing work in 2019.  In fact, he declined to work for KFC in 2019 due to the low wage rate paid and was issued a disciplinary violation for "being fired from a job."  ADOC also punished him for his alleged "refusal" to work by taking away his home passes and taking away his ability to draw money from his account.  His manager who supervised his work at that KFC wrote a letter to the Parole Board specifically recommending him for parole in light of his strong work performance.  By the time of his September 2022 parole hearing, he was working for Progressive Finishes and had also worked for Arby's and a company called Metalplate without incident, and his current employer, Progressive Finishes, recommended him for parole to the Parole Board.  Mr. Ptomey was previously considered for parole in 2017, while incarcerated at a medium-custody facility.  At that time, he was denied parole and set off for two years, setting his next date for parole consideration in 2019.  In 2019, when he asked about when his parole hearing would occur, he was informed by his Institutional Probation Officer that the Parole Board, under the guidance of

Charles Graddick and without giving Mr. Ptomey hearing or notice, had pushed back his next parole hearing by three years to 2022 because he had been convicted of a violent offense.

43.    Mr. Ptomey has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  While Mr. Ptomey was denied parole in 2022, and during the three years between 2019 and 2022 that he was denied any parole hearing at all, similarly situated white incarcerated people were granted parole.  Mr. Ptomey has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced emotional harm as a result of his continued confinement and forced labor.  Mr. Ptomey has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages, for $2 per day when leased out for labor to Montgomery, and for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Ptomey remains incarcerated.

### F.    Frederick Denard McDole

44.    Plaintiff FREDERICK DENARD MCDOLE is currently incarcerated by ADOC at Childersburg Work Release.  He has been incarcerated by ADOC since 2009 and has been housed at other ADOC facilities including Bullock, Hamilton Aged & Infirm, Ventress, and Hamilton Work Release.  Mr. McDole is a Black man.

45.    Mr. McDole had a parole hearing in 2022 and was denied parole, with his next parole hearing set off for five years.  Defendant Marshall opposed his parole.  He was previously considered for and denied parole in 2018, with a three-year set-off date, but the Parole Board advised him directly at that time that he would be granted parole if he completed a specific

rehabilitation program in Columbiana. Mr. McDole completed that rehabilitation program prior to his 2022 parole hearing, at which time he was again denied parole.

46.    Mr. McDole has worked at private work-release employers including Defendant Gemstone Foods, performing janitorial work from approximately 2021 to 2022; Hawks, a plastics company, performing a "lead man" role in which he performed many functions; and Defendant Progressive Finishes in 2024, as a line person unloading parts and stacking them on pallets for various companies. While Mr. McDole was working for Gemstone Foods, Hawks, and Progressive Finishes, ADOC charged him a fee of 40% of his gross pay, plus a fee of $5 per day for van rides to and from the work sites. In each of his work-release jobs, he worked alongside free workers who were paid more for performing the same work.

47.    Mr. McDole observed that Gemstone Foods managers were very disrespectful and abusive towards him and other incarcerated workers because they knew they had power over the workers and that ADOC would never take the workers' side or believe the incarcerated workers' accounts of what happened on the worksite. He experienced supervisors shouting profanity at incarcerated workers and insist they keep working, just because they knew the workers' situation and that they were powerless to quit or object. Gemstone Foods did not provide him with adequate clothing to stay warm, even though he was assigned to work in a very cold part of the facility, causing Mr. McDole to get sick due to the poor conditions. Mr. McDole observed that Gemstone Foods also sought out workers who were in drug rehab to work alongside incarcerated people like Mr. McDole, because they wanted a vulnerable workforce that had no choice but to work for them. Mr. McDole made $11 an hour, but observed that free world workers made more than he did. While working at Gemstone, Mr. McDole and the other incarcerated workers he worked alongside were forced to perform the more labor intensive jobs, such as heavy lifting, and the only safety equipment he was provided was a pair of gloves.

48.    Mr. McDole made $10.50 per hour at Progressive Finishes and believes the free world workers, who performed the same work for the same hours, made more.

49.    While at Ventress, a medium-security facility, Mr. McDole was assigned an unpaid job with the canine training squad, in which he was instructed to walk through the woods and wait for the dogs to find him.  Mr. McDole also worked at the Alabama Therapeutic Education Facility, where he worked as an unpaid senior coordinator for programming.  While in ADOC's custody at these locations, he felt compelled to work in order to "work his custody" down so that he could get transferred to a safer, less violent facility; he had to do that in order to survive.  While Mr. McDole would refuse to work if he thought it was unsafe to do so, he knows that if refuses work for any reason, including lack of safety or abusive or unlawful work conditions, ADOC will discipline him for that refusal and punish him, including by losing the ability to see his family for six months, which would be particularly harmful currently because his daughter recently gave birth to twins.  He feels compelled to keep working, even for employers who are abusive, to make sure that he can see his family.  Mr. McDole has been provided regular passes, without incident, to spend time living with his family in the community unsupervised on weekends.

50.    Mr. McDole was incarcerated at Childersburg during the 2022 strike, where he experienced ADOC's collective punishment in the form of restricting incarcerated people's access to the store as punishment, even though Childersburg did not join the strike.

51.    Mr. McDole has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. McDole has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced emotional harm as a result of his continued confinement and forced labor.  Mr. McDole has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. McDole remains incarcerated.

###    G.    Michael Campbell

52.    Plaintiff MICHAEL CAMPBELL is currently incarcerated by ADOC and housed in Childersburg Work Release. Mr. Campbell had a parole hearing in July 2023 and was denied parole and set off for five years. Mr. Campbell was previously scheduled for a parole hearing in 2019, which was delayed until June 2020. In 2020, he was denied parole and given a three-year set-off date. Mr. Campbell is a Black man. He has been incarcerated at Childersburg, Kilby, and Bibb.

53.    Mr. Campbell has experienced extreme violence while in ADOC's custody, including witnessing multiple assaults and killings. ADOC officers were indifferent to, and sometimes involved in, these incidents. Once, while incarcerated at Kilby, officers made him and approximately 200 other incarcerated men strip naked and throw their clothes in the shower, and then the officers lined them up and slapped many of them in the face. Mr. Campbell understands that punishments like this continue to this day at Kilby.

54.    Mr. Campbell has worked for several employers while in ADOC custody, including Defendants Bama Budweiser, Progressive Finishes, ADOT, and KFC.

55.    Mr. Campbell previously worked at Progressive Finishes, from approximately June 2019 through March 2020, and from approximately November 2021 to January 2023, alongside free workers who performed the same work. For approximately four months in 2019, Mr. Campbell was "lead man" at Progressive Finishes but not compensated as such. Although it was company policy to provide a raise after 90 days, Mr. Campbell did not receive a raise.

56.    Mr. Campbell worked for Bama Budweiser for approximately one month in 2019. During that job assignment, he was required to repackage damaged goods.

57.    Since February 2023, Mr. Campbell has worked for a KFC in Pell City as a cook. While working for Progressive Finishes and KFC and Bama Budweiser, ADOC has taken a fee

equivalent to 40% of his pay, plus a fee of $5 per day for van rides to and from the work sites, and $15 per month for laundry.

58.     During his time at ADOC work release facilities, he has observed that when you arrive at work release facility, ADOC requires you to work an unpaid job first, often on some sort of "clean up crew," before ADOC will assign you to a job with a private employer.  While he has never been cited personally, he has consistently seen ADOC "ship" people back behind the fence for purported refusals to work

59.     Mr. Campbell was previously housed at Bibb, a medium-security facility, where he worked on the road squad for Bibb County/ADOT.  During his time at Bibb, he observed violence repeatedly, many fights, and found that the guards were not present and did not help incarcerated people in danger or distress.  Mr. Campbell once saw one person stab six or seven others, but no guards tried to help or assist the people who had been stabbed, or to quell the violence.

60.     Mr. Campbell feels compelled to work because he knows that if he does not do so, he will be disciplined or shipped back to a facility like Bibb or Kilby.  If he was not at work release now, he would be trying to get a job to escape the violence.

61.     Mr. Campbell has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. Campbell has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Campbell has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and/or for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The

personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Campbell remains incarcerated.

### H.    Lanair Pritchett

62.    Plaintiff LANAIR PRITCHETT is currently incarcerated by ADOC and has been in ADOC custody since 2009.  He is currently housed in Limestone Correctional Facility, a high-security facility.  Mr. Pritchett is a Black man.

63.    He has been transferred 19 times in 17 years.  He has been housed in every ADOC facility except for Bibb and Loxley Work Release.  Currently, he is awaiting a transfer to a work release facility because he has secured the custody necessary for work release, but remains housed in one of the most notoriously dangerous dorms, J Dorm, in Limestone, a high-security facility.  Until recently, he was housed in G dorm, which is the "custody dorm" (which means the dorm is the housing assignment for lower custody individuals), but ADOC very recently transferred most of the Black men, without explanation, out of G dorm, including him, to other dorms.  After he was reassigned to J dorm, Mr. Pritchett filed a grievance with ADOC requesting a transfer to a work release facility due to the imminent danger he faced in J dorm and the fact that he had secured work release custody.  His approval for work release was processed on April 4, 2025, but he is still awaiting transfer while he has observed White incarcerated people transferred out to much safer work release facilities ahead of him.

64.    Mr. Pritchett was denied parole in 2021, after his 2020 hearing was delayed due to the pandemic, and the Parole Board set off his next hearing date for 5 years.  He was previously considered for parole in 2015 and 2017.

65.    Mr. Pritchett has witnessed extreme violence at all the high- and medium-security facilities where he has been placed while in ADOC custody, including stabbings, rapes, deaths and other violence.  He recalls that while at Donaldson, he was on the phone and saw a man stabbed who was standing right beside him.  Mr. Pritchett recalls being spattered with the man's blood.  He also has personally experienced ADOC staff ignoring or refusing to lend assistance when he has requested assistance or protection from violence.

66.    Mr. Pritchett has frequently observed ADOC staff at all ADOC facilities engaging in criminal and unlawful activities.  He has observed ADOC officers stoke tensions and allow gangs to run various dorms.  For example, he was once assigned to a cell and when he arrived at the cell, he was informed that a gang member had already "bought" the cell, forcing him to sleep in another area, and ADOC staff refused to do anything to assist him.  Mr. Pritchett has observed ADOC officers do not intervene quickly or frequently at all to quell violent incidents.  He has also observed that anyone, incarcerated or free, who tries to follow the law often becomes a target for violence inside ADOC facilities.

67.    While in Limestone, Mr. Pritchett learned recently that his uncle, also housed at Limestone, was recently beaten to death by officers, after being sent to the medical unit. Limestone, where he currently is housed despite his minimum community custody rating, is particularly violent.  He feels his life is in danger constantly at Limestone.  He has seen people killed frequently, and there are not enough guards to assist the incarcerated people when altercations occur.  Just two weeks ago, he saw a gang-related assault on a man scheduled to be released from prison the next day.  He saw the man, after the beating, left on the ground, bleeding from the head.

68.    In addition, Mr. Pritchett witnessed extreme violence at Childersburg Work Release, which began with violence from an ADOC officer against an incarcerated person:  one night, he and several other incarcerated people at Childersburg came upon another incarcerated man who had been beaten with a wooden beam by an ADOC officer.  Mr. Pritchett and the others attempted to get medical attention for the man who was beaten, resulting in ADOC transferring all of the incarcerated people who tried to get the beaten man assistance "behind the fence."  Mr. Pritchett and half the group of men who had assisted the beaten man at Childersburg Work Release were sent to Donaldson and those in the other half were sent to St. Clair.  Each of the men was each issued a disciplinary for "inciting a riot."  At Donaldson, ADOC placed Mr. Pritchett in solitary for a month with no change of clothes.  While at Donaldson, Mr. Pritchett

witnessed and experienced extreme violence.  He was stabbed in his left shoulder by three incarcerated men and was robbed of his shoes and glasses.

69.     While at Limestone currently, Mr. Pritchett has been unable to get to his medical appointments because there are not enough officers to escort him.  He still gets charged for appointments even if he cannot go due to the lack of officers.  He has observed that the lack of officers make the conditions at Limestone particularly violent, with incarcerated people forced to govern themselves and intervene when violence occurs.

70.     Mr. Pritchett has performed coerced labor while incarcerated in several settings. While in Childersburg Work Release in approximately 2014-2015, he worked on the road squad for Talladega, at a rate of $2 per day.  He also worked in the kitchen without pay at Childersburg, Limestone, Ventress, Easterling, Frank Lee, Donaldson, Alex City, and Elmore and worked as an unpaid healthcare runner at Ventress and Kilby.  During a previous period when he was housed in Elmore, he was assigned to work at a recycling facility.  He was told to report to work after lunch one day, but when he arrived, he was written up for refusing to work because he did not arrive in the morning.

71.     Mr. Pritchett also worked for Smith Company, a private work-release employer, processing wood alongside free workers who made substantially more per hour for the same work.  Mr. Pritchett also worked for the City of Troy and ADOT, for which he was paid $2 per day.  From June until October 2023, Mr. Pritchett worked as a runner cleaning up the floor of the hospital ward at Kilby.  He received no pay for that work and performed it because it allowed him to temporarily escape the horrific conditions within the dorms.

72.     Mr. Pritchett has received several work-related disciplinaries, including disciplinaries for "being fired from a job" and for "refusing to work/failing to check out for work."  These disciplinaries have been issued for occurrences as minor as being late to catch a van to get transported to a work site; cleaning tables in a way that was slightly different than his supervisor preferred; or not making it to his shift while he was sick.

73.    Mr. Pritchett has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. Pritchett has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Pritchett has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and/or for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Pritchett remains incarcerated.

### I.    Alimireo English

74.    Plaintiff ALIMIREO ENGLISH is a Black man who was formerly incarcerated by ADOC until his release in April 2025.  Mr. English had been in ADOC custody since October 2020, when the Parole Board revoked his parole, previously granted in 2017, on the basis of charges for which a jury acquitted him on November 8, 2021.  Despite the acquittal and the judge ordering his release, Mr. English remained incarcerated by ADOC.  Mr. English's parole hearing was not held until November 28, 2023, at which time the Parole Board denied him parole and issued a set-off date of one year, with Chairperson Leigh Gwathney seeking a five-year set-off.  The Parole Board finally granted him release on December 12, 2024, with Chair Gwathney voted against parole, and he was released from custody in early April 2025.

75.    While in ADOC custody, Mr. English was housed at Kilby, Easterling, Fountain, Draper, Elmore, Ventress, Decatur Work Release, Hamilton, Camden, Staton, and the Perry County Prep Center.

76.     At Ventress, Mr. English was compelled to work as the Dorm Representative for the Faith dorm, which had no other supervision by correctional officers other than by Mr. English, who served as the Officer in Charge of the Faith Dorm.  He was recommended and selected for this position by the Chaplain of the facility.  As the Officer in Charge, Mr. English had to be available 24 hours a day, seven days per week, and was responsible for overseeing all matters relating to the custodial supervision of the 190 incarcerated people in the Faith dorm.

77.     In addition to being on-call at all times, Mr. English regularly worked 12–15 hour shifts, seven days a week, screening and monitoring visitors who are not assigned to the Faith dorm, overseeing and performing maintenance tasks, supervising behavior, providing resources such as books and grievance forms, and responding to health and drug emergencies.  While Mr. English held that position, the Faith dorm had no fights, deaths, or overdoses.  Mr. English set up an entry procedure into the dorm so that no person could enter the dorm without being screened by someone at the dorm, which meant he personally and regularly put his body on the line to keep his dorm residents safe.  The Faith dorm houses 50-60 people who are elderly, many of whom are vulnerable and wheelchair bound. English also was a class coordinator and facilitator for "True Talk," which serves as a counseling and therapy group for the incarcerated men.

78.     Mr. English experienced and witnessed multiple incidents of extreme violence while in ADOC custody.  While he was at Ventress, his life was forever changed when his neighbor, who was a known drug user, was raped after an overdose.  Three other people sexually assaulted the neighbor to "wake him up," and when he did not wake because he had already died, they dragged his body to the front door and left him there.  There was never an investigation.  This incident, Mr. English notes, "traumatized me for real" and inspired him to seek a transfer to the Faith Dorm.

79.     Due to the extreme ADOC understaffing, Mr. English observed that ADOC essentially had relinquished control of many parts of facilities where he was housed to groups of incarcerated people.  He had seen, for example, ADOC allow various groups to shut some

incarcerated people out of the dorms entirely, forcing some people to sleep on the basketball court because these groups did not allow them into the dorms.

80.    On another occasion, also while at Ventress, Mr. English learned that an incarcerated person had been raped by the chapel's piano player.  When Mr. English reported the assault, which was confirmed by both the chaplain and an ADOC Captain to have occurred via camera footage, ADOC's only response was to temporarily transfer the piano player to a different dorm because he was "the best musician that the prison had".  ADOC returned the piano player to the dorm six months later.  The victim of the rape later pleaded with ADOC to be put in protective custody because he feared for his life, but ADOC refused and the man was killed later that day.

81.    Mr. English himself was assaulted by another incarcerated person when he was at Hamilton and ADOC took no action against the perpetrator of the assault, instead claiming improbably that Mr. English "slipped" and fell.  Mr. English also was sexually harassed and assaulted by an ADOC officer while at Decatur work release.  When he reported the assault, which again was confirmed by ADOC officials to have occurred because it was captured on camera footage, ADOC temporarily transferred him but then retaliated against him for his complaint by shaking him down (regularly searching his person and cell to try to find a basis for disciplining him) every other day for a month.

82.    Mr. English observed that it was mandatory to work while he was in ADOC custody.  ADOC compelled this work in several ways, including by: refusing to open the yard if people did not do what they were told; refusing to run the snack line or canteen; or threatening people with "trouble" if they did not do what they were told, including "being worked by ADOC officers" to do tasks related to the ADOC officers' illegal or criminal activities.

83.    While incarcerated at ADOC, Mr. English repeatedly saw ADOC officers bring in drugs and phones to ADOC facilities and coerce incarcerated people to sell drugs and phones for the officers' profit.  Mr. English that if he or other incarcerated people tried to refuse to assist ADOC with their illegal drug and phone trade, the ADOC officers would "shake you down,"

acting, for example, like they just discovered a phone or drugs in the incarcerated person's possession that the officer had just demanded that they sell as part of the officer's business.

84.     Mr. English was forced to work for several employers while in ADOC custody, including in the chapel at Ventress, cleaning at Decatur, and performing Department of Transportation work for the cities of Grove Hill, Camden, and Hamilton.  When he worked at Decatur, he was trying to earn his way into work release.  He personally experienced ADOC's policy to make incarcerated people work for free upon arrival at a work release center as a condition of being eligible for work release jobs.  During those periods where ADOC makes you "earn" your job at work release, Mr. English observed that they "work you like a dog" for no pay.

85.     Mr. English has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and suffered an extended detention as a result of these Defendants' agreement to subvert the parole system.  Mr. English has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. English has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.

**J.    Toni Cartwright**

86.     Plaintiff TONI CARTWRIGHT is currently incarcerated by ADOC.  She has been incarcerated since 2016, and has been housed at multiple ADOC facilities, including Tutwiler, Montgomery, and Birmingham Work Release.  Ms. Cartwright is a Black woman.

87.     Ms. Cartwright had a parole hearing in March 2021.  At that time, she had a custody level of "Minimum Community" and was working unsupervised in the community at a work-release job at a McDonald's in Birmingham six days per week.  She had submitted numerous recommendations for parole from guards and her work-release employers.  After the hearing, she was informed that she was denied parole and set off for five years.  After learning of

her parole denial and being unable to apply for parole again for 5 years, until 2026, Ms. Cartwright has struggled to find hope to move forward, relying on her faith in God and the guidance of her grandmother to keep going, despite feeling that she has proven repeatedly that she is qualified for release.  Subsequent to the parole hearing, she asked for a brief break from work requirements so that she can attend to her mental health needs, as she was so disheartened by the Parole Board's denial, but she has been repeatedly advised that any failure to work, even for health reasons, will be considered a refusal to work and will result in a disciplinary offense.

88.    Ms. Cartwright has been working at work release jobs since 2020, including jobs with Southeastern Meats, Paramount, a McDonald's restaurant, Bud's Best Cookies, and Hager's.  She was most recently employed at a Wendy's located in Montgomery.  Prior to securing her Minimum Community custody, she had been assigned to work a job inside the facilities where she was incarcerated in the kitchen.

89.    Ms. Cartwright has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and faces a substantial risk of prolonged detention as a result of these Defendants' alteration of the criteria governing parole. Ms. Cartwright has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of her continued confinement and forced labor.  Ms. Cartwright has also experienced financial harm in the form of lost wages she would have received had she not been forced to labor for no wages and/or for less than the prevailing wage and subjected to excessive, mandatory deductions for ADOC's benefit, and had she not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Ms. Cartwright remains incarcerated.

### K.    Turner Mason

90.    Plaintiff TURNER MASON is a White man who is currently incarcerated by ADOC.  Mr. Mason has been in ADOC custody since June 2024.  Mr. Mason is a former law

enforcement officer and, accordingly, has been placed in a protected custody dorm at Limestone Correctional Facility.

91.    Mr. Mason was told he had to work soon after he arrived at Limestone; he was given a job and had no choice but to work it. Mr. Mason was assigned to deliver breakfast trays to incarcerated people in a closed custody dorm in Limestone, which is where more dangerous people reside. The people to whom he was delivering breakfast asked him to deliver drugs and other contraband; when he refused, they began throwing feces and urine at him. Mr. Mason informed ADOC about this, and was told that he needed to "learn how to dodge." When he explained that he was being asked to deliver drugs, ADOC told him to move whatever he was told to move and shut up about it, which he understood to be a directive to transport the drugs. Mr. Mason still refused to move drugs. As a result, one day when he was delivering trays, an incarcerated person attempted to stab him with a broken broom handle that had been whittled into a weapon. Mr. Mason returned to ADOC and informed them that he would not work that job anymore because he feared for his life. ADOC told him that it didn't matter—he had to go back to work. When he still refused, an ADOC officer attempted to retaliate by transferring him into a general population dorm, where he would have been killed as a former police officer. Another officer intervened and prevented him from being transferred, but he was still issued two disciplinaries, including one for refusing to work and the other for disobeying a direct order, and given sixty days of restriction of visitation and canteen access per disciplinary, for a total of 120 days of restriction. During the hearing for his disciplinaries, the hearing officer told Mr. Mason that he (the hearing officer) did not care about or want to hear Mr. Mason's testimony or hear from any of the other inmate witnesses; the hearing officer advised Mr. Mason that the hearing officer's job was to punish inmates. Mr. Mason is aware of at least two other instances in which people who were incarcerated in less dangerous dorms were disciplined for refusing to transport drugs or otherwise be exposed to the violence in more dangerous dorms. Mr. Mason was eventually assigned to a new job in the library, which he works to this day.

92.    Mr. Mason has observed, experienced and understands that if an incarcerated person refuses to do work, ADOC will issue that person a disciplinary for disobeying a direct order, and may also beat, pepper spray, and/or place the person in lock up for an extended period.

93.    Mr. Mason has also witnessed severe ongoing violence and deaths in Limestone. He recalls seeing ADOC correctional officers kicking an incarcerated person who was in handcuffs.  Mr. Mason recalls seeing that the beaten man's face was so disfigured, it looked like "cheese."  He is also aware of an incarcerated person at Limestone who wrote a note to ADOC staff to report that he was being threatened with rape and that his life was in danger in the dorm to which was assigned.  In response, the ADOC officer laughed at the note and threw the note away and returned the man to the same cell and dorm.  Ultimately, the man who tried to report the rape threat killed his cell mate in self defense, after which the guards took the man away and beat him severely.  In Mr. Mason's experience, much of the violence in Limestone is meted out by the guards; there are cameras inside the dorms, but guards will take incarcerated people outside of the dorms, where there are no cameras, beat them, and then wash the blood off the sidewalk.

94.    Mr. Mason has experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Mason has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages as a result of Defendants Ivey and Marshall's unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Mason remains incarcerated.

**L.  Danny Dandridge**

95.    Plaintiff Danny Dandridge was formerly incarcerated by ADOC from 2002 until 2007, and then from 2009 until 2023.  During his time in ADOC custody, Mr. Dandridge was housed at Kilby, Ventress, Fountain, Draper, ATEF, St. Clair, Bibb County, Childersburg,

Elmore, Alex City, Loxley, Holman, Staton, Red Eagle, J.O. Davis, and North Alabama Work Release.

96.     Mr. Dandridge has worked for several public employers during his time in ADOC custody, including the ADOT, the Cities of Oak Grove, Sylacauga, Childersburg, Talladega, and Decatur; the Madison County Commissioner; the Monroeville Board of Education; Doc's Seafood Restaurant; Alabama Correctional Industries; Shelby County; and Trenholm College. He also performed labor directly for the ADOC, including working in the Childersburg, ATEF, and Red Eagle cafeterias; teaching a class at Ventress; working as a runner at Red Eagle; and working in Inmate Control System at Bibb.  He was often doing the work of officers, including administrative and healthcare work and work for the warden.

97.     Mr. Dandridge was cited for refusing to work several times while he was in ADOC custody.  In 2011, while working in the camp at Loxley, he received two work-related disciplinaries; the first was for refusal to work, and the second was for "insubordination" when he questioned the first disciplinary.  His punishment was to dig up a tree stump.  Mr. Dandridge reported the officer who wrote him up to ADOC's internal investigations unit, but nothing was done.  In 2015, while working at Trenholm College in Montgomery, he was falsely accused of hitting on his supervisor's wife.  When he went to the head supervisor to speak about what happened, the supervisor fired him and disciplined him with restriction for 45 days, during which he had no access to the phone, or store, or visitation.

98.     In 2017, while housed at J.O. Davis and working at the Board of Education, he was disciplined for "refusal to work" for refusing sexual advances from his male supervisor. Other incarcerated workers who would agree to have sex with the supervisor were not punished. Because of this alleged refusal to work, he was denied parole.

99.     In 2018, Mr. Dandridge was disciplined for allegedly "refusing to work" while cutting grass for the City of Childersburg after cutting the grass in a different way than the supervisor had instructed, even though the entire crew agreed that Mr. Dandridge's approach made more sense.  Even though he had not refused to work, Mr. Dandridge was sent to St. Clair

for 90 days as punishment alongside other work release people at Childersburg who ADOC had also decided to "punish." He recalls that three of the people sent with him by ADOC from Childersburg to St. Clair had never before been assigned to a medium- or high-security facility when ADOC decided to punish them by throwing them "behind the fence" at St. Clair. After arriving at St. Clair, he saw the three who had never before been assigned to a medium- or high-security facility get violently gang-raped while the guards did nothing. One victim ran to the shift office, screaming for help, but the guards placed him right back in population where he was subsequently raped again.

100.    In addition to being punished by being sent to St. Clair, where the rapes happened, Mr. Dandridge spent time at Bibb from 2020 to 2022, which was then known as "Bloody Bibb" because of the violence. He witnessed several murders there, and helped rush several people to the infirmary to save their lives.

101.    Mr. Dandridge is also familiar, from his time at Loxley, with the ADOC's practice of punishing incarcerated work release people who are being disciplined by requiring them to dig up large tree stumps with very deep roots, and then climb out of the holes they have created. He was punished once himself in this way.

102.    Mr. Dandridge was at North Alabama Community Work Center during the 2022 strike, and was one of the incarcerated people who participated in the strike and refused to be a strikebreaker. ADOC wanted approximately 15–20 people, including Mr. Dandridge, to strike break at Limestone, and threatened all of them to either be a strikebreaker or be put back behind the fence in a more violent facility. He was also told that he would lose his job if he didn't help with strike breaking. Mr. Dandridge was personally threatened by the warden in order to coerce him to participate in the strike.

103.    Mr. Dandridge was also involved in a 2014 strike at Holman, alongside Plaintiff Robert Council. Mr. Dandridge was placed in solitary confinement as punishment for his participation in that strike, and then shipped to another, more violent facility.

104.    Mr. Dandridge was exposed to the profound violence in Alabama's prisons.  He can recall four particularly violent incidents in particular.  First, in 2014 at Holman, he saw an incarcerated man throw some kind of acid (known as "liquid fire") on the face of another incarcerated man in the cafeteria.  The victim's face melted, and he was in the hospital for seven months.  His face was entirely reconstructed when he returned.  Second, in 2016 at Staton, he saw a person throw some type of hot mixture containing shaving powder, water, and baby oil on another man's skin, which started to melt.  The victim collapsed in the middle of the basketball court.  Third, in 2018 at St. Clair, an incarcerated man was set on fire in his cell.  Fourth, in 2020 at Bibb, he saw two incarcerated men stab another man multiple times.  Mr. Dandridge stopped them, and had he not, the victim would have been killed.  He rushed the victim to the infirmary and there was blood everywhere.  The officer who was in the cube at the time was unaware of what was happening.  Mr. Dandridge also saw a man he knew growing up get murdered only five or six paces away from him; incarcerated people had to carry the man to the infirmary, because there were no guards in sight.  Mr. Dandridge had to call the victim's sister to let her know what had happened.

105.    Mr. Dandridge has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and suffered a prolonged detention as a result of these Defendants' alteration of the criteria governing parole.  Mr. Dandridge has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his extended confinement and forced labor.  Mr. Dandridge has also experienced trauma from his experiences, and feels strongly that no one can go through all of those things without being traumatized.  Mr. Dandridge has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.

M.    **Zackary Ball**

106.    Plaintiff ZACKARY BALL is a White man who is currently incarcerated by ADOC in Limestone Correctional Facility.  He has been in ADOC custody since February 2007.  While in ADOC custody, Mr. Ball was compelled to work for no pay at the kitchen in Staton and Limestone.  He also was compelled to work on the road squad in Moulton, Alabama, and for Whitt's Deer Processing, Scruggs BBQ, Wayne Farms, and Alabama Correctional Industries.  While incarcerated by ADOC, he has been housed at Limestone, Staton, St. Clair, Kilby, Easterling, Draper, and North Alabama Work Release.

107.    The current conditions at Limestone are so dangerous that Mr. Ball requested to be placed in segregated custody for his own safety.  There have been stabbings, and he is aware of officers bringing drugs into the facility.  The guards are so involved in the drug trade that they will allow incarcerated people who are supposedly behind on payments for their drugs to be beaten, because the ADOC staff are also making money off of the process.  Mr. Ball is also aware that guards at Limestone will take incarcerated people out of the view of cameras and beat them.  He has observed that the facilities are also extremely understaffed; Mr. Ball never sees officers, and indicates that if someone is killed, it could be hours before they are found.  His entire focus right now is on staying alive until his end of sentence date later this year.

108.    Mr. Ball has experienced and observed tremendous violence at all the high- and medium-security facilities where he has been housed.  He has witnessed multiple stabbings and beatings, frequently over trivial matters like owing money for commissary items.  He personally has seen three people killed.  He recalls one person was beaten to death over a $10 debt at Staton.  He found Staton to be incredibly violent, with conditions exacerbated by the understaffing.  In Staton, he was in a dorm with more than 300 people and there was only one guard assigned to oversee the entire dorm.

109.    In fact, Mr. Ball was assigned to Staton as punishment for a purported disciplinary infraction he received while assigned to North Alabama Work Release.  He both saw and experienced extreme violence while at Staton serving his "punishment" from the work

release facility. Specifically, on one occasion, he was dragged by five people into the shower attached to the dorm and he thought he was going to die. He was beaten badly, losing so much blood there was a blood trail from where he was taken in the dorm to the shower. He doesn't recall the details of the end of the assault but ultimately, he was sent to healthcare workers, who took photos of his injuries. In a separate incident, he was beaten over a bag of cheese curls. He recalls seeing many people with head injuries in the dorm but ADOC staff made no effort to help them. He recalls seeing one injured man die from a head injury due to the absence and/or unattendance by ADOC staff.

110.    Mr. Ball has been forced to work throughout his time in ADOC custody. He has never been issued a disciplinary for refusing to work but he has been threatened with such a disciplinary on many occasions. Specifically, he recalls being assigned to work in the kitchen but due to violence and threats from other incarcerated people working in that kitchen, he reported to ADOC staff that he feared violence if he was forced to continue to work in the kitchen. In response to his report, an ADOC guard advised him that if he did not continue to work, despite the danger, he would be written up for refusing to work. Thus, he knows that if he refuses to work, he will receive a disciplinary for that refusal or for disobeying a direct order.

111.    Mr. Ball has no choice in the jobs he is assigned to, and will be assigned to jobs even if he has no experience in the work he is required to perform. Mr. Ball has seen multiple people get written up for refusing to work, even if they did not actually refuse to work. He once saw someone ask for help after being assigned a job he did not know how to do; the private employer said the person was refusing to work, and the incarcerated worker was disciplined by ADOC. Mr. Ball understands that the same will happen to him if he does anything similar, and that any refusal to work or any action that can be perceived as a refusal to work can get him sent to a more dangerous facility. He has also observed that ADOC will automatically discipline him or any incarcerated worker if they are fired from a job for any reason.

112.    While at Whitt's Deer Processing, Mr. Ball was required to do side work for its owner, including building a fence and shed at the owner's home. If Mr. Ball refused, he knew he

would be disciplined by ADOC.  Mr. Ball was also required to do side work for the owner under pain of discipline by ADOC while working at Scruggs BBQ, including working on the owners' cars and doing electrical work at the owner's house.  The owner at Scruggs would curse at and verbally abuse incarcerated workers, and threaten to have them fired and "shipped out of camp" if he was dissatisfied with their work.  Mr. Ball observed that each of his private employers was aware of the conditions in ADOC facilities and that incarcerated workers would be shipped to more dangerous facilities by ADOC if the employer reported them to the camp or terminated their job for any reason.

113.    While at St. Clair, Mr. Ball also worked for Alabama Correctional Industries doing vehicle maintenance, including paint and body work on vehicles and working on the car of at least one federal marshal.  He made 30 cents an hour, and worked seven- to eight-hour days, five days a week.  Mr. Ball was also forced to work in the kitchens at Limestone, Staton, and St. Clair; his "payment" for this work was peanut butter sandwiches and cheese sandwiches.

114.    Based on what he has observed while on jobs when leased out to labor by ADOC, Mr. Ball believes that all of the employers know that incarcerated workers must work or face disciplinary action.  Some employers, such as the owner of Scruggs BBQ, would make explicit threats to that effect, but every employer was aware that incarcerated workers' options were to do what they were told or be sent back to prison for punishment.

115.    Mr. Ball was most recently up for parole in 2021 and was set off until the end of his sentence, which was effectively a five-year set off.  At the time, Mr. Ball had a clean record for two and a half years and was working a free world job at Scruggs BBQ.  No one protested his parole.  Mr. Ball has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. Ball has experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm

as a result of his continued confinement and forced labor. Mr. Ball has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Ball remains incarcerated.

### N.    Rashaad Clark

116.    Plaintiff RASHAAD CLARK is a Black man who is currently housed in Childersburg Work Release. He has been in ADOC custody since May 2013. When Mr. R. Clark was sentenced, his attorney advised him, based on representations from the prosecutor and the judge, that he would only serve 5 years of a 20-year sentence if he took a plea. However, he has observed and experienced that Defendants' subversion of the State parole system has extended his sentence far beyond that 5-year estimate. Based on the time he has observed other people with similar sentences for the same or more severe offenses who went up to parole before 2019 served, Mr. R. Clark believes that the prosecutor's and judge's estimate, at the time the judge ordered his sentence, was accurate of the time he should have served on the 20-year sentence before being granted parole.

117.    While in ADOC custody, Mr. R. Clark has been housed at Kilby, Draper, Staton, ATEF, Bullock, Atmore, Childersburg, Alex City, Mobile, and Frank Lee.

118.    Mr. R. Clark has been repeatedly exposed to and observed rampant violence in Alabama medium- and high-security facilities, and has been forced to use work as a means of survival. He was once attacked in the middle of the night by another person with knives; the ADOC guards did nothing, and he was forced to fend for himself. Another time, he was choked unconscious by another incarcerated person who came up from behind him.

119.    Mr. R. Clark has also been exposed to regular violence from the guards themselves; he has witnessed the guards assault incarcerated people, and has been assaulted himself by guards. He has also witnessed corruption, including guards selling phones at Staton and guards participating in the drug trade, with all ADOC officials up to the warden getting a

cut.  At each of the higher security facilities, the violence he observed was all day, every day.  Mr. R. Clark has also witnessed stabbings, beatings, and rapes in various facilities.

120.    Mr. R. Clark has experienced that working for ADOC permits him to escape the violence and corruption and protect himself.  He also knows that if he refuses to work, he will be disciplined and will be denied parole.  He has seen this happen to others, and he was also disciplined personally by ADOC for refusing to work in the kitchen in Bullock.

121.    Mr. R. Clark has been forced to work both for ADOC and for private employers during his time in ADOC's custody.  While incarcerated at Draper, he was once placed in solitary for failure to tuck in his shirt, and then punished by being forced to walk miles each day to do farm work with only a single cheese sandwich to eat.  Mr. R. Clark also worked as a "runner" (a person who delivers messages) for a sergeant at Staton, which was a way to stay out of the extremely violent dorm he was placed in at that facility.  The runner work also allowed Mr. R. Clark to secure basic necessities as when he was first transferred to Staton, he was given no deodorant, soap, or other hygiene products.

122.    Mr. R. Clark describes Staton as being so violent that one needs to stay out of the dorms in order to survive, because many of the people incarcerated in that facility were using drugs and were very unpredictable.  Staton is where Mr. R. Clark was once attacked by another person in the middle of the night with knives; the entire dorm yelled for help, but no guard arrived and Mr. R. Clark was forced to fend for himself and escape the attack.  While at Staton, Mr. R. Clark also saw an officer hit another incarcerated person right in front of him; the officer punched the person extremely hard, causing the victim to have a seizure and die on the spot.

123.    Mr. R. Clark has observed that this kind of violence was a regular occurrence at ADOC high- and medium-security facilities.  He saw many people get stabbed in front of him.

124.    While he was assigned to Bullock in 2016, during Ramadan, Mr. R. Clark saw an incarcerated man ambushed by his attackers, who came at him from multiple directions.  The attackers threw some type of boiling liquid on him on his face and his skin started to peel off.  Then the attackers stabbed him in the back.  The man that was attacked tried to leave the dorm,

but Mr. R. Clark saw ADOC officer, Lieutenant White, who was in the hallway, shove the man back into the dorm, where the man bled out and died.  Lt. White never came back to check on the man.  Instead, Lt. White sent a sergeant and a corrections officer, each of whom Mr. R. Clark saw stand there and watch in shock as the victim was bleeding out.  At one point, Mr. R. Clark yelled, and the sergeant and officer snapped out of it.  Mr. R. Clark recalls that the stabbing was so bad that he could see exposed bone and other things hanging off the victim.

125.    Mr. R. Clark also witnessed at least one violent rape.  He believes Bullock was the most violent place he has been incarcerated.  Two of the dorms, F and G dorms, were at the end of a long hallway and were known as "The Bottom"; because the hallways were concrete, when there was violence or deaths people could bang on the doors and yell all they wanted, but no one heard them.  The staffing is extremely limited, and Bullock was designed with a long hallway along which doors and gates are placed, making it difficult to get assistance.  Mr. R. Clark also worked as a runner at Bullock, and so could see for himself how few guards were assigned to supervise the various dorms and yards; he observed that there were often times where there was no guard in the office, meaning that no one could see or assist of an incarcerated person got injured.  As a runner, Mr. R. Clark also moved the bodies of people who had died from overdoses or stabbings on a number of occasions, using a roller that was meant to move the trash.

126.    Mr. R. Clark saw approximately 500 people sleeping on the floor at Bullock.  Bullock had a large mental health population who really need help, but Mr. R. Clark observed ADOC personnel consistently treat that population them like they are nothing.  Mr. Clark does not think ADOC staff have the proper training to deal with the mental health population.

127.    While at Bullock, Mr. R. Clark was disciplined for refusal to work when he was suddenly assigned to the kitchen, despite his work as a runner; when he protested, he was written up by ADOC.

128.    Mr. R. Clark was forced to work for Defendant Bama Budweiser ("Budweiser") while he was housed at Frank Lee work release.  While at Budweiser, he made less than what

free world workers at Budweiser made, even though he worked the same shift and performed all of the most difficult tasks, including heavy manual labor. The free world workers also got production bonuses on top of their hourly pay. Mr. R. Clark believes that the incarcerated workers also earned bonuses, but they did not receive them, as their bonuses instead were taken by the JPOs. He would hear supervisors at Budweiser talking about how the incarcerated workers had no choice.

129.    After some time on the job, his supervisor at Budweiser, Ed, falsely accused him of not being on the job when he was, in fact, in the bathroom; the supervisor attempted to physically beat him with a stick and needed to be held back from Mr. R. Clark by another employee. Mr. R. Clark told ADOC personnel what had occurred, and was told that it was "just Ed" and to go back to work. Mr. R. Clark then complained to other management at Budweiser, who also told him that he had to just accept Ed's abuse to stay on the job. Eventually, after Mr. R. Clark conveyed how unsafe Ed's supervision was, the Budweiser manager agreed to lay off Mr. R. Clark off instead of firing him because they knew that if Mr. R. Clark were fired, he would be disciplined by ADOC and face great harm.

130.    Mr. R. Clark also had his labor leased out by ADOC to Wendy's, Blair Block, Amaze Corps, the City of Atmore, the road squad in Mobile, a restaurant called "El Giro" in Mobile, and he currently has been leased out to work at Defendant Progressive Finishes.

131.    While he was at Amaze Corp, he was cussed out by a supervisor for asking for help on the job. The supervisor was hungover and upset because a different incarcerated worker had failed to show up to work that day, and seemed to take out that frustration on Mr. R. Clark. As a result, Mr. R. Clark was disciplined by ADOC for "getting fired from the job," despite the fact that he was not the person who failed to show up for work, which increases his risk of getting sent to a more dangerous facility and decreases the likelihood that he will receive parole.

132.    While at Bullock, in the months leading up to the strike in 2022, Mr. R. Clark had conversations with ADOC personnel, including guards and the warden, who expressed sympathy with the strike and were not hostile towards it. Those ADOC staff, who Mr. R. Clark worked for

as a runner, told him that the orders directing their response to the strike were coming from Montgomery, and not what they wanted to do.  In fact, ADOC leadership at Bullock told Mr. R. Clark that they had hoped the strikers would have held out a little bit longer, because they were planning their own sympathy strike.

133.    Mr. R. Clark has been denied parole repeatedly while in ADOC custody.  His first parole date was supposed to be in 2019, but was delayed until 2020.  He was set off three years, had another hearing in 2023, and was set off three more years.  The victim of Mr. R. Clark's crime has consistently supported his release from ADOC custody and insists he deserves a second chance as she was not harmed by his offense and he was so young when it occurred.  She has communicated her views repeatedly to the Parole Board conveying her belief, but to no avail.  The Parole Board appears to consider all disciplinary offenses he has received for allegedly refusing to work as sufficient grounds to deny him parole, despite his low custody level, his demonstrated safe conduct unsupervised while working in the community, and his victim's vocal support for his release.

134.    Mr. R. Clark has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. R. Clark has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Clark has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. R. Clark remains incarcerated.

### O. Deckrice Morrissey

135.    Plaintiff DECKRICE MORRISSEY is a Black woman currently incarcerated at Montgomery Women's Facility.  She has been in ADOC custody since 2012.  The last time she was up for parole, in 2021, she was set off for five years.

136.    When Ms. Morrissey arrived at Montgomery, she was told that she was required to work 30 days in the kitchen for free before she could be eligible for any work release jobs. ADOC has refused to transfer her personal property from Birmingham to Montgomery, and forced her to wear shoes that are several sizes too small, causing her back pain.  She has also been denied access to her personal papers, hygiene products including soap, toothpaste, deodorant, her clothes, and pictures of her family.

137.    Ms. Morrissey has been forced to work for Defendant Paramount Services, Defendant Southeastern Meats, Full Moon BBQ, Bud's Cookies, and McDonald's.  While working at Full Moon BBQ, Ms. Morrissey was terminated for being too slow. Her coworkers, both free and carceral, begged the supervisor to reconsider, and explained the consequences of her losing her job, but he refused to reconsider.  Ms. Morrissey has also been disciplined at least once for "refusal to work."  In 2022, when she was working at Paramount Services, she and another incarcerated worker were coming downstairs for work and realized they had forgotten their chapstick.  They went upstairs to get it, and were told by the sergeant in charge that they would be written up for refusing to work, even though they were not late.  She has observed that even merely voicing accurate facts about a situation can have her written up for insubordination.

138.    Ms. Morrissey has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board. Her confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued her sentence, as a result of these Defendants' agreement to subvert the parole system.  Ms. Morrissey has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Ms. Morrissey

has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy. The personal and financial harms perpetrated by Defendants are ongoing each day that Ms. Morrissey remains incarcerated.

### P.  Eric Prewitt

139.    Plaintiff ERIC PREWITT is currently incarcerated at Alex City work release. He has been in ADOC custody since 2018, and has been incarcerated at Kilby, Ventress, St. Clair, Hamilton Facility, and Alex City Work Release. Mr. Prewitt was charged with his crime of conviction in April 2017.

140.    Mr. Prewitt has been forced to work for various employers while in ADOC custody, including Defendant SL Alabama, Defendant Southeast Restaurant Group-Wen LLC d/b/a Wendy's, Huddle House, Sprint Turf, and cleaning dorms at Alex City.

141.    While working at Defendant SL Alabama, Mr. Prewitt was treated punitively and forced to do labor beyond what was required for free workers working the same or similar jobs. He worked on the final quality check line, and described the job as very physical, with SL Alabama requiring him to be on his feet the entire time. Mr. Prewitt worked 12 hour shifts, 5 to 6 days a week. He made between $11 an hour and $17 an hour. Defendant SL Alabama uses a quota system: SL employees had a quota they were expected to meet, but when free world employees met their quota they were permitted to go home, but when incarcerated workers met their quota they were made to keep working.

142.    When Mr. Prewitt tried to request a transfer to a different job due to the physically grueling nature of the work for SL, ADOC retaliated against him for trying to alter his employment with SL. ADOC would allow SL to make Mr. Prewitt work on weekends when he had home passes visiting his family because SL claimed that they needed him to work overtime.

143.    While working at Defendant Wendy's, Mr. Prewitt has suffered poor treatment by Wendy's supervisors. The supervisors generally treat incarcerated workers poorly, and require them to do more work than free world workers. Mr. Prewitt works 8-hour shifts, from 5 p.m. to

1 a.m., and has to leave Alex City between 1 and 2 p.m. to get to work. He typically does not return to Alex City until approximately 2 a.m.. He makes $11 an hour. Mr. Prewitt has worked at Wendy's for approximately six months and continues to work there presently.

144.    Mr. Prewitt also experienced abusive treatment at Sprint Turf, another employer to whom his labor was leased by ADOC, where even when taking a bathroom break, he would be rushed by supervisors, who would even look under the stall to hurry him.

145.    Mr. Prewitt has experienced dangerous, violent, and retaliatory conditions while incarcerated at ADOC. Mr. Prewitt's experience is that the violence is constant and normalized in ADOC medium- and high-security facilities; he could meet someone one day, and they would be dead a week later. He has witnessed multiple stabbings, overdoses, and beatings, and had a friend killed at Fountain. Guard responses to violence, if they occur at all, are typically delayed because gates are locked, and it can take as long as five minutes to be cleared.

146.    Mr. Prewitt is constantly in fear of getting written up, even for arbitrary reasons, and has been targeted in the past. ADOC officials have sexually harassed his sister when she comes to Alex City to pick up Mr. Prewitt for his home passes. When Mr. Prewitt refused to give ADOC officials his sister's number, the retaliation intensified.

147.    Mr. Prewitt has also been affected by Defendants' deliberate subversion of the Alabama parole system. His Institutional Parole Officer told him that he could apply for early parole after 18 months of incarceration, but when he did so, he was denied. The denial letter he received expressly referenced the Parole Board's 2019 rules and regulations that were implemented by the Parole Board at the direction of Governor Ivey and Attorney General Marshall. Those rules and regulations there were not in place at the time the crime Mr. Prewitt was convicted for occurred nor were these rules and regulations in place at the time of his sentencing by the judge. He was denied parole despite the fact that Mr. Prewitt, shortly thereafter, was granted home passes that permitted him to visit his family unsupervised on the weekend. Mr. Prewitt was also considered for parole in August 2023 and set off for five years,

despite regularly living, without incident, in the community on weekends unsupervised on his weekend passes.

148.    Mr. Prewitt has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. Prewitt has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Prewitt has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Prewitt remains incarcerated.

### Q.    Trevion Clark

149.    Plaintiff TREVION CLARK is currently incarcerated by ADOC at Kilby.  Mr. T. Clark is a Black man who has been in ADOC custody for approximately 14 years, held at Kilby, Draper, Easterling, Frank Lee and Alex City facilities.  Mr. T. Clark was released on parole and remained in the community successfully for a year and a half before his parole was revoked.  Since then, he has been considered for parole once and was denied, receiving a five-year set-off.  His next parole consideration date is June 17, 2025.  ADOC recently transferred Mr. T. Clark to Kilby, a high-security facility, from Alex City, a low-custody work release facility, on the basis of a disciplinary allegation that Mr. T. Clark believes was a pretext to punish him for his prior complaints and advocacy regarding unsafe and unlawful conditions, including work conditions.

150.    Mr. T. Clark has been subjected to coerced labor, unsafe working conditions, and retaliatory discipline throughout his time in ADOC custody.  During his previous incarceration at Draper, he was required to perform field labor and understood that he did not have a choice in the matter.  He witnessed ADOC staff brutally beating other incarcerated people who refused

field work.  He also witnessed other instances of brutal violence by guards, including an incident in which officers stomped another incarcerated person while wearing steel-toed boots.

151.    Mr. T. Clark describes the other high- and medium-security ADOC facilities where he has been detained, such as Easterling, as a "murderous place" and observed that the conditions at each are uninhabitable.  There is no privacy in the bathrooms, which creates a major risk of sexual violence.  Anytime the temperature drops, pipes burst and there are sewage issues.  The water is often not drinkable, as it is brown and has an odd taste, and there is no bottled water, so the incarcerated people are forced to microwave tap water for three minutes before drinking.  In 2015, when Mr. T. Clark was assigned to Draper, at one point, ADOC lost control entirely of the segregated dorm because the dorm was taken over by incarcerated individuals to protest the unsafe conditions: "They tied up the doors with sheets and hoses and poured chemicals.  It was over the conditions."

152.    From approximately January to March 2024, Mr. T. Clark was compelled to work at Defendant Hwaseung Automotive in Elba.  He was initially assigned to work on a brazing line, but the smoke there overwhelmed him due to his chronic bronchitis.  After explaining that he could not breathe on that assignment due to his health condition, a supervisor at Hwaseung told him "If you don't like it, you can go back to the camp."  That same supervisor, in fact, tried to terminate him but his direct supervisor defended Mr. T. Clark and talked the other supervisor into letting him continue working in another position, although reducing his pay to $12.50 per hour, because the supervisor said he was such a good worker.

153.    At Hwaseung, he worked alongside free-world employees.  The working conditions at Hwaseung were abysmal, but ADOC gave Mr. T. Clark no choice but to work there.  The work tasks that he was assigned aggravated his chronic bronchitis, including welding and constant bending near gas-emitting machines.  He was not permitted to choose his job, and was not permitted to change jobs or do other work than what was assigned.  The conditions were hazardous, and included gas leaks and helium machine malfunctions.  He observed that he and

other incarcerated workers were not allowed to express concerns about conditions without facing retaliation.

154.    At Hwaseung, he worked alongside a 14-year-old boy, other underage children and a pregnant woman, all of whom Mr. T. Clark learned that Hwaesung was housing in apartments somewhere and also taking a portion of their pay, in a similar way that ADOC took 40% of incarcerated workers' pay.  Mr. T. Clark knows the age and name of the boy who worked alongside him because Mr. Clark speaks Spanish and spoke to him.

155.    Mr. T. Clark has also worked at a Burger King, where he was fired after refusing the sexual advances of a free-world female employee, who then arranged for another worker to threaten him.  He filed a grievance, but instead of receiving any protection, he was terminated from the job.

156.    In 2016, while being leased out for labor from Alex City, Mr. T. Clark was compelled to work at Fred's Cabinet Shop located in Dadeville, Alabama, building cabinets.  He was injured on the job when a blade severed the tip of his finger.  Fred's Cabinet Shop sent him to the hospital and the hospital sent him back to ADOC with the tip of his finger in a bag.  He tried, unsuccessfully, to get medical attention for two days at Alex City, in an effort to get his finger tip reattached, until someone from ADOC just removed the bag from him and threw the tip of his finger away.

157.    Mr. T. Clark sees work as a means of survival in ADOC custody.  As he explains it, "you work or you die."  Getting sent to one of ADOC's Level 4 facilities means getting sent to a "death trap," as far as he is concerned, in which his life would be at risk.  He has witnessed ADOC consistently using the threat and execution of transfers as a coercive tool, as ADOC uses the violent conditions at the medium- and high-security facilities to coerce labor and compliance on the part of Mr. T. Clark and others.  He has observed that he cannot object to conditions at work or he will be written up.  If he asks not to work a single day, he will also be written up unless there is an extreme reason for his inability to work.  And if he misses a day of work, he will lose all his privileges and be sent to a Level 4 facility.  He has observed and experienced that

ADOC uses the revocation of privileges to coerce him and others to work.  Mr. T. Clark has witnessed that ADOC typically revokes those privileges theoretically for 30 days at a time, but ADOC officials will ask every week if the incarcerated person wants to work and if the answer is no, the clock will reset and the answer is treated as grounds for new discipline.

158.    Mr. T. Clark has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. T. Clark has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. T. Clark has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. T. Clark remains incarcerated.

**R.    Larry Darnell Jarmon Jr.**

159.    Plaintiff LARRY DARNELL JARMON JR. is a Black man currently incarcerated by ADOC at North Alabama Work Release, who has been in ADOC custody for approximately 13 years.  His first parole hearing resulted in a five-year set-off; at his most recent hearing in 2025, he was set off for another three years, with no reconsideration before 2028.

160.    During his incarceration, Mr. Jarmon has been subjected to extreme violence, prolonged solitary confinement, and forced labor under coercive conditions.

161.    During his incarceration, Mr. Jarmon has been housed at North Alabama work release, Elba, Kilby, Ventress, Easterling, and Donaldson.  On one occasion, he was harshly punished by ADOC after another incarcerated person stabbed him, and he was forced to defend himself, including ADOC assigning Mr. Jarmon to six months in solitary confinement despite issuing him no disciplinary for the incident while the aggressor, whose actions were confirmed

on camera footage, received no punishment from ADOC at all.  Mr. Jarmon still bears the visible scars regarding this attack and spoke to the U.S. Department of Justice regarding the incident.

162.    Mr. Jarmon has been forced to work for both public and private employers, including the City of Elba, where he worked on the road squad for $2 to $2.50 per day; Inzi Controls; Coffee County; Pike County; the City of Enterprise; Dorsey Trailers, Alabama Cable, and Defendant Cast Products.

163.    Mr. Jarmon worked at Cast Products for approximately one year from 2022 to 2023.  He worked in a dangerous section of the plant where he was required to perform physical, hazardous labor, including manual mold-making and shoveling sand.  He suffered a severe burn injury when molten aluminum poured into his glove, which left a substantial scar across the top of his hand.  Although the injury was serious, he did not receive meaningful medical treatment; he was given burn cream, re-gloved, and sent back to work.  Cast Products provided initial protective equipment of poor quality, and required any replacements to be purchased by incarcerated workers.  Mr. Jarmon was also required to rent his work clothes, which cost him $350 out of pocket.  He never received his final paycheck from Cast Products and has been attempting to obtain it since his layoff.

164.    Mr. Jarmon has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.  Mr. Jarmon has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Jarmon has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Jarmon remains incarcerated.

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

### S. Cordarius Evans

165.    Plaintiff CORDARIUS EVANS is a Black man currently incarcerated at Limestone Correctional Facility who has been in ADOC custody since 2012.  He has had one parole hearing, in 2020, after which he was set off five years.  He has been housed at Bullock, Easterling, Alabama Therapeutic Education Facility ("ATEF"), Alex City Work Release, Staton, Elmore, Kilby, Donaldson, and Limestone.

166.    Mr. Evans has experienced extreme and unchecked violence in ADOC facilities. He has witnessed multiple stabbings while in ADOC custody, and knows that incarcerated people are often left to govern themselves because there are not guards available.  He has also been personally attacked by an incarcerated person with a knife.  Mr. Evans has also experienced the collective punishment ADOC frequently imposes by revoking privileges or food access for entire dorms based on isolated misconduct.  While he was at Alex City work release, he was disciplined after he got into an argument with another incarcerated person, which resulted in ADOC "shipping" him to Elmore, a much higher security and more violent facility.

167.    Mr. Evans has been compelled by ADOC to work for Defendant Koch Foods, Tru Cabinetry, and Amtech.

168.    Mr. Evans was forced to work at Defendant Koch Foods for approximately four to five months in 2018.   He worked on the cold side of the facility, boxing chicken and stacking packaged meat on pallets.  Mr. Evans worked the night shift from 10 PM to 6 AM, six days a week, including regular overtime.  He was paid approximately $12–13 per hour, but ADOC took as a fee a large portion of his gross earnings.  He knew that free world workers made more than him, because he was friends with some of them.

169.    The conditions at Koch were physically demanding and dangerous.  All incarcerated workers, including Mr. Evans, eventually fell ill with what was colloquially called "the bird flu."  He vomited for several days while continuing to work, because he would be disciplined if he did not continue working.  No matter how tired he was, he had to go to work. Mr. Evans was treated less favorably compared to free workers.  While free-world employees

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

could take frequent bathroom breaks without scrutiny, Mr. Evans was harassed by management at Koch Foods if he needed to go to the bathroom more than once.  Koch Foods supervisors made clear to Mr. Evans that termination from the job would mean reassignment "behind the fence" to higher-security and more punitive facilities, indicating that they were aware that one of the conditions of him losing his job was that he would be sent to one of those facilities.

170.    Mr. Evans has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board.  His confinement has been extended, compared to the time served by other people for the same or more severe offenses and compared to parole rates at the time the judge originally issued his sentence, as a result of these Defendants' agreement to subvert the parole system.    Mr. Evans has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Evans has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Evans remains incarcerated.

**T.    Michael Bullock**

171.    Plaintiff MICHAEL BULLOCK is a White man currently incarcerated at Red Eagle Honor Farm.  He has been in ADOC custody since 1990 and has been at Red Eagle with the lowest possible custody he can secure for 11 ½ years.  He has been denied parole several times, most recently in approximately 2024, when he was set off for five years.

172.    During his time incarcerated at ADOC, Mr. Bullock has been forced to work for the kitchen at Kilby and Atmore Honor Camp (now known as Fountain Annex) and perform yard and church grounds maintenance at Fountain.  He also was required to work on the roadside crew for the state "trustee squad" at Atmore.  He was compelled to work for public employers while in ADOC custody, including the Town of Franklin, the Governor's Mansion, and the Montgomery Farmer's Market.  He has worked at the Governor's Mansion for approximately

one year while Defendant Key Ivey was Governor. During his time at the mansion, Mr. Bullock worked in carpentry, painting, plumbing, and electrical maintenance. He and other incarcerated workers were subjected to brutal conditions, including being housed in an unventilated shed where temperatures reached 115 degrees. Although women and dogs inside the mansion had access to air conditioning, incarcerated workers were denied the same.

173.    Mr. Bullock has been punished for refusal to work when he missed the bus for his job one day because he was put on medication for vertigo that made him drowsy. He has witnessed other incarcerated people be transferred and stripped of privileges for refusing to work. His fear of getting transferred to a more dangerous facility makes him feel compelled to work. He experienced a severe injury during an ADOC-instigated riot at Easterling Correctional Facility in August 1996, which exacerbated an earlier injury and has resulted in long-term back damage. He spent over three months in Kilby's hospital afterward. He clearly recalls the violence he suffered while at Easterling.

174.    He has been forced to continue to perform strenuous labor as directed by ADOC, despite these long-term disabling injuries and pain caused by performing this strenuous labor, including being forced to shovel asphalt for an extended period despite his disabling back injury which causes him great pain from such assignments. He has also struggled to get treatment for chronic health issues, including a sciatic nerve issue, an upper back injury, and arthritis. He has raised some of these concerns to officials in the Town of Franklin, including the mayor, chief of police, and town clerk, and was told he just has to continue working until he is physically not capable of doing so. Mr. Bullock has never considered going to the media because he fears retaliation from the warden if he were to do so.

175.    Mr. Bullock witnessed employers, such as the town clerk at Franklin, tell other incarcerated workers that she would "call the van" if they did not cooperate and improve their attitude—a plain threat to invoke ADOC's discipline, and a clear indication that employers are aware of the consequences incarcerated people face if they are reported by their employers.

176.    While assigned by ADOC to labor at Montgomery's Farmer Market, he was subjected to harassment and threats from a Montgomery supervisor with apparent cognitive and substance use issues, who repeatedly threatened him and alluded to having influence via political connections.  Eventually, Mr. Bullock had to request that he be removed from that assignment for fear of being written up again by that threatening supervisor and the consequences such a write up would bring.

177.    Mr. Bullock has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and suffered a prolonged detention as a result of these Defendants' alteration of the criteria governing parole.  Mr. Bullock has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Bullock has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Bullock remains incarcerated.

## U.    Victor Alan Thomas

178.    Plaintiff VICTOR ALAN THOMAS is currently incarcerated at Elmore Correctional Facility.  Mr. Thomas has been in ADOC custody since 1988.  He has been incarcerated at various ADOC facilities including Staton, Frank Lee, and Elmore.

179.    Mr. Thomas has worked for several public and private employers during his time in ADOC custody.  Mr. Thomas had two vertebrae removed during a spinal surgery in 2020, which has led to ongoing complications including chronic lower back pain and pain radiating down his legs.  He also suffers from chronic arthritis, diabetes, anemia, and hypertension.  Nevertheless, he has not been provided with a wheelchair, walker, or comprehensive pain management, and has instead been forced to work for ADOC's benefit.

180.    After his spinal surgery, and despite his chronic pain and health issues, he was assigned in 2022 to perform physically demanding work that required the manual handling of large, heavy concrete sections.  He was unable to perform these assigned tasks, and consequently was forced to work cleaning the kitchen instead.  If he refused to clean the kitchen, he would be disciplined.

181.    He was then assigned to work at Defendant Ju Young Automotive.  At Ju Young, Mr. Thomas was assigned to a wide variety of tasks, including standing on his feet for hours applying tape to car parts, loading batteries onto assembly lines, and moving heavy boxes.  He was given no choice about what tasks he performed on any given day.  He worked regular hours from 7 a.m. to 3 p.m., with overtime extending to 5 p.m. and regular Saturday shifts.  He had inadequate breaks.  He made $11.25 per hour, and understood that free world workers made more than him. He observed that free world workers were also assigned less physically demanding tasks and were harassed less by Ju Young management.

182.    Supervisors at Ju Young were much harder on incarcerated workers than free world workers, and would threaten to send incarcerated workers back to camp if they did not work hard enough.  They also made it very clear that if incarcerated workers took more days off than Ju Young found acceptable, Ju Young would fire them, causing ADOC to discipline them for "being fired from a job."

183.    Ju Young supervisors were aware of the dangerous and unhealthy conditions that incarcerated workers would be subjected to if they were fired.  Supervisors also knew that workers would be disciplined if they did not work, and that being disciplined would jeopardize workers' parole or get them sent behind the fence to more dangerous facilities.

184.    Mr. Thomas did not believe there was any mechanism to file a grievance about his working conditions, and was told by ADOC personnel that it was a privilege to be in work release, so he should not be complaining.

185.    Mr. Thomas suffered a significant injury in December 2023 while lifting boxes at Ju Young.  He was not provided with a back brace or any other protective equipment, despite his

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

known medical issues, and was laid off shortly thereafter.  His supervisor expressly told him Ju Young no longer needed him because he was injured.

186.     Despite the fact that he has minimum custody, ADOC transferred Mr. Thomas to Staton—a medium security facility—after his termination by Ju Young and since been transferred to Elmore, another high security facility.  He is currently housed in a dorm with people of all different types of custody, including people in on sentences for life without possibility of parole.

187.     Mr. Thomas has observed and been exposed to extreme violence and dysfunction in ADOC's medium- and high-security facility facilities.  He has yet to receive adequate medical care for his injury and chronic health issues, and is charged for every medical visit and prescription, even though he should be designated "chronic care" given his health status.  He describes the current situation in Elmore as "very unsafe," and is housed with people who have much higher custody levels than him, increasing his personal risk as he currently is unable even to walk without great difficulty and pain.

188.     Mr. Thomas's most recent parole hearing was in 2021, when he was given a five-year set-off.  His next parole date is in 2026.

189.     Mr. Thomas has experienced profound harm as a result of the conspiracy between and among Defendants Ivey, Marshall, and the Parole Board and suffered a prolonged detention as a result of these Defendants' alteration of the criteria governing parole.  Mr. Thomas has also experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor.  Mr. Thomas has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.  The personal and financial harms perpetrated by Defendants are ongoing each day that Mr. Thomas remains incarcerated.

V.    **Retail, Wholesale and Department Store Union, Mid-South Council (RWDSU)**

190.    Plaintiff RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, MID-SOUTH COUNCIL (RWDSU) is a labor organization that represents employees in various industries, including the poultry processing industry, within the states of Alabama, Mississippi and parts of Florida, Louisiana, Ohio and Tennessee.  RWDSU represents approximately 4,000 workers working in poultry plants located across Alabama.  Defendants' actions have caused RWDSU and its members harm by perpetuating racial discrimination, unsafe working conditions, and low wages in the poultry processing industry, including in facilities operated by employers where RWDSU represents poultry processing workers.  In Alabama, RWDSU represents approximately 200 workers employed by Defendants Gemstone Foods and 1,800 workers at Koch Foods, as well as workers at poultry processors Wayne Farms and Pilgrim's Pride: each of those four companies employs or has employed persons incarcerated by ADOC as part of the coerced labor scheme at issue in this complaint.  RWDSU and its members are further harmed by Defendants' unlawful conduct, including Defendants' coerced labor scheme and unlawful subversion of the parole process, because that conduct interferes with RWDSU's ability to organize and represent workers in the poultry industry.  RWDSU has sought to represent ADOC work-release employees at Koch Foods and to ensure that its collective bargaining agreement covered those workers, but the company and ADOC took the position that the employees could not be members of RWDSU, including because the employees could not enter into binding contracts without permission of the warden.  Not being able to represent all workers in the union's bargaining unit at Koch Foods harms RWDSU's interests and the interests of its members.  RWDSU has also committed resources to organizing and seeking to represent workers at Gemstone Foods' Decatur poultry processing plant, including incarcerated persons who work at that plant.  The employment of incarcerated workers by poultry processing plants undermines RWDSU's ability to improve the wages and working conditions of poultry plant workers because it is difficult to communicate with incarcerated workers and they often fear discipline if

they advocate for better wages and working conditions. Further, the poultry processing plants' use of incarcerated labor depresses wages and working conditions for all workers in the sector, who are predominantly Black and Brown. RWDSU and its members are also harmed by the Governor, Attorney General, and Parole Board members' unlawful conduct with respect to the parole system, as well as by employer Defendants' failure to prevent or assist in preventing the racial conspiracy to deny parole to Black incarcerated individuals, because the incarcerated persons currently working pursuant to ADOC's work-release scheme, if granted parole, could be free workers and could freely become members of RWDSU. In addition, the parole conspiracy has functioned to keep a substantial portion of the poultry plant workforce incarcerated and subject to harsh penalties for any labor organizing activity, which undermines RWDSU's efforts to organize and represent workers in the poultry industry. This action pertains to the purposes for which RWDSU's members are associated together and is germane to the union's interests. Defendants' actions as alleged herein directly conflict with RWDSU's mission and goal of improving the wages and working conditions of its members, and ensuring safe, racially just, equitable, and fair workplaces and pay for its members.

   **W.    Union of Southern Service Workers, Service Employees International Union (USSW)**

   191.    The Union of Southern Service Workers, Service Employees International Union (USSW) is a project built by and for low-wage workers coming together across the service industry in the Southern United States, including in Alabama, which is committed to improving the lives of these workers and their communities and combatting systemic racism. A key industry in which USSW has been and is advocating for improved wages and working conditions is the fast-food sector. USSW has devoted significant time and resources to supporting workers at fast-food restaurants in speaking out about intolerable working conditions such as excessive heat and sexual harassment, and about the need for a living wage. USSW's work has included advocacy on behalf of workers at McDonald's, KFC, Burger King, and Wendy's locations in Alabama. The employment of incarcerated workers by fast-food employers undermines

USSW's ability to improve the working conditions of fast-food workers because it is difficult to communicate with incarcerated workers and incarcerated workers fear discipline if they advocate for better wages and working conditions. Further, these employers' use of incarcerated labor depresses wages and working conditions in the fast-food sector. USSW has expended time and resources on addressing the impact of fast-food employers' employment of incarcerated persons. This action pertains to the objectives of USSW and is germane to its interests. Defendants' actions as alleged herein directly conflict with USSW's mission and goal of improving the wages and working conditions of service workers in the Southern United States, and ensuring safe, equitable, and fair workplaces and pay for those workers.

### X. The Woods Foundation

192. Plaintiff The Woods Foundation is a non-profit organization based in Birmingham, Alabama that is dedicated to aiding persons with wrongful convictions and excessive sentences, particularly in Alabama. Woods Foundation's ability to fulfill its mission is frustrated by the arbitrary and racially discriminatory practices of the Parole Board and the scheme alleged herein to undermine Alabama's parole system. As a result of Defendants' unlawful actions, Woods Foundation has had to devote increased resources, including money and staff time, towards addressing the unfair and unlawful functioning of the parole system. For example, Woods Foundation has had to redirect resources from other projects such as investigations of wrongful convictions to address the Governor, Attorney General, and Parole Board's racially discriminatory abuse of the parole system and their rejection of Alabama law's individualized parole inquiry and the JRA's objective standards. The Woods Foundation dedicates significant resources to representing individuals in parole proceedings, ensuring their constitutional rights are upheld throughout the process, and pursuing litigation when those rights are violated. Woods Foundation will continue to divert its resources, impairing its ability to perform its mission, unless and until Defendants' unlawful conduct stops. Indeed, in the absence of lawful functioning of Alabama's parole system, and given Defendants' directives and actions

to virtually eliminate parole in the state, the Woods Foundation's mission is almost entirely frustrated.

### Y.    Quannie McCorvey: Putative Class Member

193.    Putative class member Quannie McCorvey is a Black man who was incarcerated by ADOC for two separate periods: from approximately 2002 to 2008 and again from 2017 until his release in August 2019.  During his most recent incarceration, Mr. McCorvey was housed at Kilby, Atmore, and Loxley Work Release, and previously at Childersburg, Frank Lee, and Elmore.

194.    Mr. McCorvey was assigned to work at a McDonald's restaurant in Foley, Alabama, operated by Defendant CBAK, from August 2018 through his release in August 2019. While there, he also periodically worked shifts at a second CBAK-operated McDonald's in Orange Beach.  Mr. McCorvey routinely worked 100 hours or more every two weeks and estimates some coworkers logged as many as 140 hours.  He does not believe he received overtime pay.  Although his nominal wage was approximately $12–14 per hour, Mr. McCorvey received only $300–350 per two-week pay period due to deductions imposed by ADOC.  These deductions—coupled with his inability to provide adequately for his family—strained his relationships and caused him to feel demoralized and powerless.

195.    Mr. McCorvey worked alongside free-world employees who earned more for performing the same tasks.  He was often tasked with training non-English-speaking foreign workers, including young international students from China and Russia.  CBAK relied on him to lead shifts, train workers, and perform maintenance, cleaning, and detailing duties that should have been performed by maintenance staff at the store.  For example, incarcerated workers including Mr. McCorvey were made to scrub the floors and parking lots, which was a maintenance job.  Mr. McCorvey would also take extra shifts from free-work employees who did not want to work under the conditions at CBAK.

196.    CBAK withheld food from incarcerated workers, to the point that they would sometimes be forced to sneak food to get through the day.  Mr. McCorvey understood that if he

refused to work, he would be transferred "behind the gate" to a Level 4 facility, and knew that employers like CBAK were aware of this arrangement and "in cahoots" with ADOC to enforce it. He once witnessed an ADOC officer tell CBAK supervisors to tell ADOC if the incarcerated workers weren't listening so that ADOC could "get them right." He knew that even being fired, regardless of the reason, could lead to reassignment to harsher custody levels, and McCorvey observed that some workers were terminated for personal reasons, including their sexual orientation or perceived demeanor. Mr. McCorvey witnessed one incarcerated CBAK worker who was extremely ill be forced to go to work by ADOC, because ADOC wanted to make their money. When the worker continued to be ill at CBAK, he was terminated and sent back behind the wall as punishment. When Mr. McCorvey did request a job change, he was flatly denied by the ADOC sergeant on site. Managers at CBAK would scream at incarcerated workers, deny them basic privileges like smoke breaks, and instruct supervisors to make them do extra work. One of the supervisors at CBAK also sexually harassed incarcerated workers, which was never addressed.

197.    Mr. McCorvey experienced substantial harm as a result of Defendants' forced labor scheme and has experienced physical and emotional harm as a result of his continued confinement and forced labor. Mr. McCorvey has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages and had he not been denied parole as a result of Defendants Ivey, Marshall, and the Parole Board Members' unlawful conspiracy.

## II.    DEFENDANTS

198.    Defendants in this action include Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons, who have participated and continue to participate in the unlawful and racially discriminatory scheme to profit and otherwise benefit from the forced labor of incarcerated Alabamians by orchestrating the unlawful operation of the parole system in disregard of the evidence-based standards required by law, and to discriminate on the basis of race in the evaluation of parole applications and issuance of parole rehearing dates. ADOC Commissioner Hamm is also sued in his official capacity as a necessary defendant with respect to the claims against the Governor, Attorney General, and Parole Board members for the unlawful operation of the parole system, and as a participant in the unlawful coerced-labor scheme.

199.    Defendants also include "Employer Defendants," each of which is a public or private employer that has knowingly and willingly participated in the forced-labor scheme alleged herein and that has thereby benefitted, economically and otherwise, from the unlawfully coerced labor of incarcerated Alabamians.  Defendant Ivey, who has employed and benefited from the forced labor of incarcerated individuals at the Governor's Mansion, is also an Employer Defendant.  The other Employer Defendants are identified in paragraphs 200-222 below.

### A.    Governor Kay Ivey

200.    Defendant KAY IVEY is the Governor of the State of Alabama and the head of the State's executive branch.  Defendant Ivey is sued in her individual and official capacities.  As detailed herein, Defendant Ivey conspired with Defendant Marshall and others to pervert Alabama's parole system, including by nullifying the individualized inquiry the Parole Board is required by statute to use in evaluating parole candidates, which effectively and systematically altered sentences issued by the judicial branch, substantially increasing the risk that incarcerated people, particularly Black people, eligible for parole would be subjected to extended confinement due to a denial of lawful parole consideration, with the foreseeable and intended effect of maintaining a large, incarcerated, and disproportionately Black workforce.  Defendant Ivey's mansion has employed the coerced labor of incarcerated Alabamians, including as janitors

and handymen in the Governor's Mansion.  The Governor appoints the Director of the Bureau of Pardons and Paroles, who serves at the pleasure of the Governor.  Ala. Code §15-22-21.  The Governor also appoints members of the Parole Board, choosing from a list of persons nominated by a panel set forth by statute, and designates the Chair.  *Id.* §15-22-20.  The Governor has the authority, whether formal or informal, to refuse to participate in the parole conspiracy and, further, to direct the Parole Board members to follow the evidence-based standards required by state law in making parole decisions, which would provide relief to Plaintiffs.

### B.    Attorney General Steve Marshall

201.    Defendant STEVE MARSHALL is the Attorney General of the State of Alabama. The Attorney General is an elected public officer who serves as the State's attorney and is the State's chief law enforcement officer.  Defendant Marshall is sued in his individual and official capacities.  Defendant Marshall is a co-conspirator of Defendants Ivey, Gwathney, and the associate Parole Board members.  By statute, the Parole Board cannot grant parole until it provides 30 days' notice to the Attorney General that an incarcerated person is being considered for parole.  Ala. Code §15-22-36.  Attorney General Marshall systemically submits letters to the Parole Board opposing parole for incarcerated individuals and often urges disregard of the Parole Guideline recommendations.  He also systemically coordinates with VOCAL, which opposes granting parole in many cases.  The Attorney General has the authority and, indeed, the duty to refuse to participate in the parole conspiracy and, further, to advocate for adherence to individualized inquiries in the parole process.

### C.    Parole Board Chair Leigh Gwathney

202.    Defendant LEIGH GWATHNEY is the Chair of the Parole Board within the Alabama Bureau of Pardons and Paroles, a state agency created by statute.  *See* Ala. Const., §124; Ala. Code §15-22-20.  Defendant Gwathney is sued in her individual and official capacities.  Defendant Gwathney was appointed in 2019 and since then has exercised her authority as Chair of the Parole Board to effectuate the wholesale revision of the standards governing parole eligibility in a manner substantially likely to increase the duration of

confinement for parole-eligible Alabamians and to discriminate against Black incarcerated Alabamians in the granting of parole and the issuance of parole rehearing dates.  As a member of the Parole Board, Defendant Gwathney has the authority to refuse to participate in the parole conspiracy and to consider each applicant on their own merits in the granting of parole and establishment of reset dates.

### D.    Associate Parole Board Members Darryl Littleton and Gabrelle Simmons

203.    Defendants DARRYL LITTLETON and GABRELLE SIMMONS are Associate Members of the Parole Board.  They are sued in their official capacities.  Defendant Littleton was appointed in 2021.  Defendant Simmons was appointed in August 2023.  As members of the Parole Board, Defendants Littleton and Simmons have the authority to refuse to participate in the parole conspiracy and to consider each applicant on their own merits in the granting of parole and establishment of reset dates.

### E.    ADOC Commissioner John Hamm

204.    Defendant JOHN HAMM is the Commissioner of ADOC.  The Commissioner is responsible for the independent direction, supervision, and control of the Department.  Ala. Code §14-1-1.3.  Defendant Hamm is sued in his official and individual capacities.

### F.    Transportation Director John Cooper

205.    Defendant JOHN COOPER is the Transportation Director and the chief executive officer of the Alabama Department of Transportation (ADOT).  Ala. Code §23-1-21.  ADOT regularly has persons incarcerated by ADOC perform work for the department and has been doing so since at least 1972.  From January 1, 2018 through September 7, 2023, approximately 942 people incarcerated by ADOC have worked for ADOT, generally receiving only $2 per day for their labor.  At least 130 individuals incarcerated by ADOC have worked for ADOT this fiscal year.  ADOT knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to clean and repair roadways and engage in other coerced labor to benefit ADOT.  ADOT knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons

incarcerated by ADOC by unlawful means as alleged herein.  Defendant Cooper has the power to withdraw ADOT from participating in the work-center program but has continued to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-center program, ADOT has subjected incarcerated persons to involuntary servitude.  Defendant Cooper is sued in his individual and official capacities.

      **G.**      **City of Montgomery**

      206.      Defendant CITY OF MONTGOMERY regularly has persons incarcerated by ADOC perform work for the city.  From January 1, 2018 through August 5, 2024, approximately 472 people incarcerated by ADOC have worked for the City of Montgomery and for City of Montgomery road crews, generally receiving only $2 per day for their labor. At least 111 individuals incarcerated by ADOC have worked for the City of Montgomery and its road crews in the 2024 fiscal year.  Incarcerated people also regularly perform work at Riverwalk Stadium, the home of the Montgomery Biscuits, a minor league baseball team.  From January 1, 2018 through August 5, 2024, approximately 59 people incarcerated by ADOC have worked at Riverwalk Stadium, generally receiving only $2 per day for their labor.  At least 15 individuals incarcerated by ADOT have worked for Riverwalk Stadium this calendar year.  The City of Montgomery knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform road work and engage in other coerced labor to benefit the city.  The City of Montgomery knows or should know that its lucrative enterprise with ADOC and other defendants is dependent on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein.  The City of Montgomery has the power to withdraw from the work-center program but has continued to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-center program, the City of Montgomery has subjected incarcerated persons to involuntary servitude.

      **H.**      **City of Troy**

      207.      Defendant CITY OF TROY regularly has persons incarcerated by ADOC perform work for the city.  From January 1, 2018 through August 5, 2024, approximately 306 people

incarcerated by ADOC have worked for the City of Troy, generally receiving only $2 per day for their labor. At least 23 individuals incarcerated by ADOC have worked for the City of Troy this fiscal year. The City of Troy knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform road work and engage in other coerced labor to benefit the city. The City of Troy knows or should know that its lucrative enterprise with ADOC and other defendants is dependent on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. The City of Troy has the power to withdraw from the work-center program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-center program, the City of Troy has subjected incarcerated persons to involuntary servitude.

## I.    Jefferson County

208.    Defendant JEFFERSON COUNTY regularly has persons incarcerated by ADOC perform work for the county, generally receiving only $2 per day for their labor. Jefferson County knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform road work and engage in other coerced labor to benefit the county. Jefferson County knows or should know that its lucrative enterprise with ADOC and other defendants is dependent on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Jefferson County has the power to withdraw from the work-center program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-center program, Jefferson County has subjected incarcerated persons to involuntary servitude.

## J.    RCF, LLC d/b/a Gemstone Foods, LLC

209.    Defendant RCF, LLC d/b/a GEMSTONE FOODS, LLC ("Gemstone Foods") is a poultry processing company with plant operations in Decatur and Florence, Alabama that contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. During the period of January 1, 2018 through August 5, 2024, approximately 220 people incarcerated by ADOC worked for Gemstone Foods. Gemstone Foods knowingly

benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous poultry processing work and engage in other coerced labor to benefit the company. Gemstone Foods knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Gemstone Foods has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Gemstone Foods has subjected incarcerated persons to involuntary servitude.

**K.    Ju-Young Manufacturing America, Inc.**

210.    Defendant JU-YOUNG MANUFACTURING AMERICA, INC. ("Ju-Young") is a corporation based in Montgomery, Alabama that engages in manufacturing and contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through August 5, 2024, approximately 137 people incarcerated by ADOC have worked for Ju-Young, with at least 67 incarcerated people working for the company in the 2024 fiscal year. Ju-Young knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. Ju-Young knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Ju-Young had the power to withdraw from the work-release program but continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Ju-Young has subjected incarcerated persons to involuntary servitude.

**L.    SL Alabama, LLC**

211.    Defendant SL ALABAMA, LLC ("SL Alabama") is a manufacturing company based in Alexander City, Alabama that, since at least 2018, has contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January

1, 2018 through August 5, 2024, approximately 83 people incarcerated by ADOC have worked for SL Alabama, with at least 53 incarcerated people working for the company in the 2023 fiscal year. SL Alabama knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. SL Alabama knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. SL Alabama has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, SL Alabama has subjected incarcerated persons to involuntary servitude.

### M. Hwaseung Automotive USA LLC

212. Defendant HWASEUNG AUTOMOTIVE USA LLC ("Hwaseung") is a corporation based in Enterprise, Alabama that engages in manufacturing and contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through August 5, 2024, approximately 86 people incarcerated by ADOC have worked for Hwaseung, with at least 52 incarcerated people working for the company in the 2024 fiscal year. Hwaseung knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. Hwaseung knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Hwaseung has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Hwaseung has subjected incarcerated persons to involuntary servitude.

### N.    Progressive Finishes, Inc.

213.    Defendant PROGRESSIVE FINISHES, INC. ("Progressive") is a corporation with a facility in Alabaster, Alabama that provides e-coating and powder coating services.  Since at least 2018, Progressive has contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program.  From January 1, 2018 through August 5, 2024, approximately 158 people incarcerated by ADOC have worked for Progressive, with at least 15 people working for the company in the 2024 fiscal year. Progressive knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company. Progressive knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Progressive has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Progressive has subjected incarcerated persons to involuntary servitude.

### O.    C.B.A.K., Inc. d/b/a McDonald's

214.    Defendant C.B.A.K., Inc. d/b/a MCDONALD'S ("CBAK") is a franchisee of McDonald's USA, LLC, with multiple locations in Alabama, including in Bay Minette, Daphne, Fairhope, Foley, and Loxley, which has regularly contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. During the period of January 1, 2018 through September 7, 2023, approximately 122 people incarcerated by ADOC worked at this McDonald's.  McDonald's knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage in other coerced labor to benefit the company.  McDonald's knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. McDonald's has the power to withdraw from the work-release program but has continued

to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, McDonald's has subjected incarcerated persons to involuntary servitude.

      **P.**    **Southeast Restaurant Group-Wen LLC d/b/a Wendy's**

      215.    Defendant SOUTHEAST RESTAURANT GROUP-WEN LLC d/b/a WENDY'S ("Wendy's") is a franchisee of Quality Is Our Recipe, LLC, with multiple locations in Alabama, including in Montgomery.  Wendy's contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program.  From January 1, 2018 through September 7, 2023, approximately 11 people incarcerated by ADOC have worked for Southeast Restaurant Group-Wen LLC d/b/a Wendy's, with at least 7 incarcerated people working for the company in the 2023 fiscal year.  Wendy's knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage in other coerced labor to benefit the company.  Wendy's knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein.  Wendy's has the power to withdraw from the work-release program but has continued to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Wendy's has subjected incarcerated persons to involuntary servitude.

      **Q.**    **Pell City Kentucky Fried Chicken, Inc. d/b/a KFC**

      216.    Defendant PELL CITY KENTUCKY FRIED CHICKEN, INC. d/b/a KENTUCKY FRIED CHICKEN d/b/a KFC ("KFC") is a franchisee of KFC US, LLC, with a location in Pell City, Alabama.  KFC contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program.  From January 1, 2018 through September 7, 2023, approximately 50 people incarcerated by ADOC have worked for KFC restaurants, with at least 15 incarcerated people working for KFC restaurants in the 2023 fiscal year.  The restaurants at which incarcerated people have worked include the one in Pell City where Plaintiff Campbell works.  KFC knowingly benefits, financially and otherwise, from its

exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in the kitchen and to engage in other coerced labor to benefit the company.  KFC knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. KFC has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, KFC has subjected incarcerated persons to involuntary servitude.

### R.    Masonite Corporation

217.    Defendant MASONITE CORPORATION ("Masonite") is a corporation that designs and manufactures doors and is based in Haleyville, Alabama.  Masonite contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program.  From January 1, 2018 through August 5, 2024, approximately 115 people incarcerated by ADOC have worked for Masonite, with at least 34 incarcerated people working for the company in the 2024 fiscal year. Masonite knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult manufacturing work and engage in other coerced labor to benefit the company.  Masonite knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein.  Masonite has the power to withdraw from the work-release program but has continued to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Masonite has subjected incarcerated persons to involuntary servitude.

### S.    Cast Products, Inc.

218.    Defendant CAST PRODUCTS, INC. ("Cast Products") is a corporation based in Athens, Alabama that designs and manufactures custom aluminum castings.  Cast Products contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program, and has done so since at least 2016.  From January 1, 2018 through August 5, 2024, approximately 454 people incarcerated by ADOC have worked for Cast Products, with at

least 4 incarcerated people working for the company in the 2024 fiscal year. Cast Products knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult manufacturing work and engage in other coerced labor to benefit the company. Cast Products knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Cast Products has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Cast Products has subjected incarcerated persons to involuntary servitude.

### T.   Southeastern Meats, Inc.

219.    Defendant SOUTHEASTERN MEATS, INC. ("Southeastern Meats") is a corporation based in Birmingham, Alabama that packs meat, vegetables and specialty items for freezing and for sale. Southeastern Meats contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through August 5, 2024, approximately 114 people incarcerated by ADOC have worked for Southeastern Meats, with at least 39 incarcerated people working for the company in the 2024 fiscal year. Southeastern Meats knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work in freezing conditions and engage in other coerced labor to benefit the company. Southeastern Meats knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein. Southeastern Meats has the power to withdraw from the work-release program but has continued to participate. By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Southeastern Meats has subjected incarcerated persons to involuntary servitude.

U.    **Koch Foods, LLC**

220.    Defendant KOCH FOODS, LLC ("Koch Foods") is a limited liability company that processes poultry at facilities across Alabama. Koch Foods contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through August 5, 2024, approximately 30 people incarcerated by ADOC have worked for Koch Foods, with at least 1 incarcerated person working for the company in the 2023 fiscal year.  Koch Foods knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work processing poultry and engage in other coerced labor to benefit the company.  Koch Foods knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein.  Koch Foods has the power to withdraw from the work-release program but has continued to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Koch Foods has subjected incarcerated persons to involuntary servitude.

V.    **Paramount Services, Inc.**

221.    Defendant PARAMOUNT SERVICES, INC. ("Paramount") is a corporation based in Birmingham, Alabama that provides linen and uniform services for hotels, hospitals and other establishments.  Paramount contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program.  From January 1, 2018 through August 5, 2024, approximately 82 people incarcerated by ADOC have worked for Paramount, with at least 16 incarcerated people working for the company in the 2024 fiscal year.  Paramount knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce: incarcerated persons are forced to perform difficult work hauling and laundering linens and engage in other coerced labor to benefit the company.  Paramount knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein.  Paramount has the power to withdraw from the work-release program but has continued to participate.  By requiring

incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Paramount has subjected incarcerated persons to involuntary servitude.

**W.      Bama Budweiser of Montgomery, Inc.**

222.      Defendant BAMA BUDWEISER OF MONTGOMERY, INC. ("Bama Budweiser") is a corporation based in Montgomery, Alabama that is an Anheuser-Busch wholesale beer distributor.  Bama Budweiser contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program.  From January 1, 2018 through August 5, 2024, approximately 180 people incarcerated by ADOC have worked for Bama Budweiser, with at least 13 incarcerated people working for the company in the 2024 fiscal year.  Bama Budweiser knowingly benefits, financially and otherwise, from its exploitation of this coerced workforce.  Bama Budweiser knows or should know that its lucrative enterprise with ADOC and other defendants depends on obtaining labor and services from persons incarcerated by ADOC by unlawful means as alleged herein.  Bama Budweiser has the power to withdraw from the work-release program but has continued to participate.  By requiring incarcerated persons to labor in accordance with the terms of ADOC's work-release program, Bama Budweiser has subjected incarcerated persons to involuntary servitude.

## JURISDICTION AND VENUE

223.      This Court has original jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§1983, 1985, 1986, and pursuant to 18 U.S.C. §1595(a) because Plaintiffs assert a claim under 18 U.S.C. §1589.  This court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiffs' related claims under state law.

224.      The Court has jurisdiction to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, and its equitable powers.

225.      Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.  Defendants Ivey,

Marshall, Hamm, and Gwathney maintain offices in Montgomery, which is located in this district.  Defendants Cities of Montgomery and Troy are municipalities located in this district.  Defendants Ju-Young Manufacturing America, Inc. and Bama Budweiser are based in this district.

## FACTUAL ALLEGATIONS

I.    **ALABAMA HAS CREATED AND  KNOWINGLY MAINTAINED EXTRAORDINARILY VIOLENT, INHUMANE AND UNSAFE MEDIUM- AND HIGH-SECURITY DETENTION FACILITIES THAT COERCE INCARCERATED ALABAMIANS TO LABOR TO SURVIVE.**

A.    **Overview Of ADOC's Facilities**

226.    ADOC has 15 correctional facilities, thirteen of which are for men and two for women.  The thirteen men's facilities are: Bibb, Bullock, William E. Donaldson, Easterling, Elmore, G.K. Fountain, Hamilton, William C. Holman, Kilby, Limestone, St. Clair, Staton, and Ventress; the women's prisons are Julia Tutwiler and Montgomery.  These are all medium- and high-security facilities, with the Montgomery women's facility also serving as a "work release" center.  Approximately 17,000 Alabamians are incarcerated in these facilities.

227.    ADOC assigns each of its correctional facilities a "custody" level, with "medium custody" being a medium-security facility, and "close custody" facilities being high-security (also called maximum-security).  The 15 facilities and their ADOC designations are as follows:

- o  Bibb: medium custody correctional facility

- o  Bullock: medium custody correctional facility

- o  William E. Donaldson: close custody facility and includes a death row unit

- o  Easterling: medium custody correctional facility

- o  Elmore: medium custody correctional facility

- o  G.K. Fountain: medium custody correctional facility

- o  Hamilton: medium custody correctional facility

- o  William C. Holman: close custody correctional facility, but houses minimum through closed custody individuals, and includes a death row unit

- o Kilby: close custody correctional facility, and is responsible for receiving all incarcerated individuals except death row and youth offenders, into the ADOC system for evaluation, classification, and assignment to other correctional facilities
- o Limestone: close custody correctional facility
- o Montgomery: medium custody correctional facility for women, but also operates a "work release" center
- o  St. Clair: close custody correctional facility
- o Staton: medium custody correctional facility
- o Julia Tutwiler: close custody correctional facility
- o Ventress: medium custody correctional facility

228.    ADOC also has 12 "community-based" and "community worker" centers throughout the State of Alabama.  There are approximately 3,280 Alabamians who are incarcerated in these facilities, from which they are transported by ADOC to work for public and private employers.  In addition to the "work release" center at Montgomery women's facility, women are also incarcerated at Birmingham Women's Community Based Facility.  There are 10 men's centers: Red Eagle Work Center, Loxley, Elba, Frank Lee, Hamilton, Mobile, North Alabama, Childersburg, Alex City, and Camden.  All of the community work centers are classified as minimum custody facilities with the exception of Montgomery Women's Facility, which is classified as a medium custody correctional facility.

**B.    ADOC Ties Incarcerated Workers' Custody Status and Safety to Their Willingness to Perform Work for the Benefit of ADOC and the Public and Private Employers Participating in the Forced Labor Scheme**

229.    Individuals incarcerated with ADOC are assigned custody classifications.  A person classified for "close custody" is someone ADOC deems "prone to violent behavior," "an escape risk," or unwilling to follow rules and regulations.  An individual classified as "medium custody" is someone ADOC considers "appropriate for placement in the general population."

Minimum custody is the least restrictive custody level and is for someone ADOC considers to have "adjusted to institutional rules."[2]

230.    Men who are incarcerated by ADOC will first be imprisoned at Kilby, a close custody facility.  Kilby is extremely violent and houses individuals with vastly different sentences, ranging from individuals with short sentences to those who will remain in a close custody, high-security prison.  ADOC assigns men custody classifications while they are at Kilby, after which some men will be transferred to other medium- or high-security facilities.

231.    All incarcerated persons undergo an annual review process of their custody classification.  ADOC asserts that, during this process, it examines factors like incarceration information (the crime for which an individual is convicted and amount of time to be served), "positive or negative adjustment[s]," program completions, and any discipline incurred, to determine whether an incarcerated person's custody level should be reduced, which would permit them to be moved to a lower security—and more safe—facility.[3]

232.    As described *infra* at Factual Allegations ("FA") Part II.B, C, all incarcerated individuals in medium- and high-security facilities are expected to perform unpaid labor for ADOC, and may, while at some of those facilities, be assigned to perform work for the Correctional Industries ("CI") Program.  If an individual does not perform their assigned work, whether that is because they are unable to do so, the work assignment is unsafe or unlawful, they are sick, or for any other reason, they are subject to discipline, punishment, and potential increased length of incarceration, as described *infra* at FA Part II.A–C.  Additionally, an incarcerated person who declines to work and thereby receives discipline is less likely to be able to transfer to a lower-security and less violent facility.  In other words, an individual who is incarcerated at a high-security, close custody facility like Kilby, Donaldson, Holman, Limestone, St. Clair, or Tutwiler, risks being delayed or barred from transferring to a safer, medium-security

---

[2] ADOC Male Inmate Handbook, at 6.
[3] ADOC Men's Services Classification Manual at 18; *see also* AR 400.

facility if they do not perform all work demanded of them by ADOC, even if they are sick or otherwise unable to perform the work at issue.

233.     There is a regular and consistent practice by ADOC of having its representatives use the threat of being transferred to, or being left in, dangerous facilities as a means of coercing work, as described *infra* FA Part II.  Named Plaintiffs have personally received these threats and/or actual punitive transfers to dangerous facilities or dorms by ADOC or observed ADOC make such threats or order such punitive transfers to others, as have numerous other members of the putative Forced Labor Class.[4]

234.     Only by performing work for ADOC, without pay and under threat of violence, *see infra* FA Part II, do incarcerated individuals become eligible for transfers to lower-security facilities, including the minimum-custody facilities.

235.     Upon transfer to a minimum-custody facility, ADOC requires an individual to continue performing work for ADOC *and* to be "leased" to perform work outside the prison walls for public and/or private employers, through joint ADOC-employer ventures that benefit ADOC and the participating public and private employers.  *See infra* FA Part II.

236.     ADOC's minimum custody classification includes three sub-categories, each of which relates to the individual's willingness and ability to work outside of the prison facilities:

   o  "Minimum-In" is a custody status that means an incarcerated individual's work assignments must either be on ADOC property or, if they are outside of ADOC property, they should be supervised by a correctional officer.

   o  "Minimum-Out" is a custody status that indicates that ADOC can and will assign an individual to perform work outside of ADOC property without supervision by a correctional officer.  Most individuals with "minimum-out" custody status are incarcerated at community work centers and are approved to work on government

---

[4] TheForced Labor Class is defined in the Class Allegations, *infra*.

projects for state, county, or local government entities through the work center program, *see infra* FA Part II.D. (describing "Work Centers").

   o   "Minimum-Community" is a custody status that ADOC can and will assign an individual to perform work unsupervised by a correctional officer in the community, for private companies, under ADOC's work release program, *see infra* FA Part II.E. (describing "Work Release"). The status also denotes that individuals "are allowed to work in the community and are housed in community based facilities when they are not working." Women's Services Inmate Handbook (11/01/2017) at 7; ADOC Male Inmate Handbook (9/25/2017) at 7.[5]

237.    Incarcerated persons who are assigned "Minimum-Out" or "Minimum-Community" status and who are therefore "leased" to public and private employers are housed in designated minimum-security work-release facilities and are transported to their jobs in the community each day.

238.    Any incarcerated person who has had their custody level reduced to "Minimum-Out" or "Minimum-Community" custody has already been exposed to, or learned of (such as during the initial assignment to Kilby or through communications with other incarcerated people who have been assigned to any of the higher level security facilities), the deadly, dehumanizing, and life-threatening consequences incarcerated people face when they refuse or resist the forced labor system. *See infra* FA Part II.B.

---

[5] The definition of "minimum-community custody" varies slightly by gender. For incarcerated men, ADOC defines "Minimum-Community Custody" as being "for inmates that are not seen as a risk to themselves or others. *See* ADOC Male Inmate Handbook (9/25/2017) at 7. For incarcerated women, ADOC defines the term as being "for inmates who have demonstrated the ability to adjust to a semi-structured environment and/or those inmates who are nearing the end of their incarceration in order to transition and reintegrate back into the community." *See* Women's Services Inmate Handbook (11/01/2017) at 7.

C.    **Alabama's Correctional Facilities Are Dangerously Overcrowded And Understaffed, Resulting In Life-Threatening Conditions For Incarcerated Alabamians, Rendering Submitting to Labor A Matter Of Survival**

239.    It is not hyperbole to say that, in 2023, more people left ADOC facilities in body bags than were paroled.  Through the deliberate acts of Defendants Ivey, Marshall, and Gwathney, the efforts mandated by the Justice Reinvestment Act, discussed below, to decrease the incarcerated population through parole practices that would improve public safety and decrease recidivism have been cast aside, and given Defendants Ivey, Hamm, and Gwathney, together with the other Parole Board members, effectively shutting down the possibility of parole, the existing violence and gross overcrowding at ADOC's facilities has only intensified since 2019.

1.    **In 2015, Alabama Enacted the Justice Reinvestment Act—Reforming State Parole Law—to Improve Public Safety by Reducing the Number of People Supervised Within ADOC's Overcrowded Facilities and to Allow Resources and Detention Space to Be Focused on Corrections and Rehabilitation Programming Proven to Reduce Recidivism**

240.    Although Alabama's prisons have long been notorious for systemic human rights violations—including the 1976 federal court's finding in *Pugh v. Locke*, 406 F. Supp. 318 (M.D. Ala. 1976), that the State's prison conditions violated the Eighth and Fourteenth Amendments due to rampant overcrowding, inadequate medical care, and unchecked violence—these abuses were largely tolerated by State officials and the public for decades.  It was not until the years leading up to 2014, amid a severe financial crisis, that the unsustainable fiscal burden of maintaining an overpopulated and deteriorating prison infrastructure compelled State leaders to consider reform.  At the time that Governor Bentley assumed office in 2011, with Kay Ivey serving for his entire tenure as Alabama's Lieutenant Governor, Alabama was in the midst of a desperate financial crisis—"dead, flat, broke" to quote then-Governor Bentley—and the two largest demands on Alabama's General Funds were Medicaid and Corrections.

241.    In or around 2011, the cost drivers for Corrections were: 1) the excessive costs required to prop up Alabama's aging prison facilities, which had not been designed or built at

detention grade and then were exposed to extreme stress because of persistent overcrowding; and 2) the high costs attendant to incarcerating such a large number of people, particularly in facilities designed to house about half the people Alabama had in its prisons in the time.

242.    A public report issued by the Justice Center of the Council for State Governments in March 2015 succinctly explains the historical context of the decisions made by the leaders of all three branches of Alabama's government in the decade leading up to Alabama's passage of the Justice Reinvestment Act ("JRA") in 2015:

> "Alabama's correctional system is in crisis. Two-thirds of the nearly 80,000 people convicted of felonies who are currently under correctional control in Alabama are primarily supervised in the state's overwhelmed probation and parole systems, where caseloads average close to 200 cases per officer.  The state's incarceration rate is the nation's fourth highest and, as of September 2014, Alabama's prisons—the most crowded in the country—were operating at 195 percent of capacity, with 26,029 people in a system designed to hold 13,318. Between FY2009 and FY2013, General Fund expenditures for the Alabama Department of Corrections (DOC) remained constant at $372 million, while the prison population remained stable. During the same time period, General Fund expenditures for the Alabama Board of Pardons and Paroles (BPP) decreased 41 percent, from $41 million to $25 million.

> Alabama policymakers have long wrestled with how to address prison overcrowding. Over the past 12 years, state leaders have engaged organizations outside the state to provide advice on this and other issues. . .

> Due to the state's severe level of prison crowding, Alabama policymakers must act immediately or face the prospect of the courts intervening and compelling the state to release thousands of people from prison or spend hundreds of millions of dollars to increase capacity. State leaders often cite the recent experience of California, whose prison system in 2011 was also nearing 200 percent of capacity when the U.S. Supreme Court ordered the state to immediately reduce its prison population to 137.5 percent of capacity.  For Alabama to relieve its prison population to 137.5 percent of capacity by only adding space, the state would need to spend roughly $420 million in construction costs and $93 million in annual operating costs.

> In early 2014, Alabama Governor Robert Bentley, Chief Justice Roy Moore, Senate President Pro Tempore Del Marsh, House Speaker Michael Hubbard, and then-DOC Commissioner Kim Thomas requested support from The Pew Charitable Trusts and the U.S. Department of Justice's Bureau of Justice Assistance to explore a "justice reinvestment" approach to reduce corrections

spending and ***reinvest in strategies that can reduce recidivism and improve public safety***.[6]"

243.    The financial and strategic approach Alabama adopted in the JRA—a law that Governor Ivey must have been intimately familiar with given that she shepherded it through the Legislature in her capacity as Lieutenant Governor and thus Chair of the Senate—was both sound and simple, visualized by the chart, reprinted below, from the Council of State Government's report: it called for investment in post-release supervision, allowing ADOC to reduce prison overcrowding and thereby avoid prison construction and operations costs by $407 million, and freeing up public funds to invest $26 million in supervision and behavioral health treatment program proven to reduce recidivism and improve public safety.[7]



FIGURE 2. SUMMARY OF JUSTICE REINVESTMENT POLICY FRAMEWORK AVERTED COSTS AND REINVESTMENTS

|  |  | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | Total |
|---|---|---|---|---|---|---|---|---|
| **Averted costs** | Operational costs averted | $45.0M | $45.0M | $45.0M | $45.0M | $45.0M | $45.0M | $270.0M |
|  | New construction costs averted |  |  |  |  |  |  | $137.5M |
|  | Total averted costs | $67.9M | $67.9M | $67.9M | $67.9M | $67.9M | $67.9M | $407.4M |
| **Reinvestments** | Probation and parole officers | $10.0M | $10.0M | $10.0M | $10.0M | $10.0M | $10.0M | $60.0M |
|  | Community-based programs and treatment to reduce recidivism | $8.0M | $8.0M | $8.0M | $8.0M | $8.0M | $8.0M | $48.0M |
|  | Community Corrections Programs | $6.0M | $6.0M | $6.0M | $6.0M | $6.0M | $6.0M | $36.0M |
|  | Victim notification system | $0.5M | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $1.0M |
|  | Information technology and performance outcomes | $1.5M | $1.0M | $1.0M | $1.0M | $1.0M | $1.0M | $6.5M |
|  | Total reinvestment | $26.0M | $25.1M | $25.1M | $25.1M | $25.1M | $25.1M | $151.5M |
| **Net averted costs** |  | $41.9M | $42.8M | $42.8M | $42.8M | $42.8M | $42.8M | $255.9M |

---

[6] "Justice Reinvestment in Alabama: Analysis and Framework", *Council of State Governments* (March 2015) (internal citations omitted) (emphasis added).

[7] *Id.*

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

2.     **The Violence That Pervades and Defines Alabama's Operation of All Medium- and High-Security Facilities Has Been Public Knowledge For Years and Has Been Knowingly Maintained and Exacerbated by Governor Ivey and Attorney General Marshall's Effective Shutdown of Parole Releases Since 2019**

a.     The Endemic Violence in Alabama's Prisons Became Public Knowledge by the Spring of 2014, Leading to an In-Depth Study and Analysis of the Systemic Understaffing and Dangerously Designed Facilities that Caused the Bentley-Ivey Administration to Expand on the Reforms Implemented in the Justice Reinvestment Act

244.    Although bipartisan experts and nonpartisan organizations warned that Alabama's prison system was in crisis and that overcrowding and understaffing would lead to spiraling violence in the decade up to 2014, the news of the shocking systemic abuse and violation of incarcerated women at Tutwiler women's prison barreled into focus in the Spring of 2014—irrevocably bringing to the attention of the public and Alabama's leaders the violence that quickly was shown to be endemic across all ADOC facilities.

245.    After the news broke of the mass corruption and abuse at Tutwiler—which included male correctional officers watching incarcerated women shower, commanding incarcerated women to put on stripping performances, and the operation by correctional officers of a prostitution syndicate with incarcerated women—the Bentley-Ivey administration turned its focus dramatically to prison reform.  The administration brought in a criminal justice and public safety consulting firm, The Moss Group, to collaborate with then-ADOC Commissioner Jeff Dunn to both analyze and bring forward reform proposals.  The Bentley-Ivey administration soon learned that the violence—and specifically the widely reported disturbing fact that the women at Tutwiler, due to broken phones and other impediments, had literally no way of reaching anyone on the outside to seek help or bring attention to the situation—could not be disentangled from the problems of the overcrowding, the crumbling facilities, and the systemwide understaffing.  As a result, the Bentley-Ivey administration pushed forward the comprehensive Prison Transformation Initiative Act, which Governor Bentley announced in his January 2016 annual State of the State address with the support and approval of then-Lieutenant

Governor Ivey, who was sitting just behind him at the address in her capacity as President of the Senate. The Act called for the construction of four new prisons and the closure of all but two of the remaining ADOC male and female facilities, including "slam[ming] the door shut on" Tutwiler, for a cost of $800 million. Then-Governor Bentley declared that Alabama's prisons for decades had become increasingly overcrowded and "dangerous to both inmates and our corrections officers" and "incredibly costly to taxpayers." He articulated that the "purpose" of the Alabama Prison Transformation Act was four-fold: (1) reduce overcrowding; (2) improve safety and conditions for inmates and correctional officers; (3) allow for the additional inmate reentry programs; and (4) improve the operational practices and procedures.

246.    As explained by Commissioner Dunn and the Bentley-Ivey administration at the time, including at numerous legislative sessions chaired by now Governor Ivey and in videotaped sessions with the media, all of ADOC's medium- and high-security facilities were not built to "detention grade standard," which means that they were not designed to weather the extensive usage customary in the detention context, which explained much of the facilities' dilapidated conditions at that time (which have only worsened since then).

247.    Further, as then-Commissioner Dunn and The Moss Group explained to the Bentley-Ivey administration and presumably the Legislature, Alabama's correctional facilities were not designed to permit visual and effective supervision by correctional staff. ADOC's facilities have been many blind corners and hidden areas, and are generally constructed so that correctional staff are far away from many dorms and yards, thus requiring a much larger complement of ADOC staff to supervise incarcerated people in those facilities. Indeed, then-Commissioner Dunn in one video interview explained that the staffing shortages, combined with the poor facility design, were so acute at that time that one correctional officer at Draper could be responsible for supervising *4,000* incarcerated occupants. Modern detention-grade facilities contemplated by the initiative would eliminate long corridors and blind corners and allow a small complement of correctional staff to more safely supervise incarcerated people. As repeated by then-Commissioner Dunn and then-Governor Bentley throughout 2016 (and presumably by then-

Lieutenant Governor Ivey, who met with Governor Bentley weekly and was assigned to push forward this Prison Transformation Initiative Act), the goal was for these reforms to progress in tandem with the JRA, so as to steadily and permanently reduce the state's prison population in order to maximize public safety by safely and humanely detaining those who required incarceration, while focusing resources on proven rehabilitation programming to move as many people as possible out of ADOC's overcrowded prisons and return them, through supervised reentry, to the community, using techniques, staffing, and practices proven to achieve greater public safety than available from continued incarceration.

248.    The Prison Transformation Initiative Act died in legislative session in late 2016. But the history of the legislative initiative, and the analysis and research that undergirded it, leave no doubt that Governor Ivey was and is fully aware of the persistent and dangerous levels of overcrowding and understaffing throughout ADOC's facilities.

      a.   Governor Ivey's and Attorney General Marshall's Ordered Shutdown of Parole Release Knowingly Intensified the Endemic Violence and Unsafe Conditions within ADOC Medium- and High-Security Facilities, Undermining Public Safety in Myriad Ways and Rendering All Labor by Incarcerated Alabamians Inherently Coerced

249.    Once Governor Ivey assumed office in 2017, rather than build on the reforms she was aware were necessary to address the crisis-level violence and understaffing that defined ADOC's operations, Governor Ivey dismantled them—blocking parole, expanding incarceration, and doubling down on forced labor.  The resulting violence is not an accident of inattention. Rather, Governor Ivey's tenure as Lieutenant Governor provided her with specific knowledge of the existing, violent conditions in ADOC's facilities and the dangers of shutting down parole. The current prison system Governor Ivey has created is the predictable—and intended— consequence of her direct decisions designed to extract labor and suppress resistance through fear.

250.    The scale of death, violence, and human exploitation in Alabama's prisons is undeniable.  In fact, not only can Defendants no longer plausibly claim ignorance of it, the indisputable record of Defendants Ivey, Marshall, and Hamm's actions over the last ten years demonstrates that the current spiraling violent, forced labor carceral system exists because those Defendants chose to create it.

251.    The stunningly dangerous conditions that incarcerated people in Alabama face across all of ADOC's medium- and high-security facilities are now well documented and have been widely publicized, including in the April 2019 U.S. Department of Justice ("DOJ") report summarizing its investigation of Alabama's state prisons for men[8]; DOJ's 2020 report on violence perpetrated by correctional staff[9]; DOJ's related civil litigation against the State and ADOC for their allegedly widespread cruel and inhumane treatment of incarcerated men in violation of CRIPA[10]; the litigation in *Duke v. Dunn* in which plaintiffs incarcerated at St. Clair Correctional Facility alleged that the prison was plagued by extreme levels of violence, rampant understaffing, broken cell door locks, and staff misconduct—including officers encouraging violence—and that ADOC officials knowingly failed to protect incarcerated people from harm despite repeated warnings[11]; the federal litigation resulting in an injunction—with which ADOC has not yet complied—that requires ADOC to hire approximately 2,000 correctional staff to address the "horrendously inadequate" mental health care system in a prison system plagued by "persistent and severe shortages of mental-health and correctional staff, combined with chronic

---

[8] U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (Apr. 2, 2019) ("2019 DOJ Report"), https://www.justice.gov/crt/case-document/file/1149971/download.

[9] U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (July 23, 2020) ("2020 DOJ Report"), https://www.justice.gov/crt/case-document/file/1297031/download.

[10] *See* Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. Dec. 9, 2020).

[11] *Duke v. Dunn*, No. 4:14-cv-01952-RDP (N.D. Ala. Oct. 13, 2014).  The *Duke* complaint documented six homicides within 36 months, including three in 2014, resulting in a homicide rate of 232.4 per 100,000—over 40 times the national average for prisons.

and significant overcrowding"[12]; DOJ's litigation regarding Eighth Amendment violations at Julia Tutwiler Prison for Women resulting in a consent decree requiring ADOC to address sexual abuse and harassment[13]; and numerous other media reports and prison condition cases.[14]

252.    The level of violence in Alabama's medium- and high-security prisons is extraordinary even within the U.S. carceral system.  During fiscal year 2017—the year examined in the 2019 DOJ Report—ADOC publicly reported a homicide rate that was approximately eight times the national average homicide rate for prisons—*56* per 100,000 prisoners in Alabama, compared to seven homicides per 100,000 nationwide.[15]  DOJ experts "observed that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than other similar systems" and had increased dramatically since 2013.[16]

253.    Individuals incarcerated in Alabama's medium- and high-security prisons face a serious risk of excessive force from security staff, with incidents "often result[ing] in serious

[12] *See Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1362 (M.D. Ala. 2021); *see also Braggs v. Hamm*, No. 2:14CV601-MHT, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023) (ordering parties to file a plan "to address ADOC's still grossly inadequate correctional staffing levels").

[13] *See* Consent Decree (Dkt. No. 11), *United States v. Alabama*, Case No. 2:15-cv-00368 (M.D. Ala. June 18, 2015).

[14] *See, e.g.*, *Barefield*, 2023 WL 5417550, at *1 n.1; *Sondra Ray, as Administrator of the Estate of Steven Davis, deceased, v. Roderick Gadson, et al.*, No. 2:20-cv-00499-RDP (N.D. Ala. Apr. 14, 2020) (wrongful death lawsuit where the ADOC settled for $250,000 after corrections officers beat a man to death at the William E. Donaldson Correctional Facility in 2019); *Hope v. Pelzer*, 536 U.S. 730 (2002) (holding that Alabama prison officials violated the cruel and unusual punishment clause of the Eighth Amendment by engaging in a practice of handcuffing an incarcerated person to a hitching post for extended periods, denying him water and bathroom breaks, and subjecting him to the sun, constituting cruel and unusual punishment).

[15] 2019 DOJ Report at 6 (citing DOJ's Bureau of Justice Statistics data from 2014).

[16] 2019 DOJ Report at 6.

injuries and, sometimes, death."[17]  The DOJ documented ADOC staff frequently using excessive force against even compliant or restrained prisoners, and as punishment or retribution.[18]

254.    As the 2019 DOJ report found, "ADOC does not protect prisoners in its custody from death caused by prisoner-on-prisoner violence," which "is systemic and life-threatening."[19] DOJ's report recounts that deadly and near-fatal assaults are frequently committed against people incarcerated in ADOC's medium- and high-security facilities and ADOC officials have on multiple occasions failed to protect persons who specifically alerted officials to their high risk of being killed if not adequately protected.  Weapons—homemade and contraband—are "ubiquitous" throughout ADOC's medium- and high-security facilities and are frequently used to deadly effect.[20]

255.    In 2022, Alabama experienced a then-record number of deaths within its prison system.  At least 222 incarcerated individuals died in Alabama prisons during that year, surpassing the death toll recorded during the height of the COVID-19 pandemic.  Then, in 2023, Alabama recorded 325 deaths in custody—the deadliest year ever recorded, and pushing the total death count since the DOJ put Alabama on notice in 2019 of its violations of incarcerated people's constitutional rights, to over 1,000.  Several dozens of these deaths in 2022 and 2023 were suspicious or unexplained homicides, suicides, or overdoses.  Most of those deaths occurred in the same medium- and high-security facilities which ADOC operate to extract unpaid labor: the systemic violence, inhumane conditions and corruption in ADOC's medium- and high-security facilities provide the coercion that forces people, as a method of survival, to perform labor for ADOC itself or its public and private employer partners "leasing" laborers from ADOC through its Work Release and Work Center facilities.  In the third quarter of FY

---

[17] 2020 DOJ Report at 2.

[18] *See Hope*, 536 U.S. at 737 ("Alabama's systematic use of the hitching post [is] improper corporal punishment").

[19] 2019 DOJ Report at 13, 16.

[20] *Id*. at 25.

2023 alone, ADOC publicly reported five homicides, with numerous other deaths remaining under investigation.[21]

256.    ADOC's September 2023 statistical report recorded 1,997 assaults in its medium- and high-security facilities during the fiscal year, and, based on the DOJ's indication that ADOC routinely underreports violent incidents in its facilities, it is likely that not all assaults are reported.[22]

257.    In 2024, at least 277 people died in ADOC custody.  Again, dozens of those deaths were homicides, suicides, or overdoses—many under suspicious or unexplained circumstances.  And again, most of those deaths occurred in the same medium- and high-security facilities where ADOC extracts unpaid labor and provides the coercion that compels people, as a matter of survival, to perform labor for ADOC and/or public and private employers leasing laborers from ADOC's Work Release and Work Center facilities.

258.    The ACLU of Alabama and ACLU National found that 72% of homicide victims within ADOC in 2024 were Black, and that many incarcerated individuals died after begging for protection, filing formal complaints, or being denied parole despite being deemed safe by ADOC and parole risk assessments to reenter society.  At Donaldson Correctional Facility alone, at least 24 people died in custody between January and October 2024, following a record 28 deaths the previous year.

259.    The Named Plaintiffs and putative class members have witnessed numerous homicides and suicides, as alleged *supra* Parties Part I and FA Part II.C., during their incarceration.  Plaintiff Rashaad Clark speaks of being haunted by watching a correctional officer hit a fellow incarcerated person so hard that the incarcerated person died on the spot. Another incarcerated person reports watching person after person overdose or commit suicide due to the hopelessness and dire inhumane conditions that have worsened since the dramatic

---

[21] ADOC FY 2023 Joint Legislative Prison Oversight Committee Quarterly Report Ending 06/30/2023, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding06-30-2023.pdf.

[22] ADOC September 2023 Monthly Report at 3.

shutdown of parole release since 2019, and reliving the pain of having to inform the deceased's parents and families of their tragic deaths.

260.    Official ADOC death reports tell only part of the story.  Alabama's prisons are sites of daily brutality and complex criminal operations often directed by correctional staff, including wardens.[23]  Instances of illegal acts and subsequent cover-ups underscore a broader pattern of misconduct within ADOC, where high-ranking officials have been implicated in activities that compromise the safety and integrity of the prison system.  Named Plaintiffs describe their time at high- and medium-security facilities as being surrounded by unrelenting and extreme physical assaults, sexual abuse, constant demands to engage in criminal actions of correctional staff and other incarcerated people working with them, and psychological torment. Each Named Plaintiff and all retained putative Class Members report that at all of ADOC's medium- and high-security facilities, the violence and dangers are present every day, 24 hours per day, 365 days per year.

261.    In each of ADOC's 15 major facilities, chronic staff shortages leave entire dorms unmonitored, forcing Named Plaintiffs—as well as currently and formerly incarcerated individuals across Alabama—to navigate threats of assault, extortion, and sexual violence as a part of daily life.  One retained putative class member reports that, in recent years at Bullock

---

[23] In 2024, Chadwick Crabtree, the warden of Limestone Correctional Facility, was arrested and charged with manufacturing a controlled substance, possession of marijuana, possession of a controlled substance, and possession of drug paraphernalia.  He was placed on mandatory leave without pay pending further personnel action. *See* Taylor Mitchell & Logan Sparkman, Limestone Correctional Warden, wife facing drug charges, https://whnt.com/news/athens/limestone-correctional-warden-and-his-wife-facing-drug-charges/ (last visited Apr. 24, 2024).  Additionally, in 2022, Deborah Toney, then-warden of Limestone Correctional Facility, was placed on administrative leave following allegations of sexual misconduct and failure to protect an incarcerated man who was subsequently attacked and hospitalized. *See* Savannah Tryens-Fernandes, Limestone Correctional Facility Warden Placed on Administrative Leave Over Allegations of Sexual Misconduct, 1819 News (Apr. 8, 2022), https://1819news.com/news/item/more-accusations-against-warden-of-alabamas-largest-prison-no-new-word-from-ado-04-08-2022 (last visited Apr. 24, 2024).

Correctional Facility, there is a nightly announcement for "bandage change," calling for incarcerated individuals to receive dressing changes due to the constant flow of injuries sustained inside the facility.  Upon information and belief, and based on numerous consistent reports—including those from Named Plaintiffs and putative class members—incarcerated people regularly suffer knife wounds and other serious injuries.  In ADOC's higher security facilities, due to crisis-level understaffing and poor design, as explained by Commissioner Dunn to the public leading up to the Prison Transformation Initiative Act, incarcerated individuals are typically unable to secure timely assistance of any kind—including medical assistance—let alone protection from the persistent and foreseeable violence they endure on a daily basis.

262.    Indeed, as with the shocking reports that first widely reported from Tutwiler in 2014, the male Named Plaintiffs and retained putative Class Members each attest that in all of ADOC's medium- and high-security facilities there is almost no way to get help with regard to any problem, regardless of how life threatening.  Plaintiff Rashaad Clark recalls seeing an incarcerated person bleeding from a knife wound running to get medical assistance and the guard pushing the person back into the dorm where he subsequently bled out and died.  All Plaintiffs—particularly Plaintiffs Cole, Council, Pritchett, and Dandridge, who were transferred repeatedly among many different facilities—attest that all of ADOC's male medium- and high-security facilities are uniformly designed with long corridors or linear dorm arrangements.  In many cases, dorms are located so far from any guard station that a person in distress could not reasonably expect their screams to be heard.  To reach a staffed area, one would have to pass through multiple overcrowded dorms, each posing its own risks.  Male Named Plaintiffs and putative class members further report to going days, weeks, or even months without ever seeing any correctional staff in the "yard," and that guard offices frequently are unmanned—especially at night.  Named Plaintiffs and incarcerated people uniformly describe that even when staffed, the guard offices often have only one staff member on duty, and that staff member is frequently nonresponsive to incarcerated individuals' pleas for help or protection.  Plaintiff Dandridge witnessed guards sleeping in the office, incarcerated people and guards wrestling, and

incarcerated people having sex with officers. These abuses may not be captured in annual mortality statistics, but they constitute ongoing and devastating harm.

263.    The violence is not incidental—it is structural. Alabama's medium- and high-security facilities are dangerously overcrowded and catastrophically understaffed, which are driving forces behind the lethal conditions in those facilities—compelling people incarcerated in these facilities to do whatever they can to survive the constant threat of serious bodily harm or death.

264.    ADOC's own reports show that by mid-2023 ADOC's medium-security prisons were operating at nearly double their intended capacity, while staffing levels had dropped to just 40% of what is required. In high-security facilities like Donaldson, staffing has dropped *below 30%*, leaving entire dorms unsupervised for hours at a time.

265.    ADOC's facilities were designed for a total in-house population of no more than 12,115 individuals.[24] Yet, according to the September 2023 statistical report published by ADOC, the state prison system currently houses 20,361 people, the vast majority of whom are housed in medium- and high-security facilities.[25] Specifically, ADOC's high-security facilities have a total designed capacity of 5,637 beds, but the month-end population in September 2023 exceeded that capacity by 2,661 individuals. ADOC's medium-security facilities have a total designed capacity of 4,690 beds, but the month-end population in September 2023 was 8,881— nearly double the designed capacity.[26]

266.    This overcrowding is coupled with understaffing that the DOJ found in 2019 to be "at a crisis level" and that has significantly worsened since then.[27] Over the past decade, the ADOC's security staff has plummeted. At the end of FY 2014, the ADOC employed 2,915

---

[24] ADOC September 2023 Monthly Report at 2.

[25] *Id.* at 2.

[26] *Id.* at 3.

[27] 2019 DOJ Report at 9.

security staff.[28]  At the end of FY 2024, the ADOC employed 1,986 security staff, a nearly 32%

decrease from ten years earlier.[29] Although complete staffing data is not available to the public,

ADOC public records reveal that in 2023, ADOC reported one of the lowest staffing levels in the

past ten years, when the ADOC reported having a total of 1,763 security staff members, which is

nearly 40% lower than the staffing levels reported in 2014.[30]

267.    According to the status report filed by the parties in the ongoing *Braggs et al. v.
Hamm et al.*, Case No. 2:14-CV-00601-MHT (M.D. Ala.), on March 10, 2025, the ADOC's

fourth quarter FY 2024 staffing report filed with the Court reveals that the ADOC's vacancy rate

still exceeds 50 percent, leaving all but one of ADOC's facilities significantly understaffed.[31]  As

the *Braggs* Plaintiffs report:

> Eight facilities have vacancy rates above 50 percent and all remaining facilities—
> except Hamilton A&I—have rates at or above 44 percent. Three facilities
> continue to have rates at or above 70 percent (Bullock, Easterling, and Ventress).
> …
>
> Bullock, which has a population of 1,535 incarcerated individuals, should have a
> total of 322.17 officers. Currently, there is a deficit of 241 officers. At Donaldson,
> another mental health hub with a population of 1,433 incarcerated individuals,
> there are nearly 260 vacancies for correctional staff. Altogether, ADOC has a
> shortage of 1,569 officers.[32]

---

[28] ADOC FY 2014 Annual Report at 7,
https://doc.alabama.gov/docs/AnnualRpts/2014AnnualReport.pdf

[29] ADOC FY 2024 Annual Report at 12,
https://doc.alabama.gov/docs/AnnualRpts/AnnualLegislativeStatReport-FY2024.pdf

[30] ADOC FY 2024 Quarterly Report at 5,
https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding12-31-23.pdf

[31] Joint Statement on Correctional Staffing Trends (Dkt. No. 4329), *Braggs et al. v. Hamm et al.*,
Case No. 2:14-CV-00601-MHT (M.D. Ala.), filed March 10, 2025 ("March 2025 *Braggs* Status
Report"), at 4.

[32] *Id.* at 4-5 (internal footnotes removed; citing
https://doc.alabama.gov/docs/MonthlyRpts/December%202024.pdf (ADOC Monthly Statistical
Report, December 2024 at page 4).

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

268.    Indeed, according to the following chart filed in the March 2025 *Braggs* status report, reproduced below, in the more than 10 years since plaintiffs in *Braggs* filed their action seeking urgent attention to the crisis level of understaffing, the staffing situation has worsened significantly.



*Id.* at 12.

269.    Again, as summarized by the Plaintiffs in the *Braggs* status report:

In 2014—the year this case was filed—ADOC had 2,915 correctional staff, which included 236 correctional officer trainees. In 2017—the year this Court issued its Liability Opinion—ADOC had 2,146 correctional staff, including 90 correctional officer trainees but excluding cubicle operators and wardens. In 2021—the year this Court issued its Omnibus Remedial Order—ADOC had 2,225 correctional officers, including 73 cubicle operators as well as an unspecified number of correctional officer trainees and wardens. Sadly, now—despite including every category of correctional staff that it employs—ADOC has only 1,986 correctional staff. That is 239 fewer officers than it employed three (3) years ago.[33]

---

[33] March 2025 *Braggs* Status Report at 12-13 (internal footnotes removed; citing ADOC 2014 Annual Statistical Report. https://doc.alabama.gov/docs/AnnualRpts/2014AnnualReport.pdf at page 38; ADOC 2017 Annuals Statistical Report. https://doc.alabama.gov/docs/AnnualRpts/2017AnnualReport.pdf at page 42; ADOC 2021 Annual Legislative Statistical Report. https://doc.alabama.gov/docs/AnnualRpts/AnnualLegislativeStatReport-FY2021.pdf at page 12).

270.    These extreme levels of deliberate understaffing result in violent incidents in medium- and high-security facilities, which often go unnoticed and unreported by correctional staff.  Dormitories in these facilities often have so few staff that incarcerated people are essentially unsupervised for hours or shifts at a time and are rife with weapons.  Compounding the issue, the physical layout of many ADOC housing units makes it impossible for the limited staff to observe what is occurring or to provide even minimal security.  The predictable result has been that acts of horrific violence and sexual abuse occur in ADOC facilities without any intervention from prison officials, including such horrors as hostage-taking and torture lasting days.[34]

## II.    THE STATE DEFENDANTS MAINTAIN A FORCED LABOR SCHEME THAT RELIES ON VIOLENCE, THREATS OF VIOLENCE, AND OTHER FORMS OF COERCION, WITH PUBLIC AND PRIVATE EMPLOYER DEFENDANTS KNOWINGLY PARTICIPATING IN AND BENEFITING FROM THAT SCHEME

271.    Named Plaintiffs and other incarcerated Alabamians have been and continue to be forced to work for ADOC, public employers, and private employers to reduce their risk of being subjected to violence and threats of violence, including threats to their lives and severe bodily harm, deprived of vital necessities, placed in solitary, and having their time of incarceration extended.  All these forms of violence and threats render Named Plaintiffs' and other incarcerated Alabamians' labor coerced.  This coerced labor scheme provides immense economic benefit to ADOC, while also significantly benefiting the participating public and private employers, as detailed herein.

272.    The consistent and ongoing threat to life and inhumane conditions endemic to ADOC's medium- and high-security facilities renders all labor by people incarcerated by ADOC coerced, as laboring for ADOC and its private and public partners is the best and sometimes only way to survive the ultra-violent and inhumane prison facilities created and maintained by Defendants Ivey, Hamm, and Marshall.  In short, the ever-present threat of life-threatening

_____

[34] 2019 DOJ Report at 9, 36–39.

violence makes Alabama's system inherently coercive.  Across the state, ADOC tells and demonstrates consistently and systematically to incarcerated people that if they don't work, they will be punished by remaining in, or being returned to, the violent and inhumane facilities and dorms ADOC created and maintains, where incarcerated people face a clear and present danger to their survival.

273.   As Named Plaintiffs' (discussed *supra* at Parties, Part I) and other putative class members' experiences make clear, these are not empty threats.  By way of example:

- o  At Draper, Plaintiffs Jerame Cole and Danny Dandridge witnessed frequent beatings of people who refused to work the nearby fields.  Plaintiff Dandridge also witnessed officers handcuff incarcerated people, line them up, and slap them so hard they would fall like dominoes.

- o  At Limestone, Plaintiff Turner Mason was forced to clean and serve meals in the segregation unit, despite being repeatedly facing threats from occupants that he would be killed if he returned.  He reported these threats and begged not to be reassigned, but officers sent him back anyway, telling him he had no choice.  He was ultimately disciplined for refusing to work.

- o  At Red Eagle, a retained Class Member was told, "You don't have the right to quit," and after refusing to do unsafe ditch work, was excluded from all paid jobs for six months.

- o  A retained Class Member was stabbed within hours of being transferred to a dangerous dorm at Limestone, a high-security facility, from North Alabama Work Release, as a result of a disciplinary that was later dismissed.  When he was transferred back to the Work Release site, the warden threatened him with return to a facility where he had been sexually assaulted.

o At Childersburg, Plaintiff Michael Campbell describes how refusing to work means being shipped back to Level 4, or a high-custody facility—which he calls "the jungle" due to its violence, overcrowding, and lack of supervision.

274. Because of this real and reasonable fear that a refusal or inability to work could put their lives at risk, many incarcerated people continue working through illness or injury, out of fear. Named Plaintiffs and class members report that individuals who are unable to work because they are sick or injured frequently are cited and punished for refusing to work, which can result in a loss of privileges, the assignment of additional unpaid forced labor for ADOC, downgrading of custody levels, denial of parole, and transfers to dangerous facilities and dorms.

275. Named Plaintiffs and class members report that, for those working at less dangerous Work Release and Work Center facilities, described *infra*, the jobs they are assigned can nonetheless present unsafe conditions—but workers at those jobs are coerced from speaking up due to the constant threat and practice of ADOC responding to any objection to unsafe or unlawful conditions by transferring the person back to violent and unsafe medium- and high-security facilities. Across the Work Center and Work Release job sites, Named Plaintiffs and incarcerated workers report supervisors with public and private employers openly threaten to "call the van" if incarcerated workers do not comply with every order, even those that threaten limb and life. Across the Work Center and Work Release job sites, Named Plaintiffs and incarcerated workers report supervisors and staff from public and private employers making statements and taking action that reveal they know that reporting a worker for insubordination or refusal to work could result in a loss of privileges or reassignment to dangerous higher-custody facilities. This places incarcerated workers in working situations that they would never accept if

they were not operating under constant coercion compelling them to work to survive ADOC's violent correction system.

276.    At Defendant Koch Foods, where multiple Named Plaintiffs worked, a man named Frank Ellington was killed in 2017 when a hanger snatched his arm and decapitated him.[35]  As detailed in media reports at the time, prior to this event, Defendant Koch Foods had been cited and investigated repeatedly by OSHA for unsafe conditions.  After Mr. Ellington was killed, however, the plant resumed operations within the hour.  As one putative class member leased to Koch Foods at the time, describes the situation plainly: "There are lots of jobs that will get you killed if you don't refuse them."

277.    In another example, a retained Class Member had complained about unsafe conditions to his supervisor at Defendant City of Montgomery, but that complaint was ignored.  Soon thereafter, the worker later lost an eye while on the job working for Montgomery, after which he was left bleeding for half an hour before being transported to a hospital.  Despite undergoing surgery to remove his eye, he has received no prosthetic, no eye-specific care, and no mental health support.  He also cannot work most jobs now due to the loss of his vision, jeopardizing his ability permanently to earn any income now or after release to support his son.

278.    These are not isolated or anecdotal failures.  They are representative of a statewide system in which coercion is the norm and forced labor is the intended and predicable result of that coercion.  Once a person starts working, refusal to continue subjects them to ADOC's harshest punishments.  If incarcerated workers in minimum custody want to decline an assignment, they must relinquish their classification—essentially choosing to be placed in a violent prison where they will be in physical danger.

---

[35] Will Tucker, *The Kill Line*, SPLC, https://www.splcenter.org/resources/stories/kill-line/.

279.    Any resistance to this coerced labor scheme is met with brutality. Named Plaintiff Robert Earl Council aka Kinetik Justice was nearly killed by ADOC officers in 2021 after leading peaceful labor strikes and has faced severe retaliation since then.

280.    The Defendants know this.  Governor Kay Ivey, Attorney General Steve Marshall, the Alabama Department of Corrections through Commissioner John Hamm, Leigh Gwathney and the Parole Board, and dozens of employer partners—public and private—all knowingly benefit from this system.  After a 2022 statewide labor strike organized by incarcerated people to protest these conditions, Governor Ivey directed ADOC to retaliate through starvation, solitary confinement, and regulatory changes that increased punishments for refusing to work or advocating work stoppages.

281.    These consequences of serious harm and death, viewed from the perspective of a reasonable person in the Plaintiffs' position, are more than sufficient to compel continued labor under federal law.  It is a system built on racial exploitation, designed through indifference, and operated through fear.

A.    **ADOC's Regulations and Governor Ivey's Executive Order Lay the Groundwork for a Coerced Labor Scheme that Severely Punishes Refusals of Forced Labor and Peaceful Advocacy of Refusing Forced Labor**

282.    Following a strike at all thirteen men's medium- and closed-custody facilities that made clear that ADOC facilities cannot function without the vast amount of unpaid labor provided by incarcerated individuals, *see infra* FA Part III, Governor Ivey responded to the strike by issuing a January 9, 2023 Executive Order that imposed stringent consequences on people who withhold their labor—including forced labor—or encourage others to do so.  Executive Order 725, Promoting Public Safety by Establishing Standards and Accountability for Correctional Incentive Time (Jan. 9, 2023).

283.    Governor Ivey specifically provided that "good-time" credits could be withdrawn as punishment for withholding work.  "Good-time" credits are correctional incentive time

deductions that effectively reduce the term of an incarcerated person's sentence and thus the duration of confinement.

284.    Governor Ivey's Executive Order also identifies "refusing to work" and "encouraging or causing a work stoppage"—a term that would include simple speech encouraging others to refuse to engage in forced labor—as "medium" and "high" level violations, respectively, of the ADOC rules, which means that incarcerated persons who decline work, including forced labor, or encourage others to do so are subject to significant discipline that include the loss of "good-time" credits. *See* Executive Order 725, Promoting Public Safety by Establishing Standards and Accountability for Correctional Incentive Time (Jan. 9, 2023).

285.    The Governor also expressly authorized ADOC to impose additional punishments on anyone who declines to work or who encourages others to do so, including "loss of privileges," and "time to be served in restrictive housing," which generally means solitary confinement and other cruel conditions as documented in numerous ongoing Alabama prison conditions litigation and federal government reports, cited above in FA Part I.C.

286.    ADOC's "inmate handbook" and ADOC's regulations reflect this direction by Governor Ivey. Refusing to work is a "medium level violation."  *See* ADOC Admin. Reg. 403 ("AR 403").  And "[e]ncouraging or causing others to stop work" is a "high level" violation—on par with an assault, robbery, and inciting a riot.  *Id.*; *see, e.g.*, ADOC Male Inmate Handbook (9/25/2017).

287.    Under ADOC regulations medium-level violations may be punished by, among other penalties:

>  (a) a recommendation for custody review, which can result in an incarcerated person being moved to a more restrictive security classification;

>  (b) "extra duty" for up to 45 days—meaning additional forced labor;

>  (c) confinement to restrictive housing (solitary confinement) for up to 30 days;

>  (d) forfeiture of a minimum of 720 accrued good-time days. This forfeiture of "good-time" days means the extension of the individual's sentence; for

example, forfeiture of 720 days of good time means the person will have to spend approximately two more years in prison—or, if a person's balance is less than 720 days, forfeiture of the entire accrued good-time leave balance (thereby pushing out the person's release date proportionally);

(e) at least a six-month bar from earning additional good-time days (keeping the person's sentence from being reduced for good-time credit for that six-month period); and

(f) loss of any and all privileges and incentives for up to 45 days.

288.    Incarcerated people whom ADOC finds to have committed high-level violations, including encouraging others to withhold their labor, are subject to even more severe penalties than those whom ADOC finds to have committed medium-level violations, including:

(a) a recommendation for custody review;

(b) "extra duty" for up to 60 days;

(c) loss of any privileges and incentives for up to 60 days;

(d) solitary confinement for up to 45 days;

(e) forfeiture of a minimum of 1,080 accrued good-time days—which equates to an extension of *three years* to a person's release date—or the entire leave balance if fewer than 1,080 days; and

(f) at least a one-year bar from earning additional good-time days.

AR 403 at 23.

289.    Implicit in each of these penalties in an increased risk of violence and bodily harm.  Thus, a "custody review" and loss of privileges carries with it the risk that ADOC will increase the person's custody level and/or place the individual in a dorm or facility that is more violent.  The "extra duty" involves additional forced labor that is deemed punitive because the assignments are grueling and/or dangerous.  And stripping individuals who have withheld their labor or encouraged others to do so of good-time credits and the ability to earn good-time days

necessarily increases the length of their incarcerations, meaning that they remain in the incredibly dangerous conditions of ADOC's facilities for longer.

290.    As detailed herein, the ADOC regulations and Governor's Executive Order provide the groundwork for a coerced labor scheme that relies on violence and threats of violence and bodily harm – including threats of transfers to more violent dorms or facilities, solitary confinement and increased terms of incarceration as punishment for declining to work. Under these conditions, there can be no question that Named Plaintiffs' labor for ADOC and the private and public employers with whom ADOC co-employs them, has been coerced.

**B.    *In-House ADOC Work:* ADOC Relies on Violence, Threats of Violence, and Other Coercion to Require Incarcerated Alabamians to Perform Unpaid Work Necessary for ADOC to Function and to ADOC's Immense Benefit**

**1.    Description of Coerced Work for ADOC Facilities**

291.    ADOC requires, under threat of punishment, physical violence, deprivation of necessities, and extended sentences, all incarcerated individuals to perform work that is essential to the very functioning of ADOC's facilities.

292.    ADOC has required and continues to require Named Plaintiffs and the Forced Labor Class to perform all manner of jobs necessary to run ADOC's own facilities, including: all types of skilled construction, including clearing land for, and building and repairing new and current facilities, dorms, and warden's houses; wiring and repairing the HVAC and electricity systems; overseeing and serving as direct care providers for the drug and alcohol treatment program, mental health, and hospice and wards; providing traditional prison staff duties like serving as the Officer in Charge of an entire dorm, conducting "the count" daily, or supervising incarcerated people in segregation facilities; handling medical emergencies (including primary responsibility for providing CPR), and performing the administrative aspects of correctional supervision, including processing new admittees; working in the cafeteria; handling trash; mowing lawns and other groundskeeping work; cleaning dorms and other facilities; building and maintaining fences; and providing basic needs like laundry.

293.    Each Named Plaintiff has been forced to perform this "in-house" work for ADOC.

294.    Plaintiff Moore has been compelled to work for ADOC for more than 25 years, providing an array of highly skilled mechanical, building, and electrical tasks for ADOC—including installing and maintaining the HVAC system in use today, and refurbishing and renovating houses for the wardens—without receiving a single cent in compensation for his labor. Mr. Moore currently works on the "custody squad" at Holman, where he works unsupervised cutting grass outside the walls of one of the highest-security facilities in ADOC, as Holman also houses incarcerated people on Death Row and others subject to high security classifications. He also performs maintenance tasks inside the facility, which allows him to spend time during the day away from more violent areas of the prison. In conjunction with approving Mr. Moore for this job, ADOC also approved Mr. Moore to live in a separate, much smaller, and less violent dorm within Holman that is limited to incarcerated people in kitchen, canteen, and officer-runner roles. ADOC has consistently refused to assign him to a lower-security facility, making the significant in-house work he performs for ADOC is necessary to ensure that he can escape the most dangerous areas of Holman.

295.    Plaintiff Walker was required to work long hours of uncompensated work for ADOC, upon threat of discipline and potential solitary confinement, including stripping floors, unloading chemical trucks, and providing care for mentally disabled or other ill incarcerated people.

296.    Plaintiff Ptomey was forced to work for ADOC in the kitchen and on the cleaning squad. He was responsible for the burials of individuals who died in ADOC custody and were not claimed by their families. The individuals Mr. Ptomey was instructed by ADOC to bury were sometimes known to him, and sometimes had died as a result of violence: working in this role was therefore psychologically, as well as physically, difficult. Mr. Ptomey would not have chosen this work had he been given a choice.

297.    Plaintiff McDole, while at ADOC's medium-security Ventress facility, was compelled to "work down his custody" to secure his reassignment from ADOC's higher-security facilities by performing a variety of unpaid work for ADOC, including work with a canine training squad, where he would wait in the woods to be found by the dogs.

298.    Plaintiff Pritchett has been compelled to work without pay for ADOC in the kitchens at multiple facilities: Childersburg (where he was also required to work on the road squad for the City of Talladega), Limestone, Ventress, Easterling, Frank Lee, Alex City, and Elmore.  He was also forced to work as an unpaid healthcare runner at Ventress, Kilby, and Donaldson, which included cleaning up the floor of the hospital ward.

299.    Plaintiff English was assigned to be the "Dorm Representative" for the Faith dorm at Ventress, where he served as the Officer in Charge.  He had to be available 24 hours a day, seven days per week, and was responsible for overseeing the custodial supervision, including programming, maintenance, responding to health and drug emergencies, and more, for 190 persons in the dorm.  *See infra* Parties, Part I.I.

300.    Plaintiff Morrissey was instructed by ADOC that she was required to work 30 days for free in the kitchen at Montgomery women's facility before she was eligible work release jobs.

301.    Female Named Plaintiffs and incarcerated women report that ADOC consistently uses assignment to unpaid work in the kitchen at Montgomery as a punishment for anyone who fails to work for the private employers or is terminated from such a position.

302.    Plaintiff Cole was also forced to work on the "farm" at Draper cutting grass, and was threatened with being physically beaten or forced to fight other incarcerated people if he refused.

303.    Named Plaintiffs have all also been compelled to perform a wide variety of unpaid work necessary to ADOC's functioning, including but not limited to:  Plaintiff Mason was assigned to deliver food trays to a closed custody dorm at Limestone that was extremely dangerous for him to visit, along with other unpaid work for ADOC; Plaintiff Cartwright was

required to work an unpaid kitchen job for ADOC; Plaintiff Ball was forced to work in the kitchens at Limestone, Staton, and St. Clair; Plaintiff R. Clark was forced to walk miles to do farm work while incarcerated at Draper and was assigned to work in the kitchen in Bullock. *See also supra* Parties, Part I.

304.    Named Plaintiffs and members of the Forced Labor Class do not receive training to perform the specialized roles, including the provision of healthcare, drug counseling, handling of chemicals, processing of new admittees, supervising dorms, they have been forced to perform for ADOC's benefit.

305.    All of the work ADOC has required of Named Plaintiffs and other members of the Forced Labor Class is vital to the functioning of ADOC.  None of that work is compensated and all of the work is coerced by ADOC's threats of violence, the ongoing violent and inhumane conditions created and maintained by ADOC, and threat of increased lengths of incarceration from denial of parole for refusal or failure to perform work, regardless of whether the task is lawful or unlawful, assigned by ADOC personnel.

      **2.**     **ADOC Enforces Its Requirement for In-House Work Through Violence, Threats of Violence, Deprivation of Necessities and Family Contact, Solitary Confinement, and Increased Lengths of Incarceration**

306.    Incarcerated individuals, including Named Plaintiffs and members of the Forced Labor Class, do not have any choice but to perform the work that ADOC requires of them. Their work is coerced through a combination of violence and threats of violence, including violence as punishment for failure to work and transfers to more dangerous areas or facilities, deprivation of necessities and contact with their loved ones, and increased periods of incarceration.

307.    As described *supra* at FA Part I.C., Alabama's notorious medium- and high-security prisons, which are growing increasingly dangerous over time due to worsening understaffing, severe overcrowding, and deteriorating buildings, present life-threatening conditions for the Alabamians confined in those facilities.  By creating and maintaining unsafe, including extraordinarily violent conditions at these facilities, where incarcerated people face the

constant and imminent risk of being severely injured or killed, Alabama—with the knowledge and assistance of Governor Ivey, Attorney General Marshall, and the Parole Board—has created and maintained inherently coercive conditions that render forced all labor extracted from the predominantly and disproportionately Black population incarcerated at ADOC facilities.

### a. ADOC Uses Transfers and Threats of Transfer to More Dangerous Facilities to Coerce Work

308.    ADOC coerces work from Named Plaintiffs and other Forced Labor Class members by transferring and threatening to transfer incarcerated individuals who do not work to more dangerous facilities.  Thus, if an individual is incarcerated in a medium-custody or minimum-custody facility and states that they are unable or unwilling to perform the unpaid "in-house" work ADOC requires of them, ADOC can use that as a basis for transferring them to a higher-security and more violent facility.  *See supra* FA Part II.A.

309.    ADOC has demonstrated to Named Plaintiffs and the Forced Labor Class and they understand that ADOC will discipline them for failing to do work required by ADOC, or encouraging others to do so, and that such discipline can include being transferred to a higher-security area, either within their facility or at a new facility, with the attendant greater risk of violence to themselves.

310.    For example, Plaintiff Mason, a former law enforcement officer, was required by ADOC at Limestone to deliver meals to people in a closed custody dorm, where more dangerous people reside.  When he did so, the residents of the dorm asked him to transport drugs and, when he refused, threw feces and urine at him.  When he informed ADOC of the incident, officers took no action; on a subsequent day, and after Mr. Mason again refused to transport drugs, an incarcerated person tried to stab Mr. Mason, after which Mr. Mason told ADOC that he feared for his life and would not work that job anymore.  ADOC told him to return to work and when Mr. Mason again refused, an ADOC officer attempted to punish Mr. Mason by transferring him into a general population dorm, where he would have been killed as a former police officer.

Although another ADOC officer intervened to prevent the transfer, Mr. Mason was issued two disciplinaries for refusing to work.

311.    In another example, Plaintiff Dandridge was housed at North Alabama Community Work Center during the 2022 strike by incarcerated workers at medium- and high-security facilities and was instructed to work as a strikebreaker. ADOC representatives told Plaintiff Dandridge that he would be "put back behind the fence" in a more violent facility if he refused to perform the work that ADOC needed. Also, in 2018, Plaintiff Dandridge was transferred to St. Clair for allegedly "refusing to work" after cutting the grass in a different way than his supervisor preferred. During that transfer, Dandridge witnessed three other incarcerated people who had also been transferred with him get violently gang-raped.

312.    Another retained class member was told he needed to work for 90 days, unpaid, in the kitchen before he could be permitted to transfer to another job. When the 90 days were up and he asked if he still had to work, he was written up for refusal to work and transferred to solitary confinement before being sent to the punitive farm squad at Limestone.

### b.  ADOC Uses Physical Violence and Threats of Violence and Bodily Harm to Coerce Work

313.    ADOC, at Governor Ivey's direction, coerces individuals in its custody to work by disciplining people, including through the use of violence and the threat of violence, if they refuse to work.

314.    ADOC regulations allow discipline for refusing to work, or encouraging others to stop working, that would include imposition of other forced work, which often includes work within the facilities that is dangerous and more difficult. The regulations and Governor's Executive Order also expressly call for the forfeiture of good-time credit and a bar on accruing additional good-time credit, which can result in lengthening people's sentence by months and years, *see supra* FA Part II.A., which necessarily subjects them to the pervasive violence within ADOC facilities for additional time.

315.    In addition to the threat of violence and violence that accompanies the penalties expressly identified by the regulations, Named Plaintiffs and members of the Forced Labor Class are subject to physical beatings and other bodily harm by ADOC staff, and/or are aware that they could be so subject, in the event they refuse to work.  This is true across the ADOC facilities.

316.    Plaintiff Lee Edward Moore Jr.'s experience embodies this principle. Constantly threatened by the extreme violence within the facilities in which he has been housed, Mr. Moore understands that his only means of avoiding that violence was to turn over his labor, full time, to ADOC.  For more than 25 years, Mr. Moore has worked without pay, performing skilled labor such as HVAC installation and maintenance for ADOC and renovating homes for prison officials.  He accepted this work because it allowed him to live in a dorm reserved for people who labor for ADOC and escape the violent dorms and yards in the high security facilities to which he has been consistently assigned by ADOC, even though he has had a  "clean record" for more than ten years (meaning he has no disciplinary offenses) and no "violence in his jacket" (never cited for any violent disciplinaries while incarcerated) despite being incarcerated for several decades in some of Alabama's most notoriously violent prisons.

317.    At Draper, a medium-security men's facility, there was a well-known, well-publicized, and consistent practice of guards forcing incarcerated people to fight each other if they refused to work, referred to as "gladiator school."  Plaintiff Cole experienced this "gladiator school."  At this same facility, guards would also physically beat incarcerated individuals who refused to work.  Mr. Cole was slapped by a guard to force him to work.

318.    Plaintiff T. Clark also witnessed ADOC staff at Draper beating other incarcerated people who refused to engage in field work for ADOC.  He witnessed several instances of brutal violences by guards at Draper and Easterling, including an incident in which an officer wearing steel-toed boots stomped an incarcerated person.

319.    At Ventress, Plaintiff McDole understood that he needed to "work his custody down" in order to be transferred to a safer, less violent facility, and that working was therefore key to his survival within the ADOC system.

320.    At Kilby, Plaintiff Campbell was among 200 men who ADOC officers ordered to strip naked and then stand in a line while the officers slapped most of them as a form of punishment.  He also witnessed multiple assaults and killings while in ADOC custody.

321.    At Limestone, Plaintiff Mason was nearly stabbed while doing required, unpaid work for ADOC, despite having objected to the work at issue as dangerous and having raised concerns that he had been asked to engage in the transport of illegal drugs.  Mr. Mason has observed numerous beatings and deaths at Limestone, and understands that a refusal to work, even if the work required by ADOC is itself dangerous or unlawful, will be met with beatings and/or pepper-spray from the guards, and potentially solitary for many months.

322.    Putative class member Albert Young has also witnessed extreme violence and a lack of protection in several ADOC facilities, including Kilby, Childersburg, Elmore, and Frank Lee.  Mr. Young observed guards slapping and beating incarcerated individuals as punishment.

323.    Upon information and belief, guards will also deliberately turn a blind eye to, and/or encourage, violence against incarcerated people by others in ADOC custody as a form of retaliation for refusal to work.

324.    Commissioner Hamm coerces labor from the disproportionately Black population incarcerated by ADOC by maintaining conditions of extreme understaffing and extraordinary violence that pervade every aspect of life in ADOC's medium- and high-security facilities. Being incarcerated in one of these facilities is life-threatening, and the incarcerated people who live there know it.  Accepting a job—ideally outside the walls of medium- and high-security facilities, but also in any position that physically removes an incarcerated person from the most dangerous areas in those facilities—is the only way to escape the serious threat of physical harm, even temporarily.  And "working one's custody down," or agreeing to do whatever work is demanded of one by the ADOC, is the only way to move away from the medium- and high-security facilities.

### c. ADOC Uses the Deprivation and Threat of Deprivation of Necessities to Coerce Work

325.    The ADOC regulations identify withdrawal of privileges as one penalty that ADOC will impose when individuals refuse to work.  One type of privileges that can be withdrawn is the right to use one's account at the commissary, which can mean that individuals are not able to purchase bare necessities, including food (which is needed when ADOC fails to provide adequate food), hygiene products (not regularly provided by ADOC), and clothing and shoes (also not sufficiently provided by ADOC), especially clothing and shoes required to perform the labor demanded by ADOC.

326.    Additionally, as widely and repeatedly reported across Alabama, in September 2022, ADOC deprived men incarcerated in the medium- and high-security facilities of food, the ability to maintain basic minimum sustenance, hygienic conditions, and medical care, as punishment for their refusal to perform in-house work for ADOC.  *See infra* FA Part III.A., III.B. Specifically, to coerce the men to return to work, ADOC and Governor Ivey responded with what is colloquially known as "bird-feeding," essentially reducing the supply of food to the striking workers.  ADOC also failed to maintain the toilets, remove trash, or otherwise maintain basic hygienic conditions.  Incarcerated individuals who needed medications, treatments, and other healthcare services were also denied such services as punishment for withholding their labor.

327.    Plaintiff Mason, for example, has his access to the canteen restricted for sixty days after refusing to do a job he was nearly killed doing.

328.    ADOC uses the deprivation of necessities as a tactic for collective punishment, even when incarcerated people do not participate in work stoppages.  Plaintiffs Campbell and McDole, for example, were among those incarcerated people who had their access to the canteen at Childersburg severely limited during the 2022 strike, even though the incarcerated workers at Childersburg did not participate in the strike.

329.    ADOC and the Governor's response to the September 2022 is well-known by Named Plaintiffs and members of the Forced Labor Class, and serves as an ongoing threat of the sort of consequences that will follow any refusal by incarcerated individuals to work.

330.    While the Governor and Hamm's deprivation of necessities during the 2022 strike is the most infamous instance of this sort of coercion of incarcerated Alabamians' labor, ADOC and Hamm engage in this sort of coercion regularly.  For example, Plaintiff R. Clark was forced to walk miles to do farm work for ADOC, under armed guard, and was provided only a single cheese sandwich to eat.

### d.  ADOC Uses the Deprivation and Threat of Deprivation of Family Contact to Coerce Work

331.    One of the penalties identified in ADOC's regulations for anyone who refuses to work is withdrawal of privileges.  This includes denying incarcerated individuals the right to see their family members or other visitors.

332.    Plaintiff Mason, for example, was issued two disciplinaries for refusing to work after he was nearly killed while performing an extremely dangerous job.  One of the consequences of that discipline was a sixty day restriction of visitation.

333.    A putative class member at Birmingham Work Release explained that women on work release are required to work in the kitchen for 90 days at a time.  If they refuse, they are disciplined, which leads to restriction: no phone time, no visits from family, and no access to the canteen.  They are also not allowed to go outside and are placed on "extra duty."

### e.  ADOC Uses Solitary Confinement and the Threat of Solitary Confinement to Coerce Work

334.    If an incarcerated person refuses to work on more than one occasion, or if they encourage others to refuse to work, ADOC may deem them not to be following orders and they may be placed in solitary confinement as a result.

335.    Following the 2022 strike, the Governor expressly authorized ADOC to punish individuals who withhold their labor from ADOC or encourage others to do so with "time to be

served in restrictive housing," which generally means solitary confinement and other cruel conditions.

336.    Plaintiff Council and other leaders with the Free Alabama Movement have repeatedly been placed in solitary as punishment for encouraging others to stop working for ADOC, witnessed on some occasions by Plaintiff Dandridge, who was also punished for supporting the work stoppages.  *See infra* FA Part III.A.  Mr. Council's experience is widely known within ADOC facilities and serves as a threat to other incarcerated individuals who might wish not to work or to encourage others to stop working for ADOC.

337.    Both male and female putative Forced Labor and Strike Class Members across Alabama consistently report being threatened with, subjected to, or hearing of and/or observing ADOC punish individuals who withhold their labor from ADOC or encourage others to do so with solitary confinement and other punitive conditions and assignments.  Incarcerated women consistently report being aware or having personally observed the harsh punishment ADOC meted out to leaders of a work stoppage in the women's facilities in 2014, designed to bring attention to the abusive conditions in the women's prisons, including the shockingly cruel and inhumane conditions, and forced labor compelled from women at Tutwiler.

### f.   ADOC Uses the Imposition and Threat of Increased Lengths of Incarceration to Coerce Work

338.    ADOC's regulations and Governor Ivey's Executive Order provides that incarcerated individuals may lose their good-time credits as punishment for declining to work or encouraging others to do so.  By threatening incarcerated workers with the loss of good-time credits, ADOC and the Governor are threatening the workers with increased terms of incarceration.

339.    In addition, on information and belief, individuals who decline to work receive disciplinaries on their record, which directly diminishes their opportunity to be granted parole by the Parole Board, especially since the Parole Board's modification of its scoring procedures since 2019.  Specifically, a disciplinary for failure to work, or for encouraging others to withhold their

labor, increases a parole applicant's "score," decreasing the likelihood that an individual will be granted parole. The threat of the consequences for parole is another way in which incarcerated individuals' work is coerced.

340.    Plaintiff Pritchett has been denied parole and, on information and belief, disciplinaries that he has received as a result of purportedly "being fired from a job" and for "refusing to work/failing to check out for work" have adversely impacted his ability to be released on parole. Mr. Pritchett's disciplinaries have been as minor as cleaning tables in a way that was slightly different than his supervisor preferred, being late to catch a van to be transported to a work site, and not working a shift while sick.

341.    Plaintiff Ptomey was informed by family members who attended his last parole hearing in 2022 that the Parole Board pointed to the citation he received for refusing to accept the unlawful work conditions at KFC in 2019 as the basis for denial of parole and issuing him a set off of 3 years, even though his supervisor from the KFC position had sent a letter to the Parole Board recommending his release due to his fine work at KFC.

### 3.    Defendants Hamm and Ivey Benefit from the Coerced In-House Work

342.    As described above, *supra* FA Part I.B., most incarcerated people in ADOC's custody begin their incarceration in ADOC's high- or medium-security facilities where they are required to work for free for ADOC's and the State's economic benefit. As the understaffing crisis at ADOC has intensified in recent years, Alabama has increasingly turned to forcing incarcerated persons to perform jobs that correctional and other free state employee staff historically performed. For the State, this diversion of disproportionately Black forced labor yields nothing but economic benefit because ADOC does not pay any wages to the incarcerated people whom it assigns to perform in-facility work.

343.    The economic benefit to ADOC of compelling unpaid labor from its in-house population to cover the drastic loss of correctional staff over the last decade is immense. Since 2014, ADOC has lost approximately one-third of its correctional staff, or nearly 1,000 people. *See also supra* FA Part I.C.

344.    As paid staff increasingly leave ADOC, there has been a corresponding increase in the number of unpaid incarcerated persons performing those former staff members' jobs—for free.  As detailed above, incarcerated persons are performing a wide range of jobs that correctional staff should be performing.

345.    With correctional officer trainees earning more than $24 per hour as their starting wage, assuming every incarcerated person assigned to fill a paid staff member's job at no cost to ADOC saves ADOC $24 per hour, that results in a minimum wage cost savings to ADOC of approximately $50,000 per year per position.

346.    If just the correctional staff positions lost since 2014 were filled with trainees, that would cost Alabama approximately $50 million per year (not accounting for benefits or overtime).

347.    A review of labor assignments and schedules of incarcerated people held at the St. Clair Correctional Facility (a high-security facility) indicates a net benefit to Alabama of approximately $30 million for just the labor performed by people at St. Clair from January to December 2023, extrapolating from available data through August 2023.  The work performed at St. Clair suggests a benefit to Alabama of more than $400 million in 2023 from the forced labor of the disproportionately Black Alabamians being held in Alabama's high- and medium-security facilities.

348.    Defendants Hamm and Ivey reap significant economic benefits from staffing ADOC facilities with free, coerced labor.

349.    Private and public employers participating in the coerced labor scheme also benefit from the coercion of free labor within ADOC's walls.  Each Named Plaintiff and member of the Forced Labor Class is taught, through the coercion of in-house labor for ADOC, the dire consequences of refusing to work, a lesson that carries over to their work for public and private employers: they understand that a refusal to work for the public and private employers will mean punishment and a requirement that they continue to work for the benefit of ADOC, but for free.

C.    *Correctional Industries Work:* **ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Engage in Work for ADOC's Commercial Enterprise Called "Correctional Industries," to the Benefit of ADOC and the State**

1.    **Coerced Work for Correctional Industries**

350.    Alabama's "Correctional Industries Program" requires incarcerated people at medium- and high-security facilities to produce goods on ADOC property for purchase by state and local government entities.  Incarcerated workers are required to produce and restore furniture, including judges' benches; manufacture clothing; work in printing plants; and make vehicle tags.

351.    Unlike the incarcerated people who are compelled to labor through Alabama's work-release and honor-camp schemes, the incarcerated workers who are compelled to labor in Alabama's Correctional Industries have higher security classifications and perform this labor in designated plants contained on the grounds of medium- and high-security facilities.

352.    An average of 267 incarcerated people worked in ADOC's Correctional Industries as of September 2024.  Incarcerated workers typically have a starting pay of 25 cents per hour or less.  Plaintiff Ball was compelled to work for ADOC's Correctional Industries.

2.    **ADOC Enforces Its Requirement for CI Work Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration**

353.    All of the same coercive forces that are in play with respect to the unpaid, in-house work for ADOC, as detailed *supra* FA Part II.B.2., also result in the coercion of incarcerated individuals' work for Correctional Industries, with the additional threats that a refusal to work will remove the meager pay individuals receive for their work.

354.    The threat to remove the opportunity to receive some pay for their labor is a threat to deprive incarcerated workers of bare necessities. This is because incarcerated people in ADOC facilities are required to pay excessive, marked-up amounts to ADOC to obtain basic life necessities.

355.    For example, ADOC does not provide incarcerated people with adequate warm winter clothes, usable shoes (including work shoes), or deodorant. Incarcerated people must instead purchase those items from ADOC, typically at highly marked-up prices. For example, one pair of shoes that retails for $70 outside of prison costs incarcerated people 58% more to purchase through ADOC.

356.    ADOC facilities also charge many incarcerated people fees for medical visits. These fees range from approximately $4 to $8, with additional costs for some medicines. Incarcerated people housed in facilities without on-premises medical care may be charged $8-12 for van transport to a prison with a medical facility. These fees impose a significant burden on incarcerated people, considering that the vast majority of them are paid either nothing at all or at most $2 per day for their forced labor, meaning that a single serious or recurring medical condition can wipe out years of earnings.  Incarcerated people are also required to pay approximately $10 per month to use ADOC's electronic tablets, $0.25 for every message sent on the tablet, and additional onerous fees for every minute used in a phone call to connect with their loved ones.[36]

357.    In recent years, the fees charged by ADOC to incarcerated people for some basic necessities have soared, far outpacing inflation. Meanwhile, the extremely limited purchasing power of most incarcerated people has not increased at all.

358.    The need to acquire funds to purchase such necessities contributes to forcing incarcerated people in ADOC's custody to accept any paid work they can, and to remain in those jobs no matter the conditions for as long as possible.

---

[36] The excessive prices ADOC charges for such basic necessities provide ADOC an additional incentive to keep as many people incarcerated as possible, because ADOC gets a share of all funds received for goods purchased in the canteen or the snack line. These charges further contribute to compelling incarcerated people to accept whatever work assignments they are given if the job includes any pay at all. For FY 2022, ADOC reported revenue of more than $11.2 million for "Corrections Canteen Profits," more than $5.1 million from pay telephones, more than $106,000 in medical co-pays, and more than $311,000 in electronic transfer fees.

### 3. Defendants Hamm and Ivey Benefit from the Coercion of Work at CI

359.    ADOC's September 2023 report showing that it secured more than $3.1 million in profit from the work performed by these laborers,[37] a greater amount than it obtained in FY 2022.  Most of the 2023 profit has been generated by incarcerated workers in the clothing and vehicle tag plants—more than $1.9 million from the approximately 112 workers in the clothing plant and nearly $1.5 million from the approximately 19 workers in the vehicle tag plant.

360.    These declared profits understate the true economic benefit of this program to the State, because the state agencies purchasing goods manufactured through the Correctional Industries program would have to pay more for such goods on the open market.  The purchasing agencies are simply paying another Alabama entity for goods produced through the in-house forced labor manufacturing operations.

### D.    *Work Centers:* ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for State, County, and Local Government Entities, to the Benefit of ADOC and the Co-Employing Entities

### 1.    Coerced Work for Public Employers

361.    Incarcerated individuals like Named Plaintiffs Ptomey, Campbell, Pritchett, Dandridge, Cooper, Cole, Walker, Bullock, Jarmon, and R. Clark and members of the Forced Labor Class who "work their custody down," meaning they performed compelled in-house work for ADOC in its medium- and high-security facilities, are regularly transferred to "Work Centers" and "Work Release centers," where they are compelled to work for public entities and private companies, respectively.

362.    ADOC's "Work Centers," also known as "honor camps," are populated with people who have minimum custody classifications—generally "Minimum Out"—and are compelled to perform labor for city, county, and state government agencies that contract with ADOC for such labor. Thus, before contracting out incarcerated persons' labor to these public

---

[37] ADOC September 2023 Monthly Report at 15.

employers, ADOC determines through classification analyses that the incarcerated people they are "leasing" are capable of working safely in the community without direct supervision by ADOC, frequently alongside and under the supervision of free people. The incarcerated people whose labor is "leased" through Alabama's work-center scheme generally live in designated "work center/honor camp" ADOC facilities, from which they depart and return every day to perform their outside jobs.

363.    Approximately 1,800 incarcerated people were housed in work-center facilities as of February 2025.

364.    ADOT, through Defendant Cooper, the Governor's Mansion, through Defendant Ivey, and Defendants City of Montgomery, City of Troy, and Jefferson County (collectively, "Public Employer Defendants") all contract for incarcerated labor through the work-center program, as do more than 100 other public sector employers.

365.    Regardless of how many hours incarcerated persons are required to work for state and local agencies each day—their daily income for each day of labor is generally limited to a total of $2, remarkably the same daily wage rate that the State of Alabama set for incarcerated labor in 1927.

<u>Allegations Common to All Public Employer Defendants</u>

366.    At various times between January 1, 2015 and the present, each Public Employer Defendant needed a source of cheap labor.  Upon information and belief, Public Employer Defendants sought pliant workers who could be requested when needed, easily directed and controlled, who would not complain about their wages, benefits or working conditions, and who would have good attendance given the threat of discipline for failing to work.

367.    On information and belief, each Public Employer Defendant was aware that incarcerated workers did not have the freedom to refuse or choose the work assigned to them by ADOC.

368.    Alabama Department of Corrections Administrative Regulation Number 439 (August 21, 2023) ("AR 439" or "work-center regulation") establishes "the policies,

responsibilities, and procedures for minimum-out custody inmates working on government projects," i.e., the work-center program.  AR 439 at 1.

369.    Incarcerated individuals who are assigned to the work-center program are approved to work "in their state-issued uniforms under the supervision of an ADOC Squad Officer/Designee or [a] Government Agency Inmate Supervisor."  AR 439 at 2.  The "Government Agency Inmate Supervisor" is an individual "from a participating outside governmental agency that is approved and trained to supervise inmates working on government projects."  *Id.* at 1.  This individual must supervise incarcerated workers and ensure that all "ADOC policies and safety procedures are adhered to and enforced."  *Id.* at 3.  On information and belief, personnel from each Public Employer Defendant served in this role as "Government Agency Inmate Supervisor" and were responsible for ensuring compliance with ADOC policies.

370.    The work-center regulations require the Institutional Job Review Board of the ADOC to screen and select which incarcerated workers with a minimum-out custody classification are placed on each government project, with final approval from the warden.  If the Institutional Job Review Board decides certain incarcerated workers need to work for a governmental agency on a project through the work-center program, they need to do it.  An incarcerated worker's refusal to participate in the work-center program will result in discipline.  *See infra* FA Part II.A.

371.    The work-center program regulation requires public employers who wish to participate to first submit an "Application for Inmate Work Request Form."  AR 439 at 4, 7.  On information and belief, each Public Employer Defendant has submitted such an application.

372.    The Public Employer Defendants' applications must describe a number of details about the working conditions, all of which are subject to ADOC's approval:  the scope of the work needed; any skilled labor or special talents sought; the "[n]umber of inmates requested"; the work site location; and a proposed work schedule.

373.    If ADOC approves the public employer's work-center program application, the public employer must sign ADOC Form 439-D, entitled "Inmate Government Work Project Service Agreement" (hereinafter, "Work-Center Agreement").  AR 439 at 11–16.

374.    Upon information and belief, all Public Employer Defendants participated in joint ventures with ADOC and signed Work-Center Agreements with ADOC that were effective during the time period incarcerated workers performed work for the Public Employer Defenders. *See also* AR 439 at 11 (term clause establishing one-year agreement, but subject to renewal at one-year increments "upon mutual agreement of the Parties").

375.    The Work-Center Agreement establishes a contract between ADOC and public employers in need of labor to perform general services unique to their agency as demonstrated by the agreement's opening paragraphs:

> The Government Work Project Agreement ("Agreement") has been entered into by _____ ("Agency") and the Alabama Department of Corrections _____ ("Institution" or "ADOC").

> **RECITALS**

> WHEREAS Agency is in need of workers to assist in general services; and,

> WHEREAS, the ADOC has within its custody certain inmates who are capable of providing the services requested by Agency.

AR 439 at 11.

376.    The Work-Center Agreement makes clear that ADOC and the public entity "leasing" the incarcerated workers' labor jointly exercise control over the workers' conditions of employment and the means of coercing their labor.

377.    The Work-Center Agreement ensures that ADOC, with full knowledge and assent by the signatory Public Employer Defendants, retains certain management and control over how the public entities use the labor of incarcerated workers, while also requiring public entity employers to supervise the workers:

  a.  **Number**:  Although ADOC is required to "make a good faith effort to provide the prescribed number of inmates," ADOC's failure to provide that number of incarcerated workers to the Agency does not constitute a breach of contract,

absent a showing of bad faith. AR 439 at 11. In other words, ADOC fully controls the number of workers who are provided to the government agency.

    b.  **Changes:** Any changes to jobs described in ADOC Form 439—this includes changes to schedule and location—that a public entity employer wishes to make cannot proceed without ADOC's written approval "[at] least seven (7) days in advance of the planned change." AR 439 at 12. Upon information and belief, any changes Public Employer Defendants made or make to jobs already assigned to incarcerated workers are subject to and receive ADOC's written approval.

    c.  **Payment**: ADOC requires public entity employers to pay monthly invoices it receives from ADOC within 30 days of the invoice date; and if any public entity employer, including Public Employer Defendants, had failed or fails to pay an invoice within 60 days, ADOC is entitled to withhold the labor of incarcerated workers.

    d.  **Supervision**: ADOC requires at least one employee of public entity employers, including each Public Employer Defendant, to supervise incarcerated workers at "all times." AR 439 at 12. This employee must have completed a training and is charged under the Work-Center Agreement with "follow[ing] all applicable rules, regulations, and/or standard operating procedures of the ADOC"; failing to do so "may [have] result[ed] in immediate termination of the Agreement in the sole discretion of the ADOC." *Id.*

    e.  **Independent Contractor:** As a condition of receiving incarcerated workers from ADOC, any public entity employer, including each Public Employer Defendant, needs to accept its designation as an "independent contractor" and register as a vendor in the state of Alabama's "STAARS accounting system." AR 439 at 15. Upon information and belief, each Public Employer Defendant registered as an independent contractor.

    f.  **Enforcement of ADOC and Workplace Rules**: The ADOC requires public employer entities, including each Public Employer Defendant, to help enforce the forced-labor scheme: "If an inmate fails to follow any rule, or *refuses to work as requested*, notice shall be given in writing, to [ADOC] upon the inmate's return to the Institution." AR 439 at 13 (emphasis added). If a public employer entity, including each Public Employer Defendant, failed or fails to report incarcerated workers who refuse to work or to follow ADOC or workplace rules, ADOC retains the "sole discretion . . . [to] immediate[ly] terminat[e]" the Work-Center Agreement. *Id.* Upon information and belief, each Public Employer Defendant identified to ADOC any incarcerated worker who refused to work, follow workplace or ADOC rules, or was perceived by the Public Employer Defendant as doing so.

    378.   The regulation governing work centers also requires all public employer entities, including each Public Employer Defendant, entering into a Work-Center Agreement with ADOC to police the forced-labor scheme by immediately reporting any misconduct by incarcerated workers to ADOC, which in turn would mete out the discipline:

> If any inmate behaves in a manner deemed inappropriate, the Government Agency Inmate Supervisor or Squad Officer/Designee shall inform the JPO or Warden/Designee. Any violation of ADOC Form 439-C, Inmate Work Rules, shall be reported to the JPO/Designee. The JPO/Designee will investigate and take appropriate disciplinary action as warranted.

AR 439 at 5.

379.    The regulation also makes clear that ADOC retains discretion to remove any incarcerated worker from any government project at any time with no justification required, AR 439 at 5 ("The Warden may remove any inmate from any governmental project at any time, with or without cause."); and to "conduct random job checks and searches to ensure employer and inmate accountability and public safety" with no notice to Public Employer Defendants. *Id.*

380.    Under the regulation governing the work centers, each public entity employer, including each Public Employer Defendant, must pay a fee to the ADOC of $15 to $25 per day per incarcerated worker, depending on whether ADOC provides transportation or an ADOC Squad Officer, AR 439 at 4–5, and "[o]f the fees received by the ADOC, the inmate will be paid at least $2.00 per day for labor," with the remainder of the fees going to the State General Fund Account. *Id.*

## 2. ADOC Enforces the Requirement that Incarcerated Alabamians Work for Public Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration

381.    All of the same coercive forces that affect incarcerated workers and compel their unpaid, in-house work for ADOC, as detailed *supra* Part II.B.2. (discussing threats of transfers to more violent facilities, violence and threats of violence, deprivation of necessities and family contact, and increased length of incarceration), also result in the coercion of incarcerated individuals' work for public entity employers, including Public Employer Defendants.

382.    In addition, incarcerated workers employed by ADOC and the public entities through the Work Center program are subject to additional coercion because any infraction or perceived refusal to work carries with it the threat that the worker may be sent "back behind the

wall," i.e., back to the high risk of violence and bodily harm that would result from a transfer to a medium- or high-security facility. Incarcerated workers who go from working inside ADOC facilities to working for public employers from a Work Center well know, by the time they arrive at the Work Center, that refusing to work can lead to physical, unchecked violence if they are returned to the violent higher security, higher custody facilities.

383.     Public entity employers, including the Public Employer Defendants, understand that they had an obligation to enforce ADOC rules and their own workplace policies, and that they could do so through (1) reporting workers' behavior to ADOC and leaving to ADOC to impose discipline, or (2) threatening workers with a report of the behavior to ADOC. Both of these options rely on the threat of ADOC-imposed discipline, with its attendant risks of, *inter alia*, violence, bodily harm, and increased length of incarceration.

384.     Upon information and belief, the public entity employers, including each Public Employer Defendant, contacted ADOC, or invoked the possibility of discipline by ADOC, when incarcerated workers refused to work, failed to appear for work, committed insubordination, engaged in disorderly conduct, raised concerns about work conditions or supervisors, or behaved in an inappropriate manner.

385.     Upon information and belief, the public entity employers, including each Public Employer Defendant, knew the incarcerated workers they employed understood the consequences that could result if they refused to work or engaged in insubordination, disorderly conduct, or inappropriate behavior at the job site, including the issuance of disciplinaries, transfers to more dangerous facilities, deprivation of necessities, and lengthened sentences.

386.     Named Plaintiffs' experiences demonstrate this. Plaintiff Walker, after providing a statement about sexual harassment she experienced at Jefferson County, was given a disciplinary offense for purportedly refusing to work, after which she was required to work in the facility's kitchen performing additional, unpaid forced labor.

387.     Putative Class member Albert Young was forced to work for the City of Childersburg cutting grass, knocking down trees, painting roads, and collecting garbage for $2 a

day. When he worked on the garbage truck, which required hanging off the side of the truck in the hot sun all day (not being allowed in the truck), he was given no water. One day the conditions were so bad, he began vomiting and suffered a heat stroke.

388.    Plaintiff Dandridge was disciplined several times while working for public employers for purportedly refusing to work, although in each difference the basis for the "refusal" was Mr. Dandridge's raising of concerns about his working conditions.  For example, he was disciplined for "refusing to work" when he refused sexual advances from his male supervisor at the Board of Education, and as a result of that disciplinary was denied parole.  He was also disciplined for "refusing to work" while being required to cut grass for the City of Childersburg because he cut the grass in a way different than the way the supervisor instructed.

389.    Another retained putative class member was assigned to cutting and digging ditches filled with poison oak, poison ivy, and poison sumac, even though he was highly allergic. When he complained about working conditions, the Red Eagle Warden told him that he doesn't "have the right to quit" working and that "you quit when we tell you to quit."  He contracted poison ivy over his entire body and was still forced to continue the work for months until ADOC medical pulled him from the job.

390.    ADOC, through Hamm, co-employs the incarcerated workers in the Forced Labor Class who labor for public entities through the Work Center program, and is liable for the coercion of work by those public entities, along with its own coercion.

> **3.    Public Employers Act as Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion**

391.    Each Public Employer Defendant knew or recklessly disregarded that the incarcerated labor provided by Named Plaintiffs and members of the Forced Labor Class through its contracts with ADOC was coerced.

392.    Through the Work-Center Agreement, each Public Employer Defendant obtains a workforce of workers that it can require to do more dangerous tasks or less desirable shifts than

it assigns to otherwise similarly situated free-world workers, understanding that the incarcerated workers can and are threatened with penalties and bodily harm in the event they complain about working conditions, hours, or wages.  Each Public Employer Defendant, on information and belief, knows or should know that work performed for it by incarcerated persons is coerced because the work assigned is work that free workers refuse to do and would certainly refuse to do for $2 per day.

393.    Incarcerated individuals who have worked for public entities through ADOC's Work Center program, including each Public Employer Defendant, have worked long hours, including 10- and 12-hour days, and yet have generally been paid only $2 per day.  Work assignments can be grueling and difficult work. No free worker would agree to work for $2 or a similar wage per day. Therefore, each Public Employer Defendant knew or should have known that the incarcerated individuals who worked for the public entity did so subject to coercion.

394.    Each Public Employer Defendant knew or should have known that, if incarcerated workers did not accept a Work Center assignment and the conditions of that assignment (including the wage), they could be subject to discipline, including more restrictive conditions of confinement and loss of two years of good-time credit (which correlates to an effective extension of the person's prison sentence), being sent back "behind the wall" to the life-threatening conditions in medium- and high-security facilities, and losing the ability to obtain funds needed for the worker to be able to afford basic necessities. *See supra* FA Part II.B.2.a.

395.    As detailed *supra* FA Part I.C, the exceptionally violent conditions in ADOC's medium- and high-security facilities are a matter of broad public knowledge, and each of the Public Employer Defendants knew or should have known, particularly for the many public employer partners of ADOC who have leased workers from ADOC for years or decades, that a disciplinary infraction that results in a worker being sent back "behind the wall" involved a real and significant threat of bodily harm, along with deprivation of necessities.  Named Plaintiffs who had their labor leased out to public employers consistently report actions, statements and threats from public employer supervisors that reveal that the Public Employer Defendants knew

about the extremely coercive conditions faced by their incarcerated workers at ADOC facilities and the extreme consequences they would face if their public employers reported dissatisfaction with their work or a refusal to perform any and all work assigned to ADOC.  The DOJ reports detailing the extreme levels of guard-on-prisoner and prisoner-on-prisoner violence in ADOC facilities, and shocking levels of homicides, rapes, and serious injuries, have been widely publicized in the local and national media and frequently discussed by state officials.[38]  ADOC's extreme understaffing and the corresponding rise in violence at ADOC facilities has likewise frequently covered in the media.[39]

396.    Each of the Public Employer Defendants also knew or should have known that ADOC had responded to incarcerated workers' refusal to work by denying those workers basic necessities like food and hygienic supplies.  The 2022 strike by incarcerated workers at ADOC's major correctional facilities to protest the conditions inside those facilities and to demand changes to the State's broken parole system, and the ADOC's response, including its "bird-feeding" and failure to provide basic services, was broadly covered.[40]

397.    Each of the Public Employer Defendants is, on information and belief, aware that ADOC's programs offer them access to a pool of uniquely compliant workers who, by virtue of their incarcerated status, are severely limited in their ability to advocate for improved workplace

---

[38] *See, e.g.*, Kim Chandler, *Justice Department Sues Alabama Over Prison Conditions*, AP (Dec. 9, 2020), https://apnews.com/article/alabama-constitutions-prisons-lawsuits-violence-b8549a9ee4cdd959057735f07822e8ba; Mike Cason, *U.S. Department of Justice Sues Alabama Over Unsafe Prison Conditions*, AL.com (Dec. 9, 2020), https://www.al.com/news/2020/12/us-department-of-justice-sues-alabama-over-unsafe-prison-conditions.html.

[39] *See, e.g.*, Kim Chandler, *Alabama Prison Staff Shortage Worsens Despite Court Order*, AL.com (Feb. 11, 2023), https://www.al.com/news/2023/02/alabama-prison-staff-shortage-worsens-despite-court-order.html.

[40] *See, e.g.*, Eduardo Medina, *Alabama Inmates Strike, Denouncing Prison Conditions*, N.Y. Times (Sept. 28, 2022), https://www.nytimes.com/2022/09/28/us/alabama-prisons-strike-protest.html; Evan Mealins, *'I'm Fighting for My Life': Inside Alabama's Prisons During Ongoing Labor Strike*, Montgomery Advertiser (Sept. 30, 2022), https://www.montgomeryadvertiser.com/story/news/2022/09/29/alabama-prison-labor-strike-cold-meals-conditions-inside/69524237007/.

conditions, to organize themselves and their co-workers or join a labor union, to publicize workplace abuses, or to pursue or participate in wage-and-hour or other workplace litigation.

398.    On information and belief, each Public Employer Defendant is aware of and knowingly assists in enforcing the ADOC regulations that govern work and refusals to work. Each Public Employer Defendant, on information and belief, has agreed to provide notice to ADOC of any incarcerated person's failure to follow any rule or to "refuse[] to work as requested,"[41] and has complied with that contractual obligation.

399.    Each Public Employer Defendant knew or should have known that incarcerated workers who refuse to work—a violation of ADOC rules and regulations—have incurred and will incur consequences under ADOC Administrative Regulation 403 ("AR 403"), which outlines the "disciplinary process for inmates who commit [rule] violations."  AR 403 at 1.  This includes Rule Violation #518 "Refusing to work/fail to check out for work."  AR 403 at 31.

400.    Each Public Employer Defendant knew or should have known that ADOC classified refusing to work as a "medium level rule violation" that carried the potential sanction of the forfeiture of a minimum two years of accrued Good Time days (or all time accrued if less than two years); "Confinement to Restrictive Housing for up to 30 days"; or the "Loss of any and all privileges/incentives for up to 45 days," among other penalties.  AR 403 at 23.

401.    Likewise, each Public Employer Defendant knew or should have known that an incarcerated worker's "[i]nsubordination," "[d]isorderly conduct" or "[b]eing fired from a job" constituted a "low level violation," AR 403 at 22, that could result in forfeiture of up to 30 days of accrued Good Time and the "[l]oss of any and all privileges/incentives for up to 30 days," among other penalties, AR 403 at 24.  Upon information and belief, Public Employer Defendants knew the referenced "privileges" are highly valued by incarcerated workers, and include, but are not limited to, "Canteen, Telephone, Visiting, and Outside (i.e., shopping, recreation, etc.)."  AR 403 at 24.

---

[41] ADOC Admin. Reg. 439 (Aug. 21, 2023),
https://doc.alabama.gov/docs/AdminRegs/AR439.pdf.

4.    **Defendants Hamm, Ivey, and the Public Employer Defendants Benefit from the Coercion of Work Through the Work Centers**

402.    The enormous amount of forced labor that ADOC contracts out to state and local governments through its work-center program underscores Alabama state and local governments' deep reliance on predominantly Black forced labor to provide core governmental services.

403.    Each Public Employer Defendant is benefiting from its participation in the Work-Center Program and is willingly collaborating with Defendants Hamm and Ivey to exploit incarcerated workers and to enforce explicitly coercive disciplinary rules and other work conditions as a condition of gaining access to cheap, pliant, and coerced workers that ADOC provides on-demand.

404.    Each Public Employer Defendant is positioned and has the ability to prevent or to aid in preventing the exploitation of forced labor by incarcerated Alabamians.  Nonetheless, to date, each has refused or neglected to use its power to do so.

405.    Each Public Employer Defendant has a choice about whether to participate in the work-center and work-release programs—and those programs provide a powerful incentive for the conspirators to continue operating the parole system unlawfully, particularly with respect to Black incarcerated people who are authorized to work outside of ADOC facilities. Nonetheless, each Public Employer Defendant has made the deliberate choice to continue to participate in and benefit from the forced labor of incarcerated Alabamians, instead of insisting upon the immediate release of all incarcerated workers who have been "leased" to them for labor and refusing to perpetuate and expand the scheme that compels forced labor from predominantly Black incarcerated Alabamians.

406.    The Public Employer Defendants know or should know that ADOC prohibits and severely punishes workers for any "refusal" to work, including simply being late to work, being sick, or simply not performing a job not to the employer's satisfaction, which represents a

significant benefit to the Public Employer Defendants in the form of a pliant and reliable workforce.

407.    Overall, from 2018 to 2023, Alabama public entities reaped approximately $30 million in wage savings alone by using incarcerated laborers through the work-center program instead of hiring free workers.

408.    In FY 2023 alone, Alabama state agencies and local governments procured more than ***80,000 days*** of forced labor from incarcerated Alabamians, who are predominantly Black. A huge number of state agencies and localities, and the State's highest leadership, participate in this coerced, disproportionately Black labor scheme.  For example, the State's own records show that between 2018 and 2023, Alabama compelled incarcerated people to work for the State Capitol, the Governor's Mansion, the Alabama Supreme Court, and Decatur Youth Services.  Local government entities, from the Pike County Road Department to Coffee County, have obtained coerced labor from ADOC as well.  For example, in 2023, incarcerated persons were compelled to toil as landscapers, janitors, drivers, day laborers, and teachers, among other positions for public employers.

409.    In the first eight months of 2023, Defendant City of Montgomery had already procured at least 92 incarcerated "laborers" to work in various capacities, including working directly for the city, for "Montgomery Street Maintenance," for the landfill, and for the Montgomery Biscuits park.

410.    The economic benefits of this forced labor regime are immense.  Focusing just on the arrangements between ADOT and ADOC, between 2017 and 2023, ADOT spent more than $2.5 million to "lease" incarcerated persons from ADOC to perform jobs that would otherwise be performed by state employees.  The vast majority of that $2.5 million is essentially a human trafficking fee—paid to ADOC as the provider of the incarcerated workforce.  Assuming that state employees, if they were engaged to provide the work that ADOT is "leasing" from ADOC, would likely receive starting wages of $11.30 per hour, plus benefits, and further assuming

ADOT pays only $15 per day per incarcerated person,[42] ADOT is reaping significant economic savings from its use of incarcerated labor. The $2.5 million payment reflects an estimated more than 165,000 days of incarcerated labor between 2017 and 2023, or potentially far more days pursuant to the contractual "piece rate" of 15 cents per mile reflected in other contracts between ADOT and ADOC.

411.    That ADOT and ADOC view incarcerated labor explicitly as currency is evident in their 2016 ten-year lease agreement, wherein ADOT and ADOC agreed that ADOT would lease ADOC land "in exchange for the use of" incarcerated people to perform highway maintenance.[43]

412.    Alabama has not only generated millions of dollars in fees for itself through its forced-labor scheme and labor trafficking contracts between ADOC and numerous state agencies and entities, it has also benefited, and continues to benefit, by not having to pay state employees at the statutory or prevailing rates to perform these state jobs.  For the work coerced for ADOT between 2017-2023 alone, Alabama realized a benefit estimated at more than $12.5 million (relying on just the starting wage for state employees and no addition for benefits).  This amount does not account for the fact that the road squad work incarcerated people are often required to perform—like much of the work compelled from predominantly Black incarcerated people for ADOT—is physically dangerous, as the tragic deaths of two incarcerated people killed while

---

[42] ADOC's human leasing fees appear to vary from agency to agency and over time.  For example, an April 2019 invoice between ADOC's Red Eagle work center and Defendant ADOT showed that ADOT paid the ADOC work center $50 a day per worker to weed, erect signs and guard rails, and cut trees and limbs over an 18-day period. Pursuant to ADOC policy, each incarcerated laborer would have received only $2 per day, meaning ADOC pocketed the remaining $48 per day per worker. The total amount of the invoice was $7,150, yielding an estimated $6,864 in revenue for ADOC from that single contract.

[43] This lease provides that ADOT and ADOC "mutually agree that the lease of real property in exchange for the use of prison inmates to perform highway maintenance activities will contribute" to their respective goals.

performing such work in 2023 demonstrate, and is thus work that would be difficult, if not impossible, to find free workers to perform.[44]

413.    To provide another example, between January 1, 2018 and August 5, 2024, incarcerated workers were forced to provide approximately 41,111 days of labor—or an average of 5,138 days per year—to the City of Montgomery, including at the city's landfill and for Montgomery Street Maintenance. The starting wage for a City of Montgomery service maintenance worker in sanitation and street maintenance is $13.36 per hour. Assuming the City of Montgomery pays ADOC its standard rate of $15 per day per worker, the City of Montgomery generated more than $3.7 million in wage savings alone by employing incarcerated labor during this period.

414.    Many work crews that perform grossly underpaid labor for state and local government are more disproportionately Black than the ADOC population on the whole.  Of the more than 475 people hired by the City of Montgomery to work as laborers between 2018 and 2024, approximately 66% were Black.  Incarcerated maintenance workers at Trenholm State Community College in recent years were approximately 85% Black. Over the same period, 60% of the incarcerated workers laboring for ADOT were Black. 85% of the incarcerated workers in the Bullock County Sanitation Department since 2018 have been Black.

415.    The racial breakdown of incarcerated workers among ADOC's array of forced labor-leasing operations reveals that Black people with minimum security classifications are disproportionately assigned to lower-paid work-center jobs for public employers instead of being assigned to higher-paid work-release jobs for private employers. Incarcerated Black persons perform a markedly larger proportion of the work for public employers than do incarcerated white persons, based on the number of days worked, while white incarcerated people perform a

---

[44] *2 Alabama Inmates Killed While Working on Road Crew for State,* AP (Aug. 2, 2023), https://apnews.com/article/alabama-inmates-killed-road-crew-f7b3ecdb6ee0505a6cdfc18c56c9ebdc; *see also An Alabama Prisoner Forced to Work on Road Crew Killed by Passing Car*, Equal Justice Initiative (June 18, 2012), https://eji.org/news/alabama-prisoner-kenric-turner-forced-to-work-on-road-crew-killed-by-car/.

relatively larger portion of the work for private employers.  In FY 2022, for example, Black people performed approximately 64% of the total days worked for public, work-center employers—for which they are generally paid only $2 per day.  By contrast, Black people performed approximately 54% of the days worked by incarcerated people in higher-paid work-release jobs for private employers. In each employment setting, though, the coerced workforce is disproportionately Black, as compared to Alabama's population.

### 5.    Individual Public Employers That Partner With and Act as Agents of ADOC in Coercing Labor from Incarcerated Alabamians

416.    In addition to the foregoing allegations that apply to all Public Employer Defendants, Plaintiffs provide the additional information relevant to Defendants John Cooper (Transportation Director), Kay Ivey (as relevant to the Governor's Mansion), City of Montgomery, City of Troy, and Jefferson County.

#### a.    Alabama Department of Transportation

417.    Defendant John Cooper is the Transportation Director and the chief executive officer of the Alabama Department of Transportation ("ADOT").  ADOT regularly has persons incarcerated by ADOC perform work for the department.  From January 1, 2018 through August 5, 2024, approximately 1019 people incarcerated by ADOC have worked for ADOT, generally receiving only $2 per day for their labor.  At least 108 individuals incarcerated by ADOC have worked for ADOT in the 2024 fiscal year.  ADOT benefited financially from this arrangement and benefited from receiving a workforce that could be controlled, was required to attend and perform work, and could not protest workplace conditions without threat of significant penalties.

418.    Through no choice of his own, Plaintiff Lanair Pritchett was assigned by ADOC to work for ADOT for $2 a day as a member of the Talladega road squad.  He was assigned to fix potholes alongside other incarcerated workers.  ADOT caused Mr. Pritchett to receive a disciplinary for refusal to work and terminated him when he was running late one morning and missed the morning transport van.

419.     Through no choice of his own, Plaintiff Michael Campbell was assigned by ADOC to work for ADOT maintaining Bibb County roads and infrastructure in approximately 2019.  Similarly, Plaintiff Arthur Ptomey was assigned by ADOC to work for ADOT in or about 2017.

420.     Through no choice of his own, Plaintiff Danny Dandridge was assigned by ADOC to work for ADOT for $2 a day in the City of Childersburg.  While there, his supervisor instructed incarcerated workers to steal lawnmowers, weed eaters, and other lawn care materials out of people's backyards, and threatened to fire them if they didn't—while knowing that they would be disciplined and not make parole if they were fired.  That supervisor was fired after he unknowingly instructed incarcerated workers to break into a judge's house, and the incarcerated workers who were forced into the act were shipped to St. Clair.

421.     Through no choice of his own, a retained putative class member was assigned by ADOC to work for ADOT from approximately 2022 to 2023.  He worked on the road crew at Hamilton during that time.  He was told that his choices were to work on the roads or "be put behind the fence"—a direct threat to send him to a more dangerous and violent facility unless he worked for ADOT.  ADOT also did not provide him with appropriate work boots, which caused him to suffer foot pain.

422.     ADOT supervisors regularly threatened Plaintiff Pritchett and other Forced Labor Class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct ADOT considered disorderly or insubordinate.

423.     Defendant ADOT has had a multi-decade relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiffs Pritchett, Dandridge, Walker, Ptomey and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, ADOT became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility,

and threat to good-time credits and chances at parole release. Certainly, if ADOT was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### b. City of Montgomery

424.    The City of Montgomery has regularly had persons incarcerated by ADOC perform work for the city. From January 1, 2018 through August 5, 2024, approximately 472 people incarcerated by ADOC have worked for the City of Montgomery and for City of Montgomery road crews, generally receiving only $2 per day for their labor. At least 111 individuals incarcerated by ADOC have worked for the City of Montgomery and its road crews in the 2024 fiscal year. Incarcerated people also regularly perform work at Riverwalk Stadium, the home of the Montgomery Biscuits, a minor league baseball team. From January 1, 2018 through August 5, 2024, approximately 4459 people incarcerated by ADOC have worked at Riverwalk Stadium, generally receiving only $2 per day for their labor. At least 15 individuals incarcerated by ADOT worked for Riverwalk Stadium in the 2023 calendar year. Montgomery benefited financially from these arrangements and benefited from receiving a workforce that could be controlled, was required to attend and perform work, and could not protest workplace conditions without threat of significant penalties.

425.    Incarcerated workers for the City of Montgomery like Plaintiff Arthur Charles Ptomey, Jr. made only $2.00 per day, despite often working a 7- or 8-hour workday. Ptomey worked in the "motor pool" as a mechanic who operated on, cleaned, and detailed government vehicles. Plaintiffs Cole and Bullock were also compelled to work for Montgomery.

426.    Through no choice of his own, a retained putative class member was also assigned to work as a mechanic in the motor pool for the City of Montgomery for $3.00 per day even though free world mechanics doing the same tasks he did made $26 per hour or more. He worked at eight- or nine-hour shift that began at 8:00 a.m. He received a sack lunch.

427.    City of Montgomery supervisors had incarcerated workers who chose not to work or did not work to the City's satisfaction written up and told them they could face future

discipline, including transfer to a more dangerous facility and loss of privileges. The City ignored complaints from incarcerated workers that their working conditions felt unsafe. This has led to injuries, including one incarcerated worker who lost his eye due to injury in 2021 while operating a zero-turn cutting machine for the City of Montgomery. He lay on the ground bleeding for 30 minutes before an ADOC van arrived to take him to the emergency room where surgery was performed to remove his eye. City of Montgomery supervisors also wrote up incarcerated workers for requesting sick days or time off due to injuries. City of Montgomery supervisors were aware of the terrible conditions in ADOC facilities and would discuss those conditions with incarcerated workers, but would still use those conditions as leverage to coerce incarcerated workers to keep working.

428.    On information and belief and based on conversations with a former City of Montgomery employee, Montgomery began using incarcerated labor in approximately 2009 after finding that other labor sources were unreliable. Montgomery was desperate for employees, and chose to lease incarcerated workers from Red Eagle Work Release specifically because it knew the workers would show up and keep working since they had no choice, while free world workers were difficult to find and retain. The work incarcerated workers were required to perform, for example at the Riverwalk Stadium, was physically grueling and required long, irregular hours while often exposed to the elements. Montgomery supervisors were aware of the conditions at the facilities and prevalent violence in the prisons, because incarcerated people would discuss such incidents on the job. Workers described their living conditions as harsh and unpleasant, and explained that ADOC would engage in collective punishment of all workers if there was a single complaint about one. Montgomery was also aware of the amount of control ADOC exercised over every aspect of incarcerated workers' lives, including who worked which shift, their work hours and schedules, final disciplinary decisions, and even what clothes they wore. ADOC would send workers with only a cheese or peanut butter and syrup sandwich, so sometimes Montgomery would provide extra meals. Montgomery was also aware of the culture of abuse and retaliation that was prevalent at ADOC. Montgomery was also aware of the paltry

pay that incarcerated workers received, and that ADOC was the main party profiting off their labor; Montgomery would pay incarcerated workers $2 a day, and pay ADOC $13 a day for each worker. Montgomery knew that, despite the fact that the workers made so little, ADOC would make the workers pay for transportation even when they did not use it (because Montgomery would pick them up for work instead of having ADOC transport the workers in a van).

429. City of Montgomery supervisors regularly threatened class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct City of Montgomery considered disorderly or insubordinate.

430. Defendant City of Montgomery has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Ptomey and other members of the Forced Labor Class. On information and belief, during the course of that relationship, City of Montgomery became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.

### c. City of Troy

431. Defendant City of Troy regularly has persons incarcerated by ADOC perform work for the city. From January 1, 2018 through August 5, 2024, approximately 306 people incarcerated by ADOC have worked for the City of Troy, generally receiving only $2 per day for their labor. At least 23 individuals incarcerated by ADOC have worked for the City of Troy during the 2024 fiscal year. The City of Troy benefited financially from this arrangement and benefited from receiving a workforce that could be controlled, was required to attend and perform work, and could not protest workplace conditions without threat of significant penalties.

432. City of Troy supervisors regularly threatened Plaintiff Lanair Pritchett and other class members with violence, loss of privileges, extension of sentences, and solitary confinement

if class members refused to work, questioned working conditions, or engaged in conduct City of Troy considered disorderly or insubordinate.

433.    Defendant City of Troy has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Pritchett and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, City of Troy became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if City of Troy was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### d.  Jefferson County

434.    Defendant Jefferson County regularly has persons incarcerated by ADOC perform work for the county.  Jefferson County has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

435.    Plaintiff Lakeira Walker worked for Jefferson County doing roadwork from approximately 2018 to 2020, during which time she was paid only $2 per day.  Walker left the work-center facility at 4:30 a.m. and would return at 7:30 p.m. or 8:00 p.m.  During this time, she was sexually harassed by a supervising officer, and when she gave a statement about the harassment, she was given a disciplinary offense for refusing to work, then sent back to the kitchen to perform additional, unpaid forced labor.

436.    Supervisors at Jefferson County regularly threatened Walker and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct they considered disorderly or insubordinate.

437.    On information and belief, Defendant Jefferson County has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals,

including Plaintiff Walker and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Jefferson County became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Jefferson County was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### e.  Governor's Mansion

438.    Governor Ivey regularly has persons incarcerated by ADOC perform work at the Governor's Mansion.  From January 1, 2018 through August 5, 2024, approximately 16 people incarcerated by ADOC have worked for the Governor's Mansion.  Governor Ivey has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

439.    Through no choice of his own, ADOC assigned Plaintiff Michael Bullock to work at the Governor's Mansion for approximately one year while Defendant Key Ivey was Governor. During his time at the mansion, Mr. Bullock worked in carpentry, painting, plumbing, and electrical maintenance.  He and other incarcerated workers were subjecting to brutal conditions, including being housed in an unventilated shed where temperatures reached 115 degrees. Although dogs inside the mansion had access to air conditioning, incarcerated workers were denied the same.

440.    Incarcerated workers who worked at the Governor's Mansion suffered from a lack of food and long work hours that started with leaving the work center camp at 6:00 a.m.  They are not allowed to take sick days and requests for medical evaluations were not promptly acted upon.  Like all ADOC work assignments, incarcerated workers did not have a choice of whether to work at the Governor's Mansion; the work was assigned to them.

441.    Supervisors at the Governor's Mansion regularly threatened Bullock and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct they considered disorderly or insubordinate.

442.    Defendant Governor Ivey has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Bullock and other members of the Forced Labor Class.  Plaintiff Bullock and other retained putative class members recall Governor Ivey speaking to them regularly and seeing her speak to other incarcerated workers in the Mansion.  On information and belief, during the course of that relationship, Ivey became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Ivey was not previously aware of this coercion, she should have been as of the time the original complaint in this matter was filed.

E.    ***Work Release Program:*** **ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for Private, For-Profit Companies**

1.    **Description of Required Work for Private Employers**

443.    Through its Work Release Program, ADOC contracts with private employers to "lease" incarcerated people's labor to private businesses.  Before contracting out an incarcerated person's labor, ADOC determines through classification analyses that the individual is capable of working safely in the community alongside non-incarcerated coworkers, without supervision by prison staff.  ADOC only permits individuals it has designated with its lowest custody level, "Minimum-Community," to participate in its work-release program.

444.    According to ADOC's monthly report, in February 2025, 1,482 incarcerated people were assigned to ADOC's work-release program.[45]  Named Plaintiffs Walker, Cole,

---

[45] ADOC February 2025 Monthly Report at 2.

Ptomey, McDole, Campbell, Cartwright, Ball, R. Clark, Morrissey, Prewitt, T. Clark, Jarmon, Evans, and Thomas have all participated in the Work Release Program.

445.    Defendants Gemstone Foods, Ju-Young, SL Alabama, Hwaseung, Progressive Finishes, McDonald's, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods, Bama Budweiser, and Paramount Services (collectively, "Private Employer Defendants") have all contracted for incarcerated labor through the Work Release Program, as have more than 500 other private, for-profit companies.

<u>Allegations Common to All Private Employer Defendants</u>

446.    At various times between January 1, 2015 and the present, each Private Employer Defendant needed a cheap and controllable source of labor.  Upon information and belief, Private Employer Defendants sought pliant workers who could be requested when needed, easily directed and controlled, who would not complain about their wages, benefits or working conditions, and who would have good attendance given the threat of discipline for failing to work.

447.    On information and belief, each Private Employer Defendant was aware that incarcerated workers did not have the freedom to refuse or choose the work assigned to them by ADOC.

448.    Alabama Department of Corrections Administrative Regulation Number 410 (April 8, 2024) ("AR 410") "establishes the responsibilities, policies, and procedures for the organization and function of Work Release."  AR 410 at 1.  That regulation defines the "Work Release Program" as a "transitional/rehabilitative type program in which selected inmates are allowed to leave a community-based facility for gainful civilian employment on a full-time and part-time basis and return to the facility when not working."  AR 410 at 2.

449.    Incarcerated workers classified as "Minimum-Community custody" have no input or say in whether ADOC places them in the work release program.  That decision is made by the ADOC's "Institutional Job Review Board."  This board is "responsible for screening inmates for job placement within the Work Release Program" and includes the "Job Placement Officer

(JPO), classification personnel, and a Correctional Captain." AR 410 at 1. Decisions by the Institutional Job Review Board to have certain incarcerated persons work for private employers must receive final approval through the warden. *Id.* If the Institutional Job Review Board decides certain incarcerated workers need to work for an employer through the work release program, they need to do it. An incarcerated worker's refusal to participate in the work release program will result in discipline. *See infra* FA Part II.E.2.; *supra* FA Part II.A.

450.    Under the Work Release Program, each Private Employer Defendant partners with the ADOC to jointly facilitate the employment of eligible incarcerated workers (i.e., those with minimum-community custody classifications).

451.    AR 410 requires private employers who wish to participate in the work release program to sign ADOC Form 410-A, entitled "Work Release Program Employer Agreement" ("Work Release Agreement").

452.    Upon information and belief, each Private Employer Defendant has employed incarcerated workers pursuant to Work Release Agreements with ADOC that were effective during the period of time when the incarcerated workers worked at the Private Employer Defendant's premises. *See* AR 410 at 9 (agreements generally one year in length, but subject to renewal "upon mutual agreement of the Parties").

453.    The Work Release Agreement establishes a contract between ADOC and private employers in need of labor to perform services requested by the private company:

> This Work Release Program Employer Agreement
> ("Agreement") has been entered into by _____ ("Employer")
> and the Alabama Department of Corrections _____ ("Institution"
> or "ADOC").

### RECITALS

> WHEREAS Employer is in need of workers to employ in general
> services; and,

WHEREAS, the ADOC has within its custody certain inmates

who are capable of providing the services requested by Employer.

AR 410 at 9.

454.    The Work Release Agreement makes clear that ADOC and the private company

"leasing" the incarcerated workers' labor jointly exercise control over the workers' conditions of

employment and the means of coercing their labor.

455.    The Work Release Agreement ensures that ADOC, with full knowledge and

assent by the Private Employer Defendants, retains certain management and control over how the

private employers use the labor of incarcerated workers, while also requiring private company

employers to supervise the workers, enforce ADOC rules and regulations, and to report to

ADOC any work infractions:

a.  **Description of Work and Supervision Plan**:  ADOC requires private
employers participating in the Work Release Program, including each Private
Employer Defendant, to submit a form entitled "Description of Work and
Supervision Plan" ("Supervision Form"), which describes "the type of work to
be provided, the supervision plan, and whether the Employer will be providing
transportation," and is subject to the review and approval of the warden.  AR 410
at 9, 18.  Upon information and belief, each Private Employer Defendant has
submitted the required form and ADOC has reviewed and approved it.

b.  **Schedule:**  Each Private Employer Defendant must submit to ADOC a "detailed
inmate work schedule . . . in advance of the inmate reporting to work" and must
inform, and get approval from, ADOC before they can require incarcerated
workers to work overtime.  AR 410 at 10.  Upon information and belief, ADOC
reviewed and approved the work schedules Private Employer Defendants
submitted to ADOC, as well as any overtime requests submitted by Private
Employer Defendants.

c.  **Changes to Jobs Performed by Incarcerated Labor:**  Any changes to jobs
described in the Supervision Form that a Private Employer Defendant seeks to
make may not proceed without ADOC's written approval "at least seven (7) days
in advance of the planned change." AR 410 at 9.  Upon information and belief,
any changes Private Employer Defendants made to jobs assigned to incarcerated
workers were approved by ADOC.

d.  **Placement:**  ADOC, pursuant to Administrative Regulation 410, requires each
incarcerated worker assigned to work to private employers, including each
Private Employer Defendant, to be authorized for a specific position and rate of
pay by an ADOC Job Placement Officer.  *See* ADOC Form 410-D.

e.  **Payments for Incarcerated Labor:**  ADOC has required each Private Employer
Defendant to "pay for inmate labor in the same manner as for any other

employee . . . at the agreed upon rate but not less than the Federal minimum wage." AR 410 at 10.  Further, the Work Release Agreement requires Private Employer Defendants to "pay the inmate by payroll check made payable to the inmate and ADOC and must include the inmate AIS# (Alabama Inmate Serial #) on the payee line." AR 410 at 10.  Under the Work Release Agreement, ADOC prohibits Private Employer Defendants from making cash payments or handing checks directly to incarcerated workers.  *Id.*  Rather, ADOC requires Private Employer Defendants to either mail the checks directly to the Work Release Facility, or arrange for delivery to the facility with approval from the warden.  *Id.*  Upon information and belief, Private Employer Defendants paid incarcerated workers in the manner mandated by the method-of-payment clause of the work release agreement.

f.   **Computation of Payment**:  ADOC sets the rules for how pay should be calculated for incarcerated workers.  For example, ADOC allows all participating private companies, including Private Employer Defendants, to deduct from the hours worked up to 30 minutes any incarcerated worker spent traveling to and from the worksite.  AR 410 at 10.  Upon information and belief, each of the Private Employer Defendants agreed to these conditions.

g.   **Supervision and Inmate Conduct**:  The Work Release Agreement requires all private companies participating in the Work Release Program, including Private Employer Defendants, to "properly supervise the inmate worker," including through "consistent visual observation of the inmate's activities by the employer or a supervisor and verbal communication between the employer or supervisor and the inmate on a consistent basis." AR 410 at 11.  ADOC also requires Private Employer Defendants to enforce prohibitions on inmate conduct—set by ADOC—including, but not limited to, sending and receiving mail at the worksite, using phones in the absence of an emergency, or attending events away from worksite.  *Id.*  Upon information and belief, each Private Employer Defendant agreed to supervise incarcerated workers in the manner required by the Work Release Agreement and enforced the prohibitions on workers' conduct set by ADOC.

h.   **ADOC Periodic Inspections**:  AR 410 requires the ADOC Job Placement Officer or designee to "conduct periodic job checks of Work Release Program inmates on the job," "conduct employer interviews," and "search inmate work areas as needed" with the asserted goal of "provid[ing] support and gather[ing] information regarding the program." AR 410 at 6.  Upon information and belief, ADOC Job Placement Officers conducted periodic job checks of each of the Private Employer Defendants.

i.   **Employer Enforcement of ADOC Work Rules**:  ADOC requires private employers participating in the Work Release Program, including Private Employer Defendants, to help it enforce the forced-labor scheme: "If an inmate fails to follow any rule, or *refuses to work as requested*, notice shall be given in writing, to the [ADOC Job Placement Officer]/Designee upon the inmate's return to the Work Release Facility." AR 410 at 12 (emphasis added).  Under the Work Release Agreement, if the Private Employer Defendants fail to report incarcerated workers who refused to work or follow ADOC or workplace rules,

ADOC has "sole discretion . . . [to] immediate[ly] terminat[e]" the agreement. Additionally, ADOC requires Private Employer Defendants and other employers participating in the Work Release Program to "contact the [ADOC Job Placement Officer]/Designee immediately should an inmate employee's behavior become irrational, disorderly, and/or the inmate is terminated from employment." AR 410 at 12 ("Immediate Notifications" clause). Upon information and belief, Private Employer Defendants provided reports to ADOC of all incarcerated workers who refused to work or follow workplace or ADOC rules and contacted ADOC when incarcerated workers engaged in disorderly or irrational behavior.

j. **Authorized Inmate Areas**: ADOC requires all companies participating in the Work Release Program, including each of the Private Employer Defendants, to limit incarcerated workers' movement to only "assigned work areas, break areas, non-public outside smoking area, and restrooms," AR 410 at 12, and that the only time incarcerated workers may be in the Private Employer Defendant's parking lot is "when [they are] arriving to or leaving the job site." *Id.* Upon information and belief, Private Employer Defendants complied with these requirements to restrict workers' movements.

k. **Removal of Inmate**: Although the Private Employer Defendants direct incarcerated workers' activities on the job site, they also know and understand that, "[t]he [Work Release] agreement notwithstanding, ADOC retains authority over inmate employees and may remove inmate employees from any job site at any time." AR 410 at 12. Upon information and belief, the Private Employer Defendants also know or should know that the incarcerated workers are aware that ADOC retains the ultimate authority to remove them from a job site.

l. **Independent Contractor:** As a condition of receiving incarcerated workers from ADOC, Private Employer Defendants needed to accept ADOC's designation of them as "independent contractors," and register as a vendor in the state of Alabama's "STAARS accounting system." AR 410 at 15. Upon information and belief, each Private Employer Defendant registered as an independent contractor.

456.    ADOC requires incarcerated workers who have been selected and assigned to work at private companies' facilities through the Work Release Program to sign a form that purports to reflect the incarcerated worker's agreement to ADOC's withholdings from wages paid pursuant to the Work Release Program. A worker who refused to sign the document would be subject to at least a medium-level violation of refusing to work and the attendant severe penalties. *See supra* FA Part II.A. This "agreement" provides that ADOC will "withhold 40% of [the worker's] net pay (take home pay minus 40% of gross pay) and that amount ordered by the court each pay period to pay any court-ordered monies." AR 410 at 16 (ADOC Form 410-B).

457.     Although ADOC asserts the flat 40% deduction from the gross earnings "assist[s] in defraying the cost of his/her incarceration," AR 410 at 4, it nevertheless represents costs ADOC now gets to save and reallocate to other means (e.g., profit).  Notwithstanding ADOC's 40% deduction from each incarcerated worker's *gross* earnings, all incarcerated workers in the work release program pay federal and state taxes on the entirety of the gross earnings.

458.     ADOC also deducts from any wages paid to incarcerated workers certain fees, including for laundry ($15 per month), medical and prescription co-pays (generally $4-8 per visit or prescription, but with charges up to $20 for missed appointments), and work transportation, generally $5 per day for ADOC van transportation to and from their work-release job sites (even though the vans are driven by other incarcerated individuals).

459.     The form that ADOC provides to incarcerated workers assigned to work at private companies through the Work Release Program, including at each Private Employer Defendant, demonstrates the degree of control ADOC exercises over the incarcerated worker's conditions of employment, even as the Private Employer Defendant directs the on-site work of the individual worker:

    a.  The incarcerated worker is required to comply with all ADOC rules and regulations, which includes that the worker may not refuse to work.

    b.  ADOC security staff determine the times incarcerated workers "leave and return to the Work Release Facility," AR 410 at 16.

    c.  The Job Placement Officer, or a designee, must approve any overtime.  *Id.*

    d.  An incarcerated worker cannot ride in a private vehicle, even if in connection with employment, without permission from the Warden.  *Id.*  Nor may an incarcerated worker operate a vehicle without Warden authorization.  *Id.*

    e.  The Warden must approve private free-world medical treatment, with no exception for treatment that would be needed for on-the-job injuries.  *Id.*

       f.   An incarcerated worker may not make purchases or enter into contracts without the Warden's written authorization, nor may the worker even enter any free-world business without the Warden's "specific written approval." *Id.* at 16–17.

460.    On information and belief, each Private Employer Defendant is and at all relevant times was aware of the restrictions placed by ADOC on the movements and rights of incarcerated workers.

461.    On information and belief, each Private Employer Defendant is and at all relevant times was aware that incarcerated workers were required to follow ADOC's restrictions and all ADOC rules and regulations, and that violating any of these conditions could lead to removal from the "privilege" of the work release program and return to a "major institution." AR 410 at 17.

462.    On information and belief, incarcerated workers who worked at each of the Private Employer Defendants' facilities were required to sign "agreements" in which they acknowledged their understanding that violating any ADOC rule or regulation could lead to their return to a "major institution," i.e., a more violent and dangerous ADOC facility, and to penalties including loss of good-time days and placement in solitary confinement. AR 410 at 17.

463.    All private employers that procure forced laborers through ADOC nominally agree to pay the "prevailing wage" for the jobs performed by those laborers. This prevailing-wage obligation is legally required as a condition of participating in the work-release program, yet appears to be regularly flouted. For example, Named Plaintiffs and incarcerated laborers leased out for profit by ADOC report working side-by-side with free workers who are performing less skilled or less difficult jobs while earning a markedly higher hourly rate.

464.    As a result of the fees that ADOC deducts, incarcerated Alabamians who are "leased" to private employers earn far less in practice than the hourly rates they are purportedly paid. For example, an incarcerated person forced to labor for Defendant Paramount Services, a private laundry cleaning service, may have a nominal pay rate of $7.25 per hour (even though that "leased" laborer's free coworkers are being paid more) and thus gross weekly income of

$290 for a 40-hour workweek.  The ADOC's 40% labor-trafficking fee, however, reduces that weekly wage to $174, and another 20% for federal and state payroll taxes reduces it to $116. Another $25-30 may be deducted and paid to the ADOC for weekly transportation, bringing the weekly wage to $86, and another $3.75 or so may be deducted for laundering a work uniform— leaving the worker with $82.25 for 40 hours of work, or $2.06 per hour.  Alabama takes all of these deductions before the victims or the worker's family have any opportunity to receive support from the forced laborer.  Moreover, even if no garnishment is required for victims or family support, the workers' weekly wages are reduced even further by the charges imposed by the ADOC for necessary medical treatment or basic health sustenance, such as necessary medicine, doctor visits, or to pay the high prices charged to buy a sandwich from the canteen or snack line upon returning to the ADOC facility after a long or irregular shift that caused the worker to miss ADOC's meal time.

    **2.**    **ADOC Enforces the Requirement that Incarcerated Alabamians Work for Private Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration**

465.    All of the same coercive forces that affect incarcerated workers and compel their in-house work for ADOC, *supra* FA Part II.B.2., and that compel incarcerated individuals to labor for public entities through the Work Center Program, also result in the coercion of individuals' work for private, non-profit companies, including Private Employer Defendants.

466.    Individuals employed by ADOC and private companies through the Work Release Program are subject to additional coercion because any infraction or perceived refusal to work carries with it the threat that the worker may be sent "back behind the wall," or to labor for a public entity, where they are forced to work long days without almost no pay.  Incarcerated workers who are in the Work Release Program understand that refusing to work, and being removed from the Work Release Program, can lead to significant risk of physical harm.

467.    The private companies participating in the Work Release Program, including the Private Employer Defendants, understood that they had an obligation to enforce ADOC rules and

their own workplace policies, and that they could do so through (1) reporting workers' behavior to ADOC and leaving to ADOC to impose discipline, or (2) threatening workers with a report of the behavior to ADOC.  Both of these options rely on the threat of ADOC-imposed discipline, with its attendant risks of, *inter alia*, violence, bodily harm, and increased length of incarceration.

468.    Upon information and belief, the private company employers who have chosen to participate in the Work Release Program, including each Private Employer Defendant, contacted ADOC, or invoked the possibility of discipline by ADOC, when incarcerated workers refused to work, failed to appear for work, committed insubordination, engaged in disorderly conduct, raised concerns about work conditions or supervisors, or behaved in any manner that displeased the Private Employer Defendant.

469.    Upon information and belief, the private company employers in the Work Release Program, including each Private Employer Defendant, knew the incarcerated workers they employed understood the consequences that could result if they refused any work assignment for any reason, or engaged in insubordination, disorderly conduct, or inappropriate behavior at the job site, including the issuance of disciplinaries, transfers to more dangerous facilities, deprivation of necessities, and lengthened sentences.

470.    Named Plaintiffs and members of the Forced Labor Class work for private company employers, including the Private Employer Defendants, even when those employers are abusive, because they know that a refusal to work can lead to disciplinaries, transfers to more dangerous facilities, deprivation of necessities and the ability to see one's family, and increased detention.  Named Plaintiffs' and class members' reported experiences are illustrative of the coercion imposed upon incarcerated worked leased out by ADOC to work for the Private Employer Defendants and all other private employers.

471.    Plaintiff Ptomey refused to work for KFC due to the improperly low wage rate paid and subsequently received a disciplinary for "being fired from a job."  As a result, ADOC revoked his home passes and took away his ability to use his commissary account.  The Parole

Board told Mr. Ptomey's family that he was being denied parole and given a 3-year set off because he refused to work for KFC, even though his supervisor at KFC sent the Parole Board a letter recommending him for parole due to the quality of Mr. Ptomey's work for KFC.

472.    Plaintiff McDole was compelled to work by ADOC for private employers, as well as in-house for ADOC.  When Mr. McDole worked at Defendant Royal Foods, the supervisors were abusive and did not provide adequate warm clothing, and he got sick from the poor work conditions. However, Mr. McDole knew that if he were to refuse to work, he would receive discipline that would include losing the ability to see his family for six months.  The threat of losing contact with his family was particularly difficult for Mr. McDole to accept as his daughter has recently given birth to twins and he is able to see them when he is home on weekends unsupervised on home passes.

473.    Plaintiff Campbell felt and continues to feel compelled to continue working for his work release employers, including Defendants Bama Budweiser, Progressive Finishes, ADOT, and KFC, because he fears being sent to a more violent facility like Bibb (where he once witnessed one person stab six or seven others without any response by the guards) or Kilby (where he witnessed multiple killings and assaults) if he does not.

474.    Plaintiff Cartwright asked for a break from work requirements so she could attend to her mental health needs, but was told that any failure to work, even for health reasons, would be considered a refusal to work and result in a disciplinary offense, which could impact her chances of parole and/or result in her transfer to a different facility.

475.    Plaintiff Walker was once so sick that she had to be carried to the healthcare unit and could not work, but was still approached by an ADOC job place officer who told her she needed to "get up and go make us our 40%."

476.    Plaintiff Ball was required to perform tasks such as side work for work release private employers, including working on their cars, doing electrical work on their houses, and building them fences, under pain of discipline.  Ball has also witnessed fellow workers be disciplined for refusal to work simply for not knowing how to perform an assigned task.

477.    Plaintiff R. Clark was disciplined for getting terminated simply because his supervisor at Amaze Corps was in a bad mood when Mr. Clark asked for assistance moving something.

478.    An unnamed retained class member was transferred from North Alabama work-release to Limestone as punishment for receiving a disciplinary, where he was placed in a more dangerous dorm than he should have based on his custody and was stabbed within hours.

479.    ADOC, through Hamm, co-employs the incarcerated workers in the Forced Labor Class who labor for public entities through the Work Center program, and is liable for the coercion of work by those public entities, along with its own coercion.

> **3.**    **Private Employers Act As Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion**

480.    Each Private Employer Defendant knew or recklessly disregarded that the incarcerated labor provided by Named Plaintiffs and members of the Forced Labor Class through its contracts with ADOC was coerced.

481.    Through the Work Release Agreement, each Private Employer Defendant obtains a workforce of workers that it can require to do more dangerous tasks or less desirable shifts that it assigns to otherwise similarly situated free-world workers, understanding that the incarcerated workers can be, and are, threatened with penalties and bodily harm in the event they complain about working conditions, hours, or wages.

482.    Additionally, private employers that contract with ADOC for "leased" labor, including Private Employer Defendants, do so with the knowledge that the forced laborers themselves will receive only a fraction of the wages paid.  The cooperating private employers, including Private Employer Defendant, have agreed to engage people subject to control by ADOC and pursuant to an agreement wherein they acknowledge that Alabama will deduct what is effectively a "convict leasing" fee equivalent to 40% of the gross wages paid by the company,

along with additional fees on top of that 40%.  In doing so, they knew or reasonably should have known that Named Plaintiffs' and Forced Labor Class members' labor was coerced.

483.    As detailed *supra* FA Parts I.C. and II.A., the violent conditions in ADOC's medium- and high-security facilities, as well ADOC's gross understaffing, ADOC's deprivation of necessities in response to the 2022 strike, were broadly known and each of the Private Employer Defendants knew or should have known of these conditions and understood that any disciplinary infraction for refusal to work carried with it a significant threat of bodily harm, along with deprivation of necessities.

484.    Each of the Private Employer Defendants is, on information and belief, aware that ADOC's programs offer them access to a pool of uniquely compliant workers who, by virtue of their incarcerated status, are severely limited in their ability to advocate for improved workplace conditions, to organize themselves and their co-workers or join a labor union, to publicize workplace abuses, or to pursue or participate in wage-and-hour or other workplace litigation.

485.    On information and belief, each Private Employer Defendant is aware of and knowingly assists in enforcing the ADOC regulations that govern work and refusals to work. Each Private Employer Defendant, on information and belief, has agreed to provide notice to ADOC of any incarcerated person's failure to follow any rule or to "refuse[] to work as requested,"[46] and has complied with that contractual obligation.

486.    Each Private Employer Defendant knew or should have known that incarcerated workers who refuse to work—a violation of ADOC rules and regulations—have incurred and will incur consequences under ADOC Administrative Regulation 403 ("AR 403"), which outlines the "disciplinary process for inmates who commit [rule] violations."  AR 403 at 1.  This includes Rule Violation #518 "Refusing to work/fail to check out for work."  AR 403 at 21.

487.    Each Private Employer Defendant knew or should have known that ADOC classified refusing to work as a "medium level rule violation" that carried the potential sanction

---

[46] ADOC Admin. Reg. 410 at 12 (April 8, 2024),
https://doc.alabama.gov/docs/AdminRegs/AR410.pdf.

of the forfeiture of a minimum two years of accrued Good Time days (or all time accrued if less than two years); "Confinement to Restrictive Housing for up to 30 days"; or the "Loss of any and all privileges/incentives for up to 45 days," among other penalties.  AR 403 at 23.

488.    Likewise, each Private Employer Defendant knew or should have known that an incarcerated worker's "insubordination," "disorderly conduct" or "being fired from a job" constituted a "low level violation," AR 403 at 22, that could result in forfeiture of up to 30 days of accrued Good Time and the "[l]oss of any and all privileges/incentives for up to 30 days," among other penalties, AR 403 at 24.  Upon information and belief, Private Employer Defendants knew the referenced "privileges" are highly valued by incarcerated workers, and include, but are not limited to, "Canteen, Telephone, Visiting, and Outside (i.e., shopping, recreation, etc.))."  AR 403 at 24.

489.    Upon information and belief, Private Employer Defendants knew the incarcerated workers they employed understood the consequences that could result if they refused to work or engaged in insubordination or disorderly conduct at the job site.

### 4.    ADOC and Private Employers Benefit from the Coercion of Work Through the Work Release Program

490.    Although ADOC's work-release revenue was declining at the start of the COVID-19 pandemic, as the pandemic eased—and due to Defendants Ivey, Marshalls, and Parole Board members' concerted efforts described in Part IV *infra* to grow the State's incarcerated population, particularly with Black workers who have long demonstrated that they are safe for release by working for years out in the community alongside free workers—Alabama's work-release program became an increasingly valuable money-maker.  In fiscal year ("FY") 2023, ADOC reported that it collected a record $12.9 million directly from its labor "leasing" work-release operations.[47]  In FY 2024, ADOC reported that it collected $12.2 million directly from its labor "leasing" work release operations.

---

[47] Alabama's fiscal year runs from October 1 to September 30.

491.    Alabama profits from ADOC's work-release operation in many ways, but first and most directly by assessing a labor-trafficking fee equivalent to 40% of the gross earnings paid by the private employers for the forced labor. As explained *supra*, ADOC takes this cut ahead of any garnishments or payments for family support or restitution due to victims. Specifically, for each paycheck issued by a private employer nominally in the name of the forced laborer, ADOC receives the funds and automatically deducts 40% of gross earnings—that is, the amount the forced laborer earned before required employer withholding and any deductions for federal and state payroll taxes—purportedly "to assist in defraying the cost of his/her incarceration," regardless of what those costs may actually be or how much the work-release laborer actually earned.[48]  Notably, Alabama has continued to assess this flat 40% fee, purportedly to pay for the incarcerated worker's supposedly minimally adequate conditions of confinement, even though the State has been put on notice of the shocking deficiencies in the conditions ADOC actually provides by a damning report by the U.S. DOJ and by DOJ's subsequent lawsuit that chronicle horrific conditions of incarceration,[49] court orders (including those addressing serious deficiencies in access to medical and mental health care),[50] and ongoing litigation.[51]  The shocking fact that Alabama is making these workers pay ADOC to keep them trapped in facilities unfit for habitation, thereby exposing them daily to threats to their life from violence, disease, and appallingly insufficient conditions, cannot be squared with the millions Alabama takes annually through these weekly payroll deductions—deductions that federal law

---

[48] ADOC Admin. Reg. 410 at 4.

[49] U.S. Dep't of Justice, Investigation of Alabama's State Prisons for Men (Apr. 2, 2019) ("2019 DOJ Report"), https://www.justice.gov/crt/case-document/file/1149971/download; Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. Dec. 9, 2020).

[50] *See Braggs v. Hamm*, No. 2:14CV601-MHT, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023); *see also* Consent Decree (Dkt. No. 11), *United States v. Alabama*, Case No. 2:15-cv-00368-MHT-TFM (M.D. Ala. June 18, 2015) (concerning sexual abuse and harassment at Julia Tutwiler Prison for Women).

[51] *See, e.g.*, *Barefield v. Dunn*, No. 2:20-CV-917-WKW, 2023 WL 5417550, at *1 n.1 (M.D. Ala. Aug. 22, 2023) (noting that, "[i]n the past year, several courts have found viable allegations of unconstitutionally violent conditions of confinement throughout the Alabama prison system" and citing cases).

squarely prohibits any private or public employer from taking from a non-incarcerated worker's paycheck without clear evidence and accounting of the actual cost, quality and habitability of the food and housing provided. *See* 29 C.F.R. Part 531 *et seq.*

492.    In addition to the 40% labor-trafficking fee described above, ADOC also reaps profits from charging incarcerated forced laborers for essential services, such as fees for laundry ($15 per month), medical and prescription co-pays (generally $4-8 per visit or prescription, but with charges up to $20 for missed appointments), and inflated mandatory costs for work transportation. ADOC also generally charges each incarcerated worker $5 per day for ADOC transportation to and from their work-release job sites—which will yield another approximately $1 million in revenue to Alabama in FY 2023.[52]

493.    Private Employer Defendants, together with the other approximately 560 private employers with whom ADOC has engaged in joint ventures to obtain work from forced laborers over the last four years, have benefited as a result of having an at-demand workforce.

494.    The Private Employer Defendants benefit from receiving the coerced labor force in multiple ways, including because they are able to impose long and demanding work hours on the incarcerated workers without objection; they are able to set and pay wages to incarcerated workers that are below the wage rates they pay to fee workers; they are able to maintain unsafe work conditions for incarcerated workers that they know or should know would be unlikely to be tolerated by free workers without resistance; they understand that the "leased" laborers cannot refuse to work or raise concerns about workplace conditions without risking significant discipline and return to more violent and life-threatening facilities; and ADOC regulations prohibit incarcerated people working through the Work Release Program from joining labor unions.[53]

---

[52] Overall, ADOC typically collects a transportation fee of $10 per worker per day, collecting $5 from the worker's daily wages and collecting another $5 daily from the private employer, which also indirectly depresses workers' wages since it reduces the funds available for wage payments.
[53] ADOC Admin. Reg. 410 (Jan. 3, 2023), https://doc.alabama.gov/docs/AdminRegs/AR410.pdf.

495.    Most significantly, the Private Employer Defendants know or should know that ADOC prohibits and severely punishes workers for any "refusal" to work, including simply being late to work, being sick, or simply not performing a job at the speed demanded by the employer or otherwise not to the employer's satisfaction, which represents a significant benefit to the Private Employer Defendants in the form of a pliant and reliable workforce.

> **5.    Private Employers That Partner With and Act As Agents of ADOC In Coercing Labor from Incarcerated Alabamians**

496.    In addition to the foregoing allegations that apply to all Private Employer Defendants, Plaintiffs provide the additional information relevant to Defendants Gemstone Foods, Ju-Young, SL Alabama, Hwaseung, Progressive Finishes, McDonald's, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods, Bama Budweiser, and Paramount Services.

### a. Gemstone Foods

497.    Private Employer Defendant RCF, LLC d/b/a GEMSTONE FOODS, LLC ("Gemstone") is a poultry processing company with plant operations in Decatur and Florence. During the period of January 1, 2018 through August 5, 2024, approximately 220 people incarcerated by ADOC worked for Gemstone Foods.  Gemstone has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

498.    Through no choice of his own, ADOC assigned Plaintiff Jerame Aprentice Cole to work at a Gemstone packaging and pallet-making facility from approximately November 2016 to February 2017, under difficult and dangerous conditions.  Gemstone, with authorization from ADOC, required Cole and other incarcerated workers to work 10- to 14-hour shifts, sometimes past midnight, from five or six days per week.  He and other incarcerated persons served as "dumpers"—they carried large, heavy bins of raw chicken pieces that weighed between 80 to 115 pounds, and dumped them on metal tables for the "cutters" to process.  Only incarcerated

workers worked as dumpers at Gemstone.  In fact, Cole requested a non-dumper job, but was denied.  Any free-world worker assigned to work as a dumpster resigned after one week or less, because the work was so difficult and punishing.  Some incarcerated workers needed to wear back braces just to be able to do the work.  Mr. Cole only made $11 an hour, 40% of which went to ADOC.  He was also required to pay restitution, and pay $5 for each van ride to and from work.

499.   Through no choice of his own, ADOC assigned Plaintiff Fred McDole to work at a Gemstone facility for approximately six months between 2021 and 2022.  He was assigned to clean the rack rooms for meat processing, in very cold conditions.  Gemstone only provided an apron and no other cold-weather gear; because ADOC failed to provide adequate clothing as well, he got sick.  Mr. McDole still remembers how awful the smell of the facility was.  He only made $11 an hour, and knows that free world workers made more.  As explained *infra*, Mr. McDole also suffered verbal abuse from Gemstone management while he was forced to work there.

500.   Gemstone supervisors regularly threatened to report Cole and other incarcerated workers to ADOC if they refused to work or if supervisors found their quality of work unsatisfactory.  Those supervisors were aware that reporting incarcerated workers to ADOC would result in them being sent more dangerous and violent ADOC facilities, and knew the conditions at those ADOC facilities because Mr. Cole and other incarcerated workers told them as much.

501.   Gemstone supervisors took advantage of this power they held over incarcerated workers.  For example, Plaintiff McDole experienced Gemstone supervisors conducting themselves in a consistently disrespectful manner to him and all incarcerated workers.  Gemstone supervisors were frequently abusive towards Mr. McDole and other incarcerated workers, shouting things like "get your ass back to work" when they attempted to take breaks in a way that they would not speak to free world workers.  The supervisors spoke this way, Mr. McDole observed, because the supervisors knew the power they had over the incarcerated workers and

that the incarcerated workers had to accept the abuse and continue working without objection. Gemstone supervisors were also aware that reporting an incarcerated person to ADOC would lead to severe physical and mental consequences for that person.

502.    Gemstone Foods also sought out workers who were in drug rehab to work alongside incarcerated people like Mr. McDole, because they wanted a vulnerable workforce that had no choice but to work for them.  On information and belief, Gemstone management also met with ADOC officials, including at least one warden and the ADOC "Job Board," during which ADOC policies regarding discipline for workers who refused to work was discussed.

503.    Gemstone would force incarcerated workers, including retained class members, to do the most unpleasant jobs, because they had no choice.  Gemstone supervisors would tell incarcerated workers that if they did not do any given undesirable or difficult task, they would call the camp and make the incarcerated worker get a disciplinary.

504.    Gemstone and ADOC jointly exercised control over Mr. Cole, Mr. McDole, and other Forced Labor Class members who worked at Gemstone and regularly threatened Cole and other incarcerated workers with violence, loss of privileges, extension of sentences, and solitary confinement if they refused to work, questioned working conditions, or engaged in conduct Gemstone considered disorderly or insubordinate.

505.    For instance, one retained incarcerated worker leased by ADOC to Gemstone went outside to the Gemstone parking lot to take a break; he did not know the parking lot was not considered an authorized area under the work release agreement as he regularly saw incarcerated workers in the parking lot.  Gemstone Foods reported this alleged violation to ADOC and someone from ADOC drove to the worksite and removed him.  He was later charged with attempted escape or abscondment, a severe rule violation, which exposed him to transfer to a higher security facility and threatens to greatly extend his incarceration.

506.    Defendant Gemstone has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiffs Cole, McDole and other members of the Forced Labor Class.  On information and belief, during the course of that

relationship, Gemstone became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release. Certainly, if Gemstone was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### b. Ju-Young

507.    Defendant JU-YOUNG MANUFACTURING AMERICA, INC. ("Ju-Young") is a corporation based in Montgomery, Alabama. From January 1, 2018 through August 5, 2024, approximately 137 people incarcerated by ADOC have worked for Ju-Young, with at least 67 incarcerated people working for the company in the 2024 fiscal year. Ju-Young has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

508.    Through no choice of his own, Plaintiff Victor Thomas was assigned to work at Ju Young in approximately 2023. At Ju-Young, Mr. Thomas was assigned to a wide variety of tasks, including standing on his feet for hours applying tape to car parts, loading batteries onto assembly lines, and moving heavy boxes. He was given no choice about what tasks he performed on any given day. He worked regular hours from 7 a.m. to 3 p.m., with overtime extending to 5 p.m. and regular Saturday shifts, and had inadequate breaks. He made $11.25 per hour, and believes that free world workers made more than him.

509.    Ju-Young supervisors treated free world workers better than Mr. Thomas and other incarcerated workers. In addition to making more, free world workers were harassed less and assigned less physically demanding tasks. Ju-Young supervisors would also threaten to send workers back to camp if they did not work hard enough, and made it very clear that if incarcerated workers took more days off than Ju Young found acceptable, they would be fired. Ju Young supervisors were aware of the dangerous and unhealthy conditions that incarcerated workers would be subjected to if they were fired. Supervisors also knew that workers would be

disciplined if they did not work, and that being disciplined would jeopardize workers' parole or get them sent behind the fence to more dangerous facilities.

510.     Ju-Young assigned Mr. Thomas physically challenging tasks, without any protective equipment, even though he suffers from chronic back pain and arthritis, and then terminated him when he was injured on the job. Ju-Young never informed him about the availability of workers' compensation, but simply told Mr. Thomas they did not need him anymore because he was injured.

511.     Through no choice of his own, ADOC assigned putative class member Albert Young to work at Ju-Young in May 2023. There, he performed the work of two people for only $10 per hour while free workers made hourly wages of $10 to $20.

512.     Ju-Young required Young to dispose of boxes and trash around the entire plant, and was only given water once a day, when he distributed water to other workers as part of his job responsibilities. He was also forced to work even if he was sick and felt extremely weak; he was not permitted to miss a day.

513.     After he complained about the amount of work he was being told to do for so little pay, Ju-Young management wrote him up for refusing to work. ADOC then made him wash vans at the camp for approximately 45 days as punishment for alleged refusal to work at Ju-young. Young knew that Ju-Young was aware of the consequences incarcerated workers faced if they were reported to ADOC for any reason, and consistently saw Ju-Young call ADOC to discipline workers.

514.     Other class members also performed labor intensive jobs, for long hours, and for less pay than their free world coworkers. Incarcerated workers would work shifts as long a 6AM to 5:45 PM, Monday through Sunday. Ju-Young would not provide any safety training for incarcerated workers, even if they were performing dangerous tasks such as melting down metal parts. Ju-Young would also ensure that incarcerated workers showed up to work, regardless of the circumstance for the impacted worker—for example, if an incarcerated worker took more sick days than Ju-Young preferred, that worker would be fired and thus sent to a more dangerous

facility, which Ju-Young supervisors knew.  As such, incarcerated workers worked through nose bleeds, severe spider bites, and even coughing up blood while working at Ju-Young.  One incarcerated class member described the experience as being driven "like slaves."  Every retained class member reported making between $11 and $11.50 an hour, and knew that free world workers made more.

515.    Ju-Young supervisors regularly threatened Young and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct Ju-Young considered disorderly or insubordinate.  Ju-Young supervisors were aware of the consequences that incarcerated workers would suffer if they were reported to ADOC.  They knew that workers would be disciplined if they didn't work, and knew that discipline would make it hard for workers to get parole and could get them sent to more dangerous and violent facilities.  Ju-Young supervisors repeatedly invoked the consequences incarcerated workers could suffer if they refuse to work or engage in insubordinate in behavior, advising the incarcerated workers: "you know I can mess your parole up," "I can call the camp and get you written up," and "I go to church with some of the captains."

516.    Although incarcerated workers worked alongside free workers, Ju-Young allowed the latter group to take more breaks, go to the bathroom, or leave the jobsite (e.g., get lunch at the store).  Free world workers were also assigned less demanding and labor intensive tasks.  In contrast, when incarcerated workers displayed unhealthy conditions like nosebleeds or coughing up blood and asked to not work, Ju-Young supervisors told them insubordination could result in having privileges like their home pass revoked.  The supervisors reminded incarcerated workers it was a "privilege" to be in work release and they should not complain about working conditions.

517.    Defendant Ju-Young has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Thomas and other members of the Forced Labor Class.  On information and belief, during the course of that

relationship, Ju-Young became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Ju-Young was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### c.  SL Alabama

518.    Defendant SL ALABAMA, LLC ("SL Alabama") is a manufacturing company based in Alexander City, Alabama.  From January 1, 2018 through August 5, 2024, approximately 83 people incarcerated by ADOC have worked for SL Alabama, with at least 53 incarcerated people working for the company in the 2023 fiscal year.  SL Alabama has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

519.    Through no choice of his own, ADOC assigned Plaintiff Eric Prewitt to work for SL Alabama for approximately one and a half years from between 2022 and 2024.  He worked 12-hour shifts, five to six days per week.  He started at $11 per hour.  The job was very physical and Prewitt was on his feet the entire shift.

520.    Prewitt received home passes, but could not use them on weekends if SL Alabama needed him to work.  ADOC charged him $5 per day for transportation and $15 per month for laundry services.  Prewitt worked under dangerous conditions, which became especially problematic if he needed to wait for a technician in the event of a safety issue.  SL Alabama also forced Prewitt and other incarcerated workers to perform additional work beyond what free workers were required to perform, for example by allowing free workers to go home after meeting their daily quota, but forcing incarcerated workers to stay and keep working.

521.    SL Alabama supervisors regularly threatened Prewitt and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct SL Alabama

considered disorderly or insubordinate.  At least one SL Alabama supervisor required incarcerated workers to stay late, but then insisted that if they were in the parking lot when the ADOC van arrived to pick them up, they would be written up for escape.

522.    Defendant SL Alabama has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Prewitt and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, SL Alabama became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if SL Alabama was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### d.  Hwaseung

523.    Defendant HWASEUNG AUTOMOTIVE USA LLC ("Hwaseung") is a corporation based in Enterprise, Alabama that engages in manufacturing.  From January 1, 2018 through August 5, 2024, approximately 86 people incarcerated by ADOC have worked for Hwaseung, with at least 52 incarcerated people working for the company in the 2024 fiscal year.  Hwaseung has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

524.    Through no choice of his own, ADOC assigned Plaintiff Trevion Clark to work eight- or nine-hour shifts at a Hwaseung facility in Elba from approximately January to March 2024.  He made $12.50 an hour and worked alongside free workers.  Mr. T. Clark was assigned tasks that aggravated his chronic bronchitis, including welding and constant bending near gas-emitting machines.  He was not permitted to choose his job, and was not permitted to change jobs or do other work.  When he did request a reassignment, Hwaseung retaliated by cutting his pay and told him if he didn't like it, he could "go back to the camp."  The working conditions were abysmal, hazardous, and included gas leaks and helium machine malfunctions.  He

described the experience of working at Hwaseung as akin to working for a criminal organization, given the rampant safety issues, OSHA violations, and other exploitation of workers. Mr. T. Clark also worked alongside undocumented and underage workers, indicating Hwaseung's intent to seek out and exploit vulnerable people to use as labor.

525.    Mr. T. Clark was told by ADOC that if he missed even a single day of work, he would lose all privileges and face reassignment to a Level 4 ADOC facility—a form of discipline he understood as tantamount to a death sentence. Hwaseung supervisors threatened to send him "back to the camp" if he declined assigned duties, and his requests for reassignment due to medical needs were ignored. He and other incarcerated workers were not allowed to express concerns about conditions without facing retaliation, and were generally treated as the "lowest class" at the facility. At Hwaseung, free-world employees received 401k retirement contributions, and had other basic rights that Mr. T. Clark and others were denied.

526.    Other incarcerated class members had similar experiences while working at Hwaseung. One class member worked 8–9 hours on the night shift with approximately 20 others. He worked side by side with free workers, but was denied similar privileges as them. He was disciplined after a free world worker approached him romantically and he rejected her advances, leading Hwaseung to report him for "bad manners" and, ultimately, ADOC to discipline him for "disorderly conduct." He was not permitted to access the canteen, store, or phone, and was not permitted to draw from his account or have visitors, for 45 days as punishment. He was also forced to do maintenance tasks at Elba, where he was being housed, and was told that he would receive further discipline for insubordination if he refused. Once his punishment was over, he was then transferred to a different facility.

527.    Hwaseung supervisors were aware of the harsh punishments that were the result of any report to ADOC, even for "infractions" as minor as allegedly bad manners. Hwaseung regularly threatened Mr. T. Clark and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct Hwaseung considered disorderly or insubordinate.

Hwaseung regularly disciplined incarcerated workers for "disorderly conduct," without any investigation, when customers complained about them.

528.    Defendant Hwaseung has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff T. Clark and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Hwaseung became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Hwaseung was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### e.  Progressive Finishes

529.    Defendant PROGRESSIVE FINISHES, INC. ("Progressive") is a corporation with a facility in Alabaster, Alabama that provides e-coating and powder coating services.  From January 1, 2018 through August 5, 2024, approximately 158 people incarcerated by ADOC worked for Progressive, with at least 15 people working for the company in the 2024 fiscal year.  Progressive has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

530.    Through no choice of his own, ADOC assigned Plaintiff Frederick McDole to work nine-hour shifts at Progressive in 2024 for four to six days per week for $10.50 per hour.  McDole performed as a line person for Progressive, unloading parts and stacking them on pallets.  Although incarcerated workers performed the same jobs as free world workers, the latter group made more.  The work was so taxing that Mr. McDole lost significant amounts of weight.

531.    Through no choice of his own, ADOC assigned Plaintiff Michael Campbell to work at Progressive, from approximately June 2019 through March 2020, and from approximately November 2021 to January 2023, alongside free workers who performed the same work.  For approximately four months in 2019, Mr. Campbell was "lead man" at Progressive

Finishes but not compensated as such.  Although it was company policy to provide a raise after 90 days, Mr. Campbell did not receive a raise.

532.    Through no choice of his own, ADOC assigned Plaintiff Arthur Ptomey Jr. to work at Progressive hanging parts, five and sometimes six days per week.  Because Mr. Ptomey is currently permitted to leave the ADOC facilities and live with his family in the community unsupervised on 48-hour passes every two weeks, and on 72-hour passes every 90 days, he is particularly anxious about receiving any disciplinaries that could threaten those privileges.

533.    Through no choice of his own, ADOC assigned Plaintiff Rashaad Clark to work at Progressive about a month ago, where he remains working today.  He works long shifts with very physically demanding work for Progressive, requiring him to leave for work around 3 a.m. and returning back to Childersburg from his shift with Progressive typically not until 6:45 p.m.

534.    Progressive paid Plaintiffs McDole, Campbell, Ptomey, and R. Clark and class members less than free workers, although all workers performed the same work.  Progressive also required incarcerated workers to do more difficult jobs, including heavy lifting tasks. Progressive is able to underpay its incarcerated workforce and compel them to perform more arduous tasks than free workers because it knows that incarcerated workers are a captive labor pool who cannot refuse to work or protest their working conditions without being punished by ADOC.

535.    Progressive supervisors regularly threatened its incarcerated workforce with the adverse consequences they would suffer, including likely violence, from ADOC if Progressive reported to ADOC that questioned working conditions, or engaged in conduct Progressive considered disorderly or insubordinate.

536.    Defendant Progressive has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiffs McDole, Campbell, Ptomey, R. Clark and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Progressive became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic

duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release. Certainly, if Progressive was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### f.  McDonald's

537.    Defendant C.B.A.K., Inc. d/b/a MCDONALD'S ("CBAK") is a franchisee of McDonald's USA, LLC, with multiple locations in Alabama, including in Bay Minette, Daphne, Fairhope, Foley, and Loxley. During the period of January 1, 2018 through September 7, 2023, approximately 122 people incarcerated by ADOC worked at this McDonald's. CBAK has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

538.    Through no choice of his own, ADOC assigned putative class member Quannie McCorvey to work at a McDonald's restaurant in Foley, Alabama, operated by Defendant CBAK, from August 2018 through August 2019. ADOC also assigned Plaintiff Toni Cartwright to work at a CBAK McDonald's. While at the Foley McDonald's, Mr. McCorvey also periodically worked shifts at a second CBAK-operated McDonald's in Orange Beach. McCorvey routinely worked 100 hours or more every two weeks and estimates some coworkers logged as many as 140 hours. He was not paid overtime. He made approximately $12 to $14 per hour.

539.    Mr. McCorvey worked alongside free-world employees who earned more for performing the same tasks. He was often tasked with training non-English-speaking foreign workers, including young international students from China and Russia. CBAK relied on him to lead shifts, train workers, and perform maintenance, cleaning, and detailing duties that should have been performed by maintenance staff at the store. For example, incarcerated workers including Mr. McCorvey were made to scrub the floors and parking lots, which was a maintenance job. Mr. McCorvey would also take extra shifts from free-work employees who did

not want to work under the conditions at CBAK.  CBAK withheld food from incarcerated

workers, to the point that they would sometimes be forced to sneak food to get through the day.

540.    Mr. McCorvey understood that if he refused to work, he would be transferred

"behind the gate" to a Level 4 facility, and knew that employers like CBAK were aware of this

arrangement and "in cahoots" with ADOC to enforce it.  He once witnessed an ADOC officer

tell CBAK supervisors to tell ADOC if the incarcerated workers weren't listening so that ADOC

could "get them right."  He knew that even being fired, regardless of the reason, could lead to

reassignment to harsher custody levels.  McCorvey observed that some workers were terminated

for personal reasons, including their sexual orientation or perceived demeanor.  Mr. McCorvey

witnessed one incarcerated worker who was extremely ill be forced to go to work by ADOC,

because they wanted to make their money.  When the worker continued to be ill at CBAK, he

was terminated and sent back behind the wall to Atmore as punishment.  When Mr. McCorvey

did request a job change, he was flatly denied by the ADOC sergeant on site.

541.    CBAK supervisors were aware of the coerced nature of incarcerated workers'

labor and the power they held over incarcerated workers.  Managers would say that there was no

need to pay incarcerated workers any mind or attention when they complained because they were

"just prisoners," and would say it was fine to give them extra work because they were

incarcerated.  Management was extremely verbally abusive and would yell and scream at

incarcerated workers for no reason.  One manager would also sexually harass workers.

McCorvey knew that he could not do anything about this inappropriate behavior, or the poor

working conditions at CBAK, because then CBAK would fire and report him and he would get

sent to a facility with harsher and more dangerous conditions.  Mr. McCorvey would not have

worked for CBAK if ADOC had given him a choice, because it was known as one of the worst

places to work among incarcerated workers, but he had no choice in the matter.  CBAK

supervisors regularly threatened McCorvey and other class members with violence, loss of

privileges, extension of sentences, and solitary confinement if class members refused to work,

questioned working conditions, or engaged in conduct CBAK considered disorderly or insubordinate.

542.    Defendant CBAK has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Cartwright, putative class member McCorvey, and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, CBAK became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if CBAK was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### g.  Wendy's

543.    Defendant SOUTHEAST RESTAURANT GROUP-WEN LLC d/b/a WENDY'S ("Wendy's" or "Southeast Restaurant Group") is a franchisee of Quality Is Our Recipe, LLC, with multiple locations in Alabama, including in Montgomery.  From January 1, 2018 through September 7, 2023, approximately 11 people incarcerated by ADOC have worked for Southeast Restaurant Group-Wen LLC d/b/a Wendy's, with at least 7 incarcerated people working for the company in the 2023 fiscal year.  Southeast Restaurant Group has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

544.    Through no choice of his own, ADOC assigned Plaintiff Eric Prewitt to work for Southeast Restaurant Group where he works to this day.  He makes approximately $11 an hour. In Prewitt's experience, Southeast Restaurant Group management treats incarcerated workers more poorly than free world workers.  Management will allow free world workers to relax while incarcerated workers do most of the work on a given shift.  Plaintiff Toni Cartwright was also compelled to work for Southeast Restaurant Group while in ADOC custody.

545.    Incarcerated workers ADOC assigned to work at Wendy's made $10 to $11 per hour, and worked eight hour shifts.  They did not receive pay for transportation time to and from the community-based facility, which ranged from one to four hours daily.  Wendy's supervisors regularly threatened Cartwright and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct Wendy's considered disorderly or insubordinate.

546.    Defendant Wendy's has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiffs Prewitt and Cartwright and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Wendy's became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Wendy's was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### h.  KFC

547.    Defendant PELL CITY KENTUCKY FRIED CHICKEN, INC. d/b/a KENTUCKY FRIED CHICKEN d/b/a KFC is a franchisee of KFC US, LLC ("KFC"), with a location in Pell City, Alabama.  From January 1, 2018 through September 7, 2023, approximately 50 people incarcerated by ADOC have worked for KFC restaurants, with at least 15 incarcerated people working for KFC restaurants in the 2023 fiscal year.  KFC has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

548.    Through no choice of his own, ADOC assigned Plaintiff Michael Campbell to work at KFC as a cook in approximately February 2023.  He regularly works seven-hour shifts Monday through Friday, and an additional six-hour shift on either Saturday or Sunday.

549.    Through no choice of his own, ADOC assigned Plaintiff Arthur Ptomey to work at KFC where he made $7.25 per hour.  He requested a transfer to a different work assignment because of the low hourly pay at KFC.  He was subsequently fired by KFC and issued discipline by ADOC for refusing to work.  Ptomey understood that the citation leading to his discipline was automatically issued after KFC completed the paperwork terminating his employment—further indicating that KFC was aware of the consequences of terminating Ptomey and other class members.

550.    KFC's supervisors regularly threatened incarcerated workers with a host of adverse consequences, including likely violence, from ADOC if KFC reported to ADOC that they refused to work, questioned working conditions, or engaged in conduct KFC considered disorderly or insubordinate.

551.    Defendant KFC has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Ptomey and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, KFC became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if KFC was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### i.    Masonite

552.    Defendant MASONITE CORPORATION ("Masonite") is a corporation that designs and manufactures doors and is based in Haleyville, Alabama.  From January 1, 2018 through August 5, 2024, approximately 115 people incarcerated by ADOC have worked for Masonite, with at least 34 incarcerated people working for the company in the 2024 fiscal year. Masonite has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

553.    Through no choice of his own, ADOC assigned Plaintiff Jerame Cole to worked at Masonite, primarily building doors, from December 2022 to June 2023.  Masonite deducted $225 from his wages for "safety glasses" required for use to perform his job.  Managers at Masonite also falsely accused him of drinking on the job and, when surveillance tapes proved his innocence, still threatened to report him to ADOC for refusal to work unless he expressed sufficient gratitude. Masonite also enforced strict lines between free world and incarcerated workers, even though they worked side by side.  For example, one of Mr. Cole's free world coworkers, who was a white woman, was able to have a sexual relationship with a white male coworker without incident.  However, when the same female coworker spoke to Mr. Cole, she was punished.

554.    Masonite's supervisors regularly threatened Cole and other class members with violence, loss of privileges, extension of sentences, and solitary confinement if class members refused to work, questioned working conditions, or engaged in conduct Masonite considered disorderly or insubordinate.

555.    Other retained class members describe the experience of working at Masonite as "brutal," and one of the worst jobs incarcerated workers could be assigned to.

556.    Defendant Masonite has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Cole and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Masonite became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Masonite was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### j.  Cast Products

557.    Defendant CAST PRODUCTS, INC. ("Cast") is a corporation based in Athens, Alabama that designs and manufactures custom aluminum castings.  From January 1, 2018

through August 5, 2024, approximately 454 people incarcerated by ADOC have worked for Cast, with at least 4 incarcerated people working for the company in the 2024 fiscal year.  Cast has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

558.    Through no choice of his own, ADOC assigned Plaintiff Larry Darnell Jarmon, Jr. to work at Cast for approximately one year from 2022 to 2023.  He worked in a dangerous section of the plant where he was required to perform physical, hazardous labor, including manual mold-making and shoveling sand.  He suffered a severe burn injury when molten aluminum poured into his glove, which left a substantial scar across the top of his hand.  Although the injury was serious, he did not receive meaningful medical treatment; he was given burn cream, re-gloved, and sent back to work.  Cast only provided initial protective equipment, and required any replacements to be purchased by incarcerated workers.  Mr. Jarmon was also required to rent his work clothes, which cost him $350 out of pocket.  He never received his final paycheck from Cast and has been attempting to obtain it since his layoff.

559.    Incarcerated workers grinded aluminum, shoveled sand, made manual molds with sand, poured metal (e.g., aluminum), and cleaned metal parts such as car bumpers, side steps, running boards, metallic strips that go on the sides of ambulances, and chrome trim to ensure the finished product had no dust or scratches or residue.  They worked five days per week for eight to 10 hours per day.  Incarcerated workers made between $9 to $14 per hour.  Based on conversations with free world workers, incarcerated workers learned Cast paid free world workers a higher hourly rate of $14 to $20 per hour.

560.    Cast supervisors took advantage of the power they had over incarcerated workers. One class member, for example, was romantically approached by a supervisor.  When he rebuffed her advances, she shunned him and refused to answer his work-related questions.  The class member requested that Cast management transfer him to a different department to avoid any issues, and also reported the harassment to ADOC.  Instead of addressing the harassment,

ADOC and Cast jointly decided to terminate the class member, and ADOC subsequently disciplined him for being fired from a job. Cast supervisors were also verbally abusive to incarcerated workers; they would cuss them out for no reason, and were known to be more abusive than other employers. Cast supervisors knew that incarcerated workers were powerless, because they would be disciplined if they tried to do something about the abuse.

561. Cast also enforced attendance of class members via a points attendance system, under which incarcerated workers were given points if they missed a day of work for any reason. An accumulation of enough points would result in the incarcerated worker's termination. Cast was aware that being terminated, for any reason, would subject incarcerated workers to punishment and potentially being transferred to a more violent and dangerous facility. This system was therefore designed to coerce incarcerated workers to come to work as often as possible, even when they were sick or might otherwise have opted to not go to work.

562. Cast's supervisors regularly threatened Jarmon and other class members with a host of adverse consequences, including likely violence, from ADOC if Cast reported to ADOC that class members refused to work, questioned working conditions, or engaged in conduct Cast considered disorderly or insubordinate.

563. Defendant Cast has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Jarmon and other members of the Forced Labor Class. On information and belief, during the course of that relationship, Cast became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release. Certainly, if Cast was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### k. Southeastern Meats

564. Defendant SOUTHEASTERN MEATS, INC. ("Southeastern Meats") is a corporation based in Birmingham, Alabama that packs meat, vegetables and specialty items for

freezing and for sale. From January 1, 2018 through August 5, 2024, approximately 114 people incarcerated by ADOC have worked for Southeastern Meats, with at least 39 incarcerated people working for the company in the 2024 fiscal year. Southeastern Meats has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

565.    Through no choice of her own, ADOC assigned Plaintiff Lakiera Walker to work at Southeastern Meats for 12-hour shifts, from 2pm to 2am, where she worked in harsh conditions inside freezers without adequate work clothes to prevent workplace injury and illness from October 2022 to February 2023. She described the working conditions as brutal, and eventually had to leave the job because of how hard it was on her body. Her hands hurt constantly, even after she left the job, and she was often sick because the work inside the freezer suppressed her immune system. Southeastern Meats also treated Ms. Walker and other incarcerated workers more strictly than free world workers. For example, it required incarcerated workers to request permission to go to the bathroom, but free world workers did not have the same requirement. Incarcerated workers were also only given one break during the course of their 12-hour shift. Plaintiffs Toni Cartwright and Deckrice Morrissey were also forced to work at Southeastern Meats by ADOC. Southeastern Meats also relied on coerced labor from other incarcerated workers, working extremely long shifts in difficult circumstances. Incarcerated workers assigned by ADOC to work for Southeastern Meat report suffering short- and long-term health consequences from being assigned to work in freezing temperatures in Southeastern Meats' facility. No Plaintiff or class member was given a choice about whether to work at Southeastern Meats.

566.    Although Southeastern Meats assigned its incarcerated workers to work 12-hour shifts inside freezers, Southeastern Meats failed to provide its incarcerated workers with adequate or protective work clothes or equipment. Southeastern Meats's supervisors regularly threatened Walker, Cartright, Morrissey, and other class members with a host of adverse

consequences, including likely violence, from ADOC if Southeastern Meats reported to ADOC that class members refused to work, questioned working conditions, or engaged in conduct Southeastern Meats considered disorderly or insubordinate.

567.    Defendant Southeastern Meats has had a multi-year relationship with ADOC during which it has obtained forced labor from currently incarcerated individuals, including Plaintiffs Cartwright and Morrissey and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Southeastern Meats became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Southeastern Meats was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### l.  Koch Foods

568.    Defendant KOCH FOODS, LLC ("Koch Foods") is a limited liability company that processes poultry at facilities across Alabama.  From January 1, 2018 through August 5, 2024, approximately 30 people incarcerated by ADOC have worked for Koch Foods, with at least 1 incarcerated person working for the company in the 2023 fiscal year. Koch Foods has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

569.    Through no choice of his own, ADOC assigned Plaintiff Cordarius Evans to work at Koch for approximately four or five months in 2018.  He worked on the cold side of the facility, boxing chicken and stacking packaged meat on pallets.  Mr. Evans worked the night shift from 10 p.m. to 6 a.m., six days a week, including regular overtime.  He was paid approximately $12–13 per hour, but estimates that ADOC deductions left him with only 40% of his earnings.  The conditions at Koch were physically demanding and dangerous, and required incarcerated workers to purchase additional clothing to protect against the cold temperatures.  All

incarcerated workers, including Mr. Evans, eventually fell ill with what was colloquially called "the bird flu." He vomited for several days while continuing to work, because he would be disciplined if he did not do so. Mr. Evans was treated unequally compared to free workers, who made higher hourly wages of $14 to $15. While free-world employees could take frequent bathroom breaks without scrutiny, Mr. Evans was harassed if he took more than one. Koch Foods supervisors made clear to Mr. Evans that termination from the job would mean reassignment "behind the fence" to higher-security and more punitive facilities.

570.    Koch, with ADOC approval, assigned incarcerated workers to the jobs it could not get free world workers to perform because of the harsh working conditions, including handling live chickens that fight back. Turnover among free workers was very high. Incarcerated workers regularly got sick from handling livestock, which they nicknamed "bird flu." Although incarcerated workers were given Imodium or could fill out a sick card to be seen by a nurse, an incarcerated worker typically could not secure a nurse visit immediately and a decision to not to go to work, even while sick, resulted in a citation for refusing to work.

571.    Through no choice of his own, ADOC assigned another retained class member to work at Koch, from approximately 2017 to April 2024. He performed a range of grueling jobs— live hang, rehang, sanitation—frequently resulting in injuries and illness. The class member, like all incarcerated workers, suffered from the "bird flu" when he first started working at Koch, and the on-site nurse simply gave him Imodium so he could keep working. He knew that he was required to work through any pain or illness, no matter how excruciating. For example, his hands swelled up and he was in a great deal of pain from packing up frozen poultry. He was given gloves, but they were worthless, and when he went to see the nurse he was just told he would "get used to it." He still has pain in his hands from that experience.

572.    Koch's supervisors regularly threatened Evans and other class members with a host of adverse consequences, including likely violence, from ADOC if Koch reported to ADOC that class members refused to work, questioned working conditions, or engaged in conduct Koch considered disorderly or insubordinate.

573.    Defendant Koch has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiff Evans and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Koch became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release.  Certainly, if Koch was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### m.  Bama Budweiser

574.    Defendant BAMA BUDWEISER OF MONTGOMERY, INC. ("Bama Budweiser") is a corporation based in Montgomery, Alabama that is an Anheuser-Busch wholesale beer distributor.  From January 1, 2018 through August 5, 2024, approximately 180 people incarcerated by ADOC have worked for Bama Budweiser, with at least 13 incarcerated people working for the company in the 2024 fiscal year.  Bama Budweiser has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

575.    Through no choice of his own, ADOC assigned Plaintiff Rashaad Clark to work at Bama Budweiser, where he made less than half of what free world workers made, even though he worked the same shift and performed all of the most difficult tasks, including heavy manual labor.  The free world workers also got production bonuses on top of their hourly pay, but none of the incarcerated workers report receiving those bonuses.  He heard supervisors at Budweiser talking about how the incarcerated workers had no choice.  On one occasion, his supervisor, Ed, complained because Mr. R. Clark was in the bathroom and attempted to physically beat Mr. R. Clark with a stick; the supervisor needed to be held back by another employee.  Mr. R. Clark told ADOC personnel what had occurred, and was told that it was "just Ed" and to go back to work.  Mr. R. Clark then complained to other management at Budweiser, who agreed to lay him off

instead of firing him because they knew that if he were fired, even because his life was being threatened, he would be disciplined by ADOC.

576.    Through no choice of his own, ADOC also assigned Plaintiff Michael Campbell to work at Bama Budweiser repackaging damaged goods for approximately one month in 2019.

577.    Budweiser paid incarcerated workers an hourly rate of $7.25 to $10.00 and incarcerated workers did not receive production bonuses; free world workers, in contrast, made up to double that hourly rate and received production bonuses.  The company assigned incarcerated workers to do all of the tasks that involve lifting heavy loads.

578.    Budweiser's supervisors regularly threatened R. Clark and other class members with a host of adverse consequences, including likely violence, from ADOC if Budweiser reported to ADOC that class members refused to work, questioned working conditions, or engaged in conduct Budweiser considered disorderly or insubordinate.

579.    ADOC also disciplined incarcerated workers assigned to Bama Budweiser for their inability to work because of an illness.  For instance, one putative class member felt so ill one day that he had visit the infirmary.  But because the doctor was unavailable, he went again the following day.  The Job Placement Officer cited this putative class member for "quitting the job" and disciplined him by making him perform additional labor at the ADOC facility at which he was housed without pay.

580.    Bama Budweiser was aware of the coerced nature of incarcerated workers' labor and the conditions they were subjected to by ADOC.  Bama Budweiser has used incarcerated labor for decades, and supervisors would regularly discuss how incarcerated workers had no choice but to be there.

581.    Defendant Bama Budweiser has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiffs Clark, Campbell, and other members of the Forced Labor Class.  On information and belief, during the course of that relationship, Bama Budweiser became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress,

deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release. Certainly, if Bama Budweiser was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### n. Paramount Services

582.    Defendant PARAMOUNT SERVICES, INC. ("Paramount") is a corporation based in Birmingham, Alabama that provides linen and uniform services for hotels, hospitals and other establishments. From January 1, 2018 through August 5, 2024, approximately 82 people incarcerated by ADOC have worked for Paramount, with at least 16 incarcerated people working for the company in the 2024 fiscal year. Paramount has benefited financially from this arrangement and benefited from receiving a workforce that can be controlled, is required to attend and perform work, and cannot protest workplace conditions without threat of significant penalties.

583.    Through no choice of their own, Plaintiffs Toni Cartwright and Deckrice Morrissey were assigned by ADOC to work at Paramount Services. Ms. Morrissey was forced to work in particularly poor conditions, including bathrooms in terrible condition and a ceiling that was falling in, which meant that Paramount benefitted tremendously from having a captive workforce, including Ms. Morrissey, that had no choice but to continue working for its benefit. Ms. Morrissey was terminated from Paramount for allegedly staying in the bathroom too long, even when her free world coworkers defended her.

584.    Additional, unnamed class members also experienced poor working conditions at Paramount. Paramount supervisors were verbally and emotionally abusive towards incarcerated workers, and would even fire class members for "infractions" such as crying at work, despite knowing the severe consequences that would accompany such a termination. Paramount would treat incarcerated workers worse than free world workers, and fire them for very small, "ridiculous" things. Class members also experienced pervasive racial harassment while at Paramount that was so severe they requested to be transferred to another employer. Paramount

also maintained a racially discriminatory work environment in which White workers would be assigned preferential jobs, and incarcerated Black workers would be threatened to be fired or were actually fired if they questioned those practices. Paramount paid incarcerated workers between $7.25 and $9 an hour, less than free world workers, even though they did the same work.

585.    Paramount's supervisors regularly threatened Cartwright, Morrissey, and other class members with a host of adverse consequences, including likely violence, from ADOC if Paramount reported to ADOC that class members refused to work, questioned working conditions, or engaged in conduct Paramount considered disorderly or insubordinate.

586.    Defendant Paramount has had a multi-year relationship with ADOC during which it has obtained forced labor from incarcerated individuals, including Plaintiffs Cartwright, Morrissey, and other members of the Forced Labor Class. On information and belief, during the course of that relationship, Paramount became aware or should reasonably have been aware, that the labor provided was coerced through fear of physical harm, economic duress, deprivation of necessities, threat of being sent "behind the wall" and a more dangerous facility, and threat to good-time credits and chances at parole release. Certainly, if Paramount was not previously aware of this coercion, it should have been as of the time the original complaint in this matter was filed.

### F.    The Coerced Labor Scheme Is A Well Established and Ongoing Enterprise

587.    Defendants' ongoing enterprise is well established. Defendant ADOT has contracted with ADOC at least as far back as 1972. Defendants City of Montgomery, City of Troy, Bama Budweiser, SL Alabama, Cast Products, Gemstone Foods, KFC, Koch Foods, McDonald's, Progressive Finishes, and Wendy's, contracted with ADOC at least as far back as 2018. Defendant Paramount Services has contracted with ADOC at least since 2019. Defendant Masonite has contracted with ADOC dating back at least to 2020. Defendants Ju-Young, Hwaseung, and Southeastern Meats have contracted with ADOC dating back to at least 2021.

588.    The forced-labor enterprise as a whole is involved in the production, distribution, and/or acquisition of goods and services in interstate commerce, including Budweiser beer and poultry products.

589.    As discussed above, *supra* FA Parts II.E.4. and II.E.5., the private work-release employers, including Defendants Gemstone Foods, Ju-Young, SL Alabama, Hwaseung, Progressive Finishes, McDonald's, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods, Paramount Services, and Bama Budweiser, and public work-center employers, including Defendants Ivey, ADOT, City of Montgomery, City of Troy, and Jefferson County, have a powerful economic self-interest in perpetuating and expanding the use of incarcerated forced labor.  These Public Employer Defendants and Private Employer Defendants have played and continue to play an active role in the forced-labor enterprise, and they knowingly receive substantial financial and other benefits because of their participation.

590.    The work-release and work-center employers that partner with ADOC function as an integral component of the overall forced-labor enterprise. By knowingly and willfully participating in ADOC's work-release and work-center programs, these outside employers gain access to workers who are compelled to work for them at a substantially lower cost to the employer than free-world employees performing the same work—including the lower cost realized because workers leased from ADOC are directly prohibited from refusing to work or participating in work stoppages, and effectively prohibited from communicating concerns regarding work conditions, pay, or safety, including the fact of their forced labor, by the threat of discipline for refusing to work. Meanwhile, the work-release and work-center employers funnel money to ADOC in exchange for the incarcerated labor they receive—with ADOC often receiving a substantially greater share of those workers' wages than the workers themselves receive. *See supra* FA Part I.A-B. This mutually beneficial arrangement between ADOC and the participating employers generates enormous financial benefits for everyone involved, except the incarcerated workers who have been coerced to work. *See id*. Defendants are acting together for

the common purpose of extracting profit through a pattern of daily forced labor from incarcerated Alabamians.

III. **STATE OF ALABAMA HAS RETALIATED AGAINST AND VIOLENTLY REPRESSED INCARCERATED WORKERS' EFFORTS TO PROTEST COERCIVE WORKING CONDITIONS**

A. **Defendants Ivey, Marshall, and Hamm Have Overseen, Ordered, and Maintained the Violent Repression of Plaintiffs' Council, Clark, Dandridge and Other Incarcerated Workers' Attempts to Protest Their Coercive Working Conditions**

591.    Defendants Ivey, Marshall, and Hamm have ordered, overseen and maintained the systematic, violent repression of individuals in ADOC custody seeking to exercise their First Amendment rights.  ADOC, at Governor Ivey's direction and with her consent, *see supra* FA Part II.A., systemically metes out harsh punishments to incarcerated people in ADOC custody who: express peacefully any dissatisfaction with their working conditions, pay, or work requirements, including blatantly unlawful and abusive work conditions; attempt to advocate peacefully for themselves regarding work requirements, conditions, or pay; or resist having their labor coerced for ADOC's profit and benefit.

592.    ADOC, by and through Defendant Hamm, systemically punishes incarcerated people who peacefully refuse, resist, or express or advocate that they or other incarcerated people should not be compelled, through consistent and regular exercise of violence against them, by ADOC to labor for ADOC's benefit and profit, and has done so for more than a decade.  Indeed, as explained *supra* FA Part II.A., if ADOC deems that an incarcerated person has refused on more than one occasion to submit to the labor that ADOC coerces principally through the threat and exercise of violence against them, the disciplinary offense the person receives is upgraded in severity and can be categorized as "refusing to follow orders" and other high-severity disciplinary offenses punishable through loss of good time, loss of lower custody status, and prolonged solitary confinement.

593.    Critically, ADOC systemically and consistently assesses disciplinary offenses for "refusal to work" against people who do and have *not*, in fact, refused to labor or do the job assigned.  Rather, ADOC assesses this disciplinary offense consistently against people who: simply express peacefully and in words that the work assignment is unsafe or even unlawful; are unable to do the job and ask questions about how to do the job or request training; are unable to do the work due to illness or disability or lack of training; or are unable to do the job at the speed at which the supervisor wants the job done, regardless of whether the supervisor's demands are possible or practicable to meet safely.  Named Plaintiffs, including, but not limited to Rashaad Clark, Deckrice Morrissey, Arthur Ptomey, Toni Cartwright, and Trevion Clark have experienced, and ADOC records document, regular and consistent citations for "refusing to work," specifically for: (a) not performing the job quickly enough; (b) being injured on the job and thus unable to continue working; (c) not being a "team player" due to truthful reporting of the denial of required rest and lunch breaks to company supervision;  (d) or simply "being fired from the work assignment," regardless of the reason for the termination.

594.    What is more, on information and belief, ADOC consistently subjects incarcerated people, including, but not limited to Named Plaintiffs Rashaad Clark, Lakeira Walker, Turner Mason, and Zackary Ball to unlawful work conditions and requirements, including requiring incarcerated workers to consent to rape or sexual congress with a supervisor as a condition of employment; to perform work that is outside the permitted assignment of the ADOC "leasing" contract – such as performance of work at the leasing employer's personal home; and to assist ADOC officials and correctional staff in maintaining or conducting illegal trafficking in phones, drugs, and other illegal activities.

595.    For example, Plaintiff Turner Mason, a former law enforcement official, was assigned to perform work tasks that would have required him to participate in the illegal activities of carceral staff and other incarcerated people, and which posed a clear and present threat to his life.  When Mason peacefully refused to perform this ADOC-assigned work, ADOC imposed strict discipline against him for refusing to work, including physical punishment and

attempting to place him, in violation of state law, in non-segregated housing, which is a death sentence for former police officers.

596.    In 2023, Governor Ivey deliberately enhanced this repressive regime, following a 2022 strike by incarcerated men at all thirteen of Alabama's medium- and high-security facilities, as discussed *supra* FA Part II.A., Governor Ivey's January 9, 2023 Executive Order was expressly intended to prevent pure speech by incarcerated people that encouraged others to stop working.[54]  Commissioner Hamm, as explained *supra*, implemented the Governor's retaliatory Executive Order, including through ADOC regulations.

597.    In addition to the punishments specified in ADOC's regulations, on information and belief, Commissioner Hamm has implemented an array of systematic additional punishments for refusal to labor inside ADOC and, working in conjunction with Governor Ivey, Attorney General Marshall and Parole Board Chair, has imposed additional punishment intended to retaliate against incarcerated individuals who seek to withhold their labor, including Plaintiffs Council, Strike Class Plaintiffs, and Forced Labor Plaintiffs.  As discussed, *supra* FA Parts I.A. and II.A., B.*,* this involves regular and consistent punishment by ADOC, across all of its facilities, for any flavor of the cessation of work, including when an incarcerated person experiences the termination of their position (for any reason), and when they refuse to perform unlawful work or object and refuse to accede to unlawful work conditions, including sexual or other assault.

598.    This punishment includes the imposition of additional forced labor and, on many notorious and well known instances, physical punishment meted out by correctional staff.  For example, a "punishment building" was operated for years at Draper, where correctional staff assaulted incarcerated individuals who had purportedly refused to work.  Consistently across many ADOC medium- and high-security facilities, plaintiffs including Trevion Clark and Jerame

---

[54] Correctional incentive time deductions, or "good-time" credits, reduce the term of an incarcerated person's sentence and thus the duration of confinement.

Cole, retained members of the putative class, and federal government and media investigations report incarcerated people being punished with physical beatings for refusing to work.

599.    As a matter of consistent practice, and, on information and belief, across all ADOC facilities, ADOC requires people cited for refusing to work, on top of other punishments imposed by regulation, to work for 30 days or more without compensation for ADOC for long hours performing undesirable tasks, such as working in the kitchen, digging up tree roots at one facility, or working on various crews for the ADOC staff.

600.    As discussed, *supra* FA Part II.B.2.c., ADOC also has a practice of denying bare necessities such as food and medical care to incarcerated individuals as punishment for withholding their work or encouraging others to do so.

601.    Further, ADOC uses reassignment of individuals to more dangerous dorms or facilities as a form of punishment, or threatened punishment, for those who are perceived as refusing to work.  *See supra* FA Part II.B.2.a.  Individuals who have not performed assigned work have, as punishment imposed by ADOC, by and through Commissioner Hamm, been reassigned to facilities on a temporary basis that are unsafe generally or unsafe specifically for the person concerned, including, for example because the person being reassigned has been sexually or physically assaulted at the facility to which they are sent, or because the person is likely to be assaulted due to their age, lack of familiarity or association with other incarcerated people who might be in a position to protect them from physical attacks, or because the person will others otherwise be unable to protect themselves in the new dorm or facility.

602.    As discussed, *supra* FA Part II.B.2.f., another form of punishment for refusals to work is the impact that any citation for such a refusal (or perceived refusal) has on Plaintiffs' and other Class Members' ability to be paroled.  Any discipline an incarcerated person receives, regardless of the reason for the discipline, decreases the chances a person will be paroled, as such offenses increase their parole risk assessment "score."  On information and belief, based on the sample months of letters produced by the Attorney General's office in response to public record requests, the letters consistently and regularly sent by Attorney General Marshall to the Parole

Board opposing parole in nearly all violent cases since 2019 regularly and systemically cite citations and disciplinary offenses for refusal to work as evidence in support of the Attorney General's opposition for parole. Named Plaintiffs Ptomey and Walker, and many putative class members report directly experiencing the threatened and/or actual denial of parole explicitly due to an alleged refusal to perform coerced labor (with Walker refusing to submit to sexual assault as a condition of employment and Ptomey refusing to accept an unlawful pay rate in violation of ADOC's contract with the leasing employer).

603.    ADOC uses its regulations as a tool to force incarcerated people to labor for its benefit and profit. The regulations apply to refusals to work inside ADOC facilities, or encouragement of the same, even if incarcerated people are being asked to perform dangerous work or work for which they are not qualified. The regulations equally apply to incarcerated persons being required to work for an outside public or private, for-profit employer. Thus, an incarcerated person who seeks to avoid being pressed into laboring for an outside employer, even if the working conditions are dangerous or the worker has a bona-fide medical reason for not performing the work, is subject to these extreme punishments, including extension of their incarceration.

###    B.    ADOC's Punitive and Unlawful Response to Peaceful Protests

604.    ADOC, at the direction and with the consent of Defendants Ivey and Hamm, employs both its regulations and plainly unlawful methods, including violence, to retaliate against incarcerated people who attempt to advocate on each other's behalf. That policy and practice is reflected in ADOC's response to non-violent strikes organized by incarcerated people.

605.    In 2013, Plaintiff Robert Earl Council and another individual incarcerated by ADOC founded and organized the Free Alabama Movement, which is now a nationwide movement on behalf of incarcerated people, their families, and their communities. From its inception, the Free Alabama Movement has embraced one core strategy: "the Non-Violent and Peaceful Protest strategy of 'shutdowns'/ work stoppages to combat the multi-billion dollar Prison Industrialized Complex that has incarcerated over 2 million people for the sole purpose of

exploitation through free labor, private prisons, exorbitant fees, and more."[55]  Through the Free Alabama Movement, Mr. Council and others have formed and led a labor movement whose focus has been to peacefully resist the systematic profiting by the State of Alabama from their forced labor and to eliminate modern-day forced labor trafficking and profiteering through their non-violent advocacy and protests.

606.    As part of this movement, beginning on January 1, 2014, Mr. Council and his co-leader advocated for and organized non-violent work stoppages at Holman, St. Clair, and Elmore correctional facilities, stoppages that were joined by 2,300 individuals incarcerated at those two prisons and ultimately joined by a total of 4,500 people across ADOC facilities.

607.    In 2016 and 2018, Mr. Council, along with other leaders of the Free Alabama Movement, advocated for and led national strikes of incarcerated workers.  These strikes spanned 24 states, including Alabama, and 46 prisons and jails, including as many as 57,000 incarcerated individuals.  Post-pandemic, Council and others in the Free Alabama Movement advocated for and organized a sweeping statewide strike in Alabama to protest rapidly worsening conditions and continued forced labor in ADOC medium- and high-security men's facilities on September 26, 2022.  This 2022 strike involved the withholding of labor by incarcerated men across all 13 of these facilities and lasted as long as 6 weeks at some facilities.

608.    Because ADOC relies and has relied on incarcerated people like the Named Plaintiffs to staff vital functions at the facilities, including having the men work as guards, healthcare and mental health providers, cooks, cleaners, handymen, and more, when the men withheld their work during these concerted work stoppages, the operation of these facilities ground to a halt.

609.    In response to the 2022 strike, ADOC, at the direction of Governor Ivey, meted out violent repression throughout each of the 13 facilities, and even punished incarcerated people at facilities that were not striking.  This included reducing the food supply to the strikers;

---

[55] F.A.M. Pamphlet: Who We Are, Free Alabama Movement, https://freealabamamovement.wordpress.com/fa-m-pamphlet-who-we-are/.

physically abusing and punishing them, including by placing in solitary confinement strike leaders and work-release workers who refused to work as strikebreakers as compelled by ADOC; limiting their access to food and basic hygiene products; and modifying ADOC regulations to identify increased punishments for disciplinary violations, including violations that involve the withholding of labor, refusing to work as directed by ADOC, and organizing or encouraging other people to refuse to provide coerced labor to ADOC and the private and public employers participating in Defendants' coerced labor scheme.

610.    On information and belief, despite having ordered and secured ample food to provide three full meals to all detained in ADOC facilities, ADOC immediately ordered all facilities after the commencement of the 2022 strike to severely limit the food that all incarcerated people, whether joining the strike or not, were fed.  Instead, ADOC implemented a practice known as "bird-feeding," in which it drastically restricted the calories it fed to everyone incarcerated in ADOC facilities below subsistence level.  Despite having ample food supplies in store at the time at each facility, ADOC directed its management and correctional staff to provide only meals consisting of little more than one slice of cheese between two slices of bread, a small serving of beans or potatoes, or a slice of cheese on oatmeal.  ADOC would also increase the time between meals or provide only one meal a day, not serving dinner to those in its custody until 8pm.  This policy began immediately upon commencement of the strike, at every striking facility, and continued until the strike ended.  Simply put, ADOC chose to have food rot rather than distribute it to incarcerated people, including people with fragile healthcare profiles, at the 13 facilities to punish them all for the strike.  It was a coordinated, retaliatory response by ADOC to incarcerated people's protected speech by attempting to starve them until their resistance broke.

611.    During the 2022 strike, ADOC also refused to let incarcerated people access the commissary which, as explained *supra*, is the only way for those incarcerated in Alabama to access several basic necessities.  It also stripped incarcerated workers of every right that makes

life in the overcrowded, dangerous facilities survivable mentally or physically, including access to phone contact with family, visitors, and recreational time.

612.    ADOC also responded to the 2022 strike by completely abdicating its duty of care to those in its custody.  At Donaldson Correctional Facility, for example, ADOC allowed trash to accumulate throughout the facility, causing rats and snakes to become rampant.  ADOC also removed its officers from the dorms at Donaldson, causing violence to increase even further due to the lack of supervision.  And like at other facilities, incarcerated people at Donaldson were denied recreational time and access to programs, and were prohibited from even going outside.

613.    During the 2022 strike, one incarcerated person who was at a Work Release facility was forced by ADOC to work within its facilities to attempt to break the strike. When this worker sought to honor the strike and declined to work, he was removed from the Work Release Program, put "behind the wall" at Limestone, a high-security facility and he remains today in a close-custody facility, Kilby.  In addition to transferring him to a high security, much more violent facility, ADOC placed him in solitary confinement at Limestone for several months for refusing to work as a strikebreaker.

614.    ADOC similarly punished other people who simply chose not to work as strike breakers.  For example, Plaintiff Danny Dandridge, who was being housed at Decatur during the 2022 strike, was taken to Limestone and assigned by ADOC to be a strike breaker.  When he informed ADOC officials that he did not want to work as a strike breaker, he was threatened with being placed back "behind the fence" in a more dangerous facility.  He was told that he would lose his job and thus be moved to a higher security (and more dangerous) facility, unless he worked as a strike breaker.

615.    ADOC has also engaged in collective punishment in response to work stoppages. For example, during the 2022 strike, ADOC punished all of the incarcerated people at Childersburg Work Release, including Plaintiffs Michael Campbell and Fred McDole, despite the fact that no incarcerated person at Childersburg participated in the strike.  As punishment,

ADOC limited incarcerated people's access to the Childersburg commissary, denying them access to necessary food and basic sanitary supplies.

616.    Incarcerated workers across ADOC were told by ADOC staff, including wardens, that the orders imposing retaliation against the strikers was coming "from Montgomery," which they understood to mean the Governor.  Indeed, many ADOC wardens and staff across all facilities over the months leading up to the strike and during and after the strike, expressed to incarcerated people their sympathy both with the strikers' objections to the detention and working conditions and the path of peaceful resistance chosen by the strikers.  Some ADOC staff and management even shared with incarcerated people across many ADOC facilities an interest in joining the strike themselves as a show of support, because the horrific conditions at ADOC facilities and chronic understaffing also placed a tremendous strain on them and exposed them to daily violence as well.

617.    For example, Plaintiff Rashaad Clark, was housed at Bullock Correctional Facility during the 2022 strike, where he worked as a runner for ADOC staff.  Accordingly, he was in frequent contact with those staff, and was told by both the warden and other staff members that the punitive response to the strike, including the bird-feeding and the arrival of the "riot team", was being ordered and directed by Montgomery, and the ADOC staff at Bullock were only punishing the workers because Montgomery told them they must do so.  They told Mr. Clark that they did not want to respond so aggressively to the strike and in fact were planning their own sympathy strike in support of the incarcerated people before the strike broke.

618.    The same was true for the response at Childersburg, where the incarcerated workers did not participate in the strike and yet the entire facility was punished with limited commissary access.  When those incarcerated at Childersburg asked why they were being punished even though they were still working, they were told that the order came from Montgomery.

619.    Indeed, orders to engage in retaliation such as dramatically limiting the food provided to incarcerated people could only have come from Montgomery, given ADOC's

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

controlling regulations. ADOC Administrative Regulation Number 701 requires facilities to provide each person in their custody with "a wholesome and nutritious diet" that meets national standards and includes three meals a day.[56] The only exception to the three meals a day requirement is for weekends and holidays, and even then those meals must meet basic nutritional goals, which the "bird-feeding" during the strike did not. In other words, this plain violation of ADOC regulations, which took place simultaneously statewide, must have been directed and/or approved by those with the power to do so—namely, Ivey and Hamm.

620.    Further, during the strike, ADOC sent in a "riot team" to Bullock and nearly all of the striking facilities to "lock down" each facility as punishment. Those riot teams are controlled at the regional and state level, not the facility level—further evidence that the response to the strike was coordinated and directed by leadership at the highest levels of the state.

621.    That ADOC responds to workers who withhold their labor, or who encourage others to do so, with violence, force, cutting off access to food and commissary, and moving workers to more dangerous locations, is common knowledge among incarcerated Alabamians, and guards regularly and consistently remind incarcerated individuals of that policy. *See infra* FA Part IV.C. This policy ensures that incarcerated people are dissuaded from future nonviolent resistance, including withholding their labor, for fear of similar retaliation.

622.    On information and belief, Governor Ivey and Commissioner Hamm were aware of, directed and/or did not prevent ADOC's response to the striking workers in 2022, including cutting off access to food, medical services, hygiene maintenance, and other necessities, even for those people incarcerated in work-release facilities that primarily leased labor to private employers.

623.    Public reporting during the 2022 strike confirmed that the Governor was aware of the strike, the demands of the incarcerated workers, and the ADOC response. When asked about

---

[56] State of Alabama Department of Corrections, Administrative Regulation Number 701, Food Service Administration (Feb. 21, 2025), https://doc.alabama.gov/docs/AdminRegs/AR701.pdf

the strike, Governor Ivey admitted she was aware of the demands being made by the striking workers, describing them as "unreasonable" and unwelcome in the state.[57]

624.    Governor Ivey's public statements confirmed that she was both aware of and supportive of ADOC's response to the strikes.  She publicly commended Commissioner Hamm for his response to the strike, saying that she thought he had things "well under control" and claiming—falsely—that there was no interruption of essential services.[58]

625.    Ivey and Hamm knew or should have known of the deteriorating conditions, endemic violence, and systemically coerced labor compelled across all Alabama prisons.  As explained *infra* FA Part IV.B., Governor Ivey and Hamm have long been aware of the horrifying conditions and rampant violence in Alabama's prisons.  During the strike, public reports described and showed the accumulating garbage, paltry food portions, and violence, including an apparent murder at Donaldson Correctional Facility.[59]  These reports, which made national news, were undoubtedly brought to the attention of Governor Ivey, who was asked to comment publicly on the strike.[60]

626.    ADOC's retaliation against and repression of incarcerated people who withhold their labor and advocate on their own or others' behalf has not abated.  In 2024, ADOC punished the entire population at Fountain Correctional Facility for a peaceful work stoppage, even though

---

[57] Howard Koplowitz, *Striking Alabama Inmate Workers' Demands 'Unreasonable,' Ivey Says*, al.com (Sep. 30, 2022), https://www.al.com/news/2022/09/striking-alabama-inmate-workers-demands-unreasonable-ivey-says.html

[58] *Id.*

[59] Keri Blakinger, *Alabama Said Prison Strike Was 'Under Control.' Footage Shows System in Deadly Disarray*, The Marshall Project (Oct. 6, 2022), https://www.themarshallproject.org/2022/10/06/alabama-said-prison-strike-was-under-control-footage-shows-system-in-deadly-disarray

[60] *See, e.g.*, https://www.newyorker.com/news/q-and-a/the-stunning-neglect-and-racist-politics-behind-alabamas-prison-strike; https://www.vera.org/news/what-you-need-to-know-about-the-alabama-prison-strike; https://www.nytimes.com/2022/09/28/us/alabama-prisons-strike-protest.html; https://www.npr.org/2022/10/14/1129223092/alabama-inmates-are-on-strike-protesting-sentencing-policies-and-a-parole-proces; https://www.theguardian.com/us-news/2022/oct/06/alabama-prison-strike-work-conditions; https://www.rollingstone.com/politics/politics-news/alabama-prisoner-strike-work-stoppage-1234603401/.

the entire facility did not participate.  Even those workers who were injured, disabled, elderly, or had fragile health situations and thus unable to work were subjected to facility-wide punishments, which included severe food restriction.

### C.     ADOC's Brutal Retaliation Against Robert Earl Council

627.     ADOC has made an example of the leaders of the Free Alabama Movement in order to discourage other incarcerated workers from refusing to work.  Specifically, ADOC has subjected Plaintiff Robert Earl Council, aka Kinetik Justice, to severe threats, cruel and violent physical punishment, and other retaliation by Alabama officials in response to his efforts to resist and encourage others within ADOC to resist Defendants' unlawful conduct and specifically Defendants' forced labor demands.

628.     As explained *supra*, Mr. Council has been instrumental in founding and leading the Free Alabama Movement, which is committed to nonviolent resistance of forced labor in prisons across the country.

629.     ADOC has singled out Mr. Council and other Free Alabama Movement leaders, including the late James Pleasant, for singular abuse and punishment in retaliation against their leadership of peaceful resistance to Alabama's forced labor regime.  Since 2015, Mr. Council and his co-leader have been subject to long stretches of solitary confinement in response to their resistance to forced labor, and have been the victims of physical beatings, strip searches, exposure to chemical agents, harassment, and psychological abuse at the hands of ADOC officials while in solitary confinement.

630.     Mr. Council and his co-leaders have often been assigned to ADOC's Donaldson Correctional Facility, which is infamous as a facility where ADOC personnel carry out brutal beatings of those suspected of advocating for human rights protections, as retaliation for their activism and advocacy against ADOC policies.  During the approximately two years that Mr. Council was at Donaldson, he spent more than a year in solitary confinement, with less than nine months in general population. While at Donaldson, all three leaders—Mr. Council and his two co-leaders—were attacked by ADOC personnel, including while in solitary confinement.

631.    Mr. Council has endured life-threatening abuse in retaliation for his work on the Free Alabama Movement strikes and labor protests.  In 2021, a group of ADOC officers beat Mr. Council so severely he had to be med-flighted to a trauma center to save his life.  Following the trauma center, ADOC transferred Mr. Council to a cell at Kilby and denied him medical care while he bled for 21 days, despite ADOC knowing that he had experienced devastating brain trauma and an injury to his head and eye.  As a result of that beating—for which one officer has already been convicted, and the remaining officers are currently awaiting trial on criminal prosecution for the assault—Mr. Council lost vision in one eye for more than two years, suffers from permanent vision impairment, and has suffered other extensive physical permanent damage, including brain injury.

632.    Many of these incidents of violent repression and retaliation against the leaders of peaceful resistance to forced labor have been confirmed by state and federal officials, including as part of ongoing enforcement action by the DOJ.  In addition to these physical assaults and abuse, ADOC has placed Mr. Council in cells with intolerable and inhumane conditions, including cells infested with rats, roaches, or spiders, without lights, and frequently without working plumbing and sometimes without even a mattress.  ADOC denied Mr. Council visitation privileges, phone privileges, and outside exercise activities for years at a time.

633.    Defendants Ivey and Hamm have been on notice for years of the aggressive response ADOC has to incarcerated people who speak out about their conditions, and have done nothing to put an end to that unlawful conduct.

634.    ADOC's extreme violence in response to Mr. Council and his co-leaders' peaceful efforts to resist forced labor, and its extreme response to incarcerated workers who sought to support these efforts, are common knowledge among incarcerated men and women in Alabama.  ADOC has intentionally made an example of Mr. Council and his co-leaders to deter and intimidate other incarcerated individuals from withholding their labor or from encouraging others to do so: specifically, ADOC is intentionally communicating the message—endorsed by Governor Ivey—that anyone who refuses to work, whether it be for ADOC itself or for private

and public employers outside the prison walls, but at ADOC's direction, or who speaks up about the working conditions incarcerated people are subject to, will be subject to violence, solitary confinement, and inhumane conditions. ADOC officials repeatedly caution incarcerated laborers that a refusal to work will be met with the same punishment meted out to Mr. Council. It is known as the "Robert Earl Rule."

### D.    Alabama's Limited and Inaccessible Grievance Process and ADOC's Rampant Culture of Retaliation Have Closed Off Any Other Avenue for Incarcerated People to Air Their Grievances

635.    For years, ADOC maintained this repressive regime while denying incarcerated people *any* formal mechanism via which they could raise issues regarding the forced labor to which they are subjected.  Prior to December 15, 2022, ADOC had no administrative grievance procedure at all.

636.    Since then, ADOC has implemented a grievance procedure for incarcerated people, but this procedure is unavailable to any refusals to work recorded as "behavior citations" Behavior citations are not grievable, but nevertheless carry with them the same consequences as disciplinary offenses, including the resulting denials of family visitation and home passes, denial of access to their funds, denial of access to basic supplies or food at the store, the imposition of additional forced labor onsite at the facility (described above), transfer to more violent facilities as punishment, and the denial of parole, as specifically evidenced by parole denial experienced by Plaintiff Ptomey and the behavior citations issued to many incarcerated workers.

637.    However, for those offenses subject to the alleged new grievance procedure, the grievance process is not yet fully operational, as the processes are opaque, inaccessible, and poorly advertised, and are not available to many people across the ADOC, who wish to file a grievance.  Even now, many incarcerated people are unaware that there is a grievance process, or believe that the process is useless to the extent that it does exist.  ADOC's grievance process, according to the consistent advice given by ADOC officials across all ADOC facilites, does not allow incarcerated people to file grievances about forced labor or working conditions.

638.    Even when incarcerated people do attempt to use the grievance process, they are often met with retaliation intended to dissuade them from doing so, particularly when they are close to their potential parole date.

639.    For example, Plaintiff Trevion Clark filed a grievance after he was improperly denied access to the law library.  After placing the grievance in the grievance box, however, a "runner" – who is an incarcerated person employed to work for correctional officers at ADOC by running messages or delivering paper or packages across the facilities -- attempted to destroy his grievance with bleach.  The runner then followed Mr. Clark while yelling at him, and eventually shoved him.  ADOC gave Mr. Clark a citation for disorderly conduct, but the runner was not punished, despite the runner serving as the direct representative and employee of facility management at the time he tried to destroy Mr. Clark's grievance and the facility's purported "zero-tolerance" for violence, all of which clearly indicates that the runners conduct was condoned, if not expressly ordered, by ADOC staff and management.

640.    Nor do incarcerated people have any viable alternatives through which to express their grievances with the coercive working conditions or otherwise challenge those conditions.  On information and belief, based on the experiences of the Named Plaintiffs, retained Class Members, and interviews with former Governors, incarcerated people write letters protesting the unsafe and inhumane detention and working conditions in the hundreds and thousands to the Governor and the wardens of various facilities expressing their concerns with prison conditions, violence in the facilities, and the coerced labor they are subjected to.  On information and belief, in addition to the lived experience of the Named Plaintiffs and the retained putative Class Members, none receive a response and the conditions never change or improve.

IV.    **THE GOVERNOR, ATTORNEY GENERAL, AND PAROLE BOARD HAVE CONSPIRED TO  EXTEND SENTENCES ISSUED BY THE JUDICIAL BRANCH BY ABANDONING INDIVIDUALIZED PAROLE DECISION MAKING MANDATED BY THE LEGISLATIVE BRANCH TO FUEL DEFENDANTS' FORCED LABOR SCHEME, RESULTING IN SYSTEMIC OVERDETENTION AND PARTICUARLY-SKEWED OVERDETENTION AND FORCED LABOR FOR BLACK ALABAMIANS.**

A.    **Alabama's Parole Board Historically Considered Individualized Fitness for Parole and Granted 2,441 People Parole Annually from 1992 to 2015, at an Average Grant Rate of Just Under 35%.**

641.    Since at least 1951, Alabama law has required the Parole Board[61] to determine an individual's "fitness" for parole, based on a number of factors, and grant parole based on that determination.  Ala. Code §15-22-26(a); *see* 1951 Ala. Laws 1030, 1032.  Until Alabama enacted the Justice Reinvestment Act ("JRA"), discussed below, Alabama statute provided: "No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society." Ala. Code §15-22-26 (2015).

642.    Operating within that statutory and regulatory framework, prior to the JRA's implementation, as reported in the Parole Board's annual reports, the Parole Board granted parole in the numbers and rates indicated in the chart below for each fiscal year from 1992 to 2015, which reveals an average annual parole grant rate of 34.79%, and an average of 2,441 people granted parole each year based on an average of 7,027 parole hearings conducted each year.

| Fiscal Year/Dates | Hearing Held/Paroles Considered | Granted | Percent Granted |
|---|---|---|---|
| FY 1992-1993 | 5,443 | 2,093 | 38.45% |

---

[61] The Alabama Bureau of Pardons and Paroles is an Alabama state agency.  Within the Bureau, the Parole Board is the three-person panel tasked with determining which incarcerated people may be released on parole and under what conditions.  Defendant Gwathney is the Chair of the Parole Board.

| FY 1993-1994 | 5,633 | 1,942 | 34.48% |
| FY 1994-1995 | 6,155 | 2,287 | 37.16% |
| FY 1995-1996 | 6,549 | 1,644 | 25.10% |
| FY 1996-1997 | 7,822 | 2,712 | 34.67% |
| FY 1997-1998 | 7,834 | 2,761 | 35.24% |
| FY 1998-1999 | 5,592 | 1,729 | 30.92% |
| FY 1999-2000 | 5,406 | 1,836 | 33.96% |
| FY 2000-2001 | 5,452 | 1,772 | 32.50% |
| FY 2001-2002 | 5,811 | 2,169 | 37.33% |
| FY 2002-2003 | 6,936 | 3,198 | 46.11% |
| FY 2003-2004 | 11,603 | 3,954 | 34.08% |
| FY 2004-2005 | 8,657 | 2,190 | 25.30% |
| FY 2005-2006 | 9,508 | 3,439 | 36.17% |
| FY 2006-2007 | 6,640 | 2,187 | 32.94% |
| FY 2007-2008 | 7,356 | 3,193 | 43.41% |
| FY 2008-2009 | 7,924 | 3,280 | 41.39% |
| FY 2009-2010 | 6,788 | 2,690 | 39.63% |
| FY 2010-2011 | 6,871 | 2,097 | 30.52% |
| FY 2011-2012 | 7,406 | 2,178 | 29.41% |
| FY 2012-2013 | 7,627 | 2,312 | 30.31% |
| FY 2013-2014 | 6,647 | 2,237 | 33.65% |
| FY 2014-2015 | 5,958 | 2,236 | 37.53% |

643.    At all relevant times, this consistent approach to the opportunity to secure parole prior to the implementation of the JRA in 2015, along with the grant rates for parole in Alabama, published annually by the parole board, was known to judges across Alabama charged with weighing and issuing sentences for criminal offenses, particularly when weighing whether to provide an "opportunity for parole" to any fixed-term or life sentence.

644.    More granular composite data from the parole board is not available for review by any member of the public, including any Named Plaintiff or putative class member.  Plaintiffs' specific attempts to request and secure such granular data have been denied by Defendants, most recently at least partially on the ground that Defendants suspected this information would be used to support current or future claims in litigation.  Plaintiffs are informed and believe and

thereon allege that Alabama government officials with the ADOC and the Parole Board and the Sentencing Commission have analyzed parole grant rates by different categories of offenses and/or length of sentence and produced calculations of average of time actually served in prison ("Average Incarceration Time Per Sentence") for different lengths of sentences. For numerous Named Plaintiffs, as alleged above in paragraphs 16, 34, 45, 116 and 147, and as reported by numerous retained putative class members, incarcerated people in ADOC were advised by judges, prosecutors and defense counsel in good faith of the time they actually would serve in prison for a particular sentence and/or offense and those estimates were accurate, based on what they observed relating to fellow incarcerated people in on similarly or more severe sentences and offenses until 2019.

### B. Under the Bentley-Ivey Administration, Alabama Reformed Its Parole System to Address Overcrowding, Systemic Violence, and Threats to Public Safety

645. As detailed above, Alabama's prisons are notoriously unfit for habitation, overcrowded, and unsafe. These issues are not new, however. Indeed, Alabama's government and citizenry have well understood the life-threatening conditions and spiraling costs plaguing its broken prison facilities and system for decades.

646. By February 2007, Alabama's prisons were the second-most overcrowded in the nation, with approximately 27,000 people incarcerated in facilities designed to hold approximately 13,000.[62] This overcrowding, combined with the reality of dilapidated prison buildings which were not designed for efficient or safe corrections detention (either in terms of keeping incarcerated people or correctional staff safe), forced the State to spend higher and higher amounts on corrections every year, even while cutting budgets for other departments.[63] These spiraling costs, overcrowding and unsafe and inhumane detention conditions persisted

---

[62] Alabama Case Study, Public Safety Performance Project (Feb. 2007), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2007/alabamafeb2007pdf.pdf
[63] *Id.*

even as violent crime and convictions for violent offenses dropped—in 2005, drug and alcohol offenses accounted for 38% of all prison admissions.[64]

647.    When then-Governor Robert Bentley assumed office in 2011, with Kay Ivey as his Lieutenant Governor, the crisis had only deepened.  Alabama's prisons had become the most overcrowded in the country, with Alabama's required spending for the Department of Corrections and Medicaid making up the two biggest drains on Alabama's general funds, all while the State was in a desperate fiscal crisis.  Thus, from 2011 onward, the Bentley-Ivey administration spent significant time and political energy searching for solutions to secure public safety while reining in costs.

648.    By September 2014, Alabama's prisons were operating at 195% of capacity.[65] Due to Alabama's ongoing correctional system "crisis", in 2014, a coalition of government actors (including then-Governor Bentley, the Chief Justice, and representatives from the Alabama House and Senate) asked the federal government and Pew Charitable Trusts for support "to explore a 'justice reinvestment' approach to reduce corrections spending and reinvest in strategies that can reduce recidivism and improve public safety," with technical assistance from the Council of State Governments Justice Center ("CSG").[66]  That process culminated in the 2015 Justice Reinvestment Act ("JRA"), which, among other things, reformed parole practices in the State.  The goal of the JRA reforms was to reduce ADOC's population by at least 5,000 over 5 years and implement practices proven to maximize public safety, including investing in (1) training and education programming for incarcerated people, and (2) actuarially-based and data-driven decision making by correctional, parole and probation staff to secure a long-term reduction in Alabama's carceral population by maximizing reintegration of people successfully and safely back into Alabama's communities.

---

[64] *Id.*
[65] Justice Reinvestment in Alabama Analysis and Policy Framework, Council of State Governments Justice Center (Mar. 2015) ("Justice Reinvestment Analysis"), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG-AlabamaJRFramework.pdf.
[66] *Id.*  at 2.

649.     Alabama's longstanding parole statutory framework required the Parole Board to consider incarcerated individuals for parole once they have completed a portion of their sentences, assuming the sentence is one that permits the possibility of parole.  Ala. Code §15-22-28(e)(3).

650.     The JRA improved the Parole Board's individualized inquiry by requiring it to incorporate evidence- and data-based practices into its decision-making.  The JRA also required the Parole Board to implement "structured, actuarially based" guidelines to determine fitness for parole, which "promote the use of prison space for the most violent and greatest risk offenders" and include consideration of the "prisoner's risk to reoffend, based upon a validated risk and needs assessment."  Ala. Code §15-22-26.

651.     The JRA also required the Parole Board to give each potential parolee a parole score.[67]  The Parole Guidelines indicate that the Parole Board should generally grant parole to those who score between 0-7 and should deny parole to those who score 8 or higher.

652.     The JRA achieved its goals and demonstrated how Alabama's parole system can function free of discrimination, categorical rules, and bias.  Using the evidence-based, objective standards required by the JRA, the Parole Board oversaw steady rise in parole grant rates between 2015 and 2018—achieving exactly the practical result that the Legislature had intended.  By applying the JRA's objective standards, parole grants rose from 2,236 people in FY 2015 to 3,732 people in FY 2018—more than a 50% increase in the number of incarcerated people released on parole relative to 2015.[68]  As shown in the table below, between FY 2015 and FY 2018, parole hearings peaked at 7,098, and parole grant rates peaked at 54.2%, with the parole board considering an average of 6,581 parole applications each year from FY 2016 to FY 2018.

---

[67] Parole Guidelines, Ala.  Bureau of Pardons & Paroles, https://paroles.alabama.gov/wp-content/uploads/ABPP-2-Final-PAROLE-GUIDELINES.pdf (last visited Dec.10, 2023).
[68] Ala. Bureau of Pardons & Paroles, Monthly Statistical Report (Aug. 2023), https://paroles.alabama.gov/wp-content/uploads/AUGUST-2023-MSR.pdf.

| Fiscal Year/Dates | Hearing Held/Paroles Considered | Granted | Percent Granted |
|---|---|---|---|
| FY 2014-2015 | 5,958 | 2,236 | 37.53% |
| FY 2015-2016 | 6,458 | 3,108 | 48.13% |
| FY 2016-2017 | 7,098 | 3,847 | 54.20% |
| FY 2017-2018 | 6,996 | 3,732 | 53.34% |

653.    The JRA was also successful in mitigating Alabama's overcrowding crisis in its prisons by reducing the prison population. Implementation of the JRA's evidence-based standards achieved the Legislature's stated goal of reducing the population in ADOC facilities, as the number of incarcerated persons dropped from 24,191 at the end of FY 2015 to 20,087 at the end of FY 2018. These reductions were especially pronounced among incarcerated people held and working in the community unsupervised on a daily basis from ADOC work-release and work-center facilities. These people, who already work in the community unsupervised on a daily basis and often receive home passes that allow them to live with their families and loved ones for days at a time, are precisely the people who, logically, should be the most frequently paroled once evidence-based, objective decision-making is implemented, because ADOC has already determined they pose no threat to public safety. Between 2015 and 2018, the ADOC work-release population was reduced by 38.2%, and the work-center population dropped by 17.5% with the Parole Board's application of the JRA's evidence-based parole criteria.

654.    Available data concerning parole grant rates in FY 2018 suggest that implementing the statutorily required objective, evidence-based criteria also delivered another important dividend in the public interest: near parity in parole outcomes between Black and white parole applicants. Among incarcerated people in high-security, medium-security, work-center, and work-release facilities considered for parole in FY 2018 (January-September 2018),

both Black and white parole applicants had parole grant rates above 50%, with 50.7% of Black

incarcerated people granted parole and 54.4% of white incarcerated people granted parole.

   **C.    In late 2018, Governor Ivey and Attorney General Marshall Reverse Course, Issue Instructions to Parole Board, and Take Action, Including Securing a Legislative Amendment, to Extend Sentences by Dramatically Reducing Parole Rates, Effectively Eliminating Parole Consideration for Black Alabamians and for all People Serving Sentences for "Violent" Offenses**

   655.    Despite the JRA's success in ameliorating Alabama's prison crisis, reducing the

incarcerated population, and diminishing the impact of racial bias in parole decision-making,

Governor Ivey and Attorney General Marshall joined forces in 2018 to direct the Parole Board to

reverse the tremendous progress and transform Alabama's parole system.  Clearly, the

decreasing population of Alabamians in prisons threatened ADOC's and its public and private

partners' supply of cheap incarcerated labor—and thus threatened to curtail the substantial

financial benefit ADOC and other were reaping from their institutionalized forced-labor scheme.

   656.    Seizing upon the tragic crime committed by Jimmy Spencer, a white man, after he

was released on parole and evaded supervision, and cloaking their actions in the language of

public safety, Governor Ivey and Attorney General Marshall sought to subvert the lawful

operation of Alabama's parole system by dramatically eliminating the availability of parole for

people incarcerated in the State.

   657.    In October 2018, Governor Ivey and Attorney General Marshall summoned the

members of the Parole Board to a meeting in the Governor's office.  As described by then-chair

of the Parole Board Lyn Head in an interview with the media, in that meeting, Governor Ivey

and Attorney General Marshall "set the tone for how the Board was expected to vote for people

convicted of violent crimes….  Ivey was puzzled as to why Board members would vote to

release people who had committed such crimes.  'Why would you even consider letting someone

convicted of a violent crime go free?' Ivey asked."  When Head responded by explaining to

Governor Ivey that "the parole board is required by the Legislature to use a risk assessment tool

that helps predict whether someone is likely to reoffend, and that people convicted of violent

crimes were often considered low risk based on that available data," Governor Ivey "banged her hand on the table and said, 'But don't you think these people need to pay a price?'"[69]

658.    After the meeting and until Head resigned her position on the Board, she admitted that she felt pressure from both Governor Ivey and Attorney General to change the way she had been proceeding previously—replacing data- and evidence-driven analysis with more uniform parole denials for people in prison on charges labeled "violent."

659.    Dissatisfied with the apparent unwillingness of Parole Board Chair Head and her fellow Parole Board members to acquiesce to her demands, Governor Ivey soon thereafter issued an Executive Order requiring a moratorium on early parole consideration to last for 75 days or until the Board implemented a corrective action plan.[70] Attorney General Marshall made clear when Governor Ivey issued her order, that "there was an expectation from the [G]overnor and I that we'll see change."[71]

660.    The Governor and Attorney General then continued their concerted efforts to subvert the lawful operation of Alabama's parole system via legislation.  In less than one month, the Attorney General pushed legislation through the State Legislature that gave the Governor more oversight of the Parole Board and the power to directly appoint the Executive Director, whom the Parole Board previously had appointed.[72] According to Ivey's press release, the

---

[69] Lauren Gill, *In Alabama, an "Out of Control Board" Cuts Chances for Parole*, Boltsmag.org (Nov. 28, 2023), https://boltsmag.org/alabama-parole-board/.
[70] *AL Governor Orders Freeze on Violent Inmates' Early Parole*, WSFA 12 News (Oct.  15, 2018), https://www.wsfa.com/2018/10/15/gov-ivey-issues-executive-order-freeze-early-parole-violent-inmates/; Exec. Order No.716, Imposing a Temporary Moratorium on Early Parole Hearings and Requiring the Submission and Implementation of a Corrective Action Plan for the Board of Pardons and Paroles (Oct. 15, 2018),
https://governor.alabama.gov/newsroom/2018/10/executive-order-no-716/.
[71] Brian Lyman, *Ivey Announces Early Parole Moratorium, Shake-Up of State Parole Board*, Montgomery Advertiser (Oct. 15, 2018),
https://www.montgomeryadvertiser.com/story/news/politics/2018/10/15/ivey-announces-early-parole-moratorium-shake-up-state-parole-board/1647632002/.
[72] Press Release, Office of the Governor, *Governor Ivey Signs Bill Reforming Alabama Board of Pardons and Paroles* (June 6, 2019), https://governor.alabama.gov/newsroom/2019/06/governor-ivey-signs-bill-reforming-alabama-board-of-pardons-and-paroles/.

amendment to the parole law secured, among other things, "strict rules and guidelines" would prevent "violent offenders" from receiving parole and significant increases in the Governor's control over the Parole Board, including by granting her the power to directly appoint the Executive Director, whom the Parole Board previously had appointed.

661.    Governor Ivey immediately used the powers the new bill afforded her to consolidate her control over the Parole Board and specifically direct its decisions.  In July 2019, Governor Ivey replaced Executive Director Eddie Cook with former Alabama Attorney General and Circuit Judge Charles Graddick, who once reportedly called for abolishing the Parole Board altogether.[73]  Governor Ivey appointed Graddick to oversee the Parole Board and to implement her and Attorney General Marshall's racially biased, anti-parole agenda.

662.    Shortly thereafter, the Governor installed the current Board chair, Defendant Leigh Gwathney, who had previously worked as an Assistant Attorney General in the Alabama Attorney General's Office.  From her installation as Board chair to the present date, Gwathney consistently has advised her fellow board members, parole board staff, and even members of the public and legislators in meeting that she received specific instructions from Governor Ivey— when Governor Ivey appointed Gwathney to the Parole Board upon the recommendation of Attorney General Marshall—that required her to not consider granting parole to anyone charged with a violent crime.

663.    Graddick and Ivey immediately began implementing Ivey's directives to virtually eliminate parole, ensuring that the State maintained access to a captive labor pool.  Upon his appointment in September 2019, Graddick suspended hundreds of parole hearings for 90 days until November 2019.[74]  When hearings resumed, Graddick stated, of the Parole Board, "They

---

[73] Brian Lyman, *Graddick Talks Violent Crimes Before Resumption of Parole Hearings*, Montgomery Advertiser (Nov.  4, 2019), https://www.montgomeryadvertiser.com/story/news/2019/11/04/parole-hearings-resume-pardons-and-paroles-director-charles-graddick-weighs/4149639002/.
[74] Eddie Burkhalter, *Charlie Graddick to Resign as Director of Alabama Bureau of Pardons and Paroles*, Alabama Political Reporter (Nov. 2, 2020),

know now that their job isn't to create space in Alabama['s] prison system[,] that's not what they were brought in to do."[75]

664.    When parole hearings resumed—and in the years since then—the Parole Board's own records make abundantly clear that the Governor, Attorney General, and Parole Board members agreed to, and did in fact, abandon Alabama's longstanding focus on each individual's fitness for parole in favor of a blanket effort to deny parole for any person serving a sentence on an offense categorized as "violent."

665.    In fact, in a meeting called by Alabama legislators in late 2020 to address the legislators' concerns regarding the Parole Board's slowdown in hearings and the sharp racial differences in parole outcomes since Governor Ivey installed the new board, Parole Board Chair Gwathney admitted that she did not use or rely on the objective, evidence-based standards required by the JRA—standards that formalized Alabama's longstanding individualized approach to parole consideration—because she did not think those objective standards were the "important things" to consider.

666.    Indeed, after the 2018 meeting in the Governor's office where Attorney General Marshall and Governor Ivey issued their instructions to the parole board regarding commencing broad and sweeping parole denials as a systemic practice, Attorney General Marshall sharply altered the previous practice of the Attorney General's office and now submits letters opposing parole for nearly every single parole applicant, including all applicants serving a sentence on a "violent" offense, and coordinates with a group that calls itself Victims of Crime and Leniency ("VOCAL") to appear at parole hearings to oppose parole even when the victim of a crime chooses not to oppose—or even supports—the parole application of an incarcerated person. Based on the new parole scoring guidelines issued by Executive Director Graddick, opposition

---

https://www.alreporter.com/2020/11/02/charlie-graddick-to-resign-as-director-of-alabama-bureau-of-pardons-and-paroles/.

[75] Caroline Beck, *As Parole Hearings Resume, Graddick Says Release Is Not a Right*, Alabama Daily News (Nov. 5, 2019), https://aldailynews.com/as-parole-hearings-resume-graddick-said-release-is-not-a-right/.

by the Attorney General and/or VOCAL adds a point (out of 9) to a parole applicants' "score" as does the underlying offense being classified as "violent." Thus, by sending these letters, Attorney General Marshall ensures that all parole applicants serving a sentence for a violent offense have a starting score—before consideration of anything about the individual applicant—of 2. Unsurprisingly, indicating the close coordination of Chair Gwathney with Attorney General Marshall's directives, Chair Gwathney has frequently admitted that she will only consider releasing a person if they have a parole score of "1."

667.    Ivey, Marshall, and the Parole Board have also leveraged ADOC's coercive labor policies to ensure that parole grant rates stay low and they maintain access to a cheap, captive labor force.

668.    As explained further *supra* FA Part II.A., Governor Ivey issued an executive order on January 9, 2023 that enhanced the already harsh punishments for incarcerated people who resist the statewide forced labor requirements. Refusals to work or encouragement of work stoppages are now classified as "medium" and "high" level violations, respectively, which not only subjects incarcerated people to severe discipline, but also makes it far less likely that the Parole Board, led by Defendant Gwathney, will grant them parole. The ADOC Commissioner has complied with this order and enforced these excessive regulations, making "refusal to work" a stain on an incarcerated person's record.

669.    Indeed, incarcerated people are aware of this fact. Many incarcerated people, including named Plaintiffs Zackary Ball, Danny Dandridge, Fred McDole, and Victor Thomas, have expressed that they work, no matter how dire the conditions, because they know that if they receive a disciplinary for refusal to work they will not be granted parole. Of course, whether an incarcerated person is willing to work for an abusive employer, performing hard labor for low wages, or work in the hot sun for $2 a day, has little to no bearing on their individual fitness to live as a free person in the community.

670.    These forces work in conjunction with Board Chair Gwathney's exceedingly high bar for granting parole to ensure that incarcerated people work for ADOC's benefit. Because, as

explained *supra*, the Board now requires an incarcerated person to have virtually no discipline whatsoever on their record to receive parole, Ivey, Marshall, and the private employer Defendants are able to leverage that policy to compel incarcerated people to work.  Further, because incarcerated people are disciplined for refusal to work for "infractions" as minor as being too sick to work or being a few minutes late, Defendants are able to prolong the detention of incarcerated workers and all the benefits that come from exploiting their labor.  The two systems work in concert to perpetuate the unlawful scheme.

671.    Ivey, Marshall, and Parole Board did not simply undo the work of the JRA—they fundamentally changed Alabama's justice system such that parole became virtually unavailable for any person in the state, regardless of when they were convicted, particularly for people serving time for offenses categorized by Alabama as "violent.:

672.    Between FY 1992 and FY 2017, Alabama held an average of 7,007 parole hearings annually, and those hearings resulted in parole being granted at an average rate of 36.7%.   As the chart below shows, for each year in which the data is publicly available, the parole rate when each member of the parole denial class was either arrested or indicted, whichever was earliest (the closest available proxy for the date their crime of conviction was committed) was in keeping with that trend:

| Plaintiff | Year of Arrest or Indictment | Rate of Parole (Fiscal Year) |
|---|---|---|
| Lee Moore | 1993 | 34.5% (1993) |
| Jerame Cole | 2007 | 43.4% (2007) |
| Frederick McDole | 2008 | 41.4% (2008) |
| Michael Campbell | 2003 | 34.1% (2003) |
| Arthur Ptomey | 2007 | 43.4% (2007) |
| Lanair Pritchett | 2007 | 43.4% (2007) |
| Toni Cartwright | 2011 | 29.4% (2011) |

| | | |
|---|---|---|
| **Rashaad Clark** | 2012 | 30.3% (2012) |
| **Deckrice Morrissey** | 2012 | 30.3% (2012) |
| **Eric Prewitt** | 2016 | 54.2% (2016) |
| **Trevion Clark** | 2011 | 29.4% (2011) |
| **Larry Jarmon** | 2012 | 30.3% (2012) |
| **Cordarius Evans** | 2012 | 30.3% (2012) |

673.    After Ivey, Marshall, Gwathney, and the Parole Board entered into their unlawful conspiracy, parole grant rates plummeted and, just as significantly, the pace of Parole Board's operations ground to a snail's pace, sharply reducing the opportunities for parole consideration as compared to decades of the Parole Board's operations previously.  As shown in the table below, beginning as soon as Governor Ivey installed Graddick as Executive Director, after the moratorium ordered by Governor Ivey herself and then the moratorium imposed by order of Graddick, the Parole Board immediately began conducting about a third of the number of hearings – considering just a third of the number of parole applications – than all preceding parole boards since 1992.  Indeed, as also shown in the table below, when the sharply reduced number of parole hearings is combined with the sharp decline of the parole grant rate, discussed below, Ivey and Marshall's Parole Board appointments and instructions resulted in the Parole Board granting parole in FY 2020—the first year of Graddick and Gwathney's tenure—to less than 15% of people granted parole by the Parole Board in FY 2017 and FY 2004, and the Parole Board granting parole in FY 2023 to less than 1% of the people granted parole by the Parole Board in FY 2017 and FY 2004.  Underlying the huge break from historical practice secured by Ivey and Marshall's appointed parole board, the Parole Board since FY 2020 granted parole on average annually only to 493 parole applicants, which is less than 20% of the 2,524 people to whom the Parole Boards for the 16 years from FY 1993-FY 2019 granted parole on average annually.

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

| Fiscal Year/Dates | Hearing Held/Paroles Considered | Granted |
|---|---|---|
| FY 1992-1993 | 5,443 | 2,093 |
| FY 1993-1994 | 5,633 | 1,942 |
| FY 1994-1995 | 6,155 | 2,287 |
| FY 1995-1996 | 6,549 | 1,644 |
| FY 1996-1997 | 7,822 | 2,712 |
| FY 1997-1998 | 7,834 | 2,761 |
| FY 1998-1999 | 5,592 | 1,729 |
| FY 1999-2000 | 5,406 | 1,836 |
| FY 2000-2001 | 5,452 | 1,772 |
| FY 2001-2002 | 5,811 | 2,169 |
| FY 2002-2003 | 6,936 | 3,198 |
| FY 2003-2004 | 11,603 | 3,954 |
| FY 2004-2005 | 8,657 | 2,190 |
| FY 2005-2006 | 9,508 | 3,439 |
| FY 2006-2007 | 6,640 | 2,187 |
| FY 2007-2008 | 7,356 | 3,193 |
| FY 2008-2009 | 7,924 | 3,280 |
| FY 2009-2010 | 6,788 | 2,690 |
| FY 2010-2011 | 6,871 | 2,097 |
| FY 2011-2012 | 7,406 | 2,178 |
| FY 2012-2013 | 7,627 | 2,312 |
| FY 2013-2014 | 6,647 | 2,237 |
| FY 2014-2015 | 5,958 | 2,236 |
| FY 2015-2016 | 6,458 | 3,108 |
| FY 2016-2017 | 7,098 | 3,847 |
| FY 2017-2018 | 6,996 | 3,732 |
| FY 2018-2019 | 4,270 | 1,337 |
| FY 2019-2020 | 2,704 | 544 |
| FY 2020-2021 | 4,232 | 648 |
| FY 2021-2022 | 4,002 | 409 |
| FY 2022-2023 | 3,583 | 297 |
| FY 2023-2024 | 2,786 | 565 |

674.    In addition to slowing the pace of scheduled parole hearings to a crawl, Ivey and

Marshall's newly installed Board Chair and Executive Director soon produced Board decisions

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

that tracked exactly the instructions the Attorney General and Governor gave the Parole Board members in the October 2018 meeting: systemic and sweeping parole denials, with blanket denials of parole to anyone serving a sentence for a violence offense.  As the following chart makes clear, the Ivey- and Marshall- led Parole Board has caused parole rates and the number of people granted release on parole to drop to levels that the State has never seen before, dramatically lowering the likelihood of parole for every incarcerated person who would have been eligible for parole but for the unlawful change.



675.    The degree to which the Parole Board implemented Governor Ivey's directive, at the expense of the individualized approach mandated by Alabama law, is starkly evident in the drastic reduction in parole release for incarcerated people convicted of "violent" crimes — revealing that the Parole Board effectively resentenced these individuals to terms of imprisonment "without parole."  Alabama broadly defines which crimes are deemed "violent," including not only crimes that have as an element the use, attempted use, or threatened use of a weapon or physical force against another person but also, for example, third-degree burglary, trafficking in cannabis, and attempts, conspiracies, or solicitations to commit "violent" offenses.

Ala. Code §12-25-32. As the following graph shows, the parole grant rate for people incarcerated on convictions for "violent" crimes fell from a rate of approximately 44.7% in FY 2018 to 8.8% in FY 2020 and even further to 3.5% in FY 2022.



676. Again, as ADOC and ABPP refuse to release more granular parole data regarding parole grant rates by type of offense, Plaintiffs have been barred from conducting systemic analysis of the change in parole rates by type or category of violent offense. However, analyses conducted by the media and observations from the named plaintiffs, retained putative class members, and interviews with former Parole Board members, reveal a sharp decline in parole grant rates since the 2019 Parole amendment for all types of violent offenses *compared to any time period since 1992*. On August 21, 2021, media reported that in the nearly two-year period from September 2019 to August 2021, the Parole Board led by Gwathney had denied parole to *every person* serving a sentence on a homicide charge.[76]

677. Further, using the complete offense and parole data from FY 2018 – the earliest data available—to the same data from FY 2019 to the present reveals that the parole grant rate in FY 2018 for parole applicants serving a sentence for a homicide conviction was 32.4%, but from

---

[76] Beth Shelburne (@bshelburne), TWITTER
https://x.com/RepEngland70/status/1429126533235499020

FY 2019 onward, the parole grant rate was 3.0% for people serving time on that same offense (with many years showing a parole grant rate of 0% for that offense). The same sharp reduction is true for parole applicants serving time on a robbery or assault charge: in FY 2018, the parole grant rate was 50.6% for robbery offenses, and from FY 2019 onward, it was 7.6%; in FY 2018, the parole grant rate was 38.1% for assault offenses, and from FY 2019 onward, it was 6.2%.

678. In addition, former parole board members and staff report that prior to 2019, there was not a different set of factors used to assess parole applicants depending on the offense: rather, before and after the JRA, prior to 2019, the Parole Board's analysis was guided by the parole applicant's specific program and educational certifications, disciplinary and work records. The experiences and observations of named plaintiffs and retained putative class members are in accord: Each can identify numerous individuals who were incarcerated on offenses which were the same or more severe than their offenses who were granted release by Parole Boards after serving far fewer years in prison than they have due to the blanket parole denials issued by the Parole Board since the 2019 amendments to Alabama's parole law.

679. When the data is viewed by race, the results are also disturbing for different reasons: under Gwathney and Graddick's leadership, the parole grant rate for people incarcerated on convictions for "violent" crimes fell from a rate of approximately 44.7% in FY 2018 to 6.9% for Black and 10.6% for white incarcerated people in FY 2020, falling to a rate of approximately 2.2% for Black and 4.9% for white parole candidates in FY 2022.

680. These analyses make clear that the Graddick-Gwathney Parole Board implemented Governor Ivey and Attorney General's directive to deny parole to people convicted of an offense that Alabama law characterizes as "violent," particularly with respect to Black incarcerated people. In doing so, Governor Ivey secured the alteration of thousands of sentences issued to people convicted of violent offenses, effectively changing those sentences to a fixed term *without* any real possibility of parole.

681. The Parole Board's own data show that in the vast majority of cases in recent months, the Board has wholly disregarded the individualized inquiry guided by the objective,

evidence-based Parole Guideline recommendations.  As of August 2023, the Board followed the Parole Guidelines' recommendation regarding whether an applicant should be granted parole only 6% of the time.[77]



682.    The implementation of Governor Ivey and Attorney General Marshall's directive to stop letting people out, and particularly not to let anyone with a "violent" conviction out—regardless of the individualized, case-by-case factors that Alabama law historically emphasized and the JRA requires the Parole Board to consider—has effectively altered, system-wide, sentences carefully crafted and issued by the judicial branch to permit parole, to make them harsher sentences that either do not provide parole consideration at all or only permit parole consideration in an impermissible, racially biased manner.  The Parole Board's blanket decision-making—which ignores virtually any efforts incarcerated people make towards rehabilitation and is untethered to evidence and the objective standards dictated by Alabama law—created a significant risk of prolonging the period of incarceration for all persons sentenced to a term of imprisonment with the possibility of parole.  Evidence concerning the operation of the parole system since 2019 demonstrates that this risk has become a reality: incarcerated people convicted of "violent" crimes are denied almost every time and incarcerated people convicted of all other

---

[77] Ala. Bureau of Pardons & Paroles, Monthly Statistical Report (Aug. 2023), https://paroles.alabama.gov/wp-content/uploads/AUGUST-2023-MSR.pdf.

crimes are typically denied release, regardless of the results of their Risk Assessment, the duration of confinement, their efforts to prepare for reentry, months or years without incident or re-offense working alongside free workers (including living unsupervised in the community on weekends or other extended "passes"), or any other factor.

683.    Ivey, Marshall, and the Parole Board have also subverted the lawful operation of the parole system by dramatically increasing the penalty for any alleged parole "violation," no matter how small or technical—even if the alleged violation is later determined to be unfounded.

684.    As just one example, Plaintiff English was granted parole in 2017 and was working at a car dealership full time by the time the COVID pandemic began. Mr. English's employer then falsely accused him of assault after he filed a claim against the employer for a violation of state pandemic protections. That false accusation led to Mr. English's parole being revoked. Mr. English was then acquitted of all charges in 2020, but the Parole Board refused to schedule a hearing to consider his parole until November 2023, at which point the Parole Board denied his parole for a year, with Chair Gwathney voting to set off his next parole hearing for five years. Mr. English was not granted parole until his hearing in early 2025, and was just finally released in early April 2025, nearly five years after when he was acquitted of the false charges by the jury that led to the parole revocation.

685.    Mr. English's situation is not unique. Since being appointed to the Parole Board by Ivey, Defendant Gwathney has changed the Parole Board's policy to maximize parole revocations by requiring that any person on parole who is subsequently arrested to be remanded to ADOC custody to serve the remainder of their original sentence. This policy is applied even when the arrest has no factual basis and the person on parole conclusively demonstrates that they are not guilty of a crime. On information and belief, based on the reports from numerous putative class members and Named Plaintiffs—since such data system wide is not available by public record request—this change in policy appears to be a key mechanism through which Governor Ivey, Hamm and Gwathney have grown the coerced labor force to be "leased" out or used directly by ADOC for Alabama's profit and benefit.

686.    The new, anti-parole system implemented by Governor Ivey, Attorney General Marshall, and the Parole Board has also been tainted by overt and deliberate racial bias, as both the actions of those involved and the available data regarding the Parole Board's decisions shows.

687.    Charles Graddick, who was appointed by Ivey to the Parole Board immediately after the legislation granting her unprecedented power over the Board, immediately began acting in a racially discriminatory manner.  Upon his appointment, Graddick, acting as Ivey's agent, promptly served the three top officials at the Bureau of Pardons and Paroles, each of whom was Black—Cook, as well as the Assistant Executive Director and the Director of Personnel—with disciplinary charges stating that, if they did not resign, they would be terminated.  On the day Graddick told Cook and other senior Black agency officials to resign or be fired, Graddick instructed security to escort the officials from the office.

688.    In his first week on the job, Graddick also issued a directive that the wearing of a wide array of natural hairstyles, typically worn by Black people, would be prohibited as "unprofessional" and unsuitable at the Parole Board office.

689.    Former Board chair Lyn Head resigned in September 2019.  She later disclosed that one of the reasons for her resignation was the "blatant … racial discrimination" she observed at the Parole Board after Graddick took over.[78]

690.    The data regarding the Parole Board's decisions since Governor Ivey and Attorney General Marshall implemented their plan, in collaboration with the Parole Board, also confirm that the individualized consideration required by state law has been replaced by a racially skewed decision-making process.

---

[78] Patrick Darrington, *Former Parole Chair Discusses the Declining Parole Rate*, Alabama Political Reporter (Aug. 16, 2023), https://www.alreporter.com/2023/08/16/former-pardons-and-parole-chair-discusses-the-declining-parole-rate/.

691.    The rapid decrease in the rate of parole grants, for example, has disproportionately affected Black incarcerated people by dramatically increasing the gap in parole grant rates between Black and White incarcerated people, as the following chart shows.



692.    The relative difference in parole grant rates between Black and White incarcerated people in 2018, when the JRA was still in effect, and 2021, after Governor Ivey instructed the Parole Board to fundamentally alter how Alabama issued parole also reflects the racial bias underlying that decision.



693.    Indeed, between FY 2020 and FY 2022, Governor Ivey's handpicked Board favored white incarcerated people over Black incarcerated people for parole release ***at a rate of approximately 2 to 1***, when taking into account facility type (including close/maximum, medium, minimum work center, and minimum work release, which generally reflects the parole applicant's custody level), fiscal year, sex, and whether ADOC reported that the person had an off-site job in the past year.

694.    That racial disparity holds true even when taking into account the number and severity of felonies each prospective parolee had.  In 2018, when controlling for sex, facility type, and number of each of Class A through Class D felonies, there was no significant difference in the parole grant rate for White and Black incarcerated people with parole hearings. However, between 2019 and 2023, White people with parole hearings were 1.3 times as likely to granted parole as Black people with parole hearings when controlling for the same factors.

695.    For both men and women, the Parole Board's racial bias in parole decisions at the direction of Governor Ivey and Attorney General Marshall cannot be denied—and cannot be defended on public safety grounds.  Rather, the data demonstrates that Defendants' intentional scheme to capture Black lives for use and profit for Alabama through human trafficking and forced labor has succeeded, to the enormous detriment of incarcerated Black Alabamians, plaintiff organizations, the families of incarcerated people, and communities across Alabama.

**D.     The Conspiracy Among Governor Ivey, Attorney General Marshall, and the Parole Board Has Also Resulted in Disproportionate Delay in Parole Reconsideration Dates for Black Incarcerated People.**

696.    Once a potential parolee has been denied parole, the Board typically must also specify the date upon which that person will be considered again for parole, known colloquially as a "reset" or "set-off" date.  The agreement between Governor Ivey, Attorney General Marshall, and the Parole Board members to keep Black people incarcerated and available for profit-generating forced labor is further demonstrated by the unmistakable racial skew reflected in the Parole Board's set-off date determinations.

697.    The Parole Board under Defendant Gwathney has disproportionately issued the maximum set-off date of five years to Black parole candidates, while more frequently giving white parole candidates set-off dates of fewer than five years.  The chart below reflects the distribution of set-off dates of various lengths among Black and white people who received set-off dates from the Parole Board between FY 2018 and FY 2023.



698.    Thus, in addition to denying parole to Black incarcerated people at higher rates than their white counterparts, the Parole Board also reinforces and exacerbates the racially disproportionate demographics of the Alabama prison population by more often denying Black incarcerated people, for the maximum amount of time possible, the opportunity to prove their readiness for parole.  Four years into the racist conspiracy among Governor Ivey, Attorney General Marshall, Board Chair Gwathney and the associate Board members to undermine the JRA's evidence-based practices and to keep Black people disproportionately incarcerated, the effect on the prison population has been as stark as it is unsurprising: as of the September 2023 report from ADOC, 53.4% of the incarcerated population was Black, compared to 26.8% of the overall State population.

**E.  The Clear Incompatibility Between the Board's Disproportionate and Biased Denials of Parole and the Available Evidence Further Confirms That Racial Bias and the Perpetuation of Defendants' Forced Labor Scheme, Rather Than Public Safety Concerns, Are Driving the Board's Parole Decisions.**

699.    Defendants Ivey, Marshall, Gwathney and the associate Board members' conspiracy to subvert the individualized inquiry into fitness for parole required by Alabama law

in favor of a parole system infected with racial bias is further demonstrated by the clear incompatibility between the conspirators' invocations of public safety and the Parole Board's actions. Both the Board's treatment of incarcerated people who participate in ADOC's work-release and work-center programs—incarcerated people whom ADOC has determined pose the least threat to public safety of any category of incarcerated people—and the blatant disregard for the evidence that led Alabama to attempt to improve its parole practices in the first place show that forced labor and ingrained racial animus, not public safety, is what is driving the Board's actions. If the conspirators' goal were truly to grant parole only to people who have demonstrated that they are safe to be released unsupervised in the community, those low-risk incarcerated people in ADOC's work-release and work-center programs would be released through parole at a far greater rate than they are currently being released. All ADOC work release and work center laborers go outside prison walls on a daily basis and work and even live safely on weekends alongside free people in the community unsupervised, thus demonstrating they pose little threat to the public. Similarly, those convicted of violent crimes who have completed the requisite programming and educational programs and secured low-risk institutional records would be more, not less, likely to be released through parole, as low-risk violent offenders, according to all publicly available ADOC data and the scientific and research literature, have a much lower recidivism rate than non-violent offenders.

700. As explained above, to qualify for work release, an incarcerated person must earn the lowest custody status, "Minimum-Community", typically through completion of various educational and related programs (such as what is known as the "Crime Bill" class, which is a federally subsidized training program proven to reduce recidivism and prepare a person for safe re-entry to the community). Incarcerated people classified as Minimum-Community are "allowed gainful employment in the community on a full-time basis and are supervised in community-based facilities when not working."[79] ADOC precludes incarcerated people with

---

[79] Admin. Reg. 410.

certain crimes of conviction—for example, sex offenses, homicides, or three felony convictions involving the use of a weapon within the past 15 years—from ever obtaining Minimum-Community status, regardless of the current danger presented by that incarcerated person or how much time has elapsed since their conviction.[80] ADOC only classifies individuals as Minimum-Community if they are within specified time periods near the end of their sentences or parole consideration dates and, among other restrictions, they must also have a record clear of major disciplinary actions for at least 90 days.  In addition, ADOC notifies the district attorney of each county of conviction when an individual is approved for Minimum-Community placement, and the district attorney has the right to object to the placement before it is completed.  The district attorney, for example, many years ago objected to the assignment of Named Plaintiff Arthur Ptomey to a work release facility in 2012 or 2013, which prevented him from participating in work release until a few years later.

701.    ADOC has thus already determined that all incarcerated people participating in work release pose such a minimal threat to public safety that they are permitted to attend work each day outside ADOC's walls, among non-incarcerated coworkers and customers, in ordinary civilian clothing.  Incarcerated people with Minimum-Community custody levels are also regularly granted weekend passes for unsupervised home visits that can occur as frequently as every other weekend and can extend up to 72 hours.

702.    Similarly, by ADOC's own evaluation, incarcerated people classified as "Minimum-Out"—the next-lowest security classification associated with the work-center program— "do not pose a significant risk to self or others and [are] suitable to be assigned off-property work details without the direct supervision of correctional officers."[81] ADOC only classifies individuals as "Minimum-Out" if, among other restrictions, they have had no major disciplinary actions for at least 90 days and if they satisfy certain time-frame requirements with respect to the end of their sentence or parole consideration date.  As with Minimum-Community,

---

[80] ADOC, Male Classification Manual (Jan.  2018).
[81] Definitions, ADOC, https://doc.alabama.gov/Definitions (last visited Dec. 11, 2023).

certain convictions completely bar incarcerated people from obtaining Minimum-Out classification.[82]  As with Minimum-Community, people with Minimum-Out classification are sent unsupervised by prison officials outside prison walls every day to work alongside free people.

703.    Notwithstanding the determination that individuals in Minimum-Community and Minimum-Out classifications pose a low risk of committing further offenses or interfering with public safety, the Parole Board has nevertheless denied parole to such individuals since the 2019 Parole Amendment and Ivey and Marshall's takeover and control of the Parole Board at inexplicably high rates.  Between June and August 2023, parole was granted to only 10 of the 74 individuals assigned to work-release facilities whose parole hearings were conducted publicly.

704.    The racial skew in overall parole rates is also reflected in the parole grant rates for work-release workers.  Black incarcerated people who work through a work-center or work-release facility denied parole at considerably higher rates than similarly situated white participants.

705.    The racial disparities resulting from the challenged conspiracy to wrongfully abandon the legally required evidence-based parole determination system are shown by the parole outcomes for incarcerated people in work-release facilities, who are classified as Minimum-Community.  While Black and white incarcerated people in these facilities were granted parole at essentially equal rates in 2018 (78.4% and 78.9%, respectively), the drop in parole-grant rates after 2018 was directed in a markedly disproportionate way against Black incarcerated people in work release.  By FY 2020, the parole grant rate for white individuals in work-release facilities was 45.4%, while the rate for the Black work-release group fell to 26.0%.  By FY 2022, 23.4% of white parole candidates in work-release facilities were granted parole, compared to 15.5% for Black parole candidates in work-release facilities.

---

[82] ADOC, Male Classification Manual (Jan. 2018).

706.    Throughout the challenged conspiracy, the Board has also consistently granted parole for Black incarcerated people living in work center facilities, generally in Minimum-Out custody, at lower rates than for similarly situated white incarcerated people.  In FY 2018, Black and white incarcerated people at work center facilities were granted parole more than 60% of the time (61.6% and 65.7%, respectively).  By FY 2021, after the Governor installed Chairperson Gwathney, the parole grant rate for Black incarcerated people in work center facilities fell to less than *half* the parole rate for white people in that same classification—5.2% for Black people, compared to 15.3% for white people.

707.    Further demonstrating that public safety is a pretextual justification and is not in fact driving the Parole Board's decisions, the Parole Board has maintained lower parole grant rates in recent years for individuals classified as "low" risk under the Risk Assessment[83] than for individuals classified as "medium" risk.  In FY 2021, for example, the Parole Board granted parole to only 10% of incarcerated people deemed "low" risk by the Risk Assessment, while granting parole to 25% of those deemed "medium" risk.  The chart below demonstrates these patterns, which run directly contrary to Governor Ivey's and Attorney General Marshall's repeated professions of concern only for public safety.

|  | Risk Assessment | Total Decisions | Total Granted | Grant Rate |
|---|---|---|---|---|
| FY 2021 | **Low** | 1228 | 126 | 10% |
| | **Moderate** | 1848 | 471 | 25% |
| FY 2022 | **Low** | 1312 | 131 | 10% |
| | **Moderate** | 1709 | 248 | 15% |

---

[83] As discussed, *see supra* FA Part III.A, the Risk Assessment is a component of the Parole Guidelines focused specifically on an assessing an incarcerated person's risk of reoffending.

| | | | | |
|---|---|---|---|---|
| FY 2023 (YTD, Aug. 2023) | **Low** | 1122 | 85 | 8% |
| | **Moderate** | 1517 | 160 | 11% |

708.    If public safety explained the Board's parole decisions—rather than racial bias and a desire to expand the population of low-risk coerced workers (those best situated to be "leased" to outside employers for the profit of ADOC)—the Board would not disproportionately deny parole to incarcerated people identified as presenting lower risks to public safety.

709.    Racial disparities in parole outcomes for parole candidates convicted of "non-violent" offenses further demonstrate that the Board's public safety rationale is pretextual.



710.    As shown above, during Defendant Gwathney's tenure, the Parole Board has granted parole to Black parole candidates convicted of nonviolent offenses at lower rates than white parole candidates convicted of such offenses.

711.    The shortcomings of this approach are made clear by Alabama's own data.   The same research that prompted Alabama to enact the JRA showed that "lower-level property and drug offenders have high recidivism rates."[84] The unlawful conspiracy to refuse to grant parole

---

[84] Ala. Bureau of Pardons & Paroles, Monthly Statistical Report (Aug. 2023), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG-AlabamaJRFramework.pdf, at 27.

to any person convicted of a violent crime therefore keeps those who pose the lowest threat to public safety behind bars, in direct contravention of the Parole Board's statutory mandate.

712. ADOC's publicly available data bears this out. In fiscal 2018, for example, those convicted of nonviolent crimes who received parole recidivated nearly 16% more than those convicted of violent crimes. That pattern has held true for every year since—those parolees who were convicted of nonviolent crimes were more likely to recidivate than those convicted of violent crimes in 2019, 2020, 2021, 2022, and 2023. This data reflects that the changes Ivey, Marshall, and the Parole Board have made to Alabama's parole system are driven by something other than public safety, as they are keeping the safest incarcerated individuals behind bars for longer.

713. In fact, of those people in Alabama paroled in 2018: not a single one with a murder charge on their record has recidivated, 95% of those with a robbery charge have not recidivated, and 90% of those with an assault charge have not recidivated.

714. The racial skew of parole grants since the unlawful conspiracy began also flies in the face of ADOC data. In every year for which there is available public data since 2018, Black parolees have recidivated less than White parolees.

715. That data remains true even when controlling for criminal history. Black parolees with violent convictions, for example, have recidivated less than White parolees with violent convictions every year since 2018. Black parolees with robbery or assault charges on their record likewise have a lower recidivism rate than White parolees.

716. But, as explained *supra*, the Parole Board has still granted parole to Black people at a far lower rate than White people—clear indicia that racial bias, not public safety, is driving the Board's decision making.

717. This racial bias is also reflected in the parole grant rates to people who are granted discretionary leave passes by ADOC. These passes allow incarcerated people to leave the facilities in which they reside and go stay unsupervised in their personal homes, with family, or elsewhere in the community, for as long as 72 hours. The incarcerated people then return to

ADOC custody at the end of the "pass."  Obviously, such persons cannot credibly be considered a threat to public safety, since they are permitted to live as free people for days at a time and then voluntarily return to their incarceration.

718.    But since 2019, when Ivey, Marshall, and the Parole Board took over the parole system, parole grant rates for people with discretionary leave passes have fallen dramatically, and racial bias is again apparent.  In 2018, 89% of Black people with such passes and 76% of White people with such passes were granted parole.  Between 2019 and 2023, only 28% of Black people with such passes and only 36% of White people with such passes were granted parole.  In other words, Alabama started keeping people in custody who were proven to ***pose no threat to public safety*** at extremely high rates, and also flipped the racial balance so that White people in that category became more likely to receive parole than Black people, despite the opposite being historically true.

719.    Likewise, the precipitous decline in parole grant rates threatens public safety by releasing more people from ADOC custody into the general public with no supervision.  The Council for State Governments ("CSG") gave a presentation to State leaders in 2015 that stated, unequivocally, "[d]enying parole beyond eligibility contributes to overcrowding and cost, and also compromises public safety."[85]  ADOC has no mandated supervision of those released from ADOC custody at the end of their sentence, and the Justice Center's presentation made clear that those released at the end of their sentence are more likely to recidivate than those released on parole, as the following chart shows:[86]

---

[85] Justice Reinvestment in Alabama Fourth Presentation to Prison Reform Task Force, Council of State Governments Justice Center (Jan. 29, 2015), https://csgjusticecenter.org/wp-content/uploads/2020/10/ALPrisonReformTaskForce.pdf, at 16.
[86] *Id.* at 17.

Releasing people from prison without supervision and treatment results in more crime and cost down the road.

3-Year Felony Reconviction Rates for ADOC Parole and Unsupervised Releases, FY2010

720.    In addition, the decision to prolong confinement for people who have objectively demonstrated their fitness for parole makes the public less safe given the dangerous, unsanitary, and overcrowded conditions in Alabama prisons, which are more likely to cause those trapped in such conditions to suffer from mental, emotional, and physical trauma that makes it even more difficult for them to re-enter the community safely.  Indeed, in Governor Ivey's Emergency Proclamation issued on April 13, 2020, at the urging of a broad coalition of former Alabama law enforcement officials, directing the Parole Board immediately to recommence parole hearings in virtual meeting rooms after the Parole Board shut down hearings allegedly due to the COVID-19 pandemic, Governor Ivey acknowledged that "It is vitally important we keep Alabama's criminal justice system functioning for the good of public safety."[87]

721.    The Parole Board's willingness to deny access to parole at the expense of the law is further demonstrated by the Parole Board's treatment of incarcerated people convicted of

---

[87] *See* Press Release, Office of the Governor, https://governor.alabama.gov/newsroom/2020/04/governor-ivey-issues-supplemental-emergency-proclamation-to-allow-parole-hearings-to-resume/.

"nonviolent" offenses who have been sentenced to terms of imprisonment of less than 20 years. State statute provides that "if a prisoner convicted of a nonviolent offense, as defined in Section 12-25-32, with a sentence of 20 years or less is denied parole, the board shall reconsider releasing the prisoner on parole *no more than two years* after such parole release denial." Ala. Code §15-22-37 (emphasis added). Despite this statutory requirement, Bureau of Pardons and Paroles records indicate that, between January 1, 2018 and September 7, 2023, the Parole Board established set-off dates more than two years from the date of parole denial for approximately 63 people convicted of "non-violent" offenses and sentenced to terms of less than 20 years. In FY 2022 and 2023 (through September 7, 2023), the Parole Board appears to have assigned set-off dates more than two years in the future to approximately 22 such individuals, with 18 of these individuals receiving five-year set-off dates.

722.    In addition, the moratorium and sharp reduction in the number of parole hearings held by the Parole Board since 2019 have compounded the clear violations of the two-year cap on set-off dates for people serving time on non-violent offenses such that the parole hearing for such non-violent offenders, in fact, did not occur until long after two years had passed since the last hearing.

F.    **Defendants Ivey, Marshall, and Parole Board Members' Refusal to Change the State's Parole Practices Even In the Face of Public Evidence and Criticism Proves They Intend to Perpetuate the Consequences of Their Unlawful Conspiracy: A Parole System that Disproportionately Keeps Black People Imprisoned So They Can Be Exploited as Members of the State's Captive Labor Force.**

723.    Governor Ivey, Attorney General Marshall, and the Parole Board's embrace of the racially discriminatory parole system they engineered is further demonstrated by their refusal to change course when faced with evidence of the discriminatory effects of their unlawful scheme.

724.    In early 2020, Alabama State Representative Chris England began what became monthly, and sometimes daily, notices—continuing to present day—regarding the racial bias and continuation violation of state law by Ivey, Marshall, and Chair Gwathney regarding the Parole Board's operation and decisions. Representative England began by expressing alarm in early

2020 about the harm to public safety caused by then Parole Board's refusal to conduct either parole *or* pardon hearings.  By May 2020—when the Parole Board had finally resumed parole hearings—Representative England began issuing notices about the fact that the Parole Board denied parole to all 31 parole applicants on one of its first hearings on May 29, 2020.

725.    From June 2020 onward, Representative England repeatedly and publicly called out the Parole Board's new policy of denying parole across the board to nearly all applicants, dramatically dropping parole rates and swelling the prison population.  Representative England specifically and repeatedly, throughout 2020 and 2023, brought public attention to the connection between Governor Ivey and Attorney General Marshall's takeover of the Parole Board and the sudden and sustained drop in the parole rate.  He explained how the decrease in the parole rate led to increasing the size of the prison population, further draining state resources and undermining public safety precisely in the way the evidence-based parole decision making requirements implemented by the JRA—which were still in place—were designed to prevent.

726.    As England pointed out on June 9, 2020, the continuing denial of parole has created a situation where "[t]here has been an increase in homicides, suicides, and assaults on inmates both by other inmates and also staff. We have learned that a culture of corruption exists at just about all levels that creates an environment that breeds this sort of danger and despair."[88] Similarly, on June 18, 2020, England sent out notice that the law pushed by Ivey and Marshall resulting in the Parole Board's drop in parole had reversed the decline in prison population secured by the JRA's success: "So, we are probably pushing around 25,000 inmates which is more than where we were when we passed all of the bills in 2015.  Thanks to Graddick and the parole bill @GovernorKayIvey and @AGSteveMarshall recently supported, we are trending in the wrong direction at the worst time."[89] By August 2021, Representative England was posting regularly about the detrimental impact the Parole Board's blanket refusal to utilizing the

---

[88] Chris England (@RepEngland70), TWITTER (June 9, 2020, 4:06 p.m.), https://twitter.com/RepEngland70/status/1270371702300725256.
[89] Chris England (@RepEngland70), TWITTER (June 18, 2020, 6:55 p.m.), https://twitter.com/RepEngland70/status/1273675759039787009.

evidence-based practices required by state law was having on public safety and prison conditions:  "The sad reality is that this is taking all hope from the system. Applicants that have done everything asked of them, have an exemplary record of behavior, a strong support system at home, and people recommending release, are often denied for things they can't control or change."[90]

727.    Representative England also publicized the marked racial skew that was emblematic of the Ivey- and Marshall-led Parole Board's decisionmaking.  As of June 9, 2020, Representative England noted, the Parole Board's was three times more likely to grant parole to white parole applicants than black parole applicants.  Representative England posted that the same 3-to-1 racial skew persisted in the Parole Board's July 2020 decisions.  By August 2021, Representative England was publishing the racially skewed parole decisions from the Parole Board from November 2019 to June 2021:  "White Applicants? 751 granted, 2197 denied. Black Applicants? 349 granted, 2580 denied.  Hispanic Applicants? 4 granted, 23 denied.  Of the 1104 Paroles granted, 68% of them went to White applicants."[91]

728.    In August 2021, England posted to the public damning evidence of the Parole Board's ongoing racial animus toward Black Alabamians **the same racial skew present in the Parole Board's parole decisions from November 2019 to July 2021 was present in the *same ratios* for the Parole Board's decisions as to _pardons_:**  "Let's talk pardons. Here are the numbers from Nov. 2019 to June 2021. White Applicants? 601 granted, 1565 denied. Black Applicants? 313 granted, 1792 denied. Hispanic Applicants? 2 granted, 15 denied. Of the 916 pardons that were given 65% of them went to White Applicants."[92]  As noted by Representative England on August 28, 2021:  "this [Parole] board's completely subjective standards have not

---

[90] Chris England (@RepEngland70), TWITTER (Aug. 28, 2021, 11:23 AM),
https://twitter.com/RepEngland70/status/1431683874384449540
[91] *Id.* (Aug. 28, 2021, 11:23 AM),
https://twitter.com/RepEngland70/status/1431683862762037252
[92] *Id.* (Aug. 28, 2021, 11:23 AM),
https://twitter.com/RepEngland70/status/1431683857472970755

only created a substantial racial disparity in paroles but also pardons as well. You don't have to take my word for it. Look at the numbers. The fact that the disparity exists in both is not a bug, it's a feature."[93]  Representative England's November 2021 postings continued the same message regarding the data from decisions by the Parole Board as to pardons *and* parole decisions sharply favoring white parole and pardon applicants.[94]

729.    Representative England also drew public attention to the role the Parole Board's post-2019 practice of imposing ultra-long set off dates— often in excess of what  state law permits—to the Parole Board's dramatic reduction and denial of parole:  "And as I have said before, after denying them, [Chair Gwathney] sets the next hearing as far off as possible. She will even BREAK THE LAW to deny applicants an opportunity for rehearing for as long as possible. The law is clear. She just breaks it to keep people in longer."[95]  "The Board's new set date cannot be more than 2 years following denial for applicants serving sentences of 20 years or less for nonviolent offenses or 5 years following denial for all other applicants. Despite that, the chair often sets them all for 5 years anyway."[96]

730.    As discussed, in late 2020, legislators called a meeting to address the racial differences in parole outcomes.  *See supra* ¶665.  Defendant Gwathney was present for that meeting, acknowledged that she did not rely on the evidence-based standards the JRA required the Board to consider, and did not commit to taking any action to address the racial disparities that have persisted to this day.

731.    When confronted again in March 2022 with the stark disparity in parole outcomes between Black and white parole candidates, for example, Defendant Marshall's office issued a

---

[93] *Id.* (Aug. 28, 2021, 11:23 AM),
https://twitter.com/RepEngland70/status/1431683865920352257
[94] *Id.* (Nov. 16, 2021, 9:50 AM),
https://twitter.com/RepEngland70/status/1460666570871615498
[95] *Id.* (July 25, 2021, 6:39 PM), https://twitter.com/RepEngland70/status/1419351731599720448
[96] *Id.* (Aug. 28, 2021, 11:23 AM),
https://twitter.com/RepEngland70/status/1431683866935369733; *Id.* (Aug. 28, 2021, 11:23
AM), https://twitter.com/RepEngland70/status/1431683867946201095.

public statement opposing the legislation introduced to address these disparities which underlined and echoed his intentions and directions to the Parole Board, first issued in the meeting at the Governor's Mansion in October 2018.  In this public statement, he indicated his opposition to the legislation because it would "make it more difficult for the Board to deny parole," but he also explicitly expressed his immense pride in pushing through the 2019 parole amendments because "80 percent of Alabama's prison population are violent criminals." Defendant Gwathney declined to comment.[97]

732.    Defending the curative legislation he introduced, Representative England underlined that curing these problems is critical to protecting public safety:  "HB57 will create [] oversight. It will inject objectivity into the process to ensure due process is in place and that people are treated fairly. Public safety is paramount here because the guidelines are based on evidence based standards instead of subjective opinions."[98]

733.    Nearly a year later, in August 2023, Representative England explained the opportunity cost paid that is adverse to the interests of public safety by the Parole Board's blanket denial of parole to people who pose no threat to the public upon release:  "Also, denying parole to people that are either too sick to be a threat or have demonstrated over 20 or more years in prison that they are no longer a threat denies space to those that really need to be locked up. It also wastes money that we could be using on rehabilitation."[99]

734.    The racial bias infecting the Parole Board's decisions since 2019 has also been the subject of repeated news stories.  In 2021, for example, the Associated Press reported that "Black prisoners are being granted parole less than half as often as their white counterparts," based on

---

[97] Brian Lyman, *'No One Has an Answer': Racial Disparities Accelerated in Alabama Parole Grants for 2020, 2021*, Montgomery Advertiser (Mar. 4, 2022), https://www.montgomeryadvertiser.com/story/news/2022/03/04/alabama-paroles-show-show-growing-racial-disparities-statistics-show/9332685002/.
[98] *Id.* (Aug. 28, 2021, 11:23 AM), https://twitter.com/RepEngland70/status/1498546854803517444
[99] *Id.* (Aug. 28, 2023, 9:46 AM), https://twitter.com/RepEngland70/status/1692578821625598206

data dating back to November 2019.[100]  In 2022, the Montgomery Advertiser reported on racial disparities in parole grant rates, including by reporting on a press conference held by Representative Chris England in conjunction with his proposed legislation.[101]  In another article that month, Alabama Today reported Representative England's comments that 66% of parole grants between November 2019 and January 2022 went to white applicants, with white applicants two times more likely to get released than Black applicants.[102]

735.    Attorney General Marshall, Governor Ivey, and Parole Board Chair Gwathney have taken no curative or investigative action despite years of public attention since early 2020 to these gaping racial disparities in its parole and pardon decision making, including in the year after the filing of the instant lawsuit publicizing again this stark racial bias reflected in the Parole Board's decisions.

736.    The conspiracy between Defendants Ivey, Marshall, and the Parole Board has achieved its intended purpose: the Parole Board openly disregards the evidence-based framework required by the JRA in favor of a parole system that overwhelmingly denies parole, particularly to anyone convicted of a "violent" offense, and systemically denies parole disproportionately to Black people—particularly Black people whom ADOC has deemed low-risk and eligible to participate in ADOC's extremely lucrative work-release and work-center programs.

737.    The conspirators' efforts have helped to keep the incarcerated population—and thus the labor force coerced into supporting Defendants' forced-labor scheme—disproportionately Black.

---

[100] *Alabama Paroles Drop Further; Releases Lag for Black Inmates* (Nov. 29, 2021), AP News https://apnews.com/article/prisons-alabama-race-and-ethnicity-105cd119dd76e84b29f36f810c0a0a74.

[101] Brian Lyman, *'No One Has an Answer': Racial Disparities Accelerated in Alabama Parole Grants for 2020, 2021*, Montgomery Advertiser (Mar. 4, 2022), https://www.montgomeryadvertiser.com/story/news/2022/03/04/alabama-paroles-show-show-growing-racial-disparities-statistics-show/9332685002/.

[102] Beth Cann, *AG Steve Marshall Opposes New Parole Legislation Led by Rep. Chris England*, Alabama Today (Mar. 1, 2022), https://altoday.com/archives/44332-ag-steve-marshall-opposes-new-parole-legislation-led-by-rep-chris-england.

738.    The success of the conspirators' efforts to maintain a captive, disproportionately Black labor force for the economic benefit of ADOC and others is particularly noteworthy given that white *admissions* to ADOC custody have been outpacing Black admissions for years.

| Fiscal Year | Black Admissions (%) | White Admissions (%) |
|---|---|---|
| FY 2013 | 48.93% | 50.58% |
| FY 2014 | 48.72% | 50.43% |
| FY 2015 | 46.85% | 52.49% |
| FY 2016 | 44.61% | 54.76% |
| FY 2017 | 41.52% | 57.87% |
| FY 2018 | 40.98% | 58.29% |
| FY 2019 | 39.62% | 59.63% |
| FY 2020 | 38.33% | 60.97% |
| FY 2021 | 38.64% | 60.61% |
| FY 2022 | 38.31% | 60.75% |

739.    Every person denied parole due to the unlawful operation of the conspiracy challenged herein is trapped within a system that coerces labor from incarcerated people for the benefit of all Defendants.  The defendant conspirators, Ivey, Marshall, and the Parole Board members, have long been aware that increasing the rate of parole denials, particularly for Black incarcerated people with a demonstrated history of safely participating in off-site work programs, would ensure that these low-risk incarcerated workers would remain available to provide labor for the benefit of all participants in the State's forced-labor scheme.

740.     Governor Ivey, who works in concert with Attorney General Marshall and directs the Parole Board's actions, has or should have direct knowledge of the direct threat her anti-parole directives pose to public safety in the State.

741.     Governor Ivey has been a public executive in Alabama for more than two decades.   She was the State Treasurer from 2003 to 2011, and the Lieutenant Governor from 2011 to 2017.   Particularly in her role as Lieutenant Governor, Governor Ivey had a front-row seat to the snowballing crisis in Alabama's prisons, the attendant threats that crisis posed to public safety, how the violence that has become endemic in Alabama's prisons transforms the environment to ensure that all labor from incarcerated people is compelled and forced by the threat and consistent exercise of that violence, and the efforts the State was making to fix the problem.   The Alabama Constitution makes the Lt.   Governor the president of the senate.[103] In that role, then-Lieutenant Governor Ivey was responsible for key committee assignments in the Senate[104] and for determining the committees to which legislation was referred for consideration.[105] Governor Ivey's role therefore placed her in a position in which she was not only aware of the arguments for the JRA and present for its introduction, but also dictated its progress from bill to law.

742.     Governor Ivey was also involved behind the scenes in the efforts to reduce overcrowding in Alabama's prisons, improve the operation of the State's parole system, and make the State's prison system safer and more efficient.   While Lieutenant Governor, Ivey had regular meetings with then-Governor Bentley or members of his team.   As such, she was no doubt aware of the extensive issues plaguing Alabama's prison system and the significance of the efforts seeking to address it.   Ivey was also present for then-Governor Bentley's February 2, 2016 State of the State address, during which he explained that the efforts to reduce

---

[103] Alabama Constitution, Article V, Section 117.
[104] Alabama Senate Rules, Rule 47(b).
[105] *Id.*, Rule 23(a).

overcrowding in Alabama prisons would, among other things, "ensure [] the safety of [Alabama's] citizens."[106]

743.    Defendant Gwathney, meanwhile, would boast to other members of the Parole Board that she was carrying out the direct orders of Governor Ivey in granting parole to as few incarcerated people who were eligible as possible.

744.    As a recent hearing before the Alabama Legislature showed, Defendant Gwathney has also worked to subvert the lawful operation of the Alabama parole system in furtherance of Ivey's unlawful directives.

745.    During that hearing, Defendant Gwathney drew bipartisan criticism for the precipitous decline in parole grant rates under her leadership, the Parole Board's failure to adhere to its own guidelines regarding when parole should be granted, and Gwathney's general unwillingness or inability to answer questions, many of which she was given in advance of the hearing.[107]

746.    Defendant Gwathney was also criticized by legislators for at least two plain violations of Alabama law.  First, Gwathney was criticized for the Parole Board's failure to issue revised guidelines, as required by Alabama law, to guide its decisions about when to grant parole.  Ala. Code §15-22-26.  The JRA, as amended in 2019, requires the Board to issue revised guidelines every three years.  As one legislator noted, Gwathney's Parole Board has yet to issue any guidelines, making them "two years overdue."[108]  Even then, Gwathney could not give legislators a date certain by which new guidelines would be issued, stating only that the long-overdue guidelines would be issued "very soon."[109]

---

[106] Robert Bentley, 2016 State of the State Address, YouTube (Feb. 4, 2016), https://www.youtube.com/watch?v=8J3k7WVmge0&t=9s.
[107] Alexander Willis, *Alabama Parole Board Chair Grilled by Committee Over Release Guidelines, Noncompliance*, Alabama Daily News (Oct. 24, 2024), https://aldailynews.com/alabama-parole-board-chair-grilled-by-committee-over-release-guidelines-noncompliance/.
[108] *Id.*
[109] *Id.*

747.    Defendant Gwathney also admitted to legislators that she has taken it upon herself to *change the scores the current guidelines produce for prospective parolees in advance of hearings.*[110] This conduct fundamentally undermines the integrity of the parole hearing process and further reflects Gwathney's willingness to circumvent legal processes to reach her preferred outcome.

## CLASS ALLEGATIONS

748.    Plaintiffs Robert Earl Council aka Kinetik Justice, Lee Edward Moore Jr., Lakiera Walker, Jerame Aprentice Cole, Frederick Denard McDole, Michael Campbell, Arthur Charles Ptomey Jr., Lanair Pritchett, Alimireo English, Toni Cartwright, Turner Mason, Danny Dandridge, Zackary Ball, Rashaad Clark, Deckrice Morrissey, Eric Prewitt, Trevion Clark, Larry Darnell Jarmon Jr., Cordarius Evans, Michael Bullock, and Victor Thomas ("Named Plaintiffs") bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief and damages on behalf of the following Classes, respectively**:**

749.    **Forced Labor Class (by Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Evans, Bullock, and Thomas):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who worked while in the custody of ADOC at any time between the earliest applicable statute of limitations and the date a class is certified in this action (the "Forced Labor Class").

750.    **Parole Denial Class (by Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were denied parole while in the

---

[110] *Id.*

custody of ADOC at any time between the earliest applicable statute of limitations and the date a class is certified in this action (the "Parole Denial Class").

       a. **Discriminatory Parole Denial Subclass (by Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas):** All Black Parole Denial Class Members.

       b. **Off-Site Work Subclass (by Plaintiffs Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas):** All Parole Denial Class Members who provided labor through the work-release and/or work-center programs while in the custody of ADOC.

       c. **Post-JRA Parole Class (by Plaintiff Prewitt):** All Parole Denial Class Members who committed their crimes of conviction between 2015 and 2019

751. **Strike Class (by Plaintiffs Council, Walker, Ptomey, and Rashaad Clark):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were subjected to discipline by ADOC as a result of their advocacy for or participation in any strike, work stoppage, or refusal to work while incarcerated, at any time between the earliest applicable statute of limitations and the date a class is certified in this action (the "Strike Class").

752. Plaintiffs reserve the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or to add one or more subclasses based on information obtained during this litigation.

753. All members of the Forced Labor Class, the Parole Denial Class, the Discriminatory Parole Denial Subclass, the Off-Site Work Subclass, and the Strike Class have suffered or are threatened with imminent injury as a result of Defendants' wrongful acts and omissions, as alleged herein.

754.    This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

755.    **Numerosity—Rule 23(a)(1).** The members of each Class and Subclass are so numerous that joinder of all members is impractical.  As of September 2023, ADOC reported that 20,361 incarcerated people were housed within correctional facilities it owned and operated.  Approximately 50% of the incarcerated people within ADOC's custody are Black.  Approximately 3,585 people were denied parole in FY 2022, of whom 1933 were Black.  Approximately 235 people performed work for private and public employers through the ADOC work-center/work-release programs in FY 2022 and were denied parole; of this group, approximately 141 were Black.  More than 10,000 incarcerated people participated in the September 2022 strike at ADOC facilities and, on information and belief, many incarcerated people were disciplined for their participation in that strike or other work stoppages and/or alleged refusal to perform forced labor or labor under unlawful conditions.

756.    **Commonality and Predominance—Rule 23(a)(2) and 23(b)(3).**  There are many questions of law and fact common to each of the Classes and the Subclasses that will predominate over any questions affecting only the individual members.  These common questions include, but are not limited to:

   a.   With respect to the Forced Labor Class, whether Defendants have a policy and practice of compelling incarcerated persons to work through threats of force, physical restraint, economic coercion, abuse of law or legal process, or serious harm;

   b.   With respect to the Forced Labor Class, whether Defendants have a policy and practice of subjecting incarcerated people to a condition of involuntary servitude;

   c.   With respect to the Parole Denial Class, whether the Governor, Attorney General, and Parole Board acted arbitrarily and capriciously or in a flagrant and unauthorized manner in denying lawful parole hearings and/or parole

consideration and decision-making to class members, or denied parole to class members in violation of those class members' substantive due process rights;

d.   With respect to the Parole Denial Class, whether the Governor, Attorney General, and Parole Board unlawfully implemented the 2019 Parole amendments and changed the criteria governing parole in a manner that systemically altered and/or extended sentences issued by the judicial branch and/or substantially increased the risk of the class members' prolonged confinement;

e.   With respect to the Discriminatory Parole Denial Subclass, whether the Governor, Attorney General, and Parole Board orchestrated and are legally responsible for the intentional and disproportionate denial of parole consideration and/or parole release to Black incarcerated people as compared to similarly situated white incarcerated people;

f.   With respect to the Discriminatory Parole Denial Subclass, whether the Governor, Attorney General, and Parole Board intentionally and disproportionately extended the parole reconsideration dates of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, and Cartwright, and other Black incarcerated people as compared to similarly situated white incarcerated people;

g.   Whether Defendants are part of an association-in-fact within the meaning of RICO;

h.   Whether Defendants have engaged in a pattern of racketeering activity.

757.   **Typicality—Rule 23(a)(3).**   Because the policies and practices challenged in this Complaint apply with equal force to the Named Plaintiffs and the absent members of each Class and Subclass, the Named Plaintiffs' claims are typical of the claims of the members of the putative Classes and Subclasses they purport to represent.

758.   **Adequacy—Rule 23(a)(4) and 23(g)(1).**   The Named Plaintiffs are adequate representatives of the Classes and Subclasses they represent because they are each a member of their respective Classes and Subclasses and because there are no material conflicts of interest

between Named Plaintiffs and the interests of the Classes and Subclasses they seek to represent. The Named Plaintiffs have retained and are represented by competent and qualified counsel with extensive experience handling civil rights, class action, and other complex civil litigation. Proposed class counsel have litigated dozens of civil rights and other class actions and have substantial experience litigating cases under 42 U.S.C. §1983, the Ku Klux Klan Act of 1871 ("KKK Act"), Trafficking Victims Protection Act of 2000 ("TVPA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs' counsel will vigorously prosecute this action for the benefit of all putative members of each proposed Class and Subclass.

759.    **Risk of Inconsistent Adjudications—Rule 23(b)(1).** Certification is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of putative Class and Subclass members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class and Subclass members.

760.    **Declaratory and Injunctive Relief—Rule 23(b)(2).** Certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to each respective Class and Subclass, thereby making appropriate final declaratory and injunctive relief with respect to each of the proposed Classes and Subclasses as a whole.

761.    **Predominance and Superiority—Rule 23(b)(3).** Certification is appropriate under Rule 23(b)(3) because questions of law or fact common to each of the respective Classes and Subclasses predominate over any questions affecting only individual members, and because class action treatment is superior to other available methods for fairly and efficiently adjudicating this controversy. Individual litigation of the claims of each member of the proposed Classes and Subclasses would be impracticable and unduly burdensome to the courts. There is no foreseeable difficulty in managing this action as a class action, and it provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

762.    **Issue Certification—Rule 23(c)(4).** Certification of issues of liability under Rule 23(c)(4) is appropriate because these issues are common to putative members of each Class and

Subclass, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

763.    Defendants have acted or refused to act on grounds generally applicable to the proposed Classes and Subclasses.  Their policies, practices, acts, and omissions have affected all members of each of the respective Classes and Subclasses.  Accordingly, final injunctive and declaratory relief is appropriate as to each Class and Subclass as a whole.

## COUNT I
**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(a)**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English,**
**Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark,**
**Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Forced Labor**
**Class, USSW, and RWDSU**
**Against All Defendants**

764.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–222, 226–747 and 752–63 by reference.

765.    The TVPA provides a private cause of action against anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; *or* (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. §1589(a) (emphasis added).

766.    <u>Violations of 18 U.S.C. §1589(a)(1) by State Defendants</u>.  Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained and provided labor and/or services of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas ("Forced Labor Named Plaintiffs"), and the

Forced Labor Class Members by means of force, threats of force, physical restraint, and threats of physical restraint directed to those persons, as demonstrated by the allegations set forth in paragraphs 11–189, 193–97, 200–04, and 226–747 above, which detail, *inter alia*, how Defendants Ivey, Marshall, and Hamm took actions to provide and secure the labor and services of Forced Labor Named Plaintiffs and Forced Labor Class Members under coercion, including physical violence, threats of physical violence, deprivation of basic subsistence needs, solitary confinement and increased periods of detention and the threat thereof; and how Defendants Gwathney and the associate Parole Board members took action to secure such coerced labor and services by threatening to deny parole release and denying parole release to incarcerated workers who ADOC has cited, disciplined or punished for a wide variety of conduct ADOC prohibits related to alleged failure or inability to work, including alleged failures by incarcerated people to follow ADOC orders to work to the satisfaction of ADOC directly or for public and private joint venture employer to whom ADOC leases out the labor of incarcerated workers including Named Plaintiffs Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrisey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, Thomas, and Forced Labor Class Members who are eligible for parole, *see supra* ¶¶641–747.

767.    Violations of 18 U.S.C. §1589(a)(1) by Employer Defendants.  Each Public Employer Defendant and Private Employer Defendant knowingly obtained and secured labor and/or services of at least one Forced Labor Named Plaintiff and members of the Forced Labor Class by means of force, threats of force, physical restraint, and threats of physical restraint directed to those persons, as detailed in paragraphs 11–189, 193–97, 206–22 and 229–90, and 361–626 above, and referenced in the chart below.

768.    Violations of 18 U.S.C. §1589(a)(2) by State Defendants.  Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained and provided labor and/or services of Forced Labor Named Plaintiffs and the Forced Labor Class Members by means of serious harm or threats of serious harm to those persons, including physical, psychological, economic, or reputational harm sufficiently serious under the totality of

circumstances to compel a reasonable person to perform or continue performing labor or services in order to avoid incurring those harms, as demonstrated by the allegations set forth in paragraphs 11–189, 193–97, 200–04, and 226–747 above, which detail, *inter alia*, how Defendants Ivey, Marshall, and Hamm took actions to provide and secure the labor and services of Forced Labor Named Plaintiffs and Forced Labor Class Members by serious harm, including the threat of and consistent exercise of violence and maintenance of violent, deadly detention conditions at ADOC medium- and high-security facilities, and deprivation of bare necessities, medical treatment, and visitation privileges, psychological trauma, and economic harms, and the threat thereof; and how Defendants Gwathney and the associate Parole Board members took action to secure such coerced labor and services by threatening incarcerated workers who refuse or are not able to work with increased detention and physical harm, through denial of parole release, including Named Plaintiffs Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrisey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, Thomas, and Forced Labor Class Members who are eligible for parole, *see supra* ¶¶641–747.

769.   <u>Violations of 18 U.S.C. §1589(a)(2) by Employer Defendants</u>.  Each Public Employer Defendant and Private Employer Defendant knowingly obtained and provided labor and/or services of at least one Forced Labor Named Plaintiff and members of the Forced Labor Class by means of serious harm or threats of serious harm to those persons, including physical, psychological, economic, or reputational harm sufficiently serious under the totality of circumstances to compel a reasonable person to perform or continue performing labor or services in order to avoid incurring those harms, as detailed in paragraphs 11–189, 193–97, 206–22 and 229–90, and 361–626 above, and referenced in the chart below.

770.   <u>Violations of 18 U.S.C. §1589(a)(3) by State Defendants</u>.  Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members knowingly obtained and provided labor and/or services of Forced Labor Named Plaintiffs and the Forced Labor Class Members by means of the abuse or threatened abuse of law or legal process, including in

particular by abusing the parole process through the racially discriminatory and arbitrary, capricious, flagrant, and unauthorized denial of lawful parole consideration and/or parole release to and delay of parole reconsideration dates for Black incarcerated people, in a manner contrary to the purpose for which the parole law was designed, for the purpose of ensuring the availability of incarcerated labor for the State and for work-release employers, as demonstrated by the allegations set forth in paragraphs 11–189, 193–97, 200–04, and 226–747 above.

771.    Violations of 18 U.S.C. §1589(a)(4) by State Defendants.  Defendants Ivey, Marshall, and Hamm knowingly obtained and provided labor and/or services of Forced Labor Named Plaintiffs and the Forced Labor Class Members by means of a scheme, plan, or pattern intended to cause these Plaintiffs and the Forced Labor Class Members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including serious physical, psychological, financial, or reputational harm, as demonstrated by the allegations set forth in paragraphs 11–189, 193–97, 200, 201, 204, and 226–747 above.

772.    Violations of 18 U.S.C. §1589(a)(4) by Employer Defendants.  Each Public Employer Defendant and Private Employer Defendant knowingly obtained and provided labor and/or services of at least one Forced Labor Named Plaintiff and members of the Forced Labor Class by means of a scheme, plan, or pattern intended to cause these Plaintiffs the Forced Labor Class Members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including serious physical, psychological, financial, or reputational harm, as detailed in paragraphs 11–189, 193–97, 206–22, 229–290, and 361–626 above, and referenced in the chart below.

773.    As described *supra* in Parties I.C., I.D., I.E., I.F., I.I., I.J., I.L., I.M., I.N., I.O., I.P., I.Q., I.R., I.S., I.T., and Factual Allegations II and III, public employers and private companies that participate in ADOC's Work Center and Work Release programs and which are

not named defendants in this lawsuit[111] regularly obtain labor and/or services from the Forced Labor Class Members by means of force, threats of force, physical restraint, and threats of physical restraint directed to those persons; by means of serious harm or threats of serious harm directed at those persons; and by means of a scheme intended to cause Forced Labor Class Members to believe they would suffer serious harm or physical restraint if they did not provide their labor.  The allegations set forth in paragraphs 206–22 and 361–590 establish that all public and private employers, including non-defendant entities, participating in the Work Center and Work Release program had a joint venture with ADOC to obtain such coerced labor and, further, that ADOC exercised control over members of the Forced Labor Class, and that ADOC is therefore liable for violations of 18 U.S.C. §§1589(a)(1), (2), and (4) committed by those Work Center and Work Release program employers.

774.    At all relevant times, Defendants Ivey, Marshall, Hamm, Gwathney, and the associate Parole Board members established and maintained a co-employment and/or joint venture relationship with each and every Public and Private Employer Defendant to benefit from the labor or services performed by Forced Labor Named Plaintiffs and the Forced Labor Class Members.  Defendants Ivey, Marshall, Hamm, Gwathney, the associate Parole Board members, and the Employer Defendants together controlled or had the right to control the terms and conditions of Plaintiffs and the Forced Labor Class Members' employment, including but not limited to the manner and timing of work assignments, the supervision and evaluation of work,

---

[111] These include the non-defendant employers for whom Forced Labor Named Plaintiffs worked, including Burger King (*supra* Parties, I.C. (Walker)); City of Elmore and Sale Lot (*supra* Parties, I.D. (Cole)); Arby's, Metalplate, City of Sylacauga (*supra* Parties, I.E. (Ptomey); Hawks (*supra* Parties, I.F. (McDole); McDonald's, Bud's Best Cookies, Hager's (*supra* Parties, I.J. (Cartwright)); City of Childersburg, Trenholm College in Montgomery (*supra* Parties, I.L. (Dandridge)); Whitt's Deer Processing, Scruggs BBQ (*supra* Parties, I.M. (Ball)); City of Atmore, Blair Block, "*El Giro*", Wendy's, Amaze Corps (*supra* Parties, I.N. (R. Clark)); Full Moon BBQ (*supra* Parties, I.O. (Morrissey)); Huddle Housse, Sprint Turf (*supra* Parties, I.P. (Prewitt)); Fred's Cabinet Shop (*supra* Parties, I.Q. (T. Clark)); City of Elba, Inzi Controls, Coffee County, Pike County, City of Enterprise, Dorsey Trailers, Alabama Cable (*supra* Parties, I.R. (Jarmon)); Tru Cabinetry, Amtech (*supra* Parties, I.S. (Evans)); and Town of Franklin (*supra* Parties, I.T. (Bullock)).

decisions regarding discipline and termination, work schedules, compensation, job duties, and working conditions.

775.    When engaging in the alleged violations of 18 U.S.C. §§1589(a)(1), (2), and (4), each Public Employer Defendant and Private Employer Defendant acted as the agent of ADOC and, further, was party to a joint venture and co-employment relationship with ADOC, with respect to the employment and working conditions of the Forced Labor Named Plaintiffs and members of the Forced Labor Class who were coerced to provide labor for the Public or Private Employer Defendant.

776.    The below chart identifies allegations, incorporated above, that relate to each individual Public Employer Defendant and Private Employer Defendant's violation of 18 U.S.C. §1589(a), including allegations describing the means of coercion and, in bold, allegations about specific employers and the individuals who worked for them.  This table is provided as an aid only and not intended to be exhaustive.

| Employer Defendant | Allegations Supporting Violation of 18 U.S.C. §1589(a) |
|---|---|
| Governor's Mansion, through Governor Ivey | Parties: Parts **I.T.** (Bullock, ¶¶172, 177), **II.A.** (Ivey)<br><br>Factual Allegations: Parts I.B, I.C., II.A., II.B., II.D., **II.D.5.e.**, II.F., III.A., III.B. |
| ADOC, through Commissioner Hamm | Parties: Parts **I.B.** (Moore, ¶¶11-16), **I.C.** (Walker, ¶¶17-20), **I.D.** (Cole, ¶¶21-34), **I.E.** (Ptomey, ¶¶35-43), **I.F.** (McDole, ¶¶44-51), **I.G.** (Campbell, ¶¶52-61), **I.H.** (Pritchett, ¶¶62-73), **I.I.** (English, ¶¶74-85), **I.J.** (Cartwright, ¶¶86-89), **I.K.** (Mason, ¶¶90-94), **I.L.** (Dandridge, ¶¶95-105), **I.M.** (Ball, ¶¶106-15), **I.N.** (R. Clark, ¶¶116-34), **I.O.** (Morrissey, ¶¶135-38), **I.P.** (Prewitt ¶¶139-48), **I.Q.** (T. Clark, ¶¶149-58), **I.R.** (Jarmon, ¶¶159-64), I.S. (Evans, ¶¶165-70), I.T. (Bullock, ¶¶171-77), **I.U.** (Thomas, ¶¶178-89), I.Y. (McCorvey, ¶¶193-97), **II.E.** (Hamm)<br><br>Factual Allegations: Parts I., II.A., **II.B., II.C.,** II.F., **III.A., III.B., III.C.** |

| | |
|---|---|
| ADOT, through John Cooper | Parties: Parts **I.E.** (Ptomey, ¶¶35, 37, 39, 41, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 59, 60, 61), **I.H.** (Pritchett ¶¶62, 65, 71, 72, 73), **I.L.** (Dandridge, ¶¶95, 96, 99), **II.F.** (Cooper) |
| | Factual Allegations: Parts I.B, I.C., II.A., II.B., II.D., **II.D.5.a.**, II.F., III.A., III.B. |
| City of Montgomery | Parties: Parts **I.D.** (Cole, ¶¶21-22, 31, 34), **I.E.** (Ptomey, ¶¶35-37, 41, 43), **I.T.** (Bullock, ¶¶171, 172, 176, 177), **II.G.** (Montgomery) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.b.**, II.F., III.A., III.B. |
| City of Troy | Parties: Parts **I.H.** (Pritchett, ¶¶62, 71, 72, 73), **II.H.** (Troy) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.c.**, II.F., III.A., III.B. |
| Jefferson County | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **II.I.** (Jefferson County) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.d.**, II.F., III.A., III.B. |
| RCF, LLC d/b/a Gemstone Foods, LLC | Parties: Parts **I.D.** (Cole, ¶¶21, 25, 26, 29, 34), **I.F.** (McDole, ¶¶44, 46, 47, 51), **II.J.** (Gemstone) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Koch Foods, LLC | Parties: Parts **I.S.** (Evans, ¶¶165, 167-70), **II.U.** (Koch) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.l.**, II.F., III.A., III.B. |
| Ju-Young Manufacturing America, Inc. | Parties: Parts **I.U.** (Thomas, ¶¶178, 181-86, 189), **II.K.** (Ju-Young) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.b.**, II.F., III.A., III.B. |
| SL Alabama, LLC | Parties: Parts **I.P.** (Prewitt, ¶¶139-42, 146, 148), **II.L.** (SL Alabama) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Hwaseung Automotive USA LLC | Parties: Parts **I.Q.** (T. Clark, ¶¶149, 152-55, 157-58), **II.M.** (Hwaseung) |

| | |
|---|---|
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.d.**, II.F., III.A., III.B. |
| Progressive Finishes, Inc. | Parties: Parts **I.E.** (Ptomey, ¶¶35-38, 43), **I.F.** (McDole, ¶¶44, 48, 51), **I.G.** (Campbell, ¶¶52, 53, 54, 55, 58, 60, 61), **I.N.** (R. Clark, ¶¶116, 130, 134), **II.N.** (Progressive) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.e.**, II.F., III.A., III.B. |
| C.B.A.K., Inc. d/b/a McDonald's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.Y.** (McCorvey, ¶¶193-97), **II.O.** (McDonald's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.f.**, II.F., III.A., III.B. |
| Southeast Restaurant Group-Wen LLC d/b/a Wendy's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.P.** (Prewitt, ¶¶139, 140, 143, 146, 148), **II.P.** (Wendy's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.g.**, II.F., III.A., III.B. |
| Pell City Kentucky Fried Chicken, Inc. d/b/a Kentucky Fried Chicken d/b/a KFC | Parties: Parts **I.E.** (Ptomey, ¶¶35-37, 39, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 57, 58, 60, 61), **II.Q.** (KFC) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.h.**, II.F., III.A., III.B. |
| Masonite Corporation | Parties: Parts **I.D.** (Cole, ¶¶21-22, 32-34), **II.R.** (Masonite) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.i.**, II.F., III.A., III.B. |
| Cast Products, Inc. | Parties: Parts **I.R.** (Jarmon, ¶¶159, 162-64), **II.S.** (Cast) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.j.**, II.F., III.A., III.B. |
| Southeastern Meats, Inc. | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey, ¶¶135-38), **II.T.** (Southeastern Meats) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.k.**, II.F., III.A., III.B. |
| Paramount Services, Inc. | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey. ¶¶135-38), **II.V.** (Paramount) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.n.**, II.F., III.A., III.B. |

| | |
|---|---|
| Bama Budweiser of Montgomery, Inc. | Parties: Parts **I.G.** (Campbell, ¶¶52, 53, 54, 56, 58, 60, 61)**, I.N.** (R. Clark, ¶¶116, 128-29, 134), **II.W.** (Budweiser) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.m.**, II.F., III.A., III.B. |

777.    Forced Labor Named Plaintiffs and the members of the Forced Labor Class, USSW, and RWDSU have been harmed by Defendants' TVPA violations as described in this Claim.[112]

778.    Defendants are jointly and severally liable to Forced Labor Plaintiffs and Forced Labor Class Members for the violations described in this Claim for compensatory damages and for punitive damages, in the amount to be determined at trial, together with attorneys' fees and costs.

---

[112] Named Plaintiffs Council, Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon Jr., Evans, Bullock, and Thomas are currently incarcerated in ADOC facilities.  ADOC had no administrative grievance procedure in place at all prior to December 15, 2022.  Their claims are not subject to ADOC's grievance procedure—to the extent such a grievance procedure is available to them at all—because Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Ball, Rashaad Clark, Morrissey, Trevion Clark, Jarmon Jr., Evans, and Bullock's claims concern Parole Board decisions and all Plaintiffs' claims concern the substance of federal and state laws, or are otherwise not subject to Alabama's grievance procedures. *See supra* Part FA Part II.D.  Exhaustion would therefore be futile.  Nevertheless, prior to filing this complaint, Plaintiffs Council, Moore, Cole, McDole, Campbell, Ptomey, Pritchett, and English submitted emergency grievances to ADOC concerning the regulations, conditions, and practices forcing incarcerated people to labor and remain in a condition of involuntary servitude for all times after December 15, 2022, even though the filing of such grievances is futile given that the conditions of forced labor are embedded in established regulations and systemic policies enforced by Defendants, which are the subject of this complaint. Many plaintiffs and retained putative class members also have been advised by ADOC that the grievance process is unavailable and may not be used to contest or secure review for any conditions of work, and many of the citations and punishments that Plaintiffs have received from alleged refusals to work may not be challenged by the filing of a grievance because ADOC issued a behavior citation rather than a disciplinary for the alleged refusal to work, even though the punishment for both types of alleged offenses are indistinguishable.

## COUNT II
**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(b)
By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English,
Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark,
Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Forced Labor
Class, USSW, and RWDSU
Against All Defendants**

779.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–222, 226–747, and 752–63 by reference.

780.    The TVPA provides a private cause of action against anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in [§1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means …." 18 U.S.C. §1589(b).

781.    All Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by the means described in 18 U.S.C. §1589(a), as detailed in Count I, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

782.    At all relevant times, Defendants Ivey, Marshall, Hamm established and maintained a joint venture with each and every Public Employer Defendant and Private Employer Defendant to benefit from the labor or services performed by Forced Labor Named Plaintiffs and the Forced Labor Class Members. Defendants Ivey, Marshall, Hamm, Gwathney, the associate Parole Board members, and the Public and Private Employer Defendants entered into a formal and informal mutual agreement under which they operated a single forced labor enterprise for their mutual benefit and profit, and jointly shared the risks of said venture.

783.    Defendants Ivey, Marshall, and Hamm have benefitted and continue to benefit from providing unlawfully compelled labor of Forced Labor Named Plaintiffs and the Forced Labor Class Members to ADOC, Public Employer Defendants, and Private Employer

Defendants, including financially through profits earned through Work Center and Work Release agreements and costs savings resulting from the use of compelled labor within ADOC, as detailed in the allegations in paragraphs 200, 201, 204, and 239–626.

784.   Public Employer Defendants and Private Employer Defendants knowingly benefitted, financially and otherwise, from participation in ADOC's work-release and work-center programs, knowing or in reckless disregard of the fact that their lucrative joint venture with ADOC, through Hamm, has engaged in the providing or obtaining of labor or services from at least one of the Forced Labor Named Plaintiffs and the Forced Labor Class by each of the unlawful means alleged in Claim I above.  Public Employer Defendants and Private Employer Defendants benefit from participating in the alleged joint venture by: receiving workers who can be easily controlled and who cannot complain about workplace conditions or wages, due to the extreme coercion by ADOC that compelled the incarcerated workers to begin work for the Public Employer and Private Employer Defendants through lease agreements by DOC and ongoing fear of severe penalties, violence, and further incarceration should the incarcerated workers not perform all work requested by each employer; receiving workers who can be required to perform less desirable and safe work and receive lower compensation than free world workers, as detailed in paragraphs 206–22, 229–90, and 361–626.  For Defendants City of Montgomery, City of Troy, and Jefferson County, knowingly benefiting from participation in ADOC's Work Center Program is a matter of custom and policy.

785.   As described *supra* in Parties I.C., I.D., I.E., I.F., I.I., I.J., I.L., I.M., I.N., I.O., I.P., I.Q., I.R., I.S., I.T., and Factual Allegations II and III, public employers and private companies that participate in ADOC's Work Center and Work Release programs and which are not named defendants in this lawsuit[113] regularly benefit from participating in a joint venture with ADOC, through Defendant Hamm, by which they obtain labor and/or services from the Forced Labor Class Members by means described in 18 U.S.C. §1589(a), as detailed in Count I,

---

[113] *See supra* n.111.

knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means. The allegations set forth in paragraphs 206–22, 229–90, and 361–626 establish that all public and private employers, including non-defendant entities, participating in the Work Center and Work Release program had a joint venture with ADOC to obtain such coerced labor and acted in reckless disregard of this coercion; and, further, that ADOC exercised control over members of the Forced Labor Class, and that ADOC is therefore liable for violations of 18 U.S.C. §1589(b) committed by those Work Center and Work Release program employers.

786.    When engaging in the alleged violations of 18 U.S.C. §1589(b), each Public Employer Defendant and Private Employer Defendant acted as the agent of ADOC and, further, was party to a joint venture and joint employer relationship with ADOC, with respect to the employment and working conditions of the Forced Labor Named Plaintiffs and members of the Forced Labor Class who were coerced to provide labor for the Public or Private Employer Defendant.

787.    The below chart identifies the allegations, incorporated above, that related to each individual Public Employer Defendant and Private Employer Defendant's violation of 18 U.S.C. §1589(b), including allegations describing the means of coercion, the benefit to Defendants, and, in bold, allegations about specific employers and the individuals who worked for them. This table is provided as an aid only and not intended to be exhaustive.

| Employer Defendant | Allegations Supporting Violation of 18 U.S.C. §1589(b) |
|---|---|
| Governor's Mansion, through Governor Ivey | Parties: Parts **I.T.** (Bullock, ¶¶172, 177), **II.A.** (Ivey)<br><br>Factual Allegations: Parts I.B, I.C., II.A., II.B., II.D., **II.D.5.e.**, II.F., III.A., III.B. |
| ADOC, through Commissioner Hamm | Parties: Parts **I.B.** (Moore, ¶¶11-16), **I.C.** (Walker, ¶¶17-20), **I.D.** (Cole, ¶¶21-34), **I.E.** (Ptomey, ¶¶35-43), **I.F.** (McDole, ¶¶44-51), **I.G.** (Campbell, ¶¶52-61), **I.H.** (Pritchett, ¶¶62-73), |

| | |
|---|---|
| | **I.I.** (English, ¶¶74-85), **I.J.** (Cartwright, ¶¶86-89), **I.K.** (Mason, ¶¶90-94), **I.L.** (Dandridge, ¶¶95-105), **I.M.** (Ball, ¶¶106-15), **I.N.** (R. Clark, ¶¶116-34), **I.O.** (Morrissey, ¶¶135-38), **I.P.** (Prewitt ¶¶139-48), **I.Q.** (T. Clark, ¶¶149-58), **I.R.** (Jarmon, ¶¶159-64), I.S. (Evans, ¶¶165-70), I.T. (Bullock, ¶¶171-77), **I.U.** (Thomas, ¶¶178-89), I.Y. (McCorvey, ¶¶193-97), **II.E.** (Hamm) |
| | Factual Allegations: Parts I., II.A., **II.B., II.C.,** II.F., **III.A., III.B., III.C.** |
| ADOT, through John Cooper | Parties: Parts **I.E.** (Ptomey, ¶¶35, 37, 39, 41, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 59, 60, 61), **I.H.** (Pritchett ¶¶62, 65, 71, 72, 73), **I.L.** (Dandridge, ¶¶95, 96, 99), **II.F.** (Cooper) |
| | Factual Allegations: Parts I.B, I.C., II.A., II.B., II.D., **II.D.5.a.**, II.F., III.A., III.B. |
| City of Montgomery | Parties: Parts **I.D.** (Cole, ¶¶21-22, 31, 34), **I.E.** (Ptomey, ¶¶35-37, 41, 43), **I.T.** (Bullock, ¶¶171, 172, 176, 177), **II.G.** (Montgomery) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.b.**, II.F., III.A., III.B. |
| City of Troy | Parties: Parts **I.H.** (Pritchett, ¶¶62, 71, 72, 73), **II.H.** (Troy) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.c.**, II.F., III.A., III.B. |
| Jefferson County | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **II.I.** (Jefferson County) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.d.**, II.F., III.A., III.B. |
| RCF, LLC d/b/a Gemstone Foods, LLC | Parties: Parts **I.D.** (Cole, ¶¶21, 25, 26, 29, 34), **I.F.** (McDole, ¶¶44, 46, 47, 51), **II.J.** (Gemstone) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Koch Foods, LLC | Parties: Parts **I.S.** (Evans, ¶¶165, 167-70), **II.U.** (Koch) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.l.**, II.F., III.A., III.B. |

| | |
|---|---|
| Ju-Young Manufacturing America, Inc. | Parties: Parts **I.U.** (Thomas, ¶¶178, 181-86, 189), **II.K.** (Ju-Young) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.b.**, II.F., III.A., III.B. |
| SL Alabama, LLC | Parties: Parts **I.P.** (Prewitt, ¶¶139-42, 146, 148), **II.L.** (SL Alabama) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Hwaseung Automotive USA LLC | Parties: Parts **I.Q.** (T. Clark, ¶¶149, 152-55, 157-58), **II.M.** (Hwaseung) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.d.**, II.F., III.A., III.B. |
| Progressive Finishes, Inc. | Parties: Parts **I.E.** (Ptomey, ¶¶35-38, 43), **I.F.** (McDole, ¶¶44, 48, 51), **I.G.** (Campbell, ¶¶52, 53, 54, 55, 58, 60, 61), **I.N.** (R. Clark, ¶¶116, 130, 134), **II.N.** (Progressive) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.e.**, II.F., III.A., III.B. |
| C.B.A.K., Inc. d/b/a McDonald's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.Y.** (McCorvey, ¶¶193-97), **II.O.** (McDonald's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.f.**, II.F., III.A., III.B. |
| Southeast Restaurant Group-Wen LLC d/b/a Wendy's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.P.** (Prewitt, ¶¶139, 140, 143, 146, 148), **II.P.** (Wendy's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.g.**, II.F., III.A., III.B. |
| Pell City Kentucky Fried Chicken, Inc. d/b/a Kentucky Fried Chicken d/b/a KFC | Parties: Parts **I.E.** (Ptomey, ¶¶35-37, 39, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 57, 58, 60, 61), **II.Q.** (KFC) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.h.**, II.F., III.A., III.B. |
| Masonite Corporation | Parties: Parts **I.D.** (Cole, ¶¶21-22, 32-34), **II.R.** (Masonite) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.i.**, II.F., III.A., III.B. |
| Cast Products, Inc. | Parties: Parts **I.R.** (Jarmon, ¶¶159, 162-64), **II.S.** (Cast) |

| | |
|---|---|
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.j.,** II.F., III.A., III.B. |
| Southeastern Meats, Inc. | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey, ¶¶135-38), **II.T.** (Southeastern Meats) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.k.,** II.F., III.A., III.B. |
| Paramount Services, Inc. | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey. ¶¶135-38), **II.V.** (Paramount) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.n.,** II.F., III.A., III.B. |
| Bama Budweiser of Montgomery, Inc. | Parties: Parts **I.G.** (Campbell, ¶¶52, 53, 54, 56, 58, 60, 61), **I.N.** (R. Clark, ¶¶116, 128-29, 134), **II.W.** (Budweiser) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.m.,** II.F., III.A., III.B. |

788.    Forced Labor Named Plaintiffs and the members of the Forced Labor Class, USSW, and RWDSU have been harmed by Defendants' TVPA violations as described in this Claim.[114]

789.    Defendants are jointly and severally liable to Forced Labor Plaintiffs and Forced Labor Class Members for the violations described in this Claim for compensatory damages and for punitive damages, in the amount to be determined at trial, together with attorneys' fees and costs.

790.    Defendants are jointly and severally liable to Forced Labor Plaintiffs and Forced Labor Class Members for the violations described in this Claim for compensatory damages and

---

[114] *See supra* n. 112.

for punitive damages, in the amount to be determined at trial, together with attorneys' fees and costs.

**COUNT III**

**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1962**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Forced Labor Class, USSW, and RWDSU Against All Defendants**

791.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–222, 226–747 and 752–63 by reference.

792.    The RICO Act, 18 U.S.C. §1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

793.    Each Defendant is a "person" within the meaning of the RICO Act. 18 U.S.C. §1962(a); *see id*. §1961(3) ("'person' includes any individual or entity capable of holding a legal or beneficial interest in property").

794.    Defendants together constitute an association-in-fact enterprise ("the Enterprise") "engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of the RICO Act. 18 U.S.C. §1962(c); *see id.* §1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

795.    In conducting its illegal racketeering scheme, the Enterprise acted and acts with the common purpose of illegally obtaining forced labor from Forced Labor Named Plaintiffs and the members of the Forced Labor Class for the benefit of the Enterprise's participants.

796.    Defendants conduct and participate, directly or indirectly, in the conduct of the Enterprise through a pattern of thousands of acts of racketeering activity.

797.    Pursuant to and in furtherance of their unlawful scheme, Defendants committed multiple related acts of unlawfully coercing Forced Labor Named Plaintiffs' and the members of the Forced Labor Class's labor and knowingly benefiting from such compelled labor, in violation of the TVPA, 18 U.S.C. §§1589(a) and (b), as detailed in Claims I and II above.

798.    As a direct and proximate result of Defendants' unlawful pattern of racketeering activity, Forced Labor Named Plaintiffs and the members of the Forced Labor Class have lost money or property within the meaning of 18 U.S.C. §1964(c), including but not limited to lost past, current, and prospective wages and benefits, and, with respect to Plaintiffs USSW and RWDSU, the diversion of financial resources that they could have otherwise used to further their missions.

799.    The role of Defendants Ivey, Marshall, Ivey, Gwathney, and associate members of the Parole Board in the Enterprise, and their actions that violate the TVPA, 18 U.S.C. §§1589(a) and (b), are detailed in paragraphs 200–05 and 229–634.

800.    The below chart identifies the allegations, incorporated above, that relate to each individual Public Employer Defendant and Private Employer Defendant's violation of 18 U.S.C. §1962, including allegations describing the means of coercion, the enterprise, and, in bold, allegations about specific employers and the individuals who worked for them.  This table is provided as an aid only and not intended to be exhaustive.

| Employer Defendant | Allegations Supporting Violation of 18 U.S.C. §1962 |
| --- | --- |
| Governor's Mansion, through Governor Ivey | Parties: Parts **I.T.** (Bullock, ¶¶172, 177), **II.A.** (Ivey)<br><br>Factual Allegations: Parts I.B, I.C., II.A., II.B., II.D., **II.D.5.e.**, II.F., III.A., III.B. |

| | |
|---|---|
| ADOC, through Commissioner Hamm | Parties: Parts **I.B.** (Moore, ¶¶11-16), **I.C.** (Walker, ¶¶17-20), **I.D.** (Cole, ¶¶21-34), **I.E.** (Ptomey, ¶¶35-43), **I.F.** (McDole, ¶¶44-51), **I.G.** (Campbell, ¶¶52-61), **I.H.** (Pritchett, ¶¶62-73), **I.I.** (English, ¶¶74-85), **I.J.** (Cartwright, ¶¶86-89), **I.K.** (Mason, ¶¶90-94), **I.L.** (Dandridge, ¶¶95-105), **I.M.** (Ball, ¶¶106-15), **I.N.** (R. Clark, ¶¶116-34), **I.O.** (Morrissey, ¶¶135-38), **I.P.** (Prewitt ¶¶139-48), **I.Q.** (T. Clark, ¶¶149-58), **I.R.** (Jarmon, ¶¶159-64), I.S. (Evans, ¶¶165-70), I.T. (Bullock, ¶¶171-77), **I.U.** (Thomas, ¶¶178-89), I.Y. (McCorvey, ¶¶193-97), **II.E.** (Hamm) <br><br> Factual Allegations: Parts I., II.A., **II.B.**, **II.C.**, II.F., **III.A.**, **III.B.**, **III.C.** |
| ADOT, through John Cooper | Parties: Parts **I.E.** (Ptomey, ¶¶35, 37, 39, 41, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 59, 60, 61), **I.H.** (Pritchett ¶¶62, 65, 71, 72, 73), **I.L.** (Dandridge, ¶¶95, 96, 99), **II.F.** (Cooper) <br><br> Factual Allegations: Parts I.B, I.C., II.A., II.B., II.D., **II.D.5.a.**, II.F., III.A., III.B. |
| City of Montgomery | Parties: Parts **I.D.** (Cole, ¶¶21-22, 31, 34), **I.E.** (Ptomey, ¶¶35-37, 41, 43), **I.T.** (Bullock, ¶¶171, 172, 176, 177), **II.G.** (Montgomery) <br><br> Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.b.**, II.F., III.A., III.B. |
| City of Troy | Parties: Parts **I.H.** (Pritchett, ¶¶62, 71, 72, 73), **II.H.** (Troy) <br><br> Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.c.**, II.F., III.A., III.B. |
| Jefferson County | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **II.I.** (Jefferson County) <br><br> Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.d.**, II.F., III.A., III.B. |
| RCF, LLC d/b/a Gemstone Foods, LLC | Parties: Parts **I.D.** (Cole, ¶¶21, 25, 26, 29, 34), **I.F.** (McDole, ¶¶44, 46, 47, 51), **II.J.** (Gemstone) <br><br> Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Koch Foods, LLC | Parties: Parts **I.S.** (Evans, ¶¶165, 167-70), **II.U.** (Koch) |

| | |
|---|---|
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.l.**, II.F., III.A., III.B. |
| Ju-Young Manufacturing America, Inc. | Parties: Parts **I.U.** (Thomas, ¶¶178, 181-86, 189), **II.K.** (Ju-Young) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.b.**, II.F., III.A., III.B. |
| SL Alabama, LLC | Parties: Parts **I.P.** (Prewitt, ¶¶139-42, 146, 148), **II.L.** (SL Alabama) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Hwaseung Automotive USA LLC | Parties: Parts **I.Q.** (T. Clark, ¶¶149, 152-55, 157-58), **II.M.** (Hwaseung) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.d.**, II.F., III.A., III.B. |
| Progressive Finishes, Inc. | Parties: Parts **I.E.** (Ptomey, ¶¶35-38, 43), **I.F.** (McDole, ¶¶44, 48, 51), **I.G.** (Campbell, ¶¶52, 53, 54, 55, 58, 60, 61), **I.N.** (R. Clark, ¶¶116, 130, 134), **II.N.** (Progressive) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.e.**, II.F., III.A., III.B. |
| C.B.A.K., Inc. d/b/a McDonald's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.Y.** (McCorvey, ¶¶193-97), **II.O.** (McDonald's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.f.**, II.F., III.A., III.B. |
| Southeast Restaurant Group-Wen LLC d/b/a Wendy's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.P.** (Prewitt, ¶¶139, 140, 143, 146, 148), **II.P.** (Wendy's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.g.**, II.F., III.A., III.B. |
| Pell City Kentucky Fried Chicken, Inc. d/b/a Kentucky Fried Chicken d/b/a KFC | Parties: Parts **I.E.** (Ptomey, ¶¶35-37, 39, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 57, 58, 60, 61), **II.Q.** (KFC) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.h.**, II.F., III.A., III.B. |
| Masonite Corporation | Parties: Parts **I.D.** (Cole, ¶¶21-22, 32-34), **II.R.** (Masonite) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.i.**, II.F., III.A., III.B. |

| | |
|---|---|
| Cast Products, Inc. | Parties: Parts **I.R.** (Jarmon, ¶¶159, 162-64), **II.S.** (Cast) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.j.**, II.F., III.A., III.B. |
| Southeastern Meats, Inc. | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey, ¶¶135-38), **II.T.** (Southeastern Meats) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.k.**, II.F., III.A., III.B. |
| Paramount Services, Inc. | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey. ¶¶135-38), **II.V.** (Paramount) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.n.**, II.F., III.A., III.B. |
| Bama Budweiser of Montgomery, Inc. | Parties: Parts **I.G.** (Campbell, ¶¶52, 53, 54, 56, 58, 60, 61)**, I.N.** (R. Clark, ¶¶116, 128-29, 134), **II.W.** (Budweiser) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.m.**, II.F., III.A., III.B. |

801.   As a result of Defendants' RICO violations, Forced Labor Named Plaintiffs and the members of the Forced Labor Class are entitled to injunctive relief, treble damages, attorneys' fees and costs as provided by law.

### COUNT IV
**Violation of Alabama Constitution, Article I, Section 32**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Forced Labor Class, USSW, RWDSU, and Woods Foundation**
**Against Defendants City of Montgomery, City of Troy, Jefferson County, and All Private Employer Defendants**

802.   Plaintiffs incorporate the allegations in paragraphs 1–4, 11–199, 206–22, 361–626 and 752–63 by reference.

803.   Since November 2022, Article I, Section 32 of the Alabama Constitution has categorically prohibited all forms of slavery and involuntary servitude under all circumstances

throughout the State.  Article I, Section 32, as amended, has no exemption allowing involuntary servitude for the punishment of duly convicted crimes.

804.    In direct violation of Article I, Section 32 of the Alabama Constitution and the will of the voters, Defendants have subjected Plaintiffs and the members of the Forced Labor Class to involuntary servitude by forcing them to work, whether they want to or not, through the use or threatened use of extended incarceration, increased physical restraint and confinement, physical injury, law or legal process, and/or physical, psychological, and economic coercion.

805.    As alleged herein, these practices constitute compulsory labor and involuntary servitude in violation of the Alabama Constitution.

806.    As a direct and proximate result of Defendants' unconstitutional conduct, Forced Labor Named Plaintiffs and the members of the Forced Labor Class have suffered and/or continue to suffer serious and irreparable harm.

807.    The below chart identifies the allegations, incorporated above, that relate to each individual non-state Public Employer Defendant and Private Employer Defendant's violation of 18 U.S.C. §1962, including allegations describing the means of coercion, the enterprise, and, in bold, allegations about specific employers and the individuals who worked for them.  This table is provided as an aid only and not intended to be exhaustive.

| Employer Defendant | Allegations Supporting Violation of Ala. Const., Art. I, Sec. 32 |
| --- | --- |
| City of Montgomery | Parties: Parts **I.D.** (Cole, ¶¶21-22, 31, 34), **I.E.** (Ptomey, ¶¶35-37, 41, 43), **I.T.** (Bullock, ¶¶171, 172, 176, 177), **II.G.** (Montgomery) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.b.**, II.F., III.A., III.B. |
| City of Troy | Parties: Parts **I.H.** (Pritchett, ¶¶62, 71, 72, 73), **II.H.** (Troy) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.c.**, II.F., III.A., III.B. |
| Jefferson County | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **II.I.** (Jefferson County) |

| | |
|---|---|
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.D., **II.D.5.d.**, II.F., III.A., III.B. |
| RCF, LLC d/b/a Gemstone Foods, LLC | Parties: Parts **I.D.** (Cole, ¶¶21, 25, 26, 29, 34), **I.F.** (McDole, ¶¶44, 46, 47, 51), **II.J.** (Gemstone) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Koch Foods, LLC | Parties: Parts **I.S.** (Evans, ¶¶165, 167-70), **II.U.** (Koch) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.l.**, II.F., III.A., III.B. |
| Ju-Young Manufacturing America, Inc. | Parties: Parts **I.U.** (Thomas, ¶¶178, 181-86, 189), **II.K.** (Ju-Young) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.b.**, II.F., III.A., III.B. |
| SL Alabama, LLC | Parties: Parts **I.P.** (Prewitt, ¶¶139-42, 146, 148), **II.L.** (SL Alabama) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.c.**, II.F., III.A., III.B. |
| Hwaseung Automotive USA LLC | Parties: Parts **I.Q.** (T. Clark, ¶¶149, 152-55, 157-58), **II.M.** (Hwaseung) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.d.**, II.F., III.A., III.B. |
| Progressive Finishes, Inc. | Parties: Parts **I.E.** (Ptomey, ¶¶35-38, 43), **I.F.** (McDole, ¶¶44, 48, 51), **I.G.** (Campbell, ¶¶52, 53, 54, 55, 58, 60, 61), **I.N.** (R. Clark, ¶¶116, 130, 134), **II.N.** (Progressive) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.e.**, II.F., III.A., III.B. |
| C.B.A.K., Inc. d/b/a McDonald's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.Y.** (McCorvey, ¶¶193-97), **II.O.** (McDonald's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.f.**, II.F., III.A., III.B. |
| Southeast Restaurant Group-Wen LLC d/b/a Wendy's | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.P.** (Prewitt, ¶¶139, 140, 143, 146, 148), **II.P.** (Wendy's) |
| | Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.g.**, II.F., III.A., III.B. |

| | |
|---|---|
| Pell City Kentucky Fried Chicken, Inc. d/b/a Kentucky Fried Chicken d/b/a KFC | Parties: Parts **I.E.** (Ptomey, ¶¶35-37, 39, 43), **I.G.** (Campbell, ¶¶52, 53, 54, 57, 58, 60, 61), **II.Q.** (KFC)<br><br>Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.h.**, II.F., III.A., III.B. |
| Masonite Corporation | Parties: Parts **I.D.** (Cole, ¶¶21-22, 32-34), **II.R.** (Masonite)<br><br>Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.i.**, II.F., III.A., III.B. |
| Cast Products, Inc. | Parties: Parts **I.R.** (Jarmon, ¶¶159, 162-64), **II.S.** (Cast)<br><br>Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.j.**, II.F., III.A., III.B. |
| Southeastern Meats, Inc. | Parties: Parts **I.C.** (Walker, ¶¶17, 19, 20), **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey, ¶¶135-38), **II.T.** (Southeastern Meats)<br><br>Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.k.**, II.F., III.A., III.B. |
| Paramount Services, Inc. | Parties: Parts **I.J.** (Cartwright, ¶¶86, 88, 89), **I.O.** (Morrissey. ¶¶135-38), **II.V.** (Paramount)<br><br>Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.n.**, II.F., III.A., III.B. |
| Bama Budweiser of Montgomery, Inc. | Parties: Parts **I.G.** (Campbell, ¶¶52, 53, 54, 56, 58, 60, 61)**, I.N.** (R. Clark, ¶¶116, 128-29, 134), **II.W.** (Budweiser)<br><br>Factual Allegations: Parts I.B., I.C., II.A., II.B., II.E., **II.E.5.m.**, II.F., III.A., III.B. |

## COUNT V
### Violation of First Amendment of U.S. Constitution,
### Pursuant to 42 U.S.C. §1983
### By Plaintiffs Council, Walker, Ptomey, and Rashaad Clark on Behalf of Themselves and the Strike Class, and Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Forced Labor Class
### Against Defendants Ivey and Hamm

808.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–189, 193–97, 200, 204 226–747 and 752–63 by reference.

809.    In violation of the First Amendment, ADOC has maintained a pattern and practice of retaliating against incarcerated persons who withhold labor and advocate for work stoppages and the withholding of labor in protest of the forced labor scheme alleged herein and of other inhumane conditions within ADOC facilities.

810.    Incarcerated persons' expressive activity in withholding labor and advocating for the withholding of labor by themselves and others is constitutionally protected.

811.    ADOC, as alleged in more detail herein, maintains a policy of disciplining and abusing incarcerated persons who withhold their labor and who advocate for others to withhold their labor, whether that labor is within ADOC facilities, for state and local agencies, or for private employers.  ADOC has implemented a de facto policy that refusing to work, or simply being unable to work a given job, on one or more occasions is punished, including with transfer to higher security and more violent facilities and solitary confinement.  ADOC also has a longstanding history and practice of subjecting people in solitary confinement to physical and mental abuse.  When imposed on incarcerated people because of their advocacy, this discipline and abuse constitute retaliation for protected First Amendment-protected speech and activity.

812.    ADOC has also deprived incarcerated individuals of food in response to their refusal to work and support for others who are refusing to work.  This inhumane treatment constitutes retaliation for protected First Amendment-protected speech and activity.

813.    Defendant Ivey, in a January 9, 2023 Executive Order, directed ADOC to impose additional stringent consequences for disciplinary violations, including for refusing to work and for encouraging work stoppages, which Governor Ivey and ADOC define as "medium" and "high" level violations, respectively.

814.    Defendants Ivey and Hamm were and are aware of the severe consequences they directed and oversaw—and continue to direct and oversee—ADOC to impose on incarcerated people who withheld their labor or advocate for the same, including the restrictive food policy of "bird-feeding," the restriction of access to the commissary which is the only way incarcerated people can access basic necessities, collective punishment of all incarcerated people across the state, even those who did not participate in peaceful protests, the abdication of the duty of care by ADOC staff, and the use of "riot squads" to violently quell peaceful protests. These responses were coordinated and took place simultaneously statewide, demonstrating that the highest levels of state leadership, including Defendants Ivey and Hamm, were aware. Some of the coordinated and statewide responses, such as bird-feeding, were in direct contravention of ADOC regulations. Further, Governor Ivey publicly praised Commissioner Hamm's response to the strikes, indicating both that Commissioner Hamm coordinated and directed that response, and that Governor Ivey was aware of and approved of those measures.

815.    The response of ADOC, through Commissioner Hamm, to incarcerated people who withhold their labor or advocate for the same is also flagrant and widespread. Both Governor Ivey and Commissioner Hamm knew or should have known, based on media reports, publicly filed lawsuits, letters sent by incarcerated people to the Governor and Commissioner Hamm and the wardens and ADOC staff Commissioner Hamm supervisors, and Alabama's own internal reporting processes regarding the state of the corrections system, that the state's prisons are riddled with violence, retaliation, and the suppression of lawful speech by ADOC officials.

816.    Persons of ordinary firmness would be deterred from engaging in advocacy for withholding labor in light of the severe consequences imposed by ADOC for doing so, but members of the Strike Class have nevertheless engaged in such speech and suffered the

consequences.  Members of the Forced Labor Class have been deterred and can reasonably be expected to be deterred in the future from advocating for the withholding of labor or from actually withholding their own labor because of Defendants Ivey and Hamm's policy of unlawful retaliation.

817.    Defendants Ivey and Hamm's policy of retaliating against incarcerated persons for advocating for the withholding of labor is not reasonable and is not a legitimate policy. There is no valid, rational connection between such a policy and any legitimate government interest, given the unlawfulness of forced labor and involuntary servitude.  In particular, there is no valid, rational connection between such a policy and compelling incarcerated people to work for private employers, which only serves to make money for ADOC.  Nor is there any valid, rational connection between such a policy and compelling incarcerated people, through the consistent exercise of violence, threat of violence and maintenance of conditions of extreme violence and deprivation of basic necessities, to work in abusive, unlawful, or dangerous conditions, or to perform non-approved, personal work on behalf of their private employers.

818.    The Strike Class is entitled to damages for Defendants Ivey and Hamm's violation of their First Amendment rights; and the Strike Class and Forced Labor Class are entitled to damages for violation of their First Amendment rights to date and injunctive relief prohibiting Defendants Ivey and Hamm from maintaining policies and practices of retaliating against incarcerated persons for refusing to work or encouraging work stoppages.

## <u>COUNT VI</u>
### Violation of Ex Post Facto Clause
### U.S. Const., Art. I, §10, cl. 1, Pursuant to 42 U.S.C. §1983
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Parole Denial Class, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

819.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–189, 193–97, 200–04, 641–747 and 752–63 by reference.

820.    The Ex Post Facto Clause of the U.S. Constitution, art. I, §10, cl. 1, prohibits states from enacting ex post facto laws, including laws that retroactively increase the punishment for criminal acts previously committed.[115]

821.    In 2019, Alabama amended its parole statute.  In the months prior to that amendment—which Governor Ivey and Attorney General specifically pushed and championed its passage in the Legislature—Governor Ivey and Attorney General Marshall's issued directives to the Parole Board to ignore individualized, case-by-case, fact-, evidence- and research-based approach based on validated, objective parole guidelines required then, and now, by state law in favor of blanket and categorical denials of parole, particularly for any person serving a sentence for an offense categorized as "violent" under Alabama law.

822.    As a consequence of Alabama's amendment of its parole law, which has been implemented by the Parole Board according to the directives of Governor Ivey and Attorney General Marshall, Governor Ivey, Attorney General Marshall, and the Parole Board since 2019 have violated the Ex Post Facto Clause by effectively extending sentences *after* the date the respective sentences were issued and ordered by Alabama's judiciary.  Comparing the parole grant rates since the passage of the 2019 parole amendment—which have fallen dramatically overall and headed toward zero for people serving sentences for "violent crimes"—to parole rates at the various dates each of the Named Plaintiffs were sentenced makes plain that Governor Ivey's, Attorney General Marshall's, and the Parole Board's implementation of the 2019 amendment, have dramatically extended the time served for sentences, and particularly extended the sentences for people serving sentences for offenses categorized by Alabama as "violent." For people serving sentences for "violent" offenses, the 2019 amendment to the Parole law and Governor Ivey's, Attorney General Marshall's, and the Parole Board's implementation of that

---

[115] This Court's March 20, 2025 Order granting Defendants' motions to dismiss rejected Plaintiffs' challenge to the changes the 2019 parole amendments made to the statutory language governing parole eligibility in Alabama and Defendants' implementation of that change.  Dkt. 215 at 32–33.  Plaintiffs maintain their challenge to that change, and expressly reserve the right to pursue that theory on appeal.

amendment has, effectively, rewritten sentences that provided a term "with" the possibility of parole to sentences "without" the possibility of parole.

823.    As detailed in Factual Allegations Part IV.C–F above, based on the limited data available to the Plaintiffs through public record requests and information and belief regarding Alabama's parole practices prior to 2018, the implementation of the 2019 amendment has yielded a dramatic diminishment of parole grant rates for all people, regardless of offense, but particularly for people serving sentences for offenses categorized as "violent," including a sharp change in parole rates for people serving sentences for homicide, robbery and assault.

824.    This effective rewriting of sentences issued by the Judiciary by the Legislature and the Executive Branch through the passage and implementation of the 2019 Parole amendment violates the Ex Post Facto Clause.

825.    These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State, particularly for all people serving time on "violent" offenses, and their directives to the Parole Board to implement their vision.  As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole system operated consistently and predictably prior to the unlawful directives.  Implementation of the JRA's objective, evidence- and research-based standards, which were in accord with the individualized parole consideration Alabama law has long required, resulted in the parole rate steadily increasing in the State immediately prior to Ivey and Marshall's directives in late 2018.

826.    Alabama's parole rate did not decline to levels far below the historical levels typical and customary in Alabama until Defendants Ivey and Marshall consolidated oversight of the Board via the 2019 parole amendment, which allowed Defendants Ivey and Marshall to replace the Executive Director and Chair of the Board with people who would follow their orders.  Indeed, Defendant Gwathney proudly boasts that she denies parole to all those convicted of violent crimes on direct orders from the Governor.

827.    The wholesale revision to the standards governing suitability for parole mandated by Governor Ivey and Attorney General Marshall and implemented by the Parole Board and Defendant Hamm has materially changed the substantive policies that govern parole decisions, replacing individualized consideration that takes into account each parole applicant's unique circumstances with racially skewed decision-making untethered to evidence or public safety considerations.  Both research studies and ADOC's own data show that the subversion of the lawful operation of Alabama's parole system by Governor Ivey, Attorney General Marshall, and the Parole Board members makes Alabama less safe by increasing the threat to public safety upon the ultimate release of offenders by exacerbating violence and overcrowding in state prisons, eliminating post-release services by releasing particularly people serving sentences for "violent" offenses without services by permitting release only after serving the full time of their sentences, and by releasing those people who are more likely to recidivate while lengthening the period of incarceration for those who pose the least threat to the public.

828.    All persons incarcerated in Alabama are now significantly less likely to be granted parole than at any other time in the State's history for which data is available.  Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas ("Parole Denial Named Plaintiffs"), and the members of the Parole Denial Class, each of whom committed their crimes of conviction between 1985 and 2016, were sentenced in the 1951–2016 parole regime that pre-dated Governor Ivey and Attorney General Marshall's unlawful directives, and the Parole Board and Commissioner Hamm's implementation of the same.  These policy changes have created a significant risk of increasing the duration of imprisonment for each Plaintiff and all members of Parole Denial Class whose sentences include the possibility of parole.  Indeed, Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas have already been denied parole since 2019, despite a demonstrated track record of working safely outside prison gates.

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

829.    Plaintiff Prewitt, who committed his crime of conviction between 2015 and 2019, when the JRA was in full effect and every parole decision in the State was made according to the JRA's evidence-based, objective standards, has likewise been harmed by Governor Ivey and Attorney General Marshall's unlawful directives, and the Parole Board and Commissioner Hamm's implementation of the same.  The above-referenced policy changes have created a significant risk of increasing the duration of imprisonment for Plaintiff Prewitt and all members of the Post-JRA Parole Class whose sentences include the possibility of parole and who committed their crimes of conviction between 2015 and 2019, when the JRA was in effect and when parole was granted, as required by the JRA's terms (all of which are still in effect but which have been largely ignored by the Parole Board since the passage of the 2019 parole amendment, at the directive of Governor Ivey and Attorney General Marshall) based on objective, evidence- and research-based based standards.  For people like Mr. Prewitt, who were convicted of crimes and sentenced after the passage of the JRA and before the 2019 parole amendments, parole grant rates were at an all-time high.

830.    Records concerning the operation of the Alabama parole system since Governor Ivey and Attorney General Marshall issued their directive show a precipitous decline in parole grant rates since 2019, including for incarcerated people in work-release and work-center facilities, and demonstrate the severe risk that incarcerated people who would have been granted parole under a parole system compliant with the individualized, case-by-case consideration required by Alabama law until the 2019 parole amendment are now being denied lawful parole consideration and thus are subjected to increased periods of incarceration. Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm's violation of the Ex Post Facto Clause has caused harm to Parole Denial Plaintiffs, all Parole Denial Class Members, to Named Plaintiff Prewitt and all members of the Post-JRA Parole Class, and to Plaintiffs USSW, RWDSU, and Woods Foundation.

<u>COUNT VII</u>
**Denial of Equal Protection**
**U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fourteenth Amendment Equal Protection Right Against Racially**
**Discriminatory Parole Denials**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad**
**Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas on Behalf of**
**Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU, and Woods**
**Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

831.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–16, 21–73, 86–89, 116–70, 178–97, 200–04, 641–747, and 753–63 by reference.

832.    Plaintiffs USSW, RWDSU, and Woods Foundation are organizations that have diverted resources to address racial disparities in Alabama's prison system, as described above. Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas (Discriminatory Parole Denial Named Plaintiffs) are incarcerated Black people who have been denied parole in Alabama.

833.    Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. §1983.

834.    The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. §1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws, regardless of their race.

835.    Accordingly, the Equal Protection Clause prohibits the Parole Board from discriminatorily denying parole to Black incarcerated people on the basis of their race.

836.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have unequally applied Alabama's laws governing parole, and have unequally exercised their discretion and authority, for the purposes of discriminating against the Discriminatory Parole Denial Named Plaintiffs and the Discriminatory Parole Denial Subclass Members.

837.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have intentionally and disproportionately denied parole to the Discriminatory Parole Denial Named Plaintiffs and other Black incarcerated people on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and have been at least callous or recklessly indifferent to their deprivation of Discriminatory Parole Denial Named Plaintiffs' and Discriminatory Parole Denial Subclass Members' constitutional rights.  This disproportionate rate of denial has persisted even when controlling for disciplinary history, criminal history, and likelihood of recidivism with all currently available public data.

838.    Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board who deliberately and discriminatorily denied Black people parole on the basis of their race; she failed to ensure adequate policies and procedures were in place to prevent the discriminatory exercise of the Parole Board's discretion and decision-making; she failed to take corrective action following the discriminatory practices and outcomes of the Parole Board, despite being put on notice repeatedly about the ongoing racial disparities both in parole and pardon grant rates by the Parole Board; and she acted intentionally or at least callously with reckless indifference to her and others' deprivation of Discriminatory Parole Denial Named Plaintiffs' and Discriminatory Parole Denial Subclass Members' constitutional rights.

839.    These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision.  As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole system operated without the current persistent racial bias prior to their unlawful directives. Implementation of the JRA's objective, evidence-based standards, which were in accord with the individualized parole consideration Alabama law has long required, led to Black Alabamians, particularly those in work-release and work center facilities, receiving parole at a *higher* rate than White Alabamians prior to Ivey and Marshall's directive.

FIRST AMENDED COMPLAINT; Case No. 2:23-cv-712-CLM

840.    The persistent racial bias in Alabama's parole rates did not begin until Ivey and Marshall consolidated control and oversight of the Board via legislation and replaced the Executive Director and Chair of the Board with people who would follow their orders.  Indeed, Defendant Gwathney proudly boasts that her restrictive attitudes towards parole and choice to grant parole as infrequently as possible is done on direct orders from the Governor.  Had Defendants Ivey and Marshall not made these changes to the Board and issued their unlawful directives, the racial bias in Alabama's parole system would not have taken root.  Likewise, the glaring racial disparity in parole and pardon grants in Alabama by the Parole Board would revert to prior, non-discriminatory levels if Defendants Ivey and Marshall were to end their directives, leaving the Board instead to be free to implement the still-applicable JRA statutory requirements that the Parole Board's decisions are evidence- and research-based and in accordance with validated parole guidelines —particularly since Black parolees are less likely to recidivate than their similarly situated White counterparts.

841.    This deprivation of equal protection has caused harm to Discriminatory Parole Denial Named Plaintiffs and Discriminatory Parole Denial Class Members, and Plaintiffs USSW, RWDSU, and Woods Foundation.

### COUNT VIII
**Denial of Equal Protection**
**U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fourteenth Amendment Equal Protection Right Against Racially Discriminatory Issuance of Parole Reconsideration Dates**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

842.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–16, 21–73, 86–89, 116–70, 178–97, 200–04, 641–747, and 753–63 by reference.

843.    Plaintiffs Moore, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas ("Discriminatory Parole

Denial Named Plaintiffs") are incarcerated Black people who have been denied parole in Alabama and have received discriminatory parole-reconsideration dates. Plaintiffs Cole and English were denied parole and not given reconsideration dates, with the Parole Board instead stating that they would remain incarcerated until the end of their sentences. Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. §1983.

844. The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. §1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws, regardless of their race.

845. Accordingly, the Equal Protection Clause prohibits the Alabama Board of Pardons and Paroles from disproportionately delaying parole reconsideration dates for Black incarcerated people on the basis of their race.

846. At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have unequally applied Alabama's laws governing parole, and have unequally exercised their discretion and authority, for the purposes of discriminating against Discriminatory Parole Denial Named Plaintiffs and Discriminatory Parole Denial Subclass Members.

847. At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have intentionally and disproportionately extended the parole reconsideration dates of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Thomas, and Discriminatory Parole Denial Subclass Members on the basis of those Subclass Members' race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and have displayed an intentional or at least callous and reckless indifference to the deprivation of Discriminatory Parole Denial Named Plaintiffs and Discriminatory Parole Denial Subclass Members' constitutional rights. This disproportionate rate of extended reconsideration dates has persisted even when controlling for

disciplinary history, criminal history, and likelihood of recidivism with all currently available public data.

848.    Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board who deliberately and disproportionately postponed the parole reconsideration dates for Black incarcerated people on the basis of their race; she failed to ensure adequate policies and procedures were in place to prevent the discriminatory exercise of the Parole Board's discretion and decision-making; she failed to take corrective action following the discriminatory practices and outcomes of the Parole Board, despite being put on notice repeatedly about the ongoing racial disparities in parole and pardon grant rates and the length of set-off dates; and she acted intentionally or at least callously and with reckless indifference to her and others' deprivation of Discriminatory Parole Denial Named Plaintiffs and Discriminatory Parole Denial Subclass Members' constitutional rights.

849.    These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision.  As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole system operated without the current persistent racial bias prior to their unlawful directives. Implementation of the JRA's objective, evidence-based standards, which were in accord with the individualized parole consideration Alabama law has long required, led to Black Alabamians, particularly those in work-release and work center facilities, receiving parole at a *higher* rate than White Alabamians prior to Ivey and Marshall's directive.

850.    The persistent racial bias in Alabama's parole rates did not begin until Ivey and Marshall consolidated control and oversight of the Board via legislation and replaced the Executive Director and Chair of the Board with people who would follow their orders.  Indeed, Defendant Gwathney proudly boasts that her restrictive attitudes towards parole and choice to grant parole as infrequently as possible is done on direct orders from the Governor.  Had Defendants Ivey and Marshall not made these changes to the Board and issued their unlawful

directives, the racial bias in Alabama's parole system would not have taken root. Likewise, the glaring racial disparity in parole and pardon grants in Alabama by the Parole Board would revert to prior, non-discriminatory levels if Defendants Ivey and Marshall were to end their directives, leaving the Board instead to be free to implement the still-applicable JRA statutory requirements that the Parole Board's decisions are evidence- and research-based and in accordance with validated parole guidelines —particularly since Black parolees are less likely to recidivate than their similarly situated White counterparts.

851.    This deprivation of equal protection has caused harm to Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Thomas, Discriminatory Parole Denial Subclass Members, USSW, RWDSU, and Woods Foundation.

### COUNT IX
**Denial of Substantive Due Process**
**U.S. Const. Amend. V and XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fifth and Fourteenth Amendment Right Against Arbitrary, Capricious, Flagrant, and/or Unauthorized Parole Proceedings**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas on Behalf of Themselves and the Parole Denial Class, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

852.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–189, 193–97, 200–04, 641–747 and 752–63 by reference.

853.    Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, Bullock, and Thomas ("Parole Denial Named Plaintiffs") are incarcerated Black people who have been denied parole in Alabama.

854.    Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. §1983.

855.    The Fifth and Fourteenth Amendments to the U.S. Constitution, enforceable pursuant to 42 U.S.C. §1983, prohibit arbitrary and capricious action, as well as flagrant and unauthorized action, by government officials in denying parole.

856.    At the direction of Defendants Ivey and Marshall, Defendants Gwathney and the associate Parole Board members, with the participation of Defendant Hamm, have arbitrarily, capriciously, flagrantly, and in an unauthorized manner denied lawful parole consideration and parole release to Parole Denial Named Plaintiffs and Parole Denial Class Members, including by denying parole in a racially discriminatory manner, by disregarding the evidence-based Parole Guidelines promulgated under state law and in accordance with the JRA, and by subverting the proper operation of the parole system, including by surreptitiously changing the scores of individual parole applicants and by making parole decisions well in advance of scheduled hearing dates, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution, and have acted intentionally or at least with callous and reckless indifference to their deprivation of Parole Denial Named Plaintiffs and Parole Denial Class Members' constitutional rights.

857.    Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board, deliberately choosing to implement a parole system that engaged in systematically arbitrary, capricious, flagrant, and unauthorized decision-making, failed to ensure adequate policies and procedures were in place to prevent the arbitrary, capricious, flagrant, and unauthorized exercise of the Parole Board's discretion and decision-making, failed to take corrective action following the arbitrary, capricious, flagrant, and unauthorized practices and outcomes of the Parole Board, and acted intentionally or at least with callous and reckless indifference to the deprivation of Parole Denial Named Plaintiffs and Parole Denial Class Members' constitutional rights.

858.    These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision.  As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole

system operated without the current persistent racial bias prior to their unlawful directives. Implementation of the JRA's objective, evidence-based standards, which were in accord with the individualized parole consideration Alabama law has long required, led to Black Alabamians, particularly those in work-release and work center facilities, receiving parole at a *higher* rate than White Alabamians prior to Ivey and Marshall's directive.  The persistent racial bias in Alabama's parole rates did not begin until Ivey and Marshall consolidated oversight of the Board via legislation and replaced the Executive Director and Chair of the Board with people who would follow their orders.

859.    Indeed, Defendant Gwathney proudly boasts that her restrictive attitudes towards parole and choice to grant parole as infrequently as possible is done on direct orders from the Governor.  Had Defendants Ivey and Marshall not made these changes to the Board and issued their unlawful directives, the racial bias in Alabama's parole system would not have taken root. Likewise, the glaring racial disparity in parole grants in Alabama would revert to prior, non-discriminatory levels if Defendants Ivey and Marshall were to end their directives, leaving the Board to be free to implement the still-applicable JRA requirements that the Parole Board make its decisions on the basis of evidence, research and validated parole guidelines  —particularly since Black parolees are less likely to recidivate than their similarly situated White counterparts.

860.    This deprivation of substantive due process has caused harm to Parole Denial Named Plaintiffs, Parole Denial Class Members, USSW, RWDSU, and Woods Foundation.

### COUNT X
**Conspiracy in Violation of the KKK Act, 42 U.S.C. §1985(2), (3)**
**By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU, and Woods Foundation**
**Against Defendants Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm**

861.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–16, 21–73, 86–89, 116–70, 178–97, 200–04, 641–747, and 753–63 by reference.

862.    Defendants Ivey, Marshall, Gwathney, and the associate Parole Board members, with the cooperation of Defendant Hamm, formed and implemented a civil conspiracy for the purpose of impeding, hindering, obstructing, or defeating the due course of justice in Alabama with the intent to deny Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas ("Discriminatory Parole Denial Named Plaintiffs") and the members of the Discriminatory Parole Denial Subclass the equal protection of the laws.  Specifically, they conspired to impede, hinder, obstruct, and defeat the proper and lawful operation of the State's parole system.

863.    Defendants Ivey, Marshall, Gwathney, and the associate Parole Board members, with the cooperation of Defendant Hamm, formed and implemented a civil conspiracy for the purpose of depriving Discriminatory Parole Denial Named Plaintiffs and the members of the Discriminatory Parole Denial Subclass of the equal protection of the laws and the equal privileges and immunities under the laws.  Specifically, they conspired to deprive Discriminatory Parole Denial Named Plaintiffs and the members of the Discriminatory Parole Denial Subclass of the opportunity to have parole decisions made without regard to race, and further conspired to subject those individuals on the basis of their race, to the consequences of remaining imprisoned and subject to involuntary servitude after parole is denied.

864.    Defendants Gwathney, Littleton, and Simmons, in agreement with co-conspirators Defendants Ivey and Marshall, engaged in overt acts in furtherance of their illegal objective, including denying lawful parole consideration and/or parole release to eligible Black incarcerated people on the basis of their race.

865.    Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons were motivated by race-based discriminatory animus against a protected class, namely Black people.

866.    These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision.  As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole

system operated without the current persistent racial bias prior to their unlawful directives. Implementation of the JRA's objective, evidence-based standards, which were in accord with the individualized parole consideration Alabama law has long required, led to Black Alabamians, particularly those in work-release and work center facilities, receiving parole at a *higher* rate than White Alabamians prior to Ivey and Marshall's directive. The persistent racial bias in Alabama's parole rates did not begin until Ivey and Marshall consolidated oversight of the Board via legislation and replaced the Executive Director and Chair of the Board with people who would follow their orders. Indeed, Defendant Gwathney proudly boasts that her restrictive attitudes towards parole and choice to grant parole as infrequently as possible is done on direct orders from the Governor. Had Ivey and Marshall not made these changes to the Board and issued their unlawful directives, the racial bias in Alabama's parole system would not have taken root. Likewise, the glaring racial disparity in parole grants in Alabama would revert to prior, non-discriminatory levels if Ivey and Marshall were to end their directives, cease pressuring the Board to deny parole as often as possible, leaving the Board to be free to implement the still-applicable JRA requirements that the Parole Board make its decisions on the basis of evidence, research and validated parole guidelines —particularly since Black parolees are less likely to recidivate than their similarly situated White counterparts.

867.    Discriminatory Parole Denial Named Plaintiffs, Discriminatory Parole Denial Subclass Members, and RWDSU, USSW, and Woods Foundation suffered injury to their persons and property, and Discriminatory Parole Denial Named Plaintiffs and Discriminatory Parole Denial Subclass Members were deprived of their rights and privileges as citizens of the United States as a result of the conspiracy entered into by Defendants Ivey, Marshall, Gwathney, Littleton, and Simmons.

## COUNT XI
### Conspiracy in Violation of the KKK Act, 42 U.S.C. §1985(3)
### By Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas, on Behalf of Themselves and the Discriminatory Parole Denial Subclass, USSW, RWDSU, and Woods Foundation
### Against Defendants Ivey and Marshall

868.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–16, 21–73, 86–89, 116–70, 178–97, 200, 204, 641–747, and 753–63 by reference.

869.    Defendants Ivey and Marshall formed and implemented a civil conspiracy for the purpose of preventing or hindering the constituted authorities of Alabama from giving or securing to all persons within the State the equal protection of the laws.  Specifically, Defendants Ivey and Marshall conspired to prevent and hinder the Parole Board from giving or securing to all parole candidates the equal protection and enforcement of the laws in the operation of the parole system.

870.    The conspiracy between Defendants Ivey and Marshall implicates the constitutional rights of Plaintiffs Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas ("Discriminatory Parole Denial Named Plaintiffs") and the Discriminatory Parole Denial Subclass Members, namely the rights to be free from wrongful imprisonment, the right to be free from racially discriminatory parole decision-making and/or denials of parole and/or delay of parole reconsideration, and the right to be free from arbitrary, capricious, flagrant, and/or unauthorized exercise of the power to grant parole.

871.    Defendants Ivey and Marshall engaged in overt acts in furtherance of their illegal objective, including summoning the members of the 2018 Parole Board to a meeting and directing them to abandon the standards imposed by the JRA, and opposing granting parole to many incarcerated people, including in Plaintiffs Moore's and McDole's cases.

872.    Defendants Ivey and Marshall were motivated by race-based discriminatory animus against a protected class, namely Black people, in forming the conspiracy.

873.     These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision.  As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole system operated without the current persistent racial bias prior to their unlawful directives. Implementation of the JRA's objective, evidence-based standards, which were in accord with the individualized parole consideration Alabama law has long required, led to Black Alabamians, particularly those in work-release and work center facilities, receiving parole at a *higher* rate than White Alabamians prior to Ivey and Marshall's directive.  The persistent racial bias in Alabama's parole rates did not begin until Ivey and Marshall consolidated oversight of the Board via legislation and replaced the Executive Director and Chair of the Board with people who would follow their orders.  Indeed, Defendant Gwathney proudly boasts that her restrictive attitudes towards parole and choice to grant parole as infrequently as possible is done on direct orders from the Governor.  Had Ivey and Marshall not made these changes to the Board and issued their unlawful directives, the racial bias in Alabama's parole system would not have taken root.  Likewise, the glaring racial disparity in parole grants in Alabama would revert to prior, non-discriminatory levels if Ivey and Marshall were to end their directives, cease pressuring the Board to deny parole as often as possible, leaving the Board to be free to implement the still-applicable JRA requirements that the Parole Board make its decisions on the basis of evidence, research and validated parole guidelines —particularly since Black parolees are less likely to recidivate than their similarly situated White counterparts.

874.     Discriminatory Parole Denial Named Plaintiffs, the members of the Discriminatory Parole Denial Subclass, and RWDSU, USSW, and Woods Foundation suffered injury to their persons and property, and Discriminatory Parole Denial Named Plaintiffs and Discriminatory Parole Denial Subclass Members were deprived of their rights and privileges as citizens of the United States as a result of the conspiracy entered into by Defendants Ivey and Marshall.

<u>COUNT XII</u>
**Unjust Enrichment**
**By Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English,**
**Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark,**
**Jarmon Jr., Evans, Bullock, and Thomas on Behalf of Themselves and the Forced Labor**
**Class**
**Against Public Employer Defendants and Private Employer Defendants**

875.    Plaintiffs incorporate the allegations in paragraphs 1–4, 11–189, 193–97, 206–22, 226–747 and 752–63 by reference.

876.    The involuntarily coerced labor of Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon Jr., Evans, Bullock, and Thomas ("Forced Labor Named Plaintiffs") and the members of the Forced Labor Class has conferred a benefit on the Employer Defendants in the form of, among other things, decreased costs and increased profits, including but not limited to decreased costs and increased profits resulting from the lower wages and benefits paid to Forced Labor Named Plaintiffs and Forced Labor Class Members working for them through Alabama Work Release and Work Center facilities than the Public and Private Employer Defendants would have had to pay to free workers had forced incarcerated labor not been available to them, and as a result of being able to assign work and hours to Forced Labor Named Plaintiffs and because Forced Labor Named Plaintiffs and Forced Labor Class Members that the Public and Private Employer Defendants could not easily find free workers to perform.

877.    Plaintiffs incorporate by reference the allegations in paragraphs 767, 769, 772, and 774–776 of Claim I, including the chart set forth in paragraph 776, which identifies for each Public Employer Defendant and Private Employer Defendant allegations demonstrating their unjust enrichment as a result of receiving forced labor from at least one Forced Labor Named Plaintiff and members of the Forced Labor Class.

878.    It would be unjust for Employer Defendants to retain the value of this benefit without disgorgement to Forced Labor Named Plaintiffs and the Forced Labor Class Members because Employer Defendants obtained this benefit through unconscionable conduct, including

through their knowing and voluntary participation in the State's coercive worker "leasing" programs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and respectfully request that the Court award relief as follows:

(1)     Issue a declaratory judgment that the practices complained of herein are unlawful under the TVPA, RICO, Article I Section 32 of the Alabama Constitution, the Ex Post Facto Clause of the U.S. Constitution, the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendment, and the KKK Act;

(2)     Issue a preliminary and permanent injunction requiring Defendants, their agents, employees, and all persons under their control or acting in active concert or participation with them to:

    a.     With respect to the Defendant members of the Parole Board, immediately remedy and correct their unlawful and discriminatory parole practices with respect to Plaintiffs and the members of the Parole Denial Class to whom the Parole Board denied parole after 2019;

    b.     With respect to Defendants Ivey, Marshall, and Hamm, cease enforcement of and rescind all ADOC regulations and practices coercing incarcerated people to labor; and

    c.     With respect to all Defendants, cease coercing labor from Plaintiffs and Forced Labor Class members on an ongoing basis and/or refrain from benefiting from coercion of such labor.

(3)    Award compensatory and/or consequential damages in an amount to be determined at trial pursuant to 42 U.S.C. §§1983, 1985, and 1986, and 18 U.S.C. §1595;

(4)    Award punitive damages as just and proper in light of Defendants' outrageous and malicious conduct and to deter such egregious conduct from occurring in the future;

(5)    Award treble damages pursuant to 18 U.S.C. §1964(c);

(6)    Award nominal damages in recognition of the violation of Plaintiffs' legal rights;

(7)    Require disgorgement from Defendants of the profits and benefit resulting from their participation in the forced-labor scheme alleged herein;

(8)    Certify the Classes and Subclasses as defined above, and such additional subclasses as may be appropriate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Named Plaintiffs as the representatives for the Classes and Subclasses as set forth herein, and appoint Plaintiffs' counsel as class counsel;

(9)    Award reasonable attorneys' fees and costs, pursuant to 42 U.S.C. §1988, 18 U.S.C. §1595, 18 U.S.C. §1964, and any other applicable laws;

(10)   Award pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and

(11)   Award such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

 DATED: May 9, 2024                    _/s/ Barbara J. Chisholm_

MICHAEL RUBIN (CA SBN 80618)*
BARBARA J. CHISHOLM (CA SBN 224656)*
CONNIE K. CHAN (CA SBN 284230)*
AMANDA C. LYNCH (CA SBN 318022)*
EMANUEL WADDELL (CA SBN 350156)**
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Email: mrubin@altber.com; bchisholm@altber.com;
cchan@altber.com; alynch@altber.com;
ewaddell@altber.com

JANET HEROLD (CA SBN 186419)*
JUSTICE CATALYST LAW
40 Rector Street, 9th Floor
New York, NY 10008
Telephone: (518) 732-6703
Email: jherold@justicecatalyst.org

*Counsel for All Plaintiffs and the Proposed Classes and Subclasses*

GEORGE N. DAVIES
RICHARD P. ROUCO
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
Email: gdavies@qcwdr.com; rrouco@qcwdr.com

*Counsel for Plaintiffs RWDSU and USSW*

LAUREN FARAINO
FARAINO, LLC
2647 Rocky Ridge Ln.
Vestavia Hills, AL 35216
Telephone: (205) 737-3171
Email: lauren@farainollc.com

*Counsel for The Woods Foundation, Individual Plaintiffs, and the Proposed Classes and Subclasses*

*\*Appearing pro hac vice*

*\*\*Pro hac vice pending*