IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT EARL COUNCIL *et al.*, | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | 2:23-cv-00712-CLM-JTA |
| v. | § | |
| | § | |
| KAY IVEY *et al.*, | § | |
| | § | |
| *Defendants* | § | |

---

**Bama Budweiser's Rule 12(b)(1) and 12(b)(6) Motion to Dismiss
Amended Complaint**

---

Aaron G. McLeod
R. Benjamin Thomas III
Adams and Reese LLP
1901 6th Ave. N., Ste 1110
Birmingham, AL 35203
(205) 250-5000
aaron.mcleod@arlaw.com
ben.thomas@arlaw.com
*Counsel for Bama Budweiser*

## Table of Contents

Introduction ................................................................................ 3

Argument ................................................................................... 5

    1. Plaintiffs fail to state a claim under the TVPA ............................ 5

        A.  Plaintiffs do not plead a plausible perpetrator claim............. 5

        B.  Plaintiffs do not state a plausible beneficiary claim........... 11

        C.  As Plaintiffs use it, the TVPA is unconstitutional, so the
            Court should read it narrowly............................................ 15

    2. Plaintiffs' RICO claim fails because the predicate TVPA claim
       fails, and because Plaintiffs do not allege sufficient facts .......... 20

    3. Plaintiffs do not state a claim for violation of the Alabama
       Constitution ................................................................... 23

    4. Plaintiffs do not state a claim for unjust enrichment ................. 24

    5. The entity Plaintiffs lack standing and fail to state a claim ........ 25

Conclusion ............................................................................... 30

Certificate of Service .................................................................. 30

## Introduction

Though the Amended Complaint weighs in at 298 pages, the spirit of the pleading is unchanged, so Bama Budweiser offers the below in response more to its tone than its substance.

Plaintiffs refer to the racial division of parolees or prisoners as "disproportionate[ly]" black, alleging that while 26.8% of Alabamians are black, 53.4% of Alabama's convicts are black. Complaint ¶ 698.[1] Implicit in this statement is the assumption that, but for bias, the number of black prisoners would bear the same relationship to the number of all prisoners as the black population does to the whole state. Plaintiffs are indulging in a *non sequitur*.

Black economist Dr. Thomas Sowell disposed of that fallacy. He explained that there's no reason to assume that the distribution of races in a particular class would, absent prejudice, resemble the whole population. *See* Thomas Sowell, *Discrimination and Disparities* 6 (2019). In discussing factors that lead to differing outcomes for groups, Dr. Sowell explained that differences in median age, for example, are often overlooked, yet income differences between the middle-aged and young adults are "larger than income differences between blacks and whites." *Id.* at 23. Among ethnic groups, the median age of Japanese Americans is 51 while that of Mexican Americans is only 27. *Id.* at 24, 40. "How likely is

---

[1] The Amended Complaint is cited as "Complaint" to save space.

it," he asks, that these two groups would have the same representation in occupations that require long years of education or experience? *Id.*

Dr. Sowell's discussion of crime data sheds even more light. About 13% of the U.S. population is black, while the percentage of arrestees who are black is much greater. *See id.* at 94. This disparity is cited as evidence of discrimination, but Dr. Sowell points out that this makes as much sense as inferring prejudice from the percentage of black NBA players against whom referees call fouls. *Id.* "Anyone familiar with the NBA would immediately see the fallacy," because the proportion of black players in the NBA "greatly exceeds" the proportion of blacks in the general population. *Id.* Thus, if the claim is that blacks are targeted for arrest—or parole denial—we need "objective data on the proportions of particular violations of the law committed by blacks, compared to the proportions of blacks arrested, convicted, and sentenced" for those crimes. *Id.* at 94-95.

Consider homicide: the proportion of homicide victims who are black "has been some multiple of" the proportion of blacks in the population for a long time, and the "vast majority" of victims whose killers were identified "were killed by other blacks." *Id.* at 95. It is therefore "hardly surprising" that the "arrest rate of blacks for homicide is also some multiple of the rate of homicide arrests among whites." *Id.* What is "relevant . . . is not the proportion of blacks in the general population, but the proportion of blacks among people who commit a particular crime." *Id.*

It is thus imperative to be on guard, in a case like this, against the profoundly mistaken assumption that if a statistic shows more of a minority relative to the whole than that minority's demographic relationship to the general population, some racial prejudice may be inferred.

Finally, the context of Plaintiffs' theories is best understood in light of the public records on their crimes, as shown by Bama Budweiser's first motion to dismiss. *See* Doc. 139 at 5-6. Plaintiffs include two murderers, an attempted murderer, robbers, burglars, and drug dealers. And they still come to this Court complaining about getting paid to work outside of jail.

## Argument

### 1. Plaintiffs fail to state a claim under the TVPA.[2]

Plaintiffs allege a perpetrator theory under 18 U.S.C. § 1589(a) and a beneficiary theory under § 1589(b). Complaint ¶¶ 764-69, 772, 779-84.

### A. Plaintiffs do not plead a plausible perpetrator claim.

Section 1589(a) must be read according to its plain terms and in light of the following subsection (b). *See, e.g.*, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021) (noting that statutory interpretation begins with the "common and ordinary meaning" of the words used); Norman Singer and Shambie Singer, 2A *Sutherland's Statutory Construction* § 46:5 (7th ed.) (explaining that each part of a statute "should be construed in

---

[2] Bama Budweiser adopts and incorporates all arguments asserted in motions to dismiss by other private-employer defendants.

connection with every other part or section to produce a harmonious whole").  Courts construe statutes so that each part has effect and no part is "superfluous" or redundant.  *See Sutherland Statutory Construction* § 46:6.

When read with the TVPA as a whole, § 1589(a) cannot mean the same thing as § 1589(b), as that would make the latter superfluous. Whatever a perpetrator claim requires under § 1589(a), it must be something different than what is needed to plead a beneficiary claim under § 1589(b).  *Cf. K.H. v. Riti, Inc.*, 2024 WL 505063, *2 (11th Cir. 2024) (distinguishing between perpetrator and beneficiary claims).  The statute provides that it is a crime to "provide[]" or to "obtain[]" the labor or services of a person by means of:

- Force, threats of force, physical restraint, threats of physical restraint;

- Serious harm or threats of serious harm;

- Abuse or threatened abuse of law or legal process; or

- Any scheme or plan intended to cause a person to believe he would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

Because a perpetrator claim cannot be the same thing as a beneficiary claim, to state a claim under subsection (a), Plaintiffs must allege *not* that Bama Budweiser benefitted from someone else using the means in subsection (a) to compel labor, but instead that Bama Budweiser *itself* used force or threats of force to obtain labor.  *See* 18 U.S.C. § 1589(a)-(b).

By that yardstick, Plaintiffs come up short.  From the start, they undermine their own claim by alleging that ADOC—not Bama Budweiser—decides whether to "place[] them in the work release program."  Complaint ¶¶ 235, 449.  Plaintiffs say someone *else* compelled their labor, so they lack a perpetrator claim against Bama Budweiser.

Turning to the new allegations, Plaintiffs say that Michael Campbell and Rashaad Clark worked for Bama Budweiser as part of the work-release program.  Complaint ¶¶ 54-56, 116-29.  Campbell alleges that he worked for Bama Budweiser for "one month in 2019" and that he repackaged damaged goods.  *Id.* ¶ 56.  But the Complaint does not allege that Bama Budweiser—specifically—used force or the threat of force against Campbell to compel his labor.  It does, to be sure, allege that Campbell saw "extreme violence **while in ADOC's custody**," and that he saw violence "repeatedly" while in jail and thus "feels compelled to work" to avoid prison, *id.* ¶¶ 53, 59-60 (emphasis added), but the Complaint does not state that anyone **working for Bama Budweiser** ever committed or threatened to impose serious harm upon him to obtain his month of labor.  *See id.* ¶¶ 52-61, 222, 465-70, 473, 480-88.  Instead the Complaint blurs the statutory language by alleging that Campbell "felt and continues to feel compelled to continue working for his work release employers, including Defendant Bama Budweiser," because he "fears being sent to a more violent facility" if he refuses.  *Id.* ¶ 473.  But it wouldn't be Bama Budweiser sending him there—it would be the ADOC.  *Id.* ¶¶ 483-87, 466-70.

This does not state a perpetrator claim under § 1589(a). Campbell nowhere alleges that Bama Budweiser itself used harm or force or the threat thereof to compel his labor. He instead alleges emotions and conduct that is several removes distant from the plain language of the TVPA. He alleges that *someone else* might, perhaps, threaten discipline that could possibly increase his risk of bodily harm if he refuses to work, and even then, he reaches yet further outside the statutory text in pleading not that the ADOC itself threatened him with a beating or increased confinement if he didn't work for Bama Budweiser, but instead only that he *felt* like he had to keep working because he "fears" being sent to a "more violent facility." Complaint ¶ 473. In other words, Campbell does not say that Bama Budweiser did anything illegal under § 1589(a); he says that the ADOC might have threatened to do something that he would "feel" as coercion because he would perhaps be disciplined, and that discipline *could* include being sent "back behind the wall" or being sent to a "more dangerous" jail. *See id.* ¶¶ 465-69, 473.

This is light years away from what Section 1589(a) criminalizes and which Section 1595 allows a civil remedy for. The mere possibility that someone *else*, not Bama Budweiser, *might* impose a penalty that *might* include more dangerous prison conditions or loss of privileges, does not plausibly state facts showing that Bama Budweiser perpetrated coercion under § 1589(a).

The same shortcoming hamstrings Plaintiff Clark's claim under §
1589(a). He says he's been in jail since 2013, has seen and suffered
violence in prisons, and "has been forced to work as a means of survival."
Complaint ¶¶ 116-18. He feels that the work-release program "permits him
to escape" dangerous prison conditions, discipline, and parole denial. *Id.* ¶
120. Clark says he was "forced to work for" Bama Budweiser while at
"Frank Lee work release," and unlike Campbell, Clark does allege
something specific that occurred at Bama Budweiser. *Id.* ¶ 128. Clark
alleges that "Ed," a supervisor, "falsely accused him" of shirking work and
"attempted" to "beat him with a stick" but was held back from doing so.
*Id.* ¶ 129. This incident prompted him to complain to Bama Budweiser
management, who "agreed to lay off" Clark instead of firing him because
"they knew that if" he were fired, "he would be disciplined by ADOC and
face great harm." *Id.* ¶ 129. Clark then alleges, without specifics, that
Bama Budweiser "regularly threatened R. Clark and other class members
with a host of adverse consequences, including likely violence, **from
ADOC** if Bama Budweiser reported to ADOC that class members refused
to work. . . ." *Id.* ¶ 578 (emphasis added).

Clark has not stated a perpetrator claim. As Campbell did not, Clark
also does not allege facts showing that Bama Budweiser *itself* used force or
threat of force to compel his labor. His allegations as to the list in §
1589(a) are based on what he says **ADOC** personnel or fellow convicts did
or might do to him, not on what Bama Budweiser did or threatened to do.

The one specific incident he does allege is pleaded as a punitive event that happened "after some time on the job," not as a coercive one. He says he was accused of not being on the job when he was "in the bathroom" and that a supervisor "attempted" to "beat him with a stick," but he never alleges that this was done in an effort to force him to work. Complaint ¶ 129. The claim he has to plead is a TVPA violation, not a claim for assault or battery, and he alleges that this happened after he was already working for Bama Budweiser. In fact, Clark alleges that Bama Budweiser agreed to help him *avoid* any disciplinary consequences at ADOC by laying him off instead of firing him. *Id.* But even if he had not admitted that, the key point is that Clark claims that ADOC, not Bama Budweiser, was using threats of force to compel his labor, and that all Bama Budweiser would do is report misbehavior to ADOC (as required by the work-release agreement Plaintiffs acknowledge at Paragraphs 451-52).

This is not an allegation that Bama Budweiser threatened Clark with harm or force to obtain his work. On the contrary, Plaintiffs allege that Bama Budweiser was *required* to report any failure to work or disorderly conduct. Complaint ¶ 455(i). Reporting misconduct or refusals to work, per a contractual obligation to do so, is hardly tantamount to threatening an employee with harm to compel their labor.

Neither Campbell nor Clark have stated facts showing a plausible perpetrator claim under § 1589(a). Instead they allege that Alabama prisons are dangerous places and that they thus prefer to work outside the

jails.  Understandable, but not Bama Budweiser's doing.  They allege that a third party, ADOC—for whom Bama Budweiser is not responsible—*might* impose discipline that *might* involve transfer to a more dangerous facility or loss of "good time credit" or other privileges, if Plaintiffs refuse to work. If any perpetrator claim is stated on those facts, it is against ADOC, not Bama Budweiser.

B.      Plaintiffs do not state a plausible beneficiary claim.

To state a "beneficiary claim," a plaintiff must "plausibly allege that the defendant (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit," (3) that violated the TVPA as to the plaintiff, and (4) "that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPA as to the plaintiff."  *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 719, 723, 726 (11th Cir. 2021); *see also K.H. v. Riti, Inc.*, 2024 WL 505063, *2-3 (11th Cir. Feb. 9, 2024) (clarifying that allegations of financial benefit alone are not enough to allege the enterprise element). The second element is also referred to as "participating in a venture."  *Red Roof Inns*, 21 F.4th at 725.  The last element requires allegations that a defendant "have either actual or constructive knowledge that the venture . . . violated the TVPRA as to the plaintiff."  *Id.* at 725-26.  And at least one federal appellate court has held that the TVPA requires a plaintiff to plead "with some clarity and precision" just what the nature of the alleged

violation is when that plaintiff is a criminal inmate, because such a plaintiff must show "how the conduct alleged . . . is incompatible with the legitimate constraints of the particular penal judgment imposed." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1032 (7th Cir. 2024); *cf. C.B. v. Naseeb Investments, Inc.*, 748 F. Supp. 3d 1338, 1341 (N.D. Ga. 2024) (noting that the Eleventh Circuit "intends the statute to be narrowly construed").

First, Plaintiffs do not allege sufficient facts to show that Bama Budweiser participated in some joint venture or enterprise that involved "risk and potential profit." The Complaint says that Bama Budweiser participated in the work-release program and benefitted from the forced labor of felons, *see* Complaint ¶¶ 493-94, 574, but does not allege facts to support the idea that this arrangement involved "risk" to Bama Budweiser, nor does the Complaint say what "potential profit" was involved, at least not with concrete facts. *See Red Roof Inns*, 21 F.4th at 725. Plaintiffs do not allege that Bama Budweiser paid Campbell or Clark, specifically, less than other workers so as to realize an illicit profit. *See* Complaint ¶¶ 574-77.[3] The Complaint instead vaguely alleges that Bama Budweiser paid "incarcerated workers"—without specifying Plaintiffs—an hourly rate of "$7.25 to $10.00," and that "free world workers" made "**up to** double that hourly rate." *Id.* ¶ 577 (emphasis added).

---

[3] Instead Plaintiffs say they "made" less, no doubt because, as they allege, ADOC took a share of their earnings. Complaint ¶¶ 456-58, 575.

But Plaintiffs fail to allege that *they* were paid less than free workers, and they fail to allege that Bama Budweiser realized a profit by what they say was pay to free workers of "up to" double the range paid to unnamed convict workers. "Up to" could well include *nothing* more than what inmate workers receive. On this element, Plaintiffs fail the *Twombly*/*Iqbal* test. *See* Complaint ¶ 577. (In fact, Plaintiffs admit that private employers using work-release labor "agree to pay the 'prevailing wage' for the jobs" they perform, and that this is an "obligation" of the program. *Id.* ¶ 463.)

Finally, Plaintiffs' most salient failure is that they do not allege facts showing how Bama Budweiser knew or should have known the work-release system was breaking the law as to Campell or Clark. Alleging this properly might mean stating that a defendant was itself part of imposing "extremely poor working conditions" or provided "direct on-site supervision" of the unlawful program, as in *Burrell*. *See Burrell v. Staff*, 60 F.4th 25, 40 (3d Cir. 2023). General allegations, however, that defendants "were aware" of the unlawful conditions of work but that do not "state any facts supporting that general conclusion" are insufficient. *Id.* at 41 (affirming dismissal of TVPA claims because plaintiffs "do not state any facts" plausibly showing that defendants knew of the unlawful conduct). In fact, the Eleventh Circuit analogously held, in analyzing the participation element, that even allegations of financial benefit by a defendant who observed signs of sex-trafficking in hotel rooms the

defendant rented out, were not enough to state a claim for participating in the venture. *K.H.*, 2024 WL 505063 at *4.

Plaintiffs do not offer even that much by way of specificity here. Plaintiffs plead only conclusions. The Complaint never sets out what facts make it plausible that Bama Budweiser knew or should have known that the work-release program was illegally coercing Campbell or Clark to show up at work. Complaint ¶¶ 580-81. Instead, Plaintiffs say only that Bama Budweiser "was aware of" the "coerced nature" of inmate workers' labor and the "conditions they were subjected to by ADOC." Complaint ¶ 580. And they say Bama Budweiser "became aware or should reasonably have been aware" that the labor provided "was coerced." *Id.* ¶ 581.

But Plaintiffs never say *why* or *how* Bama Budweiser did or should have become aware of this coercion by a third party elsewhere. Was Bama Budweiser standing inside the prisons, monitoring how ADOC treated work-release inmates? Was Bama Budweiser privy to how ADOC selected who would work and where? Did Bama Budweiser decide what punishments ADOC would impose if a worker refused to do his job? The Court will search in vain for concrete facts in the Complaint that would make it plausible for Bama Budweiser in particular (not lumped in with other defendants) to have known that Campbell or Clark were being coerced. As to Bama Budweiser, the Complaint never alleges what *facts* placed this Defendant on actual or constructive notice of an illegal scheme. *Id.* ¶¶ 580-81.

Given the narrow way the Eleventh Circuit applies the TVPA and the requirement that a defendant must know that a venture has engaged in unlawful coercion *as to the plaintiff*, the Amended Complaint falls short. *Red Roof Inns*, 21 F.4th at 725-26.

C.    As Plaintiffs use it, the TVPA is unconstitutional, so the Court should read it narrowly.

Bama Budweiser understands the Court is bound by precedent but makes this argument to preserve the issue.  As noted above, the TVPA has been interpreted so broadly that it is tantamount to the federal abolition of states' use of forced labor as a punishment, despite the lack of any constitutional grant of power to Congress to limit how states punish felons, outside of the cruel and unusual.  If that is indeed what the TVPA accomplishes, it represents a breathtaking arrogation of power wholly at odds with our system of federalism, contrary to the Tenth Amendment, and in defiance of the settled absence of a federal police power.  It is not for Congress to determine whether convicted felons may be forced to work instead of being a captive burden on the taxpayer.

The Thirteenth Amendment is no basis for the TVPA because it expressly excludes from its ban on involuntary servitude "punishment for crime" of which a party is "duly convicted."  U.S. Const. amend. XIII.

Nor is the Commerce Clause a source of power to Congress to interfere with states' work-release programs, despite cases like *United*

*States v. Evans* holding otherwise.  The Supreme Court's opinions allowing Congress to regulate activity that is neither commerce nor interstate have flouted any reasonable notion of what "interstate commerce" is or how much power the Framers intended the central government to have.  *See* Raoul Berger, *Judicial Manipulation of the Commerce Clause*, 74 Tex. L. Rev. 695, 715 (1996) (stating that the "precedents of the 'past 60 years'" are "entitled to no more respect than the Court accorded those of the prior 140 years").

Justice Thomas agrees: "By holding that Congress may regulate activity that is neither interstate nor commerce under the Interstate Commerce Clause, the Court abandons any attempt to enforce the Constitution's limits on federal power." *Gonzales v. Raich*, 545 U.S. 1, 58 (2005) (Thomas, J., dissenting).  The Commerce Clause "empowers Congress to regulate the buying and selling of goods and services trafficked across state lines," but does *not* empower Congress to meddle with "all economic or gainful activity" that has some "attenuated connection to trade or exchange." *Id.* (quoting caselaw); *see also United States v. Lopez*, 514 U.S. 549 (1995) (Thomas, J., dissenting); *but see United States v. Evans*, 476 F.3d 1176, 1178 (11th Cir. 2007) (affirming the flawed view that the Commerce Clause allows Congress to regulate "activities that substantially affect interstate commerce") (citing caselaw).

The alleged facts here make this case a perfect example of why the Commerce Clause does not justify the TVPA.  Bama Budweiser contracted

with the State of Alabama for work-release prisoners to labor outside of prison. The economic activity here is a transaction *with* a State and *within* a State, and thus is not commerce across state lines, nor is there any allegation that Plaintiffs worked for Bama Budweiser outside of Alabama. If Plaintiffs did work for this Defendant, that was the provision of labor within a State as part of a contract with the State. That is not commerce, nor is it interstate.

A further constitutional infirmity the TVPA suffers from is its intrusion into state police power. The Tenth Amendment is not decorative language. *Cf. Bond v. United States*, 572 U.S. 844, 857 (2014) (refusing to read a statute so as to intrude on "traditional state criminal jurisdiction"). In fact, the Supreme Court has said that "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Id.* at 858. And even during the judicially expansive 1960s, the Court recognized the "settled mandate" to not construe a federal statute as displacing the "historic police powers of the States" unless that was the "clear and manifest purpose of Congress." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146-47 (1963).

The TVPA, however, as Plaintiffs would use it, interferes with state authority by effectively abolishing forced labor as a punishment, despite the lack of any reference to penal systems or work-release programs. If state officials cannot coerce a felon to work, then Congress has blotted out an entire aspect of states' criminal-justice powers, without having said so.

This problem is avoided if the Court reads the TVPA narrowly. Indeed, some courts have questioned whether the TVPA applies to incarcerated criminals at all. *Ruderman v. Kenosha County*, for example, held that a TVPA claim had not been stated based on allegations that immigration detainees in a county jail were forced to clean common areas without pay. 752 F. Supp. 3d 1084, 1086-87, 1089-90 (E.D. Wis. 2024). The court found that those facts were "far removed" from the purpose and context of the TVPA's § 1589, and that persons "subject to a criminal sentence" could not "expect to have the same freedom of choice with respect to their work and living conditions" as free citizens. *Id.* at 1090 (citing caselaw). The court noted that whether the TVPA has "potential for application in the carceral context" is itself a "questionable premise." *Id.* at 1089. In any event, plaintiffs were "lawfully detained" and thus did not enjoy the same rights and freedoms as otherwise, while the TVPA "must be interpreted against the long-established practices in place when the statute was enacted." *Id.* at 1091. As the court summed up: "The Forced Labor statute was enacted to address human trafficking. It was not enacted to regulate legitimate authorities in the performance of their duties in housing lawfully held detainees." *Id.* at 1091.

The *Ruderman* decision was based in part on the Seventh Circuit's opinion in *Taylor v. Salvation Army National Corp.*, where the court reasoned that participants in a Salvation Army program under court supervision were, as criminals, subject to the government's "legitimate

authority" and "cannot expect to have the same freedom of choice with respect to their work and living conditions" as the law-abiding enjoy. 110 F.4th 1017, 1032 (7th Cir. 2024). Inmates are protected by a host of laws from abuse by their jailors, but applying § 1589 correctly means acknowledging "that the liberty interests that it protects have been curtailed sharply in the case of those subject to the legitimate restraints of a criminal judgment." *Id.* at 1032.

The concerns raised by these opinions are well-founded. The Supreme Court has cautioned that because the Constitution "leaves local criminal activity primarily to the States," it has "generally declined to read federal law as intruding on that responsibility" unless Congress has "clearly indicated" the law should have that scope. *Bond v. United States*, 572 U.S. 844, 848 (2014). As noted above, applying the TVPA to cover duly incarcerated criminals who are ordered to perform work—for pay—outside prison walls "would 'dramatically intrude upon traditional state criminal jurisdiction.'" *Id.* at 857 (quoting caselaw; punctuation omitted).

This Court should, therefore, "not be quick to assume" that Congress meant in the TVPA to enact a "significant change in the sensitive relation between federal and state criminal jurisdiction." *Id.* at 858-59. Since nothing in the text of § 1589 or § 1595 indicates that Congress was upsetting the penal system of every state in America that might include work-release programs, this Court should read the TVPA narrowly, to avoid any application of it to work-release programs that states elect to

require.  *Cf. Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1275, 1277-78 (11th Cir. 2020) (declining to decide if the complaint stated a TVPA claim but noting that federal courts "have long held that . . . detainees or inmates can be required to perform labor while in detention"); 8 U.S.C. § 1555.

Plaintiffs' expansive use of the TVPA is best revealed in the allegation that because Alabama prisons are dangerous places, "**all labor** by people incarcerated by ADOC" is "coerced."  Complaint ¶ 272 (emphasis added).  Plaintiffs want this Court to deem the entire Alabama system "inherently coercive."  *Id.* ¶ 272.  This Court should instead spurn a reading of the TVPA that would essentially outlaw the entire ADOC work-release program until there is sufficient space, staff, and safety in Alabama's jails to make them acceptable to convicts' lawyers.

**2.      Plaintiffs' RICO claim fails because the predicate TVPA claim fails, and because Plaintiffs do not allege sufficient facts.**

If a plaintiff alleges a RICO violation with the "predicate acts" of racketeering activity being TVPA violations, dismissal of the TVPA claim necessarily means dismissal of the RICO claim.  *Garcia-Lopez v. Waste Mgmt. of Tex.*, 2022 WL 17547458, *2-3 (5th Cir. Dec. 9, 2022); *see also Burrell v. Staff*, 60 F.4th 25, 41-42 (3d Cir. 2023).  Because the predicate acts Plaintiffs allege here are TVPA violations, the RICO claim (Count III) must fail alongside the inadequate TVPA claims.  Complaint ¶¶ 791-801.

But even if the TVPA claims are not dismissed, the RICO claim
should be, because Plaintiffs do not allege facts to support each element of
that theory:

> A private plaintiff suing under the civil provisions of RICO
> must plausibly allege six elements: that the defendants (1)
> operated or managed (2) an enterprise (3) through a pattern (4)
> of racketeering activity that included at least two predicate acts
> of racketeering, which (5) caused (6) injury to the business or
> property of the plaintiff. . . . If a plaintiff fails to adequately
> plead any one of these elements, she has failed to state a claim
> upon which relief may be granted, and her complaint must be
> dismissed.

*Cisneros v. Petland, Inc*., 972 F.3d 1204, 1211 (11th Cir. 2020) (citing
caselaw).

Plaintiffs allege an "association-in-fact enterprise" among
Defendants, Complaint ¶ 794, so they are required to set out several
additional sub-elements to satisfy the enterprise element: "To plead an
association-in-fact enterprise, the Supreme Court has held that a plaintiff
must allege that a group of persons shares three structural features: '(1) a
'purpose,' (2) 'relationships among those associated with the enterprise,'
and (3) 'longevity sufficient to permit these associates to pursue the
enterprise's purpose.'" *Cisneros*, 972 F.3d at 1211 (quoting caselaw). For
the "purpose prong" of this test, a plaintiff must plausibly allege "that the
participants shared the purpose of enriching themselves through a
particular **criminal** course of conduct." *Id.* (emphasis added). An
"abstract common purpose" like a "generally shared interest in making

money," the court noted, "will not suffice." *Id.* Instead the enterprise's purpose must specifically be to benefit from a *wrongful* course of conduct. *See id.* at 1211-12. And a complaint must have "concrete facts" to give rise to that inference. *Id.* at 1212.

Plaintiffs do not clear that hurdle. They nowhere allege that Bama Budweiser formed an association-in-fact enterprise with the State Defendants for the mutual purpose of enrichment from *unlawfully* coerced labor. Bama Budweiser is not alleged to have itself coerced a Plaintiff, and Plaintiffs do not say that the work-release program at large is unlawful, nor that Bama Budweiser's mere participation in the program was criminal. Plaintiffs have tried to allege that they were unlawfully coerced into performing labor for employer defendants by means of force or threat of force—but they never allege specific facts that make it plausible to suppose that Bama Budweiser's *reason* for participating in the work-release system was to benefit from labor that others unlawfully coerced. *See* Complaint ¶¶ 52-54, 56-61, 116, 128-29, 134, 794-98. As noted above, Plaintiffs do not allege facts showing that Bama Budweiser was *aware* of the supposedly unlawful coercion going on behind prison walls, so they do not come close to alleging a plausible claim that the purpose behind Bama Budweiser's contract with ADOC was to benefit from illegal compulsion.

Plaintiffs' allegations likewise flunk the management element. *Cisneros* requires allegations that a defendant "operated or managed" an enterprise, and the Supreme Court has explained that 18 U.S.C. § 1962(c)

(Complaint ¶ 792) requires that a defendant "must have some part in **directing**" the affairs of an alleged enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183 (1993) (emphasis added). A defendant must have "*some* part in directing the enterprise's affairs" for RICO liability to attach. *Id.* (emphasis original). But Plaintiffs allege no facts showing that Bama Budweiser played a role in managing the ADOC's work-release program. Not a word of the 300-page Complaint suggests that Bama Budweiser took part in policy-making for work release or that Bama Budweiser influenced how inmates were assigned to work. On this element, too, the RICO claim fails.

3.    **Plaintiffs do not state a claim for violation of the Alabama Constitution**.

Count IV alleges violation of the Alabama Constitution, Article 1, Section 32, which Plaintiffs plead is a ban on "slavery and involuntary servitude under all circumstances." Complaint ¶ 803. And Plaintiffs say Bama Budweiser (lumped in with other Defendants) "subjected Plaintiffs" to involuntary servitude by "forcing them" to work through coercion and force. *Id.* ¶ 804.

But Plaintiffs do not allege specific facts showing that Bama Budweiser "forced" them to work or had any control over how the ADOC determined which prisoners would show up to work. So just on the facts, Count IV fails to state a claim.

What is more, Alabama does not recognize a private cause of action "for monetary damages based on violations of the provisions of the Constitution of Alabama." *See Matthews v. Ala. A&M Univ.*, 787 So. 2d 691, 698 (Ala. 2000) (citing caselaw); *see also Brazelton Properties, Inc. v. City of Huntsville*, 237 So. 3d 209, 215 (Ala. Civ. App. 2017). There is no private cause of action Plaintiffs can pursue for damages based on a state constitutional violation.

Finally, Plaintiffs gloss over the former version of Section 32, which until January 1, 2023 specifically exempted criminal punishments from the ban on involuntary servitude. Ala Const. art. I sec. 32 (Constitution of 1901). Plaintiffs allege they are convicted criminals, so to the extent they allege that they worked for Bama Budweiser before January 1, 2023—as Plaintiff Campbell does—they fail to state a claim for relief under the Alabama Constitution. Complaint ¶ 56.

## 4.    Plaintiffs do not state a claim for unjust enrichment.

To state an unjust-enrichment claim, a plaintiff must allege that the defendant "knowingly accepted" and retained a benefit provided by another "who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, LLC*, 77 So. 3d 139, 145 (Ala. 2011) (quoting caselaw). Retention of a benefit is not unjust unless the donor of the benefit "acted under a mistake of fact or in misreliance on a right or duty," or unless the recipient "engaged in some unconscionable conduct,

such as fraud, coercion, or abuse of a confidential relationship." *Id.* at 146 (quoting caselaw).

Count XII fails from top to bottom. As noted above, the Complaint lacks sufficient facts showing that this Defendant paid Plaintiffs less than free employees would receive.

Nor are there any allegations to set forth a plausible theory that Bama Budweiser retained a benefit unjustly. Bama Budweiser is not alleged to have had authority over the work-release program, and Plaintiffs do not explain how this Defendant was aware of the supposedly illicit coercive measures taken by others. Plaintiffs seem to think they can state a claim for unjust enrichment if the employer defendants accept a benefit as part of participating in a program involving *others* coercing Plaintiffs to work. But that is not the theory under Alabama law. The claim requires Plaintiffs to plead specific facts showing that *this* Defendant engaged in unconscionable conduct like fraud or coercion, not that some third party engaged in coercion that Bama Budweiser benefited from. Since Plaintiffs state no such facts, Count XII should be dismissed.

**5.      The entity Plaintiffs lack standing and fail to state a claim.**

Plaintiffs RWDSU, USSW, and the Woods Foundation lack standing because none of them say they were coerced to work as prison inmates and because none of them allege that a named Plaintiff is a member of their organizations. Complaint ¶¶ 190-92, 798.

A plaintiff has standing if he has suffered "an injury in fact" that is "fairly traceable to the challenged conduct of the defendant" and that is "likely to be redressed" by a favorable decision. *Schultz v. Alabama*, 42 F.4th 1298, 1319 (11th Cir. 2022). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The Supreme Court's new decision in *FDA v. Alliance for Hippocratic Medicine* spells the end for Plaintiffs' organizational standing. Plaintiffs claim standing based on diversion of financial resources to address defendants' wrongful conduct. Complaint ¶¶ 190, 192, 798. That is no longer enough. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing." 2024 WL 2964140, *13 (June 13, 2024). An organization does not obtain standing by "expending money to gather information and advocate against the defendant's action." *Id.* The diversion-of-resources theory of standing is a thing of the past. Organizations cannot "manufacture" their own standing by diverting resources to fight conduct they deplore, and a justiciable controversy does not arise from "strong opposition" to a defendant's conduct. *Id.*; *see also Coker v. Warren*, 2025 WL 1575578, *5 (11th Cir. 2025) (applying *FDA*); *Tenn. Conf. of the NAACP v. Lee*, 2024 WL 3219054, *12-15 (6th Cir. 2024) (applying *FDA* to note that the

NAACP cannot show standing through "moral" or "policy disagreements" with a rule on felons' eligibility to vote).

RWDSU does not allege that it counts among its members any current or former employee of Bama Budweiser. Thus, whatever "injury in fact" RWDSU claims can only be to itself, and the Complaint lacks allegations of such an injury. Plaintiffs say that RWDSU has "sought to represent" work-release employees at Koch Foods and Gemstone Foods and that its efforts have been undermined because it cannot unionize felons, Complaint ¶ 190, but it does not allege that anything Bama Budweiser has done has interfered with those efforts, nor how its supposed injuries are traceable to Bama Budweiser.

Plaintiff USSW falls even shorter of the mark. It claims to exist to improve the "lives of [low-wage] workers" and to "combat[] systemic racism," Complaint ¶ 191,[4] with focus on the "fast-food sector." *Id.* It complains that fast-food employers—not Bama Budweiser—hiring felons through work release has frustrated the union's ability to advocate for higher wages. *Id.*

That is as may be, but it is not the allegation of a cognizable injury to the union. For one thing, as with RWDSU, USSW fails to allege the specifics of how the undermining of its activities at fast-food restaurants is fairly traceable to anything Bama Budweiser has done. *See id.*

---

[4] A curious term. The vice of racism inheres in individuals, not systems.

For another thing, there is no cause of action in the Complaint alleging a theory of recovery for workers who say they aren't getting paid enough because their boss is giving jobs to convicts. So there is no fit between the pleaded claims and the facts about why USSW is in this lawsuit. No cognizable injury is alleged to itself as part of any count of the Complaint. And as with other Plaintiffs, USSW never alleges that any of its members worked for Bama Budweiser. *See id.*

And then at last there is the Woods Foundation, a non-profit that aids "persons with wrongful convictions and excessive sentences," whose ability to fulfil that mission is "frustrated" by the supposedly discriminatory "practices of the Parole Board and the scheme alleged herein to undermine Alabama's parole system." Complaint ¶ 192. But the Woods Foundation does not allege that one of its members was a work-release convict employed by Bama Budweiser, or even that its mission concerns private-employer participation in the work-release program. *Id.* The Foundation never alleges that its projects were hampered due to Bama Budweiser's role in the "abuse of the parole system." *See id.* Woods Foundation has not alleged an injury in fact to itself or its members that fits under any legal theory, nor that any such injury is fairly traceable to Bama Budweiser.

Finally, even if these Plaintiffs have standing, they fail to state a claim. As to the statutory counts, courts "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of

interests protected by the law invoked.'" *Lexmark Intern. Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). This is a presumption of "general application" that applies "unless it is expressly negated." *Id.* (quoting caselaw).

Under this rubric, no entity Plaintiff has a case. None of them plead that any of their members or they themselves worked for Bama Budweiser, so none of them allege any illegal coercion, nor any racketeering activity. The TVPA grants a civil remedy to state attorneys general and to "**an individual who is a victim** of a violation of this chapter." 18 U.S.C. § 1595(a) (emphasis added). There is no language allowing labor unions or non-profits to file lawsuits because their missions are "frustrated" or "undermined" by the misfortunes of felons in work-release programs. *See N.Y. State Nurses Ass'n v. Albany Med. Ctr.*, 473 F. Supp. 3d 63, 71-72 (N.D.N.Y. 2020) (holding that anyone "not expressly permitted to bring a cause of action under the TVPA cannot bring a civil suit to recover for violations of it"). "[U]nions do not have a cause of action under the TVPA." *Id.* at 72.

For this additional reason, then, none of the entity Plaintiffs have a case. None of them plead, as explained earlier, that their members or they themselves have ever worked for Bama Budweiser, so none of them allege any illegal coercion, any racketeering activity, or any other injury. These Plaintiffs state no claim.

**Conclusion**

Plaintiffs' case, at bottom, is that their participation in work release was coerced because prison conditions are awful, and they are not free to quit, complain about pay, or unionize. True or not, those allegations are a far, far cry from the scope and intent of any statute or cause of action pleaded against a private employer. Bama Budweiser asks this Court to dismiss all claims against it with prejudice.

Respectfully submitted,

s/ *Aaron G. McLeod*
Aaron G. McLeod
R. Benjamin Thomas III
*Counsel for Bama Budweiser*

**Adams and Reese LLP**
1901 6th Ave. N. Ste. 1110
Birmingham, AL 35203
(205) 250-5000
aaron.mcleod@arlaw.com
ben.thomas@arlaw.com

**Certificate of Service**

I certify that on June 26, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to all counsel of record.

*/s/ Aaron G. McLeod*
Of Counsel