IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROBERT EARL COUNCIL AKA KINETIK
JUSTICE, LEE EDWARD MOORE JR.,
LAKIERA WALKER, JERAME
APRENTICE COLE, FREDERICK
DENARD MCDOLE, MICHAEL
CAMPBELL, ARTHUR CHARLES
PTOMEY JR., LANAIR PRITCHETT,
ALIMIREO ENGLISH, TONI
CARTWRIGHT, TURNER MASON,
DANNY DANDRIDGE, ZACKARY BALL,
RASHAAD CLARK, DECKRICE
MORRISSEY, ERIC PREWITT, TREVION
CLARK, LARRY DARNELL JARMON JR.,
CORDARIUS EVANS, MICHAEL
BULLOCK, and VICTOR THOMAS, on their
own behalf and on behalf of those similarly
situated; UNION OF SOUTHERN SERVICE
WORKERS, SERVICE EMPLOYEES
INTERNATIONAL UNION; RETAIL,
WHOLESALE AND DEPARTMENT
STORE UNION, MID-SOUTH COUNCIL;
and THE WOODS FOUNDATION,

　　　　　　　　　　Plaintiffs,

　　　v.

KAY IVEY, Governor of the State of
Alabama, in her individual and official
capacities; STEVE MARSHALL, Alabama
Attorney General, in his individual and
official capacities; HAL NASH,* Chair of the
Alabama Board of Pardons and Paroles, in his
official capacity; DARRYL LITTLETON,
Associate Member of the Alabama Board of
Pardons and Paroles, in his official capacity;

Case No. 2:23-cv-712-CLM

CLASS ACTION

**PLAINTIFFS' CONSOLIDATED
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS
AMENDED COMPLAINT**

JURY TRIAL DEMANDED

GABRELLE SIMMONS, Associate Member
of the Alabama Board of Pardons and Paroles,
in her official capacity; JOHN HAMM,
Commissioner of the Alabama Department of
Corrections, in his individual and official
capacities; JOHN COOPER, Transportation
Director of the Alabama Department of
Transportation, in his individual and official
capacities; CITY OF MONTGOMERY; CITY
OF TROY; JEFFERSON COUNTY; RCF,
LLC d/b/a GEMSTONE FOODS, LLC;
KOCH FOODS, LLC; JU-YOUNG
MANUFACTURING AMERICA, INC.; SL
ALABAMA, LLC; HWASEUNG
AUTOMOTIVE USA LLC; PROGRESSIVE
FINISHES, INC.; C.B.A.K., INC. d/b/a
MCDONALD'S; SOUTHEAST
RESTAURANT GROUP-WEN LLC d/b/a
WENDY'S; PELL CITY KENTUCKY
FRIED CHICKEN, INC. d/b/a KENTUCKY
FRIED CHICKEN d/b/a KFC; MASONITE
CORPORATION; CAST PRODUCTS, INC.;
SOUTHEASTERN MEATS, INC.;
PARAMOUNT SERVICES, INC.; and
BAMA BUDWEISER OF MONTGOMERY,
INC.,

Defendants.

*Hal Nash is substituted for Leigh Gwathney as
Chair of the Alabama Board of Pardons and Paroles,
in his official capacity. Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

STANDARD ................................................................................. 3

ARGUMENT ................................................................................ 3

I.   Plaintiffs' Amended Complaint Is Not a Shotgun
Pleading ............................................................................. 3

     A. Counts I & II (TVPA) ................................................... 5

     B. Count III (RICO) ......................................................... 9

     C. Count XII (Unjust Enrichment) ................................... 10

II.  Plaintiffs Adequately and Plausibly Allege TVPA
Claims Against Each Defendant ...................................... 12

     A. The TVPA Does Not Exempt Incarcerated
Individuals from Its Protections, Nor Does the
Thirteenth Amendment Require an Exemption ............... 18

     B. The TVPA Is Constitutional .......................................... 25

     C. The FAC Contains Sufficient Allegations of TVPA
Violations by Each Defendant ....................................... 27

        1. ADOC Commissioner Hamm ..................................... 27

          a. ADOC *Obtains* Plaintiffs' Labor Through
Prohibited Means ..................................................... 28

          b. ADOC *Provides* Plaintiffs' Labor to Other
Employers Through Prohibited Means ....................... 33

          c. ADOC Knowingly Benefits and Attempts to
Benefit From Participation in a Venture It
Knew or Should Have Known Violated the
TVPA ...................................................................... 37

2. Private and Public Employer Defendants .................................... 38

3. Ivey, Marshall, and Parole Board Members.................................. 57

D. Injunctive and Declaratory Relief Are Appropriate
Under the TVPA.................................................................................... 58

III.  Plaintiffs Adequately and Plausibly Allege RICO
Violations by All Defendants .................................................. 61

A. Plaintiffs' FAC Satisfies Each RICO Element.................................. 62

B. Public Employer Defendants Are Subject to RICO
Liability Here...................................................................................... 69

C. Injunctive Relief Is Available Under RICO .................................... 71

D. Plaintiffs' RICO Claims Are Not Time-Barred ............................... 73

IV.  Plaintiffs Have Stated a Plausible State Constitution
Claim for Injunctive Relief Against the Local
Government and Private Employer Defendants ............................... 74

V.  Plaintiffs Adequately Allege an Unjust Enrichment
Claim ................................................................................................ 78

A. Plaintiffs' Factual Allegations Support the Unjust
Enrichment Claim........................................................................... 79

B. Defendants' Arguments Seeking Dismissal of the
Unjust Enrichment Claim Are Meritless...................................... 81

VI.  Plaintiffs Have Standing to Assert Their Coerced
Labor Claims .................................................................................. 85

A. Individual Plaintiffs ...................................................................... 85

B. Organizational Plaintiffs .............................................................. 86

VII.  Plaintiffs Adequately and Plausibly Allege First
Amendment Violations by Ivey and Hamm...................................... 91

A. The FAC Plausibly Alleges a Violation of
Plaintiffs' First Amendment Rights ............................................. 91

    1. Plaintiffs' Allegations Establish Retaliation in
    Violation of the First Amendment .......................................... 91

    2. Ivey and Hamm Distort and Fail to Meet Their
    Burden Under *Turner* ............................................................. 93

    3. Defendants' Cited Authorities Do Not Support
    Dismissal .................................................................................. 98

B. Plaintiffs Have Standing to Seek Injunctive Relief
for First Amendment Violations ................................................. 101

VIII. Plaintiffs Adequately Plead Their Ex Post Facto
Claim .................................................................................................. 102

A. Plaintiffs Adequately Allege an Ex Post Facto
Violation Through Practical Implementation of
the 2019 Amendments .................................................................. 104

    1. Parole Defendants Have Implemented the 2019
    Amendments to Significantly Lower the
    Chance of Receiving Parole Than at Any Time
    Since 1993 ................................................................................ 104

    2. Unprecedented Reduction in Parole Grants Is a
    Direct Result of Defendants' Deliberate Efforts
    to Alter Plaintiffs' Sentences ................................................. 108

B. Plaintiffs Adequately Allege a Facial Ex Post
Facto Violation .............................................................................. 112

C. Plaintiffs' Ex Post Facto Claims Challenge
Defendants' Ongoing Policy ...................................................... 115

IX. Plaintiffs Adequately and Plausibly Plead Equal
Protection Claims ............................................................................. 116

    A. The FAC Plausibly Alleges That Similarly
       Situated Black and White Parole Candidates Are
       Treated Differently ....................................................... 117

    B. Plaintiffs Sufficiently Allege That Racial
       Discrimination Motivated Defendants'
       Administration of the Parole System ......................... 123

X.   Plaintiffs Adequately Plead Their Substantive Due
    Process Claim .................................................................. 127

    A. Plaintiffs' Allegations of Racial Discrepancies in
       Parole Grant Rates and Changes to the Parole
       System Support Their Substantive Due Process
       Claim................................................................................ 129

    B. Parole Defendants Disregard Alabama Law and
       the Parole Guidelines, Relying on Sham Hearings
       and Decisions Based on Impermissible Facts to
       Support a Coerced Labor Scheme............................... 130

XI.  Plaintiffs Adequately Plead KKK Act Claims Under
    42 U.S.C. §1985 ............................................................. 133

    A. Plaintiffs' Complaint Satisfies All Elements of
       Their §1985 Claims.................................................... 133

    B. The Intracorporate Conspiracy Doctrine Does Not
       Apply ............................................................................. 136

XII.  Plaintiffs Have Standing to Sue Ivey and Marshall
    for Their Role in the Ongoing Parole Crisis .................. 138

XIII. Defendants' Immunity Arguments Fail ......................... 140

    A. State Defendants Are Not Entitled to Qualified
       Immunity ...................................................................... 140

       1. TVPA and RICO.................................................... 140

       2. Section 1983 Claims ........................................... 144

B.  Marshall Is Not Entitled to Absolute Prosecutorial
     Immunity ........................................................................ 148

C.  Defendants Are Not Immune from the Unjust
     Enrichment Claim........................................................... 149

CONCLUSION ............................................................................ 150

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Absolute Activist Value Master Fund Ltd. v. Devine,*
   2016 WL 1572388 (M.D. Fla. Apr. 19, 2016)....................................................72

*Adams v. Demopolis City Schs.,*
   80 F.4th 1259 (11th Cir. 2023) ......................................................................125

*Adhikari v. Daoud & Partners,*
   697 F.Supp.2d 674 (S.D. Tex. 2009)................................................................66

*Al-Rayes v. Willingham,*
   914 F.3d 1302 (11th Cir. 2019) ........................................................................63

*Almanza v. United Airlines, Inc.,*
   851 F.3d 1060 (11th Cir. 2017) ........................................................................63

*Alvarez v. Lakeland Area Mass Transit Dist.,*
   406 F.Supp.3d 1348 (M.D. Fla. 2019)............................................................117

*Ambrosia Coal & Const. Co. v. Pages Morales,*
   482 F.3d 1309 (11th Cir. 2007) ........................................................................67

*Ammons v. Dade City,*
   783 F.2d 982 (11th Cir. 1986) ........................................................................126

*Aquino v. Mobis Alabama, LLC,*
   739 F. Supp. 3d 1152 (N.D. Ga. 2024)............................................................67

*Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of
   Internal Med.,*
   103 F.4th 383 (5th Cir. 2024) ........................................................................140

*Auburn Univ. v. Int'l Bus. Machines, Corp.,*
   716 F.Supp.2d 1114 (M.D. Ala. 2010)........................................................82, 83

*Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.,*
   956 F.2d 1112 (11th Cir. 1992) ......................................................................136

*Baldree v. Cargill, Inc.*,
758 F.Supp. 704 (M.D. Fla. 1990)......................................................72

*Banks v. McIntosh Cnty.*,
530 F.Supp.3d 1335 (S.D. Ga. 2021) ...............................................125

*Barmapov v. Amuial*,
986 F.3d 1321 (11th Cir. 2021) ......................................................8, 11

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003)............................................................................60

*Barrientos v. CoreCivic, Inc.*,
332 F.Supp.3d 1305 (M.D. Ga. 2018) .........................................*passim*

*Barrientos v. CoreCivic, Inc.*,
951 F.3d 1269 (11th Cir. 2020) ...................................................*passim*

*Beasley v. Ala. State Univ.*,
966 F.Supp. 1117 (M.D. Ala. 1997) ..................................................75

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007)....................................................3, 49, 66, 135

*Block v. Meese*,
793 F.2d 1303 (CADC 1986) ...........................................................139

*Block v. Potter*,
631 F.2d 233 (3d Cir. 1980) ............................................................129

*Bond v. U.S.*,
572 U.S. 844 (2014)............................................................................25

*Bostock v. Clayton Cnty, Georgia*,
590 U.S. 644 (2020)............................................................................19

*Boyle v. U.S.*,
556 U.S. 938 (2009)......................................................................63, 70

*Brandenburg v. Ohio*,
395 U.S. 444 (1969)............................................................................98

*Braun v. Cadence Healthcare Sols., LLC,*
2022 WL 3570344 (S.D. Ga. Aug. 18, 2022).....................................................10

*Bridge v. Phoenix Bond & Indem. Co.,*
553 U.S. 639 (2008).............................................................................................85

*Bridges v. Poe,*
487 F.Supp.3d 1250 (N.D. Ala. 2020)....................................................15, 21, 31

*Brooks v. Kiser,*
2022 WL 2155037 (M.D. Ala. May 13, 2022)...................................................76

*Brown v. Dunn,*
760 F.Supp.3d 1326 (M.D. Ala. 2024)..................................................................8

*Brown v. Georgia Bd. of Pardons & Paroles,*
335 F.3d 1259 (11th Cir. 2003) ........................................................................116

*Bryant v. Avado Brands, Inc.,*
187 F.3d 1271 (11th Cir. 1999) .............................................................................3

*Buckley v. Fitzsimmons,*
509 U.S. 259 (1993)...................................................................................142, 149

*Bufkin v. Collins,*
145 S. Ct. 728 (2025)..........................................................................................114

*Burrell v. Staff,*
60 F.4th 25 (3d Cir. 2023) .........................................................................*passim*

*Caicedo v. DeSantis,*
2024 WL 4729160 (M.D. Fla. Nov. 8, 2024)....................................................87

*Cain v. Calloway,*
2025 WL 913453 (M.D. Ala. Mar. 25, 2025) .................................................8, 9

*Califano v. Yamasaki,*
442 U.S. 682 (1979)......................................................................................59, 60

*Carter v. McGinnis,*
351 F. Supp. 787 (W.D.N.Y. 1972)....................................................................76

*CASA de Maryland, Inc. v. Trump*,
   355 F.Supp.3d 307 (D. Md. 2018) ................................................................129

*Castaneda v. Partida*,
   430 U.S. 482 (1977) ...................................................................................123

*Castellano v. Care Airways Corp.*,
   2025 WL 957574 (S.D. Fla. Mar. 26, 2025) ....................................................7

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016) ............................................................................72

*Chua v. Ekonomou*,
   1 F.4th 948 (11th Cir. 2021) ........................................................................134

*Church v. City of Huntsville*,
   30 F.3d 1332 (11th Cir. 1994) .....................................................................148

*Cisneros v. Petland, Inc.*,
   972 F.3d 1204 (11th Cir. 2020) ...........................................................*passim*

*City of S. Miami v. Governor*,
   65 F.4th 631 (11th Cir. 2023) ........................................................................87

*Cnty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ...................................................................................129

*Columbus Bd. of Educ. v. Penick*,
   443 U.S. 449 (1979) ...................................................................................125

*Connecticut Nat. Bank v. Germain*,
   503 U.S. 249 (1992) .....................................................................................70

*Cont'l 332 Fund, LLC v. Albertelli*,
   317 F.Supp.3d 1124 (M.D. Fla. 2018) ...........................................................10

*Cook Cnty. v. U.S.*,
   538 U.S. 119 (2003) ...............................................................................70, 71

*Cooley v. HMR of Alabama, Inc.*,
   259 F.Supp.3d 1312 (N.D. Ala. 2017) ...........................................................84

*Copeland v. C.A.A.I.R., Inc.*,
 2019 WL 4307125 (N.D. Okla. Sept. 11, 2019)..........................................*passim*

*Cottone v. Jenne*,
 326 F.3d 1352 (11th Cir. 2003) ......................................................................145

*Cranford v. Bayer*,
 147 F.App'x 947 (11th Cir. 2005) ....................................................................96

*Crowe v. Coleman*,
 113 F.3d 1536 (11th Cir. 1997) ..........................................................................6

*Culver v. Withers*,
 2022 WL 2972835 (11th Cir. July 27, 2022) ....................................................96

*Curling v. Raffensperger*,
 776 F.Supp.3d 1191 (N.D. Ga. 2025)................................................................87

*Dartmouth Review v. Dartmouth Coll.*,
 889 F.2d 13 (1st Cir. 1989)..............................................................................122

*David v. Signal Int'l, LLC*,
 37 F.Supp.3d 822 (E.D. La. 2014)....................................................................66

*Denney v. City of Albany*,
 247 F.3d 1172 (11th Cir. 2001) ......................................................................138

*Dep't of Com. v. New York*,
 588 U.S. 752 (2019)........................................................................................139

*Dickerson v. Alachua Cnty. Comm'n*,
 200 F.3d 761 (11th Cir. 2000) ................................................................137, 138

*Doe #1 v. Red Roof Inns, Inc.*,
 21 F.4th 714 (11th Cir. 2021) ..........................................................37, 38, 41, 42

*Doe 1 v. Red Roof Inns, Inc.*,
 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020)....................................................51

*Doe as Next Friend of Doe #6 v. Swearingen*,
 51 F.4th 1295 (11th Cir. 2022) ......................................................................116

*Donald v. Norris*,
131 F.4th 1255 (11th Cir. 2025) ........................................................................143

*Dream Defenders v. DeSantis*,
553 F.Supp.3d 1052 (N.D. Fla. 2021) ............................................................125

*Dream Defs. v. Governor of the State of Fla.*,
57 F.4th 879 (11th Cir. 2023) ...........................................................................101

*Ellison v. Alabama Bd. of Pardons & Paroles*,
2017 WL 6947946 (11th Cir. Dec. 13, 2017).................................................127

*Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*,
852 F.3d 1018 (11th Cir. 2016) ........................................................................117

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..................................................................................86, 87

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998)..............................................................................................140

*Firewalker-Fields v. Lee*,
58 F.4th 104 (4th Cir. 2023) .........................................................................94, 95

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963)..............................................................................................25

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ....................................................................87, 89

*Flemming v. Oregon Bd. of Parole*,
998 F.2d 721 (9th Cir. 1993) ............................................................................111

*Fletcher v. Reilly*,
433 F.3d 867 (D.C. Cir. 2006)..........................................................................111

*Fletcher v. Williams*,
2023 WL 6307494 (10th Cir. Sept. 28, 2023)..................................................22

*Fortune v. Cibran*,
2023 WL 5351986 (N.D. Ala. Aug. 21, 2023)..................................................81

*Fuller v. Georgia State Bd. of Pardons & Paroles*,
   851 F.2d 1307 (11th Cir. 1988) ......................................................121

*Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of
   Registration & Elections*,
   36 F.4th 1100 (11th Cir. 2022) ................................................86, 138

*Gaines v. Wardynski*,
   871 F.3d 1203 (11th Cir. 2017) ......................................................144

*Garcia v. U.S.*,
   469 U.S. 70 (1984)............................................................................19

*Garner v. Jones*,
   529 U.S. 244 (2000)....................................................103, 104, 107, 111

*Georgia Latino All. for Hum. Rts. v. Gov. of Georgia*,
   691 F.3d 1250 (11th Cir. 2012) ......................................................139

*Gingras v. Think Fin., Inc.*,
   922 F.3d 112 (2d Cir. 2019) ......................................................70, 71

*Gonzales v. Raich*,
   545 U.S. 1 (2005)..............................................................................25

*Gonzalez v. CoreCivic, Inc.*,
   986 F.3d 536 (5th Cir. 2021) ..........................................................141

*Gonzalez v. Lee Cnty. Hous. Auth.*,
   161 F.3d 1290 (11th Cir. 1998) ......................................................143

*Greater Birmingham Ministries v. Sec'y of State*,
   992 F.3d 1299 (11th Cir. 2021) ...............................................*passim*

*Grider v. City of Auburn*,
   618 F.3d 1240 (11th Cir. 2010) ...............................................138, 150

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971)..........................................................................138

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989)..........................................................................62

*Harden v. Bodiford*,
    442 F.App'x 893 (4th Cir. 2011) ........................................................................75

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) .......................................................................................143

*Hart v. Hodges*,
    587 F.3d 1288 (11th Cir. 2009) ......................................................................149

*Hartley v. Parnell*,
    193 F.3d 1263 (11th Cir. 1999) ......................................................................147

*Harvey v. Harvey*,
    949 F.2d 1127 (11th Cir. 1992) ......................................................................136

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ..................................................................................86, 89

*L.S. ex rel. Hernandez v. Peterson*,
    982 F.3d 1323 (11th Cir. 2020) ......................................................................128

*Hicks v. Ferrero*,
    241 F.App'x 595 (11th Cir. 2007) ..................................................................145

*Hill v. Colorado*,
    530 U.S. 703 (2000) .........................................................................................26

*Hope v. Pelzer*,
    536 U.S. 730 (2002) .......................................................................................143

*Hopkins v. Watson*,
    108 F.4th 371 (5th Cir. 2024) ...........................................................................22

*Howard v. Coonrod*,
    134 F.4th 1136 (11th Cir. 2025) ....................................................................112

*Hudson v. McMillian*,
    503 U.S. 1 (1992) ....................................................................................94, 145

*Hughes-Payne v. Argon Med. Devices, Inc.*
    (N.D. Fla. July 29, 2022) ...................................................................................8

*Hunter v. Underwood*,
    471 U.S. 222 (1985)......................................................................................123

*J.G. Rogers Corp. v. Metallized Carbon Corp.*,
    2019 WL 1597845 (N.D. Ala. Apr. 15, 2019).................................................81

*J.H. v. Paramount Hosp. LP,*
    2025 WL 2201051 (N.D. Tex. Aug. 1, 2025) .............................................38, 43

*Jackson v. BellSouth Telecomms.*,
    372 F.3d 1250 (11th Cir. 2004) .........................................................................62

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) .......................................................................140

*Jarrard v. Moats*,
    2021 WL 1192948 (N.D. Ga. Mar. 30, 2021) ...................................................94

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) .......................................................................125

*Jenkins v. Jones*,
    2017 WL 3381713 (M.D. Fla. Aug. 7, 2017).................................................147

*Johnson v. Avery*,
    393 U.S. 483 (1969).........................................................................................100

*Johnson v. Brown*,
    581 F.App'x 777 (11th Cir. 2014) .....................................................................96

*Johnson v. California*,
    543 U.S. 499 (2005)...........................................................................................95

*Johnson v. Dunn*,
    2024 WL 1076802 (N.D. Ala. Mar. 12, 2024) ...............................................150

*Jones v. N.C. Prisoners' Lab. Union, Inc.*,
    433 U.S. 119 (1977).....................................................................98, 99, 100, 145

*Jones v. Ray*,
    279 F.3d 944 (11th Cir. 2001) .........................................................................116

*In re Juul Labs, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   2022 WL 1955678 (N.D. Cal. Jan. 28, 2022) ..................................................89

*Kentucky Whip & Collar Co. v. Illinois Cent. R. Co.*,
   299 U.S. 334 (1937) ........................................................................................26

*Klivington v. Voss*,
   2023 WL 5510301 (M.D. Ala. Aug. 25, 2023) ...............................................4, 9

*Kottler v. Deutsche Bank AG*,
   607 F.Supp.2d 447 (S.D.N.Y. 2009) ...............................................................89

*Kyle K. v. Chapman*,
   208 F.3d 940 (11th Cir. 2000) ..........................................................................8

*Lafayette v. Louisiana Power & Light Co.*,
   435 U.S. 389 (1978) ........................................................................................70

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
   940 F.2d 397 (9th Cir. 1991) ..........................................................................69

*Lawrie v. Ginn Dev. Co., LLC*,
   656 F.App'x 464 (11th Cir. 2016) ...................................................................67

*Lehman v. Lucom*,
   727 F.3d 1326 (11th Cir. 2013) ......................................................................73

*Lesnik v. Eisenmann SE*,
   374 F.Supp.3d 923 (N.D. Cal. 2019) .........................................................14, 40

*Lewis v. City of Union City*,
   934 F.3d 1169 (11th Cir. 2019) ....................................................................118

*Lewis v. City of Union City, Georgia*,
   918 F.3d 1213 (11th Cir. 2019) .............................................................118, 122

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ........................................................................................89

*Lopez v. Marriott Int'l, Inc.*,
   2025 WL 661846 (D. Colo. Feb. 27, 2025) ....................................................65

*Lovett v. Ray*,
    327 F.3d 1181 (11th Cir. 2003) ........................................................116

*Loving v. Virginia*,
    388 U.S. 1 (1967) ............................................................................129

*Lynce v. Mathis*,
    519 U.S. 433 (1997) ........................................................................111

*Magnifico v. Villanueva*,
    783 F.Supp.2d 1217 (S.D. Fla. 2011) ...............................................66

*Magoon v. Texas Dep't of Crim. Just.*,
    247 F.3d 240 (5th Cir. 2001) ............................................................75

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ..........................................................62

*Malley v. Briggs*,
    475 U.S. 335 (1986) ........................................................................142

*Malowney v. Fed. Collection Deposit Grp.*,
    193 F.3d 1342 (11th Cir. 1999) ......................................................101

*In re Managed Care Litig.*,
    2004 WL 7334075 (S.D. Fla. July 21, 2004) ....................................72

*Mancero-Ramirez v. City of Hoover*,
    2006 WL 8436600 (N.D. Ala. June 14, 2006) ...................................74

*Marsh v. Butler Cnty., Ala.*,
    268 F.3d 1014 (11th Cir. 2001) ......................................................143

*Martin v. Kemp*,
    341 F.Supp.3d 1326 (N.D. Ga. 2018) ...............................................43

*Mathews v. Crosby*,
    480 F.3d 1265 (11th Cir. 2007) ....................................145, 146, 148

*Mathis v. City of Lakeland*,
    2023 WL 2568814 (11th Cir. Mar. 20, 2023) .....................................5

*McAndrew v. Lockheed Martin Corp.*,
206 F.3d 1031 (11th Cir. 2000) ...............................................135, 137

*McCleskey v. Kemp*,
481 U.S. 279 (1987).......................................................................121

*McDowell v. Brown*,
392 F.3d 1283 (11th Cir. 2004) ......................................................148

*McGarry v. Pallito*,
687 F.3d 505 (2d Cir. 2012) .............................................................75

*Menocal v. GEO Grp., Inc.*,
635 F.Supp.3d 1151 (D. Colo. 2022)................................................15

*Mickens-Thomas v. Vaughn*,
321 F.3d 374 (3d Cir. 2003) ...........................................106, 111, 115

*Miles v. M.N.C. Corp.*,
750 F.2d 867 (11th Cir. 1985) ........................................................125

*Mitchell v. Town of Hayneville*,
2020 WL 7480551 (M.D. Ala. Dec. 18, 2020)................................151

*Mitchell v. Wynne*,
2015 WL 1345208 (M.D. Ala. 2015) ..............................................112

*Monroe v. Pape*,
365 U.S. 167 (1961).......................................................................138

*Monroe v. Thigpen*,
932 F.2d 1437 (11th Cir. 1991) ......................................127, 128, 132

*Moore v. Walter Coke, Inc.*,
294 F.R.D. 620 (N.D. Ala. 2013) .....................................................82

*Muchira v. Al-Rawaf*,
850 F.3d 605 (4th Cir. 2017) ............................................................13

*Nat'l Ass'n of the Deaf v. Fla.*,
980 F.3d 763 (11th Cir. 2020) ..........................................................58

*Nat'l Org. For Women, Inc. v. Scheidler*,
   267 F.3d 687 (7th Cir. 2001) ............................................................72

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
   414 U.S. 453 (1974).........................................................................60

*New York State Nurses Ass'n v. Albany Med. Ctr.*,
   473 F.Supp.3d 63 (N.D.N.Y. 2020)...................................................89

*Norris v. Honeywell Int'l, Inc.*,
   2023 WL 6256183 (M.D. Fla. Sept. 26, 2023)...................................6

*Nurse v. Sheraton Atlanta Hotel*,
   618 F.App'x (11th Cir. 2015) ............................................................4

*O'Bryant v. Finch*,
   637 F.3d 1207 (11th Cir. 2011) ......................................................145

*O'Lone v. Est. of Shabazz*,
   482 U.S. 342 (1987).........................................................................95

*Obergefell v. Hodges*,
   576 U.S. 644 (2015).......................................................................129

*Overton v. Bazzetta*,
   539 U.S. 126 (2003).........................................................................95

*Owino v. CoreCivic, Inc.*,
   2018 WL 2193644 (S.D. Cal. May 14, 2018) ...........................*passim*

*PacifiCare Health Sys., Inc. v. Book*,
   538 U.S. 401 (2003).........................................................................71

*Parker v. Williams*,
   2005 WL 1163169 (M.D. Ala. May 16, 2005)................................112

*Parm v. Nat'l Bank of California, N.A.*,
   242 F.Supp.3d 1321 (N.D. Ga. 2017)...............................................69

*Paschal v. Wainwright*,
   738 F.2d 1173 (11th Cir. 1984) ......................................................115

*Pesci v. Budz*,
  730 F.3d 1291 (11th Cir. 2013) ............................................................96

*Pilgrim v. Luther*,
  571 F.3d 201 (2d Cir. 2009) ..........................................98, 99, 100, 145

*Pine Ridge Recycling, Inc. v. Butts Cnty.*,
  855 F.Supp.1264 (M.D. Ga. 1994) ......................................................69

*Porter v. Ray*,
  461 F.3d 1315 (11th Cir. 2006) .................................................111, 112

*Powell v. Schriver*,
  175 F.3d 107 (2d Cir. 1999) ................................................................97

*Profit v. Rabon*,
  2020 WL 687590 (N.D. Fla. Jan. 9, 2020) .........................................97

*Ray v. Gadson*,
  2023 WL 7228933 (N.D. Ala. Nov. 2, 2023) ....................................147

*Ray v. Spirit Airlines, Inc.*,
  836 F.3d 1340 (11th Cir. 2016) ...........................................................62

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997) ...........................................................................124

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) .................................................................67, 68, 69

*Rios v. Marshall*,
  100 F.R.D. 395 (S.D.N.Y. 1983) .........................................................89

*Rogers v. Miller*,
  57 F.3d 986 (11th Cir. 1995) .............................................................101

*Ruderman v. Kenosha Cnty.*,
  752 F.Supp.3d 1084 (E.D. Wisc. 2024) ..............................................23

*Ruelas v. County of Alameda*,
  2021 WL 12144269 (N.D. Cal. June 24, 2021) ..........................*passim*

*S.Y. v. Naples Garden Inn, LLC,*
    2021 WL 949610 (M.D. Fla. Mar. 12, 2021) ........................................................7

*Saleem v. Evans,*
    866 F.2d 1313 (11th Cir. 1989) ...........................................................................96

*Seals v. Leath,*
    2019 WL 6997398 (M.D. Ala. Dec. 18, 2019)....................................................10

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
    473 U.S. 479 (1985)............................................................................................141

*Shealy v. City of Albany,*
    89 F.3d 804 (11th Cir. 1996) .............................................................................125

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v.*
    *GlaxoSmithKline, PLC,*
    263 F.R.D. 205 (E.D. Pa. 2009)...........................................................................82

*Shimer v. Washington,*
    100 F.3d 506 (7th Cir. 1996) ...............................................................................95

*Smith v. Hamm,*
    2024 WL 116303 (M.D. Ala. Jan. 10, 2024)......................................................95

*Smith v. Mosley,*
    532 F.3d 1270 (11th Cir. 2008) ...................................................................92, 145

*Smith v. Vavoulis,*
    2009 WL 702903 (M.D. Fla. Mar. 17, 2009) ......................................................97

*State Farm Mut. Auto. Ins. Co. v. Weiss,*
    410 F.Supp.2d 1146 (M.D. Fla. 2006)..................................................................69

*Stone v. Kirk,*
    8 F.3d 1079 (6th Cir. 1993) .................................................................................69

*Stout by Stout v. Jefferson Cnty. Bd. of Educ.,*
    882 F.3d 988 (11th Cir. 2018) ...........................................................................123

*Street v. Talladega City Bd. of Educ.,*
    2023 WL 2520340 (N.D. Ala. Mar. 14, 2023) ..................................................117

*Sweet v. Sec'y, Dep't of Corrs.*,
  467 F.3d 1311 (11th Cir. 2006) ...................................................................117

*In re Takata Airbag Products Liab. Litig.*,
  462 F.Supp.3d 1304 (S.D. Fla. 2020) ............................................................82

*Taylor v. Salvation Army*,
  110 F.4th 1017 (7th Cir. 2024) ..............................................................*passim*

*Thomas v. Sellers*,
  691 F.2d 487 (11th Cir. 1982) ....................................................................128

*Thomas v. Wynne*,
  2016 WL 3763229 (M.D. Ala. 2016) ..........................................................112

*Thompson v. Alabama*,
  293 F.Supp.3d 1313 (M.D. Ala. 2017) ........................................................124

*Thornburgh v. Abbott*,
  490 U.S. 401 (1989)......................................................................................95

*Trawinski v. United Techs.*,
  313 F.3d 1295 (11th Cir. 2002) ..................................................................134

*Trollinger v. Tyson Foods, Inc.*,
  2007 WL 1574275 (E.D. Tenn. May 29, 2007) ............................................65

*Turner v. Safley*,
  482 U.S. 78 (1987).................................................................................*passim*

*U.S. v. Albertini*,
  472 U.S. 675 (1985)......................................................................................19

*U.S. v. Callahan*,
  801 F.3d 606 (6th Cir. 2015) ..................................................................13, 14

*U.S. v. Dann*,
  652 F.3d 1160 (9th Cir. 2011) .....................................................................14

*U.S. v. Evans*,
  476 F.3d 1176 (11th Cir. 2007) ....................................................................25

*U.S. v. Kominski,*
    487 U.S. 931 (1988) ................................................................................12, 75

*U.S. v. Law,*
    990 F.3d 1058 (7th Cir. 2021) ........................................................................14

*U.S. v. Lopez,*
    514 U.S. 549 (1995) ................................................................................25, 26

*U.S. v. Maxwell,*
    446 F.3d 1210 (11th Cir. 2006) ......................................................................25

*U.S. v. Noel,*
    893 F.3d 1294 (11th Cir. 2018) ......................................................................19

*U.S. v. Paulin,*
    329 F.App'x. 232 (11th Cir. 2009) ..................................................................22

*U.S. v. Reynolds,*
    235 U.S. 133 (1914) ......................................................................................34

*U.S. v. Smith,*
    459 F.3d 1276 (11th Cir. 2006) ......................................................................25

*U.S. v. Calimlim,*
    538 F.3d 706 (7th Cir. 2008) ...............................................14, 16, 26, 142

*U.S. v. Flores,*
    572 F.3d 1254 (11th Cir. 2009) ......................................................................67

*U.S. v. Godwin,*
    765 F.3d 1306 (11th Cir. 2014) ......................................................................68

*U.S. v. Lanier,*
    520 U.S. 259 (1997) ..............................................................................129, 142

*U.S. v. Pepe,*
    747 F.2d 632 (11th Cir. 1984) ........................................................................67

*U.S. v. Pineiro,*
    389 F.3d 1359 (11th Cir. 2004) ....................................................................135

*U.S. v. Richardson*,
    532 F.3d 1279 (11th Cir. 2008) ............................................................. 64

*U.S. v. Santoyo*,
    2024 WL 3026046 (11th Cir. June 17, 2024) ........................................ 64

*U.S. v. Schwartz*,
    541 F.3d 1331 (11th Cir. 2008) ........................................................... 135

*U.S. v. Starrett*,
    55 F.3d 1525(11th Cir. 1995) ............................................................... 62

*U.S. v. Turkette*,
    452 U.S. 576 (1981) ............................................................................ 141

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*,
    429 U.S. 252 (1977) .......................................................... 123, 124, 126

*Vinyard v. Wilson*,
    311 F.3d 1340 (11th Cir. 2002) ................................................... 143, 144

*Virtus Pharms., LLC v. Woodfield Distribution, LLC*,
    2022 WL 2829634 (M.D. Fla. July 20, 2022) ....................................... 67

*Waddell v. Hendry Cnty. Sheriff's Off.*,
    329 F.3d 1300 (11th Cir. 2003) ........................................................... 128

*Waldman v. Conway*,
    871 F.3d 1283 (11th Cir. 2017) ........................................................... 129

*Walker v. Fla. Parole Comm'n*,
    299 F.App'x 900 (11th Cir. 2008) ....................................................... 128

*Watson v. Graves*,
    909 F.2d 1549 (5th Cir. 1990) .............................................................. 76

*Weaver v. Graham*,
    450 U.S. 24 (1981) .............................................................................. 103

*Weaver v. Nat'l Better Living Ass'n, Inc.*,
    2014 WL 12614481 (N.D. Ala. July 3, 2014) ....................................... 81

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ...................................................4, 5, 10

*White v. Microsoft Corp.*,
    454 F.Supp.2d 1118 (S.D. Ala. 2006) ...................................................83

*Williams v. City of Dothan*,
    745 F.2d 1406 (11th Cir. 1984) .........................................................125

*Williams v. Mohawk Indus., Inc.*,
    465 F.3d 1277 (11th Cir. 2006) ...........................................62, 66, 85

*Williams v. Radford*,
    64 F.4th 1185 (11th Cir. 2023) .....................................................91, 100

*Wilson v. State Bar of Ga.*,
    132 F.3d 1422 (11th Cir. 1998) .........................................................102

*Yaffa v. SunSouth Bank*,
    2016 WL 10536038 (N.D. Fla. Sept. 15, 2016) .................................72

*Ex parte Young*,
    209 U.S. 123 (1908)..........................................................................58

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017)........................................................................142

## State Cases

*Ex parte Alabama Dep't of Mental Health & Retardation*,
    837 So.2d 808 (Ala. 2002)................................................................150

*Altmayer v. City of Daphne*,
    613 So.2d 366 (Ala. 1993)................................................................151

*American Family Care, Inc. v. Fox*,
    642 So.2d 486 (Ala. Civ. App. 1994)................................................83

*Ex parte Birmingham Airport Auth.*,
    274 So.3d 964 (Ala. 2018)..................................................................77

*Boshell v. Walker County Sheriff*,
    598 So.2d 843 (Ala. 1992)................................................................151

*Burnett v. Chilton Cnty. Health Care Auth.*,
  278 So.3d 1220 (Ala. 2018) ................................................................. 74

*Coffee Cnty. Comm'n v. Smith*,
  480 So.2d 1194 (Ala. 1985) ............................................................... 151

*Ex parte Davis*,
  930 So.2d 497 (Ala. 2005) ................................................................ 150

*Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*,
  314 So.2d 51 (Ala. 1975) ................................................................... 77

*Ford v. Jefferson Cnty.*,
  774 So.2d 600 (Ala. Civ. App. 2000) ................................................. 74

*George v. State*,
  39 Ala. 675 (1866) ............................................................................. 74

*Jefferson County v. Weissman*,
  69 So.3d 827 (Ala. 2011) ................................................................... 76

*Jewett v. Boihem*,
  23 So.3d 658 (Ala. 2009) ................................................................... 80

*Jordan v. Mitchell*,
  705 So.2d 453 (Ala. Civ. App. 1997) ................................................. 79

*Kennedy v. Polar-BEK & Baker Wildwood Partnership*,
  682 So.2d 443 (Ala. 1996) ................................................................. 81

*Lee v. Houser*,
  148 So.3d 406 (Ala. 2013) ............................................................... 151

*Magee v. Boyd*,
  175 So.3d 79 (Ala. 2015) ................................................................... 74

*Mantiply v. Mantiply*,
  951 So.2d 638 (Ala. 2006) ..................................................... 78, 79, 81

*Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*,
  77 So.3d 139 (Ala. 2011) ................................................................... 79

*Odom v. Helms*,
    314 So.3d 220 (Ala. 2020)...............................................................150

*Opelika Prod. Credit Ass'n v. Lamb*,
    361 So.2d 95 (Ala. 1978)..................................................................80

*Poiroux v. Rich*,
    150 So.3d 1027 (Ala. 2014)..............................................................74

*Protective Life Ins. Co. v. Jenkins*,
    386 So. 3d 443 (Ala. 2023)...............................................................83

*Scrushy v. Tucker*,
    955 So.2d 988 (Ala. 2006).................................................................78

*Town of Gurley v. M & N Materials, Inc.*,
    143 So.3d 1 (Ala. 2012)....................................................................76

## **Federal Constitution, Statutes, Rules, Legislative Material**

U.S. Constitution

    U.S. Const., amend. I..........................................................*passim*

    U.S. Const., amend. V. ......................................................127

    U.S. Const., amend. VIII....................................................112

    U.S. Const., amend. X .......................................................25

    U.S. Const., amend. XII.....................................................73

    U.S. Const., amend. XIII....................................................*passim*

    U.S. Const., amend. XIV ....................................................127

18 U.S.C.

    §1584 ................................................................................12

    §1585A...............................................................................61

    §1589 ................................................................................*passim*

    §1761 ................................................................................20, 26

    §1961 ................................................................................62, 63, 70, 143

    §1964 ................................................................................72, 73

§4121 ...........................................................................................20

22 U.S.C.

§7101 ..................................................................................13, 141

29 U.S.C §201 ...........................................................................84

34 U.S.C. §12601 .......................................................................26

42 U.S.C.

§1985 .................................................................................133, 134

§1997 .....................................................................................26

45 U.S.C. §547 ...........................................................................61

Fed. R. Civ. P. 8 ........................................................................81

Fed. R. Civ. P. 9 ........................................................................67

Fed. R. Civ. P. 12 ......................................................................95

Fed. R. Civ. P. 19 ....................................................................102

Fed. R. Civ. P. 23 ......................................................................82

Fed. R. Civ. P. 25 ........................................................................2

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922 (1970)............................................................................141

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, 114 Stat. 1464 (2000) .............................................12

H.R. Conf. Rep. 106-939 (2000)................................................13, 14, 60

## State Constitutions, Statutes, and Rules

Alabama Constitution

Ala. Const. Art. V, §32 ..........................................................2, 74

Ala. Const. Art. V, §112 ...........................................................137

Ala. Const. Art. V, §124 ........................................................................138

Alabama Code

Ala. Code §6-2-34 .........................................................................82, 83

Ala. Code §6-2-38 ...............................................................................82

Ala. Code §11- 47-190 ........................................................................151

Ala. Code §11-47-192 ........................................................................151

Ala. Code §12-25-32 ..........................................................................106

Ala. Code §14-8-4 ...............................................................................35

Ala. Code §15-22-20 ..........................................................................138

Ala. Code §15-22-26 ......................................................................*passim*

Ala. Code §15-22-36 ..........................................................................119

Ala. Code §36-12-46 ..........................................................................119

Ala. Code §41-9-542 ............................................................................58

2019 Ala. Laws Act No. 2019-393 ....................................103, 114, 126

Ala. Admin. Code R. 640-X-10-.01............................................133

## Other Authorities

Ala. Dep't of Archives & History, Alabama Convict Labor Revenue
and Demographics, 1896–1929 (Oct. 2021),
https://perma.cc/2F4Y-LDXQ ...........................................................77

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation
of Legal Texts* (2012) ...........................................................................18

Ballot Statement for the Constitution of Alabama of 2022,
https://perma.cc/5NA3-ND36...............................................................77

Othni J. Lathram, Background Information on the Removal of Racist
Language (Aug 27, 2021), https://perma.cc/N95B-ZXAK .....................77

Paramount, Merriam-Webster Dictionary, https://perma.cc/3AJ6-
9QC7 ...................................................................................................114

Restatement (Third) of Restitution and Unjust Enrichment (2011) ........................80

# INTRODUCTION

This consolidated opposition addresses Defendants' 19 motions to dismiss Plaintiffs' First Amended Complaint ("FAC"). The FAC asserts claims on behalf of twenty current or former incarcerated persons, a putative class of similarly situated individuals, and three organizations: the Union of Southern Service Workers, Service Employees International Union ("USSW"); Retail, Wholesale and Department Store Union, Mid-South Council ("RWDSU"); and The Woods Foundation.

The FAC sets forth twelve counts. Counts I and II state claims under the Trafficking Victims Protection Act ("TVPA") against all Defendants. The FAC details a system in which Plaintiffs and putative class members incarcerated by the Alabama Department of Corrections ("ADOC") have been forced to labor, through use and threats of physical violence, imposition of serious harm, deprivation of bare necessities, and extended imprisonment, for little or no money, to the significant benefit of ADOC and the other Defendants, including the public and private employers to whom ADOC "leases" the labor of incarcerated persons. The FAC now details the actual and threatened physical violence, deprivations of necessities, and other serious harms Plaintiffs have faced and continue to face if they do not labor for ADOC and the Employer Defendants.[1] The FAC also carefully delineates which

---

[1] The Employer Defendants include the Public Employer Defendants (ADOC Commissioner John Hamm, Alabama Department of Transportation ("ADOT") Director John Cooper, City of Montgomery, City of Troy, Jefferson County, and Governor Ivey), and Private Employer Defendants (Bama Budweiser, CBAK/McDonald's ("CBAK"), Southeast Restaurant Group-Wen LLC ("SRG"), Southeastern Meats, Inc. ("SMI"), Masonite Corporation, Progressive Finishes, Inc., Paramount Services, Inc., Pell City Kentucky Fried Chicken ("KFC"), SL Alabama, LLC, Ju-Young Manufacturing America, Inc., Hwaseung Automotive USA LLC, Cast Products, Inc.("Cast"), Koch Foods, LLC ("Koch"), and RCF, LLC). FAC ¶¶200, 204-22.

allegations apply to all Employer Defendants, identifies allegations specific to each Defendant and each individual Plaintiff, and details the coercion used to compel individual Plaintiffs to work. Counts III and IV state claims based on this coerced labor scheme under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Alabama Constitution, Article I, §32, respectively. Count V alleges a First Amendment claim premised on Governor Ivey and Commissioner Hamm's retaliation against those advocating against forced labor. Count XII states an unjust enrichment claim against the Employer Defendants premised on the benefits realized by participating in the coercion of Plaintiffs' labor.

Plaintiffs' Counts VI-XI are based on detailed allegations about Alabama's parole practices since 2019, which reflect a campaign by Governor Ivey and Attorney General Marshall to radically decrease access to parole, and the agreement of the Defendant members of the Alabama Board of Pardons and Paroles ("Parole Board" or "Board")[2] to implement directives from the Governor to shut down parole for parole candidates convicted of violent offenses and to discard objective decision-making protocols, despite the racially unequal impact of such changes. In support of Plaintiffs' claims for violations of the Ex Post Facto Clause (Count VI) and the Equal Protection Clause (Counts VII and VIII), the FAC provides new analysis of the retrospective impact of the 2019 changes on Plaintiffs' likely lengths of incarceration and additional comparators demonstrating the racial disparity in parole decisions.

---

[2] The Defendant Parole Board Members are the Chair and two Associate Members of the Parole Board. Since the FAC was filed, Leigh Gwathney has been replaced as Chair by Hal Nash, and he thus substituted as a Defendant in his official capacity, *see* Fed. R. Civ. P. 25(d). Plaintiffs intend to withdraw their claims against Gwathney in her individual capacity.

Plaintiffs also state related claims for denial of substantive due process (Count IX) and conspiracy to violate the KKK Act (Counts X and XI).

As this consolidated opposition demonstrates, Plaintiffs have satisfied their pleading burden and stated viable claims against all Defendants.

## STANDARD

In their 570 pages or so of briefing, Defendants chiefly take issue with the facts alleged by Plaintiffs—arguments that are improper on a motion to dismiss. The Court must accept the factual allegations in Plaintiffs' Complaint as true and construe all "reasonable inferences … in the light most favorable to" Plaintiffs. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). To overcome the motions to dismiss, Plaintiffs need only state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

## I.    Plaintiffs' Amended Complaint Is Not a Shotgun Pleading

At the outset of this consolidated opposition, Plaintiffs respond to the onslaught of "shotgun pleading" objections raised by Defendants in an effort to avoid engaging with the FAC's detailed factual allegations.[3] Defendants should not be permitted to shield themselves from responding to Plaintiffs' well-pleaded facts by wrapping themselves in the Court's prior Order, Dkt. 215 at 13-17.

---

[3] *See* Dkt. 229 at 13-18 (Ivey/Marshall); Dkt. 231 at 3 (Parole Board Members); Dkt. 234 at 10-16 (Hamm); Dkt. 236 at 9-10, 13-14 (Montgomery); Dkt. 238 at 3 (ADOT); Dkt. 240 at 6-9 (CBAK); Dkt. 242 at 7 (Progressive Finishes); Dkt. 247 at 16-18 (Masonite); Dkt. 249 at 7-10 (SRG); Dkt. 250 at 8-14 (Koch); Dkt. 251 at 6-7 (Cast). All record citations throughout this brief are to ECF page numbers, not each document's internal pagination.

The Eleventh Circuit's shotgun pleading rule requires that defendants receive "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). "A shotgun pleading is one where 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Klivington v. Voss*, 2023 WL 5510301, at *2 (M.D. Ala. Aug. 25, 2023) (quoting *Nurse v. Sheraton Atlanta Hotel*, 618 F.App'x at 987, 990 (11th Cir. 2015)). The FAC is not a shotgun pleading. Each FAC count describes the relevant allegations, specifies which Defendants are accused, and references the supporting allegations in the body of FAC. Plaintiffs added distinct sections for each Employer Defendant with detailed, Defendant-specific allegations, expressly identified allegations common to all Employer Defendants, and provided a roadmap of Plaintiffs' claims.[4]

The Eleventh Circuit has identified "four rough types or categories of shotgun pleadings":

(1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint";

(2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action";

(3) a complaint that does not separate "each cause of action or claim for relief" into a different count; and

---

[4] The FAC's primary allegations concerning Public Employer Defendants are found at paragraphs 361-415 (common) and 416-42 (Defendant-specific); Private Employer Defendants' are at paragraphs 443-495 (common) and 496-590 (Defendant-specific); and the allegations against the ADOC are at paragraphs 271-360. Other paragraphs detail violence at ADOC facilities and Plaintiffs' experiences, and these too are clearly delineated.

(4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."

*Mathis v. City of Lakeland*, 2023 WL 2568814, at *4 (11th Cir. Mar. 20, 2023) (quoting *Weiland*, 792 F.3d at 1321-23).

Defendants argue that Counts I & II (TVPA), Count III (RICO), and Count XII (unjust enrichment) fall within the first, second, and fourth shotgun pleading categories.[5] The FAC addresses the Court's instructions and provides Defendants more than adequate notice of the allegations against them.

## A.     Counts I & II (TVPA)

The Court directed Plaintiffs to describe which paragraphs support each element of their TVPA claims against which Defendant. *See* Dkt. 215 at 15. Plaintiffs did just that—the TVPA counts provide distinct paragraphs for each element, for each Defendant, and reference the paragraphs supporting the allegations for that element. *See* FAC ¶¶766-72.[6]

The Court also suggested that Plaintiffs separate the TVPA claims into distinct claims under 18 U.S.C. §1589(a) and 18 U.S.C. §1589(b). Dkt. 215 at 15. Plaintiffs have done so: Count I alleges only violations of 18 U.S.C. §1589(a) (so-called "perpetrator" liability), *see* FAC ¶¶764-78, and Count II alleges only violations of

---

[5] Ivey/Marshall, Hamm, and SRG halfheartedly suggest that other counts, which the Court previously found to pass muster under the shotgun pleading rule, *see* Dkt. 215 at 17, are improperly pleaded, but include no supporting argument. Dkt. 229 at 13; Dkt. 234 at 11; Dkt. 249 at 7-10.

[6] Parole Board Members argue that Plaintiffs do not specify which allegations apply to them, *see* Dkt. 231 at 3, but the FAC explicitly alleges claims against, and names, Parole Board Members in paragraphs alleging State Defendants' role. *See* FAC ¶¶766, 768, 770; *see also id.* ¶¶774, 778, 782 (alleging joint venture relationship).

18 U.S.C. §1589(b) ("beneficiary" liability), *id.* ¶¶779-90. Both counts are *intentionally* pled against all Defendants because Plaintiffs allege all Defendants violated both statutory provisions. Far from "ignor[ing]" the Court's advice, as Defendants suggest, *see* Dkt. 229 at 14-15, Plaintiffs responded directly by giving clear notice of which allegations they are bringing against which Defendants. That Defendants would prefer Plaintiffs only bring beneficiary liability claims against them is simply not a basis to deem the FAC a shotgun pleading.

Lastly, the Court suggested Plaintiffs create a chart connecting each Defendant with the specific factual allegations against it. Dkt. 215 at 15. Again, Plaintiffs did so: the FAC's chart in each TVPA counts lists for each Defendant the specific sections of the complaint for allegations against them. FAC ¶¶776, 787.

The thrust of several Defendants' objections appears to be that the FAC is long and it includes factual allegations about other Defendants.[7] But the FAC alleges that Ivey, Marshall, Hamm, and the Parole Board Members "maintain[] a co-employment and/or joint venture relationship with each and every Public and Private Employer Defendant to benefit from the labor or services" coerced from individual Plaintiffs. *Id.* ¶¶774, 782. Thus, allegations relating to ADOC, for example, are also relevant to the individual Employer Defendants.[8] *See Norris v. Honeywell Int'l, Inc.*,

---

[7] The FAC, of course, contains allegations common to multiple Defendants. Those common allegations are made explicit for each Defendant in the chart, and each Defendant must take those allegations as specifically made against it. *See Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997) ("When multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the allegation made about him individually.").

[8] Plaintiffs' allegation that Defendants are co-venturers means common allegations are not only permissible, but necessary since the forced labor here is compelled for entities other than ADOC.

2023 WL 6256183, at *4 (M.D. Fla. Sept. 26, 2023) (complaint not a shotgun pleading where plaintiffs alleged a "joint employment relationship," because "Plaintiffs' allegations adequately convey a theory of collective liability for the purpose of providing Defendants with notice"); *S.Y. v. Naples Garden Inn, LLC*, 2021 WL 949610, at *2 (M.D. Fla. Mar. 12, 2021) (claims under state RICO statute and TVPA against defendants alleged to be joint employers not a shotgun pleading).

Some Defendants, like CBAK, incorrectly claim that the FAC does not "specify which of the defendants are responsible for which acts or omissions," Dkt. 240 at 8.[9] The FAC contains distinct, Defendant-specific sections with detailed allegations, in addition to the common factual allegations. *See* FAC ¶¶417-42, 497-590. For example, the chart refers CBAK to section II.E.5.f of the FAC, which alleges that approximately 122 incarcerated people—including putative class member Quannie McCorvey—worked at CBAK from January 1, 2018 through September 7, 2023, and includes McCorvey's wage, job duties, specific conversations between ADOC officers and CBAK supervisors, and the forms of coerced labor that he witnessed and experienced at CBAK. *Id.* ¶¶537-42. These detailed, segregated, and charted allegations are far from ones "asserting the same general, overly broad allegations against" each Defendant, as CBAK complains. *See* Dkt. 240 at 8.

---

*Castellano v. Care Airways Corp.*, 2025 WL 957574, at *3 (S.D. Fla. Mar. 26, 2025) (not a shotgun pleading "[a]s Plaintiff has sufficiently alleged a joint employer relationship, the claims asserted … apply to all of the defendants.").

[9] *See also* Dkt. 229 at 14 (Ivey/Marshall); Dkt. 231 at 3 (Parole Board Members); Dkt. 234 at 12-13 (Hamm); Dkt. 247 at 17-18 (Masonite); Dkt. 250 at 10-11 (Koch).

The FAC's use of sections that set forth allegations that are common to multiple Defendants—e.g., addressing the terms of work-release agreements and describing discipline imposed on persons who decline to work—is certainly permissible in a complaint against multiple defendants. *See Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021); *Cain v. Calloway*, 2025 WL 913453, at *6 (M.D. Ala. Mar. 25, 2025) ("[R]efer[ring] to groups of Defendants in multiple counts…does not necessarily render [a] complaint a shotgun pleading.") (citing *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000)).

Some Defendants argue that certain allegations in the FAC, including those related to parole, are immaterial to Plaintiffs' TVPA claims. *See, e.g.*, Dkt. 229 at 16. But courts in this district have expressly found that allegations providing background and context of the pervasive horrors in ADOC's facilities *are* material. *See Brown v. Dunn*, 760 F.Supp.3d 1326, 1343 (M.D. Ala. 2024) (complaint was not a shotgun pleading because allegations of systemic abuse at all ADOC facilities provided "background" for claims against warden at one specific prison). Further, given Plaintiffs' co-venturer allegations, allegations concerning parole are directly relevant to Plaintiffs' claims against the non-Parole Board Member Defendants. *Hughes-Payne v. Argon Med. Devices, Inc.*, at *2 (N.D. Fla. July 29, 2022) (not a shotgun pleading where the complaint alleged that the defendants "acted collectively and were 'joint venturers'") (citation omitted). Further, even when a complaint's counts are "tightly related and, as with most complaints, contain facts that a given defendant might consider to be immaterial, vague, or conclusory," a complaint is not a shotgun pleading where, as here, "there are sufficient facts pleaded to place each

defendant on notice as to what is being alleged, against whom, and based upon which facts." *Klivington*, 2023 WL 5510301, at *3; *Cain*, 2025 WL 913453, at *6 (finding that "some conclusory allegations throughout the complaint" did not render it a shotgun pleading where the plaintiff also supported his claims with "relevant factual allegations"). The FAC provides each Defendant with clear notice of the TVPA allegations against it.

### B.    Count III (RICO)

The Court previously directed Plaintiffs to specify the racketeering activity that supports their RICO claim and how each Defendant participated. *See* Dkt. 215 at 15. The RICO count now includes a chart directing each Defendant to the specific section of the FAC that includes allegations against it. *See* FAC ¶800. Those specific allegations, along with the allegations specified as applying to multiple defendants, describe each Defendant's alleged involvement in RICO activity.

For example, the FAC alleges that Koch: partnered with ADOC for years to obtain forced labor from incarcerated individuals; subjected those individuals to harassing and dangerous working conditions, including by assigning incarcerated individuals to work it could not get free workers to perform while paying free workers higher wages; and benefited from the scheme. FAC ¶¶568-73. The FAC alleges Plaintiff Evans was forced to work while he was so ill he was vomiting, and that another incarcerated worker experienced swollen and painful hands from packing poultry in freezing conditions. *See id.* ¶¶569-71. Count III directs Koch to these and other allegations and gives Koch clear notice of its alleged racketeering activities. The FAC certainly provides Koch and other Defendants sufficient

information to allow them "to reasonably frame an answer." *Seals v. Leath*, 2019 WL 6997398, at *5 (M.D. Ala. Dec. 18, 2019) (internal quotation marks omitted); *see also Cont'l 332 Fund, LLC v. Albertelli*, 317 F.Supp.3d 1124, 1140 (M.D. Fla. 2018) (RICO claim not shotgun pleading where it "allege[d] the existence and purpose of [a] Scheme with the individual actions each Defendant perpetrated"). That some factual allegations support more than one count against a Defendant is not remarkable, particularly here, where the TVPA violations are the predicate acts for the RICO claim.

## C.    Count XII (Unjust Enrichment)

The Court directed Plaintiffs to clarify which allegations supporting their unjust enrichment claim relate to each Defendant. *See* Dkt. 215 at 15-16.[10] The FAC squarely addresses this instruction by incorporating the chart from Count I that identifies each Defendant with references to the specific sections of the FAC with allegations against it. *See* FAC ¶877 (referencing chart in ¶776). Contrary to Ivey and Marshall's argument, Dkt. 229 at 16, this incorporation does not fall within the first category of shotgun pleading because far from adopting the allegations of each preceding count, Count XII only adopts six targeted paragraphs to efficiently direct the Defendants to the specific allegations against them and providing notice of the facts relevant to the unjust enrichment claim. *See Weiland*, 792 F.3d at 1321-23; *see also Braun v. Cadence Healthcare Sols., LLC*, 2022 WL 3570344, at *5 (S.D. Ga. Aug. 18, 2022) ("Even if the incorporation creates some slight ambiguity," it is not

---

[10] The Court highlighted Plaintiffs' allegations regarding racial wage discrepancies. *See* Dkt. 215 at 16. As Ivey and Marshall acknowledge, the FAC removed this allegation. *See* Dkt. 229 at 16.

a shotgun pleading where "an honest reading of the allegations within each count make clear what claims Plaintiff is alleging and against which Defendants").

Koch accuses Plaintiffs of "confusing their 'enemy'" with their unjust enrichment claim. Dkt. 250 at 12-13 (quoting *Barmapov*, 986 F.3d at 1324). But Plaintiffs' addition of new sections for each Employer Defendant, clear delineation of common allegations, and identification of particular paragraphs relevant to each Employer Defendant, are clearly not intended to confuse.

The Court also asked Plaintiffs to explain how the parole allegations relate to the unjust enrichment claims. *See* Dkt. 215 at 16. The Court explained that it understands that "(a) the need for inmate labor encourages the Parole Board to deny parole for most people, and (b) that the State Defendants are coercing labor by abusing the parole system." *Id.*[11] The third step that follows (a) and (b), and is described in the FAC, is (c) the Employer Defendants are unjustly benefiting from the coerced labor, made possible via parole denials and coercion. *See* FAC ¶339 ("[I]ndividuals who decline to work receive disciplinaries on their record, which directly diminishes their opportunity to be granted parole by the Parole Board, especially since the Parole Board's modification of its scoring procedures since 2019."); *id.* ¶739.[12] Thus, "the [parole] allegations are needed as background to the

_____

[11] As used herein, unless otherwise indicated, the State Defendants are Defendants Ivey, Marshall, Hamm, and the Parole Board Members.

[12] The FAC also draws these connections at the Defendant-specific level. *See, e.g.*, FAC ¶420 (Plaintiff's ADOT supervisor wielded threat of termination over workers, "knowing that they would be disciplined and not make parole if they were fired"); *id.* ¶471 (Parole Board advised Plaintiff Ptomey's family "he was being denied parole and given a 3-year set off because he refused to work for KFC.").

[unjust enrichment] allegations." *Brown*, 760 F.Supp.3d at 1343 (background, systemic allegations not shotgun pleading).

## II.    Plaintiffs Adequately and Plausibly Allege TVPA Claims Against Each Defendant

Plaintiffs[13] allege that each Defendant violated the TVPA's prohibition on coercion of labor (Count I) and is liable as a knowing beneficiary of an arrangement that relies on labor obtained and provided in violation of the TVPA (Count II).

Defendants' continued protestations that they cannot comprehend the coercive means pleaded, and their apparent indignation that the individual Plaintiffs could possibly be allowed to complain about being forced to labor for ADOC and Employer Defendants are not well taken, particularly in light of the extensive additional allegations in the FAC linking each Employer Defendant to a Plaintiff or Plaintiffs, and detailing the physical restraint, violence, threats of violence, and other prohibited forms of coercion each Plaintiff has faced.

Congress enacted the TVPA in 2000 to override the Supreme Court's narrow definition of "involuntary servitude" in *U.S. v. Kominski*, 487 U.S. 931 (1988) (interpreting 18 U.S.C. §1584), and the Thirteenth Amendment—namely, a definition limiting "involuntary servitude" to "physical or legal coercion," and "excluding other conduct that can have the same purpose and effect."). *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386, §102(b)(13)

---

[13] As set forth in the FAC, the Plaintiffs who bring claims under the TVPA are Plaintiffs Moore, Walker, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Mason, Dandridge, Ball, R. Clark, Morrissey, Prewitt, T. Clark, Jarmon, Evans, Bullock, and Thomas, along with USSW and RWDSU. FAC, Count I (identifying "Forced Labor Named Plaintiffs"). For ease of reading, this brief uses the generic "Plaintiffs" throughout, but with the understanding that the individual Plaintiffs bringing each claim are denoted in the FAC and once in text, for each claim discussed.

(codified at 22 U.S.C. §7101(b)(13) ("Purposes and findings")); *see also* 22 U.S.C. §7101(b)(14) ("Existing legislation and law enforcement ... are inadequate" and do not "penalize[] the range of offenses involved in ... trafficking scheme[s]"). Thus, the TVPA was designed "to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined" under then-existing law. H.R. Rep. No. 106-939, at 101 (2000); *see also U.S. v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015) (noting Congress' intent "to expand the forms of coercion that could result in forced labor"); *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017) (same).

In enacting the TVPA, Congress specifically sought to ensure the "range of conduct" prohibited by the TVPA "encompasses circumstances in which the person whose labor is being exploited is faced with any number of choices as an alternative to working, including actual or threatened physical restraint, serious harm, and abuse of law or legal process." *Burrell v. Staff*, 60 F.4th 25, 37 (3d Cir. 2023).

That intent is clear in the statutory language. Indeed, the TVPA's framework is straightforward. The Eleventh Circuit, in a case involving immigration detainees who alleged that the "Voluntary Work Program" was coercive because the detainees were threatened with being sent to dorms with deplorable conditions unless they agreed to work, outlined the structure of the TVPA's private cause of action and the requisite inquiry. *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1271-72 (11th Cir. 2020). It starts with identifying the conduct prohibited by the TVPA, which is set forth in §1589(a). The TVPA prohibits knowingly *providing* or *obtaining* "'the labor or services of a person' by any one of, or combination of, the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

*Id.* (quoting 18 U.S.C. §1589(a)).

The TVPA thus reaches a broad range of types of harms and threats used to coerce labor and services. *Callahan*, 801 F.3d at 618; *Burrell*, 60 F.4th at 37. The statute itself defines the term "serious harm" to include "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. §1589(c)(1); H.R. Rep. No. 106-939, at 101 (2000); *see also U.S. v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021) (noting broad reach of statute); *U.S. v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011) (threat not to pay back wages); *U.S. v. Calimlim*, 538 F.3d 706, 709, 714 (7th Cir. 2008) (recognizing "not be[ing] able to send any more money back to … family" as a serious harm); *Lesnik v. Eisenmann SE*, 374 F.Supp.3d 923, 952 (N.D. Cal. 2019) ("financial threats, threats of litigation, and threats to withhold medical care" are serious harms).

The prohibition on obtaining or providing labor through "physical restraint" includes, for incarcerated persons, increased periods of confinement, including in the person's cell or in segregation, which itself can constitute "serious harm" within the meaning of the statute. *See Menocal v. GEO Grp., Inc.*, 635 F.Supp.3d 1151, 1187 (D. Colo. 2022) ("imposition of segregation is physical restraint"; 72 hours in solitary confinement could be "serious harm"); *Bridges v. Poe*, 487 F.Supp.3d 1250, 1261 (N.D. Ala. 2020) ("'Confinement' to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of 'physical restraint.'"); *cf. Ruelas v. County of Alameda*, 2021 WL 12144269, at *6 (N.D. Cal. June 24, 2021), *rev'd in part on other grounds*, 108 F.4th 1208 (9th Cir. 2024) (finding threat or placement in solitary confinement to be a "serious harm"); *Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *11 (S.D. Cal. May 14, 2018) (finding "solitary confinement, or the threat of solitary confinement," to be a proscribed "means to achieve forced labor", reasoning "[i]t has long been recognized that solitary confinement bears a further terror and peculiar mark of infamy" "above and beyond day-to-day incarceration" (internal quotation marks omitted)).

The statute also "broadly define[s] 'abuse or threatened abuse of law or legal process' as 'the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.'" *Burrell*, 60 F.4th at 37 (quoting 18 U.S.C. §1589(c)(1)). Thus, in *Burrell*, the Third Circuit held that the "[d]efendants' conditioning of plaintiffs' access to [a] work release program (which

[plaintiff-debtors] allege they needed to free themselves) on a period of nearly free, grueling labor at [a] Recycling Center, [was] an abuse of law or legal process under the TVPA." *Id.* "[W]arnings about … consequences … directed to an end different from those envisioned by the law [are] an abuse of the legal process." *Calimlim*, 538 F.3d at 713; *see also Copeland v. C.A.A.I.R., Inc.*, 2019 WL 4307125, at *8 (N.D. Okla. Sept. 11, 2019) (threat of punitive consequences "when work was deemed unsatisfactory" or when "unable to work due to injury, constitutes threatened abuse of law or legal process").

*Barrientos v. CoreCivic, Inc.*, 332 F.Supp.3d 1305 (M.D. Ga. 2018), *aff'd* 951 F.3d 1269 (11th Cir. 2020), illustrates how these forms of coercion can operate in a detention context. The *Barrientos* plaintiffs alleged that operators of a federal immigration facility that purported to operate a "voluntary" work program, paying between $1 and $4 per day, was coercive because the defendant did not provide hygiene products to detainees and housed plaintiffs in unsanitary, overcrowded and violence-prone dormitories—referred to as the "Chicken Coop"—but allowed detainees who participated in the work program access to two-person cells and a commissary where they could use their wages to purchase necessities. *Barrientos*, 332 F.Supp.3d at 1308; *Barrientos*, 951 F.3d at 1274. The district court found allegations that the defendant threatened to send detainees who refused to work back to the Chicken Coop or, in the case of one detainee, being placed in solitary confinement, were sufficient to support a claim of coercion in violation of the TVPA. 332 F.Supp.3d at 1309; *see also* 951 F.3d at 1274-75. On appeal, the Eleventh Circuit considered only the TVPA's applicability to claims by legally detained immigrants

and whether the fact that federal law required work programs barred the plaintiffs from asserting a TVPA claim. 951 F.3d at 1275-76. The appeals court concluded that the TVPA's broad language did not permit such an exemption from its prohibitions. *Id.* at 1276-77 (noting "no limiting principle" and "no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims").

A civil action under the TVPA may be brought by any "individual who is a victim of a violation" of the statute's prohibition on providing or obtaining forced labor or services. *See* 18 U.S.C §1595(a). That civil action may be brought (1) against "the perpetrator" and (2) against "who[m]ever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPA. 18 U.S.C. §1595(a).

In their motions to dismiss, Defendants improperly seek to ignore, or simply dispute, the factual allegations presented by Plaintiffs. Defendants urge the Court to find that it does not matter what Plaintiffs allege because no amount of coercion, violence, or threats thereof, could render the requirement that incarcerated people labor for the benefit of others unlawful. That is not the law. Just as in *Barrientos*, Plaintiffs here have alleged forms of coercion prohibited by the TVPA.

Plaintiffs first address several threshold arguments advanced by Defendants and then move to arguments relevant to individual Defendants, starting with ADOC Commissioner Hamm.

### A.    The TVPA Does Not Exempt Incarcerated Individuals from Its Protections, Nor Does the Thirteenth Amendment Require An Exemption

Hamm, along with three Private Employer Defendants, contends that the TVPA's prohibition on obtaining and providing labor through coercive means does not apply to labor of incarcerated persons, asking this Court to create a massive exemption absent from the clear text of both the TVPA and its legislative history.[14]

The plain text of the TVPA unambiguously extends to labor obtained from, or provided by, incarcerated workers if that labor is obtained through the proscribed coercive means. The statute creates a cause of action against "'[w]hoever knowingly provides or obtains the labor or services of a person' by various illegal coercive means." *Barrientos*, 951 F.3d at 1276 (quoting 18 U.S.C. §§1589(a), 1595(a)); *see also Owino*, 2018 WL 2193644, at *4 ("Section 1589 applies to any 'person'—there is no limitation on the type or status of said person."). The Eleventh Circuit has found this language "plain and unambiguous[,]" noting that the "general terms '[w]hoever' and 'person' evinces no intent on the part of Congress to restrict the application of the statute to particular actors or particular victims." *Barrientos*, 951 F.3d at 1276 (internal quotations omitted); *see also id.* at 1277 ("[T]he presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 101 (2012)). Thus, the plain text does not support carving out incarcerated persons from the term "person"; nor does it support

---

[14] *See* Dkt. 227 at 17-18 (Bama Budweiser); Dkt. 234 at 21-22, 24-25 (Hamm); Dkt. 247 at 21 (Masonite); Dkt. 250 at 26 (Koch).

excluding participants in a state's prison work program from the term "whoever." *See id.* (declining invitation to read in a "limiting principle" that had no basis in the statutory text).

In *Barrientos*, the court held that this plain text was the beginning and end of the inquiry. *Id.* at 1278 (quoting *U.S. v. Noel*, 893 F.3d 1294, 1297 (11th Cir. 2018), for proposition that, "if the statute's language is clear, there is no need to go beyond the statute's plain language into legislative history"). It is only a "'rare and exceptional circumstance[]'" that might "'justify a departure from [the statutory] language.'" *Id.* (quoting *Garcia v. U.S.*, 469 U.S. 70, 75 (1984) and *U.S. v. Albertini*, 472 U.S. 675, 680 (1985), respectively); *see also Bostock v. Clayton Cnty, Georgia*, 590 U.S. 644, 669 (2020) ("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception ... when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").[15]

Despite this controlling precedent regarding statutory interpretation of the TVPA, Defendants nevertheless seek a carve-out from TVPA liability that would cover labor obtained through a prison program. *Barrientos* is instructive in two additional ways. First, *Barrientos* makes clear that—even when a detainee work program is generally countenanced by other law, as was the case there—detainees'

---

[15] For this reason, Masonite's argument that Congress's *silence* on prison labor in the TVPA means that the statute *cannot* reach that labor, Dkt. 247 at 20-21, is clearly wrong. Moreover, Congress expanded the TVPA's private right of action in 2000, allowing victims to recover against beneficiaries. *Barrientos*, 332 F.Supp.3d at 1312; *Owino*, 2018 WL 2193644, at *11. Had Congress wanted to create an exception for incarcerated workers, it could have done so.

labor cannot be coerced through violence, serious harm, and the other proscribed means of coercion. 951 F.3d at 1278 ("[T]he mere fact that [defendant] … is operating a work program at the behest of the federal government does not … shield [it] from liability under the TVPA if it in fact obtains the forced labor of program participants through the illegal coercive means explicitly proscribed by the TVPA"); *see also Burrell*, 60 F.4th at 37; *Copeland*, 2019 WL 4307125, at *12 (rejecting argument that TVPA should not apply to work-based rehabilitation programs sanctioned by law, noting that a ruling for plaintiff would in no way "prevent the state from sending offenders to work-based rehabilitation programs ... [i]t will merely prevent [defendant] from violating the law in running its rehabilitation program."); *Barrientos*, 332 F.Supp.3d 1305, 1310-11 ("persons who are held lawfully as detainees by the government"—"although they may be lawfully detained, they cannot be forced to labor in violation of the TVPA"); *Owino*, 2018 WL 2193644, at *6 ("Lawful detention, by itself, is not a shield against illegal conduct against those held in detention."). Thus, Hamm's argument that the U.S. Bureau of Prisons is authorized to operate a work release program, *see* Dkt. 234 at 24, has no analytical import: the TVPA still broadly prohibits the coercion of labor.[16]

Second, *Barrientos* considered and rejected the argument that the TVPA's legislative history and its focus on trafficking of women and children warranted an

---

[16] Nothing in 18 U.S.C. §4121, et seq., and 18 U.S.C. §1761(b)-(c), cited by Hamm, allows coercion of labor; and 18 U.S.C. §1761(c)(4) requires that person "participate[] in such employment [through prison work pilot projects] voluntarily." The FAC is replete with specific, direct and detailed allegations making plain that Plaintiffs' submission to ADOC's work directives was not "voluntary", but rather was performed in order to assure survival, physical safety, and prevent further extensions of their detentions.

exemption for work programs in the detention context: "Just because Congress may have had in mind a particular narrow objective—here, combatting human trafficking—does not on its own justify a departure from the principle that we should give general terms their general meaning." 951 F.3d at 1278-79. That the general terms of the TVPA are intended to apply broadly is evident in the statute's definition of "serious harm," which directs that the relevant inquiry is whether the threat of harm would compel a "reasonable person … in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. §1589(c)(2). This confirms that Congress understood the terms of the TVPA would apply in a wide range of circumstances. It is thus no answer to say incarcerated persons do not have the same "absolute liberty" as other citizens. Dkt. 234 at 22; *see Bridges*, 487 F.Supp.3d at 1261 (interpreting parallel TVPA provision and concluding that a threat of "confinement [of plaintiff] to her cell for twenty-three hours a day" "restrict[ed] [her] freedom of movement" and "certainly meets the ordinary meaning of 'physical restraint'").

Contrary to this holding, Hamm suggests the Thirteenth Amendment provides the rare and exceptional circumstance justifying departure from the settled rule that a statute means what it says. Dkt. 234 at 37. But the legislative history of the TVPA, and its deliberate expansion of prohibited conduct beyond what is covered by the Thirteenth Amendment, *negates* that argument. In adopting the TVPA, Congress intentionally expanded the definition of coercion beyond the narrow scope of "involuntary servitude" covered by the Thirteenth Amendment, as construed by the Supreme Court in *Kozminski*, 487 U.S. at 948. *Burrell*, 60 F.4th at 36-37 (TVPA

"defines forced labor broader than *Kozminski*" and "Congress chose not to include the phrase 'involuntary servitude'" in TVPA).

Further, Hamm, Ivey, and Marshall's suggestion that the TVPA cannot prohibit the coercion of labor by incarcerated persons because it is permitted by the Thirteenth Amendment, Dkt. 229 at 25 n.20 & Dkt. 234 at 22 n.19,[17] makes no sense: the Thirteenth Amendment's exception is a floor, not a ceiling, and certainly not a constitutional permission slip to enslave incarcerated people. The TVPA itself is the best evidence that simply because some forms of coercion may not violate the Thirteenth Amendment does not mean Congress cannot legislate to prohibit that coercive conduct. *See, e.g.*, *U.S. v. Paulin*, 329 F.App'x. 232, 234 (11th Cir. 2009) ("conviction...for conspiring to violate the Thirteenth Amendment requires proof of physical or legal coercion...while a conviction for violating §1589(a) may be premised on psychological coercion.") (citations omitted).[18]

State Defendants and several other defendants argue that, despite the plain language of the TVPA, any coercion of so-called "housekeeping work" by incarcerated individuals is always permitted, citing *Barrientos*, 951 F.3d at 1278 n.5,

---

[17] State Defendants' identical footnotes making this point rely once again on a gross misrepresentation of a Tenth Circuit case, *Fletcher v. Williams*, 2023 WL 6307494 (10th Cir. Sept. 28, 2023). As Plaintiffs previously explained, *see* Dkt. 178 at 77-78 n.31, State Defendants quote language summarizing a magistrate judge's report and recommendation as if it was the Tenth Circuit's holding, which it is clearly not, and the quoted text was provided solely as background.

[18] Of course, simply because something is not prohibited by the Thirteenth Amendment does not render it lawful. *Cf. Hopkins v. Watson*, 108 F.4th 371, 378-79 (5th Cir. 2024) ("[C]ertain involuntary work requirements imposed on convicted criminals may violate the Cruel and Unusual Punishments Clause."). Four Employer Defendants advance versions of this same argument, i.e., because the Thirteenth Amendment does not prohibit "involuntary servitude" as "punishment for a crime," there can be no federal regulation of prisons' use and provision of coerced labor. *See* Dkt. 227 at 15-17 (Bama Budweiser); Dkt. 237 at 13-14 (Troy); Dkt. 247 at 20-22 (Masonite); Dkt. 250 at 25-26 (Koch). These arguments fail for the same reasons State Defendants' fail.

and *Taylor v. Salvation Army*, 110 F.4th 1017 (7th Cir. 2024). *See, e.g.*, Dkt. 229 at 25-26; Dkt. 234 at 23; Dkt. 227 at 18-20; Dkt. 247 at 23, 26-27. But the labor that Plaintiffs allege has been coerced is clearly not "basic personal housekeeping." *Barrientos*, 951 F.3d at 1278 n.5. Certainly, being forced to labor for ADOC's and Employer Defendants' benefit in factories, fast food restaurants, poultry processing plants, and other worksites outside the prison walls is not housekeeping.[19] Nor is the alleged in-house work for ADOC remotely mere "housekeeping" or work performed in individuals' cells. As detailed in the FAC, Plaintiffs and putative class members are coerced to work "all manner of jobs necessary to run ADOC's own facilities, including: all types of skilled construction; … overseeing and serving as direct care providers for the drug and alcohol treatment program, mental health, and hospice"; performing "traditional prison staff duties like serving as the Officer in Charge of an entire dorm, conducting 'the count' daily, or supervising incarcerated people in segregation facilities"; and "processing new admittees." FAC ¶292.[20]

---

[19] FAC ¶¶19, 25-30, 38, 41, 46, 48, 54-57, 59, 70-71, 84, 87-88, 96, 97, 106, 112, 128-30, 137, 140-44, 152-56, 162-64, 167-69, 172, 181-82 (allegations describing Plaintiffs' work for private employers). Some Defendants also cite *Ruderman v. Kenosha Cnty.*, 752 F.Supp.3d 1084, 1086, 1093 (E.D. Wisc. 2024), where the court held that a policy "requiring Plaintiffs to help clean common areas" did not constitute "forced labor" obtained "by a prohibited means within the meaning of [the TVPA]." *Ruderman* is of course not controlling, but in any event, nothing there speaks to the work at issue here, which involves work for private and public employers and in-house ADOC labor that far exceeds any minimal cleaning chores.

[20] *See* FAC ¶¶14-15 (plumbing, heating and air installation); *id.* ¶19 (stripping floors, care for mentally disabled); *id.* ¶32 (cutting grass); *id.* ¶49 (canine squad, senior coordinator for programming); *id.* ¶72 (hospital ward runner); *id.* ¶76 (Officer in Charge of the Faith Dorm); *id.* ¶91 (food delivery); *id.* ¶96 (work in Inmate Control System, administrative and healthcare work); *id.* ¶106 (kitchen); *id.* ¶172 (yard and church grounds work); *see also id.* ¶¶293-305 (collecting examples of Plaintiffs' work); *id.* ¶¶36, 350-52 (Correctional Industries work).

*Taylor* does not direct a different conclusion. It stands for the unremarkable proposition, supported by the plain text of the TVPA, that the coercive force of the conduct plaintiffs complain of must be evaluated in context. 110 F.4th at 1032; *see also* 18 U.S.C. §1589(c)(2). The court found that plaintiffs' complaint did "not come to grips with the fact that the justice-referred participants [in the rehabilitation program] are in a very different situation from other participants who have not had their liberty restricted by a penal judgment." 110 F.4th at 1032. The FAC here does not suffer from any such problem: it squarely addresses Plaintiffs' circumstances and describes why any person subject to the alleged threats of harm, violence, increased detention, and deprivations, would reasonably conclude they had no choice but to labor for the benefit of Defendants.[21]

Finally, it is no answer to argue, as Hamm does, that because some of the ways in which Plaintiffs' labor is coerced—including extended periods of incarceration, solitary confinement, and deprivation of necessities—may flow from prison rules, such coercion is beyond the reach of the TVPA. Dkt. 234 at 21. Indeed, in *Ruelas*, 2021 WL 12144269, at *6, and *Owino*, 2018 WL 2193644, at *11, the courts considered policies that punished detainees who refused to work with solitary confinement, and held such punishment and threats of punishment to be proscribed

---

[21] *Salvation Army* involved two groups of plaintiffs, "walk-in" participants who joined the work program voluntarily because of problems such as homelessness or addiction, and "justice-referred" participants who are free, but on some court supervision program, and program participation is condition of their release. 110 F.4th at 1031-32. It is with respect to the second group of plaintiffs that the Seventh Circuit suggests that the coercive impact of the program must be assessed in the context of the individuals' sentences. *Id.* at 1032.

means of coercing labor. That a particular form of coercion may be characterized as "discipline" is not a license to force individuals to labor in violation of the TVPA.[22]

## B.    The TVPA Is Constitutional

The TVPA is constitutional on its face and as Plaintiffs seek to apply it here. Bama Budweiser concedes that it cannot prevail on its challenge to the statute, and yet advances a patently meritless argument that the TVPA is beyond the authority of Congress under the Tenth Amendment and unconstitutionally intrudes on "state police power." Dkt. 227 at 15-17. Under any interpretation of the Constitution, contracts for labor are commerce, and Bama Budweiser does not cite any authority to the contrary.[23] As to the purported intrusion on state police powers, the case law cited by Bama Budweiser and Koch at best stands for the proposition that courts should not construe federal statutes as displacing states' "historic police powers" absent clear congressional mandates. Dkt. 227 at 17 (citing *Bond v. U.S.*, 572 U.S. 844 (2014); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)); Dkt. 250 at 26; *see also* Dkt. 247 (Masonite) at 21 (making similar argument). The TVPA's mandate is not ambiguous. Next, Koch and RCF cite *U.S. v. Lopez*, 514 U.S.

---

[22] Nor does Eleventh Circuit precedent permit imposition of a heightened pleading standard on incarcerated plaintiffs who bring TVPA claims, one that would require them to show with "'precision'" that coercion proscribed by the TVPA is *also* "'incompatible with the legitimate constraints of the particular penal judgment imposed,'" as Bama Budweiser urges. Dkt. 227 at 12 (quoting *Taylor*, 110 F.4th at 1032); *but see Barrientos*, 951 F.3d at 1278. Even were that the relevant standard, Plaintiffs meet it. The threats of serious harm, violence and deprivations detailed in the FAC are not part of any individual Plaintiff's sentence, nor do they serve any legitimate end.

[23] Defendant Bama Budweiser also appears to argue that Congress cannot regulate coercion of labor that occurs solely within Alabama, Dkt. 227 at 16-17, contrary to consistent Eleventh Circuit precedent recognizing the constitutionality of the TVPA "as applied to [] activities occurring solely within [a state]." *U.S. v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007) (citing *Gonzales v. Raich*, 545 U.S. 1 (2005); *U.S. v. Maxwell*, 446 F.3d 1210 (11th Cir. 2006); *U.S. v. Smith*, 459 F.3d 1276 (11th Cir. 2006)).

549, 561 n.3 (1995), for the proposition that states have "primary authority for defining and enforcing the criminal law," suggesting Congress is therefore restricted from passing any legislation relating to the treatment of state prisoners. Dkt. 243 at 23; Dkt. 250 at 25-26. But nothing in *Lopez* supports this notion and Congress can, of course, pass legislation related to state prisoners and has done so. *See, e.g.*, 42 U.S.C. §1997a (Civil Rights of Institutionalized Persons Act); 34 U.S.C. §12601 (Violent Crime Control and Law Enforcement Act of 1994).

Notably, none of the defendants advancing these arguments acknowledge *Kentucky Whip & Collar Co. v. Illinois Cent. R. Co.*, 299 U.S. 334 (1937), which upheld against a Commerce Clause challenge a federal law that had as its goal advancement of "free labor" and established specific work conditions that must be satisfied before goods made by incarcerated persons could be moved in commerce. *Id.* at 343-44, 352; *see also* 18 U.S.C. §§1761(a), (c)(2). In upholding the law, the Court explained that Congress "is as free as the states to recognize the fundamental interests of free labor" and by passing the statute, "has not sought to exercise a power not granted or to usurp the police powers of the states." *Kentucky Whip*, 299 U.S. at 352. The same is true here: Congress has a legitimate interest in ensuring that labor is not coerced and the TVPA, in barring the coercion of labor through threats of violence and other prohibited means, does not usurp the states' police powers.[24]

---

[24] Progressive Finishes also advances a baseless argument that the TVPA is "unconstitutionally vague" as applied to it because it does not understand what conduct is prohibited by the TVPA. Dkt. 242 at 23. Such an argument was soundly rejected in *Calimlim*, 538 F.3d at 710-11, which noted its conclusion was "consistent with the one that the Supreme Court reached in *Screws* [*v. U.S.*, 325 U.S. 91 (1945)] and *Hill v. Colorado*, 530 U.S. 703 [(2000)], which rejected vagueness challenges to statutes requiring scienter."

### C.    The FAC Contains Sufficient Allegations of TVPA Violations By Each Defendant

#### 1.  ADOC Commissioner Hamm

Defendant Hamm recognizes that Plaintiffs bring TVPA claims against him in his official capacity as ADOC Commissioner for ADOC's role in both providing and obtaining labor of the individual plaintiffs and the putative class through means prohibited by the TVPA, including violence, physical restraint, and serious harm, and threats of the same. *See* Dkt. 234 at 19. Despite this, Hamm does not address a single allegation of these forms of coercion other than the implementation of Defendant Ivey's Executive Order, beyond a single sentence, in which he contends that it should be "impl[ied]" that any action taken in his official capacity is within his authority—and thus, Hamm suggests, not a violation of the TVPA. *Id.* at 20-21. Even if that were the law (and it is not), any "implied" alternative facts the Court might be tempted to consider is trumped by Plaintiffs' specific allegations to the contrary, which detail unlawful coercion of incarcerated individuals' labor.

The Amended Complaint is replete with allegations that Defendant Hamm, in his official capacity as the head of Alabama Department of Corrections, both obtains and provides labor from Plaintiffs through all four prohibited means of coercion.

### a. ADOC *Obtains* Plaintiffs' Labor Through Prohibited Means

ADOC has required all individual Plaintiffs to provide labor "in-house" for the benefit of ADOC.[25] FAC ¶¶293-303.[26] The FAC lays out how ADOC obtains this work through prohibited forms of coercion in discrete sections, replete with detailed allegations[27]—all of which Hamm ignores. Below, Plaintiffs provide a shortened summary of these allegations, showing the FAC meets the pleading standard.

***Obtaining labor through violence and threats of violence.*** The FAC describes the ways in which violence and the threat of violence is used to coerce Plaintiffs to work for ADOC. One key method is that Plaintiffs are expected to "work their custody down," which means that they are told that only by working for ADOC for free, and without complaint, in the incredibly violent high-security facilities will they become eligible for a transfer to a less dangerous facility. *See* FAC ¶233 (alleging "regular and consistent practice by ADOC of having its representatives use the threat of being transferred to, or being left in, dangerous facilities as a mean of coercing work"); *id.* ¶234 ("Only by performing work for ADOC, without pay and under threat of violence ..., do incarcerated individuals become eligible for transfers

---

[25] Because ADOC jointly controls the labor of Plaintiffs who are forced to labor for public and private employers, *see* FAC ¶¶361-62, 372-79, 449-62, 479, 504-05, 560, 775, 787, it is both "providing" and "obtaining" that labor. Plaintiffs address the coercive means through which this labor outside prison walls is provided in the following section.

[26] Although Hamm attempts to minimize this labor as "chores," Dkt. 234 at 7, as detailed above, the FAC makes plain that the labor compelled by ADOC from Plaintiffs is not "basic personal housekeeping tasks," but rather extensive work throughout the ADOC facilities, much of which previously was performed by paid ADOC guards and staff. *See supra* n. 20.

[27] *See* FAC ¶¶306-41 (addressing ADOC's use of (a) transfers and threats of transfer to more dangerous facilities to coerce work, (b) physical violence and threats of violence, (c) deprivation and threat of deprivation of necessities, (d) deprivation and threat of deprivation of family contact, (e) solitary confinement and the threat thereof, (f) imposition and threat of longer incarceration).

to lower-security facilities"). ADOC uses transfers and the threat of transfer to dangerous facilities—or to more dangerous dorms—as a means of coercion and punishment. It is common knowledge at ADOC and among incarcerated individuals that they must work for free to get out of the facilities or areas[28] where there is a significant risk of death and serious harm.[29]

Once an individual is in a less dangerous facility or area, if they "state[] that they are unable or unwilling to perform the unpaid 'in-house' work ADOC requires of them, ADOC can use that as a basis" for "transferring and threatening to transfer [them] … to more dangerous facilities." FAC ¶308.[30]

In addition to their detailed description of how ADOC leverages the violent conditions in its prisons to coerce Plaintiffs' labor, Plaintiffs allege that ADOC

---

[28] Even within higher security facilities, the threat of violence compels Plaintiffs to work for free, so as to gain access to less dangerous areas of the facilities. FAC ¶324 ("Accepting a job—ideally outside the walls of medium- and high-security facilities, but also in any position that physically removes an incarcerated person from the most dangerous areas in those facilities—is the *only* way to escape the serious threat of physical harm, even temporarily," emphasis added); *see also id.* ¶71 (Plaintiff Pritchett worked without pay to "temporarily escape the horrific conditions within the dorms"); *id.* ¶294 (Plaintiff Moore has provided highly skilled labor without any compensation for decades just "to spend time during the day away from more violent areas of the prison"); *id.* ¶121 (R. Clark worked as "runner" for ADOC to "stay out of the extremely violent dorm he was placed in"); *id.* ¶173 ("fear of getting transferred to a more dangerous facility makes [Bullock] feel compelled to work"); *see also id.* ¶¶49, 121, 173, 233, 235-38, 271-74, 297, 308-12, 319, 324.

[29] *See* FAC ¶272 ("Across the state, ADOC tells and demonstrates consistently and systematically to incarcerated people that if they don't work, they will be punished by remaining in, or being returned to, the violent and inhumane facilities and dorms ADOC created and maintains, where incarcerated people face a clear and present danger to their survival"); *see also id.* ¶310 (Plaintiff Mason, a former police officer, threatened with transfer to dangerous general population dorm for not wanting to work job that requiring unlawful conduct); *id.* ¶¶12, 59, 250-70 (detailing prevalence of assaults, stabbings, extortion, and sexual violence in ADOC facilities); FAC Part II.

[30] *See also* FAC ¶58 (describing how ADOC will "'ship' people back behind the fence [to higher-security facility] for purported refusals to work"); *id.* ¶157 (if Plaintiff T. Clark "misses a day of work, he will lose all his privileges and be sent to a Level 4 facility," which he describes as a "death trap" where "his life would be at risk"); *id.* ¶274 ("individuals who are unable to work because they are sick or injured frequently are cited and punished for refusing to work," including through "downgrading of custody levels … and transfers to dangerous facilities and dorms").

personnel themselves inflict violence to enforce the requirement that Plaintiffs work.[31]

Plaintiffs' allegations are an ample basis for this Court to infer that incarcerated workers are subject to violence and threats of violence used to coerce them to labor for ADOC. Hamm argues that he should be permitted to coerce labor from incarcerated persons so long as it serves a legitimate purpose, Dkt. 234 at 21, but he articulates no purposes at all. Further, there can be no legitimate purpose behind slapping people, threatening to return someone to an area in which he was previously raped, threatening to return workers to facilities with daily physical violence, or any other of the forms of violence and threats detailed in the FAC.[32]

***Obtaining labor through serious harm and threat of serious harm.*** The FAC also details how ADOC obtains Plaintiffs' labor through imposition of serious harm and threats of serious harm. While the violence and threats of violence fall within this category, Plaintiffs who fail to work for ADOC are also placed in solitary confinement, FAC ¶¶334-37, which inflicts a psychological harm that the TVPA recognizes as "serious harm." 18 U.S.C. §1589(c)(2); *see Barrientos*, 332 F.Supp.3d at 1309 (labor coerced through threat of solitary confinement).

---

[31] *See* FAC ¶¶32, 150, 273, 318, 321-22 (ADOC officials beat and slapped people who did not want to work); *id.* ¶302 (Cole "threatened with being physically beaten or forced to fight other incarcerated people if he refused" to work in-house cutting grass); *id.* ¶317 ("gladiator school" was "well-known" and "consistent practice of guards forcing incarcerated people to fight each other if they refused to work"); *see also id.* ¶320 (ADOC officers ordered men to "strip naked" and stand in a line while the officers slapped them as punishment); *see generally id.* ¶¶308-23.

[32] *See supra* n.31; FAC ¶¶9, 26, 27, 30-32, 47, 58, 60, 63, 82, 91, 97, 109, 110, 112, 119-20, 129, 130, 145-46, 152, 157, 166-69, 173-76, 180, 187 (threats of violence compelling labor).

Plaintiffs also allege that the economic component of the coercion seriously impacts Plaintiffs' health. Plaintiffs describe the way in which ADOC uses the deprivation and threat of deprivation of necessities, which must be purchased, to coerce work. FAC ¶¶325-30. One way this coercion operates is that, in order to earn any money, Plaintiffs need to "work their custody" down so they are eligible for placement in less violent facilities and jobs that, even if they pay very little, pay something. *See supra* at 28-29. Additionally, ADOC will restrict access to the canteen as punishment for a failure to work. FAC ¶327 (Mason's access to canteen restricted for 60 days "after refusing to do a job he was nearly killed doing").

Finally, it is well-known that ADOC punished incarcerated persons in 2022 who withheld their labor by intentionally refusing to provide them with sufficient food, an example that serves as "an ongoing threat of the sort of consequences that will follow any refusal by incarcerated individuals to work." *Id.* ¶329.

***Obtaining labor through physical restraint, threats of physical restraint, and abuse of law.*** ADOC also obtains labor through the prohibited means of threats of physical restraint, physical restraint, and abuse of law. A "threat of additional confinement" qualifies as a threat of "physical restraint" within the meaning of the TVPA. *Bridges*, 487 F.Supp.3d at 1261. ADOC regularly imposes discipline and threatens to punish anyone perceived as withholding their work, with the understanding that such discipline will have severe consequences for individuals' ability to transfer away from violent facilities or to secure parole.[33] ADOC (and State

---

[33] FAC ¶¶26, 42, 97-99, 133, 137, 232-35, 289, 339-41.

Defendants more generally) use the threat of parole denials to coerce Plaintiffs' labor: a disciplinary for failure to work can doom a person's chances of being paroled, with the Parole Board denying freedom to those who refused (or were perceived as refusing) to labor for the benefit of ADOC.[34] Ivey's Executive Order and ADOC regulations also harshly penalize withholding of work, including subjecting individuals to loss of good-time credits (thus extending their terms of incarceration) and solitary confinement. FAC ¶338.[35]

*Obtaining labor through a scheme intended to cause the belief that Plaintiffs would suffer serious harm and physical restraint.* Plaintiffs' allegations detail how the organization of work and custody status maintained by ADOC is used by ADOC personnel to lead incarcerated individuals, including Plaintiffs, to believe that they must perform labor for ADOC in order to have a chance of leaving life-threateningly dangerous medium- and high-security facilities or to get out of the most dangerous areas of those facilities. *See supra* nn.28-30.

---

[34] *See* FAC ¶¶42, 98, 120, 131, 133, 149, 183, 274, 306, 338-41, 388, 471, 474, 602, 668-70.

[35] Under ADOC regulations, an incarcerated individual who refuses to work may be punished by restrictive housing, which generally means solitary confinement, for up to 30 days and losing "a minimum of 720 accrued good-time days," equivalent to a *two-year* extension of the person's sentence. *Id.* ¶287. An incarcerated person who refuses to work—whether for ADOC or for an outside employer—can also be barred for six months from "earning additional good-time days." *Id.* If a person refusing to work is deemed to have encouraged or caused others to stop working, they lose a minimum of 1,080 accrued good time days or *three years* of extended prison time, and a one-year bar on earning good time credits. *Id.* ¶288 (citing AR 403 at 23). Hamm argues that any ADOC regulation should be deemed legitimate, but *Barrientos* teaches that even when a work program is *required* by federal law, it may still violate the TVPA if labor is coerced by proscribed means. 951 F.3d at 1275.

**b. ADOC *Provides* Plaintiffs' Labor to Other Employers Through Prohibited Means**

ADOC provides labor of Plaintiffs and other incarcerated individuals to public and private employers through its "work center" and "work release" programs. FAC ¶¶236, 362-65, 443-45. Plaintiffs have alleged facts showing that ADOC provides this labor through means prohibited by the TVPA.

***Providing labor through violence and threats of violence.*** As described above, the FAC alleges that ADOC personnel regularly threaten that Plaintiffs who are in the lower-custody work center and work release facilities will be sent back "behind the wall"—i.e., to facilities where stabbings, beatings, rapes, and murders are rampant—if they do not work for the private and public employers to whom ADOC "leases" them. *See supra* nn.28-34.[36]

Further, even if it were the case that Plaintiffs entered work-release and work-centers free of coercion (which is counter to Plaintiffs' allegations of the violence and threats of violence they endured that forced them into labor with ADOC to begin with, *supra* nn.29-30, and Plaintiffs' specific allegations they worked for these employers "[t]hrough no choice of [their] own," FAC ¶¶26, 418-20, 425-26, 439, 470, 498, 499, 508, 524, 530-31, 538, 544, 548-49, 553, 558, 565, 569, 571, 575, 583), the threat of violence that is attached to any subsequent desire not to work for

---

[36] *See also* FAC ¶382 ("refusing to work" at a Work Center employer "can lead to physical, unchecked violence if [person is] returned to the violent higher security, higher custody facilities"); *id.* ¶26 (Cole worked at RFC plant, "a job he did not request but understood he could not ask be removed from without suffering punishment from ADOC, including [the] possibility [of being] put[] back 'behind the wall'"); *id.* ¶30 (Cole "was advised directly by an ADOC warden … that if he were to withhold labor [from city employer], he would be 'put behind the wall'": "he was forced to work or give up his custody and be sent back to a more dangerous facility"); *id.* ¶196 ("extremely ill" incarcerated worker "forced to go to work by ADOC" and, "[w]hen the worker continued to be ill…, he was terminated and sent back behind the wall as punishment"); *id.* ¶¶381, 465.

private or public employers—i.e., the threat of being returned to facilities where assaults, stabbings, and other violence is rampant—violates the TVPA. *See supra* nn.30-34.

In *U.S. v. Reynolds*, 235 U.S. 133, 146 (1914), the Supreme Court considered an Alabama practice in which people convicted of crimes, who would otherwise be imprisoned or sentenced to hard labor, could instead choose to have a surety—a private party—pay their fines. In exchange, they agreed to work for the surety, but if they violated that agreement, they could be rearrested and sent back to jail. *Id.* Even though the labor contract was entered "voluntarily," the Court held that laboring under "the constant fear of imprisonment" if the contract is violated, "renders the work compulsory" in violation of the Thirteenth Amendment. *Id.* at 144-46. If the "voluntary" participation in *Reynolds* was deemed to be compulsory for purposes of the Thirteenth Amendment, participation of the individual Plaintiffs and other incarcerated persons in the work-release and work-center programs, under threat of discipline and return to higher-security facilities, must fall within the TVPA's much broader scope of prohibited coercive means.

***Providing labor through serious harm and threat of serious harm.*** Another form of coercion used by ADOC is financial coercion, whereby ADOC maintains conditions in which incarcerated people need funds to purchase basic necessities, including medical care, prescriptions, food, and clothing for work. FAC ¶¶380, 456-68. Hamm argues that the only threat made against Plaintiffs is that they earn less

and ADOC will take its cut from their pay, Dkt. 234 at 23, but that ignores the need for necessities Plaintiffs allege, among other coercion.[37]

The FAC also alleges ADOC personnel insist on Plaintiffs working for private and public employers even when they have objected to working conditions, or are sick or exhausted.[38] The FAC details that many of the jobs Plaintiffs have been forced to perform for employers are dangerous[39]—resulting in death, heat stroke and permanent disability—which lends further credence to Plaintiffs' allegations that they only work those jobs because of coercion. *Burrell*, 60 F.4th at 40.

***Providing labor through physical restraint, threats of physical restraint, and abuse of law.*** The same regulations that apply to work performed for ADOC also apply to work that ADOC requires incarcerated persons to provide to public and private employers. FAC ¶¶288-89. Thus, individuals placed by ADOC in work centers and work release facilities are subject to discipline, including solitary confinement, for failing to perform work for the public and private employers; they have good time days taken away for failing to work for these employers or being perceived as not being willing to work (when, for example, they raise concerns about

---

[37] Plaintiffs' TVPA claims also are not for failure to pay minimum wage or a challenge to Ala. Code §14-8-4(1), as Hamm tries to reframe them.

[38] *See* FAC ¶377; *id.* ¶386 (Plaintiff Walker given discipline "for purportedly refusing to work" after "providing a statement about sexual harassment" at county employer); *id.* ¶388 (Plaintiff Dandridge disciplined for "'refusing to work' when he refused sexual advances" from supervisor at public employer); *id.* ¶474 (Plaintiff Cartwright told "any failure to work, even for health reasons, will be considered a refusal to work" subject to discipline); *id.* ¶475 (Plaintiff Walker told by ADOC job placement officer to go work and "make us our 40%" despite being "so sick that she had to be carried to the healthcare unit").

[39] *See* FAC ¶¶163, 169, 172, 185, 389, 427, 524, 565, 569-71.

working conditions or do not want to work because they are sick); and they have parole denied as a result of these purported infractions. *See supra* nn.32, 34.

As to Hamm's argument that the ADOC regulations are somehow due deference and cannot be the basis of a TVPA violation because they are "legitimate" discipline, that is not the law. *See supra* at 12-17. Moreover, Plaintiffs have alleged that the purpose of the severe consequences that befall Plaintiffs when they are not able to work is to ensure that incarcerated individuals continue to labor for the benefit of ADOC and the Employer Defendants and do not raise concerns about their working conditions.[40] This manipulation of "discipline" for such ends is an abuse of legal process. *See Copeland*, 2019 WL 4307125, at *8.

***Providing labor through a scheme intended to cause the belief that Plaintiffs would suffer serious harm and physical restraint.*** The FAC alleges that ADOC provides labor to private and public employers through a pattern of threatening incarcerated workers with violence, serious harm, and physical restraint—including threats of being sent to dangerous facilities, extension of prison sentences, solitary confinement, and deprivation of necessities. FAC ¶¶381-90, 465-79. This is a quintessential scheme intended to instill the belief in others that they will be subject to serious harm and physical restraint should they refuse to work. Additionally, the FAC alleges that part of the way ADOC has implemented this scheme has been by making examples of prominent opponents of the forced labor system who refuse work, depriving them of food and subjecting them to life-threatening conditions. *Id.*

---

[40] FAC ¶¶366, 403, 406, 417, 424, 431, 434, 438, 446, 495, 497, 507, 518, 523, 529, 537, 543, 547, 552, 557, 564, 568, 574, 582.

¶¶326, 336-37 (ADOC's violent treatment of strikers well known among incarcerated persons); *see Copeland*, 2019 WL 4307125, at *8 (threats to prisoners plausible based on prisoners' experience in system).

### c. ADOC Knowingly Benefits and Attempts to Benefit From Participation in a Venture It Knew or Should Have Known Violated the TVPA

While ADOC is a primary perpetrator of the TVPA violations, it also is a knowing beneficiary of its venture with work-release and work-center employers. Plaintiffs have plausibly alleged that Hamm, as ADOC Commissioner "(1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVP[]A as to the plaintiff[s], and (4) [Hamm] had constructive or actual knowledge" of that fact. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). As described above, ADOC has knowledge that it is providing labor to private and public employers through threats of violence and other proscribed means, in violation of the TVPA, satisfying the third and fourth prongs. *Supra* at 33-37. Plaintiffs have alleged facts that easily satisfy the first two prongs: ADOC reaps enormous financial and operational benefits through its work-release and work-center programs, and the commercial relationships it has with the participating employers is a common undertaking for economic gain. FAC ¶¶2, 407-12, 490-92; *see also id.* ¶¶403, 493-94 (describing benefit to participating employers of a

compliant, at-demand workforce); *see also Red Roof*, 21 F.4th at 725-26; *J.H. v. Paramount Hosp. LP*, 2025 WL 2201051, at *4 (N.D. Tex. Aug. 1, 2025).[41]

### 2. Private and Public Employer Defendants

The FAC clearly alleges facts that run to all Employer Defendants, and then sets forth additional allegations relating to specific Defendants. The common allegations, on their own, are sufficient to state a claim against each employer.[42] Plaintiffs address these common allegations first, before turning to individual issues.

***Obtaining Labor Through Prohibited Means.*** The FAC explains that Plaintiffs who have "work[ed] their custody down" by "perform[ing] compelled in-house work for ADOC in its medium- and high-security facilities," are transferred to "'Work Centers' and 'Work Release centers,'" where they are compelled to work for public entities and private companies, respectively." FAC ¶361; *supra* n.28.

Plaintiffs allege that each Defendant obtained the labor of incarcerated persons through means proscribed by the TVPA, including threats of violence, extended and solitary confinement, and serious harm, including financial harm. *See generally* FAC ¶¶271-90, 361-590. Plaintiffs allege each Defendant "was aware that incarcerated workers did not have the freedom to refuse or choose the work assigned to them by ADOC." *Id.* ¶¶367, 447.

---

[41] The FAC also adequately alleges that Hamm is a knowing beneficiary of his venture with Ivey (as is Ivey), given their joint efforts to compel unpaid labor from ADOC's in-house population, reaping significant economic benefits from staffing ADOC facilities with free, coerced labor. FAC ¶¶342-48.

[42] As stated in the FAC, Plaintiffs allege violations by each Private and Public Employer Defendant of 18 U.S.C. §1589(a)(1), (2), and (4), but not paragraph (3); and violations of 18 U.S.C. §1589(b). FAC ¶¶767, 769, 772, 784.

The general tenor of many Defendants' motions to dismiss is that these allegations are not plausible and should be discounted, but the numerous additional allegations in the FAC belie any such conclusion.

First, Plaintiffs allege each Employer Defendant enters into an agreement with ADOC—the Work Release Program Employer Agreement, for Private Employer Defendants, and the Inmate Government Work Project Service Agreement ("Work-Center Agreement") for Public Employer Defendants. FAC ¶¶373-74, 452. Both agreements require the employing entity to enforce all ADOC rules and regulations. *Id.* ¶¶377, 455. Both agreements require Defendant to provide notice to ADOC if an incarcerated person "fails to follow any rule, or *refuses to work as requested*" upon the incarcerated person's "return to" the work-center or work-release facility. *Id.* (emphasis added). Each Defendant has thus agreed to report to ADOC incarcerated people who fail to work or advocate for others to withhold work (in violation of ADOC regulations), and thereby subject workers to the coercive consequences, including violence and extended detention, described above. *Supra* nn.29-35.

Plaintiffs further plausibly allege that private and public employers are required and expected to communicate regularly with ADOC, through Job Placement Officers, and that through this close contact, each Defendant[43] is aware or should be aware that reporting a worker as being defiant, or failing to work, or not performing a task as required, carries with it the threat that the worker will be

---

[43] *See* FAC ¶¶394-95 (allegation re: all Public Employer Defendants); ¶423 (ADOT); ¶430 (Montgomery); ¶433 (Troy); ¶437 (Jefferson County); ¶442 (Governor); ¶¶465-70 (allegation re: all Private Employer Defendants); ¶506 (Gemstone); ¶517 (Ju-Young); ¶522 (SL Alabama); ¶528 (Hwaseung); ¶536 (Progressive Finishes); ¶542 (McDonald's/CBAK)); ¶546 (SRG); ¶551 (KFC); ¶567 (SMI); ¶573 (Koch); ¶581 (Bama Budweiser); ¶586 (Paramount).

sent "behind the wall" to more violent ADOC facilities, or the report will add time to workers' term of incarceration (either through loss of good time credits or adverse consequences for parole).[44] This meets Plaintiffs' burden to plead that Employer Defendants are obtaining labor through proscribed, coercive means.

Multiple Defendants argue that Plaintiffs' allegations are implausible, *see, e.g.*, Dkt. 227 at 13, but they are not. Defendant Employers had regular interactions with ADOC and the incarcerated workers.[45] Plaintiffs allege that Defendant Employers' supervisors threatened workers that, if they "refused to work or if supervisors found their quality of work unsatisfactory," they would report them to ADOC and were aware that doing so carried the threat of the workers being sent to more dangerous facilities and the workers being exposed to violence and harm.[46]

That Employer Defendants each agreed to report violations, and threaten to do so, also means they agreed to threaten the serious financial harm incurred if incarcerated persons were to lose their source of (minimal) income, which is needed to cover necessities like medical care and clothing. *See* FAC ¶¶380, 456-68, 464, 458; *Lesnik*, 374 F.Supp.3d at 952 (financial threat prohibited means of obtaining labor).

---

[44] FAC ¶¶422, 427, 429, 432, 436, 441, 500, 515, 521, 527, 535, 541, 545, 550, 554, 562, 566, 572, 578, 585.

[45] FAC ¶¶417, 423, 424, 430, 431, 433, 434, 437, 438, 442, 497, 506, 507, 517, 518, 522, 523, 528, 529, 536, 537, 542, 543, 546, 547, 551, 552, 556, 557, 563, 564, 567, 568, 573, 574, 581, 582, 586.

[46] *See supra* n.44. These allegations are buttressed by the numerous examples provided by Plaintiffs of supervisors specifically invoking these threats. *See id.* ¶¶501, 502, 541, 560, 580, 584.

***Knowing Beneficiary.*** In addition to alleging Employer Defendants are "perpetrators," Plaintiffs also adequately plead a "beneficiary" claim against each Employer Defendant because they plausibly allege that each Employer Defendant knowingly participated in an undertaking with ADOC that involved risk, potential profit, and the coercion of Plaintiffs' labor, and benefited from that participation.[47]

For each Private Employer and Public Employer Defendant, the Work Release and Work Center Agreements, respectively, establish the existence of an undertaking or enterprise involving risk and potential profit. *Red Roof*, 21 F.4th at 719. The Private Employer Defendants contract with ADOC and agree to pay ADOC to supply workers: this is a commercial transaction with a potential (and intended) financial benefit for both ADOC and the private employers. FAC ¶¶452-55, 494, 497, 507, 518, 523, 529, 537, 543, 547, 552, 557, 564, 568, 574, 582. Similarly, for each Public Employer Defendant, the Work-Center Agreement represents an undertaking for the financial benefit of both ADOC and the employing entity. *Id.* ¶¶374-80; *see also id.* ¶¶417, 424, 431, 434, 438.

The FAC alleges, on information and belief, that each Employer Defendant "sought pliant workers who could be requested when needed, easily directed and controlled, who would not complain about their wages, benefits or working conditions, and who would have good attendance given the threat of discipline for failure to work." FAC ¶¶366, 446. And, as further alleged, the Employer Defendants benefit from having a workforce that is jointly controlled with ADOC: ADOC

---

[47] *See, e.g.*, FAC ¶¶394-96, 399-401, 403, 405, 465-67, 483, 484, 486-88, 493-95.

supplied the workers on-time, prohibited the workers from refusing to work, and ensured—through threats of dire consequences—that the workers would not raise concerns about their working conditions. *See, e.g.*, *id.* ¶¶366, 403, 406, 446, 495. Nor are the Employer Defendants somehow passive participants in this undertaking: the FAC alleges that they interact directly with and supervise the incarcerated workers laboring on their worksites, interact regularly with ADOC about the workers, and are required to enforce ADOC regulations, including by reporting any failure to work as requested. *Id.* ¶¶374-80, 452-55; *see supra* n.45.

Plaintiffs allege that each of the Employer Defendants has a multi-year history of participating in ADOC's work-release program, understands ADOC's rules and regulations, understands the Employer Defendant's obligation to report any failure of incarcerated individuals to work, and understands the consequences of such reporting for the individuals.[48] Given the express provisions of the ADOC agreements, Plaintiffs' allegation of knowledge, actual or constructive, is more than plausible. *Red Roof*, 21 F.4th at 726 (for beneficiary liability, knowledge of prohibited coercion may be constructive or actual).

Finally, the FAC alleges that each Employer Defendant knows that the incarcerated individuals they employ receive only a fraction of the amount paid to ADOC for their labor, and that their incarcerated workers cannot refuse the low wages and (particularly for those employed by private employers) ADOC

---

[48] *See supra* n.45; FAC ¶¶378, 383, 566, 467; *see also id.* ¶¶114, 129, 137, 169, 183, 196, 275, 385, 392, 394-96, 399, 401, 406, 417, 422, 423, 427-28, 469, 483, 486-89, 495, 500, 509, 513, 521, 527, 535, 540, 545, 549, 554, 561, 566, 572, 578, 584.

deductions. FAC ¶¶380, 394, 399-401, 451-52, 455-58, 460-62, 467. The Employer Defendants' awareness that Plaintiffs are laboring under such adverse economic terms further bolsters Plaintiffs' allegation that the employers were aware Plaintiffs' labor was being provided under coercive conditions. *See Burrell*, 60 F.4th at 40 (knowledge of poor working conditions supported reasonable inference that defendants knew venture was using prohibited means of obtaining labor); *Paramount Hosp.* 2025 WL 2201051, at *4-5 ("overt indicators" of trafficking enough to allege knowledge for TVPA claim).[49]

**Cooper/ADOT.**[50] ADOT Director Cooper has been one of the largest beneficiaries of the coerced labor scheme, with ADOT supplying nearly 1,000 workers to DOT in recent years. FAC ¶205.

Other than arguing that the TVPA should not apply to him, Cooper's sole arguments are that the Court should not credit Plaintiffs' allegations that Cooper, as ADOT Director, was aware or should have been aware that Plaintiffs' labor was coerced, and that ADOT did not benefit from its arrangement with ADOC. Dkt. 239 at 19. First, as relevant to both "perpetrator" and "beneficiary" liability, the FAC

---

[49] Multiple Employer Defendants challenge Plaintiffs' standing to assert TVPA claims by disclaiming any participation in, or knowledge of, the threats of violence, serious harm, and other proscribed coercion of Plaintiffs' labor. While Plaintiffs address standing *infra*, Part VI, it is important, as a baseline, to understand that Plaintiffs need not plead that they were "*personally* threatened by or in the presence of" an Employer Defendant representative "to plead a particularized injury traceable to [the company]….[r]ather, [they] need only show that they have suffered an injury in fact, traceable to the challenged conduct and likely to be redressed by a favorable judicial decision." *Ruelas v. Cnty. of Alameda*, 2021 WL 12144269, at *4 (N.D. Cal. June 24, 2021), *rev'd in part on other grounds*, 108 F.4th 1208 (9th Cir. 2024) (internal quotations and citations omitted; emphasis in original).

[50] Plaintiffs Pritchett, Campbell, and Dandridge have standing to bring the TVPA claims against ADOT Director Cooper, on their own behalf and those similarly situated, FAC ¶¶418–20; as do the organizational plaintiffs, *see infra* Part VI.B. *See also Martin v. Kemp*, 341 F.Supp.3d 1326, 1333 (N.D. Ga. 2018) (only one plaintiff with standing needed for injunctive relief)

clearly and plausibly alleges that Cooper and ADOT knew or should have known that Plaintiffs Cole, Ptomey, Campbell, Pritchett, Dandridge, and other incarcerated workers labored under ADOT's harsh conditions because they were compelled to do so through threats of being returned to violent facilities, threats of discipline that would extend their sentences or subject them to harm, and other proscribed means. FAC ¶¶421-22 (ADOT incarcerated worker told his "choices were to work on the roads or 'be put behind the fence'—a direct threat to send him to a more dangerous and violent facility unless he worked for ADOT"); *id.* ¶420 (Dandridge's ADOT supervisor threatened workers with firing if they did not engage in unlawful conduct, "while knowing that [workers] would be disciplined and not make parole if they were fired"); *see also id.* ¶¶31, 41, 54, 71, 96, 205. And there can be no doubt that ADOT is a "beneficiary": the FAC alleges a long-standing arrangement between ADOT and ADOC that is to the benefit of those agencies, and even describes ADOT's agreement to "lease" individuals from ADOC, trading a piece of land for persons' labor. *Id.* ¶¶411, 423; *see also id.* ¶410 (ADOT spent $2.5 million between 2017 and 2023 "leas[ing]" incarcerated persons … to perform jobs that would otherwise be performed by state employees" at a price of $15 per day per person). Cooper asks the Court to find these arrangements were of no benefit to ADOT. Dkt. 239 at 20; *but see* FAC ¶412 (economic benefit of more than $12.5 million for 2017-2023 alone and describing dangerous, sometimes fatal, "work that would be difficult,

if not impossible, to find free workers to perform"). Not only is Cooper's argument implausible, but there is no basis for such factfinding at this stage.[51]

**Montgomery.**[52] Montgomery makes the audacious argument that Plaintiffs' allegations of coercion, threats of violence and harm, and unsafe working conditions, must be disregarded as a legal matter because, it asserts, the city did nothing more than "take part in the State-sanctioned work-center program." Dkt. 236 at 22. Montgomery's argument is squarely foreclosed by *Barrientos*, which held that even a federally required work program does not remove it from the TVPA's prohibition on coercion of labor. 951 F.3d at 1277. Montgomery also asks the Court, apparently as a factual matter, to find it could not have had knowledge, actual or constructive, of the harm that would befall individuals assigned to work for it by ADOC who did not wish to do so. But not only are the many common allegations discussed *supra* at 38-42 to the contrary, but the FAC details how Montgomery supervisors have written up workers for failing to work to the city's satisfaction or for being sick, telling workers "they could face future discipline, including transfer to a more dangerous facility and loss of privileges"; and, that supervisors "were aware of the conditions at the facilities and prevalent violence in the prisons, because incarcerated people would discuss such incidents on the job." FAC ¶¶427-28.

---

[51] Cooper also asserts that, to his knowledge, incarcerated workers' participation in the "Work Release" program "is voluntary." Dkt. 239 at 20. It would be inappropriate for the Court to consider Cooper's unsubstantiated representations and to credit them over Plaintiffs'.

[52] Plaintiffs Cole, Bullock, and Ptomey have standing to bring the TVPA claims against Montgomery, on their own behalf and on behalf of those similarly situated. FAC ¶425. Montgomery's factual arguments to the contrary are not well taken, and essentially rest on the contention that because Plaintiffs allege they worked for "Montgomery," not the "*City of Montgomery*," they must secretly reference a different entity.  Dkt. 236 at 15-18. Montgomery even admits that Ptomey alleges he worked for the City. *Id.* at 18.

Montgomery also challenges, again on a factual basis, Plaintiffs' city-specific allegations that work for Montgomery was "physically grueling and required long, irregular hours while often exposed to the elements," arguing that Plaintiffs should not be believed unless, absurdly, they provide the details of their hours and the weather conditions. Dkt. 236 at 9. Simply because Montgomery's legal brief asserts that work is not grueling or that it cannot be true that, as Plaintiffs allege, "[t]he City ignored complaints from incarcerated workers that their working conditions felt unsafe," does not make it so. *See* Dkt. 236 at 12 (asking Court to discount as a "sad story" worker's injury that resulted in a loss of an eye); *see also* FAC ¶¶277, 427.

Plaintiffs have more than adequately pled Montgomery's "perpetrator" and "beneficiary" liability: it obtained laborers from ADOC; city supervisors used the threat of reporting workers to ADOC as a way to compel their labor; the city knew or should have known that ADOC was providing individuals for the city's workforce through threats of violence, harm, deprivation of necessities, and other proscribed means; and benefited from its arrangements with ADOC. FAC ¶¶206, 277, 409, 424-30, 784; *see also id.* ¶413 (wage savings of $3.7 million between 2018 and 2024).

**Troy.**[53] The City of Troy argues that because Plaintiffs allege that Pritchett and other incarcerated individuals were compelled to work for it through threats that they would be harmed *by ADOC* and not by Troy itself, it could not have engaged in proscribed coercion. Dkt. 237 at 14. That argument misunderstands the TVPA. *See supra* n.49. Troy's alleged conduct—including "regular threat[s]" of violence, loss

---

[53] Plaintiff Pritchett clearly has standing to bring the TVPA claims against the City of Troy, on his own behalf and those similarly situated. FAC ¶432.

of privileges, extension of sentences, and solitary confinement to Pritchett and other class members, to say nothing of its multi-year contractual relationship with ADOC—establish perpetrator liability. FAC ¶¶432-33. Plaintiffs' allegations, both common and specific to Troy, establish that Troy was a knowing beneficiary of Pritchett's and others' coerced labor. *Id.* ¶¶207, 431-32; *supra* at 41-43.[54]

**Jefferson County**.[55] Jefferson County first focuses its arguments on erroneously claiming that Plaintiff Walker has not alleged an injury connected to the County: Walker plausibly alleges that the County knowingly benefited from its arrangement with ADOC to compel Walker to labor for it and that Walker was injured by this. Dkt. 235 at 12; FAC ¶¶19, 208, 435, 784. Next, the County argues Plaintiffs must plead that ADOC's work program has been "determined by a court or by legislative action to be illegal." Dkt. 235 at 12. But the relevant inquiry is whether the County knew or should have known that Walker and others would not have worked for the County but for fear of the harm, violence, and increased detention that would befall them if they were to refuse, not whether there has been a prior ruling as to the scheme's illegality. The County's arguments also ignore Plaintiffs' allegations that it allowed Walker to be sexually harassed by a supervisor with impunity, "regularly threatened Walker and other class members with violence, loss of privileges, extension of sentences, and solitary confinement" to compel their

---

[54] Troy also contests Plaintiffs' allegations that it benefited from participation in its venture with ADOC and that its participation reflected a custom or policy, Dkt. 237 at 12, but provides no good reason the Court should disregard the FAC's allegations. *See* FAC ¶¶207, 431, 784. Troy asserts it ceased participating in the work-release program, Dkt. 237 at 10, but that too is a fact dispute.

[55] Plaintiff Walker has standing to bring the TVPA claims against Jefferson County, on her own behalf and those similarly situated. FAC ¶435. The County asserts it no longer participates in the ADOC program, but that is a factual contention.

labor, and benefited from its participation in the coerced labor scheme, FAC ¶¶435-36, which when taken with the FAC's common allegations, are sufficient to state both perpetrator and beneficiary claims against the County.

**Bama Budweiser.**[56] Remarkably, Bama Budweiser argues Plaintiffs cannot allege perpetrator or beneficiary liability despite Plaintiffs' allegations that a Bama Budweiser supervisor personally attempted to beat Plaintiff R. Clark at the Bama Budweiser worksite for Clark's perceived failure to work; that company management knew he "would be disciplined by ADOC and face great harm" if he were fired; and that Bama Budweiser regularly used the threat of violence from ADOC to compel R. Clark and other class members to work. FAC ¶575. Given these allegations, Bama Budweiser's claim that Plaintiffs do not allege it used force or a threat of force to compel labor, Dkt. 227 at 9-10, are simply wrong. Bama Budweiser also seems to be under the misimpression that a TVPA claim cannot be based on Bama Budweiser's threats of violence on incarcerated workers if that violence is inflicted not by it (even though Plaintiffs allege that is precisely what happened), but by ADOC. *Id.* at 10; *but see Ruelas*, 2021 WL 12144269, at *6. Plaintiffs' allegations, both common and specific to Bama Budweiser, fully support their perpetrator and beneficiary claims. *See* FAC ¶¶578-81 (Bama Budweiser "was aware of the coerced nature of incarcerated workers' labor," including because it "has used incarcerated labor for decades, and supervisors would regularly discuss how incarcerated workers had no choice but to be there").

---

[56] Plaintiffs R. Clark and Campbell have standing to bring the TVPA claims against Bama Budweiser, on their own behalf and those similarly situated, FAC ¶¶575, 576.

**Koch.**[57] With respect to Koch, in addition to the common allegations, the FAC alleges that Plaintiff Evans was compelled to work despite being tired and "vomit[ing] for several days while continuing to work, because he would be disciplined if he did not continue working." FAC ¶¶167-69. And "Koch Foods supervisors made clear to Mr. Evans that termination from the job would mean reassignment 'behind the fence.'" *Id.* ¶¶169, 569.[58] Koch's claim that this does not allege coercion because "[a]ny such transfer decision had nothing to do with [it]" is without merit: the FAC alleges that Koch understood the threat of a higher security facility to be a threat of harm and violence. *Id.* ¶¶220, 572-73.[59] Koch thus used the threat of harm that would befall Evans and other incarcerated workers to ensure they kept working, rendering it liable as a perpetrator, and was clearly aware of the threats of harm that compelled Plaintiffs to work for Koch, thereby knowingly benefiting from their labor. *Id.*

---

[57] Plaintiff Evans clearly has standing to bring the TVPA claims against Koch, on his own behalf and those similarly situated. FAC ¶569. RWDSU has associational standing to bring claims on behalf of itself, Koch-employed members, and incarcerated workers it would represent. *Id.* ¶190.

[58] *See also* FAC ¶569 (alleging all incarcerated workers at Koch fell ill with this "bird flu"); *id.* ¶570-71 (incarcerated workers "required to work through any pain or illness, no matter how excruciating" and not doing so would result in citation).

[59] The FAC also alleges that Koch's working conditions were unsafe (so much so that an incarcerated worker was decapitated in 2017), and Koch should have known that individuals would not voluntarily work in these conditions. FAC ¶¶276, 569-70 (Koch "assigned incarcerated workers to the jobs it could not get free world workers to perform because of the harsh working conditions"); *see Burrell*, 60 F.4th at 40. Obtaining workers to labor in these conditions was also a benefit to Koch. FAC ¶784. Koch, like some other Defendants, also complains about allegations made "on information and belief," but Plaintiffs satisfy the liberal pleading standard with such allegations so long as they are plausible. *See Twombly*, 550 U.S. at 551 (2007) (considering information-and-belief allegation).

**RCF.**[60] RCF ignores the majority of Plaintiffs' allegations regarding its use of coerced labor and misconstrues others. The FAC plausibly alleges that RCF obtained from ADOC a coerced and pliant labor force, describing in the RCF-specific allegations how RCF required Cole[61] and other incarcerated workers to work up to 14-hour shifts as "dumpers," a job "so difficult and punishing" that free-world workers assigned to it "resigned after one week or less." FAC ¶¶497-98. Nor do the FAC's allegations of knowledge end at the point of RFC's reporting to ADOC, as RCF suggests, Dkt. 243 at 19: RCF personnel "repeatedly made comments that reflected that they were well aware of the conditions at violent and unsafe ADOC facilities 'behind the fence' and the severe physical and mental consequences that any termination of his employment with them would cause." FAC ¶26.[62] Given RCF's longstanding, involved relationship with ADOC, these allegations are plausible and support its perpetrator and beneficiary liability. *Id.* ¶¶502, 506.

**Masonite.**[63] Masonite asks the Court to disregard Plaintiffs' factual allegations regarding its supervisors' threat to report Plaintiff Cole to ADOC, knowing that such a report would subject Cole to potential violence and harm. Dkt.

---

[60] Plaintiffs Cole and McDole have standing to bring the TVPA claims against RCF, on their own behalf and those similarly situated, FAC ¶¶498-99; as does RWDSU, *see supra* n.57.

[61] RCF seeks a standard of proof that does not apply, objecting to Plaintiffs' factual allegations of McDole's abuse from RCF supervisors as being "without factual support." Dkt. 243 at 9.

[62] *See also* FAC ¶500 ("supervisors were aware that reporting incarcerated workers to ADOC would result in them being sent more dangerous and violent ADOC facilities, and knew the conditions at those ADOC facilities because Mr. Cole and other incarcerated workers told them"); *id.* ¶501 (supervisors aware that reporting person to ADOC would lead to "severe physical and mental consequences for that person"); *id.* ¶503 ("[RCF] supervisors would tell incarcerated workers that if they did not do any given undesirable or difficult task, [the supervisors] would call the camp and make the incarcerated worker get a disciplinary"); *id.* ¶504.

[63] Plaintiff Cole clearly has standing to bring the TVPA claims against Masonite, on his own behalf and those similarly situated. FAC ¶553.

247 at 9; *see also* FAC ¶¶27, 553-56. Masonite's only explanation as to why this is "implausible" is that Plaintiffs have pleaded similar facts as to other Employer Defendants. *Id.* But Plaintiffs' allegations regarding Masonite are plausible, based on Cole's individual experience and knowledge Masonite necessarily acquired through its long-term relationship and interaction with Cole, other incarcerated workers, and ADOC. FAC ¶¶31, 217, 552-53, 556. Masonite's attempt to analogize this case to *Doe 1 v. Red Roof Inns, Inc.*, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020), where the only allegations of hotel franchisors' knowledge were that there had been complaints about prostitution at the hotels, but franchisors had no interaction with plaintiffs, is unpersuasive. Dkt. 247 at 25.[64] Masonite's threats to Cole and its long-term contractual arrangement with ADOC plausibly allege liability for both the perpetrator and beneficiary prongs of the TVPA.

**Ju-Young/SL Alabama/Hwaseung (Auto Defendants).**[65] Although Auto Defendants argue that Plaintiffs have not alleged "more than receipt of a passive benefit" from Auto Defendants' participation in the venture with ADOC, Dkt. 226 at 9, Plaintiffs allege in detail how Auto Defendants knowingly obtained labor through coercive means;[66] and their knowing participation in an undertaking with ADOC that

---

[64] Masonite also makes the meritless argument that Plaintiff Cole must allege that he would not have started working for Masonite absent unlawful coercion. Dkt. 247 at 23. Cole, of course, *does* so allege, noting the imperative of "working down" his custody status, FAC ¶33; but labor can be involuntary if a person cannot stop without threat of violence or harm. *See supra* at 14-16.

[65] Plaintiffs Prewitt, Thomas, Young, and T. Clark have standing to bring the TVPA claims against the Auto Defendants, on their own behalf and those similarly situated. FAC ¶¶508, 511, 519, 524.

[66] In addition to the common allegations, the FAC includes Auto Defendant-specific allegations. FAC ¶509 ("Ju-Young supervisors would … threaten to send workers back to camp if they did not work hard enough…. Ju Young supervisors were aware of the dangerous and unhealthy conditions that incarcerated workers would be subjected to if they were fired. Supervisors also knew … that

involved the provision of coerced labor to Auto Defendants' benefit.[67] Far from passive benefits, Plaintiffs allege Auto Defendants directly receive a significant benefit from each Auto Defendant's multi-year undertaking with ADOC: an on-demand workforce of employees who cannot set their own hours, cannot complain, and cannot ask to stop working without threat of significant harm. FAC ¶¶507, 516, 525; *see also id.* ¶509. And Auto Defendants' suggestion that this was a "run-of-the-mill staffing arrangement," Dkt. 226 at 13, is simply counter to the facts alleged. Plaintiffs have adequately alleged perpetrator and beneficiary liability.[68]

**McDonald's (CBAK).**[69] Like other Defendants, CBAK urges the Court to disregard Plaintiffs' allegations regarding its knowledge of coercion. Dkt. 240 at

---

being disciplined would jeopardize workers' parole or get them sent behind the fence to more dangerous facilities."); *id.* ¶¶515-16; *id.* ¶521 (SL Alabama "regularly threatened Prewitt and other class members … if class members refused to work, questioned working conditions, or engaged in conduct SL Alabama considered disorderly or insubordinate"); *id.* ¶524 (when T. Clark "request[ed] a reassignment" from "tasks that aggravated his chronic bronchitis[,]" "Hwaseung retaliated by cutting his pay and told him if he didn't like it, he could 'go back to the camp'"); ¶525 ("incarcerated workers [at Hwaseung] were not allowed to express concerns about conditions without facing retaliation").

[67] FAC ¶507; *id.* ¶513 ("After [Young] complained about the amount of work he was being told to do for so little pay, Ju-Young management wrote him up for refusing to work…. Ju-Young was aware of the consequences incarcerated workers faced if they were reported to ADOC for any reason, and [Young] consistent saw Ju-Young call ADOC to discipline workers."); *id.* ¶¶515-18; *id.* ¶¶520-22 (SL Alabama required Plaintiff Prewitt and other incarcerated workers to perform additional work beyond what was required of free workers); *id.* ¶526 (incarcerated workers treated worse than free workers at Hwaseung).

[68] Moreover, Auto Defendants' disclaimer of a benefit is at odds with their other argument, which is that they are but one participant in a "market" for leased labor and cannot be deemed to have any control over the "supplier"—i.e., ADOC. Dkt. 226 at 12. Putting aside the offensiveness of this argument that compares the provision of workers to a market of supplies, Auto Defendants' logic fails because Plaintiffs allege that Auto Defendants chose to enter into the ventures with ADOC for their own benefit and executed agreements obligating them to report failures to work, reports they knew or reasonably should have known were a method of compelling the employees' labor. FAC ¶¶513, 520, 524.

[69] Plaintiff Quannie McCorvey clearly has standing to bring the TVPA claims against CBAK, on his own behalf and those similarly situated. FAC ¶538.

17.[70] But the FAC alleges that CBAK was aware that, if Plaintiff McCorvey refused to work for it, he would be transferred to a more dangerous facility, FAC ¶196; that workers were compelled to work even when sick and, when they could not, would be "terminated and sent back behind the wall as punishment," *id.*; and that CBAK managers treated incarcerated workers in an abusive manner such that workers could not complain without fear of harm, *id. See also id.* ¶¶541-42 ("Managers would say that there was no need to pay incarcerated workers any mind or attention when they complained because they were 'just prisoners,' and would say it was fine to give them extra work because they were incarcerated."). These allegations, together with the common allegations, establish that CBAK participated in, and was a knowing beneficiary of, the coercion of Plaintiffs' labor. *Id.* ¶¶455-60, 542.

**Progressive Finishes.**[71] Progressive Finishes puzzlingly recites in its motions the allegations concerning Ptomey, McDole, Campbell, and R. Clark, but largely ignores allegations common to all Employer Defendants, such as the impact of the ADOC contracts. Dkt. 242 at 12-13. With respect to the specific allegations regarding the four plaintiffs who worked for it, Progressive Finishes' response appears to be that no single paragraph makes out all the elements of the TVPA claim and to quibble that the allegations are not detailed enough (i.e. suggesting that Plaintiffs cannot allege that "Progressive supervisors regularly threatened" workers

---

[70] CBAK also inappropriately asks the Court to credit its assertions of fact over Plaintiffs' allegations, contending that Toni Cartwright did not work for it, Dkt. 240 at 12, and that CBAK stopped participating in the ADOC program in 2020, *id.* at 13.

[71] Plaintiffs McDole, Campbell, Ptomey, and Clark have standing to bring the TVPA claims against Progressive, on their own behalf and those similarly situated. FAC ¶¶530-33.

unless they identify specific dates), which of course is not the standard. *Id.* at 19. Progressive's choice to ignore many allegations establishing Plaintiffs' claim does not change that Plaintiffs' FAC adequately alleges Progressive's liability both as a perpetrator and beneficiary of coerced labor.[72]

**SRG (Wendy's).**[73] SRG's primary argument is that Plaintiffs have not alleged SRG knew or should have known that Prewitt, Cartwright, and other incarcerated workers who were provided to it by ADOC labored under threat of serious harm. Dkt. 249 at 12. In particular, SRG contends that the Court should not credit Plaintiffs' specific allegation that it knew that the work-release program coerced Plaintiffs to work by threatening them with being sent back to violent facilities. Dkt. 249 at 14 (citing FAC ¶466); *see* FAC ¶546. But there is no legitimate reason for the Court to discount Plaintiffs' well-pleaded allegation, and it is plausible for all the reasons discussed above. *See* FAC ¶¶215, 544-56. The FAC's allegations plainly establish that SRG knowingly benefitted from the coerced labor of Prewitt and Cartwright, and SRG has no response to Plaintiffs' allegations that its multi-year contractual relationship with ADOC included the perpetration and enforcement of Plaintiffs' coerced labor. *Id.* ¶¶455-60, 546.

---

[72] The FAC alleges Progressive knowingly obtained coerced labor, FAC ¶534; that Progressive supervisors threaten workers who question their working conditions, *id.* ¶535; that it has long participated in a venture with ADOC, *id.* ¶536; and that it "knowingly benefits, financially and otherwise, from its exploitation of [a] coerced workforce: incarcerated persons are forced to perform difficult and dangerous manufacturing work and engage in other coerced labor to benefit the company." *Id.* ¶213.

[73] Plaintiff Prewitt has standing to bring the TVPA claims against SRG, on his own behalf and those similarly situated. FAC ¶544.

**KFC.**[74] KFC's suggestion that the FAC's allegations regarding its knowledge of compelled labor are insufficient, Dkt. 244 at 5, should be rejected. *See* FAC ¶¶547-51.[75] KFC also remarkably argues that Plaintiffs need to "provide[] … detail as to the actual types of violence" threatened by ADOC, Dkt. 244 at 5, even though the FAC has extensive detail about the prevalence of assaults, stabbing, rape, and more in the high-security facilities. *See* FAC ¶¶37, 65, 100, 125, 251-63, 270.

**Southeastern Meats (SMI).**[76] SMI makes many of the same unpersuasive arguments as other employers, but also argues that it cannot be liable for coercion of Plaintiffs Morrissey, Walker, and Cartwright's and other incarcerated workers' labor because ADOC, not SMI, *assigns* workers to SMI. Dkt. 248 at 5. But that is merely the difference between obtaining and providing labor through coercive means. Plaintiffs allege that they were assigned to SMI through no choice of their own, endured harsh and unhealthy conditions, and were compelled to continue working for SMI under threat that they would be reported to ADOC for questioning working conditions. FAC ¶¶564-67. SMI's objection that Plaintiffs have not demonstrated the requisite intent behind its plan to obtain a coerced workforce, Dkt. 248 at 9, is belied by Plaintiffs' allegations of SMI's knowledge, its interest in obtaining a compliant workforce, and its long-term relations with ADOC. FAC ¶¶219, 564, 567.

---

[74] Plaintiffs Campbell and Ptomey have standing to bring the TVPA claims against KFC, on their own behalf and those similarly situated. FAC ¶¶548, 549.

[75] In addition to the common allegations, the FAC alleges that KFC threatens to report workers and actually reported Plaintiff Ptomey. FAC ¶¶341, 471 (Ptomey received disciplinary for "being fired from a job," leading to deprivation of privileges and parole denial); *id.* ¶549 (KFC's awareness of consequences of terminating Ptomey and others); *see also id.* ¶¶215-16, 550-51.

[76] Plaintiffs Walker, Cartwright, and Morrissey have standing to bring the TVPA claims against SMI, on their own behalf and those similarly situated. FAC ¶565.

**Paramount.**[77] Paramount's primary argument is that it is ADOC, not Paramount, that compels Plaintiffs to work, and that Paramount has no part whatsoever in the venture. Dkt. 245 at 6. For all the reasons stated above, that is not a fair reading of the FAC. In addition to the common allegations, the FAC alleges that Paramount subjected Plaintiffs Cartwright, Morrissey, and others to "poor working conditions" and "abus[e]", treated them "worse than free world workers," and Plaintiffs "had no choice but to continue working for [its] benefit." FAC ¶¶583-86.

**Cast.**[78] Cast's arguments track those of other Employer Defendants, challenging Plaintiffs' allegations of knowledge despite the FAC's detailed common allegations and Cast-specific allegations, including that Plaintiff Jarmon, whom ADOC supplied to Cast, was coerced to work through prescribed means. Dkt. 251 at 9; *but see* FAC ¶¶162-63, 218, 557, 560-63.[79] Cast attempts to analogize Plaintiffs' allegations to *Taylor*, 110 F.4th at 1034, but the plaintiff's allegation there that he was threatened with re-incarceration for non-participation in a rehabilitation program is vastly differently from the threats to expose Plaintiffs to extreme violence and risk of serious harm. FAC ¶¶163, 561-63. *Barrientos* is the more appropriate

---

[77] Plaintiffs Cartwright and Morrissey have standing to bring the TVPA claims against KFC, on their own behalf and those similarly situated. FAC ¶583.

[78] Plaintiff Jarmon has standing to bring the TVPA claims against Cast, on his own behalf and those similarly situated. FAC ¶558.

[79] Cast also argues that the Court should disbelieve Plaintiffs' allegation that Private Employers were aware ADOC deducted a fee of 40% of the gross wages paid by the employer, Dkt. 251 at 13 (citing FAC ¶482). There is no good basis for the Court to disregard this well-pleaded allegation.

analogy: plaintiffs were threatened with being sent to the unsanitary and dangerous "Chicken Coop" if they refused to work. 332 F.Supp.3d at 1308.

### 3. Ivey, Marshall, and Parole Board Members

Defendants Ivey, Marshall, and the Parole Board Members each contend that Plaintiffs have failed to state a TVPA claim against them. First, Plaintiffs have stated a claim against Ivey and Marshall for their role in subverting the Alabama parole system in order to secure the state's access to cheap labor. Indeed, Ivey and Marshall admit that Plaintiffs allege this, Dkt. 229 at 23, but insist they were acting in furtherance of public safety. That is yet another factual dispute that this Court cannot reach and is belied by Plaintiffs' direct allegations—supported by data—that the public safety justification is pretext. FAC ¶¶656, 699, 707, 713, 714, 719.[80] Ivey has personally compounded the harm with her executive order dramatically increasing the punishment for refusing to work, a measure she admits was a response to incarcerated workers' efforts to draw attention to their deplorable living and working conditions. *Id.* ¶¶282-90. This conditioning of workers' freedom on their willingness to perform often unpaid, backbreaking labor is precisely what the TVPA was intended to prevent. *See Barrientos*, 332 F.Supp.3d at 1309.

Plaintiffs have also stated a TVPA claim against Ivey in relation to her capacity as the resident, owner, and director of the Governor's Mansion. *See* FAC ¶¶438-42. Ivey protests that the work conducted by Plaintiff Bullock on the

---

[80] While Ivey and Marshall argue that Plaintiffs do not have standing to bring their TVPA claim because they do not have standing to bring their parole-related claims, Dkt. 229 at 18, that is mistaken because Plaintiffs do have standing to bring those parole claims against these Defendants. *See infra* Part XII.

Governor's Mansion is a benefit that accrued only to the Mansion Authority, not the Governor, Dkt. 229 at 29; but the Authority does not control work involving the Mansion's private living quarters (for the Governor's benefit), and is completely subject to the Governor. *See* Ala. Code §41-9-542(d); FAC ¶¶172-73, 200, 439.

Finally, Plaintiffs have stated a claim against the Parole Board Members for their role in knowingly providing and benefitting from the coerced labor to which Plaintiffs are subjected. Plaintiffs allege that the Board Members, at Ivey's request, began denying parole at unprecedented rates to guarantee the state's access to a captive labor pool. FAC ¶¶655-57, 662, 736. In particular, the Board has denied parole to incarcerated workers who live and work in the community at historically unprecedented rates, leading to the plausible inference that they are doing so to ensure those people continue working for the state's benefit. *Id.* ¶¶653, 703, 705, 706, 736. Plaintiffs further allege that, since the 2019 Amendments, the Board denies parole for even the most minor of "infractions" related to refusal to work—in other words, abusing legal process to compel their labor. *Id.* ¶¶340, 341, 669.

### D. Injunctive and Declaratory Relief Are Appropriate Under the TVPA

State Defendants appear to acknowledge, as they must, that they are subject to suit for declaratory and injunctive relief pursuant to *Ex parte Young*, 209 U.S. 123 (1908). *Ex parte Young* applies when a litigant sues state officials in their official capacities, seeks prospective declaratory or injunctive relief, and advances a federal statutory or constitutional claim. *See, e.g.*, *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 774 (11th Cir. 2020). Each of these requirements is plainly met with respect to

Plaintiffs' coerced labor claims against state officials. The State Defendants, however, argue that equitable relief is not available under the TVPA's private right of action, contending that it authorizes only money damages. Dkt. 229 at 20-21; Dkt. 231 at 4; Dkt. 234 at 18-19; Dkt. 239 at 17. State Defendants' limiting construction of the TVPA is incorrect.[81]

By its plain terms, the TVPA authorizes a private right of action and does not expressly limit the forms of relief a private plaintiff may pursue. The language authorizing a private cause of action provides: "[a]n individual who is a victim of a violation [of the TVPA] may bring a civil action against the perpetrator" or a beneficiary "in an appropriate district court of the United States *and* may recover damages and reasonable attorneys fees." 18 U.S.C. §1595(a) (emphasis added). The statute thus first authorizes private plaintiffs to "bring a civil action" and then *also* authorizes the "recover[y]" of damages and attorneys' fees. *Id.* Defendants' contention that this language limits district courts' abilities to award equitable relief would erroneously read the word "and" out of the statute, effectively rewriting the statute to provide for a civil action only "for" damages and fees.

When Congress grants a court jurisdiction to enforce a statute, unless Congress expressly limits that jurisdiction in the "clearest" language, the court retains power to issue all appropriate equitable remedies. *See Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). *Califano* is controlling. There, the government argued that the district court lacked jurisdiction to issue an injunction to stop the government

---

[81] Plaintiffs do not seek damages from the State Defendants in their official capacities.

from issuing recoupment orders to individuals who it claimed had been overpaid, without first providing a notice and hearing. *Id.* at 698-99. The government—like State Defendants here—contended that the district court's authority was limited by language in the Social Security Act that authorized the court to enter "a judgment affirming, modifying, or reversing" the agency's decision. *Id.* The Supreme Court disagreed, holding that the statutory language, while identifying some aspects of district courts' authority, did not indicate Congress's intent to limit the equitable power of courts "to issue injunctions in suits over which they have jurisdiction." *Id.* at 698-99; *see also id.* at 705. Here, as in *Califano*, that the TVPA identifies certain remedies the Court is permitted to award should not be read as limiting or infringing on the Court's equitable powers. *See also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one [item] to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").[82]

State Defendants rely on *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453 (1974), but that case does not stand for the proposition that any time there is both public and private enforcement of a statute, the remedies available through public enforcement necessarily are not available to private plaintiffs. *See* Dkt. 234 at 18. In *National Railroad*, the Court considered whether a private right of action existed under the Amtrak Act. 414 U.S. at 455. Plaintiffs there sought to challenge a decision to discontinue passenger trains, but the only statutory

---

[82] The TVPA's broadly stated purpose also warrants caution in constraining courts' authority to award equitable relief. *See* H.R. Conf. Rep. 106-939, at 5-6 (2000).

provision possibly creating a private cause of action was "explicitly limited to 'a case involving a labor agreement'" and available only to affected employees. *Id.* at 457 (quoting 45 U.S.C. §547(a)). Thus, the language at issue was nothing like the TVPA's express language authorizing individuals to bring civil actions. Nor was *National Railroad* a case about remedies. As such, State Defendants' reliance on *National Railroad* for the proposition that any "public cause of action" necessarily eliminates remedies created for private enforcement, Dkt. 234 at 18-19, is misplaced. Congress's subsequent amendment of the TVPA to add provisions articulating the U.S. Attorney General's authority to bring a civil action, including for injunctive relief, *see* 18 U.S.C. §1585A, does not mean that the pre-existing reference in §1595(a) to a "civil action" should retroactively be read as limiting district courts' equitable powers.

## III. Plaintiffs Adequately and Plausibly Allege RICO Violations by All Defendants

In addition to the systematic violations of the TVPA, Plaintiffs[83] have adequately alleged that all Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by forming and maintaining a labor trafficking enterprise for the purpose of benefiting from the unlawful forced labor of Coerced Labor Individual Plaintiffs and other incarcerated workers.

A RICO plaintiff must establish "(1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated, either

---

[83] The RICO claim is brought by the same Plaintiffs that bring the TVPA claims. *See supra* n.13.

directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity." *U.S. v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995).[84]

## A.    Plaintiffs' FAC Satisfies Each RICO Element

<u>Pattern of Racketeering Activity.</u> By law, violations of the TVPA are RICO predicate acts, or "racketeering activity." *See* 18 U.S.C. §1961(1). No Defendant contests that if Plaintiffs' TVPA allegations pass muster, this RICO element is satisfied. Because Plaintiffs adequately plead a TVPA claim, *see supra* Part II, this central RICO element has been met.

Likewise, no Defendant directly challenges the conclusion that, if Plaintiffs have adequately alleged they committed multiple TVPA violations, Plaintiffs have adequately alleged a "pattern" of racketeering activity. A RICO "pattern" simply means "at least two acts of racketeering activity ... within ten years" of each other. 18 U.S.C. §1961(5); *see Maiz v. Virani*, 253 F.3d 641, 671 (11th Cir. 2001). *See supra* Part II.C (listing allegations of each Defendant violating TVPA).[85] Some

---

[84] Because Plaintiffs bring a civil RICO claim, they must also establish "[6] the requisite injury to 'business or property,' and [7] that such injury was 'by reason of' the substantive RICO violation." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006). These elements are addressed in the discussion of standing, *infra* Part VI.

[85] This pattern of TVPA violations is also "continuing," as the Supreme Court has defined that term. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989) (continuing RICO pattern "may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business"); *see also Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216 (11th Cir. 2020) (continuity may be alleged "either by alleging 'a series of related predicates extending over a substantial period of time'...'that the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future'") (quoting *H.J. Inc.*, 492 U.S. at 242 and *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004)). *See* FAC ¶¶366-67, 403-13, 446-47, 493-95, 800 (alleging each Employer Defendant has obtained coerced labor via a years-long relationship with ADOC); *id.* ¶¶417-42, 497-590 (alleging incarcerated labor

Defendants[86] claim they no longer participate in the forced labor scheme, but these factual claims cannot be resolved at this stage of proceedings. Further, those Defendants would still be liable for their past participation in the unlawful scheme.

<u>Existence of a RICO Enterprise.</u> A RICO enterprise includes "any ... group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). An associated-in-fact enterprise may be "'informal,' and requires only three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (quoting *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (internal quotation marks omitted)). "[T]he very concept of an association in fact is expansive[,]" *id.* (quoting *Boyle v. U.S.*, 556 U.S. 938, 944 (2009), and the FAC's allegations support each of the three structural elements.[87]

Taking the "relationship" and "longevity" features first, *Cisneros v. Petland, Inc.*, 972 F.3d 1204 (11th Cir. 2020)—on which many Defendants rely—is instructive. There, the plaintiff's complaint failed to allege "specific interactions between" the various defendants, "nor allegations regarding the origins or scope of the alleged scheme." *Id.* at 1213. The FAC has no such shortcoming. Plaintiffs have

---

is a regular part of each Employer Defendant's business practices; *id.* ¶¶417-42, 497-590 (alleging business arrangement between ADOC and Employer Defendants is ongoing).

[86] *See* Dkt. 235 at 4 (Jefferson County); Dkt. 237 at 10 (Troy); Dkt. 240 at 13 (CBAK).

[87] Parole Board Members argue that Plaintiffs' RICO claim fails because Defendants and their parole decisions "are not part of an agreement." Dkt. 231 at 6. But because Plaintiffs allege an association-in-fact enterprise here, no formal agreement is required for a RICO enterprise to exist. In any event, Plaintiffs have alleged that the Parole Board Members' decisions have been directed by Governor Ivey, which must be accepted as true at this stage. *See* FAC ¶¶657-62, 743.

alleged that each Employer Defendant interacted directly with ADOC—indeed, it is impossible for ADOC and each Employer to Defendant to *not* have coordinated, because individual Plaintiffs are or were incarcerated and could not freely work outside prison walls without ADOC approval and facilitation.[88] FAC ¶¶361-80, 443-64. Plaintiffs also specifically describe the coordination between each Employer Defendant and ADOC as it pertained to the individual Plaintiff(s) whom they employed. *Id.* ¶¶417-42, 496-589, 800. Likewise, Plaintiffs describe the origins of the forced-labor scheme as illustrated through the contractual arrangements between ADOC and Defendants, including the length of these relationships. *Id.* ¶¶361-80, 417-42, 446-64, 496-589.

Turning to the structural purpose features of Defendants' enterprise, Plaintiffs "must plausibly allege that the participants shared the purpose of enriching themselves though a particular criminal course of conduct." *Cisneros*, 972 F.3d at 1211-12. Plaintiffs allege that Defendants shared the common purpose of the coerced labor-trafficking of incarcerated people for the financial benefit of the enterprise, and that their relationships served that purpose by establishing and maintaining access to a captive, compliant labor pool. *See, e.g.*, FAC ¶¶342-49, 361-85, 402-15, 443-64, 490-95. The FAC extensively alleges "concrete facts" giving rise to the inference that the whole reason Defendants are willing to participate in the ADOC-

---

[88] Nor is there any requirement that the Employer Defendants coordinated amongst themselves to be liable as co-conspirators. *See U.S. v. Santoyo*, 2024 WL 3026046, at *9 (11th Cir. June 17, 2024) ("[I]t is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the [plaintiff] must prove is an agreement or common purpose to violate the law and intentional joining in this goal by coconspirators.") (quoting *U.S. v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008)).

sponsored scheme is to access a pool of highly coerced individuals who cannot resist or refuse workplace abuses or otherwise advocate for themselves. *Cisneros*, 972 F.3d at 1212; *supra* at 41-43. Plaintiffs' allegations are not conclusory, as some Defendants protest.[89] Rather, Defendants' arguments are simply a rehash of their objections to Plaintiffs' TVPA claims, and center on their contention that they could not have known that individual Plaintiffs' labor was coerced; but for all the reasons explained *supra* at 41-43, Plaintiffs have more than met their pleading burden. *See also Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007) (a policy of "willful blindness" to legal violations associated with the provision of workers was sufficient to survive a motion to dismiss RICO claim).

Several Defendants claim Plaintiffs' allegations are insufficient because they do not establish Defendants acted with a *criminal* purpose, claiming they were simply conducting normal business operations or operating under lawful contracts with the state. *See, e.g.*, Dkt. 240 at 23-24 (CBAK); Dkt. 249 at 17-18 (SRG); Dkt. 250 at 29 (Koch), Dkt. 251 at 16 (Cast). But the fact that ADOC and the Employer Defendants have contractual arrangements does not mean that they could not have a common purpose of benefiting from the exploitation of others' labor. It is often the case that trafficking and exploiting vulnerable populations for their labor will rely on the existence of legal relationships, and the existence of contracts, even with the government, does not turn that wrongful conduct lawful. *See, e.g.*, *Lopez v. Marriott*

---

[89] *See* Dkt. 226 at 20, 22 (Auto Defendants); Dkt. 236 at 7 (Montgomery); Dkt. 237 at 13 (Troy); Dkt. 240 at 19 (CBAK); Dkt. 242 at 26 (Progressive); Dkt. 243 at 26 (RFC); Dkt. 248 at 16 (SMI); Dkt. 249 at 22 (SRG); Dkt. 251 at 16 (Cast).

*Int'l, Inc.*, 2025 WL 661846, at *11 (D. Colo. Feb. 27, 2025), *report and recomm. adopted,* 2025 WL 1568037 (D. Colo. Mar. 31, 2025) (trafficking and forced labor allegations rooted in defendant's exploitation of Mexican immigrants in a visa program pleaded association in fact RICO enterprise); *Magnifico v. Villanueva*, 783 F.Supp.2d 1217, 1230 (S.D. Fla. 2011) (allegations that "overall objective of the conspiracy [was] to increase profits by recruiting and exploiting low-cost Filipino laborers" stated a RICO conspiracy claim); *Adhikari v. Daoud & Partners*, 697 F.Supp.2d 674, 692 (S.D. Tex. 2009) (allegations that defendant was part of a unit with "the common illegal purpose of providing trafficked labor at a low cost" adequately pleaded RICO enterprise); *David v. Signal Int'l, LLC*, 37 F.Supp.3d 822, 833 (E.D. La. 2014) (complaint alleging "involuntary servitude[] and forced labor" via recruiting temporary workers established RICO claim). The same is true here: whatever the merits of any program to employ incarcerated people in state and federal programs elsewhere, the manner in which Defendants have implemented that program has perverted it from any lawful operation.[90]

Further, the purpose of an enterprise does *not* need to be fraudulent for RICO liability to attach.[91] For example, an enterprise may have as its purpose making money, although that purpose is pursued through the unlawful hiring of

---

[90] Some Defendants argue that their purpose could not have been criminal because they allegedly paid Plaintiffs a prevailing wage, *see, e.g.*, Dkt. 251 at 18 (Cast), but again, the fact that Cast or any Defendant paid a prevailing wage does not alter that the labor was coerced, especially given how dangerous Plaintiffs allege the work conditions frequently were (FAC ¶¶169, 209-13, 412, 498, 510-14, 520, 558, 569, 603) or the violence they faced if they refused to do the work. Further, the purpose need not be unlawful and to the extent these Defendants simply take issue with Plaintiffs' factual allegations, the Court cannot resolve such disputes on a motion to dismiss.

[91] *See* Dkt. 226 at 19-21 (Auto Defendants), Dkt. 240 at 21-22 (CBAK), Dkt. 249 at 17-18 (SRG).

undocumented immigrants. *See, e.g.*, *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284-85 (11th Cir. 2006), *abrogated on other grounds by Twombly*, 550 U.S. at 544; *Aquino v. Mobis Alabama, LLC*, 739 F.Supp.3d 1152, 1210 (N.D. Ga. 2024) (common purpose of recruiting and employing Mexican engineers sufficient); *Virtus Pharms., LLC v. Woodfield Distribution, LLC*, 2022 WL 2829634, at \*7 (M.D. Fla. July 20, 2022) (common purpose of distributing and trafficking controlled substances and counterfeit drugs sufficient).[92]

The FAC easily satisfies the remaining RICO elements. Defendants rightly do not dispute that the enterprise Plaintiffs allege is engaged in and affects interstate commerce. *U.S. v. Flores*, 572 F.3d 1254, 1267 (11th Cir. 2009) ("[I]n the context of a RICO conspiracy, only a slight effect on interstate commerce is required." (internal quotation marks omitted)).

As established *supra* Part III.A, Plaintiffs have adequately pleaded an association-in-fact RICO enterprise in which all Defendants participated. The FAC also adequately alleges facts sufficient to show each Defendant "participate[d] in the operation or management of the enterprise itself" to be subject to RICO liability.

---

[92] It would be error to apply Rule 9(b)'s heightened pleading standard to Plaintiffs' RICO claim, as Auto Defendants, CBAK, and SRG urge. *See* Dkt. 226 at 19-21; Dkt. 240 at 21-22; Dkt. 249 at 17-18. The Eleventh Circuit has squarely held that "[a] plain reading of the statute indicates that RICO does *not* contain any separate mens rea or scienter elements beyond those encompassed in its predicate acts." *U.S. v. Pepe*, 747 F.2d 632, 675-76 (11th Cir. 1984) (emphasis added). The cases Defendants cite are not inconsistent: they involve predicate acts that involve fraud, and thus the elements of the predicate act (not RICO) warrant a heightened standard. *See, e.g.*, *Cisneros*, 972 F.3d at 1216 (fraud); *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1311, 1316-17 & n.12 (11th Cir. 2007) (fraudulent inducement); *Lawrie v. Ginn Dev. Co., LLC*, 656 F.App'x 464, 467 (11th Cir. 2016) ("fraud-premised RICO"). Because the predicate acts here do not involve fraud, Rule 9(b)'s heightened pleading does not apply.

*Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Several Defendants[93] point to *Reves* to argue that Plaintiffs failed to plead "operation or management." But these arguments misread *Reves* and misconstrue the FAC.

The *Reves* Court held that the mere provision of accounting services was not participation in the operation or management of a RICO enterprise and therefore did not subject the service provider to RICO liability. 507 U.S. at 186. The Court *also* emphasized that RICO liability "is not limited to upper management," because "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," and may also be operated or managed by others who are merely associate, even peripherally or financially, with the enterprise. *Id.* at 184; *see also U.S. v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014) ("Because [t]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise, even lower-rung participants or virtual outsiders may, by virtue of their conduct, find themselves ensnared." (internal quotation marks omitted; alteration in original)).

The FAC alleges each Employer Defendant actively participates in the enterprise, controlling whether to receive incarcerated workers, enter into agreements with ADOC, and report workers to ADOC if workers do not perform exactly as Defendants wish—knowing it will result in discipline and threat of violence, serious harm, and increased detention. *See supra* at 39 & nn.44-45, 47.

---

[93] *See* Dkt. 226 at 21-22 (Auto Defendants); Dkt. 227 at 22-23 (Bama Budweiser); Dkt. 243 at 25-26 (RFC); Dkt. 245 at 12-13 (Paramount); Dkt. 247 at 32 (Masonite); Dkt. 251 at 16-17 (Cast).

Employer Defendants are simply nothing like the outside service providers discussed in the cases they cite, where a service provider was operating in the normal course of its business, which otherwise had no connection to the RICO enterprise at issue. *See, e.g.*, *Reves*, 507 U.S. at 175-77 (accounting firm performing external audit); *Parm v. Nat'l Bank of California, N.A.*, 242 F.Supp.3d 1321, 1348-49 (N.D. Ga. 2017) (bank transmitting ACH payments); *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993) (tax preparer and sales representative acting in normal course of business); *see also State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F.Supp.2d 1146, 1157 (M.D. Fla. 2006) (describing *Reves* as relevant when determining "the liability of *outsiders* who may assist the enterprise's affairs"). Employer Defendants are not outsiders: they have had long-term relationships with ADOC that revolve around the provision of incarcerated persons' labor. *Supra* n.48.

## B.    Public Employer Defendants Are Subject to RICO Liability Here

The local government Defendants—Jefferson County, City of Montgomery, and City of Troy—dispute that they may be held liable under RICO at all. *See* Dkt. 235 at 14; Dkt. 236 at 25–27; Dkt. 237 at 18. Their arguments are unpersuasive.

Local government Defendants point out that some courts (but notably *not* the Eleventh Circuit) have accepted arguments that municipal corporations cannot form the mens rea necessary for RICO liability. *See Pine Ridge Recycling, Inc. v. Butts Cnty.*, 855 F.Supp.1264, 1273 (M.D. Ga. 1994); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991). The logic of these courts' decisions, however, is unpersuasive, and this Court should follow the better-

reasoned holding of the Second Circuit, which concludes that municipal corporations, like any other corporation, fall within RICO's broad sweep.

As the Second Circuit explained, "courts exempting municipalities from RICO liability on the ground that they are incapable of forming a RICO *mens rea* have failed to furnish a defensible explanation for their conclusion, particularly given that private corporations are routinely held liable for damages under RICO." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 125 (2d Cir. 2019). Those courts also fail to give sufficient deference to RICO's plain text, which subjects "*any* ... entity capable of holding a legal or beneficial interest in property" to liability, without exception. 18 U.S.C. §§1961(3), (4); *see Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). RICO also "provides that its terms are to be liberally construed to effectuate its remedial purposes," and excepting municipal corporations from its ambit would violate that mandate. *See Cisneros*, 972 F.3d at 1211 (quoting *Boyle*, 556 U.S. at 944).

Because Plaintiffs have adequately alleged the municipalities engaged in predicate TVPA violations, Plaintiffs clear the hurdle of establishing a RICO violation premised on those predicate acts.[94] *Cf. Cook Cnty. v. U.S.*, 538 U.S. 119, 128 (2003) ("[I]t has not been regarded as anomalous to require compliance by

---

[94] Jefferson County also argues that Plaintiffs have not adequately pleaded it acted with criminal intent because it purportedly believed the ADOC work agreement to be completely legal. Dkt. 235 at 15. Plaintiffs have plausibly alleged that Jefferson County, like other Employer Defendants, knew or should have known that incarcerated workers were coerced unlawfully to work, *see* FAC ¶¶393-401—and Jefferson County's factual contention to the contrary is simply an effort to smuggle a factual dispute into a motion to dismiss.

municipalities with the substantive standards of ... federal laws which impose both civil and criminal sanctions upon 'persons.'") (quoting *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 400 (1978)) (holding local governments are "persons" subject to liability under the False Claims Act ("FCA")).

Local government Defendants also argue that they are not subject to RICO liability because RICO's treble damages are punitive. *See* Dkt. 235 at 15; Dkt. 236 at 26, 28; Dkt. 237 at 22. While it is true that municipalities are typically immune from punitive damages liability, statutory treble-damages provisions sit on a "spectrum between purely compensatory and strictly punitive." *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405-06 (2003); *see also Cook Cnty*, 538 U.S. at 130 ("[I]t is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives."). RICO damages fall on the remedial end of the spectrum; the Court has "repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature." *PacifiCare Health Sys.*, 538 U.S. at 406.

In any event, even if the local government defendants are immune from treble RICO damages, Plaintiffs may still obtain injunctive relief under the statute. *See infra* Part III.C; *Gingras*, 922 F.3d at 125 ("[C]oncern for the inappropriateness of saddling the taxpayers with the financial burden of punitive damages imposed on a government entity is plainly not implicated where, as here, the relief sought is an injunction and not money damages."); *cf. Cook County*, 538 U.S. at 133 (although FCA damages were punitive, Congress did not intend municipalities to be "immune not only from treble damages but from any liability whatsoever under the FCA").

### C.    Injunctive Relief is Available Under RICO

State Defendants incorrectly argue that injunctive relief is not available to private parties bringing RICO claims. Dkt. 229 at 22; Dkt. 231 at 5; Dkt. 239 at 21; Dkt. 234 at 19. While it is true that the Circuits are split on this issue, the Eleventh Circuit has yet to weigh in on the topic.[95] In the absence of Eleventh Circuit precedent, this Court should follow the decisions that have held injunctive relief is available to private parties and necessary to give full effect to RICO's text and broad remedial purpose. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 138 (2d Cir. 2016) (holding federal courts are authorized to award equitable relief to civil RICO plaintiffs and explaining that RICO's remedy language "neither states that any category of persons may not obtain relief that is within the powers granted to the federal courts nor specifies the persons in whose favor the courts are authorized to exercise the powers there granted"); *Nat'l Org. For Women, Inc. v. Scheidler*, 267 F.3d 687, 697 (7th Cir. 2001), *rev'd on other grounds,* 537 U.S. 393 (2003) (explaining that private parties may "seek injunctions under the combination of grants in §§1964(a) and (c)"). District courts in the Eleventh Circuit have agreed with that reasoning. *See Absolute Activist Value Master Fund Ltd. v. Devine*, 2016 WL 1572388, at *4 (M.D. Fla. Apr. 19, 2016) (determining that civil RICO plaintiffs may seek injunctive relief; collecting cases); *see also Yaffa v. SunSouth Bank*, 2016 WL 10536038, at *10 n.34 (N.D. Fla. Sept. 15, 2016) (reaffirming prior decision to

---

[95] The Eleventh Circuit has, in an unpublished order, affirmed a district court order granting preliminary injunctive relief to a private RICO plaintiff. *See Baldree v. Cargill, Inc.*, 758 F.Supp. 704, 705 (M.D. Fla. 1990), *aff'd,* 925 F.2d 1474 (11th Cir. 1991).

allow plaintiff to seek injunctive relief); *In re Managed Care Litig.*, 2004 WL 7334075, at *9 (S.D. Fla. July 21, 2004), *report and recomm. adopted,* 2004 WL 7334073 (S.D. Fla. Aug. 17, 2004) ("Plaintiffs are empowered to pursue permanent injunctive relief under 18 U.S.C. §1964(a).").[96]

### D.    Plaintiffs' RICO Claims Are Not Time-Barred

Three Private Employer Defendants argue that Plaintiffs' RICO claims are barred by the statute of limitations because the individual Plaintiffs who worked for them began working for them more than four years prior to the commencement of this action. *See* Dkt. 240 at 19-20 (CBAK); Dkt. 243 at 24 (RCF); Dkt. 250 at 29 (Koch). This Circuit, however, applies the "separate accrual rule" to civil RICO actions, which "provides that if a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over for the damages caused by the new act." *Lehman v. Lucom*, 727 F.3d 1326, 1330-31 (11th Cir. 2013). Each time individual Plaintiffs are trafficked and compelled to work under the pain of transfer, punishment, and extreme violence, Defendants commit "a new and independent act that is not merely a reaffirmation of a previous act" that "inflict[s] new and accumulating injury on the [affected] [P]laintiff[s]." *Id.* at 1331. Additionally, these Defendants ignore that USSW and RWDSU also assert RICO claims. Because these organizational plaintiffs have standing based on the injuries Defendants' repeated trafficking causes their and their members' interests, *see infra*

---

[96] To the extent State Defendants argue they are immune from RICO damages under the Eleventh Amendment, that is beside the point. Plaintiffs do not seek damages from State Defendants for RICO violations in their official capacities, only injunctive relief. *See* Dkt. 239 at 21-22.

Part VI.B, and the separate accrual rule is equally applicable to them, and the statute of limitations is no bar to Plaintiffs' claims.

## IV.    Plaintiffs Have Stated a Plausible State Constitution Claim for Injunctive Relief Against the Local Government and Private Employer Defendants

In November 2022, Alabama voters ratified a state constitutional amendment that removed the historical exception to the state's ban on involuntary servitude. Previously, the Alabama Constitution excluded from the constitutional ban on involuntary servitude "punishment of crime, of which the party shall have been duly convicted." Ala. Const., art. I, §32 (1901). Effective January 1, 2023, Article I, Section 32 of Alabama's Constitution declares: "That no form of slavery shall exist in this state; and there shall not be any involuntary servitude." Ala. Const., art. I, §32 (2022). Plaintiffs[97] allege that Defendants subject them to involuntary servitude—a wrong for which they may now seek redress under the amended state constitution.[98]

As discussed in the preceding sections, the FAC alleges that individual Plaintiffs were forced to work under threat of severe punishment, including solitary

---

[97] Plaintiffs for Count IV are the same as Count I, *supra* n.13, plus The Woods Foundation. Count IV is brought against the local government Defendants and Private Employer Defendants.

[98] Some Defendants point out that the Alabama Constitution does not create a private right of action for damages. *See* Dkt. 227 at 24 (Bama Budweiser); Dkt. 237 at 14 (Troy); Dkt. 240 at 24 (CBAK); Dkt. 242 at 27-28 (Progressive); Dkt. 245 at 13-14 (Paramount); Dkt. 246 at 33 (Masonite); Dkt. 248 at 17 (SMI); Dkt. 249 at 22-23 (SRG); Dkt. 250 at 29-30 (Koch). But Plaintiffs are pursuing only equitable relief, not damages, for their state constitutional claim, which Alabama courts regularly permit. *See, e.g.*, *Burnett v. Chilton Cnty. Health Care Auth.*, 278 So.3d 1220, 1236-37 (Ala. 2018); *Magee v. Boyd*, 175 So.3d 79, 91, 106, 142 (Ala. 2015); *Poiroux v. Rich*, 150 So.3d 1027, 1032, 1043 (Ala. 2014); *Ford v. Jefferson Cnty.*, 774 So.2d 600, 605 (Ala. Civ. App. 2000); *Mancero-Ramirez v. City of Hoover*, 2006 WL 8436600, at *3-4 (N.D. Ala. June 14, 2006). Further, constitutional protections against involuntary servitude, which were enacted with provisions abolishing slavery following the Civil War, run against private parties. *See George v. State*, 39 Ala. 675, 676 (1866) (discussing purpose of amendment). The cases cited by CBAK, Dkt. 240 at 24 and SRG, Dkt. 249 at 23, which specifically address the analysis that applies when a party seeks to assert a private right of action under a "statutory scheme," are thus inapposite.

confinement, denial of medical care, transfers to more violent facilities, physical violence, parole denials, and includes detailed and specific allegations concerning each Defendant. *See supra* Part II.C & nn.27-36. Multiple Defendants argue that they did not or could not force Plaintiffs to work for them,[99] but those arguments fail for the reasons discussed above. *Id.* Some Defendants also strangely contend that they cannot have subjected Plaintiffs to involuntary servitude as long as Plaintiffs had a "choice" not to work, mostly relying on *U.S. v. Kozminski*, 487 U.S. 931, 948 (1988). *See* Dkt. 236 at 29; Dkt. 237 at 13-14; Dkt. 243 at 27-28; Dkt. 247 at 35; Dkt. 251 at 17-18. But the Court in *Kozminski* defined involuntary servitude to include *both* physical coercion and "situations in which the victim is compelled to work by law," 487 U.S. at 942-44, which is precisely the wrongful conduct Plaintiffs allege here).[100] Cases following *Kozminski* consequently recognize that threats of more severe forms of confinement and discipline that will extend the duration of confinement, like those enshrined in ADOC's regulations and incorporated into the contracts between ADOC and the local government and private Employer Defendants, violate prohibitions of involuntary servitude.[101] As such, these

---

[99] Dkt. 226 at 29-30; Dkt. 227 at 23; Dkt. 237 at 14; Dkt. 240 at 24-25; Dkt. 241 at 27; Dkt. 243 at 27-28; Dkt. 245 at 14-15; Dkt. 247 at 35; Dkt. 248 at 17-18; Dkt. 249 at 23; Dkt. 251 at 17-19.

[100] Montgomery argues that Ptomey and Cole's claims are barred by the statute of limitations. *See* Dkt. 236 at 28. The forced labor practices that Plaintiffs allege, however, are ongoing and constitute a continuing violation. *See Beasley v. Ala. State Univ.*, 966 F.Supp. 1117, 1130 (M.D. Ala. 1997) (continuing violation doctrine applies where the wrongful acts are part of a continuous policy or practice). Plaintiffs have alleged that the same coercive labor system has been in effect across multiple years, *See* FAC ¶¶424-30. Where the harm is ongoing, and the challenged practice remains in place, the statute of limitations does not bar the claim.

[101] *See, e.g.*, *McGarry v. Pallito*, 687 F.3d 505, 508, 511-12, 514 (2d Cir. 2012) (pretrial detainee alleging he was compelled to work in prison laundry under threat of solitary confinement and disciplinary reports stated a 13th Amendment claim); *Harden v. Bodiford*, 442 F.App'x 893, 894-95 (4th Cir. 2011) (denial of summary judgment was appropriate where pretrial detainee alleged

Defendants' efforts to reduce the forced labor here to a painful "choice" is absurd. Plaintiffs allege the only choice they had was "between the rock and the whirlpool," *Carter v. McGinnis*, 351 F.Supp. 787, 794 (W.D.N.Y. 1972): the consequence of refusing to work is not merely continued incarceration, but active retaliation, including prolonged segregation, removal from work release, loss of access to rehabilitative programs, threats of reclassification, and physical violence. *See supra* Part II.C & nn. 36, 38. None of the cases Defendants cite support the notion that individuals presented with a "choice" between work and the severe consequences Plaintiffs allege would render the individuals' labor voluntary and outside the prohibition on involuntary servitude. *See, e.g.*, *Watson v. Graves*, 909 F.2d 1549, 1552-53 (5th Cir. 1990) (choice between "work[ing] outside of the jail for twenty dollars a day or remain[ing] inside the jail and earn[ing] nothing); *Brooks v. Kiser*, 2022 WL 2155037, at *4 (M.D. Ala. May 13, 2022), *report and recomm. adopted*, 2022 WL 2134987 (M.D. Ala. June 14, 2022) (plaintiff alleged defendant threatened to terminate him from other job if he did not continue cutting his grass without pay).

Defendant Masonite makes a blanket argument that, despite the plain language of the 2022 amendment, the Court should rely on the amendment's legislative history to conclude that it does not apply to incarcerated people. Dkt. 247 at 34. This effort flies in the face of the Alabama Supreme Court's "long-settled and

---

that, if he refused work assignments, he would be placed in punitive segregation); *Magoon v. Texas Dep't of Crim. Just.*, 247 F.3d 240, at *2 (5th Cir. 2001) (per curiam) (unpublished) ("Assuming arguendo that both Austin and Magoon have been placed in punitive segregation for their refusal to work, the compulsion requirement has been met."); *Ruelas*, 2021 WL 12144269, at *15 ("Plaintiffs allege that County Defendants forced them to work under the threat of punishment, including lengthier sentences and solitary confinement.").

fundamental rule … [of] adherence to the plain meaning of the text" in interpreting the state constitution, and should be rejected on that basis alone. *Town of Gurley v. M & N Materials, Inc.*, 143 So.3d 1, 13 (Ala. 2012) (quoting *Jefferson County v. Weissman*, 69 So.3d 827, 834 (Ala. 2011) (internal quotation marks omitted)); *Ex parte Birmingham Airport Auth.*, 274 So.3d 964, 968 n.3 (Ala. 2018). In any event, the legislative history supports Plaintiffs' claims. The 2022 amendment was intended to "remove racist language" from the Constitution of 1901,[102] and, in keeping with that project, sought to rid the Constitution of any vestiges of "convict leasing."[103] The Legislature was well aware of the implications of the change: it considered a series of graphs showing "Alabama Convict Labor Revenue and Demographics, 1896–1929," materials that revealed the proportion of the State's revenue collected through "lease of state prisoners as well as…state-operated enterprises" during that time period.[104] Masonite's lone evidence of intent, a memorandum that asserts with no facts or reasoning that the amendment "would have no practical impact on … current incarceration practices," cannot undermine the constitution's plain text.[105]

---

[102] Othni J. Lathram, Background Information on the Removal of Racist Language (Aug 27, 2021), https://perma.cc/N95B-ZXAK.

[103] *See* Ballot Statement for the Constitution of Alabama of 2022, https://perma.cc/5NA3-ND36. Given the express reference to elimination of convict leasing, Masonite's suggestion that this Ballot Statement supports its argument, Dkt. 247 at 34, is flat wrong.

[104] Ala. Dep't of Archives & History, Alabama Convict Labor Revenue and Demographics, 1896–1929 (Oct. 2021), https://perma.cc/2F4Y-LDXQ.

[105] Koch argues that Plaintiffs' state constitutional claim would require the Court to find that the Alabama Legislature repealed the work-release program by implication, which is "not favored." Dkt. 250 at 28. Plaintiffs are not asking the Court to hold unconstitutional the statutes governing Alabama's work-release program; they are asking the Court to hold unconstitutional the work-release program as implemented by Defendants, which includes harsh punishment for refusals to work and the threat that workers will be sent to life-endangering higher-security facilities if they do not work. In any event, it is quite plausible that an amendment providing enhanced constitutional protection to incarcerated workers might be "repugnant to or in conflict with" a

Finally, several Defendants argue that Plaintiffs' allegations concerning conduct that occurred before the 2022 amendment took effect are barred because the pre-2023 constitution "allowed" Defendants to force Plaintiffs into involuntary servitude. *See* Dkt. 227 at 24 (Bama Budweiser); Dkt. 235 at 16-17 (Jefferson County); Dkt. 236 at 28-29 (Montgomery); Dkt. 240 at 25 (CBAK); Dkt. 243 at 27 (RCF); Dkt. 245 at 14 n.3 (Paramount); Dkt. 247 at 34 (Masonite); Dkt. 249 at 23-24 (SMI).[106] This is a red herring: because the challenged practices persisted after the 2022 amendment took effect, and Plaintiffs' claim concerns Defendants' post-amendment conduct, *see* FAC ¶¶431, 497, 507, 518, 523-24, 529, 537, 543, 547, 552, 557, 564, 568, 574, 582; and because the previous Alabama Constitution did not "allow" the forced labor of Plaintiffs—it just did not expressly prohibit it.

## V.    Plaintiffs Adequately Allege an Unjust Enrichment Claim

Plaintiffs[107] have stated a claim for unjust enrichment against each Employer Defendant. An Alabama plaintiff states an unjust enrichment claim by showing that "the defendant holds money which, *in equity or good conscience*, belongs to the plaintiff." *Mantiply v. Mantiply*, 951 So.2d 638, 654 (Ala. 2006) (internal quotation omitted); *see Scrushy v. Tucker*, 955 So.2d 988, 1011 (Ala. 2006). The doctrine prevents one party from being "unjustly enriched at the expense of another,"

---

program providing incarcerated labor to private parties under the circumstances presented here. *Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass'n*, 314 So.2d 51, 55 (Ala. 1975).

[106] Jefferson County contends that it discontinued its participation in the work-release program in 2020. Dkt. 235 at 4. While resolution of this factual question is not appropriate on a motion to dismiss, Plaintiffs would agree that, if no evidence contradicts the county's proffer, this Alabama Constitution claim would not lie against Jefferson County.

[107] The Unjust Enrichment claim is brought against Employer Defendants by the same Plaintiffs asserting the TVPA claims. *See supra* n.13.

particularly if "the recipient … engaged in some unconscionable conduct, such as … coercion …." *Mantiply*, 951 So.2d at 654-55 (internal quotations omitted).[108]

## A.    Plaintiffs' Factual Allegations Support the Unjust Enrichment Claim

Private Employer Defendants. Plaintiffs allege these Defendants knowingly accepted and retained the benefits of coerced labor from Plaintiffs and the putative class, who are not able to withhold their labor and have no or little opportunity to turn down assignments or complain about workplace conditions. *See supra* at 41-43 nn. 30, 32, 38, 40, 44-46.[109]

Non-ADOC Public Employers. Plaintiffs allege the non-ADOC Public Employers' use of incarcerated labor, including by Plaintiffs, deprives workers of wages and depresses wages and working conditions, to those Defendants' benefit.[110] Public Employer Defendants that "lease" incarcerated workers from ADOC generally pay workers only $2 a day and often only pay ADOC $15 a day, far less than free-market wages. FAC ¶365; *see supra* at 44, 46.

---

[108] CBAK and the Auto Defendants incorrectly argue that the requisite unconscionable conduct is limited to "mistake or fraud," Dkt. 226 at 31, Dkt. 240 at 26; but the case law consistently recognizes "coercion" alongside fraud and abuse of a confidential relationship as the sort of unconscionable conduct that will make out an unjust enrichment claim. *See, e.g.*, *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So.3d 139, 146 (Ala. 2011); *Mantiply*, 951 So.2d at 654-55; *Jordan v. Mitchell*, 705 So.2d 453, 458 (Ala. Civ. App. 1997).

[109] Some private Employer Defendants contend (as a factual matter) that they pay the prevailing wage to incarcerated workers and thus that there can be no unjust enrichment claim against them. Dkt. 226 at 31; Dkt. 227 at 25; Dkt. 234 at 34. But Plaintiffs allege that the arrangement is beneficial to private Employer Defendants because they receive a captive workforce with limited ability to complain about wages and working conditions; and that they are aware ADOC takes a significant cut before paying workers their wages. FAC ¶¶494-95; *see also supra* Part III.A.

[110] FAC ¶¶41-42, 46-49, 54-57, 71, 87-88, 96, 98-99, 106, 111-13, 128, 130, 137, 140-44, 152-56, 162-63, 167-69, 172, 174-76, 181-83, 875-78, 494-95.

<u>ADOC and Commissioner Hamm.</u> Plaintiffs allege that ADOC, sued through Commission Hamm, reaped more than $400 million from the completely unpaid labor of Plaintiffs and the incarcerated workers in the putative class. *See* FAC ¶¶342-47 (describing economic benefit to ADOC of using unpaid incarcerated labor in lieu of paid corrections staff); *supra* n.20 (describing Plaintiffs' unpaid work for ADOC). ADOC is also unjustly enriched through its deductions of more than 40% from incarcerated persons' work-release paychecks (taken *before* any restitution deductions) for its own use and despite also charging these workers for necessities like food, medicine, and doctor visits. *Id.* ¶¶355-58, 356 n.36, 457-58, 464, 491.

Participating in this forced labor scheme allowed ADOC and Employer Defendants to retain financial benefits they would not have earned without coerced labor. *See Jewett v. Boihem*, 23 So.3d 658, 661-62 (Ala. 2009) (benefit exists "[w]henever one person adds to the other's advantage in any form, whether by increasing his holdings or saving him from expense or loss") (quoting *Opelika Prod. Credit Ass'n v. Lamb*, 361 So.2d 95, 99 (Ala. 1978)). As explained in Part II, *supra*, Plaintiffs have alleged that Employer Defendants were aware their incarcerated employees' labor was coerced and willingly accepted the benefits flowing from that coercion. *See, e.g.*, *supra* nn.48, 62, 66-67, 72. These allegations state a claim for unjust enrichment. *See Barrientos*, 332 F.Supp.3d at 1312-13 (coerced labor in carceral facility stated unjust enrichment claim); *see also* Restatement (Third) of Restitution and Unjust Enrichment §1 (2011) (unjust enrichment "'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss.").

**B.    Defendants' Arguments Seeking Dismissal of the Unjust Enrichment Claim Are Meritless**

Unjust enrichment claims are ill-suited for resolution at the motion to dismiss stage because they "depend[] on the particular facts and circumstances of each case." *Mantiply*, 951 So.2d at 655. That is particularly true here, where the FAC includes detailed factual allegations satisfying the elements of the claim. *See supra* Part V.A.

Auto Defendants, Progressive Finishes, and Koch point out that Alabama law precludes plaintiffs from recovering simultaneously under both unjust enrichment and breach of contract theories. *See* Dkt. 226 at 28; Dkt. 242 at 24; Dkt. 250 at 29-30. This doctrine, however, only applies when there is an express contract between the *plaintiff* and the defendant. *Weaver v. Nat'l Better Living Ass'n, Inc.*, 2014 WL 12614481, at *24 (N.D. Ala. July 3, 2014) (quoting *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So.2d 443, 447 (Ala. 1996)). Here, Plaintiffs allege they are leased out to the Employer Defendants pursuant to an agreement between those Defendants and *ADOC*—a contract to which Plaintiffs are not a party. *See* FAC ¶¶373-77, 451-56. Thus, the logic that when there is an express agreement, "there is no need to imply an agreement between [the parties] to ward off inequitable results," *Weaver*, 2014 WL 12614481 at *24 (citation omitted)—has no force here, as Plaintiffs cannot invoke the contractual remedies inherent in the Employer Defendant-ADOC contracts. *Id.*[111]

---

[111] Regardless, "[a]lthough a party may not recover for *both* breach of contract and unjust enrichment, at the pleading stage, 'a party may state as many separate claims or defenses as it has, regardless of consistency.'" *Fortune v. Cibran*, 2023 WL 5351986, at *3 (N.D. Ala. Aug. 21, 2023) (quoting Fed. R. Civ. P. 8(d)(3) (emphasis added)); *see also J.G. Rogers Corp. v. Metallized Carbon Corp.*, 2019 WL 1597845, at *5 (N.D. Ala. Apr. 15, 2019) (while a plaintiff "may not recover on both an unjust-enrichment and breach-of-contract claim based on the same facts and

SMI and Cast argue that unjust enrichment claims are ill-suited to resolution on a class-wide basis but provide no explanation as to why the Court should entertain their argument at this stage. *See* Dkt. 248 at 19-20; Dkt. 251 at 19. *See Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 217 (E.D. Pa. 2009) ("Whether or not Alabama would certify an unjust enrichment class such as this one has no bearing on the viability [of] the claim."); *accord Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 630 (N.D. Ala. 2013).[112]

Jefferson County, SRG, SMI, Koch, and Montgomery argue that the unjust enrichment claim against them should be dismissed as wholly or partially time-barred because certain Plaintiffs worked for these Defendants more than two years ago. Dkt. 235 at 18–19; Dkt. 236 at 28; Dkt. 248 at 20; Dkt. 249 at 24; Dkt. 250 at 31. That argument misstates how the relevant statutes of limitations apply to unjust enrichment claims. Alabama has two potentially relevant statutes of limitations for unjust enrichment claims: a two-year statute of limitations for "[a]ll actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section," Ala. Code §6-2-38(l); and a six-year statute of limitations for "[a]ctions upon any simple contract or specialty not specifically

---

contract … that does not mean [plaintiffs] may not plead claims for both unjust enrichment and breach-of-contract in the alternative.").

[112] The Alabama Supreme Court cases on which Defendants rely were also interpreting the State's class-action rule, not Federal Rule of Civil Procedure 23, and "[t]hat Alabama interprets its own class action certification rule as precluding certain types of claims does not mean that the same class claims would be barred in federal court." *Sheet Metal Workers Loc. 441 Health & Welfare Plan*, 263 F.R.D. at 216-17; *see also In re Takata Airbag Products Liab. Litig.*, 462 F.Supp.3d 1304, 1333 (S.D. Fla. 2020) ("whether an unjust enrichment claim can satisfy the predominance and superiority requirements of an Alabama class action has no bearing on whether Plaintiffs can certify a nationwide unjust enrichment class action under federal law").

enumerated in this section," Ala. Code §6-2-34(9). In *Auburn Univ. v. Int'l Bus. Machines, Corp.*, 716 F.Supp.2d 1114, 1117-18 (M.D. Ala. 2010), this Court explained that "the Alabama state courts have not decided whether unjust-enrichment claims are tort claims or implied-contract claims, much less which statute of limitations applied to such claims." Which statute of limitations applies will thus turn on the nature of the unjust enrichment claim. *See id.*

Plaintiffs' unjust enrichment claim is subject to a six-year statute of limitations. *See Auburn U.*, 716 F.Supp.2d at 1118 (six-year statute of limitations applicable to claims for injuries "arising from" contracts); Ala. Code §6-2-34(9). This is because, under Alabama law, "an unjust enrichment claim sounds in the nature of quasi-contract, as the law equitably implies a contract between the parties to prevent the unjust enrichment of a defendant at the expense of a plaintiff." *See White v. Microsoft Corp.*, 454 F.Supp.2d 1118, 1132 (S.D. Ala. 2006) (citing *American Family Care, Inc. v. Fox*, 642 So.2d 486, 488 (Ala. Civ. App. 1994)).[113]

Further, this limitations question cannot be resolved on a motion to dismiss. "Whether unjust-enrichment claim falls into either category requires a factual inquiry, and, therefore, [plaintiff's] allegations in its complaint were sufficient to survive [the defendant's] motion to dismiss." *Protective Life Ins. Co. v. Jenkins*, 386 So. 3d 443, 447 (Ala. 2023) (reversing order dismissing unjust enrichment claim).

---

[113] Montgomery argues, without citations, that unjust enrichment claims based on TVPA violations or involuntary servitude are "clearly tort claims." Dkt. 236 at 31. But while Plaintiffs' unjust enrichment claims may be based on conduct that violates the TVPA and the Alabama Constitution, that does not convert the nature of the cause of action, which Alabama courts have clearly held to be quasi-contractual.

Several Defendants also raise a curious merits argument, suggesting that incarcerated workers have no reasonable expectation of compensation because they are incarcerated.[114] *See, e.g.*, Dkt. 229 at 35 (Ivey/Marshall), Dkt. 234 at 33-34 (Hamm), Dkt. 237 at 21-22 (Troy), Dkt. 243 at 29 (RFC), Dkt. 247 at 36-37 (Masonite); Dkt. 248 at 18-19 (SMI). The protection of the laws does not end at the prison gate. *Turner v. Safley*, 482 U.S. 78, 84 (1987); *see Barrientos*, 332 F.Supp.3d at 1312 (declining to dismiss unjust enrichment claim brought by incarcerated workers). As an initial matter, unjust enrichment claims are not limited to an "expectation of compensation": Defendants' unconscionable coercion of Plaintiffs' labor to the unjust benefit of Defendants is enough to state a claim. Further, Plaintiffs allege they did not receive pay reflecting the value of their labor—and received no pay at all from ADOC/Hamm. *See* FAC ¶¶55, 128, 463, 538, 575.[115]

Finally, Ivey argues that the work conducted by Plaintiff Bullock on the Governor's Mansion is a benefit accrued by the Mansion Authority as an

---

[114] To the extent the Employer Defendants argue they were not active participants in Alabama's forced labor scheme, or plead ignorance of the frequently reported conditions in Alabama's prisons and racial disparities in Alabama's parole system despite partnering with ADOC (for decades for many Defendants), those arguments contradict Plaintiffs' allegations, present factual disputes that are not appropriately resolved on motions to dismiss, and have been conclusively disproven. *See supra* Parts II.C.1, II.C.2.

[115] Cast argues that Plaintiff Jarmon's claims can only be resolved under the FLSA. Dkt. 251 at 19. This pertains, at best, to the single paycheck Jarmon alleges Cast never gave him. FAC ¶558. The value Jarmon Jr. has conferred upon Cast Products goes well beyond that single paycheck. *See Id.* ¶¶163, 558 (describing physical injuries sustained at Cast's work environment and $350 out of pocket costs for rented work clothes). And the outstanding paycheck would not reflect the value of Jarmon's labor, as Cast's enrichment far exceeds the paycheck such that FLSA does not provide an adequate remedy at law. *See id.* ¶559 (noting Cast paid incarcerated workers a lower hourly rate than free world workers); *see also Cooley v. HMR of Alabama, Inc.*, 259 F.Supp.3d 1312, 1317 (N.D. Ala. 2017) (finding "gap-time" is outside of FLSA's coverage and "[s]ince the FLSA provides no adequate remedy at law, equitable relief is not foreclosed"). Cast's argument does not warrant dismissal of Jarmon's unjust enrichment claim.

independent entity from Defendant Ivey. *See* Dkt. 229 at 35. Ivey's involvement with the Governor's Mansion, however, *see supra* at 57-58, is a sufficient basis for her liability on this claim.[116]

## VI. Plaintiffs Have Standing to Assert Their Coerced Labor Claims

### A. Individual Plaintiffs

Individual Plaintiffs who bring Counts I-IV and XII, and who have been coerced to work for ADOC and Employer Defendants, clearly have standing. These Plaintiffs allege they were compelled to work for little or no compensation under constant threat of violence, serious harm, prolonged incarceration, solitary confinement, and deprivation of necessities—means proscribed by the TVPA and in violation of the Alabama Constitution—and experienced substantial harm as a result of Defendants' participation in the coerced labor scheme, including physical, emotional, and financial harm (including "injur[ies] in [Plaintiffs'] business or property," as required for a civil RICO claim).[117] These Plaintiffs also assert injuries

---

[116] Plaintiffs are not pursuing their unjust enrichment claim against Cooper, Ivey, and Hamm in their official capacities and are not seeking injunctive relief from them with respect to this claim. Plaintiffs address State Defendants' immunity arguments in Part XII, *infra*.

[117] FAC ¶¶16, 20, 34, 43, 51, 61, 73, 85, 89, 94, 105, 134, 148, 158, 164, 170, 177, 189; *see also id.* ¶¶305, 365, 463-64, 491; *id.* ¶¶16, 34, 43, 51, 61, 73, 85, 89, 105, 115, 134, 138, 148, 158, 164, 170, 177, 189, 655, 662-63 (alleging loss of prospective wages due to the State Defendants' elimination of meaningful parole opportunities); *Williams*, 465 F.3d at 1286-87, *abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 704-05 (11th Cir. 2014) ("depressed wages" qualify as a cognizable RICO injury). Defendants Troy and Progressive Finishes make undeveloped and unsubstantiated arguments that Plaintiffs have not pleaded that their economic injuries (for RICO) were caused by Defendants, Dkt. 237 at 18, Dkt. 242 at 27; but Plaintiffs have. *See supra* at 38-40, 46-47, 53-54; *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) ("central question" for RICO proximate causation "is whether the alleged violation led directly to the plaintiff's injuries."); *Copeland v. C.A.A.I.R., Inc.*, 2019 WL 4307125, at *11 (N.D. Okla. Sept. 11, 2019) (RICO proximate cause stated where "Plaintiffs allege that they were injured because, *inter alia*, they were forced to work without payment and without the ability to leave").

flowing from State Defendants' unlawful parole conspiracy, which resulted in lengthened terms of detention and coerced labor.[118] Finally, Plaintiffs' injuries would clearly be redressed by the relief they request, including cessation of the challenged coercion of their labor. *See* FAC, Prayer for Relief.

## B. Organizational Plaintiffs

Organizational Plaintiffs RWDSU and USSW adequately allege their standing to bring Counts I, II, III, and IV against Defendants, as does The Woods Foundation to bring Count IV. An organization may establish standing (1) "through its own injury in fact" and (2) "through its members (i.e., associational standing)." *Ga. Ass'n of Latino Elected Officials, Inc. ("GALEO") v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022).

First, the FAC establishes Organizational Plaintiffs' standing to bring claims based on injury to themselves. *See* FAC ¶¶191-92. A handful of Defendants[119] attack this showing, largely based on a mistaken understanding of *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95 (2024), suggesting that the decision forecloses standing based on a diversion-of-resources injury. While *FDA* cautioned that "an organization…cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," the Court did *not* abolish diversion-of-resources standing. Indeed, the Court reiterated that an organization establishes standing if a defendant's challenged actions "directly

---

[118] *See supra* nn. 33-34, 117.

[119] *See* Dkt. 225 at 7-8 (Auto Defs); Dkt. 227 at 26 (Bama Budweiser); Dkt. 236 at 20 (Montgomery); Dkt. 240 at 10 (CBAK); Dkt. 245 at 16-17 (Paramount); Dkt. 247 at 16 (Masonite); Dkt. 243 at 12 (RFC).

affect[] and interfere[] with [an organization's] core business activities." *FDA*, 602 U.S. at 394-95 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

An organizational plaintiff has suffered a cognizable injury when it has diverted its resources to address an injury to an identified community and "the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *Curling v. Raffensperger*, 776 F.Supp.3d 1191, 1211 (N.D. Ga. 2025) (quoting *City of S. Miami v. Governor*, 65 F.4th 631, 638-39 (11th Cir. 2023) (internal quotation marks omitted); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (standing where organizations "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters"); *Caicedo v. DeSantis*, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024) (being forced to develop new ways to encourage electoral participation was injury in fact).

Each Organizational Plaintiff has clearly pled Article III standing by asserting not just injuries suffered by diversion of resources but also that Defendants' challenged actions directly affect and interfere with Organizational Plaintiffs' core business activities, as contemplated by *FDA*. Plaintiff RWDSU, a labor union representing workers laboring in poultry plants throughout Alabama, alleges that Defendants' actions have caused it harm by, *inter alia*, perpetuating "unsafe working conditions[] and low wages …, including in facilities operated by employers where RWDSU represents poultry processing workers." FAC ¶190. The FAC alleges that the "use of incarcerated labor depresses wages and working conditions for all workers in the sector," directly impeding RWDSU's core interest of pursuing higher

wages and safe working conditions for its members in the poultry industry in Alabama. *Id.* RWDSU alleges that this injury flows directly from ADOC's, RCF's, and Koch's refusal to let incarcerated workers join the Union at workplaces it represents, which directly limits its bargaining and economic power and allows those Defendants to directly benefit by replacing Union-eligible free-world workers with non-Union eligible incarcerated workers. *Id.* The FAC describes unsafe working conditions at poultry plants run by Defendants Koch and RFC, including detailing a horrific decapitation of an incarcerated worker by a poultry "hanger" at a Koch plant. *Id.* ¶¶169, 276, 498-99, 569, 571. The Complaint describes how RWDSU needed to devote resources to address employers' employment of incarcerated workers, committing substantial resources to attempt to organize and represent some of the workers. *Id.* ¶190. ADOC and poultry industry employers' use of incarcerated workers makes it difficult for RWDSU to engage them in its organization and representational activities because they "fear discipline if they advocate for better wages and working conditions." *Id.*

Similarly, USSW, whose mission is to improve the wages and working conditions of low-wage workers in the service industry, alleges it has "devoted significant time and resources to supporting workers at fast-food restaurants in speaking out about intolerable working conditions … and about the need for a living wage," and its ability to improve the working conditions of fast-food workers is undermined by: the difficulty in communicating with incarcerated workers who fear discipline if they speak up about wages and working conditions; and depression of wages and working conditions caused by the use of incarcerated labor. *Id.* ¶191.

Thus, RWDSU and USSW both allege that Defendants' unlawful conduct and coercion of labor from incarcerated individuals "directly conflict[s]" with their missions and has caused them to re-direct limited resources to addressing that conduct, in a way they would not have done but for the alleged unlawful conduct. *Id.* ¶¶190–91.[120] Because this diversion has "perceptibly impaired" both the organizations' missions, "there can be no question" that they "ha[ve] suffered injury in fact." *Havens Realty Corp.* 455 U.S. at 379; FAC ¶¶190-91.[121] This diversion of resources also qualifies as an injury to "business or property" for purposes of RICO. *See supra* at 62 n.84; *see also In re Juul Labs, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1955678, at *5 (N.D. Cal. Jan. 28, 2022) (diversion of resources to counteract unlawful conduct sufficient to establish RICO standing).[122]

---

[120] Nothing requires that the diverted resources be monetary. *See Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1165-66 (standing where organizations would need to divert personnel and time).

[121] Bama Budweiser, Montgomery, Paramount, and the Auto Defendants erroneously contend that, because RWDSU nor USSW do not represent workers in those employers' industries, RWDSU and USSW do not have standing against them. Dkt. 226 at 4-5; Dkt. 227 at 27; Dkt. 236 at 20-21; Dkt. 245 at 17. Yet the FAC alleges that each Employer Defendant has participated in an unlawful conspiracy to violate both the TVPA and RICO. *See supra* Parts II.C.2, III.A. "Conspiracy allegations represent a limited exception to the general rule of standing requiring a direct nexus between the defendant's actions and the plaintiff's injuries," and "[i]f a conspiracy is properly alleged, then injuries suffered at the hand of any particular defendant are imputed to all other conspiracy participants, and a plaintiff can overcome the otherwise absolute bar to standing." *Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 468-69 (S.D.N.Y. 2009) (citing *Rios v. Marshall*, 100 F.R.D. 395, 404 (S.D.N.Y. 1983)). Moreover, the FAC alleges that USSW advocates for workers "across the service industry" (which would include each defendant making this argument), FAC ¶¶191, 206, 210-12, 221, 222, and that both organizations' interests are harmed by race discrimination, including racial pay gaps and racial differences in work conditions—impacts that do not end at the border of an industry, *id.* ¶¶190-91.

[122] Contrary to the arguments of some Defendants, Organizational Plaintiffs' TVPA claim is cognizable. Organizational Plaintiffs fall within the "zone of interests" the TVPA protects. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). The TVPA is a broad remedial statute that protects, *inter alia*, trafficking victims who "are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities." Organizational entities are often best placed to bring claims on those victims' behalf. Disallowing them from doing so would undermine one of the purposes

Standing for Plaintiff The Woods Foundation is also similarly straightforward given its clear allegation that it too diverted resources to address an issue at the core of its organizational operation. It alleges that Defendants' unlawful actions directly conflict with its core business activity of "representing individuals in parole proceedings, ensuring their constitutional rights are upheld throughout the process, and pursuing litigation when those rights are violated," requiring it to divert resources, including money and staff time, to counteract the harm caused by the state's broken parole system. FAC ¶192; *see also id.* ¶¶738-39 (describing how parole system's unlawful practices fuel coercive labor scheme). The suggestion by Bama Budweiser, Auto Defendants, CBAK, Progressive, RCF, Paramount, SRG, Koch, and Cast, Dkt. 226 at 7-8; Dkt. 227 at 25-27; Dkt. 240 at 9; Dkt. 242 at 29-31; Dkt. 243 at 12-13; Dkt. 245 at 18; Dkt. 249 at 11; Dkt. 250 at 15; Dkt. 251 at 2-3 n.1, that these allegations are not sufficient is meritless.

RWDSU, in addition to having standing based on its own injury, also alleges associational standing via its members—standing that no Defendant expressly challenges. The FAC alleges its members work at facilities operated by RCF and Koch, as well as at two other poultry processors in Alabama that employ persons incarcerated by ADOC; RWDSU has organized and sought to represent incarcerated people working at RCF and Koch; and its membership (free and incarcerated) is harmed by the coercion of labor challenged in the FAC. FAC ¶190 ("[n]ot being able

---

of the statute. The lone, out-of-circuit case a few Defendants rely on, *New York State Nurses Ass'n v. Albany Med. Ctr.*, 473 F.Supp.3d 63, 71–72 (N.D.N.Y. 2020), does not grapple with this analysis and should be rejected by this Court.

to represent all workers in the union's bargaining unit at Koch harms RWDSU's interests and the interest of its members" and describing harms).

## VII. Plaintiffs Adequately and Plausibly Allege First Amendment Violations by Ivey and Hamm

### A. The FAC Plausibly Alleges a Violation of Plaintiffs' First Amendment Rights

#### 1. Plaintiffs' Allegations Establish Retaliation in Violation of the First Amendment

Plaintiffs[123] allege Ivey and Hamm violated their First Amendment rights by ordering and maintaining a policy of retaliating against Plaintiffs who withhold their labor or advocate for other incarcerated people to do the same. Plaintiffs have adequately alleged all three elements of their First Amendment claim: (1) Plaintiffs' speech was constitutionally protected, (2) adverse action was taken against them that "would likely deter a person of ordinary firmness from engaging in such speech[,]" and (3) a causal nexus between the retaliatory action and the protected speech. *Williams v. Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023) (quotation omitted).

Ivey and Hamm do not dispute that Plaintiffs have carried their pleading burden as to the second and third elements of the constitutional test.[124] Their motion turns only on their erroneous contention that Plaintiffs' speech and expressive conduct, as alleged, is not constitutionally protected.

---

[123] All individual Plaintiffs are First Amendment Plaintiffs. FAC, Count V.

[124] Plaintiffs have alleged that ADOC has taken adverse actions against them—including issuing discipline that threatens to extend their incarceration, transfers to more violent facilities, placement in solitary confinement, food deprivation, and direct physical violence by ADOC staff—that would deter an ordinary person from speaking. *See, e.g.*, *Williams*, 64 F.4th at 1192-93; FAC ¶¶308, 317, 609-10, 613, 627-29, 631, 816. Plaintiffs have also alleged that these actions were taken specifically in retaliation for their speech. FAC ¶¶110, 591, 609-10, 631, 809-12.

Plaintiffs' speech and expressive conduct is afforded the protections of the First Amendment.[125] Plaintiffs allege that ADOC and Ivey retaliate against them for two categories of First Amendment protected speech: (1) *individual* statements they make that an ADOC official construes as a complaint about work, resistance or refusal to working, or desire to not work, *id.* ¶¶87, 131, 173, 389, 597; and (2) their use of *collective* work stoppages as a way to draw attention to the horrific living, forced labor, and working conditions in Alabama's prisons, *id.* ¶¶605-21, 810-11.

Ivey and Hamm largely ignore the strength and volume of Plaintiffs' allegations and present no argument at all as to the entire first category of protected speech identified in the FAC. Because Ivey and Hamm do not move to dismiss the claim as to this first category of protected speech, that part of the claim, at a minimum, must be permitted to proceed.[126]

---

[125] "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. Incarcerated people are "considered to be exercising [their] First Amendment right of freedom of speech when [they] complain[] to the prison's administrators about the conditions of [their] confinement." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). When a prison official retaliates against an incarcerated person for making such complaints, it is "established that [they] may maintain a cause of action against prison administrators" to redress that unlawful retaliation. *Id.*

[126] As to the first category of protected speech, Plaintiffs allege that ADOC, both pursuant to regulations and as a matter of policy and practice independent of those regulations, retaliates against Plaintiffs for all kinds of speech and conduct in relation to work. FAC ¶¶19, 87, 109-10, 131, 284-88, 302, 317. The FAC alleges that when incarcerated individuals are required to work unsafe jobs they are retaliated against and threatened with retaliation for speaking up about the work conditions due to ADOC's well-known policy and practice of punishing people who object to any job conditions—even if that person is still willing to do the job—by transferring them to a more dangerous and life-threatening facility or simply keeping them in the dangerous situations that sparked their protected complaint. FAC ¶275; *see also id.* ¶¶91, 273 (Plaintiff Mason begged to be reassigned to avoid credible death threat met with discipline for "refusing to work"); *id.* ¶19 (Plaintiff Walker disciplined for reporting public supervisor demanding sex as part of job to ADOC); *id.* ¶110, 114 (Plaintiff Ball advised by ADOC when he reported dangerous health situation on job that his "options" were to keep working or be disciplined for refusing to work); *id.* ¶155 (Plaintiff T. Clark disciplined for filing grievance regarding another worker's sexual advances); *id.* ¶¶173, 275, 388 (Plaintiff Dandridge disciplined for refusing to work and denied parole due to refusing supervisor's sexual advances); *id.* ¶¶389, 846.

The second category of protected speech alleged by Plaintiffs concerns ADOC's systematic, statewide retaliation against incarcerated people who seek to express their grievances via collective work stoppages or simply speak to advocate for collective work stoppages. *See* FAC ¶¶604-26. The FAC alleges that this retaliation includes restriction and denial of food, *id.* ¶610; ADOC refusal to let Plaintiffs buy necessary food, health, and hygiene items, *id.* ¶611; allowing the already inhospitable conditions in ADOC facilities to deteriorate to an even more extreme degree, *id.* ¶612; and transfers of incarcerated workers who declined to work as strike breakers to more violent and dangerous facilities, or subjecting them to solitary confinement as punishment, *id.* ¶¶613-14. Plaintiffs also allege in detail that the standard methods of retaliation for protected expression by ADOC are the transfer and threat of transfer to more violent and dangerous facilities, and the repeated infliction of direct violence. *See, e.g.*, *id.* ¶¶609-10, 613-14, 812-15.[127]

### 2. Ivey and Hamm Distort and Fail to Meet Their Burden Under *Turner*

Neither Ivey nor Hamm attempt to engage with the FAC's detailed allegations describing a culture of violent and excessive retaliation for raising concerns about working conditions. Instead, they focus solely on defending their formal policies

---

[127] Multiple Plaintiffs allege they were slapped as "punishment," FAC ¶¶32, 53, or had their access to food or basic sanitary supplies restricted, *id.* ¶615, for purportedly refusing to work. Plaintiffs allege that these retaliatory tactics were employed even against incarcerated people who did not participate in a strike (and thus had not broken any alleged ADOC rule or regulation), *id.* ¶¶615, 618. Plaintiff Council specifically alleges that he was viciously beaten by ADOC officials to the point he nearly lost his life (an attack from which he still bears permanent injuries) for repeatedly calling out ADOC for its forced labor regime and the dire and dangerous living conditions within ADOC, and peacefully urging people to refuse to perform forced labor, including through a collective work stoppage. *Id.* ¶631.

(Ivey's executive order and ADOC's regulations)[128] as "legitimate prison regulations" targeting *collective* work stoppages. *See* Dkt. 229 at 30; Dkt. 234 at 29.

Ivey and Hamm try to defend their formal policies by reference to the *Turner* test, which holds that a regulation that infringes upon incarcerated people's First Amendment rights is only valid (and thus preclusive of a plaintiff's claim) if defendants establish "it is reasonably related to legitimate penological interests", *Turner*, 482 U.S. at 89; *see also* Dkt. 178 at 159-62, using a four-part test:

(1) whether there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it;

(2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates;

(3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and

(4) whether the regulation represents an exaggerated response to prison concerns.

*Jarrard v. Moats*, 2021 WL 1192948, at *6 (N.D. Ga. Mar. 30, 2021) (quotation omitted).

Critically, Ivey and Hamm do <u>not</u> identify the "legitimate government interest" the executive order and ADOC regulations purportedly seek to advance. That shortcoming alone is fatal: under *Turner*, it is defendants' "burden … to put forward the actual interests that support their policies." *See Firewalker-Fields v. Lee*,

---

[128] Plaintiffs, of course, do not only challenge ADOC's regulations that subject them to severe consequences for collectively refusing to work or speaking about doing so. They also challenge ADOC's well-documented policy and practice of inflicting severe harms on incarcerated people individually, including physical violence, for exercising their First Amendment rights. *See supra* n.127. This persistent violence, described *supra*, is not captured by the regulations or executive order, and is a result of Ivey and Hamm's condoning ADOC's violent and toxic culture. Defendants' motion to dismiss has no answer to these allegations. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.").

58 F.4th 104, 116 (4th Cir. 2023).[129] It would be inappropriate for this Court (or Plaintiffs) to speculate as to the interests Defendants might purport to advance.[130]

Plaintiffs allege Defendants' policies seek to advance interests that are not legitimate, including "compelling incarcerated people to work for private employers, which only serves to make money for ADOC." FAC ¶¶402-15, 475, 490-91, 736, 817.[131] Neither profit nor benefits to private employers are interests related to "proper prison administration." *Johnson*, 543 U.S. at 510; *cf. Burrell*, 60 F.4th at 37-38 (compelling incarcerated people to provide "nearly free labor for most of the grunt work at a joint public/private profit-seeking operation" stated a claim for abuse of the otherwise legitimate penological objectives of community service). Plaintiffs also allege Ivey and Hamm have charted the highly unusual and very risky (from the perspective of Alabama's legitimate penological interests) course of responding to

---

[129] Ivey and Hamm "cannot avoid court scrutiny by reflexive, rote assertions." *Shimer v. Washington*, 100 F.3d 506, 510 (7th Cir. 1996) (citation omitted). Defendants must identify their claimed interests so those interests can be tested and measured against the restriction on constitutional freedom; indeed, for that reason, "evaluating whether there is a legitimate penological interest that permits a restriction on the constitutional rights of incarcerated individuals is not normally an exercise that can be undertaken in the context of a motion to dismiss brought under Rule 12(b)(6)." *Smith v. Hamm*, 2024 WL 116303, at *13 (M.D. Ala. Jan. 10, 2024), *adhered to,* 2024 WL 262867 (M.D. Ala. Jan. 24, 2024), and *aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corr.*, 2024 WL 266027 (11th Cir. Jan. 24, 2024) (citation omitted).

[130] In practice, the only two penological interests that have been repeatedly confirmed to be legitimate are safety and security, neither of which Defendants invoke here. *See, e.g.*, *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) ("protecting prison security"); *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 350 (1987) ("institutional order and security"); *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("internal security"). Even if Defendants had invoked some kind of safety or security interest—which they have not—Plaintiffs, at a minimum, have alleged sufficient facts to raise a genuine dispute as to whether those are the interests the regulations and executive order actually advance. *See Johnson v. California*, 543 U.S. 499, 510 (2005) (explaining that prison officials may only invoke *Turner's* more forgiving constitutional test to the extent that the asserted right "must *necessarily* be limited in the prison context") (emphasis added)).

[131] Plaintiffs also allege that Private Employer Defendants, with the assistance of ADOC, compelled incarcerated workers to perform non-approved, personal work on their behalf, which is even further from a legitimate interest. FAC ¶¶19, 112, 155, 196.

systemic understaffing by coercing incarcerated people by the hundreds and thousands to perform jobs—including basic supervision, oversight, medical care, and counseling—that previously and traditionally have been performed by paid ADOC staff. *See, e.g.*, FAC ¶¶ 76-77, 79, 292, 343-344.[132] Plaintiffs are forced to perform many of these jobs in unsafe and oppressive conditions, which is directly opposed to any purported safety and security interest. *Id.* ¶¶49, 91, 110, 163, 169, 174.

Further, even if a penological interest is legitimate in the abstract or even as applied to many prison facilities elsewhere, Plaintiffs' claims must be analyzed in the context specifically alleged. When asserting a legitimate penological interest—which, again, Ivey and Hamm have <u>not</u> done—prison officials bear the burden of demonstrating, on a case-by-case basis, that (a) they were acting in pursuit of that interest, and (b) their actions were reasonably calculated to further the interest. *Pesci v. Budz*, 730 F.3d 1291, 1299 (11th Cir. 2013).  The inherently context-specific nature of the "legitimate penological interest" prong of the *Turner* inquiry is precisely why courts in the Eleventh Circuit repeatedly decline to resolve the issue on a motion to dismiss. *See, e.g.*, *Culver v. Withers*, 2022 WL 2972835, at *2 (11th Cir. July 27, 2022); *Cranford v. Bayer*, 147 F.App'x 947, 948 (11th Cir. 2005); *Saleem v. Evans*, 866 F.2d 1313, 1316-17 (11th Cir. 1989); *Johnson v. Brown*, 581 F.App'x 777, 781

---

[132] In this way too (in addition to the profits realized from leasing humans to labor for private and public employers), Ivey and ADOC knowingly and directly benefitted financially and otherwise from the unlawful coercion to perform work running and maintaining the ADOC facilities.

(11th Cir. 2014); *Profit v. Rabon*, 2020 WL 687590, at \*4 (N.D. Fla. Jan. 9, 2020), *report and recommendation adopted*, 2020 WL 674427 (N.D. Fla. Feb. 11, 2020).

For example, in *Powell v. Schriver*, 175 F.3d 107, 112-13 (2d Cir. 1999), the Second Circuit explained that an incarcerated person's constitutional right to privacy was violated when prison officials disclosed their medical information "gratuitous[ly]…as humor or gossip," *even though* the court observed that "[i]t is easy to think of circumstances under which disclosure of an inmate's HIV-positive status *would* further legitimate penological interests." *Id.* (emphasis in original). Likewise, Plaintiffs do not contest ADOC generally has legitimate interests in safety and security. But even if Ivey and Hamm actually asserted these interests (they do not), Plaintiffs' allegations, which *must* be presumed true, demonstrate (1) those are *not* the interests advanced by its challenged regulations, policies, and practices, and (2) the relationship between those interests and ADOC's violent and punitive actions and regulations, is insufficiently close to pass muster under *Turner*.

Ivey and Hamm's methods of advancing their illegitimate profit interests, which include consistent violence, threats of violence, and deprivations of basic necessities, are fundamentally illegitimate. *See Smith v. Vavoulis*, 2009 WL 702903, at \*3 (M.D. Fla. Mar. 17, 2009), *aff'd,* 373 F.App'x 965 (11th Cir. 2010) (beating an incarcerated person who offers no resistance serves no penological interest). Preventing collective work stoppages that reasonably threaten legitimate institutional safety or security interests is one thing, but it is clearly another when prison officials use systematic violence to categorically prohibit any protest, however mild, in service of a profit-seeking forced labor scheme that itself already

jeopardizes such legitimate institutional safety and security interests (such as by coercing incarcerated workers through violence to staff and operate the prison).[133]

### 3. Defendants' Cited Authorities Do Not Support Dismissal

Ivey and Hamm rely exclusively on *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 129 (1977) and a Second Circuit case citing *Jones* (*Pilgrim v. Luther*, 571 F.3d 201 (2d Cir. 2009)), to justify their failure to engage with the *Turner* factors and their contention that this Court should deem Ivey's executive order and ADOC's regulations facially legitimate without applying *Turner* or crediting Plaintiffs' allegations. *See* Dkt. 229 at 24-25; Dkt. 234 at 29.

Neither case holds, nor could they, that every prison rule prohibiting expressive activity related to collective work stoppages is *always* legitimate, or that requiring incarcerated people to work is permissible no matter the circumstances. Indeed, the *Jones* Court reached its conclusion *after* the prison's argument of legitimacy was put to the test. *See Jones*, 433 U.S. at 123-24 (describing three-judge district court's factual findings); *id.* at 127-28 (emphasizing district court finding that prison's articulated concerns regarding unionization appeared "sincere[]").

Further, neither *Jones* nor *Pilgrim* address the legitimacy of prison rules requiring *individuals* to work, which Plaintiffs challenge here. Both concern

---

[133] Plaintiffs also plausibly allege that ADOC's regulations are grossly disproportionate to any concerns Hamm and Ivey might have asserted. As discussed in Part II.C.1.*a, supra*, the ADOC regulations classify refusals to work as medium level violations punishable by solitary confinement for up to 30 days and the extension of a person's time in prison by nearly 2 years. FAC ¶¶286-87. The arguably less disruptive conduct of "encouraging" others to stop work—pure speech that lies squarely at the heart of the First Amendment, *see Brandenburg v. Ohio*, 395 U.S. 444, 448-49 (1969)—is punished even more harshly, with up to 45 days in solitary confinement, a three-year extension of a person's release date, and loss of privileges for up to 60 days, among other penalties on par with offenses such as assault, robbery, and inciting a riot. FAC ¶¶286, 288.

*collective* activities by incarcerated people, and the collective nature of those activities animated both decisions' concerns regarding the threat such collective actions could have to legitimate penological concerns regarding order and stability.

Narrowing the lens to ADOC's regulations and Ivey's executive order punishing expressive activity relating to *collective* work stoppages, the *Jones* Court addressed a categorically different collective activity—the formation of a labor union—not a collective work stoppage. The Court was concerned about the unique security threats posed by the introduction of a formal union structure into prisons. 433 U.S. at 126-27. Nor were these concerns mere assertions; prison officials testified, and enlisted experts to corroborate their testimony. *Id.* at 127-28.

In *Pilgrim*, a non-controlling decision, the Second Circuit did consider a rule prohibiting speech about *collective* work stoppages, but also went to great effort to explain that its upholding of that rule was the product of a series of cases in which the four *Turner* factors were considered as applied to the prison context at issue. It also critically held that collective protest was not protected "where other less disruptive means of airing grievances are available." *Pilgrim*, 571 F.3d at 205. Here, in contrast, Plaintiffs specifically and plausibly allege that other disruptive means of airing grievances are <u>not</u> available.[134]

---

[134] Indeed, *Jones* and *Pilgrim* each rested heavily on the fact that those plaintiffs had viable alternatives to the speech for which they sought constitutional protection. *See Jones*, 433 U.S. at 130 n.6; *Pilgrim*, 571 F.3d at 205. This Court's prior order found that Plaintiffs did not allege that they could not, for example, "writ[e] the warden, contact[] the media, or fil[e] a lawsuit to discuss their concerns." The FAC now alleges that the rampant culture of retaliation that pervades ADOC functionally prevents them from being able to air their grievances regarding Alabama's forced labor scheme in *any* forum. *See, e.g.*, FAC ¶174 ("Mr. Bullock has never considered going to the media because he fears retaliation from the warden if he were to do so."); *id.* ¶389 (ADOC warden told incarcerated man who complained about exposure to poison ivy that "he doesn't 'have the

Moreover, neither *Jones* nor *Pilgrim* provides Hamm or Ivey with refuge for their orders and rules prohibiting speech advocating for collective work stoppages on the specific facts Plaintiffs plausibly allege here because of the *sui generis* context: Plaintiffs allege Alabama has responded to ADOC's catastrophic understaffing by coercing forced incarcerated laborers to fill vacant positions, leaving incarcerated people to run the prison. *See, e.g.*, FAC ¶¶76-77, 79, 292, 343-44; *supra* n.20. Neither decision addresses the protected conduct at issue here, in which Plaintiffs—who are forced to work as, essentially, unpaid prison staff—seek protection for (1) their individual peaceful expression of their desire to be free from compelled labor by asking questions, raising complaints about work conditions, and/or expressing concerns about working in unsafe and illegal conditions, and (2) a time-limited, peaceful collective refusal to work to bring attention to grievances about specific, systemic and long unredressed unconstitutional conditions, including the ongoing regime requiring their regular forced labor. This speech lies at the heart of the First Amendment, *see Williams*, 64 F.4th at 1192, and the security interests that were at play in *Jones* and *Pilgrim* are not obvious, if they exist at all.

---

right to quit' working and that 'you quit when we tell you to quit.'"); *id.* ¶640 (alleging that incarcerated people have written letters in the thousands to the Governor and wardens with no response). When multiple Plaintiffs attempted to raise valid complaints about sexual harassment on the job, they were punished. *Id.* ¶¶19, 155. Likewise, one Plaintiff alleges that when he complained about being violently physically attacked by his workplace supervisor, ADOC simply told him to go back to work. *Id.* ¶¶129, 575. And of course, the lawsuit the Court suggests might be filed is *this case*. Plaintiffs are currently using the only avenue ADOC has left available to them. *See Johnson v. Avery*, 393 U.S. 483, 487, 490 (1969) (holding that regulation preventing some incarcerated people from providing legal assistance to others effectively prevented illiterate people from filing habeas petitions and was thus unenforceable "unless and until the State provides some reasonable alternative").

**B.    Plaintiffs Have Standing to Seek Injunctive Relief for First Amendment Violations**

The currently incarcerated Plaintiffs are also entitled to and have standing to seek injunctive relief against Ivey and Hamm.[135] Defendants erroneously contend that the FAC concerns only past conduct, Dkt. 229 at 29; Dkt. 234 at 26, but Plaintiffs plausibly "allege facts from which it appears there is a substantial likelihood that [they] will suffer injury in the future." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999).

Plaintiffs plausibly allege that the "threatened injury" of ADOC enforcing its regulations and engaging in other retaliatory conduct "is certainly impending or there is a substantial risk that the harm will occur." *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) (internal quotations omitted). Plaintiffs have stated facts supporting the inference that they "wish to exercise their right to protest, speech that is affected with a First Amendment interest, and believe that [ADOC regulations and practices] prevent[] them from doing so." *Id.* That belief is well-founded, given ADOC's history of enforcing its regulations and engaging in brutal retaliatory conduct. *See* FAC ¶¶591-603, 609-20, 627-34. Plaintiffs have also alleged an intent by ADOC to enforce the challenged regulations in the future. *Id.* ¶¶271, 626, 809, 816; *see Dream Defs.*, 57 F.4th at 887-88. The regulations are presently in effect, and Ivey and Hamm have vigorously defended their right to enforce them in this litigation. *See* FAC ¶¶811, 816; Dkt. 148 at 84-85; Dkt. 229 at 30-31; Dkt. 234 at 29; *Dream Defs.*, 57 F.4th at 887-88. Plaintiffs allege Defendants'

---

[135] Claims against public official defendants for prospective relief are not subject to a qualified immunity defense. *See Rogers v. Miller*, 57 F.3d 986, 988 n.4 (11th Cir. 1995).

retaliation and repression "has not abated," as reflected by the recent collective punishment at Fountain, including of the frail and elderly, for a peaceful work stoppage. FAC ¶626.

Moreover, Plaintiffs allege that they "have been deterred and can reasonably be expected to be deterred in the future from advocating for the withholding of labor or from actually withholding their own labor because of Defendants Ivey and Hamm's policy of unlawful retaliation." FAC ¶816.[136] Ivey and Hamm disingenuously label this allegation as conclusory, disregarding the numerous supporting allegations detailing ADOC's practice and policy of requiring Plaintiffs to keep silent about their working conditions and continue to work out of fear of retaliation.[137] *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998).

## VIII.  Plaintiffs Adequately Plead Their Ex Post Facto Claim

Plaintiffs[138] have adequately alleged their Ex Post Facto Claim against Ivey, Marshall, Gwathney, Littleton, Simmons, and Hamm ("Parole Defendants").

The Ex Post Facto Clause "bar[s] enactments which, by retroactive operation, increase the punishment for a crime after its commission," and prohibits the

---

[136] This allegation includes all currently incarcerated Plaintiffs except for Council.

[137] *See, e.g.*, *id.* ¶49 (Plaintiff McDole "feels compelled to keep working ... to make sure that he can see his family"); *id.* ¶60 ("Mr. Campbell feels compelled to work" to avoid being "disciplined or shipped back" to a more violent facility); *id.* ¶157 (Plaintiff T. Clark alleging that "[i]f he asks not to work a single day, he will [] be written up…"); *id.* ¶174 ("Mr. Bullock has never considered going to the media because he fears retaliation from the warden if he were to do so."); *id.* ¶638 ("Even when incarcerated people do attempt to use the grievance process, they are often met with retaliation intended to dissuade them from doing so[.]").

[138] As set forth in the FAC, the Plaintiffs who bring claims under the Ex Post Facto Clause are the currently incarcerated Plaintiffs who have been denied parole (Moore, Cole, McDole, Campbell, Ptomey, Pritchett, English, Cartwright, Ball, R. Clark, Morrisey, Prewitt, T. Clark, Jarmon, Evans, Bullock, and Thomas), and the Organizational Plaintiffs. FAC, Count VI. Hamm is joined only to the extent that he is necessary to afford complete relief to Plaintiffs. Fed. R. Civ. P. 19(a)(1)(A).

enforcement of any law that would extend or alter a person's criminal sentence *after* the judiciary has issued a sentence for a given criminal act. *Garner v. Jones*, 529 U.S. 244, 249 (2000). The Supreme Court has explained that the Ex Post Facto Clause's prohibitions extend to changes in parole laws, as a retroactive change in "laws governing parole ... may be violative of [the prohibition of retroactive punishment]" when it creates "a sufficient risk of increasing the measure of punishment." *Id.* at 250 (internal quotations omitted).[139]

Plaintiffs allege in detail how Ivey, Marshall, and the Parole Board Members' implementation of the 2019 revisions to Alabama's parole statutes ("Parole Amendments" or "2019 Amendments")[140] has created a significant risk of prolonging the incarceration of currently incarcerated Plaintiffs and the Parole Class they seek to represent. *See, e.g.*, FAC¶¶249, 291, 327, 366, 433, 501, 673, 682, 729, 822, 828. The FAC also cures the deficiency identified by this Court in its prior order, now comparing Alabama's current parole statute to the statutes in effect when Plaintiffs committed their crimes. *See* Dkt. 215 at 29-32.[141] In so doing, the FAC presents extensive factual allegations showing as-applied and facial Ex Post Facto violations.

---

[139] This prohibition serves two constitutional purposes. First, it "assure[s] that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). Second, it enforces the separation of powers by "confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law." *Id.* at 29 n.10.

[140] 2019 Ala. Laws Act No. 2019-393, §1 (amending Ala. Code §15-22-26).

[141] The FAC addresses this in two ways. First, it directly compares the 2019 Parole Amendments to the 1951 Alabama parole statute that was in effect when most Plaintiffs committed their crimes. Second, the FAC adds Plaintiff Prewitt, who committed his crime between 2015 and 2019, and thus also compares (for Prewitt and others sentenced in this period) the 2019 Parole Amendments to the parole statute in effect from 2015 to 2019 (when the Justice Reinvestment Act was in effect).

A.    **Plaintiffs Adequately Allege an Ex Post Facto Violation Through Practical Implementation of the 2019 Amendments**

1.    **Parole Defendants Have Implemented the 2019 Amendments to Significantly Lower the Chance of Receiving Parole Than at Any Time Since 1993**

To meet their burden at the motion to dismiss stage, Plaintiffs need only allege that the "practical implementation" of Alabama's 2019 alterations to its parole system "creates a significant risk of prolonging [Plaintiffs'] incarceration" as compared to "under the earlier rule." *Garner*, 529 U.S. at 249, 255; *see also* Dkt. 215 at 33 (quoting *Garner*). As this Court explained, "[t]o state an ex post facto violation, what Plaintiffs must show with [their] statistics is that the 2019 amendments have increased parole denial rates as compared to the years they committed their crimes." *Id.* Plaintiffs' FAC meets this burden.

The FAC alleges extensive facts demonstrating that the Parole Defendants took advantage of the 2019 Parole Amendments to overhaul the Alabama parole system, creating a dramatically increased risk of prolonged incarceration for all parole-eligible incarcerated people, and nearly denying parole uniformly for people convicted of "violent" offenses. *See, e.g.*, FAC ¶¶660-62, 664, 673-82, 828, 883. These detailed allegations clearly state an actionable Ex Post Facto claim.

The FAC alleges that prior to the 2019 Parole Amendments, Alabama's Parole Board operated with remarkable consistency for decades. The FAC identifies the number of people paroled each year from 1992 to 2023-2024 (the last available numbers), showing that from FY 1992 to FY 2019, the Board granted parole at an average annual rate of 36.7%, reviewing an average of 7,007 cases per year during

that same time period. FAC ¶¶672-73. Also from FY 1992-2019, the Board granted release annually, on average, to more than 2,500 people, with the low bar prior to 2019 being 1,644 people in 1995-1996 and the highest level of 3,954 people being in FY 2003. *Id.* This consistency persisted across different Board compositions, governors, and political climates, demonstrating this pace of releases and rate of grants reflected the steady, practical implementation of Alabama's parole statute. *Id.*

The FAC alleges that the implementation of the Parole Amendments shattered this historical pattern. It alleges that the Parole Defendants seized on the Jimmy Spencer tragedy and the following change in statutory language to drop parole grant rates dramatically from 53.34% in FY 2018 to 20.12% in FY 2020, 10.22% in FY 2022, and 8.29% in FY 2023. FAC ¶¶652, 656-73. Defendants reduced parole grants to a trickle not just by slashing the parole grant rate for those who appeared before the Board, but also by: 1) sharply limiting the number of hearings held—from the typical annual 7,000 to just 2,704 in FY 2020, delaying hearings without explanation months and years beyond the scheduled date; and 2) dramatically increasing set off periods. *See, e.g.*, *id.* ¶¶672-77, 712-13. The Board has granted parole on average to less than 500 people annually since 2019, which is *an 80% reduction* in annual parole grants compared to the average *for all years before 2019*. *Id.*

The change is even more pronounced for people serving sentences issued for offenses Alabama categorizes as "violent."[142] For such people, the FAC alleges that

---

[142] Alabama law classifies many crimes as "violent" that do not involve any physical violence. *See* Ala. Code §12-25-32(15) ("violent" crimes include sodomy, stalking, burglary, extortion, promoting prostitution, and drug trafficking).

Defendants have implemented a near complete alteration of their sentences since the 2019 Amendments, to remove altogether the possibility of parole. FAC ¶¶657, 662-64, 675-80, 822. In FY 2018, before the challenged changes, 44.7% of parole candidates with violent convictions were granted release. *Id.* ¶675. By FY 2022, that rate had collapsed to 3.5% overall, with zero parole grants for people convicted of certain offences, such as homicide.[143] *Id.* ¶¶675-76.

Each individual Plaintiff alleges[144] that they are now *significantly* less likely to receive parole than when they committed their crimes because of Parole Defendants' implementation of the 2019 Amendments. FAC ¶¶672-73, 828. This dramatic reduction in parole grant rates, which has caused each Plaintiff to have an increased risk of a longer sentence, *see id.* ¶¶828-29, is due in significant part to the exact retroactive "practical implementation" that *Garner* forbids. 529 U.S. at 255. The Board's own data confirms this transformation: parole grant rates plummeted from historical averages exceeding 30% to single digits, with grants for those

---

[143] Parole Defendants' argument that these low rates reflect public outcry from the Spencer murders fails for three reasons. First, it ignores that the parole grant rate *also* saw another precipitous decline after the passage of the 2019 Parole Amendments. FAC ¶¶660-61, 673, 675. Second, public support for a retroactive alteration of sentences does not excuse or justify violation of the Ex Post Facto Clause, a provision that necessarily contemplates a situation where the legislative branch, based perhaps on public outcry, takes action to retroactively change sentences for crimes which occurred in the past. *See Mickens-Thomas*, 321 F.3d at 387 (while parole boards are "entitled to learn from past experiences and mistakes … [t]hat a Board or legislature may learn from experience does not mean that those who were sentenced at an earlier juncture may now be more severely re-sentenced in the light of newly-found wisdom."). Third, at best, Defendants' argument raises a factual dispute that cannot be resolved on a motion to dismiss.

[144] In addition to the FAC's specification of parole data back to 1992 (the date at which public data could be secured by the time of the FAC filing), Plaintiffs also specifically allege that they are aware of individuals who served far less time than they have now served on identical or more severe sentences because those people were granted parole under the standards and law prior to 2019. *Id.* ¶¶16, 43, 116, 678.

convicted of violent offenses falling from 44.7% in FY 2018 to as low as 3.5% in FY 2022. FAC ¶¶642, 673, 675-76.[145]

Although Plaintiffs' allegations of the heightened risk of lengthened sentences are clearly plausible based on the public information analyzed and cited in the FAC, Plaintiffs' claim is bolstered by additional allegations regarding the Board's changed practices. Plaintiffs allege numerous facts, including publicly available data, FAC ¶¶672-78, reports of Board practices, *id.* ¶¶682-85, and the statements of Defendants' themselves, *id.* ¶¶657-60, 663, 665, showing Parole Defendants' statewide modification of carefully crafted judicial sentences from "with possibility of parole" to "without possibility of parole," particularly for those convicted of "violent" offenses—regardless of any data or victims supporting these individuals' release, the duration of their confinement, their efforts to prepare for reentry, their disciplinary record, their proven track record of working unsupervised in the community without incident, other work history, or any other factor. *Id.* ¶¶666, 675, 680, 682, 703, 707, 713, 718, 726; *see also id.* ¶¶678, 680, 821 (former Board members and staff confirm change in Board's practices)[146]

---

[145] Parole Board Members argue that the fact Plaintiff English eventually received parole after Board Member Simmons was appointed proves that parole grant rates simply reflect individual Board Members' discretion. Dkt. 231 at 11. The fact that the Parole Board is granted discretion in its decision-making is not a defense to an Ex Post Facto Clause violation: a violation is detected by an analysis of the practical impact of an enactment by the legislature or the executive to retroactively lengthen sentences systemwide. *Garner*, 549 U.S. at 249, 255.

[146] The FAC also points to Parole Defendants' subversion of the lawful operation of the parole system by revoking parole systemically for unproven and frequently meritless assertions without providing minimal due process, further increasing the length of sentences served by Plaintiffs. FAC ¶¶683-85.

Finally, the Ex Post Facto claim brought by Plaintiff Prewitt, who committed his crime of conviction in 2016, presents the stark contrast between the parole practices when the 2015 Justice Reform Act ("JRA") was in full effect and the Board's practices following the 2019 Amendments. *Id.* ¶¶672, 829, 858. The appropriate comparison for Prewitt and others similarly sentenced between 2015 and 2019 is the JRA, which required that the Board to abide by evidence- and data-based practices in its decisions. *Id.* ¶¶650-53. During that time, more than half of all parole applicants received parole. *Id.* ¶¶672, 674. Parole Defendants cannot chalk up those rates to changed Board composition as the increase happened immediately after the same Board began applying the JRA's evidence-based decision-making framework.[147] *Id.* ¶¶650-54. Parole Defendants' wholesale abandonment of those statutory requirements after 2019 offends the Ex Post Facto Clause as applied to Prewitt and all others who committed their crimes while the JRA was in effect.

### 2. Unprecedented Reduction in Parole Grants Is a Direct Result of Defendants' Deliberate Efforts to Alter Plaintiffs' Sentences

This drastic and unprecedented reduction in the annual parole grants is not a mere statistical fluctuation attributable to the exercise of Board members' discretion, as Defendants improperly urge this Court to decide as a matter of fact at the pleading stage. Dkt. 231 at 9-11. To the contrary, Plaintiffs specifically allege a deliberate scheme initiated by the Governor and Attorney General, who summoned Parole Board Members to a meeting where they instructed them to stop releasing people

---

[147] In any event, Defendants' speculation that the changes in grant rates are due to the decisions of particular members is a factual dispute that is not appropriate for a motion to dismiss.

convicted of violent crimes. FAC ¶657. When Board members resisted their direct commands, Ivey issued a parole moratorium while Marshall and Ivey pushed through legislative changes altering the statutory language and giving the Governor unprecedented control over the Board. *Id.* ¶¶659-60. Ivey used that authority to hand-pick an executive director and a new Board Chair, Gwathney, under whose leadership the number of hearings, grants and parole rate plummeted. *Id.* ¶¶661-62, 673-74, 722.

The FAC also describes how Ivey was involved in pre-2019 efforts to reduce overcrowding and unsafe and violent conditions in Alabama's prisons and how the JRA was intended to and did reduce the ADOC population through evidence-based parole practices, including prioritizing the parole of incarcerated people who already worked in the community unsupervised on a regular basis. *Id.* ¶¶646-53. Until the 2019 Amendments, the Parole Board's focus on parole applicants' documented likelihood to reoffend naturally tended to grant parole to those who had already demonstrated a "reasonable probability" of being able to work in the community unsupervised, because they already were doing so. *Id.* ¶¶641-43.[148]

Defendants cannot sidestep these facts by arguing that they began implementing their unlawful scheme before it was enshrined in law. *See* Dkt. 231 at 10. The decrease in the parole grant rate between fiscal years 2018 and 2019—which overlaps with the time when Spencer committed his crimes—just as plausibly

---

[148] The JRA, which Defendants abandoned, honed and standardized the existing practice of using work in the community as a reliable indicator of which persons had a reasonable probability of living safely in the community, leading to extremely high parole rates among that population. FAC ¶¶717-18.

reflects that the Parole Defendants seized on Spencer's crimes as an opportunity to begin the process of closing down parole statewide. Indeed, that is precisely what Plaintiffs allege.[149] FAC ¶656. Defendants have no explanation for why the grant rate and the number of people paroled annually continued to decline to an all-time low of 8.29%, representing just 297 people paroled, in 2023.

Parole Board Members also emphasize that the parole grant rate increased from 8.29% in FY 2022 to 20.28% in FY 2023, Dkt. 231 at 10, but this fact does not provide Defendants with a defense to the Ex Post Facto violation: applying basic math sense to the data, a parole grant rate is relevant only in relation to the number of hearings held: clearly, an Ex Post Facto violation could be well-plead even in situations where a parole grant rate was 100% if the Parole Board only scheduled one or a handful of hearings each year. In the year that Defendants boast of a 20.28% parole grant rate, the Parole Board held only 2,786 hearings—just above the all-time low number of 2,704 hearings it conducted in FY 2019. Thus, its 20.28% parole grant rate that year resulted in just 565 parole releases. FAC ¶673.

Also contrary to Defendants' arguments here, neither the Legislature's motive in passing the law nor the fact that the Parole Board is granted or exercises discretion in its decision-making are determinative of whether the Ex Post Facto Clause has been violated. Rather, the inquiry is a practical one: had the law in question "create[d] a significant risk of prolonging…incarceration." *Garner*, 529 U.S. at 251. *Mickens-Thomas v. Vaughn*, 321 F.3d 374, 377-78 (3d Cir. 2003), is on point. There,

---

[149] And even if that were not the case, the parole grant rate in fiscal year 2018—31.31%—was in keeping with Alabama's historical averages. *See* FAC ¶674.

the Third Circuit relied heavily on statistical evidence—namely, a dramatic change in parole grant rates after the challenged amendment for prospective parolees in the same category as the plaintiff—to find an unconstitutional retrospective change in parole eligibility. The court emphasized the significance of the consistency of the historical rate over time, given that "[d]oubtless, the[] earlier Parole Boards spanned a wide spectrum of political and penological philosophies." *Id*. at 385. There, like here, "[t]he [plaintiff's] application [was] distinguished from [the historical] cases only by the intervening policy directive ... emphasizing public safety." *Id*.[150]

Defendants' heavy reliance on *Porter v. Ray*, 461 F.3d 1315 (11th Cir. 2006), is misplaced. There, the Eleventh Circuit reasonably concluded that statistical evidence showing, on average, that individuals served 79% of their sentences was insufficient on its own to establish a de facto policy of requiring prisoners to serve the greater of 90% of their sentences or a Guidelines range. *Id*. at 1321. The *Porter* plaintiffs did not present evidence at summary judgment comparing parole determinations before adoption of the alleged de facto policy; they asserted only that people served lower percentages of their sentences previously. *Id*. In expressing doubt that the *Porter* plaintiffs' statistics supported the de facto policy alleged, the court did *not* hold that statistics have "no value" in an Ex Post Facto challenge to parole laws and practices. *Id*. Plaintiffs here allege both that the Legislature plainly altered the standards for how the Parole Board was to exercise its discretion, adding

---

[150] *See also Lynce v. Mathis*, 519 U.S. 433, 442-43 (1997) (state's motivation "not relevant to the essential inquiry demanded by the Ex Post Facto Clause"); *Flemming v. Oregon Bd. of Parole*, 998 F.2d 721, 726 (9th Cir. 1993) ("discretionary aspects of a law do not preclude an ex post facto violation"); *Fletcher v. Reilly*, 433 F.3d 867, 876 (D.C. Cir. 2006) ("the existence of discretion [in parole determinations] is not dispositive").

"public safety" as a new factor to consider and dictating that this new factor should be the Board's "paramount duty," *see* Ala. Code §15-22-26(a); *and* that the statistics confirm that implementation of this mandate significantly and systemically reduced access to parole, creating a significant risk of increased punishment.[151]

Finally, Parole Board Members cite a series of cases that simply prove the accuracy of Plaintiffs' factual allegation that *until the implementation of the 2019 Amendment*s, the Parole Board conducted a multifactor analysis of individuals' fitness for parole that did *not* rely exclusively on the applicant's underlying crime of commission. *See* Dkt. 231 at 12.[152] Plaintiffs specifically and plausibly allege, with data, that the Board has abandoned that holistic inquiry. FAC ¶¶658, 675, 822-23.

## B.    Plaintiffs Adequately Allege a Facial Ex Post Facto Violation

As the FAC alleges, Parole Defendants were only able to implement their wholesale remaking of Alabama's parole system and the corresponding extension of Plaintiffs' sentences because the Alabama Legislature amended the parole statute in 2019. FAC ¶¶659-64. Those 2019 Amendments materially altered the standards for parole from the 1951 version in effect when most of the Plaintiffs who bring Ex Post Facto Clause claims and those in the putative class were issued sentences by

---

[151] Defendants also cite *Howard v. Coonrod*, 134 F.4th 1136, 1146-47 (11th Cir. 2025), but that case involved an Eighth Amendment challenge to Florida's juvenile parole system, not an Ex Post Facto claim; and the court considered a static snapshot of Florida's parole rate, not the comparative analysis the Ex Post Facto Clause demands.

[152] *See Thomas v. Wynne*, 2016 WL 3763229, at *4-5 (M.D. Ala. 2016) (documents, nature of the offense, and hearing testimony); *Mitchell v. Wynne*, 2015 WL 1345208, at *4-5 (M.D. Ala. 2015) ("personal history, social history, criminal history ... details of the offenses ... adjustment during his sentence ... proposed home [plan] and job program and information about ... Mr. Mitchell's being paralyzed"); *Parker v. Williams*, 2005 WL 1163169, at *6 (M.D. Ala. May 16, 2005) (describing the plaintiff's mental health assessment, which determined that he suffered from severe behavioral deficiencies and was psychologically at a high risk for recidivism).

Alabama's judges, by imposing a requirement that "public safety" be treated as the "paramount" consideration. FAC ¶¶641, 660; Ala. Code §15-22-26(a).[153]

From 1951 until 2015, Alabama's 1951 parole law established a standard for granting parole that focused on each individual applicant's suitability for early release.[154] That law required the Board to assess, on a case-by-case basis, whether a "reasonable probability" existed that the applicant could successfully reintegrate into society without reoffending—a forward-looking, individualized inquiry into rehabilitation and fitness for release that accounted for social, cultural, and economic factors, not just safety. FAC ¶641.

With the 2019 Amendments, the individualized assessment mandated by the 1951 statute was replaced with an order to prioritize public safety above all else:

> No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that the prisoner meets criteria and guidelines established by the board to determine a prisoner's fitness for parole and to ensure public safety. The guidelines shall serve as an aid in the parole decision making process and shall promote the use of prison space for the most violent and greatest risk offenders, while recognizing that the board's paramount duty is to protect public safety.

---

[153] While the Court previously construed Plaintiffs' Ex Post Facto claim to be a challenge to the difference between the 1951 statute and the 2019 amendments, Dkt. 215 at 32, Plaintiffs acknowledge that their original Complaint did not fully address these differences. The FAC provides more detail on the differences and, Plaintiffs believe, responds to the deficiencies identified in the Court's prior order.

[154] *See* Ala. Code §15-22-26 (1951) ("No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society.").

2019 Ala. Laws Act No. 2019-393 §1 (amending §15-22-26(a) with addition of underscored language).

The 2019 Amendments' addition of statutory language identifying public safety as an additional and "paramount" duty must be given effect. Courts should be particularly reluctant to treat a statutory amendment as having no effect; when a legislature acts, "it intends its amendment to have real and substantial effect." *Bufkin v. Collins*, 145 S. Ct. 728, 741 (2025) (internal quotations omitted).

"Paramount" means "superior to all others" or "supreme."[155] If, as Parole Defendants argue, Dkt. 231 at 8, the Legislature did *not* intend to change how the Board exercised its discretion, it would have had no need to have used this language designating protection of public safety as the "paramount" duty, or to say it twice. Defendants' explanation that "paramount" has no new meaning is also incompatible with the dramatic, immediate, and persistent decline in parole grants after the 2019 Amendments. *See supra* Part VIII.A.1. The more reasonable reading is that the Board's newly designated "paramount" duty to protect "public safety" is distinct from, and in addition to, the Board's prior responsibility to analyze "fitness for parole."[156]

Parole Board Members insist that the Board had discretion over whether to grant parole under either version of the statute, Dkt. 231 at 8—a fact that is both

---

[155] Paramount, Merriam-Webster Dictionary, https://perma.cc/3AJ6-9QC7.

[156] As alleged in the FAC, the Parole Board's decisions since the 2019 Amendments clearly indicate that Defendants themselves interpret this new statutory language to require the Parole Board to look at, and give greatest weight to, something different from a parole applicant's likelihood of reoffending—the touchstone for Alabama parole decisions since 1951. *See supra* Part VIII.A.1.

undisputed and inapposite to the relevant inquiry. The relevant change is how the 2019 Amendments restricted the exercise of that discretion by instructing that "public safety" is "paramount" over, and different from, assessing a person's "fitness for parole." *See Mickens-Thomas*, 321 F.3d at 377-78. This case is akin to *Mickens-Thomas*, where the Third Circuit held that a state's change in a parole statute that previously "made no specific mention of public safety" to one mandating that the parole board consider public safety "first and foremost," created a risk of increased punishment because even if "public safety was always a consideration," that "does not mean the Board gave it the same weight" before and after the amendments. 321 F.3d at 377-78, 384-85; *cf. Paschal v. Wainwright*, 738 F.2d 1173, 1180 (11th Cir. 1984) (court concluded that Florida parole guidelines "ensured an explicit, systematic continuation of the Parole Commission's past practice").

### C.    Plaintiffs' Ex Post Facto Claims Challenge Defendants' Ongoing Policy

Parole Defendants contend that the statute of limitations bars Plaintiffs Ptomey, Campbell, English, Cartwright, R. Clark, Prewitt, T. Clark, Jarmon, and Evans from bringing an Ex Post Facto claim. *See* Dkt. 231 at 13-14. Plaintiffs, however, challenge an *ongoing policy* of refusal to grant them parole in violation of the Constitution. Those "continuing enforcement actions ... continue[] to violate their rights" each time they are denied parole. *Doe as Next Friend of Doe #6 v. Swearingen*, 51 F.4th 1295, 1309 (11th Cir. 2022). Each Plaintiff bringing the Ex Post Facto claim was either denied parole within two years of the filing of the original complaint or will be subjected to the ongoing policy at their next parole

hearing, and the statute of limitations therefore poses no bar to their claims. *See* FAC ¶¶42, 52, 87, 133, 147, 149, 159, 165.[157]

## IX.    Plaintiffs Adequately and Plausibly Plead Equal Protection Claims

To state an Equal Protection Clause claim, Plaintiffs[158] must plausibly allege "an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1321 (11th Cir. 2021). In the parole context, the Eleventh Circuit requires a plaintiff to demonstrate that "he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray,* 279 F.3d 944, 946-47 (11th Cir. 2001) (internal quotations omitted). Although Plaintiffs' original complaint met this standard, in light of the Court's previous criticism of Plaintiffs' Equal Protection claim as not alleging adequate comparators, Dkt. 215 at 36-39, the FAC includes new factual allegations providing the requested comparators. *See* FAC¶¶679, 694, 699, 703, 711-22. The FAC also pleads robust, detailed facts sufficient to support the plausible inference that Black parole candidates are treated less favorably than similarly situated White candidates. *Id.* ¶¶655-747. And while Parole Defendants challenge Plaintiffs

---

[157] *Brown v. Georgia Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261-62 (11th Cir. 2003), and *Lovett v. Ray*, 327 F.3d 1181, 1182-83 (11th Cir. 2003), cited by Defendants, are thus inapposite because they rejected plaintiffs' challenges to a "one time act" that changed the *frequency* of parole considerations under Georgia law. *See Lovett*, 327 F.3d at 1183.

[158] Plaintiffs asserting Equal Protection claims are Moore, Cole, McDole, Campbell, Ptomey, Pritchett, Cartwright, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, Evans, and Thomas, and the Organizational Plaintiffs. *See* FAC, Counts VII, VIII.

allegations that Defendants acted with discriminatory intent, Dkt. 231 at 18-21, the FAC's allegations are detailed and plausible, as described below.

## A.    The FAC Plausibly Alleges That Similarly Situated Black and White Parole Candidates Are Treated Differently

Contrary to Defendants' arguments in their motions to dismiss, Plaintiffs do not need to prove their case at the pleading stage nor is Plaintiffs' Equal Protection claim subject to any heightened standard simply because it involves incarcerated individuals. Rather, it is well settled that an Equal Protection complaint "only needs to 'set out enough factual content to allow a court to draw the reasonable inference' of disparate treatment" because determining whether plaintiffs and their comparators are similarly situated is fact-intensive and better suited to summary judgment, upon a more developed factual record. *Street v. Talladega City Bd. of Educ.*, 2023 WL 2520340, at *8 (N.D. Ala. Mar. 14, 2023) (quoting *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1023 (11th Cir. 2016)); *see also Alvarez v. Lakeland Area Mass Transit Dist.*, 406 F.Supp.3d 1348, 1354 (M.D. Fla. 2019).

Here, the FAC presents detailed, well-substantiated allegations that Plaintiffs are "similarly situated to other prisoners who received more favorable treatment" sufficient to allow a reasonable factfinder to plausibly draw the inference that Black parole candidates were treated differently from White parole candidates. *Sweet v. Sec'y, Dep't of Corrs.*, 467 F.3d 1311, 1318-19 (11th Cir. 2006).[159] The Eleventh

---

[159] This Court's prior order advised that Plaintiffs needed to allege discrimination among similarly situated comparators in order to state an Equal Protection claim. Dkt. 215 at 35-36. Plaintiffs reserve their argument that they have also adequately alleged "a convincing mosaic of circumstantial evidence" of discrimination that, standing alone, is sufficient to state an Equal Protection claim. *See Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Circuit has cautioned that "exact correlation is neither likely nor necessary" and identified several factors for courts to consider when assessing whether Equal Protection plaintiffs have adequately pled similar situation to their comparators—*all* of which Plaintiffs' FAC meet:

- Plaintiffs satisfy the *Lewis* suggestion that comparators "will have engaged in the same basic conduct (or misconduct) as [Plaintiffs]" because their allegations control for the number of Class A-D felonies, incorporating into their comparators both the number of underlying offenses and the severity of those offenses, FAC ¶694;

- Plaintiffs satisfy the *Lewis* suggestion that comparators "will have been subject to the same [] policy, guideline, or rule as [Plaintiffs]" with their allegation that every person incarcerated in Alabama's prisons who is eligible for parole is subject to the same post-2019 parole statutes and guidelines, *id.* ¶¶839, 846;

- Plaintiffs allege facts akin to the *Lewis* suggestion that comparators "will ordinarily . . . have been under the jurisdiction of the same supervisor as [Plaintiffs]" because their allegations all pertain to the actions of a single entity, the Parole Board, led by the same Chair for the period through filing of the FAC, *id.* ¶¶693-95, 697-98, 710; and

- Plaintiffs satisfy the *Lewis* suggestion that comparators "will share the plaintiff's employment or disciplinary history," in their *new additional allegations presenting analyses that control for disciplinary history and employment status* by controlling for facility type, as well as analyses controlling for specific offense, where possible, with the data available to plaintiffs. *Id.* ¶¶693-94, 705-06.

*Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1226-27 (11th Cir. 2019).

Plaintiffs also present a statistically significant analysis of parole outcomes demonstrating that White parole candidates are nearly twice as likely to be granted parole than similarly situated Black parole candidates when controlling for facility type, fiscal year of hearing, sex, and job status (whether ADOC reported that the incarcerated person had checked out for a job during the fiscal year of the parole

hearing). FAC ¶693. This Court's prior order acknowledged that Plaintiffs' analysis effectively "controls for ... employment history" and "custody level," but found it did not control for other factors "such as whether the parole candidates had been convicted of the same or similar crimes, whether they were recidivists, and the time served when up for parole consideration." Dkt. 215 at 38-39. Accordingly, the FAC makes use of the limited publicly available data[160] to further allege, based on additional analyses conducted, that, even when controlling for sex, facility type, *and* number of each of Class A-D felonies, White parole candidates were still 1.3 times as likely to receive parole as Black candidates. FAC ¶694. The racially biased pattern holds for set-off dates.[161] Because the FAC now controls for these additional factors and involves comparators that meet the factors identified by the Eleventh Circuit, Plaintiffs should be permitted to proceed past the pleading stage.

Plaintiffs' FAC includes additional allegations identifying differential treatment of Black and White parole candidates within the subset of incarcerated people who are deemed sufficiently low risk to work unsupervised by ADOC staff in the community: in 2018, the Parole Board granted parole to Black parole candidates in work-release facilities at essentially equal rates as it granted parole to White candidates in 2018 (78.4% and 78.9%, respectively), but a sharp racial

---

[160] After this case was filed, Alabama amended its public records act to prohibit parties to pending litigation to avail themselves of public records requests. Ala. Code §36-12-46. Thus, contrary to Parole Board Members' misleading rejoinder, Dkt. 231 at 21, Plaintiffs did request additional data from ADOC that would allow them to more fully address the Court's concerns regarding comparators, but were denied access pursuant to the new public records statute; and individual Parole Board files remain privileged, non-public records. *See* Ala. Code §15-22-36.

[161] *See* FAC ¶¶696-98.

disparity appeared thereafter—in 2022, 23.4% of White parole candidates and 15.5% of Black parole candidates in work release were granted parole. *Id.* ¶¶704-05. The gross racial disparity is also reflected in the parole rates for those living in work center facilities, *i.e.*, among those working for public employers: in FY 2018, the parole rate was roughly equivalent for Black and White people—61.6% and 65.7%, respectively; but by FY 2021, White people were being granted parole at *three times* the rate of Black people. *Id.* ¶706.

As Plaintiffs have alleged, these disparities persist in other subsets of parole candidates. Among those serving sentences for "violent" convictions, a group for whom parole grant rates fell drastically—White candidates were favored by more than two to one among the small number of people granted parole. *Id.* ¶675. Among those serving sentences for nonviolent offenses, Black parole candidates are still granted parole less often than their White counterparts. *Id.* ¶¶709-11. There is even a racial gap in parole rates among those who are granted discretionary leave passes that allow them to live in the community unsupervised for up to 72 hours at a time.[162] And with respect to setoff dates—i.e., by how long the Board sets off a new hearing on parole—White candidates are more than twice as likely as Black candidates to receive setoffs of their parole hearing dates of two years or less, and Black candidates more likely to receive the maximum five-year setoff. That these racial disparities

---

[162] FAC ¶¶696-98; *see also id.* ¶¶717-18 (in 2018, 89% of Black people and 76% of White people with passes received parole, but between 2019 and 2023 only 28% of Black people and 36% of White people with passes received parole). To be clear, the recipients of these passes are permitted to live at home, unsupervised, in the community every other weekend for days at a time. *Id.* ¶717. The fact that they are afforded this freedom is an incredibly weighty indicator that they are members of an extremely low-risk population, as is also reflected in the historically high parole rate for members of this group. *Id.* ¶717-18.

exist across multiple subsets of parole candidates cannot be explained by pointing to recidivism rates: as alleged in the FAC, the State's own data shows that Black people recidivate at a lower rate than White people, even when controlling for crime of conviction. *Id.* ¶¶714-16. Defendants cannot point to any reason for the starkly different treatment of Black and White parole applicants that the Court must credit over Plaintiffs' detailed allegations, all of which support the plausible inference that racism is a central factor in the Board's decisions.

"[A]n unexplained statistical showing of disparate racial treatment by a single entity over a period of time" is sufficient to "raise the inference of an equal protection violation." *Fuller v. Georgia State Bd. of Pardons & Paroles*, 851 F.2d 1307, 1310 (11th Cir. 1988) (citing *McCleskey v. Kemp*, 481 U.S. 279, 295 n.15 (1987)). But Parole Defendants' only response is to handwave this overwhelming data away by quibbling over isolated data points and suggesting Plaintiffs should engage in even more refined and granular analyses than that presented in the FAC, Dkt. 231 at 16, 20, a point which is especially not well taken as Parole Defendants know that Plaintiffs requested and were denied such information. *See supra* n.160.

At this pleading stage, Plaintiffs have more than carried their burden to allege racially disparate treatment. But taking Parole Defendants' objections in turn: first, they argue that "facility type" is too broad a factor from which to draw useful comparisons, but as alleged in the FAC, ADOC itself uses facility type as a proxy[163]

---

[163] Plaintiffs do not contend that these determinations by ADOC are necessarily controlling on the Parole Board. However, they do inherently control for factors this Court found to be relevant in determining whether comparators are similarly situated for Equal Protection purposes. Dkt. 215 at 38-39.

for a wide array of relevant factors, including propensity for violent behavior, level of escape risk, willingness to follow rules and regulations, crime of conviction, amount of time to be served, program completions, and discipline incurred.[164] FAC ¶¶229, 231. Next, Parole Defendants argue that the number of Class A-D felonies is too broad because Alabama classifies both Murder and Rape I as Class A felonies. Dkt. 231 at 16-17. Not only do Defendants know that the information necessary for the analysis they urge is unavailable to Plaintiffs, but their argument would also require a level of "doppelganger-like sameness" that the Eleventh Circuit rejected in *Lewis*, 918 F.3d at 1226. "[E]xact correlation is neither likely nor necessary." *Id.* (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)).

Parole Defendants' final argument is the curious assertion that because one White Plaintiff (Ball) and three Black Plaintiffs (McDole, Cartwright, and Jarmon) were all denied parole, that fact "conclusively proves a lack of racial animus in the Board's parole decisions." Dkt. 231 at 17-18. As the Supreme Court has recognized, "mathematical disparities" are often sufficient to state a prima facie claim for racial discrimination, even if the discrimination is not absolute, based on basic observations about how large sample sizes work. *Castaneda v. Partida*, 430 U.S. 482, 495-96 & n.17 (1977). Obviously, thousands of White Plaintiffs were denied parole in this period along with a larger multiple of thousands of Black plaintiffs,

---

[164] Defendants do not, because they cannot, dispute these allegations, and in any event, at the pleading stage, Plaintiffs' allegations that facility type is a reasonable proxy for the relevant factors must be taken as true and are more than sufficient to establish that White and Black people in the different levels of facilities are similarly situated in relation to such factors.

which proves nothing: the question at issue here is whether there was a racial disparate impact in decisions to *grant* parole.[165]

### B.  Plaintiffs Sufficiently Allege That Racial Discrimination Motivated Defendants' Administration of the Parole System

In addition to alleging the stark disparate racial impact of Defendants' parole policies, Plaintiffs also allege that Parole Defendants acted with racially discriminatory intent. Plaintiffs have presented facts demonstrating that the weight of the factors articulated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), and developed in Eleventh Circuit precedent, support an inference of intentional discrimination here. *Id.* at 266-68; *see also Greater Birmingham Ministries*, 992 F.3d at 1322 (enumerating *Arlington Heights* and additional relevant factors).[166] Plaintiffs also allege facts plausibly tending to show that Defendants' proffered non-discriminatory justification for the clear racial disparities in grant rates and setoff dates is pretextual.

The "impact of the official action" is "an important starting point" for the Court's intent analysis under *Arlington Heights* because "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the

---

[165] To anticipate Defendants' likely next iteration of this nonsensical argument: of course, the Parole Board in this period has, in fact, granted parole to some Black Plaintiffs, including Alimireo English, but that merely shows that the alleged discrimination is not absolute, not that Plaintiffs have failed to allege such discrimination explains the systemic function of the Parole Board's grant decisions.

[166] As Defendants implicitly acknowledge, Dkt. 231 at 18, *Arlington Heights* and subsequent cases provide the governing framework for courts to assess whether race is a "substantial or motivating factor" in a defendant's challenged conduct. *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985) (internal quotations omitted); *see also Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018).

state action," despite its facial neutrality. 429 U.S. at 266; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487, 489 (1997) (effect is an "important starting point" because "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions"). This factor weighs strongly in favor of inferring discriminatory intent here. As discussed *supra*, parole grant rates went from almost perfect racial parity in 2018 to favoring White applicants at a rate of two to one in 2022. FAC ¶¶691-93. Plaintiffs allege these disparities persist even when looking separately at parole candidates serving sentences for "violent" convictions, *id.* ¶675, nonviolent offenses, *id.* ¶¶709-10, custody type, *id.* ¶¶705-06, and set-off dates, *id.* ¶¶696-98. *See, e.g.*, *Thompson v. Alabama*, 293 F.Supp.3d 1313, 1322 (M.D. Ala. 2017) (impact factor weighed in favor of plaintiffs who alleged statute disenfranchised 15% of the Black voting-age population but only 5% of the same White population).

Plaintiffs' allegations relevant to other *Arlington Heights* factors are likewise probative of discriminatory intent here. Starting with "the foreseeability of the disparate impact" and "knowledge of that impact," *Greater Birmingham Ministries*, 992 F.3d at 1322, Plaintiffs plausibly allege that the racial skewing of parole grant rates and setoff dates was a predictable outcome of Defendants' decision to abandon objective evidence-based assessments, FAC ¶¶675, 693, a consequence of disregarding objective standards long recognized by the courts.[167] Plaintiffs also

---

[167] *See, e.g.*, *Shealy v. City of Albany*, 89 F.3d 804, 806 (11th Cir. 1996) ("Subjective criteria tend to facilitate the consideration of impermissible criteria such as race."); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 871 (11th Cir. 1985) (Circuit has "frequently noted" "subjective evaluations" in employment context "provide a ready mechanism for racial discrimination"); *see also Williams v.*

amply allege that Parole Defendants were on notice of the discriminatory effect of their policies and practices as to parole *and* pardon[168] decisions, *id.* ¶¶665, 723, 724-38, such that failing to address these concerns is indicative of discriminatory intent.[169]

Another factor weighing in favor of Plaintiffs here is "the availability of less discriminatory alternatives." *Greater Birmingham Ministries*, 992 F.3d at 1327 (quoting *Jean*, 711 F.2d at 1486); *Dream Defenders*, 553 F.Supp.3d at 1095 ("less discriminatory alternative[], in the form of preexisting law" supports finding discriminatory intent). Here, the parole practices and procedures Ivey, Marshall, and the Parole Board Members abandoned in favor of the more restrictive and racially discriminatory system currently in place demonstrate a feasible, less discriminatory alternative. FAC ¶¶652, 654, 664, 690.

The remaining *Arlington Heights* factors address the context in which the challenged decisions were made—namely, the "historical background" of the policy or practice, the "specific sequence of events leading up" to the decisions at issue, contemporaneous statements made by the decisionmakers, and procedural and

---

*City of Dothan*, 745 F.2d 1406, 1415 (11th Cir. 1984) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.") (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979)).

[168] Plaintiffs' allegations and data indicating that the Board's pardon decisions were just as racially skewed as its parole decisions directly supports Plaintiffs' allegations of the Parole Defendants' discriminatory intent. FAC ¶728.

[169] *See, e.g.*, *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) ("knowledge of discriminatory impact" suggests discriminatory intent); *see also Dream Defenders v. DeSantis*, 553 F.Supp.3d 1052, 1094 (N.D. Fla. 2021) (where impact was known "based on the concerns raised by the opponents[,]" it supported allegation of discriminatory intent); *Banks v. McIntosh Cnty.*, 530 F.Supp.3d 1335, 1375 (S.D. Ga. 2021) (foreseeability and knowledge of impact present where defendants received "requests"); *cf. Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023) (widespread discriminatory practice may place entity on notice of need to act).

substantive irregularities in the decision-making process. *Arlington Heights*, 429 U.S. at 267-68; *Greater Birmingham Ministries*, 992 F.3d at 1322.

The FAC speaks to each of these additional factors in detail. For example, the FAC alleges that Ivey and Marshall directed Parole Board Members in 2018 to abandon the structured parole decision-making framework established by the JRA—despite the benefits of structured decision-making in reducing racial bias—and instead to stop granting parole. *See supra* Part VIII.A; FAC ¶¶654-57, 664-65. This direct pressure by Ivey and Marshall to curtail access to parole and abandon the parole decision-making framework in favor of a system marked by bias is a procedural and substantive irregularity.[170] *See generally Ammons v. Dade City*, 783 F.2d 982, 988 (11th Cir. 1986) ("history of racial discrimination in general and in [challenged area] in particular" support inference of discriminatory intent).

Parole Defendants would prefer not to engage with the *Arlington Heights* factors, but that is the governing test and Plaintiffs have clearly pleaded sufficient allegations from which a factfinder could reasonably draw inferences supporting Plaintiffs' Equal Protection claims. Dismissal at this stage is not appropriate.[171]

---

[170] And when the Parole Board initially resisted, Ivey and Marshall pushed the 2019 Parole Amendments through the Legislature, allowing them to achieve their aims: capitalizing on the new language making "public safety" the Board's "paramount duty," Ala. Act No. 2019-393, Ivey, Marshall, and ultimately the new Parole Board members, abandoned the evidence-based decision-making framework mandated by the JRA, *see* FAC ¶¶659-60, 664-65, 659-60, 686, 690.

[171] Parole Defendants instead argue, as a factual matter, that their reliance on the "public safety" considerations that led to racially discriminatory parole outcomes was not pretextual. Dkt. 231 at 19-21. Even if this were an appropriate dispute for the Court to resolve on a motion to dismiss, Plaintiffs have alleged facts that undermine the claimed stated public safety rationale. *See* FAC ¶¶705-06, 718 (Board denied parole to demonstrably low-risk Black parole candidates whom ADOC had concluded may safely work in the community and, in some cases, return home unsupervised on weekends, at higher rates than it denied White parole candidates in the same programs); *id.* ¶707 (parole grants dipped sharply after 2018 for those convicted of non-violent

## X.  Plaintiffs Adequately Plead Their Substantive Due Process Claim

Plaintiffs[172] plausibly allege a substantive due process claim against Parole Defendants. As this Court recognized, Dkt. 215 at 42, even absent a fundamental federal or state-law-created liberty interest in parole, state officials violate the substantive due process provision of the Fourteenth Amendment when they engage in "arbitrary and capricious" or "flagrant or unauthorized action" in denying parole. *Monroe v. Thigpen*, 932 F.2d 1437, 1441 (11th Cir. 1991). While the Court previously dismissed Plaintiffs' substantive due process claim, *see* Dkt. 215 at 42-44, the FAC adds allegations curing any deficiencies.

The Eleventh Circuit has repeatedly affirmed incarcerated individuals' substantive due process right not to be subject to arbitrary and capricious parole denials. *See, e.g.*, *Ellison v. Alabama Bd. of Pardons & Paroles*, 2017 WL 6947946, at *5 (11th Cir. Dec. 13, 2017) ("[E]ven though Alabama's parole statute is discretionary, *see* Ala. Code §15-22-26, a prison official may not act in an 'arbitrary and capricious' manner or engage in a 'flagrant or unauthorized action,' in denying parole[.]" (citing *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982)); *Walker v. Fla. Parole Comm'n*, 299 F.App'x 900, 902 (11th Cir. 2008).

This Court previously concluded that the sufficiency of Plaintiffs' allegations should be evaluated under *Monroe*, 932 F.2d 1437, and that "to succeed on their

---

offenses, with Black parole candidates in this group denied parole more frequently); *see also id.* ¶707 (Parole Board in recent years granted parole more frequently to incarcerated people rated as "medium" risk under its formal risk assessment than those rated who rated "low" risk).

[172] The parties for the Substantive Due Process Claim are the same as for the Ex Post Facto claim and are identified *supra* at n.138. Plaintiffs also clarify that they seek to vindicate their rights under the Fourteenth, not the Fifth, Amendment.

*Monroe*-based substantive due process claim, Plaintiffs must plausibly allege facts that allow the court to reasonably infer that the Parole Board's actions 'can be characterized as arbitrary or conscience shocking in a constitutional sense.'" Dkt. 215 at 42-43 & n.7 (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003)). Moreover, the Court "must evaluate the totality of the circumstances" alleged, in assessing whether Parole Defendants' actions were arbitrary or conscience shocking. *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1331 (11th Cir. 2020). Here, the FAC details how Ivey, Marshall, and the Parole Board Members made a deliberate decision to alter the framework governing parole and thereby arbitrarily cut off access to parole for people sentenced to terms of imprisonment with the possibility of parole, including people who have been working safely in the community. *See* FAC ¶¶655-85; *see also infra* Part XII (describing Ivey and Marshall's respective roles). As detailed below, Parole Defendants flagrantly disregarded their duties to parole candidates and the public to assess "fitness for parole," "public safety," and the Board guidelines, substituting that mandated analysis with a regime marked by racially discriminatory impacts, aimed at maintaining a profitable coerced labor scheme, and involving sham proceedings that regularly rely on impermissible or false facts. *See* FAC ¶¶656, 665, 675-95, 699, 707, 747.

A.    **Plaintiffs' Allegations of Racial Discrepancies in Parole Grant Rates and Changes to the Parole System Support Their Substantive Due Process Claim**

The Supreme Court has acknowledged that, where a claim is not fully "covered by a specific constitutional provision," a substantive due process analysis remains appropriate. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (quoting *U.S. v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (internal quotation marks omitted)). Indeed, the Supreme Court has explained that "[t]he Due Process Clause and the Equal Protection Clause are connected in a profound way," the principles are "interrelate[ed]," and there is "synergy between the two protections." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015).[173] *See also Waldman v. Conway*, 871 F.3d 1283, 1292-94 (11th Cir. 2017) (analyzing overlapping substantive due process and ex post facto claims arising from the same facts); *Block v. Potter*, 631 F.2d 233, 237 (3d Cir. 1980) ("Clearly, the [parole] Board would violate due process if it bases a decision on constitutionally impermissible criteria such as race, religion, or the exercise of free speech rights."); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 327 (D. Md. 2018) ("Substantive due process has long encompassed racial discrimination, and it is no surprise; one can hardly think of a more arbitrary motivation … than racial discrimination.").

The FAC's factual allegations concerning racial discrimination and arbitrary parole system changes are properly considered in the context of Plaintiffs'

---

[173] *Obergefell*'s explanation is consistent with earlier due process jurisprudence. In *Loving v. Virginia*, 388 U.S. 1, 12 (1967), the Supreme Court found that Virginia's anti-miscegenation statute violated the guarantee of equal protection of the laws, but because it infringed on the freedom to marry, it also violated substantive due process.

substantive due process claim because that claim is not fully covered by the Equal Protection and Ex Post Facto claims. Thus, the persistent pattern of racially disparate outcomes for parole candidates set forth in the FAC is a strong indication that the Parole Defendants are acting in a flagrant and unauthorized manner by taking race into account when deciding who is granted parole. *See* FAC ¶¶704-19, 723-28, 734-38; *see also supra* Part IX. Similarly, the 2019 Amendments and their aftermath reflect Parole Defendants' arbitrary and capricious subversion of the parole system in favor of a system that systematically denies parole, regardless of circumstance and evidence, to provide ADOC with a steady stream of captive, compliant, and profitable labor. *See* FAC ¶¶699-706; *see also supra* Parts II, VIII.

### B. Parole Defendants Disregard Alabama Law and the Parole Guidelines, Relying on Sham Hearings and Decisions Based on Impermissible Facts to Support a Coerced Labor Scheme

Plaintiffs allege Parole Defendants disregard the standards that should govern parole decision-making in favor of an unconscionably arbitrary process. As alleged in the FAC, the Parole Board has abandoned its obligation to consider fitness for parole and its "paramount duty ... to protect public safety," Ala. Code §15-22-26(a), by refusing to follow its own evidence-based guidelines and holding sham hearings to obscure the reality that its decisions are based on inaccurate or impermissible facts, or are divorced from factual considerations altogether. *See* FAC ¶¶662-66, 699-708, 726, 746-47.

Alabama law requires the Parole Board to adopt Parole Guidelines that "*shall* serve as an aid in the parole process." Ala. Code §15-22-26(a) (emphasis

added). While the Board adopted guidelines in 2019, as alleged in the FAC and in the Board's own reporting, since 2019, the Board has followed the guidelines' recommendation to grant parole only *6%* of the time. *See* FAC ¶681. Chair Gwathney also expressly disavowed the guidelines, stating "she did not think those objective standards were the 'important things' to consider." *Id.* ¶665.[174]

Parole Defendants focus their arguments on the uncontested discretion given to the Parole Board, but denying parole to nearly all candidates, to maintain a profitable labor pool as alleged in the FAC, *id.* ¶¶655, 667-70, 696, 708, 738-39, is arbitrary and conscience-shocking, and exceeds the boundaries of the Board's legitimate discretion. Plaintiffs allege that the Parole Board operated in the shadows, using impermissible factors to ensure ADOC had a steady supply of profitable captive labor. The Board disproportionately denied parole to people categorized as "low" risk, *see* FAC ¶707 ("low" risk individuals granted parole at a rate of 10%, compared to 25% for "medium" risk), because those were the workers "best situated to be 'leased' to outside employers for the profit of ADOC," *id.* ¶708. Similarly, the Parole Board granted parole to individuals in work-release programs at disproportionately low rates. *Id.* ¶703. These are the individuals *most* suitable for

---

[174] Parole Defendants object to the FAC's allegations that the Parole Board failed to revise the Parole Guidelines as required by Alabama law and challenge the FAC's allegations regarding the Parole Board's refusal to adhere to the Guidelines as, on their own, inadequate to state a claim. *See* Dkt. 231 at 23. Parole Defendants miss the forest for the trees. The Parole Board Members' failure to timely revise the Guidelines, and their refusal to adhere to the Guidelines, evidence a pervasive disregard for objective standards and provide context for the Board's reliance on impermissible, inaccurate facts.

parole, but the Parole Board refused to free them because they are also ADOC's most profitable workers. *See id.* ¶¶699-702.[175]

*Monroe*, in explaining that a parole board's discretion is "not unlimited," provided as an example that a board could not knowingly "rely upon false information in determining whether to grant parole," as that would be arbitrary and capricious and a denial of substantive due process. 932 F.2d at 1442. As set forth in the FAC, Gwathney and the other Board Members did just that. First, Gwathney *admitted* to surreptitiously changing the scores of individual parole applicants in advance of their parole hearings. *See* FAC ¶¶747, 856. She knowingly relied on and distributed to her fellow Board members false information for decision.[176] Plaintiffs provide other examples of the Parole Board knowingly relying on false information in denying parole: Plaintiff Ptomey was denied parole in 2022 because he received a disciplinary infraction in 2019 for "being fired" his job at KFC, even though he was never fired and a KFC manager recommended him for parole because of his

---

[175] The FAC also alleges the Parole Board imposed set-off dates longer than permissible under Alabama law after denying parole to individuals convicted of *nonviolent* offenses. *See* FAC ¶721. The FAC alleges the Parole Board imposed set-off dates of longer than two years in such circumstances 22 times in FY 2022 and 2023, including imposing a five-year set off 18 times. *See* FAC ¶721. The Board also drastically slowed its operations, first implementing a moratorium and then, when it resumed operations, only holding *one-third* as many hearings as it had previously. *See* FAC ¶¶659, 673. Thus, thousands of parole applicants endured years of delay before they even received a hearing. For example, Plaintiff Ptomey was initially considered for parole in 2017, and was set off for two years. *See* FAC ¶42. In 2019, when he inquired when his hearing would occur, he was informed that the hearing would be delayed for an additional three years. *See* FAC ¶42. Because Plaintiffs allege that the Parole Defendants acted to arbitrarily keep people in prison to be available to the profitable work-center and work-release programs, each of these ways in which the Parole Board departed from procedure in aid of that goal supports Plaintiffs' claim.

[176] Parole Defendants argue that Defendant Gwathney only admitted to changing scores *in favor* of applicants' release, *see* Dkt. 231 at 24, but the FAC does not allege that. It alleges that changing the scores "fundamentally undermines the integrity of the parole hearing process," and demonstrates Gwathney's "willingness to circumvent legal processes to reach her preferred outcome." FAC ¶747.

strong work performance, *see* FAC ¶42; and Plaintiff English was granted parole in 2017, then falsely accused of an assault, leading to revocation of his parole in 2020—but despite being acquitted of the fabricated charges shortly thereafter, the Parole Board refused to timely schedule a new hearing, and when his hearing finally took place three years later, he was denied parole based again on the provably false information in his record.[177] *Id.* When considered alongside the Parole Defendants' disregard for any regularized procedures and parole practices that aim to maintain a profitable coerced workforce, these allegations of intentional alteration of official information and knowing reliance on inaccurate information, support Plaintiffs' allegations that the parole process is arbitrary and conscience-shocking.

## XI.    Plaintiffs Adequately Plead KKK Act Claims Under 42 U.S.C. §1985

Plaintiffs[178] adequately plead claims against the Parole Defendants under two clauses of 42 U.S.C. §1985, also known as the KKK Act, which prohibit conspiracies for the purpose of denying persons equal protection of the laws. 42 U.S.C. §§1985(2), (3).

### A.    Plaintiffs' Complaint Satisfies All Elements of Their §1985 Claims

To state a §1985(3) claim under the "deprivation" clause, a plaintiff must allege: "(1) a conspiracy, (2) for the purpose of depriving, either directly or

---

[177] As alleged in the FAC, at the hearings conducted by the Parole Board, parole applicants have no opportunity to contest or dispute purported facts levied against them, nor are they afforded the right to appear at their hearings. *See, e.g.*, FAC ¶23. The Board makes its decisions behind closed doors, knowingly falsifying parole scores, while its records are withheld from parole applicants and the public. *See* Ala. Admin. Code R. 640-X-10-.01 ("The files and records of the Agency … are confidential and subject to an absolute statutory governmental privilege."); FAC ¶747.

[178] The Plaintiffs who bring claims under 42 U.S.C. §1985 are the same Plaintiffs who bring the Equal Protection claim and are identified, *supra*, in n.159. *See* FAC, Counts X, XI.

indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Trawinski v. United Techs.*, 313 F.3d 1295, 1299 (11th Cir. 2002). A claim under §1985(2) has similar elements, except the purpose of the conspiracy must be to impede, hinder, obstruct, or defeat, in any manner, the due course of justice in the State, with intent to deny the equal protection of the laws. *See* 42 U.S.C. §§1985(2), (3); *Chua v. Ekonomou*, 1 F.4th 948, 955 (11th Cir. 2021).

The FAC well alleges §1985 claims based on the coordinated efforts of Ivey, Marshall, and the Parole Board Members to radically decrease access to parole, particularly for Black parole candidates. *See supra* Part IX (Equal Protection). Plaintiffs allege a clear pattern of coordinated conduct beginning with the October 2018 meeting held by Ivey and Marshall, continuing through legislative changes, executive orders, and strategic appointments to pervert the parole system into one that systematically denies parole, particularly to Black applicants. *See supra* Parts III (RICO), IX (Equal Protection); *see also* FAC ¶¶655-75, 682-83, 690-99. And, as explained *supra* Part III (RICO), Plaintiffs have adequately alleged a conspiracy—that is, "a meeting of the minds between two or more persons to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc).

Parole Defendants' objections to the §1985 claims are primarily based on the misconception that Plaintiffs must prove their conspiracy allegations at this early

stage of proceedings. *See* Dkt. 231 at 25. Plaintiffs, of course, need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement," *Twombly*, 550 U.S. at 556, and "it is well-settled that the 'existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement. ... The more common method of proving an agreement is through circumstantial evidence.'" *U.S. v. Pineiro*, 389 F.3d 1359, 1369 (11th Cir. 2004); *see also U.S. v. Schwartz*, 541 F.3d 1331, 1361 (11th Cir. 2008) ("An agreement to conspire may 'be proved by circumstantial … evidence' and may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct.").

Here, the FAC alleges extensive coordination between Governor Ivey and Attorney General Marshall, beginning with their October 2018 joint meeting with Parole Board members at which they presented a consistent, unified position demanding that the Board abandon evidence-based practices and systematically deny parole to anyone convicted of "violent" crimes. FAC ¶657; *see also id.* ¶¶663-66, 671, 675. This coordinated pressure campaign continued through Ivey's Executive Order imposing a moratorium on parole hearings, *id.* ¶659, Marshall's public statements supporting the Governor's position, *id.*, and their joint effort to secure legislation expanding the Governor's control over the Parole Board, *id.* ¶660. After securing enhanced legislative authority, Governor Ivey immediately appointed Charles Graddick as Executive Director—someone who had previously called for abolishing the Parole Board altogether. *Id.* ¶661. Ivey then appointed Leigh Gwathney, who had previously worked in Attorney General Marshall's office and

who Marshall recommended to Ivey for the position, as Board Chair. *Id.* ¶662. Marshall continued his efforts to further the anti-parole conspiracy by altering the past practice of the Attorney General's office and submitting letters opposing parole for nearly every parole applicant and *all* applicants convicted of "violent" offenses. *Id.* ¶666. The Chair "consistently ... advised her fellow board members, parole board staff, and even members of the public and legislators in meeting that she received specific instructions from Governor Ivey ... that required her to not consider granting parole to anyone charged with a violent crime." *Id.* ¶662. The FAC alleges that this effort was racially biased from the outset, and included a purge of Black officials, racist personnel policies, and overtly biased parole decisions. FAC ¶¶661, 686-98.

In the cases cited by Parole Defendants, including *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992) and *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992), there simply were simply *no* factual allegations supporting coordination between the alleged conspirators. *See* Dkt. 231 at 25. Plaintiffs have alleged facts that give rise to a reasonable inference of coordination, and that is all they need do at this stage.

### B.    The Intracorporate Conspiracy Doctrine Does Not Apply

Parole Board Members once again attempt to invoke the intracorporate conspiracy doctrine to evade Section 1985 liability, Dkt. 231 at 25, but that effort is misplaced. The intracorporate conspiracy doctrine "holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in

the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). The State of Alabama in no way resembles a corporation; Parole Defendants are not the State's "employees" and, rather, are members of independent state agencies and/or separately elected constitutional officers holding independent posts.

The basic principles of agency on which the intracorporate conspiracy doctrine is premised do not support application of the doctrine here. *See Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) ("doctrine stems from basic agency principles that 'attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor'" (citations omitted)). Parole Defendants represent fundamentally different government entities: Governor Ivey is the head of the executive branch; Attorney General Marshall is a separately elected constitutional officer, *see* Ala. Const. art. V, §112; and Parole Board Members constitute a state agency governed by the Legislature and created by statute, *see* Ala. Const. art. V, §124; Ala. Code §15-22-20(a). There is no good basis to apply the intracorporate conspiracy doctrine here.[179]

_____

[179] The cases in which the Eleventh Circuit has applied the intracorporate conspiracy doctrine to government officials involved inapposite situations in which employees of *the same government office or municipality* conspired with one another in the course of their official duties. *See Denney v. City of Albany*, 247 F.3d 1172, 1191 (11th Cir. 2001) (two conspirators were city employees); *Dickerson*, 200 F.3d at 767-68 (11th Cir. 2000) (county employees); *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010) (two law enforcement officers in same police department). Extending the intracorporate conspiracy doctrine to the facts here would be at odds with section 1985's clear application to government actors and directly contradict the Supreme Court's direction that the Reconstruction civil rights acts, such as section 1985, are to be "accord[ed] [] a sweep as broad as [their] language.'" *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971); *see Monroe v. Pape*, 365 U.S. 167, 174 (1961) (discussing the historical context of §1983 and related civil rights statutes), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

## XII.  Plaintiffs Have Standing to Sue Ivey and Marshall for Their Role in the Ongoing Parole Crisis

Ivey and Marshall[180] challenge Plaintiffs' standing to sue them for their parole-related claims, Counts VI-XI, arguing that Plaintiffs have not pleaded facts sufficient to satisfy the causation and redressability prongs of Article III standing, Dkt. 229 at 18-20—but in doing so, they fail to engage with Plaintiffs' revised allegations, which directly address the shortcomings this Court previously identified in its standing analysis. "To establish causation [for purposes of standing], a plaintiff need only demonstrate, as a matter of *fact*, 'a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant.'" *GALEO*, 36 F.4th at 1116.

This Court previously held that Plaintiffs' allegations failed to establish standing to sue Ivey and Marshall for the parole claims because Alabama law vests the Parole Board with exclusive discretion to make parole decisions. *See* Dkt. 181 at 15-18; Dkt. 215 at 18-19. The FAC addresses that concern directly. Plaintiffs allege not only that Ivey and Marshall worked to consolidate unprecedented control over the Parole Board, FAC ¶¶660-61, but also that they used that newfound power to hand-pick Defendant Gwathney—who previously worked for Marshall and was hired on her recommendation—as the Board Chair. *Id.* ¶662. The FAC further alleges that Gwathney has "boast[ed] to other members of the Parole Board that she was carrying out the direct orders of Governor Ivey in granting parole to as few incarcerated people ... as possible" and that Gwathney has consistently advised

---

[180] The Parole Board Members rightly do not contest that Plaintiffs have standing to bring their parole-related claims against those Defendants.

Parole Board staff and the public that her decisions are made in accordance with specific instructions from Ivey. *Id.* ¶¶662, 743.

In other words, the dramatic decline in parole grant rates—which coincides with Gwathney's appointment as Board Chair—is traceable, in Gwathney's own words, to Ivey and Marshall. Further, if Ivey were to rescind her directive, this Court can plausibly infer that the parole rate would immediately rise, which is all that is required at this stage. "Because Article III 'requires no more than de facto causality,'" Plaintiffs' allegations establishing that the Board "will likely react in predictable ways" to a new directive from Defendants, are enough to establish standing. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (CADC 1986) (Scalia, J.)); *see also Georgia Latino All. for Hum. Rts. v. Gov. of Georgia*, 691 F.3d 1250, 1260 n.5 (11th Cir. 2012) (governor proper party and standing satisfied where governor had "sufficient, albeit indirect, contact with the [challenged] program's enforcement").[181]

This case is thus distinguishable from *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020), in which the plaintiffs failed to establish that the Florida Secretary of State "play[ed] any role" in their injury. Plaintiffs have alleged that Ivey and Marshall exercise specific and direct control over the Parole Board, that Gwathney heeds those commands, and that this coordinated effort directly coincides with the injury Plaintiffs seek to have redressed. Further, all Parole Board members

---

[181] Even if this Court finds the Board's statutory discretion significant, that would not be enough to defeat standing, because the Court "cannot know that the [Board] would have exercised its ... discretion" in the unlawful manner Plaintiffs allege without the influence of Ivey and Marshall. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998).

now owe their continued employment to Ivey and Marshall's satisfaction with their work, further enhancing the impact of their influence. As the Fifth Circuit explained, if the Defendants' challenged actions put a third party in the position of "choos[ing] self-censorship over professional self-immolation," those actions satisfy the causation and redressability prongs of Article III standing. *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 392 (5th Cir. 2024). Plaintiffs have pleaded facts sufficient to draw that inference here, and their parole-based claims should be allowed to proceed against both Ivey and Marshall.

## XIII.  Defendants' Immunity Arguments Fail

As an initial matter, Plaintiffs do not seek damages against any State Defendant in their official capacity. The Court can thus ignore those arguments. *See* Dkt. 229 at 19-20; Dkt. 231 at 26-27; Dkt. 234 at 26-27; Dkt. 239 at 7-10.

### A.    State Defendants Are Not Entitled to Qualified Immunity

#### 1.  TVPA and RICO

The State Defendants sued in their personal capacities invoke qualified immunity with respect to any damages claims against them under the TVPA or RICO. Dkt. 229 at 33; Dkt. 231 at 28; Dkt. 234 at 30. However, there is no basis in the text of the TVPA or RICO to read qualified immunity into either statute. Neither statute mentions qualified immunity, which should be dispositive. *See, e.g.*, *Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 537 (5th Cir. 2021) ("[I]f a party wishes to have its activities exempted from a statute, it must ask the Legislature to enact such an exemption, not the judiciary."). In fact, both statutes are clearly broad in

scope. The TVPA is a "comprehensive law ... that penalizes the range of offenses involved in [a] trafficking scheme," and to that end is intended to target "official participation in trafficking." 22 U.S.C. §7101(14), (16). The statute is written expansively to address trafficking wherever and by whomever it may occur, making clear that Congress did not intend to offer a safe harbor to those who engage in trafficking, even if they hold official positions. *See generally* 22 U.S.C. §7101. RICO, in turn, "directs that '[its] provisions … shall be liberally construed to effectuate its remedial purposes.'" *U.S. v. Turkette*, 452 U.S. 576, 587 (1981) (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, §904(a), 84 Stat. 922, 947). The Supreme Court has emphasized that RICO's "self-consciously expansive language and overall approach" is "to be read broadly" to accomplish its remedial purposes. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497-98 (1985). The statutes' plain and broad language should not be rewritten to include provisions for qualified immunity where none exist.

Moreover, the rationales courts have cited in recognizing a defense of qualified immunity under §1983 simply have no application to the TVPA or RICO. Qualified immunity is a judicial creation read into §1983 on the assumption that Congress did not intend *sub silentio* to abrogate common law immunities afforded to public officials accused of common law torts, and that the *constitutional* torts enforced through §1983 may be defined by analogy to common law torts. *See Malley v. Briggs*, 475 U.S. 335, 339-40 (1986); *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *see generally Ziglar v. Abbasi*, 582 U.S. 120, 159-60 (2017) (Thomas, J., concurring in part and concurring in the judgment). In this context, it is a concern

about providing "fair warning" to government officials, to ensure that they have a level of "protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes" while discharging their official duties, that has warranted a recognition of qualified immunity. *U.S. v. Lanier*, 520 U.S. 259, 270-71 (1997). This reasoning is not applicable to the TVPA or RICO. Unlike §1983, which establishes a generalized right to redress for federal and constitutional injuries caused by government officials, both the TVPA and RICO target specific wrongful conduct. The TVPA prohibits coercing labor by specific means, or knowingly benefitting from labor coerced by those means. 18 U.S.C. §1589(a), (b); *see Calimlim*, 538 F.3d at 710 (holding TVPA "provides sufficient notice of what it criminalizes"). RICO likewise establishes a defined list of statutory predicates that trigger liability, which are themselves precise and specific. 18 U.S.C. §1961(1). Neither statute subjects state officials to a vague, undefined common law tort standard, and thus common law immunities, including qualified immunity, simply have no relevance.

Finally, both the TVPA and RICO already incorporate the critical element of the qualified immunity inquiry, which asks whether the defendant's actions violated "clearly established statutory or constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1031 (11th Cir. 2001) (abrogated on other grounds as recognized in *Donald v. Norris*, 131 F.4th 1255, 1267 (11th Cir. 2025) ("fair and clear notice to government officials is the cornerstone of qualified immunity"). Because each statute already delineates the wrongful conduct it is intended to reach

with specificity, that requirement is by necessity satisfied. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) ("the words of the pertinent federal statute … in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity"); *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1302 (11th Cir. 1998) (where plaintiff does not rely on generally worded constitutional right, "statutory provisions at issue ... standing alone, provide fair warning" of clearly established law).

Even if qualified immunity could be invoked by State Defendants sued in their personal capacities under the TVPA and RICO, such a defense should be rejected. Plaintiffs allege State Defendants violated both statutes, s*ee supra* Parts II.C, III.A, and thus the question (if qualified immunity applies) is whether an objectively reasonable government official would understand their conduct obviously violated federal law. *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017).

As explained *supra*, the language of the statutes, standing alone, is sufficient to provide fair warning of the prohibited conduct. *See also Gaines*, 871 F.3d at 1209; *Vinyard*, 311 F.3d at 1350. Even if that were not the case, Plaintiffs allege conduct that clearly violates established law. Plaintiffs allege that Hamm oversees a work program that coerces incarcerated workers via threats of physical and emotional harm, in direct conflict with the provisions of the TVPA, *see, e.g.*, FAC ¶¶229-38, 271-81; Ivey has insisted on harsh punishments involving serious harm for those who fail to work, also in contradiction of the statute, and has employed incarcerated workers in her mansion while aware that the workers' labor was coerced through proscribed means, *see, e.g.*, *id.* ¶¶282-90, 438-42; and Cooper has overseen the

virtually free employment of incarcerated individuals at ADOT pursuant to "lease" agreements, in dangerous conditions, and knew or should have known that refusal to work for ADOT would subject the workers to violence, serious harm, and other prohibited forms of coercion, *see, e.g.*, *id.* ¶¶205, 417-23. Plaintiffs likewise allege that Parole Board Members were not only part of, but active participants in, a scheme intended to provide the state with continuous access to a captive labor pool in contravention of state law. *See id.* ¶¶655-747. Each of these State Defendants were on fair notice, at least based on a consensus of authority, that threats to expose persons to violence, serious harm, deprivation of necessities, and extended confinement, and to participate in a statewide conspiracy to do the same, violated the TVPA and RICO, respectively. *See supra* Parts II.C, III.A.

## 2. Section 1983 Claims

State Defendants also invoke qualified immunity as a defense to Plaintiffs' individual capacity §1983 claims, Counts V-IX. *See* Dkt. 229 at 33-34; Dkt. 234 at 27-31; Dkt. 239 at 10-12. These arguments largely just recapitulate Defendants' merits arguments and contend that, because Plaintiffs fail to state a claim, they have not established a violation of clearly established law. Accordingly, if this Court finds that Plaintiffs have stated a claim, Defendants' arguments necessarily fail.[182]

Ivey and Hamm also argue that qualified immunity applies specifically to Plaintiffs' First Amendment claim because they are not susceptible to supervisory

---

[182] To the extent Ivey and Hamm make a more robust qualified immunity argument regarding Plaintiffs' First Amendment claim, that effort also fails. Dkt. 229 at 33-34; Dkt. 234 at 27-30. The Eleventh Circuit "concluded as early as 1989—well before this [case]—that [an incarcerated person's] First Amendment free speech rights are violated when prison officials retaliate against

liability for that claim. Dkt. 229 at 31; Dkt. 234 at 29-30. Supervisory liability under §1983 is proper "when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)) (emphasis added). To establish a causal connection, plaintiffs may show: "1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; *or* 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.* (emphasis added).

Here, Plaintiffs allege a causal connection in all three ways. First, Plaintiffs allege the existence of a well-known, if not infamous, "history of widespread abuse" that should have put Ivey and Hamm on notice that constitutional deprivations are taking place in the Alabama prison system. *See, e.g.*, FAC ¶¶313-24, 623-25. Plaintiffs allege that ADOC maintains a statewide policy and practice of imposing

---

him or her for filing a grievance." *Hicks v. Ferrero*, 241 F.App'x 595, 598-99 (11th Cir. 2007). Plaintiffs have plausibly alleged that they were engaged in and have been deterred from engaging in substantially the same core conduct as grievance filing, *see* FAC ¶¶232-33—namely, making "complain[ts] to the prison's administrators about the conditions of [their] confinement." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (quoting *Smith*, 532 F.3d at 1276). As explained *supra* Part VII.A.3, the circumstances here are markedly different from those found in *Jones* and *Pilgrim*. Furthermore, it is plain that starving incarcerated people, subjecting them to extreme physical violence, or using unconstitutional prison conditions to coerce their labor violates their constitutional rights. *See, e.g.*, *Hudson*, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."). Plaintiffs have plausibly alleged that Ivey and Hamm were not merely bystanders, but active participants in the wanton trampling of Plaintiffs' rights. At a minimum, the FAC adequately alleges that Ivey and Hamm were deliberately indifferent towards the culture of coercive violence in ADOC facilities.

severe discipline upon incarcerated people who withhold their labor or even indicate that they might do so. The FAC alleges that ADOC uses the inherently dangerous conditions in its facilities, physical violence, the deprivation of necessities, solitary confinement, and increased lengths of incarceration to compel work directly for the benefit of both Ivey and Hamm. FAC ¶¶32, 53, 91, 306-49, 598. Numerous named Plaintiffs explained that the conditions in ADOC facilities——including overcrowding, understaffing, and rampant violence—are so severe that ADOC officials know they can use the threat of transfers to coerce incarcerated people to work. *Id.* ¶¶19, 33, 60, 120.

Plaintiffs further allege that reports of this widespread and flagrant abuse have been public knowledge since at least 2014, when Ivey began her services as Lieutenant Governor Alabama. *Id.* ¶¶244-50. These allegations, which reflect "multiple … incidents over the course of a 'continued duration[,]'" are sufficient to establish a causal connection to Ivey and Hamm. *Ray v. Gadson*, 2023 WL 7228933, at *7 (N.D. Ala. Nov. 2, 2023) (citing *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)); *see also Jenkins v. Jones*, 2017 WL 3381713, at *6 (M.D. Fla. Aug. 7, 2017) (allegations that deprivations are "obvious, flagrant, rampant, and of lengthy duration" are sufficient to state a claim).

Second, Plaintiffs adequately allege that Ivey and Hamm's customs and policies resulted in a culture of deliberate indifference towards Plaintiffs' First Amendment rights. Plaintiffs allege that Ivey and Hamm, by virtue of their prominent positions in Alabama's government, were necessarily aware of the endemic violence in Alabama's prisons and the ways in which that violence was

leveraged to coerce the labor of incarcerated workers. FAC ¶¶239-70. Nevertheless, both Ivey and Hamm doubled down the coercion. Ivey, on January 9, 2023, issued an executive order that identified refusals of work and the encouragement of work stoppages as medium- and high-level violations, and authorized ADOC to impose additional punishments for such violations. *Id*. ¶¶596, 813. Hamm then issued regulations that implemented that order by authorizing extreme punishments, including solitary confinement, effectively longer sentences, and even more forced labor, for incarcerated people who exercised their First Amendment rights. *Id*. ¶¶286-88. These allegations, combined with the allegations of specific, widespread and longstanding retaliation by ADOC and Ivey against incarcerated people who seek to exercise their rights, *see id.* ¶¶591-603, are sufficient to state a claim that Ivey and Hamm are personally liable for the constitutional deprivations Plaintiffs suffered. *See, e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (a "persistent and wide-spread practice" can demonstrate a policy or custom under §1983) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)).

And third, Plaintiffs' allegations "support an inference that the supervisor[s] directed subordinates to act unlawfully." *Mathews*, 480 F.3d at 1270. In particular, Plaintiffs allege that ADOC's coordinated, statewide response to Plaintiffs' non-violent protest of abhorrent prison conditions and coerced labor in 2022 reflects substantial indicia of involvement by both state executives. Plaintiffs allege that ADOC "immediately ordered all facilities … to severely limit the food that all incarcerated people, whether joining the strike or not, were fed[,]" despite having enough food to provide three full meals to those who were incarcerated. FAC ¶610.

This practice of "bird-feeding" incarcerated people statewide, which violated ADOC regulations, "must have been directed and/or approved by those with the power to do so—namely, Ivey and Hamm." *Id.* ¶619. ADOC also restricted access to the commissary statewide, even at facilities that did not participate in the strike. *Id.* ¶¶611, 615, 618. Multiple incarcerated people were told the orders for the aggressive response to the non-violent protest, which also included the use of state-directed "riot teams," were coming "from Montgomery." *Id.* ¶¶616-18. This was confirmed when Ivey publicly commended Hamm for his handling of ADOC's response to the strike. *Id.* ¶624. Ivey and Hamm's insistence now that it is implausible to even *infer* they were directly involved in the ADOC response is, at best, specious.[183]

### B. Marshall Is Not Entitled to Absolute Prosecutorial Immunity

Defendant Marshall claims he is entitled to prosecutorial immunity for Plaintiffs' TVPA, RICO, Parole, and KKK claims (Counts I-III and VI-XI), Dkt. 229 at 32, but that is mistaken. In assessing Marshall's prosecutorial immunity, the question is "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269. Where, as here, a prosecutor "acts outside the ambit of activities 'intimately associated' with the judicial process," including by carrying out administrative tasks or making statements to the press, there is no immunity. *Hart v. Hodges*, 587 F.3d 1288, 1296 (11th Cir. 2009). Marshall's argument intimates that he was simply providing information to the Parole Board,

---

[183] Hamm also argues that he has sovereign immunity from Plaintiffs' parole claims because he does not have a sufficient connection to the parole practices Plaintiffs challenge. Dkt. 234 at 17. Even assuming that is true, Hamm is only sued by Plaintiffs for those claims as a necessary party to secure complete relief. FAC ¶198.

Dkt. 229 at 32–33, but Plaintiffs' allegations go well beyond that. The FAC alleges that Marshall, among other things, informally pressured Board members in closed door meetings and made statements to the press regarding his view that there was no one left to parole, while exercising (alongside Ivey) *de facto* control over parole decisions. FAC ¶¶655-59, 662. These allegations show that Marshall went outside of his prosecutorial role or anything intimately associated with the judicial process. *Id.*; *cf. Buckley*, 509 U.S. at 274 (absolute prosecutorial immunity is limited to prosecutor's actions as an "advocate" and prosecutor is not advocate "before he has probable cause to have anyone arrested").

## C.    Defendants Are Not Immune from the Unjust Enrichment Claim

Defendants Cooper[184] and Hamm seek to invoke state-agent immunity to Plaintiffs' unjust enrichment claim. However, "a motion to dismiss is typically not the appropriate vehicle by which to assert … State-agent immunity … normally the determination as to the existence of such a defense should be reserved until the summary-judgment stage, following appropriate discovery." *Odom v. Helms*, 314 So.3d 220, 229 (Ala. 2020) (quoting *Ex parte Alabama Dep't of Mental Health & Retardation*, 837 So.2d 808, 813-14 (Ala. 2002) (internal quotation marks omitted)); *see also id.* at 229 n.3 (plaintiff need not anticipate state-immunity defense by pleading exception with particularity); *Johnson v. Dunn*, 2024 WL 1076802, at *11 (N.D. Ala. Mar. 12, 2024). Defendants Ivey and Cooper, meanwhile, assert that as

---

[184] Cooper asserts state-agent immunity for all claims against him in his individual capacity. Dkt. 239 at 12. But state-agent immunity is an Alabama common law immunity that only applies to state law claims, and is thus only relevant, at most, to the unjust enrichment claim. *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010). Such immunity does not apply when the state agent's wrongful acts are "willful," *id.* at 1255, as Cooper's were. FAC ¶¶205, 417-23.

constitutional officers, they may not be sued in their individual capacity if the basis of liability was performed within the course and scope of their employment. *See* Dkt. 229 at 36; Dkt. 239 at 7-8. But Plaintiffs adequately allege that Ivey and Cooper acted outside the course and scope of their employment, *see* FAC ¶¶200, 813-17, 856-58, and so state sovereign immunity, which applies only to "state law claims arising out of the execution of the duties of [their] office," does not apply. *Ex parte Davis*, 930 So.2d 497, 501 (Ala. 2005) (quoting *Boshell v. Walker County Sheriff*, 598 So.2d 843, 844 (Ala. 1992) (internal quotation marks omitted)).[185]

## CONCLUSION

For the foregoing reasons, each pending motion to dismiss, Dkts. 225, 227, 228, 230, 232, 233, 236, 237, 238, 240, 241, 243, 244, 245, 246, 248, 249, 250, and 250, should be denied, except to the extent Defendant Gwathney seeks dismissal of Plaintiffs' claims brought against her in her individual capacity. If the Court concludes that dismissal of any of the claims in the FAC is warranted, Plaintiffs respectfully request leave to amend.

Dated: August 15, 2025                    */s/ Barbara J. Chisholm*

---

[185] Plaintiffs' equitable unjust enrichment claims against Troy and Montgomery may also proceed given the nature of the claims, as the notice of claims statute these Defendants cite applies only to "a claim for personal injury received," Ala. Code §11-47-192, and the municipal immunity statute applies only to "damages for injury done to or wrong suffered by any person or corporation," with certain exceptions for negligence, Ala. Code §11- 47-190. *See Lee v. Houser*, 148 So.3d 406, 420 n.2 (Ala. 2013) (holding §11-47-192 applies only to personal injury claims, not, for example, claims for lost profits) (citing *Coffee Cnty. Comm'n v. Smith*, 480 So.2d 1194, 1195 (Ala. 1985)); *Mitchell v. Town of Hayneville*, 2020 WL 7480551, at *8 (M.D. Ala. Dec. 18, 2020) (§11-47-192 does not bar contract claim arising out of alleged wrongful termination, and §11-47-23 did not bar claims to the extent they sought equitable relief); *Altmayer v. City of Daphne*, 613 So.2d 366, 369 (Ala. 1993) (Ala. Code §11-47-190 "absolves a municipality from liability for the intentional torts of its agents"). Plaintiffs' quasi-contractual unjust enrichment claims are not barred.

MICHAEL RUBIN (CA SBN 80618)*
BARBARA J. CHISHOLM (CA SBN 224656)*
CONNIE K. CHAN (CA SBN 284230)*
AMANDA C. LYNCH (CA SBN 318022)*
EMANUEL WADDELL (CA SBN 350156)*
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Email: mrubin@altber.com;
bchisholm@altber.com;
cchan@altber.com; alynch@altber.com;
ewaddell@altber.com

JANET HEROLD (CA SBN 186419)*
JUSTICE CATALYST LAW
40 Rector Street, 9th Floor
New York, NY 10008
Telephone: (518) 732-6703
Email: jherold@justicecatalyst.org
*Counsel for All Plaintiffs and the
Proposed Classes and Subclasses*

GEORGE N. DAVIES
RICHARD P. ROUCO
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
Email: gdavies@qcwdr.com;
rrouco@qcwdr.com
*Counsel for Plaintiffs RWDSU and USSW*

LAUREN FARAINO
FARAINO, LLC
2647 Rocky Ridge Ln.

Vestavia Hills, AL 35216
Telephone: (205) 737-3171
Email: lauren@farainollc.com
*Counsel for The Woods Foundation,
Individual
Plaintiffs, and the Proposed Classes and
Subclasses*

*\*Appearing pro hac vice*