IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

LEE EDWARD MOORE JR., FREDERICK DENARD MCDOLE, MICHAEL CAMPBELL, LANAIR PRITCHETT, RASHAAD CLARK, DECKRICE MORRISSEY, ERIC PREWITT, TREVION CLARK, JERAME APRENTICE COLE, and LARRY DARNELL JARMON JR., on their own behalf and on behalf of those similarly situated,

Plaintiffs,

v.

KAY IVEY, Governor of the State of Alabama, in her official capacity; STEVE MARSHALL, Alabama Attorney General, in his official capacity; HAL NASH, Chair of the Alabama Board of Pardons and Paroles, in his official capacity; and GABRELLE SIMMONS, Associate Member of the Alabama Board of Pardons and Paroles, in her official capacity,

Defendants.

Case No. 2:23-cv-712-CLM

CLASS ACTION

**SECOND AMENDED COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS


INTRODUCTION ..... 1

PARTIES ..... 2

I. PLAINTIFFS ..... 2

A. Lee Edward Moore Jr. ..... 2

B. Frederick Denard McDole ..... 5

C. Michael Campbell ..... 7

D. Lanair Pritchett ..... 8

E. Rashaad Clark ..... 10

F. Deckrice Morrissey ..... 14

G. Eric Prewitt ..... 15

H. Trevion Clark ..... 16

I. Larry Darnell Jarmon Jr. ..... 18

J. Jerame Aprentice Cole ..... 20

II. DEFENDANTS ..... 22

A. Governor Kay Ivey ..... 22

B. Attorney General Steve Marshall ..... 23

C. Parole Board Chair Hal Nash ..... 24

D. Associate Parole Board Member Gabrelle Simmons ..... 24

JURISDICTION AND VENUE ..... 24

FACTUAL ALLEGATIONS ..... 25

I. ALABAMA OPERATED A CORRECTIONS SYSTEM MARKED FOR YEARS BY DYSFUNCTION, OVERCROWDING, AND ABUSE, WHICH THE LEGISLATURE SOUGHT TO ADDRESS BY REFORMING THE PAROLE SYSTEM ..... 26

II. THE GOVERNOR, ATTORNEY GENERAL, AND PAROLE BOARD HAVE EXTENDED SENTENCES ISSUED BY THE JUDICIAL BRANCH BY ABANDONING INDIVIDUALIZED PAROLE DECISION-MAKING MANDATED BY THE LEGISLATIVE BRANCH, RESULTING IN SYSTEMIC AND RACIALLY SKEWED OVERDETENTION ..... 29

A. Alabama's Parole Board Historically Considered Individualized Fitness for Parole and Granted an Average of 2,441 People Parole Annually from 1992 to 2015, at an Average Grant Rate of Just Under 35%. ..... 29

B. Under the Bentley-Ivey Administration, Alabama Reformed Its Parole System to Address Overcrowding, Systemic Violence, and Threats to Public Safety ..... 31

C. In late 2018, Governor Ivey and Attorney General Marshall Reverse Course, Issue Instructions to the Parole Board and Take Action, Including Securing a Legislative Amendment, to Extend Sentences by Dramatically Reducing Parole Rates, Effectively Eliminating Parole Consideration for Black Alabamians and for all People Serving Sentences for "Violent" Offenses ..... 33

D. The Governor, Attorney General, and Parole Board's Abandonment of the JRA's Evidence-Based, Objective Regime Deliberately Introduced Overt Racial Bias into the Parole System ..... 50

E. Governor Ivey, Attorney General Marshall, and the Parole Board Have Also Disproportionately Delayed Parole Reconsideration Dates for Black Incarcerated People ..... 54

F. The Clear Incompatibility Between the Board's Disproportionate and Biased Denials of Parole and the Available Evidence Further Confirms That Racial Bias, Rather Than Public Safety Concerns, Is Driving the Board's Parole Decisions ..... 56

G. Defendants Ivey, Marshall, and Parole Board Members' Refusal to Change the State's Parole Practices Even in the Face of Public Evidence and Criticism Proves They Intend to Perpetuate the Unlawful, Racially Discriminatory Consequences of Their Conduct, Maintenance of a Parole System that Disproportionately Keeps Black People Imprisoned ..... 67

H. Defendants' Illegal Acts and the Consequences of Chair Gwathney's Reign Have Continued ..... 75

CLASS ALLEGATIONS ..... 78

COUNT I: Violation of Ex Post Facto Clause U.S. Const. Art. I, §10, cl. 1, 42 U.S.C. §1983 ..... 81

COUNT II: Violation of Ex Post Facto Clause U.S. Const. Art. I, §10, cl. 1, 42 U.S.C. §1983 ..... 87

COUNT III: Denial of Equal Protection U.S. Const. Amend. XIV, 42 U.S.C. §1983 ..... 90

COUNT IV: Denial of Substantive Due Process U.S. Const. Amend. XIV, 42 U.S.C. §1983 ..... 94

PRAYER FOR RELIEF ..... 96

DEMAND FOR JURY TRIAL ..... 97

Plaintiffs Lee Edward Moore Jr., Frederick Denard McDole, Michael Campbell, Lanair Pritchett, Rashaad Clark, Deckrice Morrissey, Trevion Clark, Eric Prewitt, Jerame Aprentice Cole, and Larry Darnell Jarmon Jr. ("Named Plaintiffs"), on behalf of themselves and those similarly situated, allege as follows:

## INTRODUCTION

1. Plaintiffs are individuals currently incarcerated by the Alabama Department of Corrections ("ADOC") who challenge the unconstitutionally punitive and racially discriminatory subversion of Alabama's parole system by Defendants Alabama Governor Kay Ivey, Attorney General Steve Marshall, and the Parole Board, including Parole Board Chair Hal Nash and Parole Board member Gabrelle Simmons.

2. Beginning with a directive to the Parole Board in October 2018 to deny parole, particularly to those convicted of violent offenses, and facilitated by 2019 amendments to Alabama's longstanding parole statute, Governor Ivey and Attorney General Marshall orchestrated a near-complete shutdown of incarcerated Alabamians' access to parole, with devastating consequences for all those forced to endure additional years of relentless violence within ADOC's facilities and time away from their loved ones, regardless of their readiness for parole or public safety considerations. The Parole Board, at the direction of Governor Ivey and Attorney General Marshall, abandoned the individualized, evidence-based framework required by state statute in favor of a severely restricted parole regime that is infected with racial bias and systematically denies parole access to many incarcerated Alabamians who were sentenced to terms of imprisonment with the possibility of parole. The number of hearings held, annual grants of parole, and parole grant rates dropped precipitously following Governor Ivey and Attorney General Marshall's directive and the amendments to the parole statute. Access to parole was dramatically curtailed beginning in 2019, falling to its lowest point in fiscal year ("FY") 2023, and still remains far below historical levels, with especially damaging and predictable consequences for Black parole candidates, who since 2019 have been disproportionately denied

access to parole and disproportionally given longer set-off periods between parole hearings, thereby impeding their ability even to be considered for parole.

3. Plaintiffs allege that Defendants' conduct violates the Ex Post Facto and Equal Protection Clauses of the U.S. Constitution and contravenes constitutional substantive due process protections. Plaintiffs seek injunctive relief to remedy Defendants' unlawful conduct and ensure Alabama's parole system respects the constitutional rights of Plaintiffs and the members of the putative classes they seek to represent, for the benefit of all parole-eligible Alabamians and the public.

## PARTIES

### I. PLAINTIFFS

4. Plaintiffs are ten individuals currently incarcerated at facilities operated by ADOC who have been and continue to be injured by Defendants' unlawful subversion of the Alabama parole system and deliberate undermining of and disregard for the evidence-based, non-discriminatory approach to parole decision-making required by law. As a result of Defendants' conduct challenged herein, Plaintiffs have faced harm including extended detention, forced labor, and increased risk of physical violence, as detailed below.

#### A. Lee Edward Moore Jr.

5. Plaintiff LEE EDWARD MOORE JR. is currently incarcerated at William C. Holman Correctional Facility, a high-security facility operated by ADOC. Mr. Moore is a Black man and has been in ADOC facilities since 1997.

6. Mr. Moore has been before the Parole Board and denied parole five times. Most recently, he was denied parole in 2022 and given a five-year reset date. He has observed that because of Defendants' changes to the parole system and reduction of parole releases since 2019, his confinement has been extended compared to the time served by people serving time on sentences similar to or more severe than his offenses who were released by the Parole Board prior to 2019. He also notes that the length of the time he has served in prison has been extended by the sharp decline in annual parole releases and the near shutdown of parole releases for people

incarcerated on violent offenses since 2019 when compared to the number of annual parole releases in 1997, when he received his sentence, or in 1993, when the underlying conduct occurred.

7. When Mr. Moore accepted his plea, he recalls the conversations with then District Attorney Ed Green, who advised that on the length of sentences being discussed, Mr. Moore should expect to serve about one-fifth of the time in the sentence before parole, assuming good institutional behavior.

8. During the entire length of his incarceration by ADOC, Mr. Moore has performed and continues to perform a wide array of skilled labor for ADOC, including highly skilled plumbing, heating and air conditioning installation and maintenance, installation of phone lines, electrical work, including maintenance of ADOC's generators, and all manner of construction and yard work for ADOC. He has worked long hours daily, without pay, for ADOC, both inside and outside prison gates without incident. For more than thirteen years, Mr. Moore has been performing labor outside the gates of an ADOC facility, commonly without supervision. Performing labor outside the often dangerous dorms in the ADOC facilities to which he has been assigned allows Mr. Moore to stay out of the more dangerous areas of the prison, which he believes is necessary for him to avoid potential significant and life-threatening violence.

9. Mr. Moore has no record of engaging in violence since being in ADOC custody. When he went up for parole in 2022, he had what is known colloquially as a "clean jacket," which means his record was free of disciplinary concern. Today, he still has no discipline in his file. His custody level is minimum-in, which is the lowest custody level he is able to secure within ADOC.

10. As a consequence of Mr. Moore's many years of performing highly skilled work maintaining, building, and wiring various ADOC facilities, as well as work on wardens' houses, high-ranking prison officials, including several correctional officer supervisors and a warden, have recommended him for parole release.

11. The extension of the time Mr. Moore has spent incarcerated and/or the increased risk of his extended incarceration he has endured because of Defendants' changes to the parole system have exposed him, and continue to expose him, to great risk of personal injury. Mr. Moore has personally witnessed and experienced repeated incidents of violence, retaliation, and staff corruption at facilities to which he has been assigned, including Staton, Fountain, Easterling, Bullock, and Holman. He has experienced a culture in ADOC facilities to which he has been assigned in which correctional officers regularly use excessive force without provocation and without any appearance of concern for legal or other consequences. For instance, at Fountain Correctional Facility, he observed ADOC officers beat an incarcerated man who could not physically comply with a verbal command to lie down, punching him repeatedly as a punitive response. At Fountain Correctional Facility, he also witnessed an incarcerated individual tied up and denied food for a week due to an unpaid debt—an example of the widespread extortion and abuse that he has seen ADOC officers routinely ignore or facilitate. Mr. Moore has also witnessed sexual assaults of incarcerated individuals related to drug debts, enabled in part by contraband introduced by ADOC staff. Mr. Moore believes that the violence at ADOC facilities he has seen since 2019 has worsened in recent years as the collapse of the parole system has eliminated incentives for incarcerated people to follow rules or avoid conflict. Mr. Moore believes, based on what he has observed, that since the changes in 2019 with the Parole Board, incarcerated people see no way to win parole regardless of what they do.

12. Mr. Moore has been harmed by the extension of his incarceration in 2022, when he was denied parole and given a five-year set-off. The harms to Mr. Moore include the denial of his freedom and continued exposure to the violent and dangerous conditions in Alabama's prisons. Because the denial of parole and five-year set-off he received in 2022 keep him incarcerated by ADOC, Mr. Moore suffers a wide array of personal harms, including continuing to be unable to provide any economic support to his mother, who has long supported him, his two now-grown children and his six grandchildren, all of whom he has maintained a close relationship with, and his fiancé, whom he would like to marry and have children with upon his

release. Currently, his ongoing incarceration due to Defendants' conduct is causing Mr. Moore further harm because he currently has two serious health conditions for which he has not received adequate treatment or even an adequate medical examination while in ADOC custody. Mr. Moore's ongoing detention harms him physically in the short-term, as both conditions are painful, and he worries he may have long-term consequences if they are not treated appropriately and immediately. All of these harms are ongoing each day that Mr. Moore remains incarcerated.

**B. Frederick Denard McDole**

13. Plaintiff FREDERICK DENARD MCDOLE is currently incarcerated by ADOC at Childersburg Work Release. He has been incarcerated in ADOC facilities since 2017 after spending eight years in a federal correctional facility and has been housed at other ADOC facilities including Bullock, Hamilton Aged & Infirm, Ventress, and Hamilton Work Release. Mr. McDole is a Black man. The conduct underlying his conviction occurred in May 2008.

14. Mr. McDole has been before the Alabama parole board three times, first in 2016, then in May 2018, and then in March 2022. In May 2018, when the Parole Board denied his parole, they issued a three-year set-off date. Despite the three-year set-off, Mr. McDole's next hearing was not set until March 2022. At the 2018 hearing, the Parole Board advised that he would be granted parole if he completed a specific rehabilitation program ("ATEF") in Columbiana. Mr. McDole completed that rehabilitation program prior to his 2022 parole hearing but in the parole hearing in 2022, the Parole Board denied him parole again, and gave him an even longer set-off of five years.

15. Since approximately 2019, Mr. McDole has worked for multiple private employers through ADOC's work-release program. He has never been terminated from any work release job or had any work complaint made against him. However, in or about the last week of May 2026, he was informed that because his leg is injured, making it impossible for him to go to work until he can receive further physical therapy and medical clearance, his employer Supreme Cores notified ADOC that his position with them would be terminated if he is unable to return to work on Monday, June 1, 2026. On June 1, 2026, he was unable to go to work because of the

injury and lack of medical clearance. Mr. McDole tried to go back to the job with Supreme Cores in the last week of May but had to leave the job due to his leg swelling back up, exacerbating his injury again.

16. For approximately four years (since the end of the pandemic), ADOC has issued Mr. McDole regular passes, typically at a frequency of twice monthly, that have permitted him to spend weekends at home with his family in the community unsupervised, always without incident. Mr. McDole received no discipline of any kind in the year prior to his parole hearings in 2018 and in 2022.

17. Defendants' parole practices challenged in this complaint have injured Mr. McDole by extending the duration of his confinement, and continuing his exposure to the violent and dangerous conditions in Alabama's prisons. Mr. McDole is aware that he has served more time compared to others serving sentences for the same or more severe offenses who were considered for parole before Defendants Ivey and Marshall issued their directives to the Parole Board. Mr. McDole was advised at the time he pled guilty to his offenses that once he served his federal time (after roughly ten years), he would be returned to Alabama and then paroled.

18. Defendants' extension of the duration of Mr. McDole's confinement has caused great psychological and emotional harm to him. Mr. McDole feels remorse over his crime, has worked hard to change himself, and feels he is a different man now. He has been greatly harmed by the Parole Board's refusal to look at the changes he has made and the good he has done since he has been in prison. As Mr. McDole puts it, he has long been ready and able to support his family and community the way a man should. Mr. McDole's extended incarceration has harmed him, including by denying him his freedom and the ability to be with and support his wife, kids, who are now grown, and grandkids. Mr. McDole has been married for 23 years and his wife has supported him while he has been in ADOC custody. Because Mr. McDole remains incarcerated due to Defendants' challenged policies, the personal harms he suffers from that incarceration are ongoing each day that he remains incarcerated.

**C. Michael Campbell**

19. Plaintiff MICHAEL CAMPBELL is currently incarcerated by ADOC and housed in Childersburg Work Release. Mr. Campbell had a parole hearing on July 12, 2023, and the Parole Board denied him parole and set him off for five years, meaning the Parole Board does not intend to consider him for parole until 2028. Mr. Campbell was previously scheduled for a parole hearing in 2019, which was delayed until June 2020. On June 2, 2020, the Parole Board denied him parole and gave him a three-year set-off date.

20. Mr. Campbell is a Black man. He has been incarcerated by ADOC since 2002, at Childersburg, Kilby, and Bibb. The conduct underlying his conviction occurred in 2002.

21. Mr. Campbell has been working unsupervised in the community on work release since approximately 2019. Mr. Campbell has worked for several employers while in ADOC custody, including Bama Budweiser, Progressive Finishes, Alabama Department of Transportation, and KFC. The State and private employers have profited off of Mr. Campbell's labor while he remains incarcerated.

22. At Mr. Campbell's most recent parole hearing in July 2023, several people wrote emails or letters in support; he estimates approximately 15 people wrote on his behalf, although he was not permitted to attend the hearing himself. He also has a clean jacket with no disciplinaries and has a long history of working successfully and without supervision in the community. Nevertheless, the Parole Board gave him the longest possible set-off date, five years. There were only two Board members present at his hearing; one member recommended a three-year set-off, but then-Chair Gwathney insisted on five years.

23. Defendants' parole practices and the ongoing denial of parole to Mr. Campbell have exposed him to the continuing threat of grave personal injury. Mr. Campbell has experienced extreme violence while in ADOC's custody, including witnessing multiple assaults. ADOC officers were indifferent to, and sometimes involved in, these incidents. Once, while incarcerated at Kilby in approximately 2018 or 2019, ADOC officers made him and approximately 200 other incarcerated men strip naked and throw their clothes in the shower, and

then the officers lined them up and slapped many of them in the face. Mr. Campbell has been incarcerated at Kilby three times and witnessed similar punishments being administered each time. He understands that punishments like this continue to this day at Kilby.

24. Defendants' parole practices challenged in this complaint have harmed Mr. Campbell, including by denying him his freedom, increasing the risk his incarceration will be extended, and exposing him to ongoing violence and risk of physical harm. Mr. Campbell has been kept away from his daughter and missed much of her life, including graduations and other moments that he was unable to be there for. Mr. Campbell's continued incarceration prevents him from being there for his daughter now, depriving him of the ability to make up for the years and experiences he missed having with her and causing him to experience sadness and depression. Because Mr. Campbell remains incarcerated due to the denial of parole and the set-off date established by the Parole Board, the personal harms Mr. Campbell suffers are ongoing each day he remains incarcerated.

**D. Lanair Pritchett**

25. Plaintiff LANAIR PRITCHETT is currently incarcerated by ADOC and has been in ADOC custody since 2009. He is currently housed in Limestone Correctional Facility, a high-security facility. Mr. Pritchett is a Black man. Mr. Pritchett has been transferred approximately 19 times in 17 years, and he has been housed in many ADOC facilities, including high-security and work-release facilities. The conduct underlying Mr. Pritchett's convictions occurred in 2007, and he was convicted and sentenced in 2009.

26. Mr. Pritchett has been up for parole on three occasions: in 2015, in 2017, and in 2021. He was denied parole on or about August 5, 2021, after his hearing due to be scheduled in 2020 was delayed due to the pandemic. As part of the 2021 parole denial, the Parole Board set off Mr. Pritchett's next hearing date for five years. The set-off Mr. Pritchett received in 2021 was the longest he had ever received, despite completing more classes and taking more steps to demonstrate his readiness for parole in the years leading up to his 2021 parole hearing. Prior to

his 2021 parole hearing, Mr. Pritchett had also worked in the community for public and private employers.

27. Mr. Pritchett understands that the Parole Board denied parole to him in 2021 in part based on the members' conclusion that he "incited a riot," even though he was in no way involved in the riot. Mr. Pritchett's family spoke on his behalf at his 2021 parole hearing and explained that he was not involved. Mr. Pritchett also submitted documentation for his 2021 parole hearing about the classes he had completed, the certificates he had earned, and a reentry program he had graduated from. Mr. Pritchett further submitted several work reports from ADOC officers and supervisors supporting his parole. The Parole Board's decision to deny Mr. Pritchett parole seems to have relied on the inaccurate riot allegation, while discounting the course work and programs he had completed and his family's testimony. Mr. Pritchett understands based on the notice he received and his family's report that Defendant Marshall's office opposed Mr. Pritchett's parole at the 2021 hearing.

28. Defendants' parole practices and the Parole Board's 2021 denial of parole have increased the length of Mr. Pritchett's incarceration and the likelihood his incarceration will be extended. This lengthened time in ADOC custody has exposed and continues to expose Mr. Pritchett to great risk of personal injury. Mr. Pritchett has witnessed extreme violence at the high- and medium-security facilities where he has been placed while in ADOC custody, including stabbings, rapes, deaths, and other violence. He recalls that, while at Donaldson in approximately 2021, he was on the phone and saw a man stabbed who was standing right beside him. Mr. Pritchett also has experience requesting assistance and protection from violence from ADOC staff, only to have the ADOC staff ignore his requests or refuse to lend assistance.

29. Mr. Pritchett reasonably feels his life is in constant danger while he is incarcerated at Limestone. At Limestone, he is aware that multiple incarcerated people have been killed while he has been incarcerated, and there are not enough guards to assist and protect the incarcerated people when altercations occur. Mr. Pritchett's experience at Limestone is that the lack of ADOC officers makes the conditions at the prison particularly violent, with incarcerated

people in overcrowded and insufficient living conditions forced to govern themselves and intervene when violence occurs. Mr. Pritchett has also had difficulty accessing medical care at Limestone, so his continued incarceration puts him at risk of not getting needed medical care.

30. Defendants' challenged parole practices have also injured Mr. Pritchett by depriving him of the ability to be in contact with his family and to support them. The Parole Board's denial of parole to Mr. Pritchett means he has been kept away from his family, including his nearly 18-year-old son, his mother, and his brother. He knows his family is struggling and wants to be there to help and provide for them, but he cannot because of his parole denial and extreme set-off date. The denial of parole and inability to provide for his family has sometimes felt unbearable.

31. Defendants' challenged conduct has subjected Mr. Pritchett to extended confinement and/or an increased risk of extended confinement in ADOC custody, compared to the time served by other people for the same or more severe offenses who were considered for parole prior to 2019. The personal harms Mr. Pritchett suffers as a result of his extended and continued incarceration following his denial of parole in 2021 are ongoing each day that he remains incarcerated.

**E. Rashaad Clark**

32. Plaintiff Rashaad Clark is a Black man who is currently housed in North Alabama Community Work Center. He has been in ADOC custody since May 2013. While in ADOC custody, Mr. R. Clark also has been housed at Kilby, Draper, Staton, ATEF, Bullock, Atmore, Limestone, Childersburg, Alex City, Mobile, and Frank Lee.

33. The conduct that gave rise to his conviction occurred in 2012, when he was 16 years old. He accepted a plea after his attorney advised him, based on representations from the prosecutor and the judge, that he would only serve five years of a 20-year sentence if he took a plea. Mr. R. Clark believes that, at the time the judge issued his sentence, the prosecutor and judge accurately estimated the time he should have served on the 20-year sentence before being granted parole. In addition, based on what Mr. R. Clark has observed since entering ADOC, the

estimates he was given in 2012 by his attorney, the judge, and the prosecutor, all seem to be consistent with the time he has seen other people serve with similar sentences for the same or more severe offenses so long as they went up for parole before 2019.

34. Mr. R. Clark has been denied parole two times. His first parole hearing date did not occur until January 15, 2020. He was denied parole and set off three years, but his next parole hearing was not until April 26, 2023. In April 2023, the Parole Board denied him parole again, setting him off for three years, and advised him that his next parole hearing would be in April 2026. As of the date of this filing, however, Mr. R. Clark has still not been scheduled for his April 2026 parole hearing.

35. The victim of Mr. R. Clark's crime has consistently supported his release from ADOC custody, advising the Parole Board each time Mr. R. Clark has gone up for parole. In her letters, Mr. R. Clark's victim insists he deserves a second chance as she has communicated that she was not harmed by his offense and has emphasized that Mr. R. Clark was so young when the incident occurred.

36. In 2020 and 2023, Mr. R. Clark's mom attended his parole hearings and advised him that the Attorney General and VOCAL opposed his release even though his victim communicated her views supporting his release. After at least one of the denials, the Parole Board advised Mr. R. Clark that it would be "a disrespect to law enforcement" for him to be released and also advised him that his "institutional behavior" was a reason justifying his denial.

37. Mr. R Clark has had no violent disciplinaries of any kind in the years coming up to either the 2020 or the 2023 parole hearings. Indeed, in the period leading up to the 2020 parole hearing, he was in ADOC's Mobile work release facility (and serious or violent disciplinaries disqualify a person from being in work release). At Mobile work release, he was extremely well liked by both ADOC staff and his work release employer. He worked at a Mexican restaurant in Mobile and the patrons and the supervisors there all advised him repeatedly that they wanted to recommend him for parole.

38. Mr. R. Clark does not know what sort of "institutional behavior" the Board purported to cite as a basis for denying him parole, but he is concerned that the Board considered various disciplinaries issued to him by ADOC relating to false claims that he "refused to work." For example, while assigned to ADOC's Bullock facility (in or about 2016 or 2017), Mr. R. Clark was disciplined by ADOC for refusing to work when he was suddenly assigned to the kitchen, despite his work as a runner; when he protested that he already had a job, he was written up by ADOC for refusing to work. Mr. R. Clark does not know if this is what the Parole Board was referencing in its parole denial, but he has no problematic institutional behavior, as demonstrated by the fact that he has consistently been approved to return to work release and honor camps, which require low or minimal disciplinaries.

39. Mr. R. Clark is concerned that a baseless write-up from another work-release position will be used against him in his yet-to-be-scheduled parole hearing. While he was at Amaze Corp (working from ADOC's Childersburg work release facility, in or about 2024), he was cussed out by a supervisor for asking for help on the job. The supervisor was hungover and upset because a different incarcerated worker had failed to show up to work that day, and seemed to take out that frustration on Mr. R. Clark. As a result, Mr. R. Clark was disciplined by ADOC for "getting fired from the job," despite the fact that he was not actually the person who failed to show up for work. Mr. R. Clark is concerned that this disciplinary will be used as a basis to deny him parole at the hearing that was supposed to occur in April 2026 that has yet to be scheduled by the Parole Board.

40. Due to the extension of his time in prison due to his parole denials, Mr. R. Clark has been repeatedly exposed to and observed rampant violence in Alabama's medium- and high-security facilities. He was once attacked in the middle of the night by another person with knives; the ADOC guards did nothing, and he was forced to fend for himself. Another time, he was choked unconscious by another incarcerated person who came up from behind him and attacked him.

41. While incarcerated in ADOC facilities, Mr. R. Clark has also been exposed to regular violence from the ADOC guards themselves; he has witnessed the guards assault incarcerated people, and has been assaulted himself by guards. He has also witnessed corruption, including ADOC guards selling phones at Staton and ADOC guards participating in the drug trade, with ADOC officials getting a cut of the profit. At each of the higher security facilities, he observed violence "all day, every day." Mr. R. Clark has also witnessed stabbings, beatings, and rapes in various ADOC facilities. An extension of his term of incarceration thus subjects Mr. R. Clark to harm, including the reasonable fear of being subject to violence while in ADOC custody.

42. Mr. R. Clark has also experienced harm while incarcerated through his participation in ADOC's work programs, through which he has worked for ADOC and for public and private employers. He has been given work assignments that exposed him to harm, including as a runner for ADOC at Staton and Bullock and for Bama Budweiser, where a supervisor attempted to assault him. Mr. R. Clark's continued incarceration, and the denial of his parole, means that he will continue to be exposed to this sort of harm at and through work assignments.

43. In addition to the harm described above from his ongoing denial of parole release and loss of his freedom, Mr. R. Clark describes his ongoing harm from the denial of parole in the following way: "I have not yet had a chance to try to have a life because that opportunity to begin my life was snatched from me when I was so young. I want to know what it is like to pay bills on my own, start a family, and be able to be present and support my family and community." Mr. R. Clark has two brothers who require special financial assistance, and he wants to help his mother support them, as she is doing that alone now. He also wants to help care for his grandmother, who due to her age now has special health needs that he wants to help to support and assist. Similarly, in his community, he has life-long friends who have children, who he considers to be family and calls his "nieces," who are heading off for college and he wants to support them. Each of these harms is ongoing and continuing so long as Mr. R. Clark remains in prison due to Defendants' wrongful conduct.

**F. Deckrice Morrissey**

44. Plaintiff DECKRICE MORRISSEY is a Black woman currently incarcerated at Montgomery Women's Facility. She has been in ADOC custody since 2012 and, to the best of Ms. Morrissey's recollection, the conduct leading to her conviction occurred in 2011.

45. Ms. Morrissey was considered for parole by the Parole Board in 2021. Despite a record of working in the community for several private employers without presenting any public safety concerns, support from her family and people from church, and positive work reports from ADOC officers, the Parole Board denied Ms. Morrissey parole and set her off for five years. Ms. Morrissey's ill mother, who spoke on Ms. Morrissey's behalf at her hearing on October 13, 2021, reported that a representative from the Attorney General's office opposed parole for every person who was considered for parole at the hearing, including Ms. Morrissey.

46. While incarcerated, Ms. Morrissey has sought to develop her skills and improve conditions for her fellow incarcerated women. Ms. Morrissey participated in a book club in 2015 with classes led by professors at Troy University, which helped her to get her GED. Prior to Ms. Morrissey's 2021 parole hearing, she also completed a parenting class and a substance abuse program, earning certificates from both. Ms. Morrissey is also an advocate for incarcerated pregnant women. In 2023, she sent proposed improvements for legislative consideration after observing that pregnant women do not have the resources in ADOC facilities to support healthy babies and enduring shackles during her own delivery when she gave birth to her youngest daughter while in ADOC custody.

47. While incarcerated, Ms. Morrissey has been forced to work for the benefit of ADOC and for private employers through ADOC's work-release program, working safely in the community alongside non-incarcerated colleagues and customers for private employers including Paramount Services, Southeastern Meats, Full Moon BBQ, Bud's Cookies, Popeyes, Bama Seafood Restaurant, and McDonald's.

48. Defendants' challenged parole practices have injured Ms. Morrissey and continue to injure her. Because she was denied parole in 2021, Ms. Morrissey remains exposed to

uninhabitable conditions, including pervasive mold, food that has made her sick, and a culture of violence by ADOC guards against incarcerated women. She also experiences significant emotional and financial harm. Ms. Morrissey has an elderly mother who is very ill, and her mother takes care of Ms. Morrissey's youngest daughter. Because of Ms. Morrissey's mother's serious health problems, she needs assistance that it pains Ms. Morrissey not to be able to provide, and she is concerned about the burden it places on her teenage daughter. If she were not incarcerated, she would care for her family members and work to support them financially.

**G. Eric Prewitt**

49. Plaintiff ERIC PREWITT is currently incarcerated at Red Eagle Work Center. He has been in ADOC custody since 2018, and has also been incarcerated at Kilby, Ventress, St. Clair, ATEF, Alex City Work Release, and Limestone. Mr. Prewitt was charged with his crime of conviction in 2016, for conduct that occurred in 2016.

50. Mr. Prewitt has been affected by Defendants' parole practices challenged in this complaint, including the efforts to shut down grants of parole. Mr. Prewitt's Institutional Parole Officer told him that he could apply for early parole after 18 months of incarceration, but when he applied to be considered for parole early, he was denied. The denial letter he received from the Parole Board expressly referenced 2019 rules and regulations that were implemented by the Parole Board. Those rules and regulations were not in place at the time the crime for which Mr. Prewitt was convicted occurred, nor were these rules and regulations in place at the time of his sentencing.

51. The Parole Board considered Mr. Prewitt for parole in 2023. The Board denied him parole and set him off for five years. At the time the Board denied him parole in 2023, Mr. Prewitt had worked safely for employers in the community for more than a year. Three work supervisors from his job in the community and several ADOC supervisors submitted letters in support of his parole. At the time of his 2023 parole hearing, Mr. Prewitt also had a clean disciplinary record, had completed numerous ADOC programs intended to support his rehabilitation and reduce recidivism, and regularly lived, without incident, in the community

unsupervised on weekend passes. When the Board denied Mr. Prewitt parole, they cited the severity of his crime and negative input from stakeholders as the reasons for his denial.

52. Because Mr. Prewitt has been denied parole and remains incarcerated in ADOC facilities, he faces great risk of personal injury. Mr. Prewitt has experienced dangerous, violent, and retaliatory conditions while incarcerated at ADOC. Mr. Prewitt's experience is that the violence is constant and normalized in ADOC medium- and high-security facilities; he could meet someone one day, and they would be dead a week later. He has witnessed multiple stabbings, overdoses, and beatings, and had a friend killed at Fountain. ADOC guard responses to violence, if they occur at all, are often delayed at medium- and high-security facilities because gates are locked, and it can take as long as five minutes to be cleared. Mr. Prewitt's continued detention also subjects him to forced labor while incarcerated, sometimes under physically grueling conditions. Mr. Prewitt is constantly in fear of getting written up by ADOC personnel or in the context of the work he is required to do for ADOC or private employers, even for unjustified or arbitrary reasons, as that could further decrease the likelihood he will be granted parole.

53. Defendants' challenged parole practices have injured Mr. Prewitt by increasing the duration of his confinement and/or increasing the risk that his confinement will be extended. He was denied parole in 2023, which caused him to be subjected to ongoing harm, including by continuing his exposure to the violent and dangerous conditions in Alabama's prisons and preventing him from getting an education and moving forward with his life. Because he remains incarcerated due to the denial of parole, the personal harms Mr. Prewitt suffers are ongoing each day that Mr. Prewitt remains incarcerated.

### H. Trevion Clark

54. Plaintiff TREVION CLARK is currently incarcerated by ADOC at Staton Correctional Center. Mr. T. Clark is a Black man who has been in ADOC custody for approximately 14 years, held at Kilby, Draper, Easterling, Frank Lee, Mobile Work Release,

Elba Work Release, and Alex City facilities. The conduct that resulted in Mr. Clark's conviction occurred in 2011.

55. Mr. T. Clark was released on parole in 2018 and remained in the community for a year and a half before his parole was revoked. When the Board revoked his parole in 2020, it set him off for five years. The Parole Board considered Mr. T. Clark for parole on June 17, 2025 and denied him parole; his next parole consideration date was set for May 1, 2026, but he has not yet received a hearing date. For the 2025 hearing at which Mr. T. Clark was most recently denied parole, he submitted work reports, letters from former employers and his trade school, and emails from several people supporting his parole, in addition to having two people speak on his behalf.

56. From March 2024 to May 2025, Mr. T. Clark was housed at Alex City, a low-custody work release facility where he regularly worked for private employers in the community. In May 2025, ADOC transferred Mr. T. Clark to Kilby, a high security facility, on the basis of a disciplinary allegation that Mr. T. Clark reasonably understands to have been a pretext to punish him for his prior complaints and advocacy regarding unsafe and unlawful conditions, including work conditions. ADOC transferred Mr. T. Clark to Staton Correctional Center in December 2025, and so long as Mr. T. Clark continues to be incarcerated, he is at risk of being transferred back to a high-security facility.

57. Defendants' challenged parole practices have injured Mr. T. Clark by prolonging his incarceration and making it likely his period of incarceration will be extended. This has exposed him to continuing risk of personal injury because of the violence in ADOC facilities. Mr. T. Clark describes the other high- and medium-security ADOC facilities where he has been detained, such as Easterling, as a "murderous place." In 2015, when Mr. T. Clark was housed in Draper, at one point, ADOC lost control entirely of the segregated dorm because the dorm was taken over by incarcerated individuals to protest unsafe working conditions.

58. Mr. T. Clark is also harmed by continued incarceration in ADOC facilities because the conditions he has experienced at those facilities are uninhabitable. Examples of

conditions that Mr. T. Clark has experienced in ADOC facilities include bathrooms with no privacy, which creates major risk of sexual violence; low temperatures causing pipes to burst and sewage issues; and frequently undrinkable water, which is brown and has an odd taste, and the only way to get clean water is to purchase bottled water or microwave the water for several minutes. In addition, Mr. T. Clark reports that, due to inadequate sanitation and poor healthcare services at Staton, there is currently a lice and scabies outbreak at the facility.

59. Mr. T. Clark is also harmed by his continued incarceration because, so long as he is in ADOC custody, ADOC can require him to work for its financial benefit and the benefit of private employers. Mr. T. Clark is concerned that, if he refuses to work, it will negatively impact his chances at parole.

60. Defendants' challenged conduct has also harmed Mr. T. Clark's ability to maintain relationships with and provide financial support for his family. Several of Mr. T. Clark's family members passed away during the COVID-19 pandemic, including his aunt who helped to raise him, and Mr. Clark was not able to attend their funerals. Mr. T. Clark has a 15-year-old son, and has missed almost all of his son's childhood because of his incarceration, and has not been able to form the father-son relationship that he wants and that his son needs. Mr. T. Clark is also unable to provide the financial support that his son needs. Because he remains incarcerated due to the denial of parole, the personal harms Mr. T. Clark suffers are ongoing each day that he remains incarcerated.

**I. Larry Darnell Jarmon Jr.**

61. Plaintiff LARRY DARNELL JARMON JR. is a Black man currently incarcerated by ADOC at Mobile Work Release, who has been in ADOC custody for approximately 13 years. During his incarceration, Mr. Jarmon has been housed at North Alabama Work Release, Elba, Kilby, Ventress, Easterling, and Donaldson. The conduct that resulted in Mr. Jarmon's conviction occurred in October 2012.

62. Mr. Jarmon has been working safely in the community, unsupervised and without incident, on a nearly non-stop basis since 2018. He also began receiving home passes in 2025,

which he used to visit and care for his elderly and ailing parents. However, his transfer from North Alabama Community Based Facility to Mobile meant that he had to wait to receive passes again, and will not be eligible to receive a home pass until later this month.

63. Mr. Jarmon had his first parole hearing on or about February 18, 2020. That hearing was supposed to take place in 2019, but was delayed. His former pastor and church members wrote letters of support on his behalf, and he also submitted certificates demonstrating completion of various trainings and courses, such as a program known as "pre-release." He also submitted work reports from supervisors and at least one co-worker, submitted recommendations from ADOC officers, and was working unsupervised in the community without incident for approximately one year prior to the hearing. Nevertheless, he was denied parole and received a five-year set-off. His understanding is that he was denied because of the nature of his criminal conviction, a violent crime. At his most recent parole hearing on or about February 13, 2025, Mr. Jarmon again submitted letters of support from supervisors, his church family, and even ADOC officers, in addition to certificates, but he was again denied and the Parole Board set him off for another three years.

64. Defendants' challenged parole practices have exposed Mr. Jarmon to great risk of personal injury, have increased the length of his incarceration, and increased the risk his time in ADOC custody will be extended. Continued incarceration brings a risk of significant harm. During his incarceration, Mr. Jarmon has been subjected to extreme violence, prolonged solitary confinement, and forced labor under coercive conditions. On one occasion in approximately 2015, while incarcerated in Ventress Correctional Facility, he was harshly punished by ADOC after another incarcerated person stabbed him and he was forced to defend himself. ADOC assigned Mr. Jarmon to 14 months in solitary confinement despite issuing him no disciplinary for the incident and initially telling him that he would only serve six months, while the aggressor, whose actions were confirmed on camera footage, received no punishment from ADOC at all. Mr. Jarmon still bears the visible scars from this attack and spoke to the U.S. Department of Justice regarding the incident.

65. While Mr. Jarmon remains incarcerated in ADOC facilities as a result of Defendants' parole practices, he is also harmed by being forced to work for both public and private employers, for the benefit of the employers and ADOC.

66. Defendants' challenged parole practices have injured Mr. Jarmon by extending the duration of his confinement in 2020 and 2025, and continuing the harms that come from his continued exposure to the violent and dangerous conditions in Alabama's prisons. He is unable to properly care and provide for his elderly parents, who need his assistance due to chronic health conditions they both struggle with. He also cannot provide for his son, who was 10 years old when Mr. Jarmon was incarcerated. Mr. Jarmon regrets not being there for his son and is eager to be a more active part of his life now. He finds it difficult to process how long he has been incarcerated and will remain incarcerated for a single offense, his first, and finds himself losing hope that he will ever get parole. Because Mr. Jarmon remains incarcerated due to the denial of parole, the personal harms he suffers are ongoing each day that Mr. Jarmon remains incarcerated.

**J. Jerame Aprentice Cole**

67. Plaintiff JERAME APRENTICE COLE is currently incarcerated at Kilby Correctional Facility. Mr. Cole is a Black man and has been in ADOC custody for 19 years, including at Draper, West Jefferson, Elmore, Kilby, Holman, Easterling, Bullock, Limestone, Staton, and Alabama Therapeutic Education Facility; Red Eagle and J.O. Davis work centers; and Decatur, Hamilton, and Childersburg work-release facilities.

68. Mr. Cole accepted a plea in 2008 relating to conduct which occurred on March 4, 2007. He was advised when the plea was presented to him that he would not have to serve the duration of the 20-year sentence, but rather would serve seven years on a 20-year sentence.

69. He has been up for parole and denied four times, in 2014, 2017, 2020, and 2023. In the April 2017 hearing, he was given a two-year set-off. In 2018, through completion of certifications and coursework, he secured the lowest level of custody, and from 2018 to the

present date has always retained ADOC's lowest risk levels of custody, Level 1 (also known as "community custody") or Level 2 (known as "minimum in"). He has been assigned and worked alongside free workers outside prison gates through work release and honor camp assignments. In 2022, he received regular passes to live with his family in the community on weekends.

70. Despite being issued a two-year set-off in April 2017, his next hearing did not occur until February 2020. At the February 2020 hearing, the Parole Board denied his parole and gave him a longer set-off, three years, than in 2017 (despite his reduced custody level). Despite the Board issuing him a three-year set-off, Mr. Cole's next hearing did not occur until August 2023, at which point the Parole Board advised him that he would not be considered for parole again before his mandatory release date (identified as June 2026).

71. Mr. Cole has never been permitted to attend his parole hearings, but his family has attended all hearings save for 2017, when they were unavailable due to work commitments. Based on their reports and the official notifications he received, he understands: the victim of his crime has never opposed his release; and the district attorney, who said she was coordinating with the Attorney General, opposed his parole in 2020 and again in 2023.

72. Mr. Cole has witnessed and experienced severe and pervasive violence during his time in ADOC custody at each of the high- and medium-security facilities where he has been assigned. Mr. Cole has experienced extreme violence and uninhabitable conditions while in ADOC custody at medium- and high-security facilities and has witnessed criminal and unlawful activities by ADOC personnel at every facility where he has been assigned, including ADOC personnel selling drugs, phones and weapons. He has witnessed numerous deaths and seen ADOC engage in retaliatory transfers of people who make complaints about the conditions in the facilities.

73. Mr. Cole strives to mentor others in ADOC custody, but observes that many people have given up hope because the Parole Board has stopped granting parole since 2019. This lack of hope makes rehabilitation feel useless, and consequently makes conditions in the

prisons even more violent because incarcerated people feel they have no reason to control their behavior.

74. The harm Mr. Cole has suffered from Defendants' effective shutdown of the parole system since 2019, denying him meaningful parole consideration, is extreme and constant. He describes pain that is "constant" from not being able to provide for himself (such as securing food and basic sanitary supplies) "other than relying on your family who you also have no ability to support as you should." Mr. Cole is the oldest male in his family and was raised to be the head of the household. He feels constant pain in not being able to support and be present for his sisters when they needed him or to be involved in any part of the childhoods of his nieces and nephews. In just the past week before this filing, Mr. Cole learned his mother had been in a car accident and requires care that it greatly pains him to not be able to provide. Mr. Cole describes the emotional turmoil of not being able to support his family emotionally and financially as even worse than the emotional pain of being incarcerated in the violent ADOC facilities. These harms are ongoing each day that Mr. Cole remains incarcerated.

## II. DEFENDANTS

75. Defendants in this action are Governor Ivey, Attorney General Marshall, and Parole Board members Nash and Simmons. Defendants Ivey and Marshall have orchestrated, and all Defendants have intentionally maintained the unlawful operation of the parole system by dramatically reducing access to parole, including by disregarding the evidence-based standards required by law and discriminating on the basis of race in granting parole and issuing parole rehearing dates. Parole Board members Nash and Simmons have failed to investigate or redress unlawful conduct initiated by their predecessors on the Parole Board, even though such unlawful conduct continues wrongfully to keep thousands of people incarcerated who should have been paroled since 2019 and has delayed thousands of incarcerated people from being considered for parole, due to racially skewed and improperly extended set-off dates and continuing diminished parole hearing schedules.

**A. Governor Kay Ivey**

76. Defendant KAY IVEY is the Governor of the State of Alabama and the head of the State's executive branch. Defendant Ivey is sued in her official capacity. As detailed herein, Defendant Ivey collaborated with Defendant Marshall and others to subvert Alabama's parole system, nullifying the individualized inquiry the Parole Board is required by statute to use in evaluating parole candidates and effectively and systematically altering sentences issued by the judicial branch, substantially increasing the risk that incarcerated people, particularly Black people, eligible for parole would be subjected to extended confinement due to a denial of lawful parole consideration. The Governor appoints the Director of the Bureau of Pardons and Paroles, who serves at the pleasure of the Governor. Ala. Code §15-22-21. The Governor also appoints members of the Parole Board, choosing from a list of persons nominated by a panel set forth by statute, and designates the Chair. *Id.* §15-22-20. The Governor also has communicated to the Parole Board her opposition to parole for specific parole applicants. The Governor has the authority, whether formal or informal, to refuse to coordinate with the Parole Board to subvert the lawful operation of the parole system and, further, to direct the Parole Board members to follow the evidence-based standards required by state law in making parole decisions, which would provide relief to Plaintiffs.

**B. Attorney General Steve Marshall**

77. Defendant STEVE MARSHALL is the Attorney General of the State of Alabama. The Attorney General is an elected public officer who serves as the State's attorney and is the State's chief law enforcement officer. Defendant Marshall is sued in his official capacity. By statute, the Parole Board cannot grant parole until it provides 30 days' notice to the Attorney General that an incarcerated person is being considered for parole. Ala. Code §15-22-36. Attorney General Marshall systemically submits letters to the Parole Board opposing parole for incarcerated individuals and often urges the Parole Board to disregard the Parole Guideline recommendations. He systemically coordinates with a group that calls itself Victims of Crime and Leniency ("VOCAL") to oppose granting parole in most cases, and nearly without exception

in cases involving offenses classified as "violent" under Alabama law. The Attorney General has the authority to advocate for adherence to individualized, evidence- and fact-based decision-making and analysis in the parole process.

**C. Parole Board Chair Hal Nash**

78. Defendant HAL NASH is the Chair of the Parole Board within the Alabama Bureau of Pardons and Paroles, a state agency created by statute. *See* Ala. Const. art. V, §124; Ala. Code §15-22-20. Defendant Nash is sued in his official capacity. Defendant Nash was appointed in 2025 and since then has exercised his authority as Chair of the Parole Board to continue the wholesale revision of the standards governing parole eligibility initiated by his predecessor, Leigh Gwathney, in a manner substantially likely to increase the duration of confinement for parole-eligible Alabamians and to discriminate against Black incarcerated Alabamians in the granting of parole and the issuance of parole rehearing dates. As a member of the Parole Board, Defendant Nash has the authority to implement parole review, grant, and hearing reset practices that are compliant with law, evidence-based, and not racially discriminatory.

**D. Associate Parole Board Member Gabrelle Simmons**

79. Defendant GABRELLE SIMMONS is an Associate Member of the Parole Board. She is sued in her official capacity. Defendant Simmons was appointed in August 2023. As a member of the Parole Board, Defendant Simmons has the authority to implement parole review, grant, and hearing reset practices that are compliant with law, evidence-based, and not racially discriminatory.

## JURISDICTION AND VENUE

80. This Court has original jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §1983.

81. The Court has jurisdiction to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, and its equitable powers.

82. Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district. Each Defendant maintains an office in Montgomery, which is located in this district.

## FACTUAL ALLEGATIONS

83. It is not hyperbole to say that, in 2023, more people left ADOC facilities in body bags than were paroled. Through the deliberate acts of Defendants Ivey and Marshall, initially through their handpicked Parole Board Chair Leigh Gwathney and continuing to the present day, Alabama has cast aside the efforts mandated by the legislature in the Justice Reinvestment Act, discussed below, to decrease the incarcerated population through parole practices that would improve public safety and decrease recidivism. In its place, beginning in 2019, Defendants implemented a near-complete shutdown of access to parole that practically eliminated the possibility of parole in particular for individuals convicted of violent crimes and Black parole candidates. This near-complete shutdown continued through the original filing date of this lawsuit in December 2023.

84. Following sustained pressure from the media and legislators, and after the filing of this lawsuit in December 2023, Defendants' pattern of parole denials transitioned from an effective shutdown of access to parole to one in which parole candidates continue to face dramatically reduced access to parole relative to pre-2019 levels, as detailed below, with Black parole candidates continuing to experience particularly severe effects and higher rates of denial. And many people eligible for parole currently are barred from future parole consideration until the expiration of the lengthy set-off periods that were set by the Parole Board when it denied previous parole applications.

## I. ALABAMA OPERATED A CORRECTIONS SYSTEM MARKED FOR YEARS BY DYSFUNCTION, OVERCROWDING, AND ABUSE, WHICH THE LEGISLATURE SOUGHT TO ADDRESS BY REFORMING THE PAROLE SYSTEM

85. Although Alabama's prisons have long been notorious for systemic human rights violations, these abuses were largely tolerated by State officials and the public for decades. It was not until the years leading up to 2014, amid a severe financial crisis, that the unsustainable fiscal burden of maintaining an overpopulated and deteriorating prison infrastructure compelled State leaders to consider reform.

86. By February 2007, Alabama's prisons were the second-most overcrowded in the nation, with approximately 27,000 people incarcerated in facilities designed to hold approximately 13,000.[1] This overcrowding, combined with the reality of dilapidated prison buildings that were not designed for efficient or safe corrections detention (either in terms of keeping incarcerated people or correctional staff safe), forced the State to spend higher and higher amounts on corrections every year, even while cutting budgets for other departments.[2] These spiraling costs, overcrowding, and unsafe and inhumane detention conditions persisted even as violent crime and convictions for violent offenses dropped—in 2005, drug and alcohol offenses accounted for 38% of all prison admissions.[3]

87. When then-Governor Robert Bentley assumed office in 2011, with Kay Ivey as his Lieutenant Governor, the crisis had only deepened. Alabama was in the midst of a desperate financial crisis—"dead, flat, broke" to quote then-Governor Bentley—and the two largest demands on Alabama's General Funds were Medicaid and Corrections.

88. In or around 2011, the cost drivers for Corrections were: 1) the excessive costs required to prop up Alabama's aging prison facilities, which had not been designed or built at detention grade and then were exposed to extreme stress because of persistent overcrowding; and

---

[1] Alabama Case Study, Public Safety Performance Project (Feb. 2007), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2007/alabamafeb2007pdf.pdf.

[2] *Id.*

[3] *Id.*

2) the high costs attendant to incarcerating such a large number of people, particularly in facilities designed to house about half the people Alabama had in its prisons at the time.

89. By 2014, Alabama's prisons had become the most overcrowded in the country, operating at 195% of capacity.[4] Bipartisan experts and nonpartisan organizations warned that Alabama's prison system was in crisis and that overcrowding and understaffing would lead to spiraling violence. Thus, the Bentley-Ivey administration spent significant time and political energy searching for solutions to secure public safety while reining in costs.

90. Change was slow, however, until the news of the shocking systemic abuse and violation of incarcerated women at Tutwiler women's prison barreled into focus in the Spring of 2014—bringing to the attention of the public and Alabama's leaders the violence that quickly was shown to be endemic across all ADOC facilities.

91. The news of the mass corruption and abuse at Tutwiler—which included male correctional officers watching incarcerated women shower and commanding incarcerated women to put on stripping performances, and the operation by correctional officers of a prostitution syndicate with incarcerated women—made the correctional system crisis undeniable, and forced the Bentley-Ivey administration to turn its focus to prison reform. The administration brought in a criminal justice and public safety consulting firm, The Moss Group, to collaborate with then-ADOC Commissioner Jeff Dunn to both analyze and propose reforms. The Bentley-Ivey administration soon learned that the violence—and the widely reported disturbing fact that the women at Tutwiler, due to broken phones and other impediments, had no way of reaching anyone on the outside to seek help or bring attention to the situation—could not be disentangled from the problems of the overcrowding, the crumbling facilities, and the systemwide understaffing.

---

[4] Justice Reinvestment in Alabama Analysis and Policy Framework, Council of State Governments Justice Center (Mar. 2015) ("Justice Reinvestment Analysis"), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG-AlabamaJRFramework.pdf.

92. The Bentley-Ivey administration eventually pushed forward the comprehensive Prison Transformation Initiative Act, which Governor Bentley announced in his 2016 annual State of the State address with the support and approval of then-Lieutenant Governor Ivey, who was sitting just behind him at the address in her capacity as President of the Senate. The Act called for the construction of four new prisons and the closure of all but two of the remaining ADOC male and female facilities, including "slam[ming] the door shut on" Tutwiler, for a cost of $800 million. Then-Governor Bentley declared that Alabama's prisons for decades had become increasingly overcrowded and "dangerous to both inmates and our corrections officers" and "incredibly costly to taxpayers."[5] He later articulated that the purpose of the sweeping prison reform proposal was four-fold: (1) reduce overcrowding; (2) improve safety and conditions for inmates and correctional officers; (3) allow for additional inmate reentry programs; and (4) improve operational practices and procedures.

93. Meanwhile, in 2014, a coalition of government actors, including Governor Robert Bentley, Chief Justice Roy Moore, Senate President Pro Tempore Del Marsh, House Speaker Michael Hubbard, and then-DOC Commissioner Kim Thomas, had requested support from The Pew Charitable Trusts and the U.S. Department of Justice's Bureau of Justice Assistance to explore a "justice reinvestment" approach to reduce corrections spending and ***reinvest in strategies that can reduce recidivism and improve public safety***."[6]

94. That process culminated in the Alabama Legislature enacting the 2015 Justice Reinvestment Act ("JRA"), which, among other things, reformed parole practices in the State. The goal of the JRA reforms was to reduce ADOC's population by at least 5,000 over five years and implement practices proven to maximize public safety, including investing in (1) training and education programming for incarcerated people, and (2) actuarially-based and data-driven

---

[5] Robert Bentley, 2016 State of the State Address, (YouTube, Feb. 4, 2016), https://www.youtube.com/watch?v=8J3k7WVmge0&t=9s.

[6] "Justice Reinvestment in Alabama: Analysis and Framework," *Council of State Governments* (March 2015) (internal citations omitted) (emphasis added).

decision-making by correctional, parole and probation staff to secure a long-term reduction in Alabama's carceral population by maximizing reintegration of people successfully and safely back into Alabama's communities.

## II. THE GOVERNOR, ATTORNEY GENERAL, AND PAROLE BOARD HAVE EXTENDED SENTENCES ISSUED BY THE JUDICIAL BRANCH BY ABANDONING INDIVIDUALIZED PAROLE DECISION-MAKING MANDATED BY THE LEGISLATIVE BRANCH, RESULTING IN SYSTEMIC AND RACIALLY SKEWED OVERDETENTION.

### A. Alabama's Parole Board Historically Considered Individualized Fitness for Parole and Granted an Average of 2,441 People Parole Annually from 1992 to 2015, at an Average Grant Rate of Just Under 35%.

95. Alabama's longstanding parole statutory framework required the Parole Board to consider incarcerated individuals for parole once they have completed a portion of their sentences, assuming the sentence is one that permits the possibility of parole. Ala. Code §15-22-28(e)(3). Since at least 1951, Alabama law has required the Parole Board[7] to determine an individual's "fitness" for parole, based on a number of factors, and grant parole based on that determination. Ala. Code §15-22-26(a); *see* 1951 Ala. Laws 1030, 1032. Until Alabama enacted the JRA, Alabama statute provided: "No prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardons and Paroles is of the opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society." Ala. Code §15-22-26 (2015).

96. Operating within that statutory and regulatory framework, prior to the JRA's implementation, the Parole Board's annual reports show that it granted parole in the numbers and rates indicated in the chart below for each fiscal year from 1992 to 2015. During that period, the Parole Board maintained an average annual parole grant rate of 34.79%, and an average of 2,441

[7] The Alabama Bureau of Pardons and Paroles ("ABPP") is an Alabama state agency. Within the Bureau, the Parole Board is the three-person panel tasked with determining which incarcerated people may be released on parole and under what conditions. Defendant Nash is the Chair of the Parole Board. As of the date of this filing, only two of the seats on the Parole Board are filled.

people granted parole each year based on an average of 7,027 parole hearings conducted each year.

| Fiscal Year/Dates | Hearing Held/Paroles Considered | Granted | Percent Granted |
|---|---|---|---|
| FY 1992-1993 | 5,443 | 2,093 | 38.45% |
| FY 1993-1994 | 5,633 | 1,942 | 34.48% |
| FY 1994-1995 | 6,155 | 2,287 | 37.16% |
| FY 1995-1996 | 6,549 | 1,644 | 25.10% |
| FY 1996-1997 | 7,822 | 2,712 | 34.67% |
| FY 1997-1998 | 7,834 | 2,761 | 35.24% |
| FY 1998-1999 | 5,592 | 1,729 | 30.92% |
| FY 1999-2000 | 5,406 | 1,836 | 33.96% |
| FY 2000-2001 | 5,452 | 1,772 | 32.50% |
| FY 2001-2002 | 5,811 | 2,169 | 37.33% |
| FY 2002-2003 | 6,936 | 3,198 | 46.11% |
| FY 2003-2004 | 11,603 | 3,954 | 34.08% |
| FY 2004-2005 | 8,657 | 2,190 | 25.30% |
| FY 2005-2006 | 9,508 | 3,439 | 36.17% |
| FY 2006-2007 | 6,640 | 2,187 | 32.94% |
| FY 2007-2008 | 7,356 | 3,193 | 43.41% |
| FY 2008-2009 | 7,924 | 3,280 | 41.39% |
| FY 2009-2010 | 6,788 | 2,690 | 39.63% |
| FY 2010-2011 | 6,871 | 2,097 | 30.52% |
| FY 2011-2012 | 7,406 | 2,178 | 29.41% |
| FY 2012-2013 | 7,627 | 2,312 | 30.31% |
| FY 2013-2014 | 6,647 | 2,237 | 33.65% |
| FY 2014-2015 | 5,958 | 2,236 | 37.53% |

97. At all relevant times, this consistent approach to the opportunity to secure parole prior to the implementation of the JRA in 2015, along with the grant rates for parole in Alabama, published annually by the Parole Board, was known to judges across Alabama charged with weighing and issuing sentences for criminal offenses, particularly when weighing whether to provide an "opportunity for parole" to any fixed-term or life sentence.

98. More granular data from the Parole Board that would allow analysis by offense, race, gender, or votes of particular Parole Board members is not available for review by the public. Defendants have denied Plaintiffs' requests for such data, most recently at least partially on the ground that Defendants suspected this information would be used to support current or future claims in litigation. Plaintiffs are informed and believe and thereon allege that Alabama government officials with ADOC, the Parole Board, and the Sentencing Commission have analyzed parole grant rates by different categories of offenses and/or length of sentence and produced calculations of the average time actually served in prison for different lengths of sentences. Some Named Plaintiffs, as alleged above in paragraphs 7, 17, 33, and 68, and retained putative class members were advised by judges, prosecutors and/or defense counsel in good faith of the time they likely would serve in prison for a particular sentence and/or offense, given the parole regime then in place. Based on what these Plaintiffs and putative class members observed prior to 2019 relating to fellow incarcerated people serving similar or more severe sentences, for similar or more severe offenses, those estimates of the time they were likely to serve in prison were generally accurate.

### B. Under the Bentley-Ivey Administration, Alabama Reformed Its Parole System to Address Overcrowding, Systemic Violence, and Threats to Public Safety

99. The JRA improved the Parole Board's individualized inquiry by requiring it to incorporate evidence- and data-based practices into its decision-making. The JRA also required the Parole Board to implement "structured, actuarially based" guidelines to determine fitness for parole, which "promote the use of prison space for the most violent and greatest risk offenders" and include consideration of the "prisoner's risk to reoffend, based upon a validated risk and needs assessment." Ala. Code §15-22-26.

100. The JRA also required the Parole Board to give each potential parolee a parole score. The resulting Parole Guidelines indicated that the Parole Board should generally grant parole to those who score between 0-7 and should deny parole to those who score 8 or higher. [8]

101. The JRA achieved its goals and demonstrated how Alabama's parole system can function free of discrimination, categorical rules, and bias. Using the evidence-based, objective standards required by the JRA, the Parole Board oversaw a steady rise in parole grant rates between 2015 and 2018—achieving exactly the practical result that the Legislature had intended. By applying the JRA's objective standards, parole grants rose from 2,236 people in FY 2015 to 3,732 people in FY 2018—more than a 50% increase in the number of incarcerated people released on parole relative to 2015.[9] As shown in the table below, which is based on ABPP's published reports, between FY 2015 and FY 2018, the number of parole hearings held peaked at 7,098, and parole grant rates peaked at 54.2%. From FY 2016 through FY 2018, the Parole Board considered an average of 6,581 parole applications per year.

| Fiscal Year/Dates | Hearing Held/Paroles Considered | Granted | Percent Granted |
|---|---|---|---|
| FY 2014-2015 | 5,958 | 2,236 | 37.53% |
| FY 2015-2016 | 6,458 | 3,108 | 48.13% |
| FY 2016-2017 | 7,098 | 3,847 | 54.20% |
| FY 2017-2018 | 6,996 | 3,732 | 53.34% |

102. The JRA was also successful in mitigating Alabama's overcrowding crisis in its prisons by reducing the prison population. Implementation of the JRA's evidence-based

[8] Parole Guidelines, Ala. Bureau of Pardons & Paroles (2020), https://paroles.alabama.gov/wp-content/uploads/ABPP-2-Final-PAROLE-GUIDELINES.pdf.
[9] *Monthly Statistical Report*, Ala. Bureau of Pardons & Paroles (Aug. 2023), https://paroles.alabama.gov/wp-content/uploads/AUGUST-2023-MSR.pdf.

standards achieved the Legislature's stated goal of reducing the population in ADOC facilities, as the number of incarcerated persons dropped from 24,191 at the end of FY 2015 to 20,087 at the end of FY 2018. These reductions were especially pronounced among incarcerated people from ADOC work-release and work-center facilities.[10] These people, who already work in the community unsupervised on a daily basis and often receive home passes that allow them to live with their loved ones for days at a time, are precisely the people who, logically, should be the most frequently paroled once evidence-based, objective decision-making is implemented, because ADOC has already determined they pose no threat to public safety. Between FY 2015 and FY 2018, the ADOC work-release population was reduced by 38.2%, and the work-center population dropped by 17.5% with the Parole Board's application of the JRA's evidence-based parole criteria.

### C. In late 2018, Governor Ivey and Attorney General Marshall Reverse Course, Issue Instructions to the Parole Board and Take Action, Including Securing a Legislative Amendment, to Extend Sentences by Dramatically Reducing Parole Rates, Effectively Eliminating Parole Consideration for Black Alabamians and for all People Serving Sentences for "Violent" Offenses

103. Despite the JRA's success in ameliorating Alabama's prison crisis, reducing the incarcerated population, and diminishing the impact of racial bias in parole decision-making, Governor Ivey and Attorney General Marshall joined forces in 2018 to direct the Parole Board to reverse that progress and transform Alabama's parole system. Seizing upon the tragic crime committed by Jimmy Spencer, a White man, after he was released on parole and evaded supervision, and cloaking their actions in the language of public safety, Governor Ivey and Attorney General Marshall sought to subvert the lawful operation of Alabama's parole system by dramatically reducing the availability of parole for people incarcerated in the State.

---

[10] The Alabama Legislature recently made explicit that a parole candidate's work while incarcerated is highly relevant to the assessment of their fitness for parole. On April 8, 2026, HB86 was enacted, which expressly requires the Board's parole guidelines to include work and education while incarcerated as relevant factors and mandates that the Board consider work and education while incarcerated in determining whether to grant parole.

104. Between October 2018 and July 2019, Defendants Ivey and Marshall took a coordinated series of actions that fundamentally altered the operation of Alabama's parole system. These actions are described below. Their purpose and effect was to replace the individualized parole inquiry required by Alabama law—including the JRA's evidence-based, structured guidelines and validated risk assessment—with a regime of categorical denial, particularly for incarcerated persons serving sentences for offenses Alabama categorizes as "violent."

105. In October 2018, Governor Ivey and Attorney General Marshall summoned the members of the Parole Board to a meeting in the Governor's office. As described by then-chair of the Parole Board Lyn Head in an interview with the media, in that meeting, Governor Ivey and Attorney General Marshall "set the tone for how the [B]oard was expected to vote for people convicted of violent crimes.… Ivey was puzzled as to why [B]oard members would vote to release people who had committed such crimes. 'Why would you even consider letting someone convicted of a violent crime go free?' Ivey asked." When Head responded by explaining to Governor Ivey that "the parole board is required by the [L]egislature to use a risk assessment tool that helps predict whether someone is likely to reoffend, and that people convicted of violent crimes were often considered low risk based on that available data," Governor Ivey "banged her hand on the table and said, 'But don't you think these people need to pay a price?'"[11]

106. After the meeting and until Head resigned her position on the Board, Head felt pressure from both Governor Ivey and Attorney General Marshall to change the way she had been proceeding previously—replacing data- and evidence-driven analysis with more uniform parole denials for people in prison on charges labeled "violent."

107. Dissatisfied with the apparent unwillingness of then-Parole Board Chair Head and her fellow Parole Board members to acquiesce to her demands, Governor Ivey issued an Executive Order in October 2018 requiring a moratorium on all early parole consideration to last

[11] Lauren Gill, *In Alabama, an "Out of Control Board" Cuts Chances for Parole*, Boltsmag.org (Nov. 28, 2023), https://boltsmag.org/alabama-parole-board/.

for 75 days or until the Board implemented a corrective action plan.[12] Attorney General Marshall made clear when Governor Ivey issued her order that "there was an expectation from the [G]overnor and I that we'll see change."[13]

108. In addition to imposing this moratorium and directing the Board to uniformly deny parole to certain persons, the Governor and Attorney General took steps to secure legislation that would facilitate this subversion of the lawful operation of Alabama's parole system. Specifically, Defendant Marshall's office drafted legislation that fundamentally overhauled the Parole Board and its operations, legislation the Governor and Attorney General then pushed through the State Legislature.[14]

109. That legislation, HB 380, gave the Governor unprecedented, direct control over the Parole Board via the power to directly appoint an Executive Director, who acts as the CEO of the agency, controlling personnel, fiscal functions, parolee supervision policy, and rulemaking recommendations—effectively handing the Governor, via the Executive Director, control over all of the Board's administrative functions. HB 380 also granted the Governor new control over the members of the Board by stripping the judiciary of its position on the Board member nominating committee, transforming the appointment of Board members into a purely political affair guided by the Governor's political allies.

---

[12] *AL Governor Orders Freeze on Violent Inmates' Early Parole*, WSFA 12 News (Oct. 15, 2018), https://www.wsfa.com/2018/10/15/gov-ivey-issues-executive-order-freeze-early-parole-violent-inmates/; Exec. Order No.716, Imposing a Temporary Moratorium on Early Parole Hearings and Requiring the Submission and Implementation of a Corrective Action Plan for the Board of Pardons and Paroles (Oct. 15, 2018), https://governor.alabama.gov/newsroom/2018/10/executive-order-no-716/.

[13] Brian Lyman, *Ivey Announces Early Parole Moratorium, Shake-Up of State Parole Board*, Montgomery Advertiser (Oct. 15, 2018), https://www.montgomeryadvertiser.com/story/news/politics/2018/10/15/ivey-announces-early-parole-moratorium-shake-up-state-parole-board/1647632002/.

[14] Sean Ross, *AG Marshall calls on legislature to pass bill reforming pardons, paroles board*, Yellowhammer News (Apr. 9, 2019) https://yellowhammernews.com/ag-marshall-calls-on-legislature-to-pass-bill-reforming-pardons-paroles-board/.

110. Governor Ivey's press release after signing the bill made clear that the 2019 legislation was intended to fundamentally alter how the Parole Board carried out its mission. As that press release explains, the amendment to the parole law was intended to "change" the "flawed practices" of the Parole Board, and implemented, among other things, "strict rules and guidelines" that would prevent "violent offenders" from receiving parole and significant increases in the Governor's control over the Parole Board, including by granting her the power to directly appoint the Executive Director, whom the Parole Board previously had appointed.[15]

111. Governor Ivey immediately used the powers the new bill afforded her to consolidate her control over the Parole Board and specifically direct its decisions. In July 2019, Governor Ivey replaced Executive Director Eddie Cook with former Alabama Attorney General and Circuit Judge Charles Graddick, who once reportedly called for abolishing the Parole Board altogether.[16] Governor Ivey appointed Graddick to oversee the Parole Board and to implement her and Attorney General Marshall's anti-parole agenda.

112. Shortly thereafter, the Governor installed her first handpicked Board chair, Leigh Gwathney, who had previously worked as an Assistant Attorney General in the Alabama Attorney General's Office.

113. Upon installation, Chair Gwathney immediately began communicating and implementing the Governor and Attorney General's directives. Once she was installed as Board chair, Gwathney consistently advised her fellow Board members, Parole Board staff, and even members of the public and legislators in meetings that she received specific instructions from Governor Ivey—when Governor Ivey appointed Gwathney to the Parole Board upon the

---

[15] *See* Press Release, Office of the Governor, *Governor Ivey Signs Bill Reforming Alabama Board of Pardons and Paroles* (June 6, 2019), https://governor.alabama.gov/newsroom/2019/06/governor-ivey-signs-bill-reforming-alabama-board-of-pardons-and-paroles/.

[16] Brian Lyman, *Graddick Talks Violent Crimes Before Resumption of Parole Hearings*, Montgomery Advertiser (Nov. 4, 2019), https://www.montgomeryadvertiser.com/story/news/2019/11/04/parole-hearings-resume-pardons-and-paroles-director-charles-graddick-weighs/4149639002/.

recommendation of Attorney General Marshall—that required her not to consider granting parole to anyone charged with a violent crime.

114. Together, Graddick and Gwathney began implementing Ivey's directives to virtually eliminate parole. Upon his appointment in July 2019, Graddick suspended hundreds of parole hearings for 90 days until November 2019.[17] When hearings resumed, Graddick stated, of the Parole Board, "They know now that their job isn't to create space in Alabama['s] prison system[,] that's not what they were brought in to do."[18]

115. When parole hearings resumed—and in the years since then—the Parole Board's own records make abundantly clear that the Governor, Attorney General, and Parole Board members agreed to, and did in fact, abandon Alabama's longstanding focus on each individual's fitness for parole in favor of a blanket effort to deny parole for any person serving a sentence on an offense categorized as "violent."

116. In fact, in a meeting called by Alabama legislators in late 2020 to address the legislators' concerns regarding the Parole Board's slowdown in hearings and the sharp racial differences in parole outcomes since Governor Ivey installed the new board, then-Chair Gwathney admitted that she did not rely on the objective, evidence-based standards required by the JRA—standards that formalized Alabama's longstanding individualized approach to parole consideration—because she did not think those objective standards were the "important things" to consider.

117. Former Chair Gwathney's public statements revealed the effect Governor Ivey and Attorney General Marshall's directives have had on the entire Parole Board. Under Alabama law, an applicant may only be granted parole by a majority vote from the Board. Ala. Code §15-

---

[17] Eddie Burkhalter, *Charlie Graddick to Resign as Director of Alabama Bureau of Pardons and Paroles*, Alabama Political Reporter (Nov. 2, 2020), https://www.alreporter.com/2020/11/02/charlie-graddick-to-resign-as-director-of-alabama-bureau-of-pardons-and-paroles/.

[18] Caroline Beck, *As Parole Hearings Resume, Graddick Says Release Is Not a Right*, Alabama Daily News (Nov. 5, 2019), https://aldailynews.com/as-parole-hearings-resume-graddick-said-release-is-not-a-right/.

22-28(d). In other words, so long as all Parole Board seats were filled, Gwathney could not unilaterally cause the precipitous decline in parole rates described *supra*. Other members of the Board must have agreed to implement the Governor's agenda to abandon the JRA and Alabama's historical practice in favor of minimizing parole rates at all costs.

118. Indeed, after the 2018 meeting in the Governor's office where Attorney General Marshall and Governor Ivey issued their instructions to the Parole Board regarding commencing broad and sweeping parole denials as a systemic practice, Attorney General Marshall sharply altered the previous practice of the Attorney General's office and now submits letters opposing parole for nearly every parole candidate, including nearly without exception for candidates serving a sentence on a "violent" offense, and coordinates with VOCAL to appear at parole hearings to oppose parole even when the victim of a crime chooses not to oppose—or even supports—the parole application of an incarcerated person. Based on the parole scoring guidelines issued by Executive Director Graddick, opposition by the Attorney General and/or VOCAL added two points a parole applicant's "score."[19] Thus, by sending these letters, Attorney General Marshall ensured that all parole applicants serving a sentence for a violent offense had a starting score—before consideration of anything about the individual applicant—of 2. Unsurprisingly, indicating the close coordination of the Parole Board with Attorney General Marshall's directives, then-Chair Gwathney advised her fellow Parole Board members that she would only consider releasing a person if they had a parole score of "1."

119. Ivey, Marshall, and the Parole Board did not simply undo the work of the JRA—they fundamentally changed Alabama's justice system such that parole became virtually unavailable for any person in the state, regardless of when they were convicted, particularly for people serving time for offenses categorized by Alabama as "violent."

---

[19] Under the current guidelines, opposition by the Attorney General adds two points if the parole candidate does not have other individuals voicing their support for the parole candidate, or one point if other stakeholders or community members have expressed their support. Admin. Code 640-X-A-2, Form ABPP-2 (2025), https://dev-al-paroles.pantheonsite.io/wp-content/uploads/Rule-640-X-A-2-2025-Guidelines.pdf.

120. Between FY 1992 and FY 2017, Alabama held an average of 7,007 parole hearings annually, and those hearings resulted in an average of 2,557 people being paroled annually, with an average annual parole grant rate of 36.7%. As the chart below shows, the parole rate when each named Plaintiff engaged in the conduct leading to their conviction was in keeping with that trend:

| Plaintiff | Year of Conduct Leading to Conviction | Number of Parole Releases (in Relevant Fiscal Year) | Grant Rate (in Relevant Fiscal Year) |
|---|---|---|---|
| **Lee Moore** | 1993 | 1,942 | 34.5% (FY1994) |
| **Frederick McDole** | 2008 | 3,193 | 43.4% (FY2008) |
| **Michael Campbell** | 2002 | 2,169 | 37.3% (FY2002) |
| **Lanair Pritchett** | 2007 | 2,187 | 32.9% (FY2007) |
| **Rashaad Clark** | 2012 | 2,178 | 29.4% (FY2012) |
| **Deckrice Morrissey** | 2011 | 2,097 | 30.5% (FY2011) |
| **Eric Prewitt** | 2016 | 3,108 | 48.1% (FY2016) |
| **Trevion Clark** | 2011 | 2,097 | 30.5% (FY2011) |
| **Larry Jarmon** | 2012 | 2,312 | 30.3% (FY2013) |
| **Jerame Cole** | 2007 | 2,187 | 32.9% (FY2007) |

121. Beginning in 2019, parole grant rates plummeted and, just as significantly, the pace of the Parole Board's operations ground to a snail's pace, sharply reducing the opportunities for parole consideration as compared to decades of the Parole Board's previous operations. As shown in the chart below, beginning as soon as Governor Ivey installed Graddick as Executive Director, after the moratorium ordered by Governor Ivey herself and then the moratorium imposed by order of Graddick in 2019, the Parole Board immediately and dramatically reduced

the number of parole hearings it conducted—considering just a third of the number of parole applications—relative to preceding Parole Boards since 1992. Indeed, as shown in the chart, when the sharply reduced number of parole hearings is combined with the sharp decline of the parole grant rate following Ivey and Marshall's Parole Board appointments and instructions, the contrast is especially stark. Parole grant rates dropped to 31.3% in FY 2019 (1,337 parole grants), 20.1% in FY 2020 (544 parole grants), 15.3% in FY 2021 (648 parole grants), 10.2% in FY 2022 (409 parole grants), and as low as 8.3% (297 parole grants) in FY 2023; although grant rates increased somewhat in FY 2024 (20.3%) (565 parole grants) and FY 2025 (23.0%) (589 parole grants), the number of individuals granted parole did not increase to anywhere near historical levels. The new regime resulted in the Parole Board granting parole in FY 2020—the first year Ivey was able to fully exercise her consolidated authority over the Board through Graddick and Gwathney—to less than 15% of people granted parole by the Parole Board in FY 2017 and FY 2004, and the Parole Board granting parole in FY 2023 to less than 10% of the people granted parole by the Parole Board in FY 2017 and FY 2004. Similarly, reflecting the huge break from historical practice secured by Ivey, Marshall, and the Parole Board, the Parole Board between FY 2020 and FY 2025 granted parole on average annually only to 509 parole applicants, which is only 20% of the 2,524 people to whom the Parole Boards for the 27 years from FY 1993-FY 2019 granted parole on average annually.

| Fiscal Year/Dates | Hearing Held/Paroles Considered | Granted |
|---|---|---|
| **FY 1992-1993** | 5,443 | 2,093 |
| **FY 1993-1994** | 5,633 | 1,942 |
| **FY 1994-1995** | 6,155 | 2,287 |
| **FY 1995-1996** | 6,549 | 1,644 |
| **FY 1996-1997** | 7,822 | 2,712 |
| **FY 1997-1998** | 7,834 | 2,761 |
| **FY 1998-1999** | 5,592 | 1,729 |
| **FY 1999-2000** | 5,406 | 1,836 |

| | | |
|---|---|---|
| **FY 2000-2001** | 5,452 | 1,772 |
| **FY 2001-2002** | 5,811 | 2,169 |
| **FY 2002-2003** | 6,936 | 3,198 |
| **FY 2003-2004** | 11,603 | 3,954 |
| **FY 2004-2005** | 8,657 | 2,190 |
| **FY 2005-2006** | 9,508 | 3,439 |
| **FY 2006-2007** | 6,640 | 2,187 |
| **FY 2007-2008** | 7,356 | 3,193 |
| **FY 2008-2009** | 7,924 | 3,280 |
| **FY 2009-2010** | 6,788 | 2,690 |
| **FY 2010-2011** | 6,871 | 2,097 |
| **FY 2011-2012** | 7,406 | 2,178 |
| **FY 2012-2013** | 7,627 | 2,312 |
| **FY 2013-2014** | 6,647 | 2,237 |
| **FY 2014-2015** | 5,958 | 2,236 |
| **FY 2015-2016** | 6,458 | 3,108 |
| **FY 2016-2017** | 7,098 | 3,847 |
| **FY 2017-2018** | 6,996 | 3,732 |
| **FY 2018-2019** | 4,270 | 1,337 |
| **FY 2019-2020** | 2,704 | 544 |
| **FY 2020-2021** | 4,232 | 648 |
| **FY 2021-2022** | 4,002 | 409 |
| **FY 2022-2023** | 3,583 | 297 |
| **FY 2023-2024** | 2,786 | 565 |
| **FY 2024-2025** | 2,562 | 589 |

122. The following chart illustrates just how steep the decline in parole hearings, and parole grants, has been since 2019:




123. In addition to slowing the pace of scheduled parole hearings to a crawl, Ivey and Marshall's newly installed Board Chair and Executive Director soon produced Board decisions that tracked exactly the instructions the Attorney General and Governor gave the Parole Board members in the October 2018 meeting: systemic and sweeping parole denials, with blanket denials of parole to anyone serving a sentence for a violent offense. The drastic drop in the number of hearings, combined with the plummeting grant rate, dramatically lowered the likelihood of parole for every incarcerated person whom the sentencing judge determined should be eligible for parole, and virtually eliminated the possibility of parole for those with offenses deemed "violent."

124. The degree to which the Parole Board implemented Governor Ivey's directive to shut down parole and deny parole based on categories, at the expense of the individualized approach mandated by Alabama law, is evident in the drastic reduction in parole release for incarcerated people convicted of "violent" crimes—revealing that the Parole Board effectively resentenced these individuals to terms of imprisonment "without parole." Alabama broadly defines which crimes are deemed "violent," including not only crimes that have as an element the use, attempted use, or threatened use of a weapon or physical force against another person

but also, for example, third-degree burglary, trafficking in cannabis, and attempts, conspiracies, or solicitations to commit "violent" offenses. Ala. Code §12-25-32. As the following graph shows, the parole grant rate for people incarcerated on convictions for "violent" crimes fell from a rate of approximately 44.7% in FY 2018 to 8.8% in FY 2020 and even further to 3.5% in FY 2022.




125. Again, as ADOC and ABPP refuse to release more granular parole data regarding parole grant rates by type of offense, Plaintiffs have been barred from conducting systemic analysis of the change in parole rates by type or category of violent offense. However, analyses conducted by the media and observations from the named Plaintiffs, retained putative class members, and interviews with former Parole Board members, revealed a sharp decline in parole grant rates since the 2019 Parole amendment for all types of violent offenses *compared to any time period since 1992*. On August 21, 2021, media reported that in the nearly two-year period from September 2019 to August 2021, the Parole Board had denied parole to ***every person*** serving a sentence on a homicide charge.[20]

[20] Beth Shelburne (@bshelburne), X (Aug. 21, 2021, at 6:29 AM), https://x.com/RepEngland70/status/1429126533235499020 [https://x.com/SentencingProj/status/1426615617277284355] (reposted from The Sentencing Project, @SentencingProj).

126. Further, comparing the complete offense and parole data from FY 2018—the earliest data available—to the same data from FY 2019 to FY 2023 reveals that the parole grant rate in FY 2018 for parole applicants serving a sentence for a homicide conviction was 32.4%, but from FY 2019 onward, the parole grant rate was 3.0% for people serving time on that same offense (with many years showing a parole grant rate of 0% for that offense). The same sharp reduction is true for parole applicants serving time on a robbery or assault charge: in FY 2018, the parole grant rate was 50.6% for robbery offenses, and from FY 2019 onward, it was 7.6%; in FY 2018, the parole grant rate was 38.1% for assault offenses, and from FY 2019 onward, it was 6.2%.

127. Once a potential parolee has been denied parole, the Board typically must also specify the date upon which that person will be considered again for parole, known colloquially as a "reset" or "set-off" date. The Parole Board during this same period began to substantially reduce how often it issued shorter reset periods, thereby requiring parole candidates to wait additional years in ADOC confinement before they can be considered for parole again. The following chart depicts the changing reset pattern—the Board has more than doubled how often it issues reset or set-off periods of more than two years.

128. Furthermore, the Board began issuing the longest possible reset periods—four to five years—more than 60% of the time in the most recent available data. This reflects a nearly five-fold increase in the longest set-off periods as compared to 2018, the earliest fiscal year for which data is available.




129. The effect of these extended reset dates is ongoing, as many individuals shut out of parole during the most extreme excesses of the Gwathney-era Board remain ineligible to be considered for parole for years into the future due to the pairing of the drop in annual parole grants with the dramatic increase in issuance of much longer set-offs.

130. In addition, former Parole Board members and staff report that prior to 2019, there was not a different set of factors used to assess parole applicants depending on the offense: rather, prior to 2019, before and after the JRA, the Parole Board's analysis was guided by the parole applicant's specific program and educational certifications, as well as disciplinary and work records. The experiences and observations of Named Plaintiffs and retained putative class

members are in accord: Nearly every plaintiff can identify one or more individuals who were incarcerated on offenses which were the same as or more severe than their offenses who were granted release by Parole Boards after serving far fewer years in prison than they have, due to the blanket parole denials and long set-offs issued by the Parole Board since the 2019 amendments to Alabama's parole law.

131. These analyses make clear that the Parole Board, beginning with the appointment of Graddick and Gwathney and continuing through the present day, has been implementing Governor Ivey and Attorney General Marshall's directive to deny parole to people convicted of offenses that Alabama law characterizes as "violent." In doing so, Governor Ivey and Attorney General Marshall secured the alteration of thousands of sentences issued to people convicted of violent offenses, effectively changing those sentences to a fixed term *without* any real possibility of parole.

132. Further, the Parole Board's own data from FY 2021 through FY 2025, displayed graphically below, show that the Board routinely disregards the individualized inquiry guided by the objective, evidence-based Parole Guideline recommendations, consistent with its practice of engaging in categorical denials and non-individualized consideration of parole applications:



133. The implementation of Governor Ivey and Attorney General Marshall's directive to stop letting people out, and particularly not to let anyone with a "violent" conviction out—regardless of the individualized, case-by-case factors that Alabama law historically emphasized and the JRA requires the Parole Board to consider—effectively altered, system-wide, sentences carefully crafted and issued by the judicial branch to permit parole, to make them harsher sentences that either do not provide parole consideration at all or only provide parole consideration in an impermissible, racially biased manner. After the 2019 amendments, the Parole Board's blanket decision-making—which ignored virtually any efforts incarcerated people make towards rehabilitation and is untethered from evidence and the objective standards dictated by Alabama law—has created a significant risk of prolonging the period of incarceration for all persons sentenced to a term of imprisonment with the possibility of parole. This risk is compounded by the severe reduction in the number of hearings the Parole Board has held since 2019. Evidence concerning the operation of the parole system since 2019 demonstrates that this risk of prolonged incarceration has become a reality: incarcerated people convicted of "violent" crimes have been denied parole almost every time and incarcerated people convicted of all other crimes are very unlikely to be granted parole, regardless of the results of their Risk Assessment, the duration of confinement, their efforts to prepare for reentry, months or years without incident or re-offense working alongside free workers (including living unsupervised in the community on weekends or other extended "passes"), or any other factor.

134. Ivey, Marshall, and the Parole Board have also subverted the lawful operation of the parole system to further their objective of reducing access to parole by dramatically increasing the likelihood that parolees will have their parole revoked for alleged parole "violations," no matter how small or technical—even if the alleged violation is later determined to be unfounded. In fiscal year 2018, the Board's revocation rate was 41.5%. Beginning in fiscal year 2020—the year Defendant Ivey installed Graddick and Gwathney—the revocation rate jumped to 70.2%, and has not returned to pre-2019 levels in any year since.

135. The shift was not driven by any change in parolee conduct. Rather, on information and belief, and based on the experiences of putative class members and reports from former Parole Board members, the Board engaged in a systemic practice—consistent with the views then-Chair Gwathney expressed to her fellow Board members regarding her strong interest in revoking as many people out on parole as possible—when given any opportunity, including: any form of technical violation—meaning a failure to report in for a check in (regardless of work obligations that are also part of most parole requirements) or changes in housing; arrests for new charges, regardless of the strength of the underlying charges or ultimate acquittal; and even, as reported by some parolees in 2019, based solely on the parolee's underlying crime, without any violation or misstep by the parolee.

136. The post-2019 revocation regime has also limited access to parole through the "time to reset" mechanism by which a revoked parolee may again become eligible for parole consideration. Until 2019, the Board granted a time-to-reset to the substantial majority of revoked parolees with less than five years left on their sentences: in fiscal year 2018, 73.6% received a time-to-reset and 26.4% did not. In fiscal year 2020, that ratio tipped dramatically in the opposite direction: 60.0% of revoked parolees received a time-to-reset and 40.0% did not. By fiscal year 2025, the inversion was complete: only 33.3% received a time-to-reset, while 66.7% did not. As a practical matter, the Board has, since 2020, refused to set any parole reconsideration date for the majority of revoked parolees with less than five years left on their sentences—meaning those parolees, regardless of the underlying conduct or issue that resulted in their parole being revoked, must serve out the entirety of their original sentences.

137. Of those revoked parolees who received a time-to-reset between January 2019 and mid-April 2026, approximately three-quarters have received resets of thirteen months or longer, and approximately 40% received a reset of more than two years. The reset-time distribution is racially skewed: among revoked parolees during this time period who received any reset at all, Black parolees were substantially more likely to receive resets in the 25-to-60-month range than their White counterparts.

138. Alimireo English's experience reflects the operation of this regime. Mr. English was granted parole in 2017 and complied with the conditions of his parole, working full-time at a car dealership through 2020. After his employer filed false accusations with the police in response to Mr. English filing a charge against his employer with the Equal Employment Opportunity Commission, the Parole Board revoked his parole in October 2020 on the basis of those accusations. Mr. English was acquitted of all charges, with a jury acquitting him of the final charge on November 9, 2021. The Parole Board nevertheless refused to schedule any hearing to consider Mr. English's parole until November 28, 2023—more than two years after the acquittal. At the 2023 parole hearing, the Board relied on a factually inaccurate notice of Mr. English's revocation hearing that stated Mr. English's new criminal charges involved domestic violence. The Parole Board asked Mr. English's attorney at the November 2023 hearing about Mr. English's "domestic violence" charge from 2020: Mr. English's attorney explained that he had never been charged with or convicted of a crime involving domestic violence, but the Board responded that their records indicated (erroneously) that the charge that led to Mr. English's revocation was for domestic violence. The Board denied Mr. English parole and issued a one-year set-off, with then-Chair Gwathney advocating a five-year set-off. Mr. English was finally released in early April 2025, nearly four-and-a-half years after his October 2020 revocation, based on charges for which he was acquitted.

139. Mr. English's situation is not unique. After Defendant Ivey installed Gwathney as Chair, and continuing to the present-day, the Parole Board has changed its policy to maximize parole revocations and to make the effects of revocations endure by delaying or declining altogether to set reconsideration dates. This policy has been applied even when the arrest has no factual basis and the person on parole conclusively demonstrates that they are not guilty of a crime.[21] As a practical matter, even those who are ultimately granted parole remain subject to the

[21] On April 16, 2026, in apparent recognition of the unfairness of retaining in ADOC custody those whose parole was revoked on the basis of charges that are not ultimately substantiated, the Alabama Legislature enacted SB254, which as of October 1, 2026 expressly permits the Parole

jurisdiction of the Board and, given the real possibility that they will have their parole revoked based on unsubstantiated allegations, remain likely to be subject to the broken and discriminatory parole eligibility system.

### D. The Governor, Attorney General, and Parole Board's Abandonment of the JRA's Evidence-Based, Objective Regime Deliberately Introduced Overt Racial Bias into the Parole System

140. The new, anti-parole system implemented by Governor Ivey, Attorney General Marshall, and the Parole Board has also been tainted by overt and deliberate racial bias, as both the actions of those involved and the available data regarding the Parole Board's decisions show.

141. Available data concerning parole grant rates in FY 2018 suggest that implementing the JRA's statutorily required objective, evidence-based criteria delivered an important dividend in the public interest: near parity in parole outcomes between Black and White parole applicants. Among incarcerated people in high-security, medium-security, work-center, and work-release facilities considered for parole in FY 2018 (January-September 2018), both Black and White parole applicants had parole grant rates above 50%, with 50.7% of Black incarcerated people granted parole and 54.4% of White incarcerated people granted parole.

142. The near-parity outcome under the JRA was not accidental. The JRA's objective scoring framework required the Board to incorporate validated risk-assessment tools, structured guidelines, and evidence-based criteria into every parole decision, thereby constraining the kind of subjective, individualized decision-making that, in Alabama, had historically produced racially disparate outcomes. The State's historical use of carceral institutions to extract labor from Black Alabamians supplies necessary context. In the wake of the Civil War and into the 20th century, Alabama leased its prisoners to private mining and industrial employers under contracts negotiated by the State; revenue from convict leasing accounted at one point for a substantial share of the State's general fund. The system was racialized at every level: arrest,

---

Board to place a parolee on the next practicable parole hearing docket if the parolee is found not guilty, the offense was dismissed with prejudice, or the offense was nolle prossed with prejudice and without conditions.

charging, conviction, and sentencing patterns produced an overwhelmingly Black leased-labor population, and the labor was extracted in well-documented conditions of brutality.

143. The JRA produced parole-grant rates for Black and White applicants within four percentage points of one another in fiscal year 2018, the last full year before Defendants Ivey and Marshall's directives took effect.

144. Defendants Ivey and Marshall, however, deliberately circumvented the JRA's objective guidelines and coordinated with the Parole Board to do the same.

145. Charles Graddick, who was appointed by Ivey to the Parole Board immediately after the legislation granting her unprecedented power over the Board, immediately began acting in a racially discriminatory manner. Upon his appointment, Graddick, acting as Ivey's agent, promptly served the three top officials at the Bureau of Pardons and Paroles, each of whom was Black—Cook, as well as the Assistant Executive Director and the Director of Personnel—with disciplinary charges stating that, if they did not resign, they would be terminated. On the day Graddick told Cook and other senior Black agency officials to resign or be fired, Graddick instructed security to escort the officials from the office.

146. In his first week on the job, Graddick also issued a directive that the wearing of a wide array of natural hairstyles, typically worn by Black people, would be prohibited as "unprofessional" and unsuitable at the Parole Board office.

147. Former Board chair Lyn Head resigned in September 2019. She later disclosed that one of the reasons for her resignation was the "blatant … racial discrimination" she observed at the Parole Board after Graddick took over.[22]

148. The data regarding the Parole Board's decisions since Governor Ivey and Attorney General Marshall implemented their plan, in collaboration with the Parole Board, also confirm that the wholesale abandonment of the JRA's evidence-based approach and

[22] Patrick Darrington, *Former Parole Chair Discusses the Declining Parole Rate*, Alabama Political Reporter (Aug. 16, 2023), https://www.alreporter.com/2023/08/16/former-pardons-and-parole-chair-discusses-the-declining-parole-rate/.

implementation of Ivey and Marshall's directives has created a predictably racially-skewed decision-making process.

149. The rapid decrease in the rate of parole grants, for example, has disproportionately affected Black incarcerated people by dramatically increasing the gap in parole grant rates between Black and White incarcerated people, as the following chart shows.




150. The relative difference in parole grant rates between Black and White incarcerated people in 2018, when the JRA was still in effect, and 2021, after Governor Ivey instructed the Parole Board to fundamentally alter how Alabama administered parole, also reflects the racial bias underlying that decision.




151. Indeed, between FY 2020 and FY 2022, Governor Ivey's handpicked Board favored White incarcerated people over Black incarcerated people for parole release ***at a rate of approximately 2 to 1***, when taking into account facility type (including close/maximum, medium, minimum work center, and minimum work release, which generally reflects the parole applicant's custody level), fiscal year, sex, and whether ADOC reported that the person had an off-site job in the past year. Facility type, which is determined by ADOC, implicitly accounts, in addition, for crime of conviction, amount of time left to be served, "positive or negative adjustment[s]," program completions, and any discipline incurred, further demonstrating the extent of the racial disparity.[23]

[23] ADOC Men's Services Classification Manual at 18; *see also* ADOC Admin. Reg. 400. For example, Assignment to Minimum-Community or Minimum-Out custody classification requires, among other things, a disciplinary record clear of major disciplinary actions for at least 90 days and satisfaction of time-frame requirements relative to the person's parole consideration date or sentence expiration.

152. That racial disparity holds true even when taking into account the number and severity of felonies each prospective parolee had. In 2018, when controlling for sex, facility type, and number of each of Class A through Class D felonies, there was no significant difference in the parole grant rate for White and Black incarcerated people with parole hearings. However, between 2019 and 2023, White people with parole hearings were 1.3 times as likely to be granted parole as Black people with parole hearings when controlling for the same factors.

153. Although, for the reasons previously explained, Plaintiffs did not have access to the detailed data necessary to extend this statistical analysis forward to the present day, the Parole Board's own reports attest that a disparity between White and Black parole outcomes persists: according to the Parole Board, in fiscal year 2023, the parole grant rate was 10% for White candidates and 7% for Black candidates; in fiscal year 2024 it was 24% for White candidates and 17% for Black candidates; and in FY 2025 it was 26% for White candidates and 20% for Black candidates.

154. The Parole Board's racial bias in parole decisions at the direction of Governor Ivey and Attorney General Marshall is apparent—and cannot be defended on public safety grounds. Rather, the data demonstrates that Defendants' intentional scheme to capture Black lives for use and profit for Alabama through human trafficking and forced labor has succeeded, to the enormous detriment of incarcerated Black Alabamians, the families of incarcerated people, and communities across Alabama.

### E. Governor Ivey, Attorney General Marshall, and the Parole Board Have Also Disproportionately Delayed Parole Reconsideration Dates for Black Incarcerated People.

155. The unmistakable racial skew reflected in the Parole Board's set-off date determinations further demonstrates the racial animus motivating Defendants' conduct.

156. The Parole Board has disproportionately issued the maximum set-off date of five years to Black parole candidates, while more frequently giving White parole candidates set-off dates of fewer than five years. The chart below reflects the distribution of set-off dates of various

lengths among Black and White people who received set-off dates from the Parole Board between FY 2018 and FY 2023.




157. Thus, in addition to denying parole to Black incarcerated people at higher rates than their White counterparts, the Parole Board also reinforces and exacerbates the racially disproportionate demographics of the Alabama prison population by more often denying Black incarcerated people, for the maximum amount of time possible, the opportunity to prove their readiness for parole. Seven years into Defendants' concerted effort to undermine the JRA's evidence-based practices and to keep Black people disproportionately incarcerated, the effect on the prison population has been as stark as it is unsurprising: as of the February 2026 report from ADOC, 54.5% of the incarcerated population was Black, compared to 26.8% of the overall State population.[24]

---

[24] *Monthly Statistical Report for February 2026,* Ala. Dep't of Corr. (2026), https://doc.alabama.gov/docs/MonthlyRpts/February%202026.pdf at 9.

### F. The Clear Incompatibility Between the Board's Disproportionate and Biased Denials of Parole and the Available Evidence Further Confirms That Racial Bias, Rather Than Public Safety Concerns, Is Driving the Board's Parole Decisions.

158. Defendants Ivey, Marshall, and the Parole Board's agreement to subvert the individualized, objective, evidence-based inquiry into fitness for parole required by Alabama law in favor of a parole system infected with racial bias is further demonstrated by the clear incompatibility between Defendants' invocations of public safety and the Parole Board's actions. Both the Board's treatment of incarcerated people who participate in ADOC's work-release and work-center programs—incarcerated people whom ADOC has determined pose the least threat to public safety of any category of incarcerated people—and the blatant disregard for the evidence that led Alabama to attempt to improve its parole practices in the first place show that ingrained racial animus, not public safety, is what is driving the Board's actions. If Defendants' goal were truly to grant parole only to people who have demonstrated that they are safe to be released unsupervised in the community, those low-risk incarcerated people in ADOC's work-release and work-center programs would be released through parole at a far greater rate than they are currently being released. ADOC work release and work center laborers go outside prison walls on a daily basis, work, and even live on weekends alongside free people in the community unsupervised, thus demonstrating they pose little threat to the public. Similarly, those convicted of violent crimes who have completed the requisite programming and educational programs and secured low-risk institutional records would be *more*, not less, likely to be released through parole, because low-risk violent offenders, according to publicly available ADOC data and the scientific and research literature, have a lower recidivism rate than non-violent offenders.

159. To qualify for work release, an incarcerated person must earn the lowest custody status, "Minimum-Community," typically through completion of various educational and related programs (such as what is known as the "Crime Bill" class, which is a federally subsidized training program proven to reduce recidivism and prepare a person for safe reentry to the community). Incarcerated people classified as Minimum-Community are "allowed gainful

employment in the community on a full-time basis and are supervised in community-based facilities when not working."[25] ADOC precludes incarcerated people with certain crimes of conviction—for example, sex offenses, homicides, or three felony convictions involving the use of a weapon within the past 15 years—from ever obtaining Minimum-Community status, regardless of the current danger presented by that incarcerated person or how much time has elapsed since their conviction.[26] ADOC only classifies individuals as Minimum-Community if they are within specified time periods near the end of their sentences or parole consideration dates and, among other restrictions, they must also have a record clear of major disciplinary actions for at least 90 days. In addition, ADOC notifies the district attorney of each county of conviction when an individual is approved for Minimum-Community placement, and the district attorney has the right to object to the placement before it is completed.

160. ADOC has thus already determined that all incarcerated people participating in work release pose such a minimal threat to public safety that they are permitted to attend work each day outside ADOC's walls, among non-incarcerated coworkers, often interacting with the public, in ordinary civilian clothing. Incarcerated people with Minimum-Community custody levels are also regularly granted weekend passes for unsupervised home visits that can occur as frequently as every other weekend and can extend up to 72 hours.

161. Similarly, by ADOC's own evaluation, incarcerated people classified as "Minimum-Out"—the next-lowest security classification associated with the work-center program— "do not pose a significant risk to self or others and [are] suitable to be assigned off-property work details without the direct supervision of correctional officers."[27] ADOC only classifies individuals as "Minimum-Out" if, among other restrictions, they have had no major disciplinary actions for at least 90 days and if they satisfy certain time-frame requirements with respect to the end of their sentence or parole consideration date. As with Minimum-Community,

[25] ADOC Admin. Reg. 410.
[26] ADOC, Male Classification Manual (Jan. 2018).
[27] Definitions, ADOC, https://doc.alabama.gov/Definitions (last visited June 1, 2026).

certain convictions completely bar incarcerated people from obtaining Minimum-Out classification.[28] And as with Minimum-Community, people with Minimum-Out classification are sent unsupervised by prison officials outside prison walls every day to work alongside free people.

162. Notwithstanding the determination that individuals in Minimum-Community and Minimum-Out classifications pose a low risk of committing further offenses or interfering with public safety, the Parole Board has nevertheless denied parole to such individuals since the 2019 Parole Amendment and Ivey and Marshall's takeover and control of the Parole Board at inexplicably high rates. Between June and August 2023, parole was granted to only 10 of the 74 individuals assigned to work-release facilities whose parole hearings were conducted publicly.[29]

163. The racial skew in overall parole rates is also reflected in the parole grant rates for work-release workers. Black incarcerated people who work through a work-center or work-release facility were denied parole at considerably higher rates than similarly situated White participants.

164. The racial disparities resulting from Defendants' abandonment of the legally required evidence-based parole determination system are shown by the parole outcomes for incarcerated people in work-release facilities, who are classified as Minimum-Community. While Black and White incarcerated people in these facilities were granted parole at essentially equal rates in 2018 (78.4% and 78.9%, respectively), the drop in parole-grant rates after 2018 was directed in a markedly disproportionate way against Black incarcerated people in work release. By FY 2020, the parole grant rate for White individuals in work-release facilities was 45.4%, while the rate for the Black work-release group fell to 26.0%. By FY 2022, 23.4% of White parole candidates in work-release facilities were granted parole, compared to 15.5% for Black parole candidates in work-release facilities.

---

[28] ADOC, Male Classification Manual (Jan. 2018).

[29] Indeed, recently enacted HB86, which mandates that the Parole Board consider a parole candidate's work history, only emphasizes that such work experience *should* be highly relevant to the Board's parole determination.

165. After Governor Ivey and Attorney General Marshall's directive to the Parole Board, the Board has also consistently granted parole for Black incarcerated people living in work center facilities, generally in Minimum-Out custody, at lower rates than for similarly situated White incarcerated people. In FY 2018, Black and White incarcerated people at work center facilities were granted parole more than 60% of the time (61.6% and 65.7%, respectively). By FY 2021, after the Governor began exercising her newfound statutory influence over the Parole Board through former Chair Gwathney, the parole grant rate for Black incarcerated people in work center facilities fell to less than *half* the parole rate for White people in that same classification—5.2% for Black people, compared to 15.3% for White people.

166. The Parole Board's suppressed grant rates for work-release and work-center applicants are not consistent with any plausible public-safety rationale. ADOC has classified these applicants as posing the lowest risk to public safety of any custody category in the system; ADOC sends them to work each day at private and public employer sites, unsupervised by correctional officers, alongside members of the public; ADOC issues these applicants weekend passes that allow them to live with their families for as long as 72 hours at a time. The State has, in other words, already determined that these applicants are safe to be at liberty. The Parole Board's nevertheless disproportionate denial of parole to these Black applicants is consistent with one explanation only: the Board, at the direction of Defendants Ivey and Marshall, is suppressing parole in a racially biased manner, thereby maintaining a population of Black incarcerated Alabamians whom ADOC can rely upon to perform leased and assigned labor.

167. Further demonstrating that public safety is a pretextual justification and is not in fact driving the Parole Board's decisions, the Parole Board has maintained lower parole grant rates in most recent years for individuals classified as "low" risk under the Risk Assessment[30] than for individuals classified as "medium" risk. In FY 2021, for example, the Parole Board granted parole to only 10% of incarcerated people deemed "low" risk by the Risk Assessment,

[30] As discussed, *see supra* Part II.C, the Risk Assessment is a component of the Parole Guidelines focused specifically on assessing an incarcerated person's risk of reoffending.

while granting parole to 25% of those deemed "moderate" risk. The chart below demonstrates these patterns from FY2021–FY2023, which run directly contrary to Governor Ivey's and Attorney General Marshall's repeated professions of concern only for public safety.

| | Risk Assessment | Total Decisions | Total Granted | Grant Rate |
|---|---|---|---|---|
| FY 2021 | **Low** | 1228 | 126 | 10% |
| | **Moderate** | 1848 | 471 | 25% |
| FY 2022 | **Low** | 1312 | 131 | 10% |
| | **Moderate** | 1709 | 248 | 15% |
| FY 2023 | **Low** | 1205 | 97 | 8% |
| | **Moderate** | 1623 | 181 | 11% |

168. If public safety explained the Board's parole decisions—rather than racial bias and a desire to expand the population of low-risk coerced workers (those best situated to be "leased" to outside employers for the profit of ADOC)—one would expect to see substantially *higher* grant rates for those deemed "low" risk than for those deemed "medium" risk, but the data does not bear this out.

169. Racial disparities in parole outcomes for parole candidates convicted of "non-violent" offenses further demonstrate that the Board's public safety rationale is pretextual.




As shown above, via the implementation of HB 380, the Parole Board granted parole to Black parole candidates convicted of nonviolent offenses at lower rates than White parole candidates convicted of such offenses. Current granular data is not available, see supra ¶98, but the Parole Board has not indicated any change to these racist trends.

170. The shortcomings of this approach are made clear by Alabama's own data. The same research that prompted Alabama to enact the JRA showed that "lower-level property and

drug offenders have high recidivism rates."[31] Defendants' unlawful refusal to grant parole to persons convicted of violent crimes therefore keeps those who pose the lowest threat to public safety behind bars, in direct contravention of the Parole Board's statutory mandate.

171. ADOC's publicly available data bears this out. In fiscal year 2018, for example, those convicted of nonviolent crimes who received parole recidivated nearly 16% more than those convicted of violent crimes. That pattern has held true for subsequent years for which data is available—those parolees who were convicted of nonviolent crimes were more likely to recidivate than those convicted of violent crimes in 2019, 2020, 2021, 2022, and 2023. This data reflects that the changes Ivey, Marshall, and the Parole Board have made to Alabama's parole system are driven by something other than public safety, as they are keeping the safest incarcerated individuals behind bars for longer.

172. In fact, based on analysis of available ADOC data through 2023, of the people in Alabama paroled in 2018: not a single one with a murder charge on their record has recidivated, 95% of those with a robbery charge have not recidivated, and 90% of those with an assault charge have not recidivated.

173. The racial skew of parole grants since the unlawful conspiracy began also flies in the face of ADOC data. In every year for which there is available public data since 2018, Black parolees have recidivated less than White parolees.

174. That data remains true even when controlling for criminal history. Black parolees with violent convictions, for example, have recidivated less than White parolees with violent convictions every year since 2018. Black parolees with robbery or assault charges on their record likewise have a lower recidivism rate than White parolees.

---

[31] Council of State Governments, *Justice Reinvestment in Alabama* (March 2015), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG-AlabamaJRFramework.pdf, at 27.

175. But, as explained *supra*, the Parole Board has still granted parole to Black people at a far lower rate than White people—clear indicia that racial bias, not public safety, is driving the Board's decision-making.

176. This racial bias is also reflected in the parole grant rates to people who are granted discretionary leave passes by ADOC. These passes allow incarcerated people to leave the facilities in which they reside and go stay unsupervised in their personal homes, with family, or elsewhere in the community, for as long as 72 hours. The incarcerated people then return to ADOC custody at the end of the "pass." Obviously, such persons cannot credibly be considered a threat to public safety, since they are permitted to live as free people for days at a time and then voluntarily return to their incarceration.

177. But since 2019, when Ivey, Marshall, and the Parole Board took over the parole system, parole grant rates for people with discretionary leave passes have fallen dramatically, and racial bias is again apparent. In 2018, 89% of Black people with such passes and 76% of White people with such passes were granted parole. Between 2019 and 2023, only 28% of Black people with such passes and only 36% of White people with such passes were granted parole. In other words, Alabama started keeping people in custody who were proven to ***pose no threat to public safety*** at extremely high rates, and also flipped the racial balance so that White people in that category became more likely to receive parole than Black people, despite the opposite being historically true.

178. Likewise, the precipitous decline in parole grant rates threatens public safety by substituting the robust, long-term oversight and reintegration support of traditional parole with brief supervision periods. Under Ala. Code §15-22-26.2, individuals who do not receive parole are held until the tail end of their sentences and released with as little as three months of supervision—directly increasing the risk of recidivism and concomitant threat to public safety. The Council for State Governments ("CSG") warned State leaders in 2015 that "[d]enying parole

beyond eligibility contributes to overcrowding and cost, and also compromises public safety."[32] Releasing individuals with only a statutory fraction of the supervision they would receive on parole undermines rehabilitation and drives up recidivism, as the following chart demonstrates:[33]




179. In addition, the decision to prolong confinement for people who have objectively demonstrated their fitness for parole makes the public less safe given the dangerous, unsanitary, and overcrowded conditions in Alabama prisons, which are more likely to cause those trapped in such conditions to suffer from mental, emotional, and physical trauma that makes it even more difficult for them to re-enter the community safely. Indeed, in Governor Ivey's Emergency Proclamation issued on April 13, 2020, at the urging of a broad coalition of former Alabama law enforcement officials directing the Parole Board immediately to recommence parole hearings in virtual meeting rooms after the Parole Board shut down hearings allegedly due to the COVID-19

---

[32] Justice Reinvestment in Alabama Fourth Presentation to Prison Reform Task Force, Council of State Governments Justice Center (Jan. 29, 2015), https://csgjusticecenter.org/wp-content/uploads/2020/10/ALPrisonReformTaskForce.pdf, at 16.
[33] *Id.* at 17.

pandemic, Governor Ivey acknowledged that "It is vitally important we keep Alabama's criminal justice system functioning for the good of public safety."[34]

180. That the Parole Board's decision-making is infected with racial bias is further underlined by the fact that the Parole Board's *pardon* decisions reflect the same racial skew as their parole decisions. Alabama Representative Chris England reported in August 2021 that, from November 2019 to June 2021, 65% of the 914 pardons granted during this period were granted to White applicants. 601 White pardon applications were granted, with 1565 denied (a 38% grant rate for White *pardon* applicants), while only 313 pardon applications were granted for Black applicants, with 1792 denied (a 17% grant rate for Black *pardon* applicants).[35] As pardon applicants are already free, there can be no claim of any "public safety" justification for the Board to lean on as to pardon denials: indeed, the most direct effect of a grant of a pardon is the restoration of voting privileges—which makes the Board's more than two-to-one favoring of White pardon applicants an even more ominous indicator of the Board's improperly racially-biased motivations.

181. The Parole Board's willingness to deny access to parole at the expense of the law is further demonstrated by the Parole Board's treatment of incarcerated people convicted of "nonviolent" offenses who have been sentenced to terms of imprisonment of less than 20 years. State statute provides that "if a prisoner convicted of a nonviolent offense, as defined in Section 12-25-32, with a sentence of 20 years or less is denied parole, the board shall reconsider releasing the prisoner on parole *no more than two years* after such parole release denial." Ala. Code §15-22-37 (emphasis added). Despite this statutory requirement, Bureau of Pardons and Paroles records indicate that, between January 1, 2018 and September 7, 2023, the Parole Board

---

[34] *See* Press Release, Office of the Governor, Governor Ivey Issues Supplemental Emergency Proclamation to Allow Parole Hearings to Resume (April 13, 2020), https://governor.alabama.gov/newsroom/2020/04/governor-ivey-issues-supplemental-emergency-proclamation-to-allow-parole-hearings-to-resume/.
[35] Chris England (@RepEngland70), X (August 28, 2021, at 11:23 AM), https://x.com/RepEngland70/status/1431683857472970755.

formally assigned set-off dates more than two years from the date of parole denial for dozens of people convicted of "non-violent" offenses and sentenced to terms of less than 20 years. Further, in FY 2020 through 2023 (through September 7, 2023), the Parole Board appears to have actually scheduled hearing dates more than two years in the future for more than half of those in the group subject to this statutory restriction on reconsideration dates. The below chart demonstrates that, regardless of whether the set-off date on paper is within two years, in fact the Board has persistently failed to comply with the statutory cap on set-off dates for this population, particularly following the enactment of HB 380.

182. Notwithstanding the unlawfully extended set-off periods revealed by analysis of the limited data available to Plaintiffs, the Parole Board has given no indication that it audits the set-off dates issued by the Board for compliance with the law, instead accepting the risk that parole candidates will be unlawfully denied access to parole for longer than allowed by statute.



### G. Defendants Ivey, Marshall, and Parole Board Members' Refusal to Change the State's Parole Practices Even in the Face of Public Evidence and Criticism Proves They Intend to Perpetuate the Unlawful, Racially Discriminatory Consequences of Their Conduct, Maintenance of a Parole System that Disproportionately Keeps Black People Imprisoned.

183. Governor Ivey, Attorney General Marshall, and the Parole Board's embrace of the racially discriminatory parole system they engineered is further demonstrated by their refusal to change course when faced with evidence of the discriminatory effects of their unlawful scheme.

184. In early 2020, Alabama State Representative Chris England began what became monthly, and sometimes daily, notices regarding the racial bias and continual violation of state law by Ivey, Marshall, and then-Chair Gwathney regarding the Parole Board's operation and decisions. Representative England began by expressing alarm in early 2020 about the harm to public safety caused by the then-Parole Board's refusal to conduct either parole *or* pardon hearings. By May 2020—when the Parole Board had finally resumed parole hearings—Representative England began issuing notices about the fact that the Parole Board denied parole to all 31 parole applicants on one of its first hearings on May 29, 2020.

185. From June 2020 onward, Representative England repeatedly and publicly called out the Parole Board's new policy of denying parole across the board to nearly all applicants, dramatically dropping parole rates and swelling the prison population. Representative England specifically and repeatedly, throughout 2020 and 2023, brought public attention to the connection between Governor Ivey and Attorney General Marshall's takeover of the Parole Board and the sudden and sustained drop in the parole rate. He explained how the decrease in the parole rate led to increasing the size of the prison population, further draining state resources and undermining public safety precisely in the way the evidence-based parole decision-making requirements implemented by the JRA—which were still in place—were designed to prevent.

186. As England pointed out on June 9, 2020, the continuing denial of parole has created a situation where "[t]here has been an increase in homicides, suicides, and assaults on inmates both by other inmates and also staff. We have learned that a culture of corruption exists

at just about all levels that creates an environment that breeds this sort of danger and despair."[36] Similarly, on June 18, 2020, England sent out notice that the law pushed by Ivey and Marshall, which resulted in the Parole Board's shutdown of access to parole, had reversed the decline in prison population secured by the JRA's success: "So, we are probably pushing around 25,000 inmates which is more than where we were when we passed all of the bills in 2015. Thanks to Graddick and the parole bill @GovernorKayIvey and @AGSteveMarshall recently supported, we are trending in the wrong direction at the worst time."[37] By August 2021, Representative England was posting regularly about the detrimental impact the Parole Board's blanket refusal to utilize the evidence-based practices required by state law was having on public safety and prison conditions: "The sad reality is that this is taking all hope from the system. Applicants that have done everything asked of them, have an exemplary record of behavior, a strong support system at home, and people recommending release, are often denied for things they can't control or change."[38]

187. Representative England also publicized the marked racial skew that was emblematic of the Ivey- and Marshall-led Parole Board's decision-making. As of June 9, 2020, Representative England noted, the Parole Board was three times more likely to grant parole to White parole applicants than Black parole applicants. Representative England posted that the same 3-to-1 racial skew persisted in the Parole Board's July 2020 decisions. By August 2021, Representative England was publishing the racially skewed parole decisions from the Parole Board from November 2019 to June 2021: "White Applicants? 751 granted, 2197 denied. Black Applicants? 349 granted, 2580 denied. Hispanic Applicants? 4 granted, 23 denied. Of the 1104 Paroles granted, 68% of them went to White applicants."[39]

---

[36] Chris England (@RepEngland70), X (June 9, 2020, 4:06 p.m.), https://x.com/RepEngland70/status/1270371702300725256.
[37] *Id.* (June 18, 2020, 6:55 p.m.), https://x.com/RepEngland70/status/1273675759039787009.
[38] *Id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683874384449540.[39] *Id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683862762037252.
[39] *Id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683862762037252.

188. In August 2021, England posted to the public damning evidence of the Parole Board's ongoing racial animus toward Black Alabamians: **the same racial skew present in the Parole Board's parole decisions from November 2019 to July 2021 was present in the *same ratios* for the Parole Board's decisions as to *pardons*:** "Let's talk pardons. Here are the numbers from Nov. 2019 to June 2021. White Applicants? 601 granted, 1565 denied. Black Applicants? 313 granted, 1792 denied. Hispanic Applicants? 2 granted, 15 denied. Of the 916 pardons that were given 65% of them went to White Applicants."[40] As noted by Representative England on August 28, 2021: "this [Parole] board's completely subjective standards have not only created a substantial racial disparity in paroles but also pardons as well. You don't have to take my word for it. Look at the numbers. The fact that the disparity exists in both is not a bug, it's a feature."[41] Representative England's November 2021 postings continued the same message regarding the data from decisions by the Parole Board as to pardons *and* parole decisions sharply favoring White parole and pardon applicants.[42]

189. Representative England also drew public attention to the role the Parole Board's post-2019 practice of imposing ultra-long set-off dates—sometimes in excess of what state law permits—to the Parole Board's dramatic reduction in hearings and denial of parole: "And as I have said before, after denying them, [Chair Gwathney] sets the next hearing as far off as possible. She will even BREAK THE LAW to deny applicants an opportunity for rehearing for as long as possible. The law is clear. She just breaks it to keep people in longer."[43] "The Board's new set date cannot be more than 2 years following denial for applicants serving sentences of 20

---

[40] *Id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683857472970755.
[41] *Id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683865920352257.
[42] *Id.* (Nov. 16, 2021, 9:50 AM), https://x.com/RepEngland70/status/1460666570871615498 [https://x.com/bshelburne/status/1460405341104001037] (reposted from Beth Shelburne, @bshelburne).
[43] Chris England (@RepEngland70), X (July 25, 2021, 6:39 PM), https://x.com/RepEngland70/status/1419351731599720448.

years or less for nonviolent offenses or 5 years following denial for all other applicants. Despite that, the chair often sets them all for 5 years anyway."[44]

190. While Representative England's public efforts focused on then-Chair Gwathney, his critiques apply with equal force to the entire Parole Board. For example, like the decision to grant or deny parole, the length of an applicant's set-off date is voted on by the Board—meaning that Gwathney's efforts reflected an institutional shift, not just her own policy preferences. *See* Alabama Administrative Code Rule 640-X-3-.03.

191. In or about 2022, legislators called a meeting to address the racial differences in parole outcomes. Then-Chair Gwathney was present for that meeting as the Parole Board's representative and acknowledged that she did not rely on the evidence-based standards the JRA required the Board to consider, and did not commit to taking any action to address the racial disparities that have persisted to this day.

192. Defending the curative legislation he introduced, Representative England underlined that fixing these problems is critical to protecting public safety: "HB57 will create [] oversight. It will inject objectivity into the process to ensure due process is in place and that people are treated fairly. Public safety is paramount here because the guidelines are based on evidence based standards instead of subjective opinions."[45]

193. Nearly a year later, in August 2023, Representative England explained the opportunity cost paid that is adverse to the interests of public safety by the Parole Board's blanket denial of parole to people who pose no threat to the public upon release: "Also, denying parole to people that are either too sick to be a threat or have demonstrated over 20 or more years in prison that they are no longer a threat denies space to those that really need to be locked up. It also wastes money that we could be using on rehabilitation."[46]

---

[44] *Id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683866935369733; *id.* (Aug. 28, 2021, 11:23 AM), https://x.com/RepEngland70/status/1431683867946201095.[45] *Id.* (Feb. 28, 2022, 10:33 PM), https://x.com/RepEngland70/status/1498546854803517444.
[45] *Id.* (Feb. 28, 2022, 10:33 PM), https://x.com/RepEngland70/status/1498546854803517444.
[46] *Id.* (Aug. 28, 2023, 9:46 AM), https://x.com/RepEngland70/status/1692578821625598206.

194. The racial bias infecting the Parole Board's decisions since 2019 has also been the subject of repeated news stories. In 2021, for example, the Associated Press reported that "Black prisoners are being granted parole less than half as often as their white counterparts," based on data dating back to November 2019.[47] In 2022, the Montgomery Advertiser reported on racial disparities in parole grant rates, including by reporting on a press conference held by Representative Chris England in conjunction with his proposed legislation.[48] In another article that month, Alabama Today reported Representative England's comments that 66% of parole grants between November 2019 and January 2022 went to White applicants, with White applicants two times more likely to get released than Black applicants.[49]

195. Despite years of public attention since early 2020 to these gaping racial disparities in its parole and pardon decision-making, Attorney General Marshall, Governor Ivey, and the Parole Board have apparently taken no curative or investigative action, including since the filing of the instant lawsuit publicizing again this stark racial bias reflected in the Parole Board's decisions.

196. Defendants Ivey, Marshall, and the Parole Board's efforts have achieved their intended purpose: the Parole Board openly disregards the evidence-based framework required by the JRA in favor of a parole system that overwhelmingly denies parole, particularly to anyone convicted of a "violent" offense, and systemically denies parole disproportionately to Black people—particularly Black people whom ADOC has deemed low-risk and eligible to participate in ADOC's extremely lucrative work-release and work-center programs.

---

[47] *Alabama Paroles Drop Further; Releases Lag for Black Inmates* (Nov. 29, 2021), AP News https://apnews.com/article/prisons-alabama-race-and-ethnicity-105cd119dd76e84b29f36f810c0a0a74.

[48] Brian Lyman, *'No One Has an Answer': Racial Disparities Accelerated in Alabama Parole Grants for 2020, 2021*, Montgomery Advertiser (Mar. 4, 2022), https://www.montgomeryadvertiser.com/story/news/2022/03/04/alabama-paroles-show-show-growing-racial-disparities-statistics-show/9332685002/.

[49] Beth Cann, *AG Steve Marshall Opposes New Parole Legislation Led by Rep. Chris England*, Alabama Today (Mar. 1, 2022), https://altoday.com/archives/44332-ag-steve-marshall-opposes-new-parole-legislation-led-by-rep-chris-england.

197. Defendants' efforts have helped to keep the incarcerated population—and thus the labor force coerced into supporting Alabama's incarcerated forced-labor scheme—disproportionately Black, in a disturbing echo of historical "convict leasing" practices in the State. Defendants have long been aware that increasing the rate of parole denials, particularly for Black incarcerated people with a demonstrated history of safely participating in off-site work programs, would ensure that these low-risk incarcerated workers would remain available to provide labor for the benefit of all participants in the State's forced-labor scheme.

198. The success of Defendants' efforts to maintain a captive, disproportionately Black prison population is particularly noteworthy given that, according to ADOC's reports, White *admissions* to ADOC custody have been outpacing Black admissions for years.

| Fiscal Year | Black Admissions (%) | White Admissions (%) |
|---|---|---|
| **FY 2013** | 48.93% | 50.58% |
| **FY 2014** | 48.72% | 50.43% |
| **FY 2015** | 46.85% | 52.49% |
| **FY 2016** | 44.61% | 54.76% |
| **FY 2017** | 41.52% | 57.87% |
| **FY 2018** | 40.98% | 58.29% |
| **FY 2019** | 39.62% | 59.63% |
| **FY 2020** | 38.33% | 60.97% |
| **FY 2021** | 38.64% | 60.61% |
| **FY 2022** | 38.31% | 60.75% |
| **FY 2023** | 42.36% | 56.63% |
| **FY 2024** | 41.83% | 56.90% |
| **FY 2025** | 44.13% | 54.56% |

199. Governor Ivey, who works in concert with Attorney General Marshall and directs the Parole Board's actions, has or should have direct knowledge of the direct threat her anti-parole directives pose to public safety in the State.

200. Governor Ivey has been a public executive in Alabama for more than two decades. She was the State Treasurer from 2003 to 2011, and the Lieutenant Governor from 2011 to 2017. Particularly in her role as Lieutenant Governor, Governor Ivey had a front-row seat to the snowballing crisis in Alabama's prisons, the attendant threats that crisis posed to public safety, how the violence that has become endemic in Alabama's prisons transforms the environment to ensure that all labor from incarcerated people is compelled and forced by the threat and consistent exercise of that violence, and the efforts the State was making to fix the problem. The Alabama Constitution makes the Lt. Governor the president of the senate.[50] In that role, then-Lieutenant Governor Ivey was responsible for key committee assignments in the Senate[51] and for determining the committees to which legislation was referred for consideration.[52] Governor Ivey's role therefore placed her in a position in which she was not only aware of the arguments for the JRA and present for its introduction, but also dictated its progress from bill to law.

201. Governor Ivey was also involved behind the scenes in the efforts to reduce overcrowding in Alabama's prisons, improve the operation of the State's parole system, and make the State's prison system safer and more efficient. While Lieutenant Governor, Ivey had regular meetings with then-Governor Bentley or members of his team and as President of the Senate, she attended all legislative hearings on the pending legislation. As such, she was well versed in the extensive issues plaguing Alabama's prison system and the significance of the efforts seeking to address it. Ivey was also present for then-Governor Bentley's February 2, 2016

---

[50] Alabama Constitution, Article V, Section 117.
[51] Alabama Senate Rules, Rule 47(b).
[52] *Id.*, Rule 23(a).

State of the State address, during which he explained that the efforts to reduce overcrowding in Alabama prisons would, among other things, "ensure [] the safety of [Alabama's] citizens."[53]

202. Former Chair Gwathney, meanwhile, would boast to other members of the Parole Board that she was carrying out the direct orders of Governor Ivey in granting parole to as few incarcerated people who were eligible as possible. The other Parole Board members, as evidenced by the complete abandonment of Alabama's historical parole practices, clearly complied with those orders as well and have not, to date, indicated any motivation or taken any action to correct the dramatic drop in parole grants since 2019 and the dramatic increase in five-year set-offs disproportionately inflicted upon Black parole applicants since 2019.

203. As an October 2024 hearing before the Alabama Legislature showed, the Parole Board has also worked to subvert the lawful operation of the Alabama parole system in furtherance of Ivey's unlawful directives.

204. During that hearing, then-Chair Gwathney, representing the Parole Board, drew bipartisan criticism for the precipitous decline in parole grant rates and the Parole Board's failure to adhere to its own guidelines regarding when parole should be granted.[54]

205. Legislators also criticized the Parole Board for at least two plain violations of Alabama law. First, the Parole Board was criticized for its failure to issue revised guidelines, as required by Alabama law, to guide its decisions about when to grant parole. Ala. Code §15-22-26. The JRA, as amended in 2019, requires the Board to issue revised guidelines every three years. As one legislator noted, the Parole Board had yet to issue any guidelines, making them "two years overdue."[55] Even then, Gwathney, representing the Parole Board, could not give legislators a date certain by which new guidelines would be issued, stating only that the long-

---

[53] Robert Bentley, 2016 State of the State Address, (YouTube, Feb. 4, 2016), https://www.youtube.com/watch?v=8J3k7WVmge0&t=9s.

[54] Alexander Willis, *Alabama Parole Board Chair Grilled by Committee Over Release Guidelines, Noncompliance*, Alabama Daily News (Oct. 24, 2024), https://aldailynews.com/alabama-parole-board-chair-grilled-by-committee-over-release-guidelines-noncompliance/.

[55] *Id.*

overdue guidelines would be issued "very soon."[56] Only in 2025, after the legislature made the Parole Board's funding depend on drafting new guidelines, did the Board at last draft new guidelines.[57]

206. Then-Chair Gwathney also admitted to legislators that she had taken it upon herself to *change the scores the current guidelines produce for prospective parolees in advance of hearings.*[58] This conduct, which other members of the Board did not prevent or publicize, fundamentally undermines the integrity of the parole hearing process and further reflects the Parole Board's willingness to circumvent legal processes to reach their preferred outcome.

**H. Defendants' Illegal Acts and the Consequences of Chair Gwathney's Reign Have Continued**

207. Despite the growing public and Legislative criticism, Defendants have not repudiated their unlawful acts, renounced their coordinated plan to unlawfully limit parole, or taken any corrective or curative action.

208. To the contrary, the architecture Defendants Ivey and Marshall built in conjunction with former-Chair Gwathney remains intact. The increased executive control over the Parole Board that Defendants Ivey and Marshall obtained through the 2019 parole amendments has not been repealed and the Governor has wielded that control to ensure that her appointees advance her policy preferences regarding parole, supported by the Attorney General.

209. Defendant Nash, appointed by Governor Ivey in 2025 to succeed Gwathney, has continued the practices initiated under his predecessor. The number of parole hearings held annually remains below historical levels, and parole grant rates in fiscal years 2024 and 2025 remain well below pre-2019 levels. Racial disparities in parole grants persist, and the Board has

---

[56] *Id.*
[57] Ralph Chapoco, *Alabama lawmakers to Parole Board: Produce guidelines or lose your funding,* Alabama Reflector (May 13, 2025), https://alabamareflector.com/2025/05/13/alabama-lawmakers-to-parole-board-produce-guidelines-or-lose-your-funding/.
[58] Alexander Willis, *Alabama Parole Board Chair Grilled by Committee Over Release Guidelines, Noncompliance*, Alabama Daily News (Oct. 24, 2024), https://aldailynews.com/alabama-parole-board-chair-grilled-by-committee-over-release-guidelines-noncompliance/.

taken no action to correct the racially skewed outcomes since 2019—in the form of both parole denials and long set-offs. The continuation of these practices across Board chairs demonstrates that Governor Ivey and Attorney General Marshall's directives continue to drive the Board's outcomes.

210. The number of people receiving parole in Alabama has likewise remained suppressed well below historical levels. People incarcerated in Alabama are less likely to receive the opportunity to be heard for parole, let alone be granted parole, than they were before 2019.

211. Attorney General Marshall, for his part, has continued to exert his influence to suppress Alabama's parole rate, even in the face of public criticism.

212. For example, when confronted in March 2022 with the stark disparity in parole outcomes between Black and White parole candidates, Defendant Marshall's office issued a public statement opposing the legislation introduced to address these disparities because it would "make it more difficult for the Board to deny parole." Marshall also explicitly expressed his immense pride in pushing through the 2019 parole amendments because "80 percent of Alabama's prison population are violent criminals."[59] Marshall's statement underlined and echoed his intentions and directions to the Parole Board, first issued in the meeting at the Governor's Mansion in October 2018.

213. More recently, in July 2025, Marshall signaled his continued alignment with the changes made under Gwathney's leadership of the Parole Board. Noting his support for the 2019 revisions to the state's parole system, which he characterized as "effective," Marshall wrote a letter to Governor Ivey urging her to reappoint Gwathney as the Chair of the Parole Board."[60] Marshall asserted that "nearly 85% of our prison population is comprised of violent offenders"

---

[59] Attorney General Steve Marshall Issues Statement in Support of Alabama Board of Pardons and Paroles (February 28, 2022), https://www.alabamaag.gov/attorney-general-steve-marshall-issues-statement-in-support-of-alabama-board-of-pardons-and-paroles/.

[60] Press Release, Steve Marshall, Attorney General Marshall and Law Enforcement leaders Urge Governor Ivey to Reappoint Leigh Gwathney as Chair of the Parole Board (July 1, 2025), https://www.alabamaag.gov/attorney-general-marshall-and-law-enforcement-leaders-urge-governor-ivey-to-reappoint-leigh-gwathney-as-chair-of-the-parole-board/

and commended Gwathney for refusing to release such individuals, thereby confirming his position that the nature of the offense of conviction and not the factors set forth in the State's statutory framework should govern access to parole.

214. Governor Ivey, for her part, has not made any statements repudiating her directives to the Parole Board or her position that no one convicted of a violent crime should be granted parole. She continues to wield her influence over the Parole Board to suppress the parole rate and the number of parole hearings far below Alabama's historical practice.

215. Furthermore, neither Governor Ivey nor Attorney General Marshall has repudiated any aspect of the directive they issued.

216. The deleterious impact of Chair Gwathney's time at the Parole Board also persists. The routinely prolonged set-off dates established during former Chair Gwathney's tenure bind the current Parole Board and continue to extend the confinement of those in ADOC custody today. Plaintiffs Moore (five-year set-off in 2022), McDole (five-year set-off in 2022), Pritchett (five-year set-off in 2021), Campbell (five-year set-off in 2023), Prewitt (five-year set-off in 2023), and Trevion Clark (five-year set-off in 2020) cannot, by force of those set-off dates alone, even be considered for parole until expiration of those time periods. The Gwathney-era set-offs thus impose an ongoing injury.

217. Defendants' subversion of the parole system has been so pronounced that in 2026 the Legislature was forced to intervene. On April 8, 2026, Alabama enacted HB 86, which adds education and employment to the factors the Board's guidelines must include, and requires the Board to give consideration to those factors. Those requirements take effect in October 2026.

218. While this new legislation underscores the widespread understanding that the Parole Board abandoned the lawful operation of the parole system and ignored relevant considerations, the legislation does not fully address the consequences of Governor Ivey and Attorney General Marshall's directives to shut down parole or the Parole Board's irrationally punitive and discriminatory practices. Among other things, it does not require the Board to increase the pace of parole hearings; does not change the extreme set-off dates issued by Chair

Gwathney; and does not address the racial imbalance in parole grant rates. Nor does it directly address the Governor and Attorney General's catalyzing role in directing the Parole Board to act in ways contrary to law.

## CLASS ALLEGATIONS

219. Plaintiffs Lee Edward Moore Jr., Frederick Denard McDole, Michael Campbell, Lanair Pritchett, Rashaad Clark, Deckrice Morrissey, Eric Prewitt, Trevion Clark, Larry Darnell Jarmon Jr., and Jerame Cole ("Named Plaintiffs") bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief on behalf of the following Classes, respectively**:**

220. Parole-Eligible Class (by Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole): All persons subject to the jurisdiction of the Alabama Parole Board at any time between the earliest applicable statute of limitations and the date a class is certified in this action who are or will be eligible for parole (the "Parole-Eligible Class").

a. **Parole Denial Subclass (by Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole):** All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC, who were denied parole while in the custody of ADOC at any time between the earliest applicable statute of limitations and the date a class is certified in this action.

b. **Black Parole-Eligible Subclass (by Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole):** All Black Parole-Eligible Class Members.

c. **Post-JRA Subclass (by Plaintiff Prewitt):** All Parole-Eligible Class Members who engaged in the conduct underlying their crimes of conviction between 2015 and 2019.

221. Plaintiffs reserve the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or to add one or more subclasses based on information obtained during this litigation.

222. All members of the Parole-Eligible Class, the Parole Denial Subclass, the Black Parole-Eligible Subclass and the Post-JRA Subclass have suffered or are threatened with imminent injury as a result of Defendants' wrongful acts and omissions, as alleged herein.

223. This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

224. **Numerosity—Rule 23(a)(1).** The members of each Class and Subclass are so numerous that joinder of all members is impractical. As of March 2026, ADOC reported that 21,214 incarcerated people were housed within correctional facilities it owned and operated; many of these individuals are eligible for parole. Approximately 50% of the incarcerated people within ADOC's custody are Black, many of whom are eligible for parole. Approximately 1,973 people were denied parole in FY 2025, of whom 1,012 were Black.

225. **Commonality—Rule 23(a)(2).** There are many questions of law and fact common to each of the Classes and the Subclasses. These common questions include, but are not limited to:

a. With respect to the Parole-Eligible Class and Post-JRA Subclass, whether the Governor, Attorney General, and Parole Board are acting arbitrarily and capriciously or in a flagrant and unauthorized manner in denying lawful parole hearings and/or parole consideration and decision-making to class members, or denying parole to class members in violation of those class members' substantive due process rights;

b. With respect to the Parole-Eligible Class and Post-JRA Subclass, whether the Governor, Attorney General, and Parole Board unlawfully implemented the 2019 Parole amendments and changed the criteria governing parole in a manner that systemically altered and/or extended sentences issued by the judicial branch

and/or substantially increased the risk of the class members' prolonged confinement;

c. With respect to the Black Parole-Eligible Subclass, whether the Governor, Attorney General, and Parole Board orchestrated and are legally responsible for the intentional and disproportionate denial of parole consideration and/or parole release to Black incarcerated people as compared to similarly situated White incarcerated people; and

d. With respect to the Black Parole-Eligible Subclass, whether the Governor, Attorney General, and Parole Board intentionally and disproportionately extended the parole reconsideration dates of the Named Plaintiffs and other Black incarcerated people as compared to similarly situated White incarcerated people.

226. **Typicality—Rule 23(a)(3).** Because the policies and practices challenged in this Complaint apply with equal force to the Named Plaintiffs and the absent members of each Class and Subclass, the Named Plaintiffs' claims are typical of the claims of the members of the putative Classes and Subclasses they purport to represent.

227. **Adequacy—Rule 23(a)(4) and 23(g)(1).** The Named Plaintiffs are adequate representatives of the Classes and Subclasses they represent because they are each a member of their respective Classes and Subclasses and because there are no material conflicts of interest between Named Plaintiffs and the interests of the Classes and Subclasses they seek to represent. The Named Plaintiffs have retained and are represented by competent and qualified counsel with extensive experience handling civil rights, class action, and other complex civil litigation. Proposed class counsel have litigated dozens of civil rights and other class actions and have substantial experience litigating cases under 42 U.S.C. §1983. Plaintiffs' counsel will vigorously prosecute this action for the benefit of all putative members of each proposed Class and Subclass.

228. **Risk of Inconsistent Adjudications—Rule 23(b)(1).** Certification is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of

putative Class and Subclass members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class and Subclass members.

229. **Declaratory and Injunctive Relief—Rule 23(b)(2).** Certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to each respective Class and Subclass, thereby making appropriate final declaratory and injunctive relief with respect to each of the proposed Classes and Subclasses as a whole.

230. **Issue Certification—Rule 23(c)(4).** Certification of issues of liability under Rule 23(c)(4) is appropriate because these issues are common to putative members of each Class and Subclass, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

231. Defendants have acted or refused to act on grounds generally applicable to the proposed Classes and Subclasses. Their policies, practices, acts, and omissions have affected all members of each of the respective Classes and Subclasses. Accordingly, final injunctive and declaratory relief is appropriate as to each Class and Subclass as a whole.

## COUNT I
**Violation of Ex Post Facto Clause**
**U.S. Const. Art. I, §10, cl. 1, Pursuant to 42 U.S.C. §1983**
**By Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole on Behalf of Themselves and the Parole-Eligible Class Against Defendants Ivey, Marshall, Nash, and Simmons**

232. Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole ("Parole-Eligible Named Plaintiffs") bring this claim under the Ex Post Facto Clause of the U.S. Constitution, art. I, §10, cl. 1, pursuant to 42 U.S.C. §1983, which prohibits the State of Alabama from enacting laws or implementing policies that retroactively increase the measure of punishment for a previously committed criminal act.

233. Defendants Governor Ivey, Attorney General Marshall, Parole Board Chair Nash, and Parole Board Member Simmons are liable to the Parole-Eligible Named Plaintiffs and Parole-Eligible Class because each Defendant, acting under color of state law, has engaged in

conduct, together with the other Defendants, to violate the Ex Post Facto Clause by creating a significant risk of increasing Plaintiffs' and Class members' punishment for their crimes.

234. Specifically, prior to 2018, Alabama's parole system engaged in the individualized, case-by-case fitness inquiry required by statute, held hearings at a relatively consistent annual pace, and granted parole at relatively consistent rates, on which judges, criminal defendants, and attorneys could and did rely. From 1992 through 2015, the Parole Board conducted an average of 7,027 hearings annually and granted parole at an average rate of 34.79%, for an average of 2,441 people granted parole per year. From 2015 through 2018, following implementation of the JRA's evidence-based guidelines, the Board averaged 6,851 hearings per year and 3,231 parole grants each year, with a steadily rising annual parole grant rate that peaked at 54.2% in fiscal year 2017. *See supra* ¶¶95–101.

235. In 2019, Alabama amended its parole statutes through HB 380. In the months prior to that amendment—which Governor Ivey and Attorney General Marshall pushed through the Legislature—Governor Ivey and Attorney General Marshall issued a directive to the Parole Board to ignore the individualized, fact-, evidence- and research-based approach based on validated, objective parole guidelines required then, and now, by state law in favor of blanket and categorical denials of parole, particularly for any person serving a sentence for an offense categorized as "violent" under Alabama law, and dramatically restricted access to parole hearings. HB 380 granted Governor Ivey more oversight of the Board, including the right to appoint the Director of Pardons and Paroles, and additionally decreed that "the board's paramount duty is to protect public safety," which the Parole Board seized upon to severely limit parole grants. *See supra* ¶¶103–119.

236. The post-2018 parole regime is the product of three concurrent and reinforcing components: (a) Defendants Ivey's and Marshall's October 2018 directives to the Parole Board to disregard the JRA's objective parole guidelines and instead overwhelmingly deny parole, particularly as to applicants serving sentences for offenses Alabama categorizes as "violent"; (b)

Alabama's 2019 amendments to its parole statute; and (c) the Parole Board's implementation of those directives and statutory changes from 2019 through the present.

237. Each Parole-Eligible Named Plaintiff committed the offense underlying his or her sentence before October 2018, and each has been and, without intervention by this Court, will be subjected to the post-October 2018 regime in every parole hearing held since then. *See supra* ¶¶6-10, 13-14, 19-20, 25-27, 34-39,44-45, 49-51, 54-55, 61-63, 67-70.

238. As a consequence of Alabama's 2019 amendment of its parole law—which has been implemented by the Parole Board according to the directives of Governor Ivey and Attorney General Marshall to dramatically restrict access to parole—Governor Ivey, Attorney General Marshall, and the Parole Board since 2019 have violated the Ex Post Facto Clause by effectively extending sentences and increasing the risk that sentences will be extended *after* the date the respective sentences were ordered by Alabama's judiciary.

239. Comparing both the number of annual parole grants and the parole grant rates since the passage of the 2019 parole amendment—both of which have fallen dramatically overall and in a particularly extreme way for people serving sentences for "violent" crimes—to annual parole grants and parole rates at the various dates each of the Named Plaintiffs engaged in the conduct underlying their convictions makes plain that Governor Ivey's, Attorney General Marshall's, and the Parole Board's implementation of the 2019 amendment has dramatically increased the risk of extending the time parole-eligible Alabamians, including Parole-Eligible Named Plaintiffs, serve for their sentences, and particularly increased the risk for people serving sentences for offenses categorized by Alabama as "violent." *See supra* ¶¶120-123. For people serving sentences for "violent" offenses, the 2019 amendment to the parole law and Governor Ivey's, Attorney General Marshall's, and the Parole Board's implementation of that amendment has, effectively, rewritten sentences that provided a term "with" the possibility of parole to sentences "without" the possibility of parole. *See supra* ¶¶124-126.

240. As detailed in Factual Allegations Part II.C above, based on the data available to the Plaintiffs through public record requests, interviews with prior Parole Board members, public

reporting, and information and belief regarding Alabama's parole practices prior to 2018, Defendants have created a significant risk of increasing the measure of each Parole-Eligible Named Plaintiff's punishment relative to the parole regime in place at the time of the conduct underlying their crimes of conviction. The implementation of Governor Ivey and Attorney General Marshall's directive and the 2019 amendments has yielded a dramatic diminishment of access to parole for all people, regardless of offense, but particularly for people serving sentences for offenses categorized as "violent," including a sharp change in parole rates for people serving sentences for homicide, robbery and assault. *See supra* ¶¶118, 121-126. The Board has dramatically reduced access to parole since 2019, slashing annual parole grants both by holding a fraction of the number of hearings it held historically and through plummeting grant rates, which fell to single digits in the years following the 2019 amendment and remain well below historical levels. *See supra* ¶¶121-122. The Board has further entrenched its shutdown of parole access by increasingly issuing multi-year set-off dates. *See supra* ¶¶127-129. Applied to each Parole-Eligible Named Plaintiff, the post-2018 regime materially reduces the probability of release at any given parole hearing and the frequency of parole consideration relative to the regime in place at the time of commission of the underlying crime.

241. These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State, particularly for all people serving time on "violent" offenses, and their directives to the Parole Board to implement their vision. As the implementation of the JRA and the more than 20 years of parole data preceding Ivey and Marshall's directives show, Alabama's parole system operated relatively consistently and predictably prior to the unlawful directives. *See supra* ¶¶95-97. Implementation of the JRA's objective, evidence- and research-based standards, which were in accord with the individualized parole consideration Alabama law has long required, resulted in the parole rate steadily increasing in the State after the passage of the JRA and prior to Ivey and Marshall's directives in late 2018. *See supra* ¶¶99-102.

242. Alabama's parole rate did not decline to levels far below the historical levels typical and customary in Alabama until Defendants Ivey and Marshall consolidated oversight of the Board via the 2019 parole amendment, which allowed Defendants Ivey and Marshall to replace the Executive Director and Chair of the Board with people who would follow their orders. *See supra* ¶¶107-116. Indeed, former Chair Gwathney proudly boasted that she denied parole to all those convicted of violent crimes on direct orders from the Governor. *See supra* ¶202.

243. The current Board has not disavowed or corrected the conduct of the Gwathney-era Board, and access to parole continues to be substantially limited relative to historical levels, demonstrating the ongoing impact of Governor Ivey and Attorney General Marshall's directives. *See supra* ¶¶207-218.

244. The wholesale revision to the standards governing suitability for parole mandated by Governor Ivey and Attorney General Marshall and implemented by the Parole Board has materially changed the substantive policies that govern parole decisions, replacing individualized consideration that takes into account each parole applicant's unique circumstances with punitive and racially skewed decision-making untethered to evidence or public safety considerations. *See supra* ¶¶103-139, 148-154.

245. Both research studies and ADOC's own data show that Governor Ivey, Attorney General Marshall, and the Parole Board members' subversion of the lawful operation of Alabama's parole system makes Alabama less safe. Defendants' post-2018 approach to parole increases the threat to public safety upon the ultimate release of offenders by exacerbating violence and overcrowding in state prisons, eliminating post-release services by permitting release only after people—particularly "violent" offenders—serve their full sentences, and releasing those people who are more likely to recidivate while lengthening the period of incarceration for those who pose the least threat to the public. *See supra* ¶¶170-172, 178-179.

246. All persons incarcerated in Alabama who are eligible for parole are significantly less likely to be granted parole since 2018 than at any other time previously in the State's history

for which data is available. Parole-Eligible Named Plaintiffs, each of whom committed their crimes of conviction between 1993 and 2016, were sentenced under the 1951–2018 parole regime that pre-dated Governor Ivey and Attorney General Marshall's unlawful directives, and the Parole Board's implementation of the same. *See supra* ¶¶120-121. These policy changes have created a significant risk of increasing the duration of imprisonment for each Plaintiff and all people incarcerated by ADOC whose sentences include the possibility of parole (all those in the Parole-Eligible Class).

247. Indeed, Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole were denied parole since 2019, despite a demonstrated track record of working safely outside prison gates. *See supra* ¶¶6, 8-10, 14-15, 19, 21-22, 26-27, 34-37, 45-47, 50-51, 55-56, 62-63, 69. Records concerning the operation of the Alabama parole system since Governor Ivey and Attorney General Marshall issued their directives show a precipitous decline in both the number of individuals granted parole each year and the parole grant rates since 2019, including for incarcerated people in work-release and work-center facilities, *see supra* ¶¶158-166. These records demonstrate the severe risk that incarcerated people who would have been granted parole under a parole system compliant with the individualized, case-by-case consideration required by Alabama law until the 2019 parole amendment are now being denied lawful parole consideration and thus are subjected to increased periods of incarceration and the likelihood of increased periods of incarceration.

248. Defendants Ivey, Marshall, Nash, and Simmons's violation of the Ex Post Facto Clause has caused harm to Parole-Eligible Plaintiffs and all Parole-Eligible Class Members. *See supra* ¶¶11-12, 17-18, 23-24, 28-31, 40-43, 48, 52-53, 57-60, 64-66, 72-74.

**COUNT II**
**Violation of Ex Post Facto Clause**
**U.S. Const. Art. I, §10, cl. 1, Pursuant to 42 U.S.C. §1983**
**By Plaintiff Prewitt on Behalf of Himself and the Post-JRA Subclass**
**Against Defendants Ivey, Marshall, Nash, and Simmons**

249. Plaintiff Prewitt brings this Count under the Ex Post Facto Clause of the U.S. Constitution, art. I, §10, cl. 1, pursuant to 42 U.S.C. §1983, which prohibits the State of Alabama from enacting laws or implementing policies that retroactively increase the measure of punishment for a previously committed criminal act.

250. Defendants Governor Ivey, Attorney General Marshall, Parole Board Chair Nash, and Parole Board Member Simmons are liable to Plaintiff Prewitt and the Post-JRA Subclass because each Defendant, acting under color of state law, has engaged in conduct, together with the other Defendants, to violate the Ex Post Facto Clause by creating a significant risk of increasing Plaintiff Prewitt and the Post-JRA Subclass members' punishment.

251. Plaintiff Prewitt committed the offense underlying his sentence in 2016, when the JRA was in full effect and parole decisions in the State were made according to the JRA's evidence-based, objective standards. He has been subjected to the dramatically restricted post-2018 parole regime—the product of Governor Ivey and Attorney General Marshall's directives, the 2019 amendments to Alabama's parole statute, and the Parole Board's implementation of those changes—including in the denial of the opportunity to be considered for early parole and in every parole hearing held since 2019, including his 2023 parole denial. *See supra* ¶50-51.

252. Defendants' subversion of the parole system creates a particularly acute risk of increased punishment as applied to people whose criminal conduct occurred during the JRA era. From 2015 through 2018, with the JRA's objective standards in full effect, the Parole Board broadened access to parole, granting parole to an average of 3,231 people per year. The annual parole grant rate rose steadily during this period, peaking at 54.2% in fiscal year 2017—an all-time high. *See supra* ¶¶99-102. Alabama judges at the time of Plaintiff Prewitt's sentencing in 2016 were aware of the JRA and its effect in increasing access to parole across the state.

253. As a result of Governor Ivey, Attorney General Marshall, and the Parole Board's challenged conduct, the Board dramatically reduced the number of hearings it holds per year and oversaw plummeting numbers of parole grants, as well parole grant rates that fell to single digits in the years following the amendment, particularly for those like Plaintiff Prewitt convicted of violent offenses. As described above, access to parole remains significantly reduced compared to historical levels, including the level in effect at the time Plaintiff Prewitt committed his offense. *See supra* ¶¶120-122. The Board has further entrenched its shutdown of parole access by increasingly issuing multi-year set-off dates, like the five-year set-off date Plaintiff Prewitt received in 2023. *See supra* ¶¶127-129.

254. The post-2018 regime thus materially reduces the probability of release at any given parole hearing relative to the regime in place at the time Plaintiff Prewitt and other members of the Post-JRA Subclass committed the offenses for which they were sentenced. *See supra* ¶¶95-101, 120-122.

255. The wholesale revision to the standards governing suitability for parole mandated by Governor Ivey and Attorney General Marshall and implemented by the Parole Board has materially changed the substantive policies that govern parole decisions, replacing individualized consideration that takes into account each parole applicant's unique circumstances with punitive and racially skewed decision-making untethered to evidence or public safety considerations.

256. Both research studies and ADOC's own data show that Governor Ivey, Attorney General Marshall, and the Parole Board members' subversion of the lawful operation of Alabama's parole system makes Alabama less safe. The post-2018 approach to parole increases the threat to public safety upon the ultimate release of offenders by exacerbating violence and overcrowding in state prisons, eliminating post-release services by permitting release only after people—particularly "violent" offenders—serve their full sentences, and releasing those people who are more likely to recidivate while lengthening the period of incarceration for those who pose the least threat to the public. *See supra* ¶¶170-172, 178-179.

257. These changes would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State, particularly for all people serving time on "violent" offenses, and their directives to the Parole Board to implement their vision. Alabama's parole rate did not plummet below the JRA's all-time highs, and even well below the levels typical and customary in Alabama prior to the JRA, until Defendants Ivey and Marshall began issuing their directives to the Parole Board and then consolidated oversight of the Board via the 2019 parole amendments, which allowed Defendants Ivey and Marshall to replace the Executive Director and Chair of the Board with people who would follow their orders. *See supra* ¶¶107-115. Indeed, their first hand-picked Chair, Leigh Gwathney, proudly boasted that she denied parole to all those convicted of violent crimes on direct orders from the Governor. *See supra* ¶202.

258. The current Board has not disavowed or corrected the conduct of the Gwathney-era Board, and access to parole continues to be substantially limited relative to historical levels, demonstrating the ongoing impact of Governor Ivey and Attorney General Marshall's directives. *See supra* ¶¶207-218.

259. Defendants Ivey, Marshall, Nash, and Simmons's violation of the Ex Post Facto Clause has caused harm to Plaintiff Prewitt and the Post-JRA Subclass, including by substantially increasing the risk of extending the duration of Plaintiff Prewitt's incarceration relative to the regime in place when he committed his offenses, when the JRA was in full effect. *See supra* ¶¶52-53.

**COUNT III**
**Denial of Equal Protection**
**U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fourteenth Amendment Equal Protection Right Against Racially Discriminatory Denial of Access to Parole**
**By Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole on Behalf of Themselves and the Black Parole-Eligible Subclass**
**Against Defendants Ivey, Marshall, Nash, and Simmons**

260. Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole ("Black Parole-Eligible Named Plaintiffs") bring this claim under the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. §1983, which prohibits the State of Alabama from intentionally treating similarly situated persons differently on the basis of race in granting or denying access to parole.

261. Defendants Governor Ivey, Attorney General Marshall, Parole Board Chair Nash, and Parole Board Member Simmons are liable to the Black Parole-Eligible Named Plaintiffs and the Black Parole-Eligible Subclass because each Defendant, acting under color of state law, has engaged in conduct, together with the other Defendants, to violate the Equal Protection Clause by discriminatorily limiting Black parole candidates' access to parole on the basis of their race.

262. As a result of Governor Ivey, Attorney General Marshall, and the Parole Board's conduct, the parole system has treated similarly situated White parole candidates more favorably than the Black Parole-Eligible Named Plaintiffs and the members of the Black Parole-Eligible Subclass. As discussed *supra* ¶¶141-151, parole grant rates went from near racial parity in fiscal year 2018 to favoring White parole candidates at a rate of two to one in 2022. These disparities persist even when looking separately at parole candidates serving sentences for nonviolent offenses, those in work release and work center facilities, and those who receive passes to live in the community unsupervised. *See supra* ¶¶163-165, 169-170,176-177.

263. A stark racial disparity in parole reconsideration dates also emerged following Governor Ivey and Attorney General Marshall's directive, with the Parole Board substantially more likely to assign Black parole candidates denied parole longer set-off periods at or near the

statutory maximum than White parole candidates denied parole. *See supra* ¶¶155-157. The effects of these discriminatory extended set-off periods continue, as the Parole Board refuses to consider these individuals for parole again until expiration of these set-off periods.

264. The racial disparities in parole grants and set-offs emerged immediately upon Defendants Ivey's and Marshall's October 2018 directives, displacing the prior near-parity in parole grant rates that the JRA's objective standards had produced. Defendants persisted in the resulting practices despite repeated public notice of the racial disparities in parole administration, beginning in early 2020 from Alabama State Representative Chris England. *See supra* ¶¶184-195. Defendants' decision to discard the JRA's objective parole-scoring framework—a framework that constrains the kind of subjective discretion that is reasonably understood to produce racially disparate outcomes—predictably caused the discriminatory results that followed. The post-2018 parole regime functions as a mechanism that maintains the skewed racial composition of the State's incarcerated population, notwithstanding admission trends that, absent intervention, would produce a different demographic outcome. *See supra* ¶¶196-198.

265. At the direction of Defendants Ivey and Marshall, Parole Board members including Defendants Nash and Simmons have unequally applied Alabama's laws governing parole and have unequally exercised their discretion and authority, for the purpose of discriminating against Black parole candidates.

266. At the direction of Defendants Ivey and Marshall, the Parole Board members, including Defendants Nash and Simmons, have intentionally and disproportionately denied parole to the Black Parole-Eligible Named Plaintiffs and other Black parole candidates on the basis of their race, and have intentionally and disproportionately issued extended set-off periods to Black parole candidates including Black Parole-Eligible Named Plaintiffs, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and have been at least callous or recklessly indifferent to their deprivation of Black Parole-Eligible Named Plaintiffs' and Black Parole-Eligible Subclass Members' constitutional rights. The disproportionate rate of parole denials for Black parole candidates has persisted even when

controlling for the number and severity of felonies for each parolee, facility type (which itself provides information about crime of conviction, positive or negative adjustments, and program completions), sex, fiscal year, and whether ADOC reported that the prospective parolee had an off-site job in the past year, using all currently available public data. *See supra* ¶¶151-152.

267. Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board who deliberately and discriminatorily denied Black people parole on the basis of their race; she failed to ensure adequate policies and procedures were in place to prevent the discriminatory exercise of the Parole Board's discretion and decision-making; she failed to take corrective action following the discriminatory practices and outcomes of the Parole Board, despite being put on notice repeatedly about the ongoing racial disparities in parole and pardon grant rates by the Parole Board, as well as in set-off dates set by the Parole Board; and she acted intentionally or at least callously and with reckless indifference to her and others' deprivation of Black Parole-Eligible Named Plaintiffs' and Black Parole-Eligible Subclass Members' constitutional rights.

268. The creation of the racial disparities described in the preceding paragraph and herein would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision. As the implementation of the JRA shows, Alabama's parole system operated without the current persistent racial bias prior to their unlawful directives. *See supra* ¶¶141-143. Implementation of the JRA's objective, evidence-based standards, which were in accord with the individualized parole consideration Alabama law has long required, led to Black Alabamians, particularly those in work-release and work center facilities, receiving parole at roughly equal rates to White Alabamians, prior to Ivey and Marshall's directive. *See supra* ¶¶163-166.

269. The persistent racial bias in Alabama's parole rates and set-off periods did not begin until Ivey and Marshall consolidated control and oversight of the Board via legislation and replaced the Executive Director and Chair of the Board with people who would follow their

orders. *See supra* ¶¶148-153. Indeed, former Chair Gwathney proudly boasted that her restrictive attitudes towards parole and choice to grant parole as infrequently as possible followed from direct orders from the Governor—and Gwathney could only implement the Governor's directives with the cooperation and acquiescence of other Board members. *See supra* ¶202.

270. The current Board has not disavowed or corrected the conduct of the Gwathney-era Board, causing racial disparities in parole consideration access and outcomes to persist, demonstrating the ongoing impact of Governor Ivey and Attorney General Marshall's directives. *See supra* ¶¶207-215.

271. Had Defendants Ivey and Marshall not made these changes to the Board and issued their unlawful directives, the racial bias in Alabama's parole system would not have taken root. Likewise, the glaring racial disparity in parole and pardon grants and in set-off dates by the Parole Board would revert to prior, non-discriminatory levels if Defendants Ivey and Marshall were to end their directives, leaving the Board instead free to correct the racially-skewed long set-offs disproportionately issued to Black parole applicants since 2018 and implement the still-applicable JRA statutory requirements: evidence- and research-based decisions in accordance with validated parole guidelines. Such evidence-based decisions are fully consistent with the latest statutory amendment contained in HB86, which requires consideration of a parole candidate's work and education record. A return to non-discriminatory parole outcomes is particularly likely because available evidence shows that Black parolees are less likely to recidivate than their similarly situated White counterparts. *See supra* ¶¶173-175

272. This deprivation of equal protection has caused and continues to cause harm to Black Parole-Eligible Named Plaintiffs and Black Parole-Eligible Class Members. *See supra* ¶¶11-12, 17-18, 23-24, 28-31, 40-43, 48, 52-53, 57-60, 64-66, 72-74.

**COUNT IV**
**Denial of Substantive Due Process**
**U.S. Const. Amend. XIV, Pursuant to 42 U.S.C. §1983**
**Violation of Fourteenth Amendment Right Against Arbitrary, Capricious, Flagrant, and/or Unauthorized Parole Proceedings**
**By Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole on Behalf of Themselves and the Parole-Eligible Class Against Defendants Ivey, Marshall, Nash, and Simmons**

273. Plaintiffs Moore, McDole, Campbell, Pritchett, Rashaad Clark, Morrissey, Prewitt, Trevion Clark, Jarmon, and Cole bring this claim to enforce their substantive due process rights under the Fourteenth Amendment, pursuant to 42 U.S.C. §1983, which prohibits state officials from conducting parole proceedings or making parole decisions in an arbitrary, capricious, flagrant, or unauthorized manner.

274. Defendants Governor Ivey, Attorney General Marshall, Parole Board Chair Nash, and Parole Board Member Simmons are liable to the Parole-Eligible Named Plaintiffs and the Parole-Eligible Class because each Defendant, acting under color of state law, has engaged and continues to engage in conduct that is arbitrary, capricious, flagrant, and unauthorized with respect to the administration of the parole system and that therefore violates these Plaintiffs' and Class members' substantive due process rights.

275. At the direction of Defendants Ivey and Marshall, Parole Board members, including Defendants Nash and Simmons, arbitrarily, capriciously, flagrantly, and in an unauthorized manner have denied and continue to deny lawful parole consideration and parole release to Parole-Eligible Named Plaintiffs and Parole-Eligible Class Members. These parole decisions have not been the product of the individualized, evidence-based inquiry that Alabama law continues to require. Specifically: (a) since 2019, Alabama's Parole Board, at Ivey and Marshall's direction, repeatedly and systematically disregarded the parole guidelines promulgated under state law and in accordance with the JRA, and Defendants have taken no action to correct these violations of substantive due process; (b) since 2019, Alabama's Parole Board members repeatedly have made parole determinations in advance of scheduled hearings, conducting the hearings themselves as procedural formalities rather than as occasions for

individualized consideration, and Defendants have taken no action to correct these violations of substantive due process; (c) since 2019, Alabama's Parole Board repeatedly has relied on demonstrably false information in justifying parole denials, including former Parole Board Chair Gwathney admitting that she altered parole scores for applicants and by adopting and re-stating allegations that they knew or had reason to know were unsupported by the underlying record; Defendants have taken no action to correct these violations of substantive due process. *See supra* ¶¶6-10, 14-16, 19, 21-22, 26-27, 34-37, 45-46, 50-51, 55, 62-63, 69-71, 124-126, 132-133, 138, 176-177. Defendants' conduct is ongoing.

276. Defendant Ivey exercised appointment and supervisory authority over the members of the Parole Board, deliberately choosing to implement a parole system that engaged in systematically arbitrary, capricious, flagrant, and unauthorized decision-making, failed to ensure adequate policies and procedures were in place to prevent the arbitrary, capricious, flagrant, and unauthorized exercise of the Parole Board's discretion and decision-making, failed to take corrective action following the arbitrary, capricious, flagrant, and unauthorized practices and outcomes of the Parole Board, and acted intentionally or at least with callous and reckless indifference to the deprivation of Parole-Eligible Named Plaintiffs and Parole-Eligible Class Members' constitutional rights.

277. Defendant Marshall exercised public and private influence to pressure and direct members of the Parole Board to implement a parole system that engaged in systematically arbitrary, capricious, flagrant, and unauthorized decision-making, failed to ensure adequate policies and procedures were in place to prevent the arbitrary, capricious, flagrant, and unauthorized exercise of the Parole Board's discretion and decision-making, failed to take corrective action following the arbitrary, capricious, flagrant, and unauthorized practices and outcomes of the Parole Board, and acted intentionally or at least with callous and reckless indifference to the deprivation of Parole-Eligible Named Plaintiffs' and Parole-Eligible Class Members' constitutional rights.

278. The Parole Board's challenged conduct would not have happened but for Governor Ivey and Attorney General Marshall's coordinated efforts to nearly eliminate parole in the State and their directives to the Parole Board to implement that vision.

279. This deprivation of substantive due process has caused harm to Parole-Eligible Named Plaintiffs and Parole-Eligible Class Members. *See supra* ¶¶ 11-12, 17-18, 23-24, 28-31,40-43, 48, 52-53, 57-60, 64-66, 72-74.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and respectfully request that the Court award relief as follows:

(1) Issue a declaratory judgment that the practices complained of herein are unlawful under the Ex Post Facto Clause of the U.S. Constitution, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment;

(2) Issue a preliminary and permanent injunction requiring Defendants, their agents, employees, and all persons under their control or acting in active concert or participation with them to immediately remedy and correct their unlawful and discriminatory parole practices with respect to Plaintiffs and the members of the Parole-Eligible Class;

(3) Certify the Classes and Subclasses as defined above, and such additional subclasses as may be appropriate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Named Plaintiffs as the representatives for the Classes and Subclasses as set forth herein, and appoint Plaintiffs' counsel as class counsel;

(4) Award reasonable attorneys' fees and costs, pursuant to 42 U.S.C. §1988 and any other applicable laws;

(5) Award such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

DATED: June 5, 2026

/s/ *Barbara J. Chisholm*
MICHAEL RUBIN (CA SBN 80618)*
BARBARA J. CHISHOLM (CA SBN 224656)*
CONNIE K. CHAN (CA SBN 284230)*
AMANDA C. LYNCH (CA SBN 318022)*
EMANUEL WADDELL (CA SBN 350156)*
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Email: mrubin@altber.com; bchisholm@altber.com; cchan@altber.com; alynch@altber.com; ewaddell@altber.com

JANET HEROLD (CA SBN 186419)*
JUSTICE CATALYST LAW
40 Rector Street, 9th Floor
New York, NY 10008
Telephone: (518) 732-6703
Email: jherold@justicecatalyst.org
*Counsel for All Plaintiffs and the Proposed Classes and Subclasses*
**Appearing pro hac vice*