IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

ROBERT EARL COUNCIL AKA KINETIK JUSTICE, MICHAEL CAMPBELL, TONI CARTWRIGHT, RASHAAD CLARK, TREVION CLARK, JERAME APRENTICE COLE, DANNY DANDRIDGE, ALIMIREO ENGLISH, LARRY DARNELL JARMON JR., JOSEPH LESLEY, TURNER MASON, QUANNIE MCCORVEY, FREDERICK DENARD MCDOLE, LEE MOORE, DECKRICE MORRISSEY, PIERRE PAYTON, ERIC PREWITT, LANAIR PRITCHETT, ARTHUR CHARLES PTOMEY JR., VICTOR THOMAS, and LAKIERA WALKER, on their own behalf and on behalf of those similarly situated; UNION OF SOUTHERN SERVICE WORKERS, SERVICE EMPLOYEES INTERNATIONAL UNION; and RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, MID-SOUTH COUNCIL,

Plaintiffs,

v.

KAY IVEY, Governor of the State of Alabama, in her individual and official capacities; GREG LOVELACE, Commissioner of the Alabama Department of Corrections, in his individual and official capacities; JOHN HAMM, former Commissioner of the Alabama Department of Corrections, in his individual capacity; JOHN COOPER, Transportation Director of the Alabama Department of Transportation, in his individual and official capacities; CITY OF MONTGOMERY; CITY OF TROY; BAMA BUDWEISER OF MONTGOMERY, INC.; CAST PRODUCTS, INC.; C.B.A.K., INC. d/b/a MCDONALD'S; HWASEUNG AUTOMOTIVE USA LLC; JU-YOUNG MANUFACTURING AMERICA, INC.; KOCH FOODS, LLC; MASONITE CORPORATION; PARAMOUNT SERVICES, INC.; PELL CITY KENTUCKY FRIED CHICKEN, INC. d/b/a KENTUCKY FRIED CHICKEN d/b/a KFC; PROGRESSIVE FINISHES, INC.; RCF, LLC d/b/a GEMSTONE FOODS, LLC; SL ALABAMA, LLC; SOUTHEAST RESTAURANT GROUP-WEN LLC d/b/a WENDY'S; and SOUTHEASTERN MEATS, INC.,

Defendants.

Case No. _______
(severed from Case No. 2:23-cv-712-CLM, originally filed December 12, 2023)
CLASS ACTION
**COMPLAINT**
JURY TRIAL DEMANDED

## TABLE OF CONTENTS


INTRODUCTION ..... 1

PARTIES ..... 3

I. PLAINTIFFS ..... 3

II. DEFENDANTS ..... 12

JURISDICTION AND VENUE ..... 19

FACTUAL ALLEGATIONS ..... 20

I. ALABAMA HAS CREATED AND KNOWINGLY MAINTAINED EXTRAORDINARILY VIOLENT, INHUMANE AND UNSAFE DETENTION FACILITIES THAT COERCE INCARCERATED ALABAMIANS TO LABOR TO SURVIVE ..... 20

A. Overview of ADOC's Facilities ..... 20

B. ADOC Ties Incarcerated Workers' Safety and Custody Status to Their Willingness to Perform Work for the Benefit of ADOC and the Public and Private Employers that Contract for ADOC-Supplied Labor ..... 21

C. Alabama's Correctional Facilities Are Dangerously Overcrowded and Understaffed, Resulting in Life-Threatening Conditions for Incarcerated Alabamians and Rendering Submitting to Labor a Matter of Survival ..... 25

1. The Violence That Pervades All Medium- and High-Security ADOC Facilities Has Been Public Knowledge for Years and Has Been Knowingly Maintained and Exacerbated by Defendants Lovelace, Hamm, and Ivey ..... 25

2. Documented and Well-Known Dangerous Conditions in ADOC Medium- and High-Security Facilities Threaten the Lives and Physical Safety of Persons Incarcerated There ..... 28

3. Documented and Well-Known Overcrowding and Staffing Shortages in ADOC Medium- and High-Security Facilities Exacerbate the Violence and Threaten the Lives and Physical Safety of Incarcerated Persons ..... 34

4. Named Plaintiffs Have Experienced Violence and the Threat of Violence in ADOC's Facilities and Suffered Physical and Emotional Harm as a Result ..... 39

II. IVEY, HAMM, AND LOVELACE HAVE MAINTAINED A FORCED LABOR SCHEME THAT RELIES ON VIOLENCE, THREATS OF VIOLENCE, AND OTHER FORMS OF COERCION, WITH PUBLIC AND PRIVATE EMPLOYER DEFENDANTS KNOWINGLY PARTICIPATING IN AND BENEFITING FROM THE SCHEME ........................ 57

A. ADOC's Regulations and Governor Ivey's 2023 Executive Order Lay the Groundwork for a Coerced Labor Scheme that Severely Punishes Objections to Forced Labor and Peaceful Advocacy of Refusing Forced Labor and Threatens Incarcerated Workers Working for Private and Public Employers with Return to Violent Facilities Should They Ask Not to Work or Otherwise Raise Concerns Regarding Unlawful or Unsafe Work Conditions ........................ 59

B. In-House ADOC Work: ADOC Relies on Violence, Threats of Violence, Solitary Confinement, and Other Coercion to Require Incarcerated Alabamians to Perform Work Necessary for ADOC to Function, to ADOC's Immense Benefit ........................ 63

1. Defendants Lovelace, Hamm, and Ivey, through ADOC's Regulations, Policies and Practices, and Governor Ivey's Executive Order, Have Maintained a Scheme in Which Incarcerated Alabamians Must "Work Their Custody Down," Providing Free Labor to ADOC to Gain Access to Safer Living Quarters and Avoid Punishment ........................ 64

2. The Scheme of Compelling In-House Labor Provides Substantial Economic Benefit to ADOC ........................ 65

C. Work Centers: ADOC Relies on Violence, Threats of Serious Harm, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for State, County, and Local Government Entities, to the Benefit of ADOC and the ADOC-Contracted Public Entities ........................ 67

1. ADOC Contracts with Multiple Government Entities to Provide a Coerced Work Force ........................ 68

2. ADOC Enforces the Requirement that Incarcerated Alabamians Work for Public Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration ........................ 72

3. Public Employers Act as Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion ........................ 73

4. Defendants Lovelace, Hamm, Ivey, and the Public Employer Defendants Benefit from the Coercion of Work Through the Work Centers ........................ 76

D. Work Release Program: ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for Private, For-Profit Companies........................ 78

1. ADOC Contracts with Multiple Private Companies to Provide a Coerced Work Force ........................................................................ 78

2. ADOC Enforces Its Requirement that Incarcerated Alabamians Work for Private Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration .............................................................. 84

3. Private Employers Act As Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion .............................. 86

4. Defendants Lovelace, Hamm, Ivey, and the Private Employers Benefit from the Coercion of Work Through the Work Release Program.............................................................................................. 88

III. ADOC SYSTEMATICALLY RETALIATES AGAINST INCARCERATED PEOPLE FOR THEIR PROTECTED EXPRESSIVE CONDUCT, SPEECH, AND ADVOCACY............................................................. 91

A. ADOC Retaliates Against Individuals Who Raise Concerns About or Object to Their ADOC-Assigned Work and Working Conditions....................... 91

B. ADOC Retaliates Against Those Who File Grievances or Seek Access to the Courts, and Has Closed Off Every Other Avenue for Redress .................. 94

C. ADOC Maintains a Policy of Punitive Responses to Peaceful Protests That Pose No Security Risk But Threaten Its Profits .......................................... 96

D. ADOC Makes An Example of Those Who Engage in Any Form of Advocacy Regarding Working Conditions, As Illustrated by Its Brutal Retaliation Against Robert Earl Council............................................................. 99

E. Defendants Ivey, Hamm, and Lovelace Bear Responsibility for the Foregoing Retaliation........................................................................... 102

**CLASS ALLEGATIONS**.......................................................................... 104

**COUNT I:** Violation of the Trafficking Victims Protection Act (TVPA) 18 U.S.C. §1589(a)(1) Against Defendants Lovelace, Hamm, and Ivey ........................................................................................... 108

**COUNT II:** Violation of the Trafficking Victims Protection Act (TVPA) 18 U.S.C. §1589(a)(2) Against Defendants Lovelace, Hamm, and Ivey ........................................................................................... 175

**COUNT III:** Violation of the Trafficking Victims Protection Act (TVPA) 18 U.S.C. §1589(a)(3) Against Defendants Lovelace, Hamm, and Ivey ..... 180

**COUNT IV:** Violation of the Trafficking Victims Protection Act (TVPA) 18 U.S.C. §1589(a)(4) Against Defendants Lovelace, Hamm, and Ivey ..... 184

**COUNT V:** Violation of the Trafficking Victims Protection Act (TVPA) U.S.C. §1589(b) Against Public and Private Employers ..... 185

A. Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Jarmon, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, Walker, RWDSU, and USSW's 18 U.S.C. §1589(b) Claims Against Private Employer Defendants ..... 186

B. Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Ptomey, Pritchett's Claims Against Public Employer Defendants ..... 254

**COUNT VI:** Violation of the Trafficking Victims Protection Act (TVPA) 18 U.S.C. §1589(a)(1) & (2) Against Defendants Bama Budweiser, Cast Products, Hwaseung, Ju Young, Paramount, RCF/Gemstone, SL Alabama, and Southeastern Meats ..... 269

**COUNT VII**: Violation of Alabama Constitution Article I, Section 32, Against Defendants City of Montgomery and All Private Employer Defendants other than CBAK and Koch Foods ..... 278

**COUNT VIII**: Unjust Enrichment Against Defendants Lovelace and Hamm, Public Employer Defendants, and Private Employer Defendants ..... 284

**COUNT IX**: Violation of First Amendment of U.S. Constitution Pursuant to 42 U.S.C. §1983 Against Defendants Ivey, Hamm, and Lovelace ..... 289

PRAYER FOR RELIEF ..... 303

DEMAND FOR JURY TRIAL ..... 305

Plaintiffs Robert Earl Council aka Kinetik Justice, Michael Campbell, Toni Cartwright, Rashaad Clark, Trevion Clark, Jerame Aprentice Cole, Danny Dandridge, Alimireo English, Larry Darnell Jarmon Jr., Joseph Lesley, Turner Mason, Quannie McCorvey, Frederick Denard McDole, Lee Moore, Deckrice Morrissey, Pierre Payton, Eric Prewitt, Lanair Pritchett, Arthur Charles Ptomey Jr., Victor Thomas, and Lakiera Walker ("Named Plaintiffs"), on behalf of themselves, and those similarly situated, along with the Union of Southern Service Workers, Service Employees International Union ("USSW"); and Retail, Wholesale and Department Store Union, Mid-South Council ("RWDSU") allege as follows:

## INTRODUCTION

1. This case seeks to abolish a modern-day form of slavery. Named Plaintiffs and putative class representatives Council, Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker are twenty-one individuals who are or have been incarcerated in Alabama's prison system. They have been entrapped in a system in which incarcerated people are forced to work through threats of physical violence, serious harm, deprivation of bare necessities, and extended imprisonment, for little or no money, to the significant benefit of the Alabama Department of Corrections ("ADOC"), the State of Alabama, and the numerous government entities and private businesses that contract with ADOC for the labor of incarcerated Alabamians. Plaintiffs and persons incarcerated throughout Alabama have been trusted to perform vital and skilled work within the walls of ADOC facilities, as well as outside those walls, laboring for state entities, cities and counties, and private employers in a wide variety of industries ranging from fast food, to poultry processing, to automobile manufacturing, to metal casting.

2. Defendants Governor Kay Ivey and Alabama Department of Corrections ("ADOC") Commissioner Greg Lovelace, together with the many state and local agencies and private employers participating in this resurrected "convict leasing" practice, knowingly benefit from the human suffering they support. Participating employers include the three public employers

named as Defendants here: the Alabama Department of Transportation ("ADOT") through Director John Cooper, the City of Montgomery, and the City of Troy (collectively, "Public Employer Defendants"); and the fourteen private company Defendants, many of which represent national and international brands and supply chains: franchisees of McDonald's (CBAK), KFC (Pell City KFC), and Wendy's (Southeast Restaurant Group); Bama Budweiser, a distributor of Anheuser-Busch products; poultry and meat processors including Gemstone Foods, Koch Foods, and Southeastern Meats; Paramount Services, a linen company; and manufacturing and engineering employers Masonite, Cast Products, and auto parts manufacturers and suppliers Ju-Young, Hwaseung, SL Alabama, and Progressive Finishes (collectively, "Private Employer Defendants"). Since 2018, approximately 575 private employers and more than 100 public employers have "leased" incarcerated labor from Alabama prisons. By a conservative estimate, Alabama alone enjoys a benefit of more than $450 million annually from the Named Plaintiffs' and class members' forced labor, inside and outside the prison walls.

3. Alabama's current prison labor system is a direct descendant of convict leasing, in which incarcerated people—the majority of whom are Black—are forced to labor, through threats of extraordinary violence, deprivations of bare necessities, extended incarceration, and solitary confinement, for the benefit of the State and its public and private partners. Alabama has designed a prison system so violent, so deadly, and so overcrowded that survival depends on submission to this work regime. Refusal to work, or even a perception that one has refused to work, carries immediate and often severe consequences. Named Plaintiffs have been subject to and threatened with the following consequences should they not labor for the benefit of Defendants: transfers to Alabama's ultra-violent medium- and high-security facilities, or particularly dangerous places within them, where stabbings and other assaults are common; placement in isolation units; physical violence and other serious harm; extension of their terms of incarceration through denial of parole; and loss of privileges such as family visitation, home passes, and access to food and necessities like soap and toothpaste.

4. ADOC uses the constant threat of these severe consequences as leverage to ensure compliance with work requirements and suppress resistance. So too do the Public and Private Employers use the threat of reporting incarcerated workers to ADOC, and the consequences that would flow from such reporting, to coerce individuals to work for their benefit. The use of terror to compel labor is not new in Alabama. It was central to slavery. It defined convict leasing. And in Alabama's prisons today, it remains the currency of control. Plaintiffs seek to end this modern-day convict leasing and to hold accountable those who perpetuate and benefit from it.

5. The Trafficking Victims Protection Act squarely prohibits the profitable, coerced labor scheme that ADOC has constructed within the prison walls and, with its partnering employers, outside the prison walls. The Act outlaws both providing and obtaining the labor and services of any individual—including individuals who are incarcerated—through force, physical restraint, serious harm, and threats thereof—and yet ADOC and its partners have relied on all of these measures to secure the labor of Named Plaintiffs and other incarcerated workers. Defendants' forced labor scheme also violates the recently amended bar in Alabama's Constitution on indentured servitude, which the Alabama voters confirmed applies to incarcerated Alabamians.

6. Defendants Lovelace and Ivey can only maintain this scheme by penalizing and retaliating against those who exercise their First Amendment rights to protest coerced labor and object to abusive and inhumane working conditions. Plaintiffs assert their First Amendment rights to be free of this unlawful retaliation.

## PARTIES

### I. PLAINTIFFS

7. Plaintiffs are twenty-one individuals currently and formerly incarcerated at facilities operated by ADOC, who have been subject to serious harm, including extended detention, forced labor, and increased risk of physical violence, and threats thereof, as a result of Defendants' unlawful actions; and two labor organizations committed to improving the lives and working conditions of all workers and whose members and core organizational interests have been

and continue to be injured by Defendants' unlawful procurement of the forced labor of incarcerated Alabamians.

8. Plaintiff ROBERT EARL COUNCIL aka KINETIK JUSTICE is currently incarcerated at Limestone, a high-security facility operated by ADOC. Mr. Council, a Black man, has been in ADOC custody for 31 years, including at ADOC's Holman, St. Clair, Limestone, Kilby and Donaldson facilities, among other locations. Mr. Council is one of the founders and leaders of the Free Alabama Movement, and he has experienced severe retaliation for his speech and advocacy regarding forced labor, as detailed below. The harms to Mr. Council's First Amendment rights, including the threat of abuse and retaliation against Mr. Council for his efforts to educate others about Defendants' forced labor scheme and encourage resistance to that scheme, are ongoing each day that he is subject to the punitive and retaliatory regime established and maintained by Defendants Ivey, Lovelace, and Hamm.

9. Plaintiff MICHAEL CAMPBELL is currently incarcerated at Childersburg Work Release, an ADOC minimum-custody facility, where he has been housed for approximately seven years. He has also been housed at Bibb and Kilby. Mr. Campbell has regularly performed coerced labor for outside employers, including Defendants Bama Budweiser, Progressive Finishes, ADOT, and Pell City Kentucky Fried Chicken d/b/a Kentucky Fried Chicken d/b/a KFC ("Pell City KFC"). Mr. Campbell is a Black man who is serving a sentence for an offense he was convicted of in 2002. Mr. Campbell has experienced and continues to experience significant personal and financial harm because of Defendants' forced labor scheme, including confiscation of a substantial portion of his earnings by ADOC and the psychological pain associated with being unable to provide for his daughter and of being forced to labor.

10. Plaintiff TONI CARTWRIGHT is a Black woman who was incarcerated by ADOC from 2016 until May 2026. She was housed in ADOC facilities including Tutwiler, Montgomery Women's Facility, Alabama Therapeutic Education Facility ("ATEF"), and Birmingham Work Release. Even though Ms. Cartwright is no longer in ADOC custody, the impact of being forced to labor for ADOC and Work Release employers has caused lasting effects. She struggles with

severe mental health difficulties, including high levels of anxiety. Repeatedly being threatened and punished, when she was not at fault, diminished her emotional well-being, because she felt like she deserved better treatment than she was receiving.

11. Plaintiff RASHAAD CLARK is a Black man who is currently housed in North Alabama Community Work Center. He has been in ADOC custody since May 2013. While in ADOC custody, Rashaad Clark also has been housed at Kilby, Draper, Staton, ATEF, Bullock, Atmore, Limestone, Childersburg, Alex City, Mobile, and Frank Lee. He has been forced to work for ADOC directly and for a number of private and public employers while incarcerated by ADOC. This ongoing forced labor, and the extension of his incarceration due to punishment for alleged failures to perform the labor, has greatly harmed Rashaad Clark, exposing him to an assault from Defendant Bama Budweiser and ongoing threats of violence and actual violence from ADOC, along with the harms from the continued denial of his freedom and ability to be returned to his community and family and provide emotional and financial support for them.

12. Plaintiff TREVION CLARK is a Black man who is currently incarcerated by ADOC at Staton Correctional Center. Mr. Trevion Clark has been incarcerated by ADOC for approximately fifteen years across two periods of incarceration. During his incarceration, he has been housed at Draper, Easterling, Kilby, Alex City Work Release, and Elba Work Release, among other ADOC facilities. Throughout his incarceration, ADOC has required Mr. Clark to perform unpaid field labor and in-facility work and has assigned him to private employers including Defendant Hwaseung Automotive, Fred's Cabinet Shop, Burger King, and Wellborn Cabinet. He has experienced severe violence, witnessed brutal officer misconduct, and has been subjected to retaliation by ADOC officials for filing grievances and raising concerns about his conditions.

13. Plaintiff JERAME COLE is a Black man who is currently housed at Kilby. He has been in ADOC custody for 19 years, including at Draper, Donaldson, Elmore, Kilby, Holman, Easterling, Bullock, Limestone, Staton, and Alabama Therapeutic Education Facility; Red Eagle and J.O. Davis Work Centers; and North Alabama, Hamilton, and Childersburg Work Release facilities. Mr. Cole has experienced severe harm as a result of Defendants' forced labor scheme,

including financial harm resulting from unpaid work and confiscation of much of his earnings by ADOC, physical harm including lingering pain in his hands due to work for Defendant Gemstone, and psychological harm from being forced to labor and subject to ADOC's control.

14. Plaintiff DANNY DANDRIDGE was formerly incarcerated by ADOC from 2002 until 2007, and then from 2009 until 2023. During his time in ADOC custody, Mr. Dandridge was housed at Kilby, Ventress, Fountain, Draper, ATEF, St. Clair, Bibb County, Childersburg, Elmore, Alex City, Loxley, Holman, Staton, Red Eagle, J.O. Davis, and North Alabama Work Release. Mr. Dandridge performed coerced labor in-house for ADOC, for public employers, and for private employers. Mr. Dandridge has experienced physical harm and emotional trauma as a result of the extreme violence and forced labor he experienced while incarcerated. Mr. Dandridge has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages.

15. Plaintiff ALIMIREO ENGLISH is a Black man. He was released on parole in April 2025 after years in ADOC custody, during which he was housed at Kilby, Elmore, Fountain, Ventress, Northern Alabama (Decatur) Work Release, Hamilton, Camden, Staton, and the Perry County PREP Center. At each facility, ADOC required Mr. English to perform unpaid labor. He also performed labor for Defendant Alabama Department of Transportation. Throughout his incarceration, Mr. English experienced and witnessed extreme violence, was personally assaulted by both incarcerated people and an ADOC officer, and was subjected to repeated retaliation by ADOC officials for reporting misconduct and for participating in this lawsuit.

16. Plaintiff LARRY DARNELL JARMON JR. is a Black man who is currently incarcerated at the Mobile Community Work Center. He has been in ADOC custody since 2013, and has previously been housed in ADOC facilities including North Alabama Work Release, Elba, Kilby, Ventress, Easterling, and Donaldson. Mr. Jarmon suffers from anxiety and post-traumatic stress disorder because of his experiences in ADOC facilities and at Defendant Cast Products. Mr. Jarmon finds it extremely difficult to sleep and rarely dreams, but when he does dream, it's a

nightmare. His nerves are shot and he is easily startled out of his sleep. He finds it difficult to start each day and to do the work that ADOC demands of him.

17. Plaintiff JOSEPH LESLEY was formerly incarcerated by ADOC from 2004 until 2018, and then from 2018 until 2026. During his time in ADOC custody, Mr. Lesley was housed in facilities including Bullock, St. Clair, Ventress, Staton, Limestone, North Alabama Work Release, Alexander City Work Release, and Childersburg Work Release. Mr. Lesley performed coerced labor for ADOC and for private employers. Mr. Lesley has experienced physical harm and emotional trauma as a result of the extreme violence and forced labor he experienced while incarcerated. Mr. Lesley has also experienced financial harm in the form of lost wages he would have received had he not been forced to labor for no wages.

18. Plaintiff TURNER MASON is a White man who was incarcerated by ADOC from June 2024 until March 2026. He was housed in ADOC facilities including Kilby and Limestone. Mr. Mason is a former law enforcement officer and, accordingly, at Limestone he was housed in "E" Dorm, which is a protective custody dorm. ADOC forced Mr. Mason to work for no pay at Limestone under threat of physical harm, segregation, and loss of privileges.

19. Plaintiff QUANNIE MCCORVEY is a Black man who was incarcerated by ADOC for two separate periods: from approximately 2002 to 2008 and again from 2017 until his release in August 2019. During his most recent incarceration, Mr. McCorvey was housed at Kilby, Atmore, and Loxley Work Release, and previously at Childersburg, Frank Lee, Draper, Red Eagle, Bibb, and Elmore.

20. Plaintiff FREDERICK DENARD MCDOLE is currently incarcerated at Childersburg Community Work Center, an ADOC minimum-custody facility. Mr. McDole is a Black man and has been incarcerated by ADOC since 2017. He has also been incarcerated at Bullock, Ventress, Alabama Therapeutic Education Facility, and Hamilton Work Release. Mr. McDole has performed coerced labor while incarcerated for several private employers, in addition to unpaid work within ADOC facilities. Mr. McDole has experienced and continues to experience

substantial personal and financial harm because of Defendants' forced labor scheme, including an inability to earn sufficient wages to support himself and his family after ADOC's deductions.

21. Plaintiff LEE EDWARD MOORE JR. is currently incarcerated in the William C. Holman Correctional Facility, a maximum-custody facility operated by ADOC. Mr. Moore is a Black man and has been incarcerated in ADOC facilities since 1997. He has been assigned to Holman since mid-2022. Between approximately 2013 and 2022, Mr. Moore was incarcerated at the Fountain Correctional Facility. Prior to 2013, he was incarcerated at the Staton Correctional Facility except during the time he completed a brief course at the Easterling Correctional Facility. Mr. Moore receives no pay for his labor, which provides a significant economic benefit to ADOC and the State. Because Mr. Moore receives no pay for the work he is required to perform for ADOC, Mr. Moore finds it difficult to cover necessities due to the lack of any pay for his labor.

22. Plaintiff DECKRICE MORRISSEY is a Black woman who is currently housed at Montgomery Women's Facility. She has been in ADOC custody since 2012, and has previously been housed at Birmingham Work Release, Tutwiler, and ATEF. Ms. Morrissey is eligible for parole in October 2026. ADOC has forced Ms. Morrissey to perform uncompensated work and work outside ADOC facilities.

23. Plaintiff PIERRE PAYTON is a Black man currently incarcerated at North Alabama Community Work Center. He has been in ADOC custody since 2012. While in ADOC custody, Mr. Payton has been housed at Kilby, Bullock, Fountain, Fountain Annex (Atmore Work Center), Limestone, Loxley, Childersburg, Alex City, and Frank Lee. All work Mr. Payton has performed while incarcerated, directly for ADOC or when leased to private employers, has been coerced labor. Mr. Payton has been harmed and continues to be harmed, financially and personally, by this forced labor, including an ongoing injury to his left hand, the psychological harm of being exposed for years to extreme violence and ongoing threats to return him to such violence, and continuing to be incarcerated and not free and present to support his kids and wife emotionally and financially.

24. Plaintiff ERIC PREWITT is currently incarcerated at Red Eagle Work Center, an ADOC minimum-custody facility. Mr. Prewitt is a Black man and has been incarcerated by ADOC since 2018. He has also been incarcerated at Kilby, Ventress, St. Clair, ATEF, Alex City Work Release, and Limestone. Mr. Prewitt has performed coerced labor while incarcerated for several private employers, in addition to unpaid work within Alex City. Mr. Prewitt has experienced and continues to experience substantial personal and financial harm because of Defendants' forced labor scheme, including ongoing numbness, swelling, and pain in his right hand from the repetitive work testing headlights for Defendant SL Alabama, back pain, and being unable to earn sufficient wages to support himself and his family. Being forced to labor while incarcerated makes him feel like a slave.

25. Plaintiff LANAIR PRITCHETT is currently incarcerated at North Alabama Community Work Center, an ADOC minimum-custody facility. Mr. Pritchett is a Black man and has been incarcerated by ADOC since 2009. Mr. Pritchett has performed coerced labor while incarcerated in several settings, including inside ADOC facilities, for public employers, and for private employers. Mr. Pritchett has experienced and continues to experience substantial harm as a result of Defendants' forced labor scheme, including exposure to the extreme violence in ADOC's medium- and high-security facilities, to which he has frequently been transferred, as well as emotional and financial harm, which has sometimes felt unbearable, because he cannot save money and provide for his 18-year-old son and his mother.

26. Plaintiff ARTHUR CHARLES PTOMEY JR. is a Black man who was in ADOC custody until he was released on parole in April 2026. He was incarcerated by ADOC for nearly 18 years and was in work release since 2018. During his incarceration, ADOC housed Mr. Ptomey at Bibb, St. Clair, Draper, Camden, Red Eagle, and Childersburg. Mr. Ptomey has performed compelled unpaid labor at ADOC facilities throughout his incarceration, and ADOC assigned him to work for multiple private and public employers through the work-release program.

27. Plaintiff VICTOR THOMAS is a Black man who was incarcerated by ADOC from 1988 until he was released on parole in June 2026. He now lives in Washington State. During his

incarceration, Mr. Thomas was housed at various ADOC facilities including Ventress, Frank Lee Work Release, Staton, and Elmore Correctional Facility. Mr. Thomas performed coerced labor for ADOC and for private employers while incarcerated, including for Defendant Ju Young Automotive. While working for Ju Young, and despite a known surgical history and medical restrictions that prohibited lifting more than five pounds, Mr. Thomas was required to perform heavy lifting work that caused a serious back injury. He was then terminated because of that injury, transferred to a medium-security facility where he was exposed to violence, and denied adequate medical treatment for years. Mr. Thomas suffered substantial physical, financial, and personal harm as a result of Defendants' forced labor scheme and continues to suffer the physical consequences of that harm today.

28. Plaintiff LAKIERA WALKER was incarcerated by ADOC from 2007 to 2023. Ms. Walker is a Black woman and was incarcerated in ADOC facilities, including at Tutwiler, Montgomery, and Birmingham Work Release. She currently lives in Dallas, Texas, and is scheduled to graduate with her Bachelors in Business Administration in December 2026.

29. Plaintiff RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, MID-SOUTH COUNCIL (RWDSU) is a labor organization that represents employees in various industries, including the poultry processing industry, within the states of Alabama, Mississippi and parts of Florida, Louisiana, Ohio and Tennessee. RWDSU represents approximately 4,000 workers in poultry plants located across Alabama. Defendants' actions have caused RWDSU and its members harm by perpetuating racial discrimination, unsafe working conditions, and low wages in the poultry processing industry, including in facilities operated by employers where RWDSU represents poultry processing workers. In Alabama, RWDSU represents approximately 200 workers employed by Defendant Gemstone Foods and 1,800 workers at Defendant Koch Foods, as well as workers at poultry processors Wayne Farms and Pilgrim's Pride: each of those four companies employs or has employed persons incarcerated by ADOC as part of the coerced labor scheme at issue in this complaint. RWDSU and its members are further harmed by Defendants' coerced labor scheme because Defendants' conduct interferes with RWDSU's ability to organize

and represent workers in the poultry industry. RWDSU has sought to represent ADOC work-release employees at Koch Foods and to ensure that its collective bargaining agreement covered those workers, but the company and ADOC took the position that the employees could not be members of RWDSU, including because the employees could not enter into binding contracts without permission of the warden. Not being able to represent all workers in the union's bargaining unit at Koch Foods harms RWDSU's interests and the interests of its members. RWDSU has also committed resources to organizing and seeking to represent workers at Gemstone Foods' Decatur poultry processing plant, including incarcerated persons who work at that plant. The employment of incarcerated workers by poultry processing plants undermines RWDSU's ability to improve the wages and working conditions of poultry plant workers because it is difficult to communicate with incarcerated workers and they often fear discipline if they advocate for better wages and working conditions. Further, the poultry processing plants' use of incarcerated labor depresses wages and working conditions for all workers in the sector, who are predominantly Black and Brown. In addition, Defendants' conduct has functioned to keep a substantial portion of the poultry plant workforce incarcerated and subject to harsh penalties for any labor organizing activity, which undermines RWDSU's efforts to organize and represent workers in the poultry industry. This action pertains to the purposes for which RWDSU's members are associated together and is germane to the union's interests. Defendants' actions as alleged herein directly conflict with RWDSU's mission and goal of improving the wages and working conditions of its members, and ensuring safe, racially just, equitable, and fair workplaces and pay for its members.

30. Plaintiff UNION OF SOUTHERN SERVICE WORKERS, SERVICE EMPLOYEES INTERNATIONAL UNION (USSW) is a project built by and for low-wage workers coming together across the service industry in the Southern United States, including in Alabama, which is committed to improving the lives of these workers and their communities and combatting systemic racism. A key industry in which USSW has been and is advocating for improved wages and working conditions is the fast-food sector. USSW has devoted significant time and resources to supporting workers at fast-food restaurants in speaking out about intolerable

working conditions such as excessive heat and sexual harassment, and about the need for a living wage. USSW's work has included advocacy on behalf of workers at McDonald's, KFC, Burger King, and Wendy's locations in Alabama. The employment of incarcerated workers by fast-food employers undermines USSW's ability to improve the working conditions of fast-food workers because it is difficult to communicate with incarcerated workers and incarcerated workers fear discipline by ADOC if they advocate for better wages and working conditions. Further, these employers' use of incarcerated labor depresses wages and working conditions in the fast-food sector. USSW has expended time and resources to address the impact of fast-food employers' employment of incarcerated persons. This action pertains to the objectives of USSW and is germane to its interests. Defendants' actions as alleged herein directly conflict with USSW's mission and goal of improving the wages and working conditions of service workers in the Southern United States, and ensuring safe, equitable, and fair workplaces and pay for those workers.

## II. DEFENDANTS

31. Defendant KAY IVEY is the Governor of the State of Alabama and the head of the State's executive branch. Ala. Const. §113. On January 9, 2023, Defendant Ivey issued Executive Order 725 ("2023 Executive Order"), which required ADOC to impose certain stringent consequences—the loss of correctional incentive "good-time" credits that effectively reduce the duration of confinement—and authorized ADOC to impose additional consequences—including restrictive housing (e.g., solitary confinement) and loss of privileges—on incarcerated individuals who refuse to work or encourage or cause a work stoppage, which Defendant Ivey defined as "medium" and "high" level violations, respectively. ADOC's regulations governing discipline for refusing to work and encouraging others to refuse to work reflect Defendant Ivey's 2023 Executive Order. Defendant Ivey has participated in the creation, implementation, and enforcement of a plan and venture that punishes persons incarcerated by ADOC, including by inflicting and threatening serious harm and physical restraint and by causing persons to believe they would be subject to serious harm and/or physical restraint, if they fail to work for ADOC and the public and private

employers to whom ADOC provides the labor of incarcerated individuals, if they encourage others to withhold labor, and if they raise concerns about working conditions. Defendant Ivey is sued in her official and individual capacities.

32. Defendant GREG LOVELACE is the Commissioner of ADOC. Defendant JOHN HAMM was the Commissioner of ADOC until May 1, 2026. The Commissioner is responsible for the independent direction, supervision, and control of the Department. Ala. Code §14-1-1.3. As such, the Commissioner is responsible for ADOC's vast program of coercing work from individuals incarcerated by ADOC, including the performance of essential, unpaid work that is critical to the operations of ADOC, the Correctional Industries program, and the Work Center and Work Release programs pursuant to which ADOC "leases" incarcerated workers for substantial profit to public and private employers, including Public and Private Employer Defendants. Defendants Lovelace and Hamm have participated in the creation, implementation, and enforcement of a plan and venture that punishes persons incarcerated by ADOC, including by inflicting and threatening serious harm and physical restraint and by causing persons to believe they would be subject to serious harm and/or physical restraint if they fail to work for ADOC and the public and private employers to whom ADOC provides the labor of incarcerated individuals, if they encourage others to withhold labor, or if they raise concerns about working conditions. The Classification Manual that establishes and sets out policies governing the classification of incarcerated people and their assignment to ADOC facilities is published under the authority of the Commissioner. As alleged herein, Lovelace and Hamm obtained and provided labor and services from persons incarcerated by ADOC, including from Named Plaintiffs as alleged herein, through unlawful and coercive means, to ADOC's and the State's benefit. Defendant Lovelace is sued in his official and individual capacities. Although Lovelace was appointed ADOC Commissioner by Ivey on May 1, 2026, he reportedly held leadership roles within ADOC for many years and served as ADOC Chief Deputy Commissioner, with responsibilities for operations, from 2022 until his appointment. Defendant Hamm is sued in his individual capacity.

33. Defendants also include "Employer Defendants," each of which is a public or private employer that has contracted with ADOC to obtain the labor of incarcerated Alabamians. Each Employer Defendant, identified in paragraphs 34-50 below, has knowingly and willingly participated in the forced-labor scheme alleged herein and has thereby benefitted, economically and otherwise.

34. Defendant JOHN COOPER is the Transportation Director and the chief executive officer of the Alabama Department of Transportation (ADOT) and exercises all the powers, authority, and duties vested in ADOT. Ala. Code §23-1-21. ADOT, through Cooper, regularly has persons incarcerated by ADOC perform work for the department, including but not limited to cleaning and repair of roadways, and has been doing so since at least 1972. Since January 1, 2018, at least 1029 people incarcerated by ADOC have worked for ADOT, generally receiving only $2 per day for their labor. At least 139 individuals incarcerated by ADOC have worked for ADOT in the 2024 fiscal year ("FY").[1] As alleged herein, ADOT, through Cooper, has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Campbell, R. Clark, T. Clark, Dandridge, English, Pritchett, and Ptomey, through unlawful and coercive means, to ADOT's benefit. Defendant Cooper is sued in his official and individual capacities.

35. Defendant CITY OF MONTGOMERY has regularly had persons incarcerated by ADOC perform work for the city. From January 1, 2018 through August 2, 2024, approximately 437 people incarcerated by ADOC have worked for the City of Montgomery and for City of Montgomery road crews, generally receiving only $2 per day for their labor. At least 91 individuals incarcerated by ADOC worked for the City of Montgomery and its road crews in the 2024 FY. Incarcerated people also regularly perform work at Riverwalk Stadium, the home of the Montgomery Biscuits, a minor league baseball team. Since January 1, 2018, at least 47 people incarcerated by ADOC have worked at Riverwalk Stadium, generally receiving only $2 per day for their labor. At least 15 individuals incarcerated by ADOC worked for Riverwalk Stadium in

[1] Alabama's fiscal year runs from October 1 to September 30.

the 2024 FY. As alleged herein, Montgomery has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Cole and Ptomey, through unlawful and coercive means, to Montgomery's benefit.

36. Defendant CITY OF TROY has regularly had persons incarcerated by ADOC perform work for the city. Since January 1, 2018, at least 306 people incarcerated by ADOC have worked for the City of Troy, generally receiving only $2 per day for their labor. At least 23 individuals incarcerated by ADOC have worked for the City of Troy in the 2024 FY. As alleged herein, Troy has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs T. Clark, Pritchett, and Jarmon, through unlawful and coercive means, to Troy's benefit.

37. Defendant BAMA BUDWEISER OF MONTGOMERY, INC. ("Bama Budweiser") is a corporation based in Montgomery, Alabama that is an Anheuser-Busch wholesale beer distributor. Bama Budweiser has contracted with ADOC to obtain the labor of incarcerated workers from ADOC for approximately the last two decades. Since January 1, 2018, at least 180 people incarcerated by ADOC have worked for Bama Budweiser, with at least 13 incarcerated people working for the company in the 2024 FY. As alleged herein, Bama Budweiser has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Rashaad Clark and Campbell, through unlawful and coercive means, to Bama Budweiser's benefit.

38. Defendant CAST PRODUCTS, INC. ("Cast Products") is a corporation based in Athens, Alabama that designs and manufactures custom aluminum castings. Cast Products contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program, and has done so since at least 2016. Since January 1, 2018, at least 454 people incarcerated by ADOC have worked for Cast Products, with at least 3 incarcerated people working for the company in the 2024 FY. As alleged herein, Cast Products has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Jarmon, Lesley, and Payton, through unlawful and coercive means, to Cast Products' benefit.

39. Defendant C.B.A.K., Inc. d/b/a MCDONALD'S ("CBAK") is a franchisee of McDonald's USA, LLC, with multiple locations in Alabama, including in Bay Minette, Daphne, Fairhope, Foley, and Loxley, which has regularly contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 122 people incarcerated by ADOC worked at this McDonald's franchise's locations. As alleged herein, CBAK has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiff McCorvey, through unlawful and coercive means, to CBAK's benefit.

40. Defendant HWASEUNG AUTOMOTIVE USA LLC ("Hwaseung") is a corporation based in Enterprise, Alabama that engages in manufacturing and has contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 86 people incarcerated by ADOC have worked for Hwaseung, with at least 52 incarcerated people working for the company in the 2024 FY. As alleged herein, Hwaseung has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiff Trevion Clark, through unlawful and coercive means, to Hwaseung's benefit.

41. Defendant JU-YOUNG MANUFACTURING AMERICA, INC. ("Ju-Young") is a corporation based in Montgomery, Alabama that engages in manufacturing and has contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 137 people incarcerated by ADOC have worked for Ju-Young, with at least 67 incarcerated people working for the company in the 2024 FY. As alleged herein, Ju-Young has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Payton and Thomas, through unlawful and coercive means, to Ju-Young's benefit.

42. Defendant KOCH FOODS, LLC ("Koch Foods") is a limited liability company that processes poultry at facilities across Alabama. Koch Foods contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 30 people incarcerated by ADOC have worked for Koch Foods. As alleged herein,

Koch Foods has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiff Lesley, through unlawful and coercive means, to Koch Foods' benefit.

43. Defendant MASONITE CORPORATION ("Masonite") is a corporation that designs and manufactures doors and is based in Haleyville, Alabama. Masonite contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 115 people incarcerated by ADOC have worked for Masonite, with at least 34 incarcerated people working for the company in the 2024 FY. As alleged herein, Masonite has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiff Cole, through unlawful and coercive means, to Masonite's benefit.

44. Defendant PELL CITY KENTUCKY FRIED CHICKEN, INC. d/b/a KENTUCKY FRIED CHICKEN d/b/a KFC ("KFC") is a franchisee of KFC US, LLC, with a location in Pell City, Alabama. KFC contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 62 people incarcerated by ADOC have worked for KFC restaurants, with at least 20 incarcerated people working for KFC restaurants in the 2024 FY. The restaurants at which incarcerated people have worked include the one in Pell City where Plaintiff Campbell works. As alleged herein, KFC has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Campbell and Ptomey, through unlawful and coercive means, to KFC's benefit.

45. Defendant PARAMOUNT SERVICES, INC. ("Paramount") is a corporation based in Birmingham, Alabama that provides linen and uniform services for hotels, hospitals and other establishments. Paramount contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 82 people incarcerated by ADOC have worked for Paramount, with at least 16 incarcerated people working for the company in the 2024 FY. As alleged herein, Paramount has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Cartwright, Lesley, and Morrissey, through unlawful and coercive means, to Paramount's benefit.

46. Defendant PROGRESSIVE FINISHES, INC. ("Progressive") is a corporation with a facility in Alabaster, Alabama that provides e-coating and powder coating services. Since at least 2018, Progressive has contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 160 people incarcerated by ADOC have worked for Progressive, with at least 24 people working for the company in the 2024 FY. As alleged herein, Progressive has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Campbell, R. Clark, McDole, and Ptomey, through unlawful and coercive means, to Progressive's benefit.

47. Defendant RCF, LLC d/b/a GEMSTONE FOODS, LLC ("RCF/Gemstone") is a poultry processing company with plant operations in Decatur and Florence, Alabama that has contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 220 people incarcerated by ADOC worked for RCF/Gemstone. As alleged herein, RCF/Gemstone has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Cole, McDole, and Payton through unlawful and coercive means, to RCF/Gemstone's benefit.

48. Defendant SL ALABAMA, LLC ("SL Alabama") is a manufacturing company based in Alexander City, Alabama that, from at least 2018, contracted with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018at least 83 people incarcerated by ADOC have worked for SL Alabama, with at least 53 incarcerated people working for the company in the 2023 FY. As alleged herein, SL Alabama has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiff Prewitt, through unlawful and coercive means, to SL Alabama's benefit.

49. Defendant SOUTHEAST RESTAURANT GROUP-WEN LLC d/b/a WENDY'S ("Wendy's") is a franchisee of Quality Is Our Recipe, LLC, with multiple locations in Alabama, including in Montgomery. Wendy's contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. Since January 1, 2018, at least 13 people incarcerated by ADOC have worked for Southeast Restaurant Group-Wen LLC d/b/a Wendy's,

with at least 5 incarcerated people working for the company in the 2024 FY. As alleged herein, Wendy's has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Cartwright and Prewitt, through unlawful and coercive means, to KFC's benefit.

50. Defendant SOUTHEASTERN MEATS, INC. ("Southeastern Meats") is a corporation based in Birmingham, Alabama that packs meat, vegetables and specialty items for freezing and for sale. Southeastern Meats contracts with ADOC to obtain the labor of incarcerated workers participating in ADOC's work-release program. From January 1, 2018 through August 2, 2024, approximately 114 people incarcerated by ADOC have worked for Southeastern Meats, with at least 39 incarcerated people working for the company in the 2024 FY. As alleged herein, Southeastern Meats has obtained labor and services from persons incarcerated by ADOC, including from Named Plaintiffs Cartwright, Morrissey, and Walker, through unlawful and coercive means, to Southeastern Meats' benefit.

## JURISDICTION AND VENUE

51. This Court has original jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §1983 and pursuant to 18 U.S.C. §1595(a) because Plaintiffs assert a claim under 18 U.S.C. §1589. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiffs' related claims under state law.

52. The Court has jurisdiction to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, and its equitable powers.

53. Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district. Defendants Ivey, Lovelace, and Cooper maintain offices in Montgomery, which is located in this district. Defendants Cities of Montgomery and Troy are municipalities located in this district. Defendants Ju-Young Manufacturing America, Inc. and Bama Budweiser are based in this district.

## FACTUAL ALLEGATIONS

### I. ALABAMA HAS CREATED AND KNOWINGLY MAINTAINED EXTRAORDINARILY VIOLENT, INHUMANE AND UNSAFE DETENTION FACILITIES THAT COERCE INCARCERATED ALABAMIANS TO LABOR TO SURVIVE

#### A. Overview of ADOC's Facilities

54. ADOC has 15 medium- and high-security correctional facilities, thirteen of which are for men and two for women. The thirteen men's facilities are: Bibb, Bullock, William E. Donaldson, Easterling, Elmore, G.K. Fountain, Hamilton, William C. Holman, Kilby, Limestone, St. Clair, Staton, and Ventress; the women's prisons are Julia Tutwiler and Montgomery. The Montgomery women's facility also serves as a "Work Release" center. ADOC also previously operated a men's high-security facility called Draper, which was formally closed in 2018 and re-opened for a period during the COVID-19 pandemic. Approximately 18,000 Alabamians are incarcerated in these ADOC high- and medium-security facilities.

55. ADOC assigns each of its correctional facilities a "custody" level, with "medium custody" being a medium-security facility, and "close custody" facilities being high-security (also called maximum-security). The 15 ADOC facilities have the following custody designations:

- Bibb: medium custody correctional facility
- Bullock: medium custody correctional facility
- William E. Donaldson: close custody facility and includes a death row unit
- Easterling: medium custody correctional facility
- Elmore: medium custody correctional facility
- G.K. Fountain: medium custody correctional facility
- Hamilton: medium custody correctional facility
- William C. Holman: close custody correctional facility, but houses minimum through closed custody individuals, and includes a death row unit
- Kilby: close custody correctional facility, and is responsible for receiving all incarcerated men except those on death row and some youth offenders, into the

ADOC system for evaluation, classification, and assignment to other correctional facilities

- Limestone: close custody correctional facility
- Montgomery: medium custody correctional facility for women, but also operates a “work release” center
- St. Clair: close custody correctional facility
- Staton: medium custody correctional facility
- Julia Tutwiler: close custody correctional facility for women
- Ventress: medium custody correctional facility

56. ADOC also operates 12 “community-based” and “community worker” centers throughout the State of Alabama. As of April 2026, there were approximately 3,196 Alabamians incarcerated in these facilities (2,955 men and 241 women), from which ADOC transports them to work for public and private employers. In addition to the “Work Release” center at Montgomery women’s facility, women are also incarcerated at Birmingham Women’s Community Based Facility, from which ADOC transports them to work for public and private employers. There are 10 men’s centers from which ADOC provides incarcerated people to labor for public and private employers: Red Eagle Work Center, Loxley, Elba, Frank Lee, Hamilton, Mobile, North Alabama (also known as “Decatur”), Childersburg, Alex City, and Camden. All of ADOC’s community work centers are classified as minimum custody facilities with the exception of Montgomery Women’s Facility, which is classified as a medium custody correctional facility.

### B. ADOC Ties Incarcerated Workers’ Safety and Custody Status to Their Willingness to Perform Work for the Benefit of ADOC and the Public and Private Employers that Contract for ADOC-Supplied Labor

57. Individuals incarcerated by ADOC are assigned custody classifications. A person classified for “close custody” is someone ADOC determines “cannot be safely managed in a general population setting,” poses security concerns, and is “an overall risk to institutional order and/or public safety.” An individual classified as “medium custody” is someone ADOC determines

"require[es] a higher level of management … but can be managed in a general population setting" (Level V) or someone who "require[es] a secure facility setting" but is "considered suitable for participation in formalized institutional treatment or educational/vocational programs, facility work assignments, or [has] demonstrated improved adjustment at higher security placements" (Level IV). Minimum custody is the least restrictive custody level and is for those individuals whom ADOC considers to require less supervision and management.[2] Each Named Plaintiff has been subject to this ADOC custody regime.

58. Men who are incarcerated by ADOC will first be imprisoned at Kilby, a close custody facility. This was the experience of each male Named Plaintiff. Kilby is extremely violent and houses individuals with vastly different sentences, ranging from individuals with short sentences of incarceration to those who will remain in a close custody, high-security prison. ADOC assigns men custody classifications while they are at Kilby, after which ADOC transfers some men to other medium- or high-security facilities.

59. Under ADOC policy, all incarcerated persons, including Named Plaintiffs during their periods of incarceration, are supposed to undergo a semi-annual review of their custody classification. ADOC asserts that, during this process, it examines factors like incarceration information (the crime for which an individual is convicted and amount of time to be served), "positive or negative adjustment[s]," program completions, and any discipline incurred, to determine whether an incarcerated person's custody level should be reduced. A reduction in custody level generally is necessary to permit an individual to move to a lower security—and safer—facility.[3]

60. While incarcerated individuals in ADOC's medium- and high-security facilities are not "leased" to outside employers, ADOC has instituted a scheme by which members of the Forced Labor Class housed at such facilities are required to provide unpaid labor for ADOC that is

---

[2] *See Male Classification Manual*, ADOC (June 2026), at 26-38.

[3] *Male Classification Manual*, at 18; *see also Administrative Regulation Number 400*, ADOC (June 3, 2026) ("AR 400").

essential to ADOC's functioning.[4] Named Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Council, Dandridge, English, Jarmon, McCorvey, Mason, McDole, Moore, Morrissey, Payton, Pritchett, Ptomey, Thomas, and Walker have all engaged in such work without any pay, and Plaintiff Moore is currently required by ADOC to perform such unpaid work. Named Plaintiff Dandridge and other putative class members have also been required to perform work for ADOC's benefit through the Correctional Industries ("CI") Program.

61. If an individual does not perform their assigned work for ADOC, whether that is because they are unable to do so, the work assignment is unsafe or unlawful, they are sick, or for any other reason, they are threatened with and/or subject to discipline, punishment, and potential increased length of incarceration, as described *infra* at Parts II.A-II.B.1 and in Counts I-IV (describing ADOC policies and practices and experiences of Forced Labor Named Plaintiffs).

62. Additionally, based on ADOC's classification rules and procedures, and confirmed by the experiences of Named Plaintiffs and other members of the putative class, an incarcerated person who declines to work or is perceived as declining to work at a high- or medium-security facility, and as a result receives a write-up or discipline, is less likely to be able to transfer to a lower-security and less violent facility. (The extreme violence faced by Named Plaintiffs and other incarcerated individuals at the high- and medium-security ADOC facilities is described *infra* at Parts I.C.1, 1.C.2, and 1.C.4.) In other words, Named Plaintiffs and other incarcerated individuals, while incarcerated at high-security, close custody facilities and medium-security facilities risk being delayed or barred from transferring to a safer, lower security facility where the threat of serious bodily harm is less, if they do not perform all work demanded of them by ADOC, even if they are sick or otherwise unable to perform the work at issue.

63. ADOC has a regular and consistent practice of having its agents use the threat of being transferred to, or being left in, dangerous facilities as a means of coercing incarcerated persons to perform work for ADOC, as described *infra* II. Forced Labor Named Plaintiffs have

[4] The Forced Labor Class is defined in the Class Allegations, *infra*. Forced Labor Named Plaintiffs are all Named Plaintiffs other than Council.

personally received these threats and/or actual punitive transfers to dangerous facilities or dorms by ADOC and/or have observed ADOC make such threats to or order such punitive transfers of others, as have numerous other members of the putative Forced Labor Class. *See infra* Count I.

64. Named Plaintiffs and other similarly situated incarcerated individuals have reasonably understood that only by performing work for ADOC, without pay and under threat of violence, *see infra* Part II.B.1; ¶¶329-332 (Cartwright), 337-341 (R. Clark), 349-353 (T. Clark), 362-367 (Cole), 383-386 (Dandridge), 393-396 (English), 409-410 (Jarmon), 423-432 (Mason), 433-434 (McCorvey), 437-441 (McDole), 449-450 (Moore), 461-462 (Payton), 492 (Ptomey), 496 (Thomas), does ADOC deem them eligible for placement in less violent areas of ADOC facilities and/or for transfers to lower-security facilities, including the minimum-custody facilities. This is true for men in the high- and medium-security facilities, and for women incarcerated at Tutwiler.

65. ADOC's minimum custody classification includes three sub-categories, each of which relates to ADOC's assessment of where the individual should be assigned to work outside of the prison facilities:

- "Minimum-In" is a custody status that means an incarcerated individual's work assignments must either be on ADOC property or, if they are outside of ADOC property, they should be supervised by a correctional officer.
- "Minimum-Out" is a custody status that indicates that ADOC can and will assign an individual to perform work outside of ADOC property without supervision by a correctional officer. Most individuals with "minimum-out" custody status are incarcerated at community work centers and are approved to work on government projects for state, county, or local government entities through the work center program, *see infra* Part II.C.1 (describing "Work Centers").
- "Minimum-Community" is a custody status that ADOC assigns to individuals who it authorizes to perform work unsupervised by a correctional officer in the community, for private companies, under ADOC's work release program, *see infra* II.D.1 (describing "Work Release"). The status denotes that individuals "are

allowed gainful employment in the community on a full-time basis and will be supervised in community-based facilities when not working." *Women's Services Classification Manual*, ADOC (May 2019), at 37; *see also Male Classification Manual*, at 35-38. Incarcerated persons who are assigned "Minimum-Out" or "Minimum-Community" status and who are therefore "leased" by ADOC to public and private employers are housed in designated minimum-security work-release facilities, and ADOC transports them to their jobs in the community each work day. Named Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker have all experienced this.

66. Any incarcerated person who has had their custody level reduced to "Minimum-Out" or "Minimum-Community" custody and has been designated as able to work for the public and private employers who contract with ADOC for their labor, has already been exposed to, or learned of, the dangers of having their custody level changed such that they are transferred to a more dangerous and violent facility or area of a facility. *See infra* Parts I.C.4 (describing Named Plaintiffs' experiences). This exposure comes, for the men, first during the initial assignment to Kilby, and for all incarcerated persons, through assignments at such facilities and/or through communications with others who have been assigned to any of the higher level security facilities.

### C. Alabama's Correctional Facilities Are Dangerously Overcrowded and Understaffed, Resulting in Life-Threatening Conditions for Incarcerated Alabamians and Rendering Submitting to Labor a Matter of Survival

#### 1. The Violence That Pervades All Medium- and High-Security ADOC Facilities Has Been Public Knowledge for Years and Has Been Knowingly Maintained and Exacerbated by Defendants Lovelace, Hamm, and Ivey

67. The scale of death, violence, and human exploitation in Alabama's prisons is undeniable and has been the persistent subject of public discussion in Alabama for at least a decade. Defendants cannot plausibly claim ignorance of it. And the actions of Defendants Ivey,

Lovelace, and Hamm over the last ten years demonstrate that the violent carceral system—to which forced labor is integral—currently exists because those Defendants have chosen to create and maintain it.

68. Although Alabama's prisons have long been notorious for systemic human rights violations—including the 1976 federal court's finding in *Pugh v. Locke*, 406 F. Supp. 318 (M.D. Ala. 1976), that the State's prison conditions violated the Eighth and Fourteenth Amendments due to rampant overcrowding, inadequate medical care, and unchecked violence—in recent years, several high-profile news stories have served to highlight the overpopulated and deteriorating prison infrastructure that renders Alabama's prisons the most deadly in the country.

69. Although bipartisan experts and nonpartisan organizations warned that Alabama's prison system was in crisis and that overcrowding and understaffing would lead to spiraling violence in the decade up to 2014, the news of the shocking systemic abuse and violation of incarcerated women at Tutwiler women's prison barreled into focus in the Spring of 2014—bringing to the attention of the public and Alabama's leaders the violence carried out and permitted by ADOC. Violence was revealed to be endemic across ADOC facilities.

70. After the news broke of the mass corruption and abuse at Tutwiler—which included male correctional officers watching incarcerated women shower, commanding incarcerated women to put on stripping performances, and the operation by correctional officers of a prostitution syndicate with incarcerated women—the State's executive branch, then headed by Governor Bentley and Lieutenant Governor Ivey, turned its focus to prison reform.

71. In March 2015, a public report issued by the Justice Center of the Council for State Governments highlighted the overcrowding crisis in the State's prisons:

> Alabama's correctional system is in crisis. … The state's incarceration rate is the nation's fourth highest and, as of September 2014, Alabama's prisons—the most

> crowded in the country—were operating at *195 percent of capacity*, with 26,029 people in a system designed to hold 13,318.[5]

72. Through work with a criminal justice and public safety consulting firm, The Moss Group and then-ADOC Commissioner Jeff Dunn, then-Governor Bentley and then-Lieutenant Governor Ivey soon learned that the violence—and specifically the widely reported disturbing fact that the women at Tutwiler, due to broken phones and other impediments, had no way of reaching anyone on the outside to seek help or bring attention to their abuse—could not be disentangled from the problems of overcrowding, crumbling facilities, and systemwide understaffing. In announcing a January 2016 reform initiative (which ultimately did not proceed), Governor Bentley—in Ivey's presence—declared that Alabama's prisons for decades had become increasingly overcrowded, "dangerous to both inmates and our corrections officers," and "incredibly costly to taxpayers."

73. As explained by Commissioner Dunn and the Bentley-Ivey administration at the time, including at numerous legislative sessions chaired by now-Governor Ivey and in videotaped sessions with the media, all of ADOC's medium- and high-security facilities were not built to "detention grade standard." This means that they are not designed to weather the extensive usage customary in the detention context, which explained much of the facilities' dilapidated conditions at that time—conditions that have only worsened since then.

74. Further, as then-Commissioner Dunn and The Moss Group explained to the Bentley-Ivey administration, Alabama's correctional facilities were not designed to permit effective supervision by correctional staff. ADOC's facilities have many blind corners and hidden areas, and they are generally constructed so that correctional staff are far away from many dorms and yards, meaning that a large complement of ADOC staff is necessary to safely supervise incarcerated people in its facilities. Then-Commissioner Dunn in one video interview around a decade ago, explained that ADOC staffing shortages, combined with the poor facility design, were

---

[5] *Justice Reinvestment in Alabama: Analysis and Framework*, The Council of State Governments, https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG-AlabamaJRFramework.pdf (Mar. 2015) (emphasis added) (citations omitted).

so acute that one correctional officer at Draper could be responsible for supervising *4,000* incarcerated occupants. Throughout 2016, then-Commissioner Dunn and the Bentley-Ivey administration explained that their goal was to steadily and permanently reduce the state's prison population by safely and humanely detaining those who required incarceration, while focusing resources on proven rehabilitation programming to move as many people as possible out of ADOC's overcrowded and dangerous prisons. Although the Prison Transformation Initiative Act died in legislative session in late 2016, there is no doubt that, as a result of the research and analysis done with respect to the initiative, Governor Ivey has been and is fully aware of the persistent and dangerous levels of overcrowding and understaffing throughout ADOC's facilities. Governor Ivey's tenure as Lieutenant Governor provided her with specific knowledge of the existing, violent conditions in ADOC's overcrowded facilities.

75. When Governor Ivey assumed office in 2017, rather than build on the reforms she was aware were necessary to address ADOC's crisis-level violence and understaffing, she dismantled them by taking action to close down parole and thereby exacerbate the overcrowding in ADOC facilities, and doubled down on forced labor by increasing the penalties for perceived refusals to work for ADOC's benefit. The resulting violence within ADOC facilities is not an accident of inattention. It is the predictable—and apparently intended—consequence of Governor Ivey's decisions designed to extract labor and suppress resistance through fear.

**2. Documented and Well-Known Dangerous Conditions in ADOC Medium- and High-Security Facilities Threaten the Lives and Physical Safety of Persons Incarcerated There**

76. The stunningly dangerous conditions that incarcerated people in Alabama face across all of ADOC's medium- and high-security facilities are well documented and have been widely publicized, including in (1) the April 2019 U.S. Department of Justice ("DOJ") report summarizing its investigation of Alabama's state prisons for men[6]; (2) DOJ's 2020 report on

[6] *Investigation of Alabama's State Prisons for Men*, U.S. Dep't of Justice (Apr. 2, 2019) ("2019 DOJ Report"), https://www.justice.gov/crt/case-document/file/1149971/download.

violence perpetrated by correctional staff[7]; (3) DOJ's related civil litigation against the State of Alabama and ADOC for their allegedly widespread cruel and inhumane treatment of incarcerated men in violation of the Civil Rights of Institutionalized Persons Act[8]; (4) the litigation in *Duke v. Dunn* in which plaintiffs incarcerated at St. Clair Correctional Facility alleged that the prison was plagued by extreme levels of violence, rampant understaffing, broken cell door locks, and staff misconduct—including officers encouraging violence—and that ADOC officials knowingly failed to protect incarcerated people from harm despite repeated warnings[9]; (5) the federal litigation resulting in an injunction—which the Eleventh Circuit recently affirmed in large part—requiring ADOC to implement systemic changes to address the "horrendously inadequate" mental health care system in a prison system plagued by "persistent and severe shortages of mental-health and correctional staff, combined with chronic and significant overcrowding"[10]; and (6) DOJ's litigation regarding Eighth Amendment violations at Julia Tutwiler Prison for Women resulting in a consent decree requiring ADOC to address sexual abuse and harassment.[11]

77. There have also been numerous other media reports about the pervasive violence in Alabama's prisons and prison condition cases throughout the last decade.[12] In July 2025, in

---

[7] *Investigation of Alabama's State Prisons for Men*, U.S. Dep't of Justice (July 23, 2020) ("2020 DOJ Report"), https://www.justice.gov/crt/case-document/file/1297031/download.

[8] *See* Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. 2020), Dkt. No. 1.

[9] *See Duke v. Hamm*, Case No. 4:14-cv-01952-RDP (N.D. Ala. 2014). The *Duke* complaint documented six homicides within 36 months, including three in 2014, resulting in a homicide rate of 232.4 per 100,000—more than 40 times the national average for prisons.

[10] *See Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1362 (M.D. Ala. 2021), *aff'd in part*, *Dunn v. Comm'r, Ala. Dep't of Corr.*, 2026 WL 1815442, at *16-30 (11th Cir. June 24, 2026); *see also Braggs v. Hamm*, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023) (ordering parties to file a plan "to address ADOC's still grossly inadequate correctional staffing levels").

[11] *See* Consent Decree, *United States v. Alabama*, Case No. 2:15-cv-00368 (M.D. Ala. June 18, 2015), Dkt. No. 11.

[12] *See, e.g.*, *Alabama Prison Sergeant Convicted of Assault That Fractured Incarcerated Man's Skull,* Equal Justice Initiative (Apr. 16, 2025), https://eji.org/news/alabama-prison-sergeant-convicted-of-assault-that-fractured-skull-of-ephan-moore-at-donaldson/; *see also Barefield v. Dunn*, 688 F. Supp. 3d 1026, at 1047 n.1 (M.D. Ala. 2023); *Ray v. Gadson*, No. 2:20-cv-00499-RDP (N.D. Ala. 2020) (wrongful death lawsuit where ADOC settled for $250,000 after

hearings that were covered in the Alabama press, the Legislature's Joint Prison Oversight Committee heard witness testimony about violence perpetrated by ADOC staff and those in ADOC custody, with family members voicing their reasonable concerns that their loved ones will be killed while in ADOC custody. Recently, the Oscar-nominated documentary "The Alabama Solution" shed light on the extreme level of violence experienced by men incarcerated in ADOC facilities. The deathly violent conditions of ADOC prisons exposed in the film received statewide coverage, in print media ranging from AL.com to The Birmingham Times to the Alabama Reflector; and on television through national outlets like ABC News, USA TODAY, and Reuters, and on local news stations like CBS 42 and ABC 33/40.[13] The movie was also directly addressed by the State Legislature and the Attorney General.[14] The significant public attention to the movie was accompanied by state legislative hearings, also covered by the media and in which family members of incarcerated people and others again called for reforms.[15]

---

corrections officers beat a man to death at the William E. Donaldson Correctional Facility in 2019); *Hope v. Pelzer*, 536 U.S. 730 (2002) (holding that Alabama prison officials violated the cruel and unusual punishment clause of the Eighth Amendment by engaging in a practice of handcuffing an incarcerated person to a hitching post for extended periods, denying him water and bathroom breaks, and subjecting him to the sun, constituting cruel and unusual punishment).

[13] *Oscar-nominated doc 'The Alabama Solution' exposes state's deadly prisons*, ABC News (Feb. 27, 2026), https://www.youtube.com/watch?v=aNs0gXVcT6E; *Oscar-nominated "The Alabama Solution" shows unfiltered prison life*, USA Today (Mar. 6, 2026), https://www.youtube.com/watch?v=mfWUMpi5vro; *"The Alabama Solution" exposes "murder and mayhem" in US prisons*, Reuters (Dec. 12, 2025), https://www.youtube.com/watch?v=rCmH9qzbKDQ ; *"The Alabama Solution" Documentary on HBO Max*, CBS 42 (Oct. 16, 2025), https://www.youtube.com/watch?v=VLXdGb0Ortw ; *HBO documentary "The Alabama Solution" exposes dire prison conditions*, ABC 33/40 (Oct. 10, 2025), https://www.youtube.com/watch?v=VS1imm1AVto.

[14] Austin Franklin, *A.G. Marshall responds to documentary highlighting abuse within Alabama prison system*, CBS 42 (Mar. 10, 2026) https://www.cbs42.com/news/a-g-marshall-responds-to-documentary-highlighting-abuse-within-alabama-prison-system/.

[15] *See, e.g.*, Mary Sell, *Stutts, ADOC make agreement on pilot prison oversight*, Alabama Daily News (Mar. 12, 2026), https://aldailynews.com/stutts-adoc-make-agreement-on-pilot-prison-oversight/; John Sharp, *Oscar-nominated 'Alabama Solution' fuels push for prison reform: 'We need help'*, AL.com (Mar. 11, 2026), https://www.al.com/news/2026/03/oscar-nominated-alabama-solution-fuels-push-for-prison-reform-we-need-help.html.

78. The level of violence in Alabama's medium- and high-security prisons is extraordinary even within the U.S. carceral system. During FY 2017—the year examined in the 2019 DOJ Report—ADOC publicly reported a homicide rate that was approximately eight times the national average homicide rate for prisons—56 per 100,000 prisoners in Alabama, compared to seven homicides per 100,000 nationwide.[16] DOJ experts "observed that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than other similar systems" and had increased dramatically since 2013.[17]

79. Individuals incarcerated in Alabama's medium- and high-security prisons face a serious risk of excessive force from security staff, with incidents "often result[ing] in serious injuries and, sometimes, death."[18] The DOJ documented ADOC staff frequently using excessive force against even compliant or restrained prisoners, and as punishment or retribution.[19]

80. As the 2019 DOJ report found, "ADOC does not protect prisoners in its custody from death caused by prisoner-on-prisoner violence," which "is systemic and life-threatening."[20] DOJ's report recounts that deadly and near-fatal assaults are frequently committed against people incarcerated in ADOC's medium- and high-security facilities and ADOC officials have on multiple occasions failed to protect persons who specifically alerted officials to their high risk of being killed if not adequately protected. Weapons—homemade and contraband—are "ubiquitous" throughout ADOC's medium- and high-security facilities and are frequently used to deadly effect.[21]

81. In 2022, Alabama experienced a then-record number of deaths within its prison system. At least 222 incarcerated individuals died in Alabama prisons during that year, surpassing

---

[16] 2019 DOJ Report at 6 (citing DOJ's Bureau of Justice Statistics data from 2014).

[17] 2019 DOJ Report at 6.

[18] 2020 DOJ Report at 2.

[19] *See Hope*, 536 U.S. at 737 ("Alabama's systematic use of the hitching post [is] improper corporal punishment").

[20] 2019 DOJ Report at 13, 16.

[21] *Id.* at 25.

the death toll recorded during the height of the COVID-19 pandemic. Then, in 2023, Alabama recorded 325 deaths in custody—the deadliest year ever recorded, and pushing the total death count since the DOJ put Alabama on notice in 2019 of its violations of incarcerated people's constitutional rights, to more than 1,000. Several dozens of these deaths in 2022 and 2023 were suspicious or unexplained homicides, suicides, or overdoses. In the third quarter of FY 2023 alone, ADOC publicly reported five homicides, with numerous other deaths remaining under investigation.[22] In 2024, at least 277 people died in ADOC custody. Again, dozens of those deaths were homicides, suicides, or overdoses—many under suspicious or unexplained circumstances.

82. Most of these deaths occurred in the same medium- and high-security facilities which ADOC uses to compel incarcerated people into forced labor: the systemic violence, inhumane conditions, and corruption in ADOC's medium- and high-security facilities provide the coercion that forces people, as a method of survival, to perform labor directly for ADOC or for ADOC's public and private joint venture partners, through ADOC's "leasing" of laborers from its Work Release and Work Center facilities.

83. The ACLU of Alabama and ACLU National found that 72% of homicide victims within ADOC in 2024 were Black, and that many incarcerated individuals died after begging for protection and filing formal complaints. At Donaldson Correctional Facility alone, at least 24 people died in custody between January and October 2024, following a record 28 deaths the previous year.[23]

---

[22] *Fiscal Year 2023 Joint Legislative Prison Oversight Committee Quarterly Report Ending 06/30/2023*, ADOC, at 50, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding06-30-2023.pdf.

[23] *Death Capital: Data on deaths and neglect inside the incarceration capital of the world*, ACLU Alabama and ACLU Smart Justice Alabama, at 3 & 14 (Apr. 15, 2025), https://static1.squarespace.com/static/5ff49b04c6eb3c3de1ae3d62/t/67fe9bcd74620b6d12a3e3b7/1744739292529/Death+Capital+Report+2025.pdf.

84. In 2025, ADOC reports that at least 202 people died inside Alabama state prisons.[24] While the reported 2025 number is lower than in prior years, it still represents a nearly three times higher mortality rate in state prisons than the national average.[25]

85. ADOC's public reports also underscore the pervasive violence in its medium- and high-security facilities. Its September 2023 statistical report identifies 1,997 assaults in its medium- and high-security facilities during the fiscal year.[26] The ADOC September 2024 report shows 1,766 assaults in medium- and high-security facilities during the fiscal year;[27] and the September 2025 report shows 1,664 assaults in medium and high-security facilities during the fiscal year.[28] In the first half of the current fiscal year, ADOC reports a total of 711 assaults in its facilities, of which 94% occurred in medium- and high-security facilities.[29] ADOC also tracks sexual assault investigations: in just the first three months of the 2026 calendar year, ADOC's official report indicates that it opened 153 new sexual assaults and harassment investigations.[30] Based on the DOJ's indication that ADOC routinely underreports violent incidents in its facilities, it is likely that not all assaults and harassment incidents are reported. *See infra* ¶125 (Lesley describing need to attend to self-treat injuries); ¶136 (Payton describing how assaults not reported).

86. Reports of ADOC in-custody deaths and assaults tell only part of the story of the harms that incarcerated persons face in the high- and medium-security facilities. Alabama's

---

[24] Eddie Burkhalter, *Another deadly year in Alabama prisons claims 202 lives*, Alabama Appleseed (Feb. 2, 2026), https://alabamaappleseed.org/news/another-deadly-year-in-alabama-prisons-claims-202-lives/.
[25] *Id.*
[26] Monthly Statistical Report for September 2023, ADOC, at 3, https://doc.alabama.gov/docs/MonthlyRpts/September%202023.pdf.
[27] Monthly Statistical Report for September 2024, ADOC, at 3, https://doc.alabama.gov/docs/MonthlyRpts/September%202024.pdf.
[28] Monthly Statistical Report for September 2025, ADOC, at 3, https://doc.alabama.gov/docs/MonthlyRpts/September%202025.pdf.
[29] Monthly Statistical Report for March 2026, ADOC, at 3, https://doc.alabama.gov/docs/MonthlyRpts/March%202026.pdf.
[30] Fiscal Year 2026 Joint Legislative Prison Oversight Committee Quarterly (2nd) Report Ending 3/31/2026, ADOC, at 54, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding03-31-26.pdf.

prisons are sites of daily brutality and complex criminal operations often directed by correctional staff, including wardens.[31] These too have been matters of public information and media intention, with ADOC officials frequently implicated in unlawful activities and misconduct that compromise the safety of incarcerated individuals and the integrity of the system.

### 3. Documented and Well-Known Overcrowding and Staffing Shortages in ADOC Medium- and High-Security Facilities Exacerbate the Violence and Threaten the Lives and Physical Safety of Incarcerated Persons

87. The systemic violence in ADOC's facilities is not incidental—it is structural. Alabama's medium- and high-security facilities are dangerously overcrowded and catastrophically understaffed, which are driving forces behind the lethal conditions in those facilities, and compel people incarcerated in these facilities to do whatever they can to survive the constant threat of serious bodily harm or death.

88. In each of ADOC's 15 major facilities, chronic staff shortages leave entire dorms unmonitored, forcing incarcerated individuals across Alabama, including Named Plaintiffs, to navigate threats of assault, extortion, and sexual violence as a part of daily life. *See infra* Part I.C.

---

[31] In 2024, Chadwick Crabtree, the warden of Limestone Correctional Facility, was arrested and charged with manufacturing a controlled substance, possession of marijuana, possession of a controlled substance, and possession of drug paraphernalia. He was placed on mandatory leave without pay pending further personnel action. *See* Taylor Mitchell & Logan Sparkman, *Limestone Correctional Warden, wife facing drug charges*, News19 (Apr. 19, 2024), https://whnt.com/news/athens/limestone-correctional-warden-and-his-wife-facing-drug-charges/. Additionally, in 2022, Deborah Toney, then-warden of Limestone Correctional Facility, was placed on administrative leave following allegations of sexual misconduct and failure to protect an incarcerated man who was subsequently attacked and hospitalized. *See* Will Blakely, *More accusations against warden of Alabama's largest prison; no new word from ADOC*, 1819 News (Apr. 11, 2022), https://1819news.com/news/item/more-accusations-against-warden-of-alabamas-largest-prison-no-new-word-from-ado-04-08-2022. More recently, Calvin Bush, an ADOC lieutenant at St. Clair, was arrested on charges of trafficking methamphetamine and marijuana into the facility. *See* Alex Gladden, *Agents arrest Alabama prisons lieutenant on drug trafficking charges*, Montgomery Advertiser (Aug. 2, 2025), https://www.montgomeryadvertiser.com/story/news/crime/2025/08/02/alabama-prisons-officer-faces-drug-trafficking-charges/85490443007.

89. ADOC's own reports show that by mid-2023 ADOC's medium-security prisons were operating at nearly double their intended capacity, while staffing levels had dropped to just 40% of what is required. In high-security facilities like Donaldson, staffing has dropped *below 30%*, leaving entire dorms unsupervised for hours at a time.

90. Male Named Plaintiffs and retained putative Class Members attest that—just as was widely reported with respect to Tutwiler women's prison in 2014—in all of ADOC's medium- and high-security facilities for men, there is almost no way to get help with any problem, regardless of how life threatening. ADOC's male medium- and high-security facilities are generally designed with long corridors or linear dorm arrangements. In many cases, dorms are located so far from any guard station that a person in distress could not reasonably expect their screams to be heard. To reach a staffed area, one would have to pass through multiple overcrowded dorms, each posing its own risks. Male Named Plaintiffs and putative class members further report going days, weeks, or even months without ever seeing any correctional staff in the "yard," and that guard offices frequently are unmanned—especially at night. Named Plaintiffs and putative class members describe that even when staffed, the guard offices often have only one staff member on duty, and that staff member is frequently nonresponsive to incarcerated individuals' pleas for help or protection.

91. ADOC's facilities were designed for a total in-house population of no more than 12,115 individuals.[32] Yet, according to the September 2023 statistical report published by ADOC, the state prison system currently houses 20,361 people, the vast majority of whom are housed in medium- and high-security facilities.[33] Specifically, ADOC's high-security facilities have a total designed capacity of 5,637 beds, but the month-end population in September 2023 exceeded that capacity by 2,661 individuals. ADOC's medium-security facilities have a total designed capacity of 4,690 beds, but the month-end population in September 2023 was 8,881—nearly double the

[32] Monthly Statistical Report for September 2023, ADOC, at 2.
[33] *Id.*

designed capacity.[34] At the end of September 2024, the population in ADOC's high-security facilities exceeded the design capacity by 2,820; and population in medium-security facilities exceeded the design capacity by 4,064, meaning the population was nearly double the design capacity.[35] And at the end of September 2025, the populations in both types of facilities exceeded design capacity by more than the prior year: ADOC's high-security facilities exceeded design capacity by 2,941; and population in medium-security facilities exceeded the design capacity by 4,477.[36]

92. This overcrowding is coupled with ADOC understaffing that the DOJ found in 2019 to be "at a crisis level" and that has significantly worsened since then.[37] Over the past decade, the ADOC's security staff has plummeted. At the end of FY 2014, the ADOC employed 2,915 security staff.[38] At the end of FY 2024, the ADOC employed 1,986 security staff, a nearly 32% decrease from ten years earlier.[39] Although complete staffing data is not available to the public, ADOC public records reveal that in 2023, ADOC reported one of the lowest staffing levels in the past ten years, when the ADOC reported having a total of 1,763 security staff members, which is nearly 40% lower than the staffing levels reported in 2014.[40]

93. According to the status report filed by the parties in the ongoing *Braggs et al. v. Hamm et al.*, Case No. 2:14-CV-00601-MHT (M.D. Ala.), on March 10, 2025, ADOC's fourth quarter FY 2024 staffing report filed with the Court reveals that ADOC's staff vacancy rate still

---

[34] *Id.* at 3.
[35] Monthly Statistical Report for September 2024, ADOC, at 3.
[36] Monthly Statistical Report for September 2025, ADOC, at 3.
[37] 2019 DOJ Report at 9.
[38] Annual Report Fiscal Year 2014, ADOC, at 7, https://doc.alabama.gov/docs/AnnualRpts/2014AnnualReport.pdf.
[39] Fiscal Year 2024 Annual Legislative Statistical Report, ADOC, at 12, https://doc.alabama.gov/docs/AnnualRpts/AnnualLegislativeStatReport-FY2024.pdf.
[40] Fiscal Year 2024 Joint Legislative Prison Oversight Committee Quarterly Report Ending 12/31/2023, ADOC, at 5, https://doc.alabama.gov/docs/QuarterlyRpts/QuarterlyEnding12-31-23.pdf.

exceeds 50 percent, leaving all but one of ADOC's facilities significantly understaffed.[41] As the *Braggs* plaintiffs report:

> Eight facilities have vacancy rates above 50 percent and all remaining facilities—except Hamilton A&I—have rates at or above 44 percent. Three facilities continue to have rates at or above 70 percent (Bullock, Easterling, and Ventress).
> …
>
> Bullock, which has a population of 1,535 incarcerated individuals, should have a total of 322.17 officers. Currently, there is a deficit of 241 officers. At Donaldson, another mental health hub with a population of 1,433 incarcerated individuals, there are nearly 260 vacancies for correctional staff. Altogether, ADOC has a shortage of 1,569 officers.[42]

94. Indeed, according to the following chart filed in the March 2025 *Braggs* status report, reproduced below, in the more than 10 years since plaintiffs in *Braggs* filed their action seeking urgent attention to the crisis level of understaffing, the staffing situation has worsened significantly.[43]




[41] Joint Statement on Correctional Staffing Trends, *Braggs v. Lovelace,* Case No. 2:14-CV-00601-MHT (M.D. Ala. 2014) ("March 2025 *Braggs* Status Report"), Dkt. No. 4329 at 4.

[42] *Id.* at 4-5 (internal footnotes removed; citing Monthly Statistical Report for December 2024, ADOC, at page 4).

[43] *Id.* at 12.

95. Again, as summarized by the plaintiffs in the March 2025 *Braggs* status report:

> In 2014—the year [*Braggs*] was filed—ADOC had 2,915 correctional staff, which included 236 correctional officer trainees. In 2017—the year [the *Braggs*] Court issued its Liability Opinion—ADOC had 2,146 correctional staff, including 90 correctional officer trainees but excluding cubicle operators and wardens. In 2021—the year [the *Braggs*] Court issued its Omnibus Remedial Order—ADOC had 2,225 correctional officers, including 73 cubicle operators as well as an unspecified number of correctional officer trainees and wardens. Sadly, now [in March 2025]—despite including every category of correctional staff that it employs—ADOC has only 1,986 correctional staff. That is 239 fewer officers than it employed three (3) years ago.[44]

96. In March 2026, ADOC filed a January 12, 2026 staffing report in *Braggs* that reflected continued, severe understaffing. According to that report, in the quarter ending September 30, 2025, there were 1,862.5 correctional staff. ADOC reported that it employed 307 people in correctional supervisor positions, but had 183.74 vacancies on September 30, 2025; and it employed 1,555.5 other non-supervisory correctional staff, but had 1,634.49 vacancies for such positions on September 30, 2025. In other words, of the 3,680.73 assigned correctional personnel positions in ADOC facilities, only 1,818.23 were filled at the time of the report—a staggering, ADOC-reported 49.4% vacancy rate. At multiple ADOC facilities, there were more reported *vacancies* for non-supervisory positions than there were actual staff, including: at Bibb, 123.5 non-supervisory correctional staff, but 152.76 vacancies; at Bullock, 72 non-supervisory correctional staff, but 206.36 vacancies; at Donaldson, 147.5 non-supervisory correctional staff, but 216.88 vacancies; at Easterling, 55.5 non-supervisory correctional staff, but 154.91 vacancies; at Elmore, 64 non-supervisory correctional staff, but 82.85 vacancies; at Staton, 125 non-supervisory

---

[44] March 2025 *Braggs* Status Report at 12-13 (internal footnotes removed; citing 2014 Annual Report Fiscal Year 2014, ADOC, at 38; Annual Report Fiscal Year 2017, ADOC, at 42. https://doc.alabama.gov/docs/AnnualRpts/2017AnnualReport.pdf; Fiscal Year 2021 Annual Legislative Statistical Report, ADOC, at 12, https://doc.alabama.gov/docs/AnnualRpts/AnnualLegislativeStatReport-FY2021.pdf).

correctional staff, but 135.03 vacancies; and at Ventress, 75 non-supervisory correctional staff employed, but 146.26 vacancies.[45]

97. These extreme levels of deliberate understaffing result in violent incidents in medium- and high-security facilities that often go unnoticed and unreported by correctional staff. The physical design flaws of ADOC's facilities compound the issues created by understaffing. *See supra* ¶74. The understaffing and poor facility design means incarcerated individuals are typically unable to secure timely assistance of any kind—including medical assistance—let alone protection from the persistent and foreseeable violence they endure on a daily basis. Dormitories in these facilities often have so few staff that incarcerated people are essentially unsupervised for hours or shifts at a time in areas rife with weapons. The predictable result has been that acts of horrific violence and sexual abuse occur in ADOC facilities without any intervention from prison officials, including such horrors as hostage-taking and torture lasting days.[46]

98. In short, the severe overcrowding and understaffing in ADOC facilities, detailed in multiple ADOC reports as described in the preceding paragraphs, create life-threatening and dangerous conditions for all individuals incarcerated in ADOC facilities. Ivey, Lovelace, and Hamm cannot plausibly deny knowledge of the dangerous conditions that exist in ADOC facilities, particularly medium- and high-security facilities; nor can they deny the knowledge that, as a result, any threat to extend Named Plaintiffs' period of incarceration in these facilities involves a threat to their physical wellbeing.

#### 4. Named Plaintiffs Have Experienced Violence and the Threat of Violence in ADOC's Facilities and Suffered Physical and Emotional Harm as a Result

99. Named Plaintiffs and retained putative Class Members report that at ADOC's medium- and high-security facilities, violence and danger of physical and emotion harm are

---

[45] Notice of Filing the January 12, 2026 Amended Quarterly Correctional Staffing Report by Alabama Department of Corrections, Deborah Crook, John Q. Hamm, *Braggs et al. v. Lovelace et al.*, Case No. 2:14-cv-00601 (M.D. Ala. Jun 17, 2014), Dkt. No. 4470-1.
[46] 2019 DOJ Report at 9, 35–39.

pervasive. Particularly at the men's high- and medium-security facilities, Named Plaintiffs describe being surrounded by unrelenting and extreme physical assaults, homicides, sexual abuse, demands to engage in criminal actions of correctional staff and other incarcerated people working with them, and psychological torment.

100. Michael Campbell (Kilby, Bibb). Mr. Campbell has experienced extreme violence while in ADOC's custody, including witnessing multiple assaults of incarcerated persons. ADOC officers have been indifferent to, and sometimes involved in, these incidents. Once, while incarcerated at Kilby in approximately 2018 or 2019, ADOC officers made him and approximately 200 other incarcerated men strip naked and throw their clothes in the shower. The officers then lined them up and slapped many of them in the face. Mr. Campbell has been incarcerated at Kilby three times and witnessed similar punishments being administered each time. He understands that punishments like this continue to this day at Kilby.

101. During his time at Bibb, Mr. Campbell observed violence against incarcerated individuals repeatedly, including many fights, and found that the ADOC guards were often not present and did not help incarcerated people in danger or distress. Mr. Campbell once saw an incarcerated person stab six or seven others, but no guards were present in the dorm to assist the people who had been stabbed.

102. Toni Cartwright (Tutwiler). During her incarceration, Ms. Cartwright witnessed and experienced extreme violence at the hands of ADOC officers and other incarcerated people. Ms. Cartwright reports that the violence is particularly bad at Tutwiler (the higher-security facility for women), because many of the people incarcerated at Tutwiler are there for serious charges and have long sentences, and do not care what happens to them. On one occasion in early 2025 at Tutwiler, Ms. Cartwright was attacked by another incarcerated person who pulled out one of her dreadlocks. In August 2025 at Tutwiler, Ms. Cartwright was again attacked by another incarcerated person, who stabbed her numerous times, including stabbing her hands and arms, which caused persisting nerve issues in his hands. She was attacked again in September 2025 at Tutwiler by an incarcerated person who punched her in the head with a lock. ADOC officers did nothing to protect

Ms. Cartwright from these brutal attacks. Ms. Cartwright has also experienced severely overcrowded ADOC facilities, and there are not enough toilets and showers for all of the incarcerated people to comfortably use.

103. Rashaad Clark (Kilby, Draper, Staton, Bullock, Limestone). While incarcerated in ADOC facilities, Rashaad Clark has also been exposed to regular violence. He has witnessed violence between and among incarcerated people, including suffering violence from other incarcerated people himself, which the rampant overcrowding in ADOC facilities and ADOC's systemic understaffing and corruption among ADOC personnel exacerbate and even foster. Rashaad Clark also has seen violence against incarcerated people from ADOC personnel. He has witnessed guards assault incarcerated people, and has been assaulted himself by guards. At each of the higher security facilities where he has been assigned, he observed violence "all day, every day."

104. When Rashaad Clark first was incarcerated by ADOC, he was incarcerated at Draper, a high security facility, after a brief period for sorting at Kilby. Although he was a juvenile and held in the juvenile section, the juvenile area was on the same hallway with incarcerated adults. While in the juvenile section, he repeatedly witnessed ADOC Sergeant Pettaway slap juveniles. Sergeant Pettaway attempted to hit Rashaad Clark and when he protected himself, Sergeant Pettaway sent him to work on a farm, uncompensated, for 60 or 90 days as punishment, where Rashaad Clark literally worked outside with a ball and chain attached to his ankle. Also while at Draper as a juvenile, Rashaad Clark saw a female Captain repeatedly spit on other juveniles. Also while at Draper, he was hit in the head with a stick by Officer Mills, which knocked Rashaad Clark unconscious. A few years later, in or about 2015 or 2016, after he had been transferred to other facilities and then returned to Draper briefly, he returned from work one day and an incarcerated person came up behind him and choked him unconscious. He was found by another incarcerated man in the shower, who helped him get assistance. In Rashaad Clark's experience, a consistent aspect of every medium- and high-security facility to which he has been assigned, including Draper, is extreme understaffing by ADOC, so that a person injured inside a dorm is unlikely to be assisted or even found by ADOC personnel.

105. After Draper, Rashaad Clark was assigned to Staton, a medium custody ADOC facility. ADOC assigned Rashaad Clark twice to Staton, first for a period after Draper, and then again in 2024. While at Staton on both occasions, he daily witnessed a great deal of violence. In 2024, Rashaad Clark saw an officer hit another incarcerated person right in front of him: the officer punched the person extremely hard, causing the victim to have a seizure and die. Because ADOC assigned Rashaad Clark to one of the most dangerous dorms inside Staton, Rashaad Clark worked as a runner, which was a critical way of trying to keep himself safe, as it allowed him to get out of the violent dorm, where Rashaad Clark rarely, if ever, saw ADOC personnel, other than during the brief "count" each day.

106. ADOC moved Rashaad Clark to Bullock, a medium custody facility, in or about 2016. Rashaad Clark believes Bullock was the most violent place he has been incarcerated. Rashaad Clark describes Bullock as being so violent that one needs to stay out of the dorms in order to survive, because many of the people incarcerated in that facility were using drugs or were mentally ill and were very unpredictable. In 2016, while assigned to I Dorm, Rashaad Clark was once attacked by another person in the middle of the night with knives. Everyone in the dorm yelled for help, but no guard arrived. Rashaad Clark was forced to fend for himself to escape the attack. In or about 2016, Rashaad Clark was also violently hit by the riot team while at Bullock although he was fully complying with their directives.

107. While assigned to Bullock in or around 2016, during Ramadan, Rashaad Clark saw an incarcerated man ambushed by his attackers, who came at him from multiple directions. The attackers threw some type of boiling liquid on him on his face and his skin started to peel off. Then the attackers stabbed him in the back. The man that was attacked tried to leave the dorm, but Rashaad Clark saw ADOC Lieutenant White, who was in the hallway, shove the man back into the dorm, where the man bled out and died. Lt. White never came back to check on the man. Instead, Lt. White sent a sergeant and a corrections officer, each of whom Rashaad Clark saw stand there and watch in shock as the victim was bleeding out. At one point, Rashaad Clark yelled,

and the sergeant and officer snapped out of it. Rashaad Clark recalls that the stabbing was so bad that he could see exposed bone and other things hanging off the victim.

108. Two of the dorms, F and G dorms, were at the end of a long hallway and were known as "The Bottom" because the hallways were concrete and they were a longest distance from a staff office (often called the "cubes"). When there were deaths or violence in the Bottoms, Rashaad Clark saw that people could bang on the doors and yell all they wanted, but no one heard them. The staffing at Bullock is extremely limited, and Bullock was designed with a long hallway along which doors and gates are placed, making it difficult to get assistance. Rashaad Clark witnessed at least one violent rape there.

109. While at Bullock, Rashaad Clark worked as runner, as he had at Staton, which both helped him get away from the violence in the dorms and allowed him to see for himself how few guards were assigned to supervise the various dorms and yards. He observed that there were often times where there was no guard in the office, meaning that no one could see or assist if an incarcerated person got injured. As a runner, Rashaad Clark also was assigned to move the bodies of people who had died from overdoses or stabbings on more than ten occasions, using a roller that was meant to move the trash.

110. Rashaad Clark saw approximately 500 people sleeping on the floor at Bullock. In Rashaad Clark's experience, Bullock has a large mental health population who really need help, but Rashaad Clark observed ADOC personnel consistently treat that population them like they are nothing. Mr. Clark does not think ADOC staff have the proper training to deal with the mental health population.

111. Recently, in 2025 and early 2026, ADOC assigned Rashaad Clark to Limestone, a high-security facility. At Limestone, the violence he observed was just as severe and consistent as the violence he witnessed at Bullock, with all the same causes and escalating factors: overcrowding, ADOC understaffing, corruption, drug use and untreated mental illness.

112. Rashaad Clark has observed that this brutal violence was a regular occurrence at the ADOC high- and medium-security facilities where has been assigned. Rashaad Clark has

observed that the violence is indiscriminate at these facilities, which is part of what makes it so dangerous because it is impossible to guarantee your own safety regardless of where you are in those facilities. He saw many people get stabbed in front of him at the medium- and high- security facilities where he has been incarcerated.

113. Trevion Clark (Easterling, Draper, Alex City). Trevion Clark has been housed in some of ADOC's most dangerous facilities. He describes Easterling, for example, as a "murderous place." At Draper, where Trevion Clark was housed beginning in approximately 2013, ADOC officers committed violence against incarcerated people openly and without consequence, pointing guns at them, sexually assaulting them, and beating those who refused to work for ADOC. Trevion Clark describes his time in Draper as hopeless; he had no hope, and no choice but to do what officers said. In 2013, Trevion Clark witnessed a sergeant wearing steel-toed boots stomp the head of an incarcerated person who had said he did not want to work on the farm. ADOC subsequently promoted that sergeant to lieutenant. In 2015, the situation at Draper reached a breaking point: incarcerated people barricaded themselves inside by tying the doors shut with sheets and hoses and deploying chemicals to protest the unsafe conditions inside the facility, including unsafe working conditions on the farm. In response, ADOC dropped tear gas to clear the dorm.

114. At Alex City, a work release center where Trevion Clark was housed from March 2024 to May 2025, the facility held approximately 240 people in a space designed for roughly 75. There was no central air conditioning, and the dorm reached extreme temperatures. There were no dividers between the toilets in the bathrooms, and incarcerated people were required to lower their pants with their backs to others standing in close proximity, which created a persistent and serious risk of sexual violence.

115. Jerame Cole (Donaldson, Draper, Limestone). Mr. Cole has witnessed and experienced severe and pervasive violence and uninhabitable conditions during his time in ADOC custody at each of the high- and medium-security facilities where he has been assigned. Mr. Cole has also witnessed unlawful activities by ADOC personnel at every facility where he has been assigned, including ADOC personnel selling drugs, phones, and weapons. Mr. Cole has witnessed

numerous deaths of incarcerated people at the hands of ADOC officers. For example, in 2020 at Donaldson, Mr. Cole observed ADOC officers beat an incarcerated person to death. The individual was housed in lockup, and he was experiencing a mental health crisis and banging on the door of his cell. Officers entered the man's cell and beat him, ultimately killing him.

116. At Draper, a medium-security men's facility where Mr. Cole was incarcerated from approximately 2013 to 2016, there was a well-known practice of guards forcing incarcerated people to fight each other if they were disciplined, referred to as "gladiator school." Mr. Cole experienced "gladiator school" after ADOC issued him a disciplinary at Childersburg and sent him "behind the fence" to Draper in approximately March 2013. Sergeant Mack at Draper was known for slapping incarcerated people in the face. The slaps Mr. Cole observed were hard, often knocking the person down to the ground.

117. While at Limestone in approximately 2023, Mr. Cole also witnessed incarcerated people walking around the "I" Dorm with machetes, axes, and other weapons, and observed frequent theft among incarcerated people due to the complete absence of guards in the dorm overnight.

118. Danny Dandridge (Holman, Staton, St. Clair, Bibb). Mr. Dandridge was exposed to profound violence in Alabama's prisons. Six examples are illustrative: First, in 2014 at Holman, he saw an incarcerated man throw some kind of acid (known as "liquid fire") on the face of another incarcerated man in the cafeteria. The victim's face melted, and he was in the hospital for seven months. His face was entirely reconstructed when he returned. Second, in 2016 at Staton, Mr. Dandridge saw a person throw a hot mixture containing shaving powder, water, and baby oil on another man's skin, which started to melt. The victim collapsed in the middle of the basketball court. Third, in 2018 at St. Clair, an incarcerated man was set on fire in his cell. Fourth, in 2020 at Bibb, he saw two incarcerated men stab another man multiple times. Mr. Dandridge stopped them, and had he not, the victim would have been killed. He rushed the victim to the infirmary and there was blood everywhere. The ADOC officer who was supposed to be monitoring the area was unaware the victim had even been attacked. Fifth, Mr. Dandridge saw a man he knew growing up

named Rico Lewis get murdered only five or six paces away from him in Holman; incarcerated people had to carry the man to the infirmary, because there were no guards in sight. Mr. Dandridge had to call the victim's sister to let her know what had happened. Sixth, in 2022 at Bibb, Mr. Dandridge saw an incarcerated man nicknamed "Hut" get stabbed to death by another incarcerated person.

119. The extreme violence Mr. Dandridge experienced was sometimes tied directly to ADOC's efforts to exert control over incarcerated workers. On one occasion, ADOC sent Mr. Dandridge and four other individuals from Childersburg work release to St. Clair as punishment. ADOC was punishing Mr. Dandridge for receiving a "refusal to work" disciplinary that he received not because he refused to work but because his supervisor at the City of Childersburg did not like that Mr. Dandridge had identified a more efficient way for the team to cut the grass. ADOC sent Mr. Dandridge to St. Clair for 90 days. Mr. Dandridge recalls that three of the people ADOC sent with him from Childersburg to St. Clair had never before been assigned to a medium- or high-security facility. After arriving at St. Clair, he saw the three who had never before been assigned to a medium- or high-security facility get violently gang-raped while the guards did nothing. One victim ran to the shift office, screaming for help, but the guards placed him back in population where he was subsequently raped again.

120. In addition to being punished by being sent to St. Clair, where the rapes happened, ADOC also punished Mr. Dandridge by transferring him to Bibb in 2020. The transfer was initiated by ADOC Lieutenant Noland, who Mr. Dandridge had previously had a disagreement with. Mr. Dandridge was housed at Bibb from 2020 to 2022, which was then known as "Bloody Bibb" because of the violence. He witnessed several murders there and helped rush several people to the infirmary to save their lives.

121. While at Draper in approximately 2014 or 2015 for six months, Mr. Dandridge witnessed frequent beatings by ADOC officers of people who refused to work the nearby fields. Plaintiff Dandridge also witnessed officers handcuff incarcerated people, line them up, and slap them so hard they would fall like dominoes.

122. Alimerio English (Ventress, Hamilton, Decatur). ADOC subjected Mr. English to violence and inhumane conditions across multiple facilities. At Ventress, Mr. English witnessed and was directly involved in multiple incidents of extreme violence. One night, his neighbor—a known drug user—was raped by three other incarcerated people who were attempting to "wake him up" after an overdose. The man was already dead. When they could not wake him, they dragged his body to the front door and left it there. There was never an investigation. Mr. English describes this incident as having traumatized him permanently. Also at Ventress, Mr. English learned that an incarcerated person had been raped by the chapel's piano player. Mr. English reported the assault, and an ADOC captain confirmed it on camera footage. ADOC's response, however, was merely to transfer the piano player to a different dorm because, in ADOC's assessment, he was the best musician the facility had. ADOC returned the piano player to the dorm six months later. The victim subsequently pleaded with ADOC to be placed in protective custody because he feared for his life. ADOC refused. The victim was killed that day.

123. Mr. English has also been personally assaulted while in ADOC custody. At Hamilton Work Release, for example, he was physically assaulted by another incarcerated person. ADOC took no action against the perpetrator and instead claimed, contrary to what occurred, that Mr. English had slipped and fallen. Mr. English was also sexually assaulted by an ADOC officer while at Decatur Work Release. The assault was confirmed by an ADOC official who reviewed camera footage showing that it occurred, but the officer faced no meaningful consequence. When Mr. English reported the assault and continued to raise concerns about his working conditions, ADOC retaliated against him—events described further below, *infra* ¶654.b. Due to chronic understaffing, ADOC had effectively ceded control of significant portions of several facilities to groups of incarcerated people. Mr. English observed ADOC allow these groups to lock other incarcerated people out of dormitories entirely, forcing them to sleep on the basketball court because the groups controlling the dorms would not permit entry.

124. Larry Jarmon (Ventress, Donaldson, Decatur). During his incarceration, Mr. Jarmon has witnessed and been subjected to extreme violence, particularly at the medium- and

high- security facilities in which he has been housed. On one occasion in approximately 2015 while incarcerated at Ventress Correctional Facility, he was attacked by another incarcerated person and stabbed. Mr. Jarmon still bears the visible scars regarding this attack. Although Mr. Jarmon did not receive a written disciplinary infraction for this incident, ADOC sent him to solitary confinement for six months because of it. Mr. Jarmon has also observed violence from ADOC guards against incarcerated people. For example, at Donaldson in 2016 he saw seven guards attack and beat with sticks a man suffering from mental health issues; they later claimed that they were just detaining him. Another time, at Decatur Work Release, the guards knocked an incarcerated person's teeth out and gave him two black eyes. He has also seen other violence inflicted by guards, including punching and slapping incarcerated people in the face. While most of this violence took place at non-work-release, higher security facilities, there is also a risk of violence from guards at work release facilities because incarcerated people are more vulnerable there, and are less likely to object to avoid getting sent behind the fence. The violence behind the fence is worse because it seems like there are no rules there, and anything goes; there is a regular threat of violence from both guards and other incarcerated people.

125. Joseph Lesley (Limestone). Mr. Lesley experienced severe violence while incarcerated in ADOC facilities, including being stabbed several times by other incarcerated people. The medical care at ADOC facilities is so poor that Mr. Lesley treated his own injuries, rather than seeking out substandard medical care, and on multiple occasions he treated himself by using super glue to close his own stab wounds. Mr. Lesley also witnessed extreme violence and death while incarcerated, as illustrated by several examples, all of which took place at Limestone in approximately 2024 or 2025. First, Mr. Lesley saw one incarcerated person killed after he was stabbed through the chest with a knife that was so long that it went through the man's entire body and came out the other side. Second, Mr. Lesley saw an incarcerated person stabbed in the head with a hatchet. Third, Mr. Lesley saw one incarcerated person attempt to steal a pack of cigarettes and other small items from another incarcerated person, and when the victim attempted to fight him off, he stabbed the victim approximately 36 or 37 times. These acts of violence were routine

at ADOC facilities, especially the medium- and maximum-security facilities where incarcerated people had "nothing to lose." Mr. Lesley observed violent beatings and assaults nearly every day. Mr. Lesley also observed guards frequently assaulting incarcerated people, including slapping them in the face and slamming them to the ground. The violence from guards was especially bad behind the fence, but occurred in work release facilities too.

126. Turner Mason (Limestone). Mr. Mason witnessed severe violence and deaths in Limestone. On one occasion, an incarcerated person at Limestone wrote a note to ADOC staff to report that he was being threatened with rape and that his life was in danger in the dorm to which was assigned. In response, the ADOC officer laughed at the note and threw the note away and returned the man to the same cell and dorm. Ultimately, the man who tried to report the rape threat killed his cell mate in self-defense, after which the guards handcuffed the man and beat him severely. Mr. Mason recalls seeing that the beaten man's face was so disfigured, it looked like "cheese." In Mr. Mason's experience, much of the violence in Limestone is meted out by the guards; there are cameras inside the dorms, but guards will take incarcerated people outside of the dorms, where there are no cameras, beat them, and then power-wash the blood off the sidewalk. Mr. Mason himself has also experienced severe violence at Limestone. After prisoners in his dorm asked Mr. Mason to smuggle drugs into the dorm and Mr. Mason refused, one of the prisoners approached Mr. Mason from behind and sliced his face open with a razor blade. Mr. Mason required medical care and received several stitches in his face.

127. Frederick McDole (Bullock, Ventress). At both Bullock and Ventress, Mr. McDole witnessed stabbings, beatings, and other violence on a frequent basis. He describes living inside those facilities as like living in the jungle. The violence was constant and of many kinds: violence between incarcerated people, including over sexual assault and mental health crises, and violence inflicted by correctional officers. Stabbings and beatings were so routine that violence became the norm; the violence was so pervasive that Mr. McDole struggles to recall specific incidents, as it was just a way of life in ADOC custody. A major cause of the pervasive violence was the near-total absence of correctional staff inside the dormitories. With no officers in close proximity, there

was usually no one to intervene when violence broke out. Mr. McDole contrasts his experience in ADOC's higher-security facilities with the time he served in a federal correctional facility prior to his ADOC incarceration. The federal facility, while difficult in its own ways, was far safer and more structured. ADOC's facilities are wild and lawless by comparison. Notably, in federal prison, incarcerated people were also free to decline the jobs they were offered without risk of being punished by officers.

128. Lee Moore (Staton, Fountain, Bullock, Holman). Mr. Moore has personally witnessed and experienced repeated incidents of violence, retaliation, and staff corruption at the high and medium-security facilities to which he has been assigned, including Staton, Fountain, Bullock, and Holman. He has experienced a culture in ADOC facilities to which he has been assigned in which ADOC correctional officers regularly use excessive force without provocation and without any appearance of concern for legal or other consequences. For instance, at Fountain Correctional Facility, Mr. Moore observed many stabbings and recalls ADOC officers beating an incarcerated man who could not physically comply with a verbal command to lie down, punching the man repeatedly. At Fountain Correctional Facility, he also witnessed an incarcerated individual tied up and denied food for a week due to an unpaid debt—an example of the widespread extortion and abuse that he has seen ADOC officers routinely ignore or facilitate. At Staton, he recalls seeing an incarcerated man beaten by ADOC officers until incarcerated people came forward to protect him. Mr. Moore has also witnessed sexual assaults of incarcerated individuals related to drug debts, enabled in part by contraband introduced by ADOC staff.

129. In recent months, Mr. Moore has noticed that leadership at Holman Correctional Facility has curtailed officer-on-incarcerated violence simply by reviewing camera footage and writing up offending staff. This shift suggests that the violence he has long endured in ADOC facilities has been deliberate and preventable. In Mr. Moore's experience, he has observed that ADOC officers rarely intervene to stop harm, often out of fear of retaliation or allegiance to corrupt practices. In his view, violence has worsened in recent years as the collapse of the parole system has eroded any incentive for individuals to follow rules or avoid conflict.

130. Deckrice Morrissey (Tutwiler). Ms. Morrissey has witnessed physical violence inflicted by ADOC officers against other incarcerated women, particularly at the higher-security Tutwiler facility. In 2014 when she was housed at Tutwiler, Ms. Morrissey witnessed an ADOC officer slam an incarcerated woman into a wall and yank her arm behind her back. The woman pleaded with the officer to stop, put he continued to pull her arm. The woman was transported to the hospital shortly after she was assaulted by the officer, and the next time Ms. Morrissey saw her, her arm was in a cast because the ADOC officer had broken it. At Tutwiler, Ms. Morrissey also witnessed an ADOC officer slam an incarcerated woman down on the ground so hard that he knocked the wind out of her, and then place his knee on her back, further preventing her from breathing.

131. Pierre Payton (Limestone, Kilby, Bullock, Fountain). Beginning in 2012, ADOC assigned Mr. Payton to Limestone, after approximately two months in Kilby, due to his juvenile offender status. At Kilby was his first exposure to extreme violence at ADOC: assigned to K dorm, he saw four ADOC officers, some of whom are still employed by ADOC as officers, kill two different incarcerated men. First was a young man from Dothan, Alabama, who was standing by his bed when the guards came through to do the count. Mr. Payton watched the officers direct the man to go outside and then watched from the dorms as they made him do push-ups with one of the officers placing his boot on the man's back while in the push up. When the man asked why he was being punished, Mr. Payton and the other incarcerated men in the dorm watched the four officers beat the man to death. While in the yard, he saw the same ADOC officers beat an incarcerated man in his sixties or seventies who had some sort of heart condition. Mr. Payton and others in the yard watched the officers drag the elderly man by his ankles to the tower (a central building at Kilby), killing him. Mr. Payton saw repeated violence by ADOC personnel toward incarcerated people at Kilby.

132. Once at Limestone, where ADOC assigned him for about a year, he was assigned to the juvenile offender area, which was separate from other dorms at Limestone. While at Limestone, he witnessed abusive behavior repeatedly, directed predominantly at the Black

incarcerated juvenile offenders by ADOC personnel. Mr. Payton personally experienced an ADOC officer, who he believes is still employed by ADOC today, stop him for having his shirt untucked, while saying nothing to the three white men in line in front of him also with their shirts untucked. The ADOC Sergeant asked Mr. Payton whether he wanted a "slap" or push-ups as punishment. Mr. Payton chose push-ups as he saw ADOC officers slap many incarcerated juveniles, mostly the Black incarcerated juveniles, while at Limestone. He recalls seeing the "slap" from ADOC officers render at least five different incarcerated juveniles unconscious.

133. In 2014, ADOC assigned Mr. Payton to Bullock, which is a Level IV and mental health facility. At Bullock, ADOC assigned him to F dorm, a part of the facility known as the "bottoms" because it was so far from the guard's "cubes," which are protected areas where the officers sit. While at Bullock, Mr. Payton noticed that officers stayed in their cubes while incarcerated people in the dorms, such as F and G dorms, got stabbed, killed and raped. Mr. Payton saw incarcerated people beating on the door to get help from ADOC personnel and he saw people die that way, screaming for help. He saw many rapes, assaults and deaths at Bullock. Mr. Payton observed that the violence he saw was exacerbated by the fact that many of the officers were young and were themselves gang members. To Mr. Payton, the whole facility seemed crooked, with wardens and captains supplying the gangs with drugs.

134. While at Bullock, Mr. Payton saw ADOC's riot team beat up Plaintiff Rashaad Clark. At Bullock, Mr. Payton witnessed violence daily. It never stopped. He saw incarcerated people on mental health status doing meth amphetamines and smoking "flocka," yielding wild, unpredictable and violent behavior. Mr. Payton saw incarcerated people tied up under beds, being raped, and not being allowed for days to eat as the gangs tried to get them to pay debts. Mr. Payton quickly realized that there was no way to complain because the guards at Bullock were part of the problem. Mr. Payton notes that ADOC Officer Chambers was at Bullock at the time and ultimately, Officer Chambers was arrested and charged for getting drugs and having sex with incarcerated people.

135. Although Mr. Payton diligently focused his efforts on coursework and stayed far away from drugs, alcohol and all of the crooked dealings around him at Bullock—including refusing to have or use a cell phone peddled by ADOC officers—he could not avoid harm. One day, while sitting in his bunk reading his GED textbook, Mr. Payton was attacked by an incarcerated person who he knew from childhood, but who was high on some sort of methamphetamines. Although he only defended himself from the attack, Mr. Payton was placed in solitary confinement for four months and then transferred to Fountain where he was issued a disciplinary.

136. After ADOC transferred Mr. Payton to Fountain, Fountain placed him for his first thirty days in what was known as the "hot cell," which is where ADOC at Fountain placed incarcerated people it wanted to punish. He was placed in the hot cell because of the attack while at Bullock, for which he was issued an "assault on an inmate" disciplinary, even though he was the victim, not the perpetrator, of the assault. While in the hot cell, he could hear incarcerated men in the larger section of the hot cell yelling at ADOC personnel to get off or stop beating other incarcerated men there. He heard many accounts about those beatings by ADOC personnel from the other incarcerated men in the hot cell. ADOC assigned Mr. Payton to Fountain for six years, during which he saw every type of violence, often daily, along with systemic corruption. He saw Captains and officers bringing dope and phones into the facility and selling it to incarcerated people. He observed numerous assaults, beatings, deaths, and rapes at Fountain, along with the same persistent understaffing as at Bullock. He saw stabbings every day and unlike at other ADOC facilities where he had been assigned previously and since then, at Fountain, he saw that most of the violence was not reported. He regularly saw people get stabbed at Fountain and the perpetrator was not only not charged, but ADOC put the perpetrator right back in the same dorm with the person they stabbed. At Fountain, he only saw violence between and among incarcerated people as ADOC's practice at Fountain was to take incarcerated people to the "hot cell" for beatings by ADOC personnel.

137. Eric Prewitt (Ventress, St. Clair, Limestone, Fountain). Mr. Prewitt has experienced dangerous, violent, and retaliatory conditions while incarcerated at ADOC. Mr. Prewitt's experience is that the violence is constant and normalized in ADOC medium- and high-security facilities; he could meet someone one day, and they would be dead a week later. He has witnessed multiple stabbings, which occurred at Ventress, St. Clair, and Limestone. He has also witnessed multiple overdoses and beatings, and two friends were killed at Fountain. For this reason, he understands a threat to send him back to a medium- or high-security facility to carry with it the risk that he will be harmed. One of the reasons the medium- and high-security facilities are so dangerous is because ADOC guard responses to violence, if they occur at all, are often delayed because gates are locked. It can take as long as five minutes for guards to be cleared, which allows the violence to escalate and leaves ADOC unable to intervene in time to protect victims.

138. Lanair Pritchett (Limestone, Kilby, Easterling, Donaldson, Ventress, Elmore, Draper). Mr. Pritchett has been exposed to extreme violence at numerous ADOC facilities, including the high- and medium-security facilities where he has been placed while in ADOC custody: Limestone, Kilby, Easterling, Donaldson, Ventress, Elmore, and Draper. He has witnessed stabbings, rapes, and other violence, and feels constant fear that he will again be transferred "behind the fence" to confront life-threatening conditions. One particularly vivid example is that, while at Donaldson in approximately 2020, Mr. Pritchett was on the phone and saw a man stabbed who was standing right beside him, close enough to spatter blood on his shoes. Another example concerns violence against Mr. Pritchett: while in his bunk at Elmore in approximately 2017, an incarcerated man threw hot baby oil and shaving powder on Mr. Pritchett while he was sleeping, and he suffered burns across his left arm and back, spending about two weeks in the infirmary as a result.

139. Mr. Pritchett also has experience requesting assistance and protection from violence from ADOC staff, including at Limestone, Donaldson, and Easterling, only to have the ADOC staff ignore his requests or refuse to lend assistance. He has frequently observed ADOC staff engage in unlawful activities including dealing in contraband, stoke tensions, and allow gangs

to run parts of ADOC facilities. ADOC officers are often slow to intervene, if they intervene at all, in violent incidents. He has also observed that both incarcerated people and ADOC staff who try to follow the law often become targets for violence inside ADOC facilities.

140. At Limestone, where Mr. Pritchett was incarcerated from approximately August 2024 until June 2026 (despite being approved to transfer to a Work Release facility in April 2025), Mr. Pritchett feared for his life. He was aware that multiple people were killed during his time there—including his own uncle, who was beaten to death by ADOC officers in approximately late 2024—and he often encountered violence from ADOC guards and other incarcerated people. In his experience, there are not enough guards to protect the incarcerated people living in the overcrowded dorms when violence occurs, forcing incarcerated people to govern themselves. For example, in approximately 2025, when Mr. Pritchett arrived to his assigned cell, he was told that a gang member had already "bought" the cell, and he had to negotiate with other incarcerated people for his own bed. Among other examples, Mr. Pritchett also witnessed a fight in his cell where an incarcerated man was hit in the head with a lock and, on another occasion, the men in the dorms were left to contend with a man with a machete. Mr. Pritchett also fears being incarcerated at Limestone because he has had difficulty accessing medical care: there were insufficient officers to escort him to medical appointments, and he was still charged for medical appointments even when he could not attend them due to understaffing.

141. Mr. Pritchett was punished at Childersburg Work Release in approximately 2020 for seeking medical attention for a man beaten by an ADOC officer with a wooden beam. After he and several other incarcerated men tried to get the man medical attention, ADOC issued all the men who sought help disciplinaries for "inciting a riot" and transferred them "behind the fence" to maximum-security facilities. Mr. Pritchett was transferred to Donaldson along with some of the other men who sought assistance; the others were transferred to St. Clair. In addition to the disciplinary resulting in Mr. Pritchett being sent to a more dangerous facility, the Parole Board cited this baseless disciplinary in denying him parole in 2021.

142. After transferring Mr. Pritchett to Donaldson, ADOC placed Mr. Pritchett in solitary confinement for approximately one month with no change of clothes, and he remained in solitary confinement for approximately two months in total. After leaving solitary, his exposure to extreme violence continued: while at Donaldson in approximately 2020 or 2021, three incarcerated men jumped on him, one stabbed him in his left shoulder, and they robbed him of his shoes and glasses.

143. Arthur Ptomey. Mr. Ptomey's time in ADOC custody was characterized by frequent violence. At every non-work-release ADOC facility where Mr. Ptomey was housed, stabbings were common, and he has personally witnessed a fellow incarcerated person get stabbed. The violence was constant, and in the dorm with him wherever he lived.

144. Victor Thomas (Elmore). Mr. Thomas has been housed at some of ADOC's most violent and unsafe facilities, including Elmore Correctional Facility, a high-security facility. Prior to receiving parole he spent several years at Elmore despite maintaining minimum (Level I) custody. While there, he was assigned to a dormitory of 100 to 120 people of all custody classifications, including people serving life without the possibility of parole. He described Elmore, for example, as very unsafe, out of control, and mentally tormenting.

145. Lakiera Walker (Tutwiler). When incarcerated at Tutwiler, from approximately 2007 to 2017, Ms. Walker repeatedly observed violence from the officers toward incarcerated women. She observed that officers would slam or hit incarcerated women for looking at them wrong. She saw officers slap incarcerated women off the bed and she personally observed and experienced sexually predatory behavior from ADOC officers. For example, in the first years after Ms. Walker arrived at Tutwiler, there were no partitions for the showers, and some of the male correctional officers would come into the showers while the women were showering. Ms. Walker struggled in particular with one male officer, Officer Ian Williams, who she begged "not to watch me while I was showering." Officer Williams also tried to grab her blanket and wake her up while she was sleeping and one occasion, Officer Williams tried to write her up because she wouldn't go outside with him one night. Officer Williams called his supervisor and reported that Walker

was refusing orders. In response, Ms. Walker filed a complaint against Officer Williams for his stalking behavior. In response, Warden Albright ordered Ms. Walker to lock up (solitary), telling her that she would get out "when I retire." Ms. Walker spent approximately a month in solitary as punishment for making the complaint until Warden Carla Jones had Ms. Walker brought to her office and advised Ms. Walker that if she promised to withdraw her allegations against Officer Williams and never say anything about it again, Warden Jones would let her out of lockup. Ms. Walker promised not to say anything as she was desperate to get out of solitary confinement.

146. Named Plaintiffs' experiences are emblematic of the violence and other serious physical and psychological harm that incarcerated people and putative Class Members face when housed in ADOC's extraordinarily dangerous medium- and high-security facilities.

## II. IVEY, HAMM, AND LOVELACE HAVE MAINTAINED A FORCED LABOR SCHEME THAT RELIES ON VIOLENCE, THREATS OF VIOLENCE, AND OTHER FORMS OF COERCION, WITH PUBLIC AND PRIVATE EMPLOYER DEFENDANTS KNOWINGLY PARTICIPATING IN AND BENEFITING FROM THE SCHEME

147. Forced Labor Named Plaintiffs and other incarcerated Alabamians have been and continue to be coerced to work for ADOC, public employers, and private employers. The coercion takes multiple forms: (1) all Forced Labor Named Plaintiffs reasonably understand, based on ADOC's rules and practices, that the primary way to reduce their risk of being subjected to violence and threats of violence, including threats to their lives and severe bodily harm, is to work for ADOC and for ADOC-contracted employers, regardless of whether the working conditions or pay are acceptable; (2) under Governor Ivey's 2023 Executive Order, ADOC regulations, and ADOC practices, they are all threatened with being placed in solitary for a refusal or perceived refusal to work for ADOC and/or its contracted employers, and Named Plaintiffs Dandridge and Payton have actually been placed in solitary for purported refusal to work; (3) under the Governor's 2023 Executive Order, ADOC regulations, and ADOC practices they are all threatened with deprivation of access to the canteen to purchase necessities like hygiene products and contact with their families for a refusal or perceived refusal to work for ADOC and/or its contracted

employers, and Named Plaintiffs Cartwright, Cole, Dandridge, English, Mason, Morrissey, Payton, Pritchett, and Walker have in fact received such ADOC punishment; and (4) under the Governor's Executive Order, ADOC regulations, and ADOC practices, all Forced Labor Named Plaintiffs are threatened with disciplinaries for refusal or perceived refusal to work, or for being fired from a job, that will extend the terms of their incarceration through loss of good time credits and/or posing a problem for their chances of being paroled, and Named Plaintiffs Pritchett, Ptomey, and Thomas have in fact had such disciplinaries cited as a basis for denying them parole and thus extending their incarceration. The labor coerced by these means is harnessed by ADOC to provide immense economic benefit to ADOC as well as public and private employers who participate in the coerced labor scheme, as detailed herein.

148. The consistent and ongoing threat of bodily harm, and the extraordinarily inhumane conditions endemic to ADOC's medium- and high-security facilities, render all labor by people incarcerated by ADOC coerced. The ever-present threat of life-threatening violence makes Alabama's system inherently coercive because laboring for ADOC and its private and public partners is the best and sometimes only way to survive the ultra-violent and inhumane prison conditions created and maintained by Defendants Ivey, Lovelace, and Hamm. ADOC consistently and systematically tells and demonstrates to incarcerated people that if they do not work, they will be punished by remaining in, or being returned to, the worst of the violent and inhumane conditions—that is, to facilities and dorms where incarcerated people face a clear and present danger to their survival. The significant likelihood of serious harm and death incarcerated workers face, viewed from the perspective of a reasonable person in the Named Plaintiffs' position, is more than sufficient to compel them to labor as directed by ADOC and in an effort to qualify for safer conditions.

149. Any resistance to this forced labor scheme is met with brutality, which only reinforces the coercion. In 2021, in retaliation for his work on the Free Alabama Movement, including strikes and labor protests, ADOC officers beat Named Plaintiff Robert Earl Council aka Kinetik Justice so severely that he had to be med-flighted to a trauma center to save his life. After

a 2022 statewide labor strike organized by incarcerated people to protest these conditions, Governor Ivey directed ADOC to retaliate through starvation, solitary confinement, and regulatory changes that increased punishments for refusing to work or advocating for work stoppages.

### A. ADOC's Regulations and Governor Ivey's 2023 Executive Order Lay the Groundwork for a Coerced Labor Scheme that Severely Punishes Objections to Forced Labor and Peaceful Advocacy of Refusing Forced Labor and Threatens Incarcerated Workers Working for Private and Public Employers with Return to Violent Facilities Should They Ask Not to Work or Otherwise Raise Concerns Regarding Unlawful or Unsafe Work Conditions

150. On January 9, 2023, Governor Ivey issued an Executive Order that imposed stringent consequences on incarcerated people who withhold their labor or encourage others to do so. *See* Executive Order 725, Promoting Public Safety by Establishing Standards and Accountability for Correctional Incentive Time (Jan. 9, 2023) (referred to herein as the "2023 Executive Order"). The 2023 Executive Order was a direct response to a strike at all thirteen men's medium- and closed-custody facilities that made clear that ADOC facilities cannot function without the vast amount of unpaid labor provided by incarcerated individuals, *see infra* ¶¶269-274.

151. In the 2023 Executive Order, Governor Ivey specifically provided that "good-time" credits may be withdrawn as punishment for withholding work. "Good-time" credits are correctional incentive time deductions that effectively reduce the term of an incarcerated person's sentence and thus the duration of confinement. Governor Ivey's Executive Order also identified "refusing to work" and "encouraging or causing a work stoppage"—a term that includes simple speech encouraging others to refuse to engage in forced labor—as "medium" and "high" level violations, respectively, of the ADOC rules; this means that incarcerated persons who decline work, including those who resist forced labor, or encourage others to do so are subject to significant discipline that can extend their terms of incarceration and present a barrier to receiving parole. *See* 2023 Executive Order.

152. In the Executive Order, the Governor also expressly authorized ADOC to impose additional punishments on any incarcerated person who declines to work or who encourages others

to do so, including "loss of privileges," and "time to be served in restrictive housing," which means solitary confinement and other cruel conditions, as documented in the Alabama prison conditions litigation and federal government reports cited above in Part I.

153. ADOC's regulations reflect this direction by Governor Ivey. "Refusing to work" and "fail[ing] to check out for work" are "medium level violation[s]." *See* Alabama Department of Corrections Administrative Regulation Number 403 (September 5, 2025) ("AR 403"), at 20. "Encouraging or causing others to stop work" is a "high level" violation—on par with an assault, fighting with a weapon, robbery, and inciting a riot. *Id.*, at 19; *see also* ADOC Male Inmate Handbook, at 27 (revised Mar. 2026) (incorporating disciplinary procedures from AR 403).

154. Under ADOC regulations, AR 403, at 22, medium-level violations may be punished by, among other penalties:

(a) a recommendation for custody review, which can result in an incarcerated person being moved to a more restrictive security classification;

(b) "[e]xtra duty" for up to 45 days—meaning additional forced labor;

(c) confinement to restrictive housing (solitary confinement) for up to 30 days;

(d) forfeiture of a minimum of 720 accrued good-time days. This forfeiture of "Good Time" days means the extension of the individual's sentence; for example, forfeiture of 720 days of good time means the person will have to spend approximately two more years in prison—or, if a person's balance is less than 720 days, forfeiture of the entire accrued good-time leave balance (thereby pushing out the person's release date proportionally);

(e) at least a six-month bar from earning additional good-time days (keeping the person's sentence from being reduced for good-time credit for that six-month period); and

(f) loss of any and all privileges and incentives for up to 45 days.

155. Incarcerated people whom ADOC finds to have committed high-level violations, including encouraging others to withhold their labor, are subject to even more severe penalties than those whom ADOC finds to have committed medium-level violations, including:

(a) a recommendation for custody review;

(b) "extra duty" for up to 60 days;

(c) loss of any privileges and incentives for up to 60 days;

(d) solitary confinement for up to 45 days;

(e) forfeiture of a minimum of 1,080 accrued good-time days—which equates to an extension of *three years* to a person's release date—or the entire leave balance if fewer than 1,080 days; and

(f) at least a one-year bar from earning additional good-time days.

AR 403 at 22.

156. Implicit in each of these penalties is an increased risk of violence and bodily harm. Thus, a "custody review" carries with it the risk that ADOC will increase the person's custody level and place the individual in a dorm or facility that is more violent. "Extra duty" involves additional forced labor that can be grueling and/or dangerous. And stripping individuals who have withheld their labor—or who (since actual refusals to work are rare) have been accused by ADOC of withholding their labor due to reporting concerns about workplace safety or the legality of workplace practices—or who have encouraged others to withhold their labor, of good-time credits and the ability to earn good-time days necessarily increases the length of individuals' terms of incarceration, meaning that they remain in the incredibly dangerous conditions of ADOC's facilities for longer.

157. ADOC recently sent a communication to all incarcerated men that, effective June 1, 2026, ADOC was modifying the custody level criteria. Under the new criteria, "[r]eduction in custody to any level of Minimum will require a 6-month clear record of any documented incident of negative behavior (not just a disciplinary)." Thus, any threat by ADOC to an incarcerated worker to declare a worker's conduct "negative" is effectively a threat to keep that incarcerated

worker in a dangerous medium- or high-security facility for a minimum of six additional months. Additionally, ADOC's newly revised manual provides that infractions that "result in removal from Minimum-Out/Security Level II (Work Center) and Minimum-Community Security Level I (Work Release) placements" will require persons to be placed in a Level IV facility for a minimum of 6 months, meaning that the threat of a single infraction can now be used as an extremely coercive threat by ADOC to send individuals who are housed at the less-violent Work Centers and Work Release facilities back "behind the wall" to violent facilities *for a minimum of six months*, where it is no exaggeration to say that their lives could be in real danger. Moreover, "[a]fter being removed from a Community Work Center or Work Release, there will be no review for return for at least 6 months. After failing 2 times, there will be no review for return for 18 months. After a 3rd failure there will be no review for return for that incarceration." Incarcerated workers can be removed from Community Work Center and Work Release facilities for "getting fired." ADOC's latest modifications of its manual are a significant escalation in its intimidation of incarcerated workers, because reporting workplace concerns or refusing to perform tasks that are illegal or dangerous can result in a worker getting fired, a disciplinary offense now carrying the weight of an immediate and possible permanent reassignment to the violent higher-security facilities.

158. In addition to increasing the weight that a threat of an ADOC-issued disciplinary may carry—and indeed any "documented incident of negative behavior" —the June 1, 2026 custody level criteria revisions enforce the coercion of labor from those at Work Centers and Work Release facilities. Under the changes, "[t]here is no more Relinquishing/Waiving/Giving Up of Custody. This will be known as Refusal of Approved Community Placements. These refusals will result in removal back to Security Level IV placement for at least one year." The impact of this change is that, if an incarcerated person, including each of the currently incarcerated Named Plaintiffs, does not want to work for the benefit of ADOC and the ADOC-contracted employers, that person cannot "choose" not to work without being sent back to the dangerous Level IV+ (medium- and high-security) facilities for any period of less than a year, which represents a serious risk to the individual's health and life.

### B. In-House ADOC Work: ADOC Relies on Violence, Threats of Violence, Solitary Confinement, and Other Coercion to Require Incarcerated Alabamians to Perform Work Necessary for ADOC to Function, to ADOC's Immense Benefit

159. Across its facilities, ADOC has a practice of requiring, under threat of severe punishment and consequences, incarcerated individuals to perform work with no pay that is essential to the very functioning of ADOC's facilities and results in a significant financial benefit to ADOC. Forced Labor Named Plaintiffs and retained class members have direct experience with being "punished" or seeing others punished for a perceived failure to work through (1) physical assault and violence, (2) placement in solitary, (3) transfers to a more dangerous area where they are at risk of physical harm, (4) disciplinaries that will make it harder to transfer to a safer location, (5) disciplinaries that put at risk their ability to receive access to the canteen (to purchase necessities), and (6) disciplinaries that threaten to extend the length of their detention through loss of good time credits or impeding their access to parole. Each of these forms of coercion is detailed in Counts I-IV herein.

160. Each Forced Labor Named Plaintiff has been forced to perform "in-house" work for ADOC, work that is described in detail in Count I, as well as in Counts II-IV.

161. ADOC has required and continues to require Forced Labor Named Plaintiffs and the Forced Labor Class to perform all manner of jobs that are necessary to run ADOC's own facilities, without pay, including: multiple types of skilled construction, including clearing land for, and building and repairing new and current facilities and warden's houses; wiring and repairing the HVAC and electricity systems; overseeing and serving as direct care providers for the drug and alcohol treatment program and mental health and hospice wards; providing traditional prison staff duties like serving as the Officer in Charge of an entire dorm, conducting "the count" daily, or supervising incarcerated people in segregation facilities; handling medical emergencies (including responsibility for providing CPR); performing the administrative aspects of correctional supervision, including processing new admittees; staffing all parts of food preparation and food

service in the cafeteria; handling trash; mowing lawns and other groundskeeping work; cleaning dorms and other facilities; and building and maintaining fences.

162. In or around the beginning of 2026, ADOC entered into a contract with Aramark for provision of food services in ADOC facilities across the state. ADOC is requiring incarcerated people to work, for free, for Aramark cooking in the kitchen and serving food. Incarcerated individuals are assigned to shifts and, under threat of discipline and punishment, required to work without pay for the benefit of ADOC and its private contractor.

163. ADOC also requires some incarcerated individuals to work in Alabama's "Correctional Industries" (CI) program, through which incarcerated people produce goods such as furniture and vehicle tags, generally on ADOC property, for purchase by state and local government entities. These workers generally have higher security classifications than those who labor through the Work Centers and Work Release facilities, and receive a starting pay of $0.25 per hour or less.

164. The work ADOC has required Forced Labor Named Plaintiffs and other members of the Forced Labor Class to do for ADOC is vital to the functioning of its facilities. And with the exception of the work incarcerated people perform as part of the CI program and in an extremely limited number of other roles such as work in the canteen, incarcerated people's work inside the prison gates for ADOC is entirely without pay.

**1. Defendants Lovelace, Hamm, and Ivey, through ADOC's Regulations, Policies and Practices, and Governor Ivey's Executive Order, Have Maintained a Scheme in Which Incarcerated Alabamians Must "Work Their Custody Down," Providing Free Labor to ADOC to Gain Access to Safer Living Quarters and Avoid Punishment**

165. Named Plaintiffs and other putative class members are subject to ADOC rules and practices that compel them to "work their custody down," meaning that if they perform unpaid labor for ADOC that ADOC needs to operate its facilities, ADOC will permit them to move to less dangerous locations, whether it be a safer location within one of the medium- or high-security facilities or to a Work Center or Work Release facility.

166. If a person successfully works their custody down, such that they are eligible to be transferred to a Work Center or Work Release facility, ADOC frequently still requires them to work for free for ADOC at their new facility for a period of time before they are eligible to work for an ADOC-contracted public or private employer. Once ADOC clears them to work for an outside employer, they remain subject to the threat that ADOC will issue work-related disciplinaries that could result in losing custody classification—meaning they will be transferred back to the more violent medium- or high-security ADOC facilities and will again have to work their custody down. When incarcerated workers in minimum custody confront intolerable working conditions—such as Plaintiff Walker being asked for sex with her supervisor as a condition of work or Plaintiff Payton and his coworker facing racist work conditions like those they reported to their ADOC Job Placement Officer ("JPO")—they are frequently faced with a lose-lose decision: staying in the unsafe work assignment and suffering the workplace harm, or reporting and/or refusing the work assignment and thereby effectively relinquishing their lower custody and being transferred to a violent prison where they will be in physical danger.

167. Forced Labor Named Plaintiffs' experiences, as described *infra* ¶¶324-26, 337-341, 437-441, 461-462, 484, reflect this vicious cycle, which relies on the ever-present threat that requesting not to work or objecting to working conditions will jeopardize their safety, their custody status, their access to necessities and contact with their families, and their chances of parole.

168. Each Forced Labor Named Plaintiff and member of the Forced Labor Class is taught, through ADOC's coercion of in-house labor, the dire consequences of refusing to work. This is a lesson that carries over to their work for public and private employers: they understand that a refusal to work for the public and private employers will mean punishment and a requirement that they continue to work for the benefit of ADOC, without pay.

**2. The Scheme of Compelling In-House Labor Provides Substantial Economic Benefit to ADOC**

169. The economic benefit to ADOC of compelling unpaid labor from its in-house population to cover the drastic loss of correctional staff over the last decade is immense. As the

understaffing crisis at ADOC has intensified in the last decade, Alabama has turned to forcing incarcerated persons to perform jobs that correctional and other state employee staff historically performed—for free. Yet, Forced Labor Named Plaintiffs and members of the Forced Labor Class do not receive sufficient training to perform the specialized roles ADOC has required them to perform for ADOC's benefit, including the provision of healthcare, drug counseling, handling of chemicals, processing of new admittees, and supervising dorms.

170. Since 2014, ADOC has lost approximately one-third of its correctional staff, or nearly 1,000 people. *See also supra* Part I.C.3. With correctional officer trainees earning more than $24 per hour as their starting wage, assuming every incarcerated person assigned to fill a paid staff member's job at no cost to ADOC saves ADOC $24 per hour, that results in a minimum wage cost savings to ADOC of approximately $50,000 per year per position. If just the correctional staff positions lost since 2014 were filled with trainees, that would cost Alabama approximately $50 million per year (not accounting for benefits or overtime).

171. Many of the jobs that ADOC has required Forced Labor Named Plaintiffs and other class members to perform would, if assigned to free world employees, cost ADOC much more than a trainee salary. A review of labor assignments and schedules of incarcerated people held at the St. Clair Correctional Facility (a high-security facility) indicates a net benefit to Alabama of approximately $30 million for just the labor performed by people at St. Clair from January to December 2023, extrapolating from available data through August 2023. The work performed at St. Clair suggests a benefit to Alabama of more than $400 million in 2023 from the forced labor of the Alabamians being held in Alabama's high- and medium-security facilities.

172. Alabama recently contracted with Aramark, a private company, to supervise and direct unpaid, incarcerated workers to service all the ADOC facility kitchens, underscoring that ADOC is relying on its coerced incarcerated labor force to provide essential functions, while reaping significant financial benefit. On information and belief, Aramark generally pays between $13 and $22 per hour for cooks and food service workers, and includes the cost of staff in contracts with other entities. Indeed, the Missouri Department of Corrections reportedly contracted with

Aramark to staff its kitchens *with paid Aramark employees*, as part of a $45.7 million, 5-year contract. In contrast, ADOC is providing Aramark with a free labor source that works under threat of severe consequences should they decline to work, as detailed herein.

173. The CI program has also been profitable for ADOC. Its September 2023 report, for example, revealed that it secured more than $3.1 million in profit from the work performed by incarcerated individuals in the CI program,[47] a greater amount than it obtained in FY 2022. Most of the 2023 profit was generated by incarcerated workers in the clothing and vehicle tag plants—more than $1.9 million from the approximately 112 workers in the clothing plant and nearly $1.5 million from the approximately 19 workers in the vehicle tag plant. These declared profits, however, understate the full economic benefit of the CI program to the State, as state agencies purchasing goods manufactured through the CI program would have to pay more for such goods on the open market. The purchasing agencies are simply paying another Alabama entity for goods produced through the in-house forced labor manufacturing operations.

174. Defendants Lovelace, Hamm, and Ivey, and ADOC and the State of Alabama, are and have been part of an extremely profitable venture and intentional plan to staff ADOC facilities in large part with free labor from incarcerated Alabamians who labor under the threat of consequences that include physical assault, prolonged detention, solitary confinement, and denial of necessities and familial contact.

### C. Work Centers: ADOC Relies on Violence, Threats of Serious Harm, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for State, County, and Local Government Entities, to the Benefit of ADOC and the ADOC-Contracted Public Entities

175. Named Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker and members of the Forced Labor Class who have become eligible for placement in a lower-security facility, commonly after "working their custody down," *supra* Part

[47] ADOC September 2023 Monthly Report at 15.

II.B.1 are regularly transferred to "Work Centers" and "Work Release" facilities where they are compelled to work for public entities and private companies, respectively.

### 1. ADOC Contracts with Multiple Government Entities to Provide a Coerced Work Force

176. ADOC's "Work Centers," also known as "honor camps," are populated with people who have minimum custody classifications—generally "Minimum-Out"—and are compelled to perform labor for city, county, and state government agencies that contract with ADOC for their labor. Thus, before contracting out incarcerated persons' labor to these public employers, ADOC determines through classification analyses that the incarcerated people they are "leasing" are capable of working safely in the community without direct supervision by ADOC, frequently alongside and under the supervision of free people. The incarcerated people whose labor is "leased" through Alabama's Work-Center scheme generally live in designated "Work Center" or "Honor Camp" ADOC facilities, from which ADOC transports them each day to perform their outside jobs. There are Work Centers at: Alex City, Birmingham, Camden, Childersburg, Elba, Frank Lee, Hamilton, Loxley, Mobile, North Alabama, and Red Eagle.

177. Approximately 1,800 incarcerated people were housed in Work Center facilities as of April 2026.

178. ADOT, through Defendant Cooper, and Defendants City of Montgomery and City of Troy (collectively, "Public Employer Defendants") have contracted with ADOC for incarcerated labor, and joined with ADOC in a joint venture, through the Work Center program, as have more than 100 other public sector employers since 2018.

179. Factual allegations specific to the individual Public Employer Defendants are set forth in Count V and VI, *infra*. The following allegations apply to each of the named Public Employer Defendants (ADOT/Cooper, City of Montgomery, and City of Troy), as well as the numerous other public entities that contract with ADOC for an incarcerated workforce.

180. Regardless of how many hours incarcerated persons transported by ADOC to these public entity employers are required to work for the public entities each day—their daily income

for each day of labor is generally limited to a total of $2, remarkably the same daily wage rate that the State of Alabama set for incarcerated labor in 1927.

181. Alabama Department of Corrections Administrative Regulation Number 439 (August 21, 2023) ("AR 439" or "work-center regulation") establishes "the policies, responsibilities, and procedures for minimum-out custody inmates working on government projects," i.e., the work-center program. AR 439, at 1.

182. Incarcerated individuals who are assigned to the Work Center program are approved to work "in their state-issued uniforms under the supervision of an ADOC Squad Officer/Designee or [a] Government Agency Inmate Supervisor." AR 439, at 2. The "Government Agency Inmate Supervisor" is an individual "from a participating outside governmental agency that is approved and trained to supervise inmates working on government projects." *Id.* at 1. This individual must supervise incarcerated workers and ensure that all "ADOC policies and safety procedures are adhered to and enforced." *Id.* at 3. On information and belief, personnel from each Public Employer Defendant served in this role as "Government Agency Inmate Supervisor" and were responsible for ensuring compliance with ADOC policies.

183. The Work Center regulations require the Institutional Job Review Board of the ADOC to screen and select which incarcerated workers with a minimum-out custody classification are placed on each government project, with final approval from the warden. If the Institutional Job Review Board decides certain incarcerated workers will work for a governmental agency on a project through the Work Center program, the workers must comply.

184. Under ADOC rules and consistent practices, and as directed by the 2023 Executive Order, an incarcerated worker who is assigned to work through the Work Center program and who refuses to participate in it, including by attempting to decline a work assignment, will be issued a disciplinary by ADOC; ADOC may remove a person from the Work Center program on the basis of disciplinaries, and transfer them to a higher security, more violent facility. *See supra* Part I.B, II.A.

185. The Work Center program regulation requires public employers that wish to participate to first submit an "Application for Inmate Work Request Form." AR 439, at 5, 7.

186. The Public Employer Defendants' applications must describe a number of details about the working conditions, all of which are subject to ADOC's approval: the scope of the work needed; any skilled labor or special talents sought; the "[n]umber of inmates requested"; the work site location; and a proposed work schedule.

187. If ADOC approves the public employer's work-center program application, the public employer must sign ADOC Form 439-D, entitled "Inmate Government Work Project Service Agreement" (hereinafter, "Work Center Agreement"). AR 439, at 11–16; *see id.*, at 11 (term clause establishing one-year agreement, but subject to renewal at one-year increments "upon mutual agreement of the Parties").

188. The Work Center Agreement establishes a contract between ADOC and public employers in need of labor to perform general services unique to their agency as demonstrated by the agreement's opening paragraphs:

> The Government Work Project Agreement ("Agreement") has been entered into by _____________ ("Agency") and the Alabama Department of Corrections ___________ ("Institution" or "ADOC").
>
> **RECITALS**
>
> WHEREAS Agency is in need of workers to assist in general services; and,
>
> WHEREAS, the ADOC has within its custody certain inmates who are capable of providing the services requested by Agency.

AR 439, at 11.

189. The Work Center Agreement makes clear that ADOC and the public entity "leasing" the incarcerated workers' labor jointly exercise control over the workers' conditions of employment and the means of coercing their labor.

190. The Work Center Agreement ensures that ADOC, with full knowledge and assent by the signatory Public Employer Defendants, retains certain management and control over how

the public entities use the labor of incarcerated workers, while also requiring public entity employers to supervise the workers:

a. **Number:** Although ADOC is required to "make a good faith effort to provide the prescribed number of inmates," ADOC's failure to provide that number of incarcerated workers to the public employer does not constitute a breach of contract, absent a showing of bad faith. AR 439, at 11. In other words, ADOC fully controls the number of workers who are provided to the government agency.

b. **Changes:** Any changes to jobs described in ADOC Form 439—this includes changes to schedule and location—that a public entity employer wishes to make cannot proceed without ADOC's written approval "[at] least seven (7) days in advance of the planned change." AR 439, at 12.

c. **Payment:** ADOC requires public entity employers to pay monthly invoices it receives from ADOC within 30 days of the invoice date; and if any public entity employer, including Public Employer Defendants, had failed or fails to pay an invoice within 60 days, ADOC is entitled to withhold the labor of incarcerated workers.

d. **Supervision:** ADOC requires at least one employee of public entity employers, including each Public Employer Defendant, to supervise incarcerated workers at "all times." AR 439, at 12. This employee must have completed training and is charged under the Work-Center Agreement with "follow[ing] all applicable rules, regulations, and/or standard operating procedures of the ADOC"; failing to do so "may [have] result[ed] in immediate termination of the Agreement in the sole discretion of the ADOC." *Id.*

e. **Independent Contractor:** As a condition of receiving incarcerated workers from ADOC, any public entity employer, including each Public Employer Defendant, needs to accept its designation as an "independent contractor" and register as a vendor in the state of Alabama's "STAARS accounting system." AR 439, at 15.

f. **Enforcement of ADOC and Workplace Rules:** The ADOC requires public employer entities, including each Public Employer Defendant, to help enforce the forced-labor scheme: "If an inmate fails to follow any rule, or *refuses to work as requested*, notice shall be given in writing, to [ADOC] upon the inmate's return to the Institution." AR 439, at 13 (emphasis added). If a public employer entity failed or fails to report incarcerated workers who refuse to work or to follow ADOC or workplace rules, ADOC retains the "sole discretion . . . [to] immediate[ly] terminat[e]" the Work-Center Agreement. *Id.*

191. The regulation governing Work Centers also requires all public employer entities, including each Public Employer Defendant, entering into a Work Center Agreement with ADOC

to police the forced-labor scheme by immediately reporting any misconduct by incarcerated workers to ADOC, which in turn would mete out the discipline:

> If any inmate behaves in a manner deemed inappropriate, the Government Agency Inmate Supervisor or Squad Officer/Designee shall inform the JPO or Warden/Designee. Any violation of ADOC Form 439-C, Inmate Work Rules, shall be reported to the JPO/Designee. The JPO/Designee will investigate and take appropriate disciplinary action as warranted.

AR 439, at 5.

192. The regulation also makes clear that ADOC retains discretion to remove any incarcerated worker from any government project at any time with no justification required, AR 439, at 5 ("The Warden may remove any inmate from any government project at any time, with or without cause."); and to "conduct random job checks and searches to ensure employer and inmate accountability and public safety" with no notice to Public Employer Defendants. *Id.*

193. Under the regulation governing the Work Centers, each public entity employer must pay a fee to ADOC that is generally $15 to $25 per day per incarcerated worker, depending on whether ADOC provides transportation or an ADOC Squad Officer, AR 439 at 4–5, and "[o]f the fees received by the ADOC, the inmate will be paid at least $2.00 per day for labor," with the remainder of the fees going to the State General Fund Account. *Id.* In some instances, the fee is higher: a contract between ADOC and DOT for provision of labor from Red Eagle facility provided that DOT would pay $50 per day to ADOC, but pursuant to ADOC policy, workers still would have received only around $2.00 per day.

### 2. ADOC Enforces the Requirement that Incarcerated Alabamians Work for Public Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration

194. All of the same coercive forces that affect incarcerated workers and compel their unpaid, in-house work for ADOC—threats of transfers to more violent facilities, violence and threats of violence, deprivation of access to necessities and family contact, and increased length of incarceration—also result in the coercion of incarcerated individuals' work for public entity

employers, including Public Employer Defendants. In addition, incarcerated workers employed by ADOC and the public entities through the Work Center program are subject to additional coercion because any infraction or perceived refusal to work carries with it the threat that the worker may be sent "back behind the wall," i.e., back to the high risk of violence and bodily harm that would result from a transfer to a medium- or high-security facility. Incarcerated workers who go from working inside ADOC facilities to working for public employers from a Work Center well know, by the time they arrive at the Work Center, that refusing to work can lead to unchecked physical harm if they are returned to the violent higher security, higher custody facilities. Counts I and V.B detail the ways in which these forms of coercion are evident in Forced Labor Named Plaintiffs' experiences.

195. The ADOC Commissioner is and has been a partner in this joint venture with public employers, co-employing the incarcerated workers in the Forced Labor Class who labor for public entities through the Work Center program (including but not limited to the Public Employer Defendants), and is liable for the coercion of work by those public entities, along with ADOC's own coercion of that work.

**3. Public Employers Act as Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion**

196. Through the Work Center Agreements, public entities, including the Public Employer Defendants, obtain a workforce that they can require to do more dangerous and less desirable tasks, and work longer hours, than they assign to similarly situated free-world workers or that free-world workers would be willing to do. That is because the incarcerated workers work subject to the threat of punishment, including transfer to dangerous facilities, placement in solitary, and other penalties, in the event they complain about working conditions, hours, or wages.

197. Each Public Employer Defendant, on information and belief, knows or should know that work performed for it by incarcerated persons is coerced because the work assigned often

involves grueling work and long hours and is work that free workers would likely refuse to do and would certainly refuse to do for $2 per day.

198. Each Public Employer Defendant knew or should have known that, if incarcerated workers did not accept a Work Center assignment and the conditions of that assignment (including the wage), they could be subject to discipline, including more restrictive conditions of confinement and loss of two years of good-time credit (which correlates to an effective extension of the person's prison sentence), being sent back "behind the wall" to the life-threatening conditions in medium- and high-security facilities, and losing the ability to obtain funds needed for the worker to be able to afford basic necessities. *See supra* Parts II.A, II.C.1; *infra* ¶¶587-599.

199. Each Public Employer Defendant has an obligation under the ADOC regulations and the Work Release Agreement to report a worker's "refus[al] to work as requested,"[48] and knows or reasonably should know that making such a report to ADOC will result in severe consequences for incarcerated workers, including potential transfer to a more dangerous facility and other punishments.

200. As detailed *supra* Parts I.C.1-I.C.3, the exceptionally violent conditions in ADOC's medium- and high-security facilities are a matter of broad public knowledge, and each of the Public Employer Defendants knew or should have known that a disciplinary infraction that results in a worker being sent back "behind the wall" involves a real and significant threat that the worker will be subject to bodily harm, along with deprivation of necessities. For instance, the DOJ reports detailing the extreme levels of guard-on-prisoner and prisoner-on-prisoner violence in ADOC facilities, and shocking levels of homicides, rapes, and serious injuries, have been widely publicized in the local and national media and frequently discussed by state officials.[49] ADOC's

---

[48] AR 439.

[49] *See, e.g.*, Kim Chandler, *Justice Department Sues Alabama Over Prison Conditions*, AP News (Dec. 9, 2020), https://apnews.com/article/alabama-constitutions-prisons-lawsuits-violence-b8549a9ee4cdd959057735f07822e8ba; Mike Cason, *U.S. Department of Justice sues Alabama over unsafe prison conditions*, AL.com (Dec. 9, 2020), https://www.al.com/news/2020/12/us-department-of-justice-sues-alabama-over-unsafe-prison-conditions.html.

extreme understaffing and the corresponding rise in violence at ADOC facilities have likewise frequently been covered in the media. *See supra* ¶¶67-98.[50] As employers who for years renewed their contracts for incarcerated workers with ADOC, Public Employer Defendants are not disinterested parties; it is reasonable to infer that they are more attentive to developments in ADOC facilities than the average Alabamian.

201. The 2022 strike by incarcerated workers at ADOC's major correctional facilities to protest the conditions inside those facilities and to demand changes to the State's broken parole system, and ADOC's response, including its "bird-feeding" and failure to provide basic services, was broadly covered.[51] Thus, each of the Public Employer Defendants also knew or should have known that ADOC had a practice of responding to refusals to work with harsh consequences and denial of necessities.

202. Each Public Employer Defendant is aware or reasonably should be aware that the workers supplied to it by ADOC are severely limited in their ability to advocate for improved workplace conditions, to organize themselves and their co-workers or join a labor union, to publicize workplace abuses, or to pursue or participate in wage-and-hour or other workplace litigation.

203. Each Public Employer Defendant is aware or should be aware of the ADOC rules and regulations, which are publicly available and which, on information and belief, the Public Employer Defendants have, in their agreements with ADOC, agreed to comply with and enforce. Therefore, each Public Employer Defendant knew or should have known that incarcerated workers who refuse to work—a violation of ADOC rules and regulations—have incurred and will incur

---

[50] *See, e.g.*, Kim Chandler, *Alabama prison staff shortage worsens despite court order*, AL.com (Feb. 11, 2023), https://www.al.com/news/2023/02/alabama-prison-staff-shortage-worsens-despite-court-order.html.

[51] *See, e.g.*, Eduardo Medina, *Alabama Inmates Strike, Denouncing Prison Conditions*, N.Y. Times (Sept. 28, 2022), https://www.nytimes.com/2022/09/28/us/alabama-prisons-strike-protest.html; Evan Mealins, *'I'm fighting for my life': Inside Alabama's prisons during ongoing labor strike*, Montgomery Advertiser (Sept. 30, 2022), https://www.montgomeryadvertiser.com/story/news/2022/09/29/alabama-prison-labor-strike-cold-meals-conditions-inside/69524237007/.

consequences under AR 403, which outlines the "disciplinary process for inmates who commit [rule] violations." AR 403, at 1. This includes Rule Violation #518 "Refusing to work/fail to check out for work" AR 403, at 29.

204. Each Public Employer Defendant knew or should have known that ADOC classified refusing to work as a "medium level rule violation" that carried the potential sanction of the forfeiture of a minimum two years of accrued Good Time days (or all time accrued if less than two years); "Confinement to Restrictive Housing for up to 30 days"; or the "Loss of any and all privileges/incentives for up to 45 days," among other penalties. AR 403, at 22.

205. Likewise, each Public Employer Defendant knew or should have known that an incarcerated worker's "[i]nsubordination," "[d]isorderly conduct" or "[b]eing fired from a job" constituted a "low level violation," AR 403, at 31, that could result in forfeiture of up to 30 days of accrued Good Time and the "[l]oss of any and all privileges/incentives for up to 30 days," among other penalties, AR 403, at 23. Additional detail regarding the public employers' knowledge is addressed *infra* ¶¶590-599.

**4. Defendants Lovelace, Hamm, Ivey, and the Public Employer Defendants Benefit from the Coercion of Work Through the Work Centers**

206. The significant amount of forced labor that ADOC contracts out to state and local governments through its Work Center program underscores Alabama state and local governments' deep reliance on predominantly Black forced labor to provide core governmental services.

207. ADOT, City of Montgomery, and City of Troy each benefit from participating in a venture with ADOC: their participation in the Work Center program allows them to obtain an inexpensive, on-demand, and compliant workforce to do work that it would be difficult to find free-world workers to do under similar conditions.

208. The Public Employer Defendants know or should know that ADOC prohibits and severely punishes workers for any "refusal" to work, which can include conduct like simply being late to work, being sick, or simply not performing a job to the employer's satisfaction. ADOC's harsh punishment regime, to which the Public Employer Defendants voluntarily agree to subject

their incarcerated workers, provides a significant benefit to the Public Employer Defendants in the form of a pliant and reliable workforce.

209. Lovelace, Hamm, Ivey, ADOT, and the State obtain and have obtained a significant benefit from their "leasing" of incarcerated persons' labor to public entities in Alabama. For each day of an incarcerated person's work, the State receives a fee from which it pays only around $2.00 to the worker, keeping the remainder—from $13 to $48 per day[52]—for the General Fund. AR 439, at 4–5; *see also supra* ¶193.

210. A huge number of state agencies and localities, and the State's highest leadership, have participated in this coerced labor scheme. In FY 2023 alone, Alabama state agencies and local governments procured more than ***80,000 days*** of forced labor from incarcerated Alabamians. Even if the State's profit is only $13 per day, that is equivalent to more than a million dollars.

211. Alabama has not only generated millions of dollars in fees for itself through its forced-labor scheme and labor trafficking contracts between ADOC and numerous state agencies and entities, it has also benefited, and continues to benefit, by not having to pay state employees at the statutory or prevailing rates to perform these state jobs. For the work coerced for ADOT between 2017-2023 alone, Alabama realized a benefit estimated at more than $12.5 million (relying on just the starting wage for state employees and no addition for benefits).

212. The public entities participating in the venture also reap a benefit. From 2018 to 2024, Alabama public entities reaped approximately $31 million in wage savings alone by using incarcerated laborers through the Work Center program instead of hiring free workers.

---

[52] ADOC's human leasing fees appear to vary from agency to agency and over time.

### D. Work Release Program: ADOC Relies on Violence, Threats of Violence, and Other Forms of Coercion to Require Incarcerated Alabamians to Perform Work for Private, For-Profit Companies

#### 1. ADOC Contracts with Multiple Private Companies to Provide a Coerced Work Force

213. Named Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, Jarmon, Lesley, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker, have all been compelled to work by ADOC for private, for-profit companies as part of ADOC's Work Release program. This program is a venture between ADOC and private companies for the provision of a compliant workforce consisting of workers who cannot object to their working conditions, hours or wages without reasonable fear of punishment and extreme consequences, with an immense financial benefit to ADOC and the State (40% or more of gross wages earned by the incarcerated workers).

214. Through its Work Release Program, ADOC contracts with private employers to "lease" incarcerated people's labor to private businesses. Before contracting out an incarcerated person's labor, ADOC determines through classification analyses that the individual is capable of working safely in the community alongside non-incarcerated coworkers, without supervision by prison staff. ADOC only permits individuals it has designated with its lowest custody level, "Minimum-Community," to participate in its work-release program. ADOC assigns individuals to Work Release Program private employers from the following facilities: Alex City, Birmingham, Camden, Childersburg, Elba, Frank Lee, Hamilton, Mobile, Montgomery, North Alabama (Decatur).

215. According to ADOC's monthly report, in April 2026, 1,364 incarcerated people were assigned to ADOC's work-release program.[53]

216. Defendants RCF/Gemstone, Ju-Young, SL Alabama, Hwaseung, Progressive Finishes, McDonald's, Wendy's, KFC, Masonite, Cast Products, Southeastern Meats, Koch Foods,

---

[53] Monthly Statistical Report for April 2026, ADOC, at 2, https://doc.alabama.gov/docs/MonthlyRpts/April%202026.pdf.

Bama Budweiser, and Paramount Services (collectively, "Private Employer Defendants") have all contracted for incarcerated labor through the Work Release program after 2018, as have more than 500 other private, for-profit companies.

217. Factual allegations specific to the individual Private Employer Defendants are set forth in Counts V (¶¶560-586) and VI (¶¶600-617), *infra*. The following allegations apply to each of the named Private Employer Defendants, as well as to the numerous other private companies that have contracted with ADOC for an incarcerated workforce.

218. Each of the Private Employer Defendants, as participants in the Work Release Program, are subject to the ADOC regulations "establish[ing] the responsibilities, policies, and procedures for the organization and function of Work Release," Alabama Department of Corrections Administrative Regulation Number 410 (April 8, 2024) ("AR 410"), at 1. The regulations define the "Work Release Program" as a "transitional/rehabilitative type program in which selected inmates are allowed to leave a community-based facility for gainful civilian employment on a full-time and part-time basis and return to the facility when not working." AR 410, at 2.

219. Incarcerated workers classified as "Minimum-Community custody" have no input or say in whether ADOC places them in the work release program. That decision is made by the ADOC's "Institutional Job Review Board." This board is "responsible for screening inmates for job placement within the Work Release Program" and includes the JPO, classification personnel, and a Correctional Captain." AR 410, at 1. The decision of the Job Review Board to have certain incarcerated persons work for private employers must receive final approval through the warden. *Id.*

220. The JPO at each Work Release facility is the person charged with assigning incarcerated individuals to private employer jobs. If the Institutional Job Review Board and/or the JPO decides that certain incarcerated workers need to work for an employer through the work release program, they need to do it.

221. Under ADOC rules and consistent practices, and as directed by the 2023 Executive Order, an incarcerated worker whom the JPO or the Job Review Board assigns to work as part of the Work Release Program and who refuses to participate in it, including by refusing a work assignment, is subject to a disciplinary and may be removed from the Work Release program, including through transfer to a higher security, more violent, facility. *See supra* ¶¶150-158.

222. The Work Release Program regulations, AR 410, require private employers who participate in the Work Release Program to sign ADOC Form 410-A, entitled "Work Release Program Employer Agreement" ("Work Release Agreement"). *See also* AR 410, at 9 (agreements generally one year in length, but subject to renewal "upon mutual agreement of the Parties").

223. The Work Release Agreement establishes a contract between ADOC and private employers in need of labor to perform services requested by the private company:

> This Work Release Program Employer Agreement ("Agreement") has been entered into by ___________ ("Employer") and the Alabama Department of Corrections ___________ ("Institution" or "ADOC").
>
> **RECITALS**
>
> WHEREAS Employer is in need of workers to employ in general services; and,
>
> WHEREAS, the ADOC has within its custody certain inmates who are capable of providing the services requested by Employer.

AR 410, at 9.

224. The Work Release Agreement makes clear that ADOC and the private company "leasing" the incarcerated workers' labor jointly exercise control over the workers' conditions of employment and the means of coercing their labor.

225. The Work Release Agreement ensures that ADOC, with full knowledge and assent by the Private Employer Defendants and other participating companies, retains certain management and control over how the private employers use the labor of incarcerated workers, while also requiring private company employers to supervise the workers, enforce ADOC rules and regulations, and to report to ADOC any work infractions:

a. **Description of Work and Supervision Plan**: ADOC requires private employers participating in the Work Release Program, including each Private Employer Defendant, to submit a form entitled "Description of Work and Supervision Plan" ("Supervision Form"), which describes "the type of work to be provided, the supervision plan, and whether the Employer will be providing transportation," and is subject to the review and approval of the warden. AR 410, at 9, 18.

b. **Schedule:** Each Private Employer Defendant must submit to ADOC a "detailed inmate work schedule . . . in advance of the inmate reporting to work" and must inform, and get approval from, ADOC before they can require incarcerated workers to work overtime. AR 410, at 10.

c. **Changes to Jobs Performed by Incarcerated Labor:** Any changes to jobs described in the Supervision Form that a participating employer seeks to make may not proceed without ADOC's written approval "at least seven (7) days in advance of the planned change." AR 410, at 9.

d. **Placement:** ADOC, pursuant to Administrative Regulation 410, requires each incarcerated worker assigned to a private employer to work, including each Private Employer Defendant, to be authorized for a specific position and rate of pay by an ADOC Job Placement Officer. *See* ADOC Form 410-D.

e. **Payments for Incarcerated Labor:** ADOC has required each Private Employer Defendant to "pay for inmate labor in the same manner as for any other employee . . . at the agreed upon rate but not less than the Federal minimum wage." AR 410, at 10. Further, the Work Release Agreement requires participating employers, including Private Employer Defendants, to "pay the inmate by payroll check made payable to the inmate and ADOC and must include the inmate AIS# (Alabama Inmate Serial #) on the payee line." AR 410, at 10. Under the Work Release Agreement, ADOC prohibits Private Employer Defendants from making cash payments or handing checks directly to incarcerated workers. *Id.* Rather, ADOC requires Private Employer Defendants to either mail the checks directly to the Work Release facility, or arrange for delivery to the facility with approval from the warden. *Id.*

f. **Computation of Payment**: ADOC sets the rules for how pay should be calculated for incarcerated workers. For example, ADOC allows all participating private companies, including Private Employer Defendants, to deduct from the hours worked up to 30 minutes any incarcerated worker spent traveling to and from the worksite. AR 410, at 10.

g. **Supervision and Inmate Conduct**: The Work Release Agreement requires all private companies participating in the Work Release Program, including Private Employer Defendants, to "properly supervise the inmate worker," including through "consistent visual observation of the inmate's activities by the employer or a supervisor and verbal communication between the employer or supervisor and the inmate on a consistent basis." AR 410, at 11. ADOC also requires Private Employer Defendants to enforce prohibitions on inmate conduct—set by ADOC—including, but not limited to, sending and receiving mail at the worksite, using phones in the absence of an emergency, or attending events away from worksite. *Id.*

h. **ADOC Periodic Inspections**: AR 410 requires the ADOC JPO or designee to "conduct periodic job checks of Work Release Program inmates on the job," "conduct employer interviews," and "search inmate work areas as needed" with the asserted goal of "provid[ing] support and gather[ing] information regarding the program." AR 410, at 6.

i. **Employer Enforcement of ADOC Work Rules**: ADOC requires private employers participating in the Work Release Program, including Private Employer Defendants, to help it enforce the forced-labor scheme: "If an inmate fails to follow any rule, or *refuses to work as requested*, notice shall be given in writing, to the [ADOC Job Placement Officer]/Designee upon the inmate's return to the Work Release Facility." AR 410, at 12 (emphasis added). Under the Work Release Agreement, if the Private Employer Defendants fail to report incarcerated workers who refused to work or follow ADOC or workplace rules, ADOC has "sole discretion . . . [to] immediate[ly] terminat[e]" the agreement. Additionally, ADOC requires Private Employer Defendants and other employers participating in the Work Release Program to "contact the [ADOC JPO]/Designee immediately should an inmate employee's behavior become … disorderly, and/or the inmate is terminated from employment." AR 410, at 12 ("Immediate Notifications" clause).

j. **Authorized Inmate Areas**: ADOC requires all companies participating in the Work Release Program, including each of the Private Employer Defendants, to limit incarcerated workers' movement to only "assigned work areas, break areas, non-public outside smoking area, and restrooms," AR 410, at 12, and that the only time incarcerated workers may be in the Private Employer Defendant's parking lot is "when [they are] arriving to or leaving the job site." *Id.*

k. **Removal of Inmate**: Although participating employers, including Private Employer Defendants, direct incarcerated workers' activities on the job site, they also know and understand that, "[t]he [Work Release] agreement notwithstanding, ADOC retains authority over inmate employees and may remove inmate employees from any job site at any time." AR 410, at 12.

l. **Independent Contractor:** As a condition of receiving incarcerated workers from ADOC, Private Employer Defendants needed to accept ADOC's designation of them as "independent contractors," and register as a vendor in the state of Alabama's "STAARS accounting system." AR 410, at 15.

226. ADOC deducts 40% or more from any wages earned by incarcerated workers in the Work Release Program. While ADOC requires incarcerated workers assigned to private employers to sign a form that purports to reflect the worker's agreement to ADOC's withholdings, a worker who refused to sign the document would be subject to at least a medium-level violation of refusing to work and the attendant severe penalties. *See supra* ¶¶150-158. This "agreement" outlines ADOC's deduction: ADOC will "withhold 40% of [the worker's] net pay (take home pay minus

40% of gross pay) and that amount ordered by the court each pay period to pay any court-ordered monies." AR 410, at 16 (ADOC Form 410-B). Notwithstanding ADOC's 40% deduction from each incarcerated worker's *gross* earnings, all incarcerated workers in the work release program pay federal and state taxes on the entirety of the gross earnings.

227. Although ADOC asserts the flat 40% deduction from the gross earnings "assist[s] in defraying the cost of his/her incarceration," AR 410, at 4, it nevertheless represents costs ADOC now gets to save and reallocate to other means (e.g., profit).

228. ADOC also deducts from any wages paid to incarcerated workers certain fees, including for laundry ($15 per month), medical and prescription co-pays (generally $4-8 per visit or prescription, but with charges up to $20 for missed appointments), and work transportation, generally $5 per day for ADOC van transportation to and from their work-release job sites (even though the vans are driven by other incarcerated individuals).

229. As a result of the fees that ADOC deducts, incarcerated Alabamians who are "leased" to private employers earn far less in practice than the hourly rates they are purportedly paid. For example, an incarcerated person forced to labor for Defendant Paramount Services, a private laundry cleaning service, may have a nominal pay rate of $7.25 per hour (even though that "leased" laborer's free coworkers are being paid more) and thus gross weekly income of $290 for a 40-hour workweek. The ADOC's 40% labor-trafficking fee, however, reduces that weekly wage to $174, and another 20% for federal and state payroll taxes reduces it to $116. Another $25-30 may be deducted and paid to ADOC for weekly transportation, bringing the weekly wage to $86, and another $3.75 or so may be deducted for laundering a work uniform—leaving the worker with $82.25 for 40 hours of work, or $2.06 per hour. Alabama takes all of these deductions before the victims or the worker's family have any opportunity to receive support from the forced laborer. Moreover, even if no garnishment is required for victims or family support, the workers' weekly wages are reduced even further by the charges imposed by ADOC for necessary medical treatment or basic health sustenance, such as necessary medicine, doctor visits, or to pay the high prices

charged to buy a sandwich from the canteen or snack line upon returning to the ADOC facility after a long or irregular shift that caused the worker to miss ADOC's meal time.

230. ADOC exercises significant control over the conditions of employment of incarcerated workers employed at private employers in the Work Release Program, with the full knowledge of those employers, including Private Employer Defendants. Under the Work Release Agreement and regulations:

a. The incarcerated worker is required to comply with all ADOC rules and regulations, which includes that the worker may not refuse to work.

b. ADOC security staff determine the times incarcerated workers "leave and return to the Work Release Facility," AR 410, at 16.

c. The JPO, or a designee, must approve any overtime. *Id.*

d. An incarcerated worker cannot ride in a private vehicle, even if in connection with employment, without permission from the Warden. *Id.* Nor may an incarcerated worker operate a vehicle without Warden authorization. *Id.*

e. The Warden must approve private free-world medical treatment, with no exception for treatment that would be needed for on-the-job injuries. *Id.*

f. An incarcerated worker may not make purchases or enter into contracts without the Warden's written authorization, nor may the worker even enter any free-world business without the Warden's "specific written approval." *Id.,* at 16–17.

**2. ADOC Enforces Its Requirement that Incarcerated Alabamians Work for Private Employers Through Violence, Threats of Violence, Solitary Confinement, Deprivation of Necessities, and Increased Lengths of Incarceration**

231. All of the same coercive forces that affect incarcerated workers and compel their unpaid, in-house work for ADOC—threats of transfers to more violent facilities, violence and threats of violence, deprivation of necessities and family contact, and increased length of incarceration, *supra* Part II.A-B.1—and that compel incarcerated individuals to labor for public

entities through the Work Center Program, also result in the coercion of incarcerated individuals' work for private, non-profit companies, including Private Employer Defendants.

232. In addition, incarcerated workers employed by ADOC and the private companies through the Work Release program are subject to additional coercion because any infraction or perceived refusal to work carries with it the threat that the worker may be sent "back behind the wall," i.e., back to the high risk of violence and bodily harm that would result from a transfer to a medium- or high-security facility. Incarcerated workers who go from working inside ADOC facilities to working for private employers, including Private Employer Defendants, from a Work Release facility well know, by the time they arrive at the Work Release facility, that refusing to work can lead to physical, unchecked violence if they are returned to the violent higher security, higher custody facilities.

233. The private companies participating in the Work Release Program, including the Private Employer Defendants, understood that they had an obligation to enforce ADOC rules and their own workplace policies, and that they could do so through (1) reporting workers' behavior to ADOC and leaving to ADOC to impose discipline, or (2) threatening workers with a report of the behavior to ADOC. Both of these options rely on the threat of ADOC-imposed discipline, with its attendant risks of, inter alia, violence, bodily harm, and increased length of incarceration. Forced Labor Named Plaintiffs and members of the Forced Labor Class work for private company employers, including the Private Employer Defendants, even when those employers are abusive, because they know that a refusal to work can lead to disciplinaries, transfers to more dangerous facilities, deprivation of necessities and the ability to see one's family, and increased detention.

234. Forced Labor Named Plaintiffs' and class members' reported experiences are illustrative of the coercion imposed upon incarcerated workers leased out by ADOC to work for the Private Employer Defendants and all other private employers. These are detailed in Counts I-IV, and V.A.

235. The ADOC Commissioner is and has been a partner in the joint venture that co-employs the incarcerated workers in the Forced Labor Class who labor for private entities through

the Work Release Program, and is liable for the coercion of work by those private entities, along with its own coercion.

### 3. Private Employers Act As Agents of ADOC and Are Aware or Reasonably Should Be Aware that the Incarcerated Alabamians Working for Them and ADOC Are Subject to Coercion

236. Through the Work Release Agreement, private companies, including each of the Private Employer Defendants, obtain a workforce that they can require to do more dangerous or less desirable tasks, and work longer hours, than they assign to similarly situated free-world workers or that free-world workers would be willing to do. That is because the incarcerated workers work subject to the threat of penalties and punishment, including transfer to dangerous facilities, placement in solitary, and other penalties, in the event they complain about working conditions, hours, or wages.

237. Each Private Employer Defendant knew or recklessly disregarded that the incarcerated labor provided by Named Plaintiffs and members of the Forced Labor Class through its contracts with ADOC was coerced.

238. Private employers that contract with ADOC for "leased" labor, including Private Employer Defendants, do so with the knowledge that the forced laborers themselves will receive only a fraction of the wages paid for their labor. The cooperating private employers, including Private Employer Defendants, have agreed to engage people subject to control by ADOC and pursuant to an agreement wherein they acknowledge that Alabama will deduct what is effectively a "convict leasing" fee equivalent to 40% of the gross wages paid by the private company, along with additional fees on top of that 40%. In doing so, they knew or reasonably should have known that Named Plaintiffs' and Forced Labor Class members' labor was coerced.

239. Each Private Employer Defendant has an obligation under the ADOC regulations and the Work Release Agreement to assist in enforcing the ADOC regulations that govern work and refusals to work. Under ADOC regulations, each Private Employer Defendant is obligated to

agree to provide notice to ADOC of any incarcerated person's failure to follow any rule or to "refuse[] to work as requested."[54]

240. As detailed in Count I (¶¶319-320, 322-518), many Private Employer Defendants have reported or threatened to report incarcerated workers for refusal to work, or fired or threatened to fire them. Private Employer Defendants knew or should have known that a report to ADOC would subject the reported worker to severe consequences. Private Employer Defendants also knew or should have known the incarcerated workers they employed understood the severe consequences that would result or were threatened if they refused to work, or engaged in any sort of perceived insubordination at the private employer's job site.

241. Each Private Employer Defendant knew or should have known that incarcerated workers who refuse to work—a violation of ADOC rules and regulations—have incurred and will incur consequences under ADOC Administrative Regulation 403, which outlines the "disciplinary process for inmates who commit [rule] violations." AR 403, at 1. This includes Rule Violation #518 "Refusing to work/fail to check out for work." AR 403, at 29.

242. Each Private Employer Defendant knew or should have known that ADOC classified refusing to work as a "medium level rule violation" that carried the potential sanction of the forfeiture of a minimum two years of accrued Good Time days (or all time accrued if less than two years); "Confinement to Restrictive Housing for up to 30 days"; or the "Loss of any and all privileges/incentives for up to 45 days," among other penalties. AR 403, at 22.

243. Likewise, each Private Employer Defendant knew or should have known that an incarcerated worker's "insubordination," "disorderly conduct" or "being fired from a job" constituted a "low level violation," AR 403, at 21, that could result in forfeiture of up to 30 days of accrued Good Time and the "[l]oss of any and all privileges/incentives for up to 30 days," among other penalties, AR 403, at 23.

[54] AR 410, at 12.

244. As detailed *supra* Parts I.C.1-I.C.3, the violent conditions in ADOC's medium- and high-security facilities, as well ADOC's gross understaffing and ADOC's deprivation of necessities in response to the 2022 strike, have been broadly publicized and each of the Private Employer Defendants knew or should have known of these conditions and understood that any disciplinary infraction for refusal to work carried with it a significant threat of bodily harm, along with deprivation of necessities. Like the public employers, Private Employer Defendants are not disinterested parties; their workforce is directly affected by conditions and practices within ADOC facilities.

245. Each Private Employer Defendant is aware or reasonably should be aware that the workers supplied to them by ADOC are severely limited in their ability to advocate for improved workplace conditions, to organize themselves and their co-workers or join a labor union, to publicize workplace abuses, to pursue or participate in wage-and-hour or other workplace litigation, or to join a union.

#### 4. Defendants Lovelace, Hamm, Ivey, and the Private Employers Benefit from the Coercion of Work Through the Work Release Program

246. Lovelace, Hamm, Ivey, ADOC, and the State obtain a significant benefit from their "leasing" of incarcerated persons' labor to private companies in Alabama.

247. Although ADOC's work-release revenue was declining at the start of the COVID-19 pandemic, as the pandemic eased—and due to Defendant Ivey's actions that resulted in shutting down parole and growing the State's incarcerated population—Alabama's work-release program became an increasingly valuable money-maker. In FY 2023, ADOC reported that it collected a record $12.9 million directly from its labor "leasing" work-release operations. In FY 2024, ADOC reported that it collected $12.2 million directly from its labor "leasing" work release operations, and in FY 2025, ADOC reported that it collected nearly $12.3 million from such operations.

248. Alabama profits from ADOC's work-release operation in many ways, but first and most directly by assessing a labor-trafficking fee equivalent to 40% of the gross earnings paid by the private employers for the forced labor. As explained *supra* ¶¶226-227, ADOC takes this cut

ahead of any garnishments or payments for family support or restitution due to victims. Specifically, for each paycheck issued by a private employer nominally in the name of the forced laborer, ADOC receives the funds and automatically deducts 40% of gross earnings—that is, the amount the forced laborer earned before required employer withholding and any deductions for federal and state payroll taxes—purportedly "to assist in defraying the cost of his/her incarceration," regardless of what those costs may actually be or how much the work-release laborer actually earned.[55] Notably, Alabama has continued to assess this flat 40% fee, purportedly to pay for the incarcerated worker's supposedly minimally adequate conditions of confinement, even though the State has been put on notice of the shocking deficiencies in the conditions ADOC actually provides by a damning report by the U.S. DOJ and by DOJ's subsequent lawsuit that chronicles horrific conditions of incarceration,[56] court orders (including those addressing serious deficiencies in access to medical and mental health care),[57] and ongoing litigation.[58] The shocking fact that Alabama is making these workers pay ADOC to keep them trapped in facilities unfit for habitation, thereby exposing them daily to threats to their life from violence, disease, and appallingly insufficient conditions, cannot be squared with the millions Alabama takes annually through these weekly payroll deductions.

249. In addition to the 40% labor-trafficking fee described above, ADOC also reaps profits from charging incarcerated forced laborers for essential services, such as fees for laundry ($15 per month), medical and prescription co-pays (generally $4-8 per visit or prescription, but with charges up to $20 for missed appointments), and inflated mandatory costs for work

---

[55] AR 410, at 4.

[56] 2019 DOJ Report; Complaint, *United States v. State of Alabama*, Case No. 2:20-cv-01971-JHE (N.D. Ala. 2020), Dkt. No. 1.

[57] *See Braggs v. Hamm*, 2023 WL 6656991, at *1 (M.D. Ala. Oct. 12, 2023); *see also* Consent Decree, *United States v. Alabama*, Case No. 2:15-cv-00368-MHT-TFM (M.D. Ala. June 18, 2015), Dkt. No. 11 (concerning sexual abuse and harassment at Julia Tutwiler Prison for Women).

[58] *See, e.g.*, *Barefield*, 688 F.Supp. at 1047 n.1 (noting that, "[i]n the past year, several courts have found viable allegations of unconstitutionally violent conditions of confinement throughout the Alabama prison system" and citing cases).

transportation. ADOC also generally charges each incarcerated worker $5 per day for ADOC transportation to and from their work-release job sites—which will yield another approximately $1 million in revenue to Alabama in FY 2023.[59]

250. Private Employer Defendants, together with the other more than 500 private employers with whom ADOC has engaged in joint ventures to obtain work from forced laborers since 2019, have benefited as a result of having an at-demand workforce.

251. The Private Employer Defendants benefit from receiving the coerced labor force in multiple ways, including because they are able to impose long and demanding work hours on the incarcerated workers without objection; they are able to—and sometimes do—pay wages to incarcerated workers that are below the wage rates they pay to free workers; they are able to maintain unsafe work conditions for incarcerated workers that they know or should know would be unlikely to be tolerated by free workers without resistance; they understand that the "leased" laborers cannot refuse to work or raise concerns about workplace conditions without risking significant discipline and return to more violent and life-threatening facilities; and ADOC regulations prohibit incarcerated people working through the Work Release Program from joining labor unions.[60] *See infra* Count V.A (detailing benefits to Private Employer Defendants).

252. The Private Employer Defendants know or should know that ADOC prohibits and severely punishes workers for any "refusal" to work, including simply being late to work, being sick, or simply not performing a job at the speed demanded by the employer or otherwise not to the employer's satisfaction, which represents a significant benefit to the Private Employer Defendants because it causes incarcerated workers to serve as a pliant and reliable workforce.

---

[59] Overall, ADOC typically collects a transportation fee of $10 per worker per day, collecting $5 from the worker's daily wages and collecting another $5 daily from the private employer, which also indirectly depresses workers' wages since it reduces the funds available for wage payments.

[60] AR 410, at 3.

## III. ADOC SYSTEMATICALLY RETALIATES AGAINST INCARCERATED PEOPLE FOR THEIR PROTECTED EXPRESSIVE CONDUCT, SPEECH, AND ADVOCACY

253. ADOC, under the supervision and direction of Defendants Ivey, Hamm, and Lovelace, maintains a policy, custom, and practice of retaliating against incarcerated people for expression concerning their compelled labor and the conditions in which they are made to work. That retaliation takes four forms: (1) punishing individuals who complain about, question, or object to a work assignment; (2) punishing those who file grievances or seek access to the courts; (3) punishing those who participate in collective work stoppages; and (4) punishing those who educate others or advocate against the State's forced labor system. In response to each of these forms of protected expression, ADOC retaliates both by weaponizing its rules and regulations to punish incarcerated people for speech that does not actually violate any legitimate regulation, and by using extrajudicial violence to quell dissent and deter incarcerated people from speaking out about their working conditions. This pervasive retaliation regime is used to advance ADOC's interests in profiting off incarcerated people's labor and to enable its ongoing failure to adequately staff its correctional facilities—not to effectively advance any safety, security, or other penological interest. The retaliatory regime challenged herein operates with the knowledge and assent or indifference of Defendants Ivey, Hamm, and Lovelace, who must have known about the rampant, ongoing retribution for protected expression in the Alabama prison system.

### A. ADOC Retaliates Against Individuals Who Raise Concerns About or Object to Their ADOC-Assigned Work and Working Conditions

254. ADOC retaliates against incarcerated people by routinely assessing the disciplinary offense of "refusal to work"—a formally defined violation under ADOC Administrative Regulation 403, *see supra* ¶¶153-158—against incarcerated people who have not, in fact, refused to labor or do the job assigned, but who have instead complained that an assignment is unsafe or unlawful, asked how to perform a job or requested training, or reported the denial of basic necessities on the job. *See infra* ¶653. Named Plaintiffs, as explained further below, have been or know of others who have been cited by ADOC for "refusing to work" or refusing to follow

orders—with respect to their work at ADOC facilities and for ADOC-contracted public and private employers—for nothing more than questioning a working condition or raising a concern about a supervisor.

255. The consequences ADOC has a regular practice of imposing against incarcerated people for expression regarding concerns about their working conditions are severe and lasting, and ADOC has imposed them whether or not any refusal to work occurred. As described *supra* ¶¶153-158, 166-168, a disciplinary for "refusing to work" carries with it the attendant risks of transfer to a more dangerous facility or dorm within a facility (including facilities in which the person has been or is likely to be physically or sexually assaulted), solitary confinement, deprivation of necessities and family visitation. Additionally, a person disciplined for "refusing to work" is routinely required to serve days of additional uncompensated labor that is often intended to be particularly laborious and intensive—such as digging up tree roots or cleaning vehicles in the hot sun. The disciplinary also damages parole prospects, as it is counted against the person during parole proceedings. ADOC issues many of its punishments for purported refusals to work as "behavior citations" instead of "disciplinaries." These behavior citations carry the same consequences as a disciplinary—including the loss of good time, visitation, and canteen access, transfer to a more violent facility, and negatively impacting parole prospects—but are not subject to the grievance process, allowing ADOC to sidestep even that meager form of review, as experienced by Plaintiff Rashaad Clark. *See infra* ¶338.

256. ADOC also regularly subjects incarcerated people who speak out about working conditions to outright violence. For example, a "punishment building" was operated for years at Draper, where correctional staff assaulted incarcerated individuals who had purportedly refused to work—even when in fact many, if not most, had only raised concerns about working conditions. This is consistent with reports of incarcerated people being threatened or punished with physical beatings for alleged "refusals to work" across many ADOC medium- and high-security facilities from plaintiffs including Trevion Clark, Jerame Cole, Danny Dandridge, Larry Jarmon, Turner Mason, and Quannie McCorvey, retained members of the putative class, and federal government

and media investigations. Each of these consequences would deter a person of ordinary firmness from speaking out about working conditions, and they have deterred Named Plaintiffs from doing so.

257. The punitive consequences ADOC imposes on individuals who raise concerns about working conditions do not serve a legitimate penological interest. Instead, as Named Plaintiffs' experiences demonstrate, ADOC uses its regulations as a tool to force incarcerated people to labor for its benefit. *See infra* ¶¶653-654 The regulations apply to refusals to work inside ADOC facilities even if incarcerated people are being asked to perform dangerous work or work for which they are not qualified. The regulations equally apply to incarcerated persons being required to work for an outside public or private, for-profit employer. Thus, an incarcerated person who expresses concern about or resistance to being pressed into laboring for an outside employer, even if the working conditions are dangerous or the worker has a bona-fide medical reason for not performing the work, is subject to these extreme punishments, including extension of their incarceration. *See infra* ¶¶653.a, c, e, 654.e. And subjecting incarcerated people to physical abuse, for any reason, serves no legitimate penological interest whatsoever.

258. Named Plaintiffs are aware of and subject to ADOC's widespread practice of punishing incarcerated individuals for voicing concerns about working conditions. In particular, as described more fully below, Named Plaintiffs Cartwright, Cole, R. Clark, Dandridge, Jarmon, Mason, Payton, and Pritchett, have experienced ADOC's practice of threatening to punish and/or punishing incarcerated workers for purportedly "refusing to work" when they have raised work-related concerns, including: (a) complaining about unsafe or intolerable working conditions; (b) informing ADOC personnel of injuries that make it difficult or impossible to perform their assigned task; (c) questioning supervisor's policies or procedures; or (d) reporting supervisors for wrongful conduct. *See infra* ¶653.a (Cartwright); ¶653.b (Cole:); ¶¶346, 653.c (R. Clark); ¶653.d (Dandridge); ¶¶377, 653 (Dandridge); ¶¶572, 653.e (Jarmon); ¶653.g (Mason); ¶¶464-465, 653.j (Payton).

259. The retaliation Named Plaintiffs have experienced reflects a practice so well-established that many incarcerated people do not speak at all to avoid the risk of punishment. *See infra* ¶654.a (T. Clark: avoided reducing complaints to writing); ¶653.a (Cartwright: didn't file grievance because of fear of retaliation); ¶653.h (McCorvey: couldn't speak up about CBAK); ¶653.i (Morrissey: understanding that speaking up leads to punishment); ¶653.k (Thomas: didn't speak up about Ju Young to keep his custody).

260. Across ADOC facilities, and as reflected in the experience of Named Plaintiffs and other similarly situated incarcerated people, ADOC follows a consistent practice of treating protected expression about work or working conditions as a "refusal to work" and punishing it accordingly, as described above. The practice is not limited to any genuine refusal to work, but is applied to those whose only offense was to speak. Its uniformity across facilities reflects a custom and policy rather than the isolated acts of individual officers, and it has produced a pervasive understanding among incarcerated Alabamians, including Named Plaintiffs, that any expression regarding ADOC's forced-labor regime will be met with swift and severe reprisal.

### B. ADOC Retaliates Against Those Who File Grievances or Seek Access to the Courts, and Has Closed Off Every Other Avenue for Redress

261. ADOC has ensured that Named Plaintiffs and other incarcerated people cannot lawfully complain about its forced-labor regime through formal channels both by retaliating against those who attempt to do so and by rendering its grievance process a functional nullity as to the conduct at issue. Several Named Plaintiffs, including Council, Moore, Cole, McDole, Campbell, Ptomey, Pritchett, and English, submitted grievances concerning the conditions and practices compelling their labor to no avail, and several Named Plaintiffs have been told or made to understand that the grievance process may not be used to contest working conditions or compelled labor. Mr. Cole has also seen ADOC engage in retaliatory transfers of people who make complaints about the conditions in the facilities.

262. Even for those offenses that are nominally grievable, ADOC's grievance process is a functional nullity. ADOC had no grievance process whatsoever prior to December 15, 2022. To

the extent there is a grievance process now, the experience of many incarcerated people is that filing grievances is a futile exercise that results, at best, in no change, and, at worst, leads to retaliation by ADOC officials.

263. ADOC also regularly retaliates directly against incarcerated people who attempt to assert their rights and push back against abusive, unsafe, or otherwise problematic working conditions by filing grievances. ADOC's practice of retaliating against those who seek to use the grievance process is not limited to the subject matter of work and working conditions, but is a practice that exists across facilities and subject matter. The impact of this retaliation, however, is clear: it discourages and impedes people from obtaining redress through formal channels, including as relates to work-related issues. The experiences of Trevion Clark, Mr. English, Mr. Jarmon, Mr. McDole, Mr. Payton, Mr. Prewitt, Mr. Thomas, and Ms. Walker are addressed below in Count IX. *See infra* ¶654.a (T. Clark: ADOC destruction of grievances and intimidation); ¶654 (English: retaliation for grievance filing); ¶653.e (Jarmon: same); ¶654.b (McDole: grievance futile); ¶653 (Payton: retaliation for raising safety concerns); ¶654.e (Prewitt: retaliation for raising concerns about working conditions); ¶654.f (Thomas: grievance futile); ¶653.l (Walker: disciplinary for grieving sexual demands made by ADOC-contracted employer).

264. Incarcerated people do not have any viable alternatives through which to express their grievances with the coercive working conditions or otherwise challenge those conditions. Incarcerated people cannot reasonably raise their concerns with working conditions and coerced work with ADOC leadership, with the wardens of ADOC facilities, or through the media, without fear of retaliation and punishment. This is confirmed by the experiences of the Named Plaintiffs and retained Class Members. Incarcerated people and their families write letters protesting the unsafe and inhumane detention and working conditions to the Governor and to ADOC officials, but do not receive responses or any meaningful improvement in work conditions.

### C. ADOC Maintains a Policy of Punitive Responses to Peaceful Protests That Pose No Security Risk But Threaten Its Profits

265. ADOC, at the direction and with the consent of Defendants Ivey, Hamm, and Lovelace, also maintains a policy of retaliating against incarcerated people who engage in peaceful acts of collective expression intended to protect their rights, advocate for the rights of others, and educate both incarcerated people and the outside world about the ongoing coerced labor regime. This policy is reflected in ADOC's response to non-violent work stoppages that do not implicate the safety or security interests of ADOC, but do make it more difficult for ADOC to profit off the forced labor of incarcerated workers.

266. In 2013, Plaintiff Robert Earl Council and another individual incarcerated by ADOC founded and organized the Free Alabama Movement, which is now a nationwide movement on behalf of incarcerated people, their families, and their communities. From its inception, the Free Alabama Movement has embraced as core strategies education about Alabama's scheme of extracting forced labor and otherwise profiting from incarcerated people, and non-violent work stoppages to resist the State's profiting from forced labor. Through it, Mr. Council and others have led a labor movement focused on peacefully resisting forced labor and profiteering.

267. Beginning on January 1, 2014, Mr. Council and his co-leader advocated for and organized non-violent work stoppages at Holman, St. Clair, and Elmore correctional facilities, stoppages that were joined by 2,300 individuals incarcerated at those prisons and ultimately joined by a total of 4,500 people across ADOC facilities.

268. In 2016 and 2018, Mr. Council and other Free Alabama Movement leaders supported national strikes spanning 24 states and 46 facilities, including as many as 57,000 incarcerated individuals. On September 26, 2022, they called for a statewide strike protesting worsening conditions and continued forced labor across all of ADOC's medium- and high-security men's facilities. The strike involved the withholding of labor at every one of those facilities and lasted as long as six weeks at some. As described *supra* ¶¶159-164, ADOC relies and has relied

on incarcerated people to staff vital functions at the facilities, including at the men's facilities, having them work as guards, healthcare and mental health providers, cooks, cleaners, maintenance men (including electricians, carpenters and mechanics), directors of drug rehab programs and more, in lieu of needing to hire—and pay—staff to perform those duties. Therefore, when the men withheld their work during these concerted work stoppages, the operation of these facilities ground to a halt.

269. In response to the 2022 strike, ADOC, at the direction of Governor Ivey, meted out violent repression throughout each of its men's facilities, and even punished incarcerated people at facilities that were not striking. This included reducing the food supply to strikers; physically abusing and punishing them, including by placing in solitary confinement strike leaders and work-release workers who refused to work as strikebreakers as compelled by ADOC; limiting their access to food and basic hygiene products; and, as discussed *supra* ¶¶150-158, modifying ADOC regulations pursuant to the 2023 Executive Order to identify increased punishments for disciplinary violations, including violations that involve the withholding of labor, refusing to work as directed by ADOC, and organizing or encouraging other people to refuse to provide coerced labor to ADOC and the private and public employers participating in Defendants' coerced labor scheme.

270. Although ADOC had ordered and stored ample food to provide three full meals to everyone in its custody, it ordered all men's facilities, in response to the strike, to severely restrict the food provided to all incarcerated people—strikers and non-strikers alike. Under this practice, known as "bird-feeding," ADOC cut calories below subsistence level, serving meals of little more than a slice of cheese between two slices of bread, a small serving of beans or potatoes, or a slice of cheese on oatmeal. At times, ADOC would provide only one meal a day. ADOC had food ordered and stocked and instead chose not to adequately feed the people in its custody, including those with fragile health, in order to punish them for the strike. It was a coordinated, retaliatory response to protected expression by attempting to starve them until their resistance broke.

271. ADOC responded to the strikers' protest of their working conditions by allowing living conditions for the strikers to deteriorate. At Donaldson Correctional Facility, for example, ADOC allowed trash to accumulate throughout the facility until rats and snakes became rampant, removed officers from the dorms leading to an increase in violence, and denied recreation, programming, and even outdoor access.

272. ADOC also barred incarcerated people—strikers or not—from the commissary, the only means by which they could access several basic necessities.

273. During the 2022 strike, ADOC also responded to the strikes by punishing individuals at work release facilities (which were not participating in the strike) who sought to support the strikers. Mr. Dandridge was at North Alabama Community Work Center during the 2022 strike and was one of the incarcerated people who participated in the strike and refused to be a strikebreaker. ADOC wanted approximately 15–20 people from work release, including Mr. Dandridge, to strike break at Limestone, and Warden Pickett threatened that if they did not go to Limestone to do strike-breaking work, ADOC would send them back behind the fence and take their low-custody status. Mr. Dandridge ultimately was not disciplined because he had a medical appointment that provided an excuse for not working, but others were forced to go. Another incarcerated person who was at a work release facility was forced by ADOC to work within its facilities to attempt to break the strike. When this worker sought to honor the strike and declined to work, he was removed from the Work Release Program, put "behind the wall" at Limestone, a high-security, much more violent facility. ADOC also placed him in solitary confinement for several months as punishment for his support of the strike.

274. ADOC also meted out collective punishment to incarcerated men at work release facilities, even though they were not striking or protesting their work conditions. During the 2022 strike, ADOC punished everyone at Childersburg Work Release by restricting commissary access to food and basic sanitary supplies, even though no one at Childersburg participated in the strike. This punishment sent a message to all incarcerated workers at the men's facilities that ADOC would retaliate indiscriminately if they protested their working conditions.

### D. ADOC Makes An Example of Those Who Engage in Any Form of Advocacy Regarding Working Conditions, As Illustrated by Its Brutal Retaliation Against Robert Earl Council

275. ADOC has made a public example of the leaders of the Free Alabama Movement, including Plaintiff Council, to deter other incarcerated people from refusing to work or speaking out about the conditions of their labor. It has reserved its most extreme retaliation for Mr. Council, answering his resistance to Alabama's forced labor regime with severe threats, prolonged solitary confinement, and brutal physical violence.

276. Mr. Council has been subject to severe and abusive treatment in retaliation for his efforts to educate incarcerated people and those outside the prisons about ADOC's forced labor system, to awaken people's political consciousness with respect to forced prison labor and inform them of their rights, and to advocate that incarcerated persons refuse to submit to forced labor, including by withholding their labor. Since he and his co-leader started the Free Alabama Movement, Mr. Council has been subjected to long stretches of solitary confinement, exceeding a total of eight years (including five continuous years in solitary), in response to his education and advocacy efforts. He has also been subjected to physical beatings, harassment, death threats, and psychological abuse by ADOC guards and officials as retaliation for his nonviolent advocacy.

277. Since the inception of the Free Alabama Movement, Mr. Council has consistently advocated against, and spoken to others about, Alabama's coercion of labor from incarcerated people across Alabama. He has sought to educate people about how the forced labor system works and to explain the importance of cutting off the flow of money to the involved actors to reform the system. He has repeatedly advocated for nonviolent resistance, both by individuals and collectively, to ADOC's forced labor policies, including the 2014, 2016, 2018, and 2022 work stoppages described above.

278. ADOC has singled out Mr. Council and his fellow Free Alabama Movement leaders for retaliation precisely because of their leadership of other incarcerated people. Since 2015, ADOC has held Mr. Council and his co-leader in long stretches of solitary confinement in response

to their resistance. While they were confined, ADOC has subjected them to physical beatings, strip searches, exposure to chemical agents, harassment, and psychological abuse.

279. In response to the 2014 strike, for example, ADOC placed Mr. Council and his fellow strike leaders in solitary confinement. For Mr. Council, this transfer kicked off years of solitary confinement, torture, confiscation of his personal and legal documents, beatings, and transfers between ADOC facilities to prevent him from speaking with others about Alabama's forced labor system.

280. ADOC has repeatedly assigned Mr. Council and other Movement leaders to Donaldson Correctional Facility, which is notorious for the brutal beatings its staff inflict on those suspected of advocating for human rights. Over roughly two years at Donaldson, Mr. Council spent more than a year in solitary confinement and fewer than nine months in the general population. ADOC personnel also attacked all three leaders while at Donaldson, including while they were held in solitary confinement.

281. In 2021, in retaliation for his work on the Free Alabama Movement, including the strikes and labor protests, ADOC officers beat Mr. Council so severely that he had to be med-flighted to a trauma center to save his life. ADOC then transferred him to a cell at Kilby and left him there, bleeding and without medical care, for 21 days—knowing all the while that he had suffered devastating brain trauma and injuries to his head and eye. One officer has already been convicted for the assault. Mr. Council lost vision in one eye for more than two years, remains permanently vision-impaired, and carries lasting physical damage, including a brain injury.

282. State and federal officials have confirmed much of this retaliation, including the U.S. Department of Justice as part of its ongoing enforcement action against the State. *See supra* ¶¶76-86, 248. Beyond the beatings, ADOC has held Mr. Council in cells unfit for habitation—infested with rats, roaches, and spiders; without lights; frequently without working plumbing; and at times without even a mattress. For years at a time, ADOC denied him visitation, telephone access, and any outdoor exercise.

283. ADOC's extreme violence in response to Mr. Council and his co-leaders' peaceful efforts to resist forced labor, and its extreme response to incarcerated workers who sought to support these efforts, are common knowledge among incarcerated men and women in Alabama. ADOC has intentionally made an example of Mr. Council and his co-leaders to deter and intimidate other incarcerated individuals from withholding their labor or from encouraging others to do so: specifically, ADOC is intentionally communicating the message—endorsed by Governor Ivey—that anyone who refuses to work, whether it be for ADOC itself or for private and public employers outside the prison walls, but at ADOC's direction, or who speaks up about the working conditions incarcerated people are subject to, will be subject to violence, solitary confinement, and inhumane conditions. ADOC officials repeatedly caution incarcerated laborers that a refusal to work will be met with the same punishment meted out to Mr. Council.

284. Despite the brutal retaliation he has faced, Mr. Council intends to continue educating other incarcerated people about Defendants' forced-labor scheme and the means of peaceful and effective resistance to it, and to continue advocating that incarcerated people resist that scheme, including by withholding their labor. However, he is concerned about the retaliation by ADOC that he and those who engage with him will face. The harm to his First Amendment rights is ongoing. ADOC continues to interfere with his ability to engage with other incarcerated people and with concerned people outside the prisons: for example, at Limestone, where he is currently incarcerated, ADOC has barred him from collective settings such as classes, and in January 2026, ADOC transferred Mr. Council and his Free Alabama Movement co-leaders for several weeks to an extreme segregation unit at Kilby. Based on ADOC's demonstrated and repeated willingness to retaliate against his advocacy, Mr. Council reasonably fears that he will again be subjected to solitary confinement, transfer, deprivation, and violence for his continued education and advocacy. He intends to engage in that protected expression notwithstanding that threat.

### E. Defendants Ivey, Hamm, and Lovelace Bear Responsibility for the Foregoing Retaliation

285. Governor Ivey and the ADOC Commissioner laid the groundwork for and continue to enforce the formal policy under which much of this retaliation operates. As discussed *supra* ¶¶150-158, in 2023, Governor Ivey issued Executive Order 725, which classifies "refusing to work" as a "medium" level violation and "encouraging or causing a work stoppage" as a "high" level violation, and then-Commissioner Hamm promulgated, and Commissioner Lovelace continues to enforce, the implementing regulations. AR 403.

286. Defendants were and are aware that ADOC personnel use these "refusal to work" citations as a pretext to punish incarcerated people for protected speech. The rampant abuses in Alabama's prisons, and the chronic understaffing that has left ADOC dependent on incarcerated people to perform the work of correctional officers, were well-established public knowledge when Governor Ivey issued her 2023 Executive Order. Ivey and the ADOC Commissioner therefore knew or should have known that empowering correctional officers to punish incarcerated people for refusing to work would lead to the abuse of that power—abuse that has since proven obvious, flagrant, and rampant throughout the Alabama prison system. Despite that knowledge, Ivey, Hamm, and Lovelace have implemented no corrective action, training, or oversight to stop ADOC officers from weaponizing the regulations and order they promulgated.

287. The State's response to the September 2022 statewide strike was also directed from the top. ADOC staff, including wardens, told incarcerated workers that the orders for the retaliation were coming "from Montgomery," and workers at Childersburg who continued working but were punished anyway were told the same. ADOC staff at Bullock, for whom Rashaad Clark worked as a runner, told him that the orders directing their response to the strike were coming from Montgomery, and were not what they wanted to do. In fact, ADOC leadership at Bullock told Rashaad Clark that they had hoped the strikers would have held out a little bit longer, because they were planning their own sympathy strike. Incarcerated workers understood statements by ADOC staff to mean that the directives came from Governor Ivey herself.

288. Other features of the State response confirm that it was coordinated and directed at the highest levels of the State. The order to slash food statewide could only have come from Montgomery: ADOC Administrative Regulation 701 requires a "wholesome and nutritious diet" meeting national standards, including three meals a day, and even its weekend-and-holiday exception requires meals meeting basic nutritional goals—standards the bird-feeding practice plainly did not meet. A simultaneous, statewide departure from ADOC's own regulations of that kind must have been directed or approved by those with authority to do so—Ivey and then-ADOC Commissioner Hamm. ADOC likewise sent a "riot team" to Bullock and nearly every striking facility to "lock down" each as punishment, and those teams are controlled at the regional and state level rather than by individual facilities.

289. Governor Ivey's own public statements confirm her awareness of the strike, the workers' demands, and ADOC's response. Asked about the strike, she acknowledged the strikers' demands, dismissed them as "unreasonable" and unwelcome in the state,[61] and commended then-Commissioner Hamm for having matters "well under control"—claiming, falsely, that there had been no interruption of essential services.[62] The conditions the strike protested made national news, including reports of accumulating garbage, starvation rations, and violence such as an apparent murder at Donaldson,[63] and those reports were brought to Governor Ivey's attention as she was asked to comment publicly on the strike.[64] Ivey, Hamm, and Lovelace thus knew or should have

---

[61] Howard Koplowitz, *Striking Alabama inmate workers' demands 'unreasonable,' Ivey says*, AL.com (Sep. 30, 2022), https://www.al.com/news/2022/09/striking-alabama-inmate-workers-demands-unreasonable-ivey-says.html.

[62] *Id.*

[63] Keri Blakinger, *Alabama Said Prison Strike Was 'Under Control.' Footage Shows System in Deadly Disarray*, The Marshall Project (Oct. 6, 2022), https://www.themarshallproject.org/2022/10/06/alabama-said-prison-strike-was-under-control-footage-shows-system-in-deadly-disarray.

[64] See, e.g., Isaac Chotiner, *The Stunning Neglect and Racist Politics Behind Alabama's Prison* Strike, The New Yorker (Oct. 6, 2022), https://www.newyorker.com/news/q-and-a/the-stunning-neglect-and-racist-politics-behind-alabamas-prison-strike; Sam McCann, *What You Need to Know About the Alabama Prison* Strike, Vera (Oct. 27, 2022), https://www.vera.org/news/what-you-need-to-know-about-the-alabama-prison-strike; Eduardo Medina, *Alabama Inmates Strike,*

known of the deteriorating conditions, endemic violence, and coerced labor across Alabama's prisons, of which both have long been aware. *See supra* ¶¶67-98.

290. Defendants Ivey, then-Commissioner Hamm, and, on information and belief, Lovelace were aware of, directed, and/or failed to prevent ADOC's response to the strikers—including the denial of food, medical care, hygiene, and other necessities, even at Work Release facilities that primarily leased labor to private employers. That response was not isolated or sporadic, but was employed consistently across ADOC facilities and in response to multiple distinct advocacy efforts by Plaintiff Council and others in ADOC custody. Defendants Ivey, Hamm, and Lovelace have been on notice for years of ADOC's aggressive retaliation against those who speak out about their conditions, and have done nothing to stop the unlawful conduct that continues to occur under their supervision.

## CLASS ALLEGATIONS

291. Named Plaintiffs Robert Earl Council aka Kinetik Justice, Michael Campbell, Toni Cartwright, Rashaad Clark, Trevion Clark, Jerame Aprentice Cole, Danny Dandridge, Alimireo English, Larry Darnell Jarmon Jr., Joseph Lesley, Turner Mason, Quannie McCorvey, Frederick Denard McDole, Lee Moore, Deckrice Morrissey, Pierre Payton, Eric Prewitt, Lanair Pritchett, Arthur Charles Ptomey Jr., Victor Thomas, and Lakiera Walker bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief and damages on behalf of the following Classes and Subclasses.

---

*Denouncing Prison* Conditions, The New York Times (Sept. 28, 2022), https://www.nytimes.com/2022/09/28/us/alabama-prisons-strike-protest.html; Kyle Gassiott, *Alabama inmates are on strike, protesting sentencing policies and a parole* process, NPR (Oct. 14, 2022), https://www.npr.org/2022/10/14/1129223092/alabama-inmates-are-on-strike-protesting-sentencing-policies-and-a-parole-proces; Michael Sainato, *Alabama prisoners strike over 'horrendous' conditions,* The Guardian (Oct. 6, 2022), https://www.theguardian.com/us-news/2022/oct/06/alabama-prison-strike-work-conditions; Tana Ganeva, *'We Are Human Beings': Alabama Prisoners Strike to Protest Abusive Conditions, Excessive Sentencing,* Rolling Stone (October 2, 2022), https://www.rollingstone.com/politics/politics-news/alabama-prisoner-strike-work-stoppage-1234603401/.

292. Forced Labor Class (represented by Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker): All persons who have been incarcerated in correctional facilities owned and operated by ADOC, and who worked while in the custody of ADOC, at any time between the earliest applicable statute of limitations and the date a class is certified in this action.

a. Forced Labor Injunctive Relief Subclass (represented by Plaintiffs Campbell, R. Clark, T. Clark, Cole, Jarmon, McDole, Moore, Morrissey, Payton, Prewitt, and Pritchett): All persons who are currently incarcerated in correctional facilities owned and operated by ADOC, and who worked while in the custody of ADOC, at any time between the earliest applicable statute of limitations and the date a class is certified in this action.

293. First Amendment Class (by Plaintiffs Council, Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker): All incarcerated persons within ADOC's custody and housed within correctional facilities owned and operated by ADOC at any time between the earliest applicable statute of limitations and the date a class is certified in this action.

a. First Amendment Injunctive Relief Subclass (represented by Plaintiffs Council, Campbell, R. Clark, T. Clark, Cole, Jarmon, McDole, Moore, Morrissey, Payton, Prewitt, and Pritchett): All persons who are currently incarcerated in correctional facilities owned and operated by ADOC.

294. Plaintiffs reserve the right under Rule 23 to amend or modify the Class descriptions and/or to add one or more subclasses as appropriate.

295. All members of the Forced Labor Class and the First Amendment Class have suffered or are threatened with imminent injury as a result of Defendants' wrongful acts and omissions, as alleged herein.

296. This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

297. Numerosity—Rule 23(a)(1). The members of each Class and Subclass are so numerous that joinder of all members is impractical. As of April 2026, ADOC reported that 21,169 incarcerated people were housed within correctional facilities it owned and operated and, as alleged herein, most of these individuals are coerced to work. ADOC reports that, as of April 2026, there were 1,832 people in Work Centers and 1,364 in Work Release facilities.

298. Commonality and Predominance—Rule 23(a)(2) and 23(b)(3). There are many questions of law and fact common to each of the Classes that will predominate over any questions affecting only the individual members. These common questions include, but are not limited to:

a. With respect to the Forced Labor Class, whether Defendants Ivey and Lovelace have a policy and practice of compelling incarcerated persons to work through force, physical restraint, economic coercion, abuse of law or legal process, serious harm, or threats of such means, and/or a scheme, pattern, or plan intended to cause them to believe that they or another would suffer serious harm or physical restraint;

b. With respect to the Forced Labor Injunctive Relief Subclass, whether Defendants Ivey and Lovelace have a policy and practice of subjecting incarcerated people to a condition of involuntary servitude; and

c. With respect to the First Amendment Class and First Amendment Injunctive Relief Subclass, whether Defendants Ivey and Lovelace have a policy and practice of retaliating against individuals who raise concerns about working conditions and advocate for resistance to forced labor including through work stoppages.

299. Typicality—Rule 23(a)(3). Because the policies and practices challenged in this Complaint apply with equal force to the Named Plaintiffs and the absent members of each Class and Subclass, the Named Plaintiffs' claims are typical of the claims of the members of the putative Classes and Subclasses they purport to represent.

300. Adequacy—Rule 23(a)(4) and 23(g)(1). The Named Plaintiffs are adequate representatives of the Classes and Subclasses they represent because they are each a member of their respective Classes and Subclasses and because there are no material conflicts of interest between Named Plaintiffs and the interests of the Classes and Subclasses they seek to represent. The Named Plaintiffs have retained and are represented by competent and qualified counsel with extensive experience handling civil rights, class action, and other complex civil litigation. Proposed class counsel have litigated dozens of civil rights and other class actions and have substantial experience litigating cases under 42 U.S.C. §1983 and the Trafficking Victims Protection Act of 2000 ("TVPA"). Plaintiffs' counsel will vigorously prosecute this action for the benefit of all putative members of each proposed Class and Subclass.

301. Risk of Inconsistent Adjudications—Rule 23(b)(1). Certification is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of putative Class and Subclass members would create a risk of establishing incompatible standards of conduct for Defendants and inconsistent results for Class and Subclass members.

302. Declaratory and Injunctive Relief—Rule 23(b)(2). Certification is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to each respective Class and Subclass, thereby making appropriate final declaratory and injunctive relief with respect to each of the proposed Classes and Subclasses as a whole.

303. Predominance and Superiority—Rule 23(b)(3). Certification is appropriate under Rule 23(b)(3) because questions of law or fact common to each of the respective Classes and Subclasses predominate over any questions affecting only individual members, and because class action treatment is superior to other available methods for fairly and efficiently adjudicating this controversy. Individual litigation of the claims of each member of the proposed Classes and Subclasses would be impracticable and unduly burdensome to the courts. There is no foreseeable difficulty in managing this action as a class action, and it provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

304. Issue Certification—Rule 23(c)(4). Certification of issues of liability under Rule 23(c)(4) is appropriate because these issues are common to putative members of each Class and Subclass, and because resolution of these common issues on a classwide basis will materially advance the disposition of the litigation as a whole.

305. Defendants have acted or refused to act on grounds generally applicable to the proposed Classes and Subclasses. Their policies, practices, acts, and omissions have affected all members of each of the respective Classes and Subclasses. Accordingly, final injunctive and declaratory relief is appropriate as to each Class and Subclass as a whole.

## COUNT I

**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(a)(1), By Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker on Behalf of Themselves and the Forced Labor Class, RWDSU, and USSW**

**Against Defendants Lovelace, Hamm, and Ivey for Knowingly Obtaining and Providing Forced Labor Through Means of Force and Physical Restraint and Threats Thereof**

306. Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker ("Forced Labor Named Plaintiffs"), on behalf of themselves and the Forced Labor Class, and RWDSU and USSW, bring this count against Defendants Hamm, Lovelace, and Ivey under 18 U.S.C. §§1589(a)(1), 1595(a), which prohibit persons from "knowingly provid[ing] or obtain[ing] … the labor or services of a person … by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person." 18 U.S.C. §1589(a)(1).

307. Defendants Hamm, Lovelace, and Ivey are liable to each of the Forced Labor Named Plaintiffs and the members of the Forced Labor Class, because, as detailed herein, they knowingly obtained and provided the labor and services of these individuals and did so by means of force, threats of force, physical restraint, and/or threats of physical restraint.

308. Defendants Ivey, Hamm, and Lovelace are also liable to Plaintiff RWDSU because that same conduct supplies coerced labor to ADOC-contracted employers where the union's members and supporters work and where the union seeks to organize and/or represent workers, including Defendants Koch Foods and RCF/Gemstone. Those employers' use of incarcerated labor, obtained through the coercive means described in this Count, depresses wages and degrades working conditions for all workers in the industries in which RWDSU organizes, supports, and represents workers.

309. ADOC, through Hamm and Lovelace, has maintained an intentional system of coercing labor from incarcerated individuals, including Forced Labor Named Plaintiffs, for decades and at least since 2013. Incarcerated individuals, including Named Plaintiffs and members of the Forced Labor Class, are required to perform the work that ADOC assigns them and that is for the benefit of ADOC and the State, whether it be work performed within the prison walls or for ADOC-contracted employers outside the prison walls. ADOC relies on physical force and restraint, and threats of the same, to compel incarcerated individuals to work for the benefit of ADOC and the State. The physical force and restraint, and threats thereof, occur through (1) ADOC's practice of using violence and the threat of physical harm, including as punishment for failures to work for ADOC directly and for ADOC-contracted employers, and through transfers to more dangerous areas or facilities, to convey to Forced Labor Named Plaintiffs and Forced Labor Class Members that they must labor for the benefit of ADOC; (2) application of ADOC's regulations and Defendant Ivey's 2023 Executive Order, which result in the imposition of discipline for perceived refusals to work or to work as directed, which extends individuals' periods of incarceration; and (3) ADOC's practice of placing incarcerated persons who fail to work as requested by ADOC or by ADOC-contracted employers, or are perceived as doing so, in solitary confinement and threatening them with solitary confinement.

310. Defendant Ivey has participated in and supported ADOC's scheme of coercing incarcerated individuals to labor for the benefit of ADOC and the State through means of force, threats of force, physical restraint, and/or threats of physical restraint. Ivey has participated in the

coercion of Named Plaintiffs' and Class members' labor through imposition of the 2023 Executive Order, which extends and threatens to extend those individuals' periods of incarceration in response to any refusal or perceived refusal to work, and by reaping the benefit of the significant, 40% labor trafficking fee from ADOC-contracted employers.

311. ADOC's regulations and Governor Ivey's 2023 Executive Order provide that incarcerated individuals will be issued disciplinaries for declining to work or encouraging others to do so—disciplinaries that increase the likelihood that an individual will be denied parole. Under ADOC's regulations and the 2023 Executive Order, incarcerated individuals lose their good-time credits as punishment for declining to work or encouraging others to do so. By threatening incarcerated workers with adverse parole consequences and the loss of good-time credits in the event they decline to work or support others who do so, ADOC and the Governor are threatening the workers with increased terms of incarceration. ADOC regulations, as authorized by Governor Ivey's 2023 Executive Order, also provide as consequences for declining to work or encouraging others to do so confinement to restrictive housing (solitary confinement) and a recommendation for a custody review (which can result in an incarcerated worker being sent to medium- and high-security facilities where they face a realistic prospect of physical injury or death).

312. **Defendants Hamm, Lovelace, and Ivey Are Liable Because They Have "Obtained" Services and Labor Within ADOC Facilities from Coerced Labor Named Plaintiffs, Performed for ADOC and the State's Benefit.** Forced Labor Named Plaintiffs' experiences across ADOC facilities, described below, demonstrate that ADOC has a practice of using force and threats of force and physical harm, along with threats of solitary confinement and extended incarceration (confirmed by ADOC regulations and Ivey's 2023 Executive Order), to coerce Named Plaintiffs and members of the Forced Labor Class to labor for the benefit of ADOC and Hamm and Lovelace, and the State and Ivey, within and for ADOC facilities. The labor at issue is nearly all unpaid, as described *supra* ¶¶161-164 and is essential to the functioning of ADOC. The labor that ADOC and Ivey compel Named Plaintiffs and Class members to perform has involved work that would be performed by ADOC correctional staff if ADOC facilities were

appropriately staffed, including overseeing educational programs, performing maintenance, and supervising dorms; or by outside contractors, such as skilled mechanical and building services. *See supra* ¶¶161-162, 164. The coerced work that has been performed by Named Plaintiffs and Class members is not minimal and is not limited to cleaning of their own living spaces.

313. As described in detail below, Forced Labor Named Plaintiffs have been assigned by ADOC to work: 1) in ADOC kitchens, often on full-time shifts in grueling conditions, cooking, cleaning and serving food (Cartwright, R. Clark, T. Clark Cole, English, Jarmon, McCorvey, Morrissey, Pritchett, Ptomey, class member Smith: *see infra* ¶¶331, 338, 353, 367, 393-394, 405, 407, 433, 452, 482, 486, 488, 492, 322-323); 2) laboring on ADOC's "farm" (R. Clark, T. Clark, Cole, McCorvey, Thomas: *infra* ¶¶339, 353, 364-366, 433, 496, 499, ); 3) on "blood duty," which involved cleaning up blood after fights (McCorvey: *infra* ¶433); 4) doing daily delivery of food trays to incarcerated people in violent dorms (Mason: *infra* ¶¶424-427); 5) as dorm clean-up crews (Campbell, Cole, English, Jarmon, Mason, Prewitt, Ptomey: *infra* ¶¶325, 367, 407, 410, 429, 475, 477, 492); 6) as "runners" and front office runner (R. Clark, Dandridge, Pritchett, Thomas: *infra* ¶¶340, 382, 383, 385, 483, 496); 7) stripping and buffing floors (Walker: *infra* ¶¶506, 509); 8) maintenance crew (Cole: *infra* ¶¶367-368); 9) unloading chemical trucks (Walker: *infra* ¶¶506, 509); 10) washing vans and ADOC personnel's cars (T. Clark, English: *infra* ¶¶353, 404); 11) performing administrative work, including preparation of shift reports and other paperwork for ADOC officers (Dandridge, Mason: *infra* ¶¶385, 431 (witnessing others)); 12) doing ground maintenance (English, Jarmon, Moore: *infra* ¶¶393, 409, 411, 446, 448); 13) as a Substance Abuse Prevention instructor (R. Clark: *infra* ¶341); 14) helping teach a Crime Bill class (Dandridge: *infra* ¶384); 15) for the Correctional Industries program (Dandridge: *infra* ¶387); 16) as an ADOC facility fixer and performing maintenance, including construction, HVAC, plumbing, electrical, building tasks, and work on wardens' homes (Moore: *infra* ¶¶446-451); 17) installing a heating system at ADOC facility, working with a private company (Moore: *infra* ¶446); 18) as a decoy for the canine training team (McDole: *infra* ¶438); 19) as a front gate greeter (Payton: *infra* ¶464); 20) as a programming coordinator (McDole: *infra* ¶439); 21) in health care (Dandridge, Pritchett: *infra*

¶¶383, 385, 483) and caring for mentally disabled and sick individuals (Walker: *infra* ¶506); 22) as a Faith Dorm Representative, a position that included organizing security, programs, maintenance, investigations, feeding others (English: *infra* ¶¶395, 403); and 23) burying those who died in ADOC custody and whose families did not claim their bodies (Ptomey: *infra* ¶492).

314. As detailed below, Forced Labor Named Plaintiffs reasonably understood that they could not refuse to labor for ADOC within its facilities, for no or extremely little pay, as a result of multiple, consistent ADOC policies and practices designed to compel their labor, including: 1) placing Named Plaintiffs and other incarcerated individuals in segregation/solitary for purported failures to work, and threatened to do so (*see* Jarmon, Mason, McCorvey, Walker: *infra* ¶¶409, 423, 433, 506); 2) physically beating and slapping incarcerated persons who were perceived as refusing to work (*see* Cole, Jarmon, Mason, McCorvey: *infra* ¶¶360, 364, 409, 423, 434); 3) transferring, and threatening to transfer, Named Plaintiffs and other incarcerated individuals to more violent parts of an ADOC facility or to a more violent ADOC facility for purported failures to work (*see* Campbell, Cole, Mason, McCorvey: *infra* ¶¶324, 360, 423-432, 434); 4) conveying to Named Plaintiffs and other incarcerated individuals that performing free, "in-house" ADOC work was the only way to be moved out of violent locations (*see* Cartwright, R. Clark, Cole, English, Pritchett: *infra* ¶¶332, 337, 362-363, 394, 482); 5) issuing disciplinaries for purported refusals to work, and threatening to do so, to Named Plaintiffs and other incarcerated individuals—disciplinaries that meant Named Plaintiffs and others could be deemed ineligible for transfers to lower-security and less dangerous facilities, and making them less likely to obtain parole (*see* Cartwright, R. Clark, Cole, Lesley, Mason, Payton, Prewitt, Pritchett, Thomas: *infra* ¶¶329-332, 337, 360-361, 420, 423, 428, 462-466, 476, 487-488, 499).

315. **Defendants Hamm, Lovelace, and Ivey Are Liable Because They Have "Provided" and "Obtained" Services and Labor Performed at Work Release and Work Center Job Sites By Forced Labor Named Plaintiffs, for ADOC and the State's Benefit.** Lovelace, Hamm, and Ivey have taken actions to provide and secure the services of Forced Labor Named Plaintiffs and Forced Labor Class members for numerous public and private employers

through coercion, including physical violence, threats of physical violence, solitary confinement and threats thereof, and increased periods of detention and threats thereof. These services of Forced Labor Named Plaintiffs and Forced Labor Class Members are provided to the ADOC-contracted public and private employers through ADOC's Work Center and Work Release programs, which, as explained *supra* ¶¶169-174, 206-212, 246-252, provide significant financial benefit to ADOC and the State.

316. Over the last decades, ADOC has supplied and transported Forced Labor Named Plaintiffs and Forced Labor Class members to job sites around Alabama to perform work for hundreds of private and public employers. ADOC contracts with these employers, promising to provide them with a workforce that remains subject to ADOC restrictions and threats of severe punishment should they not work as demanded, in exchange for a substantial fee (upwards of $18 per day per worker for public employers and 40% or more of all gross wages paid by private employers). *See supra* ¶¶226-227, 238, 248.

317. Forced Labor Named Plaintiffs have, among them, been assigned by ADOC to provide their labor and services to at least 23 public employers and 45 private companies. These public employers in addition to the three named Public Employer Defendants, include: Bibb County, Coffee County, Foley County, Jefferson County, Monroe County, Pike County, Shelby County, City of Atmore and Atmore Work Center, City of Childersburg, City of Decatur, City of Elmore, City of Enterprise, City of Oak Grove, City of Sylacauga, City of Talladega, Madison County Commissioner, Monroe County Board of Education, Trenholm College, and Elmore Recycling Center.

318. The private companies where Named Plaintiffs have worked, in addition to the 14 named Private Employer Defendants, include: Alabama Cable, Amaze Corps, Anderson Lawn, Applebee's, Bama Seafood Restaurant, Blair Block, Bud's Cookies, Burger King, Captain Ds, Contract Services & Fabrication Company, Doc's Seafood Restaurant, Dorsey Trailer, "El Giro" (a Mexican restaurant), Fred's Cabinet Shop, Full Moon BBQ, Inzi Controls, Kelly's Heating and Air, MacVantage Packages, McDonald's (a different franchisee than CBAK), Metal Plate, Mobile

Mitsubishi, Old Time Grill, Popeye's, Raymond Steel, Smith Company, Sprint Turf, Supreme Cores, Wayne Farms, Wellborn Cabinet, Wendy's (a different franchisee than Southeast Restaurant Group), and a plastics manufacturer.[65]

319. ADOC provides workers in its custody to the contracting employers through established and widespread practices including assigning workers to the positions requested by the contracting employers; placing or transferring individuals who refuse, or are perceived as refusing, to work, or who complain about working conditions, to dramatically more violent locations or to solitary confinement; requiring them to do punishment work, i.e., work identified by ADOC as grueling and undesirable; and issuing disciplinaries for failure to work, perceived failure to work (including when someone is sick or injured), and to work as directed, all of which increase the possibility of extended incarceration for the workers. All of these coercive practices are reflected in the experiences of Named Plaintiffs set forth below.

320. Specifically, Named Plaintiffs' experiences confirm the following coercive practices: 1) physical beatings by ADOC personnel for failure to perform work for a Work Release employer (*see* McCorvey: *infra* ¶¶434); 2) placement in solitary and threats to place Named Plaintiffs in solitary if they refused to work or follow orders of ADOC-contracted employers (*see* Cartwright, Jarmon: *infra* ¶¶329, 409, 413; Dandridge (2 weeks in segregation for refusing to follow public employer's orders and being "fired" for using wrong bathroom): *infra* ¶¶380-381); 3) transfers, and threats of transfer, of Named Plaintiffs and other incarcerated individuals to more dangerous locations and facilities if they did not work as demanded (*see* Campbell, R. Clark, T. Clark, Cole, Dandridge, Jarmon, McCorvey, Smith, Thomas: *infra* ¶¶322, 343-44, 409-419, 433-436, 496-505; 4) issuance of disciplinaries for purported failures to work, and threats to issue such disciplinaries—which would cause Named Plaintiffs and other incarcerated persons to be transferred back to violent, high-security facilities, or denied parole and have their terms of incarceration extended (*see* Campbell, Cartwright, R. Clark, Dandridge, English, McDole,

---

[65] Plaintiffs RWDSU and USSW assert this Count I, as well as Counts II-IV, with respect to compelled work at ADOC-contracted poultry and fast food employers, respectively.

Morrissey, Payton, Thomas, Walker: *infra* ¶¶324-328, 336-348, 377-408, 437-445, 452-474, 496-518); and 5) requiring Named Plaintiffs and other incarcerated persons to perform free "punishment" work at the ADOC facilities or to work at a "punishment" job for an ADOC-contracted employer, if they objected to work at an ADOC-assigned employer (*see* Campbell, Jarmon, Payton, Prewitt, Walker: *infra* ¶¶324-328, 409-419, 461-481, 506-518). Each of these coercive means to secure and provide labor and services has an impact both on the individuals against whom the force and physical restraint are threatened or used, and on those incarcerated persons, including Forced Labor Named Plaintiffs and Class members, who observe the coercion and therefore reasonably understand that they too will be subject to severe, adverse consequences should they refuse to work as demanded by ADOC and ADOC-contracted employers.

321. ADOC's agreements with Work Release and Work Center employers reserve to ADOC significant control over incarcerated individuals' work schedules, wages, and conditions, even as ADOC and the State receive financial payments for supplying and transporting the workers to the non-ADOC employer. ADOC, through Lovelace and Hamm, has had the right to control the terms and conditions of Forced Labor Named Plaintiffs and the Forced Labor Class members' employment at job sites of Work Release and Work Center employers, including but not limited to the manner and timing of work assignments, the supervision and evaluation of work, decisions regarding discipline and termination, work schedules, compensation, job duties, and working conditions. As such, at all relevant times, Hamm and/or Lovelace has established and maintained a co-employment and/or joint venture relationship with each and every Work Center and Work Release employer, including Private and Public Employer Defendants.

**<u>Named Plaintiffs and Class Members' Experience of Ivey and ADOC's Coercion</u>**

322. **Putative Class Member Chris Smith.** Incarcerated workers across ADOC are often compelled to work long hours and demanding jobs for ADOC in the kitchen, jobs which ADOC frequently uses as "punishment" jobs. In or about late January 2026, ADOC publicly announced that it had entered a contract with Aramark, a private for-profit service corporation, to take over and run the kitchens in most, if not all, of its facilities. Christopher Smith, an incarcerated

worker assigned by ADOC to work in the kitchen at Hamilton Aged & Infirm ("Hamilton A&I"), experienced—along with more than 20 of his incarcerated coworkers—being transferred from unpaid full-time work for ADOC in the kitchen to unpaid full-time work for Aramark in the kitchen. Beginning in roughly late February 2026, Smith and several of his coworkers spoke on several occasions with Aramark staff who came into the facility to train their new incarcerated workforce as to how to cook and run the kitchen according to Aramark rules and procedures. Smith spoke with Aramark Vice President of Operations, Troy Carter, David Campos (who also worked for Aramark in California out of Salinas), and Ms. Pedrosa (who worked for Aramark also in Ohio). Ms. Pedrosa explained to the incarcerated staff that elsewhere, such as in Ohio, the prison and Aramark ran a culinary school so that once you finished the culinary school inside the prison, you got paid for working for them and also had the certification. Mr. Campos and Mr. Carter advised Smith and his coworkers that Aramark had submitted paperwork in Montgomery for DOC to sign so they could pay the incarcerated kitchen workers. On or about May 14, 2026, when Mr. Carter came back through Hamilton A&I, Smith and his coworkers asked about the status of getting paid for their work for Aramark and were told by Mr. Carter that Alabama is refusing to sign Aramark's proposal to pay wages to their incarcerated kitchen workers.

323. Smith describes that while conditions at Hamilton A&I are safe, the exchange to secure an assignment to Hamilton A&I is to work unpaid for ADOC. Previous to Hamilton A&I, ADOC had assigned Smith to Limestone for many years. While at Limestone, Smith witnessed a parade of horrors and violence daily, and understands that any refusal to work in the kitchen for Aramark or elsewhere at Hamilton A&I will be met with discipline, which can bring a return "behind the fence" to Limestone. Given the proximity of Limestone to Hamilton A&I, Smith understands and has witnessed that ADOC's regular threat and standard method of compelling incarcerated people at Hamilton A&I to work is ADOC transferring them to the violence at Limestone. He has seen ADOC send three or more people back to Limestone or other similarly violent institutions as punishment when ADOC was not happy with their work or thought they were refusing to do the unpaid jobs assigned to them. Smith has witnessed one of his coworkers

in the kitchen at Hamilton A&I attempting over the last couple of months to try to leave his job in the kitchen with Ararmark. In response to this coworker's request to cease working for Aramark in the kitchen, this coworker faced threats from ADOC of denial of visitation with his family after that coworker lost his mother, and threats of discipline for refusal to work, which brings with it the threat of a transfer back to Limestone or other violent facilities. As of the date of this filing, these threats from ADOC have compelled this coworker to keep working for Aramark.

324. **Michael Campbell.** Mr. Campbell feels compelled to work because he knows that if he does not, he will be disciplined and potentially shipped back to a violent, chaotic higher-security facility like Bibb or Kilby, where he would fear for his safety. He has seen other incarcerated people refuse to work or get fired from jobs, and then get written up. If Mr. Campbell was not at Work Release now, he would be trying to get a job to escape the violence. Mr. Campbell has experienced extreme violence while in ADOC's custody, as explained *supra* ¶¶100-101 and incorporated herein.

325. Mr. Campbell has observed that, upon arrival at a Work Release facility, ADOC requires incarcerated people to work an unpaid job, often on some sort of "clean up crew," before ADOC will assign someone to a job with a private employer. Mr. Campbell worked on the dorm clean-up crew at Childersburg, as instructed, because he was trying to get employment outside of ADOC's facilities and understood he had to complete his assigned in-house job first. While he has not been cited personally, he has seen ADOC "ship" people back behind the fence for purported refusals to work.

326. While incarcerated at Bibb, a medium-security facility, Mr. Campbell briefly worked on the road squad for Bibb County and Defendant ADOT, cleaning up trash and maintaining the roads. He worked approximately seven to eight hour days, and he was paid $2 for a day's labor. He completed this work because he understood he needed to work his custody down so he could go to work release.

327. Since ADOC moved Mr. Campbell to Childersburg Work Release in 2019, he has worked for several private employers, including Defendants Bama Budweiser, Progressive

Finishes, and Pell City KFC. The State and private employers have profited off of Mr. Campbell's labor while he remains incarcerated. The details of Mr. Campbell's coerced work for these Defendants are discussed *infra* at ¶571 for Bama Budweiser, for Progressive Finishes at ¶582, and for KFC at ¶581, in Counts V-VI, and incorporated herein.

328. For the entire time he has been at Work Release, ADOC has deducted 40% of Mr. Campbell's gross pay, plus a fee of $5 per day for van rides to and from the work sites, and $15 per month for laundry.

329. **Toni Cartwright.** Ms. Cartwright has observed, experienced, and understands that if an incarcerated person refuses to do work, either for ADOC itself within the prison walls or for other employers, ADOC will issue that person a disciplinary infraction, which can result in a loss of privileges, including phone, visitation, and canteen, loss of custody, or getting placed in segregation. Ms. Cartwright has also seen how disciplinary infractions for refusing to work have a significant negative impact on an incarcerated worker's chances of getting granted parole.

330. ADOC forced Ms. Cartwright to perform long daily hours of uncompensated work, upon threat of discipline up to and including solitary confinement. Ms. Cartwright reports that each facility she was housed in (all of the ADOC women's facilities) holds a "job board" once per week. The job board involves ADOC officers, often including the Warden, Captains, Lieutenants, Sergeants, and Stewards, sitting in a room, and calling incarcerated people in one at a time to assign them to a job. Incarcerated people who have recently arrived at a given facility have no choice in the job they are assigned, and ADOC often gives them the hardest jobs such as work in the kitchen or on the grounds. The job board is mandatory for nearly all incarcerated people—if someone does not attend, ADOC officers write them a disciplinary infraction. At the work release facilities Ms. Cartwright worked, incarcerated people were required, by ADOC policy, to work (without pay) inside the facility for 30 days before becoming eligible for a work release position outside of the facility.

331. In 2011 at Tutwiler, ADOC ordered Ms. Cartwright to work in the kitchen, where she served food to other incarcerated people. Ms. Cartwright describes the working conditions as

"hell"—ADOC officers and the kitchen steward, a non-security ADOC employee who manages the kitchen, regularly talked down to and cursed at Ms. Cartwright and other incarcerated workers, and often threatened to issue disciplinary infractions if the workers allegedly "refused to work." Ms. Cartwright also worked in the kitchen at Birmingham Work Release around 2018–19, as well as in the kitchen at Montgomery Women's Facility. The ADOC officers and kitchen stewards at Montgomery regularly cursed at incarcerated workers and issued disciplinary infractions when the workers had not violated any rules. These disciplinary infractions carry significant consequences, as described below.

332. In Ms. Cartwright's experience, once ADOC assigns an incarcerated person a job through the job board, the work is mandatory, and ADOC will issue a disciplinary infraction if a worker "refuses to work," even when the worker has a valid excuse. For example, in 2025 at Tutwiler, an incarcerated worker was struggling with the side effects of a mental health medication that she was taking and was physically ill, but ADOC still issued her a disciplinary infraction for not coming to work in the kitchen. Similarly, in 2019 at Birmingham Work Release, ADOC assigned Ms. Cartwright to work in the kitchen, but she could not get out of bed one day due to a side effect of the anxiety medication that she was taking. ADOC issued Ms. Cartwright a "behavior intervention" for "failure to work," and later when she went up for a custody review, ADOC denied her a lower custody level, in part because of the failure to work behavior intervention. At Montgomery Women's Facility, Ms. Cartwright recalls ADOC issuing an incarcerated worker a disciplinary infraction for not working in the kitchen on a day that was supposed to be the worker's day off. Disciplinary infractions for refusing to work or for getting fired from an in-house job carry severe consequences, including getting placed in segregation, loss of privileges including phone, visitation, canteen, and tablet, and a negative impact on the worker's chance at parole.

333. ADOC forced Ms. Cartwright to work for private employers, including Defendants Southeastern Meats, Paramount Services, and Wendy's, along with McDonald's, Bud's Best Cookies, and Hager's. ADOC assigned Ms. Cartwright to each of these jobs—she had no choice

in the job or hours worked, and she understood that she could not quit or else ADOC would issue a disciplinary infraction, take her work release custody, and send her back to Tutwiler.

334. Ms. Cartwright's experience of coerced labor at Defendant Southeastern Meats is addressed *infra* at ¶586; her experience of coerced labor at Defendant Paramount Services at ¶580; and her experience of coerced labor at Defendant Wendy's (Southeast Restaurant Group) at ¶585, in Counts V-VI, and incorporated herein.

335. ADOC also forced Ms. Cartwright to work at Bud's Best Cookies for approximately two months while she was housed at Birmingham Work Release. She worked the third shift, from approximately 6 p.m. through 6 a.m., five days per week, on the assembly line placing cookies in bags. The working conditions were poor—the assembly line area was always dirty, and there were often bugs around Ms. Cartwright's work area. Ms. Cartwright complained to her supervisor about these conditions and her supervisor dismissed her concerns, telling her: "Don't worry about it." Supervisors at Bud's Best Cookies regularly threatened Ms. Cartwright and other incarcerated workers, including threats to "send y'all back." On at least one occasion, Ms. Cartwright observed a Bud's Best Cookies supervisor fire an incarcerated worker and call ADOC to come pick her up. Ms. Cartwright herself was fired after a White free-world employee made a racist comment to her, which started an argument between them. To the best of Ms. Cartwright's recollection, she received a disciplinary infraction for getting fired, and lost phone, visitation, and canteen privileges.

336. **Rashaad Clark.** Due to the extreme violence in ADOC facilities, Rashaad Clark focused a great deal of effort in trying to get his classification level down so that he could get out of Bullock and away from the violence and also secure some payment for working. He went to classification repeatedly to ask for help to help himself. He completed all coursework he was offered (as he had previously secured his GED). He was denied Work Release two times but got it the third time.

337. ADOC staff advised Rashaad Clark that part of the way to "work your custody down" was to work for ADOC as it was critical to reducing your custody level to not receive

disciplinaries and ADOC issued disciplinaries for failure to work. He has received disciplinaries and citations for alleged failure to work and has seen many other incarcerated people disciplined for alleged failures to work, at every ADOC facility, including work release and honor camps, where he has been assigned.

338. While at Bullock, Rashaad Clark worked as a "hallway cleaner/runner," which meant he worked cleaning the hallways outside the office of Sergeant Whit and other ADOC officers and would do any delivery or other assignments they gave him. He typically worked the same days and hours as Sergeant Whit. Even though he had a job as hallway cleaner, he also was assigned to work in the kitchen. When he failed to show up at the job due to his work as a hallway cleaner, Lieutenant White issued him a citation for "refusing to work." Because of that citation, he lost visitation and phone privileges to communicate with his family and he lost the ability to use the canteen. Because it was a citation, there is no ADOC procedure available to contest it. He also worked as a runner while at Bullock again in 2022.

339. Prior to Bullock, Rashaad Clark was forced to work on the "farm" at Draper, walking miles each day doing farm work with only a single cheese sandwich to eat, as punishment from Sergeant Pettaway for failing to tuck in his shirt and defending himself from Sergeant Pettaway's assault. While at Draper, Rashaad Clark saw many other incarcerated people punished with farm work or physical beatings from ADOC officers.

340. At Staton in 2013-2014, Rashaad Clark worked as a "runner" (a person who delivers messages) for Lt. Sewell as a means to get out of the violent dorms—which were also rife with corruption—and to secure basic personal and hygiene products, as he was not provided anything basic supplies when he was transferred to Staton from Draper. Rashaad Clark worked exactly the same hours as Lt. Sewell: whenever Lt. Sewell was on duty, so was Rashaad Clark as his runner.

341. Rashaad Clark's last job with ADOC before he secured his work release custody was at J.O. Davis, where he was employed as a Substance Abuse Prevention ("SAP") instructor.

He worked Monday through Friday in this job under the supervision of a preacher, Mr. Bishop (who was a SAP teacher and social worker).

342. After passing SAP, ADOC assigned Rashaad Clark to work for the City of Atmore in 2017-2018 for the Atmore Work Center. He worked there, Monday through Friday, 8 hours per day, for about two months. Next, ADOC assigned him to work the road squad in Mobile for ADOT for about a month, again working Monday through Friday, at least 8 hours per day. He was assigned to this work from the Mobile Honor Camp. Then, he was assigned to work by Mobile Work Release at a Mexican restaurant called "El Giro." At El Giro, he typically worked 6 days per week, Tuesday through Sunday, about eight hours per day. He worked there for about a year, finishing in 2020.

343. He was later moved to Frank Lee work release and was assigned to work at Defendant Bama Budweiser. The details of Rashaad Clark's experience performing coerced labor for Bama Budweiser are discussed *infra* ¶571, and incorporated herein.

344. After Bama Budweiser, ADOC transferred Rashaad Clark "behind the wall" to Staton until ADOC assigned him to Alex City work release. From Alex City, ADOC assigned Rashaad Clark in 2024 to work at Wendy's in Auburn, Alabama. He worked there for between four and six months, working 5 days per week, at least 8 hours per day. On the job, he had two managers, Megan and Gwen. Gwen harassed Rashaad Clark consistently, causing him to complain to ADOC officials at the camp. Captain Floyd at Alex City spoke to Rashaad Clark about the situation and she advised him to document everything. While on the job, the managers at Wendy's would threaten him and the other incarcerated workers nearly daily, constantly saying things to the effect of: "I am going to get your ass fired. You are going to get more time added to your sentence. You are going to be in the camp."

345. After Wendy's, ADOC assigned Rashaad Clark to work at Blair Block, Amaze Corps, and Defendant Progressive Finishes. While he was at Amaze Corp, after only about a week on the job, Rashaad Clark was cussed out by a supervisor for asking to change the paper on a machine. The supervisor was hungover and upset because a different incarcerated worker had

failed to show up to work that day, and seemed to take out that frustration on Rashaad Clark. As a result, Rashaad Clark was disciplined by ADOC for "getting fired from the job," despite the fact that he was not the person who failed to show up for work. In fact, when Rashaad Clark returned to the Work Release facility after being sent off the job by the supervisor, the Captain advised Rashaad Clark that he knew Rashaad Clark had not been at fault.

346. After Amaze Corps, ADOC assigned Mr. Clark to Blair Block. He worked for Blair Block for about 6 months. He was dropped off at the worksite between 3 and 4 a.m. and was assigned work from 7 a.m. until about 5 p.m., with a single 30 minute break each day. He typically worked six days per week, Monday through Saturday. His job was to help create the bricks, which Blair Block sold to ADOC to build the new prisons. Each day between 3 a.m. and 7 a.m., Blair Block advised the incarcerated workers to rest in the pavilion in front of the building and begin their shift around 7 a.m. After a few months on the job, one day, the owner of the company, Matt Blair, called an all staff meeting and asked for input on work conditions. Rashaad Clark spoke at the meeting and raised concerns about only getting one break and the unequal distribution of work between free and incarcerated workers. Mr. Blair welcomed the feedback during the meeting and the next week, Rashaad Clark was notified that he had been fired by Blair Block for "not being a team player," "complaining about the job" and disappearing "from the job for three hours." The complaints about the job and allegedly not being a team player were based on the comments Mr. Blair had invited at the employee meeting and the disappearing for three hours referred to the time Rashaad Clark spent resting in the pavilion from 3 a.m. to 7 a.m., where he had been resting with all of the other incarcerated workers, but he was the only one fired. This disciplinary remains in his file.

347. Rashaad Clark's most recent work assignment by ADOC was to Defendant Progressive Finishes. Rashaad Clark's experience performing coerced labor for Progressive Finishes is discussed *infra* at ¶582, and incorporated herein.

348. Whether assigned work inside or outside of ADOC facilities, Rashaad Clark has observed ADOC punish others and himself for refusing to work or alleged refusals to work. As

Rashaad Clark has observed, an incarcerated person cannot refuse to work because if you do, you will get in trouble and the punishment will be put in your disciplinary folder and used to deny you parole. To Rashaad Clark, the denial of parole is the biggest threat, but any disciplinary for failure to work also means the loss of phone and visitation privileges with your family and canteen privileges. He also has heard and seen ADOC personnel and various private employers where he or other incarcerated people were assigned to work by ADOC say to other incarcerated workers and to himself that if they did not work, they would be punished and put behind the fence, which means sent back to the extremely violent medium- and high-security facilities, such as Bullock and Limestone. He personally was sent to Limestone this last year for disciplinaries issued while at Childersburg work release, exposing him to great harm in the months it took to challenge the disciplinaries. He has seen incarcerated people written up for refusing to work or being perceived as refusing to work for ADOC or for public and private employers at every ADOC facility where he has been assigned. He has been disciplined a number of times personally for this alleged offense although he has never refused to work. In 2024, he was issued discipline for "getting fired from a job" at Amaze Corps. Although after he returned to the camp, the Captain advised Rashaad Clark that he knew he had not done anything wrong and that Amaze Corps management was at fault, he told Rashaad Clark that he could not, as Rashaad Clark requested, expunge the discipline from his file. He notes that a write up for his alleged refusal to work at Bullock in the kitchen in 2016 and the 2024 "getting fired from a job" disciplinary are still in his "jacket", which is the colloquial term for his record which is transmitted to the parole board.

349. **Trevion Clark.** Mr. Trevion Clark understood throughout his incarceration that the Work Release program was the only realistic path to survival and eventually to freedom. Work Release meant lower violence, home passes, the ability to earn money, and creating a work record the Parole Board required before it would grant parole. He pursued placement accordingly. But within that program, Mr. Trevion Clark had no choice over where he worked or what he did. ADOC's practice was and is to assign every incarcerated person at its Work Release facilities to a job. Mr. Trevion Clark understood the coercive stakes of that system from direct observation,

such as the vicious attacks on those who refused to work at Draper, *see supra* ¶¶113, 256, and did what he could to avoid those consequences.

350. In Mr. Trevion Clark's experience, refusing to work in ADOC results in a major disciplinary infraction. A disciplinary costs good time, eliminates access to education and trade school, strips commissary, phone, and visitation privileges, and forecloses parole. Enough disciplinaries result in transfer to a Level IV facility. Mr. Trevion Clark understands being sent to a Level IV facility as tantamount to a death sentence, and believes his choices in ADOC custody are to work or to die. In his words: "In ADOC custody, you work or you die." He views Level IV facilities as a death trap.

351. ADOC officials made the consequences of non-compliance with ADOC's work requirement explicit to Mr. Trevion Clark on multiple occasions. For example, in approximately February 2024, an ADOC secretary at Elba Work Release told him that there would be hell to pay if he called out from work. Later that year, at Alex City, an assistant to the JPO told him that he could not call out or he would go back behind the fence, and a separate JPO warned him that if he filed a complaint about her for letting people smoke in the dorms, she would make sure he was sent back behind the fence. A correctional officer at Alex City reinforced this message through a specific practice: she would recite to the incarcerated workers recent violence statistics and incidents at other ADOC facilities, such as overdose deaths, stabbings, healthcare staff departures, and disease outbreaks. She delivered these descriptions in the context of warning Mr. Trevion Clark and other incarcerated people that non-compliance with work assignments would result in transfer to those facilities. She and other officers told incarcerated workers that they would "crank the van up" at any sign of non-compliance by them with the work requirement.

352. These were not abstract threats. In May 2025, after Mr. Trevion Clark filed a grievance and raised concerns about his conditions at Alex City, ADOC transferred him from Alex City, a work-release facility, to Kilby, a high-security facility, on the basis of pretextual disciplinary charges. He learned his lesson and tried to avoid being assigned a job by ADOC while at Kilby, doing things like taking classes instead, because he believed if he had a job, it would

create a risk that ADOC would write him up and keep him in prison longer. Mr. Trevion Clark has never been formally disciplined by ADOC for an outright refusal to work, but that is because he learned to phrase things carefully to avoid the consequences that would come from a refusal. As he puts it, the system feels like a form of entrapment: ADOC makes conditions so bad that you do not want to work, but expressing that gets you disciplined.

353. While he was incarcerated at Draper in approximately 2013, Mr. Trevion Clark was assigned to the farm squad, working from sunup until two or three in the afternoon, and to the kitchen washing dishes. ADOC paid him nothing for any of this work. He understood he had no choice, because he had seen what happened to incarcerated people who refused. He has experienced a job requirement at every ADOC facility where he has been incarcerated. At Easterling, he was required to attend mental health classes which meant he was exempt from having to work a job. Even at Alex City, a Work Release facility, Mr. Trevion Clark was assigned to be a third-shift bathroom cleaner in addition to his outside job assignments. In Mr. Trevion Clark's experience, every incarcerated person at the facility received some form of in-house work assignment, irrespective of whether they had a free-world job. Similarly, at Elba Work Release, when Mr. Clark was between outside job placements, ADOC assigned him to wash the facility's vans to avoid being sent to a more dangerous facility.

354. Mr. Trevion Clark has had his labor involuntarily leased out to various public and private employers while in ADOC custody. While incarcerated at Alex City in 2016, Mr. Trevion Clark was assigned to work at Fred's Cabinet Shop in Dadeville, Alabama, building cabinets. He did not choose this assignment. While working there, a blade severed the tip of his finger. Fred's sent him to the hospital, which stabilized him and returned him to ADOC with the severed fingertip in a bag, and the possibility that it could be reattached with appropriate medical attention. For two days, Mr. Trevion Clark attempted to obtain medical attention from ADOC sufficient to save the fingertip. ADOC did not provide it; after two days, an ADOC official removed the bag and discarded the fingertip. Mr. Trevion Clark returned to Fred's Cabinet Shop for approximately ten more months after losing his fingertip, never daring to test whether he could

refuse. Despite Mr. Trevion Clark's workplace injury, incarcerated workers continued to be sent to Fred's Cabinet Shop through at least 2024.

355. Mr. Trevion Clark was later transferred by ADOC to Elba Work Release. While he was there, ADOC assigned Mr. Trevion Clark to work on an ADOT road crew. He did not choose this placement. On the road crew, he worked in the cities of Troy and Geneva, and worked Monday through Thursday from 6 a.m. to 2:30 p.m.

356. From September to November 2023, ADOC assigned Mr. Trevion Clark to work at a Burger King location in Elba, Alabama, and then to work at Burger King in Enterprise. He worked at Burger King for approximately three months. While he was working there, a Burger King supervisor used her position to pressure Mr. Trevion Clark for sex. He declined, and she then assigned him to work alongside a male employee who harassed him. Mr. Trevion Clark reported the harassment to his JPO, who told him to speak to the supervisor directly and handle it himself. The supervisor then laid Mr. Trevion Clark off, which led to him being forced to wash vehicles outside for weeks as punishment while waiting to be assigned to another private employer.

357. Mr. Trevion Clark was assigned to work for Defendant Hwaseung Automotive ("Hwaseung") in Elba from approximately January to March 2024; Mr. Trevion Clark's experience performing coerced labor for Hwaseung is discussed *infra* at ¶574, and incorporated herein.

358. Mr. Trevion Clark was also assigned to work at Wellborn Cabinet in Ashland, Alabama, doing shipping work in approximately 2024. He did not choose this assignment. Mr. Trevion Clark complained to his JPO that the work at Wellborn was too physically demanding, but the JPO refused to change his assignment and, after he ultimately withdrew from the job, refused to place him at any other employer. The JPO also lost Mr. Trevion Clark's birth certificate and Social Security card and used the missing documents as a stated reason to deny him subsequent employment. When Mr. Trevion Clark raised this with the JPO, the JPO told him that his complaining would result in being sent back behind the fence.

359. Every job that Mr. Trevion Clark had in ADOC custody was coerced. The most notable form of coercion was that refusal to work is a major disciplinary offense that would cost him good time, threaten his parole, and keep him incarcerated longer. If ADOC gave him a disciplinary, that would make it more difficult for him to take classes or attend trade school, which Mr. Trevion Clark is currently doing, and thus jeopardize his future when he is finally released. In addition, Mr. Trevion Clark reasonably feared that a disciplinary would increase the risk of physical assaults by officers, along the lines of what he experienced at Draper, and would also result in the loss of access to the things that make ADOC life livable, such as commissary, visitation, and store access. Those consequences last for months. Mr. Trevion Clark reasonably feels his options are to do as he's told, including working as directed by ADOC, or stay in ADOC custody for a long time.

360. **Jerame Cole.** Mr. Cole has observed, experienced, and understands that if an incarcerated person refuses to do work, ADOC will issue that person a disciplinary infraction, which can result in a loss of phone, visitation, and canteen privileges, loss of custody level, or getting placed in segregation. Mr. Cole has also observed ADOC officers beat incarcerated workers for allegedly refusing to work.

361. Mr. Cole himself was punished for allegedly refusing to work for ADOC. When he first arrived at Bullock in approximately 2008, he was assigned to work in the kitchen and ordered to clean the entire kitchen himself. Mr. Cole protested, and he received a disciplinary infraction for "refusal to work." He received a 30-day restriction of his phone, visitation, and canteen access.

362. Because of his experiences in medium- and high-security facilities, Mr. Cole has felt compelled to work his way down to a lower custody level so that he can avoid the violence plaguing these facilities. However, Mr. Cole has found that working down his custody can be challenging because the violence from guards causes violence from incarcerated people in return, destabilizing the entire environment.

363. In Mr. Cole's experience, medium- and high-security ADOC facilities have "job boards" where incarcerated persons meet with ADOC officers and get assigned in-house jobs. If

an incarcerated person refuses to go to the job board, they are written up for "refusing to work." A refusal to work disciplinary will eliminate for a period of time the recipient's ability to advance to a lower custody level and can and sometimes does also result in getting sent to segregation and a loss of phone, visitation, and canteen privileges.

364. While housed at Draper, Mr. Cole was forced to work on the "farm" from approximately 2013–2016. He worked from 6 a.m. to 2 p.m., five days per week, for no pay. Mr. Cole's duties included cutting the grass by swinging a long blade. ADOC officers frequently beat people who refused to work on the farm or whose work did not satisfy the ADOC officers; Mr. Cole reports that this was a near daily occurrence, and that ADOC officers would order incarcerated workers to the "back gate," where the officers would beat them. This practice was normalized and accepted at Draper, and on one occasion, an ADOC guard hit Mr. Cole in the stomach with a metal rod at the back gate because the guard claimed Mr. Cole had refused to work; he has a lasting injury from that beating and was forced to continue working. ADOC guards would regularly beat incarcerated workers and then write the workers disciplinary infractions for "assault on an officer" to cover up the beatings. An infraction for assault on an officer typically results in the person getting sent to lock-up, typically for twelve to eighteen months; a custody adjustment that allows for placement only in a Level V facility; and loss of visitation, phone, and canteen access. Sometimes, ADOC officers gave incarcerated workers a choice: the worker could choose to either get slapped by the ADOC officer, or receive a disciplinary infraction. Mr. Cole, analogizes the forced labor he and other incarcerated workers experience to slavery, with ADOC using "the disciplinaries like a whip."

365. On one occasion at Draper, ADOC guards attempted to wake Mr. Cole up in the early morning to force him to go work on the farm several hours before his shift typically began. Mr. Cole did not immediately get out of his top-bunk bed, so an ADOC sergeant pulled him off the bed, causing him to fall on the floor. When Mr. Cole stood up, the sergeant slapped him in his face; other ADOC personnel then told Mr. Cole to go to work. On another occasion, Mr. Cole witnessed an ADOC guard slap an incarcerated worker in his face for not working, and the slap

was so hard that the worker standing next to him collapsed out of fear. Mr. Cole has also observed ADOC officers at Draper spray incarcerated workers in the face with mace for refusing to work.

366. ADOC officers at Draper also regularly wrote incarcerated people disciplinary infractions for minor violations and used those infractions to build its workforce. ADOC officers referred to Tuesdays as “Humbug Tuesdays.” On Humbug Tuesdays, ADOC officers would write incarcerated people up for minor infractions, including not being clean shaven or not having one’s shirt tucked into their pants. After being written up for these minor infractions, the incarcerated person would get moved to the “Hot Bay,” which was a dorm specifically for people who had received infractions that were not serious enough to warrant transfer to segregation. People housed in the Hot Bay were then forced to go work on the farm. ADOC utilized this “Humbug Tuesday” practice to develop its workforce for the farm; in addition to being forced to work on the farm in the short term, the disciplinaries would also preclude these workers from being transferred to a less dangerous facility.

367. In addition to his work on the farm at Draper, Mr. Cole held many other in-house jobs with ADOC. He worked in the kitchen at Holman, J.O. Davis, Draper, Staton, Kilby, and Bullock. He worked on the maintenance crew at Easterling. And he worked as a dorm cleaner at Holman, Draper, Easterling, and Kilby. Mr. Cole had no say in any of these roles—he never chose his job, nor the hours that he worked. None of this work was paid.

368. Mr. Cole reports that, in his experience, the unpaid forced labor of incarcerated workers is essential to the basic functioning of ADOC facilities. Among other things, incarcerated workers maintain the facilities, run the kitchens, work as runners escorting their fellow incarcerated people to appointments, handle the facility’s laundry, and even work as hospice workers.

369. During his time at ADOC, Mr. Cole has been forced to work for a number of public employers. For example, while at the Red Eagle work center in 2016, Mr. Cole worked for the City of Elmore cleaning up trash on the roads and at a sale lot that he understood was owned by the City of Montgomery. For each of these jobs, he was paid $2 for each eight- to ten-hour day of

work. Mr. Cole was advised directly by an ADOC officer at Red Eagle that if he were to withhold labor, he would be "put behind the wall." When he arrived at Red Eagle, ADOC officers told him that it was a "disciplinary camp, and you're going to get a disciplinary if you don't work." ADOC officers told him that he would receive a job within two weeks, and if he refused to work, he would "go back behind the fence." The ADOC officers' references to being placed "behind the wall" and "behind the fence" meant that ADOC would transfer him to the higher-security facilities where he would be in danger from the violence there.

370. Based on Mr. Cole's experience, the threat to be put behind the fence was particularly potent while at North Alabama Work Release, because this facility would transfer incarcerated workers to maximum security facilities, including Limestone, where other incarcerated men would target those transferred in from work release for robberies, extortion, and other violence. He recalls officers at North Alabama making comments like, "You know you aren't going to last at Limestone," to coerce incarcerated people into being compliant on a job.

371. While Mr. Cole worked for the Elmore Department of Transportation in approximately 2016, his supervisor often threatened him and other incarcerated workers, telling them that he could "switch y'all out like socks," meaning that the employers had all the power and could send them back for a new worker at the first sign of resistance.

372. Mr. Cole worked multiple jobs through ADOC's work release program, including at Defendant RCF/Gemstone from approximately November 2016 to February 2017, at Defendant Masonite from approximately December 2022 to June 2023, and at MacVantage Packages from June 2021 to October 2022. Mr. Cole had no say in whether he worked any of these jobs or what his hours would be. ADOC assigned him to the jobs. He understood that saying no to the job would have been an "automatic" refusal to work disciplinary. If an incarcerated worker refuses to work, in Mr. Cole's experience, ADOC will make an example out of the worker and send the worker back behind the fence. While Mr. Cole had his labor leased out to private employers through the work release program, ADOC deducted 40% of his gross wages, purportedly for costs incident to confinement, and also charged him $5 per day for van rides and $15 per month for laundry.

373. Mr. Cole's experience of being coerced to labor for Defendant RCF/Gemstone is discussed *infra* ¶583, and incorporated herein.

374. Around 2022, Mr. Cole transferred to Hamilton Work Release. Mr. Cole describes the culture at Hamilton Work Release as deeply racist. For example, when he arrived at the facility, a white ADOC officer instructed him to avoid speaking with white women when he worked. The officer told him that he didn't want Mr. Cole and other incarcerated people, the majority of whom were Black, to talk to "their" women in "their" community.

375. After being transferred to Hamilton Work Release, Mr. Cole was assigned to work at Defendant Masonite. His experience being coerced to labor for Masonite is discussed *infra* at ¶¶563.g, 565.g, 579, and incorporated herein.

376. Mr. Cole and other incarcerated workers have experienced ADOC practices at Work Release and honor camp (Work Center) job sites that demonstrate ADOC's control over the incarcerated workers, including ADOC officers bringing dogs to the worksites to shake down incarcerated workers in front of the free workers and supervisors.

377. **Danny Dandridge.** ADOC cited Mr. Dandridge for refusing to work several times while he was in ADOC custody. For example, in 2011, while working in the camp at Loxley, ADOC Officer Henry Gardner issued Mr. Dandridge two work-related disciplinaries; the first was for refusal to work, and the second was for "insubordination" when he questioned the first disciplinary. His punishment was to dig up a large tree stump and then climb out of the hole he had dug. Mr. Dandridge reported Officer Gardner to ADOC's internal investigations unit, but nothing was done.

378. In 2015, while working an ADOC-assigned job at Trenholm College in Montgomery, one of the supervisors whose wife worked at the college disliked that Mr. Dandridge was in his wife's office cleaning while she was there, even though Mr. Dandridge was assigned to clean that office and nothing inappropriate occurred. He was fired from the job and received a disciplinary from ADOC that resulted in restriction for approximately 45 days, during which he had no access to the phone, or store, or family visitation.

379. In approximately 2016 or 2017, while housed at J.O. Davis and working an ADOC-assigned job for the Monroe County Board of Education cleaning an elementary school in Monroeville, he was disciplined for "refusal to work" after his male supervisor called the ADOC van to pick him up because Mr. Dandridge refused his sexual advances. Mr. Dandridge explained the situation to the warden, but the warden nevertheless approved the disciplinary. Other incarcerated workers who would agree to have sex with the supervisor were not punished.

380. In approximately 2017 or 2018, while housed at Childersburg, Mr. Dandridge was disciplined for allegedly refusing to work while cutting grass in a graveyard for the City of Childersburg. Mr. Dandridge did not refuse to work, and did not feel he was able to refuse work, because he was concerned about the effect of any disciplinary on his ability to make parole. But Mr. Dandridge's supervisor at the city told ADOC that Mr. Dandridge refused to work because Mr. Dandridge identified a more efficient way to cut the grass—splitting the grass into three sections—which resulted in him cutting the grass in a different way than the supervisor preferred. Although Mr. Dandridge had simply exercised his judgment in completing the work he was ordered to do, and the crew agreed that his approach made more sense, the city supervisor told Mr. Dandridge that he was "acting like a supervisor" and refusing to work. As a result of the disciplinary ADOC issued based on this report from the city, Mr. Dandridge lost phone and commissary access, was stripped of his visitation rights, and spent two weeks in segregation. He was also transferred to St. Clair as punishment for the disciplinary.

381. In approximately 2019, while housed at Childersburg, Mr. Dandridge's supervisor at the City of Oak Grove, where ADOC had assigned him to work, fired Mr. Dandridge because he used the bathroom closest to the worksite instead of a bathroom farther away. At the time, Mr. Dandridge was on blood pressure medication that resulted in frequent bathroom visits. Mr. Dandridge's city supervisor called ADOC, which in turn issued Mr. Dandridge at least two disciplinary infractions for being fired from a job and refusing to obey orders. As a result of this disciplinary, ADOC put Mr. Dandridge in segregation for approximately two weeks, and he was prohibited from accessing the commissary for a period.

382. Mr. Dandridge understands that the supervisors at his Work Center employers knew what consequences incarcerated workers would face if they reported that the workers were refusing to work or if they were to fire the workers, including that workers could be deprived of privileges, sent to segregation, sent to more dangerous facilities, and/or denied parole. Mr. Dandridge understands that, when employers sign on to employ ADOC-incarcerated workers, representatives from the jobs meet with people from ADOC, and ADOC provides the employers with ADOC's rules and regulations. Mr. Dandridge knows this because, when he worked as a runner at Red Eagle, he was present when some of those meetings took place and saw and heard the conversations first-hand. He heard ADOC officers tell Work Release employers that, if incarcerated workers ever appeared to be not following directions or refusing to work, the employers should call ADOC, and ADOC would write them up, which would result in serious consequences for the worker including loss of commissary, getting "shipped to a max camp," and getting placed in segregation.

383. Mr. Dandridge performed labor directly for ADOC, often doing the work of officers, including administrative and healthcare work and work for the warden. Mr. Dandridge worked unpaid in the Childersburg, ATEF, Elmore, J.O. Davis, Draper, and Red Eagle cafeterias. In his experience, ADOC expected incarcerated people to work for two to three months in the kitchen before they were eligible to be assigned other work. He also worked as an unpaid runner at Red Eagle in approximately 2015, generally working Monday through Friday, while remaining on-call on weekends.

384. He helped teach the intensive Crime Bill class at Ventress as an "intern" in approximately 2003, grading participants' homework, addressing their concerns when possible, and escalating their concerns to a counselor when necessary. He was not paid for this job. He did not choose this job; rather, ADOC personnel told him they wanted him to go to the Crime Bill classroom, strip searched him, and sent him to the classroom, where he was told he would be the intern. Mr. Dandridge had seen guards at Ventress beat incarcerated people for refusing to work, and he was aware that ADOC would likely issue a disciplinary for refusing to work, so he did not

feel he could refuse. On one occasion at Ventress, an incarcerated person was working in the kitchen, and the kitchen steward began aggressively cursing at him. The worker attempted to deescalate the situation by walking away and told the steward that he was going back to his dorm. The steward began screaming at him, and struck him in the face. Several ADOC officers arrived and further beat the incarcerated worker.

385. Mr. Dandridge performed unpaid work in the Inmate Control System at Bibb, serving as a runner in the front office, in approximately 2019. Mr. Dandridge and other incarcerated workers completed tasks that non-incarcerated ADOC employees should have fulfilled. For example, Mr. Dandridge and other incarcerated workers conducted much of the orientation for new prisoners arriving at Bibb, including reading and helping them complete orientation forms. In addition, when he worked in the infirmary, ADOC officers regularly handed Mr. Dandridge documents with prisoners' confidential and protected medical information, and ordered him to escort prisoners through the infirmary to their destination and then hand the protected medical information to a medical professional.

386. In Mr. Dandridge's experience, ADOC personnel would assign jobs and shifts for in-house work, then require incarcerated people to work them, regardless of whether they were sick. If the assigned workers did not cooperate, ADOC would impose disciplinaries and lock-up.

387. Mr. Dandridge also worked for ADOC in an Alabama Correctional Industries warehouse. There, Mr. Dandridge and other incarcerated people loaded 18-wheeler trucks with 50-gallon barrels of bleach, detergent, socks, boxes, uniforms, and other items, and then they would unload the same.

388. Mr. Dandridge worked for several non-ADOC public employers during his time in ADOC custody, including the ADOT, the Cities of Oak Grove, Sylacauga, Childersburg, Talladega, and Decatur; the Madison County Commissioner; the Monroe County Board of Education; Shelby County; and Trenholm College. He was paid $2 for a day's labor in each of these jobs, even when he worked overtime.

389. Mr. Dandridge's experience of being coerced to labor for ADOT and Defendant Cooper is discussed *infra* ¶¶590.a, 597, and incorporated herein.

390. When Mr. Dandridge worked for the City of Decatur on a truck that picked up wood, furniture, and other items left on the side of the road in approximately 2023, he was aware through his free-world coworkers that he was being $2 per day for a job that paid $20 per hour in the free world. Mr. Dandridge continued to work, even in poor conditions, because he understood that, if he did not, ADOC would write him up, take his custody, or put him in segregation, and that any of these outcomes would undermine his chances of parole.

391. Mr. Dandridge was aware that at least some of his supervisors knew this, too. He recalls his supervisor at the City of Talladega in approximately 2017 deciding to fire him, because too many people in town knew Mr. Dandridge and would say hello. Mr. Dandridge explained that if he got fired, he would get written up, sent to a more dangerous facility, and denied parole, but his supervisor fired him anyway.

392. Mr. Dandridge also worked for a private employer while incarcerated. In 2011 at Loxley Work Release, Mr. Dandridge was assigned to work at Doc's Seafood Restaurant. Mr. Dandridge first worked as a dishwasher, and later worked as a bar-back and assisted with shucking oysters in the kitchen. Mr. Dandridge had no say in his hours or duties. ADOC officers would regularly come to the restaurant when Mr. Dandridge and other incarcerated workers were working, and harass and threaten them. ADOC officers searched incarcerated workers while they were on-shift, and threatened to issue incarcerated workers disciplinary infractions and send them back "behind the fence" if they appeared to be not working. Mr. Dandridge's supervisors were often present when ADOC accosted incarcerated workers on-shift, and the supervisors heard and observed ADOC officers threatening the workers.

393. **Alimireo English.** From his earliest days in ADOC custody, Mr. English understood that every able-bodied incarcerated person was required to take on some kind of job: keeping dorms clean, painting, maintenance, working in the commissary, or working in the kitchen. Incarcerated people were assigned to do all the work that correctional officers were paid

to do, for no pay at all. Officers occasionally brought small tokens such as leftover food as compensation, but there was little else.

394. Mr. English understood throughout his incarceration that demonstrated productivity was required to move his custody level down and access work release. Work release was generally, in turn, the required path toward release. ADOC's Work Release preparation structure made this explicit. At every Work Release facility where Mr. English was housed, ADOC required incarcerated people to perform unpaid in-facility labor—such as kitchen work, mowing, cleaning, or car washing—as a mandatory precondition to being permitted to work an outside, nominally paid job. Mr. English describes the experience as being worked like a slave inside to earn the "right" to be worked like a slave outside.

395. At Ventress, Mr. English's demonstrated performance in his assigned duties led to him being assigned the role of Faith Dorm Representative. Mr. English did not object in part because the Faith Dorm offered relative safety compared to being in general population, and because he understood that refusing or performing inadequately would mean a return to general population and its violence.

396. Mr. English understood throughout his incarceration that refusing to work resulted in a disciplinary infraction, and that disciplinaries cascaded: loss of phone access, loss of visitation, loss of store privileges, and ultimately, if enough accumulated, transfer back behind the fence to a more dangerous facility. Disciplinaries also made it less likely that he would receive parole.

397. Mr. English experienced these consequences directly. During his first period of incarceration, he organized incarcerated people around conditions by advocating for basic amenities, informing people of rights they did not know they had, and documenting officer misconduct, including being among the first incarcerated people to photograph officers sleeping on the job. When ADOC learned he was a source of organizing and advocacy around issues that included work conditions, it issued approximately seven disciplinaries in short succession for various claimed infractions. He was issued at least one disciplinary for refusing to work during this time, which was how he learned first-hand that one could be disciplined for refusing to work.

He was paroled before the disciplinaries were finalized, but ADOC held them and served them on him when he returned to ADOC custody in 2020—punishing him for speech that took place during his first incarceration.

398. While Mr. English was incarcerated at the Perry County PREP Center in 2025, two incarcerated people who took Kool-Aid from the kitchen were sent back to prison with approximately 90 days remaining before their release dates. Mr. English drew the intended lesson: ADOC could ruin your life over Kool-Aid. He resolved to learn from that lesson and do whatever he was told so he could get home.

399. Approximately 30 to 45 days before Mr. English's parole hearing, he asked to be released from his ADOT work assignment so he could prepare. ADOC released him from that job but told him that if he did not take on another assignment, they would send him back to prison and that this would affect his parole. The threat came at the moment of his greatest vulnerability.

400. Mr. English was required to work several different "in-house" jobs, unpaid, during his time in ADOC custody. None of this work was voluntary; Mr. English did every job he was assigned to avoid the consequences of being assessed with a disciplinary for refusing to work or otherwise finding himself in conflict with ADOC staff. He understood the power that ADOC had over his life, and wanted to avoid anything that would prolong his time in ADOC custody, which a refusal to work disciplinary would.

401. For example, at Elmore, where Mr. English was housed for approximately 30 to 60 days in 2021, he was assigned to clean dormitories and pick up paper inside the facility and on the grounds outside, and was not paid for this work.

402. At Fountain, where Mr. English was housed in 2022, the bathrooms were covered in mold so severe that some incarcerated people showered in socks to avoid contact with the floors. Foot fungus was virtually unavoidable. When the Commissioner or other visiting officials were expected, ADOC assigned incarcerated workers, including Mr. English, to power-wash the same concrete and brickwork they were otherwise required to live among. Otherwise, between official

visits, nothing was cleaned and the mold remained. Once again, this work was performed for no pay.

403. Later, at Ventress, Mr. English served as Faith Dorm Representative from 2023 through 2024. He worked 12-to-15-hour shifts, seven days a week, and was on call 24 hours a day. He screened and monitored everyone who sought entry to the dorm. He oversaw and performed maintenance. He supervised behavior, distributed grievance forms and other resources, and responded to health and drug emergencies. The Faith Dorm housed 50 to 60 people, many of them elderly, many in wheelchairs, many of them vulnerable by virtue of their offense classifications and physical condition. Because ADOC provided no security for the dorm, Mr. English created it himself. He organized a sergeant-at-arms group from among the dorm residents to help manage incursions. When people from other parts of the facility forced their way into the dorm to rob elderly and vulnerable residents—approaching them with knives and demanding they hand over everything in their possession—Mr. English sought to protect them. He was woken at 3 a.m. by residents screaming for help and responded each time. He bandaged a resident who had cut his wrist. He investigated sexual assaults, including the piano player incident described above, and wrote reports. He managed a resident who was throwing feces at others while the warden stood nearby and laughed. He gave money and food to people from other parts of the facility who came looking for trouble, because doing so was the only way to make them leave. Mr. English essentially worked as a correctional officer performing the duties that ADOC should have been carrying out, but he did so completely unpaid. Nevertheless, he kept doing the work because if he didn't, no one else would, and because it was still safer than being in the general population.

404. At Northern Alabama Work Release in 2024, Mr. English was assigned to clean dormitories and to wash ADOC vehicles, such as vans, buses, and state-issued SUVs driven by wardens and staff. He was not given a Work Release job. ADOC staff were upset by his attempts to assert his legal rights; instead, he was required to perform this work for ADOC to avoid being shipped out of the facility. Mr. English's work ran approximately 6 to 8 hours per day across rotating shifts. It was entirely unpaid. Additionally, incarcerated workers at Northern Alabama

were for some time required by ADOC to wash staff members' personal vehicles, but that practice ended after complaints were raised in connection with this lawsuit. Working for no pay at the Work Release center was the mandatory precondition to being eligible for an outside job. Mr. English never received an outside job at Northern Alabama; the retaliatory campaign described below, *infra* ¶6561.b, led to his transfer before that happened.

405. At Hamilton in late 2024 and early 2025, Mr. English was assigned to work in the kitchen for no pay.

406. At Camden, Mr. English was required to clean dormitories morning and night as a condition of avoiding a disciplinary and qualifying for a Work Release job. He was also assigned to push-mow grass across the facility all day, because ADOC refused to purchase a battery for the riding mower. All of this work was unpaid.

407. Finally, at the Perry County PREP Center in 2025, Mr. English was also required to perform unpaid labor, including kitchen work, mowing, and cleaning dormitories and the facility generally. He and other incarcerated people were ordered to wash officers' personal vehicles until someone complained and ADOC stopped the practice. During this time, incarcerated workers including Mr. English were also ordered to enter and clean out buildings clearly marked "Do Not Enter" because of the presence of asbestos, and which ADOC was using for storage. The workers were given no protective equipment. When a roof collapsed in the cafeteria, ADOC directed incarcerated workers to clean up the debris rather than bringing in a contractor.

408. Mr. English was required to perform work for various Work Release employers during his time in ADOC custody. He worked for Defendant ADOT as part of a "road crew" for the cities of both Grove Hill and Camden; the details of Mr. English's experience of being coerced to labor for ADOT and Defendant Cooper are discussed *infra* ¶590, and incorporated herein.

409. **Larry Jarmon.** Mr. Jarmon has observed and understands that if an incarcerated person refuses to do work, ADOC will issue that person a disciplinary infraction, which can result in a loss of privileges, including phone, visitation, and canteen, loss of custody, or getting placed in segregation. Mr. Jarmon has observed ADOC officers take incarcerated workers to areas without

cameras and beat them at Ventress, Donaldson, and Elba for allegedly refusing to work, a practice the officers coined "taking for a ride." He has observed ADOC officers knock incarcerated workers' teeth out for refusing to work at Decatur. At Ventress, Mr. Jarmon observed ADOC officers slap several incarcerated workers in the face and send them to lockup for refusing to work. On one occasion, an incarcerated worker who was assigned to trash duty in addition to his kitchen job complained to an ADOC officer: "I'm tired of doing this job, and y'all don't pay us," and the guard slapped him. At Donaldson, Mr. Jarmon observed ADOC officers place incarcerated workers in segregation for allegedly refusing to perform work for ADOC; segregation is a standard punishment for a "refusal to work" disciplinary infraction. Mr. Jarmon recalls another incarcerated worker who ADOC transferred to a work release facility, but because he had previously been shot and still had bullet fragments in his body, he was not able to physically perform the work that ADOC assigned to him, and ADOC subsequently sent him back to a higher security facility because he could not work.

410. ADOC has assigned Mr. Jarmon to perform free, in-house labor while incarcerated, including being a dorm cleaner and working in the kitchen in order to work down his custody while he was behind the fence in higher security facilities. At Ventress, for example, he was required to work in the kitchen while taking classes, even though taking the class was supposed to be his assigned job. He did not complain about being assigned the additional work, even though he knew he shouldn't have had it, because he knew complaining would lead to a disciplinary.

411. Mr. Jarmon has also been required to cut grass as punishment while at Elba Work Release. This was a regular punishment at Elba; officers would make incarcerated people go to their free world job and then give out "extra duty" for punishment, such as cutting grass once workers got home.

412. ADOC forced Mr. Jarmon to work for public employers, include Defendant City of Troy, Coffee County, Pike County, and the City of Enterprise, in or around 2019. Mr. Jarmon worked for each public employer for approximately one month. ADOC and the public employers'

typical practice is to swap out road crews every month. Mr. Jarmon's experience performing coerced labor for Defendant City of Troy is discussed *infra* ¶599, and incorporated herein.

413. Mr. Jarmon also had no say in the other road crew work he did for public employers Coffee County, Pike County, and City of Enterprise: ADOC assigned him to work for each employer and Mr. Jarmon had no say in his hours or duties. For Coffee County, his duties included picking up trash along county roads and washing county-owned vehicles. At Pike County, his duties included picking up trash along roads, filling in potholes, organizing the shop, and putting new tires on the county's trucks. For the City of Enterprise, Mr. Jamon's duties primarily involved walking the county road—referred to as "walking the country mile"—and picking up trash. For each of these assignments, Mr. Jarmon was paid $2.00–2.50 per day, and his hours were approximately 6 a.m. to 5 p.m., five days per week. The road squad work for the public employers was physically grueling, hot during the summer, and almost always outside. Mr. Jarmon reasonably felt that he could not refuse these job assignments because if he were to do so, ADOC would discipline him for refusal to work, which could include being placed in solitary, transferred back to a more dangerous facility, or a loss of privileges. Mr. Clark also understood that these employers were aware of the consequences that would await if Mr. Clark was terminated or sent back to ADOC from the job, because supervisors at both Coffee County and Enterprise would tell incarcerated workers to do what they were told or he would call the van and have them sent back behind the fence.

414. Mr. Jarmon's public employer supervisors often threatened Mr. Jarmon and other incarcerated workers that, if they did not perform their duties as directed, they would be sent back to more dangerous conditions. Mr. Jarmon recalls supervisors at Coffee County and the City of Enterprise telling incarcerated workers that "if [they] don't want to work, I'll take you back to the camp and get someone else. You already know they'll send you back behind the fence." Based on Mr. Jarmon's experience, he reasonably understands that each of the public employers for which he worked knew that, if they were to discipline a worker for not working in the way directed, ADOC would likely discipline the worker and send them to more dangerous facilities.

415. ADOC also forced Mr. Jarmon to work for multiple private employers, including Defendant Cast Products, Inzi Controls, Dorsey Trailer, Alabama Cable, Contract Services & Fabrication Company, Raymond Steel, and Mobile Mitsubishi. ADOC assigned Mr. Jarmon to work for each employer and he had no say in whether he worked for the employers, nor the hours or shifts to which he was assigned. ADOC's deductions for each of these jobs include 40% of Mr. Jarmon's gross paycheck, plus additional deductions for van rides and laundry fees.

416. ADOC forced Mr. Jarmon to work for Dorsey Trailer in 2021 while incarcerated at Elba Work Release, where he worked in the custom department installing accessories in trailers. Dorsey required Mr. Jarmon to buy his own drill bits out of his paycheck. At Dorsey, incarcerated workers were treated differently from free-world workers, and given no choice but to work. At least one supervisor, Brian Collins, was also prejudiced against Black workers, and was so racist that a Black worker had to be moved to a different part of the plant.

417. Mr. Jarmon's manager at Dorsey, Joe Keith, had it out for him personally; he lied to the plant manager claiming that Mr. Jarmon was not doing his job properly, even though it was clear that Mr. Jarmon was. Joe also required Mr. Jarmon to do the job of five or six people by himself. When Mr. Jarmon was finally given someone to assist, it was a free-world worker who he was required to train. The free-world worker would then show up late and not do his job, and Joe would take it out on Larry, cussing at him and asking if they needed to get someone else and let him go. Things got so bad that Mr. Jarmon began complaining and asked to be moved to a different job at Dorsey. However, Joe just sent him to Brian, who told him "I'm gonna tell you now, I don't mind calling the camp. I don't mind getting you sent back behind the fence. I don't care." He then sent Mr. Jarmon back to work. Based on that conversation, Mr. Jarmon understood that Dorsey was aware of the conditions in ADOC prisons and the consequences incarcerated workers face if they are fired from a job.

418. Mr. Jarmon's experience performing coerced labor for Defendant Cast Products is described *infra* ¶572, and incorporated herein.

419. Despite the difficult conditions and threat of discipline, Mr. Jarmon continues working in the ADOC work release program because he needs the money and does not want to rely on his elderly mother and father to support him. He also does not want to be placed in a higher security ADOC facility.

420. **Joseph Lesley.** ADOC forced Mr. Lesley to work for private employers, including Defendants Koch Foods, Cast Products, and Paramount Services, along with other employers including Old Time Grill, Applebee's, Wayne Farms, and Kelly's Heating and Air. ADOC assigned Mr. Lesley to each of these jobs—he had no choice in the job or hours worked, and he understood that he could not quit or else ADOC would issue a disciplinary infraction, revoke his work release custody, and send him "behind the fence"—or back to a medium- or high-security facility.

421. Mr. Lesley has observed that all incarcerated people who are housed at a work release facility are ordered to work, or else face consequences. When he arrived at each work release facility in which he was housed, ADOC officers told him and other incarcerated people that, if they did not work, they would be sent back "behind the fence." In addition, ADOC explicitly informs each work release employer that, if an incarcerated worker is not performing his duties adequately, the employer should call ADOC, and ADOC will punish the worker with consequences that include sending the worker "behind the fence" to a higher security facility, placing the worker in segregation, and restricting the worker's privileges.

422. Mr. Lesley's experience performing forced labor for Defendant Koch Foods is discussed *infra* at ¶¶576-578, for Defendant Cast Products *infra* at ¶572, and for Defendant Progressive Finishes *infra* at ¶582, and incorporated herein.

423. **Turner Mason.** Mr. Mason has observed, experienced, and understands that if an incarcerated person refuses to do work, ADOC will issue that person a disciplinary infraction for disobeying a direct order, and may also beat, pepper spray, and/or place the person in segregation for an extended period. ADOC may also attempt to transfer that person to a more dangerous area of the facility as retaliation for refusal to work.

424. When Mr. Mason arrived at Limestone, ADOC officers told him that ADOC would assign him a job and that he had no choice but to work it. ADOC Sergeant Beatty then assigned Mr. Mason to deliver breakfast trays to incarcerated people in "D" Dorm, which is a closed custody dorm in Limestone, and is where more dangerous people are housed. Mr. Mason protested, telling Sergeant Beatty that he was not comfortable working in another dorm given his protective custody and former law enforcement status, but Beatty told him that he needed to do so.

425. When Mr. Mason arrived at work, ADOC Officers Stroud and Fungee ordered him to deliver breakfast trays through the "tray flap" in each cell door. Shortly after Mr. Mason began working, the people to whom he was delivering breakfast asked him to deliver drugs and other contraband; when he refused, they began throwing feces and urine at him. Mr. Mason informed the ADOC officers about this, and Officer Stroud told him that he "better learn how to dodge." When Mr. Mason explained that he was being asked to deliver drugs, ADOC told him to move whatever he was told to move and shut up about it, which he understood to be a directive to transport the drugs. Mr. Mason still refused to transport drugs. As a result, one day when he was delivering trays, an incarcerated person attempted to stab him through an open tray flap with a broken broom handle that had been whittled into a weapon. Mr. Mason informed ADOC officers that he would not work that job anymore because he feared for his life. ADOC Officer Stroud told him that "you can't quit," and to go back to work. Mr. Mason pleaded with Officer Stroud, emphasizing that the other prisoners were threatening his life, and Officer Stroud responded that he "didn't give a fuck." Mr. Mason then explained the situation to two other ADOC officers, Officer Barts and Sergeant White, and the officers told Mr. Mason that it was too dangerous for him to return to "D" Dorm.

426. The next day, Officer Stroud came to Mr. Mason's dorm to bring him to work. When Mr. Mason refused, Officer Stroud brought him to the Sergeant's office. There, ADOC Officer Runyan told Mr. Mason that if he did not return to work, ADOC officers would "beat [him], spray [him], and lock [him] up for six months." Mr. Mason attempted to explain the events that had transpired, and Officer Runyan told him that "you're going to do what the inmates want,"

which Mr. Mason interpreted as ordering him to transport drugs for the other prisoners. Mr. Mason informed Officer Runyan that Officer Barts and Sergeant White told him that it was too dangerous for him to return to “D” Dorm. Officer Runyan responded that “Officer White don’t run shit around here” and ordered Mr. Mason to return to work. Again, Mr. Mason refused and they sent him back to his dorm.

427. The following day, Officer Stroud attempted to retaliate by transferring Mr. Mason into a general population dorm, where he likely would have been killed as a former police officer. Stroud told Mr. Mason to “pack your shit, we’re moving you to population, they’ll handle you out there.” He put Mr. Mason in handcuffs and started walking him out of the dorm, when another officer intervened and prevented Mr. Mason from being transferred.

428. Although Mr. Mason was ultimately not transferred to general population in retaliation for refusing to do work that involved unlawful conduct, ADOC issued Mr. Mason two disciplinary infractions, one for refusing to work and the other for disobeying a direct order, and gave him sixty days of restriction of phone, visitation, and canteen access for each disciplinary, for a total of 120 days of restriction. During the hearing for his disciplinaries, Mr. Mason explained to Hearing Officer Westphall the events that led to his disciplinary infraction, and Westphall told Mr. Mason that his job was not to comment on the actions of ADOC officers, but to “punish inmates.” Mr. Mason later spoke with an investigator with ADOC Internal Investigations, and told him what had happened.

429. ADOC Sergeant Beatty then ordered Mr. Mason to clean the showers in “D” Dorm—the same dangerous dorm where his life was being threatened. Sergeant Beatty told Mr. Mason that he was “highly recommended” for this position by ADOC Captain Caldwell. Mr. Mason protested that he almost got killed in “D” Dorm, and Sergeant Beatty said “well, don’t hang around the tray flaps too long,” referencing the incident where a prisoner attempted to stab Mr. Mason through a tray flap. ADOC forced Mr. Mason to clean the showers in “D” Dorm for approximately two weeks.

430. ADOC then assigned Mr. Mason to a new job in his own dorm. There, he was ordered to serve breakfast, lunch, and dinner, and also to work as a dorm cleaner and shower cleaner. Mr. Mason worked seven days per week, nearly all day, for no pay. After his previous experience, Mr. Mason was afraid to refuse these job assignments, for fear that ADOC would order him to work in D-Dorm again.

431. At Limestone, ADOC officers use the labor of incarcerated people so that they can just sit in the "cube," which is the protected control room, and watch movies that they bring to the facility on flash drives, while incarcerated workers are responsible for keeping the dorm running. Mr. Mason recalls one incarcerated worker who was ordered to complete ADOC officers' paperwork, including shift reports. Incarcerated people were even responsible for maintaining the security of the facility. On one occasion, Mr. Mason recalls one incarcerated person getting caught stealing from another. When several incarcerated people reported the theft to ADOC officers, instead of responding themselves, the officers told them to "take him in the cell and handle it"—essentially ordering them to beat the person accused of theft, and delegating their own jobs to maintain the security of the facility to the incarcerated people themselves.

432. Mr. Mason is aware of at least two other instances in which people who were incarcerated in less dangerous dorms were disciplined for asking not to work in more dangerous dorms. One incarcerated worker was housed in the protective custody dorm, and ADOC ordered him to work as a runner in "D" Dorm, where he had previously been stabbed in the face. The incarcerated person said that he did not want to go back to "D" Dorm because it was dangerous for him, and ADOC responded by issuing him a disciplinary infraction. Another incarcerated worker was also attacked in "D" Dorm, and subsequently given a disciplinary infraction when he refused to go back to work in that dorm.

433. **Quannie McCorvey.** ADOC forced Mr. McCorvey to perform long daily hours of uncompensated work, upon threat of discipline up to and including solitary confinement. At Draper, Mr. McCorvey was forced to work on "the farm"—laboring outside picking vegetables. Mr. McCorvey worked as a "cell cleaner" at Draper and Red Eagle, and while housed at Bibb

around 2004–05, Mr. McCorvey was assigned to work as the "blood man," and was forced to clean up blood that was spilled after a fight or assault. In 2018, Mr. McCorvey was assigned to work in the kitchen as a dishwasher at Loxley Work Release. ADOC told Mr. McCorvey that he had to work without pay in the kitchen for a period of time before being eligible to secure a Work Release position. Mr. McCorvey was assigned these jobs and had no say in his role, the type of work to be done, or the amount of hours that he worked.

434. Mr. McCorvey understood that if he refused to work, either within ADOC or through his Work Release position at Defendant CBAK, he would be subject to disciplinary infractions that could result in being placed in segregation, transferred to higher-security facilities, and loss of privileges including canteen, phone time, and visitation. Mr. McCorvey observed ADOC punish workers for allegedly "refusing to work." At both high-security and work release facilities, Mr. McCorvey observed ADOC officers physically beat incarcerated workers who were perceived as refusing to work, and at other times issue disciplinary infractions to incarcerated workers for alleged refusals to work.

435. ADOC assigned Mr. McCorvey to work at a McDonald's restaurant in Foley, Alabama, operated by Defendant CBAK, from August 2018 through his release in August 2019. The details of Mr. McCorvey's experience of being forced to labor for Defendant CBAK, including physical assaults by Sgt. Adair for purported refusals to work, are discussed *infra* ¶573, and incorporated herein.

436. In 2019, Mr. McCorvey observed approximately six or seven incidents where incarcerated workers were transferred to higher level facilities because they allegedly "refused to work" for Work Release employers.

437. **Frederick McDole.** Mr. McDole understood that the only way to survive the violence in ADOC's Level IV facilities was to work his custody level down and earn a transfer to a lower-security facility. For him, working his custody down was the way to survive. As such, he has performed multiple, unpaid jobs at the direction of ADOC personnel.

438. From approximately 2018 to 2019 while Mr. McDole was incarcerated at Ventress, ADOC assigned Mr. McDole to the facility's canine training squad for about three months. In that role, for which he received no pay, Mr. McDole walked through the woods and waited while ADOC used him as a decoy for dogs to track and find. He worked Monday through Friday, 6 a.m. to 2 p.m. He took the assignment because the ADOC classification officer at the time told him the canine squad assignment was a good job that would lower his custody level and move him away from the dangerous conditions inside the facility, meaning that it was a path to safety.

439. Later, in 2019 while enrolled in the ATEF program in Columbiana, Mr. McDole worked as an unpaid senior coordinator for programming. He would attend classes in the morning, and then perform whatever tasks were required by ADOC officers in the afternoons and evenings, including helping incarcerated people prepare for graduation, obtaining caps and gowns, cleaning, and handling whatever other tasks were needed around the unit. He received no pay for this job, even though these were all tasks that ADOC officers were paid to do. Mr. McDole graduated from the ATEF program in December 2019.

440. In ADOC, refusing to work for any reason, including because the work is unsafe, abusive, or unlawful results in a disciplinary infraction for "refusing to work." ADOC enforces this policy consistently. Mr. McDole has personally witnessed many incarcerated people disciplined for months at a time for refusing to work.

441. The consequences of a "refusing to work" disciplinary are severe. If ADOC were to issue a disciplinary to Mr. McDole, it would result in the removal of his custody classification and ADOC would send him back to a Level IV facility, where he would be forced to live in the dangerous conditions he had worked to escape. A disciplinary would also go into Mr. McDole's file and be used against him to deny parole. It could also result in the loss of access to home passes and family visits for months at a time. Despite those consequences, Mr. McDole would refuse to work if he believed the work was physically unsafe—but he knows that consequences and losses would follow that decision. ADOC forces him to put up with things he wouldn't otherwise, just to be able to see his family, which means more than anything to him. The same is true of other

incarcerated people he speaks to; they keep working despite the low pay and poor conditions just to make sure they can receive passes from ADOC to see their families.

442. In 2022, ADOC demonstrated its willingness to use collective punishment to deter incarcerated workers from even contemplating declining to work for ADOC's benefit. When incarcerated people at other ADOC facilities went on strike, ADOC ordered Childersburg—where Mr. McDole was living—to close the facility store and impose a purchasing cap on all incarcerated people. This punishment was imposed even though Mr. McDole and every other incarcerated worker at Childersburg had continued to go to work and had taken no part in the strike. Mr. McDole understood this collective punishment as a message: any resistance to ADOC's work regime would be met with retaliation affecting the entire population.

443. Mr. McDole has worked for multiple private employers through ADOC's work-release program since approximately 2021. Those employers include Defendant RCF/Gemstone, Defendant Progressive Finishes, a plastics manufacturer, and Supreme Cores. The details of Mr. McDole's experiences being coerced to perform labor for Defendant RCF/Gemstone are addressed *infra* ¶583, and for Defendant Progressive Finishes at *infra* ¶582, and incorporated herein.

444. ADOC assigned Mr. McDole to work for the plastics manufacturer, where he worked for approximately a year and a half. At the plastics manufacturer, Mr. McDole functioned as a lead man—operating forklifts, running machines, troubleshooting equipment failures, and handling whatever the supervisor gave to him. He was given the title and responsibilities of a lead man but paid only $12 per hour. The workforce was approximately six incarcerated workers and three or four free workers; the incarcerated workers ran the machines while the free workers performed maintenance, which involved easier tasks.

445. ADOC assigned Mr. McDole to work at Supreme Cores in Alabaster, Alabama beginning in approximately 2024. He works on the night shift, performing machine operation and shipping work, including operating forklifts and loading and unloading pallets. Supreme Cores' human resources personnel are aware that Mr. McDole retains only a fraction of his wages after ADOC's deductions because he has told them directly. In approximately late May 2026, Mr.

McDole suffered an Achilles tendon injury, for which he has received minimal treatment from ADOC. He attempted to return to work at Supreme Cores in the last week of May 2026, but his leg swelled and he could not continue. Supreme Cores notified ADOC that if Mr. McDole could not return by June 1, 2026, it would terminate his position. He was unable to return because of the injury and the absence of medical clearance. As of the filing of this complaint, Mr. McDole is not clear on his employment status because he has been unable to return to work and is at risk of being transferred to a more dangerous facility if he is not able to return to work.

446. **Lee Moore.** For the entire time he has been incarcerated by ADOC, Mr. Moore has worked daily for ADOC as a fixer. He is very good with his hands, applying skills he learned from his father. Between 1997 and 2013, while Mr. Moore was at Staton, ADOC assigned him to work five days a week, typically 8 or more hours per day, for ADOC on tasks and jobs inside the prison gates. ADOC assigned him to work on the maintenance team, where he was assigned to a wide variety of construction, HVAC, plumbing, electrical and building tasks. For example, ADOC assigned Mr. Moore to work alongside a private company, Johnson Controls, installing the entire heating system at the Staton Correctional Facility in 2010 and 2011.

447. In 2013, ADOC finally dropped Mr. Moore's custody level to "minimum-in" and ADOC assigned him to jobs and work outside the prison walls, often unaccompanied by supervision from ADOC correctional staff. From 2013 to mid-2022, ADOC assigned him to work on the "custody squad" at the Fountain Correctional Facility, working under Lieutenant Gray. In that job, Mr. Moore exited the prison gates on a daily basis to perform assigned landscaping and other maintenance work outside the facility as well as warehousing tasks, such as unloading trucks that carried chemicals, towels, and other materials for doing laundry. ADOC also assigned Mr. Moore to do maintenance work, including working on the razor wire prison fence, maintaining the air conditioning system, and renovating the homes of various wardens, including Warden Cook, Warden Stewart, Warden Raybon, and Warden Butler. At the wardens' homes, ADOC assigned Mr. Moore to lay new tile floors, paint the walls, put in new garbage disposals, new commodes, new bathrooms, new kitchens, and make various other upgrades and improvements to the wardens'

homes. ADOC assigned Mr. Moore to perform this work outside the secure area of the prison on state property. At Fountain, ADOC assigned Mr. Moore to work eight hours daily, varying between seven-day work weeks and five-day work weeks.

448. Since being transferred to William C. Holman Correctional Facility in mid-2022, ADOC has assigned Mr. Moore to work on the "custody squad," which involves cutting grass and doing other grounds work outside the institution and around the trailer park where officers live. For example, as part of his work assignments by ADOC, he drives a tractor mower, on his own, outside the prison facility, often five days a week. Although Mr. Moore checks in with his supervisor, Officer Paul Brown, every day so that Office Brown knows where Mr. Moore is, Officer Brown does not accompany Mr. Moore while he works. ADOC also assigns Mr. Moore high-skilled maintenance work inside the institution, including maintaining the plumbing, the air conditioning system, the phone lines, the generator, and the electricity system. At Holman, ADOC's work schedule for Mr. Moore is Monday through Friday, typically from 7 a.m. until 4 p.m., with work on Sunday by ADOC related to trash disposal.

449. Mr. Moore understands that it is important to do the work assigned by ADOC and maintain a good relationship with his ADOC supervisors, including all of the wardens where he has worked for ADOC, in order to keep him safe from the violence and so they support his parole release. Two of his supervisors at the Holman Facility, Officers Paul Brown and Chris Brown, wrote letters in the last couple of years supporting his petition for a reduction in his sentence to Judge Donald McLeod of Wilcox County. For close to two decades now, Mr. Moore has had wardens and officers recommend him for parole, including in 2009, when he was recommended for parole by then-warden of the Fountain Correctional Facility, Cynthia Stewart.

450. Mr. Moore has not received compensation of any kind for his full-time work for the past 26 years for ADOC. He has felt compelled to work for ADOC to keep himself safe and away from the violence within the dorms, yards, and other secure areas of the prison. By working these jobs, he has been able to secure housing in a safer dorm at facilities where violence is widespread. At both Holman and Fountain, he was assigned to E dorm, which was reserved for

kitchen and canteen workers and other workers, like him, permitted to work outside the facility. It is much safer than the other dorms although it is virtually unsupervised by ADOC personnel.

451. Since 2013, Mr. Moore has had a classification level of "minimum-in" and his classification officer, Mr. Odom, has repeatedly advised Mr. Moore that he does not understand why his security level will not drop further. Mr. Moore does not understand it either as he recalls two other incarcerated men who worked with him on the custody squad previously, Maurice and Mike, who were incarcerated by ADOC on the same charge, but their custody levels dropped to "minimum-community," so they could go to a Work Release facility and get paid for their labor. Mr. Moore's work for ADOC is too valuable to permit him to be leased out to other employers and, on information and belief, that is why ADOC has not dropped his security level further, hindering his ability to secure any pay for his labor and his ability to secure parole release.

452. **Deckrice Morrissey.** ADOC has forced Ms. Morrissey to perform long daily hours of uncompensated work, upon threat of discipline up to and including solitary confinement. At Tutwiler, Ms. Morrissey was required to work approximately seven hours per day, five days per week in the kitchen for roughly 90 days. Ms. Morrissey reports that the working conditions were terrible—not only was the work physically exhausting, but the temperature in the kitchen was uncomfortably hot, it smelled bad, and the kitchen had rats, roaches, and mold. When Ms. Morrissey was transferred to Montgomery Women's Facility around March 2025, two ADOC officers told her that she would be required to work 30 days in the kitchen for free before she could be eligible for any work release jobs and that this requirement was ADOC policy. Although Ms. Morrissey herself was transferred away from Montgomery Women's Facility before she was required to work in the kitchen, she observed that other women were forced to do so. Ms. Morrissey has observed that, if incarcerated workers assigned to the kitchen refuse to work, ADOC representatives will write them up for disciplinaries. At Birmingham Work Release, the kitchen steward, a non-security ADOC employee, regularly threatens to tell the Warden if she thinks workers are not working hard enough, which leads to ADOC issuing a disciplinary infraction.

453. Ms. Morrissey experienced and observed ADOC punish her and other incarcerated women for refusing to work or alleged refusals to work. Ms. Morrissey reports that, at Tutwiler: "if you don't work, you're getting put in segregation. If you get out of seg and still don't work, you're going back to seg. That will go on until they break you." Morrissey observed ADOC officers place incarcerated workers in segregation for not coming to work. On approximately 5–7 occasions, ADOC officers went to Ms. Morrissey's dorm, handcuffed a worker who allegedly did not appear for their assigned work shift, and take them to segregation as punishment.

454. In 2022, when Ms. Morrissey was housed at Birmingham Work Release and working for Defendant Paramount Services, Ms. Morrissey received a disciplinary infraction for allegedly "refusing to work." Ms. Morrissey and another incarcerated worker were coming downstairs to leave the facility for work and realized they had forgotten their chapstick. They went back upstairs to get it, and when they came downstairs, the ADOC Lieutenant told them that he was writing her up for "refusing to work," even though other incarcerated workers were still getting in the van, Ms. Morrissey was not late, and she never refused to work. Ms. Morrissey expressed confusion to the Lieutenant, who threatened to write her another disciplinary for insubordination. As a consequence of the disciplinary infraction, Ms. Morrissey lost canteen, phone, and visitation privileges.

455. Ms. Morrissey also understands that disciplinary infractions for "failure to work" may severely harm her chances at being granted parole. Ms. Morrissey reports that, when incarcerated people are housed at a work release facility, they have a lot to lose, including privileges like home passes, and ADOC holds that over their head and forces them to work, or else have their privileges revoked.

456. Ms. Morrissey has also been required to work outside ADOC facilities and in the community, including at Defendant Paramount Services, Defendant Southeastern Meats, Full Moon BBQ, Bud's Cookies, Popeye's, Bama Seafood Restaurant, and McDonald's, all while housed at Birmingham Work Release. Ms. Morrissey had no choice in any of her job assignments.

The job assignments were given to her by the ADOC JPO and Ms. Morrissey understood that if she refused the job assignments, she would be disciplined for refusal to work.

457. Ms. Morrissey's experience performing coerced labor for Defendant Paramount Services is discussed *infra* at ¶580, and her work for Defendant Southeastern Meats is discussed *infra* at ¶586, and incorporated herein.

458. In 2025, Ms. Morrissey worked for Full Moon BBQ's Trussville location for eight days, and then their Hoover location for seven days. While working at Full Moon BBQ, Ms. Morrissey was terminated allegedly for being too slow. Three or four of her coworkers, both free and incarcerated, begged the supervisor to reconsider (because they knew that ADOC would take action against Ms. Morrissey if she were fired), but he refused. One free worker who worked as a baker begged the owner to allow Ms. Morrisey to try working with her instead of terminating Ms. Morrissey, but the owner refused.

459. Later in 2025, Ms. Morrissey worked at the Bama Seafood Market. There, Ms. Morrissey and other incarcerated workers were subject to sexual harassment from their supervisors. On one occasion, a manager named Eli asked Ms. Morrissey to come to the basement to help him with something. When she arrived downstairs, Eli asked her "You gonna let me get in them pants?" Ms. Morrissey told him no, and he threatened to "call the van" for Ms. Morrissey, saying "you don't wanna do nothing, you ain't gonna do right, I'll call the van on you." Ms. Morrissey understood the threat to "call the van" to be a threat to tell ADOC that she had refused to work, which would result in her getting a disciplinary. Ms. Morrissey nevertheless refused again, and the manager retaliated against her by taking her off the schedule for several days. Later, Ms. Morrissey was terminated for allegedly talking too loudly while she was walking through the lobby of the restaurant during her break.

460. Ms. Morrissey wants to work in the community so that she can make money to support her family, but she does not want to work under coercive conditions. She also wants to work in the community so that she can get out of the inhumane ADOC facilities where she is housed.

461. **Pierre Payton.** At both Fountain and at Bullock, Mr. Payton learned that the best way to try to survive the violent conditions was to get out of the dorms by working for ADOC in an unpaid job—such as a runner—or taking classes and training for trade certifications, which ADOC counted as a job. Mr. Payton took every class and course ADOC allowed him to take, studying to earn his GED and earning a wide array of certifications. For example, he took the Substance Abuse Prevention Course ("SAP"), even though he has never used drugs and he does not drink alcohol, along with courses on Anger Management, Stress Management, Depression, and various trade schools. ADOC classification officers advised Mr. Payton that by taking these classes, he could "work his custody down"—which meant reducing his custody level to Level II so that he could be transferred to a safer facility, where he could be placed in a job where he could be paid some type of wages.

462. By 2019, Mr. Payton had worked his custody down to Level II and ADOC transferred him to Loxley Work Center and assigned him his first job. From the first job assigned by ADOC at Loxley to the present day, where ADOC assigns him to work for Cast Products, all work Mr. Payton has performed has been compelled and coerced by: threats of violence, including the transfer back to violent high security facilities; threat of solitary confinement; threats to and/or causing the denial of parole due to disciplinaries related to compelled work; and the loss of the ability to communicate and support his wife and kids financially and emotionally. Mr. Payton has been going home on weekend passes regularly since 2022 and he has endured miserable, unhealthy, and often physically unsafe conditions on the jobs assigned by ADOC in order to keep seeing and supporting his family. Mr. Payton knows, from observation and conversation with many other incarcerated men in ADOC facilities, that their work is and has been compelled by these same threats and ongoing system of coercion.

463. Mr. Payton has experienced that regardless of training or certification, all of which is documented in his file as it is for every incarcerated person, and even after going through his training and trade skills with his JPO at each Work Center and Work Release facility, neither Mr. Payton nor any incarcerated person to his observation has any say in or control of the job to which

ADOC assigns him and others. In his experience, ADOC assigns you to do work you do not know how to do, advising you that if you do not do what is assigned, they will write you up, giving you a disciplinary, which brings with it the consequences of being transferred back to the ultra-violent higher security facilities, denial of parole, and loss of visitation and ability to communicate and support your family. Mr. Payton observes that ADOC's treatment of incarcerated laborers is just like the treatment you see of slaves in movies. Instead of the cotton fields, ADOC incarcerated workers are given often unsafe jobs with private employers, with harsh treatment and dangerous conditions, with incarcerated workers punished for any attempt to question or stay safe while performing the dangerous work. At the same time, ADOC profits from every hour of work Mr. Payton and others perform.

464. For example, at Loxley, where ADOC assigned Mr. Payton his first jobs, ADOC issued Mr. Payton the first of two "refusing to work" disciplinaries he has received, even though on neither occasion did he refuse to work or even fail to do the work precisely as assigned. At Loxley, he was assigned to man an internal ADOC gate from 8 a.m. to 10 p.m. each day, without pay, with strict orders to smile at each person entering and exiting for whom he opened the gate. About three months into this job, in March 2019, ADOC Lieutenant January issued him three disciplinaries allegedly for "refusing to work, failing to check out for work" and "failure to obey a direct order of an ADOC employee" for not being on the gate at 7:45 a.m., even though his shift did not begin until 8 a.m., and his work was performed inside the facility so ADOC never required him to check in or out for his work assignment. When the disciplinaries went before then-Captain Peterson for review, Captain Peterson advised Mr. Payton that because three disciplinaries required ADOC putting him "back behind the fence," Captain Peterson would void one of the disciplinaries because of the Captain's concerns about the validity of the disciplinaries and transferred him to Atmore Work Center (also known as Fountain Annex) for another job. Captain Peterson advised Mr. Payton would have to eat the other two disciplinaries, even though Mr. Payton had done nothing wrong and would have to face his next job at Atmore, knowing that any perceived misstep on the job would mean his return behind the fence to the ultra violent facilities.

465. ADOC JPO Knight issued Mr. Payton a second disciplinary in November 2021 at Decatur work release for "refusing to work." Again, he had not refused to work. Rather, ADOC issued him discipline because he and his coworker, Marco, reported racist work conditions they were subjected to at Captain Ds to JPO Knight. Neither he nor Marco advised ADOC that they were unwilling to continue working at Captain Ds, where ADOC had assigned them to work: they simply asked ADOC to intervene and try to correct the racist and abusive treatment on the job there. By way of response, the JPO issued refusal to work disciplines to both Mr. Payton and Marco, ending their visitation, phone, and canteen privileges for 30 or sixty days.

466. JPO Knight assigned Mr. Payton to work at another Captain Ds. After the supervisor at that Captain Ds, Ms. Kelly, fired Mr. Payton within 45 minutes of being on the job, due to his awareness of an improper relationship she was having with another incarcerated worker, Ms. Kelly herself issued a disciplinary on an ADOC form and ADOC placed him in solitary for 14 days as punishment. Although at the end of his time in solitary, Warden Pickens threw out the disciplinary as improperly issued by a private actor, Mr. Payton still suffered the punishment of solitary and understood the extreme control both ADOC and private work release employers have over his freedom and physical safety.

467. ADOC has repeatedly assigned Mr. Payton work that has threatened his health and ADOC has twice issued him behavior citations and punished him for "being fired from a job" due to simply not being able to do the job. First, at Atmore Work Center in June 2019, ADOC assigned Mr. Payton to work Monday to Friday, 11 to 12 hours per day, at Pothole 200, for Foley County, for $2 a day. At this job, his job duties were to shovel asphalt as he had no other skills that would allow him to do other duties related to laying asphalt. After about three months of work, Mr. Payton was fired from the job because he had no special skills to do anything other than be assigned to shovel asphalt all day long and he struggled to keep up with the work in the heat, as he was so small (about 120 pounds) at the time. Even though the ending of the job was through no fault of Mr. Payton, Mr. Payton was punished, with ADOC blocking him from communication with his family and endangering his chances at parole.

468. The second occasion involved an ADOC-assignment to Ju Young. In or around June 2022, ADOC at Frank Lee assigned Mr. Payton to work for Ju Young. The details of Mr. Payton's coerced labor for Defendant Ju Young are addressed *infra* at ¶575, incorporated herein.

469. Since the first jobs assigned by ADOC at Loxley, ADOC has assigned Mr. Payton to perform many jobs for public and private employers. In addition to Pothole 200 for Foley County, ADOC's Atmore Work Center also assigned him to work 10 hours per day, cleaning up trash and performing other work needed by Monroe County for about four months, paying him $2 per day. From Decatur work release, ADOC assigned him to work at two different Captain Ds, one in Hartford and one in Decatur, as described above, and then assigned him to work at Gemstone as a dumper for about 1-2 months, and then assigned him to work at Cast Products in the foundry. At each place, he was assigned to work Monday to Friday, roughly 8 hours per day. (The details of Mr. Payton's coerced labor for Defendant Cast Products, where he has also been assigned to work for roughly the last year, are addressed *infra* at ¶572, and incorporated herein.)

470. When Mr. Payton was incarcerated at Frank Lee work release, ADOC assigned him to work for a state contractor that was helping to break ground for a new prison. His work involved driving a bulldozer to level and flatten the ground around the new prison. He worked four 10-hour days weekly. He was paid not with a payroll check, but with certified checks that he was told to give to ADOC, which then took out its 40% fee from the gross wages. Mr. Payton was told that Governor Ivey did not have funding to continue the work and the job ended. After that, ADOC assigned Mr. Payton to work at Anderson Lawn, a seasonal contractor, where he worked for approximately 6 months, first working five eight-hour days, Monday through Friday, and then working four 10-hour days, from Monday to Thursday.

471. At Childersburg in 2022 through late 2023, ADOC assigned Mr. Payton to work at a family-owned catering business and restaurant, Good Ole Boys, for a little more than a year. At Good Ole Boys, he worked 14-15 hours per day most days of the week and performed all parts of the catering work with the owner, Daniel Bogan, but received every other weekend off to go home on passes. Mr. Payton is confident that Mr. Bogan liked his work immensely because he, his wife,

and kids all traveled to the Parole Board in June 2023 to advocate for Mr. Payton's parole release. Even though Mr. Bogan advised the Parole Board that Mr. Payton could continue his work for him upon release and live at his home with Mr. Bogan's family, the Parole Board denied him release with Parole Board Chair Gwathney citing his "negative institutional conduct record" and Board Member Davidson citing an "insufficient effort made towards reentry plan" and all Board members citing "negative stakeholder input" as justifying the denial of parole.

472. From Alex City work release, in early 2024, ADOC assigned Mr. Payton to work at Candlewick as a machine operator, on night shift, working from 11 p.m. to 7 a.m. He was assigned six days per week and permitted to take weekend passes every other weekend.

473. In or around mid to late 2024, Mr. Payton was transferred to Decatur work release and assigned by JPO Horton to work at Captain Ds on Airport Road for about eight months. After a couple of months on the job, Mr. Payton reported to ADOC that he had not received any pay at all for the work, to which the ADOC Captain responded that ADOC had not received any paycheck from Captain Ds. Mr. Payton asked why he had to keep working when Captain Ds was not paying any wages at all, and the Captain told him he had to keep working and ADOC would try to get him his pay. Both the Captain and the JPO specifically advised Mr. Payton that he could not quit the job or he would face discipline. Mr. Payton continued working the job for approximately eight months until ADOC finally reassigned him; he kept working because he knew that any refusal to work would result in discipline, threatening his parole chances and his ability to see his family on passes. Mr. Payton, as of this filing, has still not received any pay at all for the eight months he worked at this Captain Ds.

474. Mr. Payton observes that he is faced with coercion to continue working any job assigned by ADOC by the improper and seemingly random issuance of discipline by ADOC and the inability of incarcerated people to contest such discipline through any meaningful due process. In late November 2023, he was approached by an incarcerated man in the yard at Childersburg who asked him to try to help him get his job back at Good Ole Boys, a catering business where Mr. Payton had been employed successfully for more than a year. Mr. Payton advised the man that

he could not help him due to the nature of the man's misconduct on the job. Later that day, fully on video and in the presence of Officer Turner, this man attacked Mr. Payton, coming at him with a weapon. Mr. Payton defended himself and Officer Turner issued no discipline. About two weeks later, at the direction of Captain Morris, ADOC issued Mr. Payton discipline for "fighting with a weapon," one of ADOC's most serious disciplinaries, and shipped him to Kilby for reclassification. When Mr. Payton arrived at Kilby, he pleaded with the classification officer to look at the video and investigate the matter. When she did so, she found that Mr. Payton was not at fault and, thus, she did *not* lower his custody but immediately transferred him to Alex City work release to be assigned to another job. While Mr. Payton was relieved to not be sent back to the violent high security facilities, he is now stuck with a terrible disciplinary on his record, which will likely impact him negatively for parole, extending his sentence and requiring him to continue to work for ADOC's benefit, even though he correctly defended his private employer's firing decision and did nothing but defend himself from a violent attack.

475. **Eric Prewitt.** While incarcerated in dangerous medium- and high-security facilities, Mr. Prewitt completed numerous classes offered by ADOC because his classification officer recommended them to him and Mr. Prewitt understood that completing them would help lower his custody more quickly, which would allow him to be transferred to a less dangerous facility. When ADOC lowered Mr. Prewitt's custody status in approximately March 2023 and transferred him to Alex City, ADOC first directed Mr. Prewitt to work for two to three weeks without pay as a dorm cleaner. He was assigned a shift and a dorm at the facility to clean. In Mr. Prewitt's experience, ADOC requires individuals to perform unpaid labor within the facility before they can access paid work outside of ADOC facilities and home passes.

476. After Mr. Prewitt completed this unpaid work for ADOC, ADOC assigned him to work for a series of private employers. Mr. Prewitt understood that he could not refuse any assigned work, because if he did so, he would be subject to discipline and sent back to a more dangerous ADOC facility like the ones he experienced between 2018 and 2022.

477. Mr. Prewitt continued to work cleaning dorms at Alex City whenever he was not assigned to a free-world job, and sometimes even when he had a free-world job because officers would assign him extra duty. He performed this assigned work because he understood that he had to do so to maintain his custody status and access to home passes, and to avoid a write-up that would make it more difficult for him to get parole.

478. In Mr. Prewitt's experience, ADOC writes up incarcerated workers when they are unable to work or to work at the pace or in the manner the employer directs, and if they refuse to work the jobs ADOC has assigned. When Mr. Prewitt has been sick, ADOC officers at Alex City have told him that, despite his illness, they will write him up if he does not go work and, as a result, he has gone to work while sick. ADOC officers will sometimes threaten to or actually write up incarcerated workers for refusing to work or disobeying a direct order if they are the last person to report to the ADOC transport van; Mr. Prewitt received such threats on occasion.

479. Mr. Prewitt is constantly in fear of getting written up by ADOC personnel, even for unjustified or arbitrary reasons, because the consequences could be devastating: a disciplinary would decrease the likelihood he will be granted parole, could lead to ADOC revoking his home passes, and could result in him being sent "behind the fence" to a more dangerous facility, where he fears violence from both ADOC personnel and other incarcerated people.

480. He fears these consequences because he has been the target of retaliatory write-ups in the past, which led to ADOC revoking his custody status and sending him to Limestone. *See infra* ¶653. (discussing retaliatory disciplinaries resulting in transfer to Limestone).

481. Mr. Prewitt has worked for several outside employers while in ADOC custody, including for Defendant SL Alabama, Defendant Wendy's (Southeast Restaurant Group), Huddle House, and Sprint Turf. Mr. Prewitt's coerced labor for Defendant SL Alabama is discussed *infra* at ¶584, and his coerced work for Defendant SRG is discussed *infra* at ¶585, allegations that are incorporated herein.

482. **Lanair Pritchett.** Mr. Pritchett has performed coerced labor without pay in the kitchens at Childersburg, Limestone, Ventress, Easterling, Frank Lee, Donaldson, Alex City, and

Elmore. In Mr. Pritchett's experience, ADOC personnel tell recently transferred individuals that they are required to work in the kitchen or another assigned job within the facility for a period of time, usually 45 days, before they can work any job for which they are paid. Mr. Pritchett has repeatedly performed unpaid work in the kitchen for ADOC's benefit because he sees it as the only way to get away from the worst of the violence and chaos inside ADOC's facilities.

483. Mr. Pritchett also worked as a healthcare runner at Ventress in approximately 2018, Donaldson in approximately 2020-2021, and Kilby in approximately 2023, where he cleaned the floor of the hospital ward and fed the people within the ward. He received no pay for that work and performed it because it allowed him to temporarily escape the horrific conditions within the dorms. In 2023, while working the runner job at Kilby, Mr. Pritchett's supervisor was verbally abusive toward Mr. Pritchett, disagreed with how he was handling trays for food delivery, and assaulted Mr. Pritchett by pushing his shoulder. Because of this incident, his supervisor fired Mr. Pritchett from the job; ADOC issued Mr. Pritchett a disciplinary and moved him into a more dangerous dorm.

484. While incarcerated at Elmore in approximately 2017, ADOC assigned Mr. Pritchett to work at a recycling center across the street from the prison. Mr. Pritchett understood that ADOC ran the facility, and he was supervised by ADOC officers and received no pay for his work. He performed this unpaid labor under horrible conditions in a facility with serious safety hazards to "work his custody down," so he could get transferred to a less dangerous facility where he could possibly be paid for his work.

485. Mr. Pritchett has received work-related disciplinaries from ADOC, including for "being fired from a job" and "refusing to work/failing to check out for work." ADOC personnel have issued these disciplinaries for occurrences as minor as being late to catch a van to get transported to a work site; cleaning tables in a way that was slightly different from what his supervisor preferred; or not making it to his shift while he was sick. Mr. Pritchett is very concerned about the effect these disciplinaries have on his ability to obtain parole. He has also suffered the immediate consequences of each disciplinary, including being denied contact with his family

through visits or phone calls for approximately 45 days, being barred from using the canteen to purchase necessities, and the increased risk that he will be transferred to a more dangerous facility.

486. While working in the kitchen at Childersburg in approximately 2014 or 2015, Mr. Pritchett was erroneously blamed for stealing hot dogs, fired from the kitchen job, and issued a disciplinary as a result of his baseless firing. The Parole Board referred to this baseless disciplinary when they denied him parole in 2017.

487. While performing unpaid work at ADOC's recycling center in Elmore in approximately 2017, Mr. Pritchett's supervisor told him to report to work after lunch. When he arrived at the specified time, however, ADOC wrote him a disciplinary for refusing to work because he had not arrived in the morning.

488. On another occasion when he was assigned to Childersburg, the kitchen steward fired him from his unpaid kitchen job because she disliked that Mr. Pritchett would clear the tables all at once and wipe them, rather than wiping the tables one by one. The steward fired Mr. Pritchett and as a result, ADOC issued him a disciplinary.

489. During the strike in 2022, ADOC personnel threatened people incarcerated at Childersburg with solitary confinement if they would not agree to work at ADOC's Bibb facility, and Mr. Pritchett is aware that at least one man was put in solitary and transferred behind the fence for refusing to work during this period.

490. Mr. Pritchett performed coerced labor for Defendant ADOT in approximately 2014-2015, and again in 2022; this work is discussed *infra* at ¶597, and incorporated herein. The coerced labor Mr. Pritchett performed for the City of Troy is addressed *infra* at ¶599, and incorporated herein.

491. Mr. Pritchett worked for Smith Company in approximately 2020, processing wood alongside free workers who made more per hour for the same work. When he asked for a raise based on this information, a supervisor told him that Smith Company had agreed with ADOC to pay $7.50 per hour, and his wage was going to stay at that rate.

492. **Arthur Ptomey.** Mr. Ptomey understood throughout his incarceration that performing work and completing programming were required to lower his custody level, access Work Release, and ultimately earn freedom. Throughout his incarceration, ADOC required Mr. Ptomey to perform unpaid in-facility labor. At multiple ADOC facilities, ADOC assigned him to work in the kitchen and on the cleaning squad. At one point, ADOC also made Mr. Ptomey responsible for the burial of incarcerated people who died in ADOC custody and whose families did not claim their bodies. He received no pay for this work. ADOC also assigned Mr. Ptomey to work on road squads for Defendant ADOT and the City of Sylacauga. While Mr. Ptomey was housed at Red Eagle, ADOC assigned him to the state motor pool in Montgomery, where he detailed vehicles for government use. He left camp at 6 a.m. and returned at 3:30 p.m., Monday through Friday, for approximately four months. ADOC paid him $2 per day for his work for these public employers.

493. When ADOC issues a disciplinary to an incarcerated person for refusing to work, it strips an incarcerated person of home passes, the ability to draw money from their account, phone access, and canteen privileges, and visitation—you lose all privileges that ADOC offers you. The precise consequences depend on the warden's or disciplinary officer's discretion. The disciplinary also goes on file and follows the person when they appear before the Parole Board. Mr. Ptomey experienced these consequences directly when an incident at his job at Pell City KFC cost him his parole. The coerced labor Mr. Ptomey performed for Pell City KFC is addressed *infra* at ¶581 and incorporated herein.

494. Mr. Ptomey was required to work for both public and private employers during his time in ADOC custody. Among the public employers, ADOC assigned Mr. Ptomey to work for Defendant ADOT. He worked for ADOT in approximately 2012 and again in 2015, approximately four to five months each time. Mr. Ptomey was also assigned to work for Defendant Pell City KFC, as noted above, and Defendant Progressive Finishes. His compelled work for Progressive Finishes is discussed *infra* at ¶582, and incorporated herein.

495. Additionally, ADOC assigned Mr. Ptomey to work at Arby's at $12 per hour. He worked there from November 2021 until February or March 2022. The warden terminated the employer contract because of COVID-19 outbreaks at the worksite. Mr. Ptomey had no say in the termination of the employment relationship. In or around 2022, ADOC assigned Mr. Ptomey to work at Metal Plate at $12 per hour on the second shift and, toward the end of his assignment to the company, on the first shift. At Metal Plate, all of the Black incarcerated workers were taken off of the second shift and moved to the first shift without explanation, which felt like the company was trying to segregate the workplace. Other incarcerated workers raised the discriminatory treatment with the warden. The warden took no action.

496. **Victor Thomas.** Mr. Thomas worked for virtually his entire four decades in ADOC custody. When he first entered the system in the late 1980s, ADOC required every incarcerated person to have a job immediately, which could be on the farm squad, in the kitchen, dorm cleaning, or whatever else classification assigned. Mr. Thomas was not given the option to decline; if he had had such an option, he would have taken it. He typically worked as a shift runner during that time—delivering paperwork for ADOC officers, finding other incarcerated people and delivering messages, and assisting those who were injured or otherwise needed help. This work was unpaid, but required by ADOC; Mr. Thomas would not have done the work if ADOC did not make him do it or without the fear and reality of reprisal or institutional sanctioning if he did not perform the work.

497. The requirement and mandate to work persisted throughout Mr. Thomas's time in ADOC custody. At Ventress, for example, where Mr. Thomas was housed for approximately eight years, his classification specialist told him directly that he needed to and had to be productive, stay active, and maintain a job. He understood—from this instruction and from four decades of observation—that keeping a clean record and demonstrating productive work was required to access work release, and that work release was the necessary path to earning freedom. As he put it: first you earn work release, then you earn freedom.

498. In 2022, Mr. Thomas's classification officer initiated his transfer to work release at Frank Lee during his annual review. He was told he was eligible to change his custody status. He had wanted to be assigned to Red Eagle Work Center, but was sent to Frank Lee instead because of his insulin-dependent diabetes. He did not choose Frank Lee. When he arrived at Frank Lee, he was told he had to have a job, and was given no choice in the matter.

499. Mr. Thomas understood throughout his incarceration that refusing to work, for any reason, would result in a disciplinary infraction and the loss of all privileges: no phone, no visitation, no access to the store, and inherently adverse effects on any hope of attaining freedom. Enough disciplinaries meant being sent back behind the fence to a more dangerous facility. Disciplinaries also affected parole. Mr. Thomas personally experienced these consequences earlier in his incarceration when he received disciplinaries for refusing to work on the farm. The disciplinary action that he received also ultimately had adverse and negative impacts on his parole hearings for years, as they were used at his parole hearings as factors to repeatedly deny him parole. He understood from that experience exactly what refusal cost.

500. This lesson was so engrained that Mr. Thomas would ignore the damage to his body the work he was required to perform was doing. In approximately 2020, Mr. Thomas had major back surgery to address two vertebrae that were touching—a condition that developed in ADOC custody. His physician told him that he should not lift anything over five pounds to avoid exacerbating the injury. Nevertheless, ADOC assigned him to work that placed a heavy strain on his back during the following years in ADOC custody; yet Mr. Thomas worked those jobs without complaint to avoid being disciplined and all the negative consequences that accompany such discipline.

501. Mr. Thomas understood that if an incarcerated worker was not able to work, ADOC would send them back behind the fence. No one needed to tell him this explicitly; it was the known rule, confirmed by everything he had observed over decades in ADOC custody. He knew that being fired from a work-release job would result in a disciplinary, and that a disciplinary could cost him his custody level and his chance at parole. While working for various work-release

employers, Mr. Thomas wanted to take days off but did not, because he knew that too many absences would result in termination and the disciplinary consequences that followed. Even when the work aggravated his severe, chronic back injury, he went to work in pain, day after day, because the alternative was worse.

502. Likewise, Mr. Thomas did not file any grievances about his working conditions because he believed that doing so would give ADOC a reason to write him up and send him back behind the fence. As he put it, he just had to suck it up and accept it so he didn't go backwards.

503. In approximately 2022, Mr. Thomas was transferred to Frank Lee Work Release by ADOC as a result of his custody review, which determined he was eligible for work release. Shortly after arriving at Frank Lee, Mr. Thomas was assigned to work for a concrete products company. The work required him to manually pop large concrete sections, each three to four feet long and very heavy, out of plastic molds and move them. His post-surgical medical restriction, issued by his treating physician, prohibited him from lifting anything over five pounds. ADOC's JPO knew Mr. Thomas could not physically perform that work but assigned him to it anyway. Mr. Thomas did not object at the time of the assignment, because he understood that objecting would be treated as refusing to work and would result in discipline. Instead, he attempted the work despite being physically unable to do it. After a couple of hours, the employer's supervisor determined that he was physically unable to perform the work and called ADOC, chastising them for sending Mr. Thomas to a job he could not do. He was not formally disciplined, but he was taken off the job and placed in a waiting period of approximately two to three months, during which he performed unpaid dorm-cleaning work at the facility. He would have been disciplined had he refused this dorm cleaning assignment. Indeed, during this period, he was punished for declining a different unpaid work assignment: one morning ADOC officers came to wake Mr. Thomas to work in the kitchen in addition to his regular cleaning assignment. He told them he was too exhausted to do two jobs and said no. He was immediately placed on restrictions, including no visitation and no phone access, for that refusal.

504. ADOC next assigned Mr. Thomas to work for Defendant Ju Young Automotive in approximately August 2023, without giving him any choice in the matter. Mr. Thomas' coerced labor for Defendant Ju Young Automotive is addressed *infra* at ¶¶563, 575, 613575, and incorporated herein.

505. After he was terminated from Ju Young, Mr. Thomas was returned to Staton, where medical evaluation confirmed chronic arthritis in his lower back. To this day, Mr. Thomas still experiences pain radiating from his back into his legs. Some days he cannot walk. He was denied an MRI for approximately one year after his back flare-up. He also suffers from diabetes, anemia, and hypertension, managed with insulin twice daily and multiple medications. Despite meeting the criteria for chronic care classification, he was charged $4 for every medical visit and every prescription packet and was not designated chronic care. Medical staff ordered a wheelchair, a walker, and a cane for him; he received none of them. He was later transferred to Elmore Correctional Facility, a high-security facility with no medical clinic, where he remained in a mixed-custody dormitory of 100-200 people, in severe pain and without adequate treatment, until his release on parole in June 2026.

506. **Lakiera Walker.** Beginning in approximately 2010, ADOC required Ms. Walker to perform long daily hours of uncompensated work, upon threat of discipline up to and including solitary confinement, including dorm-wide cleaning assignments, stripping and buffing floors, providing care for mentally disabled or other ill incarcerated people, and unloading chemical trucks. She was regularly required to work seven days a week, many years working two shifts a day. From approximately 2018 until her release in 2023, Ms. Walker was also required to work outside ADOC facilities and in the community, including at Defendant Southeastern Meats, Jefferson County, and Burger King.

507. Throughout the entirety of Ms. Walker's incarceration, ADOC consistently enforced a rule that incarcerated women, including her, must work or face punishment, including segregation, disciplinaries or dangerous work assignments. Beginning in 2010, Ms. Walker was assigned at Tutwiler to various jobs by Capt. Evans, Warden Albright, and Ms. Lacey Jackson.

For any breach of rule, Warden Albright's typical response was to put people in solitary confinement, known as segregation or colloquially at Tutwiler as "lock up." Ms. Walker recalls Warden Albright on nearly a daily basis yelling "lock up" at any person who violated any rule, including ADOC's rule that you had to work. Ms. Walker saw many women sent to lock up by Warden Albright for all kinds of alleged infractions, including alleged failure or refusal to work. Ms. Walker observed ADOC officers place an incarcerated woman in her sixties, Melvina Campbell, in handcuffs and take her to lock up for allegedly refusing to work. Ms. Walker recalls Ms. Campbell had a cane and was unable physically to do the job assigned to her and thus was punished for not being able to work. Ms. Walker performed all jobs assigned by ADOC because she understood, based on what she observed, that if she did not do the jobs assigned, she would be sent to segregation by Warden Albright or be issued other discipline, which could include dangerous work assignments, curtailing all communication with her family, including her son, and threaten or extinguish her opportunity for parole.

508. In order to secure her "custody"—referring to a security level classification of minimum community that would allow Ms. Walker to earn any wages at all for the jobs she worked while incarcerated and allow her to provide some financial support for her young son who lived with her mother—Ms. Walker had to keep a good institutional record. Keeping a good institutional record meant having to work all jobs assigned by ADOC, taking classes, and not getting disciplinaries. As ADOC issued disciplinaries for refusal to work, to secure her custody, Ms. Walker knew she had to do all jobs assigned and not make complaints, even about unlawful activities, such as Officer Williams' predatory behavior, *see supra* ¶145. Ms. Walker really wanted to secure her community custody because she wanted to show society that she could do the right thing. She wanted to make her own money from the jobs she worked and be able to provide for her son. She didn't want to take from him; she wanted to give to him. Ms. Walker also felt deeply uncomfortable with her mom being required to send her money for necessities in prison at the same time that her mom was taking care of her son.

509. Beginning in 2010 and continuing until approximately 2017, when she secured her lowest community custody level, ADOC compelled Ms. Walker to perform long daily hours of uncompensated work at Tutwiler (until 2016) and at Montgomery (in approximately 2016 and 2017), upon threat of discipline which included a consistent threat of solitary confinement at Tutwiler, loss of visitation and communication privileges and threats to custody status, and ultimately parole consideration. She regularly worked seven days per week, frequently two shifts per day. Sergeant Mears at Birmingham facility (after Ms. Walker secured her work release custody) also assigned her to work in the kitchen at Birmingham without compensation. Warden Albright, Captain Evans and Ms. Lacey Jackson typically issued Ms. Walker her job assignments at Tutwiler but any officer at Tutwiler could issue Ms. Walker a job. She regularly was required to work seven days a week, often working two shifts a day in many years at Tutwiler and Montgomery. For many years at Tutwiler, she worked on the floor crew, cleaning and buffing floors and hallways throughout the facility. She was also regularly assigned regular cleaning duties, such as sweeping and mopping the entire dorm, cleaning the smoke yard, cleaning all the showers, passing out chemicals, unloading chemicals or other trucks, or passing out sanitary products. Although some of Ms. Walker's assigned jobs were called "housekeeping," none of her assigned jobs involved maintaining the cleanliness of her cell or immediate area, as maintaining the cleanliness of your immediate area was mandatory for all incarcerated people and was not considered a job. She worked first shift, starting at 5 a.m. and finishing around 2 p.m. on many occasions but she also worked third shift regularly, beginning at 9 p.m. and concluding at 6 a.m. She also regularly worked first shift to win points to secure "family night" visitations. ADOC established a system at Tutwiler and Montgomery that an incarcerated woman had to earn 1000 points to secure "family night" visitation every six months, which could be earned by performing all types of assigned jobs, but Ms. Walker preferred caring for the elderly and sick incarcerated women and tended to earn her points by working first shift, from 6 a.m. to 3 p.m.

510. In or about 2017, Ms. Walker, while assigned to work for free in the kitchen, narrowly avoided assault from a kitchen steward. Because of the attempted assault, ADOC

removed Ms. Walker from the kitchen but it was because of the known dangerous behavior of the kitchen stewards that the kitchen job was used as a punishment by ADOC.

511. In late 2017 to early 2018, Sergeant Mears at Birmingham work release assigned Ms. Walker to work on the Jefferson County road crew in Keytona. Ms. Walker had no choice in the job assignment and she understood that if she refused the job assignment, she would be disciplined for refusal to work. She felt compelled to work because a refusal to work endangered her chance for parole, the ability to earn any money to support her son, and her ability to visit and communicate with her family and child. For Jefferson County, she typically worked four to five days per week and was on the job approximately 10 hours per day. She and her coworkers walked along the roads picking up trash or retrieving large-item trash that someone had left outside for pickup. She was paid $2 per day of work. While working in Keytona, her Jefferson County supervisor demanded that she engage in a variety of sexual acts as part of her work on the job, promising an array of benefits for a menu of sexual acts. The benefits included promised phone calls or visits with her son at the worksite. Ms. Walker refused the sexual demand and immediately upon returning to the ADOC Birmingham facility, she told Lt. Wanda Williams what happened. Lt. Williams liked to cuss a lot and Ms. Walker recalls Lt. Williams colorfully (meaning with curse words) saying to Ms. Walker over and over that she did not want to hear it and that Ms. Walker was "lying." Ms. Walker called her mother to discuss what to do and then wrote and filed a written grievance and gave it to the PREA (Prison Rape Elimination Act) officer, Lieutenant Wilder. In response to filing the complaint, ADOC issued a disciplinary to Ms. Walker for "refusing to work" and then ADOC Sergeant Mears assigned Ms. Walker an unpaid "punishment" job in the kitchen, where she had previously been attacked by a kitchen steward.

512. When Ms. Walker complained about the sexual work conditions at Jefferson County, she also immediately lost her phone, canteen, and visitation privileges. In addition, Ms. Walker was eligible for parole beginning in 2020 and was supposed to come up for hearing in 2020. However, without any hearing, Ms. Walker was notified that her first parole hearing had been delayed until 2022. She did not actually receive her first parole hearing until 2023, when she

was granted parole over the denial vote of then-Chair Leigh Gwathney and opposition from the Attorney General, despite her victims appearing at the hearing and advocating for her release. Ms. Walker does not know why her 2020 parole was denied summarily without a hearing, but she assumes that the disciplinary she was issued about her Jefferson County PREA complaint had a negative effect and caused the denial of her parole consideration in 2020.

513. In late 2019 and early 2020, Warden Crabtree assigned Ms. Walker again to work for Jefferson County, but this time in Bessemer. Again, Ms. Walker was assigned to work on the road crew and her duties and hours remained the same as in Keytona, except without the demand for sexual acts as a condition of work. Ms. Walker performed the work because it was assigned by ADOC and she did not feel able, given the punishment she had just endured from being accused of refusing to work in Keytona, to refuse any job assignment. Also, compared to the unpaid work she had been assigned since the Keytona assignment, she preferred being paid anything ($2 per day), rather than nothing, for her daily work.

514. In addition to being ordered to segregation, which she observed Warden Albright do on many occasions to incarcerated women perceived as refusing to work (as Ms. Walker rarely, if ever, observed any incarcerated woman actually refuse to work), Ms. Walker experienced and observed ADOC deploy a variety of punishments for disciplinaries for refusal or perceived refusal to work, including the alleged offense of "being fired for a job", including: 1) jeopardizing or delaying your ability to secure your custody because of the disciplinary issued; 2) punishing assignments, such as the kitchen, where Ms. Walker was assigned to punish her for filing a PREA complaint regarding threats of sexual violence on the job, as discussed above; 3) immediate and extended loss of visitation and phone privileges to communicate with your family (usually 45 days but could be as long as 90 days if at work release); 4) if at Work Release, any disciplinary also means the forfeiture of any home passes for three months and then starting over from beginning to earn home passes of any duration (beginning at 4 hours and ending at 72 hours); 5) loss of canteen privileges, which meant an inability to access basic hygiene products; and 6); the loss of

the chance to win parole. Ms. Walker observes that one of the most devastating threats for any incarcerated woman was the impact a refusal to work disciplinary had on your chances for parole.

515. In or about September 2022 to February 2023, the JPO, St. Gaston, assigned Ms. Walker to work at Southeastern Meats. Ms. Walker's coerced labor for Defendant Southeastern Meats is addressed *infra* at ¶586, and incorporated herein.

516. Ms. Walker knew she had to have her JPO's permission to alter her job placement and could not just quit working at Southeastern Meats (or any job) because it was a major disciplinary to refuse a job. Receiving a disciplinary could jeopardize chances of parole, lead to a transfer to a more dangerous facility, and have other serious impacts as described above. Additionally, at Birmingham, Captain Brian Riggins had a practice of pushing for "refusing to work" disciplinaries, particularly for Black women, even though she rarely, if ever, saw any Black incarcerated woman refuse to work. Ms. Walker recalls him saying repeatedly that they (the incarcerated women workers) did not have a "say so" about where you go. Ms. Walker regularly observed that as to job assignments, if one of the Black women complained about the job, he would write the woman up or get the JPO to do it, but if white women complained, he might let it pass.

517. A couple of months into her time at Southeastern Meats, on one morning, Ms. Walker became so sick, she could not rise in the morning from her bed. Officer Gaston came into her dorm and told her he had been instructed by Captain Brian Riggs to tell her to "get up and make the 40%." Ultimately, because Ms. Walker could not move, her friend, Ashley Jenkins, carried her to the healthcare center. Ms. Walker recalls being off work for about a week due to her weakened condition. Ms. Walker recalls being scared the entire time she was ill that she was going to be disciplined for refusing to work, because she had seen other incarcerated women disciplined for refusing to work when they were too sick or physically unable to do the job assigned, but she managed on that occasion not to get disciplined and returned back to work at Southeastern Meats.

518. After her repeated pleading, Sergeant Price at the Birmingham Work Release facility granted Ms. Walker's request and moved her to a job at Burger King. As at Southeastern Meats, Ms. Walker had no ability to refuse the job assignment but found the work conditions far

less onerous than those at Southeastern Meats. Ms. Walker worked for Burger King, at two different locations, up until her release.

## COUNT II

**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(a)(2)**
**By Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker on Behalf of Themselves and the Forced Labor Class, RWDSU, and USSW**
**Against Defendants Lovelace, Hamm, and Ivey for Knowingly Obtaining and Providing Forced Labor Through Means of Serious Harm and Threats Thereof**

519. Forced Labor Named Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker, on behalf of themselves and the Forced Labor Class, and RWDSU and USSW, bring this count against Defendants Lovelace, Hamm, and Ivey under 18 U.S.C. §§1589(a)(2), 1595(a), which prohibit persons from "knowingly provid[ing] or obtain[ing] … the labor or services of a person … by means of serious harm or threats of serious harm to that person or another person." 18 U.S.C. §1589(a)(2).

520. Defendants Lovelace, Hamm, and Ivey are liable to each of the Forced Labor Named Plaintiffs and the members of the Forced Labor Class, because they knowingly obtained the labor and services of these individuals and did so by means of serious harm or threats of serious harm to that person and other persons.

521. Defendants Lovelace, Hamm, and Ivey are also liable to RWDSU because, by that same conduct, they provided the labor of Plaintiffs and the members of the Forced Labor Class to the Private Employer Defendants and other private employers in Alabama at the expense of Plaintiff RWDSU and its members, leading directly to the depression of wages and degradation of working conditions for all workers and impeding the union's organizing and representational efforts. *See supra* ¶¶29, 308.

522. Defendants Lovelace, Hamm, and Ivey took actions to provide and secure the labor and services of Forced Labor Named Plaintiffs and Forced Labor Class Members by serious harm,

including the threat of and frequent exercise of violence and maintenance of extremely violent, life-threatening detention conditions at ADOC medium- and high-security facilities; deprivation of bare necessities, medical treatment, phone contact with family, and visitation privileges; psychological trauma; economic harms; and the threat of each of the above.

523. ADOC's practice of using the threat and exercise of violence against incarcerated persons, including Forced Labor Named Plaintiffs, should they fail to work, is detailed in Count I. *See supra.*

524. As set forth in Forced Labor Named Plaintiffs' detailed allegations in Count I, ADOC regularly and consistently threatens to issue disciplinaries, and issues disciplinaries, to incarcerated individuals for purported failures to work and for being "fired" from ADOC-assigned jobs. *See supra* ¶¶314, 319 (collecting and summarizing Named Plaintiffs' experience with work-related disciplinaries and threats thereof).

525. While ADOC's disciplinaries involve threat of force and extended sentences, as described in Count I, they also carry with them a threat of, and often an actual, loss of visitation and phone privileges, as well as the loss of home passes, which are the only ways that Named Plaintiffs and other incarcerated individuals are able to stay in touch with their families. The ADOC regulations identify withdrawal of privileges, including visitation, phone, and canteen privileges, as one penalty that ADOC will impose when individuals refuse to work or encourage others to do so. *See supra* ¶¶153-158, 222-230. This penalty denies incarcerated individuals the right to see their family members or other visitors, as well as the ability to obtain necessities such as hygiene items and food.

526. ADOC uses threats to deny family contact, and the actual denial of family contact, including through denial of visitation and phone privileges, to coerce labor for ADOC itself and for ADOC-contracted employers (*see* Cartwright, *supra* ¶¶329, 332, 335; R. Clark, *supra* ¶¶338, 348 T. Clark, *supra* ¶¶350, 359; Cole, *supra* ¶361; Dandridge, *supra* ¶¶378, 380; Jarmon, *supra* ¶409; Mason, *supra* ¶428; McCorvey, *supra* ¶434; McDole, *supra* ¶441; Morrissey, *supra* ¶¶454-455; Payton, *supra* ¶¶462, 463, 465, 467, 473; Prewitt, *supra* ¶¶477, 479; Pritchett, *supra* ¶485;

Ptomey, *supra* ¶493; Thomas, *supra* ¶¶499; Walker, *supra* ¶¶507, 509, 511, all of which are incorporated herein).

527. These work-related disciplinaries also regularly result in a loss of canteen privileges and access to food and hygiene products (*see* Cartwright, *supra* ¶¶329, 332, 335; R. Clark, *supra* ¶338; T. Clark, *supra* ¶¶350, 359; Cole, *supra* ¶361; Dandridge, *supra* ¶¶378, 380-381; Jarmon, *supra* ¶409; Mason, *supra* ¶428; McCorvey, *supra* ¶434; Morrissey, *supra* ¶454; Payton, *supra* ¶465; Pritchett, *supra* ¶485; Ptomey, *supra* ¶493; Thomas, *supra* ¶499; Walker, *supra* ¶512, incorporated herein). For example, ADOC issued Plaintiff Mason two disciplinary infractions, one for refusing to work and the other for disobeying a direct order, and gave him sixty days of restriction of phone, visitation, and canteen access for each disciplinary, for a total of 120 days of restriction. And a putative class member at Birmingham Work Release explained that women on work release are required to work in the kitchen for 90 days at a time. If they refuse, they are disciplined, which leads to restriction: no phone time, no visits from family, and no access to the canteen. They are also not allowed to go outside and are placed on "extra duty."

528. Additionally, as widely and repeatedly reported across Alabama, in September 2022, ADOC deprived men incarcerated in the medium- and high-security facilities of the ability to maintain basic minimum sustenance, hygienic conditions, and medical care, as punishment for their refusal to perform in-house work for ADOC. *See infra* ¶¶97, 665. Specifically, to coerce the men to return to work, ADOC and Governor Ivey responded with what is colloquially known as "bird-feeding"—that is, reducing the supply of food to the striking workers. ADOC also failed to maintain the toilets, remove trash, or otherwise maintain basic hygienic conditions. Incarcerated individuals who needed medications, treatments, and other healthcare services were also denied such services as punishment for withholding their labor.

529. ADOC and the Governor's response to the September 2022 work stoppage is well-known by Named Plaintiffs and members of the Forced Labor Class, and serves as an ongoing threat of the sort of consequences that will follow any refusal by incarcerated individuals to work.

530. ADOC uses the deprivation of necessities as a tactic for collective punishment, even when incarcerated people do not participate in work stoppages. Plaintiff McDole, for example, was among those incarcerated people who had their access to the canteen at Childersburg severely limited during the 2022 strike, even though the incarcerated workers at Childersburg did not participate in the strike.

531. While the Governor and then ADOC-Commissioner Hamm's deprivation of necessities during the 2022 strike is the most infamous instance of this sort of coercion of incarcerated Alabamians' labor, ADOC engages in this sort of coercion regularly, including by failing to provide adequate food during the workday. For example, Plaintiff Rashaad Clark was forced to work on the "farm" at Draper with only a single cheese sandwich to eat. *See supra* ¶339.

532. ADOC also threatens to withhold and withholds opportunities for incarcerated workers to receive any pay for their work, as a means of coercing incarcerated workers to perform labor as directed and without complaint. As described *supra*, ADOC regularly transfers Named Plaintiffs and other incarcerated individuals away from Work Center and Work Release facilities to higher-security facilities where they are unlikely to be able to earn any money, as punishment for purported refusals to work or objecting to a work assignment. Campbell, *supra* ¶325; R. Clark, *supra* ¶344; T. Clark, *supra* ¶¶351-352; Cole, *supra* ¶369; English, *supra* ¶399; Jarmon, *supra* ¶413; Prewitt, *supra* ¶477; Thomas, *supra* ¶505. ADOC also has regularly assigned "punishment" work to Named Plaintiffs, including unpaid work for ADOC, in response to their raising concerns about ADOC-assigned work. Dandridge, *supra* ¶377; Jarmon, *supra* ¶411; Walker, *supra* ¶514.

533. Depriving incarcerated workers of any opportunity to be compensated for their labor—whether by precluding them from participating in Work Release, Work Center, or CI jobs—eliminates the only meager pay individuals lawfully may earn for their work while incarcerated. As a practical matter, precluding incarcerated workers from participating in paid work also often results in workers being transferred away from safer, lower-security facilities to dangerous medium- and high-security facilities.

534. The threat to remove the opportunity to receive some pay for their labor is a threat to deprive incarcerated workers of bare necessities. This is because incarcerated people in ADOC facilities, including Forced Labor Named Plaintiffs, are and have been required to pay excessive, marked-up amounts to ADOC to obtain basic life necessities.

535. For example, ADOC does not provide incarcerated people with adequate warm winter clothes, usable shoes (including work shoes), or deodorant. Incarcerated people must instead purchase those items from ADOC, typically at highly marked-up prices—for example, a more than 50% markup for a pair of shoes.

536. ADOC facilities also charge many incarcerated people fees for medical visits. These fees range from approximately \$4 to \$8, with additional costs for some medicines. Incarcerated people housed in facilities without on-premises medical care may be charged \$8-12 for van transport to a prison with a medical facility. These fees impose a significant burden on incarcerated people, considering that the vast majority of them are paid either nothing at all or at most \$2 per day for their forced labor, meaning that a single serious or recurring medical condition can wipe out years of earnings. Incarcerated people are also required to pay approximately \$1.80 per hour to use ADOC's electronic tablets, \$0.15 for every message sent on the tablet, and additional onerous fees for every minute used in a phone call to connect with their loved ones.[66]

537. In recent years, the fees charged by ADOC to incarcerated people for some basic necessities have soared, far outpacing inflation. Meanwhile, the extremely limited purchasing power of most incarcerated people has not increased at all.

538. The need to acquire funds to purchase such necessities contributes to forcing incarcerated people in ADOC's custody to accept any paid work they can, and to remain in those

---

[66] The excessive prices ADOC charges for such basic necessities provide ADOC an additional incentive to keep as many people incarcerated as possible, because ADOC gets a share of all funds received for goods purchased in the canteen or the snack line. These charges further contribute to compelling incarcerated people to accept whatever work assignments they are given if the job includes any pay at all. For FY 2022, ADOC reported revenue of more than \$11.2 million for "Corrections Canteen Profits," more than \$5.1 million from pay telephones, more than \$106,000 in medical co-pays, and more than \$311,000 in electronic transfer fees.

jobs no matter the conditions for as long as possible. *See also* Jarmon, *supra* ¶419; Walker, *supra* ¶511.

539. In addition, ADOC subjects incarcerated individuals to serious harm and threats of serious harm by employing violence and threats of physical harm, including as punishment for failures to work and through transfers to more dangerous areas or facilities; extension and threatened extension of incarcerated workers' periods of incarceration and through application of ADOC's regulations and Defendant Ivey's Executive Order; and subjecting and threatening to subject incarcerated workers who fail to work as requested to solitary confinement. Thus, the facts alleged in support of Count I regarding ADOC's use of these practices are also evidence of ADOC's providing and obtaining labor or services by means of serious harm and threats of serious harm.

**COUNT III**

**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(a)(3)**
**By Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker on Behalf of Themselves and the Forced Labor Class, RWDSU, and USSW**
**Against Defendants Lovelace, Hamm, and Ivey for Knowingly Obtaining and Providing Forced Labor Through Means of the Abuse or Threatened Abuse of Law or Legal Process**

540. Forced Labor Named Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker, on behalf of themselves and the Forced Labor Class, and RWDSU and USSW, bring this count against Defendants Lovelace, Hamm, and Ivey under 18 U.S.C. §§1589(a)(3), 1595(a), which prohibit persons from "knowingly provid[ing] or obtain[ing] … the labor or services of a person … by means of the abuse or threatened abuse of law or legal process." 18 U.S.C. §1589(a)(3).

541. Defendants Lovelace, Hamm, and Ivey knowingly obtained and provided labor and/or services of Forced Labor Named Plaintiffs and the Forced Labor Class members by means of the abuse or threatened abuse of law or legal process, including by (a) threatening to issue and

issuing disciplinaries for purported failures or refusal to work that are directed at ensuring that incarcerated individuals continue to labor for the benefit of ADOC, without complaint and for little if any pay, and not for any valid need for discipline; and (b) abusing the parole process and threatening to withhold parole from individuals who have proven their fitness for parole based on their objections to working conditions or being compelled to work.

542. Lovelace, Hamm, and Ivey have a consistent practice of using the threat of disciplinaries and the issuance of disciplinaries to compel Named Plaintiffs and other incarcerated individuals to labor for the financial benefit of ADOC even when the individuals are too sick or injured to do so, or the individuals have requested not to work, including to avoid unlawful conduct such as sexual harassment, racial discrimination, coerced labor, and transport of prohibited substances. *See supra* ¶¶517 (Ms. Walker, when ill, told to "get up and make the 40%"), 511 (Ms. Walker reported for failing to work after reporting sexual harassment), 428 (Mr. Mason disciplined for refusing to transport drugs), 465 (Mr. Payton disciplined after reporting race discrimination at job); *infra* ¶¶548 (Mr. Ptomey disciplined for raising concerns about low wage rates), 565.m.ii (Ms. Cartwright told a failure to work for health reasons would be deemed a refusal to work and result in disciplinary). 203.m.ii

543. Individuals who decline to work receive disciplinaries on their record, which directly diminishes their opportunity to be granted parole by the Parole Board, especially since the Parole Board's modification of its scoring procedures since 2019. Specifically, a disciplinary for failure to work, or for encouraging others to withhold their labor, increases a parole applicant's "score," decreasing the likelihood that an individual will be granted parole. The threat of the consequences for parole is another way in which incarcerated individuals' work is coerced.

544. ADOC's use of these disciplinaries has perverted the parole process intended by the Legislature. ADOC has obtained the services and labor of Forced Labor Named Plaintiffs and Forced Labor Class members, for itself and for ADOC-contracted employers, through the abuse and threatened abuse of legal process because it has a regular practice of threatening and issuing

discipline for "refusal to work" or for objecting to work conditions, not for any need to impose discipline, but knowing that such discipline will interfere with individuals' ability to obtain parole.

545. This practice is borne out by Forced Labor Named Plaintiffs' experiences, as set forth in detail in Count I (*see, e.g.*, Cartwright, *supra* ¶¶329, 332; Rashaad Clark, *supra* ¶348; Moore, *supra* ¶451; Payton, *supra* ¶¶463, 473; Prewitt, *supra* ¶¶477, 479; Ptomey, *supra* ¶493; Pritchett, *supra* ¶485; Thomas, *supra* ¶499; Walker, *supra* ¶¶511-512, 514).

546. Across ADOC facilities, ADOC personnel have and continue to threaten incarcerated individuals, including Forced Labor Named Plaintiffs, that an objection to working for ADOC's benefit and as directed by ADOC, whether for ADOC or for its contracted employers, will interfere with their rights under the parole process. The impact of this threat and of the disciplinaries is significant.

547. Ms. Walker saw many women who had been issued a work disciplinary immediately thereafter denied parole and it was widely understood that any work disciplinary meant saying goodbye to your chance of parole. After Ms. Walker filed a PREA complaint regarding her Jefferson County supervisor demanding that she engage in a variety of sexual acts as part of her work on the job, *see supra* ¶¶511-512, ADOC issued discipline to Ms. Walker allegedly for "refusing to work," which delayed her parole hearing, among other consequences.

548. Mr. Ptomey's parole was affected by a work-related incident. In November 2019, the owner of Pell City KFC, where he was working, asked Mr. Ptomey to cook some tenders for her personal catering service. These requests had been going on for some time, requiring Mr. Ptomey to do extra work even though he only made $7.50 an hour. Mr. Ptomey declined to perform the task on this occasion, and the manager of KFC then fired him. He did not learn he was fired until he got back to the camp. There was no misconduct: no violence, no drug use, no disciplinary behavior. ADOC nonetheless issued a disciplinary violation for "being fired from a job" and stripped Mr. Ptomey of his home passes and his ability to draw on his account. Three years later, the Parole Board denied Mr. Ptomey parole. The Parole Board told his family that the reason for the denial was that Mr. Ptomey had been fired from KFC for refusing to work in 2019. The Parole

Board's characterization was inaccurate. Mr. Ptomey had sought reassignment over a wage dispute, had no misconduct record at KFC, and was working at a different employer at the time of his parole hearing with a strong work performance record. The KFC-related disciplinary nonetheless cost him his parole.

549. Mr. Pritchett is very concerned about the effect disciplinaries for "being fired from a job" and "refusing to work/failing to check out for work" have on his ability to obtain parole. Mr. Pritchett has received work-related disciplinaries from ADOC, including disciplinaries for occurrences as minor as being late to catch a van to get transported to a work site; cleaning tables in a way that was slightly different from what his supervisor preferred; or not making it to his shift while he was sick. One of the reasons he is worried is that the Parole Board in 2017, when it denied him parole, referred to an incident in which he was fired from a kitchen job when he was erroneously blamed for stealing hot dogs.

550. Mr. English's experience asking for time off from his ADOT assignment and ADOT's threat that a failure to take on another assignment would affect his parole, shows the manner in which ADOT links the work requirement with parole chances. *See supra* ¶399. And Mr. Payton kept working at an ADOC-assigned job for a private employer despite not receiving any pay for approximately eight months because he was concerned about the threat to his parole chances. *See supra* ¶473.

551. Defendants' abuse of the parole process injures Plaintiffs RWDSU, by keeping incarcerated workers who would otherwise be paroled and free to join RWDSU within Defendants' coerced labor system. By using the disciplinary process to ensure a compliant workforce, Defendants Hamm, Lovelace and Ivey have also ensured that incarcerated workers at the ADOC-contracted employers where the union's members work cannot object to wages or working conditions, or associate with a union, without jeopardizing their liberty, depressing wages and degrading working conditions for all workers, including those RWDSU represents, and obstructing the union's efforts to organize and represent workers at those employers. *See supra* ¶¶29, 307-308.

## COUNT IV

**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(a)(4)**
**By Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker on Behalf of Themselves and the Forced Labor Class, RWDSU, and USSW**
**Against Defendants Lovelace, Hamm, and Ivey for Knowingly Obtaining and Providing Forced Labor By Means of a Scheme Intended to Cause Plaintiffs and Class Members to Believe They Would Suffer Serious Harm or Physical Restraint If They Did Not Labor for ADOC**

552. Forced Labor Named Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker, on behalf of themselves and the Forced Labor Class, and RWDSU and USSW, bring this count against Defendants Lovelace, Hamm, and Ivey under 18 U.S.C. §§1589(a)(4), 1595(a), which prohibit persons from "knowingly provid[ing] or obtain[ing] … the labor or services of a person … by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint" 18 U.S.C. §1589(a)(4).

553. Defendants Lovelace, Hamm, and Ivey are liable to each of the Forced Labor Named Plaintiffs and the members of the Forced Labor Class, because they knowingly obtained the labor and services of these individuals and did so by means of a scheme, plan, and pattern intended to convey to incarcerated workers that, if they did not labor for ADOC and ADOC-contracted employers, they would suffer serious harm or physical restraint.

554. Defendants Lovelace, Hamm, and Ivey are also liable to Plaintiff RWDSU and its members, because, via that same conduct, they obtain and provide the labor of Forced Labor Named Plaintiffs and the members of the Forced Labor Class to ADOC-contracted employers. Those incarcerated workers cannot refuse to work, object to working conditions, or join a union, depressing wages and degrading working conditions for all workers and impeding the union's organizing and representation. *See supra* ¶29.

555. Defendants Lovelace, Hamm, and Ivey took actions to create and maintain a scheme that was intended to convey to incarcerated workers that, if they did not labor for ADOC and ADOC-contracted employers, they would suffer physical restraint and serious harm, including through the exercise of violence and maintenance of violent, deadly detention conditions at ADOC medium- and high-security facilities, deprivation of bare necessities, medical treatment, and visitation privileges, psychological trauma, and economic harms, and the threat thereof. The facts alleged above, including in Count I regarding ADOC's use of violence, transfers to facilities where individuals face a serious risk of physical harm, extended periods of incarcerations as a consequence of discipline for refusing to work, and solitary confinement, and in Count II regarding other serious harms such as deprivation of access to family and the means to purchase necessities, and threats to use such means, to extract labor, are also evidence of ADOC's scheme, plan, and pattern intended to cause Forced Labor Named Plaintiffs and putative members of the Forced Labor Class to believe that, if they do not perform labor or services as directed by ADOC, they would suffer serious harm and/or physical restraint.

556. The Work Center and Work Release programs, as set forth *supra* ¶¶176-205 and 213-245, also evidence a clear plan intended to cause Forced Labor Named Plaintiffs and putative members of the Forced Labor Class to believe that, if they do not perform labor or services as directed by ADOC, they will suffer serious harm and/or physical restraint.

## COUNT V

**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(b)**
**By Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, English, Jarmon, Lesley, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker, on Behalf of Themselves and the Forced Labor Class, USSW, and RWDSU Against Public and Private Employer Defendants for Knowingly Benefiting from Participating in a Venture Which Engages in the Unlawful Coercion of Labor**

557. The TVPA provides a private cause of action against anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in

[§1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means ….” 18 U.S.C. §1589(b).

558. All Public and Private Employer Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture that has engaged in the providing or obtaining of labor or services by the means described in 18 U.S.C. §1589(a), as detailed in Counts I-IV, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

559. At all relevant times, the ADOC Commissioner has established and maintained a joint venture with each and every Public and Private Employer Defendant to benefit from the labor or services performed by Forced Labor Named Plaintiffs and the Forced Labor Class Members.

### A. Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Jarmon, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, Walker, RWDSU, and USSW's 18 U.S.C. §1589(b) Claims Against Private Employer Defendants

560. Plaintiffs Campbell, Cartwright, Rashaad Clark, Trevion Clark, Cole, Jarmon, Lesley, McCorvey, McDole, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, Walker, on behalf of themselves and the Forced Labor Class, RWDSU, and USSW bring this count against Private Employer Defendants, as specified below in paragraphs (a) through (n), under 18 U.S.C. §§1589(b), 1595(a), which prohibit persons from participating in a venture that has engaged in providing or obtaining labor or services by means prohibited in 18 U.S.C. §1589(a).

a. Plaintiffs Campbell and Rashaad Clark bring this count against Defendant Bama Budweiser, on behalf of themselves and other Forced Labor Class members who have worked for Bama Budweiser and those whom ADOC may assign to do so in the future.

b. Plaintiffs Jarmon, Lesley, and Payton bring this count against Defendant Cast Products, on behalf of themselves and other Forced Labor Class members who have worked for Cast Products and those whom ADOC may assign to do so in the future.

c. Plaintiff McCorvey brings this count against Defendant CBAK (McDonald's), on behalf of himself and other Forced Labor Class members who have worked for CBAK and those

whom ADOC may assign to do so in the future. Plaintiff USSW also brings this count against CBAK.

d. Plaintiff T. Clark brings this count against Defendant Hwaseung, on behalf of himself and other Forced Labor Class members who have worked for Hwaseung and those whom ADOC may assign to do so in the future.

e. Plaintiffs Payton and Thomas bring this count against Defendant Ju-Young, on behalf of themselves and other Forced Labor Class members who have worked for Ju-Young and those whom ADOC may assign to do so in the future.

f. Plaintiffs Lesley brings this count against Defendant Koch Foods, on behalf of himself and other Forced Labor Class members who have worked for Koch Foods and those whom ADOC may assign to do so in the future. Plaintiff RWDSU also brings this count against Koch Foods.

g. Plaintiff Cole brings this count against Defendant Masonite, on behalf of himself and other Forced Labor Class members who have worked for Masonite and those whom ADOC may assign to do so in the future.

h. Plaintiffs Cartwright and Morrissey bring this count against Defendant Paramount, on behalf of themselves and other Forced Labor Class members who have worked for Paramount and those whom ADOC may assign to do so in the future.

i. Plaintiffs Campbell and Ptomey bring this count against Defendant Pell City KFC, on behalf of themselves and other Forced Labor Class members who have worked for Pell City KFC and those whom ADOC may assign to do so in the future. Plaintiff USSW also brings this count against Pell City KFC.

j. Plaintiffs Campbell, R. Clark, Lesley, McDole, and Ptomey bring this count against Defendant Progressive Finishes, on behalf of themselves and other Forced Labor Class members

who have worked for Progressive Finishes and those whom ADOC may assign to do so in the future.

k. Plaintiffs Cole, McDole, and Payton bring this count against Defendant RCF/Gemstone, on behalf of themselves and other Forced Labor Class members who have worked for RCF/Gemstone and those whom ADOC may assign to do so in the future. Plaintiff RWDSU also brings this count against RCF/Gemstone.

l. Plaintiff Prewitt brings this count against Defendant SL Alabama, on behalf of himself and other Forced Labor Class members who have worked for SL Alabama and those whom ADOC may assign to do so in the future.

m. Plaintiffs Prewitt and Cartwright bring this count against Defendant Southeast Restaurant Group (Wendy's), on behalf of themselves and other Forced Labor Class members who have worked for Southeast Restaurant Group (Wendy's) and those whom ADOC may assign to do so in the future. Plaintiff USSW also brings this count against Southeast Restaurant Group (Wendy's).

n. Plaintiffs Cartwright, Morrissey and Walker bring this count against Defendant Southeastern Meats, on behalf of themselves and other Forced Labor Class members who have worked for Southeastern Meats.

561. **Venture.** Private Employer Defendants Bama Budweiser, Cast Products, CBAK (McDonald's), Hwaseung, Ju-Young, Koch Foods, Masonite, Paramount, Pell City KFC, Progressive Finishes, RCF/Gemstone, SL Alabama, Southeast Restaurant Group (Wendy's), and Southeastern Meats have each taken part in a venture with ADOC. ADOC has maintained and implemented this venture for at least the last 13 years . This is a common undertaking by ADOC and each of the Private Employer Defendants pursuant to which each Private Employer Defendant receives incarcerated workers from ADOC to labor for the Private Employer Defendant's benefit. As part of this venture, the workers remain subject to ADOC's control and coercion, rendering them restricted in their abilities to object to work assignments or working conditions.

a. Bama Budweiser has participated in ADOC's Work Release Program for more than a decade and, on information and belief, continues to participate in ADOC's Work Release Program, through which ADOC has provided, and Bama Budweiser has obtained, the labor and services of incarcerated individuals, including Plaintiffs Campbell and Rashaad Clark. Pursuant to Work Release Agreements with ADOC, Bama Budweiser has received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 220 or more ADOC-incarcerated people have worked for Bama Budweiser.

b. Cast Products has participated in ADOC's Work Release Program since at least 2018, and continues to participate in ADOC's Work Release Program, through which ADOC has provided, and Cast Products has obtained, the labor and services of incarcerated individuals, including Plaintiffs Jarmon, Lesley, and Payton. Pursuant to Work Release Agreements with ADOC, Cast Products has received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 586 or more ADOC-incarcerated people have worked for Cast Products.

c. CBAK (McDonald's) participated since at least 2018 in ADOC's Work Release Program, through which ADOC provided, and CBAK obtained, the labor and services of incarcerated individuals, including Plaintiff McCorvey. Pursuant to Work Release Agreements with ADOC, CBAK received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 178 or more ADOC-incarcerated people worked for CBAK.

d. Hwaseung participated since at least 2021 in ADOC's Work Release Program, through which ADOC provided, and Hwaseung obtained, the labor and services of incarcerated individuals, including Plaintiff T. Clark. Pursuant to Work Release Agreements with ADOC, Hwaseung received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 105 or more ADOC-incarcerated people worked for Hwaseung.

e. Ju-Young participated since at least 2021 in ADOC's Work Release Program, through which ADOC provided, and Ju-Young obtained, the labor and services of incarcerated individuals, including Plaintiffs Payton and Thomas. Pursuant to Work Release Agreements with

ADOC, Ju-Young received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 174 or more ADOC-incarcerated people worked for Ju-Young.

f. Koch Foods participated since at least 2018 in ADOC's Work Release Program, through which ADOC provided, and Koch Foods obtained, the labor and services of incarcerated individuals, including Plaintiff Lesley. Pursuant to Work Release Agreements with ADOC, Koch Foods received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 36 or more ADOC-incarcerated people worked for Koch Foods. RWDSU represents approximately 1,800 workers at Koch Foods, and has sought to represent incarcerated workers at Koch Foods but been denied pursuant to ADOC policy.

g. Masonite participated since at least 2020 in ADOC's Work Release program, through which ADOC provided, and Masonite obtained, the labor and services of incarcerated individuals, including Plaintiff Cole. Pursuant to Work Release Agreements with ADOC, Masonite received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 221 or more ADOC-incarcerated people worked for Masonite.

h. Paramount participated since at least 2019 in ADOC's Work Release program, through which ADOC provided, and Paramount obtained, the labor and services of incarcerated individuals, including Plaintiffs Cartwright and Morrissey. Pursuant to Work Release Agreements with ADOC, Paramount received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 95 or more ADOC-incarcerated people worked for Paramount.

i. Pell City KFC has participated in ADOC's Work Release Program since at least 2018, and continues to participate in ADOC's Work Release Program, through which ADOC has provided, and Pell City KFC has obtained, the labor and services of incarcerated individuals, including Plaintiffs Campbell and Ptomey. Pursuant to Work Release Agreements with ADOC, Pell City KFC has received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 74 or more ADOC-incarcerated people have worked for Pell City KFC.

j. Progressive Finishes has participated in ADOC's Work Release Program since at least 2018, and continues to participate in ADOC's Work Release Program, through which ADOC

has provided, and Progressive Finishes has obtained, the labor and services of incarcerated individuals, including Plaintiffs Campbell, R. Clark, Lesley, McDole, and Ptomey. Pursuant to Work Release Agreements with ADOC, Progressive Finishes has received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 196 or more ADOC-incarcerated people have worked for Progressive Finishes.

k. RCF/Gemstone has participated since at least 2018, and on information and belief continues to participate in ADOC's Work Release program, through which ADOC provided, and Gemstone obtained, the labor and services of incarcerated individuals, including Plaintiffs Cole, McDole, and Payton. Pursuant to Work Release Agreements with ADOC, Gemstone received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 202 or more ADOC-incarcerated people worked for Gemstone. RWDSU represents approximately 200 workers at Gemstone and has sought to represent incarcerated workers at Gemstone but been denied pursuant to ADOC policy.

l. SL Alabama participated since at least 2018 in ADOC's Work Release Program, through which ADOC provided, and SL Alabama obtained, the labor and services of incarcerated individuals, including Plaintiff Prewitt. Pursuant to Work Release Agreements with ADOC, SL Alabama received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 99 or more ADOC-incarcerated people worked for SL Alabama.

m. Southeast Restaurant Group (Wendy's) has participated in ADOC's Work Release Program since at least 2018, and continues to participate in ADOC's Work Release Program, through which ADOC has provided, and Southeast Restaurant Group has obtained, the labor and services of incarcerated individuals, including Plaintiffs Prewitt and Cartwright. Pursuant to Work Release Agreements with ADOC, Southeast Restaurant Group has received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 11 or more ADOC-incarcerated people have worked for Southeast Restaurant Group.

n. Southeastern Meats has participated in ADOC's Work Release Program since at least 2021, and continues to participate in ADOC's Work Release Program, through which ADOC

has provided, and Southeastern Meats has obtained, the labor and services of incarcerated individuals, including Plaintiffs Cartwright, Morrissey, and Walker. Pursuant to Work Release Agreements with ADOC, Southeastern Meats has received incarcerated workers from ADOC to work for it on its premises. Since 2018, approximately 166 or more ADOC-incarcerated people have worked for Southeastern Meats.

562. ADOC regulations require any employer participating in ADOC's Work Release Program to enter into a Work Release Agreement covering the time period(s) during which ADOC is supplying the employer with incarcerated individuals to work. *See supra* ¶¶222-225. On information and belief, each Private Employer Defendant has been a party to a contract with ADOC that involves the payment of money in exchange for labor provided by individuals in ADOC custody, to be supplied and transported by ADOC. On information and belief, each Private Employer Defendant has, as required by AR 410, entered into one or more Work Release Agreements with ADOC covering the time it has received ADOC-supplied workers—agreements that authorize the transaction and confirm, as set forth in AR 410, that the Private Employer Defendant is in need of workers to provide services and that ADOC is supplying such workers from among those it has in custody. This is a commercial transaction that involves a potential (and intended) financial benefit for both ADOC and each Private Employer Defendant.

563. **Knowing Benefit from Participation in Joint Venture.** Each Private Employer Defendant knowingly benefits and has benefited from its participation in this joint venture with ADOC. Through agreements with ADOC, each Private Employer Defendant receives access to an on-demand source of incarcerated workers who can be employed to their benefit when needed and not employed when they are not. Each Private Employer Defendant benefits from having a workforce that is jointly controlled by ADOC: ADOC's consistent practice is to supply workers on-time, prohibit the workers from refusing to work, and ensure—through threats of dire consequences—that workers will not raise concerns about working conditions. Each Private Employer Defendant benefits from receiving ADOC-supplied workers because these workers are directed by the employer's co-venturer, ADOC, that they cannot complain about their wages,

benefits or working conditions, and unlike free workers, the Private Employer Defendants are assured by ADOC that the assigned incarcerated workers will show up for their shifts, given: the threat of discipline from ADOC for failing to work as directed and for "getting fired" from the assigned job for any reason, including voicing concerns about work conditions or safety; the related risks of return to more violent facilities from any negative work report given by the Private Employer Defendant to ADOC that subject workers to a life-threatening risk of serious harm and denial of parole, extending that person's sentence and the time for which they are denied their freedom; and ADOC regulations prohibiting incarcerated people working through the Work Release Program from joining labor unions and thereby trying to negotiate for higher wages and better work conditions. In entering into these ventures with ADOC in which ADOC retains significant control over the incarcerated workers it provides, each Private Employer Defendant has agreed to the risks that may accompany such a venture.

a. **Bama Budweiser** has benefited from the services performed by Plaintiffs Campbell and Rashaad Clark and other Forced Labor Class members who performed work on Bama Budweiser's premises, at its direction, and to its specifications.

i. The company benefits financially from its participation in the venture by receiving laborers from ADOC it can control absolutely and who are intimidated and restrained from complaining about or refusing to perform any work task, regardless of its potential for danger or illegality. The company also benefits financially by being able to assign incarcerated workers to strenuous work that it would be difficult to assign to free workers, including at the wages (without benefits) paid to the incarcerated workers assigned by ADOC. After a Bama Budweiser supervisor attempted to physically beat Rashaad Clark with a stick and needed to be held back from Rashaad Clark by another employee, the Bama Budweiser shift supervisor told Rashaad Clark that he had to just accept the supervisor's abuse to stay on the job, and an ADOC officer told him that it was "just [the supervisor]" and to go back to work. Bama Budweiser's ability to secure a workforce that is intimidated and discouraged from defending themselves from an abusive

supervisor is a financial benefit to Bama Budweiser as free workers would either leave such a position or negotiate far greater wages or workplace protections to remedy the abuse.

ii. Bama Budweiser benefits financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers.

iii. Bama Budweiser has the ability to have ADOC supply workers to work the hours it needs, and to dismiss the workers when it wants, without any concern for ensuring that the workers receive full-time hours. On information and belief, Bama Budweiser regularly did not provide incarcerated workers a full shift, starting incarcerated workers in the early afternoon and ending their paid hours when the loading was done. This arrangement has provided a benefit to Bama Budweiser because free workers are not willing to stay in positions without consistent hours and, thus, consistent pay. The incarcerated workers had no choice as to the job they did for Bama Budweiser or the employer assignment, with complaint or request for reassignments met with threats of discipline or actual discipline for refusal to work.

iv. Bama Budweiser benefits from receiving ADOC-supplied workers because it can and does assign those workers strenuous tasks like pushing heavy pallets outside that free-world workers do not want to do and may refuse to do. Bama Budweiser also benefits from being able to subject incarcerated workers to unsafe working conditions, such as violence and threatened abuse from supervisors, that free-world workers were not subjected to. Mr. Clark's supervisor, Ed, threatened to beat Mr. Clark with a stick and had to be restrained by other employees, and was known to be abusive to incarcerated workers. Unlike free-world workers, incarcerated workers had no ability to refuse employment at Bama Budweiser or challenge Ed's abuse.

b. **Cast Products** has benefited from the services performed by Plaintiffs Jarmon, Lesley, Payton, and other Forced Labor Class members who performed work on Cast Products' premises, at its direction, and to its specifications.

i. The company benefits financially from its participation in the venture by

receiving laborers from ADOC it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. The company has assigned incarcerated workers to extremely dangerous foundry work, including manually pouring 1,400-degree molten aluminum from large pots into molds, that it would be difficult to assign to free workers, particularly at the wages paid to incarcerated workers. When Mr. Jarmon suffered a severe burn on his hand while pouring molten aluminum—his skin was peeling off his hand—and Cast just gave him a new glove and some burn cream and sent him back to work. His hand is still heavily scarred. The company's ability to secure a workforce that is intimidated and discouraged from reporting such workplace injuries or objecting to a working environment that leads to such injuries is a benefit to the company because free workers would likely leave the workplace or object to being sent back to work immediately after suffering a severe injury.

ii. Cast Products benefits financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. For example, Cast paid Mr. Jarmon approximately $12.50 to $13.50 an hour and Mr. Lesley approximately $9 to $11 an hour, but paid some free-world workers significantly more—between $17 and $24 an hour.

iii. Cast Products, through its relationship with ADOC, is able to receive workers to work the hours it needs. When free-world workers failed to show up for their shifts, Cast would require incarcerated workers including Mr. Jarmon to cover their shifts. This arrangement has provided a benefit to the company because it could staff difficult and dangerous positions without offering wages or conditions sufficient to guarantee that free-world workers would show up to their shifts, knowing that incarcerated workers would always be available to cover any gaps.

iv. Cast Products benefits from receiving ADOC-supplied workers because it can and does require those workers to work harder than free-world employees under conditions that free-world workers do not want to do and would not reasonably tolerate at the wages Cast paid

incarcerated workers. Cast's foundry building was unventilated, not climate-controlled, and filled with aluminum dust and soot. As Cast's foundry area has inadequate ventilation, Mr. Payton repeatedly experienced extreme breathing problems, resulting in him collapsing one day at work. The molten aluminum was combustible—a drop of sweat caused it to bubble and spray—and Mr. Jarmon's pants caught on fire multiple times. Another incarcerated worker was hospitalized for at least two weeks after molten aluminum covered his body; a third worker's hair caught fire when a mold exploded. Conditions were so severe that ADOC treated assignment to Cast as a "punishment job" for incarcerated people.

c. **CBAK (McDonald's)** has benefited from the services performed by Plaintiff McCorvey and other Forced Labor Class members who performed work on CBAK's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. The company also has benefited financially by being able to assign incarcerated workers to extreme hours, maintenance work, shift leadership, and training responsibilities that it would be difficult to assign to free workers, including at the wages (without overtime) paid to the incarcerated workers assigned by ADOC. Mr. McCorvey routinely worked 100 hours or more every two weeks, with some coworkers working as many as 140 hours, and never received any overtime pay. On one occasion, Mr. McCorvey's feet swelled from standing so long that he struggled to put his shoes on, and an ADOC officer just mocked him and forced him to go to work. When Mr. McCorvey requested a job change due to the harsh working conditions, an ADOC sergeant flatly denied him, telling him "hell no, you ain't going nowhere." CBAK's ability to secure a workforce that is intimidated and discouraged from objecting to these hours, wages, and working conditions—or to a supervisor's sexual harassment, as occurred when a CBAK supervisor named Justin touched incarcerated

workers and made sexual advances, telling those who refused they would get sent back behind the wall—is a benefit to it because free workers would leave or object to such treatment.

ii. CBAK has benefited financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work. Mr. McCorvey worked alongside free-world employees who earned more than he did for performing the same tasks, a wage discrepancy he learned about from the free workers themselves. This benefit also accrues at the expense of Plaintiff USSW, because CBAK's use of incarcerated labor depresses wages and degrades working conditions for all workers.

iii. CBAK, through its relationship with ADOC, was able to receive workers to work the hours it needs. CBAK would often cut free workers' shifts early and force incarcerated workers including Mr. McCorvey to pick up the extra work, and incarcerated workers were made to take extra shifts from free employees who did not want to work under the conditions at CBAK. This arrangement has provided a benefit to the company because it did not have to pay the free workers for those hours and could instead keep the incarcerated workers longer at lower wages, while ensuring shifts were covered regardless of whether free workers wanted to stay. At one point, an ADOC sergeant directed Mr. McCorvey to pressure other incarcerated workers to work harder in order to "knock the free world people out of the job"; that same sergeant also indicated that he received a bonus from either CBAK or ADOC based on the productivity of incarcerated workers. CBAK would give him the names of workers who it felt were not working hard enough, and he would then have those workers beaten.

iv. CBAK has benefited from receiving ADOC-supplied workers because it can and does assign those workers difficult or degrading work that free-world workers do not want to do and may refuse to do. CBAK relied on Mr. McCorvey and other incarcerated workers to lead shifts, train workers (including non-English-speaking foreign workers and young international students), and perform maintenance, cleaning, and detailing duties that should have been performed by dedicated maintenance staff, including scrubbing floors and parking lots. On

information and belief, free-world workers were unwilling to perform this combination of line work, training, shift-leadership, and maintenance duties at the wages paid to incarcerated workers.

d. **Hwaseung** has benefited from the services performed by Plaintiff T. Clark and other Forced Labor Class members who performed work on Hwaseung's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. The company has also benefited financially by being able to assign incarcerated workers to physically punishing and hazardous production work, including brazing-line work, pipe-fitting on a low table, and work in a room with leaking helium tank, including at low wages of $12.50 an hour. On Mr. T. Clark's first day, a Hwaseung supervisor named Dave told the assembled incarcerated workers as a group, "I have no problem sending you back to the camp," and repeated that threat throughout Mr. T. Clark's assignment, including when Mr. T. Clark raised that brazing-line smoke was aggravating his chronic bronchitis. When Mr. T. Clark objected to working bent over at a pipe-fitting table, Dave told him to work the table or Dave would "send [his] ass back to the camp." Each time Mr. Clark raised a health or safety concern he was threatened with being sent back to the camp, such that after two attempts he did not feel he could raise a third. Hwaseung's ability to secure a workforce that is intimidated and discouraged from objecting to dangerous and physically harmful working conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. Hwaseung has benefited from receiving ADOC-supplied workers because it can and does assign those workers dangerous and physically harmful work that free-world workers would not reasonably tolerate. As described above, Hwaseung assigned Mr. T. Clark to a brazing line where smoke from the machinery overwhelmed his chronic bronchitis, to a pipe-fitting machine mounted on a low table that forced him, at 6'2", to work bent over for his entire shift, and then to a room containing leaking helium tanks he reasonably believed to be a safety hazard. These hazardous conditions, including gas leaks and malfunctioning helium machines, were known to

Hwaseung supervisors and, to Mr. Clark's understanding, were neither reported to OSHA nor corrected. Free-world workers with viable alternatives would be unlikely to tolerate these conditions; Hwaseung relied heavily on vulnerable populations and Mr. Clark worked primarily alongside Guatemalan immigrants, including at one point a 14-year-old boy. The threat of ADOC discipline and its consequences for parole and placement gave incarcerated workers no ability to refuse as compared to free-world workers.

e. **Ju Young** has benefited from the services performed by Plaintiffs Payton and Thomas and other Forced Labor Class members who performed work on Ju Young's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC who it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. The company has also benefited financially by being able to assign incarcerated workers to physically punishing production work—taping car parts while standing for hours, loading batteries and parts onto assembly lines, and sustained heavy lifting—that it would be difficult to assign to free workers, at wages of approximately $11.25 to $11.50 per hour before ADOC deductions. As described *infra* ¶575, Ju-Young supervisors knew that the work was difficult for Mr. Thomas, who had a bad back, but did not pay attention to complaints he or other workers might raise; conveying that they needed to keep up with production or be fired. Ju Young's ability to secure a workforce that is intimidated and discouraged from objecting to dangerous and physically harmful working conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. Ju Young has benefited financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. Mr. Thomas was paid approximately $11.25 to $11.50

per hour, while some free-world workers performing the same work earned approximately $14 to $15 per hour.

iii. Ju Young further benefited from incarcerated labor, on information and belief, by treating those laborers off the books. After Mr. Payton left Ju Young, they refused to send him his W-2s so he could file his taxes. After his wife inquired directly to Ju Young headquarters about his W-2, she was advised by Ju Young that they had no record of Mr. Payton working for them. Another incarcerated person assigned by ADOC to work at Ju Young told Mr. Payton that he also experienced this failure to provide a W-2. By disclaiming any record of the incarcerated workers it employed, Ju Young positioned itself to retain the financial benefit of their labor while avoiding the employer-side obligations, including payroll taxes, that attach to an acknowledged employment relationship.

iv. Ju Young has benefited from receiving ADOC-supplied workers because it can and does assign those workers difficult and physically harmful work that free-world workers do not want to do and may refuse to do. At Ju Young, the work was not distributed equally. Free-world workers performed lighter tasks, such as affixing small rubber pieces to plastic components, while incarcerated workers like Mr. Thomas were assigned the physically harder work of bending, sustained heavy lifting, and constant standing and movement. Ju Young permanently assigned Mr. Thomas to a heavy-lifting position despite his disclosed back-surgery history and a medical restriction against lifting more than five pounds, never provided him a back brace or lifting belt, and—when his back locked up entirely—terminated him for having taken too many days off while receiving medical care. Free-world workers would likely not accept this assignment of the hardest and most physically harmful work at the wages Ju Young paid incarcerated workers, but the threat of ADOC discipline and its consequences for custody level, family access, and parole gave incarcerated workers no comparable ability to refuse. Injuries to free-world workers would also be far more costly to Ju Young as, unlike with Mr. Thomas, Ju Young would have to pay for treatment and provide wage replacement for a free worker injured on the job. For Mr. Thomas, Ju Young

simply fired him when he was injured and washed their hands of him and any of the expenses for his disabling injury, which left him unable to work any other job.

f. **Koch Foods** has benefited from the services performed by Plaintiff Lesley and other Forced Labor Class members who performed work on Koch Foods' premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC who it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. As described *infra*, incarcerated workers sometimes begged supervisors not to "call the van" because they were fearful of the consequences and so the company knew the workers could be intimidated. The company also benefited financially by being able to assign incarcerated workers to grueling overnight poultry-processing work, including trimming diseased parts from chickens, hanging chickens by their legs in a refrigerated area, and running birds through the evisceration line, on night shifts of twelve hours, six or seven days per week, at barely more than minimum wage. Koch Foods' ability to secure a workforce that is intimidated and discouraged from objecting to these hours, wages, and conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. Koch Foods has benefited financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. Mr. Lesley was paid barely more than minimum wage. Some free-world workers were paid much more, which Mr. Lesley learned from speaking with them and looking at their pay stubs. This benefit also accrues at the expense of Plaintiff RWDSU and its members, 1,800 of whom work at Koch Foods, because Koch Foods' use of incarcerated labor depressed wages and degraded working conditions for all workers.

iii. Koch Foods, through its relationship with ADOC, was able to receive workers to work the hours it needs. Mr. Lesley and other incarcerated workers were required to work 12-hour night shifts for Koch, six or seven days a week, while making barely more than

minimum wage. This arrangement has provided a benefit to the company because obtaining free-world labor to work such long hours overnight, particularly given the gruesome nature of the work at Koch Foods, would have required Koch to offer more attractive wages or provide better benefits or working conditions.

iv. Koch Foods has benefited from receiving ADOC-supplied workers because it can and does assign those workers dangerous work that free-world workers would not reasonably tolerate for the same wages. Koch Foods supervisors knew that incarcerated workers could not say no to them, or else they would be punished by ADOC—punishments which could include getting sent back to a medium- or high-security facility. Accordingly, they forced incarcerated workers to do tasks that free-world employees did not want to do, and forced incarcerated workers to work harder than free-world employees. Koch Foods supervisors knew that all they had to do was threaten to call the van, and incarcerated workers would do whatever they asked because the workers do not want to be punished by ADOC for "refusing to work." The work itself was hazardous and an incarcerated worker was killed on the job, as described *infra*. Workers were also expected to work in cold areas, and Koch Foods gave workers jumpsuits to keep blood off their clothes, but no additional layering for warmth. Free-world workers would not reasonably tolerate this combination of physical danger and grueling conditions at the wages paid, but the threat of ADOC discipline gave incarcerated workers no comparable ability to refuse.

g. **Masonite** has benefited from the services performed by Plaintiff Cole and other Forced Labor Class members who performed work on Masonite's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. Masonite supervisors repeatedly threatened to send Mr. Cole and other incarcerated workers "behind the wall" if they did not perform to the supervisors' satisfaction. As described *infra* ¶579.e, managers unfairly reprimanded Mr. Cole. Masonite's ability to secure a workforce that is intimidated and discouraged from

objecting to its conditions and treatment is a benefit to it because free workers would object to or leave such treatment.

h. **Paramount** has benefited from the services performed by Plaintiffs Cartwright, Lesley, and Morrissey, and other Forced Labor Class members who performed work on Paramount's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC it can control and who are intimidated and restrained from complaining about or refusing to perform any work task. As described *infra* at ¶580 Paramount supervisors regularly threatened to "call the van," which they understood would mean termination, ADOC discipline, and the worker's return to a non-work-release facility. The company has also benefited financially by being able to assign incarcerated workers to industrial laundry work on early-morning and full-day shifts, at wages of approximately $7 to $10 per hour. Paramount's ability to secure a workforce that is intimidated and discouraged from objecting to its wages, conditions, and treatment is a benefit to it because free workers would likely object to or leave such treatment.

ii. Paramount has benefited financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. Ms. Cartwright was paid approximately $10 per hour, while some free-world workers performing the same work earned approximately $12 to $13 per hour, as Ms. Cartwright learned from the free workers themselves.

iii. Paramount, through its relationship with ADOC, has been able to receive workers to work the hours it needs and to treat those workers as interchangeable and immediately replaceable. Ms. Cartwright's supervisor made this explicit, telling incarcerated workers, "I'm gonna get the [work release] center to come back for y'all because y'all not doing what you're supposed to be doing. I'll just get someone else." This arrangement has provided a benefit to the company because, unlike free-world workers, ADOC-supplied workers could be summoned and

discarded on demand without the company bearing any cost of turnover, and the credible threat of immediate replacement kept the workforce compliant.

iv. Paramount has benefited from receiving ADOC-supplied workers because it can assign those workers degrading conditions that free-world workers would not reasonably tolerate. Ms. Morrissey performed her work in a facility that was filthy, it smelled, there were roaches and bugs everywhere, and there was no air conditioning. Incarcerated workers were only permitted to take one restroom break, in addition to their lunch break, per eight-hour shift. As a result, Ms. Morrissey had to hold her urine while she worked nearly every day. Free-world workers would not reasonably tolerate these conditions, but the threat of ADOC discipline and transfer to a non-work-release facility gave incarcerated workers no comparable ability to refuse or leave.

i. **Pell City KFC** has benefited from the services performed by Plaintiffs Campbell and Ptomey and other Forced Labor Class members who performed work on Pell City KFC's premises, at its direction, and to its specifications.

i. The company benefits financially by being able to assign incarcerated workers to restaurant work, such as cooking, at wages as low as $7.25 per hour. Mr. Ptomey worked 36 to 40 hours per week across morning and evening shifts at $7.25 per hour, receiving only a $0.25 raise over an entire year. Pell City KFC obtains a workforce that is intimidated and discouraged from objecting to its wages and conditions, which is a benefit to the company.

ii. Pell City KFC benefits financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers would likely either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. Mr. Ptomey was paid $7.25 per hour to start and only $7.50 after a year, while some free-world workers performing the same work earned more. This benefit also accrues at the expense of Plaintiff USSW, because Pell City KFC's use of incarcerated labor depresses wages and degrades working conditions for all workers.

iii. Pell City KFC's ownership and management have a long history of employing incarcerated workers supplied by ADOC. Through its relationship with ADOC, the

company can receive workers to work the hours it needs, including by staffing its restaurant with four to five incarcerated workers per day across morning and evening shifts. This arrangement has provided a benefit to the company because it can fill shifts—including less desirable early-morning and evening hours—with workers who cannot decline the assignment or the hours, and who cannot leave for better terms, as free-world workers would.

j. **Progressive Finishes** has benefited from the services performed by Plaintiffs Campbell, R. Clark, Lesley, McDole, and Ptomey, and other Forced Labor Class members who performed work on Progressive Finishes' premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC who it can control and who are intimidated and restrained from complaining about or refusing to perform any work task, including because Progressive supervisors would tell incarcerated workers that failure to perform would result in termination. The company has benefited financially by being able to assign incarcerated workers to strenuous powder-coating work—hanging and stacking heavy painted metal parts on the line, running parts through sandblasting equipment, and supporting the coating operation—at wages of roughly $9 to $11.50 per hour before ADOC deductions. Progressive's ability to secure a workforce that is intimidated and discouraged from objecting to its wages and conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. Progressive has benefited financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work and assigning ADOC-supplied workers to jobs and tasks that free-world workers would either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. Mr. McDole was paid $10.50 per hour, while free-world workers were paid more for the same work; Progressive assigned incarcerated workers the heavy lifting and most physically demanding tasks even when free workers were performing the same jobs.

iii. Progressive, through its relationship with ADOC, has been able to receive workers to work the hours it needs, and to do so in volume. Incarcerated workers were made to

absorb punishing schedules that began with departures from the facility around 4 a.m. for shifts starting at 6 a.m. and returns after dark, with no compensation for the extensive transport time. This arrangement has provided a benefit to the company because securing free-world labor in those numbers, for those hours, to perform work this physically demanding would have required Progressive to offer more attractive wages, hours, or working conditions.

iv. Progressive has benefited from receiving ADOC-supplied workers because it can and does assign those workers dangerous and physically punishing work, *see infra* ¶¶582582.a (describing head injury, crushed foot, and heat sickness), 582.c (describing heat sickness); free-world workers would not reasonably tolerate such conditions at the wages provided to incarcerated workers. ADOC personnel themselves regarded Progressive as a "punishment" job because the labor was so difficult. The work was performed in an old building with no climate control; Mr. McDole described it as among the most physically punishing work he has ever done, the equivalent of a week's labor elsewhere compressed into a day, and both he and Mr. Campbell suffered physically from the work. Free-world workers treated Progressive as short-term work and did not stay long, particularly in summer, but the threat of ADOC discipline gave incarcerated workers no comparable ability to refuse or leave.

k. **RCF/Gemstone** has benefited from the services performed by Plaintiffs Cole, McDole, and Payton, and other Forced Labor Class members who performed work on RCF/Gemstone's premises, at its direction, and to its specifications.

i. The company benefits financially from its participation in the venture by receiving laborers from ADOC it can control and who are intimidated and restrained from complaining about the work they are assigned; and by being able to assign incarcerated workers to grueling poultry-processing work in abusive working conditions. Mr. Cole, for example, was made to work as a "dumper," lifting bins of raw chicken weighing 80 to 115 pounds and dumping them onto processing tables—at approximately $11 per hour before ADOC deductions. Gemstone supervisors shouted profanity at incarcerated workers, demanded they keep working at any perceived slowdown, and threatened to report workers to ADOC. Mr. Payton was assigned to move

100 to 150 pound loads, which he could not do given his small size. Gemstone's ability to secure a workforce that is intimidated and discouraged from objecting to its wages and conditions is a benefit to it because free workers would object to or leave such conditions.

ii. Gemstone has benefited financially by paying some ADOC-supplied workers less than it pays free-world workers to perform the same work. Mr. McDole was paid approximately $11 per hour, while free-world workers were paid more. And Gemstone assigned the heavier, more physically demanding tasks, such as sustained heavy lifting, to incarcerated workers even when free workers performed the same jobs. Gemstone primarily assigned incarcerated workers to the "dumper" position and denied Mr. Cole's request for any other assignment. This benefit also accrues at the expense of Plaintiff RWDSU and its members, approximately 200 of whom work at Gemstone, because Gemstone's use of incarcerated labor depresses wages and degrades working conditions for all workers.

iii. Gemstone benefits from receiving ADOC-supplied workers because it can and does assign those workers dangerous and physically punishing work that free-world workers would not reasonably tolerate. ADOC personnel regarded Gemstone as a "punishment" job, known to be physically demanding and unsafe work that no worker, free or incarcerated, wanted to do. The "dumper" work to which Gemstone confined incarcerated workers was so punishing that some needed back braces to perform it, and free-world workers who were assigned it usually quit within a few days. Gemstone's business model depends on a workforce of laborers who have no practical ability to refuse the conditions it imposes, and incarcerated workers supplied by ADOC are one component of that workforce. Alongside incarcerated workers, Gemstone contracted with a drug-rehabilitation program to staff its facility with people in recovery, another group of people with no practical ability to refuse the conditions Gemstone offered—conditions that free-world workers routinely refused, as reflected by free workers quitting after a shift or two. Gemstone benefited

financially from assembling a workforce it could subject to conditions free labor would not accept, and the supply of incarcerated labor from ADOC was integral to that design.

l. **SL Alabama** has benefited from the services performed by Plaintiff Prewitt and other Forced Labor Class members who performed work on SL Alabama's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by receiving laborers from ADOC who it can control by threatening to send incarcerated workers "back to the camp" if they did not work as directed. The company has also benefited financially by being able to assign incarcerated workers to physically demanding assembly work. . SL Alabama's ability to secure a workforce that is discouraged from objecting to its conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. SL Alabama has benefited financially by requiring ADOC-supplied workers to work longer hours than free-world workers and assigning them jobs that free-world workers would likely either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. For example, SL Alabama set production quotas and permitted free-world workers who met their quotas to go home for the day, but required incarcerated workers who met the same quotas to keep working, directing them to clean not only their own areas but the entire plant. SL Alabama threatened to call ADOC to report any incarcerated worker who protested the extra work, consistently extracting more labor from incarcerated workers than from free-world workers for the same or lower pay.

iii. SL Alabama, through its relationship with ADOC, was able to receive workers to work the hours it needs, and to do so in volume. At the time Mr. Prewitt worked for SL Alabama, approximately four van-loads of incarcerated workers performed work at SL Alabama during his shift. After Mr. Prewitt requested to change jobs, ADOC began allowing SL Alabama to make Mr. Prewitt work overtime on weekends when he had home passes to visit his family. This arrangement has provided a benefit to the company because securing free-world labor in those numbers, for shifts that long and on weekends, would have required SL Alabama to offer more

attractive wages, hours, or working conditions, whereas incarcerated workers could be required to work the hours SL Alabama needed and could not decline.

iv. SL Alabama has benefited from receiving ADOC-supplied workers because it can and does assign those workers dangerous and physically punishing work. The work required Mr. Prewitt to stand for his entire shift. He saw coworkers faint from the heat inside the building, and once workers were on the assembly line, they were not permitted to take water breaks. In addition, headlights were conveyed on a belt above his work station, and the glue used to adhere the headlight components sometimes made them stick to the conveyer belt, where they would periodically become dislodged and fall off the belt. There was a risk that those headlights would fall down onto him or other workers. Mr. Prewitt has experienced ongoing numbness, swelling, and pain in his right hand from the repetitive work; when he raised the numbness with the ADOC JPO, the JPO told him to "deal with it," and he was required to continue working. Free-world workers would not reasonably tolerate these conditions at the wages provided, but the threat of ADOC discipline and transfer to a more dangerous facility gave incarcerated workers no comparable ability to refuse or leave.

m. **Southeast Restaurant Group (Wendy's)** has benefited from the services performed by Plaintiffs Prewitt and Cartwright and other Forced Labor Class members who performed work on Wendy's premises, at its direction, and to its specifications.

i. The company has benefited financially from its participation in the venture by being able to assign incarcerated workers to restaurant crew work at its Auburn location, on shifts that ran from 5 p.m. to 1 a.m., five to six days a week, at $11 per hour before ADOC deductions. The company benefits financially by receiving laborers from ADOC who it can control and who are restrained from complaining about or refusing to perform any work task, including because supervisors threaten workers with sending them "back to the camp" and "behind the fence" if they complain about working conditions. Wendy's ability to secure a workforce that is

intimidated and discouraged from objecting to its conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. Wendy's benefits financially by assigning ADOC-supplied workers to jobs and tasks that free-world workers either refuse to do or refuse to do at the wage rates paid to ADOC-supplied workers. Wendy's supervisors generally treated incarcerated workers worse than free-world workers and required them to do more work than free-world workers. For example, Mr. Prewitt and the other incarcerated workers would be assigned to simultaneously staff the sandwich, fries, and grill stations, while supervisors allowed free-world workers to smoke and sit on their phones. Free-world workers would not reasonably tolerate the abuse and extra duties that Wendy's imposed on incarcerated workers for the wages it offered. This benefit also accrues at the expense of Plaintiff USSW, because Wendy's use of incarcerated labor depresses wages and degrades working conditions for all workers.

n. **Southeastern Meats** has benefited from the services performed by Plaintiffs Cartwright, Morrissey, and Walker and other Forced Labor Class members who performed work on Southeastern Meats' premises, at its direction, and to its specifications.

i. The company benefits financially from its participation in the venture by receiving laborers from ADOC who are intimidated and restrained from complaining about or refusing to perform any work task, including because supervisors threaten workers by saying they will "call the van": on several occasions, incarcerated workers begged supervisors not to do so, and Ms. Cartwright twice saw a supervisor call ADOC to have workers picked up, after which those workers were fired and disciplined. The company also benefits financially by being able to assign incarcerated workers to meat- and food-processing work performed in frigid conditions, on shifts including twelve-hour second shifts running from 2 p.m. to 2 a.m., and sometimes later, at roughly $12 to $14 per hour before ADOC deductions. Southeastern Meats' ability to secure a

workforce that is intimidated and discouraged from objecting to its conditions is a benefit to it because free workers would likely object to or leave such conditions.

ii. Southeastern Meats benefits financially by imposing conditions on incarcerated workers that it did not impose on free-world workers performing the same work: Ms. Walker's supervisor told her that incarcerated workers did not get breaks like free workers and threatened to fire her for taking one.

iii. Southeastern Meats, through its relationship with ADOC, is able to receive workers to work the hours it needs, including overnight hours that are difficult to fill with free-world labor. Ms. Walker and Ms. Morrissey were required to work twelve-hour second shifts running from approximately 2 p.m. to 2 a.m., and Ms. Walker was sometimes kept until 3 or 4 a.m. This arrangement has provided a benefit to the company because obtaining free-world labor to work twelve-hour shifts ending in the early morning hours, in the refrigerated conditions in which the work was performed, would likely have required Southeastern Meats to offer more attractive wages, hours, or working conditions, whereas incarcerated workers could be assigned those hours and could not decline them.

iv. Southeastern Meats benefits from receiving ADOC-supplied workers because it can and does assign those workers to work in conditions that free-world workers would not reasonably tolerate. The work was performed in extreme cold—Ms. Walker recalls a thermometer near her workstation reading thirty degrees—and Southeastern Meats provided incarcerated workers no adequate cold-weather gear, giving Ms. Walker only a sweatshirt and a pair of thin, non-insulated plastic gloves akin to garden gloves. The cold was so well known among incarcerated women assigned there that they lent one another warm clothing. The conditions caused Ms. Walker to lose weight and ache throughout her body, and on one occasion left her so sick she could not rise from her bed and had to be carried to the healthcare center. Ms. Cartwright, assigned to package vegetables inside a cooler without adequate clothing, suffered aggravation of her severe ankle arthritis from the cold. Free-world workers would not reasonably tolerate these conditions at the wages paid to incarcerated workers, but the threat of ADOC discipline and

transfer to a more dangerous facility gave incarcerated workers no comparable ability to refuse or leave.

564. **Venture Involves Prohibited Coercion in Violation of the TVPA.** The joint venture between ADOC and each Private Employer Defendant—the arrangement pursuant to which ADOC, for substantial fees, supplies the private companies with persons to perform services needed by the companies—violates the TVPA because ADOC has provided the services of Forced Labor Named Plaintiffs and other Forced Labor Class members to the Private Employer Defendants through prohibited means, including use of force and threats thereof; physical restraint and threats thereof; serious harm and threats thereof; abuse of the legal process and threats thereof; and a scheme to convey that they would suffer force, physical restraint, and serious harm if they did not labor for the companies to which ADOC assigns them, as set forth in Counts I—IV.

565. ADOC has provided each Private Employer Defendant with the labor and services of incarcerated individuals, including the Forced Labor Named Plaintiffs identified above, *supra* ¶560, through threats and imposition of the following penalties for failure to work an ADOC-assigned job and/or failure to work as directed by the private employer: (a) a revocation of custody status and/or transfer out of a Work Release facility to a more dangerous ADOC facility where the person will be at risk of serious harm; (b) placement in solitary confinement, as provided for in ADOC regulations; (c) deprivation of visitation, phone, and canteen privileges; (d) loss of good time credits; and (e) a disciplinary that will adversely affect their chances of parole, and thus extend the length of incarceration. *See supra* ¶¶320-518. ADOC's threats and imposition of these penalties impact both the workers who receive the threats and penalties, and other incarcerated individuals to whom ADOC effectively conveys what consequences they will face should they refuse to work.

a. **Bama Budweiser**. ADOC supplied Mr. Campbell and Mr. Rashaad Clark's labor and services, and that of other incarcerated individuals, to Bama Budweiser through prohibited coercive means.

i. Mr. Campbell feels compelled to work because he knows that if he does not, he will be disciplined and potentially shipped back to a violent, chaotic higher-security facility like Bibb or Kilby, where he would fear for his safety. He has seen other incarcerated people refuse to work or get fired from jobs, and then get written up. *See also supra* ¶¶324-326.

ii. In Rashaad Clark's experience, an incarcerated person cannot refuse to work because if you do, you will get in trouble and the punishment will be put in your disciplinary folder and used to deny you parole. He has been disciplined a number of times personally for this alleged offense although he has never refused to work. To Rashaad Clark, the denial of parole is the biggest threat, but any disciplinary for failure to work also means the loss of phone and visitation privileges with your family and canteen privileges. *See also supra* ¶¶336-348.

b. **Cast Products**. ADOC supplied Mr. Payton, Mr. Jarmon, and Mr. Lesley's labor and services, and that of other incarcerated individuals, to Cast Products through prohibited coercive means.

i. All work Mr. Payton has performed at ADOC-assigned jobs has been compelled and coerced by: threats of violence, including the transfer back to violent high security facilities; threat of solitary confinement; threats to and/or causing the denial of parole due to disciplinaries related to compelled work; and the loss of the ability to communicate and support his wife and kids financially and emotionally. *See also supra* ¶462 He has endured miserable, unhealthy, and often physically unsafe conditions on the jobs assigned by ADOC in order to keep seeing and supporting his family. To punish Mr. Payton for complaining about the racist work conditions at another employer, described *supra* ¶465 the ADOC JPO assigned Mr. Payton to work at the two "punishment" jobs, one of which was at Cast Products. Mr. Payton repeatedly

experienced extreme breathing problems at Cast Products, resulting in him collapsing one day at work and being sent back to the camp for review by ADOC medical staff. *See also infra* ¶572.

ii. In Mr. Jarmon's experience, ADOC officers place incarcerated workers in segregation for allegedly refusing to perform work for ADOC. *See supra* ¶409 One of the reasons Mr. Jarmon continues working in the ADOC Work Release program is because does not want to be placed in a higher security ADOC facility. *See supra* ¶419.

iii. ADOC assigned Mr. Lesley to work for Cast Products—he had no choice in the job or hours worked, and he understood that he could not quit or else ADOC would issue a disciplinary infraction, revoke his work release custody, and send him "behind the fence"—or back to a medium- or high-security facility. *See also supra* ¶420.

c. **CBAK (McDonald's)**. ADOC supplied Mr. McCorvey's labor and services, and that of other incarcerated individuals, to CBAK through prohibited coercive means.

i. Mr. McCorvey understood that if he refused to work at his Work Release position at CBAK, he would be subject to disciplinary infractions that could result in being placed in segregation, transferred to higher-security facilities, and loss of privileges including canteen, phone time, and visitation. *See also supra* ¶434.

d. **Hwaseung.** ADOC supplied Mr. Trevion Clark's labor and services, and that of other incarcerated individuals, to Hwaseung through prohibited coercive means.

i. ADOC officials made the consequences of non-compliance with ADOC's work requirement explicit to Mr. Trevion Clark on multiple occasions. An assistant to the JPO told him that he could not call out from a job or he would go back behind the fence. *See also supra* ¶¶349-353.

e. **Ju-Young**. ADOC supplied Mr. Thomas and Mr. Payton's labor and services, and that of other incarcerated individuals, to Ju-Young through prohibited coercive means.

i. As discussed *supra* ¶¶499, 501, Mr. Thomas understood throughout his incarceration that refusing to work, for any reason, would result in a disciplinary infraction and

the loss of all privileges: no phone, no visitation, no access to the store, and inherently adverse effects on any hope of attaining freedom.

ii. Mr. Payton has received disciplinaries for purported refusals to work. Additionally, ADOC has punished him for "being fired from a job" due to simply not being able to do the job, as discussed *supra* ¶¶258, 467-468. And as discussed *infra* ¶575, Mr. Payton was punished by ADOC after Ju-Young fired him for his bathroom use.

f. **Koch Foods**. ADOC supplied Mr. Lesley's labor and services, and that of other incarcerated individuals, to Koch Foods through prohibited coercive means.

i. Mr. Lesley has observed that all incarcerated people who are housed at a Work Release facility are ordered to work, or else face consequences. ADOC officers have told him and other incarcerated people that, if they did not work, they would be sent back "behind the fence." *See supra* ¶¶420-421

g. **Masonite**. ADOC supplied Mr. Cole's labor and services, and that of other incarcerated individuals, to Masonite through prohibited coercive means.

i. Mr. Cole had no say in whether he worked any of his work release jobs, including at Masonite, or what his hours would be. ADOC assigned him to the jobs. He understood that saying no to the job would have been an "automatic" refusal to work disciplinary. If an incarcerated worker refuses to work, in Mr. Cole's experience, ADOC will make an example out of the worker and send the worker back behind the fence. *See supra* ¶¶360-361, 370, 372.

h. **Paramount**. ADOC supplied Ms. Morrissey, Ms. Cartwright, and Mr. Lesley's labor and services, and that of other incarcerated individuals, to Paramount through prohibited coercive means.

i. Ms. Morrissey reports that, when incarcerated people are housed at a work release facility, they have a lot to lose, including privileges like home passes, and ADOC holds that over their head and forces them to work, or else have their privileges revoked. *See also supra* ¶¶455-456, 460.

ii. Ms. Cartwright has observed, experienced, and understands that if an incarcerated person refuses to do work, either for ADOC itself within the prison walls or for other employers, ADOC will issue that person a disciplinary infraction, which can result in a loss of privileges, including phone, visitation, and canteen, loss of custody, or getting placed in segregation. Ms. Cartwright has also seen how disciplinary infractions for refusing to work have a significant negative impact on an incarcerated worker's chances at getting granted parole. *See also supra* ¶¶329-330, 332.

i. **Pell City KFC**. ADOC supplied Mr. Campbell and Mr. Ptomey's labor and services, and that of other incarcerated individuals, to Pell City KFC through prohibited coercive means.

i. As set forth above, Mr. Campbell feels compelled to work because he knows that if he does not, he will be disciplined and potentially shipped back to a violent, chaotic higher-security facility like Bibb or Kilby, where he would fear for his safety. He has seen other incarcerated people refuse to work or get fired from jobs, and then get written up. *See also supra* ¶¶324-326.

ii. In Mr. Ptomey's experience, when ADOC issues a disciplinary to an incarcerated person for refusing to work, it strips an incarcerated person of home passes, the ability to draw money from their account, phone access, canteen privileges, and visitation—you lose all privileges that ADOC offers you. The precise consequences depend on the warden's or disciplinary officer's discretion. The disciplinary also goes on file and follows the person when they appear before the Parole Board. *See also supra* ¶493.

j. **Progressive Finishes**. ADOC supplied Mr. Campbell, Mr. Lesley, Mr. McDole, Mr. Ptomey, and Mr. Rashaad Clark's labor and services, and that of other incarcerated individuals, to Progressive Finishes through prohibited coercive means.

i. Mr. Campbell, Mr. Lesley, Mr. Rashaad Clark, and Mr. Ptomey were coerced by ADOC to work for Progressive Finishes in the same manner as they were coerced to

work for other Work Release employers, *see supra* ¶¶324-328 (Campbell), 420-422 (Lesley), 348 (Rashaad Clark), 493 (Ptomey).

ii. In Mr. McDole's experience, in ADOC, refusing to work for any reason, including because the work is unsafe, abusive, or unlawful results in a disciplinary infraction for "refusing to work." ADOC enforces this policy consistently. Mr. McDole has personally witnessed many incarcerated people disciplined for months at a time for refusing to work. The consequences of a "refusing to work" disciplinary are severe. If ADOC were to issue a disciplinary to Mr. McDole, it would result in the removal of his custody classification and ADOC would send him back to a Level IV facility, where he would be forced to live in the dangerous conditions he had worked to escape. A disciplinary would also go into Mr. McDole's file and be used against him to deny parole. *See also supra* ¶¶437, 440-441

k. **RCF/Gemstone**. ADOC supplied Mr. Cole and Mr. McDole's labor and services, and that of other incarcerated individuals, to RCF/Gemstone through prohibited coercive means.

i. Mr. McDole and Mr. Cole were coerced by ADOC to work for RCF/Gemstone in the same manner as they were coerced to work for other Work Release employers, *see supra* ¶¶360, 369 (Cole), 440-442 (McDole).

l. **SL Alabama**. ADOC supplied Mr. Prewitt's labor and services, and that of other incarcerated individuals, to SL Alabama through prohibited coercive means.

i. In Mr. Prewitt's experience, ADOC writes up incarcerated workers when they are unable to work or to work at the pace or in the manner the employer directs, and if they refuse to work the jobs ADOC has assigned. Mr. Prewitt is constantly in fear of getting written up by ADOC personnel, even for unjustified or arbitrary reasons, because the consequences could be devastating: a disciplinary would decrease the likelihood he will be granted parole, could lead to ADOC revoking his home passes, and could result in him being sent "behind the fence" to a more

dangerous facility, where he fears violence from both ADOC personnel and other incarcerated people. *See also supra* ¶¶478-480.

m. **Southeast Restaurant Group (Wendy's)**. ADOC supplied Mr. Prewitt and Ms. Cartwright's labor and services, and that of other incarcerated individuals, to Southeast Restaurant Group (Wendy's) through prohibited coercive means.

i. Mr. Prewitt and Ms. Cartwright were coerced by ADOC to work for Wendy's in the same manner as they were coerced to work for other Work Release employers, *see supra* ¶¶478-480 (Prewitt), 331-332 (Cartwright).

ii. While she worked for Southeast Restaurant Group, Ms. Cartwright began experiencing mental health difficulties, and asked ADOC if she could take some time off from work to care for her mental health needs. The officer responded that if she did not go to work, she would receive a disciplinary infraction for "failure to work."

n. **Southeastern Meats**. ADOC supplied Ms. Morrissey, Ms. Walker, and Ms. Cartwright's labor and services, and that of other incarcerated individuals, to Southeastern Meats through prohibited coercive means.

i. Ms. Morrissey and Ms. Cartwright were coerced by ADOC to work for Southeastern Meats in the same manner as they were coerced to work for other Work Release employers, *see supra* ¶¶331-332 (Cartwright), 452-453.

ii. In Ms. Walker's experience, through the entirety of her incarceration, ADOC consistently enforced a rule that incarcerated women, including her, must work or face punishment, including segregation, disciplinaries or dangerous work. *See supra* ¶505.

566. **Knowledge of Coercion.** Each Private Employer Defendant—Bama Budweiser, Cast Products, CBAK (McDonald's), Hwaseung, Ju-Young, Koch Foods, Masonite, Paramount, Pell City KFC, Progressive Finishes, RCF/Gemstone, SL Alabama, Southeast Restaurant Group (Wendy's), and Southeastern Meats—knew or should have known that its undertaking with ADOC involved the provision of services from ADOC-incarcerated workers, including Forced Labor Named Plaintiffs as identified *supra* ¶560, through coercive means involving threats of force,

physical restraint, serious harm, and a scheme to convey to those workers that they would suffer force, physical restraint, and serious harm if they did not labor for Bama Budweiser when ADOC assigned them to do so.

567. Each Private Employer Defendant, through the Work Release Agreements required by AR 410, is aware that ADOC retains significant control over the incarcerated persons ADOC supplies and transports to the Private Employer Defendant to work. The Work Release Agreement sets forth clearly the extent of continued ADOC control and requires the employer to notify ADOC of any refusal or failure to work as requested; provides that workers' movement should be restricted and that ADOC retains control over job assignments and schedules and may remove workers from the job site.

568. Each of the Private Employer Defendants had or has had a multi-year relationship with ADOC during which ADOC has supplied the Private Employer Defendant with incarcerated workers. Through its history of participating in ADOC's Work Release program and its contracts with ADOC, each Private Employer Defendant knows or should know that workers whom ADOC assigns to work for it do not have a say in the assignment and did not have the freedom to refuse or choose the work assigned to them by ADOC; each Private Employer Defendant also is or should be familiar with ADOC policies and procedures and is aware or should be aware that workers reasonably fear being reported to ADOC for not working as directed because such a report can result in a disciplinary and/or removal from the Work Release program and being sent to a higher-security ADOC facility where the worker will be in danger. *See supra* ¶¶76, 199 (describing widely publicized dangers of ADOC facilities). Each Private Employer Defendant's history and familiarity with the Work Release program also means that it knew or should have known that workers feared being reported for not working because it could result in ADOC issuing a disciplinary that could subject them to confinement to restrictive housing, would deny them privileges including access to the canteen and family visitation, AR 403, at 22; and threaten a worker's chances of parole. Certainly, if each Private Employer Defendant was not previously

aware that workers were laboring under these coercive threats, it was on notice as of the time the original complaint in this matter was filed.

569. Each Private Employer Defendant, through the Work Release Agreement it is required to have with ADOC as a result of its participation in the Work Release program, and through its long history with ADOC, knows or should know that it pays ADOC for the services provided by the ADOC-supplied workers and that ADOC keeps 40% or more of that fee, deducting 40% of gross wages for the State, plus money for transporting the workers to the employer and potentially making other deductions, remitting only a fraction of the fee to the workers. Each Private Employer Defendant, through the Work Release Agreement, also knows or should know that incarcerated workers cannot refuse the low resulting wages or object to ADOC's deductions. Each Private Employer Defendant knows or should know that, absent the threat of being removed from the Work Release program or of a disciplinary, the incarcerated workers would not choose to work subject to the terms set by the Private Employer Defendant and ADOC for so little money.

570. On information and belief, ADOC meets with work-release employers to provide them with ADOC's rules and regulations, instructs them to call ADOC if the employer concludes a worker is not following directions or is refusing to work so that ADOC can write up the worker, and explains the serious consequences for the incarcerated worker of a write-up. *See supra* ¶382 (Plaintiff Dandridge was present for some such meetings while working as a runner at Red Eagle); *see also supra* ¶421.

571. **<u>Bama Budweiser.</u>**

a. Mr. Campbell worked for Bama Budweiser for approximately one month in 2019 as a temporary day laborer repackaging damaged goods. He recalls being paid $9-10 per hour, and he worked five days per week alongside free-world people. For the entire time he has been at Work Release, ADOC has deducted 40% of Mr. Campbell's gross pay, plus a fee of $5 per day for van rides to and from the work sites, and $15 per month for laundry.

b. Rashaad Clark worked at Budweiser from March 21, 2023 until June 7, 2023. For Budweiser, he was assigned work Monday through Friday, beginning in the afternoon each day

around 1 p.m., typically working a 6-hour shift. He worked loading the trucks, outside. He was responsible for assembling and wrapping the loads and then pushing the very heavy pallets onto trucks. It was very strenuous work. The free workers also assigned to loading worked inside pulling orders, which required less lifting, and worked in air conditioning. There were two free workers assigned to strapping the loads that the incarcerated workers assembled, but those workers sat in the truck and only came outside to do the strapping.

c. Bama Budweiser paid Rashaad Clark at a rate of $7.25 per hour, from which ADOC took its fees. Based on conversations with free workers at Bama Budweiser, Rashaad Clark believes he made less than what free world workers at Bama Budweiser made, even though he and the other incarcerated workers were assigned more strenuous tasks. The free world workers also got production bonuses on top of their hourly pay, which the incarcerated workers did not receive.

d. While at Bama Budweiser, Rashaad Clark heard supervisors at Budweiser talking about how the incarcerated workers had no choice. Rashaad Clark observed that Bama Budweiser had been using incarcerated labor for roughly twenty years and its supervisors, Ed (Rashaad Clark's supervisor) and the first shift supervisor, made comments that indicated to Rashaad Clark that they well knew that incarcerated workers were forced to work upon threat of serious punishment by ADOC. He can recall supervisors talking at Budweiser, saying that if you got fired, you got more time—meaning your sentence was extended because you were denied parole. He can remember Ed, his supervisor, making threats and statements to other incarcerated workers, often in profane language to the following effect: "I'm going to fire your ass"; "You know what is going to happen"; "I ain't gotta play with him. I am going to fire him and have him fucked up in the camp."

e. After some time on the job, Rashaad Clark's supervisor at Budweiser, Ed, falsely accused him of not being on the job when he was, in fact, in the bathroom. The supervisor attempted to physically beat him with a stick and needed to be held back from Rashaad Clark by another employee. Rashaad Clark asked for the van to be called to retrieve him so he could get away from Ed and immediately told two or three ADOC personnel at Frank Lee what had

occurred. He recalls one ADOC officer telling him that it was "just Ed" and to go back to work. ADOC sent him back to Budweiser the next day. When he returned, Rashaad Clark asked to speak to Budweiser's Human Resources and the Budweiser day shift supervisor intercepted him on the way to HR and asked to talk to him. Rashaad Clark told the supervisor what happened with Ed, who told him that Rashaad Clark had to just accept Ed's abuse to stay on the job. Eventually, after Rashaad Clark conveyed how unsafe Ed's supervision was, the Budweiser manager agreed to lay off Rashaad Clark instead of firing him. The Budweiser manager advised Rashaad Clark that he knew that if Rashaad Clark were fired by Budweiser, he would be disciplined by ADOC and face great harm.

f. Rashaad Clark's experience demonstrates that Bama Budweiser's supervisors knew that, if they fired an incarcerated worker, the worker's sentence would be extended and that a firing would subject the worker to potential harm at the Work Release facility.

g. Rashaad Clark's experience also demonstrates that Bama Budweiser knew the incarcerated workers it employed faced serious consequences if they objected to work conditions.

572. **Cast Products.**

a. For approximately the last year, following his work without pay at Captain Ds, ADOC has assigned Mr. Payton to work at Cast Products (also known as CPI). ADOC and Cast Products assigned Mr. Payton to work the first shift Monday through Friday as a grinder. Although Cast Products promised Mr. Payton a pay increase every 90 days, like those received by free workers performing the same job at Cast Products, his pay rate has never changed. Cast Products' Human Resources representative, Ariel, told Mr. Payton that Cast Products is not "obligated to give a raise to inmates." At Cast Products, Mr. Payton has worked one of the hardest jobs there, the grease wheel, which is a dangerous machine. Cast Products provides limited protective equipment—only safety glasses and inadequate gloves. Cast Products provides no ventilation mask even though there is a lot of aluminum dust and grease in the air and the workshop is poorly ventilated.

b. Until days before this filing, Mr. Payton faced an ongoing situation where he was punished and feared additional punishment by ADOC and Cast Products for not performing work that is physically debilitating and causing him pain. Mr. Payton is currently incarcerated at Decatur work release, and for approximately the last year, ADOC has assigned Mr. Payton to work at Cast Products in the machine shop, on the grinder. The grinding job is a physically demanding job, which Mr. Payton performed without protest or complaint until April 2026, when he advised his shift leader, Dale, that he was experiencing extreme pain in his left hand. Dale told him that he was just being a baby and that he should take an ibuprofen and just push through it. A week or so later, in late April, Mr. Payton raised the injury again to both ADOC and Cast Products because he could no longer move his thumb. His manager at Cast Products asked him why he did not say anything before then and when Mr. Payton said he had told Dale, Dale admitted that Mr. Payton had raised the issue to him but Dale thought it was nothing.

c. Because he could not move his thumb at all, and the grinder work is extremely dangerous if he cannot fully use his hands, Mr. Payton told Cast Products he did not know what to do. On May 5, 2026, Cast Products arranged for him to go to HH Occupational Health Group ("HH OHG") in Greenfield, Alabama, where he was examined. HH OHG opined that they questioned the work relatedness of the injury but discharged him to see his primary health care provider. On May 9, 2026, while on a home pass, Mr. Payton went to the Emergency Room at Decatur Morgan Hospital and was diagnosed with a "trigger thumb" injury (a repetitive stress injury), placed in a hand brace and advised to see an orthopedist for further treatment.

d. When Mr. Payton returned after the home pass, ADOC suspended his future home passes allegedly due to a worker's compensation investigation, although Mr. Payton has not talked to anyone as part of any worker's compensation investigation since then. His JPO has encouraged him to waive his worker's compensation claims against Cast Products in order to get assigned a job elsewhere and to resume his passes home. Between May 9, 2026 and June 22, 2026, supervisors and the HR official at Cast Products have repeatedly advised him that Cast Products will not put him on light duty (even though Mr. Payton knows that Cast Products has light duty assignments

that Mr. Payton could perform and has assigned another work to a light duty job) and that Cast Products is done with him until he recovers from his injury.

e. Mr. Payton repeatedly has requested the resumption of his home passes, as he did nothing other than see a doctor for medical treatment while on a permitted home pass, and requested reassignment to other jobs that are not as demanding as the grinder position, so he can continue working while his hand recovers.

f. Throughout the time that his passes were blocked, Mr. Payton feared that Cast Products would fire him due to his injury and that he would be disciplined for "being fired from a job" and jeopardize his parole chances. He is scheduled to be considered for parole in June 2026, although he has not yet received a hearing date.

g. Due to ADOC's decision to cut off his weekly home passes, Mr. Payton recently missed celebrating the birthday of his sons, which pains him, along with being unable to provide any financial support while he is recovering from the injury and not allowed to work elsewhere by ADOC or Cast Products.

h. ADOC assigned Mr. Jarmon to work for each employer, including Defendant Cast Products, and he had no say in whether he worked for the employers, nor the hours or shifts to which he was assigned. ADOC's deductions for each of these jobs include 40% of Mr. Jarmon's gross paycheck, plus additional deductions for van rides and laundry fees.

i. ADOC forced Mr. Jarmon to work at Cast Products for approximately one year from 2022 to 2023 while housed at North Alabama Work Release. Mr. Jarmon was laid off from Cast Products in 2023 when the company decided to consolidate shifts. Mr. Jarmon had no choice in the job assignment, and if he had refused the assignment, ADOC would discipline him for refusal to work and perhaps not following an order or interfering with an officer. Such discipline could result in problems for his parole, transfer back to a more dangerous, higher security facility, and placement in solitary.

j. Mr. Jarmon's job at Cast Products was so traumatizing that he still thinks about it frequently to this day. He worked in a dangerous section of the plant where Cast Products required

him to perform physical, hazardous labor, including manual mold-making, which involved pouring 1,400-degree molten aluminum from a large pot into a mold. Cast Products required Mr. Jarmon to train new free-world employees, and forced Mr. Jarmon and other incarcerated workers to work harder than free-world employees, who often stood around and took breaks while incarcerated workers continued to work. Mr. Jarmon's supervisor sometimes pulled Mr. Jarmon off his regular workstation and put him on a free-world employee's work station if that worker did not show up to work. Mr. Jarmon earned $12.50-13.50 per hour, whereas free-world employees earned $14-20 per hour, for the same work, a fact which Mr. Jarmon learned through direct conversations with free-world employees. Cast Products also required Mr. Jarmon to pay $13–14 for personal protective equipment that was of poor quality, and to rent work clothes for $350. Mr. Jarmon also never received his final paycheck from Cast Products, despite many attempts to obtain it.

k. The molten pot of aluminum that Mr. Jarmon worked with at Cast Products was highly dangerous. It was combustible and bubbled up if a drop of sweat or other liquid got into it. On several occasions, as Mr. Jarmon poured the molten aluminum, it bubbled up and sprayed on him, setting his pants on fire. On one occasion, Mr. Jarmon suffered a severe burn injury when molten aluminum poured into his glove. Mr. Jarmon pulled off his glove, and he recalls that his "skin came off with it," which left substantial scarring across the top of his hand. Although the injury was serious, he did not receive meaningful medical treatment from Cast Products or ADOC; someone at Cast gave him some burn cream and some new gloves, and sent him back to work.

l. Another worker working at Cast Products was severely injured when the molten aluminum went down the back of his pants and the aluminum got all over his body. He was transported to the hospital where much of his body was treated for burns. That worker was in the hospital for at least two weeks, and his legs and body had to be wrapped up "like a mummy." Another time, an incarcerated worker's hair caught on fire when the mold exploded as he was pouring the molten aluminum at Cast Products.

m. Cast Products did not provide Mr. Jarmon and other incarcerated workers with respirators, despite poor air quality in the plant. The building was old and there was dust

everywhere, and it was not ventilated. Soot and dirt filled the air, and Mr. Jarmon often developed sinus infections due to the poor air quality. The building in which Mr. Jarmon and other incarcerated individuals worked was not temperature-controlled, and was very cold in the winter and extremely hot during the summer. It got so cold that, before the shift began, Mr. Jarmon and other workers huddled together next to the pot of molten aluminum to keep warm.

n. Mr. Jarmon's supervisor at Cast Products, named Ed, often talked down to incarcerated workers and cursed at them. He frequently made threatening comments like: "If y'all don't want to work, you'll go back behind the fence and we'll get another one. It's like a candy store." Ed often arrived at the job site upset and began hollering and fussing at the incarcerated workers and using profane language. Mr. Jarmon observed a worker respond to one of these tirades and tell Ed that "we ain't done nothing to you, this is a place of business," and Ed responded by threatening to "call the van. I'll get another one of you." Mr. Jarmon recalls once instance when an incarcerated worker "talked back" to Ed, and Ed ordered the worker to come to the office where Ed called ADOC. The ADOC van arrived to pick up the worker, and the worker was fired from the job. The worker received a disciplinary and restricted to camp as punishment.

o. Mr. Jarmon attempted to complain to an ADOC Lieutenant about Ed's rude and threatening behavior. The Lieutenant told Mr. Jarmon: "you can't quit, or you're subject to disciplinary action, and you can't get fired, or you're subject to disciplinary action." The Lieutenant told Mr. Jarmon that "this is one of the oldest contracts we have, so no matter what you say or they say, we're going with them." For Mr. Jarmon, working at Cast Products was a lose-lose proposition and he felt like he was trapped. Ed's demeanor towards incarcerated workers also impacted the way Mr. Jarmon reacted when he was badly burned on his hand—Mr. Jarmon feared punishment, including Ed calling ADOC and reporting that he was not working, so Mr. Jarmon immediately returned to work despite his injury.

p. Cast Products supervisors threatened incarcerated workers if they appeared to be not working hard enough, or even if the supervisors just did not like the incarcerated worker's persona. On one occasion, a new incarcerated worker was working his first day at Cast Products.

Mr. Jarmon observed the worker doing well, but Ed called ADOC and said "he don't want to work." The worker was fired and received a disciplinary infraction for getting fired from a job.

q. ADOC also forced Mr. Lesley to work for Defendant Cast Products from approximately 2020 through 2023, with gaps when Cast Products shut down during the COVID-19 pandemic, while he was housed at Childersburg Work Release. ADOC assigned Mr. Lesley to work at Cast Products and he had no say in his hours or duties. Mr. Lesley worked the first shift, from approximately 4 a.m. to 2:30 p.m., Monday through Friday, and Mr. Lesley regularly worked on Saturdays as well. Mr. Lesley was initially paid $9 or $10 per hour.

r. Mr. Lesley worked a number of different positions at Cast Products. He worked as a "grinder," where he picked up metal parts and held them against a large grinding belt to remove welts off the part. He worked in the "core room," where he was tasked with shoveling sand into a large machine. In addition, he occasionally worked on the "mold" station, pouring molten aluminum into molds for parts. The work was highly dangerous, and incarcerated workers were often burned or cut while working. Supervisors at Cast Products often threatened to "call the van" if incarcerated workers did not appear to be working to their satisfaction. Cast Products supervisors were aware of the potential harm to incarcerated workers if they "called the van," because Cast Products supervisors explicitly told incarcerated workers that ADOC had put them on notice. Cast Products supervisors told Mr. Lesley and other incarcerated workers that ADOC advised Cast Products that, if the workers were not performing adequately, supervisors should call ADO and ADOC would pick them up from work and punish them. On multiple occasions, Mr. Lesley observed Cast Products supervisors call ADOC regarding an incarcerated worker's performance, and ADOC picked those workers up and issued disciplinary infractions. Cast Products supervisors were regularly verbally abusive towards incarcerated workers. Supervisors knew that incarcerated workers had no power, and could not raise concerns about the working conditions at Cast Products to ADOC or else they would be punished. Cast Products supervisors used this leverage to force incarcerated workers to work harder than they required free-world employees to work. If

incarcerated workers challenged a Cast Products supervisor in any way, the supervisor would call ADOC to get the worker punished.

s. At North Alabama Work Release, Cast Products was and continues to be known as a "punishment job" because the working conditions were and are so poor. ADOC has a practice of, if an incarcerated worker has lost a job, assigning that worker next to Cast Products as punishment for losing the previous job.

573. **CBAK (McDonald's).**

a. ADOC assigned Mr. McCorvey to work at a McDonald's restaurant in Foley, Alabama, operated by Defendant CBAK, from August 2018 through his release in August 2019. While there, he also periodically worked shifts at other CBAK-operated McDonald's in Orange Beach, Gulf Shores, Dafney, Loxley, Summerville, and Robertsville. Mr. McCorvey routinely worked 100 hours or more every two weeks, and saw some coworkers logging as many as 140 hours. On one occasion, Mr. McCorvey's feet swelled up from standing up for so long while working. Mr. McCorvey struggled to put his shoes on and an ADOC officer teased him, calling him "Fred Flintstone," and forced him to go to work. Mr. McCorvey never received any overtime pay. Although his nominal wage was approximately $12–14 per hour, Mr. McCorvey received only $250–300 per two-week pay period due to the deductions ADOC made. Mr. McCorvey had no say in the amount of hours or the shifts he worked. They were set by ADOC and CBAK.

b. At McDonald's, Mr. McCorvey worked alongside free-world employees who earned more for performing the same tasks. McCorvey learned about this wage discrepancy from the free workers themselves, who told him what they earned. He was often tasked with training non-English-speaking foreign workers, including young international students. CBAK relied on him to lead shifts, train workers, and perform maintenance, cleaning, and detailing duties that should have been performed by maintenance staff at the store. For example, incarcerated workers including Mr. McCorvey were made to scrub the floors and parking lots, which was a maintenance job. Free-world employees often called out of work because they did not want to labor under the conditions at CBAK. When that happened, CBAK would call ADOC, and ADOC

would force Mr. McCorvey and other incarcerated workers who were not scheduled to work to fill the shifts. In addition, CBAK would often “cut” free workers—ending their shifts early—while forcing incarcerated workers to pick up the extra work. This was a financial benefit to CBAK because it did not have to pay the free workers, and could instead keep the incarcerated workers longer and pay them less.

c. Mr. McCorvey understood that if he refused to work, he would be transferred “behind the wall” to a Level IV or V facility, and knew that CBAK was aware of this arrangement and “in cahoots” with ADOC to enforce it. In 2019, Mr. McCorvey observed approximately six or seven incidents where incarcerated workers were transferred to higher level facilities because they allegedly “refused to work” for work-release employers.

d. Mr. McCorvey once witnessed ADOC Sergeant Adair tell CBAK supervisors to tell him if incarcerated workers weren’t working hard enough, saying: “If their ass ain’t right, let me know, I’ll tighten their ass up,” which Mr. McCorvey understood to mean that Sergeant Adair would beat them. On numerous occasions, Mr. McCorvey witnessed Sergeant Adair beating incarcerated workers, both at CBAK and Loxley. Adair used a “pop stick” (a telescoping stick) and would beat incarcerated workers with it in the legs if he perceived them not working hard enough. Mr. McCorvey observed Adair slap incarcerated workers in their face and tell them: “Why you making me look bad, you’re here to work.” These physical assaults forced Mr. McCorvey to work harder and go “above and beyond” because he feared being beaten by Sergeant Adair if he did not work hard enough.

e. On one occasion, Sergeant Adair called Mr. McCorvey into the office and encouraged him to pressure other incarcerated workers to work harder in order to “knock the free world people out of the job.” On another occasion, Mr. McCorvey observed Sergeant Adair tell incarcerated workers that “Anyone gonna stop my bonus I’m going to beat your ass. I’ve got some guys and they’re gonna stomp your ass out.” Mr. McCorvey understands that Sergeant Adair was paying other incarcerated people to beat incarcerated workers who allegedly refused to work or were not working hard enough. Mr. McCorvey understood Sergeant Adair’s reference to a “bonus”

to refer to payment that Sergeant Adair would receive from either CBAK or ADOC based on the productivity of incarcerated workers.

f. On multiple occasions, CBAK supervisors gave Sergeant Adair the names of incarcerated workers who were not working "hard enough," and Sergeant Adair, either himself or through incarcerated people that he paid, had the workers beaten. Mr. McCorvey reports that this practice led to incarcerated workers getting their nose broken, or being given two black eyes—a practice called "raccooning."

g. Mr. McCorvey knew that being fired from a work-release employer, regardless of the reason, could lead to transfer to violent, higher-security level facilities. CBAK supervisors knew this too, and would use the threat of transfer to force incarcerated workers to work harder. Mr. McCorvey observed a CBAK supervisor tell incarcerated workers: "We'll send that ass behind the wall, all we need to do is make one call." Another time, a CBAK supervisor told incarcerated workers: "One monkey doesn't stop the show. You can get beat up or sent behind the fence, or you can work."

h. On many occasions, Mc. McCorvey observed CBAK supervisors threaten to "call the van" if incarcerated workers did not work harder. "Calling the van" meant reporting the workers to ADOC and was a threat that ADOC would discipline the workers. Numerous times, CBAK supervisors called ADOC about specific workers allegedly "refusing to work" or not working hard enough, ADOC would come and pick the worker up, and the majority of the time, the worker would be issued a disciplinary infraction, get fired, and get transferred to a higher-level facility.

i. CBAK supervisors were aware of the dangerous conditions at medium and maximum-security ADOC facilities. One manager told incarcerated workers that "we feel sorry for you" that incarcerated workers get sent "back behind the wall" because of the dangerous conditions at those facilities. On one occasion, when an incarcerated worker was sick, a sympathetic manager told him that "if you can stand, you better stand up there," because he knew

that, if the worker was not capable of working, he would be fired and sent behind the wall and the dangerous conditions there.

j. CBAK's business model appears to have relied, in part, on being able to exploit incarcerated workers whom it knew could not refuse the onerous conditions it imposed on them, a model that was empowered by ADOC's violent and dehumanizing treatment of those same workers.

574. **Hwaseung.**

a. Mr. Trevion Clark was assigned to work for Defendant Hwaseung Automotive in Elba from approximately January to March 2024. He did not request this assignment and would not have chosen to work there if he were free, but he stayed on the job rather than risk the disciplinary consequences of termination or a transfer to a higher-security, dangerous ADOC facility.

b. ADOC assigned Mr. Trevion Clark to work the second shift at Hwaseung and he worked for the company from 3 p.m. to 11:30 p.m., five days a week, and some Saturdays from 8 a.m. to 4:30 p.m. Mr. Trevion Clark was paid approximately $12.50 per hour at Hwaseung. ADOC deducted forty percent of his gross wages. The ADOC-issued debit card he received could not be used for most purchases, including food delivery, and was restricted to ADOC-approved vendors. He was transported to the worksite in ADOC vans that lacked seatbelts and operated at maximum capacity, approximately fourteen people per van, with some workers sitting on the floor. ADOC deducted the van costs from his pay.

c. The workforce at Hwaseung consisted of incarcerated workers and free-world employees, predominantly Guatemalan immigrants. Incarcerated workers were placed under security surveillance at all times: they were required to remain in designated areas and could not use cell phones. Free-world workers had no such restrictions. On Mr. Trevion Clark's first day at Hwaseung, one of the supervisors, Dave, told the assembled incarcerated workers as a group: "I have no problem sending you back to the camp." Dave was aware that if he sent a worker back to

camp, that would jeopardize their parole and potentially lead to them being sent to a more violent facility.

d. Mr. Trevion Clark was first assigned to the brazing line, where smoke from the machinery overwhelmed his chronic bronchitis. He told the line supervisor that he could not breathe and asked to be reassigned. The line supervisor escalated the request to the second-shift supervisor, Carlos, and then to Carlos's supervisor, Dave. Mr. Trevion Clark told Dave that smoke was affecting his lungs, and Dave told Mr. Trevion Clark to obtain a medical excuse if he wanted off the assignment. Getting a doctor's note through ADOC was not realistically possible, however. Because of this interaction with Dave, Mr. Clark was thus nearly fired, but Carlos persuaded Dave not to fire Mr. Trevion Clark. Dave agreed to move Mr. Trevion Clark off the brazing line, but cut his pay.

e. Hwaseung next assigned Mr. Trevion Clark to a pipe fitting machine mounted on a low table. At 6'2", the assignment required him to work bent over for the duration of his shift. He raised this issue with Dave directly, and was told to work on this table or Dave would "send [his] ass back to the camp." Mr. Trevion Clark was subsequently reassigned to a room containing large helium tanks that leaked. He believed the leaking tanks created a safety hazard. At that point, having already raised two health and safety concerns and having been threatened each time, he felt he could not raise a third. The hazardous conditions at Hwaseung—including gas leaks and malfunctioning helium machines—were known to Hwaseung supervisors and ADOC representatives and, to his knowledge, were not reported to OSHA or corrected.

f. Hwaseung supervisors were aware that incarcerated workers faced severe disciplinary consequences if they were terminated or sent back to ADOC. Dave indicated as much to Mr. Trevion Clark on his first day of work and repeated it throughout Mr. Trevion Clark's time at Hwaseung. When Dave threatened to send workers back to the camp, he did so knowing that ADOC would discipline the workers and that would impact their chances for parole and could result in them being sent to dangerous ADOC facilities. One of the supervisors on the Hwaseung production line was a former ADOC corrections officer who had worked at the Elba facility; this

meant that someone who had direct, firsthand knowledge of the conditions incarcerated workers faced was supervising them. Another Hwaseung supervisor, the line supervisor on the brazing line, told Mr. Trevion Clark she had seen news reports about people being killed in ADOC prisons.

g. Hwaseung also employed other workers that it could take advantage of and who were in vulnerable positions. For example, a fourteen-year-old boy from Guatemala worked on the line alongside Mr. Trevion Clark. Mr. Trevion Clark understood that Hwaseung was reportedly housing these immigrant workers in company-controlled apartments and taking a portion of their wages through a connected temp agency. Mr. Trevion Clark described Hwaseung's operation as functioning like a criminal enterprise deliberately structured around workers with no ability to refuse or leave.

h. Mr. Trevion Clark would not have chosen to work at Hwaseung if he were free. He worked there to maintain a work record for the Parole Board, to access the benefits of work release, including not being in the more violent and dangerous ADOC facilities, and to earn money to support his son.

575. **<u>Ju-Young.</u>**

a. In June 2022, ADOC at Frank Lee assigned Mr. Payton to work for Ju Young. At the time, ADOC had prescribed Mr. Payton blood pressure medication, a form of water pill, which required him to use the bathroom more frequently. When he first arrived at the job, Mr. Payton advised Ms. Kim, one of Ju Young's plant managers, of his medical condition and the medication's effect on bathroom use and she told him it would not be a problem. However, on June 14, 2022, Ju Young's floor supervisor, a Black woman, asked Ms. Kim to fire both Mr. Payton and his coworker, Quinton Townsend, for bathroom use. Mr. Townsend worked on the same foundry line as Mr. Payton and had gotten sick from the heat and pace of the job and had gone to the bathroom to vomit. Ms. Kim fired both of them and ADOC issued both of them citations for "getting fired from the job." Even though medical staff at Frank Lee advised Warden McClane that Mr. Payton's bathroom use was outside of his control, the Warden did not alter the punishment Mr. Payton served for this "offense": he lost his family passes for six months, lost visitation and phone

privileges for 30 days, and was not assigned to any other job—preventing him from earning any wages to support his family—for the remaining 4 months he was at Frank Lee.

b. ADOC assigned Mr. Payton to work at Ju Young for six months on the production line, on first shift, Monday through Friday, until Ju Young fired him for bathroom use related to his blood pressure medicine, described above. Mr. Payton observed that the managers at Ju Young definitely knew the consequences incarcerated workers faced by getting fired. He heard the Black female Ju Young supervisor on the first shift tell him and other incarcerated workers regularly that they needed to either keep up with production or we will fire you and that: "if you get fired, you know where that will lead to." This same Ju Young supervisor would also try to use the threat of incarcerated workers getting fired to hit on them sexually. If you did not talk to her and tell her how attractive she was and pay attention to her, she would punish you.

c. After Mr. Payton left Ju Young, they refused to send him his W-2s so he could file his taxes. After his wife inquired directly to Ju Young headquarters about his W2, she was advised by Ju Young that they had no record of Mr. Payton working for them. Mr. Payton has talked to another incarcerated person assigned by ADOC to work at Ju Young who also experienced this failure to provide a W-2.

d. ADOC assigned Mr. Thomas to work for Defendant Ju Young Automotive in approximately August 2023, without giving him any choice in the matter. A lieutenant simply told him the night before his first day of work for Ju Young that he would be working at the company. An ADOC van took him to Ju Young the following morning.

e. At Ju Young, Mr. Thomas first worked as a rover assigned to different tasks each day with no say in what he did. His tasks included applying tape to car parts while standing for hours, loading batteries and other parts onto assembly lines, and moving boxes. After working in that role for two to three months, he was permanently assigned to lifting heavy batteries and boxes. His regular hours were 7 a.m. to 3 p.m., Monday through Friday, with regular Saturday shifts and overtime extending to 5 p.m. Mr. Thomas was paid $11.25 per hour at Ju Young before ADOC deductions. Some incarcerated workers eventually reached $11.50 after a long period. Based on

conversations with co-workers at Ju Young, Mr. Thomas understood that free-world workers earned approximately $14 to $15 per hour for the same work. There were approximately 24 incarcerated workers on day shift and approximately 120 free-world workers, mostly Latino men and women.

f. When Mr. Thomas first reported to Ju Young, he disclosed that he had undergone back surgery and had back problems. Ju Young placed him on light duty for a couple of days, but then he began getting assigned to different tasks around the facility. The work required constant standing, moving, and twisting, and he was only given three breaks—one in the morning, one at lunch, and one in the evening. Ju-Young then assigned him to a permanent, heavy-lifting position that was particularly bad for his injured back.

g. The work at Ju Young was not distributed equally. Free-world workers performed lighter tasks—for example, affixing small rubber pieces to plastic components. Incarcerated workers like Mr. Thomas were assigned the physically harder work: bending over, sustained heavy lifting, constant standing and movement. If Mr. Thomas paused or took a break, his supervisor, Maggie, would confront him, demand he keep moving, and pay no attention to any complaint he or other workers might raise.

h. After Ju-Young permanently assigned Mr. Thomas to heavy lifting, Mr. Thomas told Maggie that the work was causing pressure and pain in his back. She had little sympathy, and simply asked Mr. Thomas if he was saying he didn't want to work at Ju Young anymore. He told her he did, because he feared the consequences he would face from ADOC if he lost the job. He just kept working through the pain, and was never provided a back brace or lifting belt at the worksite. When he did request one, he was told to get it through the prison, which took months. Maggie also consistently treated incarcerated workers differently from free-world workers. She would yell at incarcerated workers who were not constantly moving and demanded they keep

working without pause. She subjected incarcerated workers to harassment and verbal pressure that free-world workers at Ju-Young did not face.

i. Mr. Thomas understood that Ju Young supervisors, including Maggie, knew that incarcerated workers would be disciplined if they were fired or written up, and that such discipline could affect their custody level, their access to family visits, and their parole prospects. Other incarcerated workers at Ju Young told Mr. Thomas that supervisors had made explicit statements to this effect—including that they could get workers written up or affect their parole. Mr. Thomas himself heard supervisors threaten incarcerated workers with termination and understood that termination meant disciplinary consequences from ADOC.

j. In December 2023, Mr. Thomas's effort to work through his back pain despite his doctor's orders finally caught up with him. He woke one morning unable to move because his back had locked up entirely. He was in too much pain to get himself out of bed without help. Because of the severity of his condition, ADOC transferred him to Staton for approximately one week for medical care. Immediately after, however, ADOC returned Mr. Thomas to Ju Young. He returned because he felt he had to, and he feared the disciplinary consequences of not showing up. However, he only lasted one day. Maggie permitted him to work the entire day, but at the end of the shift, she sent a floor supervisor to tell him that Ju Young no longer needed him. Ju Young's stated basis for the termination was that he had taken too many days off, apparently because ADOC failed to notify Ju Young that he was receiving medical care and was therefore absent from the job. He was never told about any workers' compensation rights or given any paperwork about his rights after being injured on the job.

k. Mr. Thomas would not have chosen to work at Ju Young, performing the work he performed for the wages he received, if he were not incarcerated. He worked there because it was less dangerous than being inside an ADOC facility, because being fired would result in discipline, and because that discipline would cost him his custody level, his family access, and his chance at parole.

576. **Koch Foods.**

a. ADOC forced Mr. Lesley to work for Defendant Koch Foods for approximately four years from 2014 through 2018 while he was housed at Alexander City. ADOC assigned Mr. Lesley to work at Koch Foods and he had no say in his hours or duties. Mr. Lesley worked the night shift, from 7 p.m. through 7 a.m., six or seven days per week, and was paid barely more than minimum wage. Free-world workers were paid much more, which Mr. Lesley learned from speaking with them and looking at their pay stubs.

b. Koch Foods is a poultry processing plant, and Mr. Lesley first worked there as a "USDA trimmer." In that role, he inspected chickens and cut off parts of the animal that were diseased or otherwise not fit for consumption. After that, he worked in the "cold rehang" area. In that role, Mr. Lesley hung chickens up by their legs as they came out of the cooler, to prepare the chickens for further processing. This work was extremely cold, and Koch Foods gave Mr. Lesley and other workers a jumpsuit to keep blood off their clothes, but no additional layering for warmth. Sometimes, Mr. Lesley worked in the "evis" area—short for evisceration—the work of which involved running chickens through a machine that removed their heads and internal organs.

577. In 2017, Mr. Lesley was on shift the day that another incarcerated worker, Dwayne Ellington, also known as "Solo," was killed while working on the "evis" station. One of the chickens got stuck on a hook, so workers stopped the machine so that the chicken could be removed. Koch Foods protocol was to "lock out and tag out" the machine, which would make it impossible to accidentally turn back on and potentially injure the worker, but that procedure was not followed and the machine was not locked off. As the incarcerated worker attempted to remove the chicken from the hook, the machine turned back on, and caught the incarcerated worker's arm. The worker was pulled into the "evis" machine—the machine designed to eviscerate chickens—killing him.

a. Supervisors at Koch Foods regularly threatened to "call the van" on incarcerated workers, which Mr. Lesley understood would lead to the termination of their jobs and a disciplinary infraction. Koch Foods supervisors threatened to call the van "all the time." The

supervisors were well aware of the harm that incarcerated workers faced if they were to "call the van" because the workers themselves told the supervisors. On numerous occasions, Mr. Lesley observed a Koch Food supervisor threaten to "call the van" on an incarcerated worker, and the worker pleaded with the supervisor to not do so. The workers explained to the supervisors that, if they called the van, the worker would receive a disciplinary infraction which could carry severe consequences. On at least one occasion, an incarcerated worker begged a Koch Foods supervisor not to call the van because "I'll get sent back behind the fence." Mr. Lesley observed Koch Foods call the van on several incarcerated workers, and ADOC picked those workers up, terminated their employment a Koch Foods, and issued them disciplinary infractions.

578. Supervisors as Koch Foods used the threat of punishment to their advantage. They knew that incarcerated workers could not say no to them, or else they would be punished by ADOC—punishments which could include getting sent back to a medium- or high-security facility. Accordingly, they forced incarcerated workers to do tasks that free-world employees did not want to do, and forced incarcerated workers to work harder than free-world employees. Koch Foods supervisors knew that all they had to do was threaten to call the van, and incarcerated workers would do whatever they asked because the workers do not want to be punished by ADOC for "refusing to work."

579. **Masonite.**

a. Mr. Cole worked multiple jobs through ADOC's work release program, including at Defendant Masonite from approximately December 2022 to June 2023. When Mr. Cole had his labor leased out to private employers through the work release program, ADOC deducted 40% of his gross wages, purportedly for costs incident to confinement, and also charged him $5 per day for van rides and $15 per month for laundry.

b. After being transferred to Hamilton Work Release, Mr. Cole was assigned to work at Defendant Masonite, where he worked from 3:30 p.m. to 11:30 p.m., Monday through Friday, with occasional overtime. Mr. Cole was given the role of "back man" where his job duties

primarily involved constructing the back portion of doors. Masonite deducted $225 from Mr. Cole's wages for safety glasses required to perform his job.

c. On multiple occasions, Mr. Cole's supervisors at Masonite threatened Mr. Cole and other incarcerated workers to send them "behind the wall" if they did not adequately perform their duties.

d. Cole also experienced searches by ADOC at the Masonite job site. Masonite supervisors expressed discomfort with the treatment of the incarcerated workers and ADOC's invasive presence at the job site.

e. On one occasion, managers at Masonite also falsely accused Mr. Cole of drinking on the job and, when surveillance tapes proved his innocence, still threatened to report him to ADOC for refusal to work unless he expressed sufficient gratitude for being given "another chance," even though he had done nothing wrong. Around the same time, Masonite supervisors reprimanded a white female coworker for her interactions with Mr. Cole but made no similar comments about the relationship between a white incarcerated worker and his female companion, who also worked at Masonite. Mr. Cole understood that someone at Masonite reported his interactions with the White woman to the warden, because the warden mentioned it to him.

f. About a week after the discussion with Masonite management about the false drinking accusation, ADOC personnel arrived at Masonite to remove Mr. Cole from work. When arriving at Masonite, ADOC personnel asserted that Mr. Cole was receiving a disciplinary based on a dirty urine sample, even though Mr. Cole never gave a urine sample. The disciplinary eventually disappeared and ADOC never defended these assertions, but on the basis of the purported disciplinary, ADOC subsequently transferred Mr. Cole "behind the fence" to Limestone.

580. **Paramount.**

a. ADOC forced Ms. Toni Cartwright to work for private employers, including Defendant Paramount Services. ADOC assigned Ms. Cartwright to this job—she had no choice in

the job or hours worked, and she understood that she could not quit or else ADOC would issue a disciplinary infraction, take her work release custody, and send her back to Tutwiler.

b. ADOC forced Ms. Cartwright to work at Defendant Paramount Services in or around 2019 or 2020 for approximately two weeks while she was housed at Birmingham Work Release. Her duties involved running linens through a press. She worked the first shift from 4 or 5 a.m. until 3 p.m., Monday through Friday. Ms. Cartwright earned approximately $10 per hour, even though free-world employees earned $12–13 for the same work, which Ms. Cartwright learned from speaking with the free workers. Ms. Cartwright's supervisor at Paramount Services regularly threatened her and other incarcerated workers, with comments including: "I'm gonna get the [work release] center to come back for y'all because y'all not doing what you're supposed to be doing. I'll just get someone else." Ms. Cartwright's supervisor knew the harsh consequences if incarcerated workers were fired. She made this clear through numerous comments to Ms. Cartwright and other workers including: "You know if I call the van and have them come get you, you're going to get fired and you're going to get your privileges taken away"; "I don't wanna have to call the van, call your Lieutenant, and get you sent back and wrote up"; "I don't wanna get y'all sent back and get y'all punished;" "Y'all gonna get wrote up and get sent back to prison." By "prison," the supervisor meant a non-work release medium- or maximum-security facility. Ms. Cartwright understands that it is ADOC policy to inform every work release job's management about the consequences to incarcerated workers if the work release job fires them. Ms. Cartwright was laid off from the job at Paramount Services.

c. ADOC forced Ms. Deckrice Morrissey to work for Defendant Paramount Services in 2019 and again in 2022. Ms. Morrissey had no choice in the job assignment. The job assignment was given to her by the ADOC JPO and Ms. Morrissey understood that if she refused the job assignment, she would be disciplined for refusal to work.

d. At Paramount Services, Ms. Morrissey's job responsibilities included running napkins through a press. She worked eight-hour shifts, and was paid approximately $7 per hour. Ms. Morrissey describes the working conditions as terrible: it was filthy, it smelled, there were

roaches and bugs everywhere, and there was no air conditioning. Incarcerated workers were only permitted to take one restroom break, in addition to their lunch break, per eight-hour shift. As a result, Ms. Morrissey had to hold her urine while she worked nearly every day. At least once, Ms. Morrissey's supervisor Kathy threatened to "call the van" because Ms. Morrissey was using the restroom too much. Ms. Morrissey understood that "calling the van" meant firing Ms. Morrisey and calling the facility where she was housed to come pick her up. Ms. Morrissey begged Kathy not to fire her, explaining that if she were fired, she would receive a disciplinary infraction from ADOC which would have negative consequences for her, including loss of privileges and potentially getting sent to higher security facility. Ms. Morrissey's free-world coworker told Kathy that Ms. Morrissey was doing a good job and just needed to use the restroom. After this incident, Ms. Morrissey was fearful of losing her job, and tried even harder to not use the restroom while she worked. But on another occasion, Kathy did "call the van" and fire Ms. Morrissey because she was allegedly taking too long to use the restroom.

581. **<u>Pell City KFC.</u>**

a. Since 2023, Mr. Campbell has worked as a cook for Defendant Pell City KFC. He currently works Tuesday to Sunday and generally works the morning shift. Over the course of the day, four to five incarcerated workers typically work in the restaurant. He is paid $11.50 per hour for his work. He understands that workers who quit or are fired from KFC are subject to discipline by ADOC, based on the experiences of others who have been fired from KFC for not working or not working as directed. He is aware that the KFC ownership and management has a long history of employing incarcerated workers provided by ADOC and that KFC management understands the consequences incarcerated workers face for quitting or being fired, including that they can receive a disciplinary, be shipped to a higher-security facility, and have their chances of parole jeopardized.

b. ADOC assigned Mr. Ptomey to Defendant Pell City KFC from approximately 2018 to 2019. He worked 36 to 40 hours per week across a mix of morning and evening shifts. KFC paid him $7.25 per hour to start. He worked in the back of the store preparing food; the front

of the store was staffed by high school students. After a year, he received a $0.25 raise. Free-world workers, including the high school students, performing the same or less work earned more, approximately $9 an hour, which Mr. Ptomey learned from speaking with them. The wage difference felt like KFC was discriminating against or taking advantage of incarcerated workers. ADOC deducted 40% of his gross wages, charged him $5 per day for transportation, $15 per month for laundry, and took a portion for restitution, which he believes was about 10% of his paycheck. His effective take-home pay was typically less than $100 per week. KFC management knew Mr. Ptomey was an incarcerated worker placed through ADOC's work-release program. Mr. Ptomey was assigned to work at Pell City KFC and did not volunteer to work there; he would not have done so at the wages they were paying if ADOC did not make him.

c. In 2019, Mr. Ptomey was terminated from KFC for refusing to perform personal work for the owner, as described *supra* ¶548. Mr. Ptomey received a disciplinary for being fired from a job and lost his home passes and the ability to draw on his account. Mr. Ptomey is not sure if the owner knew that firing him would lead to these consequences, but is confident that the owner's daughter-in-law, who was the restaurant's general manager, knew. KFC had a longstanding contract with ADOC, and on other occasions KFC had said they were laying off incarcerated workers instead of terminating them so the workers could avoid consequences at the camp. Saying Mr. Ptomey was terminated was a deliberate choice, and KFC knew the consequences of doing so.

582. **<u>Progressive Finishes.</u>**

a. Mr. Campbell worked at Defendant Progressive Finishes, a company that provides powder-coating services, from approximately June 2019 through March 2020, and from November 2021 to January 2023. He was laid off during the pandemic. ADOC personnel viewed Progressive Finishes as a "punishment" job because the labor was very difficult. Incarcerated workers were required to hang metal parts of various sizes on the line and provide related support to the powder-coating operation. Mr. Campbell worked alongside free workers, although he observed that it was a short-term job for those workers, particularly in the summer because the back-breaking work

occurred in an old building with no climate control. When Mr. Campbell initially started working at Progressive, the company did not provide cups for drinking water, and they began to do so only months after Mr. Campbell raised the issue. He was once hit in the head by equipment on the job, and he observed other safety incidents including another worker's head injury and a worker whose foot was smashed.

b. Mr. Campbell was paid $9-$11.50 per hour for his work at Progressive Finishes. He would typically leave the ADOC facility around 4:00am for a 6:00am shift, work an eight-hour shift, and return to ADOC by around 6:00 or 7:00pm. The long wait times were due to the limited ADOC vans. For approximately four months in 2019, Mr. Campbell was a "lead man" at Progressive Finishes but not compensated as such. Although it was company policy to provide a raise after 90 days, Mr. Campbell did not receive a raise. When Mr. Campbell followed up about the raise, his supervisor acted like Mr. Campbell was cracking a joke. Mr. Campbell also heard this supervisor threaten to fire incarcerated workers for going to the bathroom too often. Mr. Campbell is aware that Progressive supervisors understood the different consequences for incarcerated workers based on whether Progressive fired them or laid them off. Progressive supervisors would sometimes tell ADOC that they couldn't use a worker, rather than that the worker was fired, if the Progressive supervisor did not want a worker to get a disciplinary and risk getting shipped behind the fence. Prior to the pandemic, Progressive was one of the largest employers for individuals incarcerated at Childersburg, with approximately 14to 42 incarcerated workers being taken to Progressive each day, although the number has lessened in recent years.

c. Rashaad Clark's most recent work assignment by ADOC was to Defendant Progressive Finishes. He typically worked Monday through Friday, starting at 7 a.m. and ending at 5 p.m. with occasional Saturday shifts. He was there about three months before he was transferred to Limestone. He worked in the blast room until his last week of work when Progressive advised him that he would be transferred to the line. Rashaad Clark went on the line, as assigned, and suffered extreme heat sickness, because on the line, he worked about five feet from a heater (like an oven) and there was no air circulating in the building. He blacked out and

when he came to, he went and sat in the air conditioning. He advised the HR manager that he needed a day off to recover because he felt so poorly and Progressive HR manager (a man) said Rashaad Clark could not take a day off and fired him, and ADOC issued him a disciplinary for “getting fired.”

d. ADOC assigned Mr. McDole to work at Defendant Progressive Finishes in approximately 2023, where he worked for approximately 30 days as a line stacker, unloading and stacking heavy, painted metal parts—including tractor rims, wheels, and extension components—for various car companies. His shift was nominally 6 a.m. to 3 p.m., Monday through Thursday, with some Fridays and Saturdays, but his actual workday began far earlier. Mr. McDole woke at 3 a.m., transport buses left Childersburg between 4 and 4:20 a.m., and workers did not arrive at the work site until between 5:15 and 5:20 a.m. They returned after dark. He was not paid for this extensive transport time. Mr. McDole was one of approximately 15 incarcerated workers at Progressive Finishes. The rest of the roughly 50-person workforce consisted of free workers, most of whom were Hispanic women. Progressive Finishes assigned incarcerated workers the heavy lifting and the most physically demanding work, even when free workers were doing the same jobs. His understanding is that free workers were paid more than the $10.50 per hour incarcerated workers received.

e. Progressive Finishes was one of the most physically punishing jobs Mr. McDole has ever performed, and he only made $10.50 an hour before ADOC deductions, which was not nearly enough for how difficult the work was. He described the work as so physically demanding that what you do there in a day is a week’s worth of work anywhere else. He lost weight from the physical toll of the job. Progressive Finishes supervisors told incarcerated workers directly that failure to perform would result in termination. Progressive Finishes supervisors understood that being fired from a work-release job meant an incarcerated worker would receive a disciplinary

infraction, lose custody status, and be transferred to a higher-security and more dangerous ADOC facility.

f. ADOC also forced Mr. Lesley to work at Defendant Progressive Finishes for approximately one year around 2025, while he was housed at Childersburg Work Release. ADOC assigned Mr. Lesley to work at Progressive Finishes and he had no say in his hours or duties. Mr. Lesley worked from 5 a.m. to 2 p.m., Monday through Friday and occasionally on Saturdays. Mr. Lesley worked on the "sandblaster crew," running parts through a machine that stripped any rust of the part to prepare it to be painted.

g. ADOC also assigned Mr. Ptomey to Defendant Progressive Finishes from approximately December 2019 to 2020 and again from approximately March 2022 until approximately 2025. At Progressive, he hung parts for $10.50 to $11.50 per hour, five and sometimes six days per week, 6 a.m. to approximately 3:30–4 p.m., Monday through Friday, with some Saturdays. Progressive was a very physical job, and the workplace was hot in the summer and cold in the winter. Mr. Ptomey worked on an assembly line, so the work was constant. When Mr. Ptomey started working there, Progressive did not offer incarcerated workers a 401(k) plan or any insurance. Mr. Ptomey had conversations with supervisors at Progressive, and thus Progressive was aware that Mr. Ptomey was an incarcerated worker placed through ADOC's work-release program and that ADOC deducted a substantial portion of his wages before he received them. Progressive also understood that it could play a significant role in Mr. Ptomey's life while incarcerated, including that terminating Mr. Ptomey would result in him receiving a disciplinary infraction, which could result in his transfer to a higher-security and more dangerous ADOC facility, and could jeopardize his chances of parole.

583. **<u>RCF/Gemstone.</u>**

a. At Gemstone Foods, Mr. Cole worked the second shift from 4 p.m. through 1 a.m., five or six days a week. Gemstone Foods paid Mr. Cole at a rate of $11 an hour. Mr. Cole was forced to work as a "dumper" carrying large bins of raw chicken weighing 80 to 115 pounds, and "dumping" them on metal tables for the "cutters" to process. A "dumper" was the only position in

which Gemstone would place incarcerated workers. In fact, Mr. Cole requested a non-dumper job from Gemstone but was denied. The work was so hard that free-world employees usually quit after a few days. Some incarcerated workers needed to wear back braces just to be able to do the work. Mr. Cole understood that he could not ask to be removed from the job without suffering punishment from ADOC, including possibly getting put back "behind the wall."

b. Mr. Cole's supervisors at Gemstone Foods threatened to send him back to the facility if they were not satisfied with the quality of his work, and made comments that reflected that they were well aware of the conditions at violent and unsafe ADOC facilities "behind the fence," and the severe physical and mental consequences that any termination of his employment with them would cause.

c. Based on Mr. Cole's conversations with his supervisors at Gemstone Foods, he understands that his supervisors were aware of the dangerous conditions at ADOC facilities. Occasionally, a supervisor would comment to Mr. Cole about a news story concerning ADOC, such as a story about an incarcerated person dying at one of the medium- or maximum-security facilities, and ask Mr. Cole—"what would happen if you got sent back behind the wall?" Mr. Cole responded to those questions by informing his supervisors about the inhumane conditions that he experienced at those facilities. But Mr. Cole's supervisors would turn that knowledge against Mr. Cole if they were unsatisfied with his work. On at least one occasion, a supervisor told Mr. Cole: "If you can't get it right, we'll send you back to the camp and you'll get sent to Elmore, and you know what it's like there."

d. ADOC appeared at Gemstone Foods on multiple occasions and searched incarcerated workers during Mr. Cole's shifts. One time, ADOC came to the Gemstone Foods job site and strip-searched Mr. Cole while he was working. Masonite supervisors expressed discomfort with the treatment of the incarcerated workers and ADOC's invasive presence at the job site.

e. ADOC assigned Mr. McDole to work at Defendant Gemstone Foods beginning in approximately late 2021, where he made approximately $11 an hour. ADOC then deducted 40% of his gross wages and charged him an additional $5 per day for transportation to and from the

work site. The working conditions at Gemstone were very difficult; Gemstone assigned Mr. McDole to work in an extremely cold part of the food-processing facility, where he was also required to work with a hose that repeatedly soaked him. Gemstone provided no adequate cold-weather gear, only a white lab coat and a pair of gloves. As a result, Mr. McDole became sick on numerous occasions. Gemstone supervisors were also disrespectful and abusive toward incarcerated workers. They shouted profanity and demanded that workers keep working whenever the supervisors perceived any slowdown. Mr. McDole worked alongside free world workers, but those workers were paid more, and Gemstone still assigned the heavier, more physically demanding tasks, such as sustained heavy lifting, to incarcerated workers, including Mr. McDole. Gemstone also contracted with a drug rehabilitation program to place people in recovery alongside incarcerated people. Based on his experience, Mr. McDole reasonably understands that that Gemstone sought workers such as incarcerated people and people in drug rehabilitation because those workers had no practical ability to refuse the conditions it offered, whereas free world workers would not tolerate such conditions. Indeed, many free world workers at Gemstone quit after just one or two shifts.

584. **SL Alabama.**

a. ADOC assigned Mr. Prewitt to work for Defendant SL Alabama for approximately one-and-a-half years between 2022 and 2024. While working at SL Alabama, Mr. Prewitt was treated punitively and forced to labor beyond what was required for free workers in the same or similar jobs.

b. Mr. Prewitt worked on the final quality check line and also covered other jobs for free-world coworkers. The job was very physically demanding, with SL Alabama requiring him to be on his feet for his entire shift. Mr. Prewitt regularly worked 12-hour shifts, 5 to 6 days a week, making between $11 an hour and $17 an hour. In addition to deducting 40% of his gross pay, ADOC charged him $5 per day for transportation and $15 per month for laundry services. ADOC also charged him for supposed restitution, even though he had already completed his

restitution payments. At the time Mr. Prewitt worked for SL Alabama, approximately four van-loads of incarcerated workers performed work at SL Alabama during his shift.

c. SL Alabama required employees to meet specified quotas. When free-world employees met their quotas for the day, they were permitted to go home. When incarcerated workers met their quotas, their supervisors required them to keep working. Even if the work on the line was done, SL Alabama would tell the incarcerated workers to clean the plant—not just where they had been working, but the entire plant. SL Alabama's supervisor would threaten to call ADOC to report incarcerated workers who protested this extra work. In Mr. Prewitt's experience, SL Alabama consistently required incarcerated workers to perform more work than free-world workers.

d. Mr. Prewitt had concerns about the safety of the working conditions at SL Alabama. He saw coworkers faint from the heat inside the building, and once workers were on the assembly line, they were not permitted to take water breaks. In addition, headlights were conveyed on a belt above his work station, and the glue used to adhere the headlight components sometimes made them stick to the conveyer belt, where they would periodically become dislodged and fall off the belt. There was a risk that those headlights would fall down onto him or other workers. He also worked among tools like power screwdrivers that dangled from the ceiling. On one occasion, two free-world individuals drove by and shot at the SL Alabama building while the incarcerated workers were outside waiting for the ADOC van, and SL Alabama did not open the door to let them inside.

e. When Mr. Prewitt tried to request a transfer to a different job due to the physically grueling nature of the work for SL Alabama, Alex City's JPO denied his requests. After Mr. Prewitt requested to change jobs, ADOC began allowing SL Alabama to make Mr. Prewitt work overtime on weekends when he had home passes to visit his family. Because ADOC and SL Alabama required him to work, Mr. Prewitt could not use his home passes, which severely curtailed his ability to be present for his family. Mr. Prewitt also raised concerns about numbness

in his hand caused by his work at SL Alabama with the ADOC JPO. Instead of addressing those concerns, the JPO told him to "deal with it," and he was required to continue working.

f. Mr. Prewitt would not have chosen to work at SL Alabama, performing the work he performed for the wages he received, if he were not incarcerated. He worked for SL Alabama because being out at the worksite was less dangerous than being inside ADOC's facilities, and he would be subject to discipline if he did not work, which would result in him losing his ability to see his family on home passes, potentially being shipped to a more dangerous facility, and a lower chance of obtaining parole.

g. Mr. Prewitt understood that at least some supervisors at SL Alabama knew about the extremely dangerous conditions at ADOC facilities and that a negative report from SL Alabama could subject incarcerated workers to severe consequences, including being sent to a more dangerous facility. He heard the head floor supervisor Johnny tell incarcerated workers that if they did not want to work, they could go "back to the camp," and that they would be fired if they did not want to do the work. The same supervisor made comments about how, if the workers got write-ups, they could risk being sent "behind the fence." This supervisor frequently called ADOC to report workers who did not comply with his wishes and was aware that workers would not come back to work after he called. Another of Mr. Prewitt's supervisors was previously incarcerated by ADOC and had worked at SL Alabama when he was incarcerated, and he thus well understood the consequences of a write-up, including the violence incarcerated workers would face if they were transferred to a higher security facility. In addition, some SL Alabama supervisors mentioned that they knew or were related to ADOC officers.

h. Based on his experience, Mr. Prewitt understood that, if a supervisor called ADOC, the ADOC van would come to pick them up and that, if SL Alabama fired an incarcerated worker, the worker would be written up, often for two offenses based on the same firing—getting fired from a job and disobeying a direct order. These write-ups would often cause ADOC to send the person "behind the fence" to a more dangerous facility.

585. **Southeast Restaurant Group (Wendy's).**

a. Through no choice of his own, ADOC assigned Mr. Prewitt to perform coerced labor for Defendant Southeast Restaurant Group-Wen LLC d/b/a Wendy's from approximately August 2024 until December 2025, at a location in Auburn on North College Street. Mr. Prewitt worked eight-hour shifts, from 5 p.m. to 1 a.m. Because ADOC had a limited number of vans, ADOC would require him to leave for his shift very early (around 1 or 2 p.m.) and pick him up late, making for long work days with significant uncompensated time. Mr. Prewitt typically did not return to Alex City until approximately 2 a.m., after closing the Wendy's location. He was paid $11 per hour, before deductions by ADOC, and he worked five to six days per week.

b. Mr. Prewitt suffered poor treatment by Wendy's supervisors, who generally treated incarcerated workers worse than free-world workers and required them to do more work than free-world workers. For example, Mr. Prewitt and the other incarcerated workers would be assigned to simultaneously staff the sandwich, fries, and grill stations, while supervisors allowed free-world workers to smoke and sit on their phones.

c. If the incarcerated workers complained about working conditions, Wendy's supervisors would make comments like, "we'll send you back to the camp," or "you can go back behind the fence." Supervisors at Wendy's sometimes referred to online content they had seen about conditions at ADOC and asked the incarcerated workers questions about it—for example, whether they knew the people involved.

d. Mr. Prewitt continued to work for Wendy's because it was less dangerous than being inside an ADOC facility, to earn some money to pay for necessities like soap and toothpaste, to help support his family, and because he would be subject to discipline if he did not work, which could affect his ability to access home passes, cause him to be transferred to a more dangerous facility, and undermine his parole prospects.

e. ADOC also forced Ms. Cartwright to work at Southeast Restaurant Group-Wen d/b/a Wendy's in approximately 2022 or 2023, possibly the location at 1195 W. South Boulevard, while housed at Montgomery Women's Facility. Ms. Cartwright worked the first shift, eight hours

per day, five days per week. Ms. Cartwright's supervisor was aware of the dire consequences that incarcerated workers faced if they were fired. For example, the supervisor notified Ms. Cartwright and other workers that, when the supervisor previously fired incarcerated workers, ADOC took their work-release custody status and sent them back behind the fence. The supervisor expressed some sympathy towards Ms. Cartwright and the other workers because she knew that they faced severe consequences if ADOC sent them to higher-security facilities, while at the same time threatening Ms. Cartwright and other workers, telling them: "I don't wanna get y'all in trouble. I'm gonna give you the rope, and it's up to you whether you hang yourself." Ms. Cartwright interpreted this to mean that her supervisor was not out to get her, but if she refused to work or did not work up to her supervisor's expectations, her supervisor would notify ADOC and Ms. Cartwright would be punished. During this period, Ms. Cartwright began experiencing mental health difficulties, and asked ADOC if she could take some time off from work to care for her mental health needs. The officer responded that if she did not go to work, she would receive a disciplinary infraction for "failure to work."

586. **Southeastern Meats.**

a. ADOC forced Ms. Toni Cartwright to work for private employers, including Defendant Southeastern Meats. ADOC assigned Ms. Cartwright to these jobs—she had no choice in the job or hours worked, and she understood that she could not quit or else ADOC would issue a disciplinary infraction, take her work release custody, and send her back to Tutwiler.

b. ADOC forced Ms. Cartwright to work for Defendant Southeastern Meats for several weeks around late-2021 while she was housed at Birmingham Work Release. Her duties involved packaging vegetables inside a cooler. The conditions were extremely cold, and neither Southeastern Meats nor ADOC provided Ms. Cartwright with adequate clothing to keep her warm. She worked the first shift, five days per week, and earned approximately $14 per hour. Incarcerated workers had no choice in which shift they were assigned to. Ms. Cartwright's supervisors regularly threatened to "call the van" on incarcerated workers if they were not working hard enough, or even just because they did not like a given incarcerated worker. On several occasions, incarcerated

workers begged the supervisor not to call the van, explaining that getting fired from their job could lead to harsh consequences from ADOC. On at least two occasions, Ms. Cartwright observed a Southeastern Meats supervisor call ADOC to come pick up incarcerated workers. On those occasions, the workers were fired from their job and received disciplinary infractions from ADOC.

c. Ms. Cartwright suffers from severe arthritis in her ankles causing her pain, which the cold working conditions at Southeastern Means aggravated. Ms. Cartwright complained to an ADOC Sergeant, but the Sergeant told her that if she did not return to work, ADOC would "take her custody and send her back to Tutwiler." Ms. Cartwright was fearful of returning to Tutwiler because of the violence she observed. Ms. Cartwright sought medical attention for her arthritis, and eventually, with the medical staff's support, was able to get removed from her position at Southeastern Meats.

d. Ms. Morrissey worked for Defendant Southeastern Meats for several days in March 2022. She worked 12-hour shifts, from approximately 2 p.m. through 2 a.m., and was paid around $14 per hour. One day, Ms. Morrissey was on her break and was sitting outside next to a free-world employee, who was using his cell phone. An ADOC Sergeant drove up, saw Ms. Morrissey near the cell phone, and told her to get in the van. The free worker told the Sergeant that Ms. Morrissey was not using the phone, but the Sergeant ignored him. Ms. Morrissey received a disciplinary infraction and was terminated from her job.

e. In or about September 2022 to February 2023, the JPO, St. Gaston, assigned Ms. Lakiera Walker to work at Southeastern Meats. JPO Gaston assigned Ms. Walker to work second shift, which was a 12-hour shift that began at 2 p.m. and ended at 2 a.m., a schedule which is evidenced in the ADOC's gating records (which record the dates and times incarcerated people leave and return from the facility). Southeastern Meats gave incarcerated workers a lunch break for one hour at 8 p.m. Ms. Walker recalls she was paid at a rate of $12 per hour, with the ADOC

taking 40% of her gross pay as compensation for leasing her labor to Southeastern Meats. She occasionally worked an even longer shift, getting off at 3 or 4 a.m.

f. Ms. Walker was not given any choice as to the assignment and beginning after her first week, she asked JPO Gaston every day to please reassign her to a different job because the job made her so sick. At the time, Ms. Walker had earned weekend passes to see her family and did not want to do anything to jeopardize her visits with her son or her upcoming parole consideration (in 2023) and she wanted to be able to earn money to support her son through a work release job. She only had one interaction with a human resources representative at Southeastern Meats, who spoke to her when she was smoking during a break on one of her first days. After that brief conversation, later that day or the next day, her supervisor, Michelle, advised Ms. Walker that HR had "caught" her smoking. When Ms. Walker said she had not done anything wrong as she was smoking while on break with other workers, Michelle told Ms. Walker that she and the incarcerated workers did not get breaks like free workers and that if she went on break again, she would be fired. Based on her experience working at and with Southeastern Meats staff, Ms. Walker is confident that Michelle was aware that incarcerated workers were punished by ADOC if Southeastern Meats fired them.

g. Where she was assigned to work at Southeastern Meats, it was consistently cold. She recalls seeing the thermometer near her at work for Southeastern Meats read 30 degrees. Because she was incarcerated, she did not have warm clothing but she had been given a sweatshirt and thermals from other incarcerated women, as the cold conditions at Southeastern Meats were well known among the incarcerated women who had been assigned there. She was given only a sweatshirt to wear by Michelle, her supervisor, and a pair of noninsulated, plastic gloves, akin to garden gloves. The constant cold conditions at Southeastern Meats terribly impacted Ms. Walker's health, causing her to lose weight and ache throughout her body.

h. Ms. Walker regularly told JPO Gaston that she could not do the job. She begged him to put her on another job. In December 2022, close to Christmas, JPO Gaston told Ms. Walker to give him until February and he would move her somewhere else. After he ended up leaving,

Ms. Walker continued her pleading for a transfer to her new JPO, Sgt. Price. After he arrived, she asked him every day for a new assignment.

i. Ms. Walker knew she had to have her JPO's permission to alter her job placement and could not just quit working at Southeastern Meats (or any job) because it was a major disciplinary to refuse a job. Receiving a disciplinary could jeopardize chances of parole, lead to a transfer to a more dangerous facility, and have other serious impacts as described above, ¶516.

j. While at Southeastern Meats, Ms. Walker saw Southeastern Meats fire many incarcerated women. Ms. Walker estimates that 90% of the people fired by Southeastern Meats received a disciplinary. It was common knowledge at the Birmingham facility that incarcerated women were scared to be assigned to Southeastern Meats because they fired so many women, which would then result in a disciplinary, bringing with it a threat to parole, visitation, and denial of other paid work opportunities. Ms. Walker's experience at Southeastern Meats confirms that Southeastern Meats' management knew that incarcerated women Southeastern Meats fired would get disciplined: she recalls a conversation about an older incarcerated worker, Deborah Brooks, who Southeastern Meats wanted to fire, in which she and other incarcerated women workers explained to Southeastern Meats management the punishment Ms. Brooks would face at ADOC, such as a disciplinary and denial of parole, if they fired Ms. Brooks. The women ultimately persuaded Southeastern Meats to put Ms. Brooks in a different job she could perform. Ms. Walker also heard Michelle, her night shift manager, and other managers at Southeastern Meats reference that they knew the incarcerated workers would get punished if they did not do what Southeastern Meats told them to do.

### B. Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Ptomey, Pritchett's Claims Against Public Employer Defendants

587. Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Jarmon, Ptomey, and Pritchett bring this count against Public Employer Defendants, as specified below, under 18 U.S.C. §§1589(b), 1595(a), which prohibit persons from participating in a venture

that has engaged in providing or obtaining labor or services by means prohibited in 18 U.S.C. §1589(a).

a. Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Pritchett and Ptomey bring this count against Defendant Cooper, on behalf of themselves and other Forced Labor Class members who have worked for ADOT and those whom ADOC may assign to do so in the future.

b. Plaintiff Cole brings this count against Defendant City of Montgomery, on behalf of himself and other Forced Labor Class members who have worked for Montgomery and those whom ADOC may assign to do so in the future.

c. Plaintiffs Trevion Clark, Jarmon, and Pritchett bring this count against Defendant City of Troy, on behalf of themselves and other Forced Labor Class members who have worked for Troy and those whom ADOC may assign to do so in the future.

588. **Venture.** Public Employer Defendants Cooper, Montgomery, and Troy have each taken part in a venture with ADOC. ADOC has maintained and implemented this venture with public employers in Alabama for many years. This is a common undertaking by ADOC and each of the Public Employer Defendants pursuant to which each Public Employer Defendant receives incarcerated workers from ADOC to labor for the Public Employer Defendant's benefit. As part of this venture, the workers remain subject to ADOC's control and coercion, rendering them restricted in their abilities to object to work assignments or working conditions.

a. Cooper, as the head of ADOT, has participated in ADOC's Work Center Program for more than 15 years, and, on information and belief, continues to participate in ADOC's Work Center Program, through which ADOC has provided, and ADOT has obtained, the labor and services of incarcerated individuals, including Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Pritchett and Ptomey. ADOT has contracted with ADOC at least as far back as 1972. Pursuant to Work Center Agreements with ADOC, ADOT has received incarcerated

workers from ADOC to work for it. Since 2018, approximately 1029 or more ADOC-incarcerated people have worked for ADOT.

b. Montgomery participated in ADOC's Work Center Program after through which ADOC has provided, and Montgomery has obtained, the labor and services of incarcerated individuals, including Plaintiff Cole. Pursuant to Work Center Agreements with ADOC, Montgomery has received incarcerated workers from ADOC to work for it. Since 2018, approximately 498 or more ADOC-incarcerated people have worked for Montgomery. Montgomery's participation in ADOC's Work Center program and its knowing benefit from that participation has been a matter of custom and policy: Montgomery continued to participate in and benefit from the Work Center program, entering into Work Center Agreements with ADOC, despite, as discussed herein, the City's actual or constructive knowledge that the labor and services provided by the ADOC-incarcerated individuals were provided subject to ADOC's threats of force and serious harm.

c. Troy participated for at least 5 years in ADOC's Work Center Program, through which ADOC provided, and Troy obtained, the labor and services of incarcerated individuals, including Plaintiffs Trevion Clark, Jarmon, and Pritchett. Pursuant to Work Center Agreements with ADOC, Troy received incarcerated workers from ADOC to work for it. Since 2018, approximately 396 or more ADOC-incarcerated people worked for Troy. Troy's participation in ADOC's Work Center program and its knowing benefit from that participation was a matter of custom and policy: Troy continued to participate in and benefit from the Work Center program, entering into Work Center Agreements with ADOC, despite, as discussed herein, the City's actual or constructive knowledge that the labor and services provided by the ADOC-incarcerated individuals were provided subject to ADOC's threats of force and serious harm.

589. ADOC regulations require any employer participating in ADOC's Work Center Program to enter into a Work Center Agreement covering the time period(s) during which ADOC is supplying the employer with incarcerated individuals to work. *See supra* ¶¶187-191 On information and belief, each Public Employer Defendant has been a party to a contract with ADOC

that involves the payment of money in exchange for labor provided by individuals in ADOC custody, to be supplied and transported by ADOC. On information and belief, each Public Employer Defendant has, as required by AR 439, entered into one or more Work Center Agreements with ADOC covering the time it has received ADOC-supplied workers—agreements that authorize the transaction and confirm, as set forth in AR 439, that the Public Employer Defendant is in need of workers to provide services and that ADOC is supplying such workers from among those it has in custody. This is a commercial transaction that involves a potential (and intended) financial benefit for both ADOC and each Public Employer Defendant.

590. **Knowing Benefit from Participation in Joint Venture.** Each Public Employer Defendant knowingly benefits and has benefited from its participation in this joint venture with ADOC. Through agreements with ADOC, each Public Employer Defendant receives access to an on-demand source of incarcerated workers who can be employed to their benefit when needed and not employed when they are not. Each Public Employer Defendant benefits from having a workforce that is jointly controlled by ADOC. ADOC's consistent practice is to supply workers on-time, prohibit the workers from refusing to work, and ensure—through threats of dire consequences—that workers will not raise concerns about working conditions. Each Public Employer Defendant benefits from receiving ADOC-supplied workers because these workers are directed by the employer's co-venturer, ADOC, that they cannot complain about their wages, benefits or working conditions, and unlike free workers, the Public Employer Defendants are assured by ADOC that the assigned incarcerated workers will show up for their shifts, given: the threat of discipline from ADOC for failing to work as directed and for "getting fired" from the assigned job for any reason, including voicing concerns about work conditions or safety; and the related risks of return to more violent facilities from any negative work report given by the Public Employer Defendant to ADOC that subject workers to a life-threatening risk of serious harm and denial of parole, extending that person's sentence and the time for which they are denied their freedom. In entering into these ventures with ADOC in which ADOC retains significant control

over the incarcerated workers it provides, each Public Employer Defendant has agreed to the risks that may accompany such a venture.

a. **Cooper/ADOT** has benefited from the services performed by Named Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Pritchett and Ptomey and other Forced Labor Class members who performed work for ADOT, at its direction, and to its specifications.

i. ADOT benefits financially by receiving from ADOC a road-crew workforce performing core public road-maintenance functions, including weed-eating, clearing roadside debris, filling potholes, directing traffic, and cutting grass, for which ADOT would otherwise have to pay at least a lawful minimum wage. Instead, incarcerated workers were paid approximately $2 per day. Mr. English was assigned to road crews in Grove Hill and Camden. Supervisors on these crews primarily observed, drove, and directed, while the physical labor fell almost exclusively to the incarcerated workers. By using ADOC-supplied labor at these rates, ADOT obtained the value of public road work at a small fraction of its market cost.

ii. ADOT benefits by receiving a workforce it can control and that is intimidated and restrained from complaining about or refusing any work task. ADOT's supervisors understood that incarcerated workers could not refuse or quit their ADOT assignment, and used that knowledge to control them. ADOT supervisors frequently threatened to send workers back to the camp or to have them written up, understanding that such a report would trigger ADOC discipline, loss of work-release custody, and transfer to a more dangerous facility. When Mr. Pritchett was late for the transport van one morning, ADOT terminated him and ADOC issued a disciplinary for refusal to work. After Mr. Pritchett reported to ADOC commissioner Wendy Williams that his ADOT supervisor instructed him to go to the bathroom in a bucket by the side of the road or in the forest, rather than letting the workers use a restroom, he was fired from the ADOT job and transferred to another facility. ADOT's ability to secure a workforce that cannot object to its conditions or treatment is a benefit to it because free workers would object to or leave such conditions. Mr. Dandridge's supervisor used the power he had over incarcerated workers to

force them to commit crimes in the City of Childersburg.

iii. ADOT benefits from receiving ADOC-supplied workers because it can and does assign them dangerous and degrading work that free-world workers would not reasonably tolerate. Mr. English performed weed-eating and debris collection while avoiding venomous snakes on the roadside, working shifts from approximately 6 a.m. to 7 p.m. Mr. Pritchett performed coerced labor for Defendant ADOT in approximately 2014-2015, while housed at Childersburg Work Release, on the Talladega road squad. He used a radio and flag to direct traffic, filled in potholes, and picked up litter. He worked from approximately 8 a.m. to 2 or 3 p.m., after being transported to the work site by van, and he was given only a peanut butter sandwich and a cheese sandwich to sustain him during the hours of physical labor. Mr. Pritchett again performed labor for Defendant ADOT in 2022, while housed at Elba. He was assigned to fix potholes alongside other incarcerated workers. His ADOT supervisor told Mr. Pritchett, a Black man, that he was working on a road where the cars run over Black people. While working for ADOT in 2022, Mr. Pritchett would leave the facility around 5-6 a.m. and return around 3 p.m. Mr. Pritchett was paid $2 per day of work each time he worked for ADOT. On one ADOT crew in Childersburg, Mr. Dandridge's supervisor directed incarcerated workers to steal lawn equipment from private yards and threatened to have them fired—and thereby disciplined and denied parole—if they refused; that supervisor was removed only after he unwittingly directed the workers to break into a judge's home, after which the workers he had coerced were transferred to St. Clair as punishment. ADOT work can be so dangerous that two incarcerated workers were killed in 2023 while working on an ADOT road crew.[67] Free-world workers would not perform this work under these conditions, particularly for the scant pay ADOT offered, but the threat of ADOC discipline gave incarcerated workers no ability to refuse.

---

[67] *2 Alabama inmates killed while working on road crew for state,* AP News (Aug. 2, 2023), https://apnews.com/article/alabama-inmates-killed-road-crew-f7b3ecdb6ee0505a6cdfc18c56c9ebdc; *see also An Alabama Prisoner Forced to Work on Road Crew Killed by Passing Car*, Equal Justice Initiative (June 18, 2012), https://eji.org/news/alabama-prisoner-kenric-turner-forced-to-work-on-road-crew-killed-by-car/.

iv. ADOT has the ability to have ADOC supply workers to work the hours it needs, including long days of physical labor that begin before dawn. ADOT had incarcerated workers transported to its worksites for shifts running as long as approximately 6 a.m. to 7 p.m., as Mr. English experienced on the Grove Hill and Camden road crews, and Mr. Pritchett left his facility around 5 to 6 a.m. and returned around 3 p.m. ADOC swapped out road crews approximately every month, supplying ADOT a continuous rotation of workers. This arrangement has provided a benefit to ADOT because securing free-world labor to perform strenuous outdoor road work across days this long, for the compensation paid, would have required ADOT to offer more attractive wages, hours, or working conditions, whereas incarcerated workers could be assigned whatever hours ADOT needed and could not decline them.

b. **Montgomery** has benefited from the services performed by Named Plaintiff Cole and other Forced Labor Class members who performed work for Montgomery, at its direction, and to its specifications.

i. Montgomery has benefited financially by receiving a workforce it can require to perform valuable work for the City, including staffing a City-owned auction warehouse and sale lot, at a fraction of its market cost. Incarcerated workers, including Mr. Cole, performing this work were paid approximately $2 per day for eight to ten hour days, a substantial discount from what Montgomery would have needed to pay free-world workers to perform the same tasks.

ii. Between January 1, 2018 and August 5, 2024, incarcerated workers were forced to provide approximately 41,111 days of labor—or an average of 5,138 days per year—to the City of Montgomery, including at the city's landfill and for Montgomery Street Maintenance. The starting wage for a City of Montgomery service maintenance worker in sanitation and street maintenance is $13.36 per hour. Assuming the City of Montgomery pays ADOC its standard rate of $15 per day per worker, the City of Montgomery generated more than $3.7 million in wage savings alone by employing incarcerated labor during this period.

iii. Montgomery has also benefitted from its access to a coerced workforce that performs dangerous labor. For example, a retained member of the Forced Labor Class complained

about unsafe conditions to his supervisor at Defendant City of Montgomery, but that complaint was ignored. The worker even chose not to go to the Montgomery job one day, but was written up for refusing to work and so went back to the job to avoid further discipline. Soon thereafter, in approximately 2021 the worker lost an eye while on the job working for Montgomery, after which he was left bleeding for half an hour before being transported to a hospital. Despite undergoing surgery to remove his eye, he received no prosthetic, no eye-specific care, and no mental health support from Montgomery or from ADOC while he was incarcerated. He also cannot work many jobs now due to the loss of his vision, jeopardizing his ability permanently to earn income to support his son or to purchase necessities at the store. Mr. Cole worked eight- to ten-hour days at a City-owned auction warehouse, and the putative class member described above performed valuable maintenance and landscaping work such as weeding, grass cutting, erecting signs and guard rails, and cutting trees and limbs. This arrangement has provided a benefit to the City because it could obtain workers for full-day shifts on a standing basis, for nominal pay, without having to offer the wages or terms that free-world labor would require.

iv. Montgomery benefitted from its participation in the venture by receiving a workforce it could control and that could not refuse or quit. ADOC instructed Mr. Cole, like other incarcerated workers, that refusing to work would result in his being sent "behind the wall" to a higher security, more dangerous facility, and that the Red Eagle work center was a "disciplinary camp" where refusal to work would result in a disciplinary infraction. The City's access to a workforce that could not object to its assignments or conditions is a benefit to it because it can receive workers on demand to perform whatever tasks it assigns without concern about complaints, attendance, or dissent.

c. **Troy** has benefited from the services performed by Named Plaintiff Trevion Clark, Jarmon, and Pritchett and other Forced Labor Class members who performed work for Troy, at its direction, and to its specifications.

i. Troy has benefited financially by receiving from ADOC a workforce it can use to perform core municipal functions, including sanitation and recycling collection, grounds

maintenance, leaf and trash removal, grass cutting, and weeding, for a fraction of what it would need to pay free-world workers to perform the same tasks. Incarcerated workers performing this work were paid approximately $2.00 to $2.50 per day. Mr. Jarmon drove a leaf truck and cut grass from roughly 6 a.m. to 5 p.m., five days a week; Mr. Pritchett rode a recycling truck collecting paper. By using ADOC-supplied labor at these rates, the City obtained the value of municipal sanitation and grounds work at a small fraction of its market cost.

ii. Troy has benefited from receiving ADOC-supplied workers because it can and does assign them physically grueling outdoor work that free-world workers would be less willing to perform on the City's terms. The work was almost entirely outdoors and physically demanding, performed under the summer sun on shifts as long as 6 a.m. to 5 p.m. The conditions were severe enough, and the incarcerated workers' deprivation evident enough, that free-world coworkers and supervisors sometimes bought them lunch because they knew the workers might not otherwise have enough to eat. Free-world workers would not perform this work for the compensation and under the conditions imposed on incarcerated workers, but the threat of ADOC discipline gave them no ability to refuse.

iii. Troy had the ability to have ADOC supply workers to work the hours it needs, including working long outdoor shifts in the summer heat. Mr. Jarmon worked for the City from approximately 6 a.m. to 5 p.m., five days a week, and ADOC and the City swapped out road crews approximately every month, supplying the City a continuous rotation of workers. This arrangement has provided a benefit to the City because securing free-world labor to perform grueling sanitation and grounds work across days this long, under the summer sun and for the compensation paid, would have required the City to offer more attractive wages, hours, or working conditions, whereas incarcerated workers could be assigned whatever hours the City needed and could not decline them. Troy's supervisors understood that incarcerated workers had no choice but to work for the City and could not refuse or quit. Mr. Jarmon understood, based on the nature of ADOC's contract with the City, that his supervisors knew they could simply tell ADOC they no longer wanted a worker and that worker would never return—an arrangement that gave the City a

workforce it could discard at will and that ADOC's disciplinary system kept compliant. Had Mr. Jarmon refused the assignment, ADOC would have disciplined him for refusal to work, up to placement in solitary confinement.

591. **<u>Venture Involves Prohibited Coercion in Violation of the TVPA.</u>** The joint venture between ADOC and each Public Employer Defendant—the arrangement pursuant to which ADOC, for substantial fees, supplies the private companies with persons to perform services needed by the companies—violates the TVPA because ADOC has provided the services of Forced Labor Named Plaintiffs and other Forced Labor Class members to the Public Employer Defendants through prohibited means, including use of force and threats thereof; physical restraint and threats thereof; serious harm and threats thereof; abuse of the legal process and threats thereof; and a scheme to convey that they would suffer force, physical restraint, and serious harm if they did not labor for the companies to which ADOC assigns them, as set forth in Counts I—IV.

592. ADOC has provided each Public Employer Defendant with the labor and services of incarcerated individuals, including the Forced Labor Named Plaintiffs identified above, *supra* ¶587, through threats and imposition of the following penalties for failure to work an ADOC-assigned job and/or failure to work as directed by the private employer: (a) a revocation of custody status and/or transfer out of a Work Center facility to a more dangerous ADOC facility where the person will be at risk of serious harm; (b) placement in solitary confinement, as provided for in ADOC regulations; (c) deprivation of visitation privileges; (d) loss of good time credits; and (e) a disciplinary that will adversely affect their chances of parole, and thus extend the length of incarceration. *See supra* ¶¶319-518 ADOC's threats and imposition of these penalties impact both the workers who receive the threats and penalties, and other incarcerated individuals to whom ADOC effectively conveys what consequences they will face should they refuse to work.

a. Mr. Campbell, Mr. Rashaad Clark, Mr. Trevion Clark, Mr. Cole, Mr. Pritchett and Mr. Ptomey were coerced by ADOC to work for ADOT in the same manner as they were coerced to work for Work Release employers, *see supra* ¶590.a. Additionally, ADOT supervisors frequently threatened that they could send workers back to the "camp" (that is, the ADOC facility)

or get them written up, and Mr. Pritchett heard ADOT supervisors threaten that they could send incarcerated workers back to the camp if they did not perform to the supervisor's liking. Mr. Pritchett felt like a slave, but he performed the work to get away from ADOC officers inside the facility who would harass the incarcerated men. When Mr. Pritchett was late one morning for the transport van, ADOT terminated him, and ADOC issued a disciplinary for refusal to work. Mr. English did not choose his ADOT assignments and would not have taken them were he not compelled to do so. Mr. Dandridge was cited for refusing to work several times while in ADOC custody, even when he was not refusing at all. He was subject to disciplinaries for such purported refusals including restrictions from access to the phone, the store, or family visitation, transfer to more violent facilities, and placement in solitary confinement.

b. Mr. Cole was coerced by ADOC to work for Montgomery in the same manner as he was coerced to work for Work Release employers, *see supra* ¶590.b

c. Mr. Trevion Clark, Mr. Jarmon, and Mr. Pritchett were coerced by ADOC to work for Troy in the same manner as they were coerced to work for Work Release employers, *see supra* ¶590.c.

593. **Knowledge of Coercion.** Each Public Employer Defendant—Cooper/ADOC, Montgomery, and Troy—knew or should have known that its undertaking with ADOC involved the provision of services from ADOC-incarcerated workers, including Forced Labor Named Plaintiffs as identified *supra* ¶¶7-28, through coercive means involving threats of force, physical restraint, serious harm, and a scheme to convey to those workers that they would suffer force, physical restraint, and serious harm if they did not labor for the Public Employer Defendant when ADOC assigned them to do so.

594. Each Public Employer Defendant, through the Work Center Agreements required by AR 439, is aware that ADOC retains significant control over the incarcerated persons ADOC transports to the Public Employer Defendant to work. The Work Center Agreement sets forth clearly the extent of continued ADOC control and requires the employer, through the designated supervisor, to notify ADOC of any "refus[al] to work as requested" or "inappropriate" behavior;

provides that ADOC retains control over job assignments and schedules and may remove workers from the job site.

595. Each of the Public Employer Defendants had or has had a multi-year relationship with ADOC during which ADOC has supplied the Public Employer Defendant with incarcerated workers. Through its history of participating in ADOC's Work Center program and its contracts with ADOC, each Public Employer Defendant knows or should know that workers whom ADOC assigns to work for it do not have a say in the assignment and did not have the freedom to refuse or choose the work assigned to them by ADOC; each Public Employer Defendant also is or should be familiar with ADOC policies and procedures and is aware or should be aware that workers fear being reported to ADOC for not working as directed because such a report can result in a disciplinary and/or removal from the Work Center program and being sent to a higher-security ADOC facility where the worker will be in danger. *See supra* ¶¶67-98 (describing widely publicized dangers of ADOC facilities). Each Public Employer Defendant's history and familiarity with the Work Center program also means that it knew or should have known that workers feared being reported for not working because it could result in ADOC issuing a disciplinary that could subject them to confinement to restrictive housing, would deny them privileges including access to the canteen and family visitation, AR 403 at 22, and threaten a worker's chances of parole.

596. Each Public Employer Defendant, through the Work Center Agreement it is required to have with ADOC as a result of its participation in the Work Center program, and through its long history with ADOC, knows or should know that it pays ADOC for the services provided by the ADOC-supplied workers in the amount of approximately $15 or $25 per day per incarcerated worker, which is far below minimum wage, and that the incarcerated worker will generally be paid only $2 per day of that amount. Each Public Employer Defendant, through the Work Release Agreement, also knows or should know that incarcerated workers cannot refuse the low wages the Work Center jobs pay. Each Public Employer Defendant knows or should know that, absent the threat of being removed from the Work Center program or of a disciplinary, the incarcerated workers would not choose to work subject to the terms set by the Public Employer

Defendant and ADOC for so little money. Further, on information and belief, ADOC meets with work-center employers to provide them with ADOC's rules and regulations, instructs them to call ADOC if a worker appears not to be following directions or to be refusing to work so that ADOC can discipline the worker, and explains the severe consequences of receiving such discipline for the worker. *See supra* ¶¶382, 414.

597. **<u>Cooper/ADOT.</u>**

a. In Mr. Pritchett's experience, ADOT supervisors frequently threatened that they could send workers back to the "camp" (that is, the ADOC facility) or get them written up. He heard ADOT supervisors threaten that they could send incarcerated workers back to the camp if they did not perform to the supervisor's liking. After Mr. Pritchett reported to ADOC commissioner Wendy Williams that his ADOT supervisor instructed him to go to the bathroom in a bucket by the side of the road or in the forest, rather than letting the workers use a restroom, he was fired from the ADOT job and transferred to another facility.

b. Mr. Cole is also aware that ADOC instructs the outside employers not to give workers food, but some employers, such as ADOT, ignored that directive because they knew how hungry the incarcerated workers are. All work release and honor camp (work center) employers Mr. Cole has encountered were, based on his experience, on notice that the employment relationship was an abnormal and coerced one.

c. Mr. Dandridge was assigned by ADOC to work for ADOT for $2 a day in the City of Childersburg in approximately 2005. While there, his supervisor instructed incarcerated workers to steal lawnmowers, weed eaters, and other lawn care materials out of people's backyards, and threatened to fire them if they didn't—while knowing that they would be disciplined and likely not make parole if they were fired. That supervisor was fired after he unknowingly instructed incarcerated workers to break into a judge's house, and the incarcerated workers who were forced into the act were shipped to St. Clair as punishment.

d. If ADOT/Cooper was not previously aware that workers on its road crews were laboring under coercive threats, Cooper was on notice as of the time the original complaint in this matter was filed.

598. **Montgomery.**

a. During his time at ADOC, Mr. Cole was forced to work at a sale lot that he understood was owned by the City of Montgomery, which was a warehouse that puts on auctions. For this job, he was paid $2 for each eight- to ten-hour day of work.

b. City of Montgomery supervisors had incarcerated workers who chose not to work or did not work to the City's satisfaction written up and told them they could face future discipline, including transfer to a more dangerous facility and loss of privileges. The City ignored complaints from incarcerated workers that their working conditions felt unsafe. This has led to injuries, including one incarcerated worker who lost his eye due to injury in 2021 while operating a zero-turn cutting machine for the City of Montgomery. He lay on the ground bleeding for 30 minutes before an ADOC van arrived to take him to the emergency room where surgery was performed to remove his eye. City of Montgomery supervisors also wrote up incarcerated workers for requesting sick days or time off due to injuries. City of Montgomery supervisors were aware of the terrible conditions in ADOC facilities and would discuss those conditions with incarcerated workers, but would still use those conditions as leverage to coerce incarcerated workers to keep working. At least one City of Montgomery supervisor, Chris, was formerly incarcerated, and would often threaten that he would send currently incarcerated workers back to the camp if he was not satisfied with the quality of their work. Because Chris was formerly incarcerated, he knew that sending a worker back to camp would result in the worker getting fired and receiving a disciplinary infraction, loss of privileges, and potentially getting sent behind the fence.

c. On information and belief and based on conversations with a former City of Montgomery employee, Montgomery began using incarcerated labor in approximately 2009 after finding that other labor sources were unreliable. Montgomery was desperate for employees, and chose to lease incarcerated workers from Red Eagle Work Release specifically because it knew

the workers would show up and keep working since they had no choice, while free world workers were difficult to find and retain. Montgomery supervisors were aware of the conditions at the facilities and prevalent violence in the prisons, because incarcerated people would discuss such incidents on the job. Workers described their living conditions as harsh and unpleasant, and explained that ADOC would engage in collective punishment of all workers if there was a single complaint about one. Montgomery was also aware of the amount of control ADOC exercised over every aspect of incarcerated workers' lives, including who worked which shift, their work hours and schedules, final disciplinary decisions, and even what clothes they wore. ADOC would send workers with only a cheese or peanut butter and syrup sandwich, so sometimes Montgomery would provide extra meals. Montgomery was also aware of the culture of abuse and retaliation that was prevalent at ADOC. Montgomery was also aware of the paltry pay that incarcerated workers received, and that ADOC was the main party profiting off their labor; Montgomery would pay incarcerated workers $2 a day, and pay ADOC $13 a day for each worker. Montgomery knew that, despite the fact that the workers made so little, ADOC would make the workers pay for transportation even when they did not use it (because Montgomery would pick them up for work instead of having ADOC transport the workers in a van).

599. **<u>Troy.</u>**

a. At City of Troy, Mr. Jarmon's duties included driving a leaf truck, cutting grass, weeding, and packing up trash. Mr. Jarmon was paid $2.00–2.50 per day, and his hours were approximately 6 a.m. to 5 p.m., five days per week. The work was physically grueling, and almost always outside, so it was very hot to do the work during the summer. ADOC assigned Mr. Jamon to work for City of Troy and he had no say in his hours or duties. If Mr. Jarmon had refused the job assignment, ADOC would have disciplined him for refusal to work, which could include being placed in solitary at the camp. Mr. Jarmon's understanding was that his supervisors at the City of Troy knew that he had no choice but to work for them because of the nature of the ADOC contract with Troy; the supervisors knew that they could just tell ADOC they didn't want a worker anymore and he would never come back.

b. In approximately 2022, while housed at Elba, Mr. Pritchett worked for the City of Troy, riding a recycling truck and picking up paper. This involved physical labor under the hot sun. He was paid $2 per day. He worked from approximately 7 a.m. until 2 p.m., after being driven to the worksite by a van. Mr. Pritchett understood that his free coworkers and supervisors were aware of the inhumane conditions at ADOC and would sometimes buy the incarcerated workers lunch because they knew the incarcerated workers otherwise might not have enough to eat.

c. Even if Troy was not previously aware that workers on its road crews were laboring under coercive threats, Troy was on notice as of the time the original complaint in this matter was filed.

## COUNT VI

**Violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §1589(a)(1) & (2)**
**By Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Jarmon, McDole, Morrissey, Payton, Prewitt, Thomas, USSW, and RWDSU on Behalf of Themselves and the Forced Labor Class**
**Against Defendants Bama Budweiser, Cast Products, Hwaseung, Ju Young, Paramount, RCF/Gemstone, SL Alabama, and Southeastern Meats for Knowingly Obtaining Forced Labor Through Means of Force, Physical Restraint, Serious Harm and Threats Thereof**

600. Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Jarmon, McDole, Morrissey, Payton, Prewitt, and Thomas, on behalf of themselves and the Forced Labor Class, USSW, and RWDSU, bring this count against eight Private Employer Defendants—Defendants Bama Budweiser, Cast Products, Hwaseung, Ju Young, Paramount, RCF/Gemstone, SL Alabama, and Southeastern Meats—under 18 U.S.C. §§1589(a)(1)-(2), 1595(a), which prohibit persons from "knowingly provid[ing] or obtain[ing] … the labor or services of a person … by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; [or] by means of serious harm or threats of serious harm to that person or another person." 18 U.S.C. §1589(a)(1), (2).

601. Defendant Bama Budweiser is liable to Named Plaintiffs Campbell and Rashaad Clark and members of the Forced Labor Class who have worked for Bama Budweiser, because

Bama Budweiser knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

602. Defendant Cast Products is liable to Named Plaintiffs Jarmon, Lesley, and Payton and members of the Forced Labor Class who have worked for Cast Products, because Cast Products knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

603. Defendant Hwaseung is liable to Named Plaintiff T. Clark and members of the Forced Labor Class who have worked for Hwaseung, because Hwaseung knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

604. Defendant Ju Young is liable to Named Plaintiffs Payton and Thomas and members of the Forced Labor Class who have worked for Ju Young, because Ju Young knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

605. Defendant Paramount is liable to Named Plaintiffs Cartwright and Morrissey and members of the Forced Labor Class who have worked for Paramount, because Paramount knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

606. Defendant RCF/Gemstone is liable to Named Plaintiffs Cole, McDole, and Payton, and members of the Forced Labor Class who have worked for RCF/Gemstone, because RCF/Gemstone knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof. Gemstone is further liable to Plaintiff RWDSU and its members who are impacted by RCF/Gemstone's coercion of labor and services.

607. Defendant SL Alabama is liable to Named Plaintiff Prewitt and members of the Forced Labor Class who have worked for SL Alabama, because SL Alabama knowingly obtained

the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

608. Defendant Southeastern Meats is liable to Named Plaintiffs Cartwright, Morrissey, and Walker and other members of the Forced Labor Class who have worked for Southeastern Meats, because Southeastern Meats knowingly obtained the labor and services of these individuals and did so by means of force, physical restraint, serious harm, and/or threats thereof.

609. Each of these Private Employer Defendants, identified in paragraphs 601-608 above, has obtained the labor and services of the Named Plaintiffs identified in those same paragraphs and of other incarcerated individuals, and has engaged in practices that intentionally convey to the incarcerated workers that they must work for the company, in the manner directed by the company, or else the company will report them to ADOC with an expectation that ADOC will punish the workers in ways that will result in physical danger and serious harm to workers, including because the punishment may involve transfer of the workers "behind the fence" (to a more dangerous ADOC facility), risk to the workers' parole chances, and deprivation of the workers' contact with their families. *See supra* ¶¶319-321, 566-570.

610. **Bama Budweiser** has, through its supervisors, obtained the labor and services of Named Plaintiffs Campbell and Rashaad Clark and other incarcerated workers at Bama Budweiser through force and through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, Bama Budweiser obtained the labor and services of incarcerated workers. *See supra* ¶561.a.

b. A Bama Budweiser supervisor made threats and statements to incarcerated workers, often in profane language to the following effect: "I'm going to fire your ass"; "You know what is going to happen"; "I ain't gotta play with him. I am going to fire him and have him fucked up in the camp." These are threats, understood by the supervisor and the workers, that the workers would be subject to physical harm in the event Bama Budweiser were to report them to

ADOC or fire them. They are also a threat to take action the supervisors knew would extend the workers' sentences of incarceration. *See supra* ¶571.d .

c. A Bama Budweiser supervisor, Ed, attempted to physically beat Rashaad Clark with a stick. The supervisor did so after falsely accusing Rashaad Clark of not being on the job when he was, in fact, in the bathroom. A different Bama Budweiser supervisor told Rashaad Clark that he just had to accept Ed's abuse to stay on the job. *See supra* ¶571.e.

611. **Cast Products** has, through its supervisors, obtained the labor and services of Named Plaintiffs Jarmon, Lesley, and Payton and other incarcerated workers at Cast Products through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, Cast Products obtained the labor and services of incarcerated workers. *See supra* ¶561.b.

b. Supervisors at Cast Products often threatened to "call the van" if incarcerated workers did not appear to be working to their satisfaction. Cast Products supervisors were aware of the potential harm to incarcerated workers if they "called the van," because Cast Products supervisors explicitly told incarcerated workers that ADOC had put them on notice. Cast Products supervisors told Mr. Lesley and other incarcerated workers that ADOC advised Cast Products that, if the workers were not performing adequately, supervisors should call ADOC and ADOC would pick them up from work and punish them. On multiple occasions, Mr. Lesley observed Cast Products supervisors call ADOC regarding an incarcerated worker's performance, and ADOC picked those workers up and issued disciplinary infractions. *See supra* ¶¶572.q-s

c. A Cast Products supervisor frequently made threatening comments like: "If y'all don't want to work, you'll go back behind the fence and we'll get another one. It's like a candy store." When a worker responded to the supervisor, the supervisor responded by threatening to "call the van. I'll get another one of you." *See supra* ¶572.n.

d. Cast Product supervisors' threats to "call the van" if workers do not perform adequately, and Cast Products' calls to ADOC regarding workers' performance, are understood by

the supervisors and workers to be threats that ADOC will subject the workers to serious harm, threats that were used to secure incarcerated persons' labor.

e. Cast Product supervisors knew that incarcerated workers had no power and could not raise concerns about the working conditions at Cast Products to ADOC or else they would be punished. Cast Products supervisors used this leverage to force incarcerated workers to work harder than they required free-world employees to work. If incarcerated workers challenged a Cast Products supervisor in any way, the supervisor would call ADOC to get the worker punished. Cast Product supervisors understood that firing an incarcerated worker or reporting them to ADOC would cause serious harm for the worker. *See supra* ¶572.r.

612. **Hwaseung**, through its supervisors, obtained the labor and services of Named Plaintiff T. Clark and other incarcerated workers at Hwaseung through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, Hwaseung obtained the labor and services of incarcerated workers. *See supra* ¶561.d.

b. A Hwaseung supervisor told Mr. T. Clark and a group of assembled incarcerated workers: "I have no problem sending you back to the camp." This supervisor was aware that if he sent a worker back to camp (the ADOC facility), that would jeopardize their parole and potentially lead to them being sent to a more violent facility. *See supra* ¶574.c.

c. A Hwaseung supervisor, in response to Mr. Trevion Clark's raising an issue regarding his working conditions (the height of a work table), told Mr. Trevion Clark to work on the table or the supervisor would "send [his] ass back to camp."

d. Hwaseung supervisors were aware that incarcerated workers faced severe disciplinary consequences if they were terminated or sent back to ADOC. When a Hwaseung supervisor threatened to send workers back to the camp, he did so knowing that ADOC would discipline the workers and that would impact their chances for parole and could result in them being sent to dangerous ADOC facilities. One of the Hwaseung supervisors was a former

ADOC corrections officer and so had direct, firsthand knowledge of the conditions incarcerated workers faced was supervising them. *See supra* ¶574.f.

e. Hwaseung supervisors' threats to send incarcerated workers "back to camp" if they do not perform adequately or complain about their working conditions, are understood by the supervisors and workers to be threats that ADOC will subject the workers to serious harm, threats that were used to secure the labor of incarcerate persons, including Mr. Trevion Clark.

613. **Ju Young**, through its supervisors, obtained the labor and services of Named Plaintiffs Payton and Thomas and other incarcerated workers at Ju Young through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, Ju Young obtained the labor and services of incarcerated workers. *See supra* ¶561.e.

b. A Ju Young supervisor told Mr. Payton and other incarcerated workers regularly that they need to either keep up with production or Ju Young would fire them and that: "if you get fired, you know where that will lead to." The supervisor understood the consequences incarcerated workers faced if they were fired. *See supra* ¶575.

c. Mr. Thomas understood that Ju Young supervisors, including Maggie, knew that incarcerated workers would be disciplined if they were fired or written up, and that such discipline could affect their custody level, their access to family visits, and their parole prospects. Other incarcerated workers at Ju Young told Mr. Thomas that supervisors had made explicit statements to this effect—including that they could get workers written up or affect their parole. Mr. Thomas himself heard supervisors threaten incarcerated workers with termination and understood that termination meant disciplinary consequences from ADOC. Ju Young used these threats to secure labor from Mr. Payton, Mr. Thomas, and other incarcerated persons.

614. **Paramount**, through its supervisors, obtained the labor and services of Named Plaintiffs Cartwright and Morrissey and other incarcerated workers at Paramount through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, Paramount obtained the labor and services of incarcerated workers. *See supra* ¶561.h.

b. A Paramount supervisor regularly threatened Ms. Cartwright and other incarcerated workers, with comments including: "I'm gonna get the [work release] center to come back for y'all because y'all not doing what you're supposed to be doing. I'll just get someone else." *See supra* ¶580.

c. The Paramount supervisor knew the harsh consequences if incarcerated workers were fired. She made this clear through numerous comments to Ms. Cartwright and other workers including: "You know if I call the van and have them come get you, you're going to get fired and you're going to get your privileges taken away"; "I don't wanna have to call the van, call your Lieutenant, and get you sent back and wrote up"; "I don't wanna get y'all sent back and get y'all punished." By "sent back," the supervisor meant sent to a non-work-release facility. Additionally, it is ADOC policy to inform every work release job's management about the consequences to incarcerated workers if the work release job fires them. *See supra* ¶580.

d. A Paramount supervisor threatened to "call the van" because Ms. Morrissey was using the restroom too much. Ms. Morrissey understood that "calling the van" meant firing Ms. Morrissey and calling the ADOC facility where she was housed to come pick her up. Ms. Morrissey begged Kathy not to fire her, explaining that if she were fired, she would receive a disciplinary infraction from ADOC which would have negative consequences for her, including loss of privileges and potentially getting sent to higher security facility. *See supra* ¶580.

e. The Paramount supervisor's threats of calling the van, sending workers back, "get[ting] [workers] sent back and … punished," having workers "wrote up," and having "privileges taken away," are threats of physical force, restraint (increased incarceration), and serious harm used to secure labor from the incarcerated workers. *See supra* ¶580.

615. **RCF/Gemstone** through its supervisors, obtained the labor and services of Named Plaintiffs Cole, McDole, and Payton and other incarcerated workers at RCF/Gemstone through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, RCF/Gemstone obtained the labor and services of incarcerated workers. *See supra* ¶561.k.

b. Mr. Cole's supervisors at Gemstone Foods threatened to send him back to the facility if they were not satisfied with the quality of his work, and made comments that reflected that they were well aware of the conditions at violent and unsafe ADOC facilities "behind the fence," and the severe physical and mental consequences that any termination of his employment with them would cause. In Mr. McDole's experience, Gemstone supervisors shouted profanity and demanded that workers keep working whenever the supervisors perceived any slowdown.

c. A supervisor told Mr. Cole: "If you can't get it right, we'll send you back to the camp and you'll get sent to Elmore, and you know what it's like there." Mr. Cole understands Gemstone supervisors were aware of the dangerous conditions at ADOC facilities, *see supra* ¶583.c.

d. The Gemstone Foods' supervisors used the threat that ADOC would send incarcerated workers who were fired or reported for not working to Elmore or "behind the fence" to secure the labor of Mr. Cole and other incarcerated workers. This is a threat invoking the possibility of serious harm.

616. **<u>SL Alabama</u>** through its supervisors, obtained the labor and services of Named Plaintiff Prewitt and other incarcerated workers at SL Alabama through the communication of threats of force, physical restraint, and serious harm.

a. As set forth in Count V, SL Alabama obtained the labor and services of incarcerated workers. *See supra* ¶561.l.

b. An SL Alabama supervisor, Johnny, told incarcerated workers that if they did not want to work, they could go "back to the camp," and that they would be fired if they did not want to do the work. The same supervisor made comments about how, if the workers got write-ups, they could risk being sent "behind the fence." This supervisor frequently called ADOC to report workers who did not comply with his wishes and was aware that workers would not come back to work after he called.

c. Another SL Alabama supervisor was previously incarcerated by ADOC and had worked at SL Alabama when he was incarcerated, and thus well understood the consequences of a write-up, including the violence incarcerated workers would face if they were transferred to a higher security facility.

d. SL Alabama supervisor's threats to fire workers, send them go "back to camp," and to create a risk of them being sent "behind the fence," are threats of force, restraint (including because of the impact on parole), and serious harm in the event workers do not work as directed by SL Alabama.

617. **Southeastern Meats** through its supervisors, obtained the labor and services of Named Plaintiff Cartwright, Morrissey, and Walker and other incarcerated workers at Paramount through the communication of threats of serious harm.

a. As set forth in Count V, Southeastern Meats obtained the labor and services of incarcerated workers. *See supra* ¶561.n.

b. Supervisors regularly threatened to "call the van" on incarcerated workers if they were not working hard enough, or even just because they did not like a given incarcerated worker. On several occasions, incarcerated workers begged the supervisor not to call the van, explaining that getting fired from their job could lead to harsh consequences from ADOC. On at least two occasions, Ms. Cartwright observed a Southeastern Meats supervisor call ADOC to come pick up incarcerated workers. On those occasions, the workers were fired from their job and received disciplinary infractions from ADOC.

c. Ms. Walker's experience at Southeastern Meats confirms that Southeastern Meats' management knew that incarcerated women Southeastern Meats fired would get disciplined: she recalls a conversation about an older incarcerated worker, Deborah Brooks, who Southeastern Meats wanted to fire, in which she and other incarcerated women workers explained to Southeastern Meats management the punishment Ms. Brooks would face at ADOC, such as a disciplinary and denial of parole, if they fired Ms. Brooks. The women ultimately persuaded Southeastern Meats to put Ms. Brooks in a different job she could perform. Ms. Walker

also heard Michelle, her night shift manager, and other managers at Southeastern Meats reference that they knew the incarcerated workers would get punished if they did not do what Southeastern Meats told them to do.

d. The threat by Southeastern Meats' supervisors to "call the van" was used to secure the labor of incarcerated individuals, and carried with it the threat of serious harm.

## COUNT VII

### Violation of Alabama Constitution, Article I, Section 32 By Plaintiffs Campbell, R. Clark, T. Clark, Cole, Jarmon, McDole, Moore, Morrissey, Payton, Prewitt, and Pritchett, on Behalf of Themselves and the Forced Labor Injunctive Relief Subclass, USSW, and RWDSU, Against Defendants City of Montgomery and All Private Employer Defendants other than CBAK and Koch Foods

618. Since November 2022, Article I, Section 32 of the Alabama Constitution has categorically prohibited all forms of slavery and involuntary servitude under all circumstances throughout the State, stating that "no form of slavery shall exist in this state; and there shall not be any involuntary servitude." Article I, Section 32, as amended, has no exemption allowing involuntary servitude for the punishment of duly convicted crimes.

619. In violation of Article I, Section 32 of the Alabama Constitution and the will of the voters, these Defendants Montgomery, Bama Budweiser, Cast Products, Hwaseung, Ju-Young, Masonite, Paramount, Pell City KFC, Progressive Finishes, RCF/Gemstone, SL Alabama, Southeast Restaurant Group (Wendy's), and Southeastern Meats have subjected and continue to subject Plaintiffs and the other currently incarcerated members of the Forced Labor Class (the Forced Labor Injunctive Relief Subclass) to involuntary servitude by forcing them to work, whether they want to or not, through the means set forth more fully at *supra* ¶¶592.b, 598 (Montgomery); 565.a, 610 (Bama Budweiser); 565.b, 611 (Cast Products); 565.d, 612 (Hwaseung); 565.e, 613 (Ju-Young); 565.g (Masonite); 565.h, 614 (Paramount); 565.i (Pell City KFC); 565.j (Progressive Finishes); 565.k, 615 (RCF/Gemstone); 565.l, 616 (SL Alabama); 565.m (Southeast Restaurant Group); 565.n (Southeastern Meats), including the use or threatened use of force, physical injury, physical restraint including solitary confinement and extended incarceration

through the denial of parole and withholding of good-time credits, abuse of law or legal process, and other forms of physical, psychological, and economic coercion including exposure to extreme violence and deprivation of contact with family and access to the canteen to purchase necessities.

620. Plaintiffs Campbell, R. Clark, T. Clark, Cole, Jarmon, McDole, Moore, Morrissey, Payton, Prewitt, and Pritchett bring this claim against Defendants City of Montgomery, City of Troy, and all Private Employer Defendants—employers who have compelled them to work and for whom they fear being compelled to work in the future.

621. Each of the Defendants named in this Count have entered into an agreement with ADOC under which they agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work so that ADOC could then subject the incarcerated person to punishment for not working. *See supra* ¶¶222-225, 241-243, 594. Each of these Defendants had an active agreement with ADOC, and used that agreement to coerce the labor of Plaintiffs and other incarcerated workers, at the time this action was originally filed in December 2023.

622. None of the Defendants named in this Count have disavowed participation in ADOC's forced labor scheme, nor committed to not using incarcerated labor obtained from ADOC in the future.

623. As set forth more fully above in Counts I, II, V, and VI, these Defendants had knowledge of the extremely coercive conditions at ADOC facilities and the consequences that would follow a disciplinary for refusal to work or being fired from a job, including the likelihood of physical harm and physical restraint, and yet continued to participate in ADOC's work center and work release programs and to use the threats of these coercive consequences to its advantage.

a. **Bama Budweiser.** Defendant Bama Budweiser has compelled the labor of Plaintiffs Campbell and R. Clark and other incarcerated people through means of force and threats of force directly, as alleged in ¶610, and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.a and incorporated herein. Bama Budweiser has agreed to enforce ADOC's

rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Bama Budweiser, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225. On information and belief, Bama Budweiser continues to participate in ADOC's Work Release program.

b. **Cast Products.** Defendant Cast Products has compelled the labor of Plaintiffs Jarmon and Payton and other incarcerated people through means of force and threats of force directly, as alleged in ¶611 and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.b, and incorporated herein. Cast Products has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Cast Products, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225. Cast Products continues to participate in ADOC's Work Release program.

c. **Hwaseung.** Defendant Hwaseung has compelled the labor of Plaintiff T. Clark and other incarcerated people through means of force and threats of force directly, as alleged in ¶612, and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.d and incorporated herein. Hwaseung has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Hwaseung, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225.

d. **Ju-Young.** Defendant Ju-Young has compelled the labor of Plaintiffs Payton and Thomas other incarcerated people through means of force and threats of force directly, as alleged

in ¶613, and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.e, and incorporated herein. Ju-Young has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Ju-Young, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225.

e. **Masonite.** Defendant Masonite has compelled the labor of Plaintiff Cole and other incarcerated people through threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.g and incorporated herein. Masonite has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Masonite, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225.

f. **Paramount Services.** Defendant Paramount Services has compelled the labor of Plaintiffs Cartwright and Morrissey and other incarcerated people through means of force and threats of force directly, as alleged in ¶614 and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.h and incorporated herein. Paramount Services has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Paramount Services, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225

g. **Pell City KFC.** Defendant Pell City KFC has compelled the labor of Plaintiffs Campbell and Ptomey and other incarcerated people through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in

¶567.i, and incorporated herein. Pell City KFC has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Pell City KFC, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225. On information and belief, Pell City KFC continues to participate in ADOC's Work Release program.

h. **Progressive Finishes.** Defendant Progressive Finishes has compelled the labor of Plaintiffs Campbell, R. Clark, McDole, and Ptomey and other incarcerated people through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in 567.j, and incorporated herein. Progressive Finishes has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Progressive Finishes, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225. On information and belief, Progressive Finishes continues to participate in ADOC's Work Release program.

i. **RCF/Gemstone.** Defendant RCF/Gemstone has compelled the labor of Plaintiffs Cole, McDole, and Payton and other incarcerated people through means of force and threats of force directly, as alleged in ¶615, and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.k, and incorporated herein. Gemstone has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Gemstone, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225.

j. **SL Alabama.** Defendant SL Alabama has compelled the labor of Plaintiff Prewitt and other incarcerated people through means of force and threats of force directly, as alleged in

¶616 and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.l and incorporated herein. SL Alabama has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for SL Alabama, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225

k. **Southeast Restaurant Group (Wendy's).** Defendant Southeast Restaurant Group (Wendy's) has compelled the labor of Plaintiffs Cartwright and Prewitt and other incarcerated people through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶567.m and incorporated herein. Wendy's has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Wendy's, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225.

l. **Southeastern Meats.** Defendant Southeastern Meats has compelled the labor of Plaintiffs Cartwright, Morrissey, and Walker and other incarcerated people through means of force and threats of force directly, as alleged in ¶¶617.a-617.d, and incorporated herein; and through the threat of force, increased physical restraint and confinement, and physical, psychological, and economic coercion, as alleged in ¶568.n, and incorporated herein. Southeastern Meats has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Southeastern, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶¶222-225.

m. **Montgomery.** Defendant Montgomery has compelled the labor of Plaintiff Cole and other incarcerated people through the threat of force, increased physical restraint and

confinement, and physical, psychological, and economic coercion, as alleged in ¶¶593 and 599.a-599.c, and incorporated herein. Montgomery has agreed to enforce ADOC's rules and regulations compelling the labor of incarcerated people, including by giving notice to ADOC if any incarcerated person declined to work for Montgomery, with the understanding that ADOC will then subject the incarcerated person to punishment for not working, including punishments involving threats of violence and physical force. *See supra* ¶595.

624. As alleged herein, these practices constitute compulsory labor and involuntary servitude in violation of the Alabama Constitution. Each of the Defendants named in this Count intentionally stripped each identified Named Plaintiff and members of the Forced Labor Injunctive Relief Subclass of their agency or ability to refuse the work they were assigned.

625. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs Campbell, R. Clark, T. Clark, Cole, Jarmon, McDole, Moore, Morrissey, Payton, Prewitt, and Pritchett and the members of the Forced Labor Injunctive Relief Subclass have suffered and continue to suffer serious and irreparable harm.

## COUNT VIII
**Unjust Enrichment**
**By Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker on Behalf of Themselves and the Forced Labor Class Against Defendants Lovelace and Hamm, Public Employer Defendants, and Private Employer Defendants**

626. Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker ("Forced Labor Named Plaintiffs") bring this claim on behalf of themselves and the members of the Forced Labor Class against Lovelace and Hamm, in their individual capacities, and all the Employer Defendants under Alabama law. Forced Labor Named Plaintiffs' unjust enrichment claims against Lovelace and Hamm do not seek injunctive relief.

627. Each Employer Defendant has knowingly accepted and retained benefits in the form of, among other things, decreased costs and increased profits, including but not limited to

decreased costs and increased profits resulting from the lower wages and benefits paid to Forced Labor Named Plaintiffs and Forced Labor Class Members working for them through Alabama Work Release and Work Center facilities than the Public and Private Employer Defendants would have had to pay had forced incarcerated labor not been available to them, and as a result of being able to assign work and hours to Forced Labor Named Plaintiffs and Forced Labor Class Members that the Public and Private Employer Defendants could not easily find free workers to perform, as set forth more fully below and *supra* at ¶¶ 208, 250-252, 564, 591 (detailing benefits).

628. **ADOC and Commissioner Lovelace/Hamm.** ADOC, Hamm, and Lovelace retained benefits in the form of unpaid labor they required Plaintiffs Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker, and other incarcerated class members, to perform, including filling the roles of ADOC staff and other in-house labor to keep ADOC's facilities functioning, reaping more than $400 million in economic benefit from the forced labor scheme. *See supra* ¶¶171. ADOC, Commissioner Lovelace, and Hamm are also unjustly enriched through receipt of payments for each day of labor by incarcerated workers working for public entities through the work center program, while generally transmitting only $2 per day of that fee to the worker for their labor. *See supra* ¶¶193, 493, 596. ADOC and Commissioner Lovelace, and Hamm are further unjustly enriched by deduction of 40% from the paychecks of incarcerated work-release workers, as well as by deductions for transportation and laundry, and by charging these workers for necessities like adequate food, hygiene products, medication, and doctor visits. *See supra* ¶¶226-229.

629. **Bama Budweiser.** Bama Budweiser retained benefits in the form of paying Plaintiffs Campbell and R. Clark and other incarcerated class members lower wages than free-world workers performing the same tasks, assigning incarcerated workers to the most physically demanding outdoor labor, denying incarcerated workers the production bonuses free-world workers received, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

630. **Cast Products.** Cast Products retained benefits in the form of paying Plaintiffs Jarmon, Lesley, and Payton, and other incarcerated workers less than free-world workers performing the same work, requiring Mr. Jarmon to train free-world workers and to cover their station when they failed to appear, assigning hazardous tasks to incarcerated workers while free-world workers were not required to work as hard, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

631. **CBAK.** CBAK retained benefits in the form of paying Plaintiff McCorvey and other incarcerated workers lower wages than those of free-world workers performing the same tasks, cutting free-world workers' shifts early while requiring incarcerated workers to absorb the extra hours at lower pay, assigning incarcerated workers maintenance and cleaning duties that should have been performed by dedicated maintenance staff, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

632. **Hwaseung.** Hwaseung retained benefits in the form of paying Plaintiff Trevion Clark and other incarcerated workers lower wages than free-world workers, assigning incarcerated workers to hazardous working conditions, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

633. **Ju-Young.** Ju-Young retained benefits in the form of paying Plaintiffs Thomas and Payton and other incarcerated workers lower wages than free-world workers, consistently assigning incarcerated workers the most physically demanding tasks such as heavy lifting while free-world workers performed lighter tasks, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

634. **Koch Foods.** Koch Foods retained benefits in the form of paying Plaintiff Lesley and other incarcerated workers lower wages than free-world workers, assigning incarcerated workers to work in cold areas without providing adequate cold-weather gear, assigning incarcerated workers to perform tasks so dangerous that one incarcerated worker was killed on the job, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

635. **Masonite.** Masonite retained benefits in the form of charging Plaintiff Cole and other incarcerated workers for required safety equipment for a job he was forced to perform, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

636. **Paramount Services.** Paramount Services retained benefits in the form of paying Plaintiffs Cartwright and Morrissey and other incarcerated workers lower wages than free-world workers performing the same job, restricting incarcerated workers to a single bathroom break during an eight-hour shift, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

637. **Pell City KFC.** Pell City KFC retained benefits in the form of paying Plaintiffs Ptomey and Campbell and other incarcerated workers lower wages than free-world workers performing the same work, giving Mr. Ptomey only a $0.25 raise despite high performance, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

638. **Progressive Finishes.** Progressive Finishes retained benefits in the form of paying Plaintiffs Campbell, McDole, Ptomey, and R. Clark, and other incarcerated workers, lower wages than free-world workers performing the same work, assigning incarcerated workers to tasks so physically punishing that free-world workers would only last a few days or weeks on the job, denying a promised raise to Mr. Campbell and refusing to compensate him for performing lead-man duties for four months, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

639. **RCF/Gemstone.** RCF/Gemstone retained benefits in the form of paying Plaintiffs Cole, McDole, and Payton, and other incarcerated workers lower wages than free-world workers, assigning incarcerated workers to perform physically punishing tasks so demanding that free world workers consistently quit after a few days, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

640. **SL Alabama.** SL Alabama retained benefits in the form of requiring Plaintiff Prewitt and other incarcerated workers to perform extra work after meeting his daily quotas while free-world workers were permitted to go home, requiring incarcerated workers to perform multiple tasks simultaneously while free-world workers were permitted to take breaks, denying Mr. Prewitt overtime pay, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

641. **Southeast Restaurant Group (Wendy's).** Southeast Restaurant Group (Wendy's) retained benefits in the form of requiring Plaintiffs Prewitt and other incarcerated workers to simultaneously staff multiple stations while free-world workers took breaks, and retaining workers, including Plaintiffs Prewitt and Cartwright, who could not refuse assignments or quit without triggering severe disciplinary consequences.

642. **Southeastern Meats.** Southeastern Meats retained benefits in the form of requiring Plaintiffs Cartwright, Morrissey, and Walker, and other incarcerated workers to work in cold facilities without needing to provide them adequate cold-weather gear, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

643. **Montgomery.** Montgomery retained benefits in the form of paying Plaintiff Cole and other incarcerated workers approximately $2 per day, significantly less than it would need to pay free-world workers and generating more than $3.7 million in wage savings. Montgomery required Plaintiff Cole and other incarcerated workers to work including maintenance and landscaping work, staffing city auction houses, working at the City landfill, and sanitation maintenance. Montgomery also retained benefits in the form of requiring incarcerated workers to perform work under dangerous conditions that threatened their health and safety, knowing that those workers could not refuse the assignments or challenge the conditions without being subjected to discipline and punishment by ADOC. As alleged above, Montgomery's participation in the Work Center program, subject to Work Center Agreements with ADOC, despite knowing, or having recklessly disregarded, the coerced nature of the labor provided by ADOC-incarcerated individuals for Montgomery's benefit, has been an official city custom and policy.

644. **Troy.** Troy retained benefits in the form of paying Plaintiffs Jarmon and Pritchett and other incarcerated workers approximately $2 per day, significantly less than it would need to pay free-world workers, for physically grueling outdoor road crew work, at times for 10-11 hour days in the summer heat, and retaining workers who could not refuse assignments or quit without triggering severe disciplinary consequences. As alleged above, Troy's participation in the Work Center program, subject to Work Center Agreements with ADOC, despite knowing, or having recklessly disregarded, the coerced nature of the labor provided by ADOC-incarcerated individuals for Troy's benefit, was an official city custom and policy.

645. **ADOT and Cooper.** ADOT/Cooper retained benefits in the form of paying Plaintiffs Campbell, Rashaad Clark, Trevion Clark, Cole, Dandridge, English, Pritchett and Ptomey and other incarcerated workers approximately $2 per day to perform maintenance, landscaping, and road-crew work across the State. This was significantly less than it would need to pay free-world workers. ADOT further benefitted by using the labor of incarcerated workers who could not refuse assignments or quit without triggering severe disciplinary consequences.

646. It would be unjust for Employer Defendants to retain the value of this benefit without disgorgement to Forced Labor Named Plaintiffs and the Forced Labor Class Members because Employer Defendants obtained this benefit through unconscionable conduct, including through their knowing and voluntary participation in the State's coercive worker "leasing" programs.

## COUNT IX

**Violation of First Amendment of U.S. Constitution, Pursuant to 42 U.S.C. §1983 By Plaintiffs Council, Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt, Pritchett, Ptomey, Thomas, and Walker on Behalf of Themselves and the First Amendment Class Against Defendants Ivey, Hamm, and Lovelace**

647. Plaintiffs Council, Campbell, Cartwright, R. Clark, T. Clark, Cole, Dandridge, English, Jarmon, Lesley, Mason, McCorvey, McDole, Moore, Morrissey, Payton, Prewitt,

Pritchett, Ptomey, Thomas, and Walker ("First Amendment Plaintiffs") bring this claim under the First Amendment to the U.S. Constitution, pursuant to 42 U.S.C. §1983, which prohibits state officials from retaliating against incarcerated people for engaging in constitutionally protected expression.

648. Defendants Ivey, Hamm, and Lovelace are liable to the First Amendment Named Plaintiffs and the First Amendment Class because Ivey, Hamm, and Lovelace, acting under color of state law, have engaged and continue to engage in conduct violating the First Amendment by ordering, maintaining, and condoning a policy, custom, and practice of retaliating against those in ADOC custody for protected expression concerning their compelled labor and the conditions coercing them to perform that labor.

649. Specifically, First Amendment Named Plaintiffs have engaged and/or wish to engage in constitutionally protected expression, including in the form of:

a. Individual statements, both verbal and written, complaining about, questioning, objecting to, or expressing unwillingness to perform a work assignment or the conditions under which it is performed, *see supra* Part III.A;

b. Filing grievances and lawsuits concerning their working conditions, compelled labor, and conditions coercing them to perform that labor, *see supra* Part III.B; and

c. Advocacy and education regarding forced labor, including regarding resisting forced labor through peaceful, time-limited collective work stoppages undertaken to draw attention to systemic and long-unredressed unconstitutional conditions, and participating in such work stoppages, *see supra* Part III.C-D.

650. Defendants Ivey, Hamm, and Lovelace have subjected and continue to subject First Amendment Plaintiffs and putative First Amendment Class members to a systemic policy and practice of severely retaliating against such protected expression, as set forth more fully in Part III, *supra*, which is incorporated herein.

651. Defendants Ivey, Hamm, and Lovelace have subjected and continue to subject First Amendment Named Plaintiffs and members of the putative First Amendment Class to adverse

action through an unwritten custom and practice of retaliation for protected expression. That custom and practice includes, in response to protected expression, issuing disciplinaries; transfer and threatened transfer to more dangerous, higher-security facilities; placement in solitary confinement; deprivation of food, including the practice known as "bird-feeding" and denial of commissary access; and direct physical violence, both against those who engage in such protected expression and against others to send a message to those who might otherwise engage in such protected expression. *See supra* ¶¶255-256.

652. While this policy is longstanding and widespread, Ivey, Hamm, and Lovelace have also taken action to formally enshrine aspects of this retaliatory regime as official policy. By Executive Order dated January 9, 2023, Governor Ivey directed ADOC to treat refusals to work as medium-level violations and the encouragement of work stoppages as high-level violations, and the Hamm and Lovelace have promulgated and Lovelace continues to enforce implementing regulations authorizing, among other punishments, (1) solitary confinement of up to 30 days, the extension of a person's incarceration by nearly two years through withdrawal of good-time credits for a refusal to work, and loss of privileges for up to 45 days, and (2) solitary confinement of up to 45 days, a three-year extension of a person's incarceration, and loss of privileges for up to 60 days for encouraging a work stoppage. *See supra* ¶¶153-155; *see also* ¶¶285-290. Disciplinaries can also cause a cascade of other severe consequences, including transfer to a more violent facility. *See supra* ¶¶156, 255.

653. In practice, ADOC often issues discipline for "refusing to work" or other work-related disciplinaries in retaliation for protected expression. ADOC routinely issues "refusal to work" and other work-related disciplinaries, and the equivalent non-grievable "behavior citations," not against people who have actually refused to perform an assigned job, but against people who have complained that an assignment is unsafe or unlawful, asked how to perform a task or requested training, or otherwise protested, objected to, or simply asked about the working conditions to which they are subjected. Incarcerated persons exercise their First Amendment rights when they complain to prison administrators about forced labor, their working conditions, and the

conditions of their confinement, and Defendants may not punish that protected expression by recharacterizing it as a "refusal to work" meriting a disciplinary and the associated severe consequences. Nevertheless, Plaintiffs have been subject to retaliation in the form of punishment and threatened work-related disciplinaries, witnessed such punishment and threats, and had their speech chilled, as follows:

a. **Toni Cartwright.** Plaintiff Cartwright's experience reflects that incarcerated workers face punishment or threats of punishment from ADOC if they complain about working conditions. When Ms. Cartwright complained to an ADOC Sergeant about the freezing-cold working conditions and her ankle pain while working at Southeastern Meats, the Sergeant responded that, if she did not return to work, he would "take her custody and send her back to Tutwiler." Ms. Cartwright considered filing a grievance about the poor working conditions, but she declined to do so because she was fearful that she would be retaliated against.

b. **Jerame Cole.** Plaintiff Cole's experience confirms that incarcerated workers face punishment from ADOC if they complain about working conditions. Mr. Cole recalls an incarcerated worker at North Alabama work release telling an ADOC officer that he was not comfortable with his supervisor, and the officer responded that "well, you'll need to do 90 days," meaning that, if the worker wanted to pursue a complaint against his supervisor, he would lose the ability to work any job for 90 days. On another occasion, an incarcerated worker complained to an ADOC officer about his job, and the officer responded: "you need to either go to work and put your head down, or get fired," which would result in a disciplinary. Mr. Cole has also seen ADOC engage in retaliatory transfers of people who make complaints about the conditions in the facilities, particularly at North Alabama Work Release.

c. **Rashaad Clark.** He has seen incarcerated people written up for refusing to work or being perceived as refusing to work for ADOC or for public and private employers at every ADOC facility where he has been assigned. He has been disciplined a number of times personally for work-related offenses although he has never refused to work, including on one occasion when his private employer asked for input on work conditions and Rashaad Clark responded by raising

concerns about only getting one break and the unequal distribution of work between free and incarcerated workers. His employer then fired Rashaad Clark, and ADOC issued him a disciplinary. *See supra* ¶346; *see also supra* ¶¶345 (issued work-related disciplinary despite not being at fault), 582.c (ADOC disciplinary for being fired for raising health concern).

d. **Danny Dandridge.** Plaintiff Dandridge was cited for "refusing to work" several times while in ADOC custody when he had not refused to work. At Loxley, ADOC issued him a second disciplinary, for "insubordination," when he questioned the first disciplinary *See supra* ¶377.

e. **Larry Jarmon.** When Plaintiff Jarmon complained to the ADOC Lieutenant about working conditions at Cast Products and about his supervisor Ed's behavior, the Lieutenant not only told him that ADOC would discipline him if he quit or got fired, but that he would lose his job and custody status if he filed a grievance about working conditions at Cast Products. *See supra* ¶572.

f. **Joseph Lesley.** Plaintiff Lesley has observed that, if an incarcerated worker complains about working conditions, ADOC will issue a disciplinary infraction that could result in transfer to a medium- or high-security facility, segregation, or loss of privileges. It's "your word against theirs, and ADOC will always go with theirs," meaning that, if an incarcerated worker complains to ADOC about poor or abusive working conditions, ADOC will side with the employer. Mr. Lesley has observed incarcerated workers complain to their supervisors about working conditions, and in turn, their supervisors called ADOC and ADOC issued them disciplinary infractions.

g. **Turner Mason.** After Mr. Mason informed ADOC officers that he would not work a job any longer because he feared for his life, an ADOC officer told Mr. Mason that if he did not return to the job, ADOC officers would "beat [him], spray [him], and lock [him] up for six months," and another officer attempted to retaliate by transferring Mr. Mason into a general population dorm, where he likely would have been killed as a former police officer. *See supra* ¶¶424-429. Mr. Mason understands that, if an incarcerated worker complains about working

conditions, they will be subject to punishment including issuing that person a disciplinary infraction and potentially transferring that person to a more dangerous work assignment. Mr. Mason repeatedly complained to ADOC about the dangerous conditions in which he was forced to labor, and in return, ADOC issued him disciplinary infractions restricting his access to phone, visitation, and canteen, and threatened him with physical violence, likely death, and segregation.

h. **<u>Quannie McCorvey:</u>** Plaintiff McCorvey felt like he could not speak up about the poor working conditions at CBAK, or else he would be punished: "you're not going to buck the system. It's either work or go to lockup." Mr. McCorvey would have liked to have spoken up about the abusive working conditions at Defendant CBAK, but he feared that ADOC would punish him in retaliation.

i. **<u>Deckrice Morrissey:</u>** Plaintiff Morrissey understands that, if an incarcerated worker speaks out against poor working conditions, they will be punished by ADOC. It happens all the time, in her experience.

j. **<u>Pierre Payton:</u>** Mr. Payton has received two "refusing to work" disciplinaries, even though on neither occasion did he refuse to work. For example, in November 2021, ADOC issued Mr. Payton discipline because he and his coworker reported racist work conditions they were subjected to at Captain Ds to JPO Knight. *See supra* ¶465.

k. **<u>Victor Thomas:</u>** Plaintiff Thomas did not raise concerns about his working conditions at Ju Young through any formal channel, because he understood that doing so would give ADOC a reason to write him up, which could send him back behind the fence and cost him his custody level. That understanding was based on experience: Mr. Thomas had seen it happen to others throughout his decades in ADOC custody. He felt he could not speak up, and just had to keep on keeping on and keep moving forward to try to get out of prison.

l. **<u>Lakiera Walker:</u>** In response to filing a complaint about her supervisor's demand for sex as a condition of work, ADOC issued a disciplinary to Ms. Walker for "refusing to work" and then ADOC Sergeant Mears assigned Ms. Walker to work in the kitchen, which was an assignment ADOC gave to people as a type of punishment. *See supra* ¶511.

654. Beyond issuing work-related disciplinaries in retaliation for protected speech and expression, ADOC, through Defendants Hamm and Lovelace, has a broader practice of retaliating against those who raise concerns—about forced labor or the conditions coercing incarcerated individuals to labor—through the grievance process and/or civil litigation. *See supra* ¶¶261-264. ADOC's practice of retaliating against those who engage in protected conduct by raising concerns through official channels has harmed and continues to harm First Amendment Named Plaintiffs and putative First Amendment Class members. For example:

a. **Trevion Clark.** Plaintiff Clark did not file work-related grievances during his time at ADOC work release facilities, despite experiencing conditions that warranted them. At orientation, ADOC told incarcerated people there was a grievance box but did not explain what a grievance was or how to use it. Mr. Clark did not learn about the grievance process until shortly before the filing of this complaint, through his involvement in this litigation. He understood that filing grievances led to retaliation—transfer, write-ups, loss of passes, and loss of job placements—and he prioritized getting home. He was also warned by a correctional officer at Alex City explicitly that if incarcerated people asserted their rights, that could be charged as inciting a riot, which would cost them parole, good time, and split sentences. Despite that, Mr. Clark did file at least one non-work-related grievance. In March 2025, he filed a grievance at Alex City after a correctional officer denied him access to the law library. As he approached the grievance box to submit the complaint, a "runner" (an incarcerated person acting as an agent for the officer) placed a can of bleach on top of the grievance box in what Mr. Clark understood as an attempt to destroy his grievance. The runner then followed him, yelled at him, and shoved him. ADOC cited Mr. Clark for disorderly conduct. The runner was not disciplined, despite Alex City's stated zero-tolerance policy for violence, which indicated that ADOC approved of the runner's behavior. After Mr. Clark filed the library grievance, the same correctional officer ordered him to submit to a drug test. The disciplinary hearing officer was required by the lab result to find him guilty, but wrote in the verdict that he believed the drug test had been ordered in retaliation for the library grievance. ADOC then transferred Mr. Clark to Kilby—a far more dangerous and violent facility—the

following month. At Elba Work Release, meanwhile, a secretary actively interfered with incarcerated people attempting to file grievances by throwing grievances away and intimidating people from filing. Mr. Clark had other complaints he did not reduce to writing, because he knew what had happened to others and himself when a written grievance was filed.

b. **Alimireo English.** Plaintiff English attempted to use ADOC's grievance process to raise concerns about his working conditions and other incidents, such as an assault he suffered at Decatur in 2024. ADOC denied every grievance he filed. ADOC responses cited procedural bars, characterized his complaints as not constituting a cause for a grievance, or provided no substantive response at all. In his observation, ADOC sometimes held grievances without acting on them until the applicable limitations period had run. The grievance process was administered by former ADOC officials; there was no possibility of neutral review. Mr. English never knew anyone to win a grievance. Mr. English also experienced retaliation for attempting to use the grievance process and advocate for his rights and the rights of other incarcerated people. For example, in 2024, ADOC officials at Decatur Work Release shook him down repeatedly in short succession over the course of a month, searching his person and cell for any pretext to discipline him after Mr. English filed a grievance challenging his coerced labor and became a plaintiff in this lawsuit. He was directly told that this was in retaliation for filing the lawsuit by an ADOC captain when he asked why he was not being sent out to work for (some) pay as opposed to being forced for free for ADOC, and was told that he wouldn't be sent out while he had a lawsuit against ADOC. ADOC ultimately attributed to Mr. English a phone found on another person's bed and transferred him out of Decatur on that basis. When he protested, the officer writing the disciplinary told him that ADOC could do whatever it wanted to do. Later, at Hamilton in approximately late 2024 or early 2025, when an incarcerated person forced his way into the kitchen and Mr. English defended himself with a mop, ADOC told him there was no self-defense in prison. Mr. English had filed a complaint about the incident, but the warden told him he had two choices: he could drop the complaint or receive a disciplinary. Mr. English opted to drop the complaint to avoid any negative consequences at his approaching parole hearing, and the warden warned him that if he or any of

his lawyers raised the matter, the warden would file the disciplinary. The retaliation that followed each of Mr. English's grievance filings confirmed that raising concerns through official channels made his situation worse, not better. By the time he left ADOC custody, he had no confidence that any internal mechanism existed to address his working conditions, the violence he had experienced and witnessed, or the misconduct of ADOC officers. He understood, based on his experience, that he had no meaningful way to raise concerns about his conditions of confinement or his work while he was incarcerated.

c. **Larry Jarmon.** As described *supra*, Plaintiff Jarmon was threatened with losing his custody status (and thus being transferred to a more dangerous facility) if he filed a grievance about his supervisor's conduct. On another occasion, when an incarcerated worker at Decatur spoke with an ADOC officer about filing a grievance related to work conditions, the officer responded "you don't want to be here? You don't want your custody?" suggesting that the incarcerated person would be retaliated against by losing his work-release custody status and being transferred to a higher-security facility if he filed the grievance. In Mr. Jarmon's experience, mentioning grievances or bringing them up to officers doesn't accomplish anything but put a target on an incarcerated person's back to get sent back behind the fence to a more dangerous facility.

d. **Fred McDole.** Plaintiff McDole's time in ADOC custody has taught him that raising concerns about working conditions or pay is futile. Complaints to ADOC personnel typically have gone, and will continue to go, in one ear and out the other, and ADOC would never take a worker's side. Mr. McDole has voiced concerns when he believed something was unsafe or wrong, but doing so has accomplished little in his experience, and he has no expectation that will change. Mr. McDole is not aware of anyone successfully obtaining relief for a grievance via the grievance process. In approximately December 2023, after Mr. McDole filed an emergency grievance related to this lawsuit's forced labor claims, ADOC's JPO summoned him and required him to sign a set of forms related to the work-release program. The signing was coercive—Mr. McDole felt he had no choice but to sign, and ADOC did not provide him a copy of what he signed. Mr. McDole understood that ADOC was requiring the forced execution of those papers in direct

response to his grievance and his participation in this lawsuit.

e. **<u>Eric Prewitt:</u>** Plaintiff Prewitt fears speaking up about working conditions because he has been targeted by ADOC with retaliatory disciplinary infractions for his participation in this lawsuit, which led to ADOC revoking his custody status and sending him to Limestone. ADOC retaliated against Mr. Prewitt by issuing Mr. Prewitt a disciplinary infraction shortly after he joined this case, and ADOC continued to retaliate against Mr. Prewitt several more times by promptly issuing further disciplinary infractions after he received legal mail pertaining to this case. First, Mr. Prewitt received legal mail relating to this case in late March or early April 2025, and he also placed a confidential legal telephone call in early April. Immediately following those communications, in April 2025, ADOC issued Mr. Prewitt a disciplinary infraction—of which he was later exonerated. Second, Mr. Prewitt received legal mail relating to this case in or around October 2025, and less than a month later, an ADOC officer issued a punitive disciplinary against Mr. Prewitt for being late for curfew, despite the fact that the Tuscaloosa Police Department confirmed that Mr. Prewitt was late only because he had to wait at the police station for an officer to sign his sponsor sheet. The officer told Mr. Prewitt: "It's out of my hands, the Warden told me I had to write you up." Third, on approximately December 18, 2025, Mr. Prewitt received further legal mail relating to this case. One week later, on Christmas Day, an ADOC officer issued Mr. Prewitt a disciplinary for allegedly smoking in the bathroom. Another incarcerated person was smoking in the bathroom, and the officer did not punish him, but instead singled out Mr. Prewitt. The officer suggested Mr. Prewitt could avoid a disciplinary by performing unpaid labor washing three vans and two cars. Mr. Prewitt completed the work, but the officer issued Mr. Prewitt a disciplinary anyway. Fourth, Mr. Prewitt again received legal mail in late-January or early-February 2026, and ADOC again issued a meritless disciplinary infraction less than a month later for alleged insubordination and disobeying orders. An ADOC officer confiscated Mr. Prewitt's two free-world outfits, despite the fact that Mr. Prewitt was permitted to have those outfits for a work-release job he was supposed to start shortly thereafter. Each of these disciplinary infractions immediately followed Mr. Prewitt's receipt of legal mail pertaining to this case, and as a result of

this pattern of retaliatory disciplinaries, Mr. Prewitt was sent "behind the fence" to Limestone on February 2026 and experienced conditions far more violent than at Alex City. Mr. Prewitt now is nervous about communicating with his attorney in this case via confidential mail or attorney calls and fears further retaliatory action by ADOC if he continues to participate in this lawsuit.

f. **Victor Thomas.** Plaintiff Thomas did not file grievances about working conditions because he felt he could not without being retaliated against. He was aware from others that ADOC would sometimes refuse to provide grievance paperwork, and he had never seen anyone win a grievance. He filed medical grievances and received pro forma denials; ADOC's response was always that he had no valid claim and that everything possible had already been done, despite the severity of his conditions and his pain. He did not believe a work-related grievance would fare better, and believed attempting to submit one to ADOC would only make his situation worse.

655. As described *supra* ¶¶265-284, ADOC, under the supervision and direction of Defendants Ivey, Hamm, and Lovelace, maintains a policy and practice of punishing those who educate others about and advocate against Alabama's forced labor system, including by participating in peaceful collective work stoppages intended to express resistance to the forced labor which they are subjected and educate those within ADOC and outside it about the coerced labor regime imposed upon them.

656. **Robert Earl Council aka Kinetik Justice.** As set forth more fully above, ADOC has subjected Mr. Council, who has consistently advocated against Alabama's coercion of labor from incarcerated people across Alabama, to brutal retaliation for that advocacy, including extended periods of solitary confinement, physical beatings, strip searches, exposure to chemical agents, harassment, and psychological abuse. *See supra* ¶¶275-282. Mr. Council presently intends to continue his education and advocacy concerning Defendants' forced-labor scheme. The threat of further retaliation he faces is neither past nor speculative: ADOC currently bars Mr. Council from collective settings such as classes at Limestone, and as recently as January 2026 transferred him and his Free Alabama Movement co-leaders to an extreme segregation unit at Kilby in response to his ongoing advocacy. *See supra* ¶284. Mr. Council faces a real and immediate threat

that his continued protected expression will be met with the same solitary confinement, transfer, deprivation, and violence ADOC has imposed before. He intends to engage in that expression notwithstanding that threat. *See supra* ¶284.

a. **Danny Dandridge:** ADOC punished Mr. Dandridge with solitary confinement because he challenged ADOC's forced labor practices. Mr. Dandridge was involved in a 2014 strike at Holman, alongside Plaintiff Robert Council. The purpose of the strike was to protest ADOC's practice of forcing incarcerated people to work, and then issuing disciplinary infractions with severe consequences if they refuse to work, along with protesting poor conditions generally at Holman. Mr. Dandridge had a period of solitary confinement—where he was held in a cell with dirty water, poor climate control, and rats—extended as punishment for his involvement in that strike. Mr. Dandridge was initially ordered to spend one year in solitary, but as the strike progressed, the Holman's Warden went into the solitary cell block and told Mr. Dandridge and other incarcerated people that their time in solitary was being extended because of their involvement in the strike. Mr. Dandridge understood that he was being punished because he was encouraging others to withhold labor, and he was ultimately forced to spend approximately five additional months in solitary.

657. Each category of adverse action identified in paragraphs 650-653 would deter a person of ordinary firmness from engaging in the protected expression described herein.

658. Furthermore, it has been clearly established in this Circuit for decades that an incarcerated person exercises his First Amendment rights when he complains to prison administrators about the conditions of his confinement, and that disciplining an incarcerated person for filing a grievance violates the First Amendment.

659. The currently incarcerated First Amendment Named Plaintiffs will continue to be assigned to unsafe, abusive, and unlawful forced labor and conditions of confinement due to the current policies and practices established and maintained by Defendants Ivey, Hamm, and Lovelace. All currently incarcerated members of the putative First Amendment Class are subject to Defendants Ivey's, Hamm's, and Lovelace's policy and practice of punishing protected

expression about such subjects, including by issuing “refusal to work” disciplinaries for such expression, and they face a credible, continuing threat that any future expression will be cited and punished. *See supra* ¶¶253-256, 285.

660. Defendants’ challenged policies, customs, and practices are intended (1) to compel Plaintiffs’ uncompensated or minimally compensated labor for the financial benefit of ADOC and the public and private entities to which ADOC leases that labor; (2) to compel incarcerated workers to staff ADOC’s chronically understaffed facilities; and (3) to prevent incarcerated people from bringing attention to the coercive and unconstitutional conditions that compel them to labor for ADOC’s benefit. None of these interests are a legitimate penological interest, and Defendants’ challenged policies, customs, and practices are not reasonably related to any legitimate penological interest. *See supra* ¶257.

661. Even if Defendants could identify a legitimate penological interest, the challenged punishments are grossly disproportionate to, and an exaggerated response to, any such interest. Defendants answer protected expression—verbal and written complaints, grievances, peaceful and time-limited work stoppages, and education and advocacy—with transfer to more dangerous facilities, prolonged solitary confinement, the extension of incarceration, the denial of adequate food, the loss of commissary and visitation, and physical violence. These responses bear no reasonable relationship to institutional order or security and instead reflect Defendants’ purpose of compelling labor for their benefit and suppressing speech.

662. ADOC’s pervasive culture of retaliation, including for filing formal grievances, communication with ADOC personnel, or litigation, also forecloses any meaningful alternative avenue through which they might draw attention to or publicly discuss their working conditions or compelled labor, including contact with the media. *See supra* ¶¶261, 263-264.

663. Defendant Ivey is personally responsible for these deprivations. Ivey has exercised supervisory authority over ADOC and its officials as Governor since 2017; directed retaliatory punishments for encouraging others to refuse work through her January 9, 2023 Executive Order; failed to ensure adequate policies and procedures were in place to prevent retaliation against

protected expression; failed to take corrective action following the retaliatory practices of ADOC despite being on notice of their widespread and longstanding nature; and acted intentionally or at least with callous and reckless indifference to the deprivation of Plaintiffs' constitutional rights. *See supra* ¶¶31, 75, 286, 290, 634.

664. Defendants Hamm and Lovelace are personally responsible for these deprivations. Hamm and Lovelace have exercised supervisory authority over ADOC and its officials; promulgated and enforced the regulations implementing Governor Ivey's directive; ratified, and been deliberately indifferent to ADOC's longstanding and widespread custom and practice of retaliatory violence and deprivation despite being placed on notice by the documented history of abuse; and acted intentionally or at least with callous and reckless indifference to the deprivation of Plaintiffs' constitutional rights. *See supra* ¶¶32, 285-286, 290. Although Lovelace was appointed ADOC Commissioner on May 1, 2026, he reportedly has long served in leadership roles within ADOC and immediately prior to his appointment as Commissioner was ADOC Chief Deputy Commissioner, with responsibilities for department operations.

665. Defendants Ivey, Hamm, and Lovelace were and are aware of the severe consequences ADOC imposes, at their direction and under their oversight, on incarcerated people who withhold their labor or advocate for the same, including: the restrictive food policy of "bird-feeding"; the restriction of access to the commissary which is the only way incarcerated people can access certain basic necessities; collective punishment of all incarcerated people across the state, even those who did not participate in peaceful protests; the abdication of the duty of care by ADOC staff; and the use of "riot squads" to violently quell peaceful protests. *See supra* ¶¶269-274, 287-290. These responses were coordinated and took place simultaneously statewide, demonstrating that the highest levels of state leadership, including Defendants Ivey and Hamm, were involved. Some of the coordinated and statewide responses, such as bird-feeding, were in direct contravention of ADOC regulations. Further, Governor Ivey publicly praised then-Commissioner Hamm's response to the strikes, indicating both that the ADOC Commissioner

coordinated and directed that response, and that Governor Ivey was aware of and approved of those measures. *See supra* ¶¶287–289.

666. The unlawfully retaliatory response by ADOC, through the Commissioner, to incarcerated people who withhold their labor or advocate for the same is also flagrant and widespread. Ivey, Hamm, and Lovelace knew or should have known, based on media reports, publicly filed lawsuits, letters sent by incarcerated people to the Governor and the Commissioner's office and the wardens and ADOC staff the Commissioner supervises, and Alabama's own internal reporting processes regarding the state of the corrections system, that the state's prisons are riddled with violence, retaliation, and the suppression of lawful speech by ADOC officials.

667. Defendants Ivey, Hamm, and Lovelace's violations of the First Amendment have harmed the First Amendment Named Plaintiffs and putative First Amendment Class Members, and continue to impair the First Amendment rights of all such Named Plaintiffs and Class Members who are currently incarcerated by ADOC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and respectfully request that the Court award relief as follows:

(1) Issue a declaratory judgment that the practices complained of herein are unlawful under the TVPA, Article I Section 32 of the Alabama Constitution, and the First Amendment of the U.S. Constitution;

(2) Issue a preliminary and permanent injunction requiring Defendants, their agents, employees, and all persons under their control or acting in active concert or participation with them, to:

  a. With respect to Defendants Ivey and Lovelace, cease enforcement of and rescind all ADOC regulations and practices coercing Named Plaintiffs and members of the Forced Labor Class to labor;

b. With respect to Defendants Ivey and Lovelace, cease retaliating against Named Plaintiffs and members of the First Amendment Class on the basis of protected speech and expressive conduct, including by ceasing enforcement of and rescinding all ADOC regulations and practices punishing Named Plaintiffs and members of the First Amendment Class for encouraging resistance to forced labor and complaining about such forced labor and the conditions that compel them to labor; and

c. With respect to all Defendants, cease coercing labor from Plaintiffs and Forced Labor Class members on an ongoing basis and/or refrain from benefiting from coercion of such labor.

(3) Award compensatory and/or consequential damages in an amount to be determined at trial pursuant to 42 U.S.C. §§1983, 1985, and 1986, and 18 U.S.C. §1595;

(4) Award punitive damages as just and proper in light of Defendants' outrageous and malicious conduct and to deter such egregious conduct from occurring in the future;

(5) Award nominal damages in recognition of the violation of Plaintiffs' legal rights;

(6) Require disgorgement from Defendants of the profits and benefit resulting from their participation in the forced-labor scheme alleged herein;

(7) Certify the Classes and Subclasses as defined above, and such additional subclasses as may be appropriate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Named Plaintiffs as the representatives for the Classes and Subclasses as set forth herein, and appoint Plaintiffs' counsel as class counsel;

(8) Award reasonable attorneys' fees and costs, pursuant to 42 U.S.C. §1988, 18 U.S.C. §1595, and any other applicable laws;

(9) Award pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and

(10) Award such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

DATED: July 6, 2026

Respectfully submitted,

/s/ Barbara J. Chisholm

BARBARA J. CHISHOLM (CA SBN 224656)*
AMANDA C. LYNCH (CA SBN 318022)*
EMANUEL WADDELL (CA SBN 350156)*
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Email: mrubin@altber.com; bchisholm@altber.com; cchan@altber.com; alynch@altber.com; ewaddell@altber.com

JANET HEROLD (CA SBN 186419)*
LUKE SANDOR (CA SBN 342618)*
JUSTICE CATALYST LAW
40 Rector Street, 9th Floor
New York, NY 10008
Telephone: (518) 732-6703
Email: jherold@justicecatalyst.org

*Counsel for All Plaintiffs and the Proposed Classes and Subclasses*

GEORGE N. DAVIES
RICHARD P. ROUCO
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
Email: gdavies@qcwdr.com; rrouco@qcwdr.com

*Counsel for Plaintiffs RWDSU and USSW*

**Appearing pro hac vice*